JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (*pro hac vice* pending)
Carl E. Black (*pro hac vice* pending)

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|  | : |  |
| In re: | : | Chapter 11 |
|  | : |  |
| NII Holdings, Inc., <u>et al.</u>,[1] | : | Case No. 14-_____ (___) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |
-------------------------------------------------------------x

**DECLARATION OF DANIEL E. FREIMAN**
**IN SUPPORT OF FIRST DAY PLEADINGS AND**
**<u>IN ACCORDANCE WITH LOCAL BANKRUPTCY RULE 1007-2</u>**

---

[1]    The Debtors are comprised of the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); and NII International Services S.à r.l. (6081).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1875 Explorer Street, Suite 1000, Reston, VA  20190.

Daniel E. Freiman, being duly sworn, deposes and states:

1.      I am the Treasurer, Vice President – Corporate Development & Investor Relations of NII Holdings, Inc. ("NII Holdings"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  I have held this position at NII Holdings since 2008.  Additionally, I am the Vice President and Treasurer and a member of the boards of directors of Debtors Nextel International (Services), Ltd., NII Capital Corp., NII Aviation, Inc., NII Funding Corp. and NII Global Holdings, Inc. and a manager of Debtors NII International Holdings S.à r.l. and NII International Services S.à r.l.  As part of my employment and service in all of these capacities, I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs and books and records, as well as the Debtors' restructuring efforts.[2]

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

3.      To minimize the adverse effects of filing for chapter 11 protection and to enhance their ability to consummate a successful restructuring and confirm a chapter 11 plan, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration (this "Declaration").  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, believe the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum

---

[2]      Additional information regarding my background and the remainder of the senior management team at NII Holdings is set forth on Schedule 9 to this Declaration.

disruptions; (b) is critical to the Debtors' achievement of a successful restructuring; and (c) best

serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought in

the First Day Pleadings is narrowly tailored and necessary to achieve the goals identified above.

4.    I submit this Declaration pursuant to Rule 1007-2 of the Local Rules for

the United States Bankruptcy Court for the Southern District of New York in support of (a) the

nine Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and (b) the First Day

Pleadings.  Except as otherwise indicated, all statements set forth in this Declaration are based

upon:  (w) my personal knowledge; (x) information supplied to me by other members of the

Debtors' management or their professionals; (y) my review of relevant documents; or (z) my

opinion based upon my experience and knowledge of the Debtors' operations and financial

conditions.  If called upon to testify, I could and would testify to the facts set forth in this

Declaration.  I am authorized by the Debtors to submit this Declaration.

5.    Part I of this Declaration provides an overview of the Debtors' corporate

structure, business and prepetition indebtedness.  Part II describes the circumstances surrounding

the commencement of these chapter 11 cases.  Part III sets forth relevant facts in support of the

First Day Pleadings.  Part IV contains information required by Local Bankruptcy Rule 1007-2.

NYI-4611316v1

# I.
# THE DEBTORS' BUSINESS

A.    Corporate Structure

      6.      The Debtors consist of the following nine entities:[3]



A complete corporate organizational chart of the Debtors and their thirty-six non-debtor affiliates (collectively, the "Non-Debtor Affiliates" and, together with the Debtors, "NII") is attached hereto as Exhibit A.

B.    Description of the Business

      7.      Debtor NII Holdings is a public reporting company under Section 12(b) of the Securities and Exchange Act of 1934.  NII Holdings' shares of common stock, par value $0.001, are publicly traded under the symbol NIHD on the NASDAQ Global Select Market.  As of August 1, 2014, there were 172,363,259 shares of NII Holdings' common stock outstanding.

      8.      NII Holdings is the ultimate parent and holding company for each of the Debtors and the Non-Debtor Affiliates.  Certain of the Debtors' Non-Debtor Affiliates

---

[3]    Entities are 100% owned unless otherwise indicated.  (1) Remaining 49.998% of NII International Telecom S.C.A. owned by NII International Services S.à r.l.

(the "Operating Companies") provide wireless communication services for businesses and consumers in Brazil, Mexico and Argentina.[4]

9.      NII Holdings has the exclusive right to use the Nextel™ brand in its markets pursuant to a trademark license agreement with Sprint Corporation ("Sprint") and offers unique push-to-talk ("PTT") services associated with the Nextel™ brand in Latin America.  NII Holdings has entered into intercompany license and sublicense agreements with the Operating Companies that cover the trademarks, patents and related improvements integral to the business and licensed to or owned by NII Holdings.

10.     NII Holdings also employs the Debtors' work force and leases the building for the NII Holdings' headquarters in Reston, Virginia (the "Headquarters Office"). NII Holdings and Nextel International (Services), Ltd. ("NIS") own or lease certain of the office equipment for the Headquarters Office.  As of the Petition Date, NII Holdings had 70 full-time employees.  NIS pays substantially all of the costs and expenses associated with the operation of the Debtors, including employee wages and benefits.  On an as-needed basis, NII Holdings provides funds to NIS to pay costs and expenses, and records such fund transfers as capital contributions to NIS.

11.     Employees of NII Holdings historically provided a variety of services to the Operating Companies pursuant to certain intercompany services agreements or similar arrangements.  In the past, such services included, among other things, services related to business development, strategy, product development, sourcing, procurement, vendor management, sales, customer care, finance, legal and communications support activities.  As part

---

[4]      Each of the Operating Companies are referred to by the country in which they operate, i.e., NII Brazil, NII Mexico and NII Argentina.  NII previously also had operations in Chile and Peru, but such operations were sold in 2013 and 2014 as described in greater detail below.

NYI-4611316v1

of the Debtors' cost-cutting efforts, as described in greater detail in Section II.B below, the Debtors significantly reduced the number of NII Holdings' employees, and many of the services previously performed by NII Holdings' employees are now being performed directly by employees of the Operating Companies.  The remaining employees of NII Holdings continue to provide certain services to the Operating Companies related to finance, legal, corporate governance, network engineering support, information technology support and strategic management services.

12.     NII Aviation, Inc. ("NII Aviation") is the entity that was a party to certain agreements related to the Debtor's corporate aircraft, which was sold in early July 2014. NII Funding Corp. ("NII Funding") is no longer used for any significant purpose and NII Global Holdings, Inc. ("NII Global") serves as a holding company in the Debtors' corporate organizational structure.  Notwithstanding the limited operations of these corporate entities, as described in greater detail below, all three of these entities are guarantors of the senior unsecured notes issued by NII Capital Corp. ("NII Capital").

13.     NII International Holdings S.à r.l. ("International Holdings") and NII International Services S.à r.l. ("International Services") jointly own NII International Telecom S.C.A. ("International Telecom" and, together with International Holdings and International Services, the "Luxembourg Entities").[5]  Since 2013, International Telecom has transferred funds to certain of the Operating Companies to (a) support their operating costs, (b) to repay certain local debt and (c) to fund (i) the build out of the third-generation (3G)

---

[5]     The Luxembourg Entities were formed in 2009 as part of a series of transactions intended to maximize the efficiency of the NII corporate organizational structure.  International Holdings was created to serve as the general partner of International Telecom and International Services was created to serve as the limited partner of International Telecom.  Other than a de minimis amount of cash, the only assets of these two Luxembourg entities are their respective ownership interests in International Telecom.  Despite their status as Luxembourg entities, certain members of the Board of Managers of both International Holdings and International Services reside in, and telephonically participate in meetings from, the United States.

networks ("3G Networks") utilizing wideband code division multiple access ("WCDMA")

technology (as described in greater detail below) and (ii) other capital expenditures.  Historically,

such transfers have been done pursuant to intercompany loan agreements with, or equity

investments in, the relevant Operating Company.  The nature of each such transfer generally has

been determined by the form of transaction that would be most beneficial to NII and the

applicable Operating Company based on a number of factors including the ability to repatriate

funds out of the Operating Company, local debt covenants, local government regulations and tax

considerations.

14.     Because the Debtors are primarily holding companies, their value is tied

principally to their equity interests in their respective subsidiaries (if they have any).  In addition,

NII Holdings, NIS, NII Funding, NII Global and International Telecom hold cash in accounts

with financial institutions located in New York, New York.  Only NIS records any property,

plant and equipment on its balance sheet.[6]

C.     The Operating Companies

15.     The services offered by the Operating Companies, all of which are

provided under the Nextel™ brand, include:  (a) mobile telephone service; (b) PTT services,

including Direct Connect® and International Direct Connect® services; and (c) wireless data

services, including text messaging services, mobile internet services and e-mail services.  The

Operating Companies also offer (x) other value-added services, including location-based

---

[6]     As of September 12, 2014, (a) NII Holdings held approximately $130 million in cash in accounts with
financial institutions located in New York, New York; (b) International Telecom held approximately
$200 million in cash in accounts with financial institutions located in New York, New York; (c) NII Capital
held approximately $25 million in cash in accounts with financial institutions located in New York, New
York; (d) NII Funding held approximately $5 million in cash in an account with a financial institution
located in New York, New York; (e) NII Global held approximately $5 million in cash in an account with a
financial institution located in New York, New York; and (f) NIS held approximately $3 million in cash in
an account with a financial institution located in New York, New York.  The preceding list does not take
into account funds held by any Debtor in accounts outside of New York, New York.

NYI-4611316v1

services, digital media services and a wide-ranging set of applications available via a content management system, as well as the Android™ open application market; (y) business solutions, such as security, work force management, logistics support and productivity applications; and (z) voice and data roaming services.

### *NII Brazil*

16.    NII Brazil provides wireless services in major business centers in Brazil, including Rio de Janeiro, São Paulo, Belo Horizonte and Brasilia, in areas in the northeast region of Brazil, including Salvador, Fortaleza and Recife, as well as in Vitoria, which is in the southeast region of Brazil and along related transportation corridors and in a number of smaller markets.  NII Brazil's operations are headquartered in São Paulo, with branch offices in Rio de Janeiro and various other cities.

17.    For the six months ended June 30, 2014, NII Brazil recorded operating revenues of approximately $941 million.  This represented approximately 49% of NII's consolidated operating revenues for the six months ended June 30, 2014.  As of June 30, 2014, utilizing unaudited book values, NII Brazil had assets of approximately $3.8 billion and liabilities of approximately $3.4 billion.

### *NII Mexico*

18.    NII Mexico provides wireless services in major business centers, including Mexico City, Guadalajara, Puebla, Leon, Monterrey, Toluca, Tijuana, Torreon, Ciudad Juarez and Cancun, as well as in smaller markets and along related transportation corridors throughout Mexico.  NII Mexico is headquartered in Mexico City and has many regional offices throughout Mexico.

NYI-4611316v1

19.    For the six months ended June 30, 2014, NII Mexico recorded operating revenues of approximately $749 million.  This represented approximately 39% of NII's consolidated operating revenues for the six months ended June 30, 2014.  As of June 30, 2014, utilizing unaudited book values, NII Mexico had assets of approximately $2.4 billion and liabilities of approximately $1.5 billion.

*NII Argentina*[7]

20.    NII Argentina provides wireless services in major business centers including Buenos Aires, Cordoba, Rosario and Mendoza, along related transportation corridors and in a number of smaller markets.  NII Argentina is headquartered in Buenos Aires and has regional offices in Mar del Plata, Rosario, Mendoza and Cordoba, and numerous branches in the Buenos Aires area.

21.    For the six months ended June 30, 2014, NII Argentina recorded operating revenues of approximately $221 million.  This represented approximately 11% of NII's consolidated operating revenues for the six months ended June 30, 2014.  As of June 30, 2014, utilizing unaudited book values, NII Argentina had assets of approximately $371 million and liabilities of approximately $132 million.

*Recently Divested Operations*

22.    In connection with the strategic evaluation of its business described in greater detail below, in August 2014, NII sold its operations in Chile.  At the time of its divestiture, NII Chile accounted for less than 2% of NII's consolidated operating revenues.  Previously, in August 2013, NII sold its operations in Peru which, in the year prior to its sale, accounted for approximately 6% of NII's consolidated operating revenues.

---

[7]    As discussed in greater detail below, NII is in the process of exploring various strategic options for NII Argentina, including a possible divestiture.

*Royalties, Services Fees and Similar Intercompany Transactions*

23.     Certain of the Debtors routinely engage in transactions with the Operating Companies (the "Intercompany Transactions").  These transactions between certain of the Debtors and the Operating Companies generally fall into six principal categories:  (a) licensing transactions; (b) service transactions; (c) handset development transactions; (d) expatriate employee reimbursement; (e) funding / investment transactions; and (f) de minimis transactions. Each category is described in greater detail below.

24.     Licensing Transactions.  As noted above, NII Holdings has entered into intercompany license and sublicense agreements with the Operating Companies that cover the trademarks, patents and related improvements integral to the business and which are owned or controlled by NII Holdings, such as the right to use the Nextel$^{TM}$ brand name in Latin America. NII Mexico is charged certain fees ("Royalty Fees") under such agreements equal to 1.3% of its net revenues, with any past due amounts accruing interest at the rate of 2% per annum until paid. While such charges continue to accrue, NII Holdings last collected a Royalty Fee from NII Mexico in November 2012.  As of August 31, 2014, NII Mexico owed NII Holdings approximately $24.3 million in Royalty Fees (including accrued interest).  Under the relevant intercompany agreement between NII Holdings and NII Brazil, NII Brazil is only to be charged a Royalty Fee after achieving certain financial milestones, which have not yet been achieved.[8]

25.     Service Transactions.  Pursuant to an intercompany services agreement, employees of NII Holdings provide NII Mexico ongoing services related to business development and strategy, finance, legal and communications support, architectural engineering design and oversight and shared information technology support.  In exchange for these services,

---

[8]     Royalty Fee obligations for NII Argentina were suspended in 2013, with accrued obligations recorded as intercompany payables owing to NII Holdings.

NII Mexico is charged a fee equal to the costs of providing these services, plus a mark-up of 10% (a "Services Fee"), with any past due amounts accruing interest at the rate of 2% per annum until paid.  Since November 2012, NIS has not collected any Services Fees from NII Mexico, but NIS continues to record these charges as giving rise to intercompany claims by NIS against NII Mexico.  As of August 31, 2014, NII Mexico owed NIS approximately $90.6 million in Services Fees (including accrued interest).

26.     While NII Brazil previously was party to an intercompany services agreement with NIS, the relevant services agreement and the payment of Services Fees by NII Brazil were discontinued as of January 1, 2013.[9]  Instead, beginning in 2013, NIS has recorded an intercompany claim against NII Brazil in its books and records for services provided directly to NII Brazil under certain intercompany agreements described below in accordance with International Financial Reporting Standards, such as the costs of certain expatriate employees, handset development charges, software management fees and other similar charges.  While such charges accrue quarterly, they are invoiced annually with any past due amounts accruing interest at the rate of 2% per annum until paid.  As of August 31, 2014, NII Brazil owed NIS approximately $15.5 million in Services Fees.  Such amounts are not past due and NIS has not collected any payments on account of such charges.

27.     NIS and NII Holdings also are parties to service agreements with NII Mexico, NII Brazil and NII Argentina under which those Operating Companies provide services in Latin America to NIS and NII Holdings and charge a fee equal to the cost of providing such services plus 8% (NII Mexico), 6% (NII Brazil) and 10% (NII Argentina), with past due amounts accruing interest at the rate of 2% per annum.  The Debtors intend to continue to use the services

---

[9]     Historically, NII Argentina also was charged Services Fees, but these charges were discontinued in 2013.

provided by NII Mexico, NII Brazil and NII Argentina under these agreements, but are not

seeking authority at this time to pay any amounts relating to prepetition services that may be

owing under such agreements.

28.     Handset Development Transactions.  NIS has incurred costs with respect

to the development of handsets that are equipped to provide NII's "push-to-talk" feature on NII's

new third generation (3G) wireless network in each of Brazil and Mexico.  These development

costs are separately charged to NII Brazil and NII Mexico pursuant to intercompany agreements,

and NIS has recorded intercompany claims against NII Brazil and NII Mexico with respect to

such charges.[10]

29.     Expatriate Employee Reimbursement.  Two employees (the "Expatriate

Employees") of NII Holdings currently are working as expatriate employees in Brazil pursuant to

contractual agreements with NII Holdings.  Pursuant to an intercompany agreement, NII Brazil is

required to reimburse NII Holdings for the compensation and benefits provided to the Expatriate

Employees by NII Holdings, which charges accrue and are to be paid as described in

paragraph 26 above.

30.     Funding / Investment Transactions.  On an as-needed basis, International

Telecom transfers funds to NII Brazil and NII Mexico pursuant to intercompany loan agreements

or as equity investments.[11]  These funds are used by the respective Operating Companies to,

among other things, support their operational costs and expenses, build out wireless networks,

acquire spectrum and otherwise fund the capital expenditures and other costs of growing,

---

[10]     No handset development fees are charged to NII Argentina because NII Argentina continues to operate on a
legacy second generation (2G) network and does not have a 3G network in development.

[11]     Historically, International Telecom transferred funds to various of the Operating Companies and recorded
such transfers as either intercompany loans or as equity investments depending on what was most
beneficial to International Telecom and the relevant Operating Company with respect to each particular
transaction.

NYI-4611316v1

operating and ultimately increasing the value of the businesses of the Operating Companies for the benefit of the Debtors' stakeholders. If funds were not advanced to the Operating Companies, they would be in danger of breaching various covenants under their local lending agreements and might have insufficient cash to continue in operation. This, in turn, would have a devastating impact on the value of the Debtors' estates.

31.     During these bankruptcy cases, International Telecom intends to continue to transfer funds to NII Brazil and NII Mexico, as needed, in the form of intercompany loans based on forecasts prepared by the Debtors. These forecasts are part of a long-term business plan to return the Operating Companies to profitability. Based on these forecasts, the Debtors anticipate that during the remainder of 2014, International Telecom could loan up to $56 million to NII Brazil and up to $35 million to NII Mexico.[12]

32.     <u>De Minimis Transactions</u>. Certain of the Debtors engage in a variety of de minimis transactions with the Operating Companies on an as-needed basis. For example, NII Holdings has sometimes paid certain intellectual property licensing fees on behalf of certain Operating Companies and recorded an intercompany claim on account of such payments against the applicable Operating Company.

33.     While NII Holdings anticipates that payment of the various fees that have been charged to the Operating Companies will be paid by the applicable Operating Companies in the future when their performance improves, the ability of NII Mexico and NII Brazil to repay

---

[12]     These forecasted intercompany transfers are estimates and provided for illustrative purposes only. The amount and timing of any intercompany transfers from International Telecom to any Operating Company will be determined according to actual need based on real-time business conditions.

NYI-4611316v1

amounts owed to the Debtors are limited by the terms of certain of their local lending

agreements.[13]

D.      Significant Prepetition Indebtedness[14]

         34.      As of June 30, 2014, the Debtors had approximately $4.35 billion in

principal amount of senior unsecured notes outstanding comprised of:

- $800 million in principal amount of 10% senior unsecured Notes issued in August 2009 by NII Capital, due in 2016 (the "10% Notes");

- $500 million in principal amount of 8.875% senior unsecured Notes issued in December 2009 by NII Capital due in 2019 (the "8.875% Notes");

- $1.45 billion in principal amount of 7.625% senior unsecured Notes issued in March and December 2011 by NII Capital due in 2021 (the "7.625% Notes" and, together with the 10% Notes and the 8.875% Notes, the "NII Capital Notes");

- $900 million in principal amount of 11.375% senior unsecured Notes issued in February and April 2013 by International Telecom, due in 2019 (the "11.375% Notes"); and

- $700 million in principal amount of 7.875% senior unsecured Notes issued in May 2013 by International Telecom, due in 2019 (the "7.875% Notes" and, together with the 11.375% Notes, the "International Telecom Notes").

Together the NII Capital Notes and the International Telecom Notes are referred to as

the "Notes".

         *The 10% Notes*

         35.      The 10% Notes are senior unsecured obligations of NII Capital, and are

guaranteed as required by the indenture for the 10% Notes by NII Holdings and each of NIS,

NII Aviation, NII Funding and NII Global (together with NII Holdings, the "NII Capital Notes

Guarantor Group").  These guarantees are full and unconditional, as well as joint and several.

---

[13]      The local lending agreements of NII Brazil and NII Mexico are described in greater detail below.

[14]      The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

Subject to certain exceptions, the 10% Notes are equal in right of payment with any future unsecured, unsubordinated indebtedness of NII Capital and of the NII Capital Notes Guarantor Group, including the other series of NII Capital Notes.  The 10% Notes bear interest at a rate of 10% per year, which is payable semi-annually in arrears on February 15 and August 15.  The 10% Notes will mature on August 15, 2016 when the entire principal amount of $800 million will be due.  The net proceeds from the 10% Notes were used for general corporate purposes, including, without limitation, for (a) capital expenditures, (b) the acquisition of telecommunications spectrum licenses and (c) the deployment of new network technologies.

### *The 8.875% Notes*

36.     The 8.875% Notes are senior unsecured obligations of NII Capital and are guaranteed as required by the indenture for the 8.875% Notes by the NII Capital Notes Guarantor Group.  These guarantees are full and unconditional, as well as joint and several.  Subject to certain exceptions, the 8.875% Notes are equal in right of payment with any future unsecured, unsubordinated indebtedness of NII Capital and of the NII Capital Notes Guarantor Group, including the other series of NII Capital Notes.  The 8.875% Notes bear interest at a rate of 8.875% per year, which is payable semi-annually in arrears on June 15 and December 15.  The 8.875% Notes will mature on December 15, 2019 when the entire principal amount of $500 million will be due.  The net proceeds from the 8.875% Notes were used for general corporate purposes, including, without limitation, for (a) capital expenditures, (b) the acquisition of telecommunications spectrum licenses and (c) the deployment of new network technologies.

### *The 7.625% Notes*

37.     The 7.625% Notes are senior unsecured obligations of NII Capital and are guaranteed as required by the indenture for the 7.625% Notes by the NII Capital Notes Guarantor

Group.  These guarantees are full and unconditional, as well as joint and several.  Subject to certain exceptions, the 7.625% Notes are equal in right of payment with any future unsecured, unsubordinated indebtedness of NII Capital and of the NII Capital Notes Guarantor Group, including the other series of NII Capital Notes.  The 7.625% Notes bear interest at a rate of 7.625% per year, which is payable semi-annually in arrears on April 1 and October 1, and will mature on April 1, 2021 when the entire principal amount of $1.45 billion will be due.  The net proceeds from the 7.625% Notes were used for general corporate purposes, including, without limitation, for (a) capital expenditures, (b) the acquisition of telecommunications spectrum licenses and (c) the deployment of new network technologies.

### *The 11.375% Notes*

38.    The 11.375% Notes are senior unsecured obligations of International Telecom and are guaranteed by NII Holdings.  This guarantee is full and unconditional; however, NII Holdings is not subject to any of the restrictive covenants in the indenture governing the 11.375% Notes.  Subject to certain exceptions, the 11.375% Notes rank equally in right of payment with all existing and future unsecured and unsubordinated indebtedness of International Telecom and NII Holdings, including the 7.875% Notes (described in greater detail below).  No subsidiaries of International Telecom and no other subsidiaries of NII Holdings guarantee the 11.375% Notes.  The 11.375% Notes bear interest at a rate of 11.375% per year, which is payable semi-annually in arrears on February 15 and August 15, and will mature on August 15, 2019 when the entire principal amount of $900 million will be due.  The net proceeds from the 11.375% Notes were used for general corporate purposes, including, without limitation, for (a) capital expenditures, (b) the acquisition of telecommunications spectrum licenses and (c) the deployment of new network technologies.

*The 7.875% Notes*

39.     The 7.875% Notes are senior unsecured obligations of International

Telecom, and are guaranteed by NII Holdings.  This guarantee is full and unconditional;

however, NII Holdings is not subject to any of the restrictive covenants in the indenture

governing the 7.875% Notes.  Subject to certain exceptions, the 7.875% Notes rank equally in

right of payment with all existing and future unsecured and unsubordinated indebtedness of

International Telecom and NII Holdings, including the 11.375% Notes.  No subsidiaries of

International Telecom and no other subsidiaries of NII Holdings guarantee the 7.875% Notes.

The 7.875% Notes bear interest at a rate of 7.875% per year, which is payable semi-annually in

arrears on February 15 and August 15, and will mature on August 15, 2019 when the entire

principal amount of $700 million will be due.  The net proceeds from the 7.875% Notes were

used to fund (a) the repayment in full of (i) an NII Mexico Mexican peso-denominated term loan

facility with three Mexican banks that, as of March 31, 2013, had an outstanding balance of

approximately $331 million and (ii) an NII Brazil bank loan with Banco Bradesco SA that, as of

March 31, 2013, had an outstanding balance of approximately $328 million and (b) the

repayment or repurchase of certain other loans of NII Brazil.

E.     Other Prepetition Liabilities of the Debtors

40.     Other than the Notes, only NII Holdings and NIS have a material amount

of liabilities owed to third parties.  For NII Holdings, its material third-party liabilities (other

than its guarantee obligations in respect of the Notes) are primarily related to (a) deferred tax

liabilities, (b) certain liabilities associated with global supply agreements to which NII Holdings

is party, (c) obligations owed to NII Holdings' employees, (d) obligations under the lease for the

Headquarters Office and (e) certain contingent indemnification liabilities arising out of the sale

of NII Peru in 2013.  For NIS, its material third-party liabilities (other than its guarantee

-17-

obligations in respect of the NII Capital Notes) are primarily related to certain third party service providers and other costs and expenses of operating the Debtors.  The other Debtors generally have negligible amounts of third-party liabilities.

41.    In addition, NII Holdings and International Telecom guarantee certain obligations of NII Brazil and NII Mexico.[15]  Specifically, in July 2011, NII Mexico entered into U.S. dollar-denominated loan agreements with China Development Bank Corporation, which provided for an aggregate loan commitment of $375 million (the "NII Mexico CDB Agreements") to be used to finance infrastructure equipment and certain other costs related to the deployment of its 3G Network.[16]  In April 2012, NII Brazil entered into U.S. dollar-denominated loan agreements with China Development Bank Corporation, which provided for an aggregate loan commitment of $500 million (the "NII Brazil CDB Agreements" and together with the CDB Mexico Agreements and various related agreements, the "CDB Agreements").[17]  Pursuant to the terms of the CDB Agreements, payments by NII Brazil and NII Mexico on account of certain intercompany indebtedness are prohibited under certain circumstances.

42.    In connection with certain modifications to the CDB Agreements required in connection with the Tower Transactions (as defined below), NII Holdings provided a guarantee of NII Mexico's obligations under the NII Mexico CDB Agreements and NII Brazil's obligations under the NII Brazil CDB Agreements.  These guarantees by NII Holdings are of

---

[15]    Other material indebtedness incurred by NII Brazil that is not guaranteed by any of the Debtors includes unsecured loans in the amount, as of June 30, 2014, of R$544 million (Brazilian reais) and R$400 million (Brazilian reais) with Caixa Econômica Federal and Banco do Brasil S.A., respectively.

[16]    This financing has a final maturity of ten years, with a three-year borrowing period and a seven year repayment term commencing in 2014.  As of the Petition Date, NII Mexico had borrowed approximately $346 million under the NII Mexico CDB Agreement.

[17]    This financing has a final maturity of ten years, with a three-year borrowing period and a seven-year repayment term commencing in 2015.  As of the Petition Date, NII Brazil had borrowed approximately $367 million under the NII Brazil CDB Agreement.

NYI-4611316v1

limited duration and will expire no later than August 29, 2015 so long as the applicable

borrowers under the CDB Agreements are in compliance with the financial ratios set forth in the

applicable CDB Agreements at that time.  In addition, while these guarantees are in effect, each

of NII Brazil and NII Mexico generally are prevented from making any payments on account of

intercompany indebtedness.

43.     In August 2013, NII Brazil and NII Mexico entered into sale/leaseback

transactions with respect to 2,790 and 1,666 communication towers, respectively, with affiliates

of American Tower Corporation ("ATC") in two separate transactions for total estimated

proceeds based on foreign currency exchange rates at the time of approximately $432 million

and $391 million, respectively (together, the "Tower Transactions").  International Telecom

agreed to provide certain credit support with respect to the lease obligations of NII Brazil,

including a guarantee of repayment by NII Brazil up to a maximum amount of R$746,439,616

(Brazilian reals) (subject to certain adjustments) and an agreement to subordinate, under certain

circumstances, any right to repayment of amounts owed by NII Brazil to International Telecom

to obligations owed to the applicable ATC affiliate in connection with the Tower Transactions.

## II.
## RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING
## TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

A.     The NII Business in Recent Years

44.     Historically, NII's second generation (2G) network ("2G Network"), which

operated using a unique technology developed and provided by Motorola referred to as "iDEN"

(Integrated Digital Enhanced Network), provided unique, high-quality services that were

attractive to business users and other professionals that NII targeted as customers (including the

unique PTT feature that is the hallmark of the Nextel™ brand).  This gave NII a unique

competitive advantage.

45.     Beginning in 2009, however, NII's competitive advantage slowly began to erode because of its competitors' launch of new 3G Networks that provided significantly enhanced data capabilities and the introduction of the smart-phone to the Latin American market place.  Because smart phones generally require faster data transmission speeds, facilitate internet browsing and often integrate the use of GPS technology — little of which is supported by iDEN networks — customers who wanted the benefits of a wider range of data services began to switch to NII competitors to gain access to the services supported by their 3G Networks, including the wider range of services and functionality provided on smart-phones.[18]

46.     In response to these competitive pressures, over the past several years, NII has focused substantial resources on acquiring spectrum that could support more advanced services,[19] and deploying a 3G Network in Brazil and Mexico — NII's two largest markets, which together generated approximately 87% of NII's total consolidated operating revenues in the first quarter of 2014 — to complement NII's 2G Network in those markets (and ultimately replace them).[20]  The deployment of the 3G Network is essential to the continued survival and growth of the Operating Companies for three principal reasons.  First, as described above, consumers in Latin America — including in Brazil and Mexico — are increasingly demanding high-speed wireless networks with the capacity to support the data services available using smart-phones and their related applications.  Second, the WCDMA technology of the 3G Network is a more widely utilized standards-based platform, which is supported by a broader

---

[18]     Because iDEN does not support the data speeds typical of 3G networks, smart-phones simply were not manufactured to function on an iDEN network or to support PTT services.

[19]     NII was required to acquire new spectrum for its 3G Network because the spectrum NII used for its iDEN network was not suitable for a WCDMA network.

[20]     NII also introduced a 3G Network in Chile and in Peru prior to NII selling those operations.  In Argentina, the spectrum used for NII Argentina's 2G Network is not suitable for WCDMA technology, and because of the cancellation of a spectrum auction by Argentinean authorities, NII has not been able to acquire the spectrum that is required for the development of a 3G Network in that country.

NYI-4611316v1

range of suppliers of network equipment and handsets, enabling NII to obtain equipment and

handsets on more favorable pricing terms and to support cutting edge handsets.[21]  Finally, other

wireless communications providers have deactivated or announced plans to deactivate their

iDEN networks, including Sprint, which was the largest operator of iDEN-based networks and

deactivated its iDEN-based network the United States in June 2013.  This transition of iDEN

operators away from the technology means (a) fewer handsets for iDEN networks will be

available, (b) vendors may not continue the same level of research and development,

maintenance, optimization and other ongoing support of iDEN networks and (c) consumers with

iDEN handsets will not be able to roam onto the wireless networks of other carriers.[22]

> 47.    In connection with the acquisition of spectrum and deployment of its

3G Network, between 2011 and 2013, NII had billions of dollars of capital expenditures.  These

capital expenditures were financed with proceeds of the Notes (through investments or

intercompany loans from NII Capital and International Telecom), revenues from the Operating

Companies, debt raised by NII Brazil and NII Mexico and the Tower Transactions described

above.

> 48.    As NII was racing to complete the build out of its 3G Network, it was

experiencing increasing turnover of its customer base as customers were offered more attractive

services by its competitors on their 3G Networks.  This forced NII to (a) offer lower-priced

wireless plans and implement more aggressive subscriber-retention programs in an effort to stem

the continuing loss of its 2G customers to competitors with 3G Networks and (b) to relax its

---

[21]   Motorola, Inc. — the original developer of iDEN technology — is the only supplier of equipment for iDEN networks.

[22]   Most handsets that function on iDEN networks do not function on other network platforms.  Thus, when iDEN networks are deactivated, consumers with iDEN devices are unable to roam on the non-iDEN replacement networks, substantially reducing the geographic area in which consumers can use their iDEN handsets.

NYI-4611316v1

credit policies to try to attract new customers.  These actions, in turn, led to lower average

revenue per subscriber and an increase in bad debt expense.  In response to these trends,

NII Brazil introduced new rate plans in 2012 designed to improve its average revenue per

subscriber and made adjustments to its credit policies, including the implementation of more

stringent credit policies for new subscribers, while concurrently taking steps to accelerate the

deactivation of certain subscribers who were identified as being unprofitable.  This action

resulted in a net loss of nearly 300,000 subscribers in Brazil during the fourth quarter of 2012.

49.     Macroeconomic factors also imposed pressure on NII's performance.  In

late 2011 and continuing throughout 2012 and 2013, uncertainty in worldwide economic

conditions drove a significant decline in the value of the currencies in Latin America relative to

the U.S. dollar — particularly in Brazil and Argentina.  This had a significant effect on NII's

reported results because nearly all of its revenues are earned in non-U.S. currencies, while a

significant portion of its capital and operating expenditures, including expenditures to purchase

imported network equipment and handsets, and a substantial portion of its outstanding debt, are

denominated in U.S. dollars.  From 2011 to 2012, the depreciation of foreign currencies resulted

in an approximate 11% decrease in NII's consolidated operating revenues.  From 2012 to 2013,

the depreciation of foreign currencies resulted in an approximate 5% decrease in NII's

consolidated operating revenues.

50.     Similarly, economic growth in both Brazil and Mexico slowed

significantly from 2010 and 2013.  In Brazil, annual GDP growth fell from 7.5% in 2010 to 2.7%

in 2011, to 0.9% in 2012 and recovered nominally to 2.3% in 2013.  In Mexico, annual GDP

growth fell from 5.1% in 2010 to 4% in 2011, to 3.8% in 2012 and to just 1.1% in 2013.  This

general economic slowdown in NII's two largest markets also impacted NII's profitability as slower economic growth dampened consumer demand for NII's services.

51.     The combination of these conditions began to affect NII's financial results in 2011 and 2012.  In 2011, NII generated consolidated operating revenue of approximately $6.7 billion — an increase of more than $1 billion over consolidated operating revenues in 2010 — but experienced a decline in net income of over $100 million from 2010 to 2011, from approximately $339 million to approximately $225 million.  In 2012, NII's consolidated operating revenue declined to $6.0 billion and it recorded a net loss of approximately $765 million.

52.     In addition, over the course of the last two years, NII has continued to experience increased competition and operational challenges in its markets, particularly in Brazil and Mexico, as the 3G Networks have been deployed.  During the second half of 2013, these factors continued to have a negative impact on NII's results, which was intensified by Sprint's decision to deactivate its iDEN network in the U.S., and a failure to effectively execute plans to address them.  Because of the sharp influx of subscribers that were migrated to the 3G Network upon the deactivation of Sprint's iDEN network, customers experienced various network outages and increased dropped calls on NII Mexico's 3G Network.  In addition, the deactivation of Sprint's iDEN network resulted in changes to the connections previously available between NII's customers and their contacts in the U.S., as well as changes in their ability to roam in the U.S., making NII Mexico's services less attractive to its subscribers who used their iDEN handsets both to communicate with Sprint iDEN customers using PTT and to communicate with both Sprint and NII Mexico iDEN customers when roaming in the U.S.  These changes had an adverse impact on NII customers' experience using their services and created a negative

perception of the 3G Network in Mexico.  This, in turn, led to a loss of customers and a decrease

in new customers, particularly customers living in areas near the border of Mexico and the U.S.

As a result, from the year ended December 31, 2012 to the year ended December 31, 2013,

(a) NII Mexico's subscriber base declined by approximately 16% from approximately 3.9 million

to approximately 3.3 million,[23] (b) NII Mexico's operating revenues declined by approximately

6% from approximately $2.3 billion to approximately $2.1 billion and (c) NII Mexico swung

from generating net income of approximately $107 million to a net loss of approximately

$377 million.

      53.      Second, to avoid network quality and go-to-market readiness concerns in

Brazil, the launch of the 3G Network there was delayed until late 2013 to ensure an optimized

roll-out, leading to 2013 subscriber and revenue growth rates that were significantly lower than

originally planned, although revenue and growth rates in Brazil have recovered somewhat since

the 3G Network was launched.  At the same time, NII Brazil continued to collect lower revenues

as a result of the incentives it was required to provide to retain customers on its 2G Network in

the face of competition.  As a result of these factors, as well as continuing decline in the value of

the Brazilian currency related to the U.S. dollar, from the year ended December 31, 2012 to the

year ended December 31, 2013, NII Brazil's operating revenues declined by approximately 24%

from approximately $2.9 billion to approximately $2.2 billion, and NII Brazil swung from

generating net income of approximately $191 million to a net loss of approximately $560

million.

      54.      As a result of the various factors described above, and others described in

the various SEC filings of NII Holdings, for the fiscal year ended December 31, 2013, NII

---

[23]     NII Mexico's subscriber base experienced a further decline of approximately 10% in the first six months of
2014, for a total decline of approximately 25% since the year ended December 31, 2012.

NYI-4611316v1

recorded a net loss of approximately $1.6 billion on consolidated operating revenues of approximately $4.8 billion. As of December 31, 2013, utilizing book values, on a consolidated basis NII had assets of approximately $8.7 billion and liabilities of approximately $8.3 billion.[24]

B.    Mitigation Strategies

55.    The Debtors and the Operating Companies have taken a number of steps over the course of 2013 and 2014 to reduce their operating costs and realign their operations to be more efficient consistent with recent operating trends.

56.    For example, the Debtors have undertaken a comprehensive strategic review of the NII business with the help of various outside consultants and developed a plan to strengthen and improve their performance in their core markets of Brazil and Mexico while exploring possible strategic transactions with respect to their non-core operations.

57.    Consistent with this approach, in August 2013, NII completed the sale of all of its outstanding equity interests of NII Peru to Empresa Nacional de Telecomunicaciones S.A. and one of its subsidiaries, Entel Inversiones S.A., for approximately $406 million in cash, which included $50 million that was deposited in escrow on NII's behalf to satisfy potential indemnification claims.[25]

58.    In December 2013, NII signed agreements with Telefonica Moviles ("Telefonica"), under which Telefonica agreed to provide NII Brazil and NII Mexico with nationwide roaming voice and data coverage services on Telefonica's networks. This has

---

[24]    As of December 31, 2013, utilizing unaudited book values, on a consolidated basis the Debtors had assets of approximately $4.9 billion and liabilities of approximately $4.6 billion.

[25]    To date, approximately $7.5 million of the amount deposited in escrow has been released as a result of the settlement of certain indemnification claims, and remaining amounts will continue to be held in escrow to satisfy potential future indemnification claims.

allowed NII Brazil and NII Mexico to enhance their service offerings by expanding areas in

which customers using NII's 3G Network can access voice and data services.

59.     To streamline operations and reduce their cost structure, the Debtors

reevaluated the services provided by employees of NII Holdings to the Operating Companies.

As part of this ongoing evaluation, the Debtors have been in the process of migrating many of

the services previously provided to the Operating Companies by employees of NII Holdings

downstream to the Operating Companies themselves.  As functions such as marketing strategy,

vendor management and procurement were migrated to the Operating Companies, NII Holdings

reduced its headcount at the Headquarters Office accordingly.  Over the last two years, NII

Holdings went from over 300 employees to 70 employees as of the Petition Date.  Since

January 1, 2014, the Debtors have reduced their workforce by approximately 170 employees.

60.     NII also has implemented a number of cost savings measures at the

Operating Companies.  For example, NII Brazil has, among other things:  steadily reduced its

headcount by over 1,100 over the past eighteen months; begun the process of closing forty-eight

under-performing locations; and renegotiated certain significant contracts.  Similarly, NII

Mexico has, among other things, reduced its workforce by approximately 1,700 over the last

eight months.

61.     Finally, most recently, NII completed the sales of its operations in Chile in

August.  On August 14, 2014, NII's operations in Chile, which generated continuing losses, were

sold to Fucata S.A., a sociedad anónima existing under the Oriental Republic of Uruguay

("Fucata") for a de minimis amount.  NII also continues to explore the possible sale of its

operations in Argentina.  Although Argentina, unlike Chile, was historically profitable, the

delays in the auctions of spectrum suitable to support 3G technology combined with the

-26-

implementation by the Argentinean government of capital controls and restrictions on repatriation of funds has negatively affected NII's ability to realize benefits, or repatriate any cash, from those operations.  Finally, while NII is focused on growing and improving its businesses in Brazil and Mexico, it has continued to explore a variety of options for those markets and various strategic transactions, including possible sale transactions.

62.     As a result of these various initiatives, the Debtors believe that NII is well positioned for success in its core markets.  NII Brazil and NII Mexico have deployed and launched their 3G Network in the major business centers and related transportation corridors of their respective markets.  NII has a strong brand, unique PTT services, significant spectrum, towers and network equipment, and a skilled workforce in place to continue to service and expand its customer base.  The considerable efforts associated with development and roll-out of the 3G Networks are now substantially complete, and the transition of customers to NII's 3G Networks is fully underway.  Moreover, independent surveys show that NII's new 3G Networks in Brazil and Mexico outperform those of competitors in terms of both voice quality and data speeds.[26]  The Debtors anticipate that both NII Brazil and NII Mexico are poised to return to significant revenue growth beginning in 2015.

C.     The Decision to File Chapter 11

*Restructuring Negotiations and Continuing Business Challenges*

63.     Because of the difficulties experienced by the Operating Companies, including the impact of the overall decline in the size of the subscriber base and average revenue per subscriber, increased capital needs and slower than expected growth in customers on the 3G Network, the Debtors determined in early 2014 that they would not have sufficient cash to

---

[26]     NII Brazil and NII Mexico also have begun to develop and offer long-term evolution, or LTE, technology in certain geographic areas.

NYI-4611316v1

continue making interest payments on the Notes while continuing to fund the capital

expenditures and operational needs of the Operating Companies.

64.     In an effort to find a solution to their future liquidity issues, towards the

end of the first quarter of 2014, the Debtors began to engage certain holders of significant

amounts of the Notes (collectively, the "Majority Noteholder Group") and their respective legal

and financial advisors regarding a potential restructuring of the Notes.

65.     On March 4, 2014, Aurelius Capital Management, L.P. ("Aurelius") sent a

letter (the "Aurelius Letter") to Debtors NII Holdings, NII Capital, NII Global and non-debtors

McCaw International Brazil, LLC, Airfone Holdings, LLC and Nextel International (Uruguay),

LLC (collectively, the "Former Guarantors") alleging that (a) the inter-company transfer of

equity interests of the Former Guarantors from NII Global to International Telecom in 2009

violated the terms of the indenture governing the 10% Notes and the 8.875% Notes,

(b) the release of the Former Guarantors in 2009 from their guarantees of the 10% Notes and the

8.875% Notes were ineffective and such guarantees remain in full force and effect and (c) certain

intercompany transactions undertaken in connection with the issuance of the 11.375% Notes and

the 7.875% Notes apparently constituted fraudulent transfers.

66.     On March 19, 2014, Cede & Co., in its capacity as the holder of record of

the 8.875% Notes, delivered on behalf of Aurelius, in its capacity as the purported beneficial

owner of more than 25% of the 8.875% Notes, to NII Holdings and NII Capital a notice of

default (the "Aurelius Notice of Default") alleging that certain internal corporate restructuring

transactions undertaken by NII in 2009 and described in brief in paragraph 65 above violated the

terms of, and constitute a default under, the indenture for the 8.875% Notes (the "8.875% Notes

Indenture").

67.     On March 25, 2014, the Majority Noteholder Group delivered to Wilmington Trust Company ("Wilmington Trust"), then-trustee under the 8.875% Notes Indenture, a waiver of the alleged defaults asserted in the Aurelius Notice of Default, which was effective for an initial 30-day period and later extended for an additional 45 days from April 23, 2014.[27]

68.     In an effort to avoid unnecessary litigation expenses and distract key personnel from focusing on NII's business and a holistic restructuring of the Notes, in April 2014, the Debtors opened discussions with a group of minority holders of NII Capital Notes (the "Aurelius Group") led by Aurelius regarding (a) the allegations in the Aurelius Letter and the Aurelius Notice of Default and (b) a potential restructuring of the Notes.

69.     The advisors for the Majority Noteholder Group and the Aurelius Group were provided with access to a data room containing a voluminous body of information and documentation relating to the Debtors' and the Operating Companies' operations and the Debtors responded to, and participated in numerous meetings regarding, extensive diligence requests from such advisors.  On June 18, 2014, the Debtors, the Aurelius Group and the Majority Noteholder Group entered into a forbearance agreement with respect to certain alleged defaults asserted by Aurelius (the "Forbearance Agreement").  The Forbearance Agreement expired as of August 15, 2014, the same day on which NII publicly announced that it had elected not to pay approximately $118.8 million in interest due on August 15, 2014 on the Notes, and entered a

---

[27]     Because the Majority Noteholder Group no longer owned or controlled over 50% of the 8.875% Notes, further extension of this waiver was not sought and it was allowed to expire.

NYI-4611316v1

30-day grace period during which NII could elect to make the interest payments and cure any

potential non-payment claims.[28]

70.    At the same time that the Debtors were in discussions with the Majority

Noteholder Group and the Aurelius Group, the Debtors also began discussions with certain

significant lenders of NII Brazil and NII Mexico regarding potential covenant relief or other

modifications to the CDB Agreements and certain other local lending agreements of those

operations.  On June 27, 2014, CDB granted waivers to NII Brazil and NII Mexico, the

borrowers under the CDB Agreements, of their obligations to maintain compliance, as of the

calculation date of June 30, 2014, with certain financial covenants under the applicable CDB

Agreements.  In August 2014, NII Brazil, NII Mexico and CDB reached a preliminary agreement

in principle regarding the terms of proposed amendments to the CDB Agreements, which

agreement in principle is presently awaiting final approval before proceeding to definitive

documentation.

71.    Similarly, prior to the Petition Date, the Debtors engaged in discussions

with NII Brazil's two major local lenders, Banco do Brasil S.A. ("BdB") and Caixa Econômica

Federal ("Caixa"), regarding potential waivers and amendments to the terms of the credit

agreements with these lenders that would address the financial covenants and amortization

schedule under each agreement.  These discussions have resulted in an agreement in principle

with BdB that is awaiting final approval, and discussions remain ongoing with Caixa.

72.    Even as these various discussions with significant creditor constituencies

were ongoing, and despite NII's best efforts to mitigate its losses and stabilize operations,

---

[28]    Also, on August 15, 2014, NII publicly disclosed a broad array of information that was previously
furnished to certain holders of Notes in the interest of fostering informed restructuring discussions.  This
information remains available at the Investor Relations page of NII's website (www.nii.com) under
"Bondholder Information."

NII Brazil and NII Mexico continued to experience a number of challenges in the first half of 2014 related to the various factors discussed above.  For the six months ended June 30, 2014, NII experienced a consolidated net loss of approximately $999 million on operating revenues of approximately $1.9 billion.  As of June 30, 2014, utilizing unaudited book values, on a consolidated basis NII had assets of approximately $7.4 billion and liabilities of approximately $8.0 billion.  As of June 30, 2014, utilizing unaudited book values, on a consolidated basis the Debtors had assets of approximately $3.79 billion and liabilities of approximately $4.58 billion.

73.     Accordingly, given these continuing losses and the expiration of the 30-day grace period during which NII could elect to make the August interest payments on the Notes and cure any potential non-payment claims, and after engaging in extensive negotiations with the Majority Noteholder Group and the Aurelius Group during the months leading up to the Petition Date, the Debtors determined to commence these bankruptcy cases to complete the negotiation of, and propose and confirm, a plan of reorganization.

## III.
## FIRST DAY PLEADINGS

74.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting various forms of relief.  Generally, the Debtors narrowly tailored the First Day Pleadings to enable the Debtors to meet their goals of:  (a) continuing their operations in chapter 11, and the operations of the Operating Companies, with as little disruption as possible; (b) maintaining the confidence and support of their employees, vendors and service providers during these chapter 11 cases; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

75.     Given the importance of the relief sought in the First Day Pleadings to the Debtors' ability to preserve value as they seek to reorganize, the Debtors will move for entry of

NYI-4611316v1

an order scheduling an expedited hearing on the First Day Pleadings.  The Debtors anticipate that

the Court will conduct a hearing soon after the commencement of their chapter 11 cases

(the "First Day Hearing") at which the Court will hear and consider certain First Day Pleadings.

The Debtors also anticipate that the Court will consider the remainder of the pleadings filed

contemporaneously with this Declaration at a later time.  Those First Day Pleadings that the

Debtors anticipate will be heard at the First Day Hearing are described below.[29]

76.    I have reviewed each of the First Day Pleadings filed contemporaneously

herewith.  To the best of my knowledge, I believe that the facts set forth in the First Day

Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the

foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

77.    Further, as a result of my personal knowledge, information supplied to me

by other members of the Debtors' management, from my review of relevant documents, or upon

my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of

the Debtors' operations and financial condition, I believe the relief sought in the First Day

Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11

bankruptcy, is necessary to to avoid irreparable harm to their businesses and estates, is in the best

interests of the Debtors' creditors, estates, and other stakeholders and, ultimately, will be critical

to the Debtors' ability to consummate a chapter 11 plan consistent with the terms set forth in the

Restructuring Term Sheet.

78.    It is my further belief that, with respect to those First Day Pleadings

requesting the authority to pay discrete prepetition claims or continue selected prepetition

programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to

---

[29]    Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

their employees, cash management system, taxing authorities and insurers), the relief requested

is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm

to the Debtors, their estates, employees, creditors and other parties in interest.  Specifically, the

success of these cases depends in large part on the continuing operation of the Debtors' business

and the businesses of the Operating Companies in as normal course as possible until the Debtors

can confirm a chapter 11 plan consistent with the Restructuring Term Sheet.  Impairment of the

Debtors' operations or of the operations of the Operating Companies at the early stages of these

cases would imperil the Debtors' ability to complete a successful restructuring and potentially

significantly damage the value of the Debtors' estates.  The wireless industry in which the

Operating Companies do business is highly competitive.  Any impact that the Debtors'

bankruptcy might have on the Operating Companies likely will be used by NII's competitors to

attempt to lure customers away from the Operating Companies.  Moreover, halting intercompany

transactions between the Debtors and the Operating Companies could lead the Operating

Companies to default on various obligations in the foreign jurisdictions in which they operate.

This could force the Operating Companies to pursue separate insolvency proceedings in the

countries in which they do business, which could have a negative impact on the affected

Operating Company's business and create significant uncertainty regarding NII's ability to

successfully reorganize its business and consummate a chapter 11 plan.  Because a significant

portion of the Debtors' value relates to their equity interests in the Operating Companies, any

negative impact on the Operating Companies resulting from the Debtors' bankruptcy likely

would have an immediate and irreparable harmful impact upon the value of the Debtors' estates.

> 79.     Accordingly, the Debtors have an immediate need to continue the orderly

operation of their business by paying employees and continuing their existing cash management

NYI-4611316v1

system, including the continued intercompany transactions with, and investments in, the

Operating Companies in the normal course of business.  Continuing these practices will enable

the Debtors to preserve the going concern value of their estates, thereby maximizing recoveries

for the Debtors' stakeholders.  As such, I believe granting the various relief requested in the First

Day Pleadings will prevent irreparable harm to the Debtors' estates for the direct benefit of the

Debtors' creditors and other constituents.

80.     I respectfully request that all of the relief requested in the First Day

Pleadings, and such other further relief as may be just and proper, be granted.

A.     Joint Administration

81.     The Debtors will present a motion requesting the entry of an order

providing for the joint administration, but not the substantive consolidation, of their chapter 11

cases.  I believe that the joint administration of the Debtors' respective estates is warranted and

will ease the administrative burden for the Court, the Office of the Clerk of the Court and parties

in interest.

B.     Filing Consolidated Lists of Creditors and Related Relief

82.     Given the affiliated nature of the debtors and the fact that they share a

number of creditors in common, the Debtors will move for entry of an order authorizing them to

file a single consolidated list of the Debtors' twenty largest unsecured creditors in these

chapter 11 cases in lieu of filing separate lists of the largest twenty unsecured creditors for each

of the Debtors.  Such authority will facilitate the U.S. Trustee's review of creditors' claims and

the appointment of a single creditors' committee in these cases.  The Debtors will also seek a

waiver of the requirement that each debtor file a list of creditors containing the name and address

of each entity included or to be included on a debtor's schedules of liabilities as such information

will be provided to the Debtors' claims and noticing agent, and a waiver of the payment, income,

NYI-4611316v1

and expenditure-schedule filing requirements set forth in sections 521(a)(1)(B)(iv),

521(a)(1)(B)(v) and 521(a)(1)(B)(vi) of the Bankruptcy Code.  Last, the Debtors will seek

approval of the form and manner of notice of commencement of these chapter 11 cases and of

the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code

(the "341 Meeting").

C.      Extension of Time to File Schedules and Statements

83.      Because of the size and complexity of NII's business and the Debtors'

financial affairs, and because of the critical matters that the Debtors' management and

professionals were required to address prior to the commencement of these chapter 11 cases, the

Debtors will move for entry of an order granting them an additional fourteen days to gather the

information necessary to complete and file the required:  (a) schedules of assets and liabilities,

(b) schedules of executory contracts and unexpired leases and (c) statements of financial affairs.

In addition, the Debtors will request an extension of the time until sixty days after the

341 Meeting to (a) file their initial reports of financial information in respect of entities in which

their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy

Rule 2015.3 or (b) file a motion with the Court seeking a modification of such reporting

requirements for cause.  The Debtors also will request a waiver of the requirement that NII

Holdings (a) file a list of equity security holders within fourteen days of the Petition Date, as set

forth in Bankruptcy Rule 1007(a)(3) and (b) give notice to equity security holders of the

commencement of these chapter 11 cases and the 341 Meeting as set forth in Bankruptcy

Rule 2002(d) and Local Bankruptcy Rule 1007-1.

D.      Motion to Confirm the Protections of the Automatic Stay

84.      To aid in the administration of the Debtors' bankruptcy cases and to avoid

disruption to the Debtors' business, the Debtors will seek the entry of an order, pursuant to

section 105(a) of the Bankruptcy Code, that confirms the application of three key protections

afforded to the Debtors under the Bankruptcy Code:  (a) the automatic stay provisions of

section 362 of the Bankruptcy Code; (b) the anti-termination and anti-modification provisions of

section 365 of the Bankruptcy Code; and (c) the anti-discrimination provisions of section 525 of

the Bankruptcy Code.  Such an order is particularly appropriate in the Debtors' chapter 11 cases

because three of the Debtors are incorporated in Luxembourg, certain of the Debtors maintain

contractual relationships with foreign entities and the Debtors, through the Operating

Companies, provide wireless communication services in Latin America.  Many of the non-U.S.

creditors and contract counterparties of the Debtors affected by sections 362, 365 and 525 of the

Bankruptcy Code may be unaware of the significant protection these sections provide to the

Debtors.  Thus, the existence of such an order, which the Debtors will be able to transmit to

affected parties, will maximize the protections afforded by sections 362, 365 and 525 of the

Bankruptcy Code.

E.    Employee Wages and Benefits

85.    As noted above, the Debtors currently employ 70 full-time employees,

five of whom are hourly employees (the "Hourly Employees") and 65 of whom are salaried

employees (the "Salaried Employees" and, together with the Hourly Employees,

the "Employees").  The Debtors have steadily reduced their workforce over the last two years by

230 Employees.  In just the last eight months alone, the Debtors workforce has declined by

approximately 170 Employees from 240 as of December 31, 2013.  In addition to their regular

workforce, the Debtors also utilize the services of certain independent contractors

(the "Independent Contractors"), pursuant to formal and informal arrangements who provide,

among other things, accounting, employee benefit, engineering, information technology,

communication and marketing consulting services that are vital to the efficient operation of the

Debtors' business, and two temporary employees (the "Temporary Employees"), who assist with certain administrative and secretarial functions.

86.     The continued and uninterrupted support of the remaining Employees is essential to the Debtors' success.  The Employees perform a variety of critical functions, including a variety of ongoing services for the Operating Companies related to finance, legal, corporate governance, network engineering support, information technology support and strategic management services.  The skills and experience of the Employees, their relationships with various parties, including key individuals at the Operating Companies, and their knowledge of NII's infrastructure and business are essential to the preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to effectively reorganize.  Any interruptions in payment of prepetition Employee-related obligations will impose additional hardship on the Employees and is certain to jeopardize their continued performance during this critical time.  Likewise, the Debtors believe it is necessary to pay all outstanding obligations to the Employment Agencies so that they will continue to provide adequate staffing to the Debtors, and to the Independent Contractors to ensure uninterrupted services to the Debtors' business.

87.     Accordingly, the Debtors will request the entry of an order authorizing them, in the ordinary course of business and in their sole discretion, to:  (a) pay and honor owed or accrued wages, salaries, contractual compensation and other accrued compensation and related costs (collectively, "Prepetition Compensation") to the Debtors' Employees; (b) reimburse certain prepetition business expenses (as further described in the motion and below) ("Prepetition Business Expenses"); (c) pay and honor certain payroll deductions and various employee benefits (as further described in the motion) (collectively, with Prepetition Compensation and Prepetition Business Expenses, the "Employee Wages and Benefits"); (d) pay

NYI-4611316v1

and honor various related costs, expenses, deductions and withholdings; and (e) pay all

outstanding obligations to the Employment Agencies and to the Independent Contractors.

Furthermore, the Debtors will seek authority, solely upon entry of a final order, to honor, pay,

satisfy or remit all claims and prepetition obligations related to the following Employee Wages

and Benefits:  (a) the Cash Bonus Incentive Plan and Spot Bonus Program for non-insider

Employees only; (b) two Individual Incentive Agreements; (c) the Severance Plan for

non-insider Employees only; (d) Relocation Expenses and Expatriate Expenses; and (e) Outside

Director Compensation and Outside Director Expenses

88.     Importantly, the Debtors believe that all of their Employees are owed less

than $12,475 for any prepetition wages, salaries or benefits, not counting the potential year-end

Personal Performance Bonus.[30]  Therefore, it is my understanding that each of the Employees

who is owed any Prepetition Compensation or benefits would have a priority claim of up to the

$12,475 priority cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code

(the "Prepetition Cap") with respect to amounts earned within the 180 days prior to the Petition

Date.

89.     Furthermore, in the ordinary course of business, the Debtors reimburse

Employees for certain reasonable and customary expenses incurred in the scope of their service

on behalf of the Debtors (collectively, the "Reimbursable Expenses"), including, without

limitation, expenses related to (a) business travel, (b) business expenses and (c) other expenses

permitted pursuant to the Debtors' travel and expense policy.  In an effort to control costs, the

Debtors' policies require Employees to adhere to purchasing, travel and expense guidelines

---

[30]    For non-insider Employees, this includes potential Cash Bonus Incentive Payments for the Debtors' fiscal
third quarter.  Even if the potential Personal Performance Bonus is counted against the Prepetition Cap for
non-insider Employees, the Debtors believe many of their non-insider Employees still would fall below the
Prepetition Cap, and no individual non-insider Employee would be owed more than approximately $6,000
over the Prepetition Cap.

NYI-4611316v1

designed to ensure that the Reimbursable Expenses are reasonable and necessary.  Given the

international nature of the NII business, a vast majority of the Reimbursable Expenses are

directly related to Employees' travel to the markets where the Operating Companies do business.

In the aggregate, the Employees incur, on average, approximately $180,000 per month in

Reimbursable Expenses.  The Reimbursable Expenses are, thus, ordinary course expenses that

Employees incur in performing their job functions and vital to the continued operation of the NII

business and the preservation of the value of the Debtors' estates.  It also is essential to the

continued operation of the NII business that the Debtors be permitted to continue reimbursing, or

making direct payments on behalf of, Employees for such Reimbursable Expenses.

F.      Prepetition Taxes

90.      The Debtors, in the ordinary course of their business, incur various tax

liabilities, including, among others, property taxes, state sales tax, business license fees,

franchise taxes and certain other taxes or fees (collectively, the "Prepetition Taxes") owed to

certain Taxing Authorities.  Prior to the Petition Date, the Debtors generally paid their tax

obligations as they became due.  The Debtors have made their best efforts to prepay all

Prepetition Taxes in full prior to the Petition Date and believe that the majority of the Prepetition

Taxes were, in fact, prepaid.

91.      Out of an abundance of caution, however, and in recognition of potential

delays in processing payments, the Debtors seek the entry of interim and final orders allowing

them, in their reasonable discretion, to pay the Prepetition Taxes to the Taxing Authorities,

including all Prepetition Taxes subsequently determined upon audit to be owed for periods prior

to the Petition Date.  The Debtors believe they have ample business justifications to pay the

Prepetition Taxes because it is my understanding that:  (a) most, if not all, of the Prepetition

Taxes would be priority claims under the Bankruptcy Code that would be paid in full under a

chapter 11 plan; (b) certain of the Prepetition Taxes may not constitute property of the Debtors'

chapter 11 estates; (c) certain of the Debtors are required to pay the Prepetition Taxes to maintain

their good standing in the jurisdictions in which they do business; and (d) the State of Virginia

may impose personal liability on responsible officers of the Debtors for the failure to pay certain

Prepetition Taxes or could charge responsible officers with a misdemeanor.  Therefore, to

prevent immediate and irreparable harm that would result from such disruptions and distractions,

the Debtors seek authority to pay these claims on a first day basis.

G.     Renewals of Insurance Policies

92.     In the ordinary course of their business, the Debtors maintain numerous

insurance policies that provide coverage for, among other things, general commercial liability,

property damage, automobile damage and liability, directors and officers liability, transit

damage, crime and fiduciary liability, employment practices liability and workers' compensation

liability (collectively, as such policies may be supplemented, amended, extended, renewed

and/or replaced, the "Insurance Policies").  The Insurance Policies are essential to preserve the

Debtors' business and are, in some cases, required by various laws, regulations and contracts that

govern the Debtors' business.[31]  The premiums for the Insurance Policies generally are paid in

advance.  Many of the Debtors' Insurance Policies will expire in the coming weeks and months,

and the Debtors' total costs of such expiring policies were approximately $2.8 million.

Accordingly, the Debtors anticipate that in the near term, they may have to pay a significant

---

[31]     Typically, the Debtors negotiate a global form of insurance policy for which they pay a premium, and each of the Operating Companies then enter into identical insurance policies at the local level and pay the respective premiums for those local policies on their own behalf.  This practice generally is more efficient and less costly than the negotiation and purchase of separate coverage by each Operating Company.  In addition, certain of the Debtors' Insurance Policies may also provide some form of coverage for one or more of the Operating Companies.  Although the Operating Companies are not Debtors in these cases, the coverage that may be provided by certain of the Insurance Policies for these entities is essential to maintain the integrity of the Debtors' business and the value of the Debtors' equity interests.

NYI-4611316v1

amount of annual premiums to renew or replace their expiring Insurance Policies.  The Debtors

do not believe they have any outstanding prepetition obligations under any Insurance Policies,

nor do the Debtors believe there are any prepetition payment defaults under any policies.

While certain of the Insurance Policies do require the payment of certain deductibles with respect

to certain covered claims, the Debtors do not believe they currently owe any amounts with

respect to such deductibles.

   93. The Debtors employ Willis of New York, Inc. ("Willis") as their insurance

broker to assist them with the procurement and negotiation of their Insurance Policies.

In exchange for Willis' services, the Debtors pay Willis certain fees.  To date in 2014,

the Debtors have paid Willis $600,000 in fees.  The Debtors believe that all prepetition fees have

been fully paid as of the Petition Date.  The Debtors intend to continue to utilize the services

provided by Willis during these bankruptcy cases and believe the continued use of Willis's

services is in the best interests of their creditors and estates.

   94. I understand that Court approval may not be required to maintain the

Debtors' existing Insurance Policies, or to supplement, amend, extend, renew and/or replace the

Insurance Policies in the ordinary course of business.  However, the Debtors' insurance carriers

and broker may be reluctant to engage in ordinary course transactions with the Debtors absent a

comfort order that eliminates any uncertainty as to whether the Debtors have the requisite

authority to engage in such transactions.  Similarly, while the Debtors do not believe they have

any outstanding prepetition obligations or payment defaults with respect to the Insurance

Policies, the Debtors are seeking authority to pay any such amounts, should they exist, that

would be required to ensure continuing insurance coverage during these bankruptcy cases.

-41-

H.     Procedures for Trading in Equity Securities

95.     As a result of past losses from the operation of their businesses,

the Debtors have estimated that their available net operating losses as of the Petition Date are

approximately $1 billion (collectively, the "NOLs"), which amounts could be higher when the

Debtors emerge from chapter 11.  These NOLs are valuable tax attributes.  To preserve to the

fullest extent possible the flexibility to craft a plan of reorganization that maximizes the use of

their NOLs, the Debtors seek the entry of interim and final orders (a) establishing notice and

objection procedures regarding certain transfers of beneficial interests in equity securities in

NII Holdings, (b) establishing a record date for notice and potential sell-down procedures for

trading in claims against the Debtors and (c) granting related relief.  The relief sought will enable

the Debtors to closely monitor certain transfers of equity securities, and thereby preserve the

Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers

may jeopardize the Debtors' use of their NOLs.   In addition, establishing a record date with

respect to trading in claims against the Debtors will ensure that claimholders receive sufficient

notice that any claims purchased after such date may ultimately be subject to certain sell-down

procedures in the event an order approving such procedures is sought by the Debtors and entered

by the Court in order to preserve the Debtors' ability to use their NOLs.

I.     Application to Retain Claims Agent

96.     The Debtors recognize that the large number of creditors and other parties

in interest involved in these chapter 11 cases may impose heavy administrative and other burdens

upon the Court and the Clerk's Office.  To relieve the Court and the Clerk's Office of these

burdens, the Debtors will seek the entry of an order appointing Prime Clerk as the Debtors'

notice and claims agent in these chapter 11 cases.  Prime Clerk may, among other things:

(a) prepare and serve all notices required in the Debtors' chapter 11 cases, including notice of the

-42-

commencement of these chapter 11 cases and the 341 Meeting; (b) maintain the official claims

register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to

accept or reject any plan or plans proposed in these chapter 11 cases.  The Debtors obtained and

reviewed engagement proposals from at least two other court-approved claims and noticing

agents to ensure selection through a competitive process.  The Debtors submit, based on all

engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and

reasonable given Prime Clerk's quality of services and expertise.

J.    Cash Management

97.    As mentioned above, NII Holdings is the direct or indirect parent of each

of the other Debtors and the ultimate holding company for the Non-Debtor Affiliates.  The

Debtors and Non-Debtor Affiliates utilize an integrated, centralized cash management system

(the "Cash Management System") to collect, manage, invest and disburse funds throughout the

NII enterprise.  The Cash Management System has been in place for approximately six years,

and the Debtors maintain current and accurate accounting of all of the Debtors' transactions

through the Cash Management System.

98.    As of the Petition Date, the Debtors maintained several of the following

types of accounts:  (a) investment accounts, (b) restricted accounts, (c) main concentration

accounts, (d) overnight sweep accounts, (e) zero-balance accounts, (f) depository accounts and

(g) general purpose accounts.  The Cash Management System is further described, in detail, in

the motion.

99.    The Cash Management System provides significant benefits to the

Debtors' estates including, among other things, the ability to (a) control and monitor corporate

funds, (b) invest idle cash, (c) ensure the maximum availability of funds when and where

necessary and (d) reduce costs and administrative expenses by facilitating the movement of

-43-

funds and the development of timely and accurate account balance and presentment information.

The smooth operation of the Debtors' business and the continued smooth operation of the

Operating Companies requires the continuation of the Cash Management System during the

pendency of these chapter 11 cases.  Moreover, as a practical matter, it would be difficult,

expensive, disruptive and administratively burdensome to require the Debtors to close all of their

existing Bank Accounts and open new, segmented debtor-in-possession bank accounts for each

Debtor entity at the very outset of these bankruptcy cases as required by the UST Operating

Guidelines.  In addition, preserving a "business as usual" atmosphere and avoiding the

unnecessary distractions that inevitably would be associated with any substantial disruption of

the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition

operations and (b) maximize value for stakeholders by allowing the Non-Debtor Affiliates to

continue their operations without disruption.

   100. Thus, under the circumstances, maintaining the existing Cash

Management System is not only essential, but is in the best interest of creditors and other parties

in interest.  The Debtors therefore will request authority for the continued use of (a) their current

Cash Management System, (b) certain of their existing bank accounts (as well as authorization

for the Debtors to open and close bank accounts) and (c) their business forms.  The Debtors also

will seek authorization from the Court for the banks involved in the Debtors' Cash Management

System to honor certain transfers and charge certain bank fees and other amounts as further

described in the motion.

   101. Prior to the Petition Date, in anticipation of the requirements that would be

imposed by section 345 of the Bankruptcy Code, the Debtors directed the applicable banking

institutions to invest the cash held in certain investment accounts in certain money market

accounts that (a) only invest in obligations issued or guaranteed by U.S. government agencies,

authorities, instrumentalities or sponsored enterprises and (b) carry the highest possible ratings

under Standard & Poor's Rating Group and Moody's Investor Service, Inc.

102.    It is my understanding that by investing in the Money Market Funds, the

Debtors will be able to earn interest on excess cash, as contemplated by section 345(a) of the

Bankruptcy Code, without incurring the administrative costs and compliance risk associated with

managing a portfolio of direct purchases of U.S. Government Securities.  It is also my

understanding that the risk of a compliance breakdown in connection with these activities is at

least as large as any incremental risk posed by investment in the Money Market Funds, and the

costs associated with these activities likely would exceed the yield on the investments.

Furthermore, the Debtors are part of a large, sophisticated enterprise and have an experienced

treasury team in place that has determined that investment in the Money Market Funds will

benefit the Debtors and the value of the Debtors' estates.  Accordingly, the Debtors will request

authority to continue their Investment Practices.

103.    Last, the Debtors will seek (a) authority to continue intercompany funding

by engaging in both Inter-Debtor Transactions and Intercompany Transactions (each as defined

below and more fully discussed above and in the motion) through the Debtors' Cash

Management System and (b) the grant of super-priority administrative expense status to all

postpetition claims arising from Inter-Debtor Transactions.

104.    Historically, the Debtors have engaged in a variety of intercompany

financial transactions (collectively, the "Inter-Debtor Transactions"), including, but not limited

to, the following:  (a) NII Holdings regularly transfers cash from its accounts to NIS to fund the

costs and expenses of operating the Debtors, which transfers are recorded as investments in NIS

by NII Holdings; (b) NIS or NII Holdings pay the de minimis fees and expenses associated with

maintaining the corporate existence of NII Funding, NII Capital, NII Aviation and NII Global,

which payments are recorded either as giving rise to intercompany claims or as investments;[32]

and (c) International Telecom historically has provided funding to International Services and

International Holdings to pay the de minimis fees and expenses associated with maintaining their

corporate existence, which payments are recorded as a capital redemption and reduction of

additional paid in capital.  Also, International Telecom is party to a services agreement with NII

Holdings under which NII Holdings provides services to, and an office for, International

Telecom's Virginia branch in exchange for $40,000, which is paid annually by International

Telecom's Virginia branch after the submission of an invoice by NII Holdings.  The Debtors

intend to continue these types of Inter-Debtor Transactions, to the extent necessary, during these

bankruptcy cases.[33]

       105.    It is imperative that the Debtors be permitted to continue to engage in the

Inter-Debtor Transactions during these bankruptcy cases.  In particular, if NII Holdings cannot

continue to provide funding to certain of the other Debtors, (a) NIS will not have sufficient funds

to pay the costs associated with operating the Debtors, including the payment of the Employees,

and providing the shared services necessary to the operation of the Operating Companies and

(b) other Debtors may not have sufficient funds to maintain their corporate existence.[34]

---

[32]    Certain Debtors also have occasionally transferred cash to NII Funding or NII Global in settlement of historical intercompany claims.  The Debtors do not intend to make any such transfers of cash during these bankruptcy cases.

[33]    Historically, the Debtors have only intermittently netted or partially repaid the intercompany balances that have been created pursuant to these Inter-Debtor Transactions.

[34]    The same generally holds true for the more limited Inter-Debtor Transactions that occur between the Luxembourg Entities.

NYI-4611316v1

106.    If this Court authorizes the continuation of the Inter-Debtor Transactions, at any given time there may be balances due and owing from one Debtor to another.  These balances represent extensions of intercompany credit.  The Debtors will continue to maintain records of all Inter-Debtor Transactions, including records of all investments by NII Holdings in other Debtors, and current intercompany accounts receivable and payable.  Affording administrative expense priority to claims arising from Inter-Debtor Transactions will ensure that each separate Debtor will continue to bear ultimate payment responsibility for its respective liabilities.

107.    Certain of the Debtors also routinely engage in the Intercompany Transactions with the Operating Companies described in paragraphs 23 to 33 above.  The Debtors intend to continue these Intercompany Transactions, as needed, during their bankruptcy cases.

108.    Continuation of the Intercompany Transactions is vital to the preservation of the value of the Debtors' estates.  The Debtors' equity interests in the Operating Companies are their single-most valuable assets.  The Operating Companies simply cannot remain in operation without the continued provision of the intellectual property from NII Holdings, the services from the employees of NII Holdings and the funding from International Telecom.  The Debtors believe that if the Operating Companies were forced to cease their operations, the Debtors likely could face a complete loss of their equity investments in the Operating Companies.  Moreover, the Debtors believe that a forced shutdown of certain of the Operating Companies also could lead to claims against certain of the Debtors on account of various obligations that certain Debtors have guaranteed on behalf of the Operating Companies.  In sum, failure to permit

NYI-4611316v1

continued Intercompany Transactions likely would lead to a substantial diminution in the value of the Debtors' estates and significant dilution to the recoveries of the Debtors' creditors.

## IV.
## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

109.    I am informed that Local Bankruptcy Rule 1007-2 requires that certain information about the Debtors be provided in this Declaration.  Various information satisfying this rule, including Local Bankruptcy Rule 1007-2(a)(1), is set forth in the text above.  The remaining required information is provided in the attached schedules, as follows:

| | |
|---|---|
| Schedule 1 | The holders of the Debtors' twenty largest unsecured claims, excluding claims of insiders and information regarding such claims. |
| Schedule 2 | The holders of the Debtors' largest secured claims and information regarding such claims. |
| Schedule 3 | A summary of the Debtors' assets and liabilities, in balance sheet format, as of June 30, 2014. |
| Schedule 4 | The number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held. |
| Schedule 5 | All of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity. |
| Schedule 6 | A list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses. |
| Schedule 7 | The location of the Debtors' substantial assets; the location of their books and records and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States. |
| Schedule 8 | A list of the actions or proceedings that are pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property is imminent. |

NYI-4611316v1

| Schedule 9 | A list of the names of the individuals who comprise the Debtors' existing senior management team, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience. |
|---|---|
| Schedule 10 | Estimated amount of weekly payroll for the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors for the 30-day period following the Petition Date. |
| Schedule 11 | A list of estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the 30-day period following the Petition Date. |

I, Daniel E. Freiman, the undersigned Treasurer, Vice President – Corporate Development & Investor Relations of NII Holdings, declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 15, 2014

/s/
Daniel E. Freiman
Treasurer, Vice President – Corporate Development
& Investor Relations of NII Holdings, Inc.

NYI-4611316v1

## EXHIBIT A

**NII Corporate Organizational Chart**



NII Holdings, Inc.
Page 1 of 4
as of August 21, 2014

**NII Holdings, Inc.**
Confidential & Proprietary

Entities are 100% owned unless otherwise indicated.

(1) Remaining 16.89163% owned by NII Mercosur Móviles, S.L.
(2) Remaining 49.998% owned by NII International Services S.à r.l.

NII Holdings, Inc. (Delaware)

Nextel International Services, Ltd. (Delaware)

NII Capital Corp. (Delaware)

NII Aviation, Inc. (Delaware)

NII Funding Corp. (Delaware)

NII Global Holdings, Inc. (Delaware)

NII International Holdings S.à r.l. (Luxembourg)

NII International Services S.à r.l. (Luxembourg)

(2)    50.002%

NII International Telecom S.C.A., Inc. (Virginia Branch)

NII International Telecom S.C.A. (Luxembourg)

NII International Mercosur S.à r.l.

NII Mercosur Telecom, S.L. (Spain)

NII Mercosur Móviles, S.L. (Spain)

NII Mercosur, LLC (Delaware)

NII International Mobile S.à r.l. (Luxembourg)

NIHD Telecom Holdings, B.V. (Netherlands)

NII Holdings (Cayman) Ltd. (Cayman Islands)

McCaw International (Brazil) LLC (Virginia, U.S)

50%    50%

NII 4G, S. de R.L. de C.V. (Mexico)

Nextel International (Uruguay) LLC (Delaware)

(1)    83.10836

Nextel Communications Argentina S.R.L. (Argentina)

Nextel International (Argentina), Ltd. (Cayman Islands)

Centennial Cayman Corp. (Cayman Islands)

Nextel International (Peru) LLC (Cayman Islands)

Nextel International (Indonesia) LLC (Cayman Islands)

Airfone Holdings LLC (Delaware)

Nextel Uruguay S.A. (Uruguay)

Company is not operating.

Comunicaciones Nextel de México, S.A. de C.V. (Mexico)

Fundación Nextel para la Acción Comunitaria (NyC) (Not-for-Profit)

See Note on Page 4

99.9886131%    0.0113869%

Nextel Telecomunicações S.A. (Brazil)

38.143564267%    61.856435733%

Nextel Telecomunicações Ltda. (Brazil)

NII Mexico, LLC (Delaware)

Mexico Entities
See Page 3

Brazil Entities
See Page 2

**NII Holdings, Inc.**
**Confidential &**
**Proprietary**

NII Holdings, Inc.
Page 2 of 4
as of August 21, 2014

Entities are 100% owned unless otherwise indicated.

(1) Remaining 0.00004% owned by Nextel
    Telecomunicações S.A.
(2) Remaining 0.00033% owned by Nextel
    Telecomunicações S.A.
(3) Remaining 0.0001% owned by Nextel
    Telecomunicações Ltda.





**NII Holdings, Inc.**
**Confidential &**
**Proprietary**

NII Holdings, Inc.
Page 3 of 4
as of August 21, 2014

NII International Telecom S.C.A. (Luxembourg)

NIHD Telecom Holdings, B.V. (Netherlands)

50%

NII 4G, S. de R.L. de C.V. (Mexico)

50%

Nextel International (Uruguay) LLC (Delaware)

99.99%

Comunicaciones Nextel de México, S.A. de C.V. (Mexico)

Remaining 0.01% owned by Servicios NII, S. de R.L. de C.V.

NII Mexico, LLC (Delaware)

99.99%
Fundación Nextel, A.C. (Mexico)

Not-for-profit association. Associates: Comunicaciones Nextel de México, S.A. de C.V. and Servicios NII, S. de R.L. de C.V.

97.35%
Radiophone, S. de R.L. de C.V. (Mexico)

Remaining ownership as follows: (a) 2.64% owned by NII Telecom S.R.L. de C.V., and (b) 0.01% owned by Servicios NII, S. de R.L. de C.V.

99.99%
Prestadora de Servicios de Radiocomunicación, S. de R.L. de C.V. (Mexico)

Remaining 0.01% owned by Servicios NII, S. de R.L. de C.V.

99.99%
Servicios NII S. de R.L. de C.V. (Mexico)

Remaining 0.01% owned by Radiophone S. de R.L. de C.V.

98.77%
NII Telecom, S.R.L. de C.V. (Mexico)

Remaining ownership as follows: (a) 1.23 % owned by Radiophone, S. de R.L. de C.V., and (b) 0.002% owned by Servicios NII, S. de R.L. de C.V.

49% Series B Common Stock

Inversiones Nextel de México, S. de R.L. de C.V. (Mexico)

This is a limited foreign investment company. Remaining ownership as follows: (a) 51% Series A common stock owned by Banca Mifel, in its capacity as trustee, and (b) 100% of Series N shares owned by Comunicaciones Nextel de México, S.A. de C.V. Series N shares are limited voting and are not considered for the general ownership percentage.

99.14%
NII Digital, S. de R.L. de C.V. (Mexico)

Remaining ownership as follows: 0.86% by Comunicaciones Nextel de Mexico, S.A. de C.V., and each NII Mexico, LLC, and Servicios NII, S. de R.L. de C.V. own less than 0.001%

99.99%
Delta Comunicaciones Digitales, S. de R.L. de C.V. (Mexico)

Remaining 0.01% owned by Servicios NII, S. de R.L. de C.V.

Entities are 100% owned unless otherwise indicated.

**NII Holdings, Inc.**
Page 4 of 4
as of August 21, 2014

## Notes to the NII Legal Entities Chart

**NII Holdings, Inc.**
**Confidential &
Proprietary**

No changes were reported for this quarter.

Not for Profit Foundations:

Argentina:

Fundación Nextel para la Acción Comunitaria (NyC) – Nextel Communications Argentina, S.R.L. ("NCA") is the founding member of this not-for profit organization which is supported through contributions/donations from NCA's employees, third parties and NCA. NCA cannot sell any assets of NyC and in the event of the dissolution of NyC its remaining assets will be transferred to any other charitable entity pursuing the public benefit, with legal personality, with its principal office located in Argentina and with a valid tax exemption.

Brazil:

Instituto Nextel - Nextel Telecomunicações Ltda. is the founding member of Instituto Nextel, an NGO and not for profit organization supported by Nextel Telecomunicações Ltda. in partnership with other companies such as, Odontoprev (the Nextel dental plan provider), Sodexo (the Nextel food and transport voucher provider), among others. In the event of dissolution any assets will be transferred to similar registered foundations and cannot be distributed among the members of the Instituto Nextel.

Instituto Nextel Esporte e Cultura - Nextel Telecomunicações Ltda. is the founding member of Instituto Nextel Esporte e Cultura, an NGO and not for profit organization. In the event of dissolution any assets will be transferred to similar registered foundations and cannot be distributed among the members of the Instituto Nextel Esporte e Cultura.

## SCHEDULE 1

**Consolidated List of Creditors Holding Twenty Largest Unsecured Claims[1]**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the Debtors' twenty largest unsecured claims, on a consolidated basis, excluding claims of insiders as defined in section 101(31) of the Bankruptcy Code, according to the Debtors' books and records as of September 12, 2014.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 1. Wilmington Savings Fund Society, FSB | Wilmington Savings Fund Society, FSB 500 Delaware Avenue Wilmington, DE 19801 Attention: Patrick J. Healy, VP and Director Tel: 302-888-7420 Fax: 302-421-9137 Email: phealy@wsfsbank.com | Bond Debt - 7.625% Notes | | $1,500,674,479 |
| 2. Wilmington Trust, National Association as Trustee | Wilmington Trust, National Association as Trustee Rodney Square North 1100 North Market Street Wilmington, DE 19890 Attention: Joshua C. Jones, CCTS Tel: 302-636-6484 Fax: 302-636-4149 Email: jjones2@wilmingtontrust.com | Bond Debt - 11.375% Notes | | $961,728,125 |
| 3. Wilmington Savings Fund Society, FSB | Wilmington Savings Fund Society, FSB 500 Delaware Avenue Wilmington, DE 19801 Attention: Patrick J. Healy, VP and Director Tel: 302-888-7420 Fax: 302-421-9137 Email: phealy@wsfsbank.com | Bond Debt - 10% Notes | | $846,666,667 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Certain claims may be subject to offsets, rebates, discounts, reconciliations, credits and adjustments, which are not reflected on this schedule.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 4.  Wilmington Trust, National Association as Trustee | Wilmington Trust, National Association as Trustee<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890<br>Attention:  Joshua C. Jones, CCTS<br>Tel:  302-636-6484<br>Fax:  302-636-4149<br>Email:  jjones2@wilmingtontrust.com | Bond Debt - 7.875% Notes | | $732,746,875 |
| 5.  U.S. Bank National Association | U.S. Bank National Association<br>1420 Fifth Avenue, 7th Floor<br>Seattle, WA 98101<br>Attention:  Diana Jacobs, Vice President<br>Fax:  206-344-4694<br>Email:  diana.jacobs@usbank.com | Bond Debt - 8.875% Notes | | $511,093,750 |
| 6.  China Development Bank | China Development Bank Shenzhen Branch<br>No. 1093 Shennan Zhong Road, Shenzhen 518031<br>P. R. China<br>Attention:  Che Nan, Deputy Director Client Division II<br>Tel:  86-755-25942783<br>Fax:  86-755-25987725<br>Email:  chenan@cdb.cn | Guaranty | Contingent and Unliquidated | Undetermined |
| 7.  American Tower Do Brazil-Cessão De Infra-Estrutrua-LTDA | American Tower Do Brazil-Cessão De Infra-Estrutrua-LTDA<br>c/o American Tower Corporation<br>116 Huntington Avenue<br>Boston, MA 02116<br>Attention:  Ed Disanto<br>Tel:  617-375-7500<br>Fax:  617-375-7575 | Guaranty | Contingent and Unliquidated | Undetermined |
| 8.  Ericsson, Inc. | Ericsson, Inc.<br>Attn: Nina Macpherson, General Counsel<br>1300 E Woodfield Rd<br>Schaumburg, IL 60173<br>Tel:  847-619-6227<br>Fax:  972-583-2273 | Trade Debt | | $840,405 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 9.  American Express | American Express Company, Corporate Services Operations AESC-P 20022 North 31st Ave Mail Code AZ-08-03-11 Phoenix, AZ 85027 Attn:  Thomas Tierney, Senior Vice President Fax: 623-492-3884 | Trade Debt | | $52,903 |
| 10.  UBS Securities, LLC | UBS Securities, LLC 677 Washington Blvd Stamford, CT 06901 Tel:  203-719-3000 Fax:  203-719-1410 | Trade Debt | | $32,076 |
| 11.  Wilmington Trust, National Association as Trustee | Wilmington Trust, National Association as Trustee Rodney Square North 1100 North Market Street Wilmington, DE 19890 Attention:  Joshua C. Jones, CCTS Tel:  302-636-6484 Fax:  302-636-4149 Email:  jjones2@wilmingtontrust.com | Bond Debt - 2.875% Notes | | $23,082 |
| 12.  Verizon | Verizon 140 Water Street New York, NY 10007 Attn:  Randal S. Milch, General Counsel Tel:  212-395-1000 Fax:  212-571-1897 | Trade Debt | | $20,092 |
| 13.  Caten McGuire | Caten McGuire Reston Town Center, 11951 Freedom Drive - Suite 1300 Reston, VA 20190 Tel:  703-251-4485 Fax:  703-953-0565 | Trade Debt | | $14,656 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 14.  Amazon Web Services, Inc. | Amazon Web Services, Inc.<br>410 Terry Avenue North<br>Seattle, WA 98109<br>Attn:  Andrew Jassy, Senior Vice President - Web Services<br>Tel:  206-266-1000<br>Fax:  206-266-7010 | Trade Debt | | $8,135 |
| 15.  Tata Communications | Tata Communications<br>144 Rue Carrie-Derick<br>Montreal, Quebec<br>Canada H3C6W2<br>Tel:  514-868-7272<br>Fax:  514-868-7765 | Trade Debt | | $6,233 |
| 16.  Expesite, LLC | Expesite, LLC<br>Attn:  Van Goodrich, Chief Financial Officer<br>278 N 5th St<br>Columbus, OH 43215<br>Tel:  877-324-2604<br>Fax:  614-917-1101 | Trade Debt | | $3,914 |
| 17.  Concur Technologies | Concur Technologies<br>601 108th Ave NE, Suite 1000<br>Bellevue, WA 98004<br>Attn:  General Counsel<br>Tel:  425-590-5000<br>Fax:  425-590-5999 | Trade Debt | | $3,319 |
| 18.  Offix, LC | Offix, LLC<br>13525 Wellington Center Circle<br>Gainesville, VA 20155<br>Attn:  General Counsel<br>Tel:  703-530-1200<br>Fax:  203-530-8728 | Trade Debt | | $3,142 |
| 19.  Clearwater Analytics | Clearwater Analytics, LLC<br>950 W. Bannock Street<br>Boise, ID 83702<br>Attn:  David Boren, CEO<br>Tel:  208-918-2400<br>Fax:  208-343-2244 | Trade Debt | | $2,218 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 20.  Impact Office Products | Impact Office Products<br>6800 Distribution Dr<br>Beltsville, MD 20705<br>Attn:  Geary FitzPatrick, Executive Vice President<br>Tel:  240-542-1300<br>Fax:  240-542-1395<br>Email: gfitzpatrick@impactofficepro.com | Trade Debt | | $1,997 |

14-12611-scc    Doc 4    Filed 09/15/14    Entered 09/15/14 14:49:11    Main Document
Pg 60 of 73

## **SCHEDULE 2**

### **Five Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the Debtors' largest secured claims on a consolidated basis.[1]

| Creditor | Address | Principal Amount of Claim | Type of Collateral |
|---|---|---|---|
| Canon Financial Services | 158 Gaither Drive #200 Mt Laurel, NJ 08054 | Unknown | Equipment |

---

[1]      As of the Petition Date, the Debtors believe they have only one secured creditor.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

## SCHEDULE 3

### NII Holdings, Inc. Consolidated Balance Sheet as of June 30, 2014[1]
### (in thousands, except par values)
### (Unaudited)

| | June 30, 2014 |
|---|---|
| **ASSETS** | |
| **Current assets** | |
| Cash and cash equivalents | $ 814,023 |
| Short-term investments | 132,590 |
| Accounts receivable, less allowance for doubtful accounts of $66,200 and $61,293 | 485,185 |
| Handset and accessory inventory | 373,565 |
| Deferred income taxes, net | 98,671 |
| Prepaid expenses and other | 668,943 |
| Total current assets | 2,572,977 |
| **Property, plant and equipment, net** | 3,259,529 |
| **Intangible assets, net** | 1,019,548 |
| **Deferred income taxes, net** | 9,514 |
| **Other assets** | 577,218 |
| Total assets | $ 7,438,786 |
| **LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY** | |
| **Current liabilities** | |
| Accounts payable | $ 264,508 |
| Accrued expenses and other | 804,483 |
| Deferred revenues | 111,728 |
| Current portion of long-term debt | 5,555,298 |
| Deposits related to 2013 sale of towers | 725,611 |
| Total current liabilities | 7,461,628 |
| **Long-term debt** | 221,598 |
| **Deferred revenues** | 9,923 |
| **Deferred income tax liabilities** | 89,285 |
| **Other long-term liabilities** | 239,899 |
| Total liabilities | 8,022,333 |
| **Commitments and contingencies (Note 8)** | |
| **Stockholders' (deficit) equity** | |
| Undesignated preferred stock, par value $0.001, 10,000 shares authorized, no shares issued or outstanding | — |
| Common stock, par value $0.001, 600,000 shares authorized, 172,362 shares issued and outstanding — 2014, 172,105 shares issued and outstanding — 2013 | 172 |
| Paid-in capital | 1,511,845 |
| Accumulated deficit | (1,192,356) |
| Accumulated other comprehensive loss | (903,208) |
| Total stockholders' (deficit) equity | (583,547) |
| Total liabilities and stockholders' (deficit) equity | $ 7,438,786 |

---

[1]    This consolidated balance sheet for NII Holdings, Inc. includes both its debtor and non-debtor subsidiaries and affiliates.

## SCHEDULE 4

### Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of holders thereof.  The securities held by the Debtors' directors and officers are listed separately.

### NII Holdings, Inc. Common Stock

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common Stock, par value $0.001 | 172,363,259 | 131 | August 1, 2014 |

### NII Holdings, Inc. Common Stock Held by the Debtors' Non-Employee Directors[1]

| Name of Non-Employee Director | Number of Shares Owned | As of |
|---|---|---|
| Kevin Beebe | 58,657 | June 30, 2014 |
| Carolyn F. Katz | 80,936 | June 30, 2014 |
| Charles M. Herington | 49,936 | June 30, 2014 |
| Rosendo G. Parra | 44,936 | June 30, 2014 |
| Ricardo Knoepfelmacher | 24,407 | June 30, 2014 |
| John W. Risner | 63,436 | June 30, 2014 |
| Paulino do Rego Barros Jr. | 28,711 | June 30, 2014 |
| Donald Guthrie | 64,936 | June 30, 2014 |

[1] Includes stock owned and options to purchase stock, stock appreciation rights, deferred stock, restricted stock and phantom stock units held by non-employee directors.

### NII Holdings, Inc. Common Stock Held by the Debtors' Executive Officers[2]

| Name of Executive Officer | Number of Shares Owned | As of |
|---|---|---|
| Steven Shindler | 841,496 | June 30, 2014 |
| Gokul Hemmady | 247,844 | June 30, 2014 |
| Juan R. Figuereo | 121,361 | June 30, 2014 |
| Gary Begeman | 148,584 | June 30, 2014 |
| Raul Ramirez | 35,382 | June 30, 2014 |
| Dave Truzinski | 35,499 | June 30, 2014 |

### Public Notes[3]

| Description | Amount | Number of Holders | As of |
|---|---|---|---|
| 10% Senior Unsecured Notes due August 15, 2016 | $800 million | Unknown | June 30, 2014 |
| 8.875% Senior Unsecured Notes due December 15, 2019 | $500 million | Unknown | June 30, 2014 |
| 7.875% Senior Unsecured Notes due August 15, 2019 | $700 million | Unknown | June 30, 2014 |
| 11.375% Senior Unsecured Notes due August 15, 2019 | $900 million | Unknown | June 30, 2014 |
| 7.625% Senior Unsecured Notes due April 1, 2021 | $1.45 billion | Unknown | June 30, 2014 |

---

[2]     Includes stock owned and options to purchase stock, stock appreciation rights, deferred stock, restricted stock and phantom stock units held by the Debtors' executive officers.

[3]     The Debtors are unable to approximate the number of record holders of their publicly traded notes as only information regarding the registered holder, typically the depository company, is available.

## SCHEDULE 5

**Debtors' Property Not in the Debtors' Possession**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor or agent for such entity.

| Third Party | Property Description |
|---|---|
| Alvarez & Marsal, LLC | Retainer in the amount of $250,000 |
| Aspiro-TV | Prepaid Deposit in the amount of $121,600 |
| Astellia, Inc. | Prepaid Deposit in the amount of $66,667 |
| CORPTAX, INC | Prepaid Deposit in the amount of $39,137 |
| GOOGLE INC | Prepaid Deposit in the amount of $391,667 |
| Igloo, Inc. | Prepaid Deposit in the amount of $85,000 |
| JDA Software, Inc. | Prepaid Deposit in the amount of $66,000 |
| Jones Day | Retainer in the amount of $1,000,000 |
| McKinsey Recovery & Transformation Services | Retainer in the amount of $198,000 |
| Oracle America, Inc | Prepaid Deposit in the amount of $3,218,569 |
| Prime Clerk | Retainer in the amount of $25,000 |
| Qualcomm | Prepaid Deposit in the amount of $750,000 |
| Sungard Treas | Prepaid Deposit in the amount of $41,918 |
| The NASDAQ ST | Prepaid Deposit in the amount of $33,167 |
| Thomson Reuters (GRC) Inc. | Prepaid Deposit in the amount of $33,333 |
| UBM Techweb | Prepaid Deposit in the amount of $27,083 |
| Verticalnet Software, Inc. | Prepaid Deposit in the amount of $48,000 |
| VMWare Intern. | Prepaid Deposit in the amount of $112,067 |
| Webfilings LLC | Prepaid Deposit in the amount of $102,687 |
| Workday, Inc. | Prepaid Deposit in the amount of $333,311 |

## SCHEDULE 6

### Owned or Leased Properties

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their business.

| Address | Type of Interest | Description of Use |
|---|---|---|
| 1875 Explorer Street, Suite 1000, Reston, Virginia  20190 | Leased | Corporate Headquarters |
| One Freedom Square, 11951 Freedom Drive, Reston, Virginia | Leased | Sublet to third party; not utilized in the Debtors' business. |

## SCHEDULE 7

**Location of the Debtors' Substantial Assets and Books and Records
and Nature, Location and Value of Assets Held Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, location of their books and records, and the nature, location and value of assets held by the Debtors outside of the territorial limits of the United States.

Location of the Debtors' Substantial Assets in the United States:

Substantially all of the property, plant and equipment owned by the Debtors is located at the Debtors' corporate headquarters in Reston, Virginia.

The Debtors also maintain bank accounts with, among others, financial institutions at the following addresses:

- Barclays Wealth Management, 200 Park Avenue, New York, NY 10166, United States;

- Deutsche Bank Trust Company Americas, P.O. Box 318, Church Street Station, New York, NY 10008, United States.

- Deutsche Bank Securities, 345 Park Ave, Fl. 14, New York, NY, United States.

Books and Records

The Debtors' books and records are located at the corporate headquarters of NII Holdings, Inc., 1875 Explorer Street, Suite 1000, Reston, Virginia  20190.

Debtors' Assets Outside the United States

The Debtors' principal assets located outside of the United States include intercompany receivables owed from, and equity interests in, the Debtors' various non-debtor foreign affiliates.

NYI-4611316v1

## **SCHEDULE 8**

### **Litigation Potentially Resulting in Property Seizures**

      Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, the Debtors are not aware of any actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## SCHEDULE 9

### Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the  individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name / Position | Experience / Responsibilities |
|---|---|
| Steven Shindler<br><br>Chief Executive Officer | Steven Shindler is the chief executive officer of NII Holdings, Inc.  As chief executive officer, Mr. Shindler focuses on the company's strategic plans and priorities with the goal of maximizing NII's opportunities and long-term value of its stakeholders.<br><br>Mr. Shindler joined Nextel Communications, Inc. in 1996 as executive vice president and chief financial officer.  From 2000 to 2008, he served as chief executive officer for Nextel International, Inc., now NII.  He has been a member of NII's board of directors since 1997, serving as chairman from 2002 to May 2013.<br><br>Prior to joining Nextel, Mr. Shindler was managing director of communications finance at the Toronto Dominion Bank, one of the largest suppliers of capital to the wireless community.<br><br>Mr. Shindler is board chair of Worldfund, a US-based non-profit organization which aims to raise the quality and relevance of education in Latin America.  In April 2011, Worldfund honored him for his generous financial contributions.<br><br>Mr. Shindler earned a bachelor of arts in economics from the University of Michigan, and received a master of business administration from Cornell University. |
| Gokul Hemmady<br><br>Chief Operating Officer<br><br>President NII Brazil | Gokul Hemmady is chief operating officer (COO) of NII Holdings, Inc. and president of NII Brazil, where he provides strategic oversight and oversees the optimization of key business areas and the day-to-day operations in the market.<br><br>Mr. Hemmady, who has more than 26 years of experience in corporate finance, consulting, banking and international finance, was recognized in 2010 as Finance Executive of the Year at the prestigious International Business Awards for sound financial stewardship that was instrumental in producing strong financial performance at NII.<br><br>Before joining NII, Mr. Hemmady was vice president and chief financial officer of ADC Telecommunications, a provider of global network infrastructure and products and services, where he held financial leadership positions for ten years.  As CFO, Mr. Hemmady was a member of ADC's executive team and had direct responsibility for the company's controllership, treasury, taxation, investor relations, finance, and internal audit functions.  While at ADC, he also held the positions of controller, treasurer and managing director of ADC Ventures.  Prior to joining ADC in 1997, he held senior level international finance positions at US West, US West International and Citibank. |

| Name / Position | Experience / Responsibilities |
|---|---|
| | Mr. Hemmady received a Bachelor of Science degree in Commerce from the University of Bombay and is a member of the Institute of Chartered Accountants of India, which is equivalent to the title of certified public accountant. He also holds a Masters of Business Administration from the Yale School of Management. |
| Juan R. Figuereo<br><br>Executive Vice President, Chief Financial Officer | Juan Figuereo is the executive vice president and chief financial officer of NII Holdings, Inc. Mr. Figuereo is responsible for leading the overall financial management of the company, including financial planning, financial reporting, capital structure, taxation, investor relations, internal audit and corporate development.<br><br>Prior to joining NII, Mr. Figuereo served as executive vice president and chief financial officer at Newell Rubbermaid Inc., a global marketer of consumer and commercial products. During his tenure, he worked with the executive team to improve the company's profitability, expand its customer base globally and strengthen its balance sheet. Before serving at Newell Rubbermaid, Mr. Figuereo was executive vice president and chief financial officer of Cott Corporation, a publicly traded company and one of the world's largest manufacturers of private label soft drinks, where he was responsible for the finance function in addition to investor relations, strategic planning and information systems.<br><br>Mr. Figuereo also served as vice president of mergers and acquisitions at Wal-Mart International, where he helped the company become the top foreign retailer in China and also helped the retailer enter five new countries in Central America. He also served in a number of key international positions at PepsiCo, including vice president and managing director for Frito-Lay Dominican Republic, vice president of business integration for Frito-Lay Europe in London, vice president and chief financial officer of Frito-Lay South Europe in Barcelona, vice president and chief financial officer of Pepsi-Cola Bottling in Sao Paulo and vice president and chief financial officer of Pepsi-Cola Latin America. Mr. Figuereo began his career at Arthur Andersen & Co., in Miami, where he focused on banking, insurance and information systems consulting.<br><br>He holds a bachelor of business administration from Florida International University in Miami, completed the Executive Program in Marketing at Columbia University, and attended the Economics & Finance Program at London University. Mr. Figuereo is a native of the Dominican Republic who is fluent in English, Spanish and Portuguese. |
| Gary D. Begeman<br><br>Executive Vice President, General Counsel | Gary D. Begeman is the executive vice president and general counsel of NII Holdings, Inc. Mr. Begeman joined NII in November 2006 as vice president and deputy general counsel and was appointed general counsel in February 2007.<br><br>Prior to joining the NII team, Mr. Begeman served as senior vice president and deputy general counsel of Nextel Communications, Inc. from 2003 to 2005. Following Nextel's merger with Sprint in 2005, Mr. Begeman served as senior vice president and deputy general counsel of Sprint Nextel Corporation until 2006.<br><br>Mr. Begeman previously served as senior vice president and general counsel of XO Communications, a provider of competitive local telephone services from 1999 to 2003 and as vice president and deputy general counsel of |

| Name / Position | Experience / Responsibilities |
|---|---|
|  | Nextel Communications from 1997 to 1999.  Prior to his work with Nextel Communications, Mr. Begeman was a partner with the Jones Day law firm, where he focused on capital formation and merger and acquisition transactions.<br><br>Mr. Begeman is a graduate of the Ohio State University School of Law and the University of South Dakota, where he received a bachelor of fine arts in music education. |
| Salvador Alvarez<br><br>President, NII Mexico | Salvador Alvarez is President of Nextel de Mexico S.A. de C.V., a subsidiary of NII Holdings, Inc., where he is responsible for the management and operations of the Mexico market including all post sale customer support functions, which includes overseeing customer care, order fulfillment, and service and repair.<br><br>Prior to joining Nextel de Mexico, Mr. Alvarez served in a variety of leadership roles both in Latin America and internationally.  Most recently, he acted as the CEO of Maxcom, a fixed line telecommunications company in Mexico, from 2009 to 2013.  Prior to that, he was the CEO of Corporativo Corvi, a holding company for companies engaged in the distribution of groceries and merchandise in Mexico from 2003 to 2008.  He also served in various leadership roles at ConAgra foods both within Mexico and internationally from 1997 to 2003.<br><br>Mr. Alvarez holds a bachelor of science degree in Economics from the University Complutense in Madrid and also a post degree in Business Administration from the IPADE institute in Mexico. |
| Raul Ramirez<br><br>Executive Vice President, Chief Technology Officer | Raul Ramirez is executive vice president and chief technology officer of NII Holdings, Inc.  As the company's chief technology officer (CTO), Mr. Ramirez is responsible for the direction and management of the company's engineering and network operations.  His responsibilities also include network technology strategy and planning, including oversight of the implementation of next generation networks and services across all business markets.<br><br>Prior to joining the executive management team at NII Holdings, Mr. Ramirez was the chief technology officer of NII, a subsidiary of NII Holdings. In this role, he was instrumental in the development and deployment of NII Mexico's next generation network.  Mr. Ramirez joined NII Mexico in 1998 as a technical director and has helped build and grow the company's mobile network and IT operations across Mexico.<br><br>Prior to NII Mexico, Mr. Ramirez served as technical director of Motorola for its Latin America network operations.  In 1987, Mr. Ramirez received the National Telecommunication Award from the Secretary of Communications and Transportation.<br><br>Mr. Ramirez holds a bachelor's degree in communications and electronic engineering from the National Polytechnic Institute in Mexico. |
| David Truzinski<br><br>Executive Vice President, Chief Information Officer and Chief Digital Officer | David Truzinski is Executive Vice President, Chief Information Officer and Chief Digital Officer of NII Holdings, Inc.  In this role, Mr. Truzinski is responsible for leading critical global IT initiatives, as well as oversight and management of IT strategy and operational issues.<br><br>Prior to joining NII, Mr. Truzinski served as senior vice president and chief |

| Name / Position | Experience / Responsibilities |
|---|---|
| | information officer at Leap Wireless from 2007 to 2011 and chief information officer from 2007 to 2005.  At Leap, Mr. Truzinski transitioned the IT department into a strategic corporate partner, and he completed a full business systems transformation that spanned inventory, point of sale, supply chain, procurement and billing.<br><br>Prior to joining Leap, Mr. Truzinski was the chief information officer for Cingular/AT&T Wireless' International business, responsible for operations in Canada, the Caribbean and Taiwan. He also served as chief technology officer at ClickCollect, Inc. and as chief information officer at Insurancenow.com.  From 1989 to 1999, Mr. Truzinski served in a variety of leadership positions at AT&T Wireless/Cellular One.<br><br>Mr. Truzinski holds a bachelor of business administration from California State University in Sacramento. |
| Daniel E. Freiman<br><br>Treasurer, Vice President – Corporate Development & Investor Relations | Daniel E. Freiman is the Treasurer and Vice President of NII Holdings, Inc. In this role, Mr. Freiman is responsible for leading the company's treasury and investor relations functions, including activities related to raising capital, investment management, hedging, cash management, working capital and insurance risk management.<br><br>Prior to being appointed vice president and treasurer in 2008, Mr. Freiman served as vice president and controller of NII for three years, where he was responsible for the company's accounting and reporting functions, including the management of regular financial reporting requirements with the Securities and Exchange Commission, technical accounting, consolidation accounting, corporate accounting and internal reporting.<br><br>Mr. Freiman has 20 years of financial experience, including 14 years in the telecommunications industry.  Prior to joining the NII team in 2000, he was a manager in PricewaterhouseCoopers LLP's audit practice in Washington, D.C.<br><br>Mr. Freiman is a graduate of the University of Maryland at College Park, where he earned a bachelor of science in accounting and a master's of business administration with a concentration in finance. |

## SCHEDULE 10

### Payroll and Consultants

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

| | |
|---|---|
| **Gross Payments to Employees (Excluding Officers and Directors)**[1] | Week 1:  $0.00<br><br>Week 2: $(227,555)<br><br>Week 3:  $0.00<br><br>Week 4: $(227,555) |
| **Payments to Officers and Directors**[2] | Directors: $(221,135)<br><br>Officers: $(282,160)<br><br>Stockholders:  $0.00 |
| **Payments to Financial and Business Consultants**[3] | Rothschild: $(275,000)<br><br>A&M: $(559,000)<br><br>McKinsey: $(220,000)<br><br>Prime Clerk: $(20,000) |

---

[1]    These amounts do not include amounts disbursed for payroll taxes.

[2]    For purposes of this schedule, the Debtors' "Officers" are those individuals listed on Schedule 9 to this Declaration.

[3]    Amounts reported herein represent the Debtors' estimated liabilities for the fees and expenses of financial and business professionals to be retained under the Bankruptcy Code in these cases.  The Debtors do not expect to disperse cash in satisfaction of these liabilities within the first 30 days following the filing of these chapter 11 cases with the exception of Prime Clerk who may receive payment on account of certain amounts in normal course.

## SCHEDULE 11

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

      Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.  The amounts set forth exclude any disbursements to professionals.  The amounts set forth below could change substantially if any of the assumptions prove incorrect.

| | |
|---|---|
| **Cash Receipts** | $          321,103 |
| **Cash Disbursements** | $     (4,308,998) |
| **Net Cash Gain (Loss)** | $     (3,987,895) |
| **Estimated Unpaid Postpetition Obligations Accrued During First 30 Days** | $     (4,323,255) |
| **Estimated Unpaid Postpetition Receivables as of October 15, 2014** | $                    0 |