**Hearing Date and Time:  November 13, 2014 at 10:00 a.m. (ET)**
**Objection Deadline:  November 6, 2014 at 12:00 p.m. (ET)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

 - and –

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
: 
In re:                                                    :    Chapter 11
                                                              :
NII Holdings, Inc., <u>et al.</u>,[1]                       :    Case No. 14-12611 (SCC)
                                                              :
                            Debtors.          :    (Jointly Administered)
                                                              :
--------------------------------------------------------------x

### NOTICE OF MOTION FOR ORDER EXTENDING THE
### AUTOMATIC STAY TO CLAIMS AGAINST CERTAIN OF THE DEBTORS'
### OFFICERS PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE

---

[1]    The Debtors are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses):  NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); and NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1875 Explorer Street, Suite 1000, Reston, VA  20190.

**PLEASE TAKE NOTICE THAT:**

1.       A hearing on the Motion for an Order Extending the Automatic Stay to Claims Against Certain of the Debtors' Officers Pursuant to Sections 105 and 362 of the Bankruptcy Code (the "Motion") shall be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in courtroom 623, One Bowling Green, New York, New York 10004, on **November 13, 2014 at 10:00 a.m. (ET)**.

2.       Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York, must be filed with the Bankruptcy Court and must be served on:  (a) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:  Susan D. Golden, Esq. and Brian Masumoto, Esq.); (b) the Debtors, c/o NII Holdings, Inc., 1875 Explorer Street, Suite 1000, Reston, VA 20190 (Attn:  General Counsel); and (c) Jones Day, 222 East 41st Street, New York, NY 10017 (Attn:  Scott J. Greenberg, Esq. and George R. Howard, Esq.), not later than **12:00 p.m. (ET) on November 6, 2014** (the "Objection Deadline").

3.       If no objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Court an order substantially in the form attached to the Motion, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

    4.     Copies of the Motion may be obtained from the Court's website at

http://ecf.nysb.uscourts.gov or, free of charge, at http://cases.primeclerk.com/nii/.

Dated:  October 23, 2014
        New York, New York

Respectfully submitted,

   /s/  Lisa Laukitis
Scott J. Greenberg
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

- and -

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

  - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| -------------------------------------------------------------x | |
| In re: | Chapter 11 |
| NII Holdings, Inc., *et al.*,[1] | Case No. 14-12611 (SCC) |
|                Debtors. | (Jointly Administered) |
| -------------------------------------------------------------x | |

**MOTION FOR ORDER EXTENDING THE AUTOMATIC STAY**
**TO CLAIMS AGAINST CERTAIN OF THE DEBTORS' OFFICERS**
**PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE**

---

[1]    The Debtors are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses):  NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); and NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1875 Explorer Street, Suite 1000, Reston, VA  20190.

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

NII Holdings, Inc. ("NII Holdings") and twelve of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully

represent as follows:

**Background**

1.     On September 15, 2014 (the "Initial Petition Date"), certain of the Debtors

(the "Initial Debtors") commenced these cases by filing voluntary petitions for relief under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On October 8, 2014

(the "Subsequent Petition Date," and collectively with the Initial Petition Date, each a "Petition

Date"), four of the Initial Debtors' affiliates (the "Subsequent Debtors") also filed chapter 11

bankruptcy petitions in this District.  All of the Debtors' chapter 11 cases have been consolidated

for procedural purposes only and are being administered jointly.

2.     On September 29, 2014, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors,

pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.     The Initial Debtors are authorized to continue to operate their business and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

4.     NII Holdings is the ultimate parent and holding company for its debtor and

non-debtor affiliates (collectively, "NII").  Certain of the Debtors' non-debtor affiliates

(the "Operating Companies") provide wireless communication services under the Nextel™ brand

name for businesses and consumers in Latin America.

5.      NII Holdings is a public reporting company under Section 12(b) of the

Securities and Exchange Act of 1934.  NII Holdings' shares of common stock are publicly traded

under the symbol NIHD on the NASDAQ Global Select Market, and certain series of senior

notes issued by NII Holdings' subsidiaries that are guaranteed by NII Holdings have been

registered under the Securities Act of 1933.

6.      Additional information regarding the background of the Debtors, the

reasons for filing these cases and the Debtors' goals for these cases are set forth in the

Declaration of Daniel E. Freiman in Support of First Day Motions and in Accordance with Local

Bankruptcy Rule 1007-2 (the "Initial Freiman Declaration") [Docket No. 19] and the Declaration

of Daniel E. Freiman In Support of Motion of Debtors and Debtors in Possession for Entry of an

Order Pursuant to Section 105(a) of the Bankruptcy Code Making Certain Orders Entered in

Chapter 11 Cases of Affiliated Debtors Applicable to Recently Filed Cases and in Accordance

with Local Bankruptcy Rule 1007-2 (the "Subsequent Freiman Declaration") [Docket No. 76].

## Jurisdiction

7.      This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.      Pursuant to sections 105 and 362 of the Bankruptcy Code, the Debtors

hereby seek the entry of an order extending the automatic stay to claims asserted against two

current officers (one of whom is also a director) and one former officer of NII Holdings in the

Securities Litigation that is described below.

9.      Extending the automatic stay is necessary and appropriate here because

otherwise the burden of responding to discovery-related requests, the related costs that will be

borne by the Debtors' estates, and the distraction of some of NII Holdings' key personnel in

spending significant time participating in the defense of the Securities Litigation described below,

including its Chief Executive Officer and its Chief Operating Officer, who is also the President

of its Brazilian operating company, will seriously impair the Debtors' ability to reorganize.

### Basis for Relief

10.    NII Holdings is a defendant in a putative class-action securities litigation

that was filed before the Initial Petition Date in the United States District Court for the Eastern

District of Virginia (the "Securities Litigation").  Also named as defendants are Steven M.

Shindler, the current Chief Executive Officer and a member of the Board of Directors of NII

Holdings; Gokul Hemmady, the current Chief Operating Officer of NII Holdings and President

of its Brazilian operating subsidiary; and Steven P. Dussek, who was formerly the Chief

Executive Officer and a member of the Board of Directors of NII Holdings (collectively,

the "Officers").  The Securities Litigation is styled In re NII Holdings, Inc. Securities Litigation,

No. 14-CV-227.

11.    In the Securities Litigation, the lead plaintiffs, on behalf of a purported

class of persons and entities that acquired the securities of NII Holdings and NII Capital Corp.,

another Debtor in these cases, allege that NII Holdings and the Officers violated Sections 10(b)

of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated under the

Exchange Act, and Section 20(a) of the Exchange Act (the "Securities Claims").[2]  The Securities

Claims allege false and misleading statements and omissions by NII Holdings and the Officers

about, among other things, NII's efforts to transition from its then-existing second generation

---

[2]    A copy of the Second Amended Complaint filed in the Securities Litigation is attached as
Exhibit A.

("2G") wireless network to a third generation ("3G") wireless platform beginning in 2009.  The

Securities Claims allege that NII Holdings and the Officers made false statements throughout the

putative class period of February 25, 2010 through February 27, 2014.

12.     Before the Initial Petition Date, NII Holdings and the Officers moved to

dismiss the Securities Claims.  On October 6, 2014, District Court Judge Leonie M. Brinkema

denied the motion to dismiss.[3]  In the order, Judge Brinkema did not narrow or limit any of the

Securities Claims.  As of the Initial Petition Date, the Securities Claims against NII Holdings

have been stayed pursuant to section 362(a) of the Bankruptcy Code.  However, the Securities

Claims against the Officers have not been stayed.

13.     The Securities Litigation is pending in the Alexandria Division of the

Eastern District of Virginia, which is sometimes known as the "Rocket Docket."  The standard

period for completing all discovery in the Eastern District of Virginia is four months.[4]  To be

sure, given the complexities of the Securities Litigation, the period for discovery will have to be

longer than four months, but will still be compressed compared the time allowed for discovery in

comparable cases in other district courts.  Plaintiffs and the Officers in the Securities Litigation

will hold their discovery conference pursuant to Fed. R. Civ. P. 26(f) imminently.

14.     Extension of the stay to the Officers is appropriate in these chapter 11

cases for two reasons.  First, the continued prosecution of the Securities Litigation against the

Officers will significantly burden and distract the current Officers and other key employees of

the Debtors who are directly involved in the Debtors' efforts to reorganize.  Second, the

---

[3]     A copy of the order denying the motion to dismiss in the Securities Litigation is attached as
Exhibit B.

[4]     A copy of an order in the Securities Litigation reflecting this standard four-month period is
attached as Exhibit C. The court subsequently vacated this order at the request of the parties.

continued prosecution of the Securities Litigation against the Officers and the burden of

responding to the accompanying discovery requests that almost certainly will be made to the

Debtors and the Officers could impose considerable direct and indirect costs on the Debtors'

estates and have a substantial detrimental effect on the Debtors' ability to reorganize.

Accordingly, the Debtors seek authority to extend the automatic stay to the Officers.

<u>**Argument**</u>

15.    Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court

may authorize the extension of the automatic stay to the Officers.  Courts may extend protections

to non-debtors when extension of the stay is critical to promoting the debtor's successful

reorganization.  See <u>In re United Health Care Org.</u>, 210 B.R. 228, 232 (S.D.N.Y. 1997) ("[N]on-

debtors may be protected by the automatic stay . . . if it contributes to the debtor's efforts to

achieve rehabilitation.");  <u>In re S.I. Acquisition, Inc.</u>, 817 F.2d 1142, 1147 (5th Cir. 1987)

("[C]ourts have reasoned that a nonbankrupt codefendant may be protected by the automatic stay

of section 362(a)(1) if extension of the stay contributes to the debtor's efforts of

rehabilitation . . . .");  <u>cf.</u> <u>Fid. Mortg. Investors v. Camelia Builders, Inc.</u>, 550 F.2d 47, 55 (2d Cir.

1976),  <u>cert. denied</u>, 430 U.S. 976 (1977) (holding that the purpose of the automatic stay is to

protect the debtor from its creditors and to permit time to formulate a workable plan of

reorganization and payment).

16.    Consistent with this rationale, courts have extended the automatic stay to

non-debtor third-parties when actions against them would have a significant impact on the

debtor's reorganization efforts.  See, <u>e.g.</u>, <u>In re Johns-Manville Corp.</u>, 26 B.R. 420, 425–26

(Bankr. S.D.N.Y. 1983) (noting that the stay should be extended to actions where the

continuation of such actions against related entities or persons would interfere with the debtor's

chances for a successful reorganization);  <u>see also</u> <u>W.R. Grace & Co. v. Chakarian (In re W.R.</u>

Grace & Co.), No. 01-01139 (JKF), 2004 Bankr. LEXIS 579, at *12–13 (Bankr. D. Del. April 29, 2004) (enforcing the automatic stay on a third-party action where such action would have a direct effect on the reorganization proceedings of the debtor).

## A.    Distraction of Key Personnel of the Debtors

17.    Unless the automatic stay is extended to cover the claims asserted against the Officers in the Securities Litigation, the current Officers and other key personnel of the Debtors will spend significant time and energy responding to the expected discovery requests and will be distracted from the critical task of accomplishing a successful reorganization.  Courts have found that extending protections to third-party actions is proper when such actions would harm the debtor's ability to reorganize by distracting the debtor's personnel and diverting their attention from the debtor's reorganization strategy.  See In re North Star Contracting Corp., 125 B.R. 368, 371 (S.D.N.Y. 1991) (finding that the debtor's reorganization efforts would be harmed if an action was allowed to proceed against the debtor's president where the president was key to the corporation's reorganization process and fulfilled a critical role in formulating the debtor's reorganization strategy); Johns-Manville, 26 B.R. at 426 (noting that extension of the stay was appropriate to actions against the debtor's key personnel where the massive drain on these individuals' time and energy at the crucial hour of plan formulation could frustrate, if not doom, the debtor's vital efforts at formulating a fair and equitable plan of reorganization); United Health Care, 210 B.R. at 232 (finding that the debtor would suffer harm where allowing an action to proceed against a non-debtor would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort); S.I. Acquisition, 817 F.2d at 1154 (staying an action against nonbankrupt defendants where the debtor's control persons' "time and efforts in revamping [the debtor] in bankruptcy would be restricted" by virtue of their involvement in defending such action).

18.     Here, as the Court is aware, the Debtors and their key employees and advisors have spent the last several months in nearly constant negotiations with their stakeholders to reach a consensual plan of reorganization that would allow the Debtors to emerge from bankruptcy.  These efforts did not result in an agreement before the Petition Date, and the demands of negotiating have only increased, with the Debtors' employees and advisors working tirelessly since the Petition Date to reach an agreement with the Debtors' various creditor constituencies.  As the Debtors and their counsel have advised this Court, exiting these chapter 11 cases as quickly as possible is critical due to the Debtors' limited liquidity.

19.     Further complicating these efforts is the addition of more creditor groups and other participants to the negotiation process, including the Creditors' Committee appointed in these cases and a recently formed splinter group of holders of notes issued by NII International Telecom S.C.A., each of which has its own counsel and financial advisor.  Each of these newly formed bodies has sought meetings with the Debtors' management to discuss in detail the Debtors' business plan and potential restructuring alternatives.  These meetings are ongoing and expected to continue to occur in the coming weeks, and are in addition to similar meetings that the Debtors' senior management team will continue to have with two ad hoc groups of noteholders who have been involved in the process for several months.

20.     Mr. Shindler, the Debtors' Chief Executive Officer, has played an active and integral role in these negotiations and has personally attended most of the in-person negotiations with the various creditor groups, often traveling from NII's headquarters in Reston, Virginia to New York, where most of the creditor meetings have occurred.  In addition, Mr. Shindler fields phone calls almost daily from representatives of the Debtors' largest noteholders to discuss both operational issues and recent developments relevant to the Debtors'

efforts to reorganize. There is no question that the negotiations have required a significant amount of his time and attention and will continue to require his substantial focus if they are to be successful.

21.     Mr. Hemmady, in addition to his role as Chief Operating Officer, is also the President of the Debtors' Brazilian operations, which are a cornerstone of any reorganization. Mr. Hemmady has also been involved in responding to the extensive information requests received from the Debtors' stakeholders and has participated in multiple presentations about the Debtors' business plan. In addition, he has had in-person meetings in the United States and Brazil with representatives of some of the Debtors' largest stakeholders to discuss the performance and prospects of the Debtors' business. In fact, Mr. Hemmady was recently asked, once again, to take time away from his critical role as the leader of the Brazilian operations to prepare for and present at a meeting with the Creditors' Committee and their advisors on the Debtors' business plan and operations. As the person responsible for the Debtors' largest market, Mr. Hemmady carries a heavy burden from not only these chapter 11 cases but also his day-to-day responsibilities.

22.     The Debtors simply cannot afford to have two of their most essential leaders distracted by their role as defendants in the Securities Litigation. As it stands, they are filling multiple roles for the Company as they strive to turn around and improve the Debtors' operations, maximize the value of the estate for the benefit of all creditors, and participate in negotiations toward a consensual reorganization. Participation in discovery related to the Securities Litigation, as well as the strain and distraction of defending against those claims, would no doubt have a hugely detrimental effect on the Debtors' ability to reorganize.

B.     Burdens on and Costs to the Estates

23.     If the Securities Litigation is permitted to proceed against the Officers, there is a significant possibility that the discovery process could impose substantial burdens and costs on the Debtors.  Courts have extended the automatic stay to non-debtor defendants to avoid the irreparable harm to the debtor that is caused by tying up a debtor, its executives, and its employees in costly and time-consuming discovery requests.  See, e.g., In re Zenith Labs., Inc., 104 B.R. 659, 665 (D.N.J. 1989) (affirming the bankruptcy court's order to stay shareholder actions against non-debtor codefendants where extensive discovery would impair focus on the important business of getting the debtor back on its feet); see also In re Cont'l Airlines, 177 B.R. 475, 480–81 (D. Del. 1993) (affirming the bankruptcy court's determination that the stay applied to actions against the debtor's directors where discovery in those actions would impose burdens on both the debtor and its directors, and defense of the actions would substantially detract from the directors' reorganization efforts and would hinder the debtor's ability to emerge successfully from bankruptcy).

24.     The same concern holds true here.  The putative class-action complaint in the Securities Litigation is sprawling in length and scope.  At 126 pages, it contains 383 paragraphs of allegations about dozens of public statements by NII Holdings and the Officers over a four-year period in numerous SEC filings, financial disclosures, press releases, and conference calls with investors.  The allegations focus on the expansive topic of the Debtors' efforts to develop and implement plans to build a 3G network that would support NII's distinctive "push-to-talk" wireless telephone service and wireless Internet services in Brazil, Mexico, Argentina, Chile, and Peru (the "Market Countries").  This effort to replace NII's 2G network was a massive technical, logistical, and financial undertaking.  Indeed, work relating to this project was done by scores of employees in a host of different departments in NII Holdings

and other Debtors working in multiple countries, including the United States and the Market

Countries.

25.    Given the scope of the allegations, the plaintiffs' discovery requests in the

Securities Litigation will undoubtedly be extremely broad.  No discovery requests have yet been

served, but based on the sheer breadth and scope of the complaint, it is likely that the plaintiffs

will seek email correspondence, presentations, draft disclosures, transaction documents, board

materials, policy documents, and internal memos relating to a variety of topics, including but not

limited to:

- NII's technological development and rollout of the 3G network in the Market Countries;

- NII's laboratory and field testing of the 3G network in the Market Countries;

- Any problems and delays with the rollout of the 3G network in the Market Countries and NII's efforts to resolve them;

- NII's credit and subscriber retention policies in the Market Countries;

- NII's marketing strategies and promotions in the Market Countries;

- Data and analyses concerning subscriber de-activations and migrations from one technology to another;

- NII's activities to retain existing customers in the Market Countries; and

- NII's calculation of financial and operational metrics, such as subscriber churn, for each of the Market Countries and across the entire company.

26.    Despite the stay of the proceedings against the Debtors, it is hard to

imagine how meaningful discovery could proceed in the Securities Litigation if it continues

against the Officers without the substantial involvement of the Debtors and their employees,

since the vast majority of the information relevant to the claims and necessary to the Officers'

defense is within documents in the Debtors' control, and over which the Debtors alone may

assert privileges.  Absent a stay extension to the Officers, expenses related to Debtors' response

to discovery requests (including fees of outside counsel and vendors who will be called upon to

assist the Debtors in preparing those responses) could be borne by the Debtors and could

significantly drain the Debtors' estate.[5]  Identifying relevant custodians and non-custodial

sources of the requested information, and collecting the relevant documents from those sources,

is an arduous and expensive task that requires the help of outside lawyers and vendors.  It entails

searching email systems, imaging hard drives, copying shared and personal network drives, and

collecting hard-copy documents.  And it is complicated by the fact that custodians and

documents relevant to the Securities Litigation are spread across NII's offices in North America,

Central America, and South America.

27.     The cost of retrieving and processing relevant documents from scores of

sources in multiple countries is substantial.  Additionally, hosting the documents in a central

repository and ultimately producing the responsive materials requires the use of outside vendors.

In the end, collecting, processing, hosting, and producing the volume of documents that the

plaintiffs will likely request (which could number in the millions) would typically take as much

as six months or more.

28.     In addition to collecting and processing the documents, the Debtors would

have to engage attorneys to review them for responsiveness, redact privileged information, and

create logs for documents withheld based on privilege or work-product protection.  Many of the

responsive documents will be in foreign languages, so Spanish- and Portuguese-speaking

attorneys also would need to be engaged, and translations of the documents may be necessary,

---

[5]     The Debtors, of course, reserve the right to oppose any efforts by the plaintiffs in the Securities
Litigation to obtain third-party discovery from the Debtors.  See, e.g., In re Residential Capital,
LLC, 480 B.R. 529 (Bankr. S.D.N.Y. 2012).

again at the Debtors' expense.  The time required to review and produce the documents depends

on the scope of the discovery requests and the volume of documents collected, but Debtors

estimate that such a production would normally take another six months or more.  Along the way,

there could be disputes about the scope of the documents that need to be produced, which would

need to be presented to the trial court for resolution.

29.    Although the above estimates contemplate as long as a year for document

production, it is unlikely that the district court in the Securities Litigation will afford the parties

that long.  Compression of the schedule for production will result in a corresponding increase in

the cost and burden of any document production on the Debtors.

30.    Once the Debtors produce the documents, they will also have to expend

additional legal fees to defend current and former officers, directors, and employees at

depositions.  All in all, if the stay is not extended to the Officers, responding to discovery in the

Securities Litigation will be a costly, months-long process that will put enormous financial stress

and burden on the Debtors and substantially deplete the Debtors' estate.

31.    In addition to the out-of-pocket costs associated with responding to

discovery requests, the Debtors will also suffer substantial indirect costs from lost employee time

and productivity if the Securities Litigation against the Officers is not stayed.  For example,

coordinating the collection and processing of millions of documents puts enormous stress on the

Debtors' IT department and IT infrastructure, which disrupts the Debtors' operations and

personnel significantly.  Managing the logistics of document collection requires extensive

communications with outside vendors and lawyers, as well as with the employees whose

information is being collected, including, in some instances, the translation of those

communications.  Depositions require the Debtors' employees, officers, and directors to take

time away from work to testify.  Moreover, studying the key documents and preparing to testify require each witness to meet with lawyers at multiple meetings over several days.  All of this will cause the Debtors to suffer from lost employee productivity at a time when they can least afford it.

32.    This harm is particularly acute here where the Debtors have recently made significant reductions in staff, resulting in fewer employees being available to handle the burdensome tasks of responding to discovery requests.  As the Court is aware, the Debtors have reduced their employee headcount from over 300 employees to just 70 employees as of the Petition Date.  These employees are overloaded with the demands of operating a business while it undergoes a chapter 11 case and supporting the efforts to reorganize.  In fact, the Debtors' employees already spent much of their summer responding to voluminous due diligence requests from both the Majority Noteholder Committee, as well as a group of minority holders of NII Capital notes led by Aurelius Capital Management.  Most recently, the Debtors received an extensive due diligence request from counsel for the Creditors' Committee that the Debtors estimate will take weeks to respond to and could result in the review and production of hundreds of thousands of pages of documents.  In the end, all of the Debtors' resources and personnel must be focused on formulating and confirming a plan of reorganization and not lost on responding to burdensome discovery requests that are not related to the success of the reorganization—or else there will be substantial costs that harm the Debtors and their estates, or worse, impair the Debtors' ability to successfully confirm a chapter 11 plan.

33.    The aforementioned costs and burdens would still apply in equal measure if the stay were extended to the Securities Claims against only the two current Officers, but not the third Officer (former Chief Executive Officer Steven Dussek).  Indeed, issues of document

production, privilege protection, and legal expense would all place a tremendous burden on the

Debtors if the Securities Litigation were to proceed against Mr. Dussek.

34.    Accordingly, the extension of the automatic stay to the Officers for the

Securities Claims is appropriate and in the best interests of the Debtors, their estates, and their

creditors, and will maximize the value of the Debtors' estates.

35.    For all of the foregoing reasons, the Debtors request that this Court

approve an extension of the automatic stay to the Debtors' Officers.

### Notice

36.    No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this Motion has been provided to:  (a) U.S. Trustee; (b) counsel to the Creditors'

Committee; (c) U.S. Bank National Association, solely in its capacity as the trustee under the

indenture governing those certain 8.875% senior unsecured notes due in 2019; (d) counsel to the

ad hoc group of majority holders of the senior unsecured notes issued by the Debtors; (e) counsel

to the ad hoc group of minority holders of the senior unsecured notes issued by the Debtors; (f)

counsel to the ad hoc group of holders of the senior unsecured notes issued by NII International

Telecom S.C.A.; (g) counsel to the plaintiffs in the Securities Litigation; and (h) all parties that

have filed a request for notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no

other or further notice need be provided.

### No Prior Request

37.    No prior request for the relief sought in this Motion has been made to this

or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter an order substantially in the form attached hereto as Exhibit D, granting the relief requested herein; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  October 23, 2014
　　　　New York, New York

Respectfully submitted,


  /s/  Lisa Laukitis
Scott J. Greenberg
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

 - and -

David G. Heiman
Carl E. Black
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

## **EXHIBIT A**

NYI-524619316v1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE NII HOLDINGS, INC.<br>SECURITIES LITIGATION | Case No. 1:14-cv-00227-LMB-JFA |
| | **DEMAND FOR JURY TRIAL** |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

July 18, 2014

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................... 7

III. PARTIES ............................................................................................................ 8

    A. Plaintiffs ..................................................................................................... 8

        1. Lead Plaintiffs ..................................................................................... 8

        2. Additional Plaintiff .......................................................................... 10

    B. Defendants ............................................................................................... 11

        1. The Company .................................................................................... 11

        2. The Individual Defendants ................................................................ 11

    C. Relevant Non-Parties .............................................................................. 11

IV.  SUBSTANTIVE ALLEGATIONS .................................................................. 13

    A. Company Background ............................................................................. 13

    B. To Address Its iDEN Technology Becoming Obsolete, NII Attempted
       To Rapidly Transition PTT Technology .................................................. 14

    C. Defendants Concealed That NII's Roll-Out Of Its "High Performance"
       3G-PTT Network In Peru Was Failing ................................................... 16

    D. Delays In Developing And Deploying 3G Networks In Latin America
       Result In NII Losing Customers .............................................................. 19

        1. *Nextel Peru's Staged 3G Launch Fails* ............................................ 19

        2. *Delays In Nextel Brazil's Launch Of 3G Left NII Open To
           Increased Competitor Pressure* .......................................................... 25

        3. *Nextel Mexico Loses Hundreds Of Thousands Of Subscribers To
           Competitors Because It Could Not Successfully Migrate iDen
           Subscribers To 3G* ............................................................................. 27

    E. Without 3G, NII Resorts To Disclosing Misleading Metrics To
       Maintain The Façade Of Financial Health And Future Profitability .......... 29

F.  NII Continued The Strategy To Target Less Credit Worthy
Subscribers,  While Defendants Assured Investors NII Had Changed
Strategy .......................................................................................................... 31

G.  NII's Marketing Policy (The "Steve Dussek Special") Was Designed
to Artificially Meet Gross Subscriber Addition Targets............................... 34

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................... 36

A.  NII's 4Q 2009 and FY 2009 Financial and Operational Results............... 36

B.  NII's 1Q 2010 Financial and Operational Results..................................... 41

C.  NII's 2Q 2010 Financial and Operational Results..................................... 45

D.  NII's 3Q 2010 Financial and Operational Results..................................... 49

E.  NII's 4Q 2010 and FY 2010 Financial and Operational Results............... 54

F.  NII's 1Q 2011 Financial and Operational Results and Peru Investor
Day.............................................................................................................. 59

G.  NII's 2Q 2011 Financial and Operational Results..................................... 63

H.  NII's Press Release Announcing Nextel Peru's Re-Launch of 3G-PTT ................... 67

I.  NII's 3Q 2011 Financial and Operational Results..................................... 68

J.  NII's 4Q 2011 and FY 2011 Financial and Operational Results............... 72

K.  NII's 1Q 2012 Financial and Operational Results..................................... 76

L.  NII's 2Q 2012 Financial and Operational Results..................................... 78

M.  NII's 3Q 2012 Financial and Operational Results..................................... 80

N.  NII's 4Q 2012 and FY 2012 Financial and Operational Results............... 83

O.  Statements Concerning NII's and Nextel Mexico's Response to the
Shutdown of the US iDEN Network............................................................ 84

VI.  THE TRUTH BEGINS TO EMERGE .......................................................................... 88

VII.  ADDITIONAL INDICIA OF SCIENTER ..................................................................... 99

VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE ARE INAPPLICABLE................................................................................ 103

IX.  LOSS CAUSATION..................................................................................................... 104

X.   CONTROL PERSON ALLEGATIONS.................................................................... 105

XI.   CLASS ACTION ALLEGATIONS ................................................................... 106

XII.  LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF
     RELIANCE............................................................................................................. 108

XIII. CAUSES OF ACTION ............................................................................................ 110

    COUNT I  For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against NII........................................................................ 110

    COUNT II  For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against the Individual Defendants Steve P. Dussek, Steven
    M. Shindler, and Gokul Hemmady ........................................................................... 114

    COUNT III  For Violations of Section 20(a) of the Exchange Act Against the
    Individual Defendants Steven P. Dussek, Steven M. Shindler, and Gokul Hemmady119

XIV. PRAYER FOR RELIEF ......................................................................................... 120

Court-appointed Lead Plaintiffs Danica, Industriens, Operating Engineers Pension Trust Fund, IBEW Local No. 58 / SMC NECA Funds, Jacksonville P&F (as defined fully below) (together, "Plaintiffs"), by and through their undersigned counsel, allege the following individually and on behalf of a class of all persons and entities who purchased or otherwise acquired the securities of NII Holdings, Inc. ("NII" or the "Company") and NII Capital Corp. ("NII Capital"), a wholly owned subsidiary of the Company, between February 25, 2010 and February 27, 2014, inclusive (the "Class Period" and the "Class," as further defined herein), upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by NII, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and its operating businesses, media reports about the Company, and other publicly available information concerning NII and the Individual Defendants (as defined herein), as well as interviews with former NII employees and internal NII documents provided by former NII employees. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      In 2009, NII, one of the world's leading providers of fully integrated mobile communication services, embarked on a major corporate shift in Latin America from reliance on an outdated, obsolete telecommunications network to a network based on a more modern technology that purportedly would be able to support NII's services and higher speed data availability, referred to as "3G" connectivity. This case concerns Defendants' materially false

and misleading statements relating to NII's purportedly successful and profitable transition to 3G in Latin America.

2.      As of 2006, NII had anchored its foothold in the Latin American wireless market through its push-to-talk ("PTT") communication feature – a service option designed to enable subscribers to use their phones as walkie-talkies with unlimited range.  The Company heavily marketed PTT, hoping subscribers would become so accustomed to the distinctive feature that they would not consider leaving for a competitor's service.

3.      Before the Class Period, PTT service operated exclusively on an Integrated Digital Enhanced Network ("iDEN"), a proprietary technology created by Motorola, Inc. ("Motorola").   Similar to NII's services in Latin America, Nextel Communications, Inc. ("Nextel Communications") – an unrelated entity – offered the PTT feature utilizing iDEN technology in the United States.  The sheer volume of Nextel Communications' iDEN purchases from Motorola provided the Company with comfort that Motorola would continue to develop and maintain the iDEN technology into the foreseeable future, even though it was less cost effective than non-proprietary technologies such as third generation ("3G") and Wide-band Code Division Multiple Access ("WCDMA").

4.      By 2008, however, NII faced mounting obstacles concerning its reliance on PTT as the Company's linchpin service in Latin America.  Nextel Communications merged with Sprint Corp. ("Sprint") in 2005.  Although the combined company continued to operate PTT service utilizing Motorola's iDEN technology, industry analysts began to observe that PTT's popularity was declining in the United States.   Indeed, analysts opined that Sprint could potentially terminate its use of the costlier iDEN services by 2010.  Likewise, without Sprint's

- 2 -

long-term commitment as a buyer, Motorola would no longer be incentivized to develop and maintain iDEN technology.

5.     Potential extinction of iDEN technology posed a grave threat to NII and its PTT service.  Thus, the Company's continued success and profitability in Latin America hinged on NII's ability to quickly and efficiently transition PTT and its other services to an alternative network.  By 2009, the Company had launched an aggressive transition to a network based on WCDMA technology that purportedly would be able to support PTT services and higher speed data availability, referred to as 3G connectivity.  The Defendants described the move to 3G-PTT as their "value proposition."

6.     NII designed its roll-out of 3G services to occur in stages.  Because Mexico and Brazil were the Company's largest markets, NII tested and subsequently launched its new 3G network and services in Peru first – a smaller, seemingly more manageable market – beginning in December 2009.  As they told investors, Defendants knew that a successful and efficient deployment of a 3G network and services in Peru would pave the way for the all-important roll-outs in Brazil and Mexico, in 2012.  Indeed, NII deemed the roll-out of its 3G network in Peru to be critical to the Company's ability to ultimately launch 3G services in Mexico and Brazil, which historically accounted for 80% of the Company's revenues.  Investors and analysts alike closely monitored NII's testing and roll-out of 3G services in Peru as a bellwether of the likelihood of success for similar launches in Mexico and Brazil.

7.     Against this backdrop, this Action arises out of Defendants' pattern of material misstatements and omissions designed to convince investors that NII's transition to 3G was progressing successfully, the Company was financially healthy, and the Company's future

profitability remained bright. To the contrary, Defendants knew that NII's attempts at transitioning to 3G suffered numerous failures and deficiencies from the start.

8. Rather than disclose these significant setbacks to the Company's new business model and risk, Defendants employed a number of tactics to hide the problems from investors because Defendants were focused on raising capital to fund NII's expensive transition to 3G. These tactics distorted investors' understanding of the relative success of NII's ongoing 3G transition, downplaying the significance of technical and operational problems that NII experienced in Peru, as well as problems associated with obtaining and maintaining high-quality subscribers.

9. In particular, the roll-out in Peru – NII's primary testing ground – experienced a myriad of problems and adverse results. NII knew that in order to maintain its existing PTT customers and add new subscribers, PTT would have to work on 3G in a way that was nearly indistinguishable from PTT on the old iDEN system. From the outset, however, PTT on 3G performed terribly.

10. Among other things, NII's PTT communications on 3G experienced major delays or slowness – also known as "latency" – dropped calls, and connectivity disruptions. While Defendants repeatedly told investors that the Company had solved these latency issues and other problems, and that PTT in Peru was performing as well on 3G as on the old iDEN system, the truth was the opposite. Indeed, the latency problems were so prevalent and severe that existing subscribers left NII in droves in late 2011 and early 2012. Many new subscribers and subscribers who had upgraded to 3G returned their NII phones within 30 days. Performance was so bad that NII employees in Peru did not even want to continue to sell the Company's phones and service because customers concluded the phones were, essentially, useless. In short, the roll-

out of 3G-PTT in Peru was abysmal, foreshadowing failure in the Company's other Latin American markets, as well as undermining any reasonable expectation that NII's transition to 3G would ultimately be successful. Defendants, however, concealed the failure of their network.

11. In NII's industry, analysts and investors placed great importance on a company's "churn" rate – the proportion of contractual customers or subscribers who leave a supplier during a given time period. During the Class Period, while Defendants publicly disclosed NII's "reported" churn rate, they secretly tracked the "actual" churn rate, which vividly demonstrated the extent of the technical and operational problems with the roll-out of 3G services in Peru. Unlike the "reported" churn rate, the "actual" churn rate included certain additional subscriber categories, including 3G-PTT subscribers who (i) deactivated new plans within 30 days due to dissatisfaction or (ii) downgraded their plans from 3G to 2G, while remaining NII customers. Significantly, Defendants utilized the "actual" churn rate to track "adverse impacts on profitability," service problems, true defection from 3G, and average revenue per user ("ARPU"). Defendants' failure to disclose this metric to investors was all the more egregious given that at relevant times "actual" churn for Peru's 3G-PTT service was 1,000% percent greater than the "reported" churn for that same service. Rather than reveal the "actual" churn, Defendants concealed adverse subscriber metrics while making glowing statements about the 3G roll-out in Peru, expressly highlighting customer satisfaction and acceptance of the new 3G network.

12. Defendants further manipulated the Company's publicly reported churn rates during the Class Period. In Brazil, Defendants developed a secret policy to artificially keep the reported churn rate at below 1.5%. Specifically, management tracked delinquent accounts and intentionally did not deactivate those subscribers if doing so would cause Brazil's reported churn

rate to exceed the cap of 1.5%. Thus, NII's reported churn rates were artificially depressed for much of the Class Period, again masking the problems and difficulties the Company was experiencing in transitioning to 3G.

13.     Defendants also employed undisclosed marketing and credit strategies to keep the Company's reported churn rate from revealing NII's struggles. For example, Defendants utilized what was termed internally as the "Steve Dussek Special" in Peru (Defendant Dussek served as NII's CEO during the Class Period), which consisted of special marketing promotions aimed at artificially boosting quarter-end gross subscriber addition numbers. Based on targets set by Dussek, the "Steve Dussek Special" was engineered to be aggressive to achieve the gross addition target number. These quarter-end marketing specials attracted impulse buyers looking for a deal, which meant that after the Company claimed these subscribers in its gross addition numbers, many of them subsequently deactivated their accounts. In addition, the temporary Peruvian subscribers who returned their phones within 30 days (internally referred to as offset gross additions) would be included as part of the quarter-end gross subscriber addition numbers on investor calls, yet were omitted from the "reported" churn rate (despite being tracked internally as part of the Company's "actual" churn rate for 3G-PTT). In other words, marketing gimmicks like the "Steve Dussek Special" enabled Defendants to claim all the upside of these temporary subscribers, without the downside (*e.g.* inclusion in "reported" churn for 3G-PTT).

14.     Similarly, despite advising the market that NII was improving the credit quality of its customer base several times during the Class Period, NII was in reality targeting less creditworthy subscribers. Again, even when these credit risky accounts became delinquent, internal reports confirm that NII incentivized these subscribers to stay on by reverting to "pre-Aug[ust]" credit policies that the Company acknowledged "may increase risk." These policies

thereby discouraged these less credit worthy subscribers from deactivating – even though the likelihood of collecting on the mounting outstanding debts was remote.

15.    As detailed herein, the Individual Defendants personally knew the true state of affairs.  They individually attended so-called "deep dive" meetings in Latin America, during which they were advised of the true status of the 3G deployment and customer defections.  They also received and had access to routine internal reports that tracked, analyzed, and quantified subscriber churn in NII's Latin American regions on a consolidated and country-by-country basis through a variety of metrics.  Significantly, the Individual Defendants knew the actual churn rates versus what they publicly reported, and they knew they were operating on a skeletal network when they publicly reported substantial success.    Nevertheless, the Individual Defendants concealed the true state of affairs from the Company's securities holders.

16.    As set forth in detail herein, throughout the Class Period, Defendants repeatedly misled investors concerning the Company's purported successful transition to 3G.  By February 2014, Defendants could no longer mask the truth.  On February 28, 2014, NII shockingly warned investors that the Company "will have to significantly improve its operating performance and consider other options to enhance its liquidity position to meet its financial obligations and fund its business in 2015 and beyond."  By the end of the Class Period, NII's common stock fell from a Class Period high of $45.38 to as low as $1.15 per share, costing Plaintiffs and members of the Class hundreds of millions, if not billions of dollars in damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1391(b).  The Company maintains its principal place of business in this District and many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in or were issued from this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

#### A.     Plaintiffs

##### 1.     Lead Plaintiffs

21.     Lead Plaintiff Danica Pension, Livsforsikringsaktieselskab ("Danica") is one of Denmark's largest pension funds, with 600,000 pensioners.  Danica purchased NII common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated June 10, 2014, the Court appointed Danica as a Lead Plaintiff in this action.

22.     Lead Plaintiff Industriens Pensionsforsikring A/S ("Industriens") is one of Denmark's largest pension funds, with 400,000 pensioners.  Industriens purchased the NII securities that are the subject of this action, including common stock and bonds as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal

securities law violations alleged herein. By Order dated June 10, 2014, the Court appointed Industriens as a Lead Plaintiff in this action.

23.     Lead Plaintiff Pension Trust Fund for Operating Engineers Pension Plan ("Operating Engineers Pension Trust Fund") is the pension fund for Operating Engineers Local Union No. 3. Operating Engineers Pension Trust Fund is a defined benefit plan that managed more than $3 billion in assets as of December 2012 on behalf of more than 37,000 beneficiaries. Operating Engineers Pension Trust Fund purchased NII bonds during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated June 10, 2014, the Court appointed Operating Engineers Pension Trust Fund as a Lead Plaintiff in this action.

24.     Lead Plaintiff IBEW Local No. 58 / SMC NECA Funds ("IBEW Local No. 58 / SMC NECA Funds") are composed of the Electrical Workers Pension Trust Fund of Local Union #58, I.B.E.W., Detroit, Michigan, the I.B.E.W. Local No. 58 Annuity Fund, the Electrical Workers' Insurance Fund, and the International Brotherhood of Electrical Workers Local Union No. 58 Sound and Communications Division Pension Fund. These funds all share the same administrator, and the members of their boards of trustees are appointed by the same organizations. IBEW Local No. 58 / SMC NECA Funds collectively oversaw more than $1 billion in assets on behalf of thousands of members and beneficiaries as of December 2012. IBEW Local No. 58 / SMC NECA Funds purchased NII common stock during the Class Period, as set forth in the certification previously filed, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated June 10, 2014, the Court appointed IBEW Local No. 58 / SMC NECA Funds as a Lead Plaintiff in this action.

25.     Lead Plaintiff Jacksonville Police & Fire Pension Fund ("Jacksonville P&F") was created in 1937, and is a single-employer contributing defined benefit pension plan covering all full-time police officers and firefighters of the Consolidated City of Jacksonville.  Jacksonville P&F purchased NII common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated June 10, 2014, the Court appointed Jacksonville P&F as a Lead Plaintiff in this action.

### 2.     **Additional Plaintiff**

26.     TOBAM, SAS ("TOBAM") is a French simplified limited company headquartered in Paris, France.  TOBAM was formed by its current President, Yves Choueifaty, and his colleagues in 2006, as the Quantitative Asset Management Group within Lehman Brothers Asset Management Europe.  In 2008, the business was bought by its employees. TOBAM, with approximately $5.5 billion in assets under management, delivers best in class core quantitative investment solutions, through publicly traded vehicles and indices as well as dedicated mandates.  TOBAM is the management company for its funds, which are organized under French law as Undertakings for the Collective Investment of Transferable Securities ("UCITS").  A UCITS has no legal personality of its own.  Only the management company is authorized to act on behalf of a UCITS under its management and to exercise the rights to the assets, including bringing legal actions on behalf of the UCITS.  In doing so, the management company acts in its own name.  As set forth in its PSLRA certification previously filed with the Court, TOBAM's funds, TOBAM Anti-benchmark US Equity Fund and TOBAM Anti-benchmark Global Equity Fund, purchased a significant number of shares of NII common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

B.    **Defendants**

1.    **The Company**

27.    Defendant NII is a telecommunications company incorporated in Delaware.  NII maintains its principal executive offices at 1875 Explorer Street, Suite 1000, Reston, Virginia. NII's common stock trades under the ticker symbol "NIHD" on the NASDAQ Stock Exchange (the "NASDAQ"), which is an efficient market.

2.    **The Individual Defendants**

28.    Defendant Steven P. Dussek was CEO of NII for all relevant periods before December 13, 2012.

29.    Defendant Steven M. Shindler has been the Company's Executive Chairman of the Board of Directors since November 12, 2002, and its CEO since December 13, 2012.

30.    Defendant Gokul Hemmady was the Company's CFO for all relevant periods before October 17, 2012, and was its Chief Operating Officer ("COO") for all relevant periods after June 14, 2012.

31.    Defendants described in paragraphs 28 through 30 are collectively referred to herein as the "Individual Defendants."  Together with Defendant NII the Individual Defendants are collectively referred to herein as "Defendants."

C.    **Relevant Non-Parties**

32.    Confidential Witness ("CW") 1 worked at NII's headquarters in Reston, Virginia from April 2001 through January 2014 in Vendor Relations.  From 2005 until CW 1's departure from the Company, CW 1 served as Vendor Relations Senior Manager.  CW 1 managed the Company's relationship with Motorola related to the use of the iDEN network.  CW 1 also worked on the 3G roll-out in Latin America.  CW 1 was in a position to know, and does know, about technical problems related to the Company's 3G roll-out in Latin America, including Peru.

33.     CW 2 was a Manager of Customer Insights at NII's Reston, Virginia headquarters from November 2010 until November 2012, reporting to the Vice President of Operations. CW 2 was responsible for analyzing and reporting the churn rates in NII's markets and the reasons behind those churn rates.  CW 2 personally conducted extensive business analytics in Peru, Chile, Mexico, Brazil, and Argentina and was in a position to know, and does know, about customer retention in Latin America, including specifically Brazil and Mexico, as well as effects of the 3G roll-out in Peru.  Additionally, CW 2 was involved with drafting periodic reports concerning NII's churn rates that were circulated to executive management, including the Company CEO, CFO, and Executive Vice President of Operations (John McMann).

34.     From April 2007 until April 2009, CW 3 served as the Senior Manager of Developer and Partner Programs.  From April 2009 until June 2013, CW 3 was the Company Director of 3G Broadband and Service Delivery Platforms and traveled to Latin America on a regular basis.  CW 3 was in a position to know, and does know, about (i) the technical, operational, and procedural issues associated with the Company's 3G roll-out in Peru, Mexico, and Brazil, as well as the quality issues associated with the Company's hardware in Latin America, and (ii) the marketing of phones to customers in Brazil, as well as the technical challenges associated with physical implementation of the 3G network in Brazil.

35.     CW 4 was an IT Program Manager Consultant at NII's headquarters in Reston, Virginia from September 2009 until January 2012, a Software Development and Project Management Consultant for NII Chile from January 2012 until March 2013, and the Senior Consultant for NII Brazil from March 2013 until February 2014.  CW 4 personally worked on the launch of the IT systems in Chile and Brazil and was in a position to know, and does know, based on his individual participation, about the deep dive meetings that occurred in Latin

America and were attended by executive management from Reston in order to discuss project milestones, delays, and issues.

36.     CW 5 was the Marketing Director for Nextel Chile from April 2010 until December 2013 and was on Nextel Chile's Board of Directors from sometime after June 2012 until December 2013.  In this position, CW 5 was in a position to know, and does know, based on his individual participation, about deep dive meetings with NII executives who flew down from Reston, Virginia to Santiago, Chile.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

37.     NII is a telecommunications company that, through its subsidiaries, operates wireless voice and data networks in Mexico, Brazil, Peru, Chile and Argentina under the Nextel™ brand.  Prior to and throughout the Class Period, these wireless networks were the primary source of the Company's revenues, and their success was critical to the Company.

38.     Prior to and during the Class Period, NII's wireless service featured an idiosyncratic push-to-talk style communication option called Direct Connect.  PTT technology was key to NII's ability to differentiate the Nextel brand from competing wireless service providers in Latin America.  Beginning in 2006, NII placed its Direct Connect service front and center, hoping that subscribers would grow accustomed to using PTT, making it difficult for them to leave NII for a competitor.  In this earlier period, NII mainly marketed its services to large businesses that could benefit from PTT style communications; once a business was dependent on PTT, it could not easily transfer to a competitor that did not have network interoperability.

39.     Prior to the Company's efforts to build an alternative 3G network in Latin America during the Class Period, the PTT function only was available on an Integrated Digital Enhanced Network, or iDEN, carried by communication towers specifically designed for the iDEN network.

40.     The iDEN technology is a proprietary network developed by Motorola.  Motorola continues to be the only source for iDEN systems.  iDEN systems are generally more expensive to build and maintain than networks that use non-proprietary technologies, such as Global System for Mobile Communications ("GSM"), a second generation or 2G technology, or Wide-band Code Division Multiple Access ("WCDMA"), a third generation or 3G technology.

**B.     To Address Its iDEN Technology Becoming Obsolete,
NII Attempted To Rapidly Transition PTT Technology**

41.     Prior to 2005, PTT wireless service also was available in the United States through an iDEN network operated by Nextel Communications, Inc., an entity unrelated to NII.  During this period, Nextel Communications was the primary purchaser of iDEN-related technology from Motorola.  The scale of Nextel Communications' purchases assured NII of Motorola's continued economic incentive to support and update iDEN technology.

42.     In 2005, when Nextel Communications merged with Sprint, Sprint began to operate the PTT-compatible iDEN service in the United States.  By 2008, it had become apparent to industry analysts that the PTT technology was declining in popularity in the U.S. market.  Although Sprint publicly had committed to operate its iDEN network through at least 2010, the declining popularity of PTT in the United States led to the inescapable conclusion that Sprint would stop providing its U.S. subscribers the costly iDEN services and potentially terminate its iDEN network.

43.     If Sprint substantially reduced its offering of iDEN service or exited the market completely, Motorola would no longer continue to support and update iDEN technology.  Moreover, if Sprint terminated or closed its U.S. iDEN network, that would leave a key source of revenue for NII – subscribers that lived near the U.S.-Mexican border – unable to seamlessly call

from NII Mexico's iDEN service to Sprint's non-iDEN service (either GMS or WCDMA). In fact, NII subscribers would be unable to use their phones in the U.S.

44. Given the changing market conditions, coupled with customer demand for data service on their telecommunications devices, NII had no choice but to transition its wireless services (including PTT) to an alternative network in order to survive. According to Defendant Dussek, "[a] key component of our long-term strategy is the deployment of our 3G networks, which will enable us to expand and improve our competitive service offering."

45. In 2009, the Company launched an effort to rapidly transition to a new 3G network based on the less expensive non-proprietary WCDMA technology that would be able to support PTT-style communication and the higher-speed data availability. The success of this effort to build a WCDMA network that maintained the Company's ability to seamlessly provide its signature offering, PTT, while also maintaining the performance standards that allowed NII to realize a premium over its competitors, was essential to the Company's future growth and success in Latin America.

46. NII developed a plan to roll-out its new 3G networks and services throughout Latin America in stages, starting first with a phased implementation of 3G services – data, non-PTT voice and PTT – in Peru, one of its smaller markets, before executing a near-simultaneous launch of all 3G services (data, non-PTT voice and PTT) in Mexico and Brazil, which together accounted for approximately 80% of the Company's revenues. NII viewed the roll-out of its 3G network in Peru as critical to the Company's ability to launch 3G services in Mexico and Brazil. As Defendant Dussek explained during the Company's November 7, 2012 conference call after NII launched its 3G network in Mexico: "We have used the experience we gain in our Peru 3G

deployment to ensure that our new 3G network in Mexico delivers high quality services and an excellent experience for our customers."

47.     As a result, NII first launched 3G data in Peru in December 2009, followed shortly by non-PTT voice in April 2010.  Once NII secured the necessary bandwidth and concessions from the Mexican and Brazilian governments in late 2010 and early 2011, NII scheduled the nearly simultaneous launch of all components of its 3G services – 3G data, non-PTT 3G voice and 3G-PTT – in Mexico and Brazil for mid-2012.

### C.     Defendants Concealed That NII's Roll-Out Of Its "High Performance" 3G-PTT Network In Peru Was Failing

48.     Key to NII's plan was providing customers with PTT technology on a 3G network that was superior to PTT services provided by fast-moving competitors in each of the Latin American markets.  According to Defendant Hemmady, "[t]he Push-to-Talk offering in 3G is extremely important.  It is our value proposition."  Moreover, NII's business plan for developing 3G networks assumed that a significant number of old iDEN network customers would migrate to the Company's new 3G network.  This migration would happen only if PTT on the new 3G network worked in a way that was nearly indistinguishable from PTT on the old iDEN network.

49.     However, there were significant issues with employing PTT technology on a WCDMA or 3G network.  The PTT component was the most technologically challenging part of the development and deployment of NII's new 3G network.

50.     PTT technology relied on the iDEN network to provide a sustainable data connection between PTT-enabled handsets such that the moment the sender presses the PTT button, the signal immediately travels to the destination handset.  3G networks do not maintain a constant data connection between users and, as such, PTT-style communication over NII's 3G

network was extremely slow. This slowness – known as "latency" – was a major hurdle for developing a competitive PTT technology for a 3G environment.

51. For example, the speed of communications associated with high speed packet access ("HSPA"), a protocol to reduce latency on 3G networks, was not comparable to the iDEN system, where communications take 700 milliseconds between the time of activation and receipt of a PTT signal on iDEN. According to CW 3, the 3G-PTT experience with HSPA was perceived as slow and lagging in comparison to iDEN, with users finding it easier to make a phone call instead of utilizing the PTT communication. Significantly, if PTT communication on a 3G network was so slow that it induced a subscriber to revert to making a phone call instead, NII's key differentiating feature, through which it attracted and maintained a subscriber base in Latin America, would be completely useless.

52. Another significant hurdle was maintaining the voice quality available through PTT on an iDEN network when PTT style communications were sent through a WCDMA network. The 3G-PTT technology did not stand up to NII's competitors' offerings in terms of voice quality. For example, according to CW 3, the voice quality and the basic parameters of what it takes to make a service work were just not there with NII's 3G-PTT.

53. In order to ensure that they had accounted for the known issues, Defendants tested NII's 3G-PTT technology, both in the laboratory and in the field in Peru prior to rolling it out in other Latin American markets. According to Defendant Dussek during a conference call with analysts on July 29, 2010, the field tests included "a sizable number of sites within [NII's] coverage" and were designed to give NII "a good full testing of real live environments."

54. Defendants first reported the results of the laboratory and field tests to analysts and investors in April 2010. For example, on April 29, 2010, Defendant Dussek told investors that

NII had seen "positive results in the early system testing of the QChat technology designed to support high performance push-to-talk services on the WCDMA platform," and "[b]ased on the test results to date" Defendants were "confident that this product will meet the needs of our customers." On February 24, 2011, Defendant Dussek reported that while the early tests "exceed[ed] our expectations," the results from the field trial in Peru also "are very strong," noting that Defendants were "very pleased with the current trials." Defendant Dussek further confirmed positive test results from the Peru field trials on April 28, 2011, stating that NII's "field tests show that our customers will experience a push-to-talk service on WCDMA that is on par with our high quality push-to-talk service on iDEN."

55.     These statements were materially misleading, however, because, unbeknownst to investors, NII's 3G-PTT tests utilized an extremely small sample size and, accordingly, Defendants failed to test how the system would perform under the strain of real world conditions. According to CW 2, the network tests conducted by NII utilized only a few hundred phones to test the new network's capabilities when, in reality, the network would need to withstand the load of thousands of phones. Thus, by the time the phones were launched in Peru, NII had no real understanding as to how 3G-PTT would function under real world conditions.

56.     For example, on the first day of the Class Period, Defendant Dussek stated that, "[b]ased on the results we've seen in terms of latency and quality," NII was "confident" that NII's "high-performance push-to-talk services on the WCDMA platform . . . will meet the needs of [NII's] growing customer base." Defendant Dussek confirmed these results on October 28, 2010, stating "that both on the latency side and the call setup side . . . the performance of [3G-PTT] is certainly meeting our expectations in that regard[.]" Thereafter, on February 24, 2011, Defendant Dussek represented to investors that for calls between WCDMA networks or calls between

WCDMA and iDEN networks, "[t]he end-user experience . . . is very similar to what is experienced today in terms of both latency and call quality." Similarly, during the May 12, 2011 Peru Investor Day, Defendant Hemmady stated that "Push-to-Talk on WCDMA works like it does on iDEN," noting further that PTT on the WCDMA network was "extremely comparable to our current iDEN platform." Thus, Defendants repeatedly reassured analysts and investors that NII's "high-performance" 3G-PTT technology was a viable surrogate for its iDEN PTT technology.

57.    In reality, however, latency issues existed when Nextel Peru deployed 3G-PTT according to CW 1. More specifically, CW 2 confirmed that it was not uncommon to experience an 8 second lag before a PTT message reached its recipient. The standard connection time was only 700 milliseconds on an iDEN system.

58.    The latency issues resulted in part because NII was having difficulty tuning networks. As CW 3 explained, in order to resolve latency issues with 3G, the networks needed to be correctly tuned – a process that could take years to perfect.

### D.    Delays In Developing And Deploying 3G Networks In Latin America Result In NII Losing Customers

#### 1.    *Nextel Peru's Staged 3G Launch Fails*

59.    NII launched its first 3G offering in Peru in December 2009, offering highspeed internet access through the use of data cards. Trumpeted as a success on the first day of the Class Period, in reality, the launch was a failure. According to CW 1, there was a glitch in the system such that the network could not support all of the data cards that were provided to subscribers. Though Defendants touted the fact that the availability of the data cards drove traffic to NII's retail outlets, leading to increased demand for NII's other offerings, in reality, Nextel Peru gave

away the 3G data cards *for free* at retail stores, according to CW 1 – a fact that Defendants omitted when reporting the supposed success of the 3G data launch in Peru.

60.     NII subsequently launched 3G-PTT in Peru in September 2011.  In the related press release, NII stated that the launch of 3G-PTT in Peru was "a major milestone for NII" and "a key component in the company's strategy to pursue profitable growth across its markets[.]" Alan Strauss, NII's Chief Technology Officer, described the launch as "a major technical achievement and the first time that a truly high performance PTT solution has been delivered over a commercial HSPA-enabled network."

61.     However, unbeknownst to investors, subscriber deactivations, migrations back to older 2G technology, and returns in fewer than 30 days began to rise in Peru almost immediately as a result of technical issues with 3G-PTT described above in ¶¶48-60.

62.     Additionally, during the course of testing, and subsequently deploying, 3G-PTT technology in Peru, Defendants publicly boasted that NII had solved the latency and voice quality issues associated with running PTT style communications through a 3G Network.

63.     Defendants were well aware of the failure of the 3G launch in Peru.  Defendants Dussek (as CEO) and Hemmady, as well as John McMann, NII's EVP of Operations, received a detailed monthly "Churn Management Report," which CW 2 was involved in drafting.  These internal reports tracked, analyzed and quantified subscriber churn (or attrition) in NII's Latin American regions on a consolidated and country-by-country basis and by sales channel, through a variety of metrics.  In addition, Defendants would have also been aware of the failure in the roll-out of 3G-PTT from their participation in frequent meetings in locations throughout their Latin American regions, including Peru.  *See* ¶¶330-333.

Case 1:14-cv-00227-LPS Document 151 Filed 10/28/14 Page 25 of 127 PageID #: 996
Case 1:14-cv-00227-LPS Document 11-3 Filed 07/28/14 Page 25 of 127 PageID #: 996
Pg 45 of 154

64.    For example, in October 2011, the first full month in which 3G-PTT was available to Peruvian consumers, Nextel Peru's 3G-PTT "actual" churn rate was 5%, four percentage points higher than the same metric for September 2011.  For the next five months, from November 2011 to March 2012, Peru's "actual" churn rate ranged from approximately 3.5% to approximately 5.5%.  In contrast, in the context of Brazil, CW 2 stated NII tried to remain at a 1.5% churn rate.  According to CW 2, a shift from 2.1% to 2.8% (0.7% difference) in the churn rate was significant.

65.    Despite having information to the contrary, Defendants reassured the market that the launch of 3G-PTT in Peru was an unmitigated success, noting during the October 27, 2011 conference call that "so far [NII] ha[s] seen good customer acceptance of the product."  Defendant Dussek was more sanguine: "From a network perspective, *while I don't have metrics* I can share with you, I can give you an overall view on a performance basis that it has met and exceeded our expectations, and most importantly, the customer's expectations. . . . *it has really performed as expected, or even better than we expected*."  Two weeks later, on November 8, 2011, NII filed its financial results for the three months ended September 30, 2011 on Form 10-Q.  The Company's Form 10-Q stated unequivocally that while NII's "competitors have introduced competitive push-to-talk over cellular products, . . . [NII] believe[s] that the quality of [the Company's] Direct Connect service . . . on our WCDMA-based networks using the high performance push-to-talk service we recently launched in Peru, is superior at this time."

66.    Despite Defendants' best efforts to maintain the façade that they had adequately addressed all the technical issues associated with running PTT technology on a WCDMA network, in February 2012, Defendants admitted that as a result of customer complaints they had identified "a few areas where improvement are needed" in Peru and decided to halt its 3G-PTT

marketing and roll-out efforts in Peru until these supposedly minor issues were corrected. Defendants, however, were quick to reassure investors that they already had "implemented solutions in these areas" and were "seeing some early positive results" and that, otherwise 3G-PTT technology "ha[d] performed very well in most call scenarios."

67.    Three months later, on April 26, 2012, Defendant Dussek told investors that NII had "fixed . . . the voice quality" issue associated with Peru's 3G-PTT and was "very excited about that [re-]launch" of 3G-PTT in Peru "in early May [2012]." Thereafter on August 7, 2012 and November 7, 2012, Defendants made positive statements about customer acceptance of 3G services in Peru. For example, Defendant Dussek stated on November 7, 2012 that NII was "experiencing good traction" in Peru for the three months ended September 30, 2012 and noted that NII was "encouraged about the growth we expect to generate on these networks in the future." Defendant Hemmady echoed these comments, noting that NII was "starting to see positive momentum on our subscriber trends from the launch of our 3G networks in markets like Chile and Peru" and stated that the rise in churn in Peru for 3Q 2012 was in NII's iDEN prepaid customer base.

68.    In reality, according to CW 2 and internal NII documents, after the 3G-PTT roll-out in Peru, the service failure persisted; calls were constantly dropped, latency issues resulted in significant delays between transmissions, and churn rates rose to 4-5 percent in Peru alone.

69.    For example, according to the September 2012 Churn Management Report, which reflected certain NII operational metrics for 3Q 2012 announced on November 7, 2012, contrary to Defendants' statements in February and April 2012, the technical problems with the roll-out of 3G-PTT in Peru had not been fixed. Indeed, the report conclusively stated with respect to 3G-PTT in Peru that "[c]hurn has risen m[onth]-o[ver]-m[onth] since Apr[il 2012] due to

continued product/technical problems."  In fact, as of September 2012, "3GPTT technical issues"

still "are adversely impacting 3G growth and retention efforts" in Peru and "will pressure churn

in Q4."  This same report detailed that the number of Peru 3G subscribers who migrated back to

the older 2G technology, deactivated their accounts, suspended service, or returned their devices

within 30 days began growing in October 2011 after the initial roll-out of 3G-PTT and spiked

from May 2012 through September 2012, after Defendants publicly claimed the technical issues

with 3G-PTT had been fixed.  Indeed, contrary to Defendants' statements in April, August, and

November 2012, the September 2012 Churn Management Report demonstrated that far from

gaining "traction," NII's 3G offerings in Peru were slipping.

70.     Another contemporaneous internal presentation titled, "Impacts of Network

Experience in Peru," which according to CW 2 was published on October 24, 2012 and sent to

the CEO, COO, and CFO, among others, demonstrated that there was a high correlation between

the growth of "inbound calls for service issues" and 3G-PTT churn.  The following is a chart

from the internal document illustrating the correlative effect:



71.     Using this data, NII predicted that both the number of service calls and the 3G-PTT "reported" churn would continue to grow in October, November and December 2012.

72.     This same internal presentation determined that the increase in inbound calls and higher churn were having an "adverse impact[] on profitability," detailing specifically that "higher 3G-PTT inbound calls correlate well with reductions in ARPU [Average Revenue Per User]." The result, as detailed in the presentation, was that Nextel Peru had been steadily losing revenue since May 2012. The September 2012 Churn Management Report makes clear that this was in part due to 3G-PTT technical problems, which pressured churn. The revenue losses attributed to 3G-PTT churn with the network doubled between May and June 2012, and steadily rose thereafter, including 130% more revenue being lost in August 2012 than the prior month. Significantly, the presentation estimated that NII would continue to lose revenue as a result of service problems with its 3G-PTT offering in October, November, and December 2012. Thus, far from gaining traction in Peru with its 3G-PTT, NII was actually losing revenue and customers throughout this period.

73.     And, contrary to obtaining a "premium" for 3G-PTT services that it was able to successfully sell to its subscribers, as Defendant Hemmady publicly stated on November 7, 2012, the September 2012 Churn Management Report confirmed that in order to address the negative effects of 3G-PTT technical issues in Peru, "[d]iscounts are being offered and more call center reps were added in Jul[y]." These discounts were offered in part to offset 3G-PTT suspensions, which had been increasing month-over-month since June 2012, according to the September Churn Management Report.

74.     Thus, Defendants' positive statements regarding 3G-PTT in Peru from February 2012 through November 2012 were materially false and/or misleading when made because

Defendants were in possession of contemporaneous data demonstrating not only that the technical issues with Peru's 3G network had not been fully disclosed or fixed, but also that subscriber dissatisfaction with 3G-PTT was increasing and negatively affecting NII's results.

75.    The technical issues with Peru's 3G network and, in particular with NII's marquee feature, PTT technology, and NII's failure to secure a selection of 3G smartphone handsets, led NII's subsidiary, Nextel Peru, to experience significant competitor pressure during the Class Period which, despite Defendants' statements to the contrary, was not counteracted by the launch of 3G.

### 2.    *Delays In Nextel Brazil's Launch Of 3G Left NII Open To Increased Competitor Pressure*

76.    At the start of the Class Period, Nextel Brazil, NII's subsidiary, represented 40% of NII's consolidated revenue and 57% of the Company's net subscriber additions ("net adds") for the fiscal year ended December 31, 2009.  By February 25, 2010, Nextel Brazil had reported several years of sustained growth and low churn rates, including nine consecutive quarters of churn rates below 1.4%.  Nextel Brazil's results for 4Q 2009 and FY 2009 included "the lowest ever [churn rate]" in Brazil "and one of the lowest churn levels in the Company history," making Brazil NII's "leader in customer retention."

77.    More than a year later, commenting on Nextel Brazil's results in Q1 2011, Defendant Hemmady confirmed that Brazil's churn level "remains the lowest in the region and is consistent with what [NII] ha[s] seen from [its] Brazil team over the past five years."  Nextel Brazil "continued to set the standard" for NII throughout FY 2011.

78.    These preternaturally consistent results – themselves the product of manipulation by Defendants as discussed herein – were not sustainable given the threat posed by Sprint's

decision to stop offering iDEN services.  As such, Defendants scrambled to plan and implement a 3G network in Brazil.

79.    In December 2010, NII successfully bid on network spectrum in Brazil covering 98% of the Brazilian population to use for its new 3G network.  The Brazilian government officially awarded NII the new spectrum in 2Q 2011.  Commenting on this award, Defendants noted that Nextel Brazil was on track for a mid-2012 launch of its 3G network on its newly awarded spectrum.

80.    NII attempted to work quickly to develop and deploy its 3G network in Nextel Brazil.  However, Nextel Brazil's existing IT architecture was a mess.  While in other Latin American countries, NII had to build the networks from scratch to support the roll-out of its 3G services in Brazil.  NII also had to reconfigure highly customized legacy network structures to support 3G – a time consuming process that required a lot of changes to the system that were costly and less efficient.

81.    Ultimately, NII had to delay the launch of 3G in Brazil twice.  On February 23, 2012, NII announced that it would launch 3G in Brazil beginning in 4Q 2012 because of issues with constructing the network required to launch the Company's 3G services.  Then, on November 7, 2012, the Company announced that it would not be able to launch 3G in Brazil until 2013, and then it would have to roll-out NII's 3G services in stages.

82.    Because NII was struggling to get its launch of 3G in Brazil on track, Nextel Brazil began experiencing significant competitive pressures.  In 3Q 2011, Defendants reported seeing "an increase in promotional plans offered by [NII's] competitors in Brazil" which "result[ed] in higher customer acquisition and customer retention costs."  Despite strong overall FY 2011 results, Defendants warned in April 2012 that "strong competition" in Brazil "continue[d] to

create [a] difficult environment" because "pricing remain[ed] aggressive and the adoption of 3G devices ha[d] accelerated."

83.     As churn rates began to rise, Defendants confirmed that their "response w[ould] be to take actions designed to balance growth and profitability and position Nextel Brazil to continue delivering strong results."  Because NII's deployment of its 3G network in Brazil was severely delayed, the only option was to "chang[e] certain policies and rate plans in order to improve performance in Brazil."  As set forth in further detail herein, the actions Defendants took in Nextel Brazil, however, were designed only to maintain the façade of sustained growth and low churn rates.

### 3.     *Nextel Mexico Loses Hundreds Of Thousands Of Subscribers To Competitors Because It Could Not Successfully Migrate iDen Subscribers To 3G*

84.     NII's subsidiary, Nextel Mexico alone represented a sizeable portion of the Company's revenues, profits, and growth.  For example, in 2009 and 2010, Mexico represented 40% and 37%, respectively, of all handsets with active customer accounts on NII's networks.  NII announced in February 2011 that it had secured the rights to additional spectrum to construct a 3G network.  Shortly thereafter, NII scheduled Mexico's 3G launch in mid-2012.

85.     The timing of the launch was significant.  By 2012, there already was a considerable amount of 3G coverage in Mexico by NII's competitors.  According to CW 3, while the demand for 3G data connectivity from Nextel Mexico's core customers was not at the point that they were all starting to leave, the Company was starting to see that decision-makers at corporate subscribers were starting to transition away from Nextel Mexico.  Indeed, CW 3 noted that some NII customers maintained their NII account so that they could access the PTT feature, while purchasing a second device – a smartphone – from a competitor.

86.     As the Class Period wore on, the competition in Mexico only intensified.  CW 2 confirmed that competitors such as Claro Televisa and Entel offered prepaid smartphones in Latin America markets and NII could not compete with them.  Sprint's announcement in 2012 that it was shutting down the U.S. iDEN network on June 30, 2013 only added to NII's urgency to launch Mexico's 3G network.  Without a viable 3G network, the loss of the U.S. iDEN network meant that a large portion of Nextel Mexico's customers likely would be unable to use their phones across the border in the U.S.

87.     After experiencing construction delays similar to Brazil's, Nextel Mexico launched its 3G network in late September 2012.  According to the Company's September 26, 2012 press release, "[t]he new high performance PTT services are tightly integrated with mobile broadband data services and deliver an instant PTT experience that meets the expectations of Nextel Mexico's customers for best-in-class instant communication."  Commenting on the roll-out, NII's EVP and Chief Strategy and Marketing Officer, Greg Santoro, stated that "[t]he deployment of this new network further solidifies our positioning in one of our most important markets."

88.     Additionally, Defendants represented that while there would be negative effects on churn associated with the planned shutdown of Sprint's U.S. iDEN network on June 30, 2013, its new 3G network would more than make up for these fluctuations.  Indeed, on May 2, 2013, Defendant Shindler identified the U.S. shutdown as "a significant growth opportunity" for Nextel Mexico's 3G network.

89.     Significantly, in a press release dated July 1, 2013, titled "Nextel Mexico Continues to Keep its Customers Connected with the U.S. via its Push-to-Talk (PTT) Solutions Using its Next Generation Network," NII stated: "Sprint's decision to decommission its iDEN

network on June 30 in the United States does not affect Nextel Mexico's services." In August 2013, Defendant Shindler expounded upon the press release, noting that NII had accelerated the pace at which it was migrating iDEN customers to its new 3G network in Mexico "as a component of [NII's] plan to reduce the impact from the shutdown of the iDEN network in the US."

90.     In order to execute on this statement, NII pushed out a number of 3G phones in the region along the U.S.-Mexico border in order to compensate for the shutdown of the U.S. iDEN network, but NII's 3G network could not support these phones. While NII was pushing phones into the market, its network did not have capacity to handle the phones, rendering them useless.

### E.     Without 3G, NII Resorts To Disclosing Misleading Metrics To Maintain The Façade Of Financial Health And Future Profitability

91.     Without a viable 3G network in Peru, Brazil, or Mexico, NII resorted to several different tricks to hide the fact that its competitors were eating away at the Company's subscriber base. First, Defendants manipulated NII's churn rate calculation to avoid having to disclose subscribers that (i) deactivated their accounts less than 30 days after activating them, and (ii) migrated from 3G to 2G, an older technology.

92.     NII reported its consolidated churn rate and the churn rate for each of its Latin America subsidiaries on a quarterly basis. The churn rate reported to investors during the Class Period was a compilation of the reported churn rate of the various sales channels within each country. These sales channels included, *inter alia*, 2G prepaid, 2G postpaid, 3G-PTT, and 3G data. Internally, according to internal documents (corroborated by CW 2), the Company tracked two 3G-PTT churn rates. This included (i) the "reported" 3G-PTT churn rate (subscribers who deactivate after 30 days) and (ii) what NII called the "actual" 3G-PTT churn rate, which included

at least two groups of additional subscribers: (i) subscribers who deactivated their plans in less than 30 days (including a large segment of users in Peru who returned their phones within the first ten days) and (ii) subscribers who downgraded from 3G to 2G technology.

93.     In the context of Nextel Peru's launch of 3G, the failure to disclose the "actual" churn rate associated with these subscribers was materially misleading.  As set forth above, the publicly reported churn rate for Peru masked the fact that subscribers were so unhappy with their 3G-PTT service that they deactivated their account in less than 30 days or migrated to the older 2G technology.  In fact, the "actual" churn rate for 3G-PTT exploded because of technical problems with the network at the same time that Defendants were telling investors that all of the necessary improvements in 3G-PTT had been made and customers were very satisfied with the resulting service.

94.     Given the reality of the 3G launch in Peru, it was misleading for NII to disclose only the publicly reported churn rate for Peru and simultaneously tout the success and customer acceptance of Nextel Peru's 3G network.

95.     Second, Defendants manipulated the Company's churn rate in Brazil by avoiding recognizing involuntary deactivations when doing so would cause the churn rate to rise above a set level.  When a customer chooses to deactivate their account, the deactivation is voluntary.  If, however, a customer's account is unilaterally terminated by the Company for failure to pay or in the context of prepaid subscribers from falling inactive (*e.g.,* failing to recharge), it is an involuntary deactivation.

96.     According to CW 2, Nextel Brazil maintained a 1.5% churn rate for four or five years leading up to 2012 by not deactivating delinquent accounts.  Specifically, according to CW 2, NII would move delinquent Nextel Brazil accounts into an extension pool until NII

decided to deactivate them. CW 2 confirmed that once Nextel Brazil was aware of the number of voluntary deactivations for a given month, it would then choose to deactivate the number of subscribers in the extension pool that was necessary to maintain the 1.5% churn rate for the subsidiary.

**F.    NII Continued The Strategy To Target Less Credit Worthy Subscribers, While Defendants Assured Investors NII Had Changed Strategy**

97.    NII's competitive strategy historically focused on customers who understood NII's "value proposition" and would be willing to pay a premium for NII's services. Throughout 2010, Defendants reiterated the importance of attracting and maintaining a high-quality subscriber base, especially with respect to the expected launch of NII's new 3G services. For example, during NII's April 26, 2010 conference call with analysts, Defendant Hemmady highlighted NII's "continuing effort to improve the quality of [the Company's] subscribers and to keep those customers for a longer period." According to Defendant Hemmady, doing so would "lead to increased profitable growth over the long-term."

98.    From the start of the Class Period, however, Nextel Brazil was experiencing ever increasing competitive pressures. By 2011, aggressive promotional plans were implemented by competitors to seek out less creditworthy Brazilian subscribers. Thus, beginning in 2011, NII secretly implemented marketing strategies that focused on attracting less creditworthy subscribers in order to maintain the façade of Nextel Brazil's multi-year track record of sustained subscriber growth and low churn rates. These subscribers were more price sensitive than NII's historical base of enterprise or corporate subscribers. In the short run, this undisclosed shift allowed Nextel Brazil to artificially prop up its subscriber growth numbers and maintain a consistently low churn rate, masking the impact of its competitors' aggressive pricing plans throughout 2011.

- 31 -

99.     Beginning in 2012, however, NII could no longer hide the severity of the long

term adverse effects on profitability and ARPU (average revenue per user) resulting from its

undisclosed policy of seeking out lower credit worthy individuals to counteract its competitors'

aggressive pricing campaigns.  Finally, on the August 7, 2012 earnings call, Defendant  Dussek

was forced to disclose:

> market conditions in Brazil intensified last year, with more aggressive
> pricing campaigns and 3G device offers by our competitors.  ***We
> responded with promotions*** of our own, ***which attracted a group of price-
> sensitive customers who didn't assign significant value to our high-
> quality service*** or to the benefits of instant communications that are our
> key points of differentiation.

100.     Dussek also assured shareholders and analysts on this call that NII was no longer

targeting price sensitive and less creditworthy customers:

> we are reducing our retention investment for these customers in Brazil and
> are ***refocusing*** our rate plans, retention efforts and service ***towards more
> valuable customers***. Although these actions are causing an increase in
> churn as we realign our customer base, they are also contributing to more
> stable ARPU in Brazil.

101.     This message was reiterated by Defendant Hemmady on the same call: "***We have

also taken actions to tighten our credit policy.***  In the long run*,* we believe that ***these strategies

will position Nextel Brazil to capture high-quality subscriber growth and improve profitability

as a result of stability and ARPU***."   In other words, on the August 2012 call, Defendants made

clear that they were changing strategy (from their pre-August policy) to one focusing on more

creditworthy subscribers.  Significantly, Defendants repeated these assertions three months later

during the Company's November 7, 2012 conference call to discuss NII's 3Q 2012 financial and

operational results.

102.     Contrary to Defendants' public proclamations on August 7, 2012, however,

beginning in October 2012, NII secretly reverted to its pre-August policies by targeting less

creditworthy customers who were unwilling to pay a premium and did not align with NII's value proposition. For example, the September 2012 "Churn Management Report"—which, according to CW 2 was circulated to executive management, including Defendants Dussek (as CEO), Defendant Hemmady, and the EVP of Operations, John McMann—stated that NII was going to make "modifications to the credit policy" in Brazil beginning in October 2012 despite the possibility that these modifications "may increase risk." As part of these credit modifications, this same internal report detailed a return to the Company's "pre-Aug[ust] policy" in order to "stimulate loading." This report detailed that NII Brazil would "[a]llow loading of sub[scriber]s with delinquent debts on credit report up to R$500 (revert to pre-Aug policy);" "[a]llow High risk sub[scriber]s to add-on (revert to pre-Aug policy);" and "[i]ncrease[] by +1 handset the limit of lines that a sub[scriber] can have." Additionally, according to the September 2012 Churn Management Report, beginning in October 2012, NII Brazil was modifying its June retention strategy to include "[n]ew retention plans created by Marketing for critical risk subs," creating a team to "specialize[] [i]n negotiating with delinquent subs" and "[a]llow more flexibility to apply discounts."

103. In other words, despite Defendants' unequivocal statements to investors on August 7, 2012 regarding NII's commitment to clearing its subscriber base of these high-risk customers to "improve profitability," in actuality, as demonstrated in the September 2012 Churn Management Report, just two months later, Defendants already had decided to augment efforts to retain these very customers and revert to credit policies that previously had allowed delinquent customers to continue to run up greater debts, take on more services, and have extra telephone lines. While this undisclosed policy shift would increase reported profits, it also "increase[d the]

risk" that NII would not be able to recover from the already delinquent subscribers' accounts receivable.

104.    Nonetheless, despite the receipt of the September 2012 Churn Management Report, Defendants misleadingly reassured investors about NII's commitment to resetting its customer profile, and, incredibly, informed investors on a November 7, 2012 earnings call that NII was going to even greater lengths than previously disclosed in August 2012 to *purge*—not retain—less valuable customers.  For example, despite having direct knowledge of the decision to revert to "pre-Aug[ust]" credit policies in Brazil in October 2012, Defendant Dussek falsely represented to investors that because NII's "current approach is not aggressive enough," NII was "now taking more proactive actions to eliminate these unprofitable subscribers from [its] customer base" including "eliminating all retention efforts for these unprofitable customers immediately" and continuing "to apply our more rigorous credit policy, modified rate plan approach."

105.    On the same call, Defendant Hemmady misleadingly added that NII had "modified our approach" in order to "improv[e] the quality of our customer base" and counteract its prior policies, which had the impact of "attracting customers that were riskier."

**G.      NII's Marketing Policy (The "Steve Dussek Special") Was Designed to Artificially Meet Gross Subscriber Addition Targets**

106.    Defendants artificially inflated NII's "Gross Subscriber Addition" numbers, a key metric closely monitored by industry analysts, by implementing special promotions to hit predetermined subscriber addition targets set by Dussek at the end of each quarter.

107.    For example, CW 2 authored notes he entitled "Brainstorm on Peru Objectives" concerning a call he conducted with NII's Peruvian team.  The internal notes illustrate how NII

artificially inflated Gross Subscriber Additions at quarter end by utilizing what the notes call the

"Steve Dussek Special."

108. The document details:

> [i]n the last month of every quarter, there is a spike in gross adds as a result of aggressive promos, but these people typically use it for one month and then churn.… Each quarter they typically **run a special marketing promotion to boost gross adds, which they internally call the 'Steve Dussek Special.'** Based on where they currently are at and the **target set by Steve**, they create a promo that will achieve the goal…If we're closer to the target, the promo is less aggressive (though it would still be more aggressive than the usual). If we're further away, it gets even more aggressive. The deal in September was their most aggressive yet.

109. By timing the artificial inflation of Gross Subscriber Additions such that the

impact occurred just before the end of the quarter, NII could manipulate one of the most

important metrics for industry analysts and paint an overly rosy picture of consumers' adoption

of NII services. The "Steve Dussek Special" was carried out despite NII knowing that these

customers were only temporary additions and purely to meet the "target set by Steve." These

quarter-end marketing specials attracted impulse buyers looking for a deal, which meant that

after the Company claimed these subscribers in its gross addition numbers, many of them

deactivated or immediately returned their phones. Indeed, in comparison to 7-8% of subscribers

who deactivated three months after signing up in response to a normal sales promotion (the first

month after the mandatory inactive period in Peru), the Steve Dussek Special type promos

resulted in deactivation levels almost three times higher, or closer to 20%.

110. Additionally, the temporary Peruvian subscribers who returned their phones

within 30 days (internally referred to as offset gross additions) would be included as part of the

quarter-end gross subscriber addition numbers on investor calls, yet were omitted from the

"reported" churn rate (despite being tracked internally as part of the Company's "actual" churn

rate for 3GPTT). In other words, marketing gimmicks like the "Steve Dussek Special" enabled

Defendants to claim all the upside of these temporary subscribers, without the downside (*e.g.* inclusion in "reported" churn for 3GPTT).

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    NII's 4Q 2009 and FY 2009 Financial and Operational Results

111.    On February 25, 2010, NII issued a press release announcing its financial results for the three months and fiscal year ended December 31, 2009 (respectively, "4Q 2009" and "FY 2009") (the "February 25, 2010 Press Release").   In the February 25, 2010 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries for 4Q 2009 as follows: NII: 1.85%; Nextel Mexico: 2.18%; Nextel Brazil: 1.22%; and Nextel Peru: 2.35%. The Company also reported its consolidated churn rate and the churn rates of its subsidiaries for FY 2009 as follows: NII: 2.01%; Nextel Mexico: 2.38%; Nextel Brazil: 1.33%; and Nextel Peru: 2.26%.

112.    Defendants also held a conference call to discuss the Company's financial results for FY 2009 (the "February 25, 2010 Conference Call").

113.    During the February 25, 2010 Conference Call, Defendant Dussek stated the following with respect to NII's launch of its 3G network in Peru in 4Q 2009:

> Turning to the status of implementing this 3G strategy, we believe we have made significant progress throughout 2009 on a number of initiatives.  ***In Peru, we successfully launched our 3G network at the end of the fourth quarter*** and are now offering mobile broadband services in that market.  Our 3G network overlay covers 16 million people, and ***we are encouraged by the early acceptance of our broadband offering.***

114.    Regarding the Company's efforts to develop technology to allow its PTT services to work on NII's new 3G network, Defendant Dussek further stated:

> We continue to make progress on the development of our high-performance push-to-talk services on the WCDMA platform. ***Based on the results we've seen in terms of latency and quality, we are confident that this product will meet the needs of our growing customer base.***

115.    Following Defendant Dussek's prepared remarks, Defendant Hemmady reported

on the Company's operational results for 4Q 2009 and FY 2009 as follows:

> During the fourth quarter, we added 347,000 net subscribers, driven by a combination of strong gross adds and a sequential 10 basis point reduction in consolidated churn to 1.85%. ***Our net adds and lower churn rates during the period resulted from the initiatives we implemented in our markets during the year in response to the weaker economic conditions.*** Our team's focus on these improvements produced our highest quarterly total of subscriber adds and lowest level of churn for the year in the fourth quarter.

116.    Defendant Hemmady further stated:

> The actions we took, coupled with a stabilizing economic environment in the second half of the year, resulted in a consolidated churn in the fourth quarter of 1.85%, which is on par with the lowest churn rate in any quarter of 2008.

117.    With respect to Nextel Brazil's FY 2009 operational results, Defendant Hemmady

stated:

> Now looking at our operations on a market-by-market basis, Nextel Brazil posted outstanding results for the year. Nextel Brazil continues to fire on all cylinders, generating its highest level of subscriber growth in its history, adding more than 1 million gross adds while generating its highest level of segment earnings and segment earnings margins.
>
> Highlights for 2009 include net adds of 671,000, a 28% increase over 2008, driven by a 31% increase in gross adds and best-in-class levels of customer churn. Nextel Brazil's ending subscriber base is now approaching 2.5 million customers, a 37% increase over the subscriber base at the end of 2008.
>
> Driving these net add results was churn of 1.3% for the full-year 2009 and fourth-quarter churn of 1.22%, the lowest ever in our Brazil market and one of the lowest churn levels in Company history. Brazil has been our leader in customer retention, with monthly churn consistently at or below 1.4% for the last three years.

118.    With respect to Nextel Peru's FY 2009 operational results, Defendant Hemmady

further noted that "Nextel Peru again drove very strong subscriber growth, generating a 26%

increase in its ending subscriber base compared to the end of 2008."

Case 1:14-cv-00227-LPS Document 15-1 Filed 10/28/14 Page 32 of 127 PageID #: 1013
Case 1:14-cv-00227-LPS Document 15-1 Filed 07/23/14 Page 62 of 154
Pg 62 of 154

119.    During the question-and-answer period following Defendants' initial prepared remarks, Ric Prentiss, a Raymond James analyst, asked Defendant Dussek about 3G-PTT launch timing:

> RIC PRENTISS:  Any quantification on the push-to-talk as far as timing of getting that moving and what kind of dollar value that might be?
>
> DEFENDANT DUSSEK:   Yes, Ric.  This is Steve.  We are still poised to have push-to-talk probably in the first half of 2011, and things are moving as we expected with that.  ***We're very confident as Gokul said in terms of the quality of the product, the latency, and the overall quality being certainly in the range of that all of our users expect and are used to.***

120.    Defendant Dussek also answered questions regarding Nextel Brazil's 4Q 2009 and FY 2009 results, including this exchange with Chris King, a Stifel Nicolaus analyst:

> CHRIS KING:  First of all, obviously strong metrics across-the-board in Brazil, but wanted to talk about churn in particular.  Nice sequential stepdown in churn there in the fourth quarter.   Anything in particular going on in Brazil with respect to churn during the quarter? And is the fourth-quarter run rate a decent forecast to use for 2010?
>
>               \*        \*        \*
>
> DEFENDANT DUSSEK:  Chris, this is Steve. Let me address the churn question first. Let me start by just saying as we look back at '09, the trend throughout the year obviously was improving. We had a strong improvement in the second half of the year.
>
> Now, that was based on a number of initiatives that we put in place long before the second half arrived. So we have been working on a series of initiatives throughout the Company, things like continued investment in our customer retention programs, ***some of the stronger credit standards that Gokul talked about earlier. And with an overall goal of improving the overall quality of our subscriber base.***
>
> So as we look at all of the markets and the improvement, it was really predicated on a number of the initiatives that we had put in place.
>
>               \*        \*        \*
>
> So we're very pleased with the overall direction and trend of churn. We know it's due in large part to the efforts and the initiatives we've put in place long before the third and fourth quarter, and also a benefit from the macro stuff.

*     *     *

. . . And as we go forward we will continue to work hard on all these initiatives with the overall goal of continuing to improve the quality of our base and the resulting churn.

121.    On February 25, 2010, NII filed its financial results for the period ended December 31, 2009 ("FY 2009") with the SEC on Form 10-K (the "FY 2009 Form 10-K). Defendants Dussek, Hemmady and Shindler signed the FY 2009 Form 10-K.

122.    According to the FY 2009 Form 10-K:

In addition, we are working with equipment suppliers to develop a future high performance push-to-talk service utilizing WCDMA technology with performance characteristics that are similar to those provided by our current Direct Connect service.

Although a number of our competitors have launched or announced plans to launch services that are designed to compete with Nextel Direct Connect, *we do not believe that the services that have been deployed by our competitors to date compare favorably with our service in terms of latency, quality, reliability or ease of use.*

123.    Analysts echoed Defendants' positive statements concerning the roll-out of NII's 3G network in Peru.  For example, on March 16, 2010, Wells Fargo Securities issued a report noting "positive insights on Peru 3G," highlighting discussions with management that "indicate[d] that NIHD's 3G offering in Peru is receiving positive traction even with limited advertising and only air cards available."  Because of these positive trends, the report stated that Wells Fargo "expect[ed] 3G sales in Peru to gain momentum throughout the year."  Additionally, analysts recognized the importance of the Company's plan to roll-out its 3G network across Latin America.  For example, on April 7, 2010 Deutsche Bank reported that "[t]he adoption of WCDMA (3G) has helped NII reduce the risk of its technological evolution that has punished the company's valuation."

124.    The statements set forth above in ¶¶112-22 were materially false and/or misleading.  Contrary to statements that NII "successfully launched [its] 3G network" with the sale of data cards for 3G mobile broadband, which was greeted by consumers with "early acceptance," Defendants knew or were reckless in not knowing that there were serious problems with the launch of the Company's 3G network at its earliest stages as set forth above in ¶¶48-90.  Additionally, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶111 were materially misleading because Defendants failed to quantify and disclose the internally tracked "actual churn," which included two significant groups of subscribers – subscribers who deactivated their service within 30 days of initially purchasing it, and subscribers who migrated from 3G back to the older 2G technology.  The failure to disclose that the Company's consolidated churn rate and its subsidiaries' churn rates did not include these customers (despite the fact that NII tracked these customers in monthly reports that were provided to Defendants Dussek and Hemmady) was material to investors because the existence and relative size of these groups would have indicated the exact thing that investors were unaware of – that (i) NII's 3G launch in Peru was failing miserably and (ii) delays in launching 3G in its two biggest markets, Mexico and Brazil, and the failure to offer cutting-edge handsets were causing subscribers to leave the Company in droves.

125.    Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above (¶¶91-96).  Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were misleading because

Defendants failed to disclose that they achieved this purported consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id*.

126. Moreover, the statements set forth above in ¶¶112-22 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

### B. NII's 1Q 2010 Financial and Operational Results

127. On April 29, 2010, NII issued a press release announcing its financial results for the three months ended March 31, 2010 ("1Q 2010") (the "April 29, 2011 Press Release"). In the April 29, 2011 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 1.69%; Nextel Brazil: 1.28%; and Nextel Peru: 2.06%.

128. On April 29, 2010, Defendants held a conference call with analysts to discuss the Company's financial results for 1Q 2010 (the "April 29, 2010 Conference Call").

129. During the April 29, 2010 Conference Call, Defendant Dussek touted the Company's operational results as follows:

> Our results reflect strong operating performance across our markets, highlighted by another quarter of outstanding results in Brazil and improving results in Mexico. Nextel Brazil grew its ending subscriber base by 37% compared to a year ago . . . .

130. Additionally, with respect to the launch of the Company's 3G network in Peru and the testing of 3G-PTT Defendant Dussek stated:

> We continue to make progress in our efforts to deploy 3G capabilities consistent with our goal of providing the highest quality services to our

customers. During the first quarter, there were a number of important milestones and developments in our 3G efforts. ***We successfully launched broadband data services on our 3G network in Peru, followed by the launch of 3G voice services in that market earlier this month.*** We continued to make progress on the development of our 3G network in Chile, with plans to launch the network by the middle of next year. ***We saw positive results in the early system testing of the QChat technology designed to support high performance push-to-talk services on the WCDMA platform.*** Based on the test results to date, ***we are confident that this product will meet the needs of our customers who understand the value of the instantaneous communications supported by our push-to-talk services.*** We plan to launch a high performance push-to-talk solution on our 3G network in Peru in early 2011.

131.     Following Defendant Dussek's prepared remarks, Defendant Hemmady stated:

We generated 377,000 net adds, bringing our subscriber base at quarter end to over 7.7 million subscribers, an increase of 20% compared to our base at the end of the fourth quarter of 2009. Our continued focus on customer retention across all markets resulted in a 40 basis point reduction in our consolidated churn rate compared to the first quarter of 2009, and a 15 basis point reduction from our churn rate in the fourth quarter of 2009. Our first quarter consolidated monthly churn rate of 1.69% was the primary factor driving the sequential increase of net adds during the first quarter. Higher gross adds also contributed to a 42% increase in net adds for the quarter compared to the fourth quarter of 2009.

                           *        *        *

. . . On a consolidated basis, gross adds improved by 14% compared to the same period last year as strong customer demand, aided by improved economic conditions, helped drive an increase in gross adds. ***We believe that our continuing effort to improve the quality of our subscribers and to keep those customers for a longer period will lead to increased profitable growth over the long-term. The success of these efforts is reflected in the significant improvement in our churn rate for the quarter*** . . . .

***We have also implemented strategies in some of our markets to improve the revenue profile of our customers.*** These strategies include offering enhanced data services and new rate plan structures to stimulate usage, all supported by targeted marketing campaigns. . . .

132.     With respect to Nextel Brazil's 1Q 2010 operational results, Defendant Hemmady

further stated:

- 42 -

Now looking at operations on a market by market basis, Nextel Brazil continues to deliver excellent results, highlighted by outstanding subscriber growth and best in class operational metrics. Highlights from Brazil include net adds of 181,000, a 42% increase over the first quarter of 2009 driven by a 37% increase in gross adds and ***churn of 1.28%, a 10 basis point improvement over the same period last year***. . . .

133.    During the same call, following Defendants' initial prepared remarks, Defendant Dussek had the following exchange with Ric Prentiss, a Raymond James analyst, regarding Nextel Brazil's reported churn rate:

RIC PRENTISS:   As I look at the results . . . churn was particular impressive.   Can you break that down into how much the economy stabilizing and starting to improve helped the churn in the different markets versus your company actions.

DEFENDANT DUSSEK: . . . Brazil relative to our expectations, it has been very consistent in Brazil for the last eight quarters, and we have seen nothing going on this that market that changes that either on involuntary side driven by macroeconomics, or competitive issues on the voluntary side.  So kind of right where we expect it to be and no change there. . . .

In the [sic] Peru, churn has also come down significantly over time . . . I think that's more indicative of us putting, again, the initiatives in place and having those take root. . . .

134.    On May 6, 2010, the Company filed its 1Q 2010 financial results with the SEC on Form 10-Q (the "1Q 2010 Form 10-Q").  The Form 10-Q was signed by Defendants Dussek and Hemmady.  With respect to the use of the Company's PTT technology on its new 3G network in Latin America, the 1Q 2010 Form 10-Q stated the following:

In addition, we are in the process of developing a high performance push-to-talk service that utilizes wideband CDMA, or WCDMA, technology in an effort to continually provide differentiated service to our customers as we acquire spectrum rights and deploy WCDMA-based networks. ***Our competitors have introduced competitive push-to-talk over cellular products, but we believe that the quality of our Direct Connect service is superior at this time.***

135.    Analysts echoed Defendants' positive statements concerning the roll-out of the Company's 3G network in Peru, including Wells Fargo, which issued a report on April 29, 2010

stating that NII's purportedly successful 3G offerings in Peru "bode well for other countries" and are "a significant positive for NIHD as it proves the business case for 3G."

136. The statements set forth above in ¶¶129-34 were materially false and misleading when made. Contrary to statements that NII had a "successful launch" of its 3G network in Peru, Defendants knew or were reckless in not knowing that there were serious problems with the Company's launch of the 3G network at its earliest stages as set forth above in ¶¶48-90. Additionally, Defendants' statements concerning "positive results" from the Company's testing of "high performance push-to-talk" services were materially misleading because Defendants knew or were reckless in disregarding the fact that these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic.

137. Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶127 were materially misleading because Defendants failed to quantify and disclose "actual churn," which was tracked internally and more accurately described the true status of the Company's subscriber base.

138. Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96. Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were misleading because Defendants failed to disclose that they achieved this consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id.*

139.     Moreover, the statements set forth above in ¶¶129-34 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

**C.     NII's 2Q 2010 Financial and Operational Results**

140.     On July 29, 2010, NII issued a press release announcing its financial results for the three months ended June 30, 2010 ("2Q 2010") (the "July 29, 2010 Press Release"). In the July 29, 2010 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 1.71%; Nextel Brazil: 1.38%; and Nextel Peru: 2.06%.

141.     On July 29, 2010, Defendants held a conference call with analysts to discuss NII's financial results for 2Q 2010 (the "July 29, 2010 Conference Call").

142.     During the July 29, 2010 Conference Call, Defendant Dussek stated the following regarding the implementation of the Company's 3G network in Peru:

> Second, we continued our efforts to deploy 3G capabilities in pursuit of our goal to provide the highest quality services to our customers. For example, **in Peru, our mobile broadband offering on our new 3G network continued to experience strong demand.**

143.     Defendant Dussek further stated:

> Working with our vendors, we continue to make progress on the development efforts related to our high-performance push-to-talk solution on the WCDMA platforms. **The positive results that we've experienced thus far validate our confidence that our push-to-talk services on this platform will meet the needs and expectations of our customers.** We are planning to move ahead with our planned field tests in Peru in the fall of this year.

- 45 -

144.    Defendant Dussek also stated:

> *The development of our high-performance push-to-talk service on the WCDMA platform continues to deliver outstanding results*, and we are excited about the opportunity to deploy this service in our markets in the first half of 2011.

145.    Following Defendant Dussek's prepared remarks, Defendant Hemmady further commented on NII's operational results for 2Q 2010, stating:

> *We again generated excellent subscriber growth, delivering one of our highest levels of quarterly net adds ever, driven by continued demand for our services and improvement in customer retention.* This robust growth was balanced with our continued effort to manage our costs as we reported strong consolidated OIBDA. We believe that our focus on key operating metrics and on adding high-quality subscribers has enabled us to produce these outstanding results.
>
> Here are some highlights for the second quarter. We generated 392,000 net adds, bringing our subscriber base at quarter end to nearly 8.2 million subscribers, an increase of 22% compared to our subscriber base at the end of the second quarter of 2009. Gross adds for the quarter reflected a 20% year-over-year improvement and a 5% improvement compared to the first quarter of this year.
>
> Even with our strong growth, *our focus on customer retention remained at the forefront and resulted in a second-quarter consolidated churn rate of 1.71%, a 45 basis point reduction in our consolidated churn*, compared to the second quarter of 2009. *That focus, combined with higher growth add productivity, resulted in significant increases in net adds compared to the second quarter of last year.*
>
> *                 *                 *
>
> Let's take a look at some of the operation result in greater detail. On a consolidated basis, gross adds improved by 20%, compared to the second quarter of 2009, driven by robust customer demand and improving economic conditions in most of our markets. *We remain focused on our efforts to improve the quality of our customer base, adding the right profile of customers in an effort to improve customer retention. This has resulted in a year-over-year reduction in our consolidated churn to 1.71% for the quarter, the fourth consecutive quarter in which our consolidated churn has been below 2%.*

146. With respect to Nextel Brazil's operating results for 2Q 2010, Defendant Hemmady reported:

> Now looking at operations on a market-by-market basis, Nextel Brazil continues to deliver excellent results headlined by outstanding subscriber growth and best-in-class operation metrics. Highlights for Brazil include net adds of 204,000, a 22% increase over the second quarter of 2009, driven by a 27% increase in gross adds and continued stability in our churn level.
>
> Nextel Brazil's ending base of 2.9 million subscribers grew 36% over the subscriber base at the end of the second quarter of last year.

147. With respect to Nextel Peru's operational results for 2Q 2010, Defendant Hemmady stated:

> Nextel Peru again drove very strong net subscriber growth, generating 60,000 net adds, resulting in a 29% increase in the ending subscriber base, compared to the end of the second quarter of last year. This strong subscriber growth was aided by a 20 basis point reduction in churn and an increase of 25,000 gross adds when compared to the second quarter of 2009. ***Our customer retention program and focus on the quality of our customer base drove positive improvement in Peru's churn results.*** We remain pleased with the strong demand for our recently launched mobile broadband service on our 3G network in Peru, which continues to drive traffic to (inaudible) channels.

148. Defendant Dussek had the following exchange with Kevin Roe, an analyst from Roe Equity Research, regarding the design of the 3G-PTT trials:

> KEVIN ROE: . . . first on the PTT on WCDMA trial, I'm curious if you could give us some more detail there, how big of a trial it will be, how long the trial will last, and when you hope that product will be commercial. . . .
>
> DEFENDANT DUSSEK: With respect to the first question on the high-performance push-to-talk on WCDMA, the field trials will begin later this year in the fall timeframe. ***It will be on a sizeable number of sites within our coverage and will give us a good full testing of real live environments.*** . . .

149. On August 6, 2010, NII filed its 2Q 2010 financial results with the SEC on Form 10-Q (the "2Q 2010 Form 10-Q"). Defendants Dussek and Hemmady signed the 2Q 2010 Form

10-Q.  With respect to the use of the Company's PTT technology on its new 3G network in Latin America, the 2Q 2010 Form 10-Q included the same or substantially the same statements set forth in ¶122 above.

150.    Analysts echoed Defendants' positive statements concerning the roll-out of NII's 3G network in Peru.  For example, Deutsche Bank issued a report on September 6, 2010 noting that NII's "Peruvian management remains very confident about its ability to provide high quality PTT on 3G network" and, as a result, Deutsche Bank "expect[s] PTT on 3G to be a success and maintain [its] Buy rating on the stock."

151.    The statements set forth above in ¶¶142-49 were materially false and misleading. Contrary to statements that there was a "strong demand" for NII's 3G network, Defendants knew or were reckless in not knowing that there were serious problems with the Company's launch of the 3G network at its earliest stages as set forth in ¶¶48-90 above.  Additionally, Defendant Dussek's statement concerning the design of the 3G-PTT field trials was materially misleading because these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic in a real-world environment.

152.    Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶140 were materially misleading because Defendants failed to report "actual churn."

153.    Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96.  Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were misleading because

Defendants failed to disclose that they achieved this purported consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id.*

154.    Moreover, the statements set forth above in ¶¶142-49 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

**D.    NII's 3Q 2010 Financial and Operational Results**

155.    On October 28, 2010, NII issued a press release announcing its financial results for the three months ended September 30, 2010 ("3Q 2010") (the "October 28, 2010 Press Release").  In the October 28, 2010 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 1.64%; Nextel Brazil: 1.36%; and Nextel Peru: 2.06%.

156.    On October 28, 2010, Defendants held a conference call to discuss NII's financial results for 3Q 2010 (the "October 28, 2010 Conference Call").

157.    During the October 28, 2010 Conference Call, Defendant Dussek touted the fact that the Company "generated strong subscriber growth during" 3Q 2010 "adding 436,000 net subscribers to our network" which was "a new record for NII."  According to Dussek this strong growth "was highlighted by continued strong performance in Brazil, where our subscriber base surpassed the 3 million mark."

158.    With respect to the implementation of the 3G network in Peru, Defendant Dussek also stated:

We are also making progress on the development of our high-performance push-to-talk solution on the WCDMA platform, with field trials currently ongoing in Peru. ***The results of our testing to date have increased our confidence that push-to-talk services on our 3G platform will meet the high expectations of our customers***, expectations that come from their experience with our unmatched IM-based push-to-talk services.

159.    Following Defendant Dussek's prepared remarks, Defendant Hemmady confirmed that NII's "record subscriber growth was driven by a combination of continued success in our customer retention efforts and higher levels of gross add productivity."

160.    Defendant Hemmady subsequently provided analysts with 3Q 2010 highlights:

Here are some highlights for the third quarter.  We generated 436,000 net adds, bringing our subscriber base at quarter end to nearly 8.6 million subscribers, an increase of 22% compared to the end of the third quarter of 2009.  Gross adds sold for the quarter also set a record and represented a 17% year-over-year improvement relative to the third quarter of 2009.

Even with our strong subscriber growth, we remained committed to adding high-quality customers.  ***This commitment is reflected in our consolidated churn rate of 1.64%, a 30 basis point improvement compared to the third quarter of 2009.***

\*    \*    \*

. . . On a consolidated basis, gross adds improved 17% compared to third quarter of 2009, driven by improving customer demand, innovative pricing strategies, and improving economic conditions in most of our markets.  ***The initiatives that we put into place last year to enhance the quality of our customer base continued to pay dividends in the form of improved customer retention and year-over-year reduction in our consolidated churn to 1.64% for the quarter.  This is the third consecutive quarter in which our consolidated churn has been at or below 1.7%.***

161.    With respect to Nextel Brazil's results, Defendant Hemmady stated:

Nextel Brazil delivered outstanding results, headlined by excellent subscriber growth and strong operational metrics across the board.  Highlights for Brazil include 245,000 net adds, a 33% increase over the third quarter of 2009 and a record level for Nextel Brazil.  This performance was driven by a 33% increase in gross adds compared to the third quarter 2009, and continued low churn of 1.36% in the period.

> *Nextel Brazil's continued low churn is even more remarkable considering that Nextel Brazil has generated a 40% compound annual growth rate in subscribers during that period.*
>
> Nextel Brazil's ending base of 3.1 million subscribers grew 36% over the subscriber base at the end of the third quarter of last year.

162.  With respect to Nextel Peru's results, Defendant Hemmady stated:

> Nextel Peru again drove strong subscriber growth and reached an important milestone, as the customer base crossed the 1 million mark. Nextel Peru generated 63,000 net adds, resulting in a 29% increase in the ending subscriber base compared to the end of the third quarter last year. *This impressive subscriber growth was driven by an increase of 29,000 gross adds and stable churn.* We remain pleased with the demand for our mobile broadband service on our 3G platform in Peru, which also continued to *drive traffic to our retail channel*.

163.  Subsequently, Defendant Dussek issued some final prepared remarks before turning the call over for questions, including the following statement:

> we continue to see positive results in our development of high-performance push-to-talk capability for our 3G platforms. *Field trials are progressing very well in Peru. The technology is performing to our expectations*, and we are looking forward to our commercial launch of this product in Peru during the first half of the next year.

164.  Later, during the question-and-answer portion of the October 28, 2010 Conference Call, Defendant Dussek answered several analyst questions concerning the Company's field trials of PTT voice on its new 3G network:

> GRAY POWELL: . . . And then just given the development of push-to-talk on WCDMA, do you have any indication on the potential number of iDEN voice customers that might want to upgrade next year when the product is available?
>
> \*        \*        \*
>
> DEFENDANT DUSSEK: And on the upgrade, we are still working on all of that, Gray. *But we are just very excited with the way that the technology is performing in the field trials*, and that we are excited to get this launched in the first half of '11, and *we are very happy with the progress and very confident this is going to work and work well*.

                                    *        *        *

        KEVIN ROE:  . . . on the field trials, the high-performance push-to-talk
        field trials, it is great to hear that they are going well. Can you share with
        us any specific achievements of the trial or milestones?

                                    *        *        *

        DEFENDANT DUSSEK:  On the field trials, obviously the field trial is in
        a live environment, which is certainly far different than the lab
        environment, where we were pleased with those results. In terms of
        milestones or what's happening, *I would just tell you that both on the
        latency side and the call setup side, it is -- the performance is certainly
        meeting our expectations in that regard, coupled with very good voice
        quality*. Now, we are still testing this, and it has been underway just over
        30 days or so. And we're still testing that. . . .

        ROE:  How about hand-off, voice quality, that sort of thing?

        DEFENDANT DUSSEK:  That's what I'd mentioned. *Very good voice
        quality, and of the interop[erability] between the WCDMA and iDEN,
        everything very positive.*

        165.    On November 9, 2010, NII filed its 3Q 2010 financial results with the SEC on

Form 10-Q (the "3Q 2010 Form 10-Q").  Defendants Dussek and Hemmady signed the 3Q 2010

Form 10-Q.  With respect to the use of the Company's PTT technology on its new 3G network in

Latin America, the 3Q 2010 Form 10-Q included the same or substantially the same statements

set forth in ¶122 above.

        166.    Following the October 28, 2010 Conference Call, analysts issued reports echoing

Defendants' positive statements about the use of NII's PTT on its new 3G network in Peru.  For

example, on December 13, 2010, Wells Fargo issued a report stating that "W-CDMA PTT" was

"tracking well" and "meeting all of NIHD's voice quality, call set up and latency requirements."

According to Wells Fargo, the purportedly successful PTT voice 3G trials "should be viewed

positively for NIHD" because "it will allow the company to integrate 3G service with its existing

iDEN users" and "bodes well for future 3G expansion in Mexico and Brazil as NIHD will be able to launch service with both voice and data going forward vs. only data cards in Peru."

167. The statements set forth above in ¶¶157-65 were materially false and misleading when made. Contrary to statements that the 3G-PTT test results were positive and were meeting expectations with respect to latency and voice quality, Defendants knew or were reckless in not knowing that there were serious problems with the Company's testing and launch of its 3G network at its earliest stages, including slow or lagging service, dropped calls, latency problems, and connectivity disruptions that led consumers to revert to older-generation phones or leave the Company altogether to avoid using NII's 3G network. Additionally, Defendants' statements concerning "positive results" from the Company's testing of "high performance push-to-talk" services were materially misleading because Defendants knew or were reckless in disregarding the fact that these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic.

168. Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶155 were materially misleading because Defendants failed to disclose "actual churn."

169. Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96. Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were materially misleading because Defendants failed to disclose that they achieved this purported consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id.*

170.     Moreover, the statements set forth above in ¶¶157-65 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

### E.     NII's 4Q 2010 and FY 2010 Financial and Operational Results

171.     On February 24, 2011, NII issued a press release announcing its financial results for the three months and fiscal year ended December 31, 2010 (respectively, "4Q 2010" and "FY 2010") (the "February 24, 2011 Press Release"). In the February 24, 2011 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries for 4Q 2010 as follows: NII: 1.60%; Nextel Mexico: 1.77%; Nextel Brazil: 1.37%; and Nextel Peru: 1.93%. The Company further reported its consolidated churn rate and the churn rates of its subsidiaries for FY 2010 as follows: NII: 1.66%; Nextel Brazil: 1.35%; and Nextel Peru: 2.01%.

172.     Also on February 24, 2011, Defendants held a conference call to discuss the Company's 4Q 2011 and FY 2011 financial results (the "February 24, 2011 Conference Call").

173.     During the February 24, 2011 Conference Call, Defendant Dussek touted the Company's FY 2010 results, stating: "Strong demand for our services and improved customer retention lead to a 38% increase in our net subscriber additions compared to last year. We end the year with over 9 million subscribers, a 22% increase in our subscriber base."

174.     Commenting on these results, Defendant Dussek informed analysts and investors that NII had reached several 3G milestones, including the following:

Second, we achieved several milestones in our effort to extend our differentiated push-to-talk services to our 3G platform by completing lab tests and launching field trials of the QChat technology on our 3G network in Peru. ***To date, our field trials have shown that the push-to-talk service works well on our W-CDMA platform***. . . .

Third, we continue to make significant progress toward building our 3G networks and launching new services. ***In Peru, our 3G efforts are gaining momentum with strong demand for our mobile broadband services on the network we launched last year***.

175.    Following Defendant Dussek's prepared remarks, Defendant Hemmady also touted the Company's 4Q 2010 and FY 2010 results:

We also delivered a strong finish to the year highlighted by excellent subscriber growth.  During the fourth quarter, we added 436,000 net subscribers due to a combination of strong gross adds and continued improvements in customer retentions.

\*       \*       \*

. . . Our financial results for 2010 reflected a balanced approach, strong subscriber growth, supported by improved customer retention, stabilizing ARPU levels, while keeping customer acquisition costs in line and investing capital in our business while generating free cash flow. . . .

Our expanded distribution channel and a larger geographic footprint helped enable a 16% increase in gross adds over last year, but our success in attracting new customers did not divert us from our focus on customer retention efforts as consolidated churn for the year declined 35 basis points relative to 2009.  Both of these factors helped contribute to our record level of net adds during the year.

176.    With respect to Nextel Brazil's results, Defendant Hemmady made the following statements:

Nextel Brazil continues to set the standard with new annual highs in gross adds, net adds and OIBDA. . . . Highlights for 2010 include net adds of 836,000, a 25% increase over 2009 driven by a 29% increase in gross adds and strong customer retention.  Nextel Brazil's ending subscriber base was over 3.3 million customers, a 34% increase over the subscriber base at the end of 2009.

- 55 -

177.    Additionally, during Defendant Hemmady's prepared remarks he stated: "We believe that the launch of our 3G mobile broadband services drove additional traffic to our channel and enhanced our gross add productivity for our iDEN services in Peru."

178.    Following Defendant Hemmady's prepared remarks, Defendant Dussek further stated that NII had "successfully tested [the Company's] push-to-talk technology on the W-CDMA platform and [] experienced great success in [its] first 3G launch in Peru."

179.    Defendants Dussek and Hemmady also responded to analyst questions regarding the deployment of 3G in Latin America during the February 24, 2011 Conference Call.  For example, Defendant Dussek had the following exchange with Gray Powell, a Wells Fargo analyst, regarding the contribution NII's 3G network made to its results for Peru:

> GRAY POWELL:  . . . So yes, obviously, Peru saw a very nice improvement in net adds in Q4. Can you talk about the drivers there and how much of that was attributable to your 3G product? And then just how should we expect the run rate going forward? Is this kind of the new level for Peru?
>
> DEFENDANT DUSSEK:  Okay, Gray, it's Steve. In terms of what the drivers were, you are absolutely correct when you say we had a strong fourth quarter, but I look at the whole year in 2010 for Peru and I thought it was a very, very good year throughout the course of 2010 in terms of subscriber growth and the other key metrics of our business.
>
> But the real catalyst for our increase in net adds systemically through the course of the year were *we have improved customer retention there like we have in the majority of our markets and resulting in a lower churn metric. We have had stronger gross additions fueled by both the launch of 3G* and the overall awareness that that brought to the market through the advertising and the launch campaign that we have. So that drove more traffic through our stores that ended up taking either the 3G product or it also increased our demand on our voice product on iDEN. So we have had the increase in terms of gross adds. . . .

180.    Defendant Hemmady also engaged in the following colloquy with Kevin Roe, an analyst with Roe Equity Research,  regarding the roll-out of NII's 3G network:

KEVIN ROE: . . . I appreciate the update on QChat, PTT, W-CDMA in Peru, the trial there. Can you give us some more detail on the trial since your last call? Are you still working through bugs? My sense is the latency issue is perfectly fine. Any additional detail would be appreciated.

\*      \*      \*

DEFENDANT DUSSEK: Kevin, this is Steve. Let me give you the update on the high-performance push-to-talk development. I will just say, throughout the course of last year, we made substantial progress on the development of the high-performance push-to-talk on the new platform. I think, in large part, our team internally here has done a terrific job in working with our suppliers in a real partnership to move this forward.

We talked about the early phases, the design and being in the lab and all that and *that our test in terms of latency and quality of call was exceeding our expectations.* And then we moved into the current phase, which is the field trial in Peru, which is currently taking place and *the results in our view are very strong.* We have done, as you can imagine, the calls between W-CDMA to W-CDMA. We have done W-CDMA to iDEN. *The end-user experience from our perspective is very similar to what is experienced today in terms of both latency and call quality.*

So suffice it to say that *we are very pleased with the progress, the development*. . . .

So just in summary there, we are very pleased with the development. We are very pleased with the current trials. . . .

181. On February 24, 2011, the Company filed its financial results for the year-ended December 31, 2010 with the SEC on Form 10-K (the "FY 2010 Form 10-K"). Defendants Shindler, Dussek and Hemmady signed the FY 2010 Form 10-K. With respect to the use of NII's PTT technology on its new 3G networks in Latin America, the FY 2010 Form 10-K included the same or substantially the same statements set forth above in ¶122.

182. Once again, analysts echoed Defendants' positive statements regarding NII's development and deployment of its 3G network in Latin America. For example, on March 10, 2011, Wells Fargo issued a report stating that because "NIHD experienced an acceleration in

both net add and revenue growth in Peru after launching 3G services in Q1'10," "3G launches in Mexico and Brazil will enable NIHD to improve net adds to over 2.0MM in 2012."

183.    The statements set forth above in ¶¶173-81 were materially false and misleading when made. Contrary to statements that the launch of its 3G network in Peru was a "great success," generating a "strong demand" for NII's 3G services, Defendants knew or were reckless in not knowing that there were serious problems with the Company's launch of the 3G network at its earliest stages, including slow or lagging service, dropped calls, latency problems, and connectivity disruptions that led consumers to revert to older generation phones or leave the Company altogether to avoid using NII's 3G network. Additionally, Defendants' statements concerning positive results from the Company's testing of "high performance push-to-talk" services were materially misleading because Defendants knew or were reckless in disregarding the fact that these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic on the real 3G network.

184.    Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶171 were materially misleading because Defendants failed to disclose the Company's "actual churn."

185.    Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96. Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were misleading because Defendants failed to disclose that they achieved this purported consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id.*

186.     Moreover, the statements set forth above in ¶¶173-81 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

F.     **NII's 1Q 2011 Financial and Operational Results and Peru Investor Day**

187.     On April 28, 2011, the Company issued a press release announcing its financial results for the three months ended March 31, 2011 ("1Q 2011") (the "April 28, 2011 Press Release").   In the April 28, 2011 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 1.61%; Nextel Brazil: 1.43%; and Nextel Peru: 1.99%.

188.     On April 28, 2011, Defendants held a conference call to discuss the Company's financial results for 1Q 2011 (the "April 28, 2011 Conference Call").

189.     During the April 28, 2011 Conference Call, Defendant Dussek stated:   "Our operations in Brazil and Peru were key drivers of our subscriber growth for the quarter, highlighted by a 32% increase in Nextel Brazil's subscriber base compared to the same period last year."

190.     Regarding the purported success of the implementation of a 3G network in Peru, Defendant Dussek stated:

> In Peru, the launch of our 3G mobile broadband services enhanced the visibility of our brand and our sales of iDEN voice services, contributing to a 35% year-over-year increase in Nextel Peru's ending subscriber base.

191.     With respect to field tests of NII's 3G network, Defendant Dussek further stated:

We also continue to make progress towards the commercial launch of our push-to-talk service on our 3G network in Peru. Our field tests show that our customers will experience a push-to-talk service on WCDMA that is on par with our high quality push-to-talk service on iDEN.

192.     Following Defendant Dussek's prepared remarks, Defendant Hemmady confirmed that NII's "focus remains on attracting and retaining the most valuable customers in the industry which have produced over $3,000 of lifetime revenue per subscriber, the highest level in the Latin American market."

193.     With respect to Nextel Brazil's 1Q 2011 results, Defendant Hemmady stated:

At the market level, Nextel Brazil delivered outstanding results headlined by excellent cash flow, subscriber growth, and operational metrics. Nextel Brazil generated 190,000 net [adds], resulting in a 32% increase in the ending subscriber base, compared to the first quarter of 2010.

***This performance was driven by a 21% year-over-year increase in gross [adds] and continued low churn of 1.43%. Churn at this level remains the lowest in the region and its consistent with what we have been seeing from our Brazil team in the past 5 years.***

194.     With respect to Nextel Peru's 1Q 2011 results, Defendant Hemmady further stated:

Nextel Peru again delivered strong subscriber growth generating 97,000 net ads [sic], resulting in a 35% increase in the ending subscriber base compared to the first quarter of 2010. This impressive subscriber growth was generated from a 43% year-over-year increase in gross [adds], combined with a 5 basis point, year-over-year decline in churn. We remain enthusiastic about the demand for our mobile broadband services on our 3G platform in Peru.

We have also seen a significant benefit from the 3G launch in the form of greater customer awareness of our brand and services, which has increased traffic to our retail channel and resulted in additional sales of our iDEN voice services.

195.     Defendant Dussek also answered analysts' questions during the April 28, 2011 Conference Call, including the following exchange with Kevin Roe, an analyst with Roe Equity Research:

- 60 -

KEVIN ROE: Peru net adds continue to be quite strong. Have you broken out how many were mobile broadband versus, how much the advertising campaign of 3G has driven people into the stores and they're buying extra iDEN?

DEFENDANT DUSSEK: Yes, Rick, it's Steve. As we noted on prior calls, certainly, the launch of 3G in the market has benefited us in terms of overall traffic flow into our expanded distribution locations. The 3G is certainly helping with visibility and that's being realized through the expanded channels. In terms of breaking things out, we look at that 3G has been in the high single digit in terms of percent, but the majority of the base is still voice.

. . . Overall we are very, very pleased with the launch impact, the ability that we've seen for that to drive traffic through our expanded distribution and then the trajectory given when we come in to the high performance push-to-talk, we think that bodes well for us as we move forward, as we expected.

196.    On May 5, 2011, the Company filed its 1Q 2011 results with the SEC on Form 10-Q (the "1Q 2011 Form 10-Q"). Defendants Dussek and Hemmady signed the 1Q 2011 Form 10-Q. With respect to the use of the Company's PTT technology on its new 3G network in Latin America, the 1Q 2011 Form 10-Q included the same or substantially the same statements set forth in ¶122 above.

197.    Analysts subsequently issued positive reports concerning the development and deployment of NII's 3G network in Latin America. For example, on April 28, 2011, JPMorgan issued a report stating that "3G [is] working on Peru" which is a "positive signal on the technological transition that NIHD is facing." Indeed, JPMorgan went so far as to call NII its "top pick" in part because JPMorgan believed that "the transition to 3G will go through and eliminate technological uncertainty, reliance on an outdated technology and expand the group of potential consumers due to mobile broadband." Wells Fargo also issued a report on the same day reporting that "Peru 3G PTT development [is] tracking well" and that "3G PTT talk is performing on levels similar to that of iDEN."

198.     On May 12, 2011, Defendants held an "Investor Day" in Lima to discuss the launch of its PTT 3G service in Peru (the "May 12, 2011 Investor Day").

199.     During the May 12, 2011 Investor Day, Defendant Hemmady stated the following with respect to the Company's PTT 3G offering in Latin America:

> Over the last several months, you've heard us express confidence in our ability to very effectively create the Push-to-Talk on this new platform. PTT on our current platform has been a key differentiator for us and you will see very clearly today at the end of the day we will demonstrate to all of you very clearly that *we believe very strongly that Push-to-Talk on WCDMA works like it does on iDEN* and will continue to be a very important element for us as we go towards this destination that I've painted. So towards the end of the day, as you go through our MSO and demonstrate our Push-to-Talk capability on WCDMA, *you will see how that is extremely comparable to our current iDEN platform and will continue to be a key differentiator for us going forward*.

200.     That same day, several analysts issued reports commenting on the success of NII's 3G-PTT testing. For example, Wells Fargo stated that "the successful demonstration of 3G PTT represents the passage of yet another long-term overhang on NIHD shares" and indicates "that the official commercial launch in Peru (late August 2011) will serve as the next catalyst to disprove NIHD critics." Deutsche Bank noted in a report issued the same day that NII's ability to run a demonstration of PTT on 3G network without latency issues "represents enormous progress as previous attempts to offer PTT on non-iDEN technologies were frustrating due to high latency."

201.     The statements set forth above in ¶¶189-96 and ¶199 were materially false and misleading when made. Contrary to statements that NII was gaining traction because of its 3G network in Peru, Defendants knew or were reckless in not knowing that there were serious problems with the Company's testing and launch of the 3G network at its earliest stages, including slow or lagging service, dropped calls, latency problems, and connectivity disruptions that led consumers to revert to older-generation phones or leave the Company altogether to avoid

using NII's 3G network. Additionally, Defendants' statements concerning positive results from the Company's testing of "high performance push-to-talk" services were materially misleading because Defendants knew or were reckless in disregarding the fact that these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic on the real 3G network.

202. Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶187 were materially misleading because Defendants failed to disclose "actual churn."

203. Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96. Statements touting Nextel Brazil's consistently low churn rate over a period of quarters or fiscal years also were misleading because Defendants failed to disclose that they achieved this consistency by gaming NII's policies for involuntarily deactivating subscribers, *see id.*

204. Moreover, the statements set forth above in ¶¶189-96 and ¶199 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

### G.    NII's 2Q 2011 Financial and Operational Results

205. On July 28, 2011, the Company issued a press release announcing its financial results for the three months ended June 30, 2011 (2Q 2011) (the "July 28, 2011 Press Release").

In the July 28, 2011 Press Release, the Company reported its consolidated churn rate and the

churn rates of its subsidiaries as follows: NII: 1.71%; Nextel Brazil: 1.59%; and Nextel Peru:

2.11%.

206. On July 28, 2011, Defendants held a conference call with analysts to discuss the

Company's financial results for the three months ended June 30, 2011 ("2Q 2011") (the "July 28,

2011 Conference Call").

207. During the July 28, 2011 Conference Call, Defendant Dussek commented on the

Company's financial and operational results for 2Q 2011, stating:

> Our focus on quality service and attracting valuable customers drove a
> 36% increase in our OIBDA compared to second quarter last year. Low
> churn and solid ARPU results were indicative of our success in attracting
> high-quality customers.

208. Commenting on Nextel Brazil's operating results, Defendant Dussek stated:

> Nextel Brazil's growth led the way with 205,000 net adds resulting in a
> 30% increase in its subscriber base from a year ago. Nextel Brazil
> continues to drive, not only strong subscriber growth, but also exceptional
> revenue and cash flow growth.

209. Following Defendant Dussek's prepared remarks, Defendant Hemmady also

commented on the Company's 2Q 2011 operational results:

> We generated 382,000 net adds bringing our subscriber base at quarter end
> to 9.8 million subscribers. An increase of 20% compared to the end of the
> second quarter of 2010.
>
>     *      *      *
>
> Let's take a look at some of the operational results in greater detail. On a
> consolidated basis, gross adds improved by 9% compared to the second
> quarter of 2010 driven by customer demand for our differentiated services
> and stable economic conditions in most of our markets. ***Consolidated
> churn at 1.7% was flat compared to the second quarter of 2010 but up
> slightly from the first quarter. This represents the sixth consecutive
> quarter that our consolidated churn has been at or below 1.7% which
> remains one of the best retention levels in the region.***

- 64 -

210.    With respect to Nextel Brazil's 2Q 2011 operational results, Defendant Hemmady stated:

> We also continue to invest in capacity across all of our markets to maintain our strong network quality on our end. At the market level Nextel Brazil delivered excellent segment earnings and good subscriber growth for the quarter. Nextel Brazil generated 205,000 net adds ending the quarter with 3.7 million subscribers. A 30% increase in its ending subscriber base compared to the second quarter of 2010.
>
> This performance was driven by an 18% year-over-year increase in gross adds but slightly offset by higher churn of 1.59% when compared to the same period last year. While churn increased 15 basis points sequentially due to higher involuntary churn, ***it still remains the lowest amongst wireless carriers in the region.***

211.    Following Defendants' prepared remarks, Defendant Dussek answered analysts' questions concerning the roll-out of NII's 3G network in Latin America, including the following exchange with Andrew Campbell, a Credit Suisse analyst:

> ANDREW CAMPBELL:  I was wondering since the Peru investor day, if you have any additional color on the technology deployment with 3G. In particular I think they [sic] were still some additional testing to be done in terms of the integration of the technology with the existing network. So I just wondered if you had any update on that regard? Thank you.
>
> DEFENDANT DUSSEK:    Yes, Andrew it's Steve. Thanks for the question. We continue to make the -- right on track with our progress there and things are looking as we expect. So no changes, no delay. Really looking at a product as you saw and experienced that works and works well. So the launch is on track and product development on track.

212.    On August 4, 2011, NII filed its 2Q 2011 financial results with the SEC on Form 10-Q (the "2Q 2011 Form 10-Q").  Defendants Dussek and Hemmady signed the 2Q 2011 Form 10-Q.  With respect to the use of the Company's PTT technology on its new 3G network in Latin America, the 2Q 2011 Form 10-Q included the same or substantially the same statements set forth in ¶122 above.

213.    Following the July 28, 2011 Press Release and Conference Call, several analysts issued reports echoing Defendants' positive statements concerning NII's roll-out of PTT on Nextel Peru's 3G network.  For example, in a July 29, 2011 report, Wells Fargo stated that the "3G PTT launch in Peru [is] on target."  Additionally, after the Company filed the 2Q 2011 Form 10-Q, William Blair & Co. (William Blair) issued an analyst report noting that "Nextel's ability to achieve high-performance push-to-talk on 3G phones is tremendously significant."

214.    The statements set forth above in ¶¶207-12 were materially false and misleading when made.  Contrary to statements that the launch of the Company's 3G network in Peru was "on track," Defendants knew or were reckless in not knowing that there were serious problems with the Company's launch of the 3G network at its earliest stages, including slow or lagging service, dropped calls, latency problems, and connectivity disruptions that led consumers to revert to older-generation phones or leave the Company altogether to avoid using NII's 3G network.  Additionally, Defendants' statements concerning positive results from the Company's testing of "high performance push-to-talk" services were materially misleading because Defendants knew or were reckless in disregarding the fact that these tests utilized only a small number of devices and failed to indicate whether the Company's systems could support commercial levels of traffic in real world conditions.

215.    Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶205 were materially misleading because Defendants failed to disclose "actual churn."

216.    Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96.  Significantly, Defendants' failure to disclose

this scheme rendered statements concerning the fact that Nextel Brazil's churn rate had risen in

2Q 2011 due to "involuntary deactivations" materially misleading, as set forth above in ¶¶91-96.

217. Moreover, the statements set forth above in ¶¶207-12 regarding *how* NII was able

to report higher gross and net subscriber adds and lower churn rates were false and misleading

when made because during this period Defendants were implementing marketing and retention

strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates.

Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by

Defendants to engage and keep the kind of high-quality customers Defendants claimed to

maintain within NII's subscriber base.

**H.    NII's Press Release Announcing Nextel Peru's Re-Launch of 3G-PTT**

218. On September 29, 2011, NII issued a press release announcing the Company's

launch of PTT services on its 3G network in Peru (the "September 29, 2011 Press Release").

Specifically, the September 29, 2011 Press Release stated the following:

> NII Holdings, Inc. [NASDAQ: NIHD], a provider of differentiated mobile
> communications services under the Nextel brand in Latin America,
> announced today that its operating subsidiary, Nextel Peru, has launched
> Push-to-Talk (PTT) services on its new W-CDMA network in Peru. *The
> new PTT services are tightly integrated with the broadband data services
> already available on the network and deliver an instant PTT experience
> that meets the expectations of Nextel Peru's customers for best in class
> instant communications.* This is a major milestone for NII and is a key
> component in the company's strategy to pursue profitable growth across
> its markets by bringing new and innovative service offerings to its
> customers.

219. The September 29, 2011 Press Release also included the following quote from

NII's Chief Technology Officer, Alan Strauss:

> The launch of our PTT services on our new W-CDMA network is a *major
> technical achievement and the first time that a truly high performance
> PTT solution has been delivered over a commercial HSPA-enabled
> network ....* Our PTT service is the primary mode of instant
> communication for millions of customers in Latin America, and the launch

of this service integrated with the highspeed data capabilities of our next generation network provides our customers with a unique set of services that meet their voice and data needs.

220.     The September 29, 2011 Press Release further quoted Robert Ewald, NII's Vice President of Product Management, with respect to the launch of PTT on Peru's 3G network:

> We are excited about the launch of our next generation PTT services in Peru because ***it enables us to offer our customers a seamless, high performance PTT experience paired with a wide range of unique new capabilities and features*** . . . . As we deploy our next generation networks across our markets, we continue our commitment to delivering differentiated high quality wireless products and services that meet the needs of our large and growing customer base . . . .

221.     Analysts issued reports echoing Defendants' positive statements concerning the roll-out of 3G-PTT in Peru that same day including, a Wells Fargo report which called the September 29, 2011 Press Release "a positive announcement for NIHD."

222.     The statements set forth above in ¶¶218-20 were materially false and misleading when made because contrary to statements touting the launch of NII's PTT services on its 3G network in Peru as a "major technical achievement" that satisfied customers' voice and data needs by offering a "seamless, high performance experience" and "best in class instant communications," Defendants knew or were reckless in not knowing that NII's 3G-PTT technology was plagued by numerous latency and other technical issues that significantly reduced the quality of its performance and eroded customer demand for NII's PTT offerings.

**I.**     **NII's 3Q 2011 Financial and Operational Results**

223.     On October 27, 2011, the Company issued a press release announcing its financial results for the three months ended September 30, 2011 ("3Q 2011") (the "October 27, 2011 Press Release").  In the October 27, 2011 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 1.78%; Nextel Brazil: 1.64%; and Nextel Peru: 2.36%.

224.    On October 27, 2011, Defendants held a conference call for analysts to discuss the Company's 3Q 2011 financial results (the "October 27, 2011 Conference Call").

225.    During the October 27, 2011 Conference Call, Defendant Dussek announced that NII had achieved further significant 3G milestones in Peru:

> We achieved a key milestone with the launch of our push-to-talk service on our 3G in Peru. This new capability positions us to continue to offer our customers the best push-to-talk experience in the industry, while supporting a range of new features and functionality. . . . We launched our first hands with this new capability just a few weeks ago in our direct and indirect sales channels, and so far **_we have seen good customer acceptance of the product._**

226.    Following Defendant Dussek's prepared remarks, Defendant Hemmady commented on the Company's 3Q 2011 operational results:

> We generated 433,000 net adds, bringing our subscriber base at quarter-end to 10.2 million subscribers, an increase of 19% compared to the end of the third quarter of 2010. . . . Consolidated churn of 1.78% was up slightly on a sequential basis, driven primarily by an increase of an [involuntary charge].

227.    With respect to Nextel Brazil's 3Q 2011 operational results, Defendant Hemmady further stated:

> At the market level, Nextel Brazil generated solid subscriber and revenue growth, tempered somewhat by an increase in promotional activity late in the quarter. Nextel Brazil generated 209,000 [net adds] ending the quarter with 3.9 million subscribers at quarter-end, a 26% increase in its subscriber base compared to the end of the third quarter of 2010.
>
> This performance was driven by an 8% year-over-year increase in gross adds, slightly offset by a higher churn rate of 1.64% when compared to the same period last year. Although churn at this level was up slightly compared to the second quarter of 2011, it remains the lowest amongst wireless carriers in the region.

228.    With respect to Nextel Peru's 3Q 2011 operational results, Defendant Hemmady further stated:

Nextel Peru generated 66,000 net adds, ending the quarter with 1.4 million subscribers, a 33% increase compared to the third quarter of 2010. Our results in Peru continue to reflect some uncertainty surrounding the [tepid] economic outlook of the country.

229.    Defendants also participated in a question-and-answer session during the October 27, 2011 Conference Call.   Defendant Dussek had the following exchange with Kevin Roe regarding the Company's 3G network in Peru:

> KEVIN ROE:  . . . you may have talked about 3G in Peru in the opening comments, but if you could review and talk about the network performance of 3G in Peru? If there are any network performance metrics you could share, that would be great.
>
> DEFENDANT DUSSEK:  Yes, Kevin, it's Steve, obviously getting our high-performance push-to-talk service launched by the end of the third quarter was a real milestone for us. ***From a network perspective, while I don't have metrics I can share with you, I can give you an overall view on a performance basis that it has met and exceeded our expectations, and most importantly, the customers' expectations. Relative to both the quality of the call, the set-up of the call, and the interoperability between the WCDMA users and the iDEN users.***
>
> From a network perspective, it has really performed as expected, or even better than we had expected. We are very, very pleased with that. . . .

230.    On November 8, 2011, NII filed its 3Q 2011 financial results with the SEC on Form 10-Q (the "3Q 2011 Form 10-Q").  Defendants Dussek and Hemmady signed the 3Q 2011 Form 10-Q.

231.    The 3Q 2011 Form 10-Q stated the following with respect to the launch of 3G-PTT in Peru:

> In addition, we recently launched a high performance push−to−talk service that utilizes WCDMA technology on our third generation network in Peru as part of our effort to continually provide differentiated service to our customers in connection with the deployment of our planned third generation networks. Our competitors have introduced competitive push−to−talk over cellular products, but ***we believe that the quality of our Direct Connect service on our existing iDEN networks, and on our WCDMA−based networks using the high performance push−to−talk service we recently launched in Peru, is superior at this time.***

- 70 -

232. Following the issuance of the Company's 3Q 2011 financial results, analysts issued reports echoing Defendants' positive statements regarding the development and deployment of NII's 3G network in Latin America. For example, on October 27, 2011, William Blair issued a report stating that the "3G push-to-talk launch in Peru was successful in terms of both network performance and customer satisfaction." The next day, Wells Fargo issued a report noting that "the company's 3G upgrade will offer NIHD much opportunity."

233. Additionally, on December 5, 2011, William Blair issued a subsequent report stating that "[w]ith the 3G network build in Brazil on the horizon and favorable initial results from push-to-talk over 3G in Peru, we believe that NII Holdings is attractively positioned to capture growth in the Brazil market." William Blair further reported that NII's "[m]anagement has noted that it has not seen any impact from competitive push-to-talk offerings and growth in net additions is indicative of the strength of its push-to-talk line services, which will only strengthen in 2012." The following month, on January 9, 2012, Wells Fargo issued a report reminding investors that "on its Q3 2011 conference call, management indicated Peru's 3G service has 'met and exceeded' expectations both for the company itself and its customers."

234. The statements set forth above in ¶¶225-31 were materially false and misleading when made. Contrary to statements that NII "successfully launched" in Peru its "high performance" 3G-PTT service, which "met and exceeded" both the Company's and customers' expectations and offered customers "the best [PTT] experience in the industry," Defendants knew or were reckless in not knowing that NII's 3G-PTT technology was plagued with numerous technical issues that significantly reduced the quality of its performance and led consumers to revert to older-generation phones or leave the Company altogether to avoid using NII's 3G network.

235. Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶223 were materially misleading because Defendants failed to disclose "actual churn."

236. Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96. Significantly, Defendants' failure to disclose this scheme rendered statements concerning the fact that Nextel Brazil's churn rate had risen in 2Q 2011 due to "involuntary deactivations" materially misleading, as set forth above in ¶¶91-96.

237. Moreover, the statements set forth above in ¶¶225-31 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period, Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

**J.** **NII's 4Q 2011 and FY 2011 Financial and Operational Results**

238. On February 23, 2012, the Company issued a press release announcing its financial results for the three months and fiscal year ended December 31, 2011 (respectively, "4Q 2011" and "FY 2011") (the "February 23, 2012 Press Release"). In the February 23, 2012 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries for 4Q 2012 as follows: NII: 1.78%; Nextel Brazil: 1.63%; and Nextel Peru: 2.71%. Additionally, NII reported its consolidated churn rate and the churn rates of its subsidiaries for FY 2012 as follows: NII: 1.74%; Nextel Brazil: 1.58%; and Nextel Peru: 2.21%.

239.   On February 23, 2012, Defendants held a conference call for analysts to discuss

NII's 4Q 2011 and FY 2011 financial results (the "February 23, 2012 Conference Call").

240.   During the February 23, 2012 Conference Call, Defendant Dussek made the

following statement regarding the importance of NII's Latin America 3G network:

> The deployment of our advanced 3G networks and the investment in new
> systems and distribution channels are the backbone of this effort . . . . *We
> have created a groundbreaking push-to-talk service supported by our W-
> CDMA platform that will meet our customers' expectations for high-
> quality instant communication.*

241.   Regarding customer acceptance of NII's 3G network in Peru, Defendant Dussek

also stated:

> Now let me spend a few moments discussing our progress from push-to-
> talk services on 3G. With the combined effort of our team and partners
> over the past three years we have completed the development of the
> technology that will support our high-quality push-to-talk service on our
> W-CDMA networks. This was a major milestone that we reached in 2011.
>
> As you know, we began offering service using this new platform in Peru
> late last year through our direct channels and we have been collecting
> customer feedback and making adjustments to ensure that our customers'
> expectations for a high-quality push-to-talk experience are met. That
> customer feedback has shown that the service has performed very well in
> most call scenarios.
>
> And as expected with the launch of any new technology, this feedback has
> also helped us identify a few areas where improvements are needed. Our
> engineering team, working closely with our technology partners, have
> implemented solutions in these areas and we are seeing some early
> positive results. When that work is completed and we are confident that
> the service will meet customer expectations we will begin marketing the
> service more broadly across our distribution channels in Peru.

242.   Following Defendant Dussek's prepared remarks, Defendant Hemmady

commented on NII's FY 2011 operating results:

> *Customer satisfaction and our continued focus on customer retention
> efforts yielded a solid results [sic] that churn was relatively stable,
> increasing 8 basis points on a consolidated basis for the year to 1.74%,
> the lowest reported in the region.* While we saw some pressures on our

ARPU and margins, particularly late in the year, we believe that we were successful in balancing our goal delivering good profitability and growth despite some more intensive competitive conditions.

243.    Commenting on Nextel Brazil's 4Q 2011 operating results, Defendant Hemmady stated:

Turning to our markets, Nextel Brazil continued to set the standard driving significant growth in subscribers, revenues and OIBDA. Nextel Brazil surpassed the 4 million customer market in 2011 and generated $1 billion in segment earnings for the year. Highlights for 2011 include -- net adds of 796,000, driven by a 15% increase in gross adds compared to last year with a resulting ending subscriber base of over 4.1 million, a 24% increase over the subscriber base at the end of 2010. Churn of 1.58% remains the best customer retention metric in the region.

244.    With respect to Nextel Peru's 4Q 2011 operating results, Defendant Hemmady further stated:

Nextel Peru again drove strong subscriber growth resulting in a 27% increase in its subscriber base compared to the end of 2010. Despite the incremental cost associated with this growth segment earnings were up 59% reflecting improved profitability. We believe that as we expand the offering of our services on our 3G network, including a broader launch of our push-to-talk services, Nextel Peru will be able to drive more growth and profitability in 2012.

245.    Some analysts continued to echo Defendants' positive statements concerning the roll-out of 3G-PTT in Peru. For example, on February 23, 2012, Scotiabank issued a report describing the problems with Peru's 3G-PTT launch as "minor technology adjustments" the fixes for which "are already delivering positive results" and noting that "NIHD has a good track record and we see no reason to doubt the company's sincerity." Scotiabank followed up with a report on March 9, 2012 noting that "NIHD is now [its] LatAm TMT [Technology, Media & Telecom] top pick."

246.    Approximately one month later, on April 3, 2012, Wells Fargo issued a report stating that "[b]ased on our recent discussions with management, we believe some of the

- 74 -

challenges it faced between PTT and WCDMA devices are now behind it" and noting that "[t]his is significant as it should help put to rest the 'technology does not work' fears we have heard from some investors."

247.    Following its TMT Conference in Brazil where NII presented, Deutsche Bank issued a report on April 12, 2012 stating that NII's 3G "technical issues appear to be resolved. The voice transmission problem between the 3G and the iDEN networks in Peru has been fixed by software upgrades to the network and handsets."

248.    The statements set forth above in ¶¶240-44 were materially false and misleading when made.  Contrary to statements that 3G-PTT worked very well and needed only slight improvements, Defendants knew or were reckless in not knowing that NII's 3G-PTT technology was plagued with numerous technical issues that significantly reduced the quality of its performance and eroded customer demand for its PTT offerings.  Indeed, as Defendants were well aware through their receipt of monthly churn management reports, the number of subscribers who were canceling their plans within the first thirty days or migrating back to the older 2G technology was rising steadily beginning in October 2011.  Additionally, the number of service calls related to 3G-PTT issues was rising during the same period, raising the churn rate as well as the costs associated with customer care.  These numbers were not included in the consolidated churn number reported for Peru, and investors were therefore unaware that the metrics Defendants tracked closely indicated that the 3G-PTT offering was not as successful as they claimed.

249.    Further, NII's consolidated churn rate and its subsidiaries' churn rates set forth above in ¶238 were materially misleading because Defendants failed to disclose "actual churn."

250.    Likewise, NII's consolidated churn rate and Nextel Brazil's churn rate were materially understated as a result of Defendants' scheme to manipulate the number of involuntary deactivations in any given period in order to achieve a pre-established churn-rate percentage, as set forth in detail above in ¶¶91-96.

251.    Moreover, the statements set forth above in ¶¶240-44 regarding *how* NII was able to report higher gross and net subscriber adds and lower churn rates were false and misleading when made because during this period Defendants were implementing marketing and retention strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates. Significantly, as set forth in detail above in ¶¶97-110, these strategies were not intended by Defendants to engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's subscriber base.

## K.    NII's 1Q 2012 Financial and Operational Results

252.    On April 26, 2012, the Company issued a press release announcing its financial results for the three months ended March 31, 2012 ("1Q 2012") (the "April 26, 2012 Press Release"). In the April 26, 2012 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 2.07% and Nextel Peru: 2.89%.

253.    On April 26, 2012, Defendants held a conference call for analysts to discuss the Company's 1Q 2012 financial results (the "April 26, 2012 Conference Call").

254.    During the April 26, 2012 Conference Call, Defendant Dussek made the following statements concerning the development and deployment of 3G-PTT in Peru:

> You may recall that our initial feedback with the 3G Push-to-Talk service showed that the service worked well in most call scenarios, but we were experiencing some issues in voice quality for Push-to-Talk calls between the iDEN and 3G networks. To address this, *we developed solutions that have significantly improved the voice quality of calls between the two networks. We have completed the implementation of these solutions,*

*resulting in a service quality that provides a superior experience to our customers.*

255.    The April 26, 2012 Conference Call also included a question-and-answer session with analysts, during which Defendant Dussek engaged in the following exchange with Chris King, a Stifel Nicolaus analyst:

> CHRIS KING:  Steve, I was wondering if you tell me about the factors that led to the lower net adds than anticipated in the quarter? And just as a quick follow-up for that -- given that, do you guys -- where is your comfort level, with respect to your current net add guidance for the full year of 1.4 million?
>
> DEFENDANT DUSSEK:  In terms of our outlook for the year -- relative to the second part of your question, what we talked about in the comments we made in the script that we have our upcoming launches for 3G in Peru. *Which obviously, we're very excited about, given that we have fixed the quality issues on the voice quality on the network side. So we are very excited about that launch in early May*. Then Chile's on track to launch in mid-year, as planned.  And our launch of Mexico is on track to launch by the end of third quarter. And we fully expect that that will give us a lot of momentum headed into the balance of the year.

256.    The statements set forth above in ¶252 and ¶¶254-55 were materially false and misleading when made.  Contrary to positive statements that the Company had resolved the technical issues affecting the quality of its 3G-PTT service, which resulted in a "superior experience [for its] customers," Defendants knew or were reckless in not knowing that these issues persisted, causing further customer dissatisfaction.   Indeed, as Defendants were well aware through their receipt of monthly churn management reports, the number of subscribers who were canceling their plans within the first thirty days or migrating back to the older 2G technology was rising steadily beginning in October 2011.  Additionally, the number of service calls related to 3G-PTT issues was rising during the same period, raising the churn rate as well as the costs associated with customer care.  These numbers were not included in the churn number reported for Peru, and the market was therefore unaware that the metrics Defendants tracked

closely indicated that the 3G-PTT offering was neither as successful as claimed nor were the issues identified by customers "fixed."

**L.  NII's 2Q 2012 Financial and Operational Results**

257.  On August 7, 2012, the Company issued a press release announcing its financial results for the three months ended June 30, 2012 ("2Q 2012") (the "August 7, 2012 Press Release").  In the August 7, 2012 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 2.3% and Nextel Peru: 3.26%.

258.  On August 7, 2012, Defendants held a conference call for analysts to discuss the Company's 2Q 2012 financial results (the "August 7, 2012 Conference Call").

259.  During the August 7, 2012 Conference Call, Defendant Dussek stated the following regarding the launch of 3G services in Latin America:

> During the second quarter, we continued to move forward with the deployment of our 3G networks while addressing a number of near-term operational challenges. Gokul will give you details of our operating performance in a moment. But before I hand it over to him, I want to give you my thoughts on our results for the quarter and more insight into our direction for the future.
>
> First, looking at our 3G efforts, we successfully launched our first 3G Push-to-Talk service offering in Peru and are pleased with initial subscriber acceptance of the service.  Since our launch in May, we have added 44,000 new 3G subscribers, bringing our total 3G subscribers base in Peru to 109,000 at quarter end.

260.  Defendant Dussek made further positive statements regarding the Company's roll-out of 3G in Latin America:

> Despite these recent challenges, we are encouraged about what the future will hold for NII from a number of perspectives. . . .
>
> *              *              *
>
> Second, we are achieving milestones in our 3G efforts and beginning to see early signs of growth in our first 3G Push-to-Talk voice offering. ***The technology works well and delivers the high-quality service that our***

*customers have come to expect from us.* We started offering full services on our 3G network in Chile last week, and we expect to begin offering 3G services in Mexico next month and in Brazil by year-end.

261. Defendant Hemmady also delivered prepared remarks during the August 7, 2012

Conference Call, highlighting the positives associated with the Company's 3G roll-out in Latin

America:

> *We are encouraged by the strong demand for our 3G product and services*, as we generated 44,000 gross adds since our launch of Push-to-Talk services in early May. Also, ARPU for these new 3G customers is about that of the average iDEN customer. Our smartphone has led the way, generating the majority of our 3G gross adds in the quarter, and we believe that the trend going into the third quarter looks good as we are increasing the 3G loading on our new network

262. During the question-and-answer portion of the August 7, 2012 Conference Call,

the following exchange between Ric Prentiss, a Raymond James analyst, and Defendant

Hemmady occurred:

> RIC PRENTISS:   Okay.  And then on the 3G as you are launching 3G, you had mentioned in Chile you launched it on a roaming basis initially in May.  That obviously would not have Push-to-Talk in the product that you would have launched in May.  Now in July, you have Push-to-Talk as well as 3G.
>
> So as we think about the next set of market launches – Mexico in September and Brazil at year-end – is that a 3G launch?  Is that 3G with Push-to-Talk launch?  And how important is the Push-to-Talk offering in the 3G that you are seeing in Peru?
>
> DEFENDANT HEMMADY:   The Push-to-Talk offering in 3G is extremely important. It is our value proposition. *We believe that we are getting the traction we've gotten in Peru in the first two months with our Push-to-Talk offering*. . . .

263. The statements set forth above in ¶264 and ¶¶259-62 were materially false and

misleading when made.  Contrary to positive statements concerning 3G-PTT, Defendants knew

or were reckless in not knowing that NII's 3G-PTT technology was plagued with numerous

technical issues that significantly reduced the quality of its performance and eroded customer

demand for NII's PTT offerings. Indeed, as Defendants were well aware through their receipt of monthly churn management reports, the number of subscribers who were canceling their plans within the first thirty days or migrating back to the older 2G technology was rising steadily beginning in October 2011. Additionally, the number of service calls related to 3G-PTT issues was rising during the same period, raising the churn rate as well as the costs associated with customer care. These numbers were not included in the churn number reported for Peru, and the market was therefore unaware that the metrics Defendants tracked closely indicated that the 3G-PTT offering was neither as successful as claimed nor were the issues identified by customers "fixed."

## M.    NII's 3Q 2012 Financial and Operational Results

264.    On November 7, 2012, NII issued a press release announcing the Company's financial results for the three months ended September 30, 2012 ("3Q 2012") (the "November 7, 2012 Press Release"). In the November 7, 2012 Press Release, the Company reported its consolidated churn rate and the churn rates of its subsidiaries as follows: NII: 2.65% and Nextel Peru: 3.37%.

265.    The November 7, 2012 Press Release included the following statement from Defendant Dussek regarding the status of the Company's implementation of its 3G network in Latin America:

> A key component of our long-term strategy is the deployment of our 3G networks, which will enable us to expand and improve our competitive service offering . . . .  We have reached several milestones in this effort, including our recent launch of the initial phase of our 3G network in Mexico, and our launch of 3G services in Chile and Peru. *We are experiencing good demand for our 3G services adding 3G voice and data customers in each of our markets where our new networks have been launched,* and we are encouraged about the growth we expect to generate on these networks in the future.

266.    On November 7, 2012, Defendants also held a conference call with analysts to discuss NII's 3Q 2012 financial results (the "November 7, 2012 Conference Call").

267.    During the November 7, 2012 Conference Call, Defendant Dussek stated the following regarding the launch of 3G services in Latin America:

> . . . this quarter we achieved a number of milestones and are seeing other positive trends that will drive our business going forward. We have deployed our 3G networks in three of our markets. ***In Peru, we are experiencing good traction of 3G services since our launch in May.*** We added a total of 117,000 voice and data 3G customers in the third quarter, returning Nextel Peru to positive net add growth. . . .

268.    Defendants also answered analysts' questions during the November 7, 2012 Conference Call.  For example, the following exchange between James Breen, a William Blair analyst, and Defendant Hemmady occurred:

> JAMES BREEN:  Just two questions. One, can you talk about Peru and what you're seeing there on the 3G side just in terms of the rollout, and maybe talk about some of the dynamics of the 3G customers versus iDEN? . . .

> DEFENDANT HEMMADY:  To your first question in Peru, as we said, ***we got good traction in the second quarter with good 3G gross adds.*** Around half of those 126,000 came through promotional data card plans. And as we said, the other half came from our HP-PTT offering.

> ***We have positioned the HP-PTT offering as a premium to iDEN. We are getting that premium.*** We are seeing a premium of about 10% to 15% as it relates to ARPU. We feel very good about that. I would say that maybe about 30% to 40% of our gross adds are probably add-ons or conversions, if you will, more add-ons to our existing customer base, and the balance being going after new segments. ***So I think we feel good about how that has gone. Until now, we see continuing traction as we go into our fourth quarter and as we go into 2013.***

> As we move along this rollout in Peru, we will go after new segments. And those new segments we'll go after-- will accelerate our growth as we think about 2013. ***But for now, I think we are -- we feel good about the growth. We feel good about the fact that we are getting a premium on ARPU.***

269.     During his prepared remarks, Defendant Dussek stated the following with respect

to Nextel Brazil's 3Q 2012 operating results:

> Over the last two quarters, we have been implementing a number of actions to improve our customer base, stabilize ARPU, and attract the right type of customers to improve our long-term position in Brazil. ***These include tightening our credit policies, reducing our retention investments, and modifying our commercial offers*** and commission structure. We are seeing the positive results of these actions in the form of a more stable ARPU ***and higher quality growth loading***. However, we are also experiencing much higher churn as we clean our subscriber base of the unprofitable customers that we attracted last year. After analyzing customer behavior and response to our actions, we have been able to more clearly define the customers in our base that are not profitable and that have had a negative impact on our business.

> Based on this analysis, we have concluded that our current approach is not aggressive enough. ***We are now taking more proactive actions to eliminate these unprofitable subscribers from our customer base*** and to position Nextel Brazil to return to profitable net add growth. Let me provide some insight into the actions that we are taking under this more aggressive approach. First, ***we are eliminating all retention efforts for these unprofitable customers immediately***. The second, ***we will continue to apply our more rigorous credit policy, modified rate plan approach***, and adjusted commission structure in order to target and attract higher quality customers to our services. Early indications are that these actions are having the intended impact to the business, and ***we are beginning to see improved quality in customer loading and fewer requests for deactivations***. We expect that our more aggressive actions will allow us to remove most of the unprofitable customers from our base during the fourth quarter.

270.     Following these remarks, Defendant Hemmady made the following statement:

> As noted earlier, our gross adds in Brazil were under pressure as the result of our decision to implement more rigorous customer created policies. The good news is our recent customer loading in Brazil reflects a better mix of high quality customers. The improvement in consolidated gross adds was partially offset by an 87 basis point year-over-year increase in our consolidated churn rate, resulting in lower net adds for the quarter. This rise in churn was driven primarily by Brazil, where we continued to scale back our retention investments, and in Peru and Argentina, where churn increased in our iDEN prepaid customer base.

271.     The statements set forth above in ¶¶264-70 were materially false and misleading

when made.  Contrary to positive statements regarding customer demand for NII's 3G services,

NII's 3G-PTT technology was plagued with technical issues that reduced the quality of its

performance and eroded customer demand for NII's PTT offerings.  Indeed, as Defendants were

well aware through their receipt of monthly churn management reports, the number of

subscribers who were canceling their plans within the first thirty days or migrating back to the

older 2G technology was rising steadily beginning in October 2011.  Additionally, the number of

service calls related to 3G-PTT issues was rising during the same period, raising the churn rate as

well as the costs associated with customer care.  These numbers were not included in the churn

number reported for Peru, and the market was therefore unaware that the metrics Defendants

tracked closely indicated that the 3G-PTT offering was neither as successful as claimed nor were

the issues identified by customers "fixed."  Moreover, the statements regarding *how* NII was able

to report higher gross and net subscriber adds and lower churn rates were false and misleading

when made because during this period Defendants were implementing marketing and retention

strategies designed to inflate subscriber totals and artificially reduce NII's reported churn rates.

Significantly, as set forth in detail above, these strategies were not intended by Defendants to

engage and keep the kind of high-quality customers Defendants claimed to maintain within NII's

subscriber base.

**N.     NII's 4Q 2012 and FY 2012 Financial and Operational Results**

272.     On February 28, 2013, the Company issued a press release announcing its

financial results for the three months and fiscal year ended December 31, 2012 (respectively,

"4Q 2012" and "FY 2012") (the "February 28, 2013 Press Release").   In the February 29, 2013

Press Release, the Company reported its consolidated churn rate and the churn rates of its

subsidiaries for 4Q 2012 as follows: NII: 3.40% and Nextel Peru: 3.40%. Additionally, the

Company reported its consolidated churn rate and the churn rates of its subsidiaries for FY 2012 as follows: NII: 2.64% and Nextel Peru: 3.12%.

273.    On February 28, 2013, Defendants held a conference call to discuss the Company's 4Q 2012 and FY 2012 financial results (the "February 28, 2013 Conference Call").

274.    During the February 28, 2013 Conference Call, Defendant Shindler responded to a question from Andres Coello, a Scotiabank analyst, regarding latency issues with PTT on smartphones:

> ANDRES COELLO: the latency of that product [smartphones] will be the same as in traditional push-to-talk devices or your (inaudible) smartphones, that the latency will be just as good?
>
> DEFENDANT SHINDLER: ***The latency on our high-performance push-to-talk that we have developed for our WCDMA network and this application are not really discernible. The difference is not something that you can detect.***
>
> ***Both are a fraction behind iDEN, but close enough***. And that is what we have been working on, frankly, for the last couple years, is to make sure that experience was not something that would deteriorate from the standpoint of the customers we have been serving for a long time.

275.    The statements set forth above in ¶272 and ¶274 were materially false and misleading when made because contrary to statements touting the absence of "discernible" latency issues with regard to NII's 3G-PTT service, NII's 3G-PTT technology was plagued with numerous technical issues that reduced the quality of its performance and caused customer dissatisfaction with NII's 3G-PTT service.

**O.    Statements Concerning NII's and Nextel Mexico's Response to the Shutdown of the US iDEN Network**

276.    On May 2, 2013, Defendants held a conference call for analysts to discuss NII's financial results for the three months ended March 31, 2013 ("1Q 2013") (the "May 2, 2013 Conference Call").

277.    Defendant Shindler also addressed the impact of Sprint's decommissioning of its

iDEN network in the United States on NII's Mexican operations as follows:

> After we have deployed our new network and have sufficient coverage our
> focus will shift to driving higher subscriber growth. In Mexico, we began
> to see increased demand for our new services as customers experience our
> superior network speeds and growing coverage. However, this demand
> was somewhat offset by higher churn levels for our iDEN services as we
> continued to be impacted by Sprint's planned shutdown of its iDEN
> network in the US . . . . *but based on the trends we have seen and our
> assessment of the market, we are convinced there is a significant growth
> opportunity* which we will pursue more aggressively after we reach
> coverage parity with our iDEN network. *For now I am happy to report
> that our 3G network in Mexico is performing well, with network speeds
> significantly higher than the competition and customer feedback has
> been excellent.*

278.    In addition, Defendant Hemmady engaged in the following exchange with Chris

King, a Stifel Nicolaus analyst, concerning the impact of Sprint's decommissioning of its iDEN

network in the United States on NII's Mexican operations:

> CHRIS KING: And second question about gross add trends in Mexico,
> just wondering, I know you talk about some of the dynamics there related
> to the Sprint shutdown of iDEN in some of your border markets. Just
> wondering how you see that trending throughout the remainder of the year
> as well as you guys launch what appears to be a significant number of
> markets there going forward over the next six months.

> DEFENDANT HEMMADY:  On your question on Mexico, as you know
> we did 45,000 gross adds this quarter on 3G.  *We expect that as we
> expand our coverage, we will begin to see even more momentum.  Even
> in the first quarter as I think about the month to month traction, I find
> that it is increasing month to month.*

> As I think I said in my remarks, we are currently at about 5% of our base
> on 3G. And by year-end we expect that about 33% of our subscribers will
> be on 3G. So as you can see from that metric we are forecasting that *we
> continue to see some really good traction.*

> Now included in that, Chris, in addition to gross adds, *we got good
> traction on migrations in the first quarter.  Those migrations also on a
> month to month basis are increasing in a big way.*  Not only are the
> migrations increasing, we are also finding that we are able to get very
> good uplift in ARPU, about 15% to 20% on a like to like basis comparing

3G packages with the iDEN packages. So as we expand coverage -- and finally, *customer feedback is also extremely good*. We feel network performance is good, what we are hearing from customers is good. I think *we have laid the foundation as we expand coverage into the borders [of these]. We have really laid the foundation for increasing traction on growth throughout the remainder of the year.*

279. On July 1, 2013, NII issued a press release titled "Nextel Mexico Continues to Keep its Customers Connected with the U.S. via its Push-To Talk (PTT) Solutions Using its Next Generation Network" (the "July 1, 2013 Press Release"). The July 1, 2013 Press Release stated with respect to the impact of Sprint's decommissioning of its iDEN network in the United States on NII's Mexican operations: "Nextel de México customers can continue to call to and from the United States through its next generation network that offers voice, data, Push-to-Talk (PTT) and SMS service. *Sprint's decision to decommission its iDEN network on June 30 in the United States does not affect Nextel Mexico's services*."

280. The July 1, 2013 Press Release further quoted Cristina Ruiz de Velasco, Vice President of Communications and Institutional Relations for Nextel Mexico, as follows:

> *Sprint's decision to decommission its iDEN network in the United States will not affect our customers' ability to connect with friends, family and business colleagues in Mexico or NII Holdings' other markets.* The combination of our new Evolution network and the PRIP service will provide our customers with new ways to communicate with their contacts in the U.S. as Sprint makes this transition.

281. On August 1, 2013, Defendants held a conference call for analysts to discuss NII's financial results for the three months ended June 30, 2013 ("2Q 2013") (the "August 1, 2013 Conference Call").

282. During the August 1, 2013 Conference Call, Defendant Shindler stated as follows regarding the launch of NII's 3G network in Mexico:

> *[W]e're gaining traction, generating strong 3G subscriber growth in Mexico during the quarter. 3G gross adds in Mexico increased by is 100,000, tripling the amount from the previous quarter.* And as a

component of our plan to reduce the impact from the shutdown of the iDEN network in the US, ***our pace of migrations continued to be strong in Mexico, where we migrated about 270,000 new customers to the network in the quarter.  In total, we now have 15% of our subscriber base in Mexico on our 3G network, and are on pace to have one-third of our base on this network by year end***.

***The increase in 3G customer growth in Mexico this quarter demonstrates our strong value proposition and our ability to win new customers***, all consistent with our goal of returning to growth.  We also know that our success in reaching that goal will be dependent on our ability to continue to deliver differentiated services that meet our customers' needs in ways that others can't.  We made progress on that front as well during the quarter, bringing new products and services to the market, expanding our device portfolio, and taking our high-quality push-to-talk services to a whole new level.

We launched a new PTT service that we call PRIP.  PRIP is a high-quality push-to-talk service that operates on a wide variety of standard smartphones.  In fact, we recently launched the new ATRIX HD in Mexico, our first handset that includes our PRIP service, and we're planning to launch other devices with PRIP in the second half of the year. We have also made the PRIP services available to customers in the US as a downloadable application, expanding the PTT community, and ***giving US-based customers the ability to connect instantly with our nearly 10 million iDEN and 3G subscribers in Latin America***.

283.  The August 1, 2013 Conference Call also included a question and answer session, during which Defendant Shindler made the following statements concerning using NII's newly deployed 3G network to mitigate the effects of the U.S. iDEN network shutdown:

So the solutions that we're working on to mitigate the impact are enhancing the coverage, expanding the coverage of the new network on the border as quickly as we can.  We have moved rapidly in the second quarter, and we are going to do that more in the third, deploying inter-operability with Sprint.  We wanted to have that done by the time of the shutdown and there are some network elements that weren't quite ready for that.  So we're hopeful in the next several months we can have their QChat talking to ours to keep the connectivity and reboost some of that lost International Direct Connect revenue.

We have launched PRIP. So we're going to do some things to make people more aware of that as a solution while we try to tie the networks together.  We're creating incentives to migrate to the 3G network. and we're doing everything we can now to revamp and further improve the

communication through our PR effort so that customers understand the different options available to us. So, it will have an impact on churn, we expect, in the third quarter in particular, and we're doing everything we can to mitigate against it.

284.    The statements set forth above in ¶¶277-80 and ¶¶282-83 were materially false and misleading when made.  Contrary to statements downplaying the impact of Sprint's decision to decommission its iDEN network in the United States on NII's Mexican operations based upon the Company's efforts to increase its 3G subscriber base, Defendants knew or were reckless in not knowing that NII's 3G network in Mexico simply lacked the capacity to accommodate this growth.  Additionally, Defendants' statements concerning growing customer demand for NII's "high performance push to talk service" on its "high quality" 3G network in Mexico were materially false and misleading when made because Defendants knew or were reckless in not knowing that NII's 3G-PTT technology was plagued with technical issues that reduced the quality of its performance and eroded customer demand for NII's PTT offerings.

## VI.    THE TRUTH BEGINS TO EMERGE

285.    The true state of the Company's obsolescent business model and declining prospects became clear through a series of disclosures and through the materialization of the risks concealed by the Company.  First, on February 23, 2012, the Company revealed that, contrary to its earlier claims that its 3G-PTT was "superior" to that of competitors, the Company was going to delay the roll-out of this technology in Peru because its customers were reporting issues with the technology.  It further revealed that it was pushing back the launch date of 3G in the critical markets of Mexico and Brazil.  On the same day, the Company also revealed disappointing financial results and 2012 revenue guidance, exacerbated by the high cost of building up the 3G network and the difficulty of signing up new customers while the Company was transitioning to a new technology.

286.   Analysts decried NII's financial results and projections as "weaker-than-expected," "disappointing," and "below-expectations."  According to J.P. Morgan, "[The delay in 3G roll-out] raises questions on the current status of the technology and the NIHD network's ability to implement the high demand for capacity which is associated with a 3G/data network. NIHD is giving signs that it needs 3G to improve its growth, so a delay in 3G is not welcome."

287.   In response to this news, NII's share price dropped from $23.51 to $21.21, $2.30 a share, on heavy volume.  This represented a drop of 9.78 percent.

288.   Approximately two months later, NII revealed more bad news about its progress in Peru.  On April 26, 2012, NII released its first quarter financial results.  Dussek stated during the conference call discussing the results that "our net add performance was below what we want[ed to] accomplish in the first quarter."  He also disclosed that there was "higher customer churn" and "lower net adds," as a result of the Company's decision to push back the roll-out of 3G coverage.

289.   The Company also disclosed that it was going to sustain higher churn rates in Brazil in the current and subsequent quarters as it flushed lower-value clients from its subscriber roles.  Specifically, Hemmady stated, "We are focusing efforts on stabilizing our operating results and improving the quality of our customer base by changing policies related to customer retention and simplifying our rate plan. We believe these efforts, while potentially having further impact to our near-term subscriber growth, will put us on the path to generate profitable growth in the long run."

290.   Analysts were disappointed with the results in Peru and observed that the Company was experiencing "[c]ompetitive deterioration during the tricky transition to 3G." They noted that the Company reported "surprisingly low net adds," with several attributing the

shortfall to "weaker than [] expected" results from Peru. Credit Suisse worried, "Lower net adds in 1Q12 underscored the risk that NII's iDEN service will lose momentum before 3G offerings can pick up the baton." Similarly, Deutsche Bank expressed "disappointment" with "lower net adds" in Brazil.

291.    In response, NII's share price tanked, losing $4.35 on extremely heavy volume, a drop that represented a loss of 23.19 percent in a single day of trading.

292.    Then, NII revealed worsening prospects on August 7, 2012, with the issuance of a press release announcing its financial results for the quarter ended June 30, 2012. In connection with these results, the Company cut its guidance for the full year 2012, including by reducing projected net subscriber additions from 1.4 million to 1.0 million and by decreasing projected consolidated operating revenue from $7.1 billion to $6.1 billion. In particular, NII revealed that despite the May launch of its new 3G network in Peru, NII had still lost a net of 6,000 customers in Peru. The same day, the Company further admitted that in its previously issued financial statements for 2009, 2010, 2011, and the first quarter of 2012, it had improperly accounted for value-added taxes, income taxes, capitalization of construction in progress, and operating and capital leases, among other things. The Company falsely assured investors, however, that these accounting errors were immaterial.

293.    In addition, NII revealed that it was continuing to have bad results from Brazil, driven by its efforts to remove poor-quality customers from its rolls. Dussek stated, "From an operational perspective, our results for the quarter were impacted by the decline in foreign currency exchange rates and from actions we are taking in Brazil to address customers we attracted last year that are not the right fit for our services." Hemmady elaborated, "Late last year, in response to offers in the market, we introduced certain promotions that attracted a group

- 90 -

of customers that are not aligned with our value proposition. As Steve mentioned, we have concluded that the right long-term decision is to reduce retention spending on these customers. In the near term, this decision has resulted in higher churn and is pressuring our subscriber growth."

294. Analysts considered the Company's second-quarter results in Peru to be "a disappointment." HSBC observed, "Nextel's 2Q performance in Peru suggests that even successful launch may not provide instant gratification. In what is its lead 3G market, it reported a 2% y-o-y decline in revenue this quarter, driven by a net loss of 6,000 customers . . . ." And J.P. Morgan concluded, "Peru: very weak consolidated numbers, despite 3G launch." Morgan Stanley also noted, "In Brazil, net adds were much weaker than expected at +3.2k due to a spike in churn to 2.3% from 2.0% in 1Q."

295. In response to these revelations, NII's stock price fell $1.97 per share, or 24.38 percent, to close at $6.11 per share on August 7, 2012.

296. On October 31, the Company announced after the close of the market that the Securities and Exchange Commission was requiring it to restate its financial statements for 2009, 2010, 2011, and the first quarter of 2012 because the errors the Company had falsely described as immaterial in its announcement on August 7 were actually material. The restatement decreased the Company's retained earnings as of June 30, 2012 decreased its net income and stockholders' equity for 2010 and decreased its operating income and net income for 2009. The Company also admitted in the restatement that it had misclassified some of its tower leases as operating leases rather than capital leases, which meant that it overstated its income and understated its liabilities related to those leases. The Company also admitted that its internal controls over financial reporting were inadequate as of December 30, 2011, and June 30, 2012,

contrary to Defendants' prior representations that the internal controls were effective. In response to this news, NII's common stock fell from a close of $7.98 a share on October 31, 2012 to $7.69 on November 1 (a 3.6% drop in one day). In response to the October 31, 2012 disclosures, the NII Capital notes, which had a face value of $1,000 a note, fell steadily from $795 a note on October 31 to $690 by November 15, 2012.

297.     On November 7, 2012, NII announced financial results for the third quarter that Dussek stated "disappointed" the Company. He also announced further delays in the roll-out of 3G in Brazil. The delay boded more quarters of disappointing financial results in a key and competitive market.

298.     Analysts considered the further delays in the roll-out of 3G in Brazil to be "bad news." Credit Suisse observed, "Brazil challenges look more daunting," while J.P. Morgan cautioned, "Too early to give full credit to 3G migration, which will be done in stages in Brazil, and has yet to provide a positive growth in Peru, where it started earlier."

299.     In response to this news, NII's share price fell $0.47 per share, or 6.65%, to close at $6.60 per share on November 7, 2012.

300.     Three months later, on February 5, 2013, the Company issued a press release providing disappointing preliminary results for the quarter and full year ended December 31, 2012, as well as weak guidance for 2013, including mid-single-digit subscriber growth and consolidated revenues in the range of $5.7 to $5.9 billion. It also signaled that it would be focusing on Mexico and Brazil, investing less in secondary markets such as Peru, Chile, and Argentina.

301.     Analysts were disappointed by these financial results. Wells Fargo observed, "While most knew Q4 and guide for 2013 would not be pretty, we believe 2013 EBITDA

guidance of $600MM-650MM is lower than buyside expectations," while MacQuarie and HSBC agreed that the results were "well below expectations." MacQuarie also noted, "We think the company sent a clear message in the press release by acknowledging that Peru, Chile and Argentina are non-strategic assets and that it would not be investing in these markets."

302.     In reaction to this partial disclosure of the financial effects of the Company's struggles to upgrade its systems, NII's stock price declined $0.55 per share, or 8.62 percent, to close at $5.83 per share on that day. Further, in response to the February 5, 2013 disclosures, the market price of the NII Capital notes fell by 6.2% to close at $725 a note that day.

303.     On February 28, 2013, NII released its 2012 10K describing its yearly financial results from the year ended December 31, 2012. The statements largely confirmed the disappointing results that NII had previewed in its February 5, 2012 press release. In addition, NII revealed that it was taking a $92.2 million valuation allowance on the deferred tax assets of Nextel Peru, indicating that it did not believe that it would be able to generate positive taxable income to offset with the deferred tax assets because "Nextel Peru is expected to continue to generate negative pre-tax results for the foreseeable future." In taking this valuation allowance, NII signaled to the market that it did not believe that it would be profitable in Peru in the foreseeable future.

304.     In response, NII's stock price dropped $0.62 per share, or 11.4 percent, to close at $4.82 on February 28, 2013.

305.     On May 2, 2013, NII revealed more of the previously undisclosed truth about its implementation of 3G service in Mexico. During its conference call with investors discussing its financial results for the second quarter of 2012, NII's new CEO, Steven Shindler, revealed that "our 3G results in Mexico for the quarter have been modest," with adds not sufficient to offset

significant 2G churn as a result of Sprint's decision to shut down its iDEN network in the United States, causing NII's Mexican customers to lose PTT connectivity with subscribers in the United States.

306. Analysts again expressed disappointment at this news. J.P. Morgan stated with respect to net adds that "*Mexico disappoints*." Credit Suisse observed, "Nextel Mexico was a soft spot in the quarter; as the operation is in a lull prior to a broader 3G launch; most operating metrics weakened, including a y/y decline in local currency revenues and declining margins," while Morgan Stanley commented, "*Mexico surprisingly sluggish*."

307. In reaction to this additional partial disclosure of the Company's financial and technical struggles, NII's stock price declined $0.89 per share, or 10.68%, to close at $7.44 per share on that day.

308. NII revealed further deterioration of its Mexican customer base on August 1, 2013. In its 10-Q for the quarter ended June 30, 2013, the Company revealed that it was taking a valuation allowance against its Mexican deferred tax assets, an indication to the market that NII did not believe it would earn enough taxable income in Mexico to take advantage of these assets before their expiration. In its words, "*Nextel Mexico is expected to continue to generate negative pre-tax results for the foreseeable future*." During an analysts' conference call the same day, Shindler admitted that with respect to the shutdown of Sprint's iDEN network, "the impact on customer experience has been more significant than we expected." Furthermore, despite efforts to migrate customers in Mexico from the iDEN network to NII's new 3G network, NII experienced disappointing net adds in Mexico.

309. Numerous analysts agreed that the impact of Sprint's iDEN shutdown was "greater than expected." Gabelli and Company observed, "The decline in Nextel Mexico's

EBITDA was even greater than expected, as the company noted that Sprint's shut-down of the iDEN network in the US is having a more significant negative impact on Nextel Mexico's operations than previously anticipated." MacQuarie predicted, "Q3 is likely to prove to be another difficult quarter due to greater-than-expected challenges in Mexico from Sprint's iDen shutdown."

310. In response to this partial corrective disclosure, NII's share price fell $0.49 or 6.8%, to close at $6.71 on that day.

311. On October 31, 2013, the Company began to explicitly acknowledge the weaknesses in its network modernization efforts. NII issued a press release announcing disappointing financial results for the quarter ended September 30, 2013, including a net subscriber loss of 178,000, *driven by a loss of 247,100 subscribers in Mexico.* As Shindler stated during a conference call with investors,

> [W]hile we proactively communicated with our customers, we didn't clearly convey the temporary differences in quality and coverage they should expect on the new network, including the availability and quality of roaming service in the US. All of these factors combined to create a negative perception of our services in Mexico, particularly with customers accustomed to our high-quality coverage and cross-border services on our iDEN network, which has made it more difficult for us to attract and retain customers. This resulted in a substantial subscriber loss for Mexico in the third quarter, and, despite the actions currently underway, we expect more subscriber losses in the fourth quarter.

312. Later, as part of the question-and-answer session, Defendant Shindler participated in the following exchange:

> [Analyst]: First of all, just was wondering if you could give us a little bit more specificity on what gives you the confidence that the business will begin to materially turn around in 2014. As you can understand, equity investors are-certainly appear very, very skeptical of a material turnaround, certainly beginning as early as next year.
>
> Defendant Shindler: I think what it comes down to is it's just taken us longer to get the network to the level of quality and coverage and

comparative expectations from what our customers have-what they're accustomed to from us. So the main difference and why we're confident we can make the turn next year is that we've completed what we need to get done on the network. We spent every hour of this past quarter working towards getting to the quality levels of what our customers expect. *We've been filling in coverage holes. We've been putting in the in-building coverage that we were missing at the start of the quarter. So we ran on – I wouldn't call it a skeleton network, but it was there was – there were a lot of holes, and we were racing to combat the issue that we knew was coming against the border. We migrated a lot of customers over, and they were not pleased to see the difference in quality and compared to what they had from us previously.*

313.    In addition, NII revealed that it was continuing to struggle in Brazil:

NII Holdings' consolidated *ARPU was $31 for the third quarter of 2013, down $9 compared to the same period last year.* This decline resulted from lower priced rate plans the Company offered as part of its customer retention efforts and in response to more aggressive competition in recent quarters, primarily in Brazil and Mexico, and from the year-over-year weakening in local foreign currency exchange rates in Brazil. The Company reported consolidated churn of 3.59% percent for the third quarter, up about 105 basis points from the level reported for the same period last year, primarily related to higher iDEN churn in the Company's operations in Mexico. Consolidated cost per gross add (CPGA) was $245 for the third quarter, a $74 decrease compared to the third quarter of 2012.

314.    Numerous analysts expressed "disappointment" with the quarter of abysmal results. Gabelli and Company observed that "[o]perating results in Mexico were particularly disappointing." According to Credit Suisse, "The disappointment came chiefly on the back of: i. Much higher than expected net disconnections in Mexico, as iDen customers churned to competitors in light of Sprint's iDen network shutdown, ii. Below-expected local currency ARPUs in Brazil and Mexico, due to iDen customers being migrated to lower-priced plans in an effort to retain them . . . ." J.P. Morgan concluded, "Following 3Q13 results that were significantly below consensus and our expectations, we reduce our estimates for 2014, as we believe it will take a significant amount of time for NIHD to deliver good results . . . ."

315.    In response, NII's stock price dropped $1.37 per share, or 28.54 percent, to close at $3.43 per share on that day.  In further response to the October 31, 2013 disclosures, the NII Capital notes fell by 10.9%, closing at $570 a note.

316.    Finally, on February 28, 2014, Defendants revealed the full extent of the Company's failed efforts to implement its new systems and its true outlook.  NII published a press release with poor results for the full year and quarter ended December 31, 2013, including a larger-than-expected net loss.  NII also alerted investors that it "will have to significantly improve its operating performance and consider other options to enhance its liquidity position to meet its financial obligations and fund its business in 2015 and beyond."  Importantly, NII reported a net loss of 247,000 subscribers across all markets, including a loss of 390,000 subscribers in the Company's key Mexico market for the quarter  –  leading to a full-year net subscriber loss of 213,000.  The Company also announced consolidated operating revenues of $1.1 billion for the quarter and $4.8 billion for the full year, results significantly worse that suggested in NII's earnings warning on October 31, 2013.

317.    Although NII traditionally provided guidance for the coming full year regarding net subscriber additions and consolidated revenues as part of its announcement of full-year results, in connection with this announcement the Company offered only the following statement:

> Taking into consideration the Company's strategy for 2014, which reflects making investments to accelerate growth while balancing its need to preserve cash, the Company is providing limited guidance for the year. For 2014, the Company expects to grow its subscriber base and to invest between $600 million and $700 million in capital expenditures.  ***The Company is not providing guidance on operating revenues, adjusted OIBDA or net subscriber additions at this time. However, considering the significant investments required to accelerate growth and acquire subscribers in 2014, the Company expects its full year consolidated adjusted OIBDA to be negative.***

318.     Substantially concurrently, NII filed its Annual Report on Form 10-K for 2013, which included the same results as those reported in the Company's press release that day.  The Annual Report revealed for the first time that NII may not be in compliance with U.S. GAAP's definition of a going concern.

319.     In response to the above disclosures and the disclosure that the Company faced "continuing challenges affecting the Company's operations in Mexico," NII's stock price fell $1.43 per share, or 55.43 percent, to close at $1.15 per share on that day on extraordinarily high trading volume.  In further response to the February 28, 2014 disclosures, the NII Capital notes fell 11% to close at $375 a note.

320.     Defendants' false statements and omissions during the Class Period caused the Company's securities to trade at artificially inflated prices during the Class Period.  As the previously undisclosed conditions described above were revealed to the market or the concealed risks began to materialize, the Company's stock price fell by $44.23 per share – or 97.46 percent – from its Class Period-high closing price of $45.38 per share on December 16, 2010.

321.     The truth, which was known to Defendants but concealed from the investing public during the Class Period, was that:

(a)     the Company's efforts to transition away from its iDEN-based infrastructure were a failure from the outset, causing its subscribers to defect in droves;

(b)     the Company's replacement network in key markets such as Mexico and Peru was not ready to support the service load created by the phase-out of the iDEN network; and

(c)     as a result of the foregoing, Defendants lacked a rational basis for their projections of the Company's performance and profitability.

## VII.   ADDITIONAL INDICIA OF SCIENTER

322.   As alleged herein, during the Class Period, Defendants had actual knowledge of the false and misleading nature of the statements they made or acted with reckless disregard for the true information known to them.   In so doing, Defendants committed acts, practiced, and participated in a course of business that operated as a fraud or deceit on purchasers of NII securities and NII Capital securities during the Class Period.

323.   As more fully alleged above, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading knew that these documents or statements were issued or disseminated to the investing public and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme by virtue of their receipt of information reflecting the truth regarding NII, their control over, and receipt or modification of NII's materially false and misleading statements, and their associations with the Company which made them privy to material non-public information concerning NII.

324.   The facts alleged in this Complaint establish that Defendants' false and misleading statements were intentional or reckless, including that: (i) the fraud was both massive and lengthy, wiping out approximately 97 percent of the Company's share price; and (ii) the Company had motive to deceive the public in order for NII to obtain access to the capital markets through two bond offerings during the Class Period.   These offerings were desperately needed.

**Class Period Financing**

325. Defendants also had a motive to issue the Company's false financial statements. NII's modernization and its continued existence were contingent upon sustained access to the capital and banking markets during the Class Period. NII needed to file its financial statements with the SEC and appear to be a worthy investment; a failure to do so would mean that the Company would have been prohibited from issuing securities, thus depriving the Company of essential cash to fund its operations.

326. The Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a et seq., and the rules promulgated thereunder, require that public securities be issued pursuant to a registration statement. During the Class Period, NII issued securities – including two bond offerings – totaling $1.45 billion, pursuant to Form S-3 shelf registration statements.

327. NII was motivated to conceal the failings of its network modernization projects in order to issue $1.45 billion in notes on favorable terms. Because the issue price of debt securities is related to the relative size and stability of the issuer's future cash flows that will be used to pay interest and repay principal, concealing the poor execution and outlook for the development of these critical network assets is indicative of scienter.

328. Additionally, NII sought to sell a 30 percent equity stake in its Mexican subsidiary to Televisa for $1.44 billion. Though the Televisa transaction was not executed, it was premised upon the accuracy of NII's financial statements and Defendants' public statements that were false. Such attempts to secure a major capital injection at a time when the Company was falsely accounting for elements of its network build-out (as evidenced by the Company's restatement) and the failing 3G-PTT roll-out further support a strong inference of scienter.

## Officer Resignations

329.    Abrupt resignations by key insiders also support a strong inference of scienter.  Of particular note are the resignation of Defendant Dussek as CEO and three resignations from the Company's Controller – the Company's lead accounting executive–position during the Class Period.

(a)    November 9, 2011: NII disclosed that Teresa Gendron had notified the Company of her decision to resign from her position as Controller effective November 23, 2011.

(b)    March 1, 2012: NII announced that Daniel Freiman would step down from his role as Controller effective April 2, 2012.

(c)    December 13, 2012: NII announced that Defendant Dussek had stepped down from his position as CEO and from his membership on the board, effective immediately.

(d)    September 3, 2013: NII disclosed that on August 27, 2013, Donald Neff notified the Company of his decision to resign from his position as Controller effective September 10, 2013.

## Routine On-Site Meetings

330.    Routine on-site meetings across NII markets, which included Defendants and Company senior management, gave Defendants knowledge of the Company's Latin American network projects and the operational and technological problems they were experiencing during their transition to 3G-PTT.

331.    For example, CW 4 stated that executive management from headquarters in Reston, Virginia participated in deep dive operational review meetings throughout the NII

markets. For these deep dive meetings, NII executives would fly down to Peru, Chile, Argentina, Mexico, and Brazil to discuss project milestones, delays, and issues in person. The executives were debriefed at these meetings by various project leads. These meetings lasted one to two days, during which the executives heard from each organization, such as IT, Engineering, and Marketing, according to CW 4. The purpose of these meetings was to provide management a snapshot as to where each project was in relation to projected launch dates, according to CW 4. CW 4 also specifically stated that then COO John McMahon and other top level executives attended these deep dive meetings.

332. That Defendants participated in these deep dive meetings in the various regions is further supported by CW 5. CW 5 participated in deep dive meetings lasting one to three days with NII executives who flew down from headquarters in Reston, Virginia to Santiago, Chile. According to CW 5, among others, attendees at these meetings included CEO Shindler; COO Hemmady; CFO Figuereo; John McMahon; Nextel Chile President Peña; and Legal and Operations Department employees. CW 5 specifically recalled that defendant Schindler attended two deep dive meetings in 2013, one in the first quarter of 2013 (during the reorganization/employee termination period) and one in September or October 2013. He added that CFO Figuereo also came down twice in 2013.

333. CW 2 participated in monthly deep dive meetings during which he would question the markets on churn rates and what was driving it higher. The information learned during these meetings was used to create monthly churn management reports, according to CW 2. These reports were sent directly to Defendants Dussek and Hemmady. CW 2 also travelled to Latin America every few months and participated in roundtable discussions with the

different markets.  According to CW 2, these meetings would last a few days, during which churn rates were one of the main subjects discussed.

## VIII.  <u>THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE</u>

334.    The PSLRA's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements do not apply to the misrepresentations and omissions alleged in this Complaint.

335.    None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement ("FLS") because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

336.    To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

337.    Defendants are also liable for any false or misleading FLS alleged herein, or portion thereof, because at the time each FLS was made, the speaker knew the FLS was false or

misleading, or the FLS was authorized and approved by an executive officer of NII who knew

that the FLS was false.

## IX.    LOSS CAUSATION

338.    The market prices of NII's publicly traded securities were artificially inflated by

the material misstatements and omissions complained of herein, including the misstatements and

omissions about the success and feasibility of NII's implementation of new 3G networks in

markets including Peru, Brazil, and Mexico, the likely impact of Sprint's shutdown of its U.S.

iDEN network on NII's Mexican market, and NII's improper accounting.

339.    The artificial inflation in NII's securities prices was removed when the conditions

and risks misstated and omitted by Defendants were revealed to the market or the concealed risks

alleged herein materialized, causing investors' losses. The information was disseminated through

several partial disclosures of operational and financial information that revealed the nature and

extent of NII's problems implementing 3G networks in various markets during the Class Period

and through its admissions that its accounting was improper and its internal controls were

inadequate.  These disclosures, more fully described above, reduced the prices of NII's publicly

traded securities, causing economic injury to Plaintiffs and other members of the Class.

340.    None of the disclosures was sufficient on its own to fully remove the inflation

from NII's securities prices, because each only partially revealed the risks and conditions that

had been concealed from investors.

341.    The corrective impact of the disclosures alleged above was, however, tempered

by Defendants' continued misstatements and omissions about NII's progress in rolling out its 3G

network and its financial results and prospects.  These continued misrepresentations continued to

maintain the prices of NII's publicly traded securities at levels that were artificially inflated,

inducing members of the Class to continue purchasing NII securities even after the truth began to

partially enter into the market or the concealed risks began to materialize. Further price declines that caused additional injury to the Class occurred upon the disclosure of additional information or the further materialization of concealed risks regarding the true status of NII's business and financial condition, including the poor quality of its 3G service and its difficulty signing up new and returning customers for its network.

## X.     CONTROL PERSON ALLEGATIONS

342.     By virtue of the Individual Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about NII, its operations, financial condition, and internal controls. The Individual Defendants ascertained such information through NII's internal corporate documents, conversations, and connections with each other and with corporate officers, employees, attendance at Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as NII officers and directors.

343.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein. Because of their Board or executive and managerial positions with NII, each of the Individual Defendants had access to the adverse undisclosed information about NII's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about NII and its business or adopted by the Company materially false and misleading.

344.     The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to

be misleading before or shortly after their issuance and had the ability and opportunity to prevent

their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is therefore

primarily liable for the representations contained therein.

345.    As officers, directors, and controlling persons of a publicly-held company whose

common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the

NASDAQ, and governed by the provisions of the federal securities laws, the Individual

Defendants each had a duty to promptly disseminate accurate and truthful information with

respect to the Company's operations, financial condition, and internal controls, and to correct

any previously issued statements that had become materially misleading or untrue, so that the

market price of the Company's publicly-traded securities would be based upon truthful and

accurate information.  The Individual Defendants' material misrepresentations and omissions

during the Class Period violated these specific requirements and obligations.

## XI.    CLASS ACTION ALLEGATIONS

346.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and

entities who purchased or otherwise acquired NII and NII Capital securities during the Class

Period and who were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) present

or former executive officers of NII, members of NII's Board of Directors, and members of their

immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii)

any of the foregoing individual's and entity's legal representatives, heirs, successors or assigns;

and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of NII.

347.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, NII securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  As of February 21, 2014, NII had 172,105,746 shares outstanding, owned by thousands of persons, and NII Capital had approximately $1.45 billion in Notes outstanding and unconditionally guaranteed by the Company, owned by thousands of persons.  Record owners and other members of the Class may be identified from records maintained by NII and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

348.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the prices of NII and NII Capital's securities were artificially inflated due to the misrepresentations and/or omissions of material fact alleged herein; and

(f) whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

349. Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired NII and NII Capital's securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein.

350. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class-action securities litigation. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

351. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

## XII. LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

352. Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) NII and NII Capital securities traded in efficient markets;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of NII and NII Capital securities; and

(e)      Plaintiffs and other members of the Class purchased NII and NII Capital securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed or the concealed risks materialized, without knowledge of the misrepresented or omitted facts.

353.    At all relevant times, the markets for NII and NII Capital securities were efficient for the following reasons, among others:

(a)      as a registered issuer, NII filed periodic public reports with the SEC;

(b)      NII regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)      NII was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace;

(d)      NII and NII Capital were eligible to and did register their securities on Form S-3; and

(e)      NII's securities were actively traded in efficient markets, including the NASDAQ, where the Company's common stock trades under the ticker symbol "NIHD";

NII Capital's securities were actively traded in efficient markets, including the bond market.

354. As a result of the foregoing, the market for NII and NII Capital securities promptly digested new material information regarding NII and NII Capital from all publicly available sources and reflected such information in the price of NII and NII Capital securities. Under these circumstances, all purchasers of NII and NII Capital securities during the Class Period suffered similar injury through their purchase of NII and NII Capital securities at artificially inflated prices, and the presumption of reliance applies.

355. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

356. Accordingly, Lead Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for NII and NII Capital securities and to a presumption of reliance on Defendants' material misstatements and omissions during the Class Period.

## XIII.   CAUSES OF ACTION

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against NII**

357. Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of Plaintiffs and all other members of the Class against NII..

358.     During the Class Period, officers, management, and agents of NII carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, regarding NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, as alleged herein; (ii) enable NII to artificially inflate the price of NII and NII Capital securities; and (iii) cause Plaintiffs and other members of the Class to purchase NII and NII Capital securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, NII took the actions set forth herein.

359.     Officers, management, and agents of NII directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock and bonds in an effort to maintain NII's artificially inflated securities prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

360.     Officers, management, and agents of NII employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NII's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make the statements made about NII's

operations, financial condition, and the Company's ability to operationally and technologically modernize NII's telecommunications infrastructure in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Officers, management, and agents of NII did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of NII and NII Capital securities during the Class Period.

361.    NII is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in Form 10-Q, 10-K, and 8-K filings.

362.    NII is further liable for the false and misleading statements made by NII's officers, management, and agents in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the maker of such statements and under the principle of respondeat superior.

363.    In addition to the duties of full disclosure imposed on NII as a result of the affirmative statements and reports made by its officers, management, and agents, or participation in the making of their affirmative statements and reports to the investing public NII had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 et seq.) and S-K (17 C.F.R. §§ 229.01 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and

Case 1:14-cv-00227-DLC Document 51 Filed 07/28/14 Page 137 of 154
Case 1:14-cv-00227-DLC-MHD Document 41-7 Filed 10/23/14 Page 137 of 154
Pg 137 of 154

operational health, and the intrinsic value of NII and NII Capital securities so that the Company's securities prices would be based on truthful, complete and accurate information.

364.    The allegations above establish a strong inference that NII, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing NII's true operating condition from the investing public, including misstating the Company's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, misstating the Company's ability to retain and attract subscribers, misstating the Company's financial condition and operational health, and misstating the intrinsic value of NII and NII Capital securities.  By concealing these material facts from investors, NII and NII Capital maintained their artificially inflated securities prices throughout the Class Period.

365.    In ignorance of the fact that NII's and NII Capital's securities prices was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by NII, or upon the integrity of the market in which the stock and bonds trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by NII but not disclosed in public statements by NII during the Class Period, Plaintiffs and the other members of the Class purchased or acquired NII and NII Capital securities during the Class Period at artificially high prices and were damaged when that artificial

inflation was removed from the price of NII and NII Capital securities as the true condition of the Company was revealed.

366.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs, the other members of the Class, and the marketplace known of the truth concerning NII's modernization and roll-out efforts, operations, financial condition, and NII's intrinsic value of its securities, Plaintiffs and other members of the Class would not have purchased or acquired their NII and NII Capital securities, or, if they had purchased or acquired such stock or bonds during the Class Period, they would not have done so at the artificially inflated prices which they paid.

367.     By virtue of the foregoing, NII has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

368.     As a direct and proximate result of NII's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of NII and NII Capital securities during the Class Period.

## COUNT II

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Individual Defendants Steve P. Dussek, Steven M. Shindler, and Gokul Hemmady**

369.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other members of the Class against NII.

370.     During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, regarding NII's ability to

successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, as alleged herein; (ii) enable NII to artificially inflate the price of NII and NII Capital securities; and (iii) cause Plaintiffs and other members of the Class to purchase NII and NII Capital securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, NII took the actions set forth herein.

371.    The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock or bonds in an effort to maintain NII and NII Capital's artificially inflated securities prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. The Individual Defendants are each sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of NII as alleged below.

372.    In addition to the duties of full disclosure imposed on the Individual Defendants as a result of their affirmative statements, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 et seq.) and S-K (17 C.F.R. §§ 229.01 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational

health, and the intrinsic value of NII and NII Capital securities so that the Company's share and bond prices would be based on truthful, complete and accurate information.

373.    The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, as specified herein.

374.    The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NII's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make the statements made about NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.    The Individual Defendants additionally engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of NII and NII Capital securities during the Class Period.

375.    The Individual Defendants' primary liability, and controlling person liability, also arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at NII during the Class Period and members of NII's management team or had control thereof; (ii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of NII's management team, internal reports, and other data and information about NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities at all relevant times; and (iii) each of the Individual Defendants was aware of NII's dissemination of information to the investing public that he knew or recklessly disregarded was materially false and misleading.

376. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and without a reasonable basis for the purpose and effect of concealing NII's true operating condition from the investing public, including overstating NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities. By concealing these material facts from investors, NII and NII Capital maintained their artificially inflated securities prices throughout the Class Period.

377. In ignorance of the fact that market prices of NII and NII Capital's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class purchased or acquired NII and NII Capital securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of NII and NII Capital securities as the true condition of the Company was revealed.

378.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs, the other members of the Class, and the marketplace known of the truth concerning NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, which were not disclosed by the Individual Defendants, Plaintiffs and other members of the Class would not have purchased or acquired their NII stock or bonds, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

379.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

380.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of NII and NII Capital securities during the Class Period.

## <u>COUNT III</u>

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants
Steven P. Dussek, Steven M. Shindler, and Gokul Hemmady**

381.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Plaintiffs and all other members of the Class against the Individual Defendants.

382.    The Individual Defendants acted as controlling persons of NII within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of NII's ability to successfully modernize and roll-out high performance 3G technology with PTT capabilities, the Company's ability to retain and attract subscribers, the Company's financial condition and operational health, and the intrinsic value of NII and NII Capital securities, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

383.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  As set forth above, NII, and the Individual

Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of NII and NII Capital securities during the Class Period.

## XIV. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiffs and the members of the Class damages and interest;

C.     Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury.


DATED:  July 18, 2014


Respectfully submitted,


By:____/s/ *Susan R. Podolsky*_____

**LAW OFFICES OF SUSAN R. PODOLSKY**

Susan R. Podolsky (Va. Bar No. 27891)
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: 571-366-1702
Facsimile: 703-647-6009
Email: spodolsky@podolskylaw.com

*Local Counsel for the Proposed Class*

**LABATON SUCHAROW LLP**

Joel H. Bernstein (*pro hac vice*)
Joseph A. Fonti (*pro hac vice*)
Serena P. Hallowell (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:  212-907-0700
Facsimile:  212-818-0477
Email: jbernstein@labaton.com
           jfonti@labaton.com
           shallowell@labaton.com

*Co-Lead Counsel for the Proposed Class*


**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**

Gregory Castaldo  (*pro hac vice*)
280 King of Prussia Road
Radnor,  PA 19087
Telephone:  610-667-7706
Facsimile:  610-667-7056
Email: gcastaldo@ktmc.com

Jennifer L. Joost (*pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone :  415-400-3000
Facsimile:  415-400-3001
Email:  jjoost@ktmc.com

*Co-Lead Counsel for the Proposed Class*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

Gerald H. Silk (*pro hac vice*)
Jai K. Chandrasekhar (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: 212-554-1400
Facsimile: 212-554-1444
Email:  jerry@blbglaw.com
           jai@blbglaw.com

*Additional Counsel for the Proposed Class*

**MOTLEY RICE LLC**

James M. Hughes (*pro hac vice pending*)
Badge Humphries (*pro hac vice pending*)
David P. Abel (*pro hac vice pending*)
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: jhughes@motleyrice.com
        bhumphries@motleyrice.com
        dabel@motleyrice.com

*Counsel for Additional Plaintiff TOBAM, SAS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants on July 18, 2014.

/s/ *Susan R. Podolsky*
Susan R. Podolsky (Va. Bar No. 27891)
Law Offices of Susan R. Podolsky
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: 571-366-1702
Facsimile: 703-647-6009
Email: spodolsky@podolskylaw.com

*Local Counsel for the Proposed Class*

## EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
                          )
IN RE NII HOLDINGS, INC. SECURITY  )      14cv227 (LMB/JFA)
   LITIGATION                      )
                          )
```

ORDER

For the reasons stated in open court, it is hereby

ORDERED that the Defendants' Joint Motion To Dismiss The Second

Amended Class Action Complaint [Dkt. No. 137] be and is DENIED.

The Clerk is directed to forward copies of this Order to counsel

of record.

Entered this 6th day of October, 2014.

Alexandria, Virginia

_____ /s/

**Leonie M. Brinkema**
**United States District Judge**

**EXHIBIT C**

FILED

JUN 1 1 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Iron Workers District Council of New England Pension Fund
Individually and on Behalf of All Others Similarly Situated, et al.,
        Plaintiffs,

v.                                1:14cv227 (LMB/JFA)

NII Holdings, Inc., et al.,
        Defendants.

## ORDER

A Fed. R. Civ. P. 16(b) PRETRIAL CONFERENCE will be held on Wednesday, July 2, 2014 at 11:00 a.m. before a magistrate judge. The parties shall confer before this conference to consider the claims, defenses, possibilities of a prompt settlement or resolution of the case, trial before a magistrate judge, to arrange for the disclosures required by Rule 26(a)(1), and to develop a discovery plan which will complete discovery by Friday, October 10, 2014. A party may not exceed five (5) non-party, non-expert witness depositions and may not serve on any other party more than thirty (30) interrogatories, including parts and subparts, without leave of court. Proposed discovery plans must be filed by the Wednesday one week before the Rule 16(b) pretrial conference.

Any party required to file an answer must do so within twenty (20) days.

The FINAL PRETRIAL CONFERENCE will be held on Thursday, October 16, 2014 at 10:00 a.m.

The parties must *electronically file on or before* the final pretrial conference the Rule 26(a)(3) disclosures and a list of the exhibits to be used at trial, a list of the witnesses to be called at trial and a written stipulation of uncontested facts. The exhibits themselves or a copy should be exchanged with opposing counsel before the conference. Objections to exhibits must be filed within 10 days after the conference; otherwise the exhibits shall stand admitted in evidence. The original exhibits shall be delivered to the clerk as provided by Local Rule 79(A). Non-expert witnesses and exhibits not so disclosed and listed will not be permitted at trial except for impeachment or rebuttal, and no person may testify whose identity, being subject to disclosure or timely requested in discovery, was not disclosed in time to be deposed or to permit the substance of his knowledge and opinions to be ascertained. The trial of this case will be set for a day certain, within 4-8 weeks of the final pretrial conference.

Discovery may begin as of receipt of this Order.

**PERSONAL IDENTIFIERS MUST BE REDACTED FROM ALL PUBLICLY FILED PLEADINGS AND EXHIBITS IN ACCORDANCE WITH LOCAL RULE 7(C).**

June 11, 2014
Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                             :
In re                                        :    Chapter 11
                                             :
NII Holdings, Inc., *et al.*,[1]             :    Case No. 14-12611 (SCC))
                                             :
                    Debtors.                 :    (Jointly Administered)
                                             :
---------------------------------------------------------------X

**ORDER EXTENDING THE AUTOMATIC STAY
TO CLAIMS AGAINST CERTAIN OF THE DEBTORS' OFFICERS
PURSUANT TO SECTION 105 AND 362 OF THE BANKRUPTCY CODE**

This matter coming before the Court upon the motion of the Debtors and the Debtors in

Possession for an Order Extending the Automatic Stay to Claims Against Certain of the Debtors'

Officers Pursuant to Sections 105 and 362 of the Bankruptcy Code (the "Motion"),[2] filed by the

debtors and debtors in possession in the above captioned cases (collectively, the "Debtors"); the

Court having reviewed the Motion and having considered the statements of counsel with respect

to the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (i)

the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b), (iii) the relief requested in the Motion to the

extent addressed in this Order is in the best interests of the Debtors, their estates and their

creditors and (iv) notice of the Motion and the Hearing was sufficient under the circumstances;

---

[1]    The Debtors are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); and NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 1000, Reston, VA 20190.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      Pursuant to sections 362 and 105 of the Bankruptcy Code, the automatic stay is hereby extended to claims against the Officers, where the conduct alleged was in the course of, and within the scope of the Officers' employment, with the Debtors.

3.      No party shall take further actions or file further claims against the Officers where the conduct alleged was in the course of, and within the scope of Officers' employment with, the Debtors, absent further approval of this Court.

3.      This Order shall survive and remain in full force and effect notwithstanding any of the dismissal, conversion, appointment of a trustee or confirmation of a plan of or in these chapter 11 cases.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: New York, New York
       _____, 2014

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE