**Hearing Date and Time:  June 3, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline:  May 20, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
NII Holdings, Inc., <u>et al.</u>,[1]                       :    Case No. 14-12611 (SCC)
                                                            :
                   Debtors.                                 :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

## NOTICE OF MOTION OF DEBTORS AND
## DEBTORS IN POSSESSION FOR AN ORDER PURSUANT TO
## SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING
## <u>THEM TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT</u>

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

**PLEASE TAKE NOTICE** that a hearing on the *Motion of Debtors and Debtors in Possession for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Them to Enter into and Perform Under a Plan Support Agreement* (the "Motion") shall be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in courtroom 623, One Bowling Green, New York, New York 10004, on **June 3, 2015 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served on:  (a) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:  Susan D. Golden, Esq. and Brian Masumoto, Esq.); (b) the Debtors, c/o NII Holdings, Inc., 1875 Explorer Street, Suite 800, Reston, Virginia 20190 (Attn:  General Counsel); (c) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Scott J. Greenberg, Esq. and Lisa Laukitis, Esq.); Jones Day, North Point, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn:  David G. Heiman, Esq. and Carl E. Black, Esq.); (d) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Kenneth H. Eckstein, Esq. and Adam C. Rogoff, Esq.); (e) Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York  10019 (Attn:  Andrew Rosenberg, Esq. and Elizabeth McColm, Esq.); (f) Akin, Gump, Strauss, Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Daniel H. Golden, Esq. and David Botter, Esq.); and (g) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022

(Attn:  Paul M. Basta, Esq. and Christopher Marcus, Esq.) not later than **4:00 p.m. (Prevailing Eastern Time) on May 20, 2015** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections that are timely filed, served and received will be considered at the Hearing.  If no objections are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form attached to the Motion, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

PLEASE TAKE FURTHER NOTICE that copies of the Motion may be obtained from the Court's website at http://ecf.nysb.uscourts.gov or, free of charge, at http://cases.primeclerk.com/nii/.

Dated:  March 24, 2015
         New York, New York

Respectfully submitted,

  /s/    Scott J. Greenberg
Scott J. Greenberg
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

  - and -

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**Hearing Date and Time: June 3, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: May 20, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

- and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                    :

In re:                             :     Chapter 11

                                    :

NII Holdings, Inc., et al.,[1]         :     Case No. 14-12611 (SCC)

                                    :

              Debtors.              :     (Jointly Administered)

                                    :

-------------------------------------------------------------x

**MOTION OF DEBTORS AND DEBTORS**
**IN POSSESSION FOR AN ORDER PURSUANT TO SECTIONS**
**105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING THEM**
**TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT**

---

[1]     The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

NII Holdings, Inc. ("NII Holdings") and thirteen of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully

represent as follows:

## Preliminary Statement

1.    The Debtors' entry into the current Plan Support Agreement (the "PSA"),

which incorporates the agreed terms of a chapter 11 plan as reflected in the plan term sheet

annexed thereto (the "Plan Term Sheet"), is a significant milestone in these cases and a positive

step towards the Debtors' successful restructuring.  Importantly, creditors holding over 70% of

the senior unsecured notes issued by NII Capital Corp. (the "Capco Notes") and over 72% of the

senior unsecured notes issued by NII International Telecom S.C.A. (the "Luxco Notes") are party

to the PSA.  In addition, the PSA is supported by the official committee of unsecured creditors

appointed in these cases (the "Creditors' Committee"), which includes as members the indenture

trustees for all series of the Notes[2] and the largest holders of Notes.

2.    The PSA and the Plan Term Sheet reflect a settlement of complex

inter-estate and inter-creditor disputes that have been the subject of extensive and vigorous

negotiations beginning pre-petition and continuing post-petition, absent which these bankruptcy

cases would require extensive and potentially prohibitively expensive litigation to the detriment

of the Debtors' estates and all stakeholders.  The Debtors believe that, through implementing the

agreement set forth in the PSA and the Plan Term Sheet, they will be able to strengthen their

balance sheet and emerge as a viable and competitive business in the coming months.  Under the

Plan Term Sheet, holders of the Capco Notes and the Luxco Notes will receive a combination of

---

[2]    Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the PSA or the Plan Term Sheet, as applicable.

(a) cash, representing a portion of the net proceeds received from the sale of the entirety of the

Debtors' interest in their business in Mexico, and (b) equity interests in Reorganized NII.  At the

same time, the Debtors' estates will (a) avoid the incurrence of significant litigation cost and

delay in connection with litigation of the Potential Litigation Claims (as defined below),

(b) complete the consummation of the Sale Transaction (as defined below), (c) benefit from

having obtained postpetition financing pending the closing of the Sale Transaction, (d) eliminate

approximately $4.35 billion of senior unsecured notes and (e) exit bankruptcy protection

expeditiously and with sufficient liquidity to execute their business plan.

3.      The Debtors have done exactly what they are supposed to do in the exercise

of their fiduciary duties — they have driven their stakeholders to a resolution of the numerous

complex issues in these chapter 11 cases that will allow the Debtors to emerge from bankruptcy

in a value-maximizing manner.  Significantly, certain of the Debtors creditors that had not joined

the Prior PSA (as defined below) — specifically, the Luxco Group (as defined below) — now

support the terms set forth in the PSA and the Plan Term Sheet.  The Debtors firmly believe that

the plan of reorganization contemplated by the PSA and the Plan Term Sheet provides the

Debtors with the best opportunity to achieve confirmation after more than a year of protracted

negotiations with their majority creditors and the Creditors' Committee, among others.

Accordingly, the Debtors submit that it is a reasonable and appropriate exercise of their business

judgment to enter into the PSA and fulfill their obligations thereunder to prosecute the First

Amended Plan (as defined below).

### Background

4.      On September 15, 2014, certain of the Debtors (the "Original Debtors")

commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  On October 8, 2014 and January 25, 2015, five of

the Original Debtors' affiliates also filed chapter 11 bankruptcy petitions in this District.  All of

the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

administered jointly.

5.    The Debtors are authorized to continue to operate their business and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

6.    On September 29, 2014 and November 5, 2014, the United States Trustee

for the Southern District of New York, pursuant to sections 1102(a) and (b) of the Bankruptcy

Code, appointed the Creditors' Committee to represent the interests of all unsecured creditors in

these chapter 11 cases.

7.    On November 24, 2014, the Debtors filed the first plan support agreement

(the "Prior PSA") [Docket No. 249].

8.    On December 22, 2014, the Debtors filed a plan of reorganization [Docket

No. 322] (the "Prior Plan") and related disclosure statement [Docket No. 323] (the "Prior

Disclosure Statement").

9.    On January 26, 2015, the Debtors announced that they had reached

agreement for the sale of their operations in Mexico, operated by non-debtor Comunicaciones

Nextel de México, S.A. de C.V., to an affiliate of AT&T for $1.875 billion, subject to (a) the

approval of the Court and (b) regulatory approvals in Mexico (the "Sale Transaction").  As a

result of the Sale Transaction, the Debtors began the process of negotiating amendments to the

Prior Plan and the Prior Disclosure Statement with their major creditor constituencies.

10.     On March 13, 2015, the Debtors filed the First Amended Plan (the "First Amended Plan") and the First Amended Disclosure Statement (the "First Amended Disclosure Statement") [Docket No. 527].  On March 23, 2015, the Bankruptcy Court approved the Sale Transaction [Docket No. 575].

11.     NII Holdings is the ultimate parent and holding company for its debtor and non-debtor affiliates (such non-debtor affiliates, the "Non-Debtor Affiliates").  Certain of the Non-Debtor Affiliates provide wireless communication services under the Nextel™ brand name for businesses and consumers in Latin America.

12.     Additional information regarding the background of the Debtors, the reasons for filing these cases and the Debtors' goals for these cases are set forth in the *Declaration of Daniel E. Freiman in Support of First Day Pleadings and in Accordance with Local Bankruptcy Rule 1007-2* [Docket No. 19].

## Jurisdiction

13.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

14.     Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors hereby seek the entry of an order in substantially the form annexed hereto as Exhibit A (the "Order"), authorizing the Debtors to enter into and perform their obligations under the Plan Support Agreement attached as Exhibit 1 to the Order.  The Debtors also request, to the extent it applies, a waiver of any stay of the effectiveness of the Order under Bankruptcy Rule 6004(h). In support of the relief requested herein, the Debtors submit the Declaration of Scott W. Winn

(the "<u>Winn Declaration</u>") attached hereto as <u>Exhibit B</u> and Homer Parkhill (the "<u>Parkhill
Declaration</u>") attached hereto as <u>Exhibit C</u>.

## **Facts Relevant to this Motion**

### *The Negotiation of the Prior PSA and the Debtors' Proposed Restructuring*

15.    On November 24, 2014, the Debtors provided notice to parties in interest of
a major milestone in these chapter 11 cases — the Debtors' entry into the the Prior PSA.[3]
Attached as an exhibit to the Prior PSA was a plan term sheet (the "<u>Prior Plan Term Sheet</u>")
setting forth the material terms of the proposed restructuring of the Debtors pursuant to the Prior
Plan.

16.    On December 22, 2014, the Debtors filed the *Motion of Debtors and
Debtors in Possession for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy
Code Authorizing Them to Enter Into and Perform Under a Plan Support Agreement* [Docket
No. 320] (the "<u>Prior PSA Motion</u>"), as well as the Prior Disclosure Statement and certain other
related pleadings, contemporaneously therewith.  In brief, as described in further detail in the
Prior Disclosure Statement, the Prior Plan provided for (a) the conversion of the outstanding
senior unsecured notes (the "<u>Notes</u>" and, the holders thereof, "<u>Noteholders</u>")[4] issued by Capco
and Luxco — totaling $4.35 billion — into equity interests in Reorganized NII, (b) a proposed
settlement of certain disputed inter-estate and inter-debtor claims and disputed third party

---

[3]    <u>See</u> *Notice of Filing of Plan Support Agreement and Plan Term Sheet* [Docket No. 249].

[4]    The Notes are comprised of:  (a)(i) $800 million in principal amount of 10% senior unsecured Notes due in
2016 (the "<u>Capco 2016 Notes</u>"); (ii) $500 million in principal amount of 8.875% senior unsecured Notes
due in 2019 (the "<u>Capco 2019 Notes</u>"); and (iii) $1.45 billion in principal amount of 7.625% senior
unsecured Notes due in 2021 (the "<u>Capco 2021 Notes</u>" and, together with the Capco 2016 Notes and the
Capco 2019 Notes, the "<u>Capco Notes</u>"), all of which were issued by NII Capital Corp. ("<u>Capco</u>") and
guaranteed by certain of the other Debtors; and (b)(i) $900 million in principal amount of 11.375% senior
unsecured Notes due in 2019 (the "<u>Luxco 11.375% Notes</u>"); and (ii) $700 million in principal amount of
7.875% senior unsecured Notes due in 2019 (the "<u>Luxco 7.875% Notes</u>" and, together with the Luxco
11.375% Notes, the "<u>Luxco Notes</u>"), all of which were issued by NII International Telecom S.C.A.
("<u>Luxco</u>") and guaranteed by NII Holdings.

creditor claims (the "Potential Litigation Claims") and (c) $500 million in new capital to support

the continued turnaround of the Debtors' business.

17.    Party to the Prior PSA were four of the Debtors' major creditor

constituencies:  (a) entities managed by Capital Research and Management Company ("Capital

Group"), (b) entities managed by Aurelius Capital Management, LP ("Aurelius"); (c) American

Tower Corporation, American Tower do Brasil - Cessao de Infraestruturas Ltda. and MATC

Digital S. de R.L. de C.V. (collectively, "ATC"); and (d) the Creditors' Committee, which was

also a co-proponent with the Debtors of the Prior Plan.  Together, Aurelius and Capital Group

were holders of $1.8 billion, or 66%, of the Capco Notes and $562 million, or 36%, of the Luxco

Notes.  ATC, which is party to a variety of agreements related to NII's cellular tower leases, is a

significant contract counterparty of the Debtors and their Non-Debtor Affiliates.

18.    The Prior PSA and the Prior Plan were the result of months of intense and

continuous negotiations between the Debtors and various parties in interest that began in March

2014, six months prior to the commencement of the majority of these cases on September 15,

2014.  Such negotiations involved an active, frequent and cooperative dialogue with various

holders of Notes and their respective professionals over the key components of the Debtors'

restructuring and the holders' respective due diligence efforts.  (See Parkhill Decl. [Docket

No. 321] ¶¶ 4-13.)

19.    These negotiations were informed by, among other things, allegations

regarding certain intercompany transactions (a) between and among the Debtors and (b) between

and among the Debtors and certain of the Non-Debtor Affiliates, which transactions are now the

subject of the Potential Litigation Claims.  The Potential Litigation Claims fall into three

principal categories:  (x) claims arising from certain alleged fraudulent transfers between Debtors

or between a Debtor and a Non-Debtor Affiliate (the "Avoidance Claims"); (y) claims related to the recharacterization of certain intercompany liabilities as equity (the "Recharacterization Claims"); and (z) claims related to an alleged violation of the indentures governing the Capco 2016 Notes and Capco 2019 Notes caused by the transfer of equity interests of the Transferred Guarantors from NII Global Holdings, Inc. and the purported release of the Transferred Guarantors' guarantees of the Capco 2016 Notes and Capco 2019 Notes (the "Transferred Guarantor Claims").

20.    As part of the negotiations with various constituencies both before and after the Petition Date, the Debtors established an electronic data room and provided tens of thousands of documents related to the Potential Litigation Claims to professionals representing each of Aurelius, Capital Group and the Creditors' Committee.  Such documentation also was made available to the professionals representing the Ad Hoc Committee of Luxco Holders (the "Luxco Group").[5]

21.    The Debtors worked tirelessly to broker a deal amongst the competing creditor constituencies in these cases — namely, Aurelius, Capital Group and the Luxco Group (the latter acting through its professional advisors, Kirkland & Ellis LLP and Millstein & Co., L.P.).  Likewise, since its appointment, the Creditors' Committee undertook a comprehensive and independent investigation of the Potential Litigation Claims and joined the Debtors in their efforts to broker a resolution that could lead to a confirmable chapter 11 plan.

22.    Based on their respective independent analyses of the Potential Litigation Claims, both the Debtors and the Creditors' Committee determined that litigation of the Potential Litigation Claims would be lengthy, expensive, complex and challenging to bring to final

---

[5]    Shortly before the Petition Date, the Luxco Group withdrew from a larger group of holders of the Notes with whom the Debtors had been negotiating and retained separate legal and financial advisors.

resolution during the course of these cases.  As discussed in greater detail in the Prior Disclosure

Statement (and the First Amended Disclosure Statement), certain of the Potential Litigation

Claims — including the Avoidance Claims and Recharacterization Claims — are also highly

fact-based and would require significant evidence and expert testimony if brought to trial.

23.    While the Creditors' Committee's investigation of the Potential Litigation

Claims and other matters related to the Debtors' restructuring was ongoing, the Debtors were

negotiating the terms of a chapter 11 plan simultaneously but separately with (a) Aurelius and

Capital Group and (b) the Luxco Group and Capital Group, including the exchange of multiple

plan term sheets and settlement proposals.  The Debtors made known to the various creditor

constituencies, as well as this Court, that they were negotiating these two proposals in parallel.[6]

24.    At that time, the Debtors determined, in their business judgment in light of

then-prevailing circumstances, that the Prior PSA offered the best prospect for success, not only

because of the support of important creditor constituencies, including the Creditors' Committee,

but also because the alternative proposals did not, from the Debtors' perspective, provide a clear

path toward confirmation and lacked the requisite creditor support to confirm a plan.

25.    Accordingly, on November 24, 2014, the board of directors of NII Holdings

(the "Board") approved the Debtors' entry into the Prior PSA with Aurelius, Capital Group, the

other Consenting Parties (as defined in the Prior PSA) and the Creditors' Committee.[7]

---

[6]    See Hr'g Tr. 7:8–17, Oct. 14, 2014 ("[I]n the spirit of transparency, I will say the debtors do have two
proposals on the table . . . .  One from our Luxco group . . . and the other [Aurelius/Capital Corp.]
proposal . . . .").

[7]    Other than the Debtors' chief executive officer, the Board is comprised entirely of members who are
(a) "independent" in accordance with the listing rules of the NASDAQ Stock Market, as amended from
time to time, (b) "non-employee directors" for purposes of Rule 16b-3 under the Securities Exchange Act
of 1934 and (c) "outside directors" for purposes of Section 162(m) of the Internal Revenue Code of 1986,
as amended.

*The Sale and Renewed Negotiations Leading to the PSA*

26.    As noted above, on January 26, 2015, the Debtors announced a game changing event — an agreement to sell NII Mexico for $1.875 billion to an affiliate of AT&T. That same day, Capital Group, Aurelius and the Creditors' Committee stipulated to support the Sale Transaction.

27.    Because the Sale Transaction reflected a significant departure from the economics and structure that were the basis for the Prior Plan Term Sheet and the Prior Plan, the Debtors exercised their right to terminate the Prior PSA on January 25, 2015.  Immediately thereafter, the Debtors reengaged with their major stakeholders in an effort to gain support for consensual modifications to the Prior Plan that would take into account the impact of the Sale Transaction and allow the Debtors to emerge from chapter 11.  Accordingly, the Debtors withdrew the Prior PSA Motion on February 4, 2015 [Docket No. 426].

28.    The renewed negotiations were extensive and included the exchange of multiple plan term sheets and settlement constructs between the parties before ultimate agreement was reached on the PSA and the Plan Term Sheet.

29.    The key terms of the PSA and the Plan Term Sheet, and key differences as compared to the Prior PSA and Prior Plan Term Sheet, are as follows.  The PSA:

    (a) provides improved recoveries over the Prior PSA for all Capco and Luxco Noteholders in the following approximate amounts (see Plan Term Sheet; Prior Plan Term Sheet):

        (i)    Capco 2016 Noteholders - $41 million (or 11% over the Prior Plan);[8]

---

[8]    The figures in this sub-clause (i) and the subsequent sub-clauses (ii) through (v) have been calculated before taking into account the rights offering contemplated under the Prior Plan.  Taking into account such rights offering, these improved recoveries and percentages are as follows: $40 million, or 10%, for the Capco 2016 Noteholders; $23 million, or 10%, for the Capco 2019 Noteholders; $139 million, or 47%, for the Capco 2021 Noteholders; $117 million, or 14%, for the Luxco 11.375% Noteholders; and $88 million, or 14%, for the Luxco 7.875% Noteholders.

    (ii)    Capco 2019 Noteholders - $24 million (or 11% over the Prior Plan);

    (iii)    Capco 2021 Noteholders - $169 million (or 63% over the Prior Plan);

    (iv)    Luxco 11.375% Noteholders - $89 million (or 10% over the Prior Plan);

    (v)    Luxco 7.875% Noteholders - $68 million (or 10% over the Prior Plan);

(b) encompasses a full and final settlement of the Potential Litigation Claims to the benefit of all stakeholders (see Plan Term Sheet);

(c) secures Consenting Noteholder support of the Sale Transaction (PSA § 4.01);

(d) permits the Debtors' entry into an exit financing agreement sourced from the marketplace, subject to certain conditions (PSA § 7.01(f)); and

(e) eliminates $4.35 billion in debt from the Debtors' balance sheet (see Plan Term Sheet).

And, unlike the Prior PSA, the PSA:

(a) provides not only improved recoveries, as noted above, but also recoveries that include cash distributions (see Plan Term Sheet);

(b) permits postpetition financing pending the closing of the Sale Transaction (see Plan Term Sheet);

(c) reduces recoveries to holders of Transferred Guarantor Claims, which are now being calculated as if 21% (as opposed to 27.5% under the Prior PSA) of each Transferred Guarantor's guarantees of the Capco 2016 and Capco 2019 Notes remained in place (see Plan Term Sheet; Prior Plan Term Sheet); and

(d) has the support of the Luxco Group (see PSA).

30.    The Plan Term Sheet also incorporates the terms of a $350 million first priority debtor-in-possession loan (the "Bridge Loan"), which was being negotiated concurrently with the PSA and Plan Term Sheet and will provide incremental liquidity to ensure both that the Sale Transaction will close and that the Debtors will have sufficient liquidity in the event of any unforeseen regulatory delays.  As set forth in the Bridge Loan term sheet dated March 5, 2015, attached as Exhibit A to the Plan Term Sheet, the members of the Luxco Group agreed to provide 65% of the Bridge Loan, with Capital Group and Aurelius providing 20.56% and

14.44% of the Bridge Loan, respectively.  The Debtors filed the *Motion of Debtors and Debtors in Possession for an Order, Pursuant to 11 U.S.C. §§ 105, 363, 363 and 364, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York:  (a) Authorizing Debtors to Obtain Postpetition Financing and (b) Granting Related Relief* [Docket No. 507] on March 5, 2015.  The Court entered the *Order, Pursuant to 11 U.S.C. §§ 105, 363, 363 and 364, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York:  (a) Authorizing Debtors to Obtain Postpetition Financing and (b) Granting Related Relief* [Docket No. 573] on March 23, 2015.

31.    Ultimately, the Debtors concluded that the Plan Term Sheet represents the best path forward, not only because it is supported by the Creditors' Committee, which is a co-proponent of the Plan (together with the Debtors, the "Plan Proponents"), and important creditor constituencies comprising holders of over 70% in amount of the Capco Notes and approximately 72% in amount of the Luxco Notes, but also, importantly, because it has advantages over other constructs that had been considered by the Debtors and other creditor groups in the negotiations that had taken place over the course of nearly a year.  For example, the Plan Term Sheet:

- contemplates the complete and final settlement of the Potential Litigation Claims, eliminating the cost and delay of litigating those claims to conclusion and the risk that key amendments with the Debtors' local lenders in Brazil would begin to unravel or lead to defaults before such litigation could be resolved;[9]

---

[9]    The lenders with which the Debtors and NII Brazil have reached agreements are Banco do Brasil S.A. ("BdB") and Caixa Econômica Federal ("Caixa"), NII Brazil's two major local lenders, and China Development Bank Corp. ("CDB").  The amendments to the agreements with BdB and Caixa, which provide covenant and other relief that are necessary for the Debtors' successful reorganization, may not become effective if the Debtors fail to meet certain requirements, including their emergence from chapter 11 by September 15, 2015.  Similarly, the amendment reached with CDB is dependent upon the Debtors' ability to provide CDB with a guarantee, upon emerging from chapter 11, by September 30, 2015.  Accordingly, the failure of the Debtors to emerge from bankruptcy by September 15, 2015 could cause NII Brazil to be in default of or lose certain concessions with respect to such lending and credit agreements.

- represents significant concessions by the Luxco Group, including the relinquishment of the right to receive (i) a greater proportion of their recoveries from the cash proceeds of the Sale Transaction, (ii) potential accrued postpetition interest on their claims and (iii) any additional recovery on account of their claims in the event of a higher and better bid that exceeds the Plan Distributable Value (as defined in the Plan Term Sheet);

- provides for the prompt distribution to Holders of their full entitlement to equity in Reorganized NII without restrictions or delay due to holding some or all of such equity in reserve as would be necessary if the Potential Litigation Claims were to be litigated;

- permits postpetition financing pending the closing of the Sale Transaction; and

- allows the reorganized Debtors to seek market-tested exit financing, which would allow them to raise exit capital with less cost, at better rates and on better terms.

Perhaps most significantly, the PSA, to which the Luxco Group is now a party, is supported by holders of over 70% in amount of the Capco Notes and approximately 72% in amount of the Luxco Notes — a supermajority of the Debtors' creditors that exceeds the "two-thirds in amount" requirement of section 1126(c) of the Bankruptcy Code. Accordingly, the Debtors believe the PSA establishes the framework for obtaining the necessary creditor support for plan confirmation and provides them with a clear path towards confirming a chapter 11 plan and expeditiously emerging from these chapter 11 cases.

32.    Thus, on March 5, 2015, the Board of NII Holdings approved the Debtors' entry into the PSA with Aurelius, Capital Group and the Luxco Group (the "Requisite Consenting Noteholders") and the Creditors' Committee. The board of managers (the "Board of Managers") of NII International Holdings S.à r.l., in its capacity as sole manager of Luxco, and the board of directors of Capco (the "Capco Board") also approved Luxco's and Capco's entry into the PSA on February 25, 2015 and February 27, 2015, respectively.

33.    In accordance with the terms of the PSA, on March 13, 2015, the Debtors filed the First Amended Plan and First Amended Disclosure Statement and certain other

pleadings related to consummating the restructuring contemplated by the PSA.  The First

Amended Disclosure Statement fully describes the Proposed Settlement and the proposed

treatment of claims and equity interests under the First Amended Plan.  The First Amended Plan,

which, among other things, embodies the Proposed Settlement, is subject to confirmation in

accordance with the requirements of the Bankruptcy Code, and constitutes a motion to approve

the Proposed Settlement pursuant to Bankruptcy Rule 9019, which will be heard in connection

with the confirmation of the First Amended Plan.

*The Proposed Settlement and the Independent Manager*

34.    As the Court is aware, Scott W. Winn (the "Independent Manager") was

appointed as a Class C Manager to the Board of Managers to review the Proposed Settlement

and, on behalf of Luxco, either (a) confirm the reasonableness of, and recommend to the Board

of Managers that it cause Luxco to join in, the Proposed Settlement pursuant to Bankruptcy Code

section 1123(b)(3) and Federal Rule of Bankruptcy Procedure 9019 or (b) state his

recommendation to the Board of Managers that Luxco not join in the Proposed Settlement.  See

*So-Ordered Stipulation Regarding the Appointment and Scope of the Independent Manager for*

*NII International Telecom S.C.A.* [Docket No. 293].[10]

35.    Upon his appointment, the Independent Manager, with the assistance of his

retained legal counsel Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and Zolfo

Cooper Management, LLC ("Zolfo Cooper"), immediately commenced the process of reviewing

the Proposed Settlement and documentation related to the Transferred Guarantor Claims,

Avoidance Claims and Recharacterization Claims.  This included meeting with the professionals

for the Debtors, the Creditors' Committee, Aurelius, Capital Group and the Luxco Group in order

---

[10]    As a result of the Sale Transaction and renewed negotiations relating to the PSA, between January 26, 2015
and February 20, 2015, the Bankruptcy Court entered a series of stipulations resulting in the ultimate
extension of the Independent Manager's determination to February 27, 2015.

to facilitate fact discovery and understand the parties' respective positions with respect to the

Potential Litigation Claims.

36.    On February 25, 2015, the Board of Managers convened a meeting of its

managers in Luxembourg.  At the meeting the Independent Manager communicated his informed

analysis of the Proposed Settlement and recommended to the Board of Managers to cause Luxco

to enter into the Proposed Settlement that is embodied in the PSA and the Plan Term Sheet.  As

noted above, the Board of Managers subsequently authorized Luxco's entry into the PSA and

pursuit of confirmation of chapter 11 plan consistent with the terms of the Plan Term Sheet.  The

Winn Declaration, attached hereto as Exhibit B, provides the Independent Manager's account of

these events.

*Terms of the PSA*

37.    The material terms of the PSA are set forth below.[11]

38.    <u>Consenting Noteholders' Support of the First Amended Plan</u>.  Subject to the

terms of the PSA, each Consenting Noteholder has agreed to, subject to, in some instances,

receipt by such Consenting Noteholder of the First Amended Disclosure Statement and other

Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying

with section 1126(b) of the Bankruptcy Code:

> (a) to the extent solicited, timely vote or cause or direct to be voted all of its
> Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering
> its duly executed and completed ballot or ballots accepting such Plan on a
> timely basis following the commencement of the solicitation;
>
> (b) not change or withdraw (or cause or direct to be changed or withdrawn) such
> vote;

---

[11]    Reference is made to the PSA for a complete description of its terms.  To the extent any excerpts,
summaries and/or descriptions of the relationships of the parties and the terms of the PSA contained in the
Motion differ in any way from that contained in the PSA, the PSA shall govern.  Capitalized terms used in
this section and not otherwise defined have the meaning given to them in the PSA.

(c) not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation, or implementation of the Plan;

(d) not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan or the Sale Transaction;

(e) not directly or indirectly take an action to direct the Indenture Trustees (as applicable) to undertake any action that a Consenting Noteholder is otherwise prohibited from undertaking pursuant to Sections 3.01 (c) or (d) of the PSA; provided, however, that to the extent a Consenting Noteholder chooses to direct an Indenture Trustee to not undertake an action that a Consenting Noteholder is otherwise prohibited from undertaking pursuant to Sections 3.01 (c) and (d) of the PSA, such direction shall not be construed in any way as requiring any Consenting Noteholder to provide an indemnity to the applicable Indenture Trustee, or to incur or potentially incur any other liability in connection with such direction;

(f) not directly or indirectly object to, delay, impede or take any other action to materially interfere with consummation of the Sale Transaction; and

(g) take any and all reasonably necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan Term Sheet, the Plan, and the Plan Documents and the Sale Documents.

39.    The Debtors' Commitments under the PSA.  Subject to the Debtors' fiduciary duties under applicable law and Section 11.01 of the PSA, for so long as the PSA has not been terminated in accordance with its terms, the Debtors have agreed to use their commercially reasonable efforts to:

(a) subject to its obligations under the Stalking Horse Purchase Agreement of Purchase Agreement (as applicable), operate their business in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices;

(b) seek entry by the Bankruptcy Court of the Sale Order, and afford reasonable opportunity to review and comment on modifications to the Proposed Sale

Order to the respective legal advisory for the Committee and the Consenting Noteholders in advance of the final submissions of such order;

(c) conduct the auction (if any) in accordance with the Bidding Procedures;

(d) consummate the Sale Transaction and obtain approval of the Sale Order, including in accordance with the Bidding Procedures;

(e) take any and all actions that the Company determines to be reasonably necessary to consummate the Sale Transaction;

(f) assist the Purchaser, as reasonably necessary, in obtaining any and all, and obtain its own (if any), required regulatory approvals and material third-party approvals for the Sale Transaction;

(g) consummate the Sale Transaction in a tax-efficient manner;

(h) prepare and file this Motion seeking an order from the Bankruptcy Court authorizing the Debtors' entry into the PSA, and afford reasonable opportunity to comment and review to the respective legal advisors for the Creditors' Committee and the Consenting Noteholders in advance of the filing of this Motion;

(i) timely file, and provide the Creditors' Committee and the Consenting Noteholders with a draft of such objection at least two (2) business days prior to filing, a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; or (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code, the appointment of which has not been consented to by the Creditors' Committee and each of the Requisite Consenting Noteholders;

(j) not request entry of a Sell-Down Order as such term is defined in the *Final Order (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities, (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates and (III) Granting Related Relief* [Docket No. 138] without the consent of the Creditors' Committee and each of the Requisite Consenting Noteholders; and

(k) if the Debtors know or should know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in the PSA, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Consenting Noteholders.

40.    <u>The Plan Proponents' Commitments under the PSA</u>.  Subject to each of the

Plan Proponents' respective fiduciary duties under applicable law and Sections 11.01 and 11.02

of the PSA and for so long as the PSA has not been terminated in accordance with its terms, each

of the Plan Proponents agrees to use its commercially reasonable efforts to:

(a)    prepare the Plan Documents and any related documents, and distribute such documents concurrently to the Consenting Noteholders, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the Consenting Noteholders in advance of any filing thereof;

(b)    support and complete the Restructuring and all transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents;

(c)    take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any and all actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(d)    complete the Restructuring and all transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided therefor in the PSA; and

(e)    take no actions inconsistent with the PSA or the Plan Term Sheet, or that would delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "<u>Alternative Transaction</u>"); <u>provided</u>, <u>however</u>, that the Sale Transaction or the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of the Debtors' or their subsidiaries' assets, including the marketing and solicitation of bids for the sale any of their assets pursuant to section 363 of the Bankruptcy Code as contemplated by the Plan Term Sheet, and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by its non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction.

41.    <u>Debtors' Fiduciary Out</u>.  Notwithstanding anything to the contrary in the

PSA, (a) nothing in the PSA shall require the Company or its subsidiaries or affiliates or any of

its or their respective directors or officers (in such person's capacity as a director or officer) to

take any action, or to refrain from taking any action, to the extent that taking such action or

refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, and (b) the Debtors and their boards of directors shall be entitled to take any action in connection with the Sale Transaction and continue to market and solicit bids for the sale any of their assets pursuant to section 363 of the Bankruptcy Code in the interest of maximizing the value of the Debtors' estates, consistent with their fiduciary obligations.

42.    Creditors' Committee Fiduciary Out.    Under the PSA, the Creditors' Committee may withdraw from and no longer remain bound by the PSA in the event it determines that proceeding with the transactions contemplated by the PSA would be inconsistent with the continued exercise of its fiduciary duties.  If the Creditors' Committee determines to exercise its fiduciary out, the PSA will remain binding on the remaining parties thereto.

43.    Payment of Certain Fees and Expenses.    In accordance with the terms of the PSA, and to the extent not previously authorized by separate court order, the Debtors will pay the reasonable and documented fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP ("Akin"), (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), (iii) Blackstone Advisory Partners, L.P. ("Blackstone"), (iv) Houlihan Lokey Capital, Inc. ("HL"), (v) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robins Russell"), (vi) Kirkland & Ellis LLP ("Kirkland" and, together with Akin and Paul Weiss, "RCN Counsel") and (vii) Millstein & Co. ("Millstein") (in accordance with their applicable engagement letters, as such letters have been amended) in full in cash, provided, however, that the fees and expenses payable by the Debtors to Robins Russell, Kirkland, Millstein, Blackstone and HL are subject to certain restrictions and caps (the "Fees and Expenses of Requisite Consenting Noteholders").[12]

---

[12]    The reasonable and documented fees and expenses payable by the Debtors of (v) Robbins Russell shall not exceed $150,000, (w) Kirkland shall not exceed $4,500,000, (x) Millstein shall not exceed $4,000,000,

44.  <u>Termination by the Parties</u>.  The PSA may be terminated (a) upon the

mutual consent of the Plan Proponents and each of the Requisite Consenting Noteholders or

(b) by either of the Plan Proponents or any of the Requisite Consenting Noteholders upon two (2)

business days' prior written notice delivered to the other Parties upon the occurrence of any of

the following events (each a "<u>Termination Event</u>"); <u>provided</u>, <u>however</u>, that the PSA may be

terminated solely (x) by the Creditors' Committee or any of the Requisite Consenting

Noteholders upon the occurrence of the Termination Events set forth in clauses (a), (e), (f),

(i)-(p) below and (y) by any of the Requisite Consenting Noteholders upon the occurrence of the

Termination Event set forth in clause (g) below:

(a)  the public announcement by the Company of its intention not to pursue the Restructuring or the Sale Transaction, or the Company's acceptance of an Alternative Transaction;

(b)  following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in the PSA that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(c)  the issuance by any court of competent jurisdiction or other competent governmental or regulatory authority of an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring or the Sale Transaction or causing a material adverse effect on the economics terms of the Restructuring or the Sale Transaction, taken as a whole, in each case, in a manner that cannot reasonably be remedied by the Company;

(d)  the appointment in the Bankruptcy Cases of a trustee or receiver (but not the Independent Manager), the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Bankruptcy Cases by order of the Bankruptcy Court;

(e)  the Debtors' entry into any postpetition financing agreement in form and substance not reasonably acceptable to the Committee and each of the Requisite Consenting Noteholders;

---

(y) Blackstone, only with respect to its restructuring and discretionary fees, shall not exceed $3,000,000, and (z) HL, only with respect to its restructuring fee, shall not exceed $7,000,000.

(f)  the Debtors' entry into any exit financing agreement in form and substance not reasonably acceptable to the Committee, Capital Group and Aurelius, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders;

(g)  (i) any modification of the draft Brazil Bank Amendments dated February 13, 2015 delivered to the Requisite Consenting Noteholders on or before February 26, 2015, (ii) any CDB Amendments entered into after December 18, 2014 (including any amendments, restatements, modifications or refinancings of any CDB Amendments entered into prior to December 18, 2014), and (iii) the entry into any other agreement relating to the financing of the Debtors' operating subsidiaries, in each case, that is in form and substance not reasonably acceptable to Aurelius and Capital Group, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed;

(h)  the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to Bankruptcy Code section 1121;

(i)  the failure of the Debtors to have sought, in connection with their motion for approval of postpetition financing, authority to pay in full in cash the reasonable fees and expenses of each RCN Counsel (A) incurred through the date of the order approving such motion (the "DIP Financing Order"), with such payment to be made to Akin and Kirkland expeditiously after entry of the DIP Financing Order and receipt of the relevant invoices for such fees and expenses and to Paul Weiss on the Effective Date following the receipt of invoices for such fees and expenses, and (B) incurred from the date of the DIP Financing Order through the Effective Date, with such payment to be made to each RCN Counsel on the Effective Date, in each case, subject to the limitations set forth in Section 4.01(j) of the PSA;

(j)  the failure of the Plan Proponents to have filed the Disclosure Statement and the Plan with the Bankruptcy Court by March 13, 2015;

(k)  the failure of the Plan Proponents to have filed the PSA Motion with the Bankruptcy Court by March 24, 2015;[13]

---

[13]  This date was previously set for March 13, 2015, but was modified pursuant to the amendment and modification provisions of the PSA.

(l) the failure of the Bankruptcy Court to have entered the Sale Order by March 24, 2015;

(m) the failure of the Bankruptcy Court to have entered an order approving the Disclosure Statement by April 20, 2015;

(n) the failure of the Bankruptcy Court to have commenced a hearing on the confirmation of the Plan on or before June 3, 2015;

(o) the failure of the Bankruptcy Court to have entered the Confirmation Order and the PSA Order on or before June 12, 2015;

(p) the failure of the Plan Effective Date to have occurred by June 26, 2015 unless the only remaining conditions to the consummation of the Sale Transaction are the receipt of all governmental approvals for the Sale Transaction and the completion of deliveries that are required to be made at the closing of the Sale Transaction by the respective parties to the Purchase Agreement;

(q) the failure to have consummated the Sale Transaction by September 30, 2015;

(r) the amendment or modification of any of the Sale Documents, the Plan or Disclosure Statement in a manner that is materially adverse to any of the Plan Proponents or any of the Requisite Consenting Noteholders and is not otherwise reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders;

(s) any of the orders approving the PSA, the Sale Transaction (including the Bidding Procedures Order and the Sale Order), the Disclosure Statement, or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to any of the Plan Proponents and each of the Required Consenting Noteholders; or

(t) the determination by the NII Holdings' board of directors that (i) proceeding with the transactions contemplated by the PSA would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to the PSA would be inconsistent with its fiduciary obligations.

45. <u>Automatic Termination</u>. The PSA shall terminate automatically without

further required action or notice upon the Plan Effective Date.

46.    As of the date of this Motion, the PSA is already effective as among the

Requisite Consenting Noteholders, and will be effective as to the Debtors upon entry of the

Order approving this Motion.

**Basis for Relief Requested**

*The Debtors' Entry into the PSA Should be Approved*
*Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.*

47.    Out of an abundance of caution, and as required under the terms of the PSA,

the Debtors are seeking approval of their entry into the PSA by the Court.[14]  To the extent it may

be applicable, the Debtors believe that their entry into, and performance under, the PSA is a

sound exercise of business judgment that should be approved pursuant to section 363(b) of the

Bankruptcy Code.

48.    Under section 363(b)(l) of the Bankruptcy Code, the Court may authorize a

debtor in possession to "use, sell or lease, other than in the ordinary course of business, property

of the estate."  11 U.S.C. § 363(b)(l).  A debtor-in-possession's decision to use, sell, or lease

assets outside the ordinary course of business must be based upon its sound business judgment.

See Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.), 722 F.2d 1063,

1070 (2d Cir. 1983) (requiring an "articulated business justification"); Comm. of Asbestos-

Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as

---

[14]    Generally, courts in this District have held that a debtor's entry into a plan support agreement, in and of
itself, does not need to be approved pursuant to section 363(b) of the Bankruptcy Code because a debtor's
right to negotiate and file a plan does not implicate property of a debtor's estate.  See, e.g., Trans World
Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.), 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988) ("In sum, 11
U.S.C. § 363(b)(1) simply has no application to the Stipulation which Texaco and Pennzoil negotiated in
furtherance of the goal of effecting a confirmed plan or reorganization.  Hence prior court approval of the
Stipulation was not required . . . ."); cf. In re The Great Atlantic & Pacific Tea Company, Inc., Case No. 10-
24549 (RDD) (Bankr. S.D.N.Y. Dec. 12, 2011) (debtors sought and obtained approval of plan support
agreement under section 363 of the Bankruptcy Code out of an abundance of caution); In re Quigley Co.,
Inc., Case No. 04-15739 (SMB) (Bankr. S.D.N.Y. Mar. 21, 2011) (same); In re Chemtura Corp., Case No.
09-11233 (REG) (Bankr. S.D.N.Y. June 17, 2010) (same).

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

49.    The Debtors have valid business justifications for entering into and performing under the PSA, which was approved by the (a) Board of NII Holdings, (b) the Board of Managers, upon the Independent Manager's recommendation that the Board of Managers cause Luxco to enter into the Proposed Settlement, and (c) the Capco Board.  Among other things, the PSA will facilitate the Debtors' ability to achieve their primary goal in these cases:  a comprehensive restructuring of their obligations on an agreed-upon timetable that will minimize litigation and quickly move these cases towards resolution.  To that end, the PSA and underlying Plan Term Sheet provide (a) specific terms that have been memorialized in the First Amended Plan, (b) a time frame for the Debtors to consummate the Sale Transaction and confirm the First Amended Plan, (c) a prohibition on the parties to the PSA from proposing or supporting a competing plan or Sale Transaction, (d) the requirement that the parties to the PSA vote for the First Amended Plan and (e) a remedy of specific performance if the parties to the PSA fail to vote for the First Amended Plan.

50.    Additionally, the PSA was negotiated in good faith and at arm's-length by sophisticated parties, represented by counsel experienced in complex chapter 11 cases.  As described above, the Debtors shared extensive information and held numerous meetings with Aurelius, Capital Group, the Luxco Group and the Creditors' Committee in connection with the negotiation of the PSA.[15]  As a result of these efforts, the PSA is now supported by a

---

[15]    In addition to the Debtors' counsel and advisors, these meetings often were attended by the creditor groups' legal counsel and financial advisors, including:  (a) Akin, counsel to Aurelius, (b) Paul Weiss, counsel to Capital Group, (c) Kirkland, counsel to the Luxco Group; (d) Blackstone, financial advisor to Aurelius, (e) HL, financial advisor to Capital Group, (f) Millstein, financial advisor to the Luxco Group; (g) Kramer Levin Naftalis & Frankel LLP, counsel to the Creditors' Committee and (h) FTI Consulting, Inc., financial advisor to the Creditors' Committee.

supermajority of the Debtors' creditors across multiple classes of claims arising from the Notes and the Creditors' Committee, which represents the interests of all general unsecured creditors in these cases. The Debtors have from the outset of these cases acted as a neutral arbiter between the competing creditor groups in an effort to bring such groups to agreement. After over twelve months of negotiations, the Debtors have reached a consensual agreement with Aurelius, Capital Group, the Luxco Group and the Creditors' Committee that they believe will maximize the value of the Debtors' estates and pave the way towards confirmation of a chapter 11 plan — that agreement is embodied in the PSA.

51.    Not only were the PSA and the Proposed Settlement negotiated in good faith and at arm's-length, and the Debtors' entry into them a valid exercise of the Debtors' business judgment, but the PSA also is a significant improvement over the Prior PSA. The PSA both maintains the heavily negotiated benefits of the Prior PSA (e.g., the complete and final settlement of the Potential Litigation Claims and the removal of $4.35 billion in debt from the Debtors' balance sheet) and also provides improved recoveries, as compared to the Prior PSA, to *all* of the Debtors' Noteholders. Indeed, the recoveries to holders of the Capco 2016 and Capco 2019 Notes improved by 11%,[16] to holders of Luxco Notes improved by 10% and to holders of the Capco 2021 Notes improved by 63%, with the holders of the Capco 2021 Notes being the largest beneficiaries (by a wide margin) of the revised PSA. In the aggregate, when compared to recoveries under the Prior Plan, the Noteholders' recoveries have improved by $392 million or $407 million, when calculated from a baseline reflecting recoveries under the Prior Plan before and after taking into account the rights offering contemplated thereunder, respectively.

---

[16]    The percentages in this sentence have been calculated before taking into account the rights offering contemplated under the Prior Plan. Taking into account such rights offering, these percentages are as follows: 10% for each of the Capco 2016 Noteholders and the Capco 2019 Noteholders; 47% for the Capco 2021 Noteholders; and 14% for each of the Luxco 11.375% Noteholders and the Luxco 7.875% Noteholders.

Moreover, those improved recoveries are partially composed of *cash*, which was not

contemplated under the Prior PSA.  Finally, there is not a plan that has requisite Capco creditor

support absent the Proposed Settlement encompassed in the PSA.  And in the absence of the

Proposed Settlement it is not clear when, or if, Capco would ever have a confirmable plan and, as

a result, whether any of the Capco Noteholders would obtain any recovery on account of their

claims.  It also is unclear whether, absent the Proposed Settlement, litigation of the Potential

Litigation Claims could be resolved prior to September 15, 2015, the date at which the Debtors'

deals with certain of their local lenders in Brazil will begin to unravel, causing NII Brazil (as

defined in the First Amended Disclosure Statement) to be in default of or lose certain

concessions with respect to such lending and credit agreements.  Thus, the Debtors believe that

the PSA not only is the best path forward, but also may be the only viable path forward.

52.    Further, in consideration of the extent of the Requisite Consenting

Noteholders' support of the Plan, which exceeds the 66⅔ threshold in all classes of claims arising

from the Notes at all of the applicable Debtors, the Requisite Consenting Noteholders required as

an essential element of the PSA that the Debtors agree to pay their professional fees (subject to

certain limitations).  Such payment of the Fees and Expenses of Requisite Consenting

Noteholders is also a sound exercise of the Debtors' business judgment and warranted in light of

the robust level of support provided by the Requisite Consenting Noteholders and their extensive

diligence efforts and good faith negotiations in furtherance of the PSA and in connection with

formulation of the Prior Plan and the First Amended Plan.  Moreover, the fees and expenses to

be reimbursed by the Debtors are reasonable and highly beneficial to the Debtors and their

estates given the benefits that will inure to the Debtors' estates upon consummation of the First

Amended Plan.  Courts in this district and elsewhere have authorized the payment of fees and

expenses such as these in connection with plan or restructuring support agreements.  See In re MPM Silicones, LLC, et al., Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) (approving the payment of certain professionals' fees and expenses pursuant to the terms of the restructuring support agreement); In re Inversiones Alsacia S.A., et al., Case No. 14-12896 (MG) (Bankr. S.D.N.Y. Nov. 5, 2014) (same); In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) (same); In re Genco Shipping & Trading Ltd., 509 B.R. 455 (Bankr. S.D.N.Y. 2014) (same); see also In re USEC Inc., Case No. 14-10475 (CSS) (Bankr. D. Del. April 21, 2014) (same).

53.    As noted, this Motion does not seek approval of the First Amended Plan but instead only seeks to permit the Debtors to enter into the PSA and perform their obligations thereunder.  Taking all of the above into consideration, to the extent necessary, the Debtors' entry into the PSA should be approved by this Court pursuant to section 363(b) of the Bankruptcy Code.

54.    Finally, authorizing the Debtors to enter into and effectuate the terms of the PSA is well within the equitable powers of this Court.  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); Casse v. Key Bank Nat'l Ass'n (In re Casse), 198 F.3d 327, 336 (2d Cir. 1999) (describing section 105 as "an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case") (citation and internal quotations omitted); see also Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy

court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

*The PSA Complies with Sections 1125 and 1126 of the Bankruptcy Code*

55.    The Debtors are mindful of the solicitation and voting provisions in sections 1125 and 1126 of the Bankruptcy Code. Accordingly, the Debtors have included provisions in the PSA to ensure compliance with these sections. Section 11.17 of the PSA provides:

> This Agreement is not and shall not be deemed to be a solicitation for votes to accept or reject the Plan. The votes of the holders of Claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Disclosure Statement and related ballot, the Plan, and other required solicitation materials. In addition, the PSA does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

Additionally, Section 3.01 of the PSA is premised, in part, on the Requisite Consenting Noteholders receiving "the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code."

56.    Courts in this district and elsewhere regularly approve postpetition plan support agreements, concluding that they do not run afoul of section 1125(b) of the Bankruptcy Code. See In re Nautilus Holdings Ltd., Case No. 14-22885 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2014) (approving plan support agreement where agreement provided that obligation to vote for the plan was subject to the receipt of a disclosure statement approved by the Court); In re General Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. April 2, 2012) (same); In re The Great Atlantic & Pacific Tea Company, Inc., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) (same); In re Quigley Co., Inc., Case No. 04-15739 (SMB) (Bankr. S.D.N.Y.

Apr. 7, 2011) (same); <u>In re Chemtura Corp.</u>, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug.

9, 2010) (same); <u>In re Tronox Incorporated, et al.</u>, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y.

Dec. 23, 2009) (same); <u>In re Paper International, Inc.</u>, Case No. 08-13917 (RDD) (Bankr.

S.D.N.Y. May 15, 2009) (approving postpetition plan support agreement that provided it was

subject to the provisions of Sections 1125 and 1126 of the Bankruptcy Code); <u>see</u> <u>also</u> <u>In re</u>

<u>Owens Corning</u>, Case No. 00-03837 (JKF) (Bankr. D. Del June 29, 2006) (approving

postpetition plan support agreement that (i) required a vote in favor of the plan only after holders

were solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii)

clearly stated the agreement was not such a solicitation).[17]

57.     In this case, the PSA gives the Debtors, the Creditors' Committee and each

of the Requisite Consenting Noteholders the option to terminate the PSA should the Bankruptcy

Court fail to enter an order approving the Sale Transaction or the Sale Transaction fail to be

consummated.  Moreover, the Debtors and the Creditors' Committee will not solicit votes on the

First Amended Plan, and none of the Consenting Noteholders (as defined in the PSA) have

agreed to vote in favor of the First Amended Plan, unless and until the Court approves the First

Amended Disclosure Statement and their votes have been properly solicited pursuant to section

1125 of the Bankruptcy Code.  <u>See</u> PSA §§ 11.17; 3.01.  Additionally, the PSA contains

termination events that permit the respective parties to terminate the PSA and thereby withdraw

from their promise to vote in favor of the Plan.  <u>See</u> PSA § 7.01.  Finally, the PSA, by its terms,

does not force the Debtors or the Creditors' Committee to take any action, or refrain from taking

any action, that is inconsistent with their fiduciary duties or in contravention of the Bankruptcy

Code, the Federal Rules of Bankruptcy Procedure or the Local Bankruptcy Rules for the

---

[17]    Courts in this District also have approved motions to assume prepetition restructuring support agreements.
<u>See In re Genco Shipping & Trading Ltd.</u>, 509 B.R. 455 (Bankr. S.D.N.Y. 2014); <u>In re MPM Silicones,</u>
<u>LLC</u>, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014).

Southern District of New York.  See PSA §§ 11.01 and 11.02.  To this end, both the Debtors and

the Creditors' Committee have the right to consider alternate plans.  Id.  Accordingly, the

Debtors submit that the PSA does not constitute an impermissible "solicitation" under section

1125(b) of the Bankruptcy Code, and the Court should authorize the Debtors to enter into and

perform in accordance with the terms of the PSA.

## **Waiver of Bankruptcy Rule 6004(h)**

58.    Pursuant to Bankruptcy Rule 6004(h), the Debtors also seek, to the extent it

applies, a waiver of any stay of the effectiveness of the Order.  Bankruptcy Rule 6004(h)

provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral

is stayed until the expiration of 14 days after entry of the order, unless the court orders

otherwise."  As set forth above, the Debtors' entry into the PSA is linked to the ultimate

consummation of the Sale Transaction and the confirmation of the First Amended Plan in the

most expeditious manner possible.  Any further delay will compromise the Sale Transaction and

the Debtors' restructuring efforts and ability to ultimately put forth and confirm the First

Amended Plan.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of

the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, with respect

to the Order.

## **Notice**

59.    No trustee or examiner has been appointed in these chapter 11 cases.  Notice

of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to the Creditors'

Committee; (c) Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New

York, New York  10019 (Attn:  Andrew Rosenberg, Esq. and Elizabeth McColm, Esq.) on behalf

of Capital Group; (d) Akin, Gump, Strauss, Hauer & Feld LLP, One Bryant Park, New York,

New York  10036 (Attn:  Daniel H. Golden, Esq. and David Botter, Esq.) on behalf of Aurelius;

(e) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Paul M. Basta, Esq. and Christopher Marcus, Esq.) on behalf of the Luxco Group; and (f) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

**<u>No Prior Request</u>**

60.    No prior request for the relief sought in this Motion with respect to the PSA has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form attached hereto as Exhibit A, (i) authorizing the Debtors to enter into the PSA, (ii) authorizing the Debtors to effectuate the terms, conditions and provisions of the PSA embodied therein and (iii) granting such other and further relief as the Court deems appropriate.

Dated:  March 24, 2015
       New York, New York

Respectfully submitted,

  /s/  Scott J. Greenberg                
Scott J. Greenberg
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

- and -

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                           :
In re:                                                     :    Chapter 11
                                                           :
NII Holdings, Inc., et al.,[1]                             :    Case No. 14-12611 (SCC)
                                                           :
                               Debtors.                    :    (Jointly Administered)
                                                           :
-----------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a) AND 363(b)
### OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS
### TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT

This matter coming before the Court on the Motion of Debtors and Debtors in Possession

for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Them

to Enter Into and Perform Under a Plan Support Agreement (the "Motion"),[2] filed by the debtors

and debtors in possession in the above-captioned cases (collectively, the "Debtors"); the Court

having reviewed the Motion and having considered the statements of counsel with respect to the

Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the Motion and the Hearing was sufficient under

the circumstances, (d) the Debtors' entry into and performance under the PSA is fair and

equitable, a sound exercise of business judgment and in the best interests of the Debtors' and

their estates and (e) there is good cause to waive the 14-day stay imposed by Bankruptcy Rule

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

6004(h) to the extent it is applicable; and the Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish just cause for relief;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are hereby authorized to enter into the PSA attached hereto as

Exhibit 1, which is approved pursuant to sections 105 and 363(b) of the Bankruptcy Code.

3.      The Debtors are authorized to perform their obligations under the PSA, including

the payment of the Fees and Expenses of Requisite Consenting Noteholders as contemplated in

Section 4.01(j) therein.  Without limiting any other provision of this Order, the Court finds that

the Fees and Expenses of Requisite Consenting Noteholders provided under the PSA:  (i) are

necessary to the preservation of the Debtors' estates and (ii) shall be payable pursuant to the

terms of the PSA.

4.      Neither the Debtors' entry into nor the Debtors' performance under the PSA shall

constitute a solicitation of votes in violation of section 1125(b) of the Bankruptcy Code.

5.      The Debtors are authorized and empowered to take all steps necessary and

appropriate to carry out and otherwise effectuate the terms, conditions, and provisions of the

PSA.

6.      The Debtors are further authorized to enter into any amendments or modifications

to the PSA in accordance with and subject to the terms and conditions of the PSA without other

or further notice or order of this Court.

7.      This Order and the PSA shall be binding upon all of the parties to the PSA.

8.      Pursuant to Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be

immediately effective and enforceable upon its entry.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to this Order.

Dated: _____, 2015
        New York, New York

_____
        UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT dated March 5, 2015 (this "Agreement") is made by and among: (i) NII Holdings, Inc., NII Capital Corp. ("Capco"), NII Funding Corp., NII Aviation, Inc., Nextel International (Services), Ltd., NII Global Holdings, Inc., NII International Holdings S.à r.l. ("International Holdings"), NII International Services S.à r.l, NII International Telecom S.C.A. ("Luxco"), NII Mercosur, LLC, McCaw International (Brazil), LLC, Airfone Holdings, LLC and NIU Holdings LLC ("Selling Debtor" and, collectively with the foregoing entities, the "Company" or the "Debtors"); (ii) entities managed by Aurelius Capital Management, LP (collectively "Aurelius"), with holdings of Notes (as defined below) as set forth on its signature page hereto; (iii) entities managed by Capital Research and Management Company (collectively, "Capital Group"); (iv) the Ad Hoc Committee of Luxco Holders (the "Luxco Group" and, the members of the Luxco Group, together with Aurelius, Capital Group and any transferee of Notes that becomes a Party (as defined below) in accordance with Section 3.04 of this Agreement, the "Consenting Noteholders"), with holdings of Notes as set forth on its signature page hereto; (v) the Official Committee of Unsecured Creditors of the Debtors (the "Committee" and, together with the Debtors, the "Plan Proponents"); and (vi) each transferee that becomes a Party in accordance with Section 3.04 of this Agreement (together with the Debtors, the Consenting Noteholders, and the Committee, the "Parties" and, each, individually, a "Party").   All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan Term Sheet (as defined below).

For purposes of this Agreement, the term "Requisite Consenting Noteholders" shall be defined as each of (i) Aurelius, (ii) Capital Group and (iii) the Luxco Group.   For purposes of this Agreement, the Luxco Group shall exercise its rights as a Requisite Consenting Noteholder through approval by members of the Luxco Group holding a majority in principal amount of Notes held by the Luxco Group in the aggregate.

# RECITALS

WHEREAS, on September 15, 2014 and on October 8, 2014, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in cases (including any subsequent cases of affiliated debtors that are commenced from time to time, collectively, the "Bankruptcy Cases") before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which Bankruptcy Cases have been consolidated by order of the Bankruptcy Court for procedural purposes only and are being jointly administered under case number 14-12611 (SCC). References in this Agreement to pleadings, orders and other filings and related docket numbers are to such pleadings, orders and other filings filed or entered in the Bankruptcy Cases;

WHEREAS, Capco has issued the following series of senior notes (collectively, the "Capco Notes" and, the indentures that govern the Capco Notes, as amended, modified, or supplemented from time to time (the "Capco Indentures")):

(i)    $1,450,000,000 in principal amount of 7.625% senior notes due 2021 (the "Capco 2021 Notes") governed by that certain Indenture dated March 29, 2011 among Capco, as issuer, the guarantors party thereto, and Wilmington Savings Fund Society,

FSB, as trustee, as supplemented by that certain First Supplemental Indenture dated December 8, 2011;

      (ii)     $500,000,000 in principal amount of 8.875% senior notes due 2019 ("Capco 2019 Notes") governed by that certain Indenture dated December 15, 2009 among Capco, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, as supplemented by that certain Supplemental Indenture No. 1, dated March 8, 2010 and that certain Supplemental Indenture No. 2 dated May 28, 2010; and

      (iii)    $800,000,000 in principal amount of 10.0% senior notes due 2016 ("Capco 2016 Notes") governed by that certain Indenture dated August 18, 2009, among Capco, as issuer, the guarantors party thereto, and Wilmington Savings Fund Society, FSB (as successor-in-interest to Wilmington Trust Company), as trustee, as supplemented by that certain Supplemental Indenture No. 1 dated February 8, 2010, that certain Supplemental Indenture No. 2, dated March 8, 2010, and that certain Supplemental Indenture No. 3, dated May 28, 2010;

WHEREAS, Luxco has issued the following series of senior notes (collectively, the "Luxco Notes" and, together with the Capco Notes, the "Notes", and the indentures that govern the Luxco Notes, as amended, modified, or supplemented from time to time (the "Luxco Indentures")):

      (i)     $700,000,000 in principal amount of 7.875% senior notes due 2019 (the "Luxco 7.875% Notes") governed by that certain Indenture dated May 23, 2013 among Luxco, as issuer, NII Holdings, Inc., as guarantor, and Wilmington Trust, National Association, as trustee; and

      (ii)     $900,000,000 in principal amount of 11.375% senior notes due 2019 (the "Luxco 11.375% Notes") governed by that certain Indenture dated February 19, 2013 among Luxco, as issuer, NII Holdings, Inc., as guarantor, and Wilmington Trust, National Association, as trustee, as supplemented by that certain Supplemental Indenture, dated April 15, 2013;

WHEREAS, the Plan Proponents and the Consenting Noteholders have engaged in arm's length, good-faith discussions regarding the reorganization of the Company (collectively, the "Restructuring") pursuant to a chapter 11 plan of reorganization (the "Plan") to be proposed by the Debtors in the Bankruptcy Cases, which Plan shall contain the terms and conditions set forth in, and be consistent in all respects with, the Plan Term Sheet;

WHEREAS, the Selling Debtor and the Stalking Horse Purchaser have entered into a Purchase and Sale Agreement dated January 26, 2015 (the "Stalking Horse Purchase Agreement"), pursuant to which the Selling Debtor will sell, and the Stalking Horse Purchaser will acquire, on the Closing Date, in exchange for payment of the Estimated Purchase Price and other consideration (including, without limitation, the assumption of certain liabilities), 100% of the membership interests in Nextel International (Uruguay), LLC (such acquisition, the "Stalking

2

Horse Sale Transaction" and, such membership interests, the "Purchased Interests"), all as set forth in and pursuant to the terms of the Stalking Horse Purchase Agreement;

WHEREAS, certain of the Consenting Noteholders and the Committee executed a stipulation [Docket No. 398] in which they each confirmed their support for the Stalking Horse Sale Transaction and the channeling of any claims they may have against the Company Parent or the Company Shares (each term as defined in the Stalking Horse Purchase Agreement) to the proceeds of the sale to be held by NIU Holdings LLC, and the dismissal of the Company Parent's bankruptcy case;

WHEREAS, the Stalking Horse Sale Transaction shall be conducted pursuant to section 363 of the Bankruptcy Code and be subject to higher or better offers in accordance with the bidding procedures (the "Bidding Procedures") approved by the *Order (A) Authorizing and Approving the Bidding Procedures, Break-Up Fee and Expense Reimbursement, (B) Authorizing and Approving the Debtors Entry into the Stalking Horse Purchase Agreement, (C) Approving the Notice Procedures, and (D) Scheduling a Sale Hearing* [Docket No. 472] (the "Bidding Procedures Order") entered by the Bankruptcy Court on February 17, 2015 (the transaction effecting the Stalking Horse Sale Transaction or a sale transaction for the Purchased Interests resulting from a higher or better offer in accordance with the Bidding Procedures, the "Sale Transaction");

WHEREAS, in light of the proposed Sale Transaction, and in furtherance of the Restructuring, the Plan Proponents have requested each Consenting Noteholder to support the Plan and the Sale Transaction in accordance with this Agreement;

WHEREAS, the Independent Manager has confirmed the reasonableness of and determined to recommend to the Board of Managers (in connection with International Holdings' capacity as sole manager of Luxco) that Luxco should join the Settlement;

WHEREAS, the applicable board of directors or managers of Holdings and Capco and the Board of Managers with respect to Luxco have approved the Settlement and the applicable Debtor's entry into this Agreement; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' agreement concerning their respective obligations.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    Proposed Restructuring**.    The principal terms of the Restructuring are set forth on the term sheet attached hereto as Exhibit 1 (as such term sheet may be modified in accordance with Section 10 hereof, the "Plan Term Sheet").    The Restructuring will be implemented pursuant to various agreements and related documentation, including, without

NYI-524642321v5

limitation, (A) the Plan, which Plan shall be consistent in all material respects with the Plan Term Sheet and this Agreement; and (B) the following related documents required to implement the Restructuring that will be executed, filed with the Bankruptcy Court, become effective, or otherwise finalized (the "Plan Documents"): (a) the documents necessary to effectuate the Sale Transaction, including (i) any purchase agreement between and among any of the Debtors, their affiliates and the Purchaser other than the Stalking Horse Purchase Agreement (the "Purchase Agreement"), (ii) the order entered by the Bankruptcy Court approving the Sale Transaction (substantially in the form attached as Exhibit B to the motion seeking approval of the Sale Transaction [Docket No. 406], the "Proposed Sale Order" and, as entered by the Bankruptcy Court, the "Sale Order") and (iii) any ancillary documents related to the Sale Transaction (the documents referred to in the preceding clauses (i) through (ii) and this clause (iii), the "Sale Documents"); (b) the disclosure statement related to the Plan (the "Disclosure Statement"), (c) the materials related to the solicitation of votes to accept or reject the Plan (the "Solicitation Materials"), (d) the motion to approve the Disclosure Statement and the Solicitation Materials (the "Disclosure Statement Motion"), and the order entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (the "Disclosure Statement Order"), (e) the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents (the "Confirmation Order") and any pleadings in support of entry of the Confirmation Order, (f) any material appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Plan Documents, including any Plan supplement; (g) any term sheet and/or commitment letter for any proposed postpetition financing or exit financing, including without limitation the Bridge Loan; (h) any operative documents for any proposed postpetition financing or exit financing, including without limitation, the Bridge Loan; (i) any documents disclosing the identity of the members of the board of directors of any of the Reorganized Debtors and the nature of and compensation for any "insider" under the Bankruptcy Code who is proposed to be employed or retained by any of the Reorganized Debtors; (j) any list of material executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected; (k) a list of any material retained causes of action; (l) the certificate of incorporation and bylaws for Reorganized Holdings in forms attached as Exhibit B and Exhibit C to the Term Sheet, respectively; (m) the registration rights agreement the "Registration Rights Agreement") filed as Exhibit A to the chapter 11 plan filed by the Debtors on December 22, 2014 (the "Original Plan") [Docket No. 322]; and (n) any amendments, restatements, modifications or refinancings of (i) the Credit Agreement, dated as of April 20, 2012, among Nextel Telecomunicações Ltda. ("Nextel Brazil"), as Borrower, the Guarantors party thereto, and China Development Bank Corporation as Lender, Administrative Agent and Arranger, which credit facility benefits from the commercial and political risk insurance coverage provided by China Export and Credit Insurance Corporation (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Brazil Sinosure Credit Agreement"); (ii) the Credit Agreement, dated as of April 20, 2012, among Nextel Brazil, as Borrower, the Guarantors party thereto, and China Development Bank Corporation as Lender, Administrative Agent and Arranger (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Brazil Non-Sinosure Credit Agreement" and, together with the Brazil Sinosure Credit Agreement, the "Brazil Credit Agreements"); (iii) the Credit Agreement, dated as of July 12, 2011, among Comunicaciones Nextel de México ("Nextel Mexico"), as Borrower, the Guarantors party thereto, and China Development Bank Corporation as Lender, Administrative Agent and Arranger, which credit facility benefits from the commercial and

4

political risk insurance coverage provided by China Export and Credit Insurance Corporation (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Mexico Sinosure Credit Agreement"); (iv) the Credit Agreement, dated as of July 12, 2011, among Nextel Mexico, as Borrower, the Guarantors party thereto, and China Development Bank Corporation as Lender, Administrative Agent and Arranger (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Mexico Non-Sinosure Credit Agreement" and, together with the Mexico Sinosure Credit Agreement, the "Mexico Credit Agreements" and, together with the Brazil Credit Agreements, the "CDB Agreements"); (v) the Bank Credit Bill dated October 31, 2012 between Nextel Brazil and Banco do Brasil S.A. (the "BdB Note"); and (vi) the Bank Credit Certificate dated December 8, 2011 among Nextel Brazil, Nextel Telecomunicações S.A. and Caixa Econômica Federal (the "Caixa Note" and, together with the CDB Agreements and the BdB Note, the "Local Credit Agreements").

The Plan, the Plan Documents, the Sale Documents, any ancillary documents required to implement the Restructuring, and any amendments, modifications or supplements to the Plan, Plan Documents, the Sale Documents, and any such ancillary documents shall be consistent in all material respects with the Plan Term Sheet and, upon completion of the exhibits thereto, shall (i) otherwise be in form and substance reasonably acceptable to the Plan Proponents, Aurelius and Capital Group, and (ii) solely with respect to the Plan, the Disclosure Statement, the Solicitation Materials, the Disclosure Statement Motion, the Disclosure Statement Order, the Confirmation Order, any term sheet and/or commitment letter for the issuance of the Bridge Loan and any operative documents for the Bridge Loan, otherwise be in form and substance reasonably acceptable to the Luxco Group and with respect to all other documents, be subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders; provided, further, that (w) the foregoing consent rights of Aurelius, Capital Group and the Luxco Group with respect to (I) any amendments, restatements, modifications or refinancing of the CDB Agreements (collectively, the "CDB Amendments") shall only apply to CDB Amendments entered into after December 18, 2014, including any amendments, restatements, modifications or refinancings of any CDB Amendments entered into prior to December 18, 2014, and (II) any amendments, restatements, modifications or refinancing of the BdB Note or the Caixa Note (collectively, the "Brazil Bank Amendments") shall only apply to modifications to Brazil Bank Amendments made after February 26, 2015, including any amendments, restatements, modifications or refinancings of any the draft Brazil Bank Amendments dated February 13, 2015 that were delivered to the Requisite Consenting Noteholders prior to February 26, 2015, (x) notwithstanding the foregoing, the rights of the Committee with respect to the CDB Amendments and the Brazil Bank Amendments shall be limited to a right to consult with Company in connection therewith, (y) the consent rights of the Committee and Requisite Consenting Noteholders with respect to the Sale Order shall be limited to modifications of the Proposed Sale Order, and (z) the Luxco Group shall not have any consent rights with respect to any economic modifications to the terms of the Restructuring that do not affect the recoveries, in terms of value and form of consideration, to be afforded to holders of the

5

Luxco Notes.    Nothing contained in this section shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Plan Term Sheet set forth in Section 10 hereof.

**Section 2.        Exhibits Incorporated by Reference.**

Each of the exhibits attached hereto, including, without limitation, the Plan Term Sheet, is expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless specified otherwise, shall include the exhibits.    In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.        Consenting Noteholders' Commitments.**

3.01.    Agreement to Support the Restructuring and Vote on the Plan.    Subject to the conditions contained in Section 3.03 hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each Consenting Noteholder agrees that it shall, subject to the receipt by such Consenting Noteholder of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code (provided, however, that only the obligations set forth in Sections 3.01(a) and 3.01(b) shall be conditioned on receipt of the Disclosure Statement and other Solicitation Materials):

(a)        to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)        not change or withdraw (or cause or direct to be changed or withdrawn) such vote;

(c)        not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation, or implementation of the Plan;

(d)        not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan or the Sale Transaction;

(e)        not directly or indirectly take an action to direct the Indenture Trustees (as applicable) to undertake any action that a Consenting Noteholder is otherwise prohibited from undertaking pursuant to Sections 3.01(c) or (d) hereof; provided, however, that to the extent a Consenting Noteholder chooses to direct an Indenture Trustee to not undertake an action that a Consenting Noteholder is otherwise prohibited from undertaking pursuant to Sections 3.01(c) and (d) hereof, such direction shall not be construed in any way as requiring any

NYI-524642321v5

Consenting Noteholder to provide an indemnity to the applicable Indenture Trustee, or to incur or potentially incur any other liability in connection with such direction;

(f)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with consummation of the Sale Transaction; and

(g)    take any and all reasonably necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan Term Sheet, the Plan, the Plan Documents and the Sale Documents.

Notwithstanding anything to the contrary in this Section 3.01, the vote of a Consenting Noteholder shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement as to such Consenting Noteholder pursuant to Section 7 hereof.

3.02.    Right to Appear and Participate.    Nothing in Section 3.01 hereof shall be deemed to limit any of the following rights of the Consenting Noteholders, to the extent consistent with this Agreement:

(a)    to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance or participation and the positions advocated in connection therewith are not inconsistent with this Agreement, the Plan Term Sheet, or the terms of the Plan, and, other than as a result of actions or omissions any such Consenting Noteholder takes or does not take in good faith to enforce its rights under this Agreement, the Plan Term Sheet, or the terms of the Plan, do not hinder, delay or prevent consummation of the Plan;

(b)    to purchase, sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors, subject to the terms of Section 3.04 hereof; or

(c)    all rights under any applicable indenture, other loan document or applicable law.

3.03.    Certain Conditions.    The continuing obligations of each Consenting Noteholder set forth in Section 3.01 hereof, following the occurrence of the PSA Effective Date, are subject to the following conditions:

(a)    the Plan and Plan Documents, including the Sale Documents (other than the Stalking Horse Purchase Agreement), shall (i) be in form and substance reasonably acceptable to the Plan Proponents, Aurelius and Capital Group, and (ii) solely with respect to the Plan, the Disclosure Statement, the Solicitation Materials, the Disclosure Statement Motion, the Disclosure Statement Order, the Confirmation Order, any term sheet and/or commitment letter for the issuance of the Bridge Loan and any operative documents for the Bridge Loan, be in form and substance reasonably acceptable to the Luxco Group and with respect to all other documents, be subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent

7

not to be unreasonably withheld, conditioned or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders; provided, further, that the foregoing consent rights of Aurelius, Capital Group and the Luxco Group with respect to (A) the CDB Amendments shall only apply to CDB Amendments entered into after December 18, 2014, including any amendments, restatements, modifications or refinancings of any CDB Amendments entered into prior to December 18, 2014 and (B) the Brazil Bank Amendments shall only apply to modifications to Brazil Bank Amendments made after February 26, 2015, including any amendments, restatements, modifications or refinancings of the draft Brazil Bank Amendments dated February 13, 2015 that were delivered to the Requisite Consenting Noteholders on or prior to February 26, 2015.

(b)    this Agreement shall have not been terminated in accordance with the terms hereof.

3.04.    Transfer of Claims.

(a)    Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Party to sell, use, assign, transfer or otherwise dispose of ("Transfer") any claims as such term is defined in section 101(5) of the Bankruptcy Code (each a "Claim" and, collectively, the "Claims"); provided, however, that, for the period commencing as of the PSA Effective Date until the termination of this Agreement pursuant to the terms hereof, no Party shall Transfer any Claims, and any purported Transfer of Claims shall be null and void ab initio, unless (a) the transferee is a Party, or (b) if the transferee is not a Party, such transferee delivers to the Company (in any manner permitted by Section 11.15 hereof) within three (3) business days of the Transfer an executed joinder to this Agreement in the form attached hereto as Exhibit 2 (a "Joinder Agreement") pursuant to which such transferee shall have assumed all obligations of the Party transferring such Claims and shall become a Party; provided, further, that, if the transferor of the Claims is a Consenting Noteholder, the transferee of such Claims shall also become a Consenting Noteholder.    The failure by a Party to comply with the Transfer procedure described in the first proviso of the immediately preceding sentence (resulting in such Transfer becoming null and void ab initio) shall not constitute a material breach for purposes of Section 7.01(b) hereof.    For the avoidance of doubt, to the extent not already a Party to this Agreement, a transferee of Claims under this Agreement shall only become a Party (or Consenting Noteholder, to the extent applicable) to this Agreement with respect to the Claims that are the subject of the Transfer.    This Agreement shall in no way be construed to preclude any Party from acquiring additional Claims; provided, however, that any such additional Claims acquired by a Party shall automatically and immediately upon acquisition by such Party be deemed subject to all of the terms of this Agreement, whether or not notice of such acquisition is given to the Company, and that, so long as this Agreement has not been terminated, such Party shall vote (or cause to be voted) any such additional Claims in favor of the Plan in accordance and consistent with Section 3.01(a) hereof.

(b)    Notwithstanding anything herein to the contrary, (A) any Consenting Noteholder may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such Claims against the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the

8

Qualified Marketmaker be or become a Consenting Noteholder, provided that the Qualified Marketmaker subsequently transfers (by purchase, sale, assignment, participation or otherwise) within twenty (20) days of its receipt thereof the right, title or interest in such Claims against the Debtors to a transferee that is a Consenting Noteholder or becomes a Consenting Noteholder by executing a Joinder Agreement that is delivered to the Debtors within such time period, and such Transfer shall be null and void *ab initio* in the event the Qualified Marketmaker fails to subsequently transfer such Claims to a transferee that is or becomes a Consenting Noteholder by executing a Joinder Agreement and (B) to the extent that a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in Claims against the Debtors that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Noteholder without the requirement that the transferee of such Claims be or become a Consenting Noteholder.

For these purposes, a "Qualified Marketmaker" means an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (B) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

### Section 4.    Company's and Plan Proponents' Commitments.

4.01.    Company's Commitments.    Subject to the Company's fiduciary duties under applicable law and Section 11.01 hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, the Company agrees to use its commercially reasonable efforts to:

(a)    subject to its obligations under the Stalking Horse Purchase Agreement or Purchase Agreement (as applicable), operate its business in the ordinary course, including, but not limited to, maintaining its accounting methods, using its commercially reasonable efforts to preserve its assets and its business relationships, continuing to operate its billing and collection procedures, and maintaining its business records in accordance with its past practices;

(b)    seek entry by the Bankruptcy Court of the Sale Order, and afford reasonable opportunity to review and comment on modifications to the Proposed Sale Order to the respective legal advisors for the Committee and the Consenting Noteholders in advance of the final submission of such order;

(c)    conduct the auction in accordance with the Bidding Procedures;

(d)    consummate the Sale Transaction and obtain approval of the Sale Order, including in accordance with the Bidding Procedures;

(e)    take any and all actions that the Company determines to be reasonably necessary to consummate the Sale Transaction;

NYI-524642321v5

(f)        assist the Purchaser, as reasonably necessary, in obtaining any and all, and obtain its own (if any), required regulatory approvals and material third-party approvals for the Sale Transaction;

(g)        consummate the Sale Transaction in a tax-efficient manner;

(h)        prepare and file a motion seeking an order from the Bankruptcy Court authorizing the Debtors' entry into this Agreement (the "PSA Motion" and, such order approving the Debtors' entry into this Agreement, the "PSA Order"), and afford reasonable opportunity to comment and review to the respective legal advisors for the Committee and the Consenting Parties in advance of the filing of the PSA Motion;

(i)        timely file, and provide the Committee and the Consenting Noteholders with a draft of such objection at least two (2) business days prior to filing, a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; or (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code, the appointment of which has not been consented to by the Committee, each of the Requisite Consenting Noteholders;

(j)        pay the reasonable and documented fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP ("Akin"), (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), (iii) Blackstone Advisory Partners, L.P. ("Blackstone"), (iv) Houlihan Lokey Capital, Inc. ("HL"), (v) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell"), (vi) Kirkland & Ellis LLP ("Kirkland" and, together with Akin and Paul Weiss, "RCN Counsel") and (vii) Millstein & Co. ("Millstein") in their respective capacity as counsel or financial advisor to one or more of the Requisite Consenting Noteholders, incurred prior to the effective date of the Plan (the "Plan Effective Date") in connection with the Debtors' restructuring, including restructuring, completion or transaction fees provided for or acknowledged in the engagement letters for Blackstone and HL (and, in the case of HL and Millstein, as such engagement letter has been amended), in full in cash; provided that the reasonable and documented fees and expenses payable by the Debtors of (v) Robbins Russell shall not exceed $150,000, (w) Kirkland shall not exceed $4,500,000, (x) Millstein shall not exceed $4,000,000, (y) Blackstone, only with respect to its restructuring and discretionary fees, shall not exceed $3,000,000, and (z) HL, only with respect to its restructuring fee, shall not exceed $7,000,000;

(k)        not request entry of a Sell-Down Order as such term is defined in the *Final Order (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities, (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates and (III) Granting Related Relief* [Docket No. 138] without the consent of the Committee and each of the Requisite Consenting Noteholders; and

(l)        if the Debtors know or should know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in

10

this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Consenting Noteholders.

4.02.    Plan Proponents' Commitments.    Subject to each of the Plan Proponents' respective fiduciary duties under applicable law and Sections 11.01 and 11.02 hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Plan Proponents agrees to use its commercially reasonable efforts to:

(a)    prepare the Plan Documents and any related documents, and distribute such documents concurrently to the Consenting Noteholders, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the Consenting Noteholders in advance of any filing thereof;

(b)    support and complete the Restructuring and all transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents;

(c)    take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any and all actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(d)    complete the Restructuring and all transactions contemplated under the Plan Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided therefor in this Agreement; and

(e)    take no actions inconsistent with this Agreement or the Plan Term Sheet, or that would delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "Alternative Transaction"); provided, however, that the Sale Transaction or the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of the Debtors' or their subsidiaries' assets, including the marketing and solicitation of bids for the sale any of their assets pursuant to section 363 of the Bankruptcy Code as contemplated by the Plan Term Sheet, and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by its non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction.

**Section 5.    Mutual Representations, Warranties, and Covenants**.    Each of the Parties individually represents, warrants, and covenants to each other Party, as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer), as follows (each of which is a continuing representation, warranty, and covenant):

5.01.    Existence; Enforceability.    It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms.

5.02.    No Violation.    The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (a) any provision of law, rule or regulation

11

applicable to it or any of its subsidiaries, as applicable, or (b) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, as applicable, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries, as applicable, is a party.

5.03.    No Consent or Approval.    Except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to carry out the transactions contemplated by, and perform the respective obligations under, this Agreement.

5.04.    Power and Authority.    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

5.05.    Consenting Noteholder Representations.    Each Consenting Noteholder individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant):

(a)    it (i) is either (a) the sole beneficial owner of the principal amount of Claims set forth below its signature hereto, or (b) has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and to dispose of, exchange, assign, and transfer such Claims and (iii) holds no other Claims;

(b)    other than pursuant to this Agreement, its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(c)    it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended); and

(d)    it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of the Claims that are inconsistent or conflict with

12

representations and warranties of such Consenting Party herein or that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder, either generally or with respect to any specific Claims.

**Section 6.    No Waiver of Participation and Reservation of Rights and Ratification of Liability.**    This Agreement and the Plan Term Sheet evidence a proposed settlement of disputes among the Parties.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of each of the Parties to protect and preserve its rights, remedies and interests.    Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated, or if this Agreement is terminated for any reason (other than pursuant to Section 7.02 hereof), each of the Parties fully reserves any and all of its rights, remedies, and interests.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement, the Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any action, case, or proceeding other than an action, case or proceeding to enforce its terms.

**Section 7.    Termination Events.**

7.01.    Termination Events.    This Agreement may be terminated by (i) the mutual consent of the Plan Proponents and each of the Requisite Consenting Noteholders or (ii) either of the Plan Proponents, or any of the Requisite Consenting Noteholders upon two (2) business days prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "Termination Event"); provided, however, that this Agreement may be terminated solely (i) by the Committee or any of the Requisite Consenting Noteholders upon the occurrence of the Termination Events set forth in clauses (a), (e), (f) and (i)-(p) below and (ii) by any of the Requisite Consenting Noteholders upon the occurrence of the Termination Event set forth in clause (g) below:

(a)    the public announcement by the Company of its intention not to pursue the Restructuring or the Sale Transaction, or the Company's acceptance of an Alternative Transaction;

(b)    following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(c)    the issuance by any court of competent jurisdiction or other competent governmental or regulatory authority of an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring or the Sale Transaction or causing a material adverse effect on the economics terms of the Restructuring or the Sale Transaction, taken as a whole, in each case, in a manner that cannot reasonably be remedied by the Company;

(d)    the appointment in the Bankruptcy Cases of a trustee or receiver (but not the Independent Manager), the conversion of the Bankruptcy Cases to cases under

13

chapter 7 of the Bankruptcy Code, or the dismissal of the Bankruptcy Cases by order of the Bankruptcy Court;

(e)    the Debtors' entry into any postpetition financing agreement in form and substance not reasonably acceptable to the Committee and each of the Requisite Consenting Noteholders;

(f)    the Debtors' entry into any exit financing agreement in form and substance not reasonably acceptable to the Committee, Capital Group and Aurelius, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders;

(g)    (i) any modification of the draft Brazil Bank Amendments dated February 13, 2015 delivered to the Requisite Consenting Noteholders on or before February 26, 2015, (ii) any CDB Amendments entered into after December 18, 2014 (including any amendments, restatements, modifications or refinancings of any CDB Amendments entered into prior to December 18, 2014), and (iii) the entry into any other agreement relating to the financing of the Debtors' operating subsidiaries, in each case, that is in form and substance not reasonably acceptable to Aurelius and Capital Group, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed;

(h)    the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to Bankruptcy Code section 1121;

(i)    the failure of the Debtors to have sought, in connection with their motion for approval of postpetition financing, authority to pay in full in cash the reasonable fees and expenses of each RCN Counsel (A) incurred through the date of the order approving such motion (the "DIP Financing Order"), with such payment to be made to Akin and Kirkland expeditiously after entry of the DIP Financing Order and receipt of the relevant invoices for such fees and expenses and to Paul Weiss on the Effective Date following the receipt of invoices for such fees and expenses, and (B) incurred from the date of the DIP Financing Order through the Effective Date, with such payment to be made to each RCN Counsel on the Effective Date, in each case, subject to the limitations set forth in Section 4.01(j) hereof;

(j)    the failure of the Plan Proponents to have filed the Disclosure Statement, the Plan, the motion to approve the Disclosure Statement and the PSA Motion with the Bankruptcy Court by March 13, 2015;

(k)    the failure of the Bankruptcy Court to have entered an order approving the Disclosure Statement by April 20, 2015;

(l)      the failure of the Bankruptcy Court to have entered the Sale Order by March 24, 2015;

(m)      the failure to have consummated the Sale Transaction by September 30, 2015;

(n)      the failure of the Bankruptcy Court to have commenced a hearing on the confirmation of the Plan on or before June 3, 2015;

(o)      the failure of the Bankruptcy Court to have entered the Confirmation Order and the PSA Order on or before June 12, 2015;

(p)      the failure of the Plan Effective Date to have occurred by June 26, 2015 unless the only remaining conditions to the consummation of the Sale Transaction are the receipt of all governmental approvals for the Sale Transaction and the completion of deliveries that are required to be made at the closing of the Sale Transaction by the respective parties to the Purchase Agreement;

(q)      the amendment or modification of any of the Sale Documents, the Plan or Disclosure Statement in a manner that is materially adverse to any of the Plan Proponents or any of the Requisite Consenting Noteholders and is not otherwise reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders;

(r)      any of the orders approving this Agreement, the Sale Transaction (including the Bidding Procedures Order and the Sale Order), the Disclosure Statement, or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to any of the Plan Proponents and each of the Required Consenting Noteholders; or

(s)      the determination by any of the Company's board of directors that (i) proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations.

The Committee may withdraw from and no longer remain bound by this Agreement, it being understood that the Agreement shall remain binding among the remaining Parties, in the event the Committee determines that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties.

No Party may terminate this Agreement if such Party failed to perform or comply in any material respect with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein. Nothing in this Section 7 shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date

NYI-524642321v5

The date on which this Agreement is terminated in accordance with the provisions of this Section 7 shall be referred to as the "Termination Date".   On the Termination Date, the provisions of this Agreement and the Plan Term Sheet shall terminate, except as otherwise provided in this Agreement, unless, within three (3) business days of such Termination Date, the Plan Proponents and each of the Requisite Consenting Noteholders waive, in writing, the occurrence of the Termination Event giving rise to the occurrence of such Termination Date.

For the avoidance of doubt, each of the Parties hereby waives any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agrees not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the provision of any such notice); provided, however, that nothing in this paragraph shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.

   7.02. <u>Termination Upon Plan Effective Date</u>.   This Agreement shall terminate automatically without further required action or notice upon the Plan Effective Date.

   **Section 8.** **Cooperation and Support**.   The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.   Furthermore, subject to the terms of this Agreement, each of the Parties shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Bankruptcy Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Plan, the Plan and/or the Restructuring, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.   Furthermore, the Committee's obligations set forth in Section 4.02 hereof with respect to actions that, as a legal matter, can only be performed by the Debtors are subject to the Debtors' reasonable cooperation and performance in connection therewith.

   **Section 9.** **Effectiveness**.   This Agreement shall become effective (A) with respect to the Consenting Noteholders and the Committee, on the date on which (i) Aurelius, (ii) Capital Group, (iii) each member of the Luxco Group, and (iv) the Committee deliver to the other Parties duly executed counterpart signature pages to this Agreement (such date, the "PSA Effective Date") and (B) with respect to the Company, on the date the Bankruptcy Court enters an order approving the Debtors' entry into this Agreement.   Upon the PSA Effective Date, the Plan Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 10 hereof.

   **Section 10.** **Amendments**.   This Agreement, the Plan Term Sheet, any exhibits attached thereto, and the Plan may not be modified, amended, or supplemented without the prior written consent of (i) each of the Plan Proponents and (ii) each of the Requisite Consenting Noteholders; provided that the Luxco Group shall not have any consent rights with respect to any economic modifications to the terms of the Restructuring that do not affect the recoveries, in terms of value and form of consideration, to be afforded to holders of the Luxco Notes.

## Section 11.    Miscellaneous.

11.01.    <u>Company Fiduciary Duties</u>.    Notwithstanding anything to the contrary in this Agreement, (i) nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, and (ii) the Debtors and each of their boards of directors shall be entitled to take any action in connection with the Sale Transaction and continue to market and solicit bids for the sale any of their assets pursuant to section 363 of the Bankruptcy Code in the interest of maximizing the value of the Debtors' estates, consistent with their fiduciary obligations.

11.02.    <u>Committee Fiduciary Duties; Status of Committee Members</u>.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Committee or its members (in such member's capacity as a Committee member) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under the Bankruptcy Code and applicable law.    For the avoidance of doubt, the obligations of the Committee under this Agreement shall be binding on the Committee itself, and nothing set forth in this Agreement shall be construed to bind any individual member of the Committee in its individual capacity, unless such member has separately executed this Agreement or a Joinder Agreement in its individual capacity.

11.03.    <u>Complete Agreement</u>.    This Agreement, together with all exhibits and schedules attached hereto, is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.    No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

11.04.    <u>Parties</u>.    This Agreement shall be binding upon, and inure to the benefit of, the Parties.    No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in <u>Section 3.04</u> hereof.    Subject to <u>Section 9</u> hereof, nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.

11.05.    <u>Headings</u>.    The headings of all sections of this Agreement are solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

11.06.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF

17

LAWS PRINCIPLES THEREOF.    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party hereto.    Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

11.07.    Specific Performance.    It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and a non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

11.08.    Execution of Agreement.    This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.    Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.09.    Interpretation.    This Agreement is the product of negotiations between the Plan Proponents and the Consenting Noteholders, and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner to effect the intent of the Parties hereto, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

11.10.    Successors and Assigns; Severability.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in a bankruptcy case; provided that nothing contained in this Section 11.10 shall be deemed to permit sales, assignments, or other Transfers or other claims against or interests in the Company other than in accordance with this Agreement.    The agreements, representations and obligations of the Consenting Noteholders under this Agreement are, in all respects, several and not joint.    If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.

11.11.    Representation by Counsel.    Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in

NYI-524642321v5

connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

11.12.    Survival.    Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this Section 11 and in Sections 6 and 12 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

11.13.    Independent Due Diligence and Decision-Making.    Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

11.14.    Relationship Among Parties.    It is understood and agreed that no Consenting Party has any duty of trust or confidence in any form with any other Consenting Party, and, except as provided in this Agreement, there are no agreements, commitments or undertakings among or between them.    In this regard, it is understood and agreed that any Consenting Party may trade in the Claims or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Consenting Party, subject to applicable securities laws and the terms of this Agreement; provided, further, that no Consenting Party shall have any responsibility for any such trading by any other entity by virtue of this Agreement.    No prior history, pattern or practice of sharing confidences among or between the Consenting Noteholders shall in any way affect or negate this understanding and agreement.

11.15.    Notices.    All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

>    (a)    if to the Company, to:

>    NII Holdings, Inc.
>    1875 Explorer Street, Suite 800
>    Reston, Virginia 20190
>    Attention: Gary D. Begeman, Executive Vice President and General Counsel
>    Fax No.: 703-390-7170
>    Email: gary.begeman@nii.com

>    with copies to:

>    Jones Day
>    222 East 41st Street
>    New York, New York    10017

Fax No.: 212-755-7306
Attention: Scott J. Greenberg and Michael J. Cohen
Email: sgreenberg@jonesday.com and mcohen@jonesday.com

(b)      if to a Consenting Noteholder or a transferee thereof, to the
addresses, electronic mail addresses or facsimile numbers set forth below following the
Consenting Noteholder's signature (or as directed by any transferee thereof), as the case may be,
with copies to any counsel designated by such Consenting Noteholder, including as follows:

in respect of Capital Group:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Fax No. 212-373-3000
Attention: Andrew N. Rosenberg and Elizabeth R. McColm
Email: arosenberg@paulweiss.com and emccolm@paulweiss.com

in respect of Aurelius:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Fax No. 212-872-1002
Attention: Daniel H. Golden, David H. Botter and Brad M. Kahn
Email: dgolden@akingump.com, dbotter@akingump.com, and
          bkahn@akingump.com

in respect of the Luxco Group:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Fax No. 212-446-4900
Attention: Paul M. Basta, Christopher Marcus and Cristine Pirro
Email: pbasta@kirkland.com, cmarcus@kirkland.com;
          cpirro@kirkland.com

and

(c)      if to the Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York    10036

20

Fax No.: 212-715-8100
Attention: Kenneth H. Eckstein and Stephen D. Zide
Email: keckstein@kramerlevin.com and szide@kramerlevin.com

Any notice given by delivery, mail or courier shall be effective when received.   Any notice given by facsimile shall be effective upon oral or machine confirmation of successful transmission.   Any notice given by electronic mail shall be effective upon delivery.

11.16.   Third Party Beneficiaries.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

11.17.   No Solicitation.   This Agreement is not and shall not be deemed to be a solicitation for votes to accept or reject the Plan.   The votes of the holders of Claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Disclosure Statement and related ballot, the Plan, and other required solicitation materials.   In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**Section 12.    Public Disclosure.**   The Consenting Noteholders and the Committee hereby consent to the disclosure of the execution and contents of this Agreement by the Plan Proponents in the Plan, Disclosure Statement, the other Plan Documents, and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission (the "SEC") or as required by law or regulation; provided, however, that, except as required by law or any rule or regulation of any securities exchange or any governmental agency, each of the Plan Proponents shall not, without the applicable Consenting Noteholder's prior consent (which shall not be unreasonably withheld, delayed or conditioned), (i) except insofar such name appears in the body of this Agreement and in the Plan Term Sheet, use the name of any Consenting Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the SEC or the Bankruptcy Court or (ii) disclose the holdings of Notes of any Consenting Noteholder to any person; provided that the Plan Proponents shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, Capco Notes, Luxco Notes, any series of Notes, or the Notes beneficially owned by the Consenting Noteholders collectively (or by funds or accounts advised or managed by Consenting Noteholders).

[Signature pages follow.]

21

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

NII HOLDINGS, INC.

By: _____

Name: Gary D. Begeman
Title:  Executive Vice President and General
        Counsel


NII CAPITAL CORP.

By: _____

Name: Gary D. Begeman
Title:  Vice President & Secretary


NII FUNDING CORP.

By: _____

Name: Gary D. Begeman
Title:  Vice President & Secretary


NII AVIATION, INC.

By: _____

Name: Gary D. Begeman
Title:  Vice President & Secretary


[Signature Page to Plan Support Agreement]

NII GLOBAL HOLDINGS, INC.

By: _____

Name: Gary D. Begeman
Title:   Vice President & Secretary


NEXTEL INTERNATIONAL (SERVICES), LTD.

By: _____

Name: Gary D. Begeman
Title:   Vice President & Secretary

NII INTERNATIONAL TELECOM S.C.A.,

represented by its Sole Manager,
NII INTERNATIONAL HOLDINGS
S.À R.L.

By: _Shana C Smith_____

Name:   Shana C. Smith
Title:    Class B Manager


NEXTEL INTERNATIONAL SERVICES
S.À R.L.

By: _Shana C Smith_____

Name: Shana C. Smith
Title:  Class B Manager


NII INTERNATIONAL HOLDINGS S.À R.L.

By: _Shana C Smith_____

Name: Shana C. Smith
Title:  Class B Manager


McCAW INTERNATIONAL (BRAZIL), LLC

By: NII INTERNATIONAL MOBILE
     S.À R.L.,
     its Sole Member

By: _Shana C Smith_____

Name: Shana C. Smith
Title:  Class B Manager


[Signature Page to Plan Support Agreement]

AIRFONE HOLDINGS, LLC

By: McCaw International (Brazil), LLC,
    its Sole Member

    By: NII INTERNATIONAL MOBILE
        S.À R.L. its Sole Member

        By: *Shana C Smith*
            Name: Shana C. Smith
            Title: Class B Manager

NII MERCOSUR, LLC

By: NII International Telecom S.C.A.,
    its Sole Member

    By: NII INTERNATIONAL HOLDINGS
        S.À R.L., its Sole Manager

        By: *Shana C Smith*
            Name: Shana C. Smith
            Title: Class B Manager

NIU HOLDINGS LLC

By: *Shana C Smith*
    Name: Shana C. Smith
    Title: Manager

[Signature Page to Plan Support Agreement]

**ACP MASTER, LTD.**
By: Aurelius Capital Management, LP, solely as
investment manager and not in its individual
capacity

By: _____

Name: Dan Gropper

Title: Managing Director

Address: c/o Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022

Attn:     Dan Gropper
Tel:      646-445-6570
Fax:      212-786-5870

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

REDACTED

[Signature Page to Plan Support Agreement]

**AURELIUS CAPITAL MASTER, LTD.**
By: Aurelius Capital Management, LP, solely as
investment manager and not in its individual
capacity

By: _____
Name: Dan Gropper
Title: Managing Director

Address: c/o Aurelius Capital Management, LP
         535 Madison Avenue, 22nd Floor
         New York, NY 10022
Attn:    Dan Gropper
Tel:     646-445-6570
Fax:    212-786-5870

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

              REDACTED

[Signature Page to Plan Support Agreement]

**AURELIUS CONVERGENCE MASTER, LTD.**
By: Aurelius Capital Management, LP, solely as
investment manager and not in its individual
capacity

By: _____
Name: Dan Gropper
Title: Managing Director

Address: c/o Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022
Attn:    Dan Gropper
Tel:     646-445-6570
Fax:     212-786-5870

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:
REDACTED

[Signature Page to Plan Support Agreement]

**AURELIUS INVESTMENT, LLC**
By: Aurelius Capital Management, LP, solely as
manager and not in its individual capacity

By: _____

Name: Dan Gropper

Title: Managing Director

Address: c/o Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022

Attn:    Dan Gropper

Tel:     646-445-6570

Fax:     212-786-5870

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

REDACTED

[Signature Page to Plan Support Agreement]

**Benefit Street Partners, LLC**

By: *Alexander McMillan*
Name: Alexander McMillian
Title: Chief Compliance Officer

Notice Address:
Benefit Street Partners, LLC
9 West 57th Street, Suite 4700
New York, NY 10019

Attn.:  Josh Passman, David Ren

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

███████████████████████████

Capco 2019 Notes Claims:

███████████████████████████

Capco 2021 Notes Claims:

███████████████████████████

Luxco 7.875% Notes Claims:

███████████████████████████

Luxco 11.375% Notes Claims:

███████████████████████████

**Credit Suisse Securities (USA) LLC**

By: _____

Name: _____
~~Robert Healey~~

Title: _____
~~Authorized Signatory~~

<u>Notice Address:</u>
Credit Suisse Securities (USA) LLC
Eleven Madison Avenue
New York, NY 10010

Attn.:  Manas Babbili

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims 10%:

Capco 2019 Notes Claims 8.875%:

Capco 2021 Notes Claims 7.625%:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

CSS, LLC

By: _____
Name: Jerome P. White
Title:   Partner

Notice Address:
CSS, LLC
175 W. Jackson Blvd Suite 440
 Chicago, IL 60604

Attn.:  Jerry White

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**Empyrean Capital Partners, LP**

By: _____

Name: C. Martin Meekins
Title:   Authorized Person

Notice Address:
Empyrean Capital Partners, LP
10250 Constellation Blvd., Suite 2950
Los Angeles, CA 90067

Attn.:   Andrew Reger

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**GoldenTree Asset Management LP**

By: _____

Name: _____

Title: _____

Peter Alderman

Vice President

Notice Address:

GoldenTree Asset Management LP
300 Park Ave., 21st Floor
New York, NY 10022

Attn.:  Pat Dyson, Daniel Flores

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**JMB Capital Partners Master Fund, L.P.**

By: _____

Name: _____Karen A. Tallman_____

Title: _____Authorized Signatory_____

<u>Notice Address:</u>
JMB Capital Partners Master Fund, L.P.
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067

Attn.:  Jeff Raithel, Karen Tallman

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

████████████████████████

Capco 2019 Notes Claims:

████████████████████████

Capco 2021 Notes Claims:

████████████████████████

Luxco 7.875% Notes Claims:

████████████████████████

Luxco 11.375% Notes Claims:

████████████████████████

[Signature Page to Plan Support Agreement]

**KLS Diversified Asset Management LP**

By: _____

Name: Michael Zarrilli

Title: COO

Notice Address:

KLS Diversified Asset Management LP
452 5th Avenue, 22nd Floor
New York, NY 10018

Attn.: Ned Zachar, Neilay Mehta

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**WHITEBOX ASYMMETRIC PARTNERS, LP**
By: Whitebox Asymmetric Advisors, LLC; its General
Partner
By: Whitebox Advisors, LLC; its Managing Member

By: _____

Name:____Michael McCormick_____

Title:____Chief Financial Officer_____

<u>Notice Address:</u>
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.:  Amit Patel, Jake Mercer

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**WHITEBOX CREDIT PARTNERS, LP**
By: Whitebox Credit Advisors, LLC; its General Partner
By: Whitebox Advisors, LLC; its Managing Member

By: _____
Name: _____Michael McCormick_____
Title: _____Chief Financial Officer_____

Notice Address:
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.: Amit Patel, Jake Mercer

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

███████████████████████████

Capco 2019 Notes Claims:

███████████████████████████

Capco 2021 Notes Claims:

███████████████████████████

Luxco 7.875% Notes Claims:

███████████████████████████

Luxco 11.375% Notes Claims:

███████████████████████████

[Signature Page to Plan Support Agreement]

**WHITEBOX SPECIAL OPPORTUNITIES FUND, LP –
SERIES O**
By: Whitebox Special Opportunities Advisors, LLC its
General Partner
By: Whitebox Advisors LLC its Managing Member

By: _____

Name: _____Michael McCormick_____

Title: _____Chief Financial Officer_____

Notice Address:
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.: Amit Patel, Jake Mercer

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**WHITEBOX MULTI-STRATEGY PARTNERS, LP**
By: Whitebox Multi-Strategy Partners, LLC; its General
Partner
By: Whitebox Advisors, LLC; its Managing Member

By: _____
Name:    Michael McCormick
Title:    Chief Financial Officer

<u>Notice Address:</u>
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.:  Amit Patel, Jake Mercer

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**PANDORA SELECT PARTNERS, LP**
By: Pandora Select Advisors, LLC; its General Partner
By: Whitebox Advisors, LLC; its Managing Member

By: 
Name:    Michael McCormick
Title:    Chief Financial Officer

Notice Address:
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.:  Amit Patel, Jake Mercer


Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

███████████████████████████████

Capco 2019 Notes Claims:

███████████████████████████████

Capco 2021 Notes Claims:

███████████████████████████████

Luxco 7.875% Notes Claims:

███████████████████████████████

Luxco 11.375% Notes Claims:

███████████████████████████████


[Signature Page to Plan Support Agreement]

**WHITEBOX INSTITUTIONAL PARTNERS, LP**
By: Whitebox Advisors, LLC; its Managing Member

By: _____
Name:     Michael McCormick
Title:     Chief Financial Officer

Notice Address:
Whitebox Advisors LLC
3033 Excelsior Blvd., Suite 300
Minneapolis, MN 55416

Attn.:  Amit Patel, Jake Mercer

Aggregate principal amount of Claims beneficially owned
or managed on behalf of funds or accounts that beneficially
own such Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**AMERICAN HIGH-INCOME TRUST**

By:    Capital Research and Management
       Company, for and on behalf of
       American High-Income Trust

By:    _____
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

███████████

Capco 2019 Notes Claims:

███████████

Capco 2021 Notes Claims:

███████████

Luxco 7.875% Notes Claims:

███████████

Luxco 11.375% Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

**THE BOND FUND OF AMERICA**

By:     Capital Research and Management
        Company, for and on behalf of The
        Bond Fund of America

By:     _____
Name:   Kristine M. Nishiyama
Title:  Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

██████████

Capco 2019 Notes Claims:

██████████

Capco 2021 Notes Claims:

██████████

Luxco 7.875% Notes Claims:

██████████

Luxco 11.375% Notes Claims:

██████████

[Signature Page to Plan Support Agreement]

**CAPITAL INCOME BUILDER**

By:     Capital Research and Management
        Company, for and on behalf of Capital
        Income Builder

By:     _____
Name:   Kristine M. Nishiyama
Title:  Authorized Signatory

Address:  333 South Hope Street, 33rd Floor
          Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:      (213) 486-9108
Fax:      (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████

Capco 2019 Notes Claims:

████████

Capco 2021 Notes Claims:

████████

Luxco 7.875% Notes Claims:

████████

Luxco 11.375% Notes Claims:

████████

[Signature Page to Plan Support Agreement]

**THE GROWTH FUND OF AMERICA**

By:    Capital Research and Management
       Company, for and on behalf of The
       Growth Fund of America

By:    _____
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:  333 South Hope Street, 33rd Floor
          Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:      (213) 486-9108
Fax:      (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████████

Capco 2019 Notes Claims:

████████

Capco 2021 Notes Claims:

██████

Luxco 7.875% Notes Claims:

████████

Luxco 11.375% Notes Claims:

████████

[Signature Page to Plan Support Agreement]

**AMERICAN FUNDS GLOBAL HIGH-INCOME OPPORTUNITIES FUND**

By:    Capital Research and Management
       Company, for and on behalf of
       American Funds Global High-Income
       Opportunities Fund

By:    
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
            Los Angeles, California 90071
Attention:  Erik A. Vayntrub
Tel:        (213) 486-9108
Fax:        (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**THE INCOME FUND OF AMERICA**

By:    Capital Research and Management
       Company, for and on behalf of The
       Income Fund of America

By:    _____
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**INTERNATIONAL GROWTH AND
INCOME FUND**

By:    Capital Research and Management
       Company, for and on behalf of
       International Growth and Income Fund

By:    _____
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████████

Capco 2019 Notes Claims:

██████████

Capco 2021 Notes Claims:

████████████

Luxco 7.875% Notes Claims:

██████████

Luxco 11.375% Notes Claims:

██████████

[Signature Page to Plan Support Agreement]

**AMERICAN FUNDS INSURANCE SERIES
– ASSET ALLOCATION FUND**

By:    Capital Research and Management
       Company, for and on behalf of
       American Funds Insurance Series –
       Asset Allocation Fund

By:
Name:   Kristine M. Nishiyama
Title:   Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
            Los Angeles, California 90071
Attention:  Erik A. Vayntrub
Tel:        (213) 486-9108
Fax:        (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

██████████

Capco 2019 Notes Claims:

██████████

Capco 2021 Notes Claims:

██████████

Luxco 7.875% Notes Claims:

█████████

Luxco 11.375% Notes Claims:

██████████

[Signature Page to Plan Support Agreement]

**AMERICAN FUNDS INSURANCE SERIES
– BOND FUND**

By:    Capital Research and Management
        Company, for and on behalf of
        American Funds Insurance Series –
        Bond Fund

By:
Name:  Kristine M. Nishiyama
Title:   Authorized Signatory

Address:  333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:      (213) 486-9108
Fax:     (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████

Capco 2019 Notes Claims:

███████

Capco 2021 Notes Claims:

███████

Luxco 7.875% Notes Claims:

███████

Luxco 11.375% Notes Claims:

███████

**AMERICAN FUNDS INSURANCE SERIES
– GLOBAL BOND FUND**

By:    Capital Research and Management
       Company, for and on behalf of
       American Funds Insurance Series –
       Global Bond Fund

By:
Name:  Kristine M. Nishiyama
Title:   Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

███████

Capco 2019 Notes Claims:

███████

Capco 2021 Notes Claims:

███████

Luxco 7.875% Notes Claims:

███████

Luxco 11.375% Notes Claims:

███████

[Signature Page to Plan Support Agreement]

**AMERICAN FUNDS INSURANCE SERIES
– GLOBAL GROWTH AND INCOME
FUND**

By:    Capital Research and Management
Company, for and on behalf of
American Funds Insurance Series –
Global Growth and Income Fund

By:
Name:  Kristine M. Nishiyama
Title:  Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:      (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

Capco 2019 Notes Claims:

Capco 2021 Notes Claims:

Luxco 7.875% Notes Claims:

Luxco 11.375% Notes Claims:

[Signature Page to Plan Support Agreement]

**AMERICAN FUNDS INSURANCE SERIES
– HIGH-INCOME BOND FUND**

By:    Capital Research and Management
       Company, for and on behalf of
       American Funds Insurance Series –
       High-Income Bond Fund

By:    _____
Name:  Kristine M. Nishiyama
Title: Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
            Los Angeles, California 90071
Attention:  Erik A. Vayntrub
Tel:        (213) 486-9108
Fax:        (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

███████████

Capco 2019 Notes Claims:

███████████

Capco 2021 Notes Claims:

███████████

Luxco 7.875% Notes Claims:

███████████

Luxco 11.375% Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

**CAPITAL WORLD BOND FUND**

By:     Capital Research and Management
        Company, for and on behalf of Capital
        World Bond Fund

By:     _____
Name:   Kristine M. Nishiyama
Title:  Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████████

Capco 2019 Notes Claims:

████████████

Capco 2021 Notes Claims:

████████████

Luxco 7.875% Notes Claims:

████████████

Luxco 11.375% Notes Claims:

████████████

[Signature Page to Plan Support Agreement]

**SMALLCAP WORLD FUND, INC.**

By:    Capital Research and Management
Company, for and on behalf of
SMALLCAP World Fund, Inc.

By:
Name:  Kristine M. Nishiyama
Title:  Authorized Signatory

Address:  333 South Hope Street, 33rd Floor
Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:    (213) 486-9108
Fax:   (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:

████████

Capco 2019 Notes Claims:

████████

Capco 2021 Notes Claims:

████████

Luxco 7.875% Notes Claims:

██████

Luxco 11.375% Notes Claims:

████████

[Signature Page to Plan Support Agreement]

**JNL/CAPITAL GUARDIAN GLOBAL
BALANCED FUND**

By: Capital Guardian Trust Company, for and on behalf
of JNL/Capital Guardian Global Balanced Fund

By:        _____
Name:      Mark E. Brubaker
Title:     Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts that
beneficially own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Joinder Agreement to Plan Support Agreement]

**SEMPRA ENERGY DEFINED BENEFIT
MASTER TRUST**

By: Capital Guardian Trust Company, for and on behalf
of Sempra Energy Defined Benefit Master Trust

By: _____

Name:    Mark E. Brubaker

Title:    Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
Los Angeles, California 90071

Attention: Erik A. Vayntrub

Tel:    (213) 486-9108

Fax:    (213) 486-9041

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts that
beneficially own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Joinder Agreement to Plan Support Agreement]

**NEXT GENERATION TRUST FUND**

By: Capital Guardian Trust Company, for and on behalf
of Next Generation Trust Fund

By: _____

Name:    Mark E. Brubaker
Title:    Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:    (213) 486-9108
Fax:    (213) 486-9041

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts that
beneficially own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Joinder Agreement to Plan Support Agreement]

**CAPITAL GROUP GLOBAL HIGH-INCOME
OPPORTUNITIES TRUST (US)**

By: Capital Guardian Trust Company, for and on behalf
of Capital Group Global High-Income
Opportunities Trust (US)

By: _____

Name:    Mark E. Brubaker
Title:     Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:        (213) 486-9108
Fax:        (213) 486-9041

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts that
beneficially own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Joinder Agreement to Plan Support Agreement]

**CAPITAL GROUP US HIGH-YIELD FIXED-INCOME TRUST (US)**

By: Capital Guardian Trust Company, for and on behalf of Capital Group US High-Yield Fixed-Income Trust (US)

By: _____

Name:     Mark E. Brubaker

Title:      Authorized Signatory

Address:   333 South Hope Street, 33rd Floor
           Los Angeles, California 90071
Attention: Erik A. Vayntrub
Tel:       (213) 486-9108
Fax:       (213) 486-9041

Aggregate principal amount of Claims beneficially owned or managed on behalf of funds or accounts that beneficially own such Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Joinder Agreement to Plan Support Agreement]

**CAPITAL GROUP STRATEGIC
OPPORTUNITIES FUND**

By:    Capital Research and Management
       Company, for and on behalf of Capital
       Group Strategic Opportunities Fund

By: _____
Name:    Kristine M. Nishiyama
Title:    Authorized Signatory

Address:    333 South Hope Street, 33rd Floor
            Los Angeles, California 90071
Attention:  Erik A. Vayntrub
Tel:        (213) 486-9108
Fax:        (213) 486-9041

Aggregate principal amount of Claims
beneficially owned or managed on behalf of
funds or accounts that beneficially own such
Claims:

Capco 2016 Notes Claims:



Capco 2019 Notes Claims:



Capco 2021 Notes Claims:



Luxco 7.875% Notes Claims:



Luxco 11.375% Notes Claims:



[Signature Page to Plan Support Agreement]

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF NII HOLDINGS, INC., ET
AL.

By its counsel:

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By:

Name: Kenneth H. Eckstein
Title:  Partner

Address: 1177 Avenue of the Americas
         New York, New York 10036
Tel:     212-715-9100
Fax:     212-715-8100

[Signature Page to Plan Support Agreement]

## <u>EXHIBIT 1</u>

**PLAN TERM SHEET**

## Plan Term Sheet

### March 5, 2015

This term sheet (the "<u>Term Sheet</u>")[1] sets forth certain of the principal terms for (i) the proposed restructuring (the "<u>Restructuring</u>") of the obligations of NII Holdings, Inc. ("<u>Holdings</u>" or "<u>NII</u>") and each of its direct and indirect debtor subsidiaries except NIU (as defined below) (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>" or the "<u>Company</u>")[2] that has commenced cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and (ii) the incorporation of the Restructuring into a new plan of reorganization for the Debtors (the "<u>Plan</u>"), which Plan has the support of the official committee of unsecured creditors (the "<u>Committee</u>" and, together with the Debtors, the "<u>Plan Proponents</u>"), the Ad Hoc Committee of LuxCo Holders (the "<u>Luxco Group</u>"),[3] the entities managed by Aurelius Capital Management, LP (collectively, "<u>Aurelius</u>"), and the entities managed by Capital Research and Management Company ("<u>Capital Group</u>").  Capital Group, together with the Luxco Group and Aurelius, shall be referred to herein as the "<u>Requisite Consenting Noteholders</u>" and are holders of the following notes:

(a)    the (i) 10% Senior Notes due 2016 (the "<u>2016 Capco Notes</u>") issued by NII Capital Corp. ("<u>Capco</u>"); (ii) the 8.875% Senior Notes due 2019 issued by Capco (the "<u>2019 Capco Notes</u>" and, together with the 2016 Capco Notes, the "<u>2016 and 2019 Capco Notes</u>"); and (iii) the 7.625% Senior Notes due 2021 issued by Capco (the "<u>2021 Capco Notes</u>" and, together with the 2016 Capco Notes and the 2019 Capco Notes, the "<u>Capco Notes</u>"); and

(b)    the (i) 11.375% Senior Notes due 2019 (the "<u>11.375% Luxco Notes</u>") issued by NII International Telecom S.C.A. ("<u>Luxco</u>") and (ii) 7.875% Senior Notes due 2019 issued by Luxco (the "<u>7.875% Luxco Notes</u>" and, together with the 11.375% Luxco Notes, the "<u>Luxco Notes</u>" and, the Luxco Notes collectively with the Capco Notes, the "<u>Notes</u>").

For purposes of this Agreement, the Luxco Group shall exercise its rights as a Requisite Consenting Noteholder through approval by members of the Luxco Group holding a majority in principal amount of Notes held by the Luxco Group in the aggregate, and shall not have any consent rights with respect to any economic modifications to the terms of the Restructuring that do not affect the recoveries, in terms of value and form of consideration, to be afforded to holders of the Luxco Notes.

---

[1] The term "Term Sheet" shall include any exhibits annexed hereto.

[2] The Debtors are: (a) Holdings; (b) Nextel International (Services), Ltd. ("<u>Services</u>"); (c) NII Funding Corp. ("<u>Funding</u>"); (d) NII Aviation, Inc. ("<u>Aviation</u>"); (e) NII Capital Corp.; (f) NII Global Holdings Inc. (together with Funding, Aviation, Capco and Services, the "<u>Capco Debtors</u>"); (g) NII International Services S.à r.l.; (h) NII International Holdings S.à r.l.; (i) NII International Telecom S.C.A.; (j) McCaw International (Brazil), LLC ("<u>McCaw</u>"); (k) Airfone Holdings, LLC ("<u>Airfone</u>"); (l) Nextel International (Uruguay), LLC ("<u>NIU</u>" and, together with McCaw and Airfone, the "<u>Transferred Guarantors</u>"), (m) NII Mercosur, LLC ("<u>Mercosur</u>"), and (n) NIU Holdings LLC (together with McCaw and Airfone, the "<u>Transferred Guarantor Debtors</u>"). The Debtors' cases (the "<u>Chapter 11 Cases</u>") are jointly administered under Case No. 14-12611 (SCC).

[3] As set forth in the *Third Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 305], the members of the Luxco Group are: GoldenTree Asset Management, LP; Benefit Street Partners, LLC; Empyrean Capital Partners, LP; Whitebox Advisors LLC; KLS Diversified Asset Management LP; JMB Capital Partners Master Fund, L.P.; Credit Suisse Securities (USA) LLC; and CSS, LLC.

This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the Plan and the transactions contemplated therein, which remain subject to discussion and negotiation in good faith among the Requisite Consenting Noteholders and the Plan Proponents (the "Parties").

This Term Sheet has been prepared for settlement discussion purposes only and shall not constitute an admission of liability by any Party, nor be admissible in any action relating to any of the subject matter addressed herein. Nothing in this Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization. Further, nothing herein shall be an admission of fact or liability or deemed binding on the Parties.

## I.    Overview[4]

The Restructuring will be implemented through the Plan to be filed in the Chapter 11 Cases. The purpose of the restructuring contemplated by the Plan, consistent with the material terms and conditions described in this Term Sheet, is, among other things, following the consummation of the Sale Transaction (as defined below), to convert $4.35 billion in outstanding principal amount of Notes into the right to receive the Total Distributable Cash (as defined below) and equity interests in Reorganized NII (as defined below).

## II.    The Sale Transaction

| Purchase Agreement | New Cingular Wireless Services, Inc. (the "Stalking Horse Purchaser") and NIU Holdings LLC (the "Selling Debtor") entered into a Purchase and Sale Agreement (the "Stalking Horse Purchase Agreement") on January 26, 2015. Pursuant to the Stalking Horse Purchase Agreement, the Selling Debtor will sell, and the Stalking Horse Purchaser will acquire, on the Closing Date, in exchange for payment of the Estimated Purchase Price,[5] 100% of the membership interests in NIU, resulting in indirect ownership by Purchaser (as defined below) of 100% of the stock of Comunicaciones Nextel de México, S.A. de C.V. ("NII Mexico"; such acquisition, the "Stalking Horse Sale Transaction" and, such membership interests, the "Sale Assets"), all as set forth in and pursuant to the terms of the Stalking Horse Purchase Agreement.[6]

The Estimated Purchase Price is payable to the Selling Debtor by |

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in either the Stalking Horse Purchase Agreement (as defined below), the Plan Support Agreement to which this Term Sheet is appended (the "Plan Support Agreement") or the Bankruptcy Code, as applicable. References in this Term Sheet to pleadings, orders and other filings and related docket numbers are to such pleadings, orders and other filings filed or entered in the Bankruptcy Cases.

[5] Defined in the Purchase Agreement as "an amount in Dollars equal to (i) $1.875 billion *minus* (ii) the Estimated Net Indebtedness Amount *minus* (iii) the Estimated Expenditure Adjustment Amount."

[6] The description of the terms of the Stalking Horse Purchase Agreement set forth in this Term Sheet is for summary purposes only and qualified in all respects by the terms of the Stalking Horse Purchase Agreement.

|  | the Purchaser upon the closing under the Purchase Agreement (as defined below). |
| --- | --- |
| Sale Transaction Process | As described in the Stalking Horse Purchase Agreement, the Stalking Horse Sale Transaction shall be conducted pursuant to section 363 of the Bankruptcy Code and be subject to higher or better offers in accordance with the bidding procedures approved by the Bankruptcy Court on February 17, 2015 [Docket No. 472] (the "Bidding Procedures").  The successful bidder (the "Purchaser") at the conclusion of the auction (if held), which may be the Stalking Horse Purchaser, shall enter into and consummate the purchase agreement (the "Purchase Agreement") with the Company for the Sale Assets (the "Sale Transaction").<br><br>In the event the Stalking Horse Sale Transaction is not the Sale Transaction consummated pursuant to the auction, the alternative sale transaction that is approved by the Court shall be deemed, for the purposes hereof, as the "Alternative Sale Transaction."<br><br>The Sale Order shall provide that (i) any and all claims against NIU shall continue to exist and be asserted against the Selling Debtor, which entity shall receive the net proceeds of the Sale Transaction following the consummation of the Sale Transaction, and (ii) the chapter 11 case of NIU shall be dismissed.<br><br>The Sale Transaction shall be consummated on or before September 30, 2015, subject to the terms and conditions of the Stalking Horse Purchase Agreement or the Purchase Agreement (as applicable). |

### III. Settlement and Compromise Incorporated into the Plan

| Estate Causes of Action | "Estate Causes of Action" shall mean any and all Claims or causes of action that could be asserted (x) against any of the Debtors by any other Debtor or (y) against any non-Debtor subsidiary of the Company by any of the Debtors, in each case, including, without limitation, (i) pursuant to chapter 5 of the Bankruptcy Code (the "Avoidance Claims") or (ii) seeking the recharacterization of intercompany obligations. |
| --- | --- |

| | |
|---|---|
| Transferred Guarantor Claims | "<u>Transferred Guarantor Claims</u>" shall mean any Claims or causes of action arising under the indentures governing the 2016 and 2019 Capco Notes in connection with the transfers of the equity interests of McCaw, Mercosur and NIU that occurred in 2009 and 2010, and the purported release of the guarantees by McCaw, Mercosur, NIU, and Airfone of the 2016 and 2019 Capco Notes. |
| Settlement and Compromise | The Plan shall contain and effect a compromise and settlement (the "<u>Settlement</u>") of all Estate Causes of Action and all Transferred Guarantor Claims pursuant to section 1123(b)(3) and Rule 9019 of the Federal Rules of Bankruptcy Procedure, subject to the processes set forth below under the section below entitled "Settlement Procedures".<br><br>In consideration for the release and waiver of the Estate Causes of Action and the Transferred Guarantor Claims, the Plan shall provide as follows: |
| • Avoidance Claims | The Avoidance Claims shall include all causes of action that could be asserted against any of the Debtors or any non-Debtor by another Debtor, pursuant to chapter 5 of the Bankruptcy Code, including, but not limited to, Claims to avoid the following:<br><br>• The guarantee by Holdings of the Luxco Notes;<br><br>• The subordination to the Luxco Notes obligations of a $644 million (plus accrued interest) (the "<u>Capital Note</u>") payable by Luxco to Capco;<br><br>• Holdings' release and/or transfer of approximately $900 million of intercompany receivables, including approximately $614 million of receivables that were owed to it by Nextel Telecomunicações Ltda. and transferred to Luxco on or about February 28, 2013; and<br><br>• The release by Services and Holdings of approximately $93 million in intercompany receivables owed to them by Nextel del Peru S.A.<br><br>The Settlement will result in the recoveries to creditors of the various Debtors being calculated as if 25% of each of the foregoing transfers was avoided.  Such recoveries pursuant to the Settlement will be in full satisfaction of any and all potential recoveries that could have been included as part of |

| | the Avoidance Claims, regardless of whether such Claims are identified above or have been asserted. |
|---|---|
| • Recharacterization of Intercompany Claims (other than the Capital Note) | Pursuant to the Settlement, the recoveries to creditors of the various Debtors will be calculated as if 25% of each of the intercompany obligations existing between a Debtor and another Debtor or between a non-Debtor subsidiary of the Company and a Debtor (the "Intercompany Claims") outstanding as of the commencement of the Chapter 11 Cases (the "Petition Date") are recharacterized as equity, with the remaining 75% of such obligations treated as unsecured debts against the obligors of such intercompany obligations. For the avoidance of doubt, the Capital Note will be treated as a debt obligation in its entirety, but the claim with respect to the subordination of the Capital Note shall be resolved pursuant to the Settlement of the Avoidance Claims.<br><br>Intercompany obligations arising after the Petition Date that are owing to the Debtors by any non-Debtor subsidiary shall be paid by the applicable reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such obligations. |
| • Transferred Guarantor Claims | The Settlement will result in the recoveries to holders of the Transferred Guarantor Claims being calculated as if 21% of each Transferred Guarantor's guarantees of the 2016 and 2019 Capco Notes remained in place (the product of such percentage and $1,357.8 million, or $285,129,687.50, the "Allowed TG Claims Amount"). |
| • Impact of Settlement on Recoveries | The impact of the Settlement of each of the Estate Causes of Action and the Transferred Guarantor Claims on the recoveries by holders of the Notes shall be based upon the waterfall model previously agreed upon between the Plan Proponents and the Requisite Consenting Noteholders solely for the purposes of the Settlement (the "Waterfall Model"). The recoveries pursuant to the Settlement will be in full satisfaction of any and all potential recoveries that could have been included as part of the Estate Causes of Action or the Transferred Guarantor Claims, regardless of whether such Claims are identified above or have been asserted.<br><br>The Settlement described herein is a global settlement of any and all causes of action (asserted and unasserted) between and among the parties to the Settlement with respect to the Debtors and their estates. In the event the Settlement is not approved and the Plan is not confirmed, the parties expressly |

| | |
|---|---|
| | reserve any and all claims and defenses available to them, including the right to assert or to oppose any individual claim.<br><br>For the avoidance of doubt, the treatment of the Luxco Notes shall be in no way impacted by any calculations based on the Waterfall Model and shall only be governed by the treatment and adjustment mechanisms specifically outlined in this Term Sheet. |
| Settlement Procedures | On December 12, 2014, Scott W. Winn was appointed to serve as class C manager (the "Independent Manager") of the board of managers of NII Holdings International S.à r.l. (the "Board of Managers"), the sole manager of NII International Telecom S.C.A., to evaluate the reasonableness of the Settlement. The appointment of the Independent Manager was approved by the Court on December 11, 2014 [Docket No. 293] (the "IM Stipulation"). In connection therewith, the Independent Manager retained Quinn Emanuel Urquhart & Sullivan, LLP to assist him in performing the duties set forth in the IM Stipulation.<br><br>On February 25, 2015, the Independent Manager confirmed the reasonableness of and determined to recommend to the Board of Managers (in connection with International Holdings' capacity as sole manager of Luxco) that Luxco should join the Settlement.<br><br>A meeting of the applicable board of directors or managers of Holdings and Capco and of the Board of Managers with respect to Luxco was held to authorize Holdings, Capco and Luxco to approve the Settlement and enter in to the Plan Support Agreement, and the respective boards of directors or managers and the Board of Managers granted such authorization. |

IV. **Plan Treatment**:

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| Administrative Expense Claims | - | The Debtors (or, if applicable, the applicable Debtors, as reorganized pursuant to the confirmed Plan (the "Reorganized Debtors"; Holdings, as so reorganized, "Reorganized Holdings")) shall pay to each holder of an allowed administrative expense claim (an "Administrative Expense Claim"), on account of and in full and complete settlement, release and discharge of such claim, cash equal to the full unpaid amount of such allowed Administrative Expense Claim, which payments shall be made on either (a) the latest to occur of (i) the effective date of the Plan (the "Effective Date") (or as soon as practicable thereafter), (ii) the date such claim becomes an allowed Administrative Expense Claim, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such claim, or (b) on such other date as the Bankruptcy Court may order. |
| Priority Tax Claims | - | Unless otherwise agreed to by the Debtors (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed) and the holder of an allowed priority tax claim (a "Priority Tax Claim") (in which event such other agreement will govern), each holder of an allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of such claim, cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter) and (ii) the date such Priority Tax Claim becomes an allowed claim, or as soon as practicable thereafter.  All allowed Priority Tax Claims against any of the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms |

---

[7] Unless otherwise set forth herein and except for undetermined unliquidated Claims, disputed Claims and Claims arising from the Debtors' rejection of contracts or leases, the amount of Claims shall be reasonably acceptable to the Debtors (following consultation with the Committee) and each of the Requisite Consenting Noteholders in comparison to the estimates set forth in this Term Sheet.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| | | thereof. |
| Priority Non-Tax Claims | $130,000 | On or as soon after the Effective Date as practicable, unless otherwise agreed to by the Debtors (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed) and the holder of an allowed priority non-Tax Claim (a "Priority Non-Tax Claim") (in which event such other agreement will govern), each holder of an allowed Priority Non-Tax Claim against the Debtors shall receive on account of and in full and complete settlement, release and discharge of such claim, at the Debtors' election (following consultation with the Committee and with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed), (i) cash in the amount of such allowed Priority Non-Tax Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All allowed Priority Non-Tax Claims against the Debtors which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof. |
| Other Secured Claims | $45,000 | On or as soon after the Effective Date as practicable, secured Claims against the Debtors ("Other Secured Claims"), if any, shall receive the following treatment at the option of the Plan Proponents (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed): (i) reinstatement of any such allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) payment in full (in cash) of any such allowed Other Secured Claims; (iii) satisfaction of any such allowed Other Secured Claim by delivering the collateral securing any such allowed Other Secured Claims and paying any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iv) providing such holders with such treatment in accordance with section 1129(b) of the |

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| | | Bankruptcy Code as may be determined by the Bankruptcy Court. |
| Holders of Capco Note Claims against Holdings and the Capco Debtors | $2,858.1 million (in the aggregate) | In full and final satisfaction of the allowed Capco Note Claims against Holdings and the Capco Debtors, each holder of such Claims shall receive its pro rata share of: (A) 29.61% of the Plan Distributable Value (such amount, the "Capco Distributable Value Allocation"), subject to upward adjustment, as described below, based on the receipt of Net Overbid Proceeds (if any), which shall be comprised of (i) the Capco Stock Allocation (as defined below), subject to dilution by the MIP Shares (as defined below) and (ii) the Capco Cash Allocation (as defined below); and (B) the amount of Cash equal to the reasonable and documented fees and expenses of the indenture trustees for the applicable Capco Notes outstanding as of the Effective Date (as to which it is anticipated that each indenture trustee will exercise its contractual lien rights prior to distribution). |
| Capco General Unsecured Claims[8] | $675,000 | Unless otherwise agreed to by the Plan Proponents (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed) and the holder of an allowed Capco General Unsecured Claim (in which event such other agreement will govern), all holders of allowed Capco General Unsecured Claims, including Claims under contracts and unexpired leases rejected by Capco under the Plan (or under a separate motion) and trade payables, but excluding allowed Convenience Class claims as described below, shall receive the treatment to be determined by the Plan Proponents with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed.[9] The Plan Proponents shall reserve all rights to challenge the legal basis and amount of any Capco General |

---

[8] "Capco General Unsecured Claims" shall mean unsecured Claims against Capco, Services, NII Funding Corp., NII Aviation, Inc. and NII Global Holdings, Inc. other than Notes Claims and intercompany Claims.

[9] For the avoidance of doubt, the holders of allowed Capco General Unsecured Claims shall receive a recovery on account of such Claims at a rate no less favorable than the recovery rate for Claims arising under the applicable Notes directly against the applicable entity against which such holder has claims.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| | | Unsecured Claim. |
| Holdings General Unsecured Claims[10] | $17.5 million | Unless otherwise agreed to by the Plan Proponents (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed) and the holder of an allowed Holdings General Unsecured Claim (in which event such other agreement will govern), all holders of allowed Holdings General Unsecured Claims, including Claims under contracts and unexpired leases rejected by Holdings under the Plan (or under a separate motion) and trade payables, but excluding allowed Convenience Class claims as described below, shall receive the treatment to be determined by the Plan Proponents with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed.[11] The Plan Proponents shall reserve all rights to challenge the legal basis and amount of any Holdings General Unsecured Claim. |
| American Tower Guaranty Claims[12] against Holdings | - | In full and final satisfaction of American Tower Guaranty Claims against Holdings, all holders of such claims shall receive a revised form of guaranty of the primary obligations of Nextel Telecomunicações Ltda. to the applicable American Tower Corp. ("ATC") affiliate, which shall be in form and substance reasonably acceptable to the Plan Proponents, ATC, Aurelius and Capital Group, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed. |
| Holders of | $1,694.9 million | In full and final satisfaction of the allowed Luxco Note |

[10] "Holdings General Unsecured Claims" shall mean unsecured Claims against Holdings other than Claims arising from Holdings' guarantees of the Notes and of certain indebtedness of the Operating Companies (as defined below) and Intercompany Claims.

[11] For the avoidance of doubt, the holders of allowed Holdings General Unsecured Claims shall receive a recovery on account of such Claims at a rate no less favorable than the recovery rate for Claims against Holdings arising under the guarantees of the Capco Notes.

[12] "American Tower Guaranty Claims" means any claims arising under (a) that certain Guaranty and Subordination Agreement among American Tower do Brasil – Cessao de Infraestruturas Ltda., Luxco, and American Tower do Brasil II – Cessao de Infraestruturas Ltda., (b) that certain Guaranty of Obligations dated March 23, 2005 by Holdings in favor of MATC Celular, S. de R.L. de C.V, (c) that certain Guaranty of Obligations dated March 23, 2005 by Holdings in favor of American Tower do Brasil – Cessao de Infraestruturas Ltda., and (d) any other guarantees given by Holdings in favor of American Tower Corp. or any of its affiliates, in each case, as amended, supplemented or modified from time to time.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| 11.375% and 7.875% Luxco Notes | (in the aggregate) | Claims against Holdings and Luxco, each holder of such Claims shall receive its pro rata share of (A) 60.25% of the Plan Distributable Value (the "Luxco Notes Distributable Value Allocation"), subject to downward adjustment, as described below, based on the receipt of Net Overbid Proceeds (if any), which shall be comprised of (i) the Luxco Notes Stock Allocation (as defined below), subject to dilution by the MIP Shares (as defined below) and (ii) the Luxco Notes Cash Allocation, and (B) the amount of Cash equal to the reasonable and documented fees and expenses of the indenture trustee for the Luxco Notes outstanding as of the Effective Date (as to which it is anticipated that such indenture trustee will exercise its contractual lien rights prior to distribution). |
| Luxco General Unsecured Claims[13] | - | Unless otherwise agreed to by the Plan Proponents (with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed) and the holder of an allowed Luxco General Unsecured Claim (in which event such other agreement will govern), all holders of allowed Luxco General Unsecured Claims, if any, including Claims under contracts and unexpired leases rejected by Luxco under the Plan (or under a separate motion) and trade payables, but excluding allowed Convenience Class claims as described below, shall receive the treatment to be determined by the Plan Proponents with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed.[14] The Plan Proponents shall reserve all rights to challenge the legal basis and amount of any general unsecured claim. |
| American Tower Guaranty Claims against Luxco | - | In full and final satisfaction of American Tower Guaranty Claims against Luxco, all holders of such claims shall receive a revised form of guaranty of the primary obligations of Nextel Telecomunicações Ltda. |

---

[13] "Luxco General Unsecured Claims" shall mean unsecured Claims against Luxco other than Notes Claims and intercompany Claims.

[14] For the avoidance of doubt, the holders of allowed Luxco General Unsecured Claims shall receive a recovery on account of such Claims at a rate no less favorable than the recovery rate for Claims arising under the Luxco Notes.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| | | to the applicable ATC affiliate, which shall be in form and substance reasonably acceptable to the Plan Proponents, ATC, Aurelius and Capital Group, and subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed. |
| General Unsecured Claims Against Other Debtors | - | All holders of allowed General Unsecured Claims other than (i) Capco General Unsecured Claims, (ii) Holdings General Unsecured Claims and (iii) Luxco General Unsecured Claims, if any, including Claims under contracts and unexpired leases rejected by the applicable Debtors under the Plan (or under a separate motion) and trade payables, but excluding allowed Convenience Class claims as described below, shall receive the treatment to be determined by the Plan Proponents with the consent of each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed.[15]  The Plan Proponents shall reserve all rights to challenge the legal basis and amount of any general unsecured claim. |
| Holders of Transferred Guarantor Claims against the Transferred Guarantor Debtors | $285.1 million | In full and final satisfaction of the allowed Transferred Guarantor Claims (in accordance with the Settlement) against the Transferred Guarantor Debtors, each holder of such Claims shall receive its pro rata share of 10.14% of the Plan Distributable Value (such amount, the "TG Claims Distributable Value Allocation"), subject to downward adjustment, as described below, based on the receipt of Net Overbid Proceeds (if any), which shall be comprised of (i) the TG Claims Stock Allocation, subject to dilution by the MIP Shares, and (ii) the TG Claims Cash Allocation. |
| Convenience Class[16] | - | A holder of an allowed Convenience Class claim shall receive in full satisfaction and release of such Convenience Class claim an amount equal to 100% of such claim in cash on or as soon after the Effective |

---

[15] For the avoidance of doubt, the holders of allowed General Unsecured Claims against other Debtors shall receive a recovery on account of such Claims at a rate no less favorable than the recovery rate for Claims arising under the applicable Notes directly against the applicable entity against which such holder has Claims.

[16] If the Debtors determine, following consultation with the Committee, that the Convenience Class is necessary, it shall consist of general unsecured claims of less than an amount to be proposed by the Debtors and subject to the consent of the Committee and the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| | | Date as practicable, subject to a cap to be determined; provided, however, that if Convenience Class claims in the aggregate exceed an amount to be agreed to by Plan Proponents and the Requisite Consenting Noteholders (the "Maximum Convenience Class Payment"), holders of allowed Convenience Class claims shall receive their pro rata share of the Maximum Convenience Class Payment. |
| Intercompany Claims | - | Pursuant to the Settlement, all Intercompany Claims other than Avoidance Claims and the Capital Note (each of which shall be resolved pursuant to the Settlement, as described above with respect to the Avoidance Claims and the Recharacterization of Intercompany Claims, respectively) shall be allowed in an amount equal to 75% of the prepetition claim amount of such claim. Notwithstanding the foregoing, the Intercompany Claims may be deemed settled, cancelled, extinguished or reinstated, in whole or in part, as of the Effective Date, in each case, at the discretion of the Debtors, with the consent of the Committee and each of the Requisite Consenting Noteholders, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that such treatment shall not affect or be deemed to affect or modify (1) the Settlement of the Avoidance Claims, Recharacterization Claims and Transferred Guarantor Claims or (2) the releases contained in the Plan. |
| Existing NII Equity Interests | - | Existing NII equity interests ("Existing NII Equity Interests") shall be extinguished, cancelled and discharged as of the Effective Date, and holders of Existing NII Equity Interests shall receive no distribution in respect of their equity interests. |
| Subordinated Securities Claims[17] | - | Subordinated Securities Claims, if any, shall be extinguished, cancelled and discharged as of the Effective Date, and holders thereof shall receive no distributions in respect of their Claims. |

---

[17] "Subordinated Securities Claims" shall include all Claims arising pursuant to 11 U.S.C. § 510(b), including, without limitation, for damages arising from the sale or purchase of any debt or equity security of any of the Debtors.

| Class of Claim or Interest | Amount of Allowed Claims (estimated)[7] | Treatment of Claim or Interest |
|---|---|---|
| Intercompany Equity Interests | - | Intercompany equity interests shall receive no distribution in respect of their equity interests and shall be reinstated for administrative purposes only at the election of the Debtors. |

## V. Other:

| | |
|---|---|
| Plan Distributable Value | The Plan Distributable Value is $2.813 billion (the "Plan Distributable Value"), subject to adjustment in the event of the Debtors' acceptance of a higher or better offer for the Sale Assets in connection with the auction (an "Overbid"), whereby the Plan Distributable Value shall be increased by the amount of incremental proceeds (calculated as the difference between the proceeds received in connection with the new estimated purchase price provided by the Alternative Sale Transaction over the proceeds receivable in connection with the Estimated Purchase Price pursuant to the Stalking Horse Purchase Agreement) provided to the Debtors by the Overbid (if in a form other than cash, the value of which shall be determined by agreement of the Plan Proponents and each of the Requisite Consenting Noteholders, or absent such agreement, by order of the Bankruptcy Court) after deducting (i) any breakup fee or expense reimbursement afforded to the Stalking Horse Bidder, if applicable, and (ii) if proceeds from the Overbid are received after April 30, 2015, any negative cash flow before financing at NII Mexico from April 30, 2015 to the date on which Overbid proceeds are received (such amount, collectively, the "Net Overbid Proceeds"). |
| Overbid | In the event of an Overbid: <br><br> • the Luxco Notes Distributable Value Allocation shall be recalculated by dividing (x) the Luxco Notes prepetition claim of $1,694,882,000.00 by (y) the Plan Distributable Value (adjusted as described above); <br><br> • the TG Claims Distributable Value Allocation shall be recalculated by dividing (x) the Allowed TG Claims Amount by (y) the Plan Distributable Value (adjusted as described above); and <br><br> • the Capco Distributable Value Allocation shall be recalculated by subtracting from 100% (x) the Luxco Notes Distributable Value Allocation and (y) TG Claims |

| | Distributable Value Allocation. |
|---|---|
| Distributable Cash | The "Total Distributable Cash" means the Estimated Purchase Price *less* the Escrow Amount (as defined in the Purchase Agreement) *less* the Retained Cash Amount (defined below) *plus* any Net Overbid Proceeds (if in a form other than cash, only to the extent distributed under the Plan). <br><br> The "Luxco Notes Cash Allocation" means an amount equal to the Total Distributable Cash multiplied by Luxco Notes Distributable Value Allocation percentage. <br><br> The "TG Claims Cash Allocation" means the lesser of (A) the product of (x) 52.38% and (y) (i) Total Distributable Cash less (ii) Luxco Notes Cash Allocation and (B) the Allowed TG Claims Amount. <br><br> The "Capco Cash Allocation" means Total Distributable Cash less the Luxco Notes Cash Allocation less the TG Claims Cash Allocation. |
| New NII Common Stock Pool Allocation | The "Luxco Notes Stock Allocation" means the percentage of the New NII Common Stock Pool distributed to the Luxco Notes, which shall be calculated by dividing (x) (i) the Luxco Notes prepetition claim of $1,694,882,000.00 less (ii) the Luxco Notes Cash Allocation, by (y) (i) the Plan Distributable Value (as adjusted for an Overbid, if applicable), less (ii) Total Distributable Cash. <br><br> The "TG Claims Stock Allocation" means the percentage of the New NII Common Stock Pool distributed to holders of allowed Transferred Guarantor Claims, which shall be calculated by dividing (x) (i) the Allowed TG Claims Amount less (ii) the TG Claims Cash Allocation, by (y) (i) the Plan Distributable Value (as adjusted for an Overbid, if applicable), less (ii) Total Distributable Cash. <br><br> The "Capco Stock Allocation" means the percentage of the New NII Common Stock Pool distributed to holders of allowed Capco Note Claims, which shall be calculated by subtracting from 100% (x) the Luxco Notes Stock Allocation and (y) TG Claims Stock Allocation. |
| Retained Cash Amount | The "Retained Cash Amount" means an amount of cash, not to exceed $515 million, retained by the Debtors to fund, among other things, non-NII Mexico operations and to repay the Bridge Loan (as defined below). |

| DIP Financing | The Debtors shall file a motion for approval of a senior secured, first priority debtor in possession loan (the "Bridge Loan") in an amount and on terms and conditions consistent with Exhibit A hereto by no later than March 5, 2015.  The members of the Luxco Group shall commit to providing the Bridge Loan, with Capital Group and Aurelius providing 20.56% and 14.44% of the Bridge Loan, respectively. |
|---|---|
| Exit Financing | The Debtors may seek exit financing on terms and conditions reasonably acceptable to the Committee, Capital Group and Aurelius.  The Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders. |
| Means of Implementation | The Plan shall contain standard means of implementation, including provisions for the continued corporate existence of the Reorganized Debtors, the cancellation of certain prepetition debt and related agreements, the cancellation of prepetition equity interests in NII, the issuance of the New NII Common Stock and the revesting of Debtors' assets in the Reorganized Debtors.<br><br>The "Plan Documents" means the Plan, the disclosure statement with respect to the Plan to be filed in the Chapter 11 Cases (the "Disclosure Statement"), the proposed order confirming the Plan (the "Confirmation Order"), and any other documents or agreements filed with the Bankruptcy Court by the Debtors that are necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, including: (a) any term sheet and/or commitment letter for any proposed postpetition or exit financing facility, including the issuance of the Bridge Loan; (b) any operative documents for any proposed postpetition or exit financing facility, including without limitation the issuance of the Bridge Loan; (c) any documents disclosing the identity of the members of the board of directors of any of the Reorganized Debtors and the nature of any compensation for any "insider" under the Bankruptcy Code who is proposed to be employed or retained by any of the Reorganized Debtors; (d) any list of material executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected; (e) a list of any material retained causes of action; and (f) the registration rights agreement filed as Exhibit |

| | |
|---|---|
| | A to the proposed plan filed by the Debtors on December 22, 2014 [Docket No. 322] (the "Registration Rights Agreement"), each of which shall (i) be in form and substance reasonably acceptable to the Plan Proponents, Aurelius, and Capital Group, and (ii) solely with respect to the Plan, the Disclosure Statement, the materials for solicitation of the Plan and Disclosure Statement, the motion to approve the Disclosure Statement, the order approving the Disclosure Statement, the Confirmation Order, any term sheet and/or commitment letter for the issuance of the Bridge Loan and any operative documents for the Bridge Loan, be in form and substance reasonably acceptable to the Luxco Group and with respect to all other documents, be subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders. |
| New NII Common Stock | The Plan will provide for the cancellation of all outstanding NII common stock and the issuance of new common stock, par value $0.001 per share (the "New NII Common Stock"), in NII, as reorganized pursuant to the confirmed Plan ("Reorganized NII"). Each share of the New NII Common Stock shall entitle its holder to one vote.<br><br>The Plan will also provide that, upon emergence, Reorganized NII shall amend and restate its charter and bylaws substantially in the forms attached hereto as Exhibit B and Exhibit C, respectively, with any additions, deletions, changes and/or modifications thereto to be subject to the reasonable consent of each of the Plan Proponents and each of the Requisite Consenting Noteholders.<br><br>The New NII Common Stock will be registered under the Securities Exchange Act of 1934. |
| New NII Common Stock Pool | All New NII Common Stock to be issued and distributed on the Effective Date under the Plan, prior to dilution by the MIP Shares, shall constitute the "New NII Common Stock Pool" for purposes of this Term Sheet.<br><br>As soon as practicable after the Effective Date, but no later than 60 days after the Effective Date, Reorganized NII shall use its |

| | |
|---|---|
| | commercially reasonable efforts to cause the New NII Common Stock to be listed for trading on the New York Stock Exchange or for quotation in the NASDAQ stock market.  The New NII Common Stock will be freely tradable in accordance with section 1145 of the Bankruptcy Code.<br><br>On the Effective Date, the Debtors and the recipients of New NII Common Stock will enter into a registration rights agreement, which shall provide parties who, together with their affiliates, receive 10% or more of New NII Common Stock issued under the Plan with registration rights pursuant to the Registration Rights Agreement. |
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan shall be customary for a reorganization of this size and type, including, without limitation, the following:<br><br>• The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Plan Proponents and each of the Requisite Consenting Noteholders, approving the adequacy of the Disclosure Statement (the "<u>Disclosure Statement Order</u>").<br><br>• The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Plan Proponents and each of the Requisite Consenting Noteholders.<br><br>• All Plan Documents shall be in form and substance reasonably acceptable to the Plan Proponents, Aurelius and Capital Group, and solely with respect to the Plan, the Disclosure Statement, the materials for solicitation of the Plan and Disclosure Statement, the motion to approve the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, any term sheet and/or commitment letter for the issuance of the Bridge Loan and any operative documents for the Bridge Loan, be in form and substance reasonably acceptable to the Luxco Group, and, with respect to all other documents, be subject to the consent of the Luxco Group not to be unreasonably withheld, conditioned or delayed; provided, however, the Debtors shall consult with the Luxco Group regarding the proposed exit financing and the negotiation of the terms thereof and the final terms and conditions of such exit financing will be subject to the consent of the Luxco Group, such consent not to be unreasonably withheld, conditioned |

18

| | or delayed; provided, further, that if Capital Group or Aurelius participates in the exit financing, such financing shall be on terms and conditions reasonably acceptable to each of the Plan Proponents and each of the Requisite Consenting Noteholders.<br><br>• Each of the foregoing may be waived by the Plan Proponents, with the consent of each of the Requisite Consenting Noteholders. |
|---|---|
| Conditions to the Effective Date | The conditions precedent to the occurrence of the Effective Date of the Plan shall be customary for a reorganization of this size and type, and shall include, without limitation, the Conditions to Confirmation set forth in this Term Sheet and the following:<br><br>• All documents and agreements necessary to consummate the Plan shall have been effected or executed.<br><br>• The Bankruptcy Court shall have entered an order approving the Sale Transaction (the "Sale Order"), subject to any modifications to the Proposed Sale Order contained in the Sale Order being in form and substance reasonably acceptable to the Plan Proponents and each of the Requisite Consenting Noteholders.<br><br>• The Confirmation Order shall have become a final order.<br><br>• The Sale Transaction shall have been consummated in accordance with its terms and the Sale Order.<br><br>• Any and all agreements relating to the financing of the Debtors' operating subsidiaries (the "Operating Companies") (i) entered into after December 18, 2014 with respect to the CDB Amendments and (ii) which contain modifications made after February 26, 2015 with respect to the Brazil Bank Amendments, including, without limitation, amendments to applicable local financing agreements entered into after such date, shall be in form and substance reasonably acceptable to the applicable Operating Companies, Aurelius and Capital Group (subject to a consultation right in favor of the Committee and a consent right in favor of the Luxco Group not to be unreasonably withheld, conditioned or delayed), and any existing defaults under the Operating Companies' local financing |

|  | agreements shall have been cured or waived. |
|---|---|
| | • Any and all steps necessary to consummate the Restructuring in any applicable jurisdictions other than the United States have been effectuated. |
| | • The fees and expenses of the RCN Advisors (as defined below) shall have been paid in accordance with the provisions set forth under "Fees and Expenses of Requisite Consenting Noteholders" below. |
| | • Each of the foregoing may be waived by the Plan Proponents, with the consent of each of the Requisite Consenting Noteholders. |
| Corporate Governance Matters | On the Effective Date, the term of any current members of the board of directors of NII not identified as members of the New Board (as defined below) shall expire and such persons shall tender their resignation effective on the Effective Date.

The initial Board of Directors for Reorganized NII (the "New Board") shall consist of seven (7) directors, including (a) the chief executive officer of Reorganized NII, (b) three (3) directors designated by Capital Group, (c) one (1) director designated by Aurelius, and (d) two (2) directors designated by the Luxco Group. Each of the individuals designated as nominees to be directors (other than the chief executive officer of Reorganized NII) shall (i) be independent under the rules of the NASDAQ Stock Market and the independence requirements for members of audit and compensation committees under the rules of the Securities and Exchange Commission and (ii) not be employees of any of the Requisite Consenting Noteholders. The foregoing board designation rights shall not continue after the selection of the New Board.

The boards of directors for the direct and indirect subsidiaries of Reorganized NII shall be identified and selected by the New Board.

Reorganized NII will continue to be a reporting company with the Securities and Exchange Commission following the Effective Date. |

| | |
|---|---|
| Management Incentive Plan | Upon the Effective Date, the New Board shall adopt a management incentive plan, including (i) restricted stock units for up to 2.5% of the New NII Common Stock and (ii) options to purchase up to 2.5% of the New NII Common Stock on a fully diluted basis with any applicable exercise price to be determined by the New Board (collectively, the "<u>MIP Shares</u>").  The vesting, apportionment and granting of the MIP Shares shall be determined by the New Board. |
| Releases | The Plan shall provide certain customary release provisions for the benefit of the Debtors, their directors, officers, and agents and their respective attorneys, financial advisors and other specified professionals, the Requisite Consenting Noteholders, the indenture trustees for the Notes (the "<u>Indenture Trustees</u>"), the Committee, the members of the Committee and their respective agents, and each of their respective attorneys, financial advisors and other specified professionals, to the extent permitted by applicable law. |
| Exculpation | The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, the Indenture Trustees, the Requisite Consenting Noteholders, the Committee, the members of the Committee, and all of the foregoing parties' respective current and former officers, directors, members, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals) from any and all Claims and causes of action arising before the Effective Date and any and all Claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or the restructuring of the Debtors, with the sole exception of willful misconduct or gross negligence. |
| Fees and Expenses of Requisite Consenting Noteholders | The reasonable and documented fees and expenses of (a) Akin Gump Strauss Hauer & Feld LLP ("<u>Akin</u>"), (b) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul Weiss</u>"), (c) Blackstone Advisory Partners, L.P. ("<u>Blackstone</u>"), (d) Houlihan Lokey Capital, Inc. ("<u>HL</u>"), (e) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("<u>Robbins Russell</u>"), (f) Kirkland & Ellis LLP ("<u>Kirkland</u>") and (g) Millstein & Co. ("<u>Millstein</u>" and, together with the firms set forth in the foregoing clauses (a) |

<table>
<tr>
<td></td>
<td>through (f), the "<u>RCN Advisors</u>"), in their respective capacity as counsel or financial advisor to one or more of the Requisite Consenting Noteholders, incurred prior to the Effective Date in connection with the Debtors' restructuring, including restructuring, completion or transaction fees provided for or acknowledged in the engagement letters for Millstein, Blackstone and HL (and, in the case of HL and Millstein, as such engagement letters have been amended), will be paid in full in cash; provided that the reasonable and documented fees and expenses payable by the Debtors of (i) Robbins Russell shall not exceed $150,000, (ii) Kirkland shall not exceed $4,500,000, (iii) Millstein shall not exceed $4,000,000, (iv) Blackstone, solely with respect to its restructuring and discretionary fees, shall not exceed $3,000,000, and (v) HL, solely with respect to its restructuring fee, shall not exceed $7,000,000.

In connection with the Debtors' motion for postpetition financing, the Debtors shall seek authorization to pay in full in cash the reasonable and documented fees and expenses of Akin, Paul Weiss and Kirkland (collectively, "<u>RCN Counsel</u>") (i) incurred through the date of the order approving such motion (the "<u>DIP Financing Order</u>"), such payment to be made to Akin and Kirkland expeditiously after entry of the DIP Financing Order and receipt of the relevant invoices for such fees and expenses and to Paul Weiss on the Effective Date following the receipt of invoices for such fees and expenses, and (ii) incurred from the date of the DIP Financing Order through the Effective Date, such payment to be made to each RCN Counsel on the Effective Date, in each case, subject to the limitations set forth above. Notwithstanding anything to the contrary in this Term Sheet or the Plan Support Agreement, Paul Weiss shall be allowed to explain to the Bankruptcy Court the basis for its fee arrangement. The Debtors shall seek authorization to pay in full in cash the reasonable and documented fees and expenses of HL, Millstein and Blackstone, including any restructuring fees, no later than the hearing on confirmation of the Plan, subject to the limitations set forth above, with such payment to be made on the Effective Date.</td>
</tr>
<tr>
<td>Fiduciary Duties</td>
<td>Notwithstanding anything to the contrary in the Purchase Agreement, (i) any of the Debtors or their subsidiaries or affiliates or any of its or their respective directors or officers (in such person's capacity as a director or officer) shall not be required to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law; and (ii) any of the Debtors and their boards of directors shall be entitled to take any action in connection with the Sale Transaction and continue to</td>
</tr>
</table>

| | market and solicit bids for the sale any of their assets pursuant to section 363 of the Bankruptcy Code in the interest of maximizing the value of the Debtors' estates, consistent with their fiduciary obligations.<br><br>Notwithstanding anything to the contrary in the Plan Support Agreement, neither the Committee nor its members (in such member's capacity as a Committee member) shall be required to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under the Bankruptcy Code and applicable law. |
|---|---|

**<u>Exhibit A</u>**
**Bridge Loan Terms**

*(Execution Version)*

TERM SHEET (THE "***TERM SHEET***") IN RESPECT OF

$350,000,000 SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY

March 5, 2015

This Term Sheet is delivered with a commitment letter of even date herewith (the "***Commitment Letter***") from the DIP Lenders to the Company in connection with the debtor-in-possession credit facility described below.  Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions of the DIP Order and other necessary Court approvals as set forth below. Capitalized terms used and not otherwise set forth herein shall have the meaning set forth in the Commitment Letter.

| **I. Parties** | |
| --- | --- |
| Borrower: | The Borrower shall be NII International Telecom S.C.A. ("***Luxco***" or the "***Borrower***"). |
| Guarantors: | Each of the following entities (collectively, the "***DIP Guarantors***" and, together with the Borrower, the "***Loan Parties***" or the "***Debtors***"), each of which is a debtor in the Bankruptcy Cases, shall provide an irrevocable and unconditional guaranty of payment of all of the indebtedness and other payment, performance and other obligations under the DIP Credit Facility (the "***DIP Obligations***"), and liens on all assets constituting "Collateral" as set forth under the "Collateral and Priority" heading below :<br><br>(a)     NII Holdings, Inc. (the "***Parent***"),<br><br>(b)     Nextel International (Services), Ltd.,<br><br>(c)     NII Capital Corp.,<br><br>(d)     NII Aviation, Inc.,<br><br>(e)     NII Funding Corp.,<br><br>(f)     NII Global Holdings, Inc.,<br><br>(g)     NII International Holdings S.à r.l.,<br><br>(h)     NII International Services S.à r.l.,<br><br>(i)     Airfone Holdings, LLC,<br><br>(j)     McCaw International (Brazil), LLC, |

| | |
|---|---|
| | (k)     NII Mercosur, LLC,<br><br>(l)     NIU Holdings LLC (the "**Seller**"), and<br><br>(m)    any other subsidiary of the Parent that becomes a debtor in the Bankruptcy Cases from and after the date hereof. |
| Administrative Agent and Collateral Agent: | A financial institution to be determined by the DIP Lenders and to be reasonably acceptable to the Borrower (it being agreed that Credit Suisse AG and its affiliates shall be deemed to be acceptable to the Borrower) (collectively, in such capacities, the "**DIP Agent**"). |
| DIP Lenders: | The lenders (in such capacity, the "**DIP Lenders**") shall be (on a several, and not on a joint and several basis):<br><br>(a)     the Luxco Group in an amount equal to 65% of the DIP Credit Facility,<br><br>(b)     CapRe in an amount equal to 20.56% of the DIP Credit Facility, and<br><br>(c)     Aurelius in an amount equal to 14.44% of the DIP Credit Facility,<br><br>in each case directly or through its affiliates, and/or assignees permitted by the Commitment Letter. |
| **II. DIP Credit Facility** | |
| Type and Amount of Facility: | Superpriority debtor-in-possession single-draw term loan facility (the "**DIP Credit Facility**") in the aggregate principal amount of $350,000,000 (which shall include OID (as defined below)).  Loans extended under the DIP Credit Facility shall be referred to herein as the "**DIP Loans**". |
| Availability: | 100% of the DIP Loans shall be drawn on the Closing Date.  Amounts repaid or prepaid under the DIP Credit Facility may not be reborrowed. |
| Use of Proceeds: | Proceeds of the DIP Credit Facility shall be used (a) for general corporate purposes of the Debtors and their subsidiaries, (b) to pay annual licensing fees of one or more of the Debtors' subsidiaries in Mexico, (c) to fund operating expenses and capital expenditures of the Debtors and their subsidiaries in the ordinary course of business (including those of Parent and the payment of expenses associated with the Bankruptcy Cases) and (d) to pay transaction fees and reasonable and documented costs and expenses related to the DIP Credit Facility, including legal costs of the DIP Lenders incurred in connection with the Bankruptcy Cases payable in accordance with the DIP Order or other applicable order of the Bankruptcy Court, subject to the terms and conditions set forth in the plan support agreement ("**PSA**") to be entered into substantially in the form attached hereto as |

| | |
|---|---|
| | Annex II. |
| Maturity Date: | The "**Maturity Date**" shall be the earliest to occur of (a) the date that is 12 months after the date of entry of the DIP Order, (b) no later than the second business day following the consummation of a Section 363 sale of 100% of the equity interests in Nextel International (Uruguay), LLC owned by Seller to (i) New Cingular Wireless Services, Inc. ("**Purchaser**"), or any successor or assignee thereof, under the Purchase Agreement (as defined below), as has been or may be amended from and after the date hereof, or (ii) a third party submitting a higher or otherwise better offer for the assets of Seller in accordance with the bidding procedures approved by the Bankruptcy Court on February 17, 2015 (the "**Bidding Procedures**"), as further described in that certain Purchase and Sale Agreement dated as of January 26, 2015, as amended on or prior to the date hereof pursuant to amendments disclosed to the DIP Lenders (the "**Purchase Agreement**") (clause (i) and (ii) collectively, the "**Mexican Sale**"), (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court, or (d) the acceleration of the DIP Loans in accordance with the DIP Credit Agreement.<br><br>On the Maturity Date, the DIP Loans and the other DIP Obligations under the DIP Credit Facility and the other DIP Loan Documents shall be paid in full in cash. |
| **III.  Certain Payment Provisions** | |
| Amortization: | The Borrower will repay all outstanding DIP Loans on the Maturity Date. Prior to the Maturity Date, there shall not be any regularly scheduled amortization payments. |
| Fees and Interest Rates: | As set forth on Annex I. |
| Mandatory Prepayments: | Limited to the following (each of which shall be subject to certain materiality thresholds, customary exceptions and other exceptions to be agreed):<br><br>(a)    within two business days after receipt thereof, 100% of the net proceeds, if any, of any sale or other disposition by the Loan Parties and/or their subsidiaries outside the ordinary course of business (including (i) the Mexican Sale (ii) the sale of all of the equity interests or all or substantially all of the assets of the Loan Parties and/or their subsidiaries in Brazil and (iii) the sale of all of the equity interests or all or substantially all of the assets of the Loan Parties and/or their subsidiaries in Argentina), which proceeds, shall be net of (1) in respect of the Loan Parties, amounts required to be paid to satisfy any indebtedness secured by a lien having priority senior to the DIP Obligations and obligations owed to the Purchaser under the |

3

Purchase Agreement and in each case required by its terms as in effect on the date hereof to be so repaid, (2) in respect of the Non-Debtor Subsidiaries, amounts required to be paid to satisfy any indebtedness (secured or unsecured) required by its terms as of the date hereof to be so repaid, (3) in respect of the Non-Debtor Subsidiaries, amounts required to be retained by the Non-Debtor Subsidiaries pursuant to applicable law (including, for the avoidance of doubt, applicable corporate law, tax law and labor laws) and (4) amounts required to satisfy obligations of the Non-Debtor Subsidiaries under any material contract as in effect on the date hereof (and as amended from time to time in a manner not adverse to the DIP Lenders in any material respect) (including  existing agreements with American Tower do Brasil Cessao de Infra-Estructuras Ltda.) to which they are party (items (1), (2) (3) and (4), the "***Permitted Uses***"); <u>provided</u>, that notwithstanding anything to the contrary above, (A) none of the proceeds described in this clause (a) may be used directly or indirectly to make payments on account of intercompany debt owed by any Loan Party or any subsidiary, and (b) proceeds received by a Loan Party or a subsidiary thereof in respect of events described above occurring in a specific jurisdiction may only be applied to the Permitted Uses in respect of obligations of the receiving Loan Party or subsidiary existing under the laws of that same jurisdiction, and may not be used to fund directly or indirectly Permitted Uses of other Loan Parties or subsidiaries in a different jurisdiction;

(b)    within two business days after receipt thereof, an amount equal to 100% of the net proceeds of any issuance of any indebtedness by the Loan Parties and, subject to the Permitted Uses, the Non-Debtor Subsidiaries; and

(c)    within two business days after receipt thereof, an amount equal to 100% of the net proceeds of any insurance proceeds or condemnation awards of the Loan Parties and, subject to the Permitted Uses, the Non-Debtor Subsidiaries.

The mandatory prepayments described herein shall be applied, *first*, to the payment of all costs, fees, expenses and indemnities then due and payable to the DIP Agent and the DIP Lenders in accordance with the DIP Loan Documents, but with respect to the DIP Lenders, subject to the terms and conditions set forth in the PSA; *second*, to the payment of any accrued and unpaid interest due and payable on the DIP Loans pro rata among the DIP Lenders with respect to their respective outstanding principal amounts; and *third*, to the repayment of principal of DIP Loans pro rata among the DIP Lenders with respect to their respective outstanding principal amounts until repaid in full.

| | |
|---|---|
| Voluntary Prepayments: | The DIP Credit Agreement will not permit voluntary partial prepayments of the DIP Loans.  Voluntary prepayments of the DIP Credit Facility in full will only be permitted if, after giving pro forma effect to such prepayment (in full in cash), unrestricted cash and cash |

| | equivalents of the Borrower and its subsidiaries, on a consolidated basis, is not less than $125,000,000. |
|---|---|
| **IV.  Collateral and Other Credit Support** | |
| Collateral and Priority: | The DIP Credit Facility (and all guarantees of the DIP Credit Facility by the DIP Guarantors) shall:<br><br>(i)      at all times pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Bankruptcy Cases of the Loan Parties but subordinate, in all respects, to any superpriority claim granted to the Purchaser under or in connection with the Purchase Agreement;<br><br>(ii)      at all times pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all of the Loan Parties' assets, whether consisting of real, personal, tangible or intangible property (including 100% of the outstanding shares of capital stock of subsidiaries, other than those belonging to the Seller, and any and all intercompany claims and receivables, whether arising prior to the Petition Date or thereafter) that are not subject to valid, perfected and non-avoidable liens, including but not limited to (1) the proceeds of avoidance actions and (2) all claims held by any Loan Party against, (including, whether arising prior to the Petition Date or thereafter,  in respect of any intercompany receivables owed by) any subsidiary of any Loan Party, and in each case the proceeds of any of the foregoing;<br><br>(iii)      at all times pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a junior perfected lien on all of the Loan Parties' assets (the assets described in this clause (iii), together with the assets described in clause (ii) above, the "***Collateral***"); and<br><br>(iv)      only upon the occurrence of a Purchase Agreement Termination (as defined below), pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative claim status in the bankruptcy case of Nextel International (Uruguay), LLC; provided, with respect to such claim (1) nothing in the DIP Order or the DIP Loan Documents shall affect any of the rights of Purchaser or any successor or assignee thereof  or any of the obligations of the Seller, Luxco or any of the Debtors that are guarantors thereunder, in each case, under the Purchase Agreement, Transaction Agreements (as defined in the Purchase Agreement), Bidding Procedures Order (as defined in the Purchase Agreement) and once entered by the Bankruptcy Court, the Sale Order (as defined in the Purchase Agreement); (2) the DIP Obligations shall be repaid in full in cash at the closing of the transactions contemplated by the Purchase Agreement, as has been or may be amended from and after the date hereof, from the proceeds thereof; (3) any superpriority administrative claims granted in favor of the DIP Lenders and/or DIP Agent under or in connection with the DIP Credit Facility shall be subordinate, in all respects, to any superpriority claim granted to Purchaser under or in connection with the Purchase Agreement, and (4) notwithstanding anything to the contrary herein or |

in the DIP Loan Documents, neither the DIP Agent nor any DIP Lender shall take any action that would reasonably be expected to impede or delay the consummation of the transactions contemplated in the Purchase Agreement;

subject in all cases to (1) a Carve-Out and (2) Permitted Liens. For this purpose:

"*Carve-Out*" means, following the occurrence of an Event of Default (as defined below), an amount sufficient for payment of (A) (i) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "*Professional Fees*") of persons or firms retained by the Debtors and the official committee of unsecured creditors (the "*Creditors' Committee*") appointed in the Bankruptcy Cases incurred at any time before or on the first business day following delivery by the DIP Agent to the Debtors, their counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee of a written notice, which may be delivered following acceleration of the maturity of the DIP Facility, seeking relief from the automatic stay to foreclose upon the Collateral (a "*Carve-Out Trigger Notice*"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and (ii) after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees in an aggregate amount not to exceed an amount to be agreed; (B) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court; and (C) reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (A) above), provided, that so long as an Event of Default has not occurred, the Loan Parties shall be permitted to pay fees and expenses allowed and payable under 11 U.S.C. § 330 and § 331, as the same may become due and payable, and the same shall not reduce the Carve-Out.

"*Permitted Liens*" means (A) valid, perfected and non-avoidable liens in existence on the Petition Date (as defined below),  (B) valid, perfected and non-avoidable liens in existence and to the extent outstanding on the date of the commencement of the Bankruptcy  Cases (such date, the "*Petition Date*") that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, (C) capital leases and purchase money liens with certain restrictions to be agreed and (D) other customary and appropriate statutory or ordinary course of business liens or encumbrances to be reasonably agreed to.

Subject to the terms of the DIP Order, (A) the liens securing the DIP Credit Facility will not be subject to challenge and will attach and become valid, enforceable and perfected automatically upon entry of the DIP Order without the requirement of any further action by the DIP Agent or the DIP Lenders (B) the Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by

6

| | |
|---|---|
| | any item of Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.<br><br>The Collateral will be free and clear of other liens, claims and encumbrances, except Permitted Liens. |

## VI. Conditions

| | |
|---|---|
| Closing Conditions: | The availability of the DIP Credit Facility shall be conditioned solely upon satisfaction of the following conditions precedent (the date upon which the initial funding occurs upon the satisfaction (or waiver) of all such conditions, the "***Closing Date***"):<br><br>(a)    The Loan Parties shall have executed and delivered definitive financing documentation with respect to the DIP Credit Facility, including a credit agreement (the "***DIP Credit Agreement***"), guaranty agreement, security agreement, pledge agreements with respect to the equity and intercompany debt of each non-U.S. Loan Party, "Know-Your Customer" documentation of the Loan Parties and other customary legal documentation (collectively, together with the DIP Credit Agreement, the "***DIP Loan Documents***") mutually satisfactory to the Loan Parties and the DIP Lenders; provided, that the DIP Lenders agree that they will not require the filing of any mortgages or entry into any control agreements with respect to the Collateral as a condition precedent to the availability of the DIP Credit Facility, it being understood and agreed that the DIP Agent and/or the Required DIP Lenders (as defined below) may, in their reasonable discretion, at any time after the Closing Date require the satisfaction of any requirements for the granting or perfection of liens required or desirable pursuant to any foreign laws; provided, that (i) the Borrower shall be given a reasonable amount of time to satisfy such requirements and (ii) no such request will be made to the extent the costs and burden of doing so reasonably outweigh the benefits to be gained as determined by the DIP Agent;<br><br>(b)    The DIP Lenders and the DIP Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented, including all professionals' reasonable costs and expenses incurred solely in their capacities as DIP Lenders, on or before the Closing Date;<br><br>(c)    The DIP Lenders shall have received (i) (in scope and detail consistent with financial statements referred to in clause (a) of the section entitled "Financial Reporting" below) financial statements of the Parent for each fiscal monthly period and quarterly period ended more than 30 days prior to the Closing Date and (ii) a receipts and disbursements forecast in form, scope and detail consistent with the forecasts previously |

delivered by the Debtors to the DIP Lenders in connection with the Bankruptcy Cases and acceptable in form, scope, detail and substance to the DIP Lenders in their reasonable discretion, it being understood and agreed that the draft provided to Millstein & Co. ("***Millstein***"), Houlihan, Lokey, Howard & Zukin, Inc. ("***HLHZ***") and Blackstone Advisory Partners, L.P. ("***Blackstone***" and together with Millstein and HLHZ, the "***Restructuring Advisors***") on March 3, 2015 is acceptable (such forecast, the "***Initial Cash Flow Forecast***");

(d)    No later than March 23, 2015, the entry of an order of the Bankruptcy Court in substantially the form set forth as an exhibit to the DIP Credit Agreement (the "***DIP Order***") on an application or motion by the Borrower that is satisfactory in form and substance to the DIP Lenders and the DIP Agent, which DIP Order shall have been entered on such prior notice to such parties as may be reasonably satisfactory to the DIP Lenders and the DIP Agent, which DIP Order shall (i) authorize the extensions of credit in respect of the DIP Credit Facility in the amounts and on the terms set forth herein, (ii) grant the superpriority claim status and other collateral and liens referred to above, (iii) approve the payment by the Borrower of all of the fees and expenses provided for herein and (iv) not have been vacated, reversed, modified, amended or stayed; with the understanding, that, subject to the relevant provisions of the PSA, (1) in connection with seeking approval of the DIP Credit Facility, the Debtors shall seek authority to pay the reasonable and documented legal fees of the DIP Lenders and their affiliates incurred up to the Closing Date in connection with the Bankruptcy Cases, and (2) the approval of such legal fees shall not be a condition precedent to the availability of the DIP Credit Facility on the terms and conditions set forth herein (other than with respect to legal fees and expenses incurred in connection with the negotiation, documentation and closing of the Commitment Letter, this Term Sheet, the DIP Credit Agreement and the other DIP Loan Documents, which approval shall be a condition precedent to the availability of the DIP Credit Facility, so long as the Borrower has received an invoice in respect of such fees at least two days prior to the Closing Date);

(e)    The accuracy in all material respects (or in all respects with regards to representations and warranties already qualified by materiality) of all representations and warranties in the DIP Loan Documents (except to the extent that any such representation or warranty speaks or is referenced to a particular date, in which case such representation or warranty shall be true and correct on such date);

(f)    There being no default or Event of Default in existence at the time of, or immediately after giving effect to the making of,

|  | such extension of credit; |
|--|--------------------------|
| (g) | The DIP Order shall be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed, or modified or amended without the consent of each of the DIP Lenders; |
| (h) | The Debtors shall be in compliance in all material respects with the DIP Order; |
| (i) | No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors; |
| (j) | The DIP Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor; |
| (k) | All third party approvals and consents required from the Purchaser in connection with the grant of the administrative claim on the membership interests and assets of Nextel International (Uruguay), LLC as set forth herein under the heading "Collateral and Priority" shall have been obtained on terms reasonably satisfactory to the DIP Agent and the DIP Lenders and shall be in full force and effect; and |
| (l) | Since December 31, 2014, there shall not have occurred any event, change, circumstance, development or fact that, individually or in the aggregate, has had or would reasonably be expected to have, a Material Adverse Effect (as defined below). |

"***Material Adverse Effect***" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, business or properties of (i) the Loan Parties, taken as a whole, or (ii) the Non-Debtor Subsidiaries, taken as a whole, (b) the ability of the Loan Parties to duly and punctually pay or perform their obligations under any DIP Loan Document in accordance with the terms thereof, or (c) the practical realization of the benefits of the DIP Agent's and each DIP Lender's rights and remedies under the DIP Credit Agreement, the other DIP Loan Documents (including the DIP Order).

The Closing Date is expected to occur on or before March 23, 2015.

---

**VII. Certain Documentation Matters**

As used throughout this Term Sheet:

"***Non-Debtor Subsidiaries***" means, collectively, all direct or indirect subsidiaries of Luxco other than the Debtors.

"***Specified Pre-Petition Financing Agreements***" means credit agreements and/or indentures governing the terms and conditions of

|  |  | indebtedness for borrowed money entered into prior to the Petition Date as in effect on the date hereof, which agreements and/or indentures will be set forth in a schedule to be agreed to by the Debtors and the DIP Lenders on or prior to the Closing Date. |
| --- | --- | --- |
|  | Representations and Warranties of the Loan Parties: | Limited to the following (in each case, as applicable to the Loan Parties and their subsidiaries and with customary exceptions, materiality thresholds, limitations and qualifications to be mutually agreed):<br><br>Financial statements; existence and standing, authorization, execution and validity; compliance with law and post-petition contractual obligations; corporate power and authority; enforceability of DIP Loan Documents; survival of representations and warranties; entity names; no conflict with organizational documents, law, unstayed orders and decrees, or post-petition contractual obligations of the Loan Parties and contractual obligations of subsidiaries of Loan Parties; application of certain laws and regulations; licenses and permits; no Material Adverse Effect; no litigation; no default (other than as remedied or stayed by the Bankruptcy Cases or pursuant to standstill provisions or any other contractual arrangements entered into prior to the date hereof reasonably acceptable to the Qualified DIP Lenders (as defined below)); ownership of property; liens and indebtedness; certain bankruptcy matters; intellectual property; no burdensome post-petition restrictions; taxes and other obligations; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; equity interests; swap agreements; OSHA and environmental matters; labor matters; commercial tort claims; letter of credit rights; accuracy of disclosure; ranking and priority of obligations under the DIP Loan Documents; status and enforceability of the Purchase Agreement; PATRIOT Act; OFAC; sanctions; FCPA and other anti-terrorism laws; and anti-money laundering laws. |
|  | Financial Reporting: | Delivery to the DIP Agent of the following in the time periods set forth below, in each case, in form and detail acceptable to the DIP Agent and the Required DIP Lenders (as defined below), each of which shall be designated by the Borrower as "Public" or "Private":<br><br>(a)  (i) fiscal monthly and quarterly (for the first three fiscal quarters of the fiscal year only) financial statements in form, scope and detail consistent with the monthly and quarterly financial statements previously delivered by the Debtors to the DIP Lenders in connection with the preparation of the Bankruptcy Cases, and (ii) annual financial statements, in each case, with respect to each of the following:<br><br>    (1)  the Brazil operating companies;<br><br>    (2)  the Mexico operating companies;<br><br>    (3)  the Argentina operating companies; |

10

|  | (4) Parent, but not including items (1), (2) and (3) above; and |
|  | (5) Parent and its subsidiaries on a consolidated basis. |
|  | (b) no later than fourteen calendar days after the Closing Date, and no later than five week business days after every two week period thereafter, a report (the "***Bi-Weekly Budget Actuals Report***"), showing actual receipts and disbursements for the two week period ended on the previous Saturday for each of the entity groups referred to in clause (a) above; |
|  | (c) no later than five business days after the end of each preceding monthly period, commencing April 7, 2015, an updated rolling 13-week receipts and disbursements forecast for each of the entity groups referred to in clause (a) above, in form, scope and detail consistent with the Initial Cash Flow Forecast (the "***Updated Cash Flow Forecasts***", and, collectively with the Initial Cash Flow Forecast, the "***Cash Flow Forecasts***" and each a "***Cash Flow Forecast***"); |
|  | (d) together with each Bi-Weekly Budget Actuals Report, a variance report setting forth (the "***Budget Variance Report***") the difference between actual receipts and disbursements for the period from the Closing Date through the previous Saturday and projected receipts and disbursements set forth in the then current Cash Flow Forecast for such period; |
|  | (e) together with each Bi-Weekly Budget Actuals Report, a minimum liquidity covenant compliance certificate duly certified by a chief financial officer or treasurer of the Borrower; |
|  | (f) (i) allow and direct the restructuring advisors to the Debtors to conduct a bi-weekly conference calls with the Restructuring Advisors on the Bi-Weekly Budget Actuals Report and such other matters as are reasonably requested by any of the Restructuring Advisors in advance of such call, and (ii) allow the Restructuring Advisors reasonable access to information (including historical information) and personnel (during normal business hours), including regularly scheduled meetings (during normal business hours), as mutually agreed, with senior management of the Debtors and other advisors to the Debtors, including their financial, restructuring and legal advisors; and |
|  | (g) such other information as the DIP Agent and the Required DIP Lenders (as defined below) may reasonably request to verify compliance under the DIP Loan Documents. |
| Affirmative Covenants of the Loan Parties: | Limited to the following (in each case, as applicable to the Loan Parties and their subsidiaries and with customary exceptions, materiality thresholds, limitations and qualifications to be mutually agreed): |

| | |
|---|---|
| | Payment of fees; conduct of business and maintenance of existence; notices of violations of law, defaults, material litigation and other material events; government receivables; covenant to guarantee obligations and provide security; springing lien collateral upon existence of necessary consents (if any); further assurances; payment of indebtedness and post-petition obligations; financing orders; bankruptcy events; post-filing pleadings; contest, if requested by the DIP Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the DIP Agent or the DIP Lenders; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the DIP Agent and DIP Lenders to inspect property and books and records; compliance with environmental laws; use of proceeds; identification of "public side" and "private side" information in respect of material non-public information; standards of financial statements; reporting in connection with asset sales hereunder; and post-closing obligations with respect to foreign collateral. |
| Negative Covenants of the Loan Parties: | Limited to the following (in each case, as applicable to the Loan Parties and their subsidiaries and with customary exceptions, materiality thresholds, limitations and qualifications to be mutually agreed):<br><br>Limitations on: mergers, consolidations, liquidations and dissolutions; liens (including no additional liens on the equity or the assets of Nextel International (Uruguay), LLC or NIU Holdings LLC); guarantees; investments (including acquisitions), loans and advances; certain bankruptcy matters; dividends; indebtedness (including guarantee obligations and preferred stock of subsidiaries); nature of business; transactions with affiliates; leases; subsidiaries; changes in fiscal year; negative pledge clauses (including with regards to the equity or the assets of Nextel International (Uruguay), LLC or NIU Holdings LLC); amendment of material documents, including a prohibition on amending, modifying, supplementing and/or waiving the terms and conditions of the Purchase Agreement in any manner adverse to the interests of the DIP Lenders; ERISA compliance; prepayment of indebtedness and earn-outs; anti-terrorism and anti-money laundering laws; restrictive agreements; subordinated debt; use of Collateral; sales of assets; payment of restricted payments; no amendment, waiver or modification to the Specified Pre-Petition Financing Agreements that is adverse to the DIP Lenders; sale and leaseback transactions; swap agreements; optional payments and modifications of debt instruments; prepayment of post-petition obligations, payment of prepetition obligations; and other superpriority claims. |
| Covenants applicable to Non-Debtor Subsidiaries: | The Borrower shall cause the Non-Debtor Subsidiaries to comply with the terms and conditions of the affirmative and negative covenants set forth in the Specified Pre-Petition Credit Agreements as in effect on the date hereof without giving effect to any amendment, supplement, waiver, consent or other modification thereto (other than as remedied or stayed pursuant to standstill provisions or any other contractual |

| | |
|---|---|
| | arrangements entered into prior to the date hereof). |
| Financial Covenants: | Limited to the following:<br><br>Minimum liquidity at Luxco, the Mexico operating companies and the Brazil operating companies, in aggregate, at any time of at least $175,000,000. |
| Events of Default: | Limited to the following (each of which shall be subject to customary grace periods, materiality thresholds and exceptions to be mutually agreed):<br><br>(a) nonpayment of principal when due; (b) nonpayment of interest, fees or other amounts after a grace period to be agreed upon; (c) representations and warranties are incorrect when made in any material respect; (d) violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); (e) cross-default to occurrence of an event of default (however defined thereunder, whether or not resulting in acceleration, but giving effect to any applicable grace or cure periods), under any agreement governing post-petition indebtedness of any Debtor or any subsidiary thereof, in excess of an amount to be agreed; (f) cross-default (however defined thereunder, whether or not resulting in acceleration, but giving effect to any applicable grace or cure periods), in respect of any Specified Pre-Petition Financing Agreement; (g) certain ERISA events, as applicable; (h) any of the DIP Loan Documents ceasing to be in full force and effect or any party (other than the DIP Lenders) shall so assert in writing; (i) the DIP Order shall not have been entered by March 23, 2015; (j) any interests created by the DIP Order shall cease to be enforceable and of the same priority purported to be created thereby; (k) dismissal of the Bankruptcy Cases or conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code; (l) appointment of a trustee (subject to a period for the Borrower to contest); (m) entry of an order granting relief from the automatic stay as to assets with a value in excess of an amount to be agreed; (n) modification to the DIP Order in a manner adverse to the DIP Lenders without the consent of each of the DIP Lenders (it being agreed that amendments, modifications or waivers to the DIP Loan Documents other than the DIP Order expressly subject in this Term Sheet to a voting requirement other than the consent of each DIP Lender will be subject to such other voting requirement and will not be deemed a modification to the DIP Order for purposes of this subparagraph (n)); (o) post-petition judgments in excess of an amount to be agreed; (p) pre-petition payments (other than as permitted by the DIP Order or any "first day" or "second day" order); (q) non-compliance by the Debtors with the terms of the DIP Order; (r) petition by any Loan Party seeking, or entry of a Bankruptcy Court order granting, any superpriority claim which is senior or *pari passu* with the DIP Lenders' claims under the DIP Credit Facility; (s) entry of a Bankruptcy Court order authorizing the sale of all or substantially all of the assets of the Loan Parties (taken as a whole) or a Mexican Sale not contemplated by the Bidding Procedures and not authorized |

| | |
|---|---|
| | by the DIP Lenders, unless (i) such order contemplates repayment in full in cash of the DIP Credit Facility upon consummation of the sale or (ii) such order is part of a plan of reorganization approved by the DIP Agent and the DIP Lenders; (t) cessation of liens or superpriority claims granted with respect to the DIP Credit Facility to be valid, perfected and enforceable in all respects; (u) bankruptcy of any subsidiary (other than the Debtors or any subsidiary that becomes a Debtor in the Bankruptcy Cases from and after the date hereof for purposes of effecting a sale); (v) any Loan Party shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the DIP Agent's or any of the DIP Lenders' material rights or interests in their capacities as such under the DIP Credit Facility; and (x) (i) the termination of the Purchase Agreement in accordance with its terms, other than a termination resulting from a Competing Transaction (as defined in the Purchase Agreement) in accordance with the Bidding Procedures, or (ii) the Purchase Agreement otherwise ceases to be in full force and effect for any reason, except as a result of a consummation of the Mexican Sale pursuant to a Competing Transaction (clause (i) and clause (ii) each a "***Purchase Agreement Termination***") (each of the foregoing an "***Event of Default***"). |
| Voting: | Amendments, waivers and consents with respect to the DIP Loan Documents shall require the approval of the Borrower and DIP Lenders holding not less than a majority of the principal amount of DIP Loans under the DIP Credit Facility (the "***Required DIP Lenders***"), except that (a) the consent of each DIP Lender affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of maturity of any loan or reduce the amount or extend the payment date for, any required mandatory payments, (ii) reductions in the rate of interest or any fee or premium or extensions of any due date thereof; provided, that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the DIP Loan Documents, and (iii) increases in the amount or extensions of the expiry date of any DIP Lender's commitment; (b) the consent of each DIP Lender shall be required to (i) modify the pro rata sharing requirements of the DIP Loan Documents, (ii) permit the Loan Parties to assign its rights under the DIP Credit Agreement, (iii) modify any of the voting percentages, (iv) release any DIP Guarantor, except as otherwise permitted in the DIP Loan Documents, or (v) release all or substantially all of the Collateral; and (c) the consent of DIP Lenders holding not less than two-thirds of the principal amount of DIP Loans (the "***Qualified DIP Lenders***") under the DIP Credit Facility shall be required to allow any additional financing that is *pari passu* or senior in lien priority or senior in payment priority to the DIP Credit Facility. |
| Assignments and Participations: | The DIP Lenders shall be permitted to assign all or a portion of their DIP Loans with the consent of the DIP Agent (not to be unreasonably withheld or delayed) and, so long as no Event of Default shall have occurred and be continuing, the Borrower (not to be unreasonably |

|  | withheld or delayed) (it being understood that the Borrower shall be deemed to have consented unless it objects in writing to the DIP Agent within five business days after having received notice thereof); provided that, notwithstanding the foregoing, no consent of the DIP Agent or the Borrower will be required at any time if such assignment is to an existing DIP Lender, an affiliate or an approved fund.  In the case of partial assignments (other than to another DIP Lender, to an affiliate of a DIP Lender or an approved fund), the minimum assignment amount shall be $5,000,000 unless otherwise agreed by the Borrower (so long as no Event of Default shall have occurred and be continuing) (it being understood that the Borrower shall be deemed to have agreed unless it objects in writing to the DIP Agent within five business days after having received notice thereof) and the DIP Agent. The DIP Lenders shall also be permitted to sell participations in their DIP Loans. Participants shall have the same benefits as the DIP Lenders from which they acquired their participations with respect to yield protection and increased cost provisions. Subject to entry into customary confidentiality undertakings, each DIP Lender may disclose information to prospective participants and assignees. |
|---|---|
| Yield Protection: | The DIP Loan Documents shall contain customary provisions (a) protecting the DIP Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes, and (b) indemnifying the DIP Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Expenses and Indemnification: | Subject to the terms and conditions set forth in the PSA and the Commitment Letter, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the DIP Agent and each of the the Luxco Group, Aurelius and CapRe associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel designated by the DIP Agent and counsel for each of the DIP Lenders and additional local counsel in each applicable local jurisdictions for each of the DIP Agent and each of the DIP Lenders), (b) any and all out-of-pocket expenses of the DIP Agent and of the DIP Lenders (including the fees, disbursements and other charges of counsel designated by the DIP Agent and the DIP Lenders and appropriate local counsel in applicable local jurisdictions as described in clause (a) above) in connection with the enforcement of the DIP Loan Documents and (c) all reasonable and documented out-of-pocket expenses associated with collateral monitoring, collateral reviews and for maintenance of liens on the Collateral or any part thereof and documented fees and out-of-pocket expenses of counsel and customary advisors and professionals engaged by the DIP Agent; provided, that the outside expenses of the DIP Agent and the DIP Lenders, in the case of clause (b), shall be limited to the charges |

| | of (i) one outside primary counsel and one local counsel in each relevant jurisdiction for the DIP Lenders, (ii) one outside primary counsel and one local counsel in each relevant jurisdiction for the DIP Agent, and (iii) one or more conflicts counsel if one or more conflicts of interest arise. |
|---|---|
| | The DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; _provided_, that the Loan Parties shall have no obligation to indemnify any indemnified person against any such loss, liability cost or expense to the extent they are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of such indemnified party. |
| | The indemnity obligations contained herein shall not apply to losses, claims, damages, liabilities and reasonable and documented costs and expenses that the DIP Lenders may incur in their capacity as creditors in the Bankruptcy Cases or directly as holders of the Luxco Notes (as defined in the PSA) or the CapCo Notes (as defined in the PSA). In addition, in no event will any party hereto be liable for consequential, special, exemplary, punitive or indirect damages (including any loss of profits, business or anticipated savings), whether, directly or indirectly. |
| Governing Law: | The DIP Loan Documents will be, governed by the Bankruptcy Code, as applicable, and the laws of the State of New York. |

16

*(Execution Version)*

<u>Annex I</u>

<u>Interest and Certain Fees</u>

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans herein referred to as "***ABR Loans***") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans herein referred to as "***Eurodollar Loans***") plus the Applicable Margin.

As used herein:

"***Alternate Base Rate***" or "***ABR***" means the greatest of (a) the prime rate of interest announced from time to time by the DIP Agent (which is not necessarily the lowest rate charged to any customer), changing when and as said prime rate changes (the "***Prime Rate***"), (b) the federal funds effective rate from time to time <u>plus</u> 0.50% and (c) the Adjusted LIBO Rate for a one month interest period on such day plus 1.00%.

"***Adjusted LIBO Rate***" means the greater of (a) rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one month appearing on Reuters Page LIBOR01 (or on any other service providing comparable rate quotations) at approximately 11:00 a.m., London time, two business days prior to the first day of the applicable interest period and (b) 1.00% per annum.

"***Applicable Margin***" means, at the option of the Borrower (a) 6.00% in the case of ABR Loans and 7.00% in the case of Eurodollar Loans, if all interest is payable in cash or (b) 7.00% in the case of ABR Loans and 8.00% in the case of Eurodollar Loans, if such interest is payable in kind ("***PIK Interest***"). |
| Interest Payment Dates: | In the case of ABR Loans, interest shall be payable in cash in arrears on the first day of each month, upon any prepayment due to acceleration and at final maturity; <u>provided,</u> that PIK Interest shall be payable in kind by being capitalized to the principal amount of such DIP Loan (and thereafter shall constitute principal of such DIP Loan).

In the case of Eurodollar Loans, interest shall be payable in cash in arrears on the last day of each interest period, upon any prepayment and at final maturity; <u>provided,</u> that PIK Interest shall be payable in kind by being capitalized to the principal amount of such DIP Loan (and thereafter shall constitute principal of such DIP Loan). |
| Original Issue Discount: | The DIP Loans, when drawn, will be issued at a price of 97.75% of the principal amount thereof. |
| Commitment Fee: | A non-refundable commitment fee equal to 0.50% of the aggregate amount of the DIP Credit Facility, accrued and earned on the date hereof and payable on the date of the Bankruptcy Court's entry of the DIP Order. |

Agent Fees:                    Such additional annual administrative fees payable to the DIP Agent as are specified in the fee letter which shall not exceed $125,000 *per annum*, among the DIP Agent and the Borrower.

Default Rate:                  After any Event of Default, (a) the applicable interest rate for all DIP Loans will be increased to, and overdue interest, fees and other amounts (other than principal) shall bear interest at 2.00% per annum above the rate applicable to ABR Loans, and (b) principal shall bear interest at 2.00% above the rate otherwise applicable.

Rate and Fee Basis:            All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans) for actual days elapsed.

*(Execution Version)*

<u>Annex II</u>

<u>Plan Support Agreement</u>

<u>See Attached.</u>

**Exhibit B**
**Amended Charter for Reorganized Holdings**

**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**NII HOLDINGS, INC.**

**(Amended and Restated as of            , 2015)**

NII Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify:

1. The name of the corporation is NII Holdings, Inc. (the "Corporation"). The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on October 18, 2000 under the name of NII Acquisition Company. A Certificate of Merger was filed with the Secretary of State on November 28, 2000. A Certificate of Amendment was filed with the Secretary of State on December 21, 2001. A Restated Certificate of Incorporation was filed with the Secretary of State on November 12, 2002. Certificates of Amendment were filed with the Secretary of State on May 5, 2004 and on May 4, 2006. An Amended and Restated Certificate of Incorporation was filed with the Secretary of State on May 22, 2013.

2. The Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), which both restates and further amends the provisions of the Corporation's Amended and Restated Certificate of Incorporation as hereinafter set forth, was duly adopted in accordance with the provisions of Sections 245 and 303 of the Delaware General Corporation Law on            , 2015.

3. The text of the Amended and Restated Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

FIRST:  The name of the Corporation is NII Holdings, Inc.

SECOND:  The address of its registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

THIRD:  The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

FOURTH:  Authorized Shares.

The total authorized number of shares of all classes of capital stock which the Corporation has authority to issue is one hundred fifty million (150,000,000) shares, divided into two classes as follows:

One hundred forty million (140,000,000) shares of common stock, par value $0.001 per share (the "Common Stock"); and Ten million (10,000,000) shares of preferred stock, par value $0.001 per share (the "Preferred Stock").

A. Common Stock.

1. Voting Rights. Subject to any voting rights granted to Preferred Stock outstanding at the time, each share of Common Stock shall be entitled to one (1) vote per share, in person or by proxy, on all matters submitted to a vote of the stockholders of the Corporation on which the holders of the Common Stock are entitled to vote. Except as otherwise required in this Certificate of Incorporation, the Corporation's Bylaws or by applicable law, the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation generally (or if any holders of shares of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with such holders of shares of Preferred Stock, if any).

2. Dividends and Distributions. Subject to the preferences applicable to any Preferred Stock outstanding at any time, if any, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Corporation's Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

3. Liquidation. If the Corporation shall be liquidated (either partial or complete), dissolved or wound up, whether voluntarily or involuntarily, the holders of the Common Stock shall be entitled to share ratably in the net assets of the Corporation remaining after payment of all liquidation preferences, if any, applicable to any outstanding Preferred Stock.

B. Undesignated Preferred Stock.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock as preferred stock of one or more series and in connection with the creation of any such series to fix by the resolution or resolutions providing for the issue of shares thereof the designation, voting powers, preferences, and relative, participating, optional, or other special rights of such series, and the qualifications, limitations, or restrictions thereof. Any of the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of any such series of stock may be made dependent upon facts ascertainable outside the resolution or resolutions providing for the issue of such stock adopted by the Board of Directors, provided that the manner in which such facts shall operate upon the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of such series of stock is clearly and expressly set forth in the resolution or resolutions providing for the issue of such series adopted by the Board of Directors. Such authority of the Board of Directors with respect to each such series shall include, but not be limited to, the determination of the following:

(1) the distinctive designation of, and the number of shares comprising, such series, which number may be increased (except where otherwise provided by the Board of Directors in creating such series) or decreased (but not below the number of shares thereof then outstanding) from time to time by like action of the Board of Directors;

(2) the dividend rate or amount for such series, the conditions and dates upon which such dividends shall be payable, the relation which such dividends shall bear to the dividends payable on any other class or classes or any other series of any class or classes of stock, and whether such dividends shall be cumulative, and if so, from which date or dates for such series;

(3) whether or not the shares of such series shall be subject to redemption by the Corporation and the times, prices and other terms and conditions of such redemption;

(4) whether or not the shares of such series shall be subject to the operation of a sinking fund or purchase fund to be applied to the redemption or purchase of such shares and if such a fund be established, the amount thereof and the terms and provisions relative to the application thereof;

(5) whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes, or of any other series of any class or classes, of stock of the Corporation and if provision be made for conversion or exchange, the times, prices, rates, adjustments, and other terms and conditions of such conversion or exchange;

(6) whether or not the shares of such series shall have voting rights, in addition to the voting rights provided by law, and if they are to have such additional voting rights, the extent thereof;

(7) the rights of the shares of such series in the event of any liquidation, dissolution, or winding up of the Corporation or upon any distribution of its assets; and

(8) any other powers, preferences, and relative, participating, optional, or other special rights of the shares of such series, and the qualifications, limitations, or restrictions thereof, to the full extent now or hereafter permitted by law and not inconsistent with the provisions hereof.

C.    Non-Voting Securities.

The Corporation shall not issue non-voting equity securities; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity securities is included in this Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

FIFTH:

A. The number of directors constituting the Board of Directors shall be fixed from time to time by, or in the manner provided in, the Bylaws of the Corporation, but in no case may the number of directors be less than three.

B. Until the 2017 Annual Meeting, the directors shall be divided into two classes, designated as Class I and Class II. The initial term for the one director in Class I shall expire at the annual meeting of stockholders to be held in 2016 and thereafter at the annual meeting of stockholders to be held in 2017. The term for all of the other directors who shall be in Class II shall expire at the annual meeting of stockholders to be held in 2017. At the 2017 Annual Meeting of Stockholders, and each annual meeting of stockholders thereafter, each director shall be elected for a term expiring at the next annual meeting of stockholders and until such director's successor is elected and qualified, or such director's earlier resignation or removal. So long as the Board of Directors is divided into classes, any increase or decrease in the number of directors constituting the Board shall be apportioned among the classes so as to maintain at least one director in each class. Any director elected or appointed to fill a vacancy shall hold office for the remaining term of the class to which such director is assigned. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director. The Bylaws may contain any provision regarding classification of the Corporation's directors not inconsistent with the terms hereof. Until the 2017 Annual Meeting of Stockholders, the affirmative vote of holders of no less than seventy-five percent (75%) of the voting power of the outstanding Voting Stock, voting together as a single class, shall be required to alter, amend or repeal this Clause B.

SIXTH:

A. The Board of Directors is authorized to make, alter, amend or repeal the Bylaws of the Corporation (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and Article IX of the Bylaws (as such provisions are designated in the Bylaws in effect on the date hereof) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections). The stockholders acting by the affirmative vote of the holders of a majority of the voting power of the outstanding Voting Stock, voting together as a single class, are also authorized to make, alter, amend or repeal the Bylaws of the Corporation.

B. The Corporation shall not be governed by or subject to Section 203 of the Delaware General Corporation Law.

C. Subject to the rights of the holders of any series of Preferred Stock:

(1) any action required or permitted to be taken by the stockholders of the Company may be taken at a duly called annual or special meeting of stockholders of the Company or without a meeting by means of any consent in writing of such stockholders; and

(2) special meetings of stockholders of the Company may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the Common Stock of the Corporation issued and outstanding and entitled to vote, where beneficial ownership for these purposes may be established by any method prescribed by Rule 14a-8(b)(2) under the Securities Exchange Act of 1934, as amended, or any successor provision (without giving effect to any minimum threshold or duration of ownership limitation therein).

At any annual meeting or special meeting of stockholders of the Company, only such business will be conducted or considered as has been brought before such meeting in the manner provided in the Bylaws of the Company.  For the purposes of this Certificate of Incorporation, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

<u>SEVENTH</u>:

A. To the fullest extent permitted by the Delaware General Corporation Law as it now exists and as it may hereafter be amended, no director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of any fiduciary or other duty as a director, provided that this provision shall not eliminate or limit the liability of a director (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the Delaware General Corporation Law, or (4) for any transaction from which the director derived an improper personal benefit.

B. The rights and authority conferred in this Article SEVENTH shall not be exclusive of any other right that any person may otherwise have or hereafter acquire.

C. Neither the amendment, alteration or repeal of this Article SEVENTH, nor the adoption of any provision inconsistent with this Article SEVENTH, shall adversely affect any right or protection of a director of the Corporation existing at the time of such amendment, alteration or repeal with respect to acts or omissions occurring prior to such amendment, alteration, repeal or adoption.

D. Any person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the Delaware General Corporation Law, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any

such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Clause D shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Clause D.

      IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation this     day of          , 2015.

NII HOLDINGS, INC.

By: _____

Name: Gary D. Begeman

Office: Executive Vice President, General Counsel

**<u>Exhibit C</u>**
**Amended Bylaws for Reorganized Holdings**

**NII HOLDINGS, INC.**
**FIFTH AMENDED AND RESTATED BYLAWS**

**ARTICLE I**
**OFFICES**

Section 1.1 <u>Registered Office</u>. The registered office of NII Holdings, Inc. (the "Corporation") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.2 <u>Offices</u>. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 2.1 <u>Time and Place</u>.

(a) All meetings of the stockholders for shall be held at such time and place (if any) as designated by the Board of Directors, within or without the State of Delaware, and stated in the notice of the meeting provided in accordance with Section 2.4 hereof.  Notwithstanding the foregoing, the Board may, in its sole discretion, determine that a meeting of stockholders will not be held at any place, but may instead be held by means of remote communications pursuant to Section 8.6.  The Board may reschedule to an earlier or later date any previously scheduled annual or special meeting of stockholders (subject, in the case of a special meeting called pursuant to Section 2.3, to the requirements of therein).

(b) Except as otherwise set forth in these bylaws, every reference in these bylaws to a majority or other proportion of the entire capital stock of the Corporation necessary to take a particular action, refers to a majority or other proportion of the votes entitled to be cast with respect to a particular matter or action by all holders of the issued and outstanding capital stock of the Corporation that are entitled to vote on such matter or action.

Section 2.2 <u>Annual Meetings</u>. Annual meetings of stockholders shall be held in each year on such date (which date, other than for the 2016 annual meeting, shall be no later than 13 months after the date of the last annual meeting of stockholders) and at such time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which stockholders shall elect directors in accordance with Section 3.4 hereof, and transact such other business as may properly be brought before the meeting in accordance with Section 2.8 hereof.

Section 2.3 <u>Special Meetings</u>.

(a) Special meetings of the stockholders, unless otherwise prescribed by statute or by the Corporation's Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in

writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the common stock of the Corporation issued and outstanding and entitled to vote as of the record date (the "Requisite Percentage") referred to in this <u>Section 2.3</u>, subject to the following:  In order for a special meeting requested by one or more stockholders (a "Stockholder Requested Special Meeting") to be called by the secretary, one or more written requests for a special meeting (each a "Special Meeting Request," and collectively, the "Special Meeting Requests") stating the purpose of the special meeting and the matters proposed to be acted upon thereat must be signed and dated by the Requisite Percentage of holders of common stock of the Corporation (or their duly authorized agents), must be delivered to the secretary at the principal executive offices of the Corporation and must set forth: (i) in the case of any director nominations proposed to be presented at such Stockholder Requested Special Meeting, the information required by Section 3.3(d); (ii) in the case of any matter (other than a director nomination) proposed to be conducted at such Stockholder Requested Special Meeting, the information required by Section 2.8(b); and (iii) an agreement by the requesting stockholder(s) to notify the secretary immediately in the case of any disposition prior to the record date for the Stockholder Requested Special Meeting of shares of Voting Stock owned of record and an acknowledgement that any such disposition shall be deemed a revocation of such Special Meeting Request to the extent of such disposition such that the number of shares disposed of shall not be included in determining whether the Requisite Percentage has been reached (except that for purposes of this Section 2.3, the term "Stockholder Requested Special Meeting" will be substituted for the term "annual meeting" in all places where it appears in Section 2.8(b)).

(b) In determining whether a special meeting of stockholders has been requested by the holders of shares representing in the aggregate at least the Requisite Percentage, multiple Special Meeting Requests delivered to the secretary will be considered together only if each such Special Meeting Request (A) identifies substantially the same purpose or purposes of the special meeting and substantially the same matters proposed to be acted on at the special meeting (in each case as determined in good faith by the Board), and (B) has been dated and delivered to the secretary within 60 days of the earliest dated of such Special Meeting Requests.  Any requesting stockholder may revoke his, her or its Special Meeting Request at any time by written revocation delivered to the secretary at the principal executive offices of the Corporation; *provided*, *however*, that if following such revocation (or any deemed revocation pursuant to Section 2.3(a)(iii) above), the unrevoked valid Special Meeting Requests represent in the aggregate less than the Requisite Percentage there shall be no requirement to hold a special meeting.  The first date on which unrevoked valid Special Meeting Requests constituting not less than the Requisite Percentage shall have been delivered to the secretary is referred to herein as the "Request Receipt Date."

(c) A Special Meeting Request shall not be valid: (i) if the Special Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; and (ii) an identical or substantially similar item as determined in good faith by the Board is included in the Corporation's notice as an item of business to be brought before a stockholder meeting that has been called but not yet held or that is called for a date within 75 days after the Request Receipt Date.

(d) The Corporation will provide the requesting stockholder(s) with notice of the record date(s) for the determination of stockholders (i) entitled to submit a Special Meeting Request and (ii) entitled to vote at the Stockholder Requested Special Meeting.

(e) A Stockholder Requested Special Meeting shall be held at such date and time as may be fixed by the Board; *provided*, *however*, that the Stockholder Requested Special Meeting shall be called for a date not less than 75 calendar days after the Request Receipt Date.

(f)  No requesting stockholder will be entitled to have any matter proposed to be presented at a Stockholder Requested Meeting in any proxy statement or form of proxy that the Corporation may use in connection therewith solely as a result of such stockholder's compliance with the foregoing provisions of this Section 2.3.

(g) Business transacted at any Stockholder Requested Special Meeting shall be limited to (i) the purpose(s) stated in the valid Special Meeting Request(s) received from the Requisite Percentage of stockholders; and (ii) any additional matters that the Board determines to include in the Corporation's notice of the meeting. If none of the stockholders (owning beneficially or of record) who submitted the Special Meeting Request appears in person or by proxy to present the matters to be presented for consideration that were specified in the Stockholder Meeting Request, the Corporation need not present such matters for a vote at such meeting, notwithstanding that proxies in respect of such matter may have been solicited, obtained or delivered.

Section 2.4 Notice of Meetings. Notice of any annual or special meeting of the stockholders, stating the place (if any), date and hour of the meeting, as well as the record date for determining stockholders entitled to vote at the meeting (if such record date is different from the record date for determining stockholders entitled to notice of the meeting), and the means of remote communication (if any) by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to notice of such meeting not less than ten nor more than sixty days before the date of such meeting. Notice of special meetings of stockholders shall also include the purpose or purposes for which the meeting is called.

Section 2.5 Quorum. The holders of shares representing a majority of votes that may be cast by the entire capital stock of the Corporation issued and outstanding and entitled to vote thereat with respect to a particular matter, present in person or represented by proxy, shall constitute a quorum at all meetings with respect to each matter to be voted upon at a meeting of the stockholders for the transaction of business except as otherwise provided by the Delaware General Corporation Law (the "DGCL") or by the Certificate of Incorporation. If, however, such quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.

Section 2.6 Voting. When a quorum is present at any meeting of stockholders, the affirmative vote of a majority of the votes properly cast on the matter (excluding any abstentions or broker non-votes) will be the act of the stockholders with respect to all matters other than the election of directors which will be elected in accordance with Section 3.4, or as otherwise provided in these bylaws, the Certificate of Incorporation, a Preferred Stock Designation, or by the DGCL.

Section 2.7 Conduct of Meetings. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at such meeting by the

person presiding over the meeting. The Board of Directors may adopt by resolution such rules or regulations for the conduct of meetings of stockholders as it shall deem appropriate; provided that such rules or regulations shall be consistent with the Certificate of Incorporation and these bylaws. Unless otherwise specified in such rules or regulations, the chairman of the Board shall serve as the chair of any meeting of stockholders. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chair of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting, to stockholders (owning beneficially or of record) of the Corporation, their duly authorized and constituted proxies or such other persons as the chair shall permit; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on the time allotted to questions or comments by participants and (vi) the adjournment of the meeting by the chair. Unless, and to the extent determined by the Board of Directors or the chair of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

Section 2.8 Submission of Business for Consideration at Meetings of Stockholders.

(a) At an annual meeting of stockholders, only such business (other than the nomination of candidates for election as directors of the Corporation, which is governed by Section 3.3 hereof) will be conducted or considered as is properly brought before the annual meeting. To be properly brought before an annual meeting, business must be (i) specified in the notice of the annual meeting (or any supplement thereto) given by or at the direction of the Board of Directors in accordance with Section 2.4 hereof, (ii) otherwise properly brought before the annual meeting by the presiding officer or by or at the direction of a majority of the entire Board, or (iii) otherwise properly requested to be brought before the annual meeting by a stockholder of the Corporation in accordance with this Section 2.8. For purposes of these bylaws, "entire Board" refers to the total number of directors that the Corporation would have if there were no vacancies.

(b) For business to be properly requested by a stockholder to be brought before an annual meeting, (i) the stockholder must be the holder, beneficially or of record, of shares, (ii) the stockholder must be entitled to vote at such meeting (either directly or through a proxy or beneficial interest), and (iii) the stockholder must have given timely notice thereof in proper written form to the secretary of the Corporation. Except as otherwise provided by law, to be timely, a stockholder's notice must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 calendar days prior to the anniversary of the preceding year's annual meeting of stockholders; *provided*, *however*, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made.  In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. To be in proper written form, a stockholder's notice to the secretary of the Corporation must set forth (A) as to each matter the stockholder

proposes to bring before the annual meeting: (1) a description in reasonable detail of the business desired to be brought before the annual meeting; and (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, if the business includes a proposal to amend these bylaws or the Certificate of Incorporation, the language of the proposed amendment); and (B) as to each stockholder giving the notice and any Stockholder Associate (as defined below): (1) the name and address of the stockholder and the name and address of any Stockholder Associate; (2) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to present the business stated in the stockholder's notice; (3) the class, series and number of any securities of the Corporation that are owned of record or beneficially by any of these persons as of the date of the stockholder's notice; (4) a description of any material interests of any of these persons in the business proposed and of all agreements, arrangements and understandings between these persons and any other person (including their names) in connection with the proposal of the business by the stockholder; (5) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which any of these persons has a right to vote any shares of any securities of the Corporation; (6) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (7) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (8) a representation that after the date of the stockholder's notice and until the date of the annual meeting, each of these persons will provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (3) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understandings described in response to subclause (6) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying those agreements, arrangements or understandings; and (C) a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (1) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal; and/or (2) otherwise to solicit proxies from stockholders in support of the proposal.

For purposes of this Section 2.8 and Section 3.3 hereof, (x) "public disclosure" means disclosure in a press release reported by the Dow Jones News Service, Associated Press, Reuters, Bloomberg or comparable national news service or in a document filed by the Corporation with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") or furnished by the Corporation to its stockholders and (y) "Stockholder Associate" of any stockholder means (1) any person controlling, directly or indirectly, or acting in concert with, the stockholder; and (2) any beneficial owner of securities of the Corporation owned of record or beneficially by the stockholder. Notwithstanding the foregoing provisions of this Section 2.8, in order to include information with respect to a stockholder proposal in the Corporation's proxy statement and form of proxy for a meeting of stockholders, a stockholder must provide notice as required by, and otherwise comply with, all of the applicable requirements of Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

Nothing in this Section 2.8 will be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

(c) At a special meeting of stockholders, only such business may be conducted or considered as is properly brought before the meeting. To be properly brought before a special meeting (subject to Section 2.3(g) in the case of a Stockholder Requested Special Meeting), business must be (i) specified in the notice of the meeting (or any supplement thereto) given in accordance with these bylaws or (ii) otherwise properly brought before the meeting in accordance with these bylaws, by the presiding officer of the meeting or by or at the direction of a majority of the entire Board.

(d) The determination of whether any business sought to be brought before any annual or special meeting of stockholders is properly brought before such meeting in accordance with this Section 2.8 will be made by the presiding officer of such meeting.

Section 2.9 Action Without a Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the stockholders may be taken without a meeting, if stockholders having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted consent in writing or by electronic transmission, provided that prompt notice must be given to all stockholders of the taking of corporate action without a meeting by less than unanimous written consent.

## ARTICLE III
## DIRECTORS

Section 3.1 Number and Qualification.  The Board of Directors shall consist of at least three members, shall initially consist of seven members, and may be fixed from time to time for any period on or after the 2017 annual meeting of stockholders by (i) resolution of the Board of Directors at no more than nine members or (ii) stockholders holding a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director. Directors need not be stockholders.

Section 3.2 Election and Term.  Directors shall be elected for terms as set forth in the Certificate of Incorporation and in the manner provided in Section 3.4 hereof at the annual meeting of the stockholders.

Section 3.3 Nominations.

(a) Only persons who are nominated in accordance with the provisions of this Section 3.3 will be eligible for election as directors at a meeting of stockholders.

(b) Nominations of persons for election as directors may be made only at a meeting of stockholders (i) by or at the direction of the Board of Directors or a committee thereof or (ii) by any stockholder, beneficially or of record, at the time of giving the notice provided for in this Section 3.3, who is entitled to

vote for the election of directors at such annual meeting, and who makes the nomination pursuant to timely notice in proper written form to the secretary of the Corporation in compliance with the procedures set forth in this Section 3.3.

(c) Except as otherwise provided by law, to be timely, a stockholder's notice with respect to nominations of persons for election as directors of the Corporation must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 days prior to the anniversary of the date for the preceding year's annual meeting of stockholders; provided, however, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made.  In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above.

(d) To be in proper written form, a stockholder's notice pursuant to this Section 3.3 must set forth or include:

(i) as to each person who is not an incumbent director of the Corporation whom the stockholder proposes to nominate for election as a director, (A) the name, age, business address and residence address of such person; (B) the principal occupation or employment of such person; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by such person; (D) the date or dates the securities were acquired; (E) any other information relating to such person that is required to be disclosed in solicitation for proxies or election of directors pursuant to Regulation 14A under the Exchange Act (or any comparable successor rule or regulation); and (F) a representation that such person meets the qualifications to serve as a director of the Corporation.

(ii) as to the stockholder giving the notice and any Stockholder Associate, (A) the name and address of the stockholder and the name and address of any Stockholder Associate; (B) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to nominate the person or persons specified in the stockholder's notice; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by each of these persons as of the date of the stockholder's notice; (D) a description of any material relationships, including legal, financial and/or compensatory, between the stockholder giving the notice and any Stockholder Associate, on one hand, and the proposed nominee(s), on the other hand; (E) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (F) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (G) a representation that after the date of the stockholder's notice and until the date of the annual meeting each of these persons will

provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (C) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understanding described in response to subclause (F) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying these agreements, arrangements or understanding;

(iii)  a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (A) to deliver a proxy statement and/or form of proxy to stockholders; and/or (B) otherwise to solicit proxies from stockholders in support of the proposed nominee;

(iv) the director questionnaire (which is available from the secretary of the Corporation upon request) that is distributed to all directors of the Corporation; and

(v) a written consent of each proposed nominee to serve as a director of the Corporation, if elected.

(e) The determination of whether any nomination sought to be brought before any annual meeting of the stockholders is properly brought before such meeting in accordance with this Section 3.3 will be made by the presiding officer of such meeting.

Section 3.4 Majority Voting in Director Elections. Each director to be elected by stockholders shall be elected as such by the vote of the majority of the votes cast by stockholders for that director at a meeting for the election of directors at which a quorum is present, except that if the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of a plurality of the shares represented in person or by proxy at any such meeting. For purposes of this Section 3.4, a "majority of votes cast" shall mean that the number of shares voted "for" a director's election exceeds the number of votes cast "against" that director's election.

Section 3.5 Vacancies. In the case of any vacancy on the Board of Directors, including a vacancy created by an increase in the number of directors, the vacancy may be filled by the Board of Directors, acting by a majority of the remaining directors then in office, although less than a quorum, or by a sole remaining director or by stockholders acting by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. Any director appointed to fill a vacancy shall be appointed until the next succeeding annual meeting of stockholders (or for the remainder of the term for the applicable class of directors for so long as the Board is divided into classes) and thereafter until such director's successor is elected and qualified or such director earlier resigns or is removed.

Section 3.6 Removal. Subject to the rights of holders of preferred stock (if any) with respect to any directors elected by the holders of such preferred stock, any director, or the entire Board of Directors, may be removed from office at any time, with or without cause (except that so long as the Board of Directors is divided into classes, directors may be removed only for cause), by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote

generally in the election of directors, voting together as a single class.

Section 3.7 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by the DGCL or by the Certificate of Incorporation or by these bylaws directed or required to be exercised or done by the stockholders. The Board of Directors may adopt such special rules and regulations for the conduct of its meetings and the management of the affairs of the Corporation as the Board of Directors may deem proper, not inconsistent with law or these bylaws.

Section 3.8 Regular Meetings. Regular meetings of the Board of Directors may be held without notice at such time, on such date and at such place (if any), within or without the State of Delaware, as shall from time to time be determined by the Board of Directors.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be called by the chairman of the Board, the chief executive officer, or by the secretary upon the written request of two directors. Notice of the place (if any), date and time of each such special meeting shall be given to each director on one day's notice to each director, either personally, by mail, by telegram or by electronic transmission.

Section 3.10 Quorum. At all meetings of the Board of Directors, a majority of the directors then in office shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by the DGCL or by the Certificate of Incorporation. If a quorum is not present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time without notice other than announcement at the meeting, until a quorum is present.

Section 3.11 Action Without Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings, or, if the consent action is taken by electronic transmission, paper reproductions of such electronic transmission or transmissions, are filed with the minutes or proceedings of the Board or committee.

Section 3.12 Participation in Meetings by Remote Communication. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting in accordance with Section 8.6.

Section 3.13 Committees. There shall be such committees of the Board of Directors as the Board of Directors may, by resolution passed by a majority of the whole Board, designate. Each committee shall consist of one or more directors of the Corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. Any such committee shall have such power and authority as may be conferred by a

resolution of the board of directors; provided, however, that no such committee shall have the power and authority of the board of directors with respect to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, amending the bylaws of the Corporation, or declaring a dividend or authorizing the issuance of stock (other than in connection with a stock option or other management equity incentive plan, which plan has been approved by the Corporation's board of directors). Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

Section 3.14 Committee Meetings, Procedures and Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

## ARTICLE IV
## NOTICES

Section 4.1 Notice. Whenever, under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail addressed to such director or stockholder at his address as it appears on the records of the Corporation with postage thereon prepaid and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors and stockholders may also be given by facsimile, by telephone or by a form of electronic transmission consented to by the director or stockholder to whom the notice is given.

Section 4.2 Waiver. Whenever any notice is required to be given under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to the notice, in each case, whether before or after the time of the event for which the notice is given, shall be deemed equivalent to such notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE V
## OFFICERS

Section 5.1 Generally. The officer positions in the Corporation shall consist of such as may from time to time be designated by the Board of Directors and the officers to fill same shall be chosen by the Board of Directors. Any number of offices may be held by the same person, unless the Certificate of Incorporation or these bylaws otherwise provide.

Section 5.2 Compensation. The compensation of all officers and agents of the Corporation that are also directors of the Corporation shall be fixed by the Board of Directors. The Board of Directors may delegate the power to fix the compensation of all other officers and agents of the Corporation to an officer of the Corporation.

Section 5.3 <u>Succession</u>. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

Section 5.4 <u>Authority and Duties</u>. The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by the Board of Directors in a resolution which is not inconsistent with these bylaws, regardless of whether such authority and duties are customarily incident to such office.

## ARTICLE VI
## CAPITAL STOCK

Section 6.1 <u>Certificates</u>. The shares of capital stock of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board of Directors, to the extent required by the DGCL, every holder of shares of stock in the Corporation represented by certificates, and upon request every holder of uncertificated shares, shall be entitled to have a certificate or certificates, signed by or in the name of the Corporation by the president or a vice-president and the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder in the Corporation. Any or all of the signatures on the certificates may be facsimiles.

Section 6.2 <u>Transfer</u>.

(a) Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books or, if such shares may be represented in uncertificated form pursuant to a resolution adopted by the Board of Directors, record such transaction upon its books as an issuance of uncertificated shares to the person entitled thereto, unless such person requests a certificate or certificates, in which case such person shall be entitled to have a certificate or certificates in accordance with Section 6.1.

(b)  Transfers of shares of stock represented by certificates shall be made upon the books of the Corporation only by the record holder of such stock, in person or by duly authorized attorney, upon the surrender of the certificate or certificates for the same number of shares, properly endorsed. Transfers of uncertificated shares of stock shall be made on the books of the Corporation upon receipt of proper transfer instructions from the registered owner of the uncertificated shares, an instruction from an approved source duly authorized by such owner or from an attorney lawfully constituted in writing. The Corporation is entitled for all purposes to treat the record holder as the owner of such stock, notwithstanding any knowledge of the Corporation to the contrary. The Board of Directors shall have the power to make all such rules and regulations, not inconsistent with the Certificate of Incorporation, these bylaws and the DGCL, as the Board

of Directors may deem appropriate concerning the issue, transfer and registration of certificates for stock of the Corporation. The Board of Directors may appoint one or more transfer agents or registrars of transfers or both, and may require all stock certificates to bear the signature of either or both.

## ARTICLE VII
### INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 7.1 Right to Indemnification. Each person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the DGCL, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not so serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Section 7.1 shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any such proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such person is not entitled to be so indemnified under this Section 7.1.

Section 7.2 Non-Exclusivity of Rights. The rights to indemnification and advance payment of expenses provided by Section 7.1 hereof shall not be deemed exclusive of any other rights to which those seeking indemnification and advance payment of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

Section 7.3 Nature of Rights. The indemnification and advance payment of expenses and rights thereto provided by, or granted pursuant to, Section 7.1 hereof shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee, partner or

agent and shall inure to the benefit of the personal representatives, heirs, executors and administrators of such person.

Section 7.4 Insurance. The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, against any liability asserted against such person or incurred by such person in any such capacity, or arising out of such person's status as such, and related expenses, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the DGCL.

**ARTICLE VIII**
**GENERAL PROVISIONS**

Section 8.1 Dividends. Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

Section 8.2 Reserves. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interests of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 8.3 Checks. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 8.4 Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 8.5 Corporate Seal. The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise..

Section 8.6 Meeting Attendance via Remote Communication Equipment.

(a)    Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)        be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)        Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 8.7 Beneficial Ownership. Notwithstanding anything to the contrary in the Certificate of Incorporation or these bylaws to the extent permitted by law, any action required or permitted to be taken by the stockholders of the Company may be taken by any stockholder of record or by any beneficial owner of any Voting Stock for any period of time that has verified its holdings in accordance with any method prescribed by Rule 14a-8(b)(2) under the Exchange Act (without giving effect to any minimum threshold or duration of ownership limitation therein). For the purposes of these bylaws, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

**ARTICLE IX**
**AMENDMENTS**

These bylaws may be altered, amended or repealed or new bylaws may be adopted by the Board of Directors (other than Sections (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and this Article IX of these bylaws (as such provisions are designated in the Bylaws in effect as of ____, 2015) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections) or by stockholders provided that any amendment proposed to be acted upon is approved by the affirmative vote of the holders of at least a majority of the common stock issued and outstanding and entitled to vote.

*Effective as of              , 2015*

## EXHIBIT 2

## FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT to that certain Plan Support Agreement entered into as of March 5, 2015 by and among NII Holdings, Inc., NII Capital Corp., NII Funding Corp., NII Aviation, Inc., Nextel International (Services), Ltd., NII Global Holdings, Inc., NII International Holdings S.à r.l., NII International Services S.à r.l, NII International Telecom S.C.A., NII Mercosur, LLC, McCaw International (Brazil), LLC, Airfone Holdings, LLC, NIU Holdings, LLC, the Consenting Noteholders (in their capacities as parties thereto), and the Committee and attached hereto as Exhibit A (as amended, modified, or amended and restated from time to time in accordance with its terms, the "Plan Support Agreement"), is hereby executed and delivered by [●] (the "Joining Party") as of _____ [●], ___.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Plan Support Agreement.

Agreement to be Bound.   The Joining Party hereby agrees, on a several basis, to be bound by the Plan Support Agreement in accordance with its terms.   The Joining Party shall hereafter be deemed to be a Party, and to the extent the Joining Party is a transferee of a Consenting Noteholder, such Joining Party shall hereafter be deemed to be a Consenting Noteholder, for any and all purposes under the Plan Support Agreement.   For the avoidance of doubt, to the extent not already a Party to the Agreement, the Joining Party shall only become a Party (or Consenting Noteholder, to the extent applicable) to the Agreement with respect to the Claims that are the subject of the Transfer.   In the event of any inconsistency between this Joinder Agreement and the Plan Support Agreement, the Plan Support Agreement shall control in all respects.

Representations and Warranties.   With respect to the aggregate principal amount and type of Claims set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Parties set forth in Section 5 of the Plan Support Agreement to each other Party to the Plan Support Agreement.   For the avoidance of doubt, only the aggregate principal amount of the Claims that are the subject of the Transfer must be stated on the signature page of this Joinder Agreement.

Governing Law.   This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of laws principles thereof that would require the application of the law of any other jurisdiction.

[Signature pages follow.]

Date executed:    [_____]

[NAME OF TRANSFEREE]


By:    _____
Name:
Title:

Address:    _____

_____

_____
Attn.:    _____
Tel.:    _____
Fax:    _____
Email:    _____

Aggregate principal amount of Claims beneficially owned or managed on behalf of funds or accounts that beneficially own such Claims:

Capco 2016 Notes Claims:

$_____


Capco 2019 Notes Claims:

$_____


Capco 2021 Notes Claims:

$_____


Luxco 7.875% Notes Claims:

$_____

Luxco 11.375% Notes Claims:

$_____


[Signature Page to Joinder to Plan Support Agreement]

**<u>Exhibit A</u>**

**Plan Support Agreement**

# **EXHIBIT B**

**Winn Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
NII Holdings, Inc., et al.,[1]                              :    Case No. 14-12611 (SCC)
                                                            :
                                    Debtors.                :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

## DECLARATION OF SCOTT W. WINN, INDEPENDENT MANAGER FOR NII INTERNATIONAL TELECOM S.C.A., IN SUPPORT OF THE MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING THEM TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT

I, Scott Winn, being duly sworn, state the following under penalty of perjury:

1.      Pursuant to Court order dated December 11, 2014, I was appointed a Class C Manager (the "Independent Manager") to the board of managers (the "Board of Managers") of Debtor NII International Holdings S.à r.l. ("International Holdings"), sole manager of Debtor NII International Telecom S.C.A. ("International Telecom", and with International Holdings, "LuxCo").  I was delegated the power to undertake the "Settlement Matters" as defined in the So-Ordered Stipulation Regarding the Appointment and Scope of the Independent Manager for

---

[1]      The Debtors are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

NII International Telecom S.C.A. [Docket No. 293] (as amended, the "So-Ordered Stipulation").[2]

2.      I am a senior managing director at Zolfo Cooper, with more than 25 years of professional experience in finance, operations, and strategy, specializing in distressed and underperforming companies, with expertise covering a wide array of industries, including energy, airline, restaurant, health care, retail, telecommunications, financial services, manufacturing, and other service sectors.    Throughout my career, I have worked on high-profile public-record bankruptcies and restructurings involving from $100 million to more than $65 billion in assets. Prior to joining Zolfo Cooper in 2001, I was a partner with Deloitte & Touche in reorganization services.    I began my career with J. Henry Schroder Bank & Trust.    I have a B.S. in business from Georgetown University.

3.      I make this Declaration in support of the Motion of Debtors and Debtors in Possession for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Them to Enter Into and Perform Under a Plan Support Agreement (the "Motion"). Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### The Independent Manager's Charge

4.      Pursuant to the So-Ordered Stipulation, the Independent Manager is to review the Settlement and recommend to the Board of Managers that it cause International Telecom to (i) join in the Settlement or (ii) not join in the Settlement (the "Determination").    The So-Ordered Stipulation provides that I report my Determination by February 27, 2015.

---

[2]      All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the So-Ordered Stipulation.

**The Independent Manager's Analysis**

5.    Since my appointment, with the assistance of my retained professionals – Zolfo Cooper and Quinn Emanuel – I, among other things, met and communicated on multiple occasions with the primary parties in interest and their respective advisors, including the Debtors, the Committee, the Ad Hoc Committee of LuxCo Holders, the indenture trustee for the bonds issued by International Telecom, Capital Research and Management Co., and Aurelius Capital Management, LP.  I and my professionals reviewed materials provided by the parties, met with current and former officers and managers of the Debtors at their headquarters in Reston, Virginia, reviewed over 15,000 documents produced by the Debtors, including privileged LuxCo documents, and conducted extensive financial and legal analysis of the claims that are the subject of the Settlement (the "Claims").

6.    At certain meetings with the parties in interest, I provided preliminary feedback concerning my view of the merits of the Settlement from the perspective of LuxCo.  I believe that this informal feedback was the impetus for the revisions to the Settlement, which revisions result in significantly more value to LuxCo.

7.    Because the LuxCo Notes are paid in full (principal and pre-petition accrued interest), the additional value inures to the benefit of NII Capital Corp. ("CapCo") on account of an intercompany note LuxCo owes to CapCo.  In turn, the proceeds of that note are distributed to the holders of notes issued by CapCo *pro rata*.

**The Independent Manager's Determination**

8.    On February 25, 2015, the Board of Managers convened in Luxembourg and I delivered my Determination with respect to the Settlement, as modified subsequent to the date of my appointment.

9.      I determined it to be in LuxCo's best interests to enter into the Settlement. The Settlement distributes value in a manner consistent with my assessment of the strengths and weaknesses of the Claims, both with regards to the ultimate impact to LuxCo, including with respect to every stakeholder thereof (debt, subordinated debt and equity).

10.     In addition to my view of the strengths and weaknesses of the Claims, my Determination was based on the practical benefits of settlement as opposed to the inherent uncertainties, expense, and potential value destruction of protracted litigation.

11.     My professional opinion today is no different than it was on February 25, 2015.  The Settlement is in the best interests of LuxCo and LuxCo's entry into the PSA, in this regard, is a sound exercise of business judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 24 2015
       New York, New York


                                    ___/s/ Scott W. Winn_____
                                    Independent Manager

# **EXHIBIT C**

**Parkhill Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
NII Holdings, Inc., et al.,[1]          :    Case No. 14-12611 (SCC)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
---------------------------------------------------------------x

## DECLARATION OF HOMER PARKHILL
## IN SUPPORT OF THE MOTION OF DEBTORS AND DEBTORS
## IN POSSESSION FOR AN ORDER PURSUANT TO SECTIONS 105(a)
## AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING THEM TO
## ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT

I, Homer Parkhill, being duly sworn, state the following under penalty of perjury:

1.    I am a Managing Director at Rothschild Inc. ("Rothschild"), a financial

advisory services and investment banking firm which has its principal office at 1251 Avenue of

the Americas, 33rd Floor, New York, New York 10020.  Rothschild has been retained by the

Debtors as their financial advisor and investment banker in these chapter 11 cases.  I make this

Declaration in support of the *Motion of Debtors and Debtors in Possession for an Order*

*Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Them to Enter Into*

*and Perform Under a Plan Support Agreement* (the "Motion").[2]  Except as otherwise noted, I

have personal knowledge of the matters set forth herein.

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

2.      I have over sixteen years of investment banking experience.  I have

experience leading restructuring, refinancing, and mergers and acquisitions engagements across a

variety of industries.  My company side experience includes representing AMR Corp. (American

Airlines), US Steel Canada, OGpar, Arcapita Bank B.S.C.(c), Corporación GEO, Promotora de

Informaciones S.A., Tronox Incorporated, Vitro SAB, Controladora Comercial Mexicana SAB,

Electrical Components International, Strategic Hotels & Resorts, Verasun, Centaur Gaming,

Hilex Poly, Doral Financial, Tecumseh Products Company, APW, Inc., Innovative

Communications Corporation, Wolverine Tube, International Wire Group, Corporation Durango,

Comdisco, Inc., Viasystems, SANLUIS Corporacion, and Atlantic Express Transportation

Corporation.  I also have represented creditor constituencies in various restructuring transactions

including OGX Petróleo e Gás Participações S.A. (OGX), DirectBuy, FGIC, Foxwoods Resorts,

Truvo, General Growth Properties, and Protection One.  I joined Rothschild in 2001.  I received

a Master of Business Administration degree with a concentration in finance and a Bachelor of

Arts degree in Political Science from the University of Texas at Austin.

### The Negotiations that Ultimately
### Led to the Prior PSA and, Later, the PSA

3.      I have been responsible for Rothschild's support of the Debtors in their

efforts to reach an agreement with their key creditors regarding a restructuring of their

obligations for over a year – both prior and subsequent to the filing of the Debtors' bankruptcy

cases – and have been at the center of the related negotiations.

4.      In summary, the current Plan Support Agreement (the "PSA"), and the

material terms of the proposed restructuring of the Debtors pursuant to a chapter 11 plan of

reorganization (the "Plan") as set forth in the Plan Term Sheet annexed to the PSA (the "Plan

-2-

Term Sheet") are the result of months of intense and continuous negotiations between the

Debtors and various parties in interest that began in March 2014, six months prior to the

commencement of the majority of these cases on September 15, 2014 (the "Petition Date").

Those efforts initially led to the Debtors' entry into the prior plan support agreement on

November 24, 2014 (the "Prior PSA").  Due to evolving circumstances — namely, the sale of the

Debtors' operations in Mexico to an affiliate of AT&T — the Prior PSA was terminated and

renewed negotiations commenced between the Debtors, their major creditors and the Official

Committee of Unsecured Creditors (the "Creditors' Committee").  Both the renewed negotiations

and the negotiations leading to the Prior PSA involved an active, frequent and cooperative

dialogue with various holders of Notes (the "Holders") and their respective professionals over the

key components of the Debtors' restructuring and the Holders' respective due diligence efforts.

These efforts have culminated in the Debtors' entry into the PSA with support from Holders of

Capco Notes and Luxco Notes exceeding the requisite amounts required for plan acceptance

from all classes of claims arising from such Notes at all applicable Debtors and with the

Creditors' Committee as a co-proponent of the Plan.

**The Negotiation of the Prior PSA and the Debtors' Proposed Restructuring**

5.     The Debtors determined in early 2014 that they would not have sufficient

cash to continue making interest payments on the Notes while continuing to fund the capital

expenditures and operational needs of certain of the Debtors' non-debtor affiliates (the "Non-

Debtor Affiliates").  In February 2014, entities managed by Capital Research and Management

Company (collectively, "Capital Group") organized an ad hoc group of Holders largely

comprised of Holders of the Luxco Notes, but which also included some Holders of the Capco

Notes (the "Cross-Holder Group") to commence negotiations with the Debtors in anticipation of

-3-

a restructuring.  The Cross-Holder Group retained Paul, Weiss, Rifkind, Wharton & Garrison LLP as legal advisor and Houlihan, Lokey, Howard & Zukin, Inc. as financial advisor.

6.    About a month later, after sending a letter alleging several legal claims, some of which now constitute the Potential Litigation Claims,[2] entities managed by Aurelius Capital Management, LP (collectively, "Aurelius") organized an ad hoc group of Holders of the Capco Notes (the "Capco Group") and retained Akin Gump Strauss Hauer & Feld LLP as legal advisor and Blackstone Advisory Partners, L.P. as financial advisor.

7.    Prior to filing these cases, in the spring and summer of 2014, the Debtors actively engaged in good-faith negotiations with both the Cross-Holder Group and the Capco Group in an attempt to reach a global restructuring deal.  From almost the outset, these negotiations were complicated by, among other things, allegations regarding certain intercompany transactions between and among the Debtors and between and among the Debtors and certain of the Non-Debtor Affiliates that are now the subject of the Potential Litigation Claims.

8.    In order for the Debtors' various competing creditor constituencies to understand the scope and complexity of both the Debtors' business, including current operations and expected future financial performance, as well as the Potential Litigation Claims, the advisors for the Cross-Holder Group and the Capco Group were provided with access to a data room containing a voluminous body of information and documentation relating to the Debtors'

---

[2]    The Potential Litigation Claims are allegations regarding certain intercompany transactions between and among the Debtors and between and among the Debtors and certain of the Debtors' non-debtor affiliates (the "Non-Debtor Affiliates").  The Potential Litigation Claims fall into three principal categories:  (a) claims arising from certain alleged fraudulent transfers between Debtors or between a Debtor and a Non-Debtor Affiliate (the "Avoidance Claims"); (b) claims related to the recharacterization of certain intercompany liabilities as equity (the "Recharacterization Claims"); and (c) claims related to an alleged violation of the indentures governing the Capco 2016 Notes and Capco 2019 Notes caused by the transfer of equity interests of the Transferred Guarantors from NII Global Holdings, Inc. and the purported release of the Transferred Guarantors' guarantees of the Capco 2016 Notes and Capco 2019 Notes (the "Transferred Guarantor Claims").

-4-

and the Non-Debtor Affiliates' operations.  In addition, the Debtors, Rothschild, McKinsey

Recovery & Transformation Services U.S., LLC, Alvarez & Marsal North America, LLC and

Jones Day, counsel to the Debtors, responded to, and participated in numerous meetings

regarding, extensive diligence requests from such advisors.  To facilitate such discussions,

Rothschild also worked with other professionals and principals to develop a financial "waterfall"

model that ultimately was adopted by all parties for negotiation and settlement discussion

purposes.  In addition, numerous in-person meetings were held at the offices of Rothschild and

Jones Day in New York with various professionals and representatives of the Cross-Holder

Group and the Capco Group, and the parties engaged in highly frequent communications via

telephone and email over the terms of a potential restructuring in the months leading up to the

Petition Date.  I, personally, participated in numerous in-person meetings and hours of

conference calls with representatives of the Cross-Holder Group and the Capco Group over the

course of the summer of 2014.

      9.     In addition, in June 2014, in an accommodation to individual Holders, the

Debtors agreed to publicly disclose, or "blow out," over 60 individual documents including the

Debtors' multi-year business plan by August 15, 2014 to enable Holders to become restricted

from trading in the Notes for a limited period of time and become more fully informed with

respect to the Debtors' business operations and the facts surrounding the Potential Litigation

Claims in an effort to facilitate the negotiation of the Debtors' restructuring.

      10.    Finally, leading up to the Petition Date, various restructuring constructs

and term sheets were exchanged between the parties with a view towards potentially achieving a

consensual resolution that would have allowed the Debtors to commence pre-packaged or pre-

arranged chapter 11 cases.

NYI-524648210v1

11.     Several days before the Petition Date, the Debtors, Aurelius and Capital Group were in the process of finalizing a term sheet and plan support agreement that would have (a) preserved the Potential Litigation Claims to be resolved until after the effective date of a plan, (b) reserved a significant part of plan distributions pending resolution of the Potential Litigation Claims and (c) allowed the Debtors to quickly proceed through these chapter 11 cases in order to preserve their diminishing liquidity.  This has since been referred to as the "All Reserve Plan." However, when it became clear that negotiations could not be concluded prior to the expiration of a 30-day grace period for a required interest payment under certain of the Notes, the Debtors determined to commence these chapter 11 cases in order to complete the negotiation of, and propose and confirm, a chapter 11 plan of reorganization.

12.     Shortly before the Petition Date, a group of Holders of the Luxco Notes split from the Cross-Holder Group, formed their own ad hoc group (the "Luxco Group") and retained separate legal and financial advisors, namely Kirkland & Ellis LLP and Millstein & Co., L.P.  The Debtors acted quickly to agree to non-disclosure agreements with the retained professionals for this newly constituted group to provide them full access to the data room and related due diligence materials related to the Debtors' business as well as the Potential Litigation Claims.  I and members of the Rothschild team spent numerous hours, both in-person and over the phone, with these professionals shortly after they became restricted to allow them to come up to speed as quickly as possible on the complex issues in these chapter 11 cases, including the Potential Litigation Claims, as well as to share Rothschild's waterfall model.

13.     Extensive negotiations among the Debtors, the Creditors' Committee and various creditor groups had continued in the several months from the Petition Date to the filing of the Prior PSA.  There were numerous in-person meetings, in addition to highly frequent email

and telephone communications with the various groups of Holders and their respective professionals.  The Debtors had been negotiating, with the help of both Rothschild and Jones Day, simultaneously, but separately, with (a) Aurelius, (b) the Luxco Group and (c) Capital Group.  The Debtors, with the assistance of the Luxco Group's advisors, also reached out to Holders of the Capco 2021 Notes, who either engaged in the process or opted not to do so. These negotiations included the exchange of multiple plan term sheets and settlement proposals. All groups were made aware that the Debtors were pursuing simultaneous negotiation tracks, and this approach garnered significant concessions from all parties toward a deal more favorable to, and inuring to the ultimate benefit of, the Debtors' estates as a whole.

14.     Upon its formation, the Creditors' Committee was informed of the background and current status of the parallel negotiations and has been continually apprised of the same throughout these cases.  The professionals representing the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP and FTI Consulting, have been intimately involved in analyzing the Potential Litigation Claims and have joined the Debtors in their efforts to broker a negotiated resolution of the Potential Litigation Claims and other economic terms of a restructuring that could lead to a confirmable chapter 11 plan.  The role of the Creditors' Committee in attempting to broker a deal and facilitate due diligence has been particularly important given that the members of the Creditors' Committee represent a cross-section of Holders, as well as other important unsecured creditor constituencies in the Debtors' bankruptcy cases.

### The Selection of the Prior PSA

15.     After what had then been approximately nine months of negotiations and in light of the then-prevailing circumstances, the NII Holdings board of directors (the "Board")

NYI-524648210v1

determined, with advice from Jones Day and Rothschild, that the Prior PSA — the agreement

reached with Capital Group and Aurelius, among other major creditor constituencies, and that

had the support of the Creditors' Committee — represented the best path forward.  In analyzing

and comparing the plan term sheet accompanying the Prior PSA (the "Prior Plan Term Sheet") to

other restructuring proposals, Rothschild conducted multiple working sessions with the advisors

and principals of Aurelius, Capital Group and the Luxco Group, as well as advisors to the

Creditors' Committee, both at its offices and at Jones Day, to assist parties in understanding the

workings of a financial waterfall model, including the impact on plan distributions based on the

waterfall model that would flow from a variety of potential outcomes if some or all of the

Potential Litigation Claims were litigated to conclusion.  These discussions also considered the

impact that the creation of a litigation reserve relating to the Potential Litigation Claims would

potentially have on creditor recoveries in these cases.

16.     The Board considered these facts and others regarding the relative benefits

and risks of the Prior Plan Term Sheet compared to alternative proposals that had been proposed,

and on November 24, 2014, the Board approved the Debtors' entry into the Prior PSA.

17.     To memorialize their respective commitments to support the Prior Plan

Term Sheet, Capital Group, Aurelius and the Creditors' Committee, among other creditors,

entered into the Prior PSA on November 24, 2014.

**The Appointment of the Independent Manager**

18.     Though the Prior PSA had the support of Capital Group and Aurelius,

collectively, at that time, holders of approximately 66% of the Capco Notes and 36% of the

Luxco Notes, ATC and the Creditors Committee, the Debtors were well aware that the Prior PSA

and the settlement contained therein still did not have the support of the Luxco Group.

-8-

19.    Accordingly, on December 11, 2014, and in accordance with the Prior PSA and Prior Plan Term Sheet, the Debtors, with the support of the Creditors' Committee, Aurelius, Capital Group and the Luxco Group, stipulated their agreement to appoint Scott W. Winn as independent manager for Luxco (the "Independent Manager") to evaluate and advise the managers of Luxco (the "Board of Managers") regarding the reasonableness of the settlement of the Potential Litigation Claims (and as subsequently revised, the "Proposed Settlement") to Luxco and to determine following an evaluation period whether to recommend that Luxco join in the Proposed Settlement.  I attended several in-person meetings with the Independent Manager and his advisors in order to facilitate the Independent Manager's evaluation process.

### The Sale and Renewed Negotiations Leading to the PSA

20.    On January 26, 2015, the Debtors announced a significant development in the case — an agreement to sell NII Mexico for $1.875 billion to an affiliate of AT&T (the "Sale Transaction"), which was the product of extensive marketing efforts undertaken by the Debtors with the assistance of Rothschild.

21.    Because the Sale Transaction represented a significant departure from the economics and structure that were the basis for the Prior Plan Term Sheet and the Prior Plan, the Debtors determined to exercise the Debtors' right to terminate the Prior PSA on January 25, 2015. Immediately thereafter, the Debtors through their advisors Jones Day and Rothschild, reengaged with the Debtors' major stakeholders in an effort to gain support for consensual modifications to the Prior Plan that would allow the Debtors to emerge from chapter 11.

22.    On January 26, 2015, the same day that the sale of NII Mexico was announced, Capital Group, Aurelius and the Creditors' Committee stipulated to support the Sale Transaction.  Shortly thereafter, on January 29, 2015, I participated in a meeting among certain

-9-

of the key creditor groups, including the Luxco Group's advisors and principals.  Soon after this meeting emerged the outline of an agreement in principle on the key economic terms of the Debtors' restructuring.  I participated in communications that ensued immediately thereafter to forge consensus among the parties regarding these key economic terms, which ultimately was reached in mid-February 2015.  Negotiations regarding ancillary issues pertaining to the Debtors' restructuring continued for several more weeks and, at times, had the potential of jeopardizing the agreement on the key economic terms of the Debtors' restructuring, thereby delaying the announcement of the PSA until March 5, 2015.

   23. To facilitate such discussions, Rothschild worked with other professionals and principals to update the financial waterfall model, which again was adopted by all parties for negotiation and settlement discussion purposes.  I, personally, spent dozens of hours communicating and interacting with representatives of Capital Group, Aurelius, Luxco Group and the Creditors' Committee negotiating the final agreed terms of the PSA and Plan Term Sheet.

   24. The key terms of the PSA and the Plan Term Sheet, and key differences as compared to the Prior PSA and Prior Plan Term Sheet, are as follows.  The PSA:

   (a) provides improved recoveries over the Prior PSA for all Capco and Luxco Noteholders in the following approximate amounts (see Plan Term Sheet; Prior Plan Term Sheet):

     (i) Capco 2016 Noteholders - $41 million (or 11% over the Prior Plan);[3]

     (ii) Capco 2019 Noteholders - $24 million (or 11% over the Prior Plan);

     (iii) Capco 2021 Noteholders - $169 million (or 63% over the Prior Plan);

---

[3] The figures in this sub-clause (i) and the subsequent sub-clauses (ii) through (v) have been calculated before taking into account the rights offering contemplated under the Prior Plan.  Taking into account such rights offering, these improved recoveries and percentages are as follows: $40 million, or 10%, for the Capco 2016 Noteholders; $23 million, or 10%, for the Capco 2019 Noteholders; $139 million, or 47%, for the Capco 2021 Noteholders; $117 million, or 14%, for the Luxco 11.375% Noteholders; and $88 million, or 14%, for the Luxco 7.875% Noteholders.

-10-

(iv)   Luxco 11.375% Noteholders - $89 million (or 10% over the Prior Plan);

(i)   Luxco 7.875% Noteholders - $68 million (or 10% over the Prior Plan);

(a)   encompasses a full and final settlement of the Potential Litigation Claims to the benefit of all stakeholders (see Plan Term Sheet);

(b)   secures Consenting Noteholder support of the Sale Transaction (PSA § 4.01);

(c)   permits the Debtors' entry into an exit financing agreement sourced from the marketplace, subject to certain conditions (PSA § 7.01(f)); and

(d)   eliminates $4.35 billion in debt from the Debtors' balance sheet (see Plan Term Sheet).

And, unlike the Prior PSA, the PSA:

(a)   provides not only improved recoveries, as noted above, but also recoveries that include cash distributions (see Plan Term Sheet);

(b)   permits postpetition financing pending the closing of the Sale Transaction (see Plan Term Sheet);

(c)   reduces recoveries to holders of Transferred Guarantor Claims, which are now being calculated as if 21% (as opposed to 27.5% under the Prior PSA) of each Transferred Guarantor's guarantees of the Capco 2016 and Capco 2019 Notes remained in place (see Plan Term Sheet; Prior Plan Term Sheet); and

(d)   has the support of the Luxco Group (see PSA).

25.   The Plan Term Sheet also incorporates the terms of a $350 million first priority debtor-in-possession loan (the "Bridge Loan"), which was being negotiated concurrently with the PSA and Plan Term Sheet and will provide incremental liquidity to ensure both that the Sale Transaction will close and that the Debtors will have sufficient liquidity in the event of any unforeseen regulatory delays.  As set forth in the Bridge Loan term sheet dated March 5, 2015, attached as Exhibit A to the Plan Term Sheet, the members of the Luxco Group committed to provide 65% of the Bridge Loan, with Capital Group and Aurelius providing 20.56% and 14.44% of the Bridge Loan, respectively.

-11-

26.    Further, in consideration of the extent of the Requisite Consenting Noteholders' support of the Plan, which exceeds the 66⅔ threshold in all classes of claims arising from the Notes at all of the applicable Debtors, it is my understanding that the Requisite Consenting Noteholders required as an essential element of the PSA that the Debtors agree to pay their professional fees (subject to certain limitations).  In light of the robust level of support by Capital Group, Aurelius, and Luxco Group and their extensive efforts in furtherance thereof, the Debtors determined, in their business judgment, that payment of these constituencies' professional fees was reasonable and highly beneficial to their estates under the circumstances. Accordingly, after further negotiations with the professionals on the terms of their respective payments, such payments are provided for in the PSA as an obligation of the Debtors, subject to certain limits and conditions.

27.    Ultimately, the Debtors concluded that the Plan Term Sheet represents the best path forward, not only because it is supported by the Creditors' Committee, which is a co-proponent of the Plan (together with the Debtors, the "Plan Proponents"), and important creditor constituencies comprising holders of over 70% in amount of the Capco Notes and approximately 72% in amount of the Luxco Notes, but also, importantly, because it has advantages over other constructs that had been considered by the Debtors and other creditor groups in the negotiations that had taken place over the course of nearly a year.  For example, the Plan Term Sheet:

- contemplates the complete and final settlement of the Potential Litigation Claims, eliminating the cost and delay of litigating those claims to conclusion and the risk that key amendments with the Debtors' local lenders in Brazil would begin to unravel or lead to defaults before such litigation could be resolved;[4]

---

[4]    The lenders with which the Debtors and NII Brazil have reached agreements are Banco do Brasil S.A. ("BdB") and Caixa Econômica Federal ("Caixa"), NII Brazil's two major local lenders, and China Development Bank Corp. ("CDB").  The amendments to the agreements with BdB and Caixa, which provide covenant and other relief that are necessary for the Debtors' successful reorganization, may not become effective if the Debtors fail to meet certain requirements, including their emergence from chapter 11 by September 15, 2015.  Similarly, the amendment reached with CDB is dependent upon the Debtors'

-12-

- represents significant concessions by the Luxco Group, including the relinquishment of the right to receive (i) a greater proportion of their recoveries from the cash proceeds of the Sale Transaction, (ii) potential accrued postpetition interest on their claims and (iii) any additional recovery on account of their claims in the event of a higher and better bid that exceeds the Plan Distributable Value (as defined in the Plan Term Sheet);

- provides for the prompt distribution to Holders of their full entitlement to equity in Reorganized NII without restrictions or delay due to holding some or all of such equity in reserve as would be necessary if the Potential Litigation Claims were to be litigated;

- permits postpetition financing pending the closing of the Sale Transaction;

- allows the reorganized Debtors to seek market-tested exit financing, which would allow them to raise exit capital with less cost, at better rates and on better terms; and

- perhaps most significantly, is subject to the PSA, to which the Luxco Group is now a party, and is supported by a supermajority of the Debtors' creditors with respect to every class of claims arising from all series of Notes.

28.     On February 25, 2015, the Independent Manager stated his recommendation to the Board of Managers to cause Luxco to join the Proposed Settlement and execute the PSA.  On February 27, 2015, the board of directors of Capco also approved Capco's entry into the PSA.

29.     After considering, among other things, the facts and opinions noted above, on March 5, 2015, the Board approved the Debtors' entry into the PSA with Aurelius, Capital Group and the Luxco Group and the Creditors' Committee.

30.     In conclusion, it is my professional opinion that the Debtors' entry into the PSA, and the payment of professional fees thereunder, is a sound exercise of their business judgment and provides the Debtors with their best chance of confirming a chapter 11 plan and emerging from these chapter 11 cases as a viable business enterprise.

---

ability to provide CDB with a guarantee, upon emerging from chapter 11, by September 30, 2015. Accordingly, the failure of the Debtors to emerge from bankruptcy by September 15, 2015 could cause NII Brazil to be in default of or lose certain concessions with respect to such lending and credit agreements.

NYI-524648210v1

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 24, 2015
　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　　/s/  Homer Parkhill
　　　　　　　　　　　　　　　　　　　　Homer Parkhill
　　　　　　　　　　　　　　　　　　　　Managing Director
　　　　　　　　　　　　　　　　　　　　Rothschild, Inc.

NYI-524648210v1