JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Scott J. Greenberg
Lisa G. Laukitis

  - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                       :
In re:                                 :   Chapter 11
                                       :
NII Holdings, Inc., et al.,¹           :   Case No. 14-12611 (SCC)
                                       :
                  Debtors.             :   (Jointly Administered)
                                       :
------------------------------------------------------------x
```

## NOTICE OF MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER APPROVING THE FIRST AMENDMENT TO THEIR KEY EMPLOYEE RETENTION PLAN

---

¹ The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

**PLEASE TAKE NOTICE** that a hearing on the *Motion of Debtors and Debtors in Possession for Entry of an Order Approving the First Amendment to their Key Employee Retention Plan* (the "Motion") will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York (the "Court"), One Bowling Green, New York, New York 10004, on **April 20, 2015 at 2:00 p.m. (Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief sought in the Motion must have been made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served on: (a) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Susan D. Golden, Esq. and Brian Masumoto, Esq.); (b) the Debtors, c/o NII Holdings, Inc. 1875 Explorer Street, Suite 800, Reston, VA 20190 (Attn: General Counsel); and (c) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Lisa Laukitis, Esq. and George R. Howard, Esq.), not later than **4:00 p.m. (Eastern Time) on April 13, 2015** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that only those objections that are timely filed, served and received will be considered at the hearing. If no objections are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form attached to the Motion, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained from

the Court's website at http://ecf.nysb.uscourts.gov or, free of charge, at

http://cases.primeclerk.com/nii/.


Dated:  March 30, 2015
       New York, New York

Respectfully submitted,


   /s/  Lisa G. Laukitis
Scott J. Greenberg
Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

 - and -

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis


 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
: 
In re: : Chapter 11
 : 
NII Holdings, Inc., et al.,[1] : Case No. 14-12611 (SCC)
 : 
               Debtors. : (Jointly Administered)
 : 
-------------------------------------------------------------x

## MOTION OF DEBTORS AND DEBTORS IN
## POSSESSION FOR ENTRY OF AN ORDER APPROVING THE
## FIRST AMENDMENT TO THEIR KEY EMPLOYEE RETENTION PLAN

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

NII Holdings, Inc. ("NII Holdings") and thirteen of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully

represent as follows:

**Background**

1.    On September 15, 2014, certain of the Debtors (the "Original Debtors")

commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  On October 8, 2014 and January 25, 2015, five of

the Original Debtors' affiliates also filed chapter 11 bankruptcy petitions in this District.  All of

the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

administered jointly.

2.    The Debtors are authorized to continue to operate their business and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

3.    On September 29, 2014 and November 5, 2014, the United States Trustee

for the Southern District of New York, pursuant to sections 1102(a) and (b) of the Bankruptcy

Code, appointed an official committee of unsecured creditors (the "Creditors' Committee") to

represent the interests of all unsecured creditors in these chapter 11 cases.

4.    NII Holdings is the ultimate parent and holding company for its debtor and

non-debtor affiliates (such non-debtor affiliates, the "Non-Debtor Affiliates" and together with

the Debtors, "NII").  Certain of the Non-Debtor Affiliates provide wireless communication

services under the Nextel™ brand name for businesses and consumers in Latin America.

5.      Additional information regarding the background of the Debtors, the reasons for filing these cases and the Debtors' goals for these cases are set forth in the *Declaration of Daniel E. Freiman in Support of First Day Pleadings and in Accordance with Local Bankruptcy Rule 1007-2* [Docket No. 19].

## Jurisdiction

6.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7.      By this Motion, the Debtors seek the entry of an order (the "Order"), substantially in the form attached hereto as Exhibit A, authorizing and approving the amendment of the Debtors' key employee retention plan (the "Amended KERP") to (a) include the participation of additional individuals (the "Additional Participants") in the KERP (as defined below) and (b) authorize payments ("KERP Payments") to the Additional Participants in accordance with the terms set forth below pursuant to section 503(c)(3) and, to the extent applicable, section 363(b)(1) of the Bankruptcy Code.  The Debtors also seek, to the extent it applies, a waiver of any stay of effectiveness of the Order under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of the relief requested herein, the Debtors submit the Declaration of Shana C. Smith (the "Smith Declaration") attached hereto as Exhibit B and the Declaration of Brian Cumberland (the "Cumberland Declaration") attached hereto as Exhibit C.

## Facts Relevant to This Motion

### A.    The Development of the Amended KERP

8.    On November 20, 2014, the Debtors filed the *Motion of Debtors and Debtors in Possession for Entry of an Order Approving Their Key Employee Retention Plan* [Docket No. 240] (the "KERP Motion").  As a result of discussions with the U.S. Trustee and to resolve certain questions and concerns raised by the U.S. Trustee, on December 8, 2014, the Debtors submitted a *Supplement to the KERP Motion* [Docket No. 283] (the "Supplement").  The Court entered an order approving the Debtors' key employee retention plan as set forth in the KERP Motion (the "KERP") on December 10, 2014 [Docket No. 290] (the "KERP Order").

9.    The Debtors originally identified twelve key non-insider employees (the "Key Employees") who were critical to the Debtors' continued operation and successful restructuring for participation in the KERP.  These Key Employees were the only employees included in the KERP as approved by the Court on December 10, 2014.

10.    Since the approval of the KERP, however, a game-changing event has occurred in the Debtors' bankruptcy cases — the announcement of the sale of NII's operations in Mexico ("NII Mexico"), operated by non-debtor Comunicaciones Nextel de México, S.A. de C.V., to an affiliate of AT&T for $1.875 billion (the "Sale").[2]

11.    After the Sale, it is anticipated that the Debtors will reorganize around NII's operations in Brazil.  NII Mexico, however, was NII's second largest market, generating approximately 38% of NII's consolidated operating revenues in fiscal year 2014.  Also, as the

---

[2]    On March 23, 2015, the Court entered the *Order: (I) Approving Purchase and Sale Agreement; (II) Authorizing the Sale of all of the Membership Interests of Nextel International (Uruguay) LLC Free and Clear of Interests; (III) Approving the Transfer and Novation of the Liabilities of Nextel International (Uruguay) LLC, Enjoining the Enforcement of Such Liabilities and Dismissing its Chapter 11 Case and (IV) Granting Related Relief* [Docket No. 575], authorizing and approving the Sale.

Debtors have previously disclosed, there remains an ongoing effort to effectuate a strategic transaction with respect to NII's operations in Argentina (the "<u>Argentina Transaction</u>").  NII's operations in Argentina comprised approximately 11.5% of NII's consolidated operating revenues in fiscal year 2014.  Accordingly, after the Sale, the Debtors will be a significantly different — and smaller — company than was originally anticipated at the outset of these bankruptcy cases, and may be further reduced in size if an Argentina Transaction is accomplished.

12.     Not surprisingly, the announcement of the Sale has caused significant concern among the Debtors' employees regarding the future size and composition of the Debtors' workforce in the United States.  At the same time, however, the Debtors continue to have a critical need to retain a variety of employees who are absolutely necessary to the continued stewardship role of NII Holdings, including legal and public reporting obligations of the Debtors, and certain transition services to be provided in connection with the Sale and certain other tasks as set forth in greater detail below.  For these reasons, the Debtors now seek to amend the KERP to enhance the Debtors' ability to retain essential, non-insider employees.

**B.     The Additional Participants**

13.     The Additional Participants, for whom the Amended KERP is sought, include twenty-five individuals who are essential to several critical projects and specific milestones the Debtors must achieve, both with respect to the Debtors' daily operations and their restructuring efforts.  The Additional Participants have an average salary of $121,473 and global grades ranging from 8 to 15.[3]

---

[3]     As with the KERP and as set forth in greater detail below, the Debtors treated any employee with a global grade of 15 or below as a "non-insider" because such employees are not appointed by the Debtors' board of directors and do not exercise sufficient authority to dictate corporate policy.

14.     There generally are four categories of tasks that the Additional

Participants are needed to complete.  They are:

(a)     <u>Financial Reporting</u>.  The majority of the Additional Participants are necessary to the Debtors' continued financial reporting obligations.  The Debtors have continuing obligations to file public financial reports with the Securities & Exchange Commission that involve a substantial amount of work.  In addition, the Debtors must complete the recasting of their financial statements for discontinued operations and fresh start accounting by the second quarter of 2015.  Losing the Additional Participants prior to the end of the third quarter would significantly impede the Debtors' efforts with respect to their financial reporting obligations.  Accordingly, the Debtors seek to include seventeen Additional Participants in the KERP for financial reporting purposes (the "<u>Financial Reporting Employees</u>").

(b)     <u>Strategic Transactions</u>:  The Debtors seek to include two Additional Participants for purposes of closing strategic transactions (the "<u>Strategic Transaction Employees</u>"), including the Sale and the potential Argentina Transaction.  These two Additional Participants are critical to planned divestitures and need to be retained by the Debtors to ensure that both the Sale and the possible Argentina Transaction can be completed.[4]

(c)     <u>Engineering</u>:  Three of the Additional Participants are essential to the Debtors' development and transfer of a differentiating push-to-talk technology.  In the past, push-to-talk has been a key differentiator of the wireless communications services provided by the Debtors and the development of this program enables the continuation of this differentiator on the Debtor's new data-oriented networks (the "<u>Engineering Employees</u>").  Although the Engineering Employees currently work in a laboratory in Mexico, the Debtors provide reimbursement for their compensation because the technology they are working to develop is critical to the Debtors' operations in Brazil (and will not used by NII Mexico after the Sale).

(d)     <u>Information Technology ("IT")</u>:  The Debtors seek to include three Additional Participants (the "<u>IT Employees</u>") for the purpose of decommissioning the Debtors' headquarters' data center as part of their real estate consolidation and the transitioning of the data center to a cloud-based platform.  The Debtors must exit their current facility by mid-2015.  In addition to the relocation of the Debtors' data center, the Debtors also must stabilize the operations and support of the new cloud-based platform, which could take four to six months.  In addition to this work, the IT Employees provide the day-to-day IT support for the Debtors' headquarters and support of applications that service Mexico, Brazil and

---

[4]     Each of the Strategic Transaction Employees were previously parties to incentive agreements related to the possible Argentina Transaction.  Both of those agreements expired at the end of 2014, however, and neither Strategic Transaction Employee has or will receive any payments under those now expired incentive agreements.

Argentina. Each IT Employee has specialized knowledge about the Debtors' operational environment and the technology needed to deliver these services. Accordingly, the Debtors seek to include the IT Employees in the Amended KERP.

15.     The Debtors believe that each of the Additional Participants is an imminent flight risk that would be difficult, if not impossible, to replace at this juncture in the Debtors' reorganization. Given the Sale, and the uncertainty regarding the size and composition of the Debtors' workforce, attracting qualified employees at this stage in the Debtors' restructuring would also be extremely challenging. Even if the Debtors were successful at finding qualified employees, such qualifications, alone, would not make up for the loss of the Additional Participants' institutional knowledge of the Debtors.

16.     Thus, after a thorough analysis by the Debtors, the Debtors concluded that the Additional Participants should be included in the Amended KERP.

## C.     The Additional Participants' KERP Payments

17.     The terms of the Additional Participants' KERP Payments vary depending on the services they are being retained to perform.[5] In general, the Additional Participants will receive total KERP Payments averaging 28% of their base salary, in either one or two installments with payments received upon the achievement of certain critical milestones.[6] The Debtors estimate that the total cost of adding the Additional Participants to the KERP, assuming that all milestones are achieved and all Additional Participants remain employed through their

---

[5]     For the avoidance of doubt, the Additional Participants who are employees of the Debtors are eligible to continue participating in the Cash Bonus Incentive Plan that was approved for non-insiders by order of the Court on October 14, 2014 [Docket No. 94] and for certain other non-insider employees on December 23, 2014 [Docket No. 328].

[6]     The KERP established a discretionary pool not to exceed $250,000 in the aggregate or $25,000 individually for the KERP Committee to award as retention bonuses in their discretion or on an as-needed basis for non-insider employees that are not currently KERP participants. (See KERP Motion ¶ 15). No amount of the discretionary pool was ever used and the Debtors do not intend to use this discretionary pool to make payments to the Additional Participants.

respective retention period, will be approximately $920,111, with an average payment of $36,804 per Additional Participant. The details of the exact timing and amount of payments for each Additional Participant are set forth on Exhibit 2 to the Cumberland Declaration, which has been filed under seal to protect the confidential nature of such information.

18. Upon an involuntary termination without cause, death or disability, the Additional Participant is entitled to the entire KERP Payment, or the unpaid portion of the KERP payment if the Additional Participant has already received the first installment, within 60 days following termination.[7]

**Argument**

**A.    The Amended KERP Should be Approved
Pursuant to Section 503(c)(3) of the Bankruptcy Code**

19. The Amended KERP should be approved pursuant to section 503(c)(3) of the Bankruptcy Code. As an initial matter, the Amended KERP is not subject to the restrictions in section 503(c)(1) of the Bankruptcy Code because the Additional Participants are not "insiders" (as such term is defined by section 101(31) of the Bankruptcy Code).[8]

20. Generally, the Bankruptcy Code defines an "insider" to include, among other things, "an officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts also have concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."

---

[7]    Upon voluntary termination (including retirement) or termination for cause prior to payment of the KERP Payment, any unpaid amount will be forfeited. Such forfeited amount will not be made available to other employees.

[8]    Section 503(c)(1) of the Bankruptcy Code generally prohibits retention payments to insiders unless certain conditions are met. 11 U.S.C. § 503(c)(1).

In re Velo Holdings, Inc., 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted).  An employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  See In re Borders Grp., Inc., 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director-level" employees in that case were not insiders).

       21.     The Additional Participants generally are not "insiders" (with one unique exception).[9]  The Additional Participants were not appointed by the board of directors of NII Holdings (the "Board") and do not exercise sufficient authority to dictate corporate policy.  Much like the Key Employees, the Additional Participants *implement* critical decisions, but are not, however, in roles that require or enable them to make or influence such critical decisions.  Although the Additional Participants have titles such as director, senior director, manager and senior manager, each Additional Participant reports to a more senior employee and must obtain approval from an appropriate senior employee before taking any significant action with respect to the Debtors' corporate policies, strategy or the disposition of significant assets.  Employees that are below global grade 17 do not have regular direct access to the Board.  Indeed, based on

---

[9]     The one unique exception is that one of the Strategic Transaction Employees, while a non-senior management employee, is caught in the definition of "insider" under the Bankruptcy Code because of a family relationship with an officer of NII Holdings.  As set forth in the *Motion of Debtors and Debtors in Possession for Entry of an Order Approving (I) Their Key Employee Incentive Plan, (II) Cash Bonus Incentive Payments for Certain Employees, and (III) Potential Severance Payments to Certain Employees* [Docket No. 260] (the "KEIP Motion"), this Strategic Transaction Employee was not appointed by the Board and has no influence over the Debtors' corporate policy or disposition of significant assets.  The KEIP Motion only sought to provide such employee a bonus opportunity equivalent to that provided under the Cash Bonus Incentive Plan for non-insiders previously approved by the Court.  Given that this employee's relative has no control or influence over employee compensation and that the potential for abuse or fraud in a close family-owned company is not present since NII Holdings is a publicly traded company with independent directors that oversee compensation matters, the Debtors respectfully submit that this single employee should not be excluded from participating in the Amended KERP notwithstanding the restrictions set forth in section 503(c)(1) of the Bankruptcy Code.

additional disclosures made in the Supplement filed in connection with the approval of the original KERP Motion, this Court has already concluded that the Key Employees, who have roles, titles and responsibilities similar to the Additional Participants were not "insiders" and were eligible for participation in the KERP.

22.     Therefore, because the Additional Participants are not "insiders" of the Debtors (as such term is defined by the Bankruptcy Code), the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the Amended KERP.

23.     Accordingly, the appropriate standard for evaluating the appropriateness of the Amended KERP is the business judgment standard under section 503(c)(3) of the Bankruptcy Code.  Generally, section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).[10]  In this and other districts, courts have concluded that whether payments to employees are justified by the facts and circumstances of a case is to be determined by application of the business judgment rule.  See In re Borders Grp., Inc., 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' KERP and KEIP under business judgment rule); In re Dana Corp., 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code).

---

[10]     Section 503(c)(3) of the Bankruptcy Code provides as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

24.     In <u>Dana</u>, the bankruptcy court set forth six factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance*? . . .
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

<u>Dana</u>, 358 B.R. at 576–77 (emphasis in original).  The <u>Dana</u> factors have been adopted by courts analyzing key employee retention plans.  <u>See</u>, <u>e.g.</u>, <u>In re Residential Capital, LLC</u>, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the <u>Dana</u> factors to the debtors' retention plan for non-insiders, and approving the plan as an exercise of sound business judgment); <u>Borders</u>, 453 B.R. at 473–74 (same).  The Amended KERP should be approved under this standard as a sound exercise of business judgment.

25.     First, there is a reasonable relationship between the Amended KERP and the results to be obtained — retaining the Additional Participants to complete specific, required and necessary tasks for the Debtors' operational and financial restructuring  — which alone

should qualify the Amended KERP as a sound exercise of the Debtors' business judgment.

A debtor's implementation of a retention plan can be a proper exercise of its business judgment in that it allows the debtor to avoid the cost and delay associated with the loss of personnel and their institutional knowledge.  See In re Residential Capital, LLC, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013) (approving retention plan for non-insiders because of the "continuity promoted, and the institutional knowledge preserved, by the retention of such employees").  The Debtors' Amended KERP is intended exactly for that purpose.

26.    Losing the Additional Participants anytime in the foreseeable future would jeopardize:  (a) the timeliness and compliance of the Debtors' required SEC filings; (b) the Debtors' ability to resolve complex accounting issues; (c) the implementation of fresh start accounting upon the Debtors' emergence from chapter 11; (d) the daily management and review of the Debtors' accounts payable system; (e) the Debtors' ability to accurately determine and forecast their financial and operational performance; (f) the closing of the Sale and other potential strategic transactions; (g) the development and transfer of a strategically important push-to-talk technology crucial to the Debtors' operations in Brazil; (h) the decommissioning of the Debtors' data center; (i) the transfer of the Debtors' data center to a cloud platform; and (j) the Debtors' ability to provide basic IT support to the Debtors and certain Non-Debtor Affiliates.  As noted above, the Additional Participants also have an institutional knowledge of the Debtors and possess skills that are crucial to the Debtors during their restructuring and immediately upon emergence as a publicly traded company able to meet its listing and disclosure obligations.  In addition, to find replacements who are capable of filling the Additional Participants' positions, the Debtors would be diverted from their overall restructuring efforts, which could delay the Debtors' restructuring or cause the Debtors to incur additional expenses.

27. As set forth above and as previously described in the KERP Motion and Supplement, the KERP was carefully designed, as part of a comprehensive due diligence process, by identifying employees crucial to the Debtors' operations and restructuring and making those Key Employees eligible for retention payments structured to ensure that the Key Employees remain with the Debtors to complete certain key tasks. The same due diligence and careful design processes were used for designing the Amended KERP.

28. Second, the cost of the Amended KERP is small in comparison to the Debtors' prepetition assets and the benefits associated with retaining the Key Employees and the Additional Participants. The total cost of the Debtors' retention programs represents approximately 0.03% of the Debtors' pre-petition assets, which is below the 25th percentile (0.05%) of comparable KERPs as set forth in the Cumberland Declaration attached hereto as Exhibit B. In addition, as discussed above, the Additional Participants play critical roles in the Debtors' daily operations and in relation to the Debtors' restructuring efforts. The Debtors' believe that the costs associated with losing and replacing the Additional Participants would far exceed the cost of the Amended KERP.

29. Third, the scope of the Amended KERP is fair and reasonable and does not discriminate unfairly among employees. Together, the KERP and the Amended KERP cover 37 of the Debtors' non-insider employees. The Amended KERP covers those employees that are essential to the specific critical projects and milestones discussed above. Thus, at this time, the Debtors have appropriately limited the Amended KERP to the Additional Participants.

30. Finally, prior to seeking approval of the Amended KERP, the Debtors' sought independent review of the Amended KERP from counsel and Alvarez & Marsal Taxand, LLC ("A&M Taxand"), the tax consulting practice of Alvarez & Marsal North America LLC, the

Debtors' restructuring consultant. As with the KERP, A&M Taxand compared the Debtors' Amended KERP to similar plans approved by courts in chapter 11 cases.[11] A&M Taxand found that the Amended KERP was within the range of reasonableness, with an average KERP Payment to an Additional Participant (28% of base salary) only slightly above the median (25% of base salary) and slightly below the average (31% of base salary) of the comparable retention programs, and that the Amended KERP was reasonably designed to ensure the Additional Participants remained with the Debtors to complete necessary projects. Further, the total number of employees now covered by the KERP (37 total employees) is 0.27% of NII's prepetition employee population, which is significantly below the 25th percentile of the comparable KERPs (0.49%). A&M Taxand's findings with respect to the Amended KERP are set forth in greater detail in the Cumberland Declaration and its accompanying exhibits.

31. Accordingly, the Debtors respectfully submit that the Amended KERP is justified by the facts and circumstances of the Debtors' chapter 11 cases, is a sound exercise of their business judgment and that implementation of the Amended KERP is in the best interests of the Debtors, their estates, creditors and all other stakeholders.

**B.     The Amended KERP Should be Approved
         Pursuant to Section 363(b) of the Bankruptcy Code**

32. To the extent applicable, the Amended KERP also should be approved under section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor. See, e.g., Official Comm. Of

---

[11]     A&M limited the comparison to 22 key employee retention plans (a) with less than 50 participants and (b) that retained professionals in roles similar to those of the Additional Participants (the "Comparable KERPs").

Unsecured Creditors v. LTV Corp. (In re Chateaugay), 973 F.2d 141, 143 (2d Cir. 1992)

(affirming the bankruptcy's courts approval of debtors' asset sale pursuant to section 363(b) as a

reasonable exercise of business judgment); Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.), 722 F.2d 1063, 1072 (2d Cir. 1983) (holding that the application of section 363(b)

must be supported by "some articulated business justification, other than appeasement of major

creditors"); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing

the business judgment rule); Borders, 453 B.R. at 473 (same).

33.     The business judgment rule "is a presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company." Official Comm. of Subordinated

Bondholders v. Integrate Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business

judgment rule shields a debtor's management from judicial second guessing, "absent a showing

of bad faith, self interest, or gross negligence." See Integrated Res., 147 B.R. at 656.

Consequently, a debtor's business decision "should be approved by the court unless it is shown to

be so manifestly unreasonable that it could not be based upon sound business judgment, but only

on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001)

(internal quotations omitted) (approving the debtor's business decision to implement a KERP);

cf. Dana, 358 B.R. at 577 (citing Aerovox with approval). Moreover, "[p]arties opposing the

proposed exercise of a debtor's business judgment have the burden of rebutting the presumption

of validity." Integrated Res., 147 B.R. at 656.

34.     For the same reasons as set forth above, the Debtors' decision to

implement the Amended KERP is a valid exercise of business judgment. See Borders at 473-74

(holding that the "facts and circumstances" standard of section 503(c)(3) is "no different" than the business judgment standard under section 363(b) (citing <u>Dana</u> at 576)); <u>Velo Holdings</u>, 472 B.R. at 212 (same); <u>Residential Capital</u>, 491 B.R. at 84 (same).  The Amended KERP is reasonable in terms of the objectives it seeks to achieve, its cost and scope.  Not only would the Additional Participants be extremely difficult, if not impossible to replace, but the loss of the Additional Participants at this stage in the Debtors' chapter 11 cases also would jeopardize the Debtors' ability to complete a number of tasks that are required for the Debtors to continue in operation, complete the sale of NII Mexico, successfully complete their restructuring and emerge as a publicly traded company able to meet its listing and disclosure obligations.  Further, continuing to reimburse the compensation of the Engineering Employees and including them in the Amended KERP is also a valid exercise of the Debtors' business judgment as these three individuals, though currently located in Mexico, are working on a technology that is critical to NII's operations in Brazil.  Finally, the Amended KERP is a limited modification of the KERP, which already was approved by the Court pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code that is necessary given the dramatic change in the Debtors' circumstances caused by the Sale.  Thus, like the original KERP, the Amended KERP should likewise be approved as a valid exercise of the Debtors' business judgment pursuant to section 363(b) of the Bankruptcy Code.

### **Waiver of Bankruptcy Rule 6004(h)**

35.    Pursuant to Bankruptcy Rule 6004(h), the Debtors also seek, to the extent it applies, a waiver of any stay of the effectiveness of the Order under Bankruptcy Rule 6004(h).

36.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Amended KERP is

necessary to ensure that the Additional Participants remain with the Debtors, thus avoiding significant costs and disruptions associated with replacing the Additional Participants. In addition, the Debtors believe the Additional Participants are imminent flight risks and that any delay in the Debtors ability to implement the Amended KERP would increase the risk of the Debtors losing key employees. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, with respect to the Order.

## Notice

37.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Adam C. Rogoff, Esq. and Anupama Yerramalli, Esq.); (c) Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York 10019 (Attn:  Andrew Rosenberg, Esq. and Elizabeth McColm, Esq.) on behalf of certain noteholders; (d) Akin, Gump, Strauss, Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn:  Daniel H. Golden, Esq. and David Botter, Esq.) on behalf of certain noteholders; (e) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn:  Paul M. Basta, Esq. and Christopher Marcus, Esq.) on behalf of certain noteholders; and (f) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

## No Prior Request

38.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the

Order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein;

and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated  March 30, 2015
      New York, New York

Respectfully submitted,

  /s/  Lisa Laukitis
Scott J. Greenberg
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

- and -

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**EXHIBIT A**

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
NII Holdings, Inc., et al.,[1]                                :    Case No. 14-12611 (SCC)
                                                              :
                                  Debtors.                    :    (Jointly Administered)
                                                              :
---------------------------------------------------------------x

**ORDER APPROVING THE DEBTORS' FIRST**
**AMENDMENT TO THEIR KEY EMPLOYEE RETENTION PLAN**

This matter coming before the Court on the Motion of Debtors and Debtors in Possession

for Entry of an Order Approving the First Amendment to Their Key Employee Retention Plan

(the "Motion"),[2] filed by the debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"); the Court having reviewed the Motion, the Cumberland Declaration

and the Smith Declaration; and having considered the statements of counsel and evidence

adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court

finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334,

(b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409, (d) notice of the Motion and the Hearing was

sufficient under the circumstances, (e) the Debtors' implementation of the Amended KERP is

justified by the facts and circumstances in these bankruptcy cases in that it is only applicable to

---

[1]     The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities
        (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII
        Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation,
        Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A.
        (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone
        Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC
        (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate
        headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

non-insider employees of the Debtors and is narrowly designed to retain such non-insider employees who are vital to several of the Debtors' critical projects and to the achievement of certain milestones in the Debtors' chapter 11 cases and upon emergence from chapter 11, (f) there is good cause to waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h) to the extent it is applicable; and the Court finding that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors and all parties in interest, and the Court having determined that the legal and factual bases set forth in the Motion, the Cumberland Declaration and the Smith Declaration and at the Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED as set forth herein.

2.       Pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code, the Amended KERP is approved in its entirety and the Debtors are authorized to implement the Amended KERP.

3.       The authorization hereunder to make payments to the Additional Participants pursuant to the Amended KERP shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make payments under the Amended KERP, unless the Additional Participants meet the necessary conditions under the Amended KERP.

4.       The Debtors are authorized to execute and deliver all instruments and documents, and take all such other actions as may be necessary or appropriate to implement, effectuate and fully perform under and in accordance with this Order and the Amended KERP, including, without limitation, making the payments under the Amended KERP.

5.      Pursuant to Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon entry.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York

_____, 2015

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Cumberland Declaration**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

  - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
  :
In re:  :  Chapter 11
  :
NII Holdings, Inc., et al.,[1]  :  Case No. 14-12611 (SCC)
  :
                    Debtors.  :  (Jointly Administered)
  :
-------------------------------------------------------------x

## DECLARATION OF BRIAN CUMBERLAND IN
## SUPPORT OF MOTION OF DEBTORS AND DEBTORS
## IN POSSESSION FOR ENTRY OF AN ORDER APPROVING THE
## FIRST AMENDMENT TO THEIR KEY EMPLOYEE RETENTION PLAN

---

[1]     The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

I, Brian Cumberland, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.      I am the National Managing Director of the Compensation & Benefits Practice at Alvarez & Marsal Taxand, LLC ("A&M Taxand"), the tax consulting practice of Alvarez & Marsal, LLC, a restructuring advisory services firm with numerous offices throughout the country and which is serving as restructuring adviser to NII Holdings, Inc. and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2.      I submit this Declaration in support of the Motion of Debtors and Debtors in Possession for Entry of an Order Approving the First Amendment to Their Key Employee Retention Plan (the "Motion").[2]

3.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of the Debtors.

## Qualifications

4.      I am an expert in executive and management compensation with over 20 years of experience in the field. I have familiarized myself with the Debtors, gathered relevant market data on retention plans in chapter 11 cases and analyzed whether the Amended KERP is consistent with typical market practice.

---

[2]     Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

5.     I received my bachelor's degree in business administration from the University of Texas, my juris doctor from St. Mary's School of Law and my master of laws in taxation from the University of Denver.  Prior to joining A&M Taxand, I led KPMG's Compensation and Benefits Group for the Southwest United States, and I was also a member of KPMG's National Tax Practice in Washington, D.C.

6.     My curriculum vitae, which includes a list of my publications in the previous ten years, is attached hereto as Exhibit 1.

7.     A&M Taxand is an international professional services firm that offers a wide variety of services to private and public clients, including expert analysis of executive and management compensation.  My responsibilities at A&M Taxand primarily have involved consulting to corporate clients, specifically with regard to executive compensation.  I currently lead A&M Taxand's Compensation and Benefits practice and A&M Taxand's Central Region Tax Practice. In this capacity, I have worked with numerous Fortune 1000 companies and am frequently retained by these companies to advise them on their management compensation strategies, programs and pay levels.

**The Amended KERP**

8.     The terms of the Additional Participants' KERP Payments vary depending on the services they are being retained to perform.  In general, the Additional Participants will receive total KERP Payments averaging 28% of their base salary, in either one or two installments with payments received upon the achievement of certain critical milestones.  Through A&M Taxand's analysis with the Debtors, A&M Taxand and the Debtors estimate that the total cost of adding the Additional Participants to the KERP, assuming that all milestones are achieved and all Additional Participants remain employed through their respective retention period, will be

approximately $920,111, with an average payment of $36,804 per Additional Participant. Additional details regarding the amount and timing of payments are set forth in <u>Exhibit 2</u> hereto.

9.      Upon an involuntary termination without cause, death or disability, the Additional Participant is entitled to the entire KERP Payment, or the unpaid portion of the KERP payment if the Additional Participant has already received the first installment, within 60 days following termination.

10.     As with the KERP, A&M Taxand compared the Debtors' Amended KERP to similar plans approved by courts in chapter 11 cases.   A&M Taxand found that the Amended KERP was within the range of reasonableness, with an average KERP Payment to an Additional Participant (28% of base salary) only slightly above the median (25% of base salary) and slightly below the average (31% of base salary) of the comparable retention programs, and that the Amended KERP was reasonably designed to ensure the Additional Participants remained with the Debtors to complete necessary projects.

11.     Further, the Amended KERP covers 0.27% of NII's prepetition employee population, which is significantly below the 25th percentile of the comparable KERPs (0.49%). Finally, the cost of the Amended KERP is small in comparison to the benefits associated with retaining the Additional Participants.  The total cost of the Debtors' retention programs represents approximately 0.03% of the Debtors' pre-petition assets, which is below the 25th percentile of comparable retention programs (0.05%).  Additional detail regarding the Amended KERP can be found in the attached <u>Exhibit 3</u>, which is an overview and analysis of the Amended KERP prepared by A&M Taxand.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on March 30, 2015                    By:  /s/  Brian Cumberland
                                                        Brian Cumberland

# EXHIBIT 1

## Brian Cumberland Curriculum Vitae

**Brian L. Cumberland**
National Managing Director, Compensation and Benefits
Alvarez & Marsal Taxand, LLC
2100 Ross Avenue, 21st Floor
Dallas, Texas 75201
*Phone: (214) 438-1013*
*Cell: (214) 232-5372*
Email: bcumberland@alvarezandmarsal.com

## Relevant Experience

Brian Cumberland leads the Firm's Compensation and Benefits practice. Prior to joining Alvarez & Marsal ("A&M"), Mr. Cumberland led KPMG's Compensation and Benefits Group for the Southwest. Prior to relocating to the Dallas office, Mr. Cumberland was in KPMG's Washington National Tax Practice. Mr. Cumberland has experience in various facets of executive compensation, qualified plan and welfare benefit consulting.

## Representative Accomplishments

Mr. Cumberland has participated in a variety of compensation & benefit consulting engagements, including:

- Executive Compensation, including issues related to stock options, restricted stock, non-qualified retirement plans, deferred compensation, top hat plans, global compensation strategies, golden parachute rules and the one million-dollar deduction limitation.

- Qualified plan consulting, including areas such as plan design, qualification issues and nondiscrimination testing. Mr. Cumberland has extensive knowledge and hands-on experience in all aspects involving retirement plans including thrift, 401(k), profit sharing, and ESOPs.

- Welfare Benefit plan consulting, including extensive knowledge and hands-on experience in most aspects of Voluntary Employee Beneficiary Associations (VEBAs), welfare benefit plans, fringe benefits, cafeteria plans, and health savings accounts.

- Assist with the development of compensation strategies, benchmarking compensation, annual incentive, and long-term compensation programs to align with a company's business strategies and with consideration of the tax and accounting ramifications, including designing compensation programs for executives and members of a company's board of directors, Key Employee Incentive Programs ("KEIPs") for insiders, and Key Employee Retention Programs ("KERPs").

- Partnered with Fortune 1000 companies to develop and deliver human resources services on both national and international levels. Worked with clients to develop worldwide strategic direction. Identified industry "best practices" and how these could be used to meet client growth strategies.

**Education**

- BBA in Finance, the University of Texas
- Juris Doctorate, St. Mary's School of Law
- LL.M - Taxation from the University of Denver

**Professional Activities**

- National Managing Director - Compensation and Benefits, Alvarez & Marsal Taxand, Dallas, Texas
- Member of the United States Supreme Court
- Member of the State Bar of Texas
- Member of American Bar Association (ABA)
- Member of Southwest Benefits Association
- Member of Dallas Bar Association (DBA)

**Publications Authored In Prior Ten Years**

- *KEIPing Key Employees Motivated in Bankruptcy and Beyond,* Tax Advisor Weekly, September 9, 2014.
- *Deferred No Longer — Here Come Deferred Compensation Audits*, Tax Advisor Weekly, August 26, 2014.
- *Golden Parachutes Still Mean Big Bucks for Executives,* Tax Advisor Weekly, March 11, 2014.
- *2014-2013 Executive Change in Control Report,* January 2014.
- *End-of-Year Compensation Planning Opportunities,* Tax Advisor Weekly, November 27, 2013.
- *Transfer Pricing: Don't be an Easy Target, Think About Your Equity Arrangements,* Tax Advisor Weekly, October 9, 2013.
- *CHIPping Away at Deductions on Employee Compensation,* Tax Advisor Weekly, July 23, 2013.
- *Bankruptcy Compensation Survey - Post-BAPCPA,* Tax Advisor Weekly, March 26, 2013.
- *Smartphone Confusion: Deciphering the Tax Rules Applicable to Mobile Device Policies,* Tax Advisor Weekly, September 12, 2012.
- *Bonus Time! A Discussion of the Timing of Bonus Deductions,* Tax Advisor Weekly, June 12, 2012.
- *Top 10 Payroll Mistakes Companies Make**, Tax Advisor Weekly*, March 27, 2012*.
- *2012-2011 Executive Change in Control Report,* January 2012.
- *How Pre-IPO Companies Can Hit a Compensation Grand Slam,* Tax Advisor Weekly, October 18, 2011.
- *Maneuvering Through the IRS Employment Tax and Reporting Minefield,* Tax Advisor Weekly, March 15, 2011.

- *2010-2009 Executive Change in Control Report,* January 2010.
- *Executive Change in Control Arrangements at the Top 200 Companies,* Tax Advisor Weekly, January 12, 2010.
- *Alternatives for Underwater Stock Options in a Depressed Market,* Tax Advisor Weekly, July 9, 2009.
- *There's More to Deferred Compensation Than 409A: Maintaining Top Hat Plan Status,* Tax Advisor Weekly, January 27, 2009.
- *Troubled Assets Relief Program - Laying the Groundwork for Executive Compensation Changes to Come,* November 11, 2008.
- *Taxation of Equity Compensation in Mergers and Acquisitions,* Tax Advisor Weekly, September 16, 2008.
- *ESOPs: The Basics, Creating a Market for Closely Held Stock and the Transition to Employee Ownership,* Alvarez & Marsal Taxand, LLC, 2008.
- *The 409A Compliance Deadline is Looming – The A&M Taxand Action Plan,* Tax Advisor Weekly, July 29, 2008.
- *Severance Payments – Go on, Take the Money and Run,* Tax Advisor Weekly, July 15, 2008.
- *Retention of Key Executives during a Recession,* May 27, 2008.
- *Section 409A Non-Qualified Deferred Compensation, by Brian L. Cumberland and J.D. Ivy,* Taxation of Executive Compensation and Retirement, March 2008.
- *IRS Drops 162(m) Bomb,* February 21, 2008.
- *Executive Change in Control Arrangements at the Top 200 Companies,* Tax Advisor Weekly, January 23, 2008.
- *2007 Executive Change in Control Report,* January 2007.
- *New Cafeteria Plan Regulations: After 20 Years, Now is the Time to Get Your Plans up to Code,* Tax Advisor Weekly, October 18, 2007.
- *401(k) Wrap Plans: Rising to the Operating Challenges,* Tax Advisor Weekly, August 16, 2007.
- *They're Here: 409A Final Deferred Compensation Regulations,* Tax Advisor Weekly, June 22, 2007.
- *Funding a U.K. Employee Share Ownership Trust,* Tax Advisor Weekly, April 12, 2007.
- *2006 Executive Change in Control Report,* January 2008.
- *Deadline December 31 – New Rules and Guidance Change the Landscape for Compensation and Benefits Reporting,* Tax Advisor Weekly, November 30, 2006.
- *Analysis of Executive Change in Control Arrangements of the Top 200 Companies,* Tax Advisor Weekly, October 5, 2006.
- *What Every Tax Director Needs to Know Regarding Benefit Plan Tax Issues,* Tax Advisor Weekly, August 10, 2006.
- *SEC Proposes to Broaden Disclosure of Golden Parachute Payments, by Brian Cumberland and J.D. Ivy,* Executive's Tax & Management Report, July 2006.
- *Expensing Stock Options: Income Tax Consequences, by Brian L. Cumberland and J.D. Ivy,* Financial Reporting Watch, July 2006.
- *Backdating Stock Options: Tax Ramifications, by Brian L. Cumberland and J.D. Ivy,* Tax Analysts, June 2006.

- *The Tax Implications of Expensing Stock Options – Global Equity Compensation Programs,* Tax Advisor Weekly, June 15, 2006.
- *SEC Proposed Changes to Executive Pay Disclosure Requirements – What Companies may not have Focused on,* Tax Advisor Weekly, April 19, 2006.
- *Expensing Stock Options: Income Tax Impact,* Tax Advisor Weekly, March 1, 2006.
- *The Real IMPACT of Stock Dilution, Co-author with Aaron Brown,* The Corporate Board, November/December 2004.


**Professional Organization Speeches**

- Speaker, Dallas Bar Association – *Bankruptcy Compensation: Relevant Issues and Practices*, September 3, 2014.
- Speaker, Dallas Bar Association – *Change in Control Payments Section 280G,* February 5, 2014.
- Speaker, American Bar Association, Executive Compensation Subcommittee – *Change in Control Report.* January 24, 2014.
- Speaker, Tax Executives Institute, Portland Chapter – *Compensation and Benefits Issues.* February 19, 2014.
- Speaker, Tax Executive Institute, Fort Worth Chapter: - Tax Aspects of Healthcare Law. May 29, 2013.
- Speaker, Tax Executives Institute, Tulsa Chapter: - *Change in Control Survey, Compensation Clawback Policies, Timing of Bonus Deduction, Employment Tax Audit Issues, Worker Classification: (Employee vs. Independent Contractor).* February 2012.
- Speaker, Tax Executives Institute, New Jersey Chapter: - *Golden Parachute Rules, Change in Control Survey, Compensation Clawback Policies, Timing of Bonus Deduction, Employment Tax Audit Issues, Worker Classification: (Employee vs. Independent Contractor).* February 2012.
- Speaker, NASPP, Executive Compensation: *Impact of the Dodd-Frank Act.* March 10, 2011.
- Speaker, Haynes & Boone Conference - *Planning for Proxy Season; Executive Compensation & Corporate Governance Issues - Dodd-Frank Wall Street Reform and Consumer Protection Act.* October 14, 2010.
- Speaker, Tax Executive Institute, Austin: - *Compensation & Benefit Issues Recent Trends*, October 2009.
- Speaker, Lorman Education Services: *Designing and Structuring Incentive, Retention and Severance Plans for Companies in Bankruptcy, Scheduled,* February 2009.
- Speaker, Tax Executive Institute, Florida *Compensation & Benefits Update*, June 2008.
- Speaker, State Bar of Texas: *Executive Fringe Benefits*, April 2008.
- Speaker, Tax Executive Institute, North Carolina: *Executive Compensation and Deferred Compensation Issues*, December 2007.
- Speaker, Lorman Education Services: *Executive Compensation Issues*, November 2007.
- Speaker, Tax Executive Institute, Tulsa: *Executive Compensation and Deferred Compensation Issues*, September 2007.

- Speaker, Tax Executive Institute, Houston: *Executive Compensation and Deferred Compensation Issues*, June 2007.
- Speaker, Tax Executive Institute, South Florida: *Executive Compensation and Deferred Compensation Issues*, June 2007.
- Speaker, Southwest Benefits Association 32nd Annual Conference: *Best Practices in Coping with the New Deferred Compensation Rules*, May 2007.
- Speaker, Tax Executive Institute, Dallas: *Executive Compensation and Deferred Compensation Issues*, May 2007.
- Speaker, Tax Executive Institute, Fort Worth: *Executive Compensation and Deferred Compensation Issues*, April 2007.
- Speaker, Southwest Benefits Association: *Section 409A Final Regulations,* May 2007.
- Speaker, Tax Executive Institute/San Jose State University High Technology Tax Institute: *Section 409A – Deferred Compensation Update*, November 2006.
- Speaker, Tax Executive Institute, Dallas: *Executive Compensation and Deferred Compensation Issues*, May 2006.
- Speaker, Tax Executive Institute, Dallas: *Deferred Compensation Rules – Section 409A*, December 2005.
- Speaker, Tax Executive Institute Austin: *SFAS 123R – Expensing Equity Compensation*, November 2005.
- Speaker, Financial Services, Healthcare & Public Sector, Information, Communications & Entertainment Roundtable: *Understanding SFAS 123R: Accounting Practices, Executive Compensation Issues, Valuation Techniques Used in Expensing Stock Option Awards, and Deferred Tax Assets Related to Equity Awards*, September 2005.
- Speaker, Financial Executives Institute: *SFAS 123R – Stock Option Expensing*, September 2005.
- Speaker, Houston Private Equity Luncheon, Houston: *FAS 123R, Deferred Tax Assets, and Compensation Trends*, June 2005.
- Speaker, Byron Nelson Tax CPE Event, Dallas: *IRC Section 409A, FAS123R, and Redesign of Executive Compensation*, May 2005.
- Speaker, Tax Executives Institute, Fort Worth Chapter: *FAS 123R and Executive Compensation Trends*, May 2005.
- Speaker, Power & Utilities Tax Best Practices Share Forum: *FAS 123R, Executive Compensation and Compensation Trends*, May 2005.
- Speaker, National Association of Regulatory Utility Commissioners Staff Subcommittee on Accounting and Finance: *FAS 123R and Executive Compensation Trends*, April 2005.
- Speaker, Burkenroad Reports Investment Conference: *Senior Executive & Board Compensation – The Changing Environment*, April 2005.
- Speaker, Tax Executives Institute, Houston Chapter: *FAS 123R: Tax Impact*, April 2005.
- Speaker, Tax Executives Institute, Houston Chapter: *IRS Initiative on Executive Compensation*, March 2005.
- Speaker, Gutman's New Law Training, Dallas: *Compensation and Benefits Provisions of the American Job Creation Act of 2004*, December 2004.
- Speaker, Gutman's New Law Training, Houston: *Compensation and Benefits Provisions of the American Job Creation Act of 2004*, December 2004.

- Speaker, Tax Executives Institute, San Antonio Chapter: *Compensation and Benefits Provisions of the American Job Creation Act of 2004*, December 2004.
- Speaker, Tax Executive Institute, Dallas Chapter: *IRS Initiative on Executive Compensation, FAS 123, and Deferred Compensation Legislation*, October 2004.
- Speaker, Corporate Officers Forum: *Executive and Equity Compensation*, December 2003.
- Speaker, Turnaround Management Association: *Running a Bankrupt Company*, January 2003.
- Speaker, Tax Executives Institute, Dallas Chapter: *Executive Compensation Update*, September 2002.


**Articles Quoting Brian Cumberland**

- *Execs' Exit Packages Shrinking Amid Shareholder Pressure,* Corporate Secretary, April 2, 2014.
- *'Golden Parachute' Benefits Provided to Executives Declining, According to New Report by Alvarez & Marsal,* March 10, 2014.
- *"Golden Parachute" Payments Up by 320% Over Two Years at Large Firms,* SHRM, January 11, 2012.
- *Golden Parachutes Feeling Pressure, Seeing Change,* Compliance Week, February 23, 2010.
- *CEO parachute deals come to light in new filings,* Reuters, March 2, 2007.
- *Executive Pay Practices Under Scrutiny* by Brian Grow and Eamon Javers, Business Week, September 2006.
- *Coco-Cola's Director Pay Draws Criticism*, Base and Bonus, May 2006.
- *Designing New Deferred Compensation Plans is a Top Corporate Priority*, Houston Medical Journal, May 2005.
- *IRS Limits When Execs Can Cash in Deferred Compensation*, El Paso, Inc., February 2005.
- *Companies Mull Over Stock Option Alternatives* by Chad Eric Watt, Dallas Business Journal, January 2005.
- *Perks Altered Following Changes to Deferred Compensation Rules* by Sonya Stinson, New Orleans City Business Journal, January 2005.
- *Paid Time Off Offers Greater Flexibility* by Lisa Tanner, Austin Business Journal, October 2004.
- *Paid Time Off Offers Greater Flexibility* by Lisa Tanner, Dallas Business Journal, September 2004.


**Sources Citing Change in Control Reports**

- *Ex-executive Pay,* Reuters, April 17, 2014
- *CEOs' Golden Parachutes Stay At High Levels,* Journal Gazette (via the Washington Post), April 6, 2014.

- *Execs' Exit Packages Shrinking Amid Shareholder Pressure,* Corporate Secretary, April 2, 2014.
- *Most CEOs still can bank on a soft landing,* St. Louis Post-Dispatch, March 27, 2014.
- *Dismantling CEOs' Golden Parachutes,* The Washington Post, March 26, 2014.
- *2014 – 2013 Change in Control report also covered by the following publications:* JournalGazette.net, CSuite Insight Magazine
- *Golden Parachute Payments for CEOs Increased by 32%* by Compensation Standards, February 2012.
- *Golden Parachutes Appear To Be Losing Their Luster*, Workforce Management, February 2012.
- *Golden Parachutes,* Directors & Boards e-briefing, February 2012.
- *Golden Parachute Values Up 32% Over Two-Year Period*, Pension & Benefits Reporter, January 2012.
- *Golden Parachute Values Up 32% Over Two-Year Period*, Pension & Benefits Daily, January 2012.
- *Golden Parachute Values Up 32% Over Two-Year Period*, Daily Tax Report, January 2012.
- *'Golden Parachute' Payments Up by 32% Over Two Years at Large Firms,* SHRM Online, January 11, 2012.
- *Value of "Golden Parachute" Payments Increased by 32% in Past Two Years, According to New Study by Alvarez & Marsal Taxand,* Business Wire, January 9, 2012.
- *2012 – 2011 Change In Control  report also covered by the following publications*: MarketWatch, WorldatWork, CBS Moneywatch, Boston Globe, SFGate.com, WABC New York, Business Insider, Minneapolis-St. Paul Star Tribune, Houston Chronicle, Morningstar, Kansas City Star, Dallas Morning News, InvestorPlace, Miami Herald, San Jose Mercury News, Sacramento Bee, Pittsburgh Tribune Review, Charlotte Observer, Cincinnati Enquirer, Sign On San Diego, Oklahoman, WCBSTV New York, Salt Lake Tribune, International Business Times, Columbus Dispatch, Newsday, Fort Worth Star-Telegram, United Press International, Albany Times Union.com, Deal Law Wire.
- *New Report by A&M Indicates Diminishing Luster in 'Golden Parachutes,' A&M Taxand Change in Control Report by Brian Cumberland*. Business and Finance Week February 27, 2010.
- *Terminated? Who Cares? Severance-pay packages for CEOs appear to be coming down. But slowly.* By Perri Capell, Wall Street Journal, April 14, 2008.
- *Exit Pay: Best Practices in Practice* by Institutional Shareholder Services, May 2007.

**Recent Bankruptcy Clients**

- A123 Systems, Inc.*
- Arcapita Bank B.S.C.(c)*
- Bruno's Supermarkets, LLC*
- Coldwater Creek, Inc.*
- Eastman Kodak Company*
- Eddie Bauers*
- EnviroSolutions, Inc.*
- Fresh & Easy Neighborhood Market*
- Furniture Brands International, Inc.*
- Global Geophysical Services, Inc.*
- Green Field Energy Services, Inc.*
- Hawker Beechcraft Corporation*
- Lehman Brothers Holdings, Inc.*
- LightSquared, Inc.*
- Longview Power, LLC*
- Mark IV Industries, Inc.*
- Nortel*
- Orchard Supply Hardware Stores*
- Qimonda*
- Reader's Digest*
- SP Newsprint Company*
- Tribune Company*
- Tronox, Inc.*
- Truck Pro*
- Vitesse*
- Vitro Americas*
- Washington Mutual*
- YRC Worldwide*

* Compensation Consulting, including Key Employee Incentive Program (KEIP), Key Employer Retention Plan (KERP) and Severance Plan Design.

## EXHIBIT 2

## Amended KERP Payment Details

# [FILED UNDER SEAL]

# EXHIBIT 3

## Amended KERP Overview and Analysis



# NII HOLDINGS, INC.

OVERVIEW AND ANALYSIS OF
AMENDED KEY EMPLOYEE RETENTION PLAN

March 30, 2015



This report was prepared by:

**Alvarez & Marsal Taxand, LLC**
Compensation and Benefits Group
2100 Ross Avenue
Suite 2100
Dallas, TX 75201

Brian Cumberland
*National Managing Director, Compensation & Benefits*
bcumberland@alvarezandmarsal.com
214-438-1013

Rob Casburn
*Director*
rcasburn@alvarezandmarsal.com
214-438-8470

Byron Smyl
*Managing Director, A&M NACR*
bsmyl@alvarezandmarsal.com
305-704-6736

© Copyright 2015 Alvarez & Marsal Holdings, LLC. All rights reserved. ALVAREZ & MARSAL®,
Λ⅃ ® and A&M® are trademarks of Alvarez & Marsal Holdings, LLC.





# TABLE OF CONTENTS

Executive Summary……………………………………………………… 3
Amended Retention Plan…..……………………….…………………… 5

© Copyright 2015 Alvarez & Marsal Holdings, LLC. All rights reserved. ALVAREZ & MARSAL®,
Ⓜ ® and A&M® are trademarks of Alvarez & Marsal Holdings, LLC.





# EXECUTIVE SUMMARY





# EXECUTIVE SUMMARY



# EXECUTIVE SUMMARY

**Amended Key Employee Retention Plan ("Amended KERP")**

| Number of Participants | Total Plan Cost | Average Cost Per Participant | Average % of Base Salary |
|---|---|---|---|
| 25 | $920,111 | $36,804 | 28% |

- Provides KERP Payments ranging from 25% to 54% of annual base salary for an additional 24 key, non-insider employees and 1 mid-level employee who meets the technical definition of insider, although this individual continues to participate in the non-insider Cash Bonus Incentive Plan and does not serve in a role that would, by itself, cause this individual to be deemed an insider.

- The Amended KERP is essential to retaining these key employees through their respective retention periods, as future reductions in force will occur following the Mexico and Argentina transactions and in connection with an expected restructuring of operations at the headquarters level to reflect changes in the business resulting from those transactions.

- To earn the full KERP Payment, employees must remain employed through the end of the retention period; except in the event of death, disability or termination without cause.

- KERP Payments for 19 of the participants will be made in a lump sum at the end of the retention period. KERP Payments for the other 6 participants will be made in two installments based on meeting certain milestones during the retention period.

ALVAREZ & MARSAL





# AMENDED KEY EMPLOYEE RETENTION PLAN



# AMENDED KEY EMPLOYEE RETENTION PLAN



*Key Terms*

**Participants**

- The Amended KERP applies to non-insiders due to section 503(c)'s requirements for retention plans applicable to insiders.

- The Company has included 25 additional key employees in the Amended KERP ("Additional Participants") who are critical to the continued operations and successful ongoing operation of the Company during the sale process. Each Additional Participant's importance has been carefully evaluated and documented by the Company.

  – Additional Participants represent functions including finance, engineering and information technology.

  – Average salary: $121,473 (Global Grades 8 to 15).

**Cost**

- The total cost of adding the Additional Participants to the Amended KERP, assuming all milestones are completely achieved and all Additional Participants remain employed through the retention period, is $920,111.



# AMENDED KEY EMPLOYEE RETENTION PLAN



*Key Terms (cont'd)*

**Determination of KERP Payments**

- The KERP Payment will be equal to a percentage of each KERP participant's current base salary ranging from 25% to 54%, with an average of 28%.

- The average KERP Payment for the Additional Participants under the Amended KERP is $36,804.

- KERP Payments will be made as follows:

  – For 16 Additional Participants – upon filing of the Q3 2015 Form 10-Q;

  – For 3 Additional Participants – upon completion of Omnicrom;

  – For 3 Additional Participants – 50% upon transitioning the data center; remaining 50% will be paid 6 months following the 1st payment;

  – For 2 Additional Participants – 70% upon the closing of the Mexico transaction; 30% upon the closing of the Argentina transaction; and

  – For 1 Additional Participant – 50% upon the earlier of: (i) 60 days following emergence from bankruptcy or (ii) January 30, 2016; remaining 50% one year following the first payment.

- For the avoidance of doubt, the Additional Participants are eligible to continue participation in the Cash Bonus Incentive Plan that was approved for non-insiders by order of the Bankruptcy Court on October 14, 2014 (Docket No. 94).





*Key Terms (cont'd)*

**Termination Provisions**

 Upon voluntary termination (including retirement) or termination for cause prior to payment of the KERP Payment, any unpaid amount of an Additional Participant's KERP Payment will be forfeited. Such forfeited amount will not be made available to other employees.

 In the event of termination upon death, Disability, or by the Company without Cause, any unpaid amounts will be paid within sixty (60) days following such termination of employment.



**ALVAREZ & MARSAL**



# AMENDED KEY EMPLOYEE RETENTION PLAN

*Bankruptcy Comparison – Comparable KERPs*



- A&M evaluated the reasonableness of the Amended KERP by comparing the plan to similar plans approved by the Courts in Chapter 11 bankruptcy situations since 2005.

- A&M compiled a list of 22 KERPs from the following 16 companies:

| | |
|---|---|
| » Aleris International, Inc. | » Hawker Beechcraft |
| » Coldwater Creek | » Local Insight Media Holdings, Inc. |
| » Edison Mission Energy | » Nebraska Book Company, Inc. |
| » Energy Conversion, Inc. | » Refco Inc. |
| » Fedders Corporation | » SIRVA, Inc. |
| » Furniture Brands, Inc. | » Tribune Company |
| » Global Geophysical Services, Inc. | » Visteon Corporation |
| » Green Field Energy Services, Inc. | » Whitehall Jewelers |

- The comparable KERPs were determined using the following constraints:

  – KERPs which contained less than 50 participants. As the Amended KERP contains 37 employees, we did not feel it was appropriate compare plans which contained significantly more participants.

  – Generally, every attempt was made to limit the comparable KERPs to plans that retained professional employees in roles similar to those of the participants in the Amended KERP and to exclude plans that were clearly applicable only to rank-and-file employees (e.g., retail store workers).

- A&M's key findings are presented on the following page.



ALVAREZ & MARSAL

# AMENDED KEY EMPLOYEE RETENTION PLAN



*Bankruptcy Comparison – Comparable KERPs (cont'd)*

**Key Findings**

- To receive the full KERP Payment, participants must remain employed for the full retention period.  This is a desirable feature as it ensures participants are devoted to the long-term success of the Company.

- The Amended KERP is essential to retaining these key employees through their respective retention periods, as future reductions in force will occur following the Mexico and Argentina transactions and in connection with an expected restructuring of operations at the headquarters level to reflect changes in the business resulting from those transactions.

- The Amended KERP provides a total KERP Payment for the Additional Participants equal to, on average, 28% of salary.  This is slightly above the median (25%) and slightly below the average (31%) of the comparable KERPs.

- With the inclusion of the Additional Participants, the Amended KERP covers 37 employees, or 0.27% of the pre-petition employee population. This is significantly below the 25th percentile of the comparable KERPs (0.49%).

- The cost of the Amended KERP is small in comparison to the Debtors' prepetition assets and the benefits associated with retaining these key employees.  The cost of the Amended KERP represents approximately 0.03% of the Debtors' pre-petition assets, which is below the 25th percentile of the comparable KERPs (0.05%).

**A&M believes that the cost of the Amended KERP is reasonable in the aggregate and supportable as reasonable compensation for services rendered during the retention period.**



**ALVAREZ & MARSAL**

Taxand

# EXHIBIT C

**Smith Declaration**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

- and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
             :
In re:              :     Chapter 11
             :
NII Holdings, Inc., <u>et al.</u>,[1]    :     Case No. 14-12611 (SCC)
             :
             Debtors.    :     (Jointly Administered)
             :
-------------------------------------------------------------x

# DECLARATION OF SHANA SMITH IN
# SUPPORT OF MOTION OF DEBTORS AND DEBTORS
# IN POSSESSION FOR ENTRY OF AN ORDER APPROVING THE
# <u>FIRST AMENDMENT TO THEIR KEY EMPLOYEE RETENTION PLAN</u>

---

[1]     The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

I, Shana C. Smith, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.     I am Vice President, Deputy General Counsel and Secretary of NII Holdings, Inc. ("NII Holdings"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  I have held positions in the legal department at NII Holdings since November 2009 and have overseen executive compensation since May 2013 and human resources at NII Holdings since December 2013.  As part of my employment and service in all of these capacities, I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs and books and records, as well as the Debtors' restructuring efforts.

2.     I submit this Declaration in support of the Motion of Debtors and Debtors in Possession for Entry of an Order Approving the First Amendment to Their Key Employee Retention Plan (the "Motion").[2]

3.     Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with other responsible management and professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of the Debtors.

**The Additional Participants**

4.     The Additional Participants, for whom the Amended KERP is sought, include twenty-five individuals who are essential to several critical projects and specific milestones the

---

[2]     Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Motion.

Debtors must achieve, both with respect to the Debtors' daily operations and their restructuring efforts.  The Additional Participants have an average salary of $121,473 and global grades ranging from 8 to 15.

5.      There generally are four categories of tasks that the Additional Participants are needed to complete.  They are:

(a)     Financial Reporting.  The majority of the Additional Participants are necessary to the Debtors' continued financial reporting obligations.  The Debtors have continuing obligations to file public financial reports with the Securities & Exchange Commission that involve a substantial amount of work.  In addition, the Debtors must complete the recasting of their financial statements for discontinued operations and fresh start accounting by the second quarter of 2015.  Losing the Additional Participants prior to the end of the third quarter would significantly impede the Debtors' efforts with respect to their financial reporting obligations.  Accordingly, the Debtors seek to include seventeen Additional Participants in the KERP for financial reporting purposes (the "Financial Reporting Employees").

(b)     Strategic Transactions:  The Debtors seek to include two Additional Participants for purposes of closing strategic transactions (the "Strategic Transaction Employees"), including the Sale and the potential Argentina Transaction.  These two Additional Participants are critical to planned divestitures and need to be retained by the Debtors to ensure that both the Sale and the possible Argentina Transaction can be completed.[3]

(c)     Engineering:  Three of the Additional Participants are essential to the Debtors' development and transfer of a differentiating push-to-talk technology.  In the past, push-to-talk has been a key differentiator of the wireless communications services provided by the Debtors and the development of this program enables the continuation of this differentiator on the Debtor's new data-oriented networks (the "Engineering Employees").  Although the Engineering Employees currently work in a laboratory in Mexico, the Debtors provide reimbursement for their compensation because the technology they are working to develop is critical to the Debtors' operations in Brazil (and will not used by NII Mexico after the Sale).

(d)     Information Technology ("IT"):  The Debtors seek to include three Additional Participants (the "IT Employees") for the purpose of decommissioning the Debtors' headquarters' data center as part of their real estate consolidation and the

---

[3]     Each of the Strategic Transaction Employees were previously parties to incentive agreements related to the possible Argentina Transaction.  Both of those agreements expired at the end of 2014, however, and neither Strategic Transaction Employee has or will receive any payments under those now expired incentive agreements.

transitioning of the data center to a cloud-based platform. The Debtors must exit their current facility by mid-2015. In addition to the relocation of the Debtors' data center, the Debtors also must stabilize the operations and support of the new cloud-based platform, which could take four to six months. In addition to this work, the IT Employees provide the day-to-day IT support for the Debtors' headquarters and support of applications that service Mexico, Brazil and Argentina. Each IT Employee has specialized knowledge about the Debtors' operational environment and the technology needed to deliver these services. Accordingly, the Debtors seek to include the IT Employees in the Amended KERP.

6.     The Additional Participants were not appointed by the board of directors of NII Holdings (the "Board") and do not exercise sufficient authority to dictate corporate policy. Much like the Key Employees, the Additional Participants implement critical decisions, but are not, however, in roles that require or enable them to make or influence such critical decisions. Although the Additional Participants have titles such as director, senior director, manager and senior manager, each Additional Participant reports to a more senior employee and must obtain approval from an appropriate senior employee before taking any significant action with respect to the Debtors' corporate policies, strategy or the disposition of significant assets. Employees that are below global grade 17 do not have regular direct access to the Board.

## The Debtors' Objectives in Seeking the Amended KERP

7.     After the Sale, the Debtors will be a significantly different — and smaller — company than was originally anticipated at the outset of these bankruptcy cases. The announcement of the Sale, and its attendant consequences, has caused significant concern among the Debtors' employees regarding the future size and composition of the Debtors' workforce in the United States. The Debtors, however, continue to have a critical need to retain a variety of employees who are absolutely necessary to the continued stewardship role of NII Holdings, including legal and public reporting obligations of the Debtors, and certain transition services to be provided in connection with the Sale as well as certain other tasks described in the Motion.

8.     The Debtors believe that each of the Additional Participants is an imminent flight risk that would be difficult, if not impossible, to replace at this juncture in the Debtors' reorganization.  Given the Sale, and the uncertainty regarding the size and composition of the Debtors' workforce, attracting qualified employees at this stage in the Debtors' restructuring would also be extremely challenging.  Even if the Debtors were successful at finding qualified employees, such qualifications, alone, would not make up for the loss of the Additional Participants' institutional knowledge of the Debtors.

9.     It is the Debtors' belief that losing the Additional Participants anytime in the foreseeable future would jeopardize (a) the timeliness and compliance of the Debtors' required SEC filings; (b) the Debtors' ability to resolve complex accounting issues; (c) the implementation of fresh start accounting upon the Debtors' emergence from chapter 11; (d) the daily management and review of the Debtors' accounts payable system; (e) the Debtors' ability to accurately determine and forecast their financial and operational performance; (f) the closing of the Sale and other potential strategic transactions; (g) the development and transfer of a strategically important push-to-talk technology crucial to the Debtors' operations in Brazil; (h) the decommissioning of the Debtors' data center; (i) the transfer of the Debtors' data center to a cloud platform; and (j) the Debtors' ability to provide basic IT support to the Debtors and certain Non-Debtor Affiliates.

10.     As noted above, the Additional Participants also have an institutional knowledge of the Debtors and possess skills that are crucial to the Debtors during their restructuring and emergence as a publicly traded company able to meet its listing and disclosure obligations.  In addition, to find replacements who are capable of filling the Additional Participants' positions, the Debtors would be diverted from their overall restructuring efforts, which could delay the Debtors' restructuring or cause the Debtors to incur additional expenses.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on March 30, 2015                    By:  /s/  Shana C. Smith
                                                            Shana C. Smith