JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg
Lisa Laukitis

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
NII Holdings, Inc., et al.,[1]                              :    Case No. 14-12611 (SCC)
                                                            :
                        Debtors.                            :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

**NOTICE OF FILING OF PLAN SUPPLEMENT**
**RELATING TO THE FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION PROPOSED BY THE PLAN DEBTORS AND DEBTORS IN**
**POSSESSION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On April 20, 2015, the above-captioned debtors and debtors in possession
(collectively, the "Debtors") and the official committee of unsecured creditors (the "Creditors'
Committee" and, together with the Debtors, the "Plan Proponents") filed the *First Amended Joint
Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the
Official Committee of Unsecured Creditors* (as amended or modified from time to time,
the "Plan") (a copy of which is attached as Exhibit 1 to the *First Amended Disclosure Statement
for First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in
Possession and the Official Committee of Unsecured Creditors* [Docket No. 664, Ex. A]).[2]

2.      In accordance with paragraph 6 of the *Order (I) Approving Disclosure
Statement, (II) Approving the Form and Manner of Service of Disclosure Statement Notice,
(III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of
Reorganization, and (IV) Scheduling Hearing on Confirmation of Plan of Reorganization*,
entered on April 20, 2015 [Docket No. 655], the Plan Proponents hereby file certain draft forms,
signed copies or summaries of material terms of certain documents relating to the Plan and/or to
be executed, delivered, assumed and/or performed in connection with the consummation of the
Plan on the Effective Date, which comprise this Plan Supplement.

3.      The applicable Plan Documents that have now been appended as exhibits
to this Plan Supplement are as follows:

- Exhibit B-1 – Certificate of Incorporation of Reorganized NII (revised)

- Exhibit B-2 – Blackline of Certificate of Incorporation of
  Reorganized NII compared to form filed as Exhibit B to the Plan

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

-2-

- <u>Exhibit C-1</u> – Bylaws of Reorganized NII (revised)

  - <u>Exhibit C-2</u> – Blackline of Bylaws of Reorganized NII compared to form filed as Exhibit C to the Plan

- <u>Exhibit D</u> – New Directors of Reorganized NII

- <u>Exhibit E</u> – Form of Management Incentive Plan

- <u>Exhibit F</u> – Amendments to Operating Company Credit Agreements

- <u>Exhibit G</u> – Executory Contracts and Unexpired Leases to be Assumed

- <u>Exhibit H</u> – New NII-ATC Guaranty

- <u>Exhibit I</u> – Retained Causes of Action

4.      The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  However, **these documents have not yet been approved by the Bankruptcy Court**.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

5.      The Plan Proponents reserve all rights to amend, modify, or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan.  To the extent material amendments or modifications are made to any of these documents, the Plan Proponents will file a blackline of such document with the Bankruptcy Court.

6.       Copies of the Plan, the Plan Supplement and all other pleadings filed in

these cases may be obtained from the Bankruptcy Court's website at http://ecf.nysb.uscourts.gov

or, free of charge, at http://cases.primeclerk.com/nii/.

Dated:  May 11, 2015                           Respectfully submitted,
        New York, New York

                                                  /s/    Scott J. Greenberg
                                               Scott J. Greenberg
                                               Lisa Laukitis
                                               JONES DAY
                                               222 East 41st Street
                                               New York, New York  10017
                                               Telephone:  (212) 326-3939
                                               Facsimile:  (212) 755-7306

                                                - and -

                                               David G. Heiman (admitted *pro hac vice*)
                                               Carl E. Black (admitted *pro hac vice*)
                                               JONES DAY
                                               North Point
                                               901 Lakeside Avenue
                                               Cleveland, Ohio  44114
                                               Telephone:  (216) 586-3939
                                               Facsimile:  (216) 579-0212

                                               ATTORNEYS FOR DEBTORS AND
                                               DEBTORS IN POSSESSION

NYI-524658045v1

## **EXHIBIT B-1**

**Certificate of Incorporation of Reorganized NII
(Revised)**

**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**NII HOLDINGS, INC.**

**(Amended and Restated as of              , 2015)**

NII Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify:

1. The name of the corporation is NII Holdings, Inc. (the "Corporation"). The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on October 18, 2000 under the name of NII Acquisition Company. A Certificate of Merger was filed with the Secretary of State on November 28, 2000. A Certificate of Amendment was filed with the Secretary of State on December 21, 2001. A Restated Certificate of Incorporation was filed with the Secretary of State on November 12, 2002. Certificates of Amendment were filed with the Secretary of State on May 5, 2004 and on May 4, 2006. An Amended and Restated Certificate of Incorporation was filed with the Secretary of State on May 22, 2013.

2. The Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), which both restates and further amends the provisions of the Corporation's Amended and Restated Certificate of Incorporation as hereinafter set forth, was duly adopted in accordance with the provisions of Sections 245 and 303 of the Delaware General Corporation Law on              , 2015.

3. The text of the Amended and Restated Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

FIRST:  The name of the Corporation is Nextel International, Inc.

SECOND:  The address of its registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

THIRD:  The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

FOURTH:  Authorized Shares.

The total authorized number of shares of all classes of capital stock which the Corporation has authority to issue is one hundred fifty million (150,000,000) shares, divided into two classes as follows:

One hundred forty million (140,000,000) shares of common stock, par value $0.001 per share (the "Common Stock"); and Ten million (10,000,000) shares of preferred stock, par value $0.001 per share (the "Preferred Stock").

A. Common Stock.

1. Voting Rights. Subject to any voting rights granted to Preferred Stock outstanding at the time, each share of Common Stock shall be entitled to one (1) vote per share, in person or by proxy, on all matters submitted to a vote of the stockholders of the Corporation on which the holders of the Common Stock are entitled to vote. Except as otherwise required in this Certificate of Incorporation, the Corporation's Bylaws or by applicable law, the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation generally (or if any holders of shares of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with such holders of shares of Preferred Stock, if any).

2. Dividends and Distributions. Subject to the preferences applicable to any Preferred Stock outstanding at any time, if any, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Corporation's Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

3. Liquidation. If the Corporation shall be liquidated (either partial or complete), dissolved or wound up, whether voluntarily or involuntarily, the holders of the Common Stock shall be entitled to share ratably in the net assets of the Corporation remaining after payment of all liquidation preferences, if any, applicable to any outstanding Preferred Stock.

B. Undesignated Preferred Stock.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock as preferred stock of one or more series and in connection with the creation of any such series to fix by the resolution or resolutions providing for the issue of shares thereof the designation, voting powers, preferences, and relative, participating, optional, or other special rights of such series, and the qualifications, limitations, or restrictions thereof. Any of the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of any such series of stock may be made dependent upon facts ascertainable outside the resolution or resolutions providing for the issue of such stock adopted by the Board of Directors, provided that the manner in which such facts shall operate upon the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of such series of stock is clearly and expressly set forth in the resolution or resolutions providing for the issue of such series adopted by the Board of Directors. Such authority of the Board of Directors with respect to each such series shall include, but not be limited to, the determination of the following:

(1) the distinctive designation of, and the number of shares comprising, such series, which number may be increased (except where otherwise provided by the Board of Directors in creating such series) or decreased (but not below the number of shares thereof then outstanding) from time to time by like action of the Board of Directors;

(2) the dividend rate or amount for such series, the conditions and dates upon which such dividends shall be payable, the relation which such dividends shall bear to the dividends payable on any other class or classes or any other series of any class or classes of stock, and whether such dividends shall be cumulative, and if so, from which date or dates for such series;

(3) whether or not the shares of such series shall be subject to redemption by the Corporation and the times, prices and other terms and conditions of such redemption;

(4) whether or not the shares of such series shall be subject to the operation of a sinking fund or purchase fund to be applied to the redemption or purchase of such shares and if such a fund be established, the amount thereof and the terms and provisions relative to the application thereof;

(5) whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes, or of any other series of any class or classes, of stock of the Corporation and if provision be made for conversion or exchange, the times, prices, rates, adjustments, and other terms and conditions of such conversion or exchange;

(6) whether or not the shares of such series shall have voting rights, in addition to the voting rights provided by law, and if they are to have such additional voting rights, the extent thereof;

(7) the rights of the shares of such series in the event of any liquidation, dissolution, or winding up of the Corporation or upon any distribution of its assets; and

(8) any other powers, preferences, and relative, participating, optional, or other special rights of the shares of such series, and the qualifications, limitations, or restrictions thereof, to the full extent now or hereafter permitted by law and not inconsistent with the provisions hereof.

C.      Non-Voting Securities.

The Corporation shall not issue non-voting equity securities; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity securities is included in this Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

FIFTH:

A. The number of directors constituting the Board of Directors shall be fixed from time to time by, or in the manner provided in, the Bylaws of the Corporation, but in no case may the number of directors be less than three.

B. Until the 2017 Annual Meeting, the directors shall be divided into two classes, designated as Class I and Class II. The initial term for the one director in Class I shall expire at the annual meeting of stockholders to be held in 2016 and thereafter at the annual meeting of stockholders to be held in 2017. The term for all of the other directors who shall be in Class II shall expire at the annual meeting of stockholders to be held in 2017. At the 2017 Annual Meeting of Stockholders, and each annual meeting of stockholders thereafter, each director shall be elected for a term expiring at the next annual meeting of stockholders and until such director's successor is elected and qualified, or such director's earlier resignation or removal. So long as the Board of Directors is divided into classes, any increase or decrease in the number of directors constituting the Board shall be apportioned among the classes so as to maintain at least one director in each class. Any director elected or appointed to fill a vacancy shall hold office for the remaining term of the class to which such director is assigned. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director. The Bylaws may contain any provision regarding classification of the Corporation's directors not inconsistent with the terms hereof. Until the 2017 Annual Meeting of Stockholders, the affirmative vote of holders of no less than seventy-five percent (75%) of the voting power of the outstanding Voting Stock, voting together as a single class, shall be required to alter, amend or repeal this Clause B.

SIXTH:

A. The Board of Directors is authorized to make, alter, amend or repeal the Bylaws of the Corporation (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and Article IX of the Bylaws (as such provisions are designated in the Bylaws in effect on the date hereof) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections). The stockholders acting by the affirmative vote of the holders of a majority of the voting power of the outstanding Voting Stock, voting together as a single class, are also authorized to make, alter, amend or repeal the Bylaws of the Corporation.

B. The Corporation shall not be governed by or subject to Section 203 of the Delaware General Corporation Law.

C. Subject to the rights of the holders of any series of Preferred Stock:

(1) any action required or permitted to be taken by the stockholders of the Company may be taken at a duly called annual or special meeting of stockholders of the Company or without a meeting by means of any consent in writing of such stockholders; and

(2) special meetings of stockholders of the Company may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the Common Stock of the Corporation issued and outstanding and entitled to vote, where beneficial ownership for these purposes may be established by any method prescribed by Rule 14a-8(b)(2) under the Securities Exchange Act of 1934, as amended, or any successor provision (without giving effect to any minimum threshold or duration of ownership limitation therein).

At any annual meeting or special meeting of stockholders of the Company, only such business will be conducted or considered as has been brought before such meeting in the manner provided in the Bylaws of the Company.  For the purposes of this Certificate of Incorporation, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

SEVENTH:

A. To the fullest extent permitted by the Delaware General Corporation Law as it now exists and as it may hereafter be amended, no director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of any fiduciary or other duty as a director, provided that this provision shall not eliminate or limit the liability of a director (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the Delaware General Corporation Law, or (4) for any transaction from which the director derived an improper personal benefit.

B. The rights and authority conferred in this Article SEVENTH shall not be exclusive of any other right that any person may otherwise have or hereafter acquire.

C. Neither the amendment, alteration or repeal of this Article SEVENTH, nor the adoption of any provision inconsistent with this Article SEVENTH, shall adversely affect any right or protection of a director of the Corporation existing at the time of such amendment, alteration or repeal with respect to acts or omissions occurring prior to such amendment, alteration, repeal or adoption.

D. Any person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the Delaware General Corporation Law, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any

such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Clause D shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Clause D.

IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation this    day of                , 2015.

NII HOLDINGS, INC.

By: _____
Name: Gary D. Begeman
Office: Executive Vice President, General Counsel

## <u>EXHIBIT B-2</u>

**Blackline of Certificate of Incorporation of Reorganized NII
compared to form filed as Exhibit B to the Plan**

**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**NII HOLDINGS, INC.**

**(Amended and Restated as of            , 2015)**

NII Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify:

1. The name of the corporation is NII Holdings, Inc. (the "Corporation"). The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on October 18, 2000 under the name of NII Acquisition Company. A Certificate of Merger was filed with the Secretary of State on November 28, 2000. A Certificate of Amendment was filed with the Secretary of State on December 21, 2001. A Restated Certificate of Incorporation was filed with the Secretary of State on November 12, 2002. Certificates of Amendment were filed with the Secretary of State on May 5, 2004 and on May 4, 2006. An Amended and Restated Certificate of Incorporation was filed with the Secretary of State on May 22, 2013.

2. The Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), which both restates and further amends the provisions of the Corporation's Amended and Restated Certificate of Incorporation as hereinafter set forth, was duly adopted in accordance with the provisions of Sections 245 and 303 of the Delaware General Corporation Law on            , 2015.

3. The text of the Amended and Restated Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

FIRST:  The name of the Corporation is ~~NII Holdings~~Nextel International, Inc.

SECOND:  The address of its registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

THIRD:  The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

<u>FOURTH</u>:  Authorized Shares.

The total authorized number of shares of all classes of capital stock which the Corporation has authority to issue is one hundred fifty million (150,000,000) shares, divided into two classes as follows:

One hundred forty million (140,000,000) shares of common stock, par value $0.001 per share (the "Common Stock"); and Ten million (10,000,000) shares of preferred stock, par value $0.001 per share (the "Preferred Stock").

A. Common Stock.

1. <u>Voting Rights</u>.  Subject to any voting rights granted to Preferred Stock outstanding at the time, each share of Common Stock shall be entitled to one (1) vote per share, in person or by proxy, on all matters submitted to a vote of the stockholders of the Corporation on which the holders of the Common Stock are entitled to vote. Except as otherwise required in this Certificate of Incorporation, the Corporation's Bylaws or by applicable law, the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation generally (or if any holders of shares of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with such holders of shares of Preferred Stock, if any).

2. <u>Dividends and Distributions</u>.  Subject to the preferences applicable to any Preferred Stock outstanding at any time, if any, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Corporation's Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

3. <u>Liquidation</u>.  If the Corporation shall be liquidated (either partial or complete), dissolved or wound up, whether voluntarily or involuntarily, the holders of the Common Stock shall be entitled to share ratably in the net assets of the Corporation remaining after payment of all liquidation preferences, if any, applicable to any outstanding Preferred Stock.

B. <u>Undesignated Preferred Stock</u>.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock as preferred stock of one or more series and in connection with the creation of any such series to fix by the resolution or resolutions providing for the issue of shares thereof the designation, voting powers, preferences, and relative, participating, optional, or other special rights of such series, and the qualifications, limitations, or restrictions thereof. Any of the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of any such series of stock may be made dependent upon facts ascertainable outside the resolution or resolutions providing for the issue of such stock adopted by the Board of Directors, provided that the manner in which such facts shall operate upon the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of such series of stock is clearly and expressly set forth in the resolution or resolutions providing for the issue of such series adopted by the Board of Directors. Such authority of the Board of Directors with respect to each such series shall include, but not be limited to, the determination of the following:

(1) the distinctive designation of, and the number of shares comprising, such series, which number may be increased (except where otherwise provided by the Board of Directors in creating such series) or decreased (but not below the number of shares thereof then outstanding) from time to time by like action of the Board of Directors;

(2) the dividend rate or amount for such series, the conditions and dates upon which such dividends shall be payable, the relation which such dividends shall bear to the dividends payable on any other class or classes or any other series of any class or classes of stock, and whether such dividends shall be cumulative, and if so, from which date or dates for such series;

(3) whether or not the shares of such series shall be subject to redemption by the Corporation and the times, prices and other terms and conditions of such redemption;

(4) whether or not the shares of such series shall be subject to the operation of a sinking fund or purchase fund to be applied to the redemption or purchase of such shares and if such a fund be established, the amount thereof and the terms and provisions relative to the application thereof;

(5) whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes, or of any other series of any class or classes, of stock of the Corporation and if provision be made for conversion or exchange, the times, prices, rates, adjustments, and other terms and conditions of such conversion or exchange;

(6) whether or not the shares of such series shall have voting rights, in addition to the voting rights provided by law, and if they are to have such additional voting rights, the extent thereof;

(7) the rights of the shares of such series in the event of any liquidation, dissolution, or winding up of the Corporation or upon any distribution of its assets; and

(8) any other powers, preferences, and relative, participating, optional, or other special rights of the shares of such series, and the qualifications, limitations, or restrictions thereof, to the full extent now or hereafter permitted by law and not inconsistent with the provisions hereof.

C.      Non-Voting Securities.

The Corporation shall not issue non-voting equity securities; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity securities is included in this Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

FIFTH:

A. The number of directors constituting the Board of Directors shall be fixed from time to time by, or in the manner provided in, the Bylaws of the Corporation, but in no case may the number of directors be less than three.

B. Until the 2017 Annual Meeting, the directors shall be divided into two classes, designated as Class I and Class II. The initial term for the one director in Class I shall expire at the annual meeting of stockholders to be held in 2016 and thereafter at the annual meeting of stockholders to be held in 2017. The term for all of the other directors who shall be in Class II shall expire at the annual meeting of stockholders to be held in 2017. At the 2017 Annual Meeting of Stockholders, and each annual meeting of stockholders thereafter, each director shall be elected for a term expiring at the next annual meeting of stockholders and until such director's successor is elected and qualified, or such director's earlier resignation or removal. So long as the Board of Directors is divided into classes, any increase or decrease in the number of directors constituting the Board shall be apportioned among the classes so as to maintain at least one director in each class. Any director elected or appointed to fill a vacancy shall hold office for the remaining term of the class to which such director is assigned. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director. The Bylaws may contain any provision regarding classification of the Corporation's directors not inconsistent with the terms hereof. Until the 2017 Annual Meeting of Stockholders, the affirmative vote of holders of no less than seventy-five percent (75%) of the voting power of the outstanding Voting Stock, voting together as a single class, shall be required to alter, amend or repeal this Clause B.

SIXTH:

A. The Board of Directors is authorized to make, alter, amend or repeal the Bylaws of the Corporation (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and Article IX of the Bylaws (as such provisions are designated in the Bylaws in effect on the date hereof) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections). The stockholders acting by the affirmative vote of the holders of a majority of the voting power of the outstanding Voting Stock, voting together as a single class, are also authorized to make, alter, amend or repeal the Bylaws of the Corporation.

B. The Corporation shall not be governed by or subject to Section 203 of the Delaware General Corporation Law.

C. Subject to the rights of the holders of any series of Preferred Stock:

(1) any action required or permitted to be taken by the stockholders of the Company may be taken at a duly called annual or special meeting of stockholders of the Company or without a meeting by means of any consent in writing of such stockholders; and

(2) special meetings of stockholders of the Company may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the Common Stock of the Corporation issued and outstanding and entitled to vote, where beneficial ownership for these purposes may be established by any method prescribed by Rule 14a-8(b)(2) under the Securities Exchange Act of 1934, as amended, or any successor provision (without giving effect to any minimum threshold or duration of ownership limitation therein).

At any annual meeting or special meeting of stockholders of the Company, only such business will be conducted or considered as has been brought before such meeting in the manner provided in the Bylaws of the Company.  For the purposes of this Certificate of Incorporation, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

SEVENTH:

A. To the fullest extent permitted by the Delaware General Corporation Law as it now exists and as it may hereafter be amended, no director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of any fiduciary or other duty as a director, provided that this provision shall not eliminate or limit the liability of a director (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the Delaware General Corporation Law, or (4) for any transaction from which the director derived an improper personal benefit.

B. The rights and authority conferred in this Article SEVENTH shall not be exclusive of any other right that any person may otherwise have or hereafter acquire.

C. Neither the amendment, alteration or repeal of this Article SEVENTH, nor the adoption of any provision inconsistent with this Article SEVENTH, shall adversely affect any right or protection of a director of the Corporation existing at the time of such amendment, alteration or repeal with respect to acts or omissions occurring prior to such amendment, alteration, repeal or adoption.

D. Any person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the Delaware General Corporation Law, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any

such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Clause D shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Clause D.

IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation this ___ day of _____, 2015.

NII HOLDINGS, INC.

By: _____
Name: Gary D. Begeman
Office: Executive Vice President, General Counsel

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 4/1/2015 1:53:32 PM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:**iw://NYI/NYI/524643187/1 | |
| **Modified DMS:** iw://NYI/NYI/524643187/2 | |
| **Changes:** | |
| Add | 3 |
| Delete | 3 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 6 |

## **EXHIBIT C-1**

**Bylaws of Reorganized NII**
**(Revised)**

**NEXTEL INTERNATIONAL, INC.**
**FIFTH AMENDED AND RESTATED BYLAWS**

**ARTICLE I**
**OFFICES**

Section 1.1 Registered Office. The registered office of Nextel International, Inc. (the "Corporation") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.2 Offices. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 2.1 Time and Place.

(a) All meetings of the stockholders for shall be held at such time and place (if any) as designated by the Board of Directors, within or without the State of Delaware, and stated in the notice of the meeting provided in accordance with Section 2.4 hereof.  Notwithstanding the foregoing, the Board may, in its sole discretion, determine that a meeting of stockholders will not be held at any place, but may instead be held by means of remote communications pursuant to Section 8.6.  The Board may reschedule to an earlier or later date any previously scheduled annual or special meeting of stockholders (subject, in the case of a special meeting called pursuant to Section 2.3, to the requirements of therein).

(b) Except as otherwise set forth in these bylaws, every reference in these bylaws to a majority or other proportion of the entire capital stock of the Corporation necessary to take a particular action, refers to a majority or other proportion of the votes entitled to be cast with respect to a particular matter or action by all holders of the issued and outstanding capital stock of the Corporation that are entitled to vote on such matter or action.

Section 2.2 Annual Meetings. Annual meetings of stockholders shall be held in each year on such date (which date, other than for the 2016 annual meeting, shall be no later than 13 months after the date of the last annual meeting of stockholders) and at such time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which stockholders shall elect directors in accordance with Section 3.4 hereof, and transact such other business as may properly be brought before the meeting in accordance with Section 2.8 hereof.

Section 2.3 Special Meetings.

(a) Special meetings of the stockholders, unless otherwise prescribed by statute or by the Corporation's Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in

writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the common stock of the Corporation issued and outstanding and entitled to vote as of the record date (the "Requisite Percentage") referred to in this <u>Section 2.3</u>, subject to the following:  In order for a special meeting requested by one or more stockholders (a "Stockholder Requested Special Meeting") to be called by the secretary, one or more written requests for a special meeting (each a "Special Meeting Request," and collectively, the "Special Meeting Requests") stating the purpose of the special meeting and the matters proposed to be acted upon thereat must be signed and dated by the Requisite Percentage of holders of common stock of the Corporation (or their duly authorized agents), must be delivered to the secretary at the principal executive offices of the Corporation and must set forth: (i) in the case of any director nominations proposed to be presented at such Stockholder Requested Special Meeting, the information required by Section 3.3(d); (ii) in the case of any matter (other than a director nomination) proposed to be conducted at such Stockholder Requested Special Meeting, the information required by Section 2.8(b); and (iii) an agreement by the requesting stockholder(s) to notify the secretary immediately in the case of any disposition prior to the record date for the Stockholder Requested Special Meeting of shares of Voting Stock owned of record and an acknowledgement that any such disposition shall be deemed a revocation of such Special Meeting Request to the extent of such disposition such that the number of shares disposed of shall not be included in determining whether the Requisite Percentage has been reached (except that for purposes of this Section 2.3, the term "Stockholder Requested Special Meeting" will be substituted for the term "annual meeting" in all places where it appears in Section 2.8(b)).

(b) In determining whether a special meeting of stockholders has been requested by the holders of shares representing in the aggregate at least the Requisite Percentage, multiple Special Meeting Requests delivered to the secretary will be considered together only if each such Special Meeting Request (A) identifies substantially the same purpose or purposes of the special meeting and substantially the same matters proposed to be acted on at the special meeting (in each case as determined in good faith by the Board), and (B) has been dated and delivered to the secretary within 60 days of the earliest dated of such Special Meeting Requests.  Any requesting stockholder may revoke his, her or its Special Meeting Request at any time by written revocation delivered to the secretary at the principal executive offices of the Corporation; *provided*, *however*, that if following such revocation (or any deemed revocation pursuant to Section 2.3(a)(iii) above), the unrevoked valid Special Meeting Requests represent in the aggregate less than the Requisite Percentage there shall be no requirement to hold a special meeting.  The first date on which unrevoked valid Special Meeting Requests constituting not less than the Requisite Percentage shall have been delivered to the secretary is referred to herein as the "Request Receipt Date."

(c) A Special Meeting Request shall not be valid: (i) if the Special Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; and (ii) an identical or substantially similar item as determined in good faith by the Board is included in the Corporation's notice as an item of business to be brought before a stockholder meeting that has been called but not yet held or that is called for a date within 75 days after the Request Receipt Date.

(d) The Corporation will provide the requesting stockholder(s) with notice of the record date(s) for the determination of stockholders (i) entitled to submit a Special Meeting Request and (ii) entitled to vote at the Stockholder Requested Special Meeting.

(e) A Stockholder Requested Special Meeting shall be held at such date and time as may be fixed by the Board; *provided*, *however*, that the Stockholder Requested Special Meeting shall be called for a date not less than 75 calendar days after the Request Receipt Date.

(f)  No requesting stockholder will be entitled to have any matter proposed to be presented at a Stockholder Requested Meeting in any proxy statement or form of proxy that the Corporation may use in connection therewith solely as a result of such stockholder's compliance with the foregoing provisions of this Section 2.3.

(g) Business transacted at any Stockholder Requested Special Meeting shall be limited to (i) the purpose(s) stated in the valid Special Meeting Request(s) received from the Requisite Percentage of stockholders; and (ii) any additional matters that the Board determines to include in the Corporation's notice of the meeting. If none of the stockholders (owning beneficially or of record) who submitted the Special Meeting Request appears in person or by proxy to present the matters to be presented for consideration that were specified in the Stockholder Meeting Request, the Corporation need not present such matters for a vote at such meeting, notwithstanding that proxies in respect of such matter may have been solicited, obtained or delivered.

Section 2.4 Notice of Meetings. Notice of any annual or special meeting of the stockholders, stating the place (if any), date and hour of the meeting, as well as the record date for determining stockholders entitled to vote at the meeting (if such record date is different from the record date for determining stockholders entitled to notice of the meeting), and the means of remote communication (if any) by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to notice of such meeting not less than ten nor more than sixty days before the date of such meeting. Notice of special meetings of stockholders shall also include the purpose or purposes for which the meeting is called.

Section 2.5 Quorum. The holders of shares representing a majority of votes that may be cast by the entire capital stock of the Corporation issued and outstanding and entitled to vote thereat with respect to a particular matter, present in person or represented by proxy, shall constitute a quorum at all meetings with respect to each matter to be voted upon at a meeting of the stockholders for the transaction of business except as otherwise provided by the Delaware General Corporation Law (the "DGCL") or by the Certificate of Incorporation. If, however, such quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.

Section 2.6 Voting. When a quorum is present at any meeting of stockholders, the affirmative vote of a majority of the votes properly cast on the matter (excluding any abstentions or broker non-votes) will be the act of the stockholders with respect to all matters other than the election of directors which will be elected in accordance with Section 3.4, or as otherwise provided in these bylaws, the Certificate of Incorporation, a Preferred Stock Designation, or by the DGCL.

Section 2.7 Conduct of Meetings. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at such meeting by the

person presiding over the meeting. The Board of Directors may adopt by resolution such rules or regulations for the conduct of meetings of stockholders as it shall deem appropriate; provided that such rules or regulations shall be consistent with the Certificate of Incorporation and these bylaws. Unless otherwise specified in such rules or regulations, the chairman of the Board shall serve as the chair of any meeting of stockholders. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chair of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting, to stockholders (owning beneficially or of record) of the Corporation, their duly authorized and constituted proxies or such other persons as the chair shall permit; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on the time allotted to questions or comments by participants and (vi) the adjournment of the meeting by the chair. Unless, and to the extent determined by the Board of Directors or the chair of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

Section 2.8 Submission of Business for Consideration at Meetings of Stockholders.

(a) At an annual meeting of stockholders, only such business (other than the nomination of candidates for election as directors of the Corporation, which is governed by Section 3.3 hereof) will be conducted or considered as is properly brought before the annual meeting. To be properly brought before an annual meeting, business must be (i) specified in the notice of the annual meeting (or any supplement thereto) given by or at the direction of the Board of Directors in accordance with Section 2.4 hereof, (ii) otherwise properly brought before the annual meeting by the presiding officer or by or at the direction of a majority of the entire Board, or (iii) otherwise properly requested to be brought before the annual meeting by a stockholder of the Corporation in accordance with this Section 2.8. For purposes of these bylaws, "entire Board" refers to the total number of directors that the Corporation would have if there were no vacancies.

(b) For business to be properly requested by a stockholder to be brought before an annual meeting, (i) the stockholder must be the holder, beneficially or of record, of shares, (ii) the stockholder must be entitled to vote at such meeting (either directly or through a proxy or beneficial interest), and (iii) the stockholder must have given timely notice thereof in proper written form to the secretary of the Corporation. Except as otherwise provided by law, to be timely, a stockholder's notice must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 calendar days prior to the anniversary of the preceding year's annual meeting of stockholders; *provided*, *however*, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made.  In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. To be in proper written form, a stockholder's notice to the secretary of the Corporation must set forth (A) as to each matter the stockholder

proposes to bring before the annual meeting: (1) a description in reasonable detail of the business desired to be brought before the annual meeting; and (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, if the business includes a proposal to amend these bylaws or the Certificate of Incorporation, the language of the proposed amendment); and (B) as to each stockholder giving the notice and any Stockholder Associate (as defined below): (1) the name and address of the stockholder and the name and address of any Stockholder Associate; (2) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to present the business stated in the stockholder's notice; (3) the class, series and number of any securities of the Corporation that are owned of record or beneficially by any of these persons as of the date of the stockholder's notice; (4) a description of any material interests of any of these persons in the business proposed and of all agreements, arrangements and understandings between these persons and any other person (including their names) in connection with the proposal of the business by the stockholder; (5) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which any of these persons has a right to vote any shares of any securities of the Corporation; (6) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (7) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (8) a representation that after the date of the stockholder's notice and until the date of the annual meeting, each of these persons will provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (3) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understandings described in response to subclause (6) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying those agreements, arrangements or understandings; and (C) a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (1) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal; and/or (2) otherwise to solicit proxies from stockholders in support of the proposal.

For purposes of this Section 2.8 and Section 3.3 hereof, (x) "public disclosure" means disclosure in a press release reported by the Dow Jones News Service, Associated Press, Reuters, Bloomberg or comparable national news service or in a document filed by the Corporation with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") or furnished by the Corporation to its stockholders and (y) "Stockholder Associate" of any stockholder means (1) any person controlling, directly or indirectly, or acting in concert with, the stockholder; and (2) any beneficial owner of securities of the Corporation owned of record or beneficially by the stockholder. Notwithstanding the foregoing provisions of this Section 2.8, in order to include information with respect to a stockholder proposal in the Corporation's proxy statement and form of proxy for a meeting of stockholders, a stockholder must provide notice as required by, and otherwise comply with, all of the applicable requirements of Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

Nothing in this Section 2.8 will be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

(c) At a special meeting of stockholders, only such business may be conducted or considered as is properly brought before the meeting. To be properly brought before a special meeting (subject to Section 2.3(g) in the case of a Stockholder Requested Special Meeting), business must be (i) specified in the notice of the meeting (or any supplement thereto) given in accordance with these bylaws or (ii) otherwise properly brought before the meeting in accordance with these bylaws, by the presiding officer of the meeting or by or at the direction of a majority of the entire Board.

(d) The determination of whether any business sought to be brought before any annual or special meeting of stockholders is properly brought before such meeting in accordance with this Section 2.8 will be made by the presiding officer of such meeting.

Section 2.9 Action Without a Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the stockholders may be taken without a meeting, if stockholders having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted consent in writing or by electronic transmission, provided that prompt notice must be given to all stockholders of the taking of corporate action without a meeting by less than unanimous written consent.

## ARTICLE III
## DIRECTORS

Section 3.1 Number and Qualification.  The Board of Directors shall consist of at least three members, shall initially consist of seven members, and may be fixed from time to time for any period on or after the 2017 annual meeting of stockholders by (i) resolution of the Board of Directors at no more than nine members or (ii) stockholders holding a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director. Directors need not be stockholders.

Section 3.2 Election and Term.  Directors shall be elected for terms as set forth in the Certificate of Incorporation and in the manner provided in Section 3.4 hereof at the annual meeting of the stockholders.

Section 3.3 Nominations.

(a) Only persons who are nominated in accordance with the provisions of this Section 3.3 will be eligible for election as directors at a meeting of stockholders.

(b) Nominations of persons for election as directors may be made only at a meeting of stockholders (i) by or at the direction of the Board of Directors or a committee thereof or (ii) by any stockholder, beneficially or of record, at the time of giving the notice provided for in this Section 3.3, who is entitled to

vote for the election of directors at such annual meeting, and who makes the nomination pursuant to timely notice in proper written form to the secretary of the Corporation in compliance with the procedures set forth in this Section 3.3.

(c) Except as otherwise provided by law, to be timely, a stockholder's notice with respect to nominations of persons for election as directors of the Corporation must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 days prior to the anniversary of the date for the preceding year's annual meeting of stockholders; provided, however, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made.  In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above.

(d) To be in proper written form, a stockholder's notice pursuant to this Section 3.3 must set forth or include:

(i) as to each person who is not an incumbent director of the Corporation whom the stockholder proposes to nominate for election as a director, (A) the name, age, business address and residence address of such person; (B) the principal occupation or employment of such person; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by such person; (D) the date or dates the securities were acquired; (E) any other information relating to such person that is required to be disclosed in solicitation for proxies or election of directors pursuant to Regulation 14A under the Exchange Act (or any comparable successor rule or regulation); and (F) a representation that such person meets the qualifications to serve as a director of the Corporation.

(ii) as to the stockholder giving the notice and any Stockholder Associate, (A) the name and address of the stockholder and the name and address of any Stockholder Associate; (B) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to nominate the person or persons specified in the stockholder's notice; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by each of these persons as of the date of the stockholder's notice; (D) a description of any material relationships, including legal, financial and/or compensatory, between the stockholder giving the notice and any Stockholder Associate, on one hand, and the proposed nominee(s), on the other hand; (E) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (F) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (G) a representation that after the date of the stockholder's notice and until the date of the annual meeting each of these persons will

provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (C) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understanding described in response to subclause (F) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying these agreements, arrangements or understanding;

(iii)  a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (A) to deliver a proxy statement and/or form of proxy to stockholders; and/or (B) otherwise to solicit proxies from stockholders in support of the proposed nominee;

(iv) the director questionnaire (which is available from the secretary of the Corporation upon request) that is distributed to all directors of the Corporation; and

(v) a written consent of each proposed nominee to serve as a director of the Corporation, if elected.

(e) The determination of whether any nomination sought to be brought before any annual meeting of the stockholders is properly brought before such meeting in accordance with this Section 3.3 will be made by the presiding officer of such meeting.

Section 3.4 Majority Voting in Director Elections. Each director to be elected by stockholders shall be elected as such by the vote of the majority of the votes cast by stockholders for that director at a meeting for the election of directors at which a quorum is present, except that if the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of a plurality of the shares represented in person or by proxy at any such meeting. For purposes of this Section 3.4, a "majority of votes cast" shall mean that the number of shares voted "for" a director's election exceeds the number of votes cast "against" that director's election.

Section 3.5 Vacancies. In the case of any vacancy on the Board of Directors, including a vacancy created by an increase in the number of directors, the vacancy may be filled by the Board of Directors, acting by a majority of the remaining directors then in office, although less than a quorum, or by a sole remaining director or by stockholders acting by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. Any director appointed to fill a vacancy shall be appointed until the next succeeding annual meeting of stockholders (or for the remainder of the term for the applicable class of directors for so long as the Board is divided into classes) and thereafter until such director's successor is elected and qualified or such director earlier resigns or is removed.

Section 3.6 Removal. Subject to the rights of holders of preferred stock (if any) with respect to any directors elected by the holders of such preferred stock, any director, or the entire Board of Directors, may be removed from office at any time, with or without cause (except that so long as the Board of Directors is divided into classes, directors may be removed only for cause), by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote

generally in the election of directors, voting together as a single class.

Section 3.7 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by the DGCL or by the Certificate of Incorporation or by these bylaws directed or required to be exercised or done by the stockholders. The Board of Directors may adopt such special rules and regulations for the conduct of its meetings and the management of the affairs of the Corporation as the Board of Directors may deem proper, not inconsistent with law or these bylaws.

Section 3.8 Regular Meetings. Regular meetings of the Board of Directors may be held without notice at such time, on such date and at such place (if any), within or without the State of Delaware, as shall from time to time be determined by the Board of Directors.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be called by the chairman of the Board, the chief executive officer, or by the secretary upon the written request of two directors. Notice of the place (if any), date and time of each such special meeting shall be given to each director on one day's notice to each director, either personally, by mail, by telegram or by electronic transmission.

Section 3.10 Quorum. At all meetings of the Board of Directors, a majority of the directors then in office shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by the DGCL or by the Certificate of Incorporation. If a quorum is not present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time without notice other than announcement at the meeting, until a quorum is present.

Section 3.11 Action Without Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings, or, if the consent action is taken by electronic transmission, paper reproductions of such electronic transmission or transmissions, are filed with the minutes or proceedings of the Board or committee.

Section 3.12 Participation in Meetings by Remote Communication. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting in accordance with Section 8.6.

Section 3.13 Committees. There shall be such committees of the Board of Directors as the Board of Directors may, by resolution passed by a majority of the whole Board, designate. Each committee shall consist of one or more directors of the Corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. Any such committee shall have such power and authority as may be conferred by a

resolution of the board of directors; provided, however, that no such committee shall have the power and authority of the board of directors with respect to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, amending the bylaws of the Corporation, or declaring a dividend or authorizing the issuance of stock (other than in connection with a stock option or other management equity incentive plan, which plan has been approved by the Corporation's board of directors). Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

Section 3.14 Committee Meetings, Procedures and Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

## ARTICLE IV
## NOTICES

Section 4.1 Notice. Whenever, under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail addressed to such director or stockholder at his address as it appears on the records of the Corporation with postage thereon prepaid and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors and stockholders may also be given by facsimile, by telephone or by a form of electronic transmission consented to by the director or stockholder to whom the notice is given.

Section 4.2 Waiver. Whenever any notice is required to be given under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to the notice, in each case, whether before or after the time of the event for which the notice is given, shall be deemed equivalent to such notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE V
## OFFICERS

Section 5.1 Generally. The officer positions in the Corporation shall consist of such as may from time to time be designated by the Board of Directors and the officers to fill same shall be chosen by the Board of Directors. Any number of offices may be held by the same person, unless the Certificate of Incorporation or these bylaws otherwise provide.

Section 5.2 Compensation. The compensation of all officers and agents of the Corporation that are also directors of the Corporation shall be fixed by the Board of Directors. The Board of Directors may delegate the power to fix the compensation of all other officers and agents of the Corporation to an officer of the Corporation.

Section 5.3 Succession. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

Section 5.4 Authority and Duties. The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by the Board of Directors in a resolution which is not inconsistent with these bylaws, regardless of whether such authority and duties are customarily incident to such office.

## ARTICLE VI
## CAPITAL STOCK

Section 6.1 Certificates. The shares of capital stock of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board of Directors, to the extent required by the DGCL, every holder of shares of stock in the Corporation represented by certificates, and upon request every holder of uncertificated shares, shall be entitled to have a certificate or certificates, signed by or in the name of the Corporation by the president or a vice-president and the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder in the Corporation. Any or all of the signatures on the certificates may be facsimiles.

Section 6.2 Transfer.

(a) Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books or, if such shares may be represented in uncertificated form pursuant to a resolution adopted by the Board of Directors, record such transaction upon its books as an issuance of uncertificated shares to the person entitled thereto, unless such person requests a certificate or certificates, in which case such person shall be entitled to have a certificate or certificates in accordance with Section 6.1.

(b) Transfers of shares of stock represented by certificates shall be made upon the books of the Corporation only by the record holder of such stock, in person or by duly authorized attorney, upon the surrender of the certificate or certificates for the same number of shares, properly endorsed. Transfers of uncertificated shares of stock shall be made on the books of the Corporation upon receipt of proper transfer instructions from the registered owner of the uncertificated shares, an instruction from an approved source duly authorized by such owner or from an attorney lawfully constituted in writing. The Corporation is entitled for all purposes to treat the record holder as the owner of such stock, notwithstanding any knowledge of the Corporation to the contrary. The Board of Directors shall have the power to make all such rules and regulations, not inconsistent with the Certificate of Incorporation, these bylaws and the DGCL, as the Board

of Directors may deem appropriate concerning the issue, transfer and registration of certificates for stock of the Corporation. The Board of Directors may appoint one or more transfer agents or registrars of transfers or both, and may require all stock certificates to bear the signature of either or both.

**ARTICLE VII**
**INDEMNIFICATION OF DIRECTORS AND OFFICERS**

Section 7.1 Right to Indemnification. Each person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the DGCL, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not so serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Section 7.1 shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any such proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such person is not entitled to be so indemnified under this Section 7.1.

Section 7.2 Non-Exclusivity of Rights. The rights to indemnification and advance payment of expenses provided by Section 7.1 hereof shall not be deemed exclusive of any other rights to which those seeking indemnification and advance payment of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

Section 7.3 Nature of Rights. The indemnification and advance payment of expenses and rights thereto provided by, or granted pursuant to, Section 7.1 hereof shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee, partner or

agent and shall inure to the benefit of the personal representatives, heirs, executors and administrators of such person.

Section 7.4 Insurance. The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, against any liability asserted against such person or incurred by such person in any such capacity, or arising out of such person's status as such, and related expenses, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the DGCL.

## ARTICLE VIII
## GENERAL PROVISIONS

Section 8.1 Dividends. Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

Section 8.2 Reserves. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interests of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 8.3 Checks. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 8.4 Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 8.5 Corporate Seal. The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise..

Section 8.6 Meeting Attendance via Remote Communication Equipment.

(a)    Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)        be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)        _Board Meetings_.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

_Section 8.7_ _Beneficial Ownership_. Notwithstanding anything to the contrary in the Certificate of Incorporation or these bylaws to the extent permitted by law, any action required or permitted to be taken by the stockholders of the Company may be taken by any stockholder of record or by any beneficial owner of any Voting Stock for any period of time that has verified its holdings in accordance with any method prescribed by Rule 14a-8(b)(2) under the Exchange Act (without giving effect to any minimum threshold or duration of ownership limitation therein). For the purposes of these bylaws, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

### ARTICLE IX
### AMENDMENTS

These bylaws may be altered, amended or repealed or new bylaws may be adopted by the Board of Directors (other than Sections (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and this Article IX of these bylaws (as such provisions are designated in the Bylaws in effect as of ____, 2015) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections) or by stockholders provided that any amendment proposed to be acted upon is approved by the affirmative vote of the holders of at least a majority of the common stock issued and outstanding and entitled to vote.

_Effective as of            , 2015_

## **EXHIBIT C-2**

**Blackline of Bylaws of Reorganized NII
compared to form filed as Exhibit C to the Plan**

~~NII HOLDINGS~~NEXTEL INTERNATIONAL, INC.
**FIFTH AMENDED AND RESTATED BYLAWS**

**ARTICLE I**
**OFFICES**

Section 1.1 Registered Office. The registered office of ~~NII Holdings~~Nextel International, Inc. (the "Corporation") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.2 Offices. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 2.1 Time and Place.

(a) All meetings of the stockholders for shall be held at such time and place (if any) as designated by the Board of Directors, within or without the State of Delaware, and stated in the notice of the meeting provided in accordance with Section 2.4 hereof.  Notwithstanding the foregoing, the Board may, in its sole discretion, determine that a meeting of stockholders will not be held at any place, but may instead be held by means of remote communications pursuant to Section 8.6.  The Board may reschedule to an earlier or later date any previously scheduled annual or special meeting of stockholders (subject, in the case of a special meeting called pursuant to Section 2.3, to the requirements of therein).

(b) Except as otherwise set forth in these bylaws, every reference in these bylaws to a majority or other proportion of the entire capital stock of the Corporation necessary to take a particular action, refers to a majority or other proportion of the votes entitled to be cast with respect to a particular matter or action by all holders of the issued and outstanding capital stock of the Corporation that are entitled to vote on such matter or action.

Section 2.2 Annual Meetings. Annual meetings of stockholders shall be held in each year on such date (which date, other than for the 2016 annual meeting, shall be no later than 13 months after the date of the last annual meeting of stockholders) and at such time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which stockholders shall elect directors in accordance with Section 3.4 hereof, and transact such other business as may properly be brought before the meeting in accordance with Section 2.8 hereof.

Section 2.3 Special Meetings.

(a) Special meetings of the stockholders, unless otherwise prescribed by statute or by the Corporation's Second Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate of Incorporation"), may be called by the secretary upon the written request of the chairman of the Board or chief executive officer at any time and shall be called by the secretary upon the request in

writing of not less than a majority of the Board of Directors, or of stockholders holding, beneficially or of record, not less than thirty-three percent (33%) of the common stock of the Corporation issued and outstanding and entitled to vote as of the record date (the "Requisite Percentage") referred to in this <u>Section 2.3</u>, subject to the following:  In order for a special meeting requested by one or more stockholders (a "Stockholder Requested Special Meeting") to be called by the secretary, one or more written requests for a special meeting (each a "Special Meeting Request," and collectively, the "Special Meeting Requests") stating the purpose of the special meeting and the matters proposed to be acted upon thereat must be signed and dated by the Requisite Percentage of holders of common stock of the Corporation (or their duly authorized agents), must be delivered to the secretary at the principal executive offices of the Corporation and must set forth: (i) in the case of any director nominations proposed to be presented at such Stockholder Requested Special Meeting, the information required by Section 3.3(d); (ii) in the case of any matter (other than a director nomination) proposed to be conducted at such Stockholder Requested Special Meeting, the information required by Section 2.8(b); and (iii) an agreement by the requesting stockholder(s) to notify the secretary immediately in the case of any disposition prior to the record date for the Stockholder Requested Special Meeting of shares of Voting Stock owned of record and an acknowledgement that any such disposition shall be deemed a revocation of such Special Meeting Request to the extent of such disposition such that the number of shares disposed of shall not be included in determining whether the Requisite Percentage has been reached (except that for purposes of this Section 2.3, the term "Stockholder Requested Special Meeting" will be substituted for the term "annual meeting" in all places where it appears in Section 2.8(b)).

(b) In determining whether a special meeting of stockholders has been requested by the holders of shares representing in the aggregate at least the Requisite Percentage, multiple Special Meeting Requests delivered to the secretary will be considered together only if each such Special Meeting Request (A) identifies substantially the same purpose or purposes of the special meeting and substantially the same matters proposed to be acted on at the special meeting (in each case as determined in good faith by the Board), and (B) has been dated and delivered to the secretary within 60 days of the earliest dated of such Special Meeting Requests.  Any requesting stockholder may revoke his, her or its Special Meeting Request at any time by written revocation delivered to the secretary at the principal executive offices of the Corporation; *provided*, *however*, that if following such revocation (or any deemed revocation pursuant to Section 2.3(a)(iii) above), the unrevoked valid Special Meeting Requests represent in the aggregate less than the Requisite Percentage there shall be no requirement to hold a special meeting.  The first date on which unrevoked valid Special Meeting Requests constituting not less than the Requisite Percentage shall have been delivered to the secretary is referred to herein as the "Request Receipt Date."

(c) A Special Meeting Request shall not be valid: (i) if the Special Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; and (ii) an identical or substantially similar item as determined in good faith by the Board is included in the Corporation's notice as an item of business to be brought before a stockholder meeting that has been called but not yet held or that is called for a date within 75 days after the Request Receipt Date.

(d) The Corporation will provide the requesting stockholder(s) with notice of the record date(s) for the determination of stockholders (i) entitled to submit a Special Meeting Request and (ii) entitled to vote at the Stockholder Requested Special Meeting.

(e) A Stockholder Requested Special Meeting shall be held at such date and time as may be fixed by the Board; *provided*, *however*, that the Stockholder Requested Special Meeting shall be called for a date not less than 75 calendar days after the Request Receipt Date.

(f)    No requesting stockholder will be entitled to have any matter proposed to be presented at a Stockholder Requested Meeting in any proxy statement or form of proxy that the Corporation may use in connection therewith solely as a result of such stockholder's compliance with the foregoing provisions of this Section 2.3.

(g) Business transacted at any Stockholder Requested Special Meeting shall be limited to (i) the purpose(s) stated in the valid Special Meeting Request(s) received from the Requisite Percentage of stockholders; and (ii) any additional matters that the Board determines to include in the Corporation's notice of the meeting. If none of the stockholders (owning beneficially or of record) who submitted the Special Meeting Request appears in person or by proxy to present the matters to be presented for consideration that were specified in the Stockholder Meeting Request, the Corporation need not present such matters for a vote at such meeting, notwithstanding that proxies in respect of such matter may have been solicited, obtained or delivered.

Section 2.4  Notice of Meetings. Notice of any annual or special meeting of the stockholders, stating the place (if any), date and hour of the meeting, as well as the record date for determining stockholders entitled to vote at the meeting (if such record date is different from the record date for determining stockholders entitled to notice of the meeting), and the means of remote communication (if any) by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to notice of such meeting not less than ten nor more than sixty days before the date of such meeting. Notice of special meetings of stockholders shall also include the purpose or purposes for which the meeting is called.

Section 2.5  Quorum. The holders of shares representing a majority of votes that may be cast by the entire capital stock of the Corporation issued and outstanding and entitled to vote thereat with respect to a particular matter, present in person or represented by proxy, shall constitute a quorum at all meetings with respect to each matter to be voted upon at a meeting of the stockholders for the transaction of business except as otherwise provided by the Delaware General Corporation Law (the "DGCL") or by the Certificate of Incorporation. If, however, such quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.

Section 2.6  Voting. When a quorum is present at any meeting of stockholders, the affirmative vote of a majority of the votes properly cast on the matter (excluding any abstentions or broker non-votes) will be the act of the stockholders with respect to all matters other than the election of directors which will be elected in accordance with Section 3.4, or as otherwise provided in these bylaws, the Certificate of Incorporation, a Preferred Stock Designation, or by the DGCL.

Section 2.7  Conduct of Meetings. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at such meeting by the

person presiding over the meeting. The Board of Directors may adopt by resolution such rules or regulations for the conduct of meetings of stockholders as it shall deem appropriate; provided that such rules or regulations shall be consistent with the Certificate of Incorporation and these bylaws. Unless otherwise specified in such rules or regulations, the chairman of the Board shall serve as the chair of any meeting of stockholders. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chair of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting, to stockholders (owning beneficially or of record) of the Corporation, their duly authorized and constituted proxies or such other persons as the chair shall permit; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on the time allotted to questions or comments by participants and (vi) the adjournment of the meeting by the chair. Unless, and to the extent determined by the Board of Directors or the chair of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

Section 2.8 Submission of Business for Consideration at Meetings of Stockholders.

(a) At an annual meeting of stockholders, only such business (other than the nomination of candidates for election as directors of the Corporation, which is governed by Section 3.3 hereof) will be conducted or considered as is properly brought before the annual meeting. To be properly brought before an annual meeting, business must be (i) specified in the notice of the annual meeting (or any supplement thereto) given by or at the direction of the Board of Directors in accordance with Section 2.4 hereof, (ii) otherwise properly brought before the annual meeting by the presiding officer or by or at the direction of a majority of the entire Board, or (iii) otherwise properly requested to be brought before the annual meeting by a stockholder of the Corporation in accordance with this Section 2.8. For purposes of these bylaws, "entire Board" refers to the total number of directors that the Corporation would have if there were no vacancies.

(b) For business to be properly requested by a stockholder to be brought before an annual meeting, (i) the stockholder must be the holder, beneficially or of record, of shares, (ii) the stockholder must be entitled to vote at such meeting (either directly or through a proxy or beneficial interest), and (iii) the stockholder must have given timely notice thereof in proper written form to the secretary of the Corporation. Except as otherwise provided by law, to be timely, a stockholder's notice must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 calendar days prior to the anniversary of the preceding year's annual meeting of stockholders; *provided*, *however*, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made. In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. To be in proper written form, a stockholder's notice to the secretary of the Corporation must set forth (A) as to each matter the stockholder

proposes to bring before the annual meeting: (1) a description in reasonable detail of the business desired to be brought before the annual meeting; and (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, if the business includes a proposal to amend these bylaws or the Certificate of Incorporation, the language of the proposed amendment); and (B) as to each stockholder giving the notice and any Stockholder Associate (as defined below): (1) the name and address of the stockholder and the name and address of any Stockholder Associate; (2) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to present the business stated in the stockholder's notice; (3) the class, series and number of any securities of the Corporation that are owned of record or beneficially by any of these persons as of the date of the stockholder's notice; (4) a description of any material interests of any of these persons in the business proposed and of all agreements, arrangements and understandings between these persons and any other person (including their names) in connection with the proposal of the business by the stockholder; (5) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which any of these persons has a right to vote any shares of any securities of the Corporation; (6) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (7) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (8) a representation that after the date of the stockholder's notice and until the date of the annual meeting, each of these persons will provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (3) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understandings described in response to subclause (6) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying those agreements, arrangements or understandings; and (C) a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (1) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal; and/or (2) otherwise to solicit proxies from stockholders in support of the proposal.

For purposes of this Section 2.8 and Section 3.3 hereof, (x) "public disclosure" means disclosure in a press release reported by the Dow Jones News Service, Associated Press, Reuters, Bloomberg or comparable national news service or in a document filed by the Corporation with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") or furnished by the Corporation to its stockholders and (y) "Stockholder Associate" of any stockholder means (1) any person controlling, directly or indirectly, or acting in concert with, the stockholder; and (2) any beneficial owner of securities of the Corporation owned of record or beneficially by the stockholder. Notwithstanding the foregoing provisions of this Section 2.8, in order to include information with respect to a stockholder proposal in the Corporation's proxy statement and form of proxy for a meeting of stockholders, a stockholder must provide notice as required by, and otherwise comply with, all of the applicable requirements of Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

Nothing in this Section 2.8 will be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act (or any comparable successor rule or regulation).

(c) At a special meeting of stockholders, only such business may be conducted or considered as is properly brought before the meeting. To be properly brought before a special meeting (subject to Section 2.3(g) in the case of a Stockholder Requested Special Meeting), business must be (i) specified in the notice of the meeting (or any supplement thereto) given in accordance with these bylaws or (ii) otherwise properly brought before the meeting in accordance with these bylaws, by the presiding officer of the meeting or by or at the direction of a majority of the entire Board.

(d) The determination of whether any business sought to be brought before any annual or special meeting of stockholders is properly brought before such meeting in accordance with this Section 2.8 will be made by the presiding officer of such meeting.

Section 2.9 Action Without a Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the stockholders may be taken without a meeting, if stockholders having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted consent in writing or by electronic transmission, provided that prompt notice must be given to all stockholders of the taking of corporate action without a meeting by less than unanimous written consent.

## ARTICLE III
## DIRECTORS

Section 3.1 Number and Qualification. The Board of Directors shall consist of at least three members, shall initially consist of seven members, and may be fixed from time to time for any period on or after the 2017 annual meeting of stockholders by (i) resolution of the Board of Directors at no more than nine members or (ii) stockholders holding a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director. Directors need not be stockholders.

Section 3.2 Election and Term. Directors shall be elected for terms as set forth in the Certificate of Incorporation and in the manner provided in Section 3.4 hereof at the annual meeting of the stockholders.

Section 3.3 Nominations.

(a) Only persons who are nominated in accordance with the provisions of this Section 3.3 will be eligible for election as directors at a meeting of stockholders.

(b) Nominations of persons for election as directors may be made only at a meeting of stockholders (i) by or at the direction of the Board of Directors or a committee thereof or (ii) by any stockholder, beneficially or of record, at the time of giving the notice provided for in this Section 3.3, who is entitled to

vote for the election of directors at such annual meeting, and who makes the nomination pursuant to timely notice in proper written form to the secretary of the Corporation in compliance with the procedures set forth in this Section 3.3.

(c) Except as otherwise provided by law, to be timely, a stockholder's notice with respect to nominations of persons for election as directors of the Corporation must be delivered to or mailed and received by the secretary of the Corporation at the principal executive offices of the Corporation not less than 75 days prior to the anniversary of the date for the preceding year's annual meeting of stockholders; provided, however, that if there was no annual meeting in the preceding year or the date of the annual meeting is advanced more than 30 calendar days prior to, or delayed by more than 30 calendar days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 45th calendar day prior to such annual meeting or the 10th calendar day following the day on which public disclosure of the date of such meeting is first made.  In no event shall the public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above.

(d) To be in proper written form, a stockholder's notice pursuant to this Section 3.3 must set forth or include:

(i) as to each person who is not an incumbent director of the Corporation whom the stockholder proposes to nominate for election as a director, (A) the name, age, business address and residence address of such person; (B) the principal occupation or employment of such person; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by such person; (D) the date or dates the securities were acquired; (E) any other information relating to such person that is required to be disclosed in solicitation for proxies or election of directors pursuant to Regulation 14A under the Exchange Act (or any comparable successor rule or regulation); and (F) a representation that such person meets the qualifications to serve as a director of the Corporation.

(ii) as to the stockholder giving the notice and any Stockholder Associate, (A) the name and address of the stockholder and the name and address of any Stockholder Associate; (B) a representation that at least one of these persons is a holder of record or beneficially of securities of the Corporation entitled to vote at the meeting and intends to remain so through the date of the meeting and to appear in person or by proxy at the meeting to nominate the person or persons specified in the stockholder's notice; (C) the class, series and number of securities of the Corporation that are owned of record or beneficially by each of these persons as of the date of the stockholder's notice; (D) a description of any material relationships, including legal, financial and/or compensatory, between the stockholder giving the notice and any Stockholder Associate, on one hand, and the proposed nominee(s), on the other hand; (E) a description of any derivative positions related to any class or series of securities of the Corporation owned of record or beneficially by the stockholder or any Stockholder Associate; (F) a description of whether and the extent to which any hedging, swap or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of securities) has been made, the effect or intent of which is to mitigate loss to, or manage risk of stock price changes for, or to increase the voting power of, the stockholder or any Stockholder Associate with respect to any securities of the Corporation; and (G) a representation that after the date of the stockholder's notice and until the date of the annual meeting each of these persons will

provide written notice to the secretary of the Corporation as soon as practicable following a change in the number of securities of the Corporation held as described in response to subclause (C) above that equals 1% or more of the then-outstanding shares of the Corporation, and/or entry, termination, amendment or modification of the agreements, arrangements or understanding described in response to subclause (F) above that results in a change that equals 1% or more of the then-outstanding shares of the Corporation or in the economic interests underlying these agreements, arrangements or understanding;

(iii) a representation as to whether the stockholder giving notice and any Stockholder Associate intends, or intends to be part of a group that intends: (A) to deliver a proxy statement and/or form of proxy to stockholders; and/or (B) otherwise to solicit proxies from stockholders in support of the proposed nominee;

(iv) the director questionnaire (which is available from the secretary of the Corporation upon request) that is distributed to all directors of the Corporation; and

(v) a written consent of each proposed nominee to serve as a director of the Corporation, if elected.

(e) The determination of whether any nomination sought to be brought before any annual meeting of the stockholders is properly brought before such meeting in accordance with this Section 3.3 will be made by the presiding officer of such meeting.

Section 3.4 Majority Voting in Director Elections. Each director to be elected by stockholders shall be elected as such by the vote of the majority of the votes cast by stockholders for that director at a meeting for the election of directors at which a quorum is present, except that if the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of a plurality of the shares represented in person or by proxy at any such meeting. For purposes of this Section 3.4, a "majority of votes cast" shall mean that the number of shares voted "for" a director's election exceeds the number of votes cast "against" that director's election.

Section 3.5 Vacancies. In the case of any vacancy on the Board of Directors, including a vacancy created by an increase in the number of directors then, the vacancy may be filled by the Board of Directors, acting by a majority of the remaining directors then in office, although less than a quorum, or by a sole remaining director or by stockholders acting by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class. Any director appointed to fill a vacancy shall be appointed until the next succeeding annual meeting of stockholders (or for the remainder of the term for the applicable class of directors for so long as the Board is divided into classes) and thereafter until such director's successor is elected and qualified or such director earlier resigns or is removed.

Section 3.6 Removal. Subject to the rights of holders of preferred stock (if any) with respect to any directors elected by the holders of such preferred stock, any director, or the entire Board of Directors, may be removed from office at any time, with or without cause (except that so long as the Board of Directors is divided into classes, directors may be removed only for cause), by the affirmative vote of the holders of a majority of the voting power of all of the shares of capital stock of the Corporation then entitled to vote

generally in the election of directors, voting together as a single class.

Section 3.7 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by the DGCL or by the Certificate of Incorporation or by these bylaws directed or required to be exercised or done by the stockholders. The Board of Directors may adopt such special rules and regulations for the conduct of its meetings and the management of the affairs of the Corporation as the Board of Directors may deem proper, not inconsistent with law or these bylaws.

Section 3.8 Regular Meetings. Regular meetings of the Board of Directors may be held without notice at such time, on such date and at such place (if any), within or without the State of Delaware, as shall from time to time be determined by the Board of Directors.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be called by the chairman of the Board, the chief executive officer, or by the secretary upon the written request of two directors. Notice of the place (if any), date and time of each such special meeting shall be given to each director on one day's notice to each director, either personally, by mail, by telegram or by electronic transmission.

Section 3.10 Quorum. At all meetings of the Board of Directors, a majority of the directors then in office shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by the DGCL or by the Certificate of Incorporation. If a quorum is not present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time without notice other than announcement at the meeting, until a quorum is present.

Section 3.11 Action Without Meeting. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings, or, if the consent action is taken by electronic transmission, paper reproductions of such electronic transmission or transmissions, are filed with the minutes or proceedings of the Board or committee.

Section 3.12 Participation in Meetings by Remote Communication. Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting in accordance with Section 8.6.

Section 3.13 Committees. There shall be such committees of the Board of Directors as the Board of Directors may, by resolution passed by a majority of the whole Board, designate. Each committee shall consist of one or more directors of the Corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. Any such committee shall have such power and authority as may be conferred by a

resolution of the board of directors; provided, however, that no such committee shall have the power and authority of the board of directors with respect to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, amending the bylaws of the Corporation, or declaring a dividend or authorizing the issuance of stock (other than in connection with a stock option or other management equity incentive plan, which plan has been approved by the Corporation's board of directors). Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

Section 3.14 Committee Meetings, Procedures and Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

## ARTICLE IV
## NOTICES

Section 4.1 Notice. Whenever, under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail addressed to such director or stockholder at his address as it appears on the records of the Corporation with postage thereon prepaid and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors and stockholders may also be given by facsimile, by telephone or by a form of electronic transmission consented to by the director or stockholder to whom the notice is given.

Section 4.2 Waiver. Whenever any notice is required to be given under the provisions of the DGCL or of the Certificate of Incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to the notice, in each case, whether before or after the time of the event for which the notice is given, shall be deemed equivalent to such notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE V
## OFFICERS

Section 5.1 Generally. The officer positions in the Corporation shall consist of such as may from time to time be designated by the Board of Directors and the officers to fill same shall be chosen by the Board of Directors. Any number of offices may be held by the same person, unless the Certificate of Incorporation or these bylaws otherwise provide.

Section 5.2 Compensation. The compensation of all officers and agents of the Corporation that are also directors of the Corporation shall be fixed by the Board of Directors. The Board of Directors may delegate the power to fix the compensation of all other officers and agents of the Corporation to an officer of the Corporation.

Section 5.3 <u>Succession</u>. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

Section 5.4 <u>Authority and Duties</u>. The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by the Board of Directors in a resolution which is not inconsistent with these bylaws, regardless of whether such authority and duties are customarily incident to such office.

**ARTICLE VI**
**CAPITAL STOCK**

Section 6.1 <u>Certificates</u>. The shares of capital stock of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board of Directors, to the extent required by the DGCL, every holder of shares of stock in the Corporation represented by certificates, and upon request every holder of uncertificated shares, shall be entitled to have a certificate or certificates, signed by or in the name of the Corporation by the president or a vice-president and the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder in the Corporation. Any or all of the signatures on the certificates may be facsimiles.

Section 6.2 <u>Transfer</u>.

(a) Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books or, if such shares may be represented in uncertificated form pursuant to a resolution adopted by the Board of Directors, record such transaction upon its books as an issuance of uncertificated shares to the person entitled thereto, unless such person requests a certificate or certificates, in which case such person shall be entitled to have a certificate or certificates in accordance with Section 6.1.

(b)  Transfers of shares of stock represented by certificates shall be made upon the books of the Corporation only by the record holder of such stock, in person or by duly authorized attorney, upon the surrender of the certificate or certificates for the same number of shares, properly endorsed. Transfers of uncertificated shares of stock shall be made on the books of the Corporation upon receipt of proper transfer instructions from the registered owner of the uncertificated shares, an instruction from an approved source duly authorized by such owner or from an attorney lawfully constituted in writing. The Corporation is entitled for all purposes to treat the record holder as the owner of such stock, notwithstanding any knowledge of the Corporation to the contrary. The Board of Directors shall have the power to make all such rules and regulations, not inconsistent with the Certificate of Incorporation, these bylaws and the DGCL, as the Board

of Directors may deem appropriate concerning the issue, transfer and registration of certificates for stock of the Corporation. The Board of Directors may appoint one or more transfer agents or registrars of transfers or both, and may require all stock certificates to bear the signature of either or both.

## ARTICLE VII
## INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 7.1 Right to Indemnification. Each person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether by or in the right of the Corporation or otherwise (a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan, shall be (and shall be deemed to have a contractual right to be) indemnified and held harmless by the Corporation (and any successor to the Corporation by merger or otherwise) to the fullest extent authorized by, and subject to the conditions and (except as provided herein) procedures set forth in the DGCL, as the same exists or may hereafter be amended (but any such amendment shall not be deemed to limit or prohibit the rights of indemnification hereunder for past acts or omissions of any such person insofar as such amendment limits or prohibits the indemnification rights that said law permitted the Corporation to provide prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith; provided, however, that the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. Persons who are not directors or officers of the Corporation and are not so serving at the request of the Corporation may be similarly indemnified in respect of such service to the extent authorized at any time by the Board of Directors of the Corporation. The indemnification conferred in this Section 7.1 shall also include the right to advancement by the Corporation of any and all expenses (including attorneys' fees) incurred in the defense of or other involvement in any such proceeding in advance of its final disposition; provided, however, that the advancement of expenses (including attorneys' fees) incurred by a person in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such person to repay all amounts so paid in advance if it shall ultimately be determined that such person is not entitled to be so indemnified under this Section 7.1.

Section 7.2 Non-Exclusivity of Rights. The rights to indemnification and advance payment of expenses provided by Section 7.1 hereof shall not be deemed exclusive of any other rights to which those seeking indemnification and advance payment of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

Section 7.3 Nature of Rights. The indemnification and advance payment of expenses and rights thereto provided by, or granted pursuant to, Section 7.1 hereof shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee, partner or

agent and shall inure to the benefit of the personal representatives, heirs, executors and administrators of such person.

Section 7.4 Insurance. The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, partner (limited or general) or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, against any liability asserted against such person or incurred by such person in any such capacity, or arising out of such person's status as such, and related expenses, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the DGCL.

## ARTICLE VIII
## GENERAL PROVISIONS

Section 8.1 Dividends. Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

Section 8.2 Reserves. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interests of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 8.3 Checks. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 8.4 Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 8.5 Corporate Seal. The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise..

Section 8.6 Meeting Attendance via Remote Communication Equipment.

(a)     Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)     participate in a meeting of stockholders; and

(ii)         be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)         Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 8.7 Beneficial Ownership. Notwithstanding anything to the contrary in the Certificate of Incorporation or these bylaws to the extent permitted by law, any action required or permitted to be taken by the stockholders of the Company may be taken by any stockholder of record or by any beneficial owner of any Voting Stock for any period of time that has verified its holdings in accordance with any method prescribed by Rule 14a-8(b)(2) under the Exchange Act (without giving effect to any minimum threshold or duration of ownership limitation therein). For the purposes of these bylaws, "Voting Stock" means stock of the Company of any class or series entitled to vote generally in the election of Directors.

## ARTICLE IX
## AMENDMENTS

These bylaws may be altered, amended or repealed or new bylaws may be adopted by the Board of Directors (other than Sections (other than Sections 2.2 (Annual Meetings), 2.3 (Special Meetings), 2.5 (Quorum), 2.6 (Voting), 2.8 (Submission of Business for Consideration at Meetings of Stockholders), 2.9 (Action Without a Meeting), 3.1 (Number and Qualification), 3.2 (Election and Term), 3.3 (Nominations), 3.4 (Majority Voting in Director Elections); 3.5 (Vacancies); 3.6 (Removal), 8.7 (Beneficial Ownership) and this Article IX of these bylaws (as such provisions are designated in the Bylaws in effect as of _____, 2015) unless otherwise provided in any such provision, or any provision to the extent adopted, altered, amended or repealed pursuant to an action taken by stockholders, any successor provision to such provisions or any other alteration or amendment inconsistent with such sections) or by stockholders provided that any amendment proposed to be acted upon is approved by the affirmative vote of the holders of at least a majority of the common stock issued and outstanding and entitled to vote.

*Effective as of              , 2015*

| Summary report:<br>Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 4/1/2015<br>1:59:54 PM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:** iw://NYI/NYI/524643186/1 | |
| **Modified DMS:** iw://NYI/NYI/524643186/2 | |
| **Changes:** | |
| Add | 4 |
| Delete | 4 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 8 |

# **EXHIBIT D**

## **New Directors of Reorganized NII**

## Initial Directors of Reorganized NII[1]

Set forth below is biographical information regarding six (6) of the initial seven (7) members comprising the New Board.[2]  The remaining member of the New Board has not been selected to date and will be identified prior to the Confirmation Hearing as required by section 1129(a)(5) of the Bankruptcy Code.

***Kevin L. Beebe***.  Mr. Beebe has been a member of the board of directors of NII Holdings since 2010 and has served as Chairman of the board since 2013.  Mr. Beebe has been President and Chief Executive Officer of 2BPartners, LLC, a partnership that provides strategic, financial and operational advice to private equity clients, investors and management since November 2007.  Previously, he was Group President of Operations at ALLTEL Corporation, a telecommunications services company, from 1998 to 2007.  Mr. Beebe also serves as a director for Skyworks Solutions, Inc., a semiconductor and wireless handset chip supplier, and SBA Communications Corporation, a provider of wireless and broadcast communications infrastructure.

***James V. Continenza***.  Mr. Continenza has been the Chairman and CEO of The Berry Company, a marketing services company, since 2012.  Prior to joining The Berry Company, Mr. Continenza served as President of STi Prepaid, LLC, a telecommunications company from 2007 to 2010.  Prior to that, Mr. Continenza served as Interim Chief Executive Officer of Anchor Glass Container Corp., a leading manufacturer of glass containers; President and Chief Executive Officer of Teligent, Inc., a provider of communications services including voice, data, and internet access; Chief Operating Officer of Arch Wireless, Inc., a wireless services provider and as President and Chief Executive Officer of Lucent Technologies Product Finance, a global leader in telecom equipment.  In addition, Mr. Continenza currently serves as a director and Chairman of the boards of Eastman Kodak Inc., Neff Rental, LLC, and Tembec Inc.

***Howard Hoffman***.  Mr. Hoffman has served as a Managing Partner at De Novo Perspectives, a professional services firm specializing in financial and operational performance improvement, crisis and litigation management, investor and creditor advisory services, and corporate turnaround and restructuring advisory services since 2008.  From 1990 to 2008, Mr. Hoffman served as a Managing Partner at Nightingale & Associates, LLC, a consulting firm providing financial, business advisory and management services. Mr. Hoffman also currently serves as Executive Director at Hickey Smith LLP, a multi-state law firm.

***Ricardo Knoepfelmacher***.  Mr. Knoepfelmacher has served as a member of the board of directors of NII Holdings since May 2013.  Mr. Knoepfelmacher co-founded Angra Partners, a financial advisory and private equity firm, in 2003 and is currently a Managing Partner of the

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization for the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors*, filed on April 20, 2015 (a copy of which is attached as Exhibit 1 to the *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization for the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors*, filed on April 20, 2015 [Docket No. 664, Ex. A]).

[2]    The directors for the boards of directors of the direct and indirect subsidiaries of Reorganized NII will be identified and selected by the New Board.  See Plan, Section III.F.2.

firm.  Prior to his service as Managing Partner at Angra Partners, Mr. Knoepfelmacher served as
Chief Executive Officer of Brasil Telecom from 2005 to 2009 and Chief Executive Officer of
Pegasus Telecom from 2000 to 2002.  He also worked for Citibank and McKinsey & Company
before starting his first company, MGDK & Associados, a restructuring and consulting firm later
sold to Monitor Group.

***Christopher T. Rogers***.    Mr. Rogers has been a General Partner at Lumia Capital since 2013.
From 1991 until 2012, Mr. Rogers held various executive positions with Sprint Corporation and
Nextel Communications, Inc.  Most recently, Mr. Rogers served as Senior Vice President,
Corporate Development and Spectrum, at Sprint, where he oversaw mergers, acquisitions,
divestitures, equity investments and joint ventures and was responsible for management and
oversight of wireless spectrum licenses and Sprint's portfolio of emerging technology
investments.  Mr. Rogers serves as director of Digital Turbine (NASDAQ:APPS) and is a
director of LightSquared, Inc., having been appointed as an independent director during its
chapter 11 cases.

***Steven M. Shindler***.  Mr. Shindler has served as Chief Executive Officer of NII Holdings since
December 2012 and has served as a member of its board of directors since 1997 (including as its
Chairman from 2002 to 2013).  Prior to his most recent appointment as Chief Executive Officer,
Mr. Shindler served as Executive Chairman of NII Holdings from February 2008 to July 2012
and as Chief Executive Officer from 2000 until February 2008.  Mr. Shindler also served as
Executive Vice President and Chief Financial Officer of Nextel Communications from 1996 until
2000.  From 1987 to 1996, Mr. Shindler was an officer with Toronto Dominion Bank, where he
was a managing director in its communications finance group.

## **EXHIBIT E**

**Form of Management Incentive Plan**

**Nextel International, Inc.**
**2015 Incentive Compensation Plan**

**Nextel International, Inc.**
**2015 Incentive Compensation Plan**

1.       **Purpose of the Plan**

The primary purpose of the Plan is to assist the Company in attracting, retaining and motivating Directors, officers and other designated employees of the Company and its Subsidiaries, and to further align their interests with the interests of the Company's stockholders by increasing their ownership interests in the Company, and/or providing incentives based on the financial performance of the Company and its Subsidiaries.

2.       **Definitions**

2.1       "1934 Act" means the Securities Exchange Act of 1934, as amended.

2.2       "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person.   Unless the context requires otherwise, when a specified Person is not referenced, the term "Affiliate" shall refer to Affiliates of the Company and/or its Subsidiaries.

2.3       "Award" means a grant of an Option, Restricted Stock, Restricted Stock Unit or Cash-Based Incentive Award.

2.4       "Award Agreement" means the agreement, letter, notice, certificate or other document which evidences an Award, and specifies the terms and conditions of the Award, including the vesting requirements, Exercise Price, Goals or Performance Goals, exercise and/or distribution provisions, and forfeiture provisions applicable to that Award.   The Committee shall determine the form and substance of Award Agreements.   It is contemplated, generally, that Award Agreements, other than Cash-Based Incentive Awards, will be in the form of an agreement between the Company and the Participant, and that Award Agreements evidencing Cash-Based Incentive Awards will be in the form of a certificate or other notice from the Company to Participants describing the form, conditions and parameters of the Cash-Based Incentive Award.

1

2.5    "Board" means the Board of Directors of the Company.

2.6    "Cash-Based Incentive Award" means an Award granted pursuant to Section 9 hereof, that entitles the Participant to receive cash or shares of Common Stock upon the attainment of specified Goals or Performance Goals during a performance period, as determined by the Committee.

2.7    "Cause" shall mean Cause as such term is defined in any employment agreement between the Participant and the Company or its Subsidiaries or Affiliates, or, if there is no such agreement that defines Cause, in an Award Agreement.  If no such definition exists, "Cause" shall exist with respect to a Participant if such Participant has:  (i) committed an act of fraud, embezzlement, misappropriation or breach of fiduciary duty against the Company, any Subsidiary or any Affiliate, or a felony involving the business, assets, or customers of the Company, any Subsidiary or any Affiliate, or been convicted by a court of competent jurisdiction or pled guilty or nolo contendere to any other felony or other crime involving moral turpitude; (ii) committed a material breach of any confidentiality, non-compete, non-solicitation or business opportunity covenant or obligation owed by the Participant to the Company, any Subsidiary or any Affiliate; (iii) used alcohol or drugs in a manner that materially interferes with the performance of Participant's duties; (iv) violated material written policies of the Company, any Subsidiary or any Affiliate; (v) engaged in wrongful conduct materially harmful (whether financially, reputationally or otherwise) to the Company, any Subsidiary or any Affiliate or (vi) failed to perform, or exhibited gross negligence in the performance of, such Participant's duties to the Company, any Subsidiary or any Affiliate, in each case, after written notice and a 30-day cure period is provided to Participant; provided, that such cure right only applies to the first instance of the conditions described in (iii), (iv), (v) or (vi) above and shall not apply to subsequent instances of the same such conditions; provided, further that no cure right shall exist in respect of the conditions described in (i) and (ii) above. A termination for Cause shall include a determination by the Committee following a termination of service that the conditions described in (i) or (ii) existed during the service period and would have

justified a termination by the Company for Cause; provided, that such determination must be made within six months of the termination of service.

2.8    "Change in Control" means the first occurrence of any of the events set forth in any one of the following paragraphs, in each case with the Board of Directors determining by resolution the specific date of the triggering event:

(a)    The Company is merged or consolidated or reorganized into or with another company or other legal entity, and as a result of such merger, consolidation or reorganization less than a majority of the combined voting power of the then outstanding securities of such resulting company or entity immediately after such transaction is held directly or indirectly in the aggregate by the holders of voting securities of the Company immediately prior to such transaction, including voting securities issuable upon the exercise or conversion of options, warrants or other securities or rights; or

(b)    The Company sells or otherwise transfers all or substantially all of its assets to another company or other legal entity, and immediately following such sale or other transfer of assets, less than a majority of the combined voting power of the then outstanding securities of such company or other legal entity is held directly or indirectly in the aggregate by the holders of voting securities of the Company immediately prior to such sale or transfer, including voting securities issuable upon exercise or conversion of options, warrants or other securities or rights; or

(c)    Individuals who, as of the effective date of the Plan, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or

-3-

consents by or on behalf of a person or entity other than the Board; provided, that this clause (c) shall only apply to the extent the Common Stock is then listed or traded on a national securities exchange; or

(d)      Approval by the stockholders of the Company of a complete liquidation or dissolution of the Company; or

(e)      An acquisition by an individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the 1934 Act) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of 50% or more of either the then outstanding shares of the Company ("Outstanding Company Stock"), or the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors ("Outstanding Company Voting Securities"), excluding, however, the following: (i) any acquisition directly from the Company other than the acquisition by virtue of the exercise of a conversion privilege unless the security being so converted was itself acquired directly from the Company, (ii) any acquisition by the Company or any of its Subsidiaries, or (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any of its Subsidiaries.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the Common Stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions.

2.9      "Chapter 11 Plan" means the First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors dated April 20, 2015, as filed on the docket of the bankruptcy case styled *In re NII Holdings, Inc, et al.*, Case No. 14-12611 (SCC), commenced in the U.S. Bankruptcy Court for the Southern District of New York.

2.10    "Chapter 11 Plan Effective Date" shall have the meaning ascribed to such term in the Chapter 11 Plan.

2.11    "Code" means the Internal Revenue Code of 1986, as amended.

2.12    "Committee" means the Compensation Committee of the Board, or such other committee or subcommittee designated by the Board to administer the Plan.  The Committee shall have at least two members, and all Committee members shall be both Non-Employee Directors and Outside Directors.  The Committee may designate a subcommittee of members of the Committee, and/or officers of the Company, to act on certain matters where such designation is necessary or desirable.

2.13    "Common Stock" means the common stock of the Company.

2.14    "Company" means Nextel International, Inc.

2.15    "Confirmation Order" shall have the meaning ascribed to such term in the Chapter 11 Plan.

2.16    "Director" means a member of the Board.

2.17    "Employee" means an individual who is employed as an employee by the Company, a Subsidiary or an Affiliate, including a director or an officer who is an employee.

2.18    "Exercise Price" means the exercise price per share of Common Stock of an Option.

2.19    "Fair Market Value" means, on any given date, the closing price of a share of Common Stock on the principal national securities exchange on which the Common Stock is listed or traded on such date or, if Common Stock was not traded on such date, on the last preceding day on which the Common Stock was traded.  Alternatively, if the Common Stock is not listed on any securities exchange, the Fair Market Value shall be the value of Common Stock as determined in good faith by the Committee, consistent with applicable legal requirements (including, if applicable, the requirements of Code Section 409A).

2.20    "Goal" means any objective measure or target selected by the Committee, including, but not limited to, any measure or target based upon one or more of the criteria

listed in Appendix "A" attached hereto, that must be met by the time and in the manner specified by the Committee.  Goals may be based on Company-wide performance or other performance levels, such as performance of a Subsidiary, Affiliate or business unit.  Goals may be defined in absolute terms or measured relative to other companies or against a predefined index.  Additionally, Goals may be expressed as a percentage change or in absolute value terms, or in combination or in relationship to one another.  Goals may be adjusted by the Committee.

2.21    "Incentive Stock Option" means an Option which is designated as, and is intended to meet the requirements of, an incentive stock option as defined in Code Section 422.

2.22    "Material Business Event" means the Company (i) effects one or more stock dividends, stock split-ups, subdivisions or consolidations of shares or (ii) engages in a transaction to which Code Section 424(a) applies.

2.23    "Named Executive Officer" means a Participant who  is one of the group of "covered employees," as defined in the regulations promulgated under Code Section 162(m).

2.24    "Non-Employee Director" means a member of the Board who meets the definition of a "non-employee director" under Rule 16b-3(b)(3) promulgated by the Securities and Exchange Commission under the 1934 Act.

2.25    "Non-Qualified Option" means an Option that is not intended to be, and/or does not meet the requirements of, an Incentive Stock Option.

2.26    "Option" means any stock option granted from time to time under Section 6 of this Plan.  Options granted under the Plan may be Non-Qualified Options or Incentive Stock Options, as determined by the Committee.

2.27    "Outside Director" means a member of the Board who meets the definition of an "outside director" under Treasury Regulation § 1.162-27(e)(3).

2.28    "Participant" means an eligible individual to whom an Award is granted.

2.29    "Performance Goal" means an objective goal subject to the provisions of Code Section 162(m) that must be met by the time and in the manner specified by the Committee based

upon one or more of the criteria listed on Appendix "A" attached hereto and made a part hereof. Performance Goals may be based on Company-wide performance or other performance levels, such as performance of a Subsidiary, Affiliate or business unit. Performance Goals may be defined in absolute terms or measured relative to other companies or against a predefined index. Additionally, Performance Goals may be expressed as a percentage change or in absolute value terms, or in combination or in relationship to one another. Performance Goals may be adjusted to account for Material Business Events as the Committee deems appropriate and equitable, except where such action would result in the loss of the otherwise available exemption of the award under Code Section 162(m).

2.30    "Person" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof; provided that the term "Person" does not include the Company or any affiliate of the Company, and the term Person does not include any employee-benefit plan maintained by the Company or any affiliate of the Company, or any person or entity organized, appointed, or established by the Company or any affiliate of the Company for or pursuant to the terms of any such employee-benefit plan, unless the Committee determines that such an employee-benefit plan or such person or entity is a "Person".

2.31    "Plan" means the Nextel International, Inc. 2015 Incentive Compensation Plan herein set forth, as amended from time to time.

2.32    "Plan Year" means the twelve-month period ending December 31st, each calendar year, provided that the plan year for the first year shall be less than twelve months.

2.33    "Restricted Stock" means an Award of Common Stock granted pursuant to Section 7 hereof, subject to such conditions and criteria as the Committee may determine.

2.34    "Restricted Stock Units" means an Award granted pursuant to Section 8 hereof, in the amount determined by the Committee, stated with reference to a specified number of shares of Common Stock, that entitles the Participant to receive shares of Common Stock or cash for each Restricted Stock Unit equal to the Fair Market Value of a share of Common Stock on the date of payment,

upon the lapse of a Restriction Period and/or subject to such other conditions and criteria as the Committee may determine.

2.35    "Restriction Period" means the period during which an Award is subject to forfeiture.  A Restriction Period shall not lapse until all conditions, imposed under this Plan or under the applicable Award Agreement, have been satisfied.

2.36    "Subsidiary" means, with respect to the Company, any corporation, partnership, association, limited liability company or other business entity of which (i) if a corporation, a majority of the overall economic equity or a majority of the total voting power of shares of stock entitled (regardless of whether, at the time, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other Subsidiaries of the Company or a combination thereof; or (ii) if a partnership, association, limited liability company or other business entity, a majority partnership or other similar ownership interest thereof is, at the time, owned or controlled, directly or indirectly, through a majority of the overall economic interest or a majority of the total voting power by the Company or one or more of the other Subsidiaries of the Company or a combination thereof.

2.37    "Ten Percent Stockholder" means a Person who, on any given date, owns, either directly or indirectly (taking into account the attribution rules contained in Code Section 424(d)), shares possessing 10% or more of the total combined voting power of all classes of shares of the Company or a Subsidiary.

2.38    "Termination Date" means the day on which a Participant's employment or service with the Company and its Subsidiaries and Affiliates terminates or is terminated.  If an Award is intended or required to comply with Code Section 409A, the term "Termination Date" shall, with respect to such Award, mean "separation from service" as defined in Code Section 409A and the regulations promulgated thereunder.

-8-

3.        **Eligibility**

3.1       Any Director or any Employee of the Company, its Subsidiaries or Affiliates is eligible to participate in this Plan.  The Committee shall determine, in its sole discretion, the eligible Persons to whom Awards shall be made.  The mere status of an individual as an Employee or Director shall not entitle such individual to an Award hereunder; all Awards hereunder must be approved by the Committee as provided for herein.

4.        **Administration and Implementation of Plan**

4.1       The Plan shall be administered by the Committee, which shall have full power to interpret and administer the Plan and full authority to take, or cause to be taken, any and all action which it deems necessary to implement, carry out and administer the Plan, including without limitation:   (a) selecting the eligible Persons to whom Awards will be granted; (b) determining the amount and type of Awards to be granted to each Participant; (c) determining the terms and conditions of all Awards; and (d) determining and interpreting the terms of Award Agreements.   Additionally, the Committee may impose restrictions, including without limitation, confidentiality, non-compete, non-recruitment and non-solicitation restrictions, as well as the attainment of Goals or Performance Goals, on the grant, vesting, exercise and/or payment of any Award, as the Committee determines to be appropriate.

4.2       The Committee shall have the power to adopt procedures for carrying out the Plan and to change such procedures as it shall, from time to time, deem advisable.  Any interpretation by the Committee of the terms and provisions of the Plan and/or any Award Agreement and the administration thereof, and all actions taken by the Committee, shall be final and binding on all Participants, and any Person claiming any rights through a Participant.  Each Participant shall, as a condition to the Participant's participation hereunder, take whatever actions and execute whatever documents the Committee may, in its reasonable judgment, deem necessary or advisable in order to carry out or effect the obligations or restrictions imposed on the Participant pursuant to the provisions of this Plan and/or an Award Agreement.

-9-

4.3    The Committee may (but is not required to) condition the vesting, exercise and/or payment of any Award or the lapse of any Restriction Period (or any combination thereof) upon the achievement of one or more Goals or Performance Goals established by the Committee.  The Committee shall have discretion to determine the specific targets and parameters with respect to each category of Goals or Performance Goals relative to any Award.  Performance Goals for Awards to Named Executive Officers shall be established not later than ninety (90) days after the beginning of the applicable performance period (or at such other date as may be required or permitted for "performance-based" compensation under Code Section 162(m)), and shall otherwise meet the requirements of Code Section 162(m), including the requirement that the outcome of the Performance Goals be substantially uncertain at the time established, and that the attainment of the Performance Goals be certified in writing by the Committee prior to paying the Award.

4.4    To the extent applicable law so permits, the Committee, in its discretion, may delegate to one or more officers of the Company all or part of the Committee's authority and duties with respect to Awards to be granted to individuals who are not Named Executive Officers or other officers, Directors or more than 10% beneficial owners of any class of the Company's equity securities that is registered pursuant to Section 12 of the Securities Exchange Act of 1934, as determined by the Committee in accordance with Section 16 of the Securities Exchange Act of 1934.  The Committee may revoke or amend the terms of any such delegation at any time, but such action shall not invalidate any prior actions of the Committee's delegate(s) that were consistent with the terms of the Plan and the Committee's prior delegation.  Notwithstanding any other provision of this Plan, all Awards, including applicable Performance Goals, of Named Executive Officers or other officers, Directors or more than 10% beneficial owners of any class of the Company's equity securities that is registered pursuant to Section 12 of the Securities Exchange Act of 1934, as determined by the Committee in accordance with Section 16 of the Securities Exchange Act of 1934, shall be determined and approved by the Committee.

4.5    Notwithstanding any other provision of the Plan to the contrary, no vesting date of any Award granted under the Plan to a Participant (but excluding Awards to Non-

Employee Directors and those made within six months of the effective date of the Plan) shall be less than one year following the date the Award is granted; provided, however, that (i) the Committee, in its sole discretion, may determine that, on an ad hoc basis, Awards may be granted under the Plan without regard to the foregoing minimum vesting provisions in order to achieve a specified business objective, such as an inducement to a new hire or a retention award to a key employee or group of key employees; (ii) Awards may be granted to certain Participants under the Plan without regard to the foregoing minimum vesting provisions (x) if such Participant is subject to laws and/or regulations imposing certain requirements or restrictions on the remuneration of such individual or (y) in order to conform with local laws applicable to such Award; and (iii) nothing in this Section 4.5 shall preclude the Committee from taking action, in its sole discretion, to accelerate the vesting of any Award upon circumstances it deems appropriate, including, without limitation, upon or following a Change in Control or the Participant's death, disability, retirement or involuntary termination.

## 5.    **Shares Subject to the Plan**

5.1    Subject to adjustment as provided in Section 10 hereof, the total number of shares of Common Stock authorized and available for Awards under the Plan shall be 5,263,158 (all of which may be issued as Incentive Stock Options).  Awards granted under the Plan that are settled in cash, in whole or in part, shall not count against the total number of shares of Common Stock available for Awards under the Plan to the extent of such cash settlement.  Subject to adjustment as provided in Section 10 hereof and the other share counting rules in the Plan, the total number of shares of Common Stock available for Awards under the Plan will be reduced by (a) one share of Common Stock for every one share of Common Stock subject to an Option granted under this Plan, and (b) 1.5 shares of Common Stock for every one share of Common Stock subject to an Award other than an Option granted under this Plan.

5.2    The following limits (each, an "Annual Award Limit", and collectively, "Annual Award Limits") shall, subject to adjustment as provided in Section 10, apply to grants of Awards under this Plan:

(a)      Options:  The maximum aggregate number of shares of Common Stock subject to Options which may be granted in any one Plan Year to any one Participant shall be 1,000,000.  All such Options may be issued as Incentive Stock Options.

(b)      Restricted Stock:  The maximum aggregate number of shares of Common Stock subject to Awards of Restricted Stock that are intended to qualify as "qualified performance-based compensation" under Code Section 162(m) which may be granted in any one Plan Year to any one Participant shall be 500,000.

(c)      Restricted Stock Units:  The maximum aggregate number of shares of Common Stock subject to Restricted Stock Units that are intended to qualify as "qualified performance-based compensation" under Code Section 162(m) which may be granted in any one Plan Year to any one Participant shall be 500,000 shares of Common Stock.

(d)      Cash-Based Incentive Awards:  The maximum aggregate Cash-Based Incentive Award cash payments that are intended to qualify as "qualified performance-based compensation" under Code Section 162(m)  that may be made in any one Plan Year to any one Participant shall be $3,000,000.

5.3      (a)      Shares of Common Stock covered by an Award shall be removed from the Plan share reserve as of the date of grant (except in the case of Awards payable in either stock or cash, which shares of Common Stock will not be removed from the Plan share reserve until payment), and the following shares of Common Stock may not again be made available for issuance as Awards under the Plan: (i) shares of Common Stock not issued or delivered as a result of the net settlement of an outstanding Option; (ii) shares of Common Stock used to pay the Exercise Price or withholding taxes related to an outstanding Option; and (iii) shares of Common Stock repurchased on the open market with the proceeds of Option Exercise Price.

(b)      To the extent that an Award is canceled, terminates, expires, is forfeited or otherwise lapses for any reason, including the non-attainment of Goals or Performance Goals, any shares of Common Stock subject to the Award will again, to the extent of such cancellation,

-12-

termination, expiration, forfeiture or lapse, be available for issuance pursuant to Awards granted under the Plan.

(c)    To the extent that an Award is not an Option, shares of Common Stock withheld by the Company or otherwise used to satisfy the payment of withholding taxes relating to such outstanding Award will again be available for issuance as Awards granted under the Plan on and after the date the Plan becomes effective as provided in Section 13.1 through the day prior to the 10-year anniversary of the effective date of the Plan.

(d)    Substitute Awards granted pursuant to Section 11 of the Plan shall not count against the shares of Common Stock otherwise available for issuance under the Plan or any Annual Award Limits.

5.4    It is intended generally that Awards granted under this Plan shall not constitute "non-qualified deferred compensation" as defined under Code Section 409A.  If, however, any Award is, or becomes, subject to any of the requirements of Code Section 409A, such Award, and the applicable Award Agreement, shall be interpreted and administered to be consistent with such requirements (including any required six-month delay on payments to "specified employees"), and the Committee shall be entitled, on a unilateral basis, to amend, reform, interpret and administer this Plan, such Award and such Award Agreement accordingly.

## 6.    **Options**

Options shall be subject to the following terms and conditions:

6.1    Each Option shall be evidenced by an Award Agreement.  Such Award Agreement shall conform to the requirements of the Plan, and may contain such other provisions as the Committee shall deem advisable, including without limitation, the number of shares of Common Stock underlying the Option, the type of the Option, the Exercise Price, any applicable Goals or Performance Goals, and forfeiture provisions (including forfeitures and exercise rights following the Participant's Termination Date).  The terms of Option Awards need not be uniform among all such Awards granted hereunder.

6.2     The Exercise Price of an Option shall be determined by the Committee; however, the Exercise Price per share shall not be less than the Fair Market Value of a share of Common Stock underlying such Option on the date of grant.  In the case of any Incentive Stock Option granted to a Ten Percent Stockholder, the Exercise Price per share shall not be less than 110% of the Fair Market Value of a share of Common Stock on the date of grant.

6.3     Award Agreements evidencing Options shall specify when and under what terms and conditions an Option shall become vested and may be exercisable, which may include the attainment of specified Goals or Performance Goals.  The term of an Option shall in no event be greater than ten years (five years in the case of an Incentive Stock Option granted to a Ten Percent Stockholder). The Option shall also expire, be forfeited and terminate at such times and in such circumstances as otherwise provided hereunder and/or under the applicable Award Agreement.

6.4     Incentive Stock Options may only be granted to Employees of the Company or a Subsidiary (provided, however, that solely for this purpose, grants of Incentive Stock Options to an employee of a Subsidiary may only be made if the Company controls at least a majority of the total voting power of such Subsidiary, as determined in accordance with Code Section 424 and the regulations thereunder).  Incentive Stock Options shall not be granted to any nonresident alien in return for services performed outside of the United States.  Any Incentive Stock Options, which first become exercisable in any one calendar year that are in excess of the $100,000 statutory limit shall be treated as Non-Qualified Stock Options, with respect only to such excess.  Participants shall notify the Company of any sale or other disposition of shares of Common Stock acquired pursuant to an Incentive Stock Option if such sale or disposition occurs (i) within two years of the grant of an Incentive Stock Option or (ii) within one year of the issuance of shares of Common Stock to the Participant upon the exercise of an Incentive Stock Option.  Such notice shall be in writing and directed to the Secretary of the Company, or such Secretary's designee.  The Company shall not be liable to any Participant or any other person if the Internal Revenue Service or any court or other authority having jurisdiction over such matter determines

for any reason that an Option intended to be an Incentive Stock Option does not qualify as an Incentive Stock Option.

6.5      The total number of shares of Common Stock subject to an Option may, but need not, vest and become exercisable in periodic installments, which installments may, but need not, be equal.  An Option may be subject to such other terms and conditions on the time or times when it may be exercised (which may be based on performance, the attainment of Goals or Performance Goals, or other criteria) as the Committee may deem appropriate.  The vesting provisions of individual Options, as provided in the Award Agreement, may vary.  The Committee may, in its sole discretion, accelerate the vesting and exercisability of Options.

6.6      The Participant shall not have any rights as a stockholder (including no rights to dividends or other distributions) with respect to any shares of Common Stock underlying an Option until such time as the Option has been exercised and the shares of Common Stock have been so issued.

6.7      Subject to vesting and other restrictions provided for hereunder or in an Award Agreement, an Option may be exercised, and payment of the Exercise Price made, by a Participant (or, where appropriate, a permitted transferee of the Participant) only by notice (in the form prescribed by the Committee) to the Company specifying the number of shares of Common Stock to be purchased.

6.8      The aggregate Exercise Price and any related taxes shall be paid in full upon the exercise of the Option.  Payment must be made by one of the following methods:

(a)      cash or a certified or bank cashier's check;

(b)      if approved by the Committee in its sole discretion, shares of Common Stock previously owned and held for such period of time as necessary to avoid a charge for financial accounting purposes and having an aggregate Fair Market Value on the day prior to the date of exercise equal to the aggregate Exercise Price;

(c)      a broker assisted cashless exercise methodology approved by the Committee; or

(d)    any combination of such methods of payment or any other legal method acceptable to the Committee in its discretion.

**7.    Restricted Stock**

An Award of Restricted Stock shall be subject to the following terms and conditions:

7.1    Each Award of Restricted Stock shall be evidenced by an Award Agreement.  Such Award Agreement shall conform to the requirements of the Plan, may contain such terms, conditions and provisions as the Committee shall deem advisable including, without limitation, any applicable Restriction Period, any applicable Goals or Performance Goals, forfeiture provisions (including forfeiture following the Participant's Termination Date), and the price, if any, to be paid by the Participant for each share of Common Stock subject to the Award.  Such terms and conditions need not be uniform among all Awards.

7.2    Unless the Committee determines otherwise and as provided in the applicable Award Agreement, during the Restriction Period, the Participant shall have (i) the right to vote the shares of Restricted Stock and, (ii) unless the Restricted Stock Award includes Goals or Performance Goals, the right to receive the Participant's allocable share of any cash dividends declared and paid by the Company on its Common Stock. Should the Restricted Stock Award be subject to Goals or Performance Goals, the Committee may, in its discretion and to the extent the Company pays dividends on the Common Stock during the Restriction Period, determine that the Participant may be credited with dividend equivalent units equal in value to the amount of dividends the Participant would have received had he/she owned the target number of shares of Common Stock underlying the Award.  Such dividend equivalent units, if so determined by the Committee, shall be accumulated but shall not be paid during the Restriction Period and, if all applicable conditions are satisfied and the restrictions imposed under the Award lapse, shall be paid to the Participant in cash, or shares of Common Stock of equal value, as soon as reasonably practical following the expiration of the Restriction Period and, in any event, no later than the fifteenth (15th) day of the third (3rd) month following the end of the year during which the Restriction Period ends.

7.3    The Committee may (but shall not be required to) condition the payment of an Award of Restricted Stock upon the Participant's continued service over a period of time with the Company, its Subsidiaries or its Affiliates, or satisfaction of Goals or Performance Goals as specified in the Award Agreement.  If the specified conditions are not attained, the Participant shall forfeit the Award, or portion of the Award with respect to which those conditions are not attained, and the underlying Common Stock shall be forfeited.

7.4    Upon the expiration of the Restriction Period, if all applicable conditions have been satisfied, the restrictions imposed under the Award shall lapse with respect to the applicable number of shares of Restricted Stock as determined by the Committee.  The Committee may, in its sole discretion, accelerate the vesting of Restricted Stock.

7.5    If applicable, the purchase price per share of Common Stock acquired pursuant to the Award of Restricted Stock and any related taxes shall be paid in one of the following ways:

(a)    in cash at the time of purchase;

(b)    at the discretion of the Committee, and to the extent legally permissible, according to a deferred payment or other similar arrangement with the Participant;

(c)    at the discretion of the Committee, by services rendered or to be rendered to the Company;

(d)    through net settlement, or

(e)    in any other form of legal consideration that may be legally permissible and acceptable to the Committee in its sole discretion.

## 8.    Restricted Stock Units

An Award of Restricted Stock Units shall be subject to the following terms and conditions:

8.1    Each Award of a Restricted Stock Unit shall be evidenced by an Award Agreement.  Such Award Agreement shall conform to the requirements of the Plan and may contain such

-17-

other provisions as the Committee shall deem advisable, including, without limitation, the applicable Restriction Period, any applicable Goals or Performance Goals, forfeiture provisions (including forfeiture following the Participant's Termination Date) and payment provisions.  Such terms and conditions need not be uniform among all Awards.

8.2    During the Restriction Period the Participant shall not be entitled to exercise voting rights with respect to shares of Common Stock underlying the Award.

8.3    At the time the Restricted Stock Unit is granted, the Committee may, in its discretion and to the extent the Company pays dividends on the Common Stock during the Restriction Period, determine that the Participant may be credited with dividend equivalent units equal in value to the amount of dividends the Participant would have received had he/she owned the target number of shares of Common Stock underlying the Award.  Such dividend equivalent units, if so determined by the Committee, shall be accumulated but shall not be paid during the Restriction Period and if all applicable conditions are satisfied and the Award is distributed in accordance with Section 8.5 below, shall be paid to the Participant in cash, or shares of Common Stock of equal value, as soon as reasonably practical following the expiration of the Restriction Period and, in any event, no later than the fifteenth (15th) day of the third (3rd) month following the end of the year during which the Restriction Period ends.

8.4    The Committee may condition the expiration of the Restriction Period with respect to a grant of Restricted Stock Units upon the Participant's continued service over a period of time with the Company, its Subsidiaries or Affiliates, or satisfaction of Goals or Performance Goals as specified in the Award Agreement.  If the specified conditions are not attained, the Participant shall forfeit the portion of the Award with respect to which those conditions are not attained, and the underlying Common Stock and Award, including dividend equivalent units, if any, shall be forfeited.

8.5    Upon the expiration of the Restriction Period, if all applicable conditions have been satisfied, the Participant shall be entitled to receive a share of Common Stock for each share underlying the Restricted Stock Unit Award that is then free from restriction, or cash equal to the Fair Market Value of such shares of Common Stock on the date the Restriction Period expires, and such shares

or cash shall be delivered to the Participant (or, where appropriate, the Participant's legal representative) as soon as reasonably practical thereafter, and, in any event, no later than the fifteenth (15th) day of the third (3rd) month following the end of the year during which the Restriction Period ends.  The Committee may, in its sole discretion, accelerate the vesting of Restricted Stock Units.

9.        **Cash-Based Incentive Awards**

A Cash-Based Incentive Award shall be subject to the following terms and conditions:

9.1        Each Cash-Based Incentive Award shall be evidenced by an Award Agreement or Committee resolutions, if the Cash-Based Incentive Award is to be settled solely in cash. Such Award Agreements or Committee resolutions shall conform to the requirements of the Plan and may contain such other provisions as the Committee shall deem advisable.

9.2        The applicable Award Agreement or Committee resolutions shall set forth the Goals or Performance Goals and/or continued employment requirements that must be satisfied in order for the Participant to receive payment under the Cash-Based Incentive Award.  If the specified conditions are not attained, the Participant shall forfeit the Award, or the portion of the Award with respect to which those conditions are not attained, and the underlying Common Stock, if any.

9.3        The Participant shall not have any rights as a stockholder with respect to a Cash-Based Incentive Award until such time as the Cash-Based Incentive Award has been earned and settled, provided that such settlement is made in shares of Common Stock.

9.4        The Award Agreement shall specify the form of payment under a Cash-Based Incentive Award, which may be in cash, by the issuance of shares of Common Stock, or by a combination thereof.

9.5        If and to the extent the applicable conditions are satisfied during the applicable performance period, the Company shall distribute the Award to the Participant as soon as reasonably practical following the expiration of the applicable performance period, and, in any event, no later than the fifteenth (15th) day of the third (3rd) month following the expiration of the performance period.

10.    **Adjustments upon Changes in Capitalization**

10.1    In the event of a Material Business Event, the Committee, in its sole discretion, in order to prevent dilution or enlargement of Participants' rights under this Plan, may substitute or adjust, as applicable:

(a)    the number and/or kind of shares that may be issued under this Plan or under particular types of Awards;

(b)    the number and/or kind of shares subject to outstanding Awards;

(c)    the Exercise Price or other economic terms of any outstanding Awards;

(d)    the Annual Award Limits;

(e)    the amount and/or type of payment to be received under Awards; and

(f)    any other value determinations applicable to outstanding Awards.

10.2    Additionally, upon the occurrence of a Material Business Event, the Committee, in its sole discretion, may make appropriate adjustments or modifications in the terms and conditions of any outstanding Awards under this Plan, including, but not limited to, modifications and accelerations of vesting provisions, Performance Goals and Restriction Periods.

10.3    The determination of the occurrence of a Material Business Event, as well as any appropriate adjustments or modifications shall be made in the sole discretion of the Committee, and its determinations shall be conclusive and binding on all interested parties, including Participants under this Plan.    Notwithstanding the foregoing, the Committee shall not make any adjustments or modifications to an Award where such action would result in the loss of an otherwise available exemption of the Award under Code Section 162(m).

## 11.    Substitute Awards

11.1    The Committee may grant Awards under the Plan in substitution for stock-based awards held by employees of another entity who become employees of the Company, a Subsidiary or an Affiliate as a result of a merger or consolidation of the former employing entity with the Company, a Subsidiary or an Affiliate, or the acquisition by the Company, a Subsidiary or an Affiliate of property or stock of the former employing corporation.  The Committee may direct that the substitute Awards be granted on such terms and conditions as the Committee considers appropriate in the circumstances.

## 12.    Change in Control

12.1    Unless an outstanding Award is assumed, replaced or converted to an equivalent award by the continuing entity (a "Replacement Award"), or as otherwise determined by the Committee, upon a Change in Control (i) each outstanding Award of Restricted Stock or Restricted Stock Units shall be fully vested, except that any Awards of Restricted Stock or Restricted Stock Units that are subject to Goals or Performance Goals shall vest at the target level, (ii) each outstanding Award of Options shall be fully exercisable (in whole or in part at the discretion of the holder), except that any Awards of Options that are subject to Goals or Performance Goals shall become exercisable at the target level, and (iii) each outstanding Cash-Based Incentive Award shall be earned pro-rata based on the fraction (using the nearest whole months) of the performance period that has elapsed from the beginning of the performance period until the Change in Control and assuming achievement of Goals and Performance Goals at the target level (if applicable).  Any Replacement Award shall be fully exercisable, vested or earned (except that Replacement Awards subject to Goals or Performance Goals or other performance goals shall be exercisable, vested or earned at the target level) if, within twelve (12) months after a Change in Control, (a) the Participant's employment or other service with the Company (or other Affiliate to which the Participant provides services) is terminated by the Company or such Affiliate without Cause and not in the circumstances described in the following sentence, or (b) the Participant voluntarily terminates his or her service with the Company or such Affiliate for Good Reason (if

applicable).  Notwithstanding the preceding sentence, the exercisability, vesting or payment of such Replacement Award shall not be accelerated or enhanced (as contemplated in the preceding sentence) if the Participant's employment or services with the Company or an Affiliate is terminated within twelve (12) months after a Change in Control for Cause or because (i) of the Participant's retirement or voluntary withdrawal from employment, other than for Good Reason; (ii) of the Participant's death; (iii) the Participant becomes permanently disabled within the meaning of, and begins actually to receive disability benefits pursuant to, the long-term disability plan in effect for, or applicable to, the Participant; (iv) of the Participant's failure to return to work after a temporary lay-off; or (v) of the Participant's withdrawal or loss of employment due to personal leave, other than for Good Reason.  To the extent applicable, any such Replacement Awards shall satisfy the substitution requirements of Code Section 409A and the Incentive Stock Option rules.  An Option that becomes exercisable pursuant to this Section shall remain exercisable thereafter in accordance with the terms of the Award Agreement.

12.2    In connection with a Change in Control, the Committee may in its sole discretion provide that such Awards and all rights thereunder (after applying the provisions of Section 12.1) shall terminate on the Change in Control and each Participant shall receive, in exchange therefor, a cash payment as described below; provided that if the calculations below do not amount to a positive cash payment, all rights under such Award shall terminate without payment in any event.  In the case of Options such cash payment shall equal the amount (if any) by which (A) the per share consideration to be paid for each outstanding share of Common Stock in (or other applicable per share value) the Change in Control multiplied by the number of shares subject to such outstanding Options, exceeds (B) the aggregate Exercise Price of such Options.  In the case of Restricted Stock and Restricted Stock Units, the cash payment shall be based on the value of the underlying Common Stock (calculated as the per share consideration to be paid for each outstanding share of Common Stock in (or other applicable per share value) the Change in Control).

12.3    Notwithstanding the foregoing, the time for payment for an Award shall not be accelerated under this Section to the extent such acceleration would be contrary to the payment timing or other rules under Code Section 409A.

12.4    The following defined terms shall apply for purposes of Sections 12.1 through 12.4:

(a)    "Base Salary" means with respect to each Participant, the annual base salary or retainer, exclusive of any bonus, special pay (including any retention pay) or other benefits he or she may receive, but without giving effect to any salary reductions authorized by the Participant under any qualified or non-qualified deferred compensation plan of the Company or an Affiliate, in effect (i) on the date immediately preceding the date of the relevant Change in Control or (ii) on the date of the Participant's termination of employment or services with the Company or an Affiliate, whichever is the highest.

(b)    "Good Reason" shall mean Good Reason as such term is defined in any employment agreement between the Participant and the Company or its Subsidiaries or Affiliates, or, if there is no such agreement that defines Good Reason, in an Award Agreement.  If no such definition exists, "Good Reason" shall mean, with respect to any Participant (i) any material and adverse change in or reduction of the Participant's duties and responsibilities, as compared in each case to the corresponding circumstances in place on the date immediately preceding the first occurrence of a Change in Control (the "Reference Date"); (ii) a relocation of the principal work location at which the Participant is based on the Reference Date that would increase such Participant's one way travel by more than forty (40) miles; or (iii) a material reduction in Base Salary or Target Bonus not agreed to by the Participant.

(c)    "Target Bonus" means the amount obtained by multiplying the Participant's target bonus percentage as established and in effect for the Participant (i) on the Reference Date, or (ii) on the date of the Participant's termination of employment or services with the Company or an Affiliate, whichever is higher, by the Participant's Base Salary.

### 13.    Effective Date, Termination and Amendment

13.1    The Plan has been authorized for adoption and implementation by the Board on or promptly after the Chapter 11 Plan Effective Date pursuant to the Chapter 11 Plan and the Confirmation Order and shall become effective upon the Chapter 11 Plan Effective Date . The Plan shall remain in full force and effect until the earlier of [_____ __, 2025] (ten years following the effective date of the Plan), or the date it is terminated by the Board. The Plan shall be deemed to have satisfied the stockholder approval requirements in accordance with Section 16 of the Securities Exchange Act of 1934 and Code Section 162(m).

13.2    The Committee shall have the power to amend, suspend or terminate the Plan at any time, provided that any such termination of the Plan shall not affect Awards outstanding under the Plan at the time of termination. Notwithstanding the foregoing, an amendment will be contingent on approval of the Company's stockholders, to the extent required by law or by the rules of any stock exchange on which the Company's securities are traded.

13.3    Subject to the limitations set forth in this Plan, including in Section 15.2, the Committee may amend any outstanding Award in whole or in part from time to time. Any such amendment which the Committee determines, in its sole discretion, to be necessary or appropriate to conform the Award to, or otherwise satisfy, any legal requirement (including without limitation the provisions of Code Sections 162(m) or 409A or the regulations or rulings promulgated thereunder), may be made retroactively or prospectively and without the approval or consent of the Participant. Additionally, the Committee may, without the approval or consent of the Participant, make adjustments in the terms and conditions of an Award in recognition of unusual or nonrecurring events affecting the Company or the financial statements of the Company in order to prevent the dilution or enlargement of the benefits intended to be made available pursuant to the Award. Other amendments or adjustments to Awards not expressly contemplated in the two preceding sentences may be made by the Committee with the consent of the affected Participant(s).

14.    **Transferability**

Awards may not be pledged, assigned or transferred for any reason during the Participant's lifetime, and any attempt to do so shall be void.  Notwithstanding the generality of the foregoing, if the Award Agreement provides, an Award (other than Incentive Stock Options) may be transferred by a Participant to the Participant's children, grandchildren, spouse, one or more trusts for the benefit of such family members or a partnership in which such family members are the only partners, on such terms and conditions as may be permitted under Securities Exchange Commission Rule 16b-3 as in effect from time to time.  Any transferee of a Participant shall, in all cases, be subject to the Plan and the provisions of the Award Agreement between the Company and the Participant; provided, however, that such transferee may not transfer the Award except by will or the laws of descent and distribution.

15.    **General Provisions**

15.1    The Committee may postpone any grant, exercise, vesting or payment of an Award for such time as the Committee in its sole discretion may deem necessary in order to permit the Company:  (i) to effect, amend or maintain any necessary registration of the Plan or the shares of Common Stock issuable pursuant to the Award under applicable securities laws; (ii) to take any action in order to (A) list such shares of Common Stock or other shares of stock of the Company on a stock exchange if shares of Common Stock or other shares of stock of the Company are not then listed on such exchange, or (B) comply with restrictions or regulations incident to the maintenance of a public market for its shares of Common Stock or other shares of stock of the Company, including any rules or regulations of any stock exchange on which the shares of Common Stock or other shares of stock of the Company are listed; (iii) to determine that such shares of Common Stock in the Plan are exempt from such registration or that no action of the kind referred to in (ii)(B) above needs to be taken; (iv) to comply with any other applicable law, including without limitation, securities and tax laws; or (v) to otherwise comply with any prohibition on such acts or payments during any applicable blackout period. Additionally, the granting, exercise, vesting or payment of an Award shall be postponed during any period that the Company or any Affiliate is prohibited from doing or permitting any of such acts under

applicable law, including without limitation, during the course of an investigation of the Company or any Affiliate, or under any contract, loan agreement or covenant or other agreement to which the Company or any Affiliate is a party.  The Company shall not be obligated by virtue of any terms and conditions of any Award Agreement or any provision of the Plan to recognize the grant, exercise, vesting or payment of an Award or to grant, sell or issue shares of Common Stock or make any such payments in violation of any law, including any securities or tax laws, or the laws of any government having jurisdiction thereof or any of the provisions hereof.  Any such postponement shall not extend the term of the Award, and neither the Company nor its directors and officers nor the members of the Committee or the Board or any delegate thereof shall have any obligation or liability to any Participant or to any other person with respect to shares of Common Stock or payments as to which the Award shall lapse because of such postponement.

15.2    Except as provided in connection with a Material Business Event as described in Section 10 or Section 12.2, without the approval of the Company's stockholders, neither the Board nor the Committee shall take any action to change or amend the terms of outstanding Awards to reduce the Exercise Price of outstanding Options or cancel Options in exchange for cash or other Awards or Options with an Exercise Price that is less than the Exercise Price of the original Options.

15.3    Nothing contained in this Plan, nor any Award granted pursuant to this Plan nor any Award Agreement, shall constitute or create any employment or other relationship, or confer upon any Participant any right to continued employment or service with the Company or any Subsidiary or Affiliate, nor interfere in any way with the right of the Company, a Subsidiary or an Affiliate to terminate the employment or service of any Participant at any time.

15.4    Nothing contained in this Plan, and no action taken pursuant to the provisions of the Plan, shall create or shall be construed to create a trust of any kind, or a fiduciary relationship between the Committee, the Company or its Subsidiaries or Affiliates, or their officers or other representatives or the Board, on the one hand, and the Participant, the Company, its Subsidiaries or Affiliates or any other person or entity, on the other.  The Plan shall be unfunded, and the Company shall not be required to segregate any assets that may at any time be represented by grants under this Plan.  Any

liability of the Company to any person with respect to any grant under this Plan shall be based solely upon any contractual obligations that may be created pursuant to this Plan.

15.5    For purposes of this Plan, a transfer of employment between the Company, its Subsidiaries and its Affiliates shall not be deemed a termination of employment.

15.6    The Company shall indemnify and hold harmless the members of the Committee, the Board, and any delegate thereof, from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act or omission to act in connection with the performance of such person's duties, responsibilities and obligations under the Plan, to the maximum extent permitted by applicable law.

15.7    Participants shall be responsible to make appropriate provision for all taxes required to be withheld in connection with any Award or the transfer of shares of Common Stock pursuant to this Plan.  Such responsibility shall extend to all applicable Federal, state, local or foreign withholding taxes.  The Company shall have the right to retain from the payment under an Award the number of shares of Common Stock or a portion of the value of such Award equal in value to the amount of any required withholdings.

15.8    In order to facilitate the making of any grant of an Award under this Plan, the Committee may provide for such special terms for Awards to Participants who are foreign nationals or who are employed by the Company or any Subsidiary outside of the United States of America as the Committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom, which special terms may be contained in an Appendix attached hereto. Moreover, the Committee may approve such supplements to or amendments, restatements or alternative versions of this Plan as it may consider necessary or appropriate for such purposes, without thereby affecting the terms of this Plan as in effect for any other purpose, and the Secretary or other appropriate officer of the Company may certify any such document as having been approved and adopted in the same manner as this Plan.  No such special terms, supplements, amendments or restatements, however, shall include any provisions that are inconsistent with the terms of this Plan as then in effect unless this Plan

could have been amended to eliminate such inconsistency without further approval by the stockholders of the Company.

15.9     To the extent applicable to the type of Award, each Participant may designate a person or persons to receive in the event of his or her death, any Award or any amount payable pursuant thereto, to which he or she would then be entitled under the terms of the Plan. Such designation will be made upon forms supplied by and delivered to the Company and may be revoked in writing.

15.10    The adoption of the Plan by the Board shall not be construed as amending, modifying or rescinding any previously approved incentive arrangement or as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options otherwise than under the Plan, to the extent permitted by the rules of the exchange on which the shares are listed or applicable law, and such arrangements may be either applicable generally or only in specific cases.

15.11    To the extent that Federal laws (such as the 1934 Act, the Code or the Employee Retirement Income Security Act of 1974) do not otherwise control, this Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Delaware and shall be construed accordingly.

15.12    The duties and obligations of the Company, the Board, the Committee and each member thereof shall be determined only with reference to the Plan, and no implied duties or obligations shall be read into the Plan or any Award Agreement on the part of the Company, the Board, the Committee or any member thereof.

15.13    Notwithstanding anything to the contrary contained in the Plan, the Board may, in its sole discretion, at any time and from time to time, grant Awards and administer the Plan with respect to such Awards. Any such actions by the Board shall be subject to the applicable rules of the principal securities market on which shares of Common Stock are traded. In any such case, the Board shall have all the authority granted to the Committee under the Plan.

16.      **Compliance with Section 409A of the Code.**

16.1     To the extent applicable, it is intended that this Plan and any Awards made hereunder comply with the provisions of Code Section 409A, so that the income inclusion provisions of Code Section 409A(a)(1) do not apply to the Participants.  This Plan and any Awards made hereunder will be administered in a manner consistent with this intent.  Any reference in this Plan to Code Section 409A will also include any regulations or any other formal guidance promulgated with respect to such Section by the U.S. Department of the Treasury or the Internal Revenue Service.

16.2     Neither a Participant nor any of a Participant's creditors or beneficiaries will have the right to subject any deferred compensation (within the meaning of Code Section 409A) payable under this Plan and Awards hereunder to any anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment.  Except as permitted under Code Section 409A, any deferred compensation (within the meaning of Code Section 409A) payable to a Participant or for a Participant's benefit under this Plan and Awards hereunder may not be reduced by, or offset against, any amount owing by a Participant to the Company or any of its Subsidiaries.

16.3     If, at the time of a Participant's separation from service (within the meaning of Code Section 409A), (i) the Participant will be a specified employee (within the meaning of Code Section 409A and using the identification methodology selected by the Company from time to time) and (ii) the Company makes a good faith determination that an amount payable hereunder constitutes deferred compensation (within the meaning of Code Section 409A) the payment of which is required to be delayed pursuant to the six (6) month delay rule set forth in Code Section 409A in order to avoid taxes or penalties under Code Section 409A, then the Company will not pay such amount on the otherwise scheduled payment date but will instead pay it, without interest, on the fifth (5th) business day of the seventh (7th) month after such separation from service.

16.4     Notwithstanding any provision of this Plan and the Award Agreements hereunder to the contrary, in light of the uncertainty with respect to the proper application of Code Section 409A, the Company reserves the right to make amendments to this Plan and Awards hereunder as

the Company deems necessary or desirable to avoid the imposition of taxes or penalties under Code

Section 409A.  In any case, a Participant will be solely responsible and liable for the satisfaction of all

taxes and penalties that may be imposed on a Participant or for a Participant's account in connection with

this Plan and Awards hereunder (including any taxes and penalties under Code  Section 409A), and

neither the Company nor any of its Affiliates will have any obligation to indemnify or otherwise hold a

Participant harmless from any or all of such taxes or penalties.

# APPENDIX A

## GOAL CRITERIA

| Performance Measure | General Definition |
| --- | --- |
| AATP Margin | AATP divided by Sales |
| Adjusted After-Tax Profit (AATP) | APTP minus book income taxes (reported tax rate applied to APTP). The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Adjusted Earnings Before Interest and Taxes (AEBIT) | EBIT excluding gain on asset sales |
| Adjusted Pre-Tax Profit (APTP) | Income before provision for income taxes plus interest expense plus implied interest on capitalized operating leases. The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Average Revenue Per User (ARPU) | Subscriber revenues divided by the weighted average number of handsets in commercial service |
| Capitalized Economic Profit | Economic Profit divided by a predetermined rate reflecting the cost of capital |
| Capitalized Entity Value | Sum of average invested capital in the business and the Capitalized Economic Profit |
| Capitalized Equity Value | Capitalized Entity Value minus total debt |
| Cashflow | Net cash provided by operating activities less net cash used for investing activities |
| Cashflow Return on Capital | Cashflow divided by average invested capital |
| Cashflow Return on Capitalized Entity/Equity Value | Cashflow divided by Capitalized Entity/Equity Value |
| Cashflow Return on Investment | The amount comprised of net income plus depreciation and amortization minus working capital expenditures, divided by the amount comprised of gross fixed assets plus net working capital excluding cash and debt |
| Change in Capital | Capital expenditures plus/minus change in operating working capital plus net proceeds from asset sales |

1

| Performance Measure | General Definition |
| --- | --- |
| Change in Operating Working Capital | GAAP cash flow of accounts receivable (including allowance for doubtful accounts), inventory, and accounts payable |
| Change in Price of Shares | Percentage increase in per-share price. This measure may be adjusted for change in capitalization (as described in the Plan). |
| Change in Working Capital | Increase or decrease in working capital |
| Churn | Measure of subscribers who leave during a given time period |
| Customer Satisfaction | Measure of subscriber perception of performance |
| Debt | Third-party debt recorded on the balance sheet. The measure may include or exclude lease obligations, accounts payable, and current or long-term accrued liabilities |
| Debt Leverage | Change in company's debt leverage rates |
| Debt Reduction | Decrease in total debt from one period to another |
| Earnings Before Interest and Taxes (EBIT) | Earnings minus interest and taxes. The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) | Earnings minus interest, taxes, depreciation, and amortization. The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Earnings Per Share | Primary or fully diluted earnings per share. The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Economic Profit | AATP minus a charge for capital |
| Economic Value Added (EVA) | Net operating results with reduction for capital costs |
| Employee Engagement | Measure of employees' satisfaction, commitment and engagement |
| Free Cash Flow | Cashflow available for distribution among securities holders |
| Market Capitalization | Value of the tradable shares of the Company |
| Market Share | Increase in percentage share of target market |

| Performance Measure | General Definition |
|---|---|
| Net income | Net income as reported in Nextel International, Inc.'s annual financial statements or the books and records of its segments. The measure may include or exclude income from discontinued operations, extraordinary items, changes in accounting principles, and restructuring expense |
| Net Income Return on Capital | Net Income divided by average invested capital |
| Net Subscriber Additions | Number of new subscribers in a given period and/or market |
| OIBDA | Operating income before depreciation and amortization |
| OIBDA Margin | OIBDA divided by total operating revenues |
| Operating Expenses | Change in operational expenses |
| Operating Margin | Operating Profit divided by revenues |
| Operating Profit | Revenues less operating expenses (with or without reduction for taxes) |
| Operating Working Capital | Net accounts receivable plus inventory minus accounts payable |
| Personal Performance | Individualized measure of Participant's performance |
| Return on Assets (ROA) | Net Income divided by average total assets |
| Return on Equity (ROE) | Net Income divided by average stockholders' equity |
| Return on Gross Investment | Sum of Net Income plus depreciation divided by sum of average invested capital plus accumulated depreciation |
| Return on Invested Capital | Net Income of AATP divided by average invested capital |
| Return on Net Assets (RONA) | Net Income, APTP, or income before taxes, divided by average net assets |
| Sales | Net sales of products and service revenues |
| Sales Growth | Percentage change in Sales from year to year |
| Subscriber to Employee Ratio | Ratio of number of customers to number of employees |
| Subscriber Growth | Increase in number or ratio of subscribers on a gross or net basis |
| Total Enterprise Value | Market Capitalization plus debt |
| Total Return to Stockholders | Percentage change in stockholder value (stock price plus reinvested dividends) |

| Performance Measure | General Definition |
| --- | --- |
| Working Capital | Current assets minus current liabilities |

**<u>EXHIBIT F</u>**

**Amendments to Operating Company Credit Agreements**

**<u>EXHIBIT F</u>**

**Amendments to Operating Company Credit Agreements**

**<u>EXHIBIT F-1</u>**

*EXECUTION VERSION*

AMENDMENT AGREEMENT NO. 2

Among

NEXTEL TELECOMUNICAÇÕES LTDA.
as Borrower under the Sinosure Credit Agreement

THE GUARANTORS SIGNATORIES HERETO
as Guarantors under the Sinosure Credit Agreement

CHINA DEVELOPMENT BANK CORPORATION
as Lender, Administrative Agent and Arranger under the Sinosure Credit Agreement

Dated as of ___5___ December 2014

Table of Contents

Page

SECTION  1.  DEFINITIONS AND RULES OF INTERPRETATION. .......................................5
    1.     Defined Terms ...............................................................5
    2.     Rules of Interpretation ..................................................5

SECTION  2.  AMENDMENTS TO THE SINOSURE CREDIT AGREEMENT.......................6

SECTION  3.  ACKNOWLEDGMENT.......................................................................6

SECTION  4.  EFFECTIVENESS AND TERMINATION. .........................................6

SECTION  5.  CONDITIONS PRECEDENT. .........................................................6
    1.     Legal Opinions...............................................................6
    2.     Charter Documents .........................................................7
    3.     Other Amendment Terms Summary. ...........................7
    4.     Sinosure Consent Letter ...............................................7

SECTION  6.  TRANSLATION AND REGISTRATION ...........................................8

SECTION  7.  REPRESENTATIONS, WARRANTIES AND AGREEMENTS.....................8

SECTION  8.  NO WAIVER.....................................................................................9

SECTION  9.  NO NOVATION................................................................................9

SECTION  10. MISCELLANEOUS. .........................................................................9
    **Annex 1** ............................................................................16
    Amendments to the Sinosure Credit Agreement ............................16
    1.     Amendments to Appendix A of the Sinosure Credit Agreement .........16
    2.     Amendments to Section 5 (*Covenants*) of the Sinosure Credit
         Agreement........................................................................21
    3.     Amendments to Section 6 (*Payment Provisions; Fees*) of the
         Sinosure Credit Agreement.............................................23
    4.     Amendments to Section 7 (*Events of Default and Remedies*) of the
         Sinosure Credit Agreement.............................................24
    5.     Amendments to Section 9.2 (*Bankruptcy*) of the Sinosure Credit
         Agreement........................................................................26
    6.     Amendments to Section 10.13 (*Assignments, Participations, etc.*) of
         the Sinosure Credit Agreement.......................................26

EXHIBIT A   FORM OF AMENDMENT TO THE PARENT GUARANTY

EXHIBIT B   FORM OF BORROWER ACCOUNTS PLEDGE

EXHIBIT C   EXCLUDED REVENUE COLLECTION ACCOUNTS

EXHIBIT D   OTHER AMENDMENT TERMS

ASIA 20422880 (2K)

*5*   AMENDMENT AGREEMENT NO. 2 (this "Amendment"), dated as of December 2014, among (i) NEXTEL TELECOMUNICAÇÕES LTDA., a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil in its capacity as borrower (the "Borrower") under the Sinosure Credit Agreement (as defined below), (ii) the persons listed as guarantors on the signature pages hereto in their capacities as guarantors (the "Guarantors") under the Sinosure Credit Agreement and (iii) CHINA DEVELOPMENT BANK CORPORATION as lender (in such capacity, the "Lender"), administrative agent (in such capacity, the "Administrative Agent") and arranger (in such capacity, the "Arranger") under the Sinosure Credit Agreement.

W I T N E S S E T H:

WHEREAS, the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger are parties to a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is supported by the Sinosure Insurance (the "Sinosure Credit Agreement");

WHEREAS, the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger are parties to a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is not supported by the Sinosure Insurance (the "Non-Sinosure Credit Agreement", together with the Sinosure Credit Agreement, the "Credit Agreements");

WHEREAS, the Borrower has notified the Administrative Agent and has requested that the Lender agree to amend certain terms and conditions of the Sinosure Credit Agreement to facilitate the balance sheet restructuring of NII Holdings, Inc. (the "**Parent**") and certain of the Parent's affiliates pursuant to which the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. will be restructured;

WHEREAS, the Parent and such affiliates have commenced the Chapter 11 Cases, and other affiliates may, from time to time thereafter, commence cases under chapter 11 of title 11 of the United States Code; and

WHEREAS, it is anticipated that the Parent Restructuring Plan and the order confirming it will provide that the Parent's obligations under (i) the Shareholder Undertaking, (ii) the Subordination Agreements and (iii) the Parent Guaranty, amended as set forth in the Amendment to the Parent Guaranty, will not be discharged, but will instead continue in full force and effect, binding the Parent or a Successor Guarantor, as of the Parent Restructuring Effective Date;

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

4

SECTION 1.  <u>DEFINITIONS AND RULES OF INTERPRETATION</u>.

      1.      <u>Defined Terms</u>

      Except as otherwise expressly provided herein, capitalized terms used in this Amendment shall have the meanings assigned to such terms in Appendix A (*Defined Terms and Rules of Interpretation*) of the Sinosure Credit Agreement, as amended by Amendment No. 1 and as amended hereby.

      2.      <u>Rules of Interpretation</u>

      The rules of interpretation set forth in Appendix A (*Defined Terms and Rules of Interpretation*) of the Sinosure Credit Agreement shall apply to this Amendment, *mutatis mutandis*.

5

SECTION 2. <u>AMENDMENTS TO THE SINOSURE CREDIT AGREEMENT</u>.

On the Effective Date (as defined below), the terms and conditions of the Sinosure Credit Agreement shall be amended as set forth in Annex 1 hereto.

SECTION 3. <u>ACKNOWLEDGMENT</u>.

Each Party to this Amendment hereby acknowledges and agrees that the terms and conditions of each of the Financing Documents in effect as of the date hereof shall continue in full force and effect unchanged except as amended and supplemented hereby or as otherwise set forth herein.

SECTION 4. <u>EFFECTIVENESS AND TERMINATION</u>.

Notwithstanding anything in this Amendment to the contrary, this Amendment shall become effective on the date on which (i) this Amendment has been executed by all parties hereto and (ii) each of the conditions precedent set forth in Section 5 (*Conditions Precedent*) shall have been fulfilled in a manner reasonably satisfactory to the Administrative Agent or have been waived in writing by the Administrative Agent, in its sole discretion (the "<u>Effective Date</u>").

In the event the formal documentation entered into by the Borrower (or any of its subsidiaries, as applicable) in connection with the Other Amendments Terms is different from those set forth in the Other Amendment Terms Summary and such differences are, in the reasonable opinion of the Lender, materially adverse to the Lender, the Administrative Agent shall, as instructed by the Lender in its sole discretion, be entitled to terminate this Amendment and all amendments contemplated herein shall be void *ab initio*.

SECTION 5. <u>CONDITIONS PRECEDENT</u>.

On or prior to the Effective Date, the Administrative Agent shall have received the following, each of which shall be in form and substance satisfactory to the Administrative Agent (acting on the instructions of all Lenders):

1.      <u>Legal Opinions</u>

The Administrative Agent shall have received a copy of the following legal opinions, which legal opinions shall be dated as of the Effective Date and addressed to each Financing Party:

(a)     the legal opinion of White & Case LLP, New York counsel to the Administrative Agent and the Lenders, as to matters of enforceability of this Amendment under New York law;

6

(b)      the legal opinion of Dias Carneiro, Arystóbulo, Flores, Sanches e Thomaz Bastos Advogados, Brazilian counsel to the Administrative Agent and the Lenders, as to matters of due incorporation, due authorization of the execution, delivery, and performance of this Amendment with respect to the Borrower and each Brazilian Guarantor; and

(c)      the legal opinion of Morris James LLP, Delaware counsel to the Administrative Agent and the Lenders, as to matters of execution and delivery of the Amendment to the Parent Guaranty.

2.      Charter Documents

The Administrative Agent shall have received the following documents, dated as of the Effective Date, each certified as indicated below:

(a)      the Officer's Certificate of the Borrower certifying that attached thereto is a true and complete copy of the resolutions duly adopted by the board of directors (or other equivalent body) of the Borrower duly registered with São Paulo's Board of Commerce (*Junta Comercial do Estado de São Paulo*): (A) approving the transactions contemplated by this Amendment; (B) authorizing the execution, delivery and performance of this Amendment; and (C) authorizing a named person or persons to execute this Amendment and any documents to be delivered by the Borrower under this Amendment and dispatch all documents and notices to be signed and/or dispatched by the Borrower under or in connection with this Amendment, and that such resolutions have not been modified, rescinded or amended and are in full force and effect; and

(b)      the Officer's Certificate of each Guarantor certifying that attached thereto is a true and complete copy of the resolutions duly adopted by the board of directors (or other equivalent body) of such Guarantor duly registered with the relevant Board of Commerce (*Junta Comercial*): (A) approving the transactions contemplated by this Amendment; (B) authorizing the execution, delivery and performance of this Amendment; and (C) authorizing a named person or persons to execute this Amendment and any documents to be delivered by the Guarantor under this Amendment and dispatch all documents and notices to be signed and/or dispatched by the Guarantor under or in connection with this Amendment, and that such resolutions have not been modified, rescinded or amended and are in full force and effect.

3.      Other Amendment Terms Summary.

The Administrative Agent shall have received an Officer's Certificate of the Borrower certifying that attached thereto is a true and complete copy of the Other Amendment Terms Summary, as such may be updated from time to time prior to the date of execution of this Amendment.

4.      Sinosure Consent Letter

ASIA 20422880 (2K)

The Administrative Agent shall have received written consent from Sinosure for the execution and delivery of this Amendment by the Borrower, on the terms as contemplated in this Amendment.

SECTION 6.  <u>TRANSLATION AND REGISTRATION</u>

The Borrower shall deliver an original of this Amendment (A) sworn translated into Portuguese by a sworn translator registered with the Board of Commerce (*Junta Comercial*) and (B) registered with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) of the city in which the Borrower and each of the Brazilian Guarantors is headquartered, on or prior to the date falling thirty (30) days after the date on which the Administrative Agent has provided to the Borrower an original of this Amendment duly notarized and legalized with the competent Brazilian consulate in China.

SECTION 7.  <u>REPRESENTATIONS, WARRANTIES AND AGREEMENTS.</u>

(a)     The Borrower and each Guarantor (as applicable) confirms to the Administrative Agent that the Repeating Representations and the representation made under Section 4.20 (*Ranking*) of the Sinosure Credit Agreement are true and correct on and as of the Effective Date as if made on and as of such date and as if the references to "this Agreement" in that section were references to the Sinosure Credit Agreement as amended by this Amendment.

(b)     Each Guarantor agrees to the amendments contemplated by this Amendment and confirms that its obligations under the Financing Documents to which it is a party will not be released or diminished by the amendments or waivers contemplated herein.

(c)     Upon receipt of the corresponding invoice by the appropriate party, the Borrower shall promptly, in any event within ten (10) Business Days, pay or arrange for the payment of (i) an amendment fee equal to US$12,500, and (ii) all reasonable and documented costs and expenses incurred by any Financing Party (including Attorney Costs) in connection with the preparation, issuance, delivery, filing, recording and administration of this Amendment and the Parent Restructuring and any other documents which may be delivered in connection herewith or therewith.  In addition, the Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in Brazil, the United States or China in connection with the execution, delivery, filing and recording of this Amendment or any other Financing Document, or any other document which may be delivered in connection with this Amendment, and agrees to save the Financing Parties harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

(d)     The Borrower shall, within the earlier to occur of (i) the date falling ten (10) Business Days after the Amendment No. 2 Closing Date and (ii) the

8

Interest Payment Date or Principal Payment Date immediately following the Amendment No. 2 Closing Date, deliver to the Administrative Agent evidence satisfactory to it that (A) the ROF registered by the Borrower with the Central Bank for purposes of Section 3.1(m) (*Foreign Exchange Registration*) of the Sinosure Credit Agreement has been cancelled (*baixada*) and (B) the aggregate Loans outstanding as of the Amendment No. 2 Closing Date, and the relevant fees, expenses and commissions expressly referred to in the Financing Documents, as applicable, are registered within a new ROF with the Central Bank.

(e)      Each Guarantor expressly waives any benefit it may have under Sections 363 to 366, 821, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Law 10,406, enacted on 10 January 2002 (Brazilian Civil Code) and Sections 77 I, II and III and 595 of the Brazilian Law 5,869, enacted on 11 January 1973 (Brazilian Civil Procedure Code). No such waiver shall be construed so as to prejudice any right of the Lender under the Sinosure Credit Agreement, which shall be absolute.

## SECTION 8. NO WAIVER.

Except as expressly provided in this Amendment, each of the Financing Documents shall remain unchanged and in full force and effect, and no provision of this Amendment shall be deemed (i) to be a consent, waiver or modification of any term or condition of the Financing Documents or any of the instruments or documents referred to therein, or (ii) to prejudice any rights or remedies which any Financing Party may have now or in the future under or in connection with any of the Financing Documents.

## SECTION 9. NO NOVATION.

The execution of this Amendment does not constitute a novation, payment, satisfaction, performance, extinction or fulfillment of any of the obligations under the Sinosure Credit Agreement whatsoever, including its annexes, exhibits and schedules.

## SECTION 10.      MISCELLANEOUS.

Section 10 (*Miscellaneous*) of the Sinosure Credit Agreement, including but not limited to Section 10.20 (*Governing Law; Submission to Jurisdiction; Etc.*), shall be incorporated into this Amendment as if set forth in full herein, *mutatis mutandis*.

*                    *                    *

*[Remainder of page intentionally left blank.]*

9

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**NEXTEL TELECOMUNICAÇÕES LTDA., as Borrower under the Sinosure Credit Agreement**

<u>Notice Address:</u>

Avenida das Nações Unidas No. 14,171
Crystal Tower – 30th floor
Vila Gertrudes, City of São Paulo, State of São Paulo
Brazil 04795-100
Facsimile No.: 55-11-2145-2037
Email: financial.operations@nextel.com.br

with a copy to:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170

By:_____
Name: Américo Rodrigues de Figueiredo
Title: Director

By:_____
Name: Sultana Shamin Khan
Title: Director

The Guarantors:

**NEXTEL TELECOMUNICAÇÕES DE LONGA DISTÂNCIA LTDA.**
**NEXTEL TELECOMUNICAÇÕES SMP LTDA.**
**SUNBIRD PARTICIPAÇÕES LTDA.**
**SUNBIRD TELECOMUNICAÇÕES LTDA.**

Notice Address for all Guarantors under the Sinosure Credit Agreement:

Avenida das Nações Unidas No. 14.171
Crystal Tower – 30th floor
Vila Gertrudes, City of São Paulo, State of São Paulo
Brazil 04795-100
Facsimile No.: 55-11-2145-2037
Email: financial.operations@nextel.com.br

with a copy to:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170


On behalf of the Guarantors

By: _____
Name: Américo Rodrigues de Figueiredo
Title: Director

By: _____
Name: Sultana Shamin Khan
Title: Director

**CHINA DEVELOPMENT BANK CORPORATION, as Lender**

Notice Address:

| | |
|---|---|
| Address: | 14th Floor, CITIC Tower |
| | No. 1093 Shennan Zhong Road |
| | Shenzhen 518031, P.R. China |
| Attention: | Che Nan |
| Telephone No.: | +86 (755) 2594 2783 |
| Facsimile No.: | +86 (755) 2598 7725 |

By: _____

Name: Liu Wensheng

Title: Deputy General Manager
of Shenzhen Branch

12

ASIA 20422880 (2K)

**CHINA DEVELOPMENT BANK CORPORATION, as Administrative Agent**

<u>Notice Address</u>:

Address:         14th Floor, CITIC Tower
                 No. 1093 Shennan Zhong Road
                 Shenzhen 518031, P.R. China
Attention:       Che Nan
Telephone No.:   +86 (755) 2594 2783
Facsimile No.:   +86 (755) 2598 7725

By:
Name: Liu Wensheng
Title: Deputy General
Manager of Shenzhen
Branch

13

**CHINA DEVELOPMENT BANK CORPORATION, as Arranger**

<u>Notice Address</u>:

Address:       14th Floor, CITIC Tower
               No. 1093 Shennan Zhong Road
               Shenzhen 518031, P.R. China
Attention:     Che Nan
Telephone No.: +86 (755) 2594 2783
Facsimile No.: +86 (755) 2598 7725

By: _____

Name: *Liu Wensheng*
Title: *Deputy General Manager*
       *of Shenzhen Branch*

14

WITNESSES

By: _____

Name: *Che Nan*

ID: *Deputy Director, Shenzhen Branch*

By: _____

Name: *Wang Yinan*

ID: *Client Manager, Shenzhen Branch*

15

ASIA 20423880 (2K)

**Annex 1**

Amendments to the Sinosure Credit Agreement

1.        Amendments to Appendix A of the Sinosure Credit Agreement

(a)        The following definitions shall be added in the appropriate alphabetical positions in the Sinosure Credit Agreement:

"Account Bank" shall mean each bank with which a Revenue Collection Account is opened and maintained.

"Amendment No. 2" shall mean the Amendment Agreement No. 2 dated as of _5_ December 2014 entered into among the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger.

"Amendment No. 2 Closing Date" shall mean the date on which:

(a)        the Amendment No. 2 Effective Date has occurred;

(b)        the Borrower Accounts Pledge has been executed and delivered;

(c)        the Borrower has prepaid the Loans in an amount not less than the Required Prepayment Amount; and

(d)        solely in respect of the Sinosure Credit Agreement, the Borrower has paid to Sinosure all additional fees and premiums required by Sinosure to be paid for the purposes of the Borrower entering into the Amendment No.2,

provided that no Event of Default has occurred and is continuing on such date and provided further that such date shall have occurred on or prior to the earlier of (I) five (5) Business Days after the Parent Restructuring Effective Date and (II) September 30, 2015.

"Amendment No. 2 Effective Date" shall have the meaning given to it as the Effective Date in the Amendment No. 2.

"Amendment to the Parent Guaranty" shall mean the amendment to the Parent Guaranty dated as of the date of the Amendment No. 2. being _5_ December 2014 and entered into among the Parent and the Administrative Agent (for the benefit of the Financing Parties) substantially in the form of Exhibit A hereto.

"Borrower Accounts Pledge" shall mean each fiduciary assignment guarantee over the Revenue Collection Accounts, entered between the Borrower, the Lender, the relevant Account Bank and the Security Agent substantially in the form of Exhibit B hereto.

"BRL" shall mean the lawful currency of Brazil.

16

"Chapter 11 Cases" shall mean the cases commenced on September 15, 2014 or thereafter by the Parent and certain of its affiliates under chapter 11 of title 11 of the United States Code styled In re NII Holdings, Inc., et al., No. 14-12611 (SCC) in the United States Bankruptcy Court for the Southern District of New York.

"Cut-off Date" shall mean June 27, 2014.

"Excluded Revenue Collection Accounts" shall mean such revenue collection accounts of the Borrower which are subject to, or will be subject to, Liens created in favor of a Person other than the Lender, the details of which are provided to the Administrative Agent on or prior to the date of the Amendment No. 2 as set forth in Exhibit C hereto.

"Other Amendment Terms" shall mean the material terms set forth in Exhibit D hereof pursuant to any restructuring or amendment which the Borrower or any of its Subsidiaries will enter into with providers of Indebtedness to the Borrower or its Subsidiaries (other than in relation to the Financing Documents), as updated from time to time by the Borrower.

"Other Amendment Terms Summary" shall mean a summary of the Other Amendment Terms.

"Parent Change of Control" shall mean:

(a)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (as amended), but excluding any employee benefit plan of such "person" or its subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of such plan) becomes the beneficial owner, directly or indirectly, of 35% or more of the voting stock of the Parent or Successor Guarantor on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right to the extent that such option right is exercisable within 60 days after the date of determination); or

(b)      a majority of the members of the board of directors of the Parent or Successor Guarantor are not Continuing Directors;

provided that "Parent Change of Control" shall not include the Parent Restructuring Plan and the Parent Restructuring Plan shall be deemed not to result in a Parent Change of Control.

"Parent Guaranty Amendment Effective Date" shall have the meaning given to it in the Amendment to the Parent Guaranty.

"Parent Restructuring" shall mean the balance sheet restructuring of the Parent and certain of the Parent's Subsidiaries in the Chapter 11 Cases.

"Parent Restructuring Effective Date" shall mean the date on which the Parent Restructuring Plan becomes effective.

"Parent Restructuring Plan" shall mean the plan in respect of the Parent confirmed under 11 U.S.C. § 1129 in the Chapter 11 Cases, pursuant to which, together with the chapter 11 plans of applicable affiliates, the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. are restructured or compromised, including, without limitation, through the full or partial conversion of such notes into equity shares of the Parent and/or its Affiliates.

"Permitted Indebtedness" shall mean:

(a)   any Indebtedness permitted under the Financing Documents and which is incurred prior to the execution date of the Amendment No. 2;

(b)   Indebtedness arising under any Permitted Sale Leaseback Transaction;

(c)   any Subordinated Restricted Intercompany Indebtedness;

(d)   any other Indebtedness fully subordinated in right of payment and upon insolvency of the Borrower to the Lender, and under which no payment (including principal, interest or any other form of payment), prepayment or repayment may be made before the unconditional and irrevocable payment in full of all amounts under the Financing Documents;

(e)   Indebtedness incurred in connection with the ordinary course of business of the Borrower, provided that the aggregate outstanding amount of such Indebtedness at any time shall not exceed US$50,000,000 (or its equivalent in BRL));

(f)   Indebtedness incurred for the purpose of refinancing Indebtedness of the Borrower existing on the date of the Amendment No. 2 (without any increase in the principal amount thereof or any shortening of the average maturity of any principal amount thereof in comparison with the average maturity of the Indebtedness being refinanced); and

(g)   the amount of any liability in respect of any guaranty for any of the items referred to in paragraphs (a) to (f) above.

"Principal Payment Dates" shall mean, collectively, (i) prior to the occurrence of the Amendment No. 2 Closing Date, the first Interest Payment Date immediately following the expiry of the Availability Period and thereafter, each next succeeding Interest Payment Date, and (ii) upon the occurrence of the Amendment No. 2 Closing Date, on each date set forth below which follows the Amendment No. 2 Closing Date:

| Principal Payment Date |
| --- |
| August 15, 2015 |
| February 15, 2016 |
| August 15, 2016 |

| February 15, 2017 |
| August 15, 2017 |
| February 15, 2018 |
| August 15, 2018 |
| February 15, 2019 |
| August 15, 2019 |
| February 15, 2020 |
| August 15, 2020 |
| February 15, 2021 |
| August 15, 2021 |
| December 27, 2021 |

provided that the last Principal Payment Date shall be the Loan Maturity Date.

"Required Prepayment Amount" shall mean an amount equal to seventeen percent (17%) of the Loans outstanding on the Cut-off Date.

"Required Revenue Collection Inflow" shall mean an aggregate cash inflow of no less than BRL200,000,000 during each six month period ending on the last day of each fiscal quarter of the Borrower, provided that only cash inflows resulting from collections that are identified as service (including any pre-paid services) and handset revenues for accounting purposes of the Borrower shall be included in the calculation of the Required Revenue Collection Inflow.

"Revenue Collection Accounts" shall mean certain revenue collection accounts of the Borrower subject to the Liens created pursuant to the Borrower Accounts Pledges, the details of which are set out more fully in the Borrower Accounts Pledges.

"Successor Guarantor" shall mean the entity which (i) becomes, or is deemed as, the legal successor of the Parent as a result of, or pursuant to, the Parent Restructuring Plan or the order of the applicable Governmental Authority in the Chapter 11 Cases confirming the Parent Restructuring Plan, but not by reason of sale (even if pursuant to the Parent Restructuring Plan or such order), and only if such succession or deemed succession shall not have occurred before the Parent Restructuring Effective Date (unless preceded by the unconditional and irrevocable repayment in full of the Guaranteed Obligations (as such term is defined in the Parent Guaranty)), and (ii) has undertaken, as of the Parent Restructuring Effective Date, the Parent's obligations under the Shareholder Undertaking, the Subordination Agreements and the Parent Guaranty, as amended pursuant to the Amendment to the Parent Guaranty.

(b)     The following definitions shall be amended to read in its entirety as follows:

"Change of Control" shall mean:

      (a)      a Parent Change of Control;

      (b)      the Borrower ceases, directly or indirectly, to control any of the Guarantors;

      (c)      Nextel Telecomunicações S.A. and McCaw International (Brazil), LLC cease to respectively own 61.86% and 38.14% of the entire issued and outstanding share capital of the Borrower; or

      (d)      the Parent or the Successor Guarantor ceases, directly or indirectly, to control the Borrower,

for purposes of this definition, "control" shall mean, with respect to a Person, (i) the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise, and (ii) the ownership (directly or indirectly) of 51% of the entire issued and outstanding share capital of such Person.

"Financing Documents" shall mean, collectively, this Agreement, the Amendment No. 1., the Amendment No. 2., the Parent Guaranty, the Amendment to the Parent Guaranty, any Subordination Agreement, the Shareholder Undertaking, the Security Documents, the Fee Letter, each Notice of Borrowing and after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and any other document designated from time to time as such and as agreed by the Borrower and the Administrative Agent.

"Loan Maturity Date" shall mean (i) prior to the occurrence of the Amendment No. 2 Closing Date, the date falling ten (10) years from the earlier of (x) the Closing Date and (y) June 30, 2012, except that if such date is not a Business Day, then the Loan Maturity Date shall be the Business Day immediately preceding the date falling ten (10) years from such date, or (ii) upon the occurrence of the Amendment No. 2 Closing Date, December 27, 2021.

"Parent Guaranty" shall mean the guaranty agreement dated as of September 25, 2013, entered into among the Parent, the Administrative Agent and the Sinosure Administrative Agent, for the benefit of the Financing Parties, as amended from time to time.

"Security Documents" shall mean the Borrower Accounts Pledges, the Fiduciary Assignment and any other document designated as a Security Document by the Financing Parties and the Borrower (acting reasonably).

"Waiver Period" shall mean the period commencing on the effective date of Amendment No. 1 and ending on June 30, 2017 (inclusive).

2.    <u>Amendments to Section 5 (*Covenants*) of the Sinosure Credit Agreement</u>

(a)    <u>Paragraph (d) of Section 5.1 (*Financial Statements and Other Information*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:</u>

"(d)    <u>Financial Ratio</u>. Together with each set of financial statements delivered pursuant to Section 5.1(a) or 5.1(b) above, (i) a detailed calculation of the financial ratios set forth in Section 5.22 (*Financial Ratios*) as tested as of the Calculation Date immediately falling prior to the delivery of such financial statements for the period of twelve (12) months ending on such Calculation Date, certified by the chief financial officer, treasurer or financial controller of the Borrower; and (ii) a Compliance Certificate, provided that, during the Waiver Period only, the Borrower shall not be required to deliver a Compliance Certificate, provided further that, the Borrower shall not, during the period from June 30, 2015 to the Amendment No.2 Closing Date, deliver any Compliance Certificate in respect of the twelve months period ending on June 30, 2015 for purposes of effecting a release of the liabilities of the Parent Guarantor under the Parent Guaranty pursuant to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty. For the avoidance of doubt, any calculation of financial ratios provided on or prior to the last day of the Waiver Period shall be provided for the Lender's information purposes only."

(b)    <u>A new paragraph (n) of Section 5.1 (*Financial Statements and Other Information*) of the Sinosure Credit Agreement shall added to read in its entirety as follows:</u>

"(n)    <u>Restructuring and Other Amendment Terms.</u>

(i)    As soon as available, any updates to the Other Amendment Terms Summary and the Other Amendment Terms; and

(ii)    such information with respect to the Parent Restructuring (including with respect to its process and status) as the Administrative Agent may request from time to time (acting reasonably)."

(c)    <u>Section 5.22 (*Financial Ratio*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:</u>

"The Borrower shall:

(a)    maintain (i) a Net Debt to Consolidated EBITDA ratio of no greater than 2.5 to 1.0, (ii) a Net Debt to Total Net Worth ratio of no greater than 2.0 to 1.0, and (iii) a Consolidated EBITDA to Consolidated Interest Expense ratio of no less than 3.0 to 1.0., in each case, as tested as of each Calculation Date falling after the last day of the Waiver Period for the period of twelve (12) months ending on such Calculation Date; and

(b)    ensure that, as of the date after the last day of the Waiver Period, the amount of the Consolidated Cash Balance shall be (i) no less than US$100,000,000 as tested as of each Calculation Date falling in the period when the sum of the outstanding principal amount

of all the Loans is more than US$100,000,000, and (ii) no less than the then outstanding principal amount of all the Loans as tested as of each Calculation Date falling after the sum of the outstanding principal amount of all the Loans falls below US$100,000,000."

(d)    Section 5.25 (*Incremental Indebtedness and Subordinated Restricted Intercompany Indebtedness*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"5.25   Incremental Indebtedness and Subordinated Restricted Intercompany Indebtedness.

(a)    During the Waiver Period, the Borrower shall not, and shall not permit any of the Guarantors to, directly or indirectly, contract, create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness.

(b)    After the last day of the Waiver Period, the Borrower shall not, and shall not permit any of the Guarantors to, directly or indirectly, contract, create, incur, assume or suffer to exist any Indebtedness (other than the Indebtedness under the Financing Documents), unless (i) no Default or Event of Default then exists or would result therefrom; and (ii) the Borrower has complied and after the incurrence thereof on a pro forma basis, is in compliance with Section 5.22 (*Financial Ratio*) as tested on the Calculation Date immediately preceding the proposed date of such incurrence.

(c)    No Obligor nor its Subsidiaries, shall pay, or cause to be paid, any Subordinated Restricted Intercompany Indebtedness without the prior written consent of the Administrative Agent and the Sinosure Administrative Agent."

(e)    A new Section 5.32 (*Borrower Accounts Pledge*) of the Sinosure Credit Agreement shall added to read in its entirety as follows:

"5.32   Borrower Accounts Pledge.

The Borrower shall:

(a)    within fifteen (15) days after each fiscal quarter of the Borrower occurring after the date of a Borrower Accounts Pledge, deliver to the Administrative Agent a statement from each relevant Account Bank setting out the details of the aggregate cash inflow of all Revenue Collection Accounts, together with an Officer's Certificate of the Borrower (i) calculating the aggregate amount of revenue flow of all Revenue Collection Accounts represented by such account statements and (ii) certifying that the Account Bank statements are true and complete and represent the calculations (in reasonable detail) of the aggregate cash inflow of all Revenue Collection Accounts, in each case, in respect of the three-month period ending on the last day of such fiscal quarter;

(b)    within forty-five (45) days after each fiscal quarter of the Borrower occurring after the date of a Borrower Accounts Pledge, deliver to the Administrative Agent the

electronic documentation in portable document format – pdf, supporting all calculations delivered pursuant to paragraph (a) above; and

(c)    if the certification delivered pursuant to paragraph (a) above provides that the aggregate cash inflow of all Revenue Collection Accounts is less than the Required Revenue Collection Inflow, promptly, and in any case within forty (40) days of the delivery of such certification referred to in paragraph (a) above, procure that additional revenue collection accounts (other than the Excluded Revenue Collection Accounts) not already subject to a Lien created by the Borrower Accounts Pledges  are fiduciarily assigned in favor of the Security Agent pursuant to the terms of a Borrower Accounts Pledge, provided that if all existing revenue collection accounts of the Borrower (other than the Excluded Revenue Collection Accounts) are already subject to a Lien created by the Borrower Accounts Pledges, the Borrower shall not be required to fiduciarily assign additional revenue collection accounts pursuant to this paragraph (c)."

3.    Amendments to Section 6 (*Payment Provisions; Fees*) of the Sinosure Credit Agreement

(a)    Section 6.1 (*Repayment of Principal*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"(a)    Prior to the occurrence of the Amendment No. 2 Closing Date, the Borrower shall repay the aggregate principal amount of the Loans outstanding on each Principal Payment Date in fifteen (15) equal semi-annual instalments commencing on the first Interest Payment following the expiry of the Availability Period.

(b)    Upon the occurrence of the Amendment No. 2 Closing Date:

(i)    the Borrower shall repay the aggregate principal amount of the Loans outstanding on each Principal Payment Date in the amounts (expressed as a percentage of the aggregate Loans outstanding as of the Cut-off Date) as set out below:

| Principal Payment Date | Amount Due (expressed as a percentage of the aggregate Loans outstanding as of the Cut-off Date) |
|---|---|
| August 15, 2015 | 0.28% |
| February 15, 2016 | 0.28% |
| August 15, 2016 | 0.28% |
| February 15, 2017 | 0.28% |
| August 15, 2017 | 8.19% |
| February 15, 2018 | 8.19% |

| | |
|---|---|
| August 15, 2018 | 8.19% |
| February 15, 2019 | 8.19% |
| August 15, 2019 | 8.19% |
| February 15, 2020 | 8.19% |
| August 15, 2020 | 8.19% |
| February 15, 2021 | 8.19% |
| August 15, 2021 | 8.19% |
| December 27, 2021 | 8.17% |

(ii)    any amounts repaid or prepaid by the Borrower on and from the Cut-off Date and prior to the occurrence of the Amendment No. 2 Closing Date shall be applied in the following order of priority:

(A)    first, towards repayment of the principal amount of the Loans on each Principal Payment Date occurring on and from the Cut-off Date and prior to the Amendment No. 2 Closing Date in accordance with paragraph (b)(i) above in chronological order;

(B)    second, towards prepayment of the Required Prepayment Amount; and

(C)    third, towards the repayment of the principal amount of the Loans outstanding in accordance with paragraph (b)(i) above on each Principal Payment Date occurring after the Amendment No.2. Closing Date in chronological order. "

4.    Amendments to Section 7 (*Events of Default and Remedies*) of the Sinosure Credit Agreement

(a)    New paragraphs of Section 7.1 (*Events of Default*) of the Sinosure Credit Agreement shall be added to read in its entirety as follows:

"(s)    Borrower Accounts Pledges.    The Borrower shall fail to (A) execute and deliver the Borrower Accounts Pledges to the Security Agent, which shall contain, inter alia, (i) fiduciary assignments in relation to the Revenue Collection Accounts; and (ii) powers of attorney in favor of the Lender and the Security Agent authorizing them before the Account Banks to, upon occurrence of an Event of Default, prevent any withdrawals from the Revenue Collection Accounts by the Borrower and, upon occurrence of a Non-Payment Event of Default, apply all amounts in the Revenue Collection Accounts against any overdue principal and/or interest under the Financing Documents,  and (B) perfect the Liens created or intended to be created under or evidenced by the Borrower Accounts Pledges, in each case of (A) and (B), by February 28, 2015.

(t)    Parent Restructuring Plan.    Upon confirmation of the Parent Restructuring Plan, either of the Parent Restructuring Plan or the order confirming it shall fail to provide in form and substance reasonably acceptable to the Administrative Agent for the terms and obligations of the Parent Guaranty, the Shareholder Undertaking and the Subordination Agreements to be undertaken by the Parent or a Successor Guarantor.

(u)     Revenue Collection Accounts.   The Borrower shall fail to procure that additional revenue collection accounts (other than the Excluded Revenue Collection Accounts) are pledged or fiduciarily assigned (at the discretion of the Lender) in favour of the Security Agent in accordance with the terms of and within the time stipulated in paragraph (d) of Section 5.32 (*Borrower Accounts Pledges*).

(v)     Amendment to the Parent Guaranty.   The Amendment to the Parent Guaranty is not authorized or approved by the appropriate Governmental Authority in the Chapter 11 Cases or otherwise does not take full force and effect in accordance with the terms thereof, on the earlier of (i) the Amendment No. 2. Closing Date and (ii) September 30, 2015.

(w)     Claims in the Chapter 11 Cases.   The claims of the Administrative Agent and the Financing Parties for the Guaranteed Obligations (as such term is defined in the Parent Guaranty) in the Chapter 11 Cases shall for any reason be disallowed, avoided, nullified or subordinated, or any liability under the Parent Guaranty shall be released or discharged for any reason (including under Section 20 of the Parent Guaranty) other than due to (i) any affirmative act of the Administrative Agent or the Lender, (ii) the failure of the Administrative Agent or Lender to file a proof of claim in the Chapter 11 Cases in respect of any such claim (only if the filing thereof is otherwise required pursuant to an order of the relevant Governmental Authority in the Chapter 11 Cases or pursuant to the applicable Bankruptcy Law to preserve such claim) or defend any such claim against any objection thereto, or (iii) the unconditional and irrevocable repayment in full of the Guaranteed Obligations (as such term is defined in the Parent Guaranty), provided that there shall not be an Event of Default under this Section 7.1(w) (a) in the event such claims are reinstated pursuant to the Parent Restructuring Plan, or (b) so long as such claims are so reinstated, as a result of any action that is appropriate to administer and maintain the claims register in the Chapter 11 Cases.

(x)     Delivery of the Compliance Certificates.   The Borrower delivers the Compliance Certificates pursuant to Section 5.1 (*Financial Statements and Other Information*) in respect of the twelve (12) months period ending on June 30, 2015 confirming that it is in compliance with the financial ratios set out in the Sinosure Credit Agreement.

(y)     Shareholder Undertaking, Subordination Agreements.   The Shareholder Undertaking or any Subordination Agreement shall fail to be reinstated by the appropriate Governmental Authority in the Chapter 11 Cases or the claim of the Administrative Agent and the Financing Parties under the Shareholder Undertaking or Subordination Agreements shall for any reason be disallowed, avoided, nullified or subordinated, or any liability under the Shareholder Undertaking or Subordination Agreements shall be released or discharged for any reason other than due to (i) any affirmative act of the Administrative Agent or the Lender, (ii) the failure of the Administrative Agent or Lender to file a proof of claim in the Chapter 11 Cases in respect of any such claim (only if the filing thereof is otherwise required pursuant to an order of the relevant Governmental Authority in the Chapter 11 Cases or pursuant to the applicable Bankruptcy Law to preserve such claim) or defend any such claim against any objection thereto, or (iii) the unconditional and irrevocable repayment in full of the Loans, provided that there shall not be an Event of Default under this Section 7.1(y) (a) in the event such claims are reinstated pursuant to the Parent Restructuring Plan, or (b) so long as such claims are so reinstated, as a

result of any action that is appropriate to administer and maintain the claims register in the Chapter 11 Cases.

     5.    <u>Amendments to Section 9.2 (*Bankruptcy*) of the Sinosure Credit Agreement</u>

     (a)    <u>Section 9.2 (*Bankruptcy*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:</u>

"Additionally, the Guarantors unconditionally and irrevocably, jointly and severally, guarantee the payment of any and all of the Guaranteed Obligations to the Financing Parties whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Sections 7.1(e), 7.1(g) and 7.1(h), and irrevocably and unconditionally promise to pay such Guaranteed Obligations to the Financing Parties upon such occurrence."

     6.    <u>Amendments to Section 10.13 (*Assignments, Participations, etc.*) of the Sinosure Credit Agreement</u>

     (a)    <u>Paragraph (a) of Section 10.13 (*Assignments, Participations, etc.*) of the Sinosure Credit Agreement shall be amended to read in its entirety as follows:</u>

"(a)    Subject to Section 10.13(b) below, any Lender may, with the prior consent of the Borrower (which consent shall not be unreasonably withheld or delayed or conditioned, however, it will not be considered unreasonable for the Borrower to withhold consent if any such assignment could have the effect of increasing the Borrower's or any Guarantor's costs under the Financing Documents, due to new or increased Taxes, or otherwise), at any time assign all or any part of its Loan Commitments or Loans and the other rights and obligations of such Lender hereunder and under the other Financing Documents, to another bank or financial institution, provided that no consent of the Borrower shall be required for any assignment by a Lender of all or any part of its Loan Commitments or Loans and other rights and obligations after the occurrence of the Amendment No. 2. Closing Date. Any partial assignment of Loan Commitments or Loans under this Section 10.13(a) shall not be less than US$10,000,000 or any integral multiple of US$5,000,000 in excess thereof."

Exhibit A

**Form of Amendment to the Parent Guaranty**

AMENDMENT TO THE PARENT GUARANTY

between

NII HOLDINGS, INC.
as Parent Guarantor

and

CHINA DEVELOPMENT BANK CORPORATION
as Administrative Agent under the Sinosure Credit Agreement and the Non-Sinosure
Credit Agreement

Dated as of _____ December 2014

ASIA 20423961 (2K)

Table of Contents

Page

SECTION  1.  DEFINITIONS ................................................................................4

SECTION  2.  AMENDMENTS TO THE PARENT GUARANTY ..............................................4

SECTION  3.  ACKNOWLEDGMENT ......................................................................4

SECTION  4.  EFFECTIVENESS AND TERMINATION. ..........................................................4

SECTION  5.  NO NOVATION ...............................................................................4

SECTION  6.  MISCELLANEOUS. .............................................................................4

**Annex 1** ...........................................................................................8
Amendment to the Parent Guaranty ...................................................................8
1.      Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty ...................8
2.      Amendments to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty ...................................................9
3.      Amendments to Section 11 (*Covenants of Parent Guarantor*) of the Parent Guaranty .....................................................................9

2

AMENDMENT TO THE PARENT GUARANTY (this "Amendment"), dated as of
_____ December 2014, among (i) NII Holdings, Inc., a holding company organized
and existing under the laws of Delaware (the "Parent Guarantor"), and (ii) China
Development Bank Corporation in its capacities as administrative agent under the
Sinosure Credit Agreement and the Non-Sinosure Credit Agreement, for the benefit of
the Financing Parties defined thereunder.

W I T N E S S E T H:

WHEREAS, Nextel Telecomunicações Ltda.    (the "Borrower"), the
persons listed as guarantors on the signature pages to the Non-Sinosure Credit Agreement
(as defined below) in their capacities as guarantors (the "Guarantors"), China
Development Bank Corporation, as Lender, as administrative agent (in such capacity, the
"Administrative Agent") and as arranger (in such capacity, the "Arranger"), are parties to
(i) a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on
September 25, 2013, and as further amended and waived from time to time, which is
supported by the Sinosure Insurance (the "Sinosure Credit Agreement") and (ii) a
US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September
25, 2013, and as further amended and waived from time to time, which is not supported
by the Sinosure Insurance (the "Non-Sinosure Credit Agreement", together with the
Sinosure Credit Agreement, the "Credit Agreements" and each a "Credit Agreement");

WHEREAS, the Borrower has notified the Administrative Agent and has
requested that the Lender agree to amend certain terms and conditions of the Credit
Agreements to facilitate the balance sheet restructuring of the Parent Guarantor and
certain of the Parent Guarantor's affiliates pursuant to which the US$4,350,000,000 notes
issued by NII Capital Corp. and/or NII International Telecom S.C.A. will be restructured
by way of an amendment agreement to the Sinosure Credit Agreement and an
amendment agreement to the Non-Sinosure Credit Agreement (together the "Credit
Agreement Amendment Agreements");

WHEREAS, the Borrower is a Subsidiary of the Parent Guarantor;

WHEREAS, the Parent Guarantor and such affiliates have commenced the
Chapter 11 Cases;

WHEREAS, the Parent Guarantor will obtain benefits from the
amendments contemplated in the Credit Agreement Amendment Agreements and,
accordingly, desires to execute this Amendment to induce the Lender to agree to the
Credit Agreement Amendment Agreements; and

WHEREAS, it is anticipated that the Parent Guaranty, as amended under
the terms and subject to the conditions set forth herein, will become effective on the
Parent Guaranty Amendment Effective Date (as defined below).

3

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

SECTION 1. <u>DEFINITIONS</u>.

Except as otherwise expressly provided herein, capitalized terms used in this Amendment shall have the meanings assigned to such terms in the Credit Agreement Amendment Agreements and the Parent Guaranty, as amended from time to time, as applicable.

SECTION 2. <u>AMENDMENTS TO THE PARENT GUARANTY.</u>

On the Parent Guaranty Amendment Effective Date (as defined below), the terms and conditions of the Parent Guaranty shall be amended as set forth in <u>Annex 1</u> hereto.

SECTION 3. <u>ACKNOWLEDGMENT.</u>

Each Party to this Amendment hereby acknowledges and agrees that (i) the terms and conditions of the Parent Guaranty in effect as of the date hereof shall continue in full force and effect unchanged, except as amended and supplemented hereby and (ii) this Amendment shall take full force or effect as of the Parent Guaranty Amendment Effective Date and the Parent Guarantor shall assume all obligations and duties under the Parent Guaranty as amended by this Amendment as of the Parent Guaranty Amendment Effective Date.

SECTION 4. <u>EFFECTIVENESS AND TERMINATION</u>.

Notwithstanding anything in this Amendment to the contrary, this Amendment shall only become effective on the earlier to occur of (i) the Amendment No. 2 Closing Date (as such term is defined in each Credit Agreement Amendment Agreement) and (ii) the Parent Restructuring Effective Date (as such term is defined in each Credit Agreement Amendment Agreement) (the "<u>Parent Guaranty Amendment Effective Date</u>").

SECTION 5. <u>NO NOVATION.</u>

The execution of this Amendment does not constitute a novation, amendment, payment, satisfaction, performance or fulfillment of any of the obligations under the Parent Guaranty.

SECTION 6. <u>MISCELLANEOUS</u>.

Section 17 (*Notice*), Section 19 (*Consent to Jurisdiction; Service of Process; and Waiver of Trial by Jury*), Section 22 (*Counterparts*), and Section 24 (*Headings Descriptive*) of the Parent Guaranty shall be incorporated into this

4

Amendment as if set forth in full herein, *mutatis mutandis*.

\*                              \*                              \*

[*Remainder of page intentionally left blank.*]

5

ASIA 20423961 (2K)

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**NII HOLDINGS, INC., as Parent Guarantor**

Notice Address:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170


By:_____
Name:
Title:


By:_____
Name:
Title:

ASIA 20423961 (2K)

**CHINA DEVELOPMENT BANK CORPORATION, as Administrative Agent**

<u>Notice Address</u>:

| | |
|---|---|
| Address: | 14th Floor, CITIC Tower |
| | No. 1093 Shennan Zhong Road |
| | Shenzhen 518031, P.R. China |
| Attention: | Che Nan |
| Telephone No.: | +86 (755) 2594 2783 |
| Facsimile No.: | +86 (755) 2598 7725 |

By:_____

Name:

Title:

ASIA 20423961 (2K)

**Annex 1**

Amendment to the Parent Guaranty

1.    Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty

(a)    Section 2 (*Parent Guaranty*) of the Parent Guaranty shall be amended to read in its entirety as follows:

"2.    PARENT GUARANTY

(a)    The Parent Guarantor, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety to the Financing Parties the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise pursuant to the terms of each Credit Agreement) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under each Credit Agreement and (y) all other payment obligations (including, without limitation, obligations which, but for the effect of any bankruptcy, insolvency, receivership or similar proceeding, would become payable), liabilities and indebtedness owing by the Borrower to the Financing Parties under each Financing Document to which the Borrower is a party (including, without limitation, indemnities, fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in each Credit Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with each such Financing Document and the due performance and compliance by the Borrower with all of its payment obligations in all such Financing Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (i) being herein collectively called the "Guaranteed Obligations");

The Parent Guarantor understands, agrees and confirms that the Financing Parties may, in accordance with Section 9, enforce this Parent Guaranty up to the full amount of the Guaranteed Obligations against the Parent Guarantor without proceeding against the Borrower or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations.  This Parent Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)    Additionally, the Parent Guarantor, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower upon the occurrence in respect of the Borrower of any of the events specified in Section 7.1(e) (*Insolvency*), Section 7.1(g) (*Voluntary Insolvency Proceedings*) and Section 7.1(h) (*Involuntary Insolvency Proceedings(Borrower)*) of each Credit Agreement, and unconditionally, absolutely and irrevocably, promises to pay such Guaranteed Obligations to the Financing Parties upon such occurrence.

8

2.        Amendments to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty

Section 20 (*Release of Liability of Parent Guarantor*) shall be deleted in its entirety.

3.        Amendments to Section 1 (*Definitions*) of the Parent Guaranty

The definition of "Compliance Date" under Section 1 (*Definitions*) of the Parent Guarantee shall be deleted in its entirely.

4.        Amendments to Section 11 (*Covenants of Parent Guarantor*) of the Parent Guaranty

(a)        A new Section 11.4 (*Keepwell Undertaking*) of the Parent Guaranty shall be added to read in its entirety as follows:

"11.4    Keep-well Undertaking

The Parent Guarantor shall, directly or indirectly through any one or more of its Affiliates, make such equity contributions or injections and/or provide such Subordinated Restricted Intercompany Indebtedness to the Borrower in order to ensure that the Borrower has sufficient funds for the operating expenditure, capital expenditure and debt service cash requirements of such Borrower."

Exhibit B

**Form of Borrower Accounts Pledge**

# COLLATERAL ACCOUNTS AGREEMENT

*by and among*

## CHINA DEVELOPMENT BANK CORPORATION
*in the capacity of Lender and Assignee*

## NEXTEL TELECOMUNICAÇÕES LTDA.
*in the capacity of Borrower and Assignor*

## [•]
*in the capacity as Account Bank*

*and*

## PLANNER TRUSTEE DTVM LTDA.
*in the capacity of Security Agent*

_____

Dated

[Date], 2014

_____

## COLLATERAL ACCOUNTS AGREEMENT[1]

This Collateral Accounts Agreement ("**Agreement**") is entered into by and between:

I.    **CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented by its attorney-in-fact, Planner Trustee DTVM Ltda., a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46 ("**CDB**", "**Lender**" or "**Assignee**");

II.    **NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower,, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Borrower**" or "**Assignor**");

III.    [•], a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives][2] ("**Account Bank**"); and

IV.    **PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**").

(Assignor, Assignee and Security Agent are hereinafter referred to individually as "**Party**", and collectively, the "**Parties**")

**WHEREAS:**

a)    the USD 250,000,000.00 Non-Sinosure backed Credit Agreement and the USD 250,000,000.00 Sinosure backed Credit Agreement, both dated April 20, 2012

---

[1] [NTD: Draft agreement is expected to suffer minor revisions made by Account Bank, only.]

[2] Account Bank to confirm its qualification.

ASIA 20424090

(as amended and waived from time to time), have been entered into by and among the Lender, as lender, administrative agent and arranger, the Borrower and the entities named therein as Guarantors, in order to finance the acquisition of equipment and related services from the Suppliers for the build-out and deployment of the telecommunications networks being deployed or to be deployed by the Borrower or its Affiliates in Brazil as amended by the Amendment Agreement No. 1 (as defined below), the Amendment Agreement No. 2 (as defined below) and as further amended from time to time (the "**Credit Agreements**" and each a "**Credit Agreement**");

b)      the collateral agency agreement dated April 20, 2012 has been entered into by and among, the Lender, as Sinosure Administrative Agent and Sinosure Lender and Non-Sinosure Administrative Agent and Non-Sinosure Lender and Planner Trustee DTVM Ltda., as Security Agent with respect to the Security Documents;

c)      an amendment agreement dated September 25, 2013 corresponding to each Credit Agreement has been entered into by and among the Lender, the Borrower and the Guarantors (the "**Amendment Agreements No. 1**" and each an "**Amendment Agreement No. 1**"), which amended certain terms and conditions of the Credit Agreements;

d)      the waiver letters to the Credit Agreements dated June 27, 2014 have been issued by the Lender on behalf of the Parent, the Borrower and the entities named therein as Guarantors, and duly accepted by the Borrower and the Parent (the "**Waiver Letters**"), through which the Lender, *inter alia*, cancelled the undisbursed credit under the Credit Agreements until such date, in the amount of USD 133,062,715.93, upon the undertaking and compliance by the Borrower of certain conditions precedent and subsequent thereto;

e)      the summary of amendment conditions dated August 31, 2014 has been issued by the Lender and duly accepted by Comunicaciones Nextel de México, S.A. de C.V., the Borrower and the Parent (the "**Amendment Conditions**"), through which certain terms and conditions applicable to the amendment of the Credit Agreements were set forth; and

f)      an amendment agreement dated [•] corresponding to each Credit Agreement has been entered into by and among the Lender, the Borrower and the Guarantors (the "**Amendment Agreements No. 2**" and each an "**Amendment Agreement No. 2**"), which set forth, *inter alia*, the creation of additional security liens by means of the execution of Additional Security Documents (as defined therein), including a security lien over certain revenue collection bank accounts held by the Borrower in the Account Bank.

NOW, THEREFORE, the Parties have agreed to enter into and execute this Agreement, which is governed by the following clauses:

**Section One – Definitions and Interpretation**

**1.1.**    Unless expressly defined herein, capitalized terms in this Agreement will have the meaning attributed to them in the Credit Agreements, as the case may be.

**1.2.**    The rules of interpretation established in each Credit Agreement apply *mutatis mutandis* to this Agreement; provided, however, that the terms herein shall be governed and construed in accordance to the Brazilian laws, as set forth by Section 10 below, and that the rules of interpretation are in accordance with such laws.

**1.3.**    "Execution Date" means the date on which this Agreement is executed.

**1.4.**    Any and all references to Business Days comprised herein shall be a reference to any day except Saturday, Sunday and any day which shall be in New York City, Beijing or city of São Paulo, State of São Paulo, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in any such city.

**1.5.**    Any reference in this Agreement to any agreement (including exhibits), document or statute means a reference to such agreement (including exhibits), document or statute that is in force as amended, restated, waived, modified and/or supplemented, from time to time.

**1.6.**    The meaning of each word or expression in this Agreement shall be the same irrespective of the words in question being used in the masculine or feminine form, or as singular or plural.

**1.7.**    The Exhibits, including the powers of attorney granted hereunder by the Assignor, form part of this Agreement for all legal and contractual purposes and effects.

**1.8.**    All references to Parties include their successors and permitted assignees and transferees.

**1.9.**    Any and all references to the Security Agent comprised herein shall be interpreted as a reference to the Security Agent, acting exclusively as attorney-in-fact of the Assignee and for the benefit of the Assignee, and as expressly set forth herein, as attorney-in-fact of the Assignor, in accordance with the instructions provided by the Assignee, under the terms of each Credit Agreement, as set forth therein.

**Section Two – Secured Obligations**

**2.1.**    As set forth under the Amendment Agreements No. 2, the Assignor irrevocably and unconditionally creates a security interest, for the benefit of the

Assignee, under the terms set forth in this Agreement, and exclusively for purposes of Section 1362 of Law 10406 of January 10, 2002 (the "**Brazilian Civil Code**"), of Section 66-B of Law 4728 of July 14, 1965 and of Decree Law 911 of October 1, 1969, to secure the timely and full payment and performance of (i) all payment obligations arising out of each Credit Agreement and each Financing Document, including but not limited to the payment in full of principal, interest, charges, default interest, indemnities, fees, commissions, liabilities and all other amounts due by the Assignor to the Assignee, which are described, without limitation, in Exhibit I, as they may be extended, modified and/or amended from time to time, and (ii) all present and future costs and expenses arising out of or in connection with each Credit Agreement and each Financing Document, including but not limited to attorneys' fees and court costs incurred by the Assignee or the Security Agent to enforce the security created hereby and/or resulting from the breach of any obligations undertaken by Assignor hereunder (the "**Secured Obligations**").

2.2.    This Agreement shall create a continuing security and no change or amendment whatsoever in any Financing Document shall affect the validity of either this Agreement or the obligations which are imposed on the Assignor pursuant to it. The Security Interest (as defined below) shall cover all the Secured Obligations, to which the Assignor hereby explicitly consents.

**Section Three – Security Interest**

3.1.    In order to secure the full payment and the compliance of all Secured Obligations, the Assignor hereby, irrevocably and irreversibly, assigns to the Assignee, in sole and absolute fiduciary assignment, the property (*propriedade resolúvel*) and the indirect possession of all Assignor's rights directly related to the Account Banks to which the Assignor is an owner as indicated, for the purposes and effects of item IV of Section 1362 of the Brazilian Civil Code, in Exhibit II hereto (as such may be re-numbered or re-designated from time to time), including, but not limited to, any and all amounts deposited or invested therein and any and all credits arising out therefrom against the Account Bank (the "**Assigned Collection Accounts and Rights**"), which will be subject to the *in rem* guarantee instituted herein and governed by the terms and conditions stipulated in this Agreement (the "**Security Interest**").

       3.1.1.    For the purposes of Section 290 of the Brazilian Civil Code, the Account Bank hereby expressly acknowledges and agrees with the creation of the Security Interest over the Assigned Collection Accounts and Rights and undertakes to comply with all obligations set forth herein, particularly those of Section 7.1 below.

3.2.    With respect to the Assigned Collection Accounts and Rights, the Assignor hereby undertakes to:

**3.2.1.**  within 15 (fifteen) days after each fiscal quarter of the Borrower occurring after the date hereof, deliver to the Administrative Agent and to the Security Agent a statement from the relevant Account Bank setting out the details of the aggregate cash inflow of all Assigned Collection Accounts and Rights, together with an Officer's Certificate of the Borrower (i) calculating the aggregate amount of revenue flow of all Assigned Collection Accounts and Rights represented by such account statements and (ii) certifying that the Account Bank statements are true and complete and represent the calculations (in reasonable detail) of the aggregate cash inflow of all Assigned Collection Accounts and Rights, in each case, in respect of the three-month period ending on the last day of such fiscal quarter; and

**3.2.2.**  within 45 (forty five) days after each fiscal quarter of the Borrower occurring after the date hereof, deliver to the Assignee and to the Security Agent the electronic documentation in portable document format – pdf, supporting all calculations delivered pursuant Section 3.2.1 above; and

**3.2.3.**  if the certification delivered pursuant to Section 3.2.1 above provides that the aggregate cash inflow of all Assigned Collection Accounts and Rights is less than the Required Revenue Collection Inflow, promptly, and in any case within 40 (forty) days of the delivery of such certification referred to in Section 3.2.1., procure that additional revenue collection bank accounts (other than the Excluded Revenue Collection Accounts) not already subject to the Security Interest  and any and all credits arising out therefrom against the corresponding bank (the "**Additional Assigned Collection Accounts and Rights**") are fiduciarily assigned in favor of the Assignee (the "**Additional Security Interest**"), provided that if all existing revenue collection bank accounts of the Borrower (other than the Excluded Revenue Collection Accounts) are already subject to a Security Interest created hereby, the Borrower shall not be required to fiduciarily assign additional revenue collection bank accounts pursuant to this Section 3.2.3. For purposes of the above, (A) if the Additional Assigned Collection Accounts and Rights are open with the Account Bank, the Borrower shall execute amendments to this Agreement, substantially in the form of Exhibit III hereto, and/or (B)  if the Additional Assigned Collection Accounts and Rights are opened with a bank other than the Account Bank, execute a collateral accounts agreement with such bank covering such Additional Assigned Collection Accounts and Rights substantially in the form of this Agreement.

## Section Four – Formalities

**4.1.**  The Assignor shall, at its own cost and expense, obtain and make/perform all formalities, registrations, authorizations and filings over public entities specifically

required under this Agreement, the Brazilian Civil Code and Applicable Law for the purpose of (i) constituting and perfecting the Security Interest, (ii) amending this Agreement and (iii) allowing the Assignee and the Security Agent to fully perform all the rights they have been granted herein.

**4.2.**    Without prejudice to other formalities required under Applicable Law, the Assignor shall register this Agreement promptly after the Execution Date but no later than February 28, 2015 and any of its amendments promptly after their execution with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) located in the city in which the Assignor's head office is located (which is, on the Execution Date, the city of São Paulo, State of São Paulo), pursuant to Section 1361, First Paragraph of the Brazilian Civil Code. The Assignor shall deliver to each the Assignee and the Security Agent original copies of this Agreement and any of its amendments duly registered within 5 (five) Business Days of the relevant registration.

> **4.2.1**  In case Assignee executes this Agreement or any amendment outside Brazil, the registration stated forth in Section 4.2 above shall be made promptly after the delivery by Assignee, of the original copies of this Agreement or relevant amendment with the Assignee's signatures duly notarized in its place of execution and legalized with the competent Brazilian consulate.

**Section Five – Representations, Warranties, Undertakings and Covenants**

**5.1.**    The Assignor expressly and unconditionally represents and warrants to the Assignee, on the Execution Date, the following:

> (a)    it is duly incorporated, validly existing and in good standing under the laws of Brazil and duly authorized and qualified to do business in the jurisdictions as they are currently being carried out;

> (b)    the execution, delivery and performance by the Assignor of this Agreement, and the transactions contemplated by this Agreement: (i) have been duly authorized by all necessary corporate action; (ii) will not breach, contravene, violate, conflict with or constitute a default under (A) any of its Charter Documents, (B) any applicable Law or (C) any contract, loan, agreement, indenture, mortgage, lease or other instrument to which it is a party or by which it or any of its Properties may be bound or affected, including all Governmental Approvals, except in the case of clauses (B) and (C) above, to the extent that such breach, contravention, violation or other conflict or default could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(c)      this Agreement (i) has been duly executed and delivered by the Assignor and (ii) upon satisfaction of the formalities established in Section 4.2 of this Agreement, the Security Interest under this Agreement constitute a legal, valid, exclusive interest and binding obligation of the Assignor, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by insolvency, moratorium, bankruptcy or similar laws affecting the enforcement of creditors' rights generally;

(d)      the powers of attorney granted pursuant to this Agreement (i) have been duly executed and delivered by the Assignor, (ii) are the legal, valid and binding obligations of the Assignor, enforceable against it in accordance with its terms, and (iii) validly confer the corresponding powers to the Security Agent and the Assignee (as the case may be), and the Assignor has not granted any power of attorney or any other instrument with similar effect to any third party in connection with the Security Interest;

(e)      all authorizations required to make this Agreement admissible in evidence in Brazil have been obtained or effected and are in full force and effect;

(f)      all Assigned Collection Accounts and Rights are legally and beneficially owned by the Assignor;

(g)      there are no options, acquisition rights, encumbrances, liens or any other arrangements for the assignment or acquisition of the Assigned Collection Accounts and Rights;

(h)      there are no other agreements or any other rights or claims of any sort whatsoever regarding the acquisition, repurchase, redemption or assignment, with respect to any of the Assigned Collection Accounts and Rights, and which could adversely affect the lien created under this Agreement or the rights herein granted to the Assignee;

(i)      upon satisfaction of the formalities established in Section 4.2 of this Agreement, the lien arising hereunder will have first ranking priority and is not subject to any prior ranking or *pari passu* ranking Lien;

(j)      the Assignor has full knowledge of the terms and conditions of each Credit Agreement, including, without limitation, of the Events of Default set forth therein that may result in the acceleration of the Secured Obligations in accordance with the terms and conditions set forth therein; and

(k)      there is no action, suit, bankruptcy proceeding, other legal proceeding, arbitral proceeding, inquiry or investigation pending or, to the best of the

Assignor's knowledge, threatened, against it by or before any Governmental Authority or in any arbitral or other forum, nor any order, decree or judgment in effect, pending, or, to the best of the Assignor's knowledge, threatened, that, individually or in the aggregate, could (i) restrain the Assignor in respect of the entry into, the performance of or compliance with any of its obligations under this Agreement, or (ii) jeopardize, restrict or limit the Security Interest.

**5.2.**    For as long as this Agreement is in full force and effect and has not been terminated, the Assignor irrevocably undertakes to comply with the following obligations:

(a)      the Assignor shall not create, incur or permit to be created any other liens or encumbrances in favor of, or at the request of, any person on the Assigned Collection Accounts and Rights or any rights thereon, except for any Security Permitted Liens; and

(b)      the Assignor shall maintain and preserve all liens created hereunder and shall notify the Security Agent, within 5 (five) Business Days, of occurrence of any event, fact or circumstance, including, without limitation, any decision, suit, claim, investigation or change in laws (or in the interpretation thereof) or any threatened event, fact or circumstance, which in either case could adversely affect the validity, legality, perfection and the liens created hereunder.

**5.2.1.**   For the purposes of Section 5.2(a) above, "**Security Permitted Liens**" shall mean Liens created by Brazilian courts in connection with proceedings against the Assignor related to tax or workers' compensation claims; provided, however, that (i) the Assignor is contesting in good faith any such tax or workers' compensation claims by appropriate actions, (ii) adequate reserves as required under Brazilian GAAP shall have been established with respect to any such tax or workers' compensation claim, (iii) enforcement of the contested item shall be effectively stayed within the applicable statutory terms, and (iv) to the extent a final decision is rendered, such final decision of the Brazilian courts in connection with such proceedings related to tax and workers' compensation claims releases the Liens created.

**5.3.**    All information provided by or on behalf of the Assignor under this Agreement shall be true, complete and accurate in all material respects as at the date it is provided and shall not be misleading in any respect.

**5.4.**    The breach and the failure of the Assignor to comply with any representation, warranties and obligations under Sections 5.1 and 5.2 hereunder will constitute an Event of Default pursuant to the terms of Clauses 7.1(c) (*Misrepresentation*) and 7.1(d) (*Breach of Other Obligations*), as applicable, of each Credit Agreement.

**Section Six – Expenses and Indemnification**

**6.1.**    The Assignor agrees to indemnify or to pay in advance or reimburse (where appropriate), without duplication in relation to any other costs or expenses arising under this Agreement or under each Credit Agreement, within 3 (three) Business Days of demand, the Assignee and the Security Agent, as the case may be, for all costs, taxes, fees, charges and expenses of any kind, attorneys' fees, court costs and other expenses directly or indirectly related to, or reasonably incurred by, the Assignee and the Security Agent (or third parties retained by the same) as a result of the preparation, negotiation, execution, registration, formalization (including creation and perfection), implementation, amendment, foreclosure, international remittance of amounts obtained as a consequence of the foreclosure, and termination (whether amicable, judicial or extra-judicial) of this Agreement and of any other documents produced in connection with this Agreement (including any amendments).

**6.2.**    If the Assignor fails to meet any commitment under this Agreement, the Assignee and the Security Agent may, at their sole discretion, decide to comply with that commitment, or arrange for its compliance on the assumption that the Assignor will be liable for all reasonable and documented costs, taxes, fees, charges and expenses of any kind, attorneys' fees, court costs and other direct expenses incurred by the Assignee and the Security Agent (or any third parties retained by the same) for such purposes.

**6.3.**    Except if already indemnified or held harmless by the Assignor pursuant to the provisions of each Credit Agreement with respect to any Losses (as defined below), the Assignor hereby irrevocably undertakes to indemnify and hold harmless the Assignee and the Security Agent as well as their Affiliates, executive officers, directors, employees, agents, representatives, successors and assigns (collectively, the "**Indemnified Parties**" and each, an "**Indemnified Party**") from and against any and all actions, suits, proceedings (including investigations or inquiries), claims, incurred losses, direct damages, liabilities, reasonable and documented costs or expenses that any Indemnified Party may suffer as a result of or arising out of any violation, breach or failure to comply with any obligation undertaken by the Assignor herein (collectively, the "**Losses**"), except if caused by the gross negligence (*culpa*) or willful misconduct (*dolo*) of such Indemnified Party (as determined by a court of competent jurisdiction in a final and non-appealable judgment). This obligation of the Assignor shall remain in full force and effect following the termination of this Agreement and each Credit Agreement and will be considered to be cumulative and without prejudice to any other indemnification obligation assumed by the Assignor under any other instrument executed by the Parties or the Indemnified Party.

**Section Seven – Events of Default and Assignment**

**7.1.**    Prior to the occurrence of an Event of Default, Assignor is permitted to make withdrawals from any Assigned Collection Accounts and Rights without the consent of the Assignee or Security Agent.

**7.2**    Upon the occurrence of a Non-Payment Event of Default, (a) the full property over the Assigned Collection Accounts and Rights will be consolidated into the Assignee, (b) the Assignor will not be able to exercise any rights or powers in relation to the Assigned Collection Accounts and Rights, and (c) the Security Agent and the Assignee will have the right to exercise all rights and powers in relation to the Assigned Collection Accounts and Rights, and to immediately instruct the Account Bank (i) not to follow any instructions by the Assignor, including transfers out of the Assigned Collection Accounts and Rights and termination thereof, (ii) to withhold any amounts and block any withdrawals from the Assigned Collection Accounts and Rights, including by the Assignor, and (iii) to transfer and allocate the balances of the Assigned Collection Accounts and Rights, as a whole or in part, for the sole payment of the Secured Obligations.

**7.3.**    Subject to Section 7.1 above, the Assignor hereby irrevocably grants to the Assignee and to the Security Agent all authorizations, instructions and powers pursuant to Article 684 of the Brazilian Civil Code necessary for performing its rights under Section 7.2. above. To that effect, the Borrower shall, on the date hereof, execute and, no later than 3 (three) Business Days, deliver to the Security Agent the power of attorney in the same form and substance of the power of attorney attached hereto as Exhibit IV.

**7.4.**    The Parties and the Account Bank acknowledge that the Account Bank will not be required to request any additional instructions or authorizations from the Assignor to complete any transfer of amounts or funds from the Assigned Collection Accounts and Rights, as well as withdrawals, disbursements, remittances, investments, redemptions, settlements and liquidation of funds, performed in accordance with Sections 7.1, 7.2 and 7.3 of this Agreement.

**7.5.**    Except for that provided under Section 7.1 above, without the prior written consent by the Security Agent or the Assignee, the Assignor shall not close or otherwise dispose of any of the Assigned Collection Accounts and Rights or Additional Assigned Collection Accounts and Rights which are considered as an Additional Security Interest.

**Section Eight – Termination**

**8.1.**    This Agreement shall be terminated, as well as all the rights and obligations hereunder, including for such purpose the property (*propriedade resolúvel*) of the

Assigned Collection Accounts and Rights on the Termination Date. For the purposes of this Agreement, "**Termination Date**" shall mean the date on which the Loan Commitments under each Credit Agreement have been terminated, no Note under either Credit Agreement is outstanding, all Loans thereunder have been paid in full in cash, and all Secured Obligations have been fully and indefeasibly paid to the full satisfaction of the Lender.

8.2.    Upon the occurrence of the event referred to in Section 8.1 above, the Assignee and/or the Security Agent, at the written request of the Assignor, shall release the Security Interest by, as soon as reasonably practicable, executing a written release letter (or any similar document required by Applicable Law) and delivering it to the Assignor, which shall also authorize that any additional amount deposited in the Assigned Collection Account and Rights shall be released to the Assignor, and the Assignor shall advance or reimburse, as applicable, the Assignee and the Security Agent for all reasonable and documented costs and expenses incurred by the same for the cancellation of the Security Interest and the termination of this Agreement.

**Section Nine – Notices**

9.1.    All notices, requests, demands and communications to be made in connection with this Agreement must be made in accordance with the provisions of each Credit Agreement.

9.2.    The notices, requests, demands and communications under this Agreement shall be made to the following addresses or any substitute address, facsimile number or officer as the Party may notify to the other Parties by not less than 5 (five) Business Days' prior notice:

(a)    in the case of the Assignor:

Address:    Avenida das Nações Unidas, 14171
            Rochaverá/Torre Crystal – 32° andar
            São Paulo/SP - Brazil– CEP 04794-000
Att.        Treasury Department
Fax:        (+55 11) 2145 2040

With a copy to:
**NII Holdings, Inc.**
1875 Explorer Street
Reston, VA, 20190
Att: Chief Commercial Counsel
Facsimile: (+1 703) 390 7170

(b)    in the case of the Assignee:

ASIA 20424090

Address:        14th Floor, CITIC Tower, No. 1093
Shennan Zhong Road, Shenzhen 518031, China
Att.            Che Nan
Fax:            +86 (755) 2598 7725

(c)     in the case of the Account Bank:

[•]³

(d)     in the case of the Security Agent:

Address:        Avenida Brigadeiro Faria Lima nº 3.900, 10º andar
CEP 04538-133, São Paulo – SP
Att.:           Viviane Rodrigues and Tatiana Lima
Fax:            (11) 3078-7264
E-mail:         vrodrigues@planner.com.br
                tlima@planner.com.br

**Section Ten – Applicable Law and Choice of Jurisdiction**

**10.1.**   This Agreement shall be governed by, and construed in accordance with, the laws of Federative Republic of Brazil ("**Applicable Law**") and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of Law 5869 of January 11, 1973 (the "**Brazilian Code of Civil Procedure**").

**10.2.**   The Assignor hereby acknowledges and agrees that any assumed obligation under this Agreement or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

**10.3.**   The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Agreement.

**10.4.**   No provision in this Agreement may affect the right of the Assignee to carry out any means of service of process permitted under Applicable Law on the Assignor.

---

³ To be confirmed by the Account Bank.

**Section Eleven – Successor Security Agent**

**11.1.**   The Assignor hereby acknowledges that the Security Agent may resign or be removed and be succeeded pursuant to the terms and conditions of the Collateral Agency Agreement, in which case the Assignor undertakes to carry out any and all acts, and to sign any and all necessary documents and instruments for the successor Security Agent appointed under the Collateral Agency Agreement to become vested with all the rights, powers, privileges and duties of such resigning or removed Security Agent.

**Section Twelve – Miscellaneous**

**12.1.**   No term or condition under this Agreement may be subject to amendment, supplement or modification unless such amendment, supplement or modification is made in writing and signed by the authorized representatives or any attorney-in-fact (holding sufficient powers) of the Parties. The express written waiver of a particular right will not be considered a waiver of any other right.

**12.2.**   No provision under this Agreement, including the choice of jurisdiction indicated in Section 10.3, constitutes a waiver of any immunities, exemptions or privileges granted to the Assignee under its organizational documents, this Agreement, each Credit Agreement or Applicable Law.

**12.3.**   Any failure or delay to exercise any right, power or privilege hereunder shall not be construed as a waiver or novation of any right, power or privilege under this Agreement or any other instrument.

**12.4.**   The partial exercise of any right will not prohibit any future exercise of that right or any other.

**12.5.**   If any clause of this Agreement is held illegal, invalid or unenforceable by any authority in any jurisdiction, that clause shall be eliminated from the Agreement without affecting the legality, validity or enforceability of all surviving clauses and the Parties will negotiate and agree to include a similar provision that reflects the original intent of the Parties, to the extent permitted by the decision of the corresponding authority.

**12.6.**   The Security Interest established under this Agreement shall be in addition to, and without prejudice to, any other guarantees or security granted by the Assignor or any other party as a guarantee of the obligations under each Credit Agreement, and may be enforced individually, alternatively or jointly with any other guarantee or security, as applicable, at the Assignee's sole discretion, if an Event of Default has occurred and is continuing under each Credit Agreement. The foreclosure of the Security Interest by the Assignee shall not prevent the Assignee from foreclosing or

executing any other guarantees or security granted to ensure the performance of the Secured Obligations.

**12.7.**  This Agreement is not a novation and does not modify any obligations of the Assignor to the Assignee, under any contracts entered into between them including, among others, each Credit Agreement.

**12.8.**  The exercise by the Assignee of any of its rights or remedies under this Agreement shall not relieve the Assignor of any of their respective duties or obligations under each Credit Agreement or related documents and instruments.

**12.9.**  This Agreement creates a permanent security interest over the Assigned Collection Accounts and Rights and shall:

>   (a)    bind the Assignor and the Security Agent, their successors, permitted assigns and permitted transferees; and

>   (b)    be made in favor the Assignee and its successors, assigns and transferees.

**12.10.**  Without prejudice to the terms established in Section 12.9 (b) above and subject to all conditions established on each Credit Agreement, the Assignee may, by giving no less than 10 (ten) Business Days prior written notice to the Assignor and the Security Agent (which notice will attach the relevant Assignment and Acceptance executed pursuant to the relevant Credit Agreement), assign or transfer its rights and obligations, in whole or in part, under this Agreement to any third party to whom the Assignee has assigned or transferred, in whole or in part, its rights and obligations under each Credit Agreement ("**Additional Assignee**"), the beneficiary of which will then be vested with all the corresponding benefits provided to and obligations undertaken by the Assignee under this Agreement and Applicable Law.

>   **12.10.1.**    For the purpose of the assignment or transfer of the Assignee's rights and obligations, in whole or in part, under this Agreement:

>   (a)    the Assignor and the Security Agent shall, within 10 (ten) Business Days of the reception of the notice referred to in Section 12.10 above, execute and deliver to the Assignee a duly completed amendment to this Agreement in the form of <u>Exhibit V</u>, according to which the Additional Assignee accedes and becomes a party to this Agreement as Assignee for all purposes and effects of this Agreement and in Applicable Law, being any reference in this Agreement to the Assignee considered as a reference to any Additional Assignee;

(b)    the Assignor shall comply with the formalities established in Section 4 above, as applicable.

12.10.2.    The Assignee and any Additional Assignee may not assign or transfer any of their rights or obligations established hereunder without the respective assignment or transference of their related rights and obligations under the relevant Credit Agreement.

**12.11.** The Assignor, the Account Bank and the Security Agent may not assign or transfer any of their rights or obligations established hereunder without the prior written consent of the Assignee.

**12.12.** As required by Applicable Law, the Assignor, on the Execution Date, shall provide the Assignee and the Security Agent with the following (most recent and valid) certificate issued by the Brazilian Federal Revenue Service in connection with social security contributions to the Brazilian Social Security Institute (*Certidão Positiva com Efeitos de Negativa de Débitos relativos às Contribuições Previdenciárias e às de Terceiros*), No. 190562014-88888229, issued on July 25, 2014 and valid until January 21, 2015 (Exhibit VI).

**12.13.** To the extent permitted by Applicable Law, if any of the payments relating to the Secured Obligations is declared null, as a result of insolvency, bankruptcy, intervention or judicial or extrajudicial recovery proceeding, the Borrower assumes the obligation to reinstate the Security Interest set forth herein, in the understanding that it has been effective at all times since the moment of its constitution without intermittence or interruption, as if no release had taken place at any moment. The Borrower, upon request from the Lender or the Security Agent, shall, within a period of 2 (two) business days execute or grant any public or private document and proceed with any communication that the Lender or the Security Agent deems necessary, useful or convenient for such reinstatement. Without prejudice to the aforementioned obligation, the Borrower hereby appoints and constitutes, irrevocably and unconditionally, the Lender and the Security Agent as their attorneys-in-fact so that they may, on behalf and as a representative of the Borrower, grant for these purposes any public or private documents as well as proceed with any communication, including in the case auto contracting, for the purposes of Article 117 of the Brazilian Civil Code. Such power of attorney is a condition in this Agreement to fulfill the purposes of Article 684 of the Brazilian Civil Code and, as a consequence, is irrevocable.

IN WITNESS WHEREOF, the Parties execute this Agreement in 5 (five) originals, equal in form and substance, in the presence of the undersigned witnesses.

São Paulo, [date], 2014

*(Remainder of the page intentionally left blank)*

ASIA 20424090

Signature page 1 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.


**PLANNER TRUSTEE DTVM LTDA. on behalf of CHINA DEVELOPMENT BANK CORPORATION as Assignee**


_____    _____

**Name:**                           **Name**
**Position:**                       **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 2 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.


**NEXTEL TELECOMUNICAÇÕES LTDA. as Assignor**


_____    _____
**Name:**                                          **Name**
**Position:**                                      **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 3 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.


**[ACCOUNT BANK] as Account Bank**


_____          _____
**Name:**                                          **Name**
**Position:**                                      **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 4 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**PLANNER TRUSTEE DTVM LTDA. as Security Agent**

_____    _____
**Name:**                                      **Name**
**Position:**                                  **Position:**

*(Remainder of the page intentionally left blank)*

Signature page 5 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**WITNESSES**

1. _____    2. _____
**Name:**                                              **Name**
**ID:**                                                **ID:**

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### EXHIBIT I

#### SECURED OBLIGATIONS

### 1. **CDB Sinosure Credit Agreement**

1.1.Principal. US$ 250,000,000.00 (for reference and registration purposes, equivalent to R$ [●] ([●]) in accordance with PTAX 800, option 5 issued by the Central Bank on [DATE]).

1.2.Interest. LIBOR + 1.8% per annum.

1.3.Installments and principal repayment dates. Unless a Principal Payment Date does not fall in a Business Day, the CDB Sinosure Principal Repayment Schedule shall be as follows:

| CDB Sinosure Principal Repayment Schedule | | |
|---|---|---|
| **Repayment Dates** | **Amounts Due (in US$)** | **Percentage** |
| Closing Date | 42,500,000 | 17.00% |
| 15/8/2015 | 700,000.00 | 0.28% |
| 15/2/2016 | 700,000.00 | 0.28% |
| 15/8/2016 | 700,000.00 | 0.28% |
| 15/2/2017 | 700,000.00 | 0.28% |
| 15/8/2017 | 20,475,000.00 | 8.19% |
| 15/2/2018 | 20,475,000.00 | 8.19% |
| 15/8/2018 | 20,475,000.00 | 8.19% |
| 15/2/2019 | 20,475,000.00 | 8.19% |
| 15/8/2019 | 20,475,000.00 | 8.19% |
| 15/2/2020 | 20,475,000.00 | 8.19% |
| 15/8/2020 | 20,475,000.00 | 8.19% |
| 15/2/2021 | 20,475,000.00 | 8.19% |
| 15/8/2021 | 20,475,000.00 | 8.19% |
| 27/12/2021 | 20,425,000.00 | 8.17% |
| Total (in US$) | 250,000,000.00 | 100.00% |

1.4.Interest payment dates. (i) before the First Repayment Date, the last Business Day of an Interest Period, e (ii) subsequently, the First Repayment Date and each subsequent Repayment Date.

1.5.Default interest. 2% *per annum* above LIBOR + 1.8% *per annum* which would accrue to a Loan.

1.6.Amendment Fee: USD12,500

## 2.  CDB Non-Sinosure Credit Agreement

2.1.Principal. US$ 116,937,338.07 (for reference and registration purposes, equivalent to R$ [●] ([●]) in accordance with PTAX 800, option 5 issued by the Central Bank on [DATE]).

2.2.Interest. LIBOR + 2.9% *per annum*.

2.3.Installments and principal repayment dates. Unless a Principal Payment Date does not fall in a Business Day, the CDB Non-Sinosure Principal Repayment Schedule shall be as follows:

| CDB Non-Sinosure Principal Repayment Schedule | | |
|---|---|---|
| Repayment Dates | Amounts Due (in US$) | Percentage |
| Closing Date | 19,879,338.29 | 17.00% |
| 15/8/2015 | 327,424.40 | 0.28% |
| 15/2/2016 | 327,424.40 | 0.28% |
| 15/8/2016 | 327,424.40 | 0.28% |
| 15/2/2017 | 327,424.40 | 0.28% |
| 15/8/2017 | 9,577,163.57 | 8.19% |
| 15/2/2018 | 9,577,163.57 | 8.19% |
| 15/8/2018 | 9,577,163.57 | 8.19% |
| 15/2/2019 | 9,577,163.57 | 8.19% |
| 15/8/2019 | 9,577,163.57 | 8.19% |
| 15/2/2020 | 9,577,163.57 | 8.19% |
| 15/8/2020 | 9,577,163.57 | 8.19% |
| 15/2/2021 | 9,577,163.57 | 8.19% |
| 15/8/2021 | 9,577,163.57 | 8.19% |
| 27/12/2021 | 9,553,163.57 | 8.17% |
| Total (in US$) | 116,937,284.07 | 100.00% |

2.4.Interest Payment Dates. (i) before the First Repayment Date, the last Business Day of an Interest Period, and (ii) subsequently, the First Repayment Date and each subsequent Repayment Date.

2.5.Default interest. 2% *per annum* above LIBOR + 2.9% *per annum* which would accrue to a Loan.

2.6.Amendment Fee: USD12,500

## 3.  Other Fees, costs and expenses

Assignor undertakes to incur, on behalf and for the benefit of the Assignee, any additional costs and expenses related to or deriving from the Financing Documents, including but not limited to:

3.1.Commitment Fee. 0.20% *per annum* calculated on the daily balance of the

2

amount of the Available Loan Commitments from time to time during the Availability Period.

3.2.<u>Costs and Expenses</u>. (i) all reasonable and documented costs and expenses incurred by any Financing Party (including Attorney Costs) in connection with the preparation, issuance, delivery, filing, recording and administration of the Financing Documents and any other documents which may be delivered in connection herewith or therewith, (ii) any and all amounts which any Financing Party has paid relative to curing any Event of Default resulting from the acts or omissions of the Borrower under this Agreement or any other Financing Document, (iii) the enforcement or preservation of any rights or remedies under this Agreement or any other Financing Document, and (iv) any reasonable and documented costs and expenses related to any amendment, waiver or consent with respect to any provision contained in this Agreement or any other Financing Document.

3.3.<u>Security Agent Costs</u>. US$ [•].

The above information is included solely for the purposes of Section 1362 of the Brazilian Civil Code and in no way limits either the Assignor's obligations under each Credit Agreement or the Assignee's rights under the same.

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### EXHIBIT II

### ASSIGNED COLLECTION ACCOUNTS AND RIGHTS

| Bank | Agency | Current Account No. |
|------|--------|--------------------|
| [●] | [●] | [●] |

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### Exhibit III

#### Amendment Form for the inclusion of Additional Assigned Collection Accounts

This Amendment to the Collateral Accounts Agreement ("**Amendment**") is entered into by and between:

**I.    CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**CDB**", "**Lender**" or "**Assignee**");

**II.    NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Borrower**" or "**Assignor**");

**III.    [•]**, a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives] ("**Account Bank**"); and

**IV.    PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**").

**WHEREAS**:

a)  The Assignor, the Assignee, the Account Bank and the Security Agent entered into the Collateral Accounts Agreement (the "**Agreement**"), dated [●], to secure the Secured Obligations, which was duly registered with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) as follows:

| Registry | City | Registry No. |
|----------|------|--------------|
| [●]      | [●]  | [●]          |

    b) on this date, pursuant to Section 3.2.3 (A) of the Agreement, the Assignor shall fiduciarily assign the revenue collection bank accounts identified below in addition to the Assigned Collection Accounts.

The Parties agree to enter into and execute this Amendment, which is governed by the following terms and conditions:

1. Unless expressly defined herein, capitalized terms in this Amendment will have the meaning attributed to them in the Agreement.

2. The rules of interpretation established in the Agreement apply *mutatis mutandis* to this Amendment.

3. The Assignor hereby irrevocably fiduciarily assigns, for the benefit of the Assignee, under the terms set forth in the Agreement and this Amendment, the property (*propriedade resolúvel*) and the indirect possession of the revenue collection bank accounts identified below for the purposes and effects of item IV of Section 1362 of the Brazilian Civil Code:

| Bank | Agency | Current Account No. |
|------|--------|---------------------|
| [●]  | [●]    | [●]                 |

4. The Parties amend and restate <u>Exhibit II</u> to the Agreement which, as of this date, will enter into force with the form and content of <u>Exhibit A</u> hereto, thereby forming part of the Agreement (as amended hereby) for all legal and contractual purposes.

5. The Assignor expressly and unconditionally repeats the representations and warranties granted under Section 5.1 of the Agreement, as if such representations and warranties were fully transcribed herein and made, *mutatis mutandis,* as of the execution date of this Amendment, other than those expressly made as of a specific date, and only in respect to this Amendment and the Additional Assigned Collection Accounts and Rights described in Section 3 herein.

6. The Assignor hereby grants the Security Agent and the Assignee powers of attorney in substantially the same terms as those in the form attached as <u>Exhibit IV</u> to the Agreement.

7. The Assignor shall comply with the applicable formalities established in Section Four of the Agreement.

8. Except as expressly amended under the terms hereof, all provisions, terms and conditions of the Agreement remain in full force and effect and expressly ratified by all the signatories to this Amendment.

9. This Amendment shall be governed by, and construed in accordance with, the Laws of the Federative Republic of Brazil and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of the Brazilian Code of Civil Procedure.

10. The Assignor hereby acknowledges and agrees that any assumed obligation under this Amendment or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

11. The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Amendment.

This Amendment is signed in [4 (four)] counterparts in the presence of the two undersigned witnesses.

[DATE]

**NEXTEL TELECOMUNICAÇÕES LTDA., as Assignor**

_____          _____
[Name]                                 [Name]
[Information of representative]         [Information of representative]

**CHINA DEVELOPMENT BANK CORPORATION, as Assignee**

| | |
|---|---|
| _____ | _____ |
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**PLANNER TRUSTEE DTVM LTDA., as Security Agent**

| | |
|---|---|
| _____ | _____ |
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**[•], as Account Bank**

| | |
|---|---|
| _____ | _____ |
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**WITNESSES:**

| | |
|---|---|
| _____ | _____ |
| [Name] | [Name] |
| [ID] | [ID] |

*(Remainder of the page intentionally left blank)*

EXHIBIT A TO AMENDMENT No. [•], DATED [_____]

| Bank | Agency | Current Account No. |
|------|--------|---------------------|
| [●] | [●] | [●] |

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### EXHIBIT IV

### [POWER OF ATTORNEY][1]

By this power-of-attorney,

**NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**Grantor**");

appoints and constitutes hereby as its attorneys-in-fact,

**CHINA DEVELOPMENT BANK CORPORATION**, company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**Grantee**"); and

**PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association] by its undersigned legal representatives ("**Security Agent**"),

to which it grants powers to, (A) individually, acting on behalf of the Grantor, pursuant to the terms and conditions of the Collateral Accounts Agreement dated [●], as amended from time to time, executed by the Grantor as Assignee, the Grantee as Assignor and the Security Agent and the Account Bank in such capacities (and which, as amended, modified or supplemented and is, from time to time, in force, is hereinafter referred to as "**Collateral Accounts Agreement**") and each Credit Agreement, including for the purposes of Article 117 of the Brazilian Civil Code (auto contracting), in relation to [●] (the "**Bank Account**")][2] and (B) further provided that the powers granted herein shall be exercised in accordance with applicable Law

---

[1] Account Bank to confirm if the powers are sufficient and whether or not the collection bank accounts should be identified herein.

[2] This POA should be granted in connection to a specific bank account and not to any bank accounts held with the Account Bank.

and where exercised in violation of applicable Law, such exercise shall not be deemed to have been made on behalf of the Grantor:

1)      block any withdrawals by the Grantor from the Bank Account, unless such withdrawals are made with the Grantee consent;

2)      collect, receive, withhold any and all current and future funds deposited in the Bank Account, including any and all rights and credits of the Grantor resulting from the Bank Account, as amended from time to time, and investments made with amounts deposited therein and gains and earnings arising therefrom (collectively, the "**Bank Account Funds and Rights**");

3)      endorse checks and credit certificates, purchase foreign currency and remit the Bank Account Funds and Rights abroad up to the amount required to pay for then due and payable Secured Obligations, as well as enter into foreign exchange agreements or other documents necessary, useful or convenient to proceed with such remittances, with powers to represent the Grantor, for such purposes, before the Brazilian Central Bank (*Banco Central do Brasil*) and any bank or financial institution in Brazil, including any of their subdivisions or departments;

4)      subject to the prior consent of the Grantor (which consent shall not be unreasonably withheld or delayed or conditioned, however, it will not be considered unreasonable for the Grantor to withhold consent if any such delegation could have the effect of increasing the Grantor's or any Guarantor's costs under the Financing Documents, due to new or increased Taxes, or otherwise), delegate all or part of the powers granted herein, with or without reservation, to any assignees of the Assignee and the Security Agent or to third parties as may be necessary for the enforcement of the Security, subject to the terms and conditions of the Financing Documents, as well as revoke such delegations, provided that no consent of the Grantor shall be required for any delegation or revocation by the Assignee after the occurrence of the Amendment No. 2 Closing Date (as defined under the Amendment Agreement No. 2);

5)      request any and all previous approvals, authorizations or consents that might be necessary, useful or convenient for the performance of any and all acts mentioned herein, at court or otherwise, before third parties and any and all federal, state or municipal authorities or agencies, in all of its respective divisions and departments, including, amongst others, Registries of Deeds and Documents (*Registros de Títulos e Documentos*), Protest Registries (*Cartórios de Protesto*), banking institutions, Brazilian Central Bank (*Banco Central do Brasil*), Brazilian Federal Revenue Department (*Secretaria da Receita Federal*) and any other agencies and federal, state or municipal agencies or authorities, and all of their respective divisions and departments, or any other third parties;

6)      in the event any payments relating to the Secured Obligations is declared null, in whole or in part, such as, for example, in the context of an insolvency, bankruptcy, intervention or judicial or extrajudicial recovery proceeding to carry out any and all acts, and to sign any and all documents, that are in its sole opinion necessary, useful or convenient for the purposes of reinstating the Security Interest set forth under the Agreement ("**Reinstatement**"); and

7)      take all actions and executed any documents necessary, advisable or convenient to the full enforcement of this power-of-attorney.

Until the Termination Date, the Grantee and the Security Agent are hereby appointed as Grantor's attorneys-in-fact, on an irrevocable and irreversible basis, in compliance with the terms in Section 684 of the Brazilian Civil Code.

Capitalized terms used herein, but not defined herein, will have the same meanings attributed to them in the Collateral Accounts Agreement. The exercise of the powers granted to the Grantee and the Security Agent pursuant to the terms of this instrument constitute a right of the Grantee and the Security Agent, and not an obligation to exercise.

This power-of-attorney is governed by and construed in accordance with the laws of the Federative Republic of Brazil and the Parties herein irrevocably and indefeasibly undertake to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this instrument, waiving any rights they might have to any preferential venue.

The present power-of-attorney is granted on [DATE], in the City of São Paulo, State of São Paulo, Brazil.

(Signatures of the Grantors)

**NOTES:**     1) The signatures need to be notarized by a Notary Public Office and, if issued abroad, notarized and consularized.
2) This power-of-attorney shall be registered with the registry of deeds and documents (*registro de títulos e documentos*).

*(Remainder of the page intentionally left blank)*

**COLLATERAL ACCOUNTS AGREEMENT**

**EXHIBIT V**

**AMENDMENT FORM FOR THE INCLUSION OF ADDITIONAL ASSIGNEES**

This amendment to the Collateral Accounts Agreement ("**Amendment**") is entered into by and between:

**I.    CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives (the "**Original Assignee**");

**II.    NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Assignor**");

**III.    [•]**, a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives] ("**Account Bank**"); and

**IV.    PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**"), and

**V.    [***Additional Assignee***]**, duly represented in this act in accordance with its organizational documents by the undersigned legal representatives (the "**Additional Assignee**").

to be collectively referred to as the "**Parties**", and individually as a "**Party**".

**WHEREAS**:

a) The Original Assignor, the Assignee, the Account Bank and the Security Agent entered into the Collateral Accounts Agreement, dated [●], in order to, *inter alia*, secure the Secured Obligations (as amended from time to time, the "**Agreement**"), which was duly registered with the Registry of Titles and Deeds (*Registro de Títulos e Documentos*) as follows:

| Registry | City | Registry No. |
|----------|------|--------------|
| [●] | [●] | [●] |

b) The Original Assignee intends to [assign/transfer] to the Additional Assignee, and the Additional Assignee intends to [purchase/assume] from the Assignee, [a portion] [all] of the Assignee's rights and obligations under each Credit Agreement and the Agreement;

c) The Additional Assignee shall therefore become a party to the Agreement and, to the extent provided in this Amendment, have the rights and obligations of an Assignee thereunder and under Applicable Law, and the Original Assignee shall, to the extent provided in this Amendment, relinquish [a portion] [all] of its rights and be released from [a portion] [all] of its obligations under the Agreement and Applicable Law, and as further provided below.

For these above purposes, the Parties agree to enter into and execute this Amendment, which is governed by the following terms and conditions:

1. Unless expressly defined herein, capitalized terms in this Amendment will have the meaning attributed to them in the Agreement.

2. The Assignee hereby [assigns / transfers] to the Additional Assignee without recourse and without representation or warranty, and the Additional Assignee hereby [purchases/ assumes] from the Assignee, [all] [a portion] of the Assignee's rights and obligations under each Credit Agreement and the Agreement as of the date hereof.

3. The Additional Assignee (i) confirms that, without breaching any confidentiality obligations, it has received a copy of the Agreement, and such other documents and information as it has deemed appropriate to make its own decision to enter into this Amendment; (ii) appoints and ratifies the Security Agent as security agent under the

14

Agreement; and (iii) agrees to be bound by the terms and conditions of the Agreement as an Assignee thereof.

4.  The Parties hereby agree that, as of the date hereof, (i) the Additional Assignee shall be deemed as Assignee under the Agreement and, to the extent provided in this Amendment, have the rights and obligations of an Assignee under the Agreement and Applicable Law, and (ii) the original Assignee shall, to the extent provided in this Amendment, relinquish [all] [a portion] of its rights and obligations and be released from [all] [a portion] of its obligations under the Agreement.

5.  The Assignor expressly and unconditionally repeats the representations and warranties granted under Section 5.1 of the Agreement, as if such representations and warranties were fully transcribed herein and made, *mutatis mutandis,* as of the execution date of this Amendment, other than those expressly made as of a specific date, and only in respect to this Amendment.

6.  The Assignor hereby grants the Additional Assignee a power of attorney in the form attached as Exhibit IV to the Agreement.

7.  The Assignor shall comply with the applicable formalities established in Section Four of the Agreement.

8.  The Additional Assignee's administrative details for the purposes of the notices, requests, demands and communications under the Agreement are such address, facsimile number, email or officer as it has notified to the Assignee, as the case may be, in the Assignment and Acceptance attached hereto as Exhibit A.

9.  Except as expressly amended under the terms hereof, all provisions, terms and conditions of the Agreement remain in full force and effect and expressly ratified by all Parties to this Amendment.

10. This Amendment is not a novation and does not modify any obligations of the Assignor to the Assignee, under any contracts

entered into between them including, among others, the Agreement and each Credit Agreement.

11. If any term and condition of this Amendment is held illegal, invalid or unenforceable by any authority in any jurisdiction, that term and condition shall be eliminated from the Amendment without affecting the legality, validity or enforceability of all surviving terms and conditions and the Parties will negotiate and agree to include a similar provision that reflects the original intent of the Parties, to the extent permitted by the decision of the corresponding authority.

12. The Assignor hereby acknowledges and agrees that any assumed obligation under this Amendment or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

13. The effective date of this Amendment shall be the date of its signature.

14. This Amendment shall be governed by, and construed in accordance with, the Laws of the Federative Republic of Brazil and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of the Brazilian Code of Civil Procedure.

15. The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Amendment.

This Amendment is signed in [5 (five)] counterparts in the presence of the two undersigned witnesses.

[DATE]

**NEXTEL TELECOMUNICAÇÕES LTDA., as Assignor**

| | |
|---|---|
| _____ | _____ |
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**CHINA DEVELOPMENT BANK CORPORATION, as Assignee**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**[ADDITIONAL ASSIGNEE], as Additional Assignee**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**PLANNER TRUSTEE DTVM LTDA., as Security Agent**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**[•], as Account Bank**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**WITNESSES:**

| | |
|---|---|
| [Name] | [Name] |
| [ID] | [ID] |

*(Remainder of the page intentionally left blank)*

17

EXHIBIT A TO AMENDMENT No. [•], DATED [_____]

[•]

*(Remainder of the page intentionally left blank)*

**COLLATERAL ACCOUNTS AGREEMENT**

**EXHIBIT VI**

**CERTIFICATE ON DEBTS RELATED TO SOCIAL SECURITY CONTRIBUTIONS AND TO THIRD PARTIES RELATED IN THE NAME OF THE ASSIGNOR** (*Certidão Positiva com Efeitos de Negativa de Débitos relativos às Contribuições Previdenciárias e às de Terceiros*)

[•]

*(Remainder of the page intentionally left blank)*

<u>Exhibit C</u>

**Excluded Revenue Collection Accounts**

BANCO DO BRASIL S/A
Branch: 3070
Account: 5567-0
Address: Av. Paulista, 2163 – 2º Andar - São Paulo – SP - CEP 01310-200
Phone: 55 11 2128-7314

CAIXA ECONOMICA FEDERAL
Branch: 3150
Account: 180-4
Address: Av. Elias Alves da Costa, 485 – Centro – Vargem Grande Paulista – SP - 06730-000
Phone: 55 11 2802-7500

Exhibit D

**Other Amendment Terms**

**[Exhibit Omitted]**

**EXHIBIT F-2**

*EXECUTION VERSION*

AMENDMENT AGREEMENT NO.2

Among

NEXTEL TELECOMUNICAÇÕES LTDA.
as Borrower under the Non-Sinosure Credit Agreement

THE GUARANTORS SIGNATORIES HERETO
as Guarantors under the Non-Sinosure Credit Agreement

CHINA DEVELOPMENT BANK CORPORATION
as Lender, Administrative Agent and Arranger under the Non-Sinosure Credit Agreement

Dated as of ___5___ December 2014

Table of Contents

Page

SECTION  1.  DEFINITIONS AND RULES OF INTERPRETATION. .......................................5
    1.    Defined Terms ...............................................................5
    2.    Rules of Interpretation ...................................................5

SECTION  2.  AMENDMENTS TO THE NON-SINOSURE CREDIT
    AGREEMENT. ..............................................................5

SECTION  3.  ACKNOWLEDGMENT. ...................................................5

SECTION  4.  EFFECTIVENESS AND TERMINATION. .................................5

SECTION  5.  CONDITIONS PRECEDENT. ............................................5
    1.    Legal Opinions ..............................................................6
    2.    Charter Documents ........................................................6
    3.    Other Amendment Terms Summary. ..................................7

SECTION  6.  TRANSLATION AND REGISTRATION ..................................7

SECTION  7.  REPRESENTATIONS, WARRANTIES AND AGREEMENTS............7

SECTION  8.  NO WAIVER. .............................................................8

SECTION  9.  NO NOVATION. ..........................................................8

SECTION  10. MISCELLANEOUS. ......................................................8

    **Annex 1** ....................................................................16
    Amendments to the Non-Sinosure Credit Agreement ......................16
    1.    Amendments to Appendix A of the Non-Sinosure Credit Agreement ...............16
    2.    Amendments to Section 5 (*Covenants*) of the Non-Sinosure Credit
    Agreement.................................................................21
    3.    Amendments to Section 6 (*Payment Provisions; Fees*) of the Non-
    Sinosure Credit Agreement............................................23
    4.    Amendments to Section 7 (*Events of Default and Remedies*) of the
    Non-Sinosure Credit Agreement......................................24
    5.    Amendments to Section 9.2 (*Bankruptcy*) of the Non-Sinosure
    Credit Agreement.......................................................26
    6.    Amendments to Section 10.13 (*Assignments, Participations, etc.*) of
    the Non-Sinosure Credit Agreement..................................26

2

EXHIBIT A    FORM OF AMENDMENT TO THE PARENT GUARANTY

EXHIBIT B    FORM OF BORROWER ACCOUNTS PLEDGE

EXHIBIT C    EXCLUDED REVENUE COLLECTION ACCOUNTS

EXHIBIT D    OTHER AMENDMENT TERMS

ASIA 20422879 (2K)

AMENDMENT AGREEMENT NO. 2 (this "Amendment"), dated as of December 2014, among (i) NEXTEL TELECOMUNICAÇÕES LTDA., a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil in its capacity as borrower (the "Borrower") under the Non-Sinosure Credit Agreement (as defined below), (ii) the persons listed as guarantors on the signature pages hereto in their capacities as guarantors (the "Guarantors") under the Non-Sinosure Credit Agreement and (iii) CHINA DEVELOPMENT BANK CORPORATION as lender (in such capacity, the "Lender"), administrative agent (in such capacity, the "Administrative Agent") and arranger (in such capacity, the "Arranger") under the Non-Sinosure Credit Agreement.

W I T N E S S E T H:

WHEREAS, the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger are parties to a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is not supported by the Sinosure Insurance (the "Non-Sinosure Credit Agreement");

WHEREAS, the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger are parties to a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is supported by the Sinosure Insurance (the "Sinosure Credit Agreement", together with the Non-Sinosure Credit Agreement, the "Credit Agreements");

WHEREAS, the Borrower has notified the Administrative Agent and has requested that the Lender agree to amend certain terms and conditions of the Non-Sinosure Credit Agreement to facilitate the balance sheet restructuring of NII Holdings, Inc. (the "Parent") and certain of the Parent's affiliates pursuant to which the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. will be restructured;

WHEREAS, the Parent and such affiliates have commenced the Chapter 11 Cases, and other affiliates may, from time to time thereafter, commence cases under chapter 11 of title 11 of the United States Code; and

WHEREAS, it is anticipated that the Parent Restructuring Plan and the order confirming it will provide that the Parent's obligations under (i) the Shareholder Undertaking, (ii) the Subordination Agreements and (iii) the Parent Guaranty, amended as set forth in the Amendment to the Parent Guaranty, will not be discharged, but will instead continue in full force and effect, binding the Parent or a Successor Guarantor, as of the Parent Restructuring Effective Date;

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

4

ASIA 20422879 (2K)

SECTION 1. <u>DEFINITIONS AND RULES OF INTERPRETATION</u>.

      1.     <u>Defined Terms</u>

      Except as otherwise expressly provided herein, capitalized terms used in this Amendment shall have the meanings assigned to such terms in Appendix A (*Defined Terms and Rules of Interpretation*) of the Non-Sinosure Credit Agreement, as amended by Amendment No. 1 and as amended hereby.

      2.     <u>Rules of Interpretation</u>

      The rules of interpretation set forth in Appendix A (*Defined Terms and Rules of Interpretation*) of the Non-Sinosure Credit Agreement shall apply to this Amendment, *mutatis mutandis*.

SECTION 2. <u>AMENDMENTS TO THE NON-SINOSURE CREDIT AGREEMENT</u>.

      On the Effective Date (as defined below), the terms and conditions of the Non-Sinosure Credit Agreement shall be amended as set forth in Annex 1 hereto.

SECTION 3. <u>ACKNOWLEDGMENT</u>.

      Each Party to this Amendment hereby acknowledges and agrees that the terms and conditions of each of the Financing Documents in effect as of the date hereof shall continue in full force and effect unchanged except as amended and supplemented hereby or as otherwise set forth herein.

SECTION 4. <u>EFFECTIVENESS AND TERMINATION</u>.

      Notwithstanding anything in this Amendment to the contrary, this Amendment shall become effective on the date on which (i) this Amendment has been executed by all parties hereto and (ii) each of the conditions precedent set forth in Section 5 (*Conditions Precedent*) shall have been fulfilled in a manner reasonably satisfactory to the Administrative Agent or have been waived in writing by the Administrative Agent, in its sole discretion (the "<u>Effective Date</u>").

      In the event the formal documentation entered into by the Borrower (or any of its subsidiaries, as applicable) in connection with the Other Amendments Terms is different from those set forth in the Other Amendment Terms Summary and such differences are, in the reasonable opinion of the Lender, materially adverse to the Lender, the Administrative Agent shall, as instructed by the Lender in its sole discretion, be entitled to terminate this Amendment and all amendments contemplated herein shall be void *ab initio*.

SECTION 5. <u>CONDITIONS PRECEDENT</u>.

5

On or prior to the Effective Date, the Administrative Agent shall have received the following, each of which shall be in form and substance satisfactory to the Administrative Agent (acting on the instructions of all Lenders):

1.    Legal Opinions

The Administrative Agent shall have received a copy of the following legal opinions, which legal opinions shall be dated as of the Effective Date and addressed to each Financing Party:

(a)    the legal opinion of White & Case LLP, New York counsel to the Administrative Agent and the Lenders, as to matters of enforceability of this Amendment under New York law;

(b)    the legal opinion of Dias Carneiro, Arystóbulo, Flores, Sanches e Thomaz Bastos Advogados, Brazilian counsel to the Administrative Agent and the Lenders, as to matters of due incorporation, due authorization of the execution, delivery, and performance of this Amendment with respect to the Borrower and each Brazilian Guarantor; and

(c)    the legal opinion of Morris James LLP, Delaware counsel to the Administrative Agent and the Lenders, as to matters of execution and delivery of the Amendment to the Parent Guaranty.

2.    Charter Documents

The Administrative Agent shall have received the following documents, dated as of the Effective Date, each certified as indicated below:

(a)    the Officer's Certificate of the Borrower certifying that attached thereto is a true and complete copy of the resolutions duly adopted by the board of directors (or other equivalent body) of the Borrower duly registered with São Paulo's Board of Commerce (*Junta Comercial do Estado de São Paulo*): (A) approving the transactions contemplated by this Amendment; (B) authorizing the execution, delivery and performance of this Amendment; and (C) authorizing a named person or persons to execute this Amendment and any documents to be delivered by the Borrower under this Amendment and dispatch all documents and notices to be signed and/or dispatched by the Borrower under or in connection with this Amendment, and that such resolutions have not been modified, rescinded or amended and are in full force and effect; and

(b)    the Officer's Certificate of each Guarantor certifying that attached thereto is a true and complete copy of the resolutions duly adopted by the board of directors (or other equivalent body) of such Guarantor duly registered with the relevant Board of Commerce (*Junta Comercial*): (A) approving the transactions contemplated by this Amendment; (B) authorizing the execution, delivery and performance of this

6

Amendment; and (C) authorizing a named person or persons to execute this Amendment and any documents to be delivered by the Guarantor under this Amendment and dispatch all documents and notices to be signed and/or dispatched by the Guarantor under or in connection with this Amendment, and that such resolutions have not been modified, rescinded or amended and are in full force and effect.

3.      Other Amendment Terms Summary.

The Administrative Agent shall have received an Officer's Certificate of the Borrower certifying that attached thereto is a true and complete copy of the Other Amendment Terms Summary, as such may be updated from time to time prior to the date of execution of this Amendment.

SECTION 6. TRANSLATION AND REGISTRATION

The Borrower shall deliver an original of this Amendment (A) sworn translated into Portuguese by a sworn translator registered with the Board of Commerce (*Junta Comercial*) and (B) registered with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) of the city in which the Borrower and each of the Brazilian Guarantors is headquartered, on or prior to the date falling thirty (30) days after the date on which the Administrative Agent has provided to the Borrower an original of this Amendment duly notarized and legalized with the competent Brazilian consulate in China.

SECTION 7. REPRESENTATIONS, WARRANTIES AND AGREEMENTS.

(a)      The Borrower and each Guarantor (as applicable) confirms to the Administrative Agent that the Repeating Representations and the representation made under Section 4.20 (*Ranking*) of the Non-Sinosure Credit Agreement are true and correct on and as of the Effective Date as if made on and as of such date and as if the references to "this Agreement" in that section were references to the Non-Sinosure Credit Agreement as amended by this Amendment.

(b)      Each Guarantor agrees to the amendments contemplated by this Amendment and confirms that its obligations under the Financing Documents to which it is a party will not be released or diminished by the amendments or waivers contemplated herein.

(c)      Upon receipt of the corresponding invoice by the appropriate party, the Borrower shall promptly, in any event within ten (10) Business Days, pay or arrange for the payment of (i) an amendment fee equal to US$12,500, and (ii) all reasonable and documented costs and expenses incurred by any Financing Party (including Attorney Costs) in connection with the preparation, issuance, delivery, filing, recording and administration of this Amendment and the Parent Restructuring and any other documents which may be delivered in connection herewith or therewith.  In addition, the Borrower

7

shall pay any and all stamp and other taxes and fees payable or determined to be payable in Brazil, the United States or China in connection with the execution, delivery, filing and recording of this Amendment or any other Financing Document, or any other document which may be delivered in connection with this Amendment, and agrees to save the Financing Parties harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

(d)     The Borrower shall, within the earlier to occur of (i) the date falling ten (10) Business Days after the Amendment No. 2 Closing Date and (ii) the Interest Payment Date or Principal Payment Date immediately following the Amendment No. 2 Closing Date, deliver to the Administrative Agent evidence satisfactory to it that (A) the ROF registered by the Borrower with the Central Bank for purposes of Section 3.1(m) (*Foreign Exchange Registration*) of the Non-Sinosure Credit Agreement has been cancelled (*baixada*) and (B) the aggregate Loans outstanding as of the Amendment No. 2 Closing Date, and the relevant fees, expenses and commissions expressly referred to in the Financing Documents, as applicable, are registered within a new ROF with the Central Bank.

(e)     Each Guarantor expressly waives any benefit it may have under Sections 363 to 366, 821, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Law 10,406, enacted on 10 January 2002 (Brazilian Civil Code) and Sections 77 I, II and III and 595 of the Brazilian Law 5,869, enacted on 11 January 1973 (Brazilian Civil Procedure Code). No such waiver shall be construed so as to prejudice any right of the Lender under the Non-Sinosure Credit Agreement, which shall be absolute.

## SECTION 8. NO WAIVER.

Except as expressly provided in this Amendment, each of the Financing Documents shall remain unchanged and in full force and effect, and no provision of this Amendment shall be deemed (i) to be a consent, waiver or modification of any term or condition of the Financing Documents or any of the instruments or documents referred to therein, or (ii) to prejudice any rights or remedies which any Financing Party may have now or in the future under or in connection with any of the Financing Documents.

## SECTION 9. NO NOVATION.

The execution of this Amendment does not constitute a novation, payment, satisfaction, performance, extinction or fulfillment of any of the obligations under the Non-Sinosure Credit Agreement whatsoever, including its annexes, exhibits and schedules.

## SECTION 10.          MISCELLANEOUS.

Section 10 (*Miscellaneous*) of the Non-Sinosure Credit Agreement, including but not limited to Section 10.20 (*Governing Law; Submission to Jurisdiction;*

8

*Etc.*),  shall be incorporated into this Amendment as if set forth in full herein, *mutatis mutandis*.

\*                    \*                    \*

*[Remainder of page intentionally left blank.]*

ASIA 20422879 (2K)

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**NEXTEL TELECOMUNICAÇÕES LTDA., as Borrower under the Non-Sinosure Credit Agreement**

<u>Notice Address:</u>

Avenida das Nações Unidas No. 14,171
Crystal Tower – 30th floor
Vila Gertrudes, City of São Paulo, State of São Paulo
Brazil 04795-100
Facsimile No.: 55-11-2145-2037
Email: financial.operations@nextel.com.br

with a copy to:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170

By:_____
Name: Américo Rodrigues de Figueiredo
Title: Director

By:_____
Name: Sultana Shamin Khan
Title: Director



The Guarantors:

**NEXTEL TELECOMUNICAÇÕES DE LONGA DISTÂNCIA LTDA.**
**NEXTEL TELECOMUNICAÇÕES SMP LTDA.**
**SUNBIRD PARTICIPAÇÕES LTDA.**
**SUNBIRD TELECOMUNICAÇÕES LTDA.**

Notice Address for all Guarantors under the Non-Sinosure Credit Agreement:

Avenida das Nações Unidas No. 14.171
Crystal Tower – 30th floor
Vila Gertrudes, City of São Paulo, State of São Paulo
Brazil 04795-100
Facsimile No.: 55-11-2145-2037
Email: financial.operations a nextel.com.br

with a copy to:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170


On behalf of the Guarantors

By: _____
Name: Américo Rodrigues de Figueiredo
Title: Director

By: _____
Name: Sultana Shamin Khan
Title: Director

**CHINA DEVELOPMENT BANK CORPORATION, as Lender**

Notice Address:

Address:       14th Floor, CITIC Tower
No. 1093 Shennan Zhong Road
Shenzhen 518031, P.R. China
Attention:     Che Nan
Telephone No.: +86 (755) 2594 2783
Facsimile No.: +86 (755) 2598 7725

By: _____
Name: Liu Wensheng
Title: Deputy General
Manager of Shenzhen
Branch

12

ASIA 20422879 (2K)

**CHINA DEVELOPMENT BANK CORPORATION, as Administrative Agent**

<u>Notice Address:</u>

Address:     14th Floor, CITIC Tower
No. 1093 Shennan Zhong Road
Shenzhen 518031, P.R. China
Attention:   Che Nan
Telephone No.: +86 (755) 2594 2783
Facsimile No.: +86 (755) 2598 7725

By: _____
Name: Liu Wensheng
Title: Deputy General Manager
of Shenzhen Branch

13

**CHINA DEVELOPMENT BANK CORPORATION, as Arranger**

Notice Address:

Address:        14th Floor, CITIC Tower
                    No. 1093 Shennan Zhong Road
                    Shenzhen 518031, P.R. China
Attention:      Che Nan
Telephone No.:  +86 (755) 2594 2783
Facsimile No.:  +86 (755) 2598 7725

By: _____
Name: Liu Wensheng
Title: Deputy General Manager
       of Shenzhen Branch

14

WITNESSES

By: _____

Name: Che Nan

ID: Deputy Director, Shenzhen Branch


By: _____

Name: Wang Yinan

ID: Client Manager, Shenzhen Branch

15

**Annex 1**

Amendments to the Non-Sinosure Credit Agreement

1.      Amendments to Appendix A of the Non-Sinosure Credit Agreement

(a)      The following definitions shall be added in the appropriate alphabetical positions in the Non-Sinosure Credit Agreement:

"Account Bank" shall mean each bank with which a Revenue Collection Account is opened and maintained.

"Amendment No. 2" shall mean the Amendment Agreement No. 2 dated as of _5_ December 2014 entered into among the Borrower, the Guarantors, the Lender, the Administrative Agent and the Arranger.

"Amendment No. 2 Closing Date" shall mean the date on which:

(a)      the Amendment No. 2 Effective Date has occurred;

(b)      the Borrower Accounts Pledge has been executed and delivered;

(c)      the Borrower has prepaid the Loans in an amount not less than the Required Prepayment Amount; and

(d)      solely in respect of the Sinosure Credit Agreement, the Borrower has paid to Sinosure all additional fees and premiums required by Sinosure to be paid for the purposes of the Borrower entering into the Amendment No.2,

provided that no Event of Default has occurred and is continuing on such date and provided further that such date shall have occurred on or prior to the earlier of (I) five (5) Business Days after the Parent Restructuring Effective Date and (II) September 30, 2015.

"Amendment No. 2 Effective Date" shall have the meaning given to it as the Effective Date in the Amendment No. 2.

"Amendment to the Parent Guaranty" shall mean the amendment to the Parent Guaranty dated as of the date of the Amendment No. 2. being _5_ December 2014 and entered into among the Parent and the Administrative Agent (for the benefit of the Financing Parties) substantially in the form of Exhibit A hereto.

"Borrower Accounts Pledge" shall mean each fiduciary assignment guarantee over the Revenue Collection Accounts, entered between the Borrower, the Lender, the relevant Account Bank and the Security Agent substantially in the form of Exhibit B hereto.

"BRL" shall mean the lawful currency of Brazil.

16

ASIA 20422879 (2K)

"Chapter 11 Cases" shall mean the cases commenced on September 15, 2014 or thereafter by the Parent and certain of its affiliates under chapter 11 of title 11 of the United States Code styled In re NII Holdings, Inc., et al., No. 14-12611 (SCC) in the United States Bankruptcy Court for the Southern District of New York.

"Cut-off Date" shall mean June 27, 2014.

"Excluded Revenue Collection Accounts" shall mean such revenue collection accounts of the Borrower which are subject to, or will be subject to Liens created in favor of a Person other than the Lender, the details of which are provided to the Administrative Agent on or prior to the date of the Amendment No. 2 as set forth in Exhibit C hereto.

"Other Amendment Terms" shall mean the material terms set forth in Exhibit D hereof pursuant to any restructuring or amendment which the Borrower or any of its Subsidiaries will enter into with providers of Indebtedness to the Borrower or its Subsidiaries (other than in relation to the Financing Documents), as updated from time to time by the Borrower.

"Other Amendment Terms Summary" shall mean a summary of the Other Amendment Terms.

"Parent Change of Control" shall mean:

(a)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (as amended), but excluding any employee benefit plan of such "person" or its subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of such plan) becomes the beneficial owner, directly or indirectly, of 35% or more of the voting stock of the Parent or Successor Guarantor on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right to the extent that such option right is exercisable within 60 days after the date of determination); or

(b)      a majority of the members of the board of directors of the Parent or Successor Guarantor are not Continuing Directors;

provided that "Parent Change of Control" shall not include the Parent Restructuring Plan and the Parent Restructuring Plan shall be deemed not to result in a Parent Change of Control.

"Parent Guaranty Amendment Effective Date" shall have the meaning given to it in the Amendment to the Parent Guaranty.

"Parent Restructuring" shall mean the balance sheet restructuring of the Parent and certain of the Parent's Subsidiaries in the Chapter 11 Cases.

"Parent Restructuring Effective Date" shall mean the date on which the Parent Restructuring Plan becomes effective.

"Parent Restructuring Plan" shall mean the plan in respect of the Parent confirmed under 11 U.S.C. § 1129 in the Chapter 11 Cases, pursuant to which, together with the chapter 11 plans of applicable affiliates, the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. are restructured or compromised, including, without limitation, through the full or partial conversion of such notes into equity shares of the Parent and/or its Affiliates.

"Permitted Indebtedness" shall mean:

(a)    any Indebtedness permitted under the Financing Documents and which is incurred prior to the execution date of the Amendment No. 2;

(b)    Indebtedness arising under any Permitted Sale Leaseback Transaction;

(c)    any Subordinated Restricted Intercompany Indebtedness;

(d)    any other Indebtedness fully subordinated in right of payment and upon insolvency of the Borrower to the Lender, and under which no payment (including principal, interest or any other form of payment), prepayment or repayment may be made before the unconditional and irrevocable payment in full of all amounts under the Financing Documents;

(e)    Indebtedness incurred in connection with the ordinary course of business of the Borrower, provided that the aggregate outstanding amount of such Indebtedness at any time shall not exceed US$50,000,000 (or its equivalent in BRL));

(f)    Indebtedness incurred for the purpose of refinancing Indebtedness of the Borrower existing on the date of the Amendment No. 2 (without any increase in the principal amount thereof or any shortening of the average maturity of any principal amount thereof in comparison with the average maturity of the Indebtedness being refinanced); and

(g)    the amount of any liability in respect of any guaranty for any of the items referred to in paragraphs (a) to (f) above.

"Principal Payment Dates" shall mean, collectively, (i) prior to the occurrence of the Amendment No. 2 Closing Date, the first Interest Payment Date immediately following the expiry of the Availability Period and thereafter, each next succeeding Interest Payment Date, and (ii) upon the occurrence of the Amendment No. 2 Closing Date, on each date set forth below which follows the Amendment No. 2 Closing Date:

| Principal Payment Date |
| --- |
| August 15, 2015 |

| |
|---|
| February 15, 2016 |
| August 15, 2016 |
| February 15, 2017 |
| August 15, 2017 |
| February 15, 2018 |
| August 15, 2018 |
| February 15, 2019 |
| August 15, 2019 |
| February 15, 2020 |
| August 15, 2020 |
| February 15, 2021 |
| August 15, 2021 |
| December 27, 2021 |

provided that the last Principal Payment Date shall be the Loan Maturity Date.

"Required Prepayment Amount" shall mean an amount equal to seventeen percent (17%) of the Loans outstanding on the Cut-off Date.

"Required Revenue Collection Inflow" shall mean an aggregate cash inflow of no less than BRL200,000,000 during each six month period ending on the last day of each fiscal quarter of the Borrower, provided that only cash inflows resulting from collections that are identified as service (including any pre-paid services) and handset revenues for accounting purposes of the Borrower shall be included in the calculation of the Required Revenue Collection Inflow.

"Revenue Collection Accounts" shall mean certain revenue collection accounts of the Borrower subject to the Liens created pursuant to the Borrower Accounts Pledges, the details of which are set out more fully in the Borrower Accounts Pledges.

"Successor Guarantor" shall mean the entity which (i) becomes, or is deemed as, the legal successor of the Parent as a result of, or pursuant to, the Parent Restructuring Plan or the order of the applicable Governmental Authority in the Chapter 11 Cases confirming the Parent Restructuring Plan, but not by reason of sale (even if pursuant to the Parent Restructuring Plan or such order), and only if such succession or deemed succession shall not have occurred before the Parent Restructuring Effective Date (unless preceded by the unconditional and irrevocable repayment in full of the Guaranteed Obligations (as such term is defined in the Parent Guaranty)), and (ii) has undertaken, as of the Parent Restructuring Effective Date, the Parent's obligations under the Shareholder Undertaking, the Subordination Agreements and the Parent Guaranty, as amended pursuant to the Amendment to the Parent Guaranty.

(b)    The following definitions shall be amended to read in its entirety as

follows:

"Change of Control" shall mean:

        (a)      a Parent Change of Control;

        (b)      the Borrower ceases, directly or indirectly, to control any of the Guarantors;

        (c)      Nextel Telecomunicações S.A. and McCaw International (Brazil), LLC cease to respectively own 61.86% and 38.14% of the entire issued and outstanding share capital of the Borrower; or

        (d)      the Parent or the Successor Guarantor ceases, directly or indirectly, to control the Borrower,

for purposes of this definition, "control" shall mean, with respect to a Person, (i) the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise, and (ii) the ownership (directly or indirectly) of 51% of the entire issued and outstanding share capital of such Person.

"Financing Documents" shall mean, collectively, this Agreement, the Amendment No. 1., the Amendment No. 2., the Parent Guaranty, the Amendment to the Parent Guaranty, any Subordination Agreement, the Shareholder Undertaking, the Security Documents, the Fee Letter, each Notice of Borrowing and after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and any other document designated from time to time as such and as agreed by the Borrower and the Administrative Agent.

"Loan Maturity Date" shall mean (i) prior to the occurrence of the Amendment No. 2 Closing Date, the date falling ten (10) years from the earlier of (x) the Closing Date and (y) June 30, 2012, except that if such date is not a Business Day, then the Loan Maturity Date shall be the Business Day immediately preceding the date falling ten (10) years from such date, or (ii) upon the occurrence of the Amendment No. 2 Closing Date, December 27, 2021.

"Parent Guaranty" shall mean the guaranty agreement dated as of September 25, 2013, entered into among the Parent, the Administrative Agent and the Sinosure Administrative Agent, for the benefit of the Financing Parties, as amended from time to time.

"Security Documents" shall mean the Borrower Accounts Pledges, the Fiduciary Assignment and any other document designated as a Security Document by the Financing Parties (acting reasonably) and the Borrower.

"Waiver Period" shall mean the period commencing on the effective date of the Amendment No. 1 and ending on June 30, 2017 (inclusive).

2.    Amendments to Section 5 (*Covenants*) of the Non-Sinosure Credit Agreement

(a)    Paragraph (d) of Section 5.1 (*Financial Statements and Other Information*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"(d)    Financial Ratio. Together with each set of financial statements delivered pursuant to Section 5.1(a) or 5.1(b) above, (i) a detailed calculation of the financial ratios set forth in Section 5.22 (*Financial Ratios*) as tested as of the Calculation Date immediately falling prior to the delivery of such financial statements for the period of twelve (12) months ending on such Calculation Date, certified by the chief financial officer, treasurer or financial controller of the Borrower; and (ii) a Compliance Certificate, provided that, during the Waiver Period only, the Borrower shall not be required to deliver a Compliance Certificate, provided further that, the Borrower shall not, during the period from June 30, 2015 to the Amendment No.2 Closing Date, deliver any Compliance Certificate in respect of the twelve months period ending on June 30, 2015 for purposes of effecting a release of the liabilities of the Parent Guarantor under the Parent Guaranty pursuant to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty. For the avoidance of doubt, any calculation of financial ratios provided on or prior to the last day of the Waiver Period shall be provided for the Lender's information purposes only."

(b)    A new paragraph (m) of Section 5.1 (*Financial Statements and Other Information*) of the Non-Sinosure Credit Agreement shall added to read in its entirety as follows:

"(m)    Restructuring and Other Amendment Terms.

(i)    As soon as available, any updates to the Other Amendment Terms Summary and the Other Amendment Terms; and

(ii)    such information with respect to the Parent Restructuring (including with respect to its process and status) as the Administrative Agent may request from time to time (acting reasonably)."

(c)    Section 5.22 (*Financial Ratio*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"The Borrower shall:

(a)    maintain (i) a Net Debt to Consolidated EBITDA ratio of no greater than 2.5 to 1.0, (ii) a Net Debt to Total Net Worth ratio of no greater than 2.0 to 1.0, and (iii) a Consolidated EBITDA to Consolidated Interest Expense ratio of no less than 3.0 to 1.0., in each case, as tested as of each Calculation Date falling after the last day of the Waiver Period for the period of twelve (12) months ending on such Calculation Date; and

(b)    ensure that, as of the date after the last day of the Waiver Period, the amount of the Consolidated Cash Balance shall be (i) no less than US$100,000,000 as tested as

of each Calculation Date falling in the period when the sum of the outstanding principal amount of all the Loans is more than US$100,000,000, and (ii) no less than the then outstanding principal amount of all the Loans as tested as of each Calculation Date falling after the sum of the outstanding principal amount of all the Loans falls below US$100,000,000."

(d)    Section 5.25 (*Incremental Indebtedness and Subordinated Restricted Intercompany Indebtedness*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"5.25    Incremental Indebtedness and Subordinated Restricted Intercompany Indebtedness.

(a)    During the Waiver Period, the Borrower shall not, and shall not permit any of the Guarantors to, directly or indirectly, contract, create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness.

(b)    After the last day of the Waiver Period, the Borrower shall not, and shall not permit any of the Guarantors to, directly or indirectly, contract, create, incur, assume or suffer to exist any Indebtedness (other than the Indebtedness under the Financing Documents), unless (i) no Default or Event of Default then exists or would result therefrom; and (ii) the Borrower has complied and after the incurrence thereof on a pro forma basis, is in compliance with Section 5.22 (*Financial Ratio*) as tested on the Calculation Date immediately preceding the proposed date of such incurrence.

(c)    No Obligor nor its Subsidiaries, shall pay, or cause to be paid, any Subordinated Restricted Intercompany Indebtedness without the prior written consent of the Administrative Agent and the Sinosure Administrative Agent."

(e)    A new Section 5.32 (*Borrower Accounts Pledge*) of the Non-Sinosure Credit Agreement shall added to read in its entirety as follows:

"5.32    Borrower Accounts Pledge.

The Borrower shall:

(a)    within fifteen (15) days after each fiscal quarter of the Borrower occurring after the date of a Borrower Accounts Pledge, deliver to the Administrative Agent a statement from each relevant Account Bank setting out the details of the aggregate cash inflow of all Revenue Collection Accounts, together with an Officer's Certificate of the Borrower (i) calculating the aggregate amount of revenue flow of all Revenue Collection Accounts represented by such account statements and (ii) certifying that the Account Bank statements are true and complete and represent the calculations (in reasonable detail) of the aggregate cash inflow of all Revenue Collection Accounts, in each case, in respect of the three-month period ending on the last day of such fiscal quarter;

(b)    within forty-five (45) days after each fiscal quarter of the Borrower occurring after the date of a Borrower Accounts Pledge, deliver to the Administrative Agent the

electronic documentation in portable   document format – pdf, supporting all calculations delivered pursuant to paragraph (a) above; and

(c)       if the certification delivered pursuant to paragraph (a) above provides that the aggregate cash inflow of all Revenue Collection Accounts is less than the Required Revenue Collection Inflow, promptly, and in any case within forty (40) days of the delivery of such certification referred to in paragraph (a) above, procure that additional revenue collection accounts (other than the Excluded Revenue Collection Accounts) not already subject to a Lien created by the Borrower Accounts Pledges  are fiducially assigned in favor of the Security Agent pursuant to the terms of a Borrower Accounts Pledge, provided that if all existing revenue collection accounts of the Borrower (other than the Excluded Revenue Collection Accounts) are already subject to a Lien created by the Borrower Accounts Pledges, the Borrower shall not be required to fiducially assign additional revenue collection accounts pursuant to this paragraph (c)."

3.       Amendments to Section 6 (*Payment Provisions; Fees*) of the Non-Sinosure Credit Agreement

(a)       Section 6.1 (*Repayment of Principal*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"(a)       Prior to the occurrence of the Amendment No. 2 Closing Date, the Borrower shall repay the aggregate principal amount of the Loans outstanding on each Principal Payment Date in fifteen (15) equal semi-annual instalments commencing on the first Interest Payment following the expiry of the Availability Period.

(b)       Upon the occurrence of the Amendment No. 2 Closing Date:

(i)       the Borrower shall repay the aggregate principal amount of the Loans outstanding on each Principal Payment Date in the amounts (expressed as a percentage of the aggregate Loans outstanding as of the Cut-off Date) as set out below:

| Principal Payment Date | Amount Due (expressed as a percentage of the aggregate Loans outstanding as of the Cut-off Date) |
|---|---|
| August 15, 2015 | 0.28% |
| February 15, 2016 | 0.28% |
| August 15, 2016 | 0.28% |
| February 15, 2017 | 0.28% |
| August 15, 2017 | 8.19% |
| February 15, 2018 | 8.19% |

| | |
|---|---|
| August 15, 2018 | 8.19% |
| February 15, 2019 | 8.19% |
| August 15, 2019 | 8.19% |
| February 15, 2020 | 8.19% |
| August 15, 2020 | 8.19% |
| February 15, 2021 | 8.19% |
| August 15, 2021 | 8.19% |
| December 27, 2021 | 8.17% |

(ii)    any amounts repaid or prepaid by the Borrower on and from the Cut-off Date and prior to the occurrence of the Amendment No. 2 Closing Date shall be applied in the following order of priority:

(A)    first, towards repayment of the principal amount of the Loans on each Principal Payment Date occurring on and from the Cut-off Date and prior to the Amendment No. 2 Closing Date in accordance with paragraph (b)(i) above in chronological order;

(B)    second, towards prepayment of the Required Prepayment Amount; and

(C)    third, towards the repayment of the principal amount of the Loans outstanding in accordance with paragraph (b)(i) above on each Principal Payment Date occurring after the Amendment No.2 Closing Date in chronological order. "

4.    Amendments to Section 7 (*Events of Default and Remedies*) of the Non-Sinosure Credit Agreement

(a)    New paragraphs of Section 7.1 (*Events of Default*) of the Non-Sinosure Credit Agreement shall be added to read in its entirety as follows:

"(s)    Borrower Accounts Pledges.  The Borrower shall fail to (A) execute and deliver the Borrower Accounts Pledges to the Security Agent, which shall contain, inter alia, (i) fiduciary assignments in relation to the Revenue Collection Accounts; and (ii) powers of attorney in favor of the Lender and the Security Agent authorizing them before the Account Banks to, upon occurrence of an Event of Default, prevent any withdrawals from the Revenue Collection Accounts by the Borrower and, upon occurrence of a Non-Payment Event of Default, apply all amounts in the Revenue Collection Accounts against any overdue principal and/or interest under the Financing Documents, and (B) perfect the Liens created or intended to be created under or evidenced by the Borrower Accounts Pledges, in each case of (A) and (B), by February 28, 2015.

(t)    Parent Restructuring Plan.  Upon confirmation of the Parent Restructuring Plan, either of the Parent Restructuring Plan or the order confirming it shall fail to provide in form and substance reasonably acceptable to the Administrative Agent for the terms and obligations of the Parent Guaranty, the Shareholder Undertaking and the Subordination Agreements to be undertaken by the Parent or a Successor Guarantor.

(u)    <u>Revenue Collection Accounts</u>.  The Borrower shall fail to procure that additional revenue collection accounts (other than the Excluded Revenue Collection Accounts) are pledged or fiduciarily assigned (at the discretion of the Lender) in favour of the Security Agent in accordance with the terms of and within the time stipulated in paragraph (d) of Section 5.32 (*Borrower Accounts Pledges*).

(v)    <u>Amendment to the Parent Guaranty</u>.  The Amendment to the Parent Guaranty is not authorized or approved by the appropriate Governmental Authority in the Chapter 11 Cases or otherwise does not take full force and effect in accordance with the terms thereof, on the earlier of (i) the Amendment No. 2 Closing Date and (ii) September 30, 2015.

(w)    <u>Claims in the Chapter 11 Cases</u>.  The claims of the Administrative Agent and the Financing Parties for the Guaranteed Obligations (as such term is defined in the Parent Guaranty) in the Chapter 11 Cases shall for any reason be disallowed, avoided, nullified or subordinated, or any liability under the Parent Guaranty shall be released or discharged for any reason (including under Section 20 of the Parent Guaranty) other than due to (i) any affirmative act of the Administrative Agent or the Lender, (ii) the failure of the Administrative Agent or Lender to file a proof of claim in the Chapter 11 Cases in respect of any such claim (only if the filing thereof is otherwise required pursuant to an order of the relevant Governmental Authority in the Chapter 11 Cases or pursuant to the applicable Bankruptcy Law to preserve such claim) or defend any such claim against any objection thereto, or (iii) the unconditional and irrevocable repayment in full of the Guaranteed Obligations (as such term is defined in the Parent Guaranty), provided that there shall not be an Event of Default under this Section 7.1(w) (a) in the event such claims are reinstated pursuant to the Parent Restructuring Plan, or (b) so long as such claims are so reinstated, as a result of any action that is appropriate to administer and maintain the claims register in the Chapter 11 Cases.

(x)    <u>Delivery of the Compliance Certificates</u>.  The Borrower delivers the Compliance Certificates pursuant to Section 5.1 (*Financial Statements and Other Information*) in respect of the twelve (12) months period ending on June 30, 2015 confirming that it is in compliance with the financial ratios set out in the Non-Sinosure Credit Agreement.

(y)    <u>Shareholder Undertaking, Subordination Agreements</u>.  The Shareholder Undertaking or any <u>Subordination Agreement</u> shall fail to be reinstated by the appropriate Governmental Authority in the Chapter 11 Cases or the claim of the Administrative Agent and the Financing Parties under the Shareholder Undertaking or <u>Subordination Agreements</u> shall for any reason be disallowed, avoided, nullified or subordinated, or any liability under the Shareholder Undertaking or <u>Subordination Agreements</u> shall be released or discharged for any reason other than due to (i) any affirmative act of the Administrative Agent or the Lender, (ii) the failure of the Administrative Agent or Lender to file a proof of claim in the Chapter 11 Cases in respect of any such claim (only if the filing thereof is otherwise required pursuant to an order of the relevant Governmental Authority in the Chapter 11 Cases or pursuant to the applicable Bankruptcy Law to preserve such claim) or defend any such claim against any objection thereto, or (iii) the unconditional and irrevocable repayment in full of the Loans, provided that there shall not be an Event of Default under this Section 7.1(y) (a) in the event such claims are reinstated pursuant to the Parent Restructuring Plan, or (b) so long as such claims are so reinstated, as a

result of any action that is appropriate to administer and maintain the claims register in the Chapter 11 Cases.

    5.    Amendments to Section 9.2 (*Bankruptcy*) of the Non-Sinosure Credit Agreement

    (a)    Section 9.2 (*Bankruptcy*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"Additionally, the Guarantors unconditionally and irrevocably, jointly and severally, guarantee the payment of any and all of the Guaranteed Obligations to the Financing Parties whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Sections 7.1(e), 7.1(g) and 7.1(h), and irrevocably and unconditionally promise to pay such Guaranteed Obligations to the Financing Parties upon such occurrence."

    6.    Amendments to Section 10.13 (*Assignments, Participations, etc.*) of the Non-Sinosure Credit Agreement

    (a)    Paragraph (a) of Section 10.13 (*Assignments, Participations, etc.*) of the Non-Sinosure Credit Agreement shall be amended to read in its entirety as follows:

"(a)    Subject to Section 10.13(b) below, any Lender may, with the prior consent of the Borrower (which consent shall not be unreasonably withheld or delayed or conditioned, however, it will not be considered unreasonable for the Borrower to withhold consent if any such assignment could have the effect of increasing the Borrower's or any Guarantor's costs under the Financing Documents, due to new or increased Taxes, or otherwise), at any time assign all or any part of its Loan Commitments or Loans and the other rights and obligations of such Lender hereunder and under the other Financing Documents, to another bank or financial institution, provided that no consent of the Borrower shall be required for any assignment by a Lender of all or any part of its Loan Commitments or Loans and other rights and obligations after the occurrence of the Amendment No. 2. Closing Date. Any partial assignment of Loan Commitments or Loans under this Section 10.13(a) shall not be less than US$10,000,000 or any integral multiple of US$5,000,000 in excess thereof."

Exhibit A

**Form of Amendment to the Parent Guaranty**

---

## AMENDMENT TO THE PARENT GUARANTY

between

### NII HOLDINGS, INC.
as Parent Guarantor

and

### CHINA DEVELOPMENT BANK CORPORATION
as Administrative Agent under the Sinosure Credit Agreement and the Non-Sinosure
Credit Agreement

Dated as of _____ December 2014

---

ASIA 20423961 (2K)

Table of Contents

Page

SECTION  1.  DEFINITIONS.................................................................................4

SECTION  2.  AMENDMENTS TO THE PARENT GUARANTY ...............................4

SECTION  3.  ACKNOWLEDGMENT....................................................................4

SECTION  4.  EFFECTIVENESS AND TERMINATION. ...........................................4

SECTION  5.  NO NOVATION..............................................................................4

SECTION  6.  MISCELLANEOUS. .........................................................................4

**Annex 1** ...........................................................................................8
Amendment to the Parent Guaranty.......................................................8
1.       Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty ..................8
2.       Amendments to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty..................................9
3.       Amendments to Section 11 (*Covenants of Parent Guarantor*) of the Parent Guaranty ...........................................9

2

AMENDMENT TO THE PARENT GUARANTY (this "Amendment"), dated as of _____ December 2014, among (i) NII Holdings, Inc., a holding company organized and existing under the laws of Delaware (the "Parent Guarantor"), and (ii) China Development Bank Corporation in its capacities as administrative agent under the Sinosure Credit Agreement and the Non-Sinosure Credit Agreement, for the benefit of the Financing Parties defined thereunder.

W I T N E S S E T H:

WHEREAS, Nextel Telecomunicações Ltda. (the "Borrower"), the persons listed as guarantors on the signature pages to the Non-Sinosure Credit Agreement (as defined below) in their capacities as guarantors (the "Guarantors"), China Development Bank Corporation, as Lender, as administrative agent (in such capacity, the "Administrative Agent") and as arranger (in such capacity, the "Arranger"), are parties to (i) a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is supported by the Sinosure Insurance (the "Sinosure Credit Agreement") and (ii) a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is not supported by the Sinosure Insurance (the "Non-Sinosure Credit Agreement", together with the Sinosure Credit Agreement, the "Credit Agreements" and each a "Credit Agreement");

WHEREAS, the Borrower has notified the Administrative Agent and has requested that the Lender agree to amend certain terms and conditions of the Credit Agreements to facilitate the balance sheet restructuring of the Parent Guarantor and certain of the Parent Guarantor's affiliates pursuant to which the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. will be restructured by way of an amendment agreement to the Sinosure Credit Agreement and an amendment agreement to the Non-Sinosure Credit Agreement (together the "Credit Agreement Amendment Agreements");

WHEREAS, the Borrower is a Subsidiary of the Parent Guarantor;

WHEREAS, the Parent Guarantor and such affiliates have commenced the Chapter 11 Cases;

WHEREAS, the Parent Guarantor will obtain benefits from the amendments contemplated in the Credit Agreement Amendment Agreements and, accordingly, desires to execute this Amendment to induce the Lender to agree to the Credit Agreement Amendment Agreements; and

WHEREAS, it is anticipated that the Parent Guaranty, as amended under the terms and subject to the conditions set forth herein, will become effective on the Parent Guaranty Amendment Effective Date (as defined below).

3

ASIA 20423961 (2K)

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

SECTION 1.  <u>DEFINITIONS</u>.

Except as otherwise expressly provided herein, capitalized terms used in this Amendment shall have the meanings assigned to such terms in the Credit Agreement Amendment Agreements and the Parent Guaranty, as amended from time to time, as applicable.

SECTION 2.  <u>AMENDMENTS TO THE PARENT GUARANTY.</u>

On the Parent Guaranty Amendment Effective Date (as defined below), the terms and conditions of the Parent Guaranty shall be amended as set forth in <u>Annex 1</u> hereto.

SECTION 3.  <u>ACKNOWLEDGMENT.</u>

Each Party to this Amendment hereby acknowledges and agrees that (i) the terms and conditions of the Parent Guaranty in effect as of the date hereof shall continue in full force and effect unchanged, except as amended and supplemented hereby and (ii) this Amendment shall take full force or effect as of the Parent Guaranty Amendment Effective Date and the Parent Guarantor shall assume all obligations and duties under the Parent Guaranty as amended by this Amendment as of the Parent Guaranty Amendment Effective Date.

SECTION 4.  <u>EFFECTIVENESS AND TERMINATION</u>.

Notwithstanding anything in this Amendment to the contrary, this Amendment shall only become effective on the earlier to occur of (i) the Amendment No. 2 Closing Date (as such term is defined in each Credit Agreement Amendment Agreement) and (ii) the Parent Restructuring Effective Date (as such term is defined in each Credit Agreement Amendment Agreement) (the "<u>Parent Guaranty Amendment Effective Date</u>").

SECTION 5.  <u>NO NOVATION.</u>

The execution of this Amendment does not constitute a novation, amendment, payment, satisfaction, performance or fulfillment of any of the obligations under the Parent Guaranty.

SECTION 6.  <u>MISCELLANEOUS</u>.

Section 17 (*Notice*), Section 19 (*Consent to Jurisdiction; Service of Process; and Waiver of Trial by Jury*), Section 22 (*Counterparts*), and Section 24 (*Headings Descriptive*) of the Parent Guaranty shall be incorporated into this

4

Amendment as if set forth in full herein, *mutatis mutandis*.

\*                              \*                              \*

[*Remainder of page intentionally left blank.*]

5

ASIA 20423961 (2K)

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**NII HOLDINGS, INC., as Parent Guarantor**

Notice Address:

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170

By:_____
Name:
Title:

By:_____
Name:
Title:

6

**CHINA DEVELOPMENT BANK CORPORATION, as Administrative Agent**

<u>Notice Address</u>:

Address:        14th Floor, CITIC Tower
                No. 1093 Shennan Zhong Road
                Shenzhen 518031, P.R. China
Attention:      Che Nan
Telephone No.:  +86 (755) 2594 2783
Facsimile No.:  +86 (755) 2598 7725


By:_____
Name:
Title:

7

**Annex 1**

Amendment to the Parent Guaranty

1.        Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty

(a)        Section 2 (*Parent Guaranty*) of the Parent Guaranty shall be amended to read in its entirety as follows:

"2.        PARENT GUARANTY

(a)        The Parent Guarantor, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety to the Financing Parties the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise pursuant to the terms of each Credit Agreement) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under each Credit Agreement and (y) all other payment obligations (including, without limitation, obligations which, but for the effect of any bankruptcy, insolvency, receivership or similar proceeding, would become payable), liabilities and indebtedness owing by the Borrower to the Financing Parties under each Financing Document to which the Borrower is a party (including, without limitation, indemnities, fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in each Credit Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with each such Financing Document and the due performance and compliance by the Borrower with all of its payment obligations in all such Financing Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (i) being herein collectively called the "Guaranteed Obligations");

The Parent Guarantor understands, agrees and confirms that the Financing Parties may, in accordance with Section 9, enforce this Parent Guaranty up to the full amount of the Guaranteed Obligations against the Parent Guarantor without proceeding against the Borrower or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations.  This Parent Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)        Additionally, the Parent Guarantor, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower upon the occurrence in respect of the Borrower of any of the events specified in Section 7.1(e) (*Insolvency*), Section 7.1(g) (*Voluntary Insolvency Proceedings*) and Section 7.1(h) (*Involuntary Insolvency Proceedings(Borrower)*) of each Credit Agreement, and unconditionally, absolutely and irrevocably, promises to pay such Guaranteed Obligations to the Financing Parties upon such occurrence.

8

2.      Amendments to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty

Section 20 (*Release of Liability of Parent Guarantor*) shall be deleted in its entirety.

3.      Amendments to Section 1 (*Definitions*) of the Parent Guaranty

The definition of "Compliance Date" under Section 1 (*Definitions*) of the Parent Guarantee shall be deleted in its entirely.

4.      Amendments to Section 11 (*Covenants of Parent Guarantor*) of the Parent Guaranty

(a)      A new Section 11.4 (*Keepwell Undertaking*) of the Parent Guaranty shall be added to read in its entirety as follows:

"11.4   Keep-well Undertaking

The Parent Guarantor shall, directly or indirectly through any one or more of its Affiliates, make such equity contributions or injections and/or provide such Subordinated Restricted Intercompany Indebtedness to the Borrower in order to ensure that the Borrower has sufficient funds for the operating expenditure, capital expenditure and debt service cash requirements of such Borrower."

<u>Exhibit B</u>

**Form of Borrower Accounts Pledge**

# COLLATERAL ACCOUNTS AGREEMENT

*by and among*

## CHINA DEVELOPMENT BANK CORPORATION
*in the capacity of Lender and Assignee*

## NEXTEL TELECOMUNICAÇÕES LTDA.
*in the capacity of Borrower and Assignor*

## [•]
*in the capacity as Account Bank*

*and*

## PLANNER TRUSTEE DTVM LTDA.
*in the capacity of Security Agent*

_____

Dated

[Date], 2014

_____

## COLLATERAL ACCOUNTS AGREEMENT[1]

This Collateral Accounts Agreement ("**Agreement**") is entered into by and between:

I.     **CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented by its attorney-in-fact, Planner Trustee DTVM Ltda., a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46 ("**CDB**", "**Lender**" or "**Assignee**");

II.    **NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower,, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Borrower**" or "**Assignor**");

III.   [•], a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives][2] ("**Account Bank**"); and

IV.    **PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**").

(Assignor, Assignee and Security Agent are hereinafter referred to individually as "**Party**", and collectively, the "**Parties**")

**WHEREAS:**

a)     the USD 250,000,000.00 Non-Sinosure backed Credit Agreement and the USD 250,000,000.00 Sinosure backed Credit Agreement, both dated April 20, 2012

---

[1] [NTD: Draft agreement is expected to suffer minor revisions made by Account Bank, only.]

[2] Account Bank to confirm its qualification.

(as amended and waived from time to time), have been entered into by and among the Lender, as lender, administrative agent and arranger, the Borrower and the entities named therein as Guarantors, in order to finance the acquisition of equipment and related services from the Suppliers for the build-out and deployment of the telecommunications networks being deployed or to be deployed by the Borrower or its Affiliates in Brazil as amended by the Amendment Agreement No. 1 (as defined below), the Amendment Agreement No. 2 (as defined below) and as further amended from time to time (the "**Credit Agreements**" and each a "**Credit Agreement**");

b)      the collateral agency agreement dated April 20, 2012 has been entered into by and among, the Lender, as Sinosure Administrative Agent and Sinosure Lender and Non-Sinosure Administrative Agent and Non-Sinosure Lender and Planner Trustee DTVM Ltda., as Security Agent with respect to the Security Documents;

c)      an amendment agreement dated September 25, 2013 corresponding to each Credit Agreement has been entered into by and among the Lender, the Borrower and the Guarantors (the "**Amendment Agreements No. 1**" and each an "**Amendment Agreement No. 1**"), which amended certain terms and conditions of the Credit Agreements;

d)      the waiver letters to the Credit Agreements dated June 27, 2014 have been issued by the Lender on behalf of the Parent, the Borrower and the entities named therein as Guarantors, and duly accepted by the Borrower and the Parent (the "**Waiver Letters**"), through which the Lender, *inter alia*, cancelled the undisbursed credit under the Credit Agreements until such date, in the amount of USD 133,062,715.93, upon the undertaking and compliance by the Borrower of certain conditions precedent and subsequent thereto;

e)      the summary of amendment conditions dated August 31, 2014 has been issued by the Lender and duly accepted by Comunicaciones Nextel de México, S.A. de C.V., the Borrower and the Parent (the "**Amendment Conditions**"), through which certain terms and conditions applicable to the amendment of the Credit Agreements were set forth; and

f)      an amendment agreement dated [•] corresponding to each Credit Agreement has been entered into by and among the Lender, the Borrower and the Guarantors (the "**Amendment Agreements No. 2**" and each an "**Amendment Agreement No. 2**"), which set forth, *inter alia*, the creation of additional security liens by means of the execution of Additional Security Documents (as defined therein), including a security lien over certain revenue collection bank accounts held by the Borrower in the Account Bank.

NOW, THEREFORE, the Parties have agreed to enter into and execute this Agreement, which is governed by the following clauses:

**Section One – Definitions and Interpretation**

**1.1.**    Unless expressly defined herein, capitalized terms in this Agreement will have the meaning attributed to them in the Credit Agreements, as the case may be.

**1.2.**    The rules of interpretation established in each Credit Agreement apply *mutatis mutandis* to this Agreement; provided, however, that the terms herein shall be governed and construed in accordance to the Brazilian laws, as set forth by Section 10 below, and that the rules of interpretation are in accordance with such laws.

**1.3.**    "Execution Date" means the date on which this Agreement is executed.

**1.4.**    Any and all references to Business Days comprised herein shall be a reference to any day except Saturday, Sunday and any day which shall be in New York City, Beijing or city of São Paulo, State of São Paulo, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in any such city.

**1.5.**    Any reference in this Agreement to any agreement (including exhibits), document or statute means a reference to such agreement (including exhibits), document or statute that is in force as amended, restated, waived, modified and/or supplemented, from time to time.

**1.6.**    The meaning of each word or expression in this Agreement shall be the same irrespective of the words in question being used in the masculine or feminine form, or as singular or plural.

**1.7.**    The Exhibits, including the powers of attorney granted hereunder by the Assignor, form part of this Agreement for all legal and contractual purposes and effects.

**1.8.**    All references to Parties include their successors and permitted assignees and transferees.

**1.9.**    Any and all references to the Security Agent comprised herein shall be interpreted as a reference to the Security Agent, acting exclusively as attorney-in-fact of the Assignee and for the benefit of the Assignee, and as expressly set forth herein, as attorney-in-fact of the Assignor, in accordance with the instructions provided by the Assignee, under the terms of each Credit Agreement, as set forth therein.

**Section Two – Secured Obligations**

**2.1.**    As set forth under the Amendment Agreements No. 2, the Assignor irrevocably and unconditionally creates a security interest, for the benefit of the

Assignee, under the terms set forth in this Agreement, and exclusively for purposes of Section 1362 of Law 10406 of January 10, 2002 (the "**Brazilian Civil Code**"), of Section 66-B of Law 4728 of July 14, 1965 and of Decree Law 911 of October 1, 1969, to secure the timely and full payment and performance of (i) all payment obligations arising out of each Credit Agreement and each Financing Document, including but not limited to the payment in full of principal, interest, charges, default interest, indemnities, fees, commissions, liabilities and all other amounts due by the Assignor to the Assignee, which are described, without limitation, in Exhibit I, as they may be extended, modified and/or amended from time to time, and (ii) all present and future costs and expenses arising out of or in connection with each Credit Agreement and each Financing Document, including but not limited to attorneys' fees and court costs incurred by the Assignee or the Security Agent to enforce the security created hereby and/or resulting from the breach of any obligations undertaken by Assignor hereunder (the "**Secured Obligations**").

2.2.    This Agreement shall create a continuing security and no change or amendment whatsoever in any Financing Document shall affect the validity of either this Agreement or the obligations which are imposed on the Assignor pursuant to it. The Security Interest (as defined below) shall cover all the Secured Obligations, to which the Assignor hereby explicitly consents.

**Section Three – Security Interest**

3.1.    In order to secure the full payment and the compliance of all Secured Obligations, the Assignor hereby, irrevocably and irreversibly, assigns to the Assignee, in sole and absolute fiduciary assignment, the property (*propriedade resolúvel*) and the indirect possession of all Assignor's rights directly related to the Account Banks to which the Assignor is an owner as indicated, for the purposes and effects of item IV of Section 1362 of the Brazilian Civil Code, in Exhibit II hereto (as such may be re-numbered or re-designated from time to time), including, but not limited to, any and all amounts deposited or invested therein and any and all credits arising out therefrom against the Account Bank (the "**Assigned Collection Accounts and Rights**"), which will be subject to the *in rem* guarantee instituted herein and governed by the terms and conditions stipulated in this Agreement (the "**Security Interest**").

3.1.1.    For the purposes of Section 290 of the Brazilian Civil Code, the Account Bank hereby expressly acknowledges and agrees with the creation of the Security Interest over the Assigned Collection Accounts and Rights and undertakes to comply with all obligations set forth herein, particularly those of Section 7.1 below.

3.2.    With respect to the Assigned Collection Accounts and Rights, the Assignor hereby undertakes to:

**3.2.1.** within 15 (fifteen) days after each fiscal quarter of the Borrower occurring after the date hereof, deliver to the Administrative Agent and to the Security Agent a statement from the relevant Account Bank setting out the details of the aggregate cash inflow of all Assigned Collection Accounts and Rights, together with an Officer's Certificate of the Borrower (i) calculating the aggregate amount of revenue flow of all Assigned Collection Accounts and Rights represented by such account statements and (ii) certifying that the Account Bank statements are true and complete and represent the calculations (in reasonable detail) of the aggregate cash inflow of all Assigned Collection Accounts and Rights, in each case, in respect of the three-month period ending on the last day of such fiscal quarter; and

**3.2.2.** within 45 (forty five) days after each fiscal quarter of the Borrower occurring after the date hereof, deliver to the Assignee and to the Security Agent the electronic documentation in portable document format – pdf, supporting all calculations delivered pursuant Section 3.2.1 above; and

**3.2.3.** if the certification delivered pursuant to Section 3.2.1 above provides that the aggregate cash inflow of all Assigned Collection Accounts and Rights is less than the Required Revenue Collection Inflow, promptly, and in any case within 40 (forty) days of the delivery of such certification referred to in Section 3.2.1., procure that additional revenue collection bank accounts (other than the Excluded Revenue Collection Accounts) not already subject to the Security Interest  and any and all credits arising out therefrom against the corresponding bank (the "**Additional Assigned Collection Accounts and Rights**") are fiduciarily assigned in favor of the Assignee (the "**Additional Security Interest**"), provided that if all existing revenue collection bank accounts of the Borrower (other than the Excluded Revenue Collection Accounts) are already subject to a Security Interest created hereby, the Borrower shall not be required to fiduciarily assign additional revenue collection bank accounts pursuant to this Section 3.2.3. For purposes of the above, (A) if the Additional Assigned Collection Accounts and Rights are open with the Account Bank, the Borrower shall execute amendments to this Agreement, substantially in the form of Exhibit III hereto, and/or (B)  if the Additional Assigned Collection Accounts and Rights are opened with a bank other than the Account Bank, execute a collateral accounts agreement with such bank covering such Additional Assigned Collection Accounts and Rights substantially in the form of this Agreement.

## Section Four – Formalities

**4.1.** The Assignor shall, at its own cost and expense, obtain and make/perform all formalities, registrations, authorizations and filings over public entities specifically

required under this Agreement, the Brazilian Civil Code and Applicable Law for the purpose of (i) constituting and perfecting the Security Interest, (ii) amending this Agreement and (iii) allowing the Assignee and the Security Agent to fully perform all the rights they have been granted herein.

**4.2.**    Without prejudice to other formalities required under Applicable Law, the Assignor shall register this Agreement promptly after the Execution Date but no later than February 28, 2015 and any of its amendments promptly after their execution with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) located in the city in which the Assignor's head office is located (which is, on the Execution Date, the city of São Paulo, State of São Paulo), pursuant to Section 1361, First Paragraph of the Brazilian Civil Code. The Assignor shall deliver to each the Assignee and the Security Agent original copies of this Agreement and any of its amendments duly registered within 5 (five) Business Days of the relevant registration.

**4.2.1**  In case Assignee executes this Agreement or any amendment outside Brazil, the registration stated forth in Section 4.2 above shall be made promptly after the delivery by Assignee, of the original copies of this Agreement or relevant amendment with the Assignee's signatures duly notarized in its place of execution and legalized with the competent Brazilian consulate.

**Section Five – Representations, Warranties, Undertakings and Covenants**

**5.1.**    The Assignor expressly and unconditionally represents and warrants to the Assignee, on the Execution Date, the following:

(a)    it is duly incorporated, validly existing and in good standing under the laws of Brazil and duly authorized and qualified to do business in the jurisdictions as they are currently being carried out;

(b)    the execution, delivery and performance by the Assignor of this Agreement, and the transactions contemplated by this Agreement: (i) have been duly authorized by all necessary corporate action; (ii) will not breach, contravene, violate, conflict with or constitute a default under (A) any of its Charter Documents, (B) any applicable Law or (C) any contract, loan, agreement, indenture, mortgage, lease or other instrument to which it is a party or by which it or any of its Properties may be bound or affected, including all Governmental Approvals, except in the case of clauses (B) and (C) above, to the extent that such breach, contravention, violation or other conflict or default could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(c)      this Agreement (i) has been duly executed and delivered by the Assignor and (ii) upon satisfaction of the formalities established in Section 4.2 of this Agreement, the Security Interest under this Agreement constitute a legal, valid, exclusive interest and binding obligation of the Assignor, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by insolvency, moratorium, bankruptcy or similar laws affecting the enforcement of creditors' rights generally;

(d)      the powers of attorney granted pursuant to this Agreement (i) have been duly executed and delivered by the Assignor, (ii) are the legal, valid and binding obligations of the Assignor, enforceable against it in accordance with its terms, and (iii) validly confer the corresponding powers to the Security Agent and the Assignee (as the case may be), and the Assignor has not granted any power of attorney or any other instrument with similar effect to any third party in connection with the Security Interest;

(e)      all authorizations required to make this Agreement admissible in evidence in Brazil have been obtained or effected and are in full force and effect;

(f)      all Assigned Collection Accounts and Rights are legally and beneficially owned by the Assignor;

(g)      there are no options, acquisition rights, encumbrances, liens or any other arrangements for the assignment or acquisition of the Assigned Collection Accounts and Rights;

(h)      there are no other agreements or any other rights or claims of any sort whatsoever regarding the acquisition, repurchase, redemption or assignment, with respect to any of the Assigned Collection Accounts and Rights, and which could adversely affect the lien created under this Agreement or the rights herein granted to the Assignee;

(i)      upon satisfaction of the formalities established in Section 4.2 of this Agreement, the lien arising hereunder will have first ranking priority and is not subject to any prior ranking or *pari passu* ranking Lien;

(j)      the Assignor has full knowledge of the terms and conditions of each Credit Agreement, including, without limitation, of the Events of Default set forth therein that may result in the acceleration of the Secured Obligations in accordance with the terms and conditions set forth therein; and

(k)      there is no action, suit, bankruptcy proceeding, other legal proceeding, arbitral proceeding, inquiry or investigation pending or, to the best of the

Assignor's knowledge, threatened, against it by or before any Governmental Authority or in any arbitral or other forum, nor any order, decree or judgment in effect, pending, or, to the best of the Assignor's knowledge, threatened, that, individually or in the aggregate, could (i) restrain the Assignor in respect of the entry into, the performance of or compliance with any of its obligations under this Agreement, or (ii) jeopardize, restrict or limit the Security Interest.

**5.2.**    For as long as this Agreement is in full force and effect and has not been terminated, the Assignor irrevocably undertakes to comply with the following obligations:

(a)    the Assignor shall not create, incur or permit to be created any other liens or encumbrances in favor of, or at the request of, any person on the Assigned Collection Accounts and Rights or any rights thereon, except for any Security Permitted Liens; and

(b)    the Assignor shall maintain and preserve all liens created hereunder and shall notify the Security Agent, within 5 (five) Business Days, of occurrence of any event, fact or circumstance, including, without limitation, any decision, suit, claim, investigation or change in laws (or in the interpretation thereof) or any threatened event, fact or circumstance, which in either case could adversely affect the validity, legality, perfection and the liens created hereunder.

**5.2.1.**    For the purposes of Section 5.2(a) above, "**Security Permitted Liens**" shall mean Liens created by Brazilian courts in connection with proceedings against the Assignor related to tax or workers' compensation claims; provided, however, that (i) the Assignor is contesting in good faith any such tax or workers' compensation claims by appropriate actions, (ii) adequate reserves as required under Brazilian GAAP shall have been established with respect to any such tax or workers' compensation claim, (iii) enforcement of the contested item shall be effectively stayed within the applicable statutory terms, and (iv) to the extent a final decision is rendered, such final decision of the Brazilian courts in connection with such proceedings related to tax and workers' compensation claims releases the Liens created.

**5.3.**    All information provided by or on behalf of the Assignor under this Agreement shall be true, complete and accurate in all material respects as at the date it is provided and shall not be misleading in any respect.

**5.4.**    The breach and the failure of the Assignor to comply with any representation, warranties and obligations under Sections 5.1 and 5.2 hereunder will constitute an Event of Default pursuant to the terms of Clauses 7.1(c) (*Misrepresentation*) and 7.1(d) (*Breach of Other Obligations*), as applicable, of each Credit Agreement.

**Section Six – Expenses and Indemnification**

**6.1.**    The Assignor agrees to indemnify or to pay in advance or reimburse (where appropriate), without duplication in relation to any other costs or expenses arising under this Agreement or under each Credit Agreement, within 3 (three) Business Days of demand, the Assignee and the Security Agent, as the case may be, for all costs, taxes, fees, charges and expenses of any kind, attorneys' fees, court costs and other expenses directly or indirectly related to, or reasonably incurred by, the Assignee and the Security Agent (or third parties retained by the same) as a result of the preparation, negotiation, execution, registration, formalization (including creation and perfection), implementation, amendment, foreclosure, international remittance of amounts obtained as a consequence of the foreclosure, and termination (whether amicable, judicial or extra-judicial) of this Agreement and of any other documents produced in connection with this Agreement (including any amendments).

**6.2.**    If the Assignor fails to meet any commitment under this Agreement, the Assignee and the Security Agent may, at their sole discretion, decide to comply with that commitment, or arrange for its compliance on the assumption that the Assignor will be liable for all reasonable and documented costs, taxes, fees, charges and expenses of any kind, attorneys' fees, court costs and other direct expenses incurred by the Assignee and the Security Agent (or any third parties retained by the same) for such purposes.

**6.3.**    Except if already indemnified or held harmless by the Assignor pursuant to the provisions of each Credit Agreement with respect to any Losses (as defined below), the Assignor hereby irrevocably undertakes to indemnify and hold harmless the Assignee and the Security Agent as well as their Affiliates, executive officers, directors, employees, agents, representatives, successors and assigns (collectively, the "**Indemnified Parties**" and each, an "**Indemnified Party**") from and against any and all actions, suits, proceedings (including investigations or inquiries), claims, incurred losses, direct damages, liabilities, reasonable and documented costs or expenses that any Indemnified Party may suffer as a result of or arising out of any violation, breach or failure to comply with any obligation undertaken by the Assignor herein (collectively, the "**Losses**"), except if caused by the gross negligence (*culpa*) or willful misconduct (*dolo*) of such Indemnified Party (as determined by a court of competent jurisdiction in a final and non-appealable judgment). This obligation of the Assignor shall remain in full force and effect following the termination of this Agreement and each Credit Agreement and will be considered to be cumulative and without prejudice to any other indemnification obligation assumed by the Assignor under any other instrument executed by the Parties or the Indemnified Party.

**Section Seven – Events of Default and Assignment**

**7.1.**    Prior to the occurrence of an Event of Default, Assignor is permitted to make withdrawals from any Assigned Collection Accounts and Rights without the consent of the Assignee or Security Agent.

**7.2**    Upon the occurrence of a Non-Payment Event of Default, (a) the full property over the Assigned Collection Accounts and Rights will be consolidated into the Assignee, (b) the Assignor will not be able to exercise any rights or powers in relation to the Assigned Collection Accounts and Rights, and (c) the Security Agent and the Assignee will have the right to exercise all rights and powers in relation to the Assigned Collection Accounts and Rights, and to immediately instruct the Account Bank (i) not to follow any instructions by the Assignor, including transfers out of the Assigned Collection Accounts and Rights and termination thereof, (ii) to withhold any amounts and block any withdrawals from the Assigned Collection Accounts and Rights, including by the Assignor, and (iii) to transfer and allocate the balances of the Assigned Collection Accounts and Rights, as a whole or in part, for the sole payment of the Secured Obligations.

**7.3.**    Subject to Section 7.1 above, the Assignor hereby irrevocably grants to the Assignee and to the Security Agent all authorizations, instructions and powers pursuant to Article 684 of the Brazilian Civil Code necessary for performing its rights under Section 7.2. above. To that effect, the Borrower shall, on the date hereof, execute and, no later than 3 (three) Business Days, deliver to the Security Agent the power of attorney in the same form and substance of the power of attorney attached hereto as Exhibit IV.

**7.4.**    The Parties and the Account Bank acknowledge that the Account Bank will not be required to request any additional instructions or authorizations from the Assignor to complete any transfer of amounts or funds from the Assigned Collection Accounts and Rights, as well as withdrawals, disbursements, remittances, investments, redemptions, settlements and liquidation of funds, performed in accordance with Sections 7.1, 7.2 and 7.3 of this Agreement.

**7.5.**    Except for that provided under Section 7.1 above, without the prior written consent by the Security Agent or the Assignee, the Assignor shall not close or otherwise dispose of any of the Assigned Collection Accounts and Rights or Additional Assigned Collection Accounts and Rights which are considered as an Additional Security Interest.

**Section Eight – Termination**

**8.1.**    This Agreement shall be terminated, as well as all the rights and obligations hereunder, including for such purpose the property (*propriedade resolúvel*) of the

Assigned Collection Accounts and Rights on the Termination Date. For the purposes of this Agreement, "**Termination Date**" shall mean the date on which the Loan Commitments under each Credit Agreement have been terminated, no Note under either Credit Agreement is outstanding, all Loans thereunder have been paid in full in cash, and all Secured Obligations have been fully and indefeasibly paid to the full satisfaction of the Lender.

**8.2.**    Upon the occurrence of the event referred to in Section 8.1 above, the Assignee and/or the Security Agent, at the written request of the Assignor, shall release the Security Interest by, as soon as reasonably practicable, executing a written release letter (or any similar document required by Applicable Law) and delivering it to the Assignor, which shall also authorize that any additional amount deposited in the Assigned Collection Account and Rights shall be released to the Assignor, and the Assignor shall advance or reimburse, as applicable, the Assignee and the Security Agent for all reasonable and documented costs and expenses incurred by the same for the cancellation of the Security Interest and the termination of this Agreement.

**Section Nine – Notices**

**9.1.**    All notices, requests, demands and communications to be made in connection with this Agreement must be made in accordance with the provisions of each Credit Agreement.

**9.2.**    The notices, requests, demands and communications under this Agreement shall be made to the following addresses or any substitute address, facsimile number or officer as the Party may notify to the other Parties by not less than 5 (five) Business Days' prior notice:

(a)    in the case of the Assignor:

| | |
|---|---|
| Address: | Avenida das Nações Unidas, 14171 |
| | Rochaverá/Torre Crystal – 32° andar |
| | São Paulo/SP - Brazil– CEP 04794-000 |
| Att. | Treasury Department |
| Fax: | (+55 11) 2145 2040 |

With a copy to:
**NII Holdings, Inc.**
1875 Explorer Street
Reston, VA, 20190
Att: Chief Commercial Counsel
Facsimile: (+1 703) 390 7170

(b)    in the case of the Assignee:

Address:        14th Floor, CITIC Tower, No. 1093
Shennan Zhong Road, Shenzhen 518031, China
Att.              Che Nan
Fax:             +86 (755) 2598 7725

(c)      in the case of the Account Bank:

[•]³

(d)      in the case of the Security Agent:

Address:        Avenida Brigadeiro Faria Lima nº 3.900, 10º andar
CEP 04538-133, São Paulo – SP
Att.:            Viviane Rodrigues and Tatiana Lima
Fax:             (11) 3078-7264
E-mail:          vrodrigues@planner.com.br
                 tlima@planner.com.br

**Section Ten – Applicable Law and Choice of Jurisdiction**

**10.1.**    This Agreement shall be governed by, and construed in accordance with, the laws of Federative Republic of Brazil ("**Applicable Law**") and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of Law 5869 of January 11, 1973 (the "**Brazilian Code of Civil Procedure**").

**10.2.**    The Assignor hereby acknowledges and agrees that any assumed obligation under this Agreement or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

**10.3.**    The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Agreement.

**10.4.**    No provision in this Agreement may affect the right of the Assignee to carry out any means of service of process permitted under Applicable Law on the Assignor.

---

³ To be confirmed by the Account Bank.

**Section Eleven – Successor Security Agent**

**11.1.**   The Assignor hereby acknowledges that the Security Agent may resign or be removed and be succeeded pursuant to the terms and conditions of the Collateral Agency Agreement, in which case the Assignor undertakes to carry out any and all acts, and to sign any and all necessary documents and instruments for the successor Security Agent appointed under the Collateral Agency Agreement to become vested with all the rights, powers, privileges and duties of such resigning or removed Security Agent.

**Section Twelve – Miscellaneous**

**12.1.**   No term or condition under this Agreement may be subject to amendment, supplement or modification unless such amendment, supplement or modification is made in writing and signed by the authorized representatives or any attorney-in-fact (holding sufficient powers) of the Parties. The express written waiver of a particular right will not be considered a waiver of any other right.

**12.2.**   No provision under this Agreement, including the choice of jurisdiction indicated in Section 10.3, constitutes a waiver of any immunities, exemptions or privileges granted to the Assignee under its organizational documents, this Agreement, each Credit Agreement or Applicable Law.

**12.3.**   Any failure or delay to exercise any right, power or privilege hereunder shall not be construed as a waiver or novation of any right, power or privilege under this Agreement or any other instrument.

**12.4.**   The partial exercise of any right will not prohibit any future exercise of that right or any other.

**12.5.**   If any clause of this Agreement is held illegal, invalid or unenforceable by any authority in any jurisdiction, that clause shall be eliminated from the Agreement without affecting the legality, validity or enforceability of all surviving clauses and the Parties will negotiate and agree to include a similar provision that reflects the original intent of the Parties, to the extent permitted by the decision of the corresponding authority.

**12.6.**   The Security Interest established under this Agreement shall be in addition to, and without prejudice to, any other guarantees or security granted by the Assignor or any other party as a guarantee of the obligations under each Credit Agreement, and may be enforced individually, alternatively or jointly with any other guarantee or security, as applicable, at the Assignee's sole discretion, if an Event of Default has occurred and is continuing under each Credit Agreement. The foreclosure of the Security Interest by the Assignee shall not prevent the Assignee from foreclosing or

ASIA 20424090

executing any other guarantees or security granted to ensure the performance of the Secured Obligations.

**12.7.**   This Agreement is not a novation and does not modify any obligations of the Assignor to the Assignee, under any contracts entered into between them including, among others, each Credit Agreement.

**12.8.**   The exercise by the Assignee of any of its rights or remedies under this Agreement shall not relieve the Assignor of any of their respective duties or obligations under each Credit Agreement or related documents and instruments.

**12.9.**   This Agreement creates a permanent security interest over the Assigned Collection Accounts and Rights and shall:

(a)   bind the Assignor and the Security Agent, their successors, permitted assigns and permitted transferees; and

(b)   be made in favor the Assignee and its successors, assigns and transferees.

**12.10.**   Without prejudice to the terms established in Section 12.9 (b) above and subject to all conditions established on each Credit Agreement, the Assignee may, by giving no less than 10 (ten) Business Days prior written notice to the Assignor and the Security Agent (which notice will attach the relevant Assignment and Acceptance executed pursuant to the relevant Credit Agreement), assign or transfer its rights and obligations, in whole or in part, under this Agreement to any third party to whom the Assignee has assigned or transferred, in whole or in part, its rights and obligations under each Credit Agreement ("**Additional Assignee**"), the beneficiary of which will then be vested with all the corresponding benefits provided to and obligations undertaken by the Assignee under this Agreement and Applicable Law.

**12.10.1.**   For the purpose of the assignment or transfer of the Assignee's rights and obligations, in whole or in part, under this Agreement:

(a)   the Assignor and the Security Agent shall, within 10 (ten) Business Days of the reception of the notice referred to in Section 12.10 above, execute and deliver to the Assignee a duly completed amendment to this Agreement in the form of Exhibit V, according to which the Additional Assignee accedes and becomes a party to this Agreement as Assignee for all purposes and effects of this Agreement and in Applicable Law, being any reference in this Agreement to the Assignee considered as a reference to any Additional Assignee;

(b)      the Assignor shall comply with the formalities established in Section 4 above, as applicable.

**12.10.2.**      The Assignee and any Additional Assignee may not assign or transfer any of their rights or obligations established hereunder without the respective assignment or transference of their related rights and obligations under the relevant Credit Agreement.

**12.11.** The Assignor, the Account Bank and the Security Agent may not assign or transfer any of their rights or obligations established hereunder without the prior written consent of the Assignee.

**12.12.** As required by Applicable Law, the Assignor, on the Execution Date, shall provide the Assignee and the Security Agent with the following (most recent and valid) certificate issued by the Brazilian Federal Revenue Service in connection with social security contributions to the Brazilian Social Security Institute (*Certidão Positiva com Efeitos de Negativa de Débitos relativos às Contribuições Previdenciárias e às de Terceiros*), No. 190562014-88888229, issued on July 25, 2014 and valid until January 21, 2015 (Exhibit VI).

**12.13.** To the extent permitted by Applicable Law, if any of the payments relating to the Secured Obligations is declared null, as a result of insolvency, bankruptcy, intervention or judicial or extrajudicial recovery proceeding, the Borrower assumes the obligation to reinstate the Security Interest set forth herein, in the understanding that it has been effective at all times since the moment of its constitution without intermittence or interruption, as if no release had taken place at any moment. The Borrower, upon request from the Lender or the Security Agent, shall, within a period of 2 (two) business days execute or grant any public or private document and proceed with any communication that the Lender or the Security Agent deems necessary, useful or convenient for such reinstatement. Without prejudice to the aforementioned obligation, the Borrower hereby appoints and constitutes, irrevocably and unconditionally, the Lender and the Security Agent as their attorneys-in-fact so that they may, on behalf and as a representative of the Borrower, grant for these purposes any public or private documents as well as proceed with any communication, including in the case auto contracting, for the purposes of Article 117 of the Brazilian Civil Code. Such power of attorney is a condition in this Agreement to fulfill the purposes of Article 684 of the Brazilian Civil Code and, as a consequence, is irrevocable.

IN WITNESS WHEREOF, the Parties execute this Agreement in 5 (five) originals, equal in form and substance, in the presence of the undersigned witnesses.

São Paulo, [date], 2014

*(Remainder of the page intentionally left blank)*

ASIA 20424090

Signature page 1 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**PLANNER TRUSTEE DTVM LTDA. on behalf of CHINA DEVELOPMENT BANK CORPORATION as Assignee**

_____          _____

**Name:**                                                            **Name**

**Position:**                                                      **Position:**

*(Remainder of the page intentionally left blank)*

Signature page 2 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**NEXTEL TELECOMUNICAÇÕES LTDA. as Assignor**


_____          _____
**Name:**                                **Name**
**Position:**                            **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 3 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**[ACCOUNT BANK] as Account Bank**


_____          _____
**Name:**                                **Name**
**Position:**                            **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 4 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**PLANNER TRUSTEE DTVM LTDA. as Security Agent**


_____          _____
**Name:**                                  **Name**
**Position:**                              **Position:**


*(Remainder of the page intentionally left blank)*

Signature page 5 of 5 of the Collateral Accounts Agreement, dated [DATE], 2014, between China Development Bank Corporation, Nextel Telecomunicações Ltda., [Account Bank] and Planner Trustee DTVM Ltda.

**WITNESSES**

1. _____    2. _____
**Name:**                                 **Name**
**ID:**                                    **ID:**

*(Remainder of the page intentionally left blank)*

# COLLATERAL ACCOUNTS AGREEMENT

## Exhibit I

### Secured Obligations
### 1. CDB Sinosure Credit Agreement

1.1.Principal. US$ 250,000,000.00 (for reference and registration purposes, equivalent to R$ [●] ([●]) in accordance with PTAX 800, option 5 issued by the Central Bank on [DATE]).

1.2.Interest. LIBOR + 1.8% per annum.

1.3.Installments and principal repayment dates. Unless a Principal Payment Date does not fall in a Business Day, the CDB Sinosure Principal Repayment Schedule shall be as follows:

| CDB Sinosure Principal Repayment Schedule | | |
|---|---|---|
| Repayment Dates | Amounts Due (in US$) | Percentage |
| Closing Date | 42,500,000 | 17.00% |
| 15/8/2015 | 700,000.00 | 0.28% |
| 15/2/2016 | 700,000.00 | 0.28% |
| 15/8/2016 | 700,000.00 | 0.28% |
| 15/2/2017 | 700,000.00 | 0.28% |
| 15/8/2017 | 20,475,000.00 | 8.19% |
| 15/2/2018 | 20,475,000.00 | 8.19% |
| 15/8/2018 | 20,475,000.00 | 8.19% |
| 15/2/2019 | 20,475,000.00 | 8.19% |
| 15/8/2019 | 20,475,000.00 | 8.19% |
| 15/2/2020 | 20,475,000.00 | 8.19% |
| 15/8/2020 | 20,475,000.00 | 8.19% |
| 15/2/2021 | 20,475,000.00 | 8.19% |
| 15/8/2021 | 20,475,000.00 | 8.19% |
| 27/12/2021 | 20,425,000.00 | 8.17% |
| Total (in US$) | 250,000,000.00 | 100.00% |

1.4.Interest payment dates. (i) before the First Repayment Date, the last Business Day of an Interest Period, e (ii) subsequently, the First Repayment Date and each subsequent Repayment Date.

1.5.Default interest. 2% *per annum* above LIBOR + 1.8% *per annum* which would accrue to a Loan.

1.6.Amendment Fee: USD12,500

## 2.  CDB Non-Sinosure Credit Agreement

2.1.Principal. US$ 116,937,338.07 (for reference and registration purposes, equivalent to R$ [●] ([●]) in accordance with PTAX 800, option 5 issued by the Central Bank on [DATE]).

2.2.Interest. LIBOR + 2.9% *per annum*.

2.3.Installments and principal repayment dates. Unless a Principal Payment Date does not fall in a Business Day, the CDB Non-Sinosure Principal Repayment Schedule shall be as follows:

| CDB Non-Sinosure Principal Repayment Schedule | | |
|---|---|---|
| Repayment Dates | Amounts Due (in US$) | Percentage |
| Closing Date | 19,879,338.29 | 17.00% |
| 15/8/2015 | 327,424.40 | 0.28% |
| 15/2/2016 | 327,424.40 | 0.28% |
| 15/8/2016 | 327,424.40 | 0.28% |
| 15/2/2017 | 327,424.40 | 0.28% |
| 15/8/2017 | 9,577,163.57 | 8.19% |
| 15/2/2018 | 9,577,163.57 | 8.19% |
| 15/8/2018 | 9,577,163.57 | 8.19% |
| 15/2/2019 | 9,577,163.57 | 8.19% |
| 15/8/2019 | 9,577,163.57 | 8.19% |
| 15/2/2020 | 9,577,163.57 | 8.19% |
| 15/8/2020 | 9,577,163.57 | 8.19% |
| 15/2/2021 | 9,577,163.57 | 8.19% |
| 15/8/2021 | 9,577,163.57 | 8.19% |
| 27/12/2021 | 9,553,163.57 | 8.17% |
| Total (in US$) | 116,937,284.07 | 100.00% |

2.4.Interest Payment Dates. (i) before the First Repayment Date, the last Business Day of an Interest Period, and (ii) subsequently, the First Repayment Date and each subsequent Repayment Date.

2.5.Default interest. 2% *per annum* above LIBOR + 2.9% *per annum* which would accrue to a Loan.

2.6.Amendment Fee: USD12,500

## 3.  Other Fees, costs and expenses

Assignor undertakes to incur, on behalf and for the benefit of the Assignee, any additional costs and expenses related to or deriving from the Financing Documents, including but not limited to:

3.1.Commitment Fee. 0.20% *per annum* calculated on the daily balance of the

amount of the Available Loan Commitments from time to time during the Availability Period.

3.2.<u>Costs and Expenses</u>. (i) all reasonable and documented costs and expenses incurred by any Financing Party (including Attorney Costs) in connection with the preparation, issuance, delivery, filing, recording and administration of the Financing Documents and any other documents which may be delivered in connection herewith or therewith, (ii) any and all amounts which any Financing Party has paid relative to curing any Event of Default resulting from the acts or omissions of the Borrower under this Agreement or any other Financing Document, (iii) the enforcement or preservation of any rights or remedies under this Agreement or any other Financing Document, and (iv) any reasonable and documented costs and expenses related to any amendment, waiver or consent with respect to any provision contained in this Agreement or any other Financing Document.

3.3.<u>Security Agent Costs</u>. US$ [•].

The above information is included solely for the purposes of Section 1362 of the Brazilian Civil Code and in no way limits either the Assignor's obligations under each Credit Agreement or the Assignee's rights under the same.

*(Remainder of the page intentionally left blank)*

**COLLATERAL ACCOUNTS AGREEMENT**

<u>**E�xʜɪʙɪᴛ II**</u>

Aꜱꜱɪɢɴᴇᴅ Cᴏʟʟᴇᴄᴛɪᴏɴ Aᴄᴄᴏᴜɴᴛꜱ ᴀɴᴅ Rɪɢʜᴛꜱ

| Bank | Agency | Current Account No. |
|------|--------|---------------------|
| [●] | [●] | [●] |

*(Remainder of the page intentionally left blank)*

# COLLATERAL ACCOUNTS AGREEMENT

## Exhibit III

### Amendment Form for the inclusion of Additional Assigned Collection Accounts

This Amendment to the Collateral Accounts Agreement ("**Amendment**") is entered into by and between:

**I.    CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**CDB**", "**Lender**" or "**Assignee**");

**II.    NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Borrower**" or "**Assignor**");

**III.    [•]**, a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives] ("**Account Bank**"); and

**IV.    PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**").

**WHEREAS**:

a)    The Assignor, the Assignee, the Account Bank and the Security Agent entered into the Collateral Accounts Agreement (the "**Agreement**"), dated [●], to secure the Secured Obligations, which was duly registered with the Registry of Titles and Deeds (*Cartório de Registro de Títulos e Documentos*) as follows:

| Registry | City | Registry No. |
|----------|------|--------------|
| [●] | [●] | [●] |

b) on this date, pursuant to Section 3.2.3 (A) of the Agreement, the Assignor shall fiduciarily assign the revenue collection bank accounts identified below in addition to the Assigned Collection Accounts.

The Parties agree to enter into and execute this Amendment, which is governed by the following terms and conditions:

1. Unless expressly defined herein, capitalized terms in this Amendment will have the meaning attributed to them in the Agreement.

2. The rules of interpretation established in the Agreement apply *mutatis mutandis* to this Amendment.

3. The Assignor hereby irrevocably fiduciarily assigns, for the benefit of the Assignee, under the terms set forth in the Agreement and this Amendment, the property (*propriedade resolúvel*) and the indirect possession of the revenue collection bank accounts identified below for the purposes and effects of item IV of Section 1362 of the Brazilian Civil Code:

| Bank | Agency | Current Account No. |
|------|--------|---------------------|
| [●] | [●] | [●] |

4. The Parties amend and restate Exhibit II to the Agreement which, as of this date, will enter into force with the form and content of Exhibit A hereto, thereby forming part of the Agreement (as amended hereby) for all legal and contractual purposes.

5. The Assignor expressly and unconditionally repeats the representations and warranties granted under Section 5.1 of the Agreement, as if such representations and warranties were fully transcribed herein and made, *mutatis mutandis,* as of the execution date of this Amendment, other than those expressly made as of a specific date, and only in respect to this Amendment and the Additional Assigned Collection Accounts and Rights described in Section 3 herein.

**6.**  The Assignor hereby grants the Security Agent and the Assignee powers of attorney in substantially the same terms as those in the form attached as <u>Exhibit IV</u> to the Agreement.

**7.**  The Assignor shall comply with the applicable formalities established in Section Four of the Agreement.

**8.**  Except as expressly amended under the terms hereof, all provisions, terms and conditions of the Agreement remain in full force and effect and expressly ratified by all the signatories to this Amendment.

**9.**  This Amendment shall be governed by, and construed in accordance with, the Laws of the Federative Republic of Brazil and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of the Brazilian Code of Civil Procedure.

**10.** The Assignor hereby acknowledges and agrees that any assumed obligation under this Amendment or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

**11.** The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Amendment.

This Amendment is signed in [4 (four)] counterparts in the presence of the two undersigned witnesses.

[DATE]

**NEXTEL TELECOMUNICAÇÕES LTDA., as Assignor**

_____          _____
[Name]                                                      [Name]
[Information of representative]                    [Information of representative]

**CHINA DEVELOPMENT BANK CORPORATION, as Assignee**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**PLANNER TRUSTEE DTVM LTDA., as Security Agent**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**[•], as Account Bank**

| | |
|---|---|
| [Name] | [Name] |
| [Information of representative] | [Information of representative] |

**WITNESSES:**

| | |
|---|---|
| [Name] | [Name] |
| [ID] | [ID] |

*(Remainder of the page intentionally left blank)*

EXHIBIT A TO AMENDMENT No. [•], DATED [_____]

| Bank | Agency | Current Account No. |
|------|--------|---------------------|
| [●] | [●] | [●] |

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### <u>EXHIBIT IV</u>

### [POWER OF ATTORNEY][1]

By this power-of-attorney,

**NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**Grantor**");

appoints and constitutes hereby as its attorneys-in-fact,

**CHINA DEVELOPMENT BANK CORPORATION**, company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives ("**Grantee**"); and

**PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association] by its undersigned legal representatives ("**Security Agent**"),

to which it grants powers to, (A) individually, acting on behalf of the Grantor, pursuant to the terms and conditions of the Collateral Accounts Agreement dated [●], as amended from time to time, executed by the Grantor as Assignee, the Grantee as Assignor and the Security Agent and the Account Bank in such capacities (and which, as amended, modified or supplemented and is, from time to time, in force, is hereinafter referred to as "**Collateral Accounts Agreement**") and each Credit Agreement, including for the purposes of Article 117 of the Brazilian Civil Code (auto contracting), in relation to [●] (the "**Bank Account**")][2] and (B) further provided that the powers granted herein shall be exercised in accordance with applicable Law

---

[1] Account Bank to confirm if the powers are sufficient and whether or not the collection bank accounts should be identified herein.

[2] This POA should be granted in connection to a specific bank account and not to any bank accounts held with the Account Bank.

and where exercised in violation of applicable Law, such exercise shall not be deemed to have been made on behalf of the Grantor:

1)      block any withdrawals by the Grantor from the Bank Account, unless such withdrawals are made with the Grantee consent;

2)      collect, receive, withhold any and all current and future funds deposited in the Bank Account, including any and all rights and credits of the Grantor resulting from the Bank Account, as amended from time to time, and investments made with amounts deposited therein and gains and earnings arising therefrom (collectively, the "**Bank Account Funds and Rights**");

3)      endorse checks and credit certificates, purchase foreign currency and remit the Bank Account Funds and Rights abroad up to the amount required to pay for then due and payable Secured Obligations, as well as enter into foreign exchange agreements or other documents necessary, useful or convenient to proceed with such remittances, with powers to represent the Grantor, for such purposes, before the Brazilian Central Bank (*Banco Central do Brasil*) and any bank or financial institution in Brazil, including any of their subdivisions or departments;

4)      subject to the prior consent of the Grantor (which consent shall not be unreasonably withheld or delayed or conditioned, however, it will not be considered unreasonable for the Grantor to withhold consent if any such delegation could have the effect of increasing the Grantor's or any Guarantor's costs under the Financing Documents, due to new or increased Taxes, or otherwise), delegate all or part of the powers granted herein, with or without reservation, to any assignees of the Assignee and the Security Agent or to third parties as may be necessary for the enforcement of the Security, subject to the terms and conditions of the Financing Documents, as well as revoke such delegations, provided that no consent of the Grantor shall be required for any delegation or revocation by the Assignee after the occurrence of the Amendment No. 2 Closing Date (as defined under the Amendment Agreement No. 2);

5)      request any and all previous approvals, authorizations or consents that might be necessary, useful or convenient for the performance of any and all acts mentioned herein, at court or otherwise, before third parties and any and all federal, state or municipal authorities or agencies, in all of its respective divisions and departments, including, amongst others, Registries of Deeds and Documents (*Registros de Títulos e Documentos*), Protest Registries (*Cartórios de Protesto*), banking institutions, Brazilian Central Bank (*Banco Central do Brasil*), Brazilian Federal Revenue Department (*Secretaria da Receita Federal*) and any other agencies and federal, state or municipal agencies or authorities, and all of their respective divisions and departments, or any other third parties;

6)      in the event any payments relating to the Secured Obligations is declared null, in whole or in part, such as, for example, in the context of an insolvency, bankruptcy, intervention or judicial or extrajudicial recovery proceeding to carry out any and all acts, and to sign any and all documents, that are in its sole opinion necessary, useful or convenient for the purposes of reinstating the Security Interest set forth under the Agreement ("**Reinstatement**"); and

7)      take all actions and executed any documents necessary, advisable or convenient to the full enforcement of this power-of-attorney.

Until the Termination Date, the Grantee and the Security Agent are hereby appointed as Grantor's attorneys-in-fact, on an irrevocable and irreversible basis, in compliance with the terms in Section 684 of the Brazilian Civil Code.

Capitalized terms used herein, but not defined herein, will have the same meanings attributed to them in the Collateral Accounts Agreement. The exercise of the powers granted to the Grantee and the Security Agent pursuant to the terms of this instrument constitute a right of the Grantee and the Security Agent, and not an obligation to exercise.

This power-of-attorney is governed by and construed in accordance with the laws of the Federative Republic of Brazil and the Parties herein irrevocably and indefeasibly undertake to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this instrument, waiving any rights they might have to any preferential venue.

The present power-of-attorney is granted on [DATE], in the City of São Paulo, State of São Paulo, Brazil.

(Signatures of the Grantors)

**NOTES:**      1) The signatures need to be notarized by a Notary Public Office and, if issued abroad, notarized and consularized.
2) This power-of-attorney shall be registered with the registry of deeds and documents (*registro de títulos e documentos*).

*(Remainder of the page intentionally left blank)*

## COLLATERAL ACCOUNTS AGREEMENT

### EXHIBIT V

#### AMENDMENT FORM FOR THE INCLUSION OF ADDITIONAL ASSIGNEES

This amendment to the Collateral Accounts Agreement ("**Amendment**") is entered into by and between:

I.    **CHINA DEVELOPMENT BANK CORPORATION**, a company duly incorporated in accordance with the laws of People's Republic of China, with headquarters at 29 Fuchengmenwai Street, Xicheng District, in the city of Beijing, herein duly represented pursuant to its bylaws by its undersigned legal representatives (the "**Original Assignee**");

II.    **NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Av. das Nações Unidas, 14.171, 32o. floor, Rochavera Crystal Tower, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 66.970.229/0001-67, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Assignor**");

III.    [•], a [financial institution duly organized and validly existing in accordance with the laws of Brazil, with headquarters at [•], enrolled with the corporate taxpayers' registry under the CNPJ/MF No. [•], herein duly represented pursuant to its bylaws by its undersigned legal representatives] ("**Account Bank**"); and

IV.    **PLANNER TRUSTEE DTVM LTDA.**, a limited liability company (*sociedade limitada*) organized and existing under the laws of Brazil, with headquarters at Avenida Brigadeiro Faria Lima, 3900, 10th floor, in the city of São Paulo, State of São Paulo, enrolled with the corporate taxpayers' registry under the CNPJ/MF No. 67.030.395/0001-46, herein duly represented pursuant to its articles of association by its undersigned legal representatives ("**Security Agent**"), and

V.    [*Additional Assignee*], duly represented in this act in accordance with its organizational documents by the undersigned legal representatives (the "**Additional Assignee**").

to be collectively referred to as the "**Parties**", and individually as a "**Party**".

**WHEREAS**:

a) The Original Assignor, the Assignee, the Account Bank and the Security Agent entered into the Collateral Accounts Agreement, dated [●], in order to, *inter alia*, secure the Secured Obligations (as amended from time to time, the "**Agreement**"), which was duly registered with the Registry of Titles and Deeds (*Registro de Títulos e Documentos*) as follows:

| Registry | City | Registry No. |
|----------|------|--------------|
| [●] | [●] | [●] |

b) The Original Assignee intends to [assign/transfer] to the Additional Assignee, and the Additional Assignee intends to [purchase/assume] from the Assignee, [a portion] [all] of the Assignee's rights and obligations under each Credit Agreement and the Agreement;

c) The Additional Assignee shall therefore become a party to the Agreement and, to the extent provided in this Amendment, have the rights and obligations of an Assignee thereunder and under Applicable Law, and the Original Assignee shall, to the extent provided in this Amendment, relinquish [a portion] [all] of its rights and be released from [a portion] [all] of its obligations under the Agreement and Applicable Law, and as further provided below.

For these above purposes, the Parties agree to enter into and execute this Amendment, which is governed by the following terms and conditions:

1. Unless expressly defined herein, capitalized terms in this Amendment will have the meaning attributed to them in the Agreement.

2. The Assignee hereby [assigns / transfers] to the Additional Assignee without recourse and without representation or warranty, and the Additional Assignee hereby [purchases/ assumes] from the Assignee, [all] [a portion] of the Assignee's rights and obligations under each Credit Agreement and the Agreement as of the date hereof.

3. The Additional Assignee (i) confirms that, without breaching any confidentiality obligations, it has received a copy of the Agreement, and such other documents and information as it has deemed appropriate to make its own decision to enter into this Amendment; (ii) appoints and ratifies the Security Agent as security agent under the

14

Agreement; and (iii) agrees to be bound by the terms and conditions of the Agreement as an Assignee thereof.

4. The Parties hereby agree that, as of the date hereof, (i) the Additional Assignee shall be deemed as Assignee under the Agreement and, to the extent provided in this Amendment, have the rights and obligations of an Assignee under the Agreement and Applicable Law, and (ii) the original Assignee shall, to the extent provided in this Amendment, relinquish [all] [a portion] of its rights and obligations and be released from [all] [a portion] of its obligations under the Agreement.

5. The Assignor expressly and unconditionally repeats the representations and warranties granted under Section 5.1 of the Agreement, as if such representations and warranties were fully transcribed herein and made, *mutatis mutandis,* as of the execution date of this Amendment, other than those expressly made as of a specific date, and only in respect to this Amendment.

6. The Assignor hereby grants the Additional Assignee a power of attorney in the form attached as <u>Exhibit IV</u> to the Agreement.

7. The Assignor shall comply with the applicable formalities established in Section Four of the Agreement.

8. The Additional Assignee's administrative details for the purposes of the notices, requests, demands and communications under the Agreement are such address, facsimile number, email or officer as it has notified to the Assignee, as the case may be, in the Assignment and Acceptance attached hereto as <u>Exhibit A.</u>

9. Except as expressly amended under the terms hereof, all provisions, terms and conditions of the Agreement remain in full force and effect and expressly ratified by all Parties to this Amendment.

10. This Amendment is not a novation and does not modify any obligations of the Assignor to the Assignee, under any contracts

entered into between them including, among others, the Agreement and each Credit Agreement.

11. If any term and condition of this Amendment is held illegal, invalid or unenforceable by any authority in any jurisdiction, that term and condition shall be eliminated from the Amendment without affecting the legality, validity or enforceability of all surviving terms and conditions and the Parties will negotiate and agree to include a similar provision that reflects the original intent of the Parties, to the extent permitted by the decision of the corresponding authority.

12. The Assignor hereby acknowledges and agrees that any assumed obligation under this Amendment or related hereto will be subject to specific performance in accordance with Sections 461 and 461-A and related provisions of the Brazilian Code of Civil Procedure, among other applicable regulations.

13. The effective date of this Amendment shall be the date of its signature.

14. This Amendment shall be governed by, and construed in accordance with, the Laws of the Federative Republic of Brazil and constitutes an enforceable extrajudicial security (*título executivo extrajudicial*), in accordance with the terms of Section 585, items II and III, of the Brazilian Code of Civil Procedure.

15. The Assignor, irrevocably and indefeasibly undertakes to be subject to the jurisdiction of the courts of São Paulo in the State of São Paulo, Brazil to resolve all disputes and controversies relating to this Amendment.

This Amendment is signed in [5 (five)] counterparts in the presence of the two undersigned witnesses.

[DATE]

**NEXTEL TELECOMUNICAÇÕES LTDA., as Assignor**

_____          _____
[Name]                                                    [Name]
[Information of representative]                [Information of representative]

_____          _____

**CHINA DEVELOPMENT BANK CORPORATION, as Assignee**

_____          _____
[Name]                                   [Name]
[Information of representative]           [Information of representative]


**[ADDITIONAL ASSIGNEE], as Additional Assignee**

_____          _____
[Name]                                   [Name]
[Information of representative]           [Information of representative]


**PLANNER TRUSTEE DTVM LTDA., as Security Agent**

_____          _____
[Name]                                   [Name]
[Information of representative]           [Information of representative]

**[•], as Account Bank**

_____          _____
[Name]                                   [Name]
[Information of representative]           [Information of representative]

**WITNESSES:**

_____          _____
[Name]                                   [Name]
[ID]                                     [ID]

*(Remainder of the page intentionally left blank)*

17

<u>EXHIBIT A TO AMENDMENT No. [•], DATED [_____]</u>

[•]

*(Remainder of the page intentionally left blank)*

**COLLATERAL ACCOUNTS AGREEMENT**

**E**XHIBIT **VI**

**C**ERTIFICATE ON **D**EBTS **R**ELATED TO **S**OCIAL **S**ECURITY **C**ONTRIBUTIONS AND TO **T**HIRD **P**ARTIES **R**ELATED **I**N THE **N**AME OF THE **A**SSIGNOR (*Certidão Positiva com Efeitos de Negativa de Débitos relativos às Contribuições Previdenciárias e às de Terceiros*)

[•]

*(Remainder of the page intentionally left blank)*

<u>Exhibit C</u>

**Excluded Revenue Collection Accounts**

BANCO DO BRASIL S/A
Branch: 3070
Account: 5567-0
Address: Av. Paulista, 2163 – 2º Andar - São Paulo – SP - CEP 01310-200
Phone: 55 11 2128-7314

CAIXA ECONOMICA FEDERAL
Branch: 3150
Account: 180-4
Address: Av. Elias Alves da Costa, 485 – Centro – Vargem Grande Paulista – SP - 06730-000
Phone: 55 11 2802-7500

<u>Exhibit D</u>

**Other Amendment Terms**

**[Exhibit Omitted]**

**EXHIBIT F-3**

*EXECUTION VERSION*

## AMENDMENT TO THE PARENT GUARANTY

between

### NII HOLDINGS, INC.
as Parent Guarantor

and

### CHINA DEVELOPMENT BANK CORPORATION
as Administrative Agent under the Sinosure Credit Agreement and the Non-Sinosure
Credit Agreement

Dated as of __5__ December 2014

Table of Contents

Page

SECTION 1. DEFINITIONS ................................................................................4

SECTION 2. AMENDMENTS TO THE PARENT GUARANTY ...........................4

SECTION 3. ACKNOWLEDGMENT .................................................................4

SECTION 4. EFFECTIVENESS AND TERMINATION. ........................................4

SECTION 5. NO NOVATION ............................................................................4

SECTION 6. MISCELLANEOUS. ......................................................................4

**Annex 1** ......................................................................................................8
Amendment to the Parent Guaranty ......................................................................8
1.    Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty ..................8
2.    Amendments to Section 20 (*Release of Liability of Parent
      Guarantor*) of the Parent Guaranty ................................................................9
3.    Amendments to Section 11 (*Covenants of Parent Guarantor*) of the
      Parent Guaranty ..........................................................................................9

ASIA 20423961 (2K)

AMENDMENT TO THE PARENT GUARANTY (this "Amendment"), dated as of ___5___ December 2014, among (i) NII Holdings, Inc., a holding company organized and existing under the laws of Delaware (the "Parent Guarantor"), and (ii) China Development Bank Corporation in its capacities as administrative agent under the Sinosure Credit Agreement and the Non-Sinosure Credit Agreement, for the benefit of the Financing Parties defined thereunder.

W I T N E S S E T H:

WHEREAS, Nextel Telecomunicações Ltda. (the "Borrower"), the persons listed as guarantors on the signature pages to the Non-Sinosure Credit Agreement (as defined below) in their capacities as guarantors (the "Guarantors"), China Development Bank Corporation, as Lender, as administrative agent (in such capacity, the "Administrative Agent") and as arranger (in such capacity, the "Arranger"), are parties to (i) a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is supported by the Sinosure Insurance (the "Sinosure Credit Agreement") and (ii) a US$250,000,000 credit agreement dated as of April 20, 2012, as amended on September 25, 2013, and as further amended and waived from time to time, which is not supported by the Sinosure Insurance (the "Non-Sinosure Credit Agreement", together with the Sinosure Credit Agreement, the "Credit Agreements" and each a "Credit Agreement");

WHEREAS, the Borrower has notified the Administrative Agent and has requested that the Lender agree to amend certain terms and conditions of the Credit Agreements to facilitate the balance sheet restructuring of the Parent Guarantor and certain of the Parent Guarantor's affiliates pursuant to which the US$4,350,000,000 notes issued by NII Capital Corp. and/or NII International Telecom S.C.A. will be restructured by way of an amendment agreement to the Sinosure Credit Agreement and an amendment agreement to the Non-Sinosure Credit Agreement (together the "Credit Agreement Amendment Agreements");

WHEREAS, the Borrower is a Subsidiary of the Parent Guarantor;

WHEREAS, the Parent Guarantor and such affiliates have commenced the Chapter 11 Cases;

WHEREAS, the Parent Guarantor will obtain benefits from the amendments contemplated in the Credit Agreement Amendment Agreements and, accordingly, desires to execute this Amendment to induce the Lender to agree to the Credit Agreement Amendment Agreements; and

WHEREAS, it is anticipated that the Parent Guaranty, as amended under the terms and subject to the conditions set forth herein, will become effective on the Parent Guaranty Amendment Effective Date (as defined below).

3

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

SECTION 1. DEFINITIONS.

Except as otherwise expressly provided herein, capitalized terms used in this Amendment shall have the meanings assigned to such terms in the Credit Agreement Amendment Agreements and the Parent Guaranty, as amended from time to time, as applicable.

SECTION 2. AMENDMENTS TO THE PARENT GUARANTY.

On the Parent Guaranty Amendment Effective Date (as defined below), the terms and conditions of the Parent Guaranty shall be amended as set forth in Annex 1 hereto.

SECTION 3. ACKNOWLEDGMENT.

Each Party to this Amendment hereby acknowledges and agrees that (i) the terms and conditions of the Parent Guaranty in effect as of the date hereof shall continue in full force and effect unchanged, except as amended and supplemented hereby and (ii) this Amendment shall take full force or effect as of the Parent Guaranty Amendment Effective Date and the Parent Guarantor shall assume all obligations and duties under the Parent Guaranty as amended by this Amendment as of the Parent Guaranty Amendment Effective Date.

SECTION 4. EFFECTIVENESS AND TERMINATION.

Notwithstanding anything in this Amendment to the contrary, this Amendment shall only become effective on the earlier to occur of (i) the Amendment No. 2 Closing Date (as such term is defined in each Credit Agreement Amendment Agreement) and (ii) the Parent Restructuring Effective Date (as such term is defined in each Credit Agreement Amendment Agreement) (the "Parent Guaranty Amendment Effective Date").

SECTION 5. NO NOVATION.

The execution of this Amendment does not constitute a novation, amendment, payment, satisfaction, performance or fulfillment of any of the obligations under the Parent Guaranty.

SECTION 6. MISCELLANEOUS.

Section 17 (*Notice*), Section 19 (*Consent to Jurisdiction; Service of Process; and Waiver of Trial by Jury*), Section 22 (*Counterparts*), and Section 24 (*Headings Descriptive*) of the Parent Guaranty shall be incorporated into this

ASIA 20423961 (2K)

Amendment as if set forth in full herein, *mutatis mutandis*.

\*                    \*                    \*

[*Remainder of page intentionally left blank.*]

5

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**NII HOLDINGS, INC., as Parent Guarantor**

<u>Notice Address:</u>

NII Holdings, Inc.
1875 Explorer Street
Reston, VA 20190
Attention: Chief Commercial Counsel
Facsimile No: +703 390 7170

By: _____
Name: GARY D. BEGEMAN
Title: EVP, GENERAL COUNSEL

By: _____
Name: Shana C. Smith
Title: VP, DEPUTY GC

ASIA 20423961 (2K)

**CHINA DEVELOPMENT BANK CORPORATION, as Administrative Agent**

<u>Notice Address:</u>

Address:           14th Floor, CITIC Tower
                   No. 1093 Shennan Zhong Road
                   Shenzhen 518031, P.R. China
Attention:         Che Nan
Telephone No.:     +86 (755) 2594 2783
Facsimile No.:     +86 (755) 2598 7725

By: _____
Name: Liu Wensheng
Title: Deputy General Manager of Shenzhen Branch

7

**Annex 1**

Amendment to the Parent Guaranty

1.      Amendments to Section 2 (*Parent Guaranty*) of the Parent Guaranty

(a)     Section 2 (*Parent Guaranty*) of the Parent Guaranty shall be amended to read in its entirety as follows:

"2.     PARENT GUARANTY

(a)     The Parent Guarantor, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety to the Financing Parties the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise pursuant to the terms of each Credit Agreement) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under each Credit Agreement and (y) all other payment obligations (including, without limitation, obligations which, but for the effect of any bankruptcy, insolvency, receivership or similar proceeding, would become payable), liabilities and indebtedness owing by the Borrower to the Financing Parties under each Financing Document to which the Borrower is a party (including, without limitation, indemnities, fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in each Credit Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with each such Financing Document and the due performance and compliance by the Borrower with all of its payment obligations in all such Financing Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (i) being herein collectively called the "Guaranteed Obligations");

The Parent Guarantor understands, agrees and confirms that the Financing Parties may, in accordance with Section 9, enforce this Parent Guaranty up to the full amount of the Guaranteed Obligations against the Parent Guarantor without proceeding against the Borrower or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations.  This Parent Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)     Additionally, the Parent Guarantor, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower upon the occurrence in respect of the Borrower of any of the events specified in Section 7.1(e) (*Insolvency*), Section 7.1(g) (*Voluntary Insolvency Proceedings*) and Section 7.1(h) (*Involuntary Insolvency Proceedings(Borrower)*) of each Credit Agreement, and unconditionally, absolutely and irrevocably, promises to pay such Guaranteed Obligations to the Financing Parties upon such occurrence.

8

ASIA 28423961 (2K)

       2.     Amendments to Section 20 (*Release of Liability of Parent Guarantor*) of the Parent Guaranty

       Section 20 (*Release of Liability of Parent Guarantor*) shall be deleted in its entirety.

       3.     Amendments to Section 1 (*Definitions*) of the Parent Guaranty

       The definition of "Compliance Date" under Section 1 (*Definitions*) of the Parent Guarantee shall be deleted in its entirely.

       4.     Amendments to Section 11 (*Covenants of Parent Guarantor*) of the Parent Guaranty

       (a)    A new Section 11.4 (*Keepwell Undertaking*) of the Parent Guaranty shall be added to read in its entirety as follows:

"11.4   Keep-well Undertaking

       The Parent Guarantor shall, directly or indirectly through any one or more of its Affiliates, make such equity contributions or injections and/or provide such Subordinated Restricted Intercompany Indebtedness to the Borrower in order to ensure that the Borrower has sufficient funds for the operating expenditure, capital expenditure and debt service cash requirements of such Borrower."

**<u>EXHIBIT F-4a</u>**



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| Aditamento 001 à Cédula de Crédito Bancário nº 21.3150.777.0000001-97 | Vencimento:<br>08/12/2018 | Valor - R$<br>R$ 640.000.000,00 |
|---|---|---|

**I - CREDORA** - A **CAIXA ECONÔMICA FEDERAL**, instituição financeira sob a forma de empresa pública, criada nos termos do Decreto-Lei nº 759, de 12 de agosto de 1969, vinculada ao Ministério da Fazenda, regendo-se pelo seu estatuto vigente na data da presente contratação, com sede no Setor Bancário Sul, Quadra 4, lotes 3/4, em Brasília/DF, inscrita no CNPJ/MF sob nº 00.360.305/0001-04, Superintendência Regional Osasco/SP, por seu representante legal ao fim assinado, doravante designada **CAIXA** ou **CREDORA**.

**II - EMITENTE** - A empresa **NEXTEL TELECOMUNICAÇÕES LTDA**, com sede na cidade de São Paulo, Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, inscrita no CNPJ/MF sob o nº. 66.970.229/0001-67, neste ato representada na forma de seu estatuto social, pelos representantes abaixo indicados, doravante designada **CREDITADA**.

**III – CARACTERÍSTICAS DO CRÉDITO:**

| 1 – CREDITADA/EMITENTE<br>**NEXTEL TELECOMUNICAÇÕES LTDA** | | | | 2 – CNPJ<br>66.970.229/0001-67 | | | |
|---|---|---|---|---|---|---|---|
| 3 - Conta de não livre movimentação | | | | 4 - Conta corrente de livre movimentação | | | |
| Agência | Op. | Conta | DV | Agência | Op. | Conta | DV |

| 5 – Tipo de Operação |
|---|
| Investimento – CDI - Pós<br>777 – Crédito Especial Empresa – Grandes Corporações - Investimentos |

| 6 – Valor Total do Crédito |
|---|
| R$ 640.000.000,00 (seiscentos e quarenta milhões de reais) |

| 7 - Encargos Financeiros |
|---|
| 115% (cento e quinze por cento) CDI CETIP ao ano, calculados de acordo com a Cláusula Terceira |

| 8 – Prazo e Sistema de Amortização |
|---|
| Prazo: 84 (oitenta e quatro) meses<br>    (a) nos primeiros 24 meses haverá carência do Principal, com o pagamento apenas dos Encargos Financeiros em periodicidade trimestral.<br>    (b) nos 60 meses subsequentes, haverá amortização do Principal, devidamente acrescido dos Encargos Financeiros, em periodicidade trimestral.<br><br>SAC – Sistema de Amortização Constante. |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

1



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| 9 – Praça para Pagamento São Paulo/SP |
| --- |

| 10 – Avalista | CNPJ |
| --- | --- |
| Nextel Telecomunicações S.A. | 00.169.369/0001-22 |

## IV – ALTERAÇÕES OBJETO DESTE ADITAMENTO

| 3 - Conta de não livre movimentação | | | | 4 - Conta corrente de livre movimentação | | |
| --- | --- | --- | --- | --- | --- | --- |
| Op. | Conta | DV | Agência | Op. | Conta | DV |
| 003 | 180 | 4 | 3150 | 003 | 1859 | 6 |

| 7 - Encargos Financeiros 139,54% (cento e trinta e nove vírgula cinquenta e quatro por cento) CDI CETIP ao ano |
| --- |

| 11 – Garantia | Valor Mínimo |
| --- | --- |
| Cessão Fiduciária de Direitos Creditórios sobre Convênio de Arrecadação CAIXA (SICAP) | Fluxo médio mensal mínimo no valor de R$ 70.000.000,00 |

**CONSIDERANDO:**

I – Nos termos da Cédula de Crédito Bancário nº 21.3150.777.0000001-97, emitida em 08 de dezembro de 2011, a **CREDORA** concedeu empréstimo à **CREDITADA**, cujas características originais serão alteradas pelo Primeiro Aditamento à Cédula de Crédito Bancário ("Primeiro Aditamento"), conforme as características descritas no Quadro III acima ("Cédula");

II – Neste ato, as partes desejam repactuar a taxa da operação, bem como incluir a garantia de Cessão Fiduciária de Direitos Creditórios sobre Convênio de Arrecadação CAIXA (SICAP), alterar as hipóteses de vencimento antecipado e de cessão da Cédula.

Resolvem as partes aditar a Cédula por meio do presente Primeiro Aditamento, de acordo com as seguintes cláusulas e condições:

**DO PRIMEIRO ADITAMENTO À CÉDULA**
**CLÁUSULA PRIMEIRA** – As partes resolvem alterar os encargos financeiros da Cédula ora aditada, conforme parâmetros descritos no Quadro IV do Preâmbulo deste Primeiro Aditamento.

**Parágrafo Único** – Todas as cláusulas e condições da Cédula e do Primeiro Aditamento que mencionam os termos ora alterados ficam expressamente aditadas para refletir os novos parâmetros acordados, nos termos deste Primeiro Aditamento.

**CLÁUSULA SEGUNDA – DA INCLUSÃO DE GARANTIA**

TEXT_SP 9080887v8 1803/14
**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
caixa.gov.br

2

 **CAIXA** PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

Em razão da inclusão da garantia referente à Cessão Fiduciária de Direitos Creditórios sobre Convênio de Arrecadação CAIXA (SICAP), é incluída nova Cláusula Décima na Cédula ora aditada passará a ter a seguinte redação, sendo as demais sucessivamente renumeradas:

***CLÁUSULA DÉCIMA – CONSTITUIÇÃO DE GARANTIA** – Para assegurar o cumprimento das obrigações assumidas na Cédula ("Obrigações Garantidas"), a CREDITADA cede e transfere fiduciariamente à CAIXA, em caráter irrevogável e irretratável, por este ato e na melhor forma de direito, nos termos do § 3º do artigo 66-B da Lei nº 4.728/65, com a redação dada pela Lei nº 10.931/04, dos artigos 18 a 20 da Lei nº 9.514/97, e do Decreto Lei nº 911/69 e posteriores alterações, e no que for aplicável dos artigos 1.361 e seguintes do Código Civil, a titularidade, o domínio resolúvel e a posse direta e indireta da integralidade dos direitos creditórios sobre os recebíveis, presentes e futuros, decorrentes da prestação de serviços de telecomunicações realizada pela CREDITADA aos seus clientes, abrangendo toda a receita proveniente dos valores recebidos a esse título, os quais sejam arrecadados pela CAIXA ("Recebíveis"), nos termos abaixo descritos, bem como dos recursos depositados ou mantidos na Conta Vinculada ("Direitos Cedidos").*

***PARÁGRAFO PRIMEIRO** – Os valores relativos a parte dos Recebíveis são recebidos pela CAIXA por meio de arrecadação de guias não compensáveis e débito automático, de acordo com o Convênio de Arrecadação, celebrado entre a CREDITADA e a CAIXA (nº 400089) ("Convênio de Arrecadação").*

***PARÁGRAFO SEGUNDO** – Doravante, os valores recebidos diariamente no âmbito do Convênio de Arrecadação ("Valores Arrecadados"), representativos de parcela dos Recebíveis e de quaisquer outros créditos, passarão a ser creditados na conta nº 180-4, Agência nº 3150, Operação 003, de movimentação exclusiva da CAIXA, vinculada à liquidação das obrigações decorrentes da Cédula ("Conta Vinculada"), cujo saldo e valores nela creditados diariamente também são ora cedidos fiduciariamente pela CREDITADA à CAIXA, integrando-se, para todos os efeitos, aos Direitos Cedidos, nos termos do Caput desta Cláusula. A CREDITADA se compromete a, em caráter irrevogável e irretratável, (i) não tomar medidas que visem a receber diretamente qualquer quantia referente aos Recebíveis; (ii) não alterar, de maneira material, os procedimentos e formas de cobrança dos Recebíveis atualmente em vigor, bem como tomar qualquer medida, ou deixar de tomar, quando aplicável, que vise a ou tenha como efeito diminuir a arrecadação dos Recebíveis pela CAIXA, até a satisfação integral das obrigações da CREDITADA previstas na Cédula; (iii) durante a vigência da Cédula, manter em vigor o Convênio de Arrecadação; e (iv) não ceder, alienar, transferir, vender, onerar, caucionar, empenhar ou gravar ou por qualquer forma negociar os Direitos Cedidos, sem o prévio e expresso consentimento da CAIXA.*

***PARÁGRAFO TERCEIRO** – Fica convencionado que o montante mensal médio dos Valores Arrecadados que transitarão pela Conta Vinculada nos três meses imediatamente anteriores à apuração pela CAIXA em cada trimestre ("Período"), a ser realizada nos dias 31 de março, 30 de junho, 30 de setembro e 31 de dezembro de cada ano deverá perfazer – e a CREDITADA se obriga a adotar todas as medidas necessárias para que perfaça – o valor mínimo equivalente a R$ 70.000.000,00 (setenta milhões de reais) ("Valor Médio Mínimo"), calculado pelo valor total dos recursos que vierem a ser depositados na Conta Vinculado durante cada Período, divido por 3 (três). Caso em determinado Período o Valor Médio Mínimo não seja verificado pela CAIXA, a CAIXA poderá, a seu exclusivo critério, declarar imediatamente vencidas, de pleno direito, as*

**SAC CAIXA:** 0800 726 0101 (informações, reclamações, sugestões e elogios)                3
**Para pessoas com deficiência auditiva ou de fala:** 0800 726 2492
**Ouvidoria:** 0800 725 7474
**caixa.gov.br**



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

obrigações da CREDITADA no âmbito da Cédula. Não obstante, e sem prejuízo ao seu direito *avençado no âmbito da presente Cláusula, a CAIXA poderá, a seu exclusivo critério, alternativamente à declaração de vencimento antecipado das obrigações da CREDITADA na presente Cédula, exigir que a CREDITADA no prazo de 10 (dez) dias, a contar da solicitação da CAIXA nesse sentido, deposite na Conta Vinculada um valor equivalente à diferença entre o Valor Médio Mínimo e o montante mensal médio efetivamente apurado pela CAIXA nos termos da presente Cláusula ("Valor do Déficit"). Nesse caso, o Valor do Déficit ficará retido na Conta Vinculada até que o Valor Médio Mínimo apurado pela CAIXA em uma data de apuração nos termos da presente cláusula tenha sido reestabelecido.*

**PARÁGRAFO QUARTO** – *Sem prejuízo do disposto no parágrafo a seguir, fica a CAIXA, a partir deste ato, legalmente identificado como o único e legítimo titular, em caráter fiduciário, dos Direitos Cedidos, cuja condição perdurará até o integral adimplemento de todas as obrigações assumidas pela CREDITADA na Cédula, de modo que, ocorrendo o seu cumprimento pela CREDITADA, conforme atestado pela CAIXA, resolver-se-á a propriedade fiduciária da CAIXA, retornando os Direitos Cedidos à propriedade plena da CREDITADA.*

**PARÁGRAFO QUINTO** – *Ressalvada a hipótese de retenção do Valor do Déficit, os Valores Arrecadados serão, diariamente, até às 14h00, liberados à conta de livre movimentação da CREDITADA, após a necessária verificação da CAIXA nas respectivas datas avençadas, e desde que a CREDITADA não tenha ocorrido um evento de vencimento antecipado, hipótese de pagamento antecipado obrigatório ou descumprimento de obrigação pecuniária pela CREDITADA.*

**PARÁGRAFO SEXTO** – *A CREDITADA declara neste ato que:*

*(i)    está autorizada, nos termos da lei e de seu estatuto social, a ceder os Direitos Cedidos de que é titular, bem como cumprir as disposições deste instrumento;*
*(ii)    a celebração deste instrumento não viola nenhuma disposição de seu estatuto social, assim como não infringe ou viola qualquer disposição legal e regulamentos a que está sujeita;*
*(iii)    os Direitos Cedidos estão livres e desembaraçados de quaisquer ônus, encargos, pendências judiciais ou extrajudiciais de qualquer natureza, inclusive fiscais, dúvidas, dívidas e/ou gravames de qualquer natureza, exceto a presente cessão fiduciária de direitos creditórios;*
*(iv)    inexiste impedimento legal contido em avenças de que a CREDITADA seja parte, que vede a presente cessão fiduciária dos Direitos Cedidos ora convencionada, em favor da CAIXA; e*
*(v)    teve prévio conhecimento, de forma clara e suficiente, das atribuições a ela impostas, e que anui a todos os termos do instrumento, e que decidiu, livre e espontaneamente, sem qualquer vício de vontade e consentimento, ceder fiduciariamente os Direitos Cedidos em garantia indivisível, irrevogável e irretratável.*

**PARÁGRAFO SÉTIMO** – *A CREDITADA será responsável por todos e quaisquer prejuízos causados à CAIXA que decorram da falsidade ou inexatidão das declarações e garantias aqui prestadas.*

**PARÁGRAFO OITAVO** – *Verificada a ocorrência de um evento de inadimplemento em relação às obrigações pecuniárias assumidas pela CREDITADA na Cédula, observados os respectivos prazos de cura, conforme aplicáveis todos os valores relativos aos Direitos Cedidos passarão a ser retidos pela CAIXA na Conta Vinculada e, ocorrendo a decretação do vencimento antecipado da dívida ou hipótese de pagamento antecipado obrigatório nos termos desta Cédula, poderão ser*

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)       4
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*utilizados na amortização das referidas obrigações da CREDITADA, até a sua integral liquidação, nos termos da Cédula, até o limite das Obrigações Garantidas.*

**PARÁGRAFO NONO –** *Ocorrendo a decretação do vencimento antecipado da dívida nos termos desta Cédula, a CAIXA poderá, independentemente de qualquer notificação, promover a imediata utilização dos Direitos Cedidos para satisfazer as obrigações garantidas então vencidas e não liquidadas, mediante a excussão judicial ou venda amigável dos Recebíveis, conforme seja aplicável, ou, no caso dos Valores Arrecadados, simplesmente aplicá-los no pagamento das Obrigações Garantidas, nos termos da lei e em conformidade com os termos da Cédula, até o total adimplemento das obrigações. Neste sentido, a CAIXA terá o direito de imediatamente exercer sobre os Direitos Cedidos todos os poderes que lhe são assegurados pela legislação vigente, nos termos da Cédula, podendo dispor de, cobrar, receber, realizar, vender, ou ceder, inclusive de forma particular, total ou parcialmente, os Recebíveis, nos termos e condições que a CAIXA considere apropriado, dar quitação e assinar quaisquer documentos ou termos por mais especiais que sejam, necessários à prática dos atos aqui referidos, independentemente de qualquer comunicação e/ou autorização adicional da CREDITADA. Todo valor que sobejar às Obrigações Garantidas deverá ser devolvido à CREDITADA.*

**PARÁGRAFO DÉCIMO –** *A CREDITADA renuncia neste ato a qualquer direito ou privilégio legal ou contratual que possa afetar a livre e integral exequibilidade e transferência dos Direitos Cedidos no caso de sua excussão, observados os termos e condições previstos nesta Cédula.*

**PARÁGRAFO DÉCIMO PRIMEIRO–** *Sem prejuízo do disposto na Cédula, e para os fins do artigo 1.362 do Código Civil Brasileiro, da Lei 9.514/97, conforme alterada, e da Lei 4.728/65, conforme alterada, as Obrigações Garantidas podem ser resumidamente descritas da seguinte forma:*

*(i)     Valor estimado de principal da dívida: R$512.000.000,00 (quinhentos e doze milhões de reais);*
*(ii)     Prazo e condições de pagamento: pagamento do principal, após 24 (vinte e quatro) meses da data de assinatura da Cédula, em 20 (vinte) parcelas trimestrais de R$32.000.000,00 (trinta e dois milhões de reais) com datas de vencimento em março, junho, setembro e dezembro de cada ano e o pagamento trimestral dos encargos financeiros, a partir da data de assinatura da Cédula, em março, junho, setembro e dezembro de cada ano;*
*(iii)     Taxa de juros: 139,54% do CDI;*
*(iv)     Juros de mora: CDI mais 2% ao mês; e*
*(v)     Cláusula penal: 2% sobre o valor devido.*

**PARÁGRAFO DÉCIMO SEGUNDO –** *As partes têm conhecimento e concordam que a CREDITADA não possui sistema de individualização de recebíveis capaz de identificar clientes, valores e faturas que serão efetivamente depositadas na Conta Vinculada e, da mesma forma, exceto se de outra forma expressamente indicada nesta Cédula, não assume nenhuma obrigação de realizar tal individualização.*

**CLÁUSULA TERCEIRA –** A Cláusula Terceira da Cédula, que trata dos ENCARGOS, passa a viger com a seguinte redação:

*DOS ENCARGOS*

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)         5
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 **CAIXA**    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*CLÁUSULA TERCEIRA – Sobre o valor contratado incidirão encargos financeiros correspondentes a 139,54% (cento e trinta e nove inteiros e cinquenta e quatro centésimos pontos percentuais) da taxa média diária do CDI Over (Certificados de Depósitos Interbancários), divulgada diariamente pela CETIP S.A. – Mercados Organizados ("CDI CETIP"), capitalizados diariamente.*

*Parágrafo Primeiro – A taxa média diária dos Certificados de Depósitos Interbancários – CDI utilizada na correção do saldo devedor é aquela posicionada no segundo dia útil anterior à data de aplicação da correção.*

*Parágrafo Segundo – Na extinção do índice CDI CETIP, a CAIXA utilizará automaticamente em seu lugar aquele que vier a ser estabelecido pelas autoridades competentes. Na falta de determinação legal ou regulamentar, utilizar-se-á a base de remuneração que estiver sendo praticada nas operações de crédito dos bancos comerciais, no mercado financeiro.*

*Parágrafo Terceiro – Os referidos Encargos Financeiros, calculados por dias úteis, serão cobrados trimestralmente.*

*Parágrafo Quarto – Nos casos de pagamento, amortização extraordinária ou liquidação antecipada em épocas diferentes daquelas indicadas na Cláusula Segunda, será feita a aplicação "pro-rata" dia útil, devendo ser comunicado à CAIXA, por escrito, com 3 (três) dias úteis de antecedência.*

**CLÁUSULA QUARTA** – O caput da atual Cláusula Vigésima Segunda da Cédula, que trata das hipóteses de VENCIMENTO ANTECIPADO, passa a viger com a seguinte redação, mantendo-se a redação de seus parágrafos:

*DO VENCIMENTO ANTECIPADO*
*CLÁUSULA VIGÉSIMA SEGUNDA - São motivos de vencimento antecipado da dívida e imediata execução desta Cédula, independentemente de notificação judicial ou extrajudicial, além dos casos previstos em lei:*

*I)    inadimplemento, pela CREDITADA, de qualquer obrigação de natureza pecuniária assumida nesta Cédula, que não seja sanado no prazo de 1 (um) dia útil, contado da data de vencimento original;*

*II)    inadimplemento, pela CREDITADA, de qualquer obrigação não pecuniária prevista nesta Cédula, que não seja sanado no prazo de 30 (trinta) dias contados da comunicação que lhe for enviada pela CAIXA a respeito do fato;*

*III)    descumprimento, falsidade, imprecisão, incorreção ou omissão material imputável à CREDITADA, em qualquer declaração, garantia, informação ou documento material que houver sido firmado, prestado ou entregue pela CREDITADA relativo a esta operação de crédito, desde que não sanados no prazo de 10 (dez) dias úteis;*

*IV)    vencimento antecipado ou inadimplemento de qualquer obrigação pecuniária da CREDITADA ou de qualquer Afiliada Brasileira, excluindo obrigações exclusivamente entre a CREDITADA e a Avalista,, em valor unitário ou agregado, que seja igual ou superior a R$*

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)    6
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*10.000.000,00 (dez milhões de reais), que não seja sanado no prazo de 10 (dez) dias úteis, contados da notificação enviada pela CAIXA, ressalvados os casos em que tais obrigações estejam com seu pagamento suspenso em razão de decisão administrativa ou judicial ou em que tenha sido garantido o Juízo;*

*V)    vencimento antecipado de qualquer outra obrigação pecuniária da CREDITADA com a CAIXA desde que não sanada nos prazos estabelecidos nos respectivos instrumentos;*

*VI)    protesto cambiário contra a CREDITADA em valor unitário ou agregado igual ou superior a R$ 10.000.000,00 (dez milhões de reais), que não seja sanado no prazo de 30 (trinta) dias após o aviso por escrito enviado pela CAIXA, ou que venha a se transformar em procedimento judicial e que se encontre com o pagamento suspenso por meio de decisão judicial, ou que tenha sido garantido o Juízo;*

*VII)    (a) pedido de autofalência pela CREDITADA e/ou de qualquer Afiliada Brasileira; (b) pedido de falência da CREDITADA e/ou de qualquer Afiliada Brasileira formulado por terceiro e não elidido no prazo legal; (c) decretação de falência ou liquidação da CREDITADA e/ou de qualquer Afiliada Brasileira; (d) pedido de recuperação judicial ou extrajudicial pela CREDITADA e/ou de qualquer Afiliada Brasileira;*

*VIII)    liquidação, dissolução ou extinção da CREDITADA;*

*IX)    caso a CREDITADA ou qualquer de suas Afiliadas Brasileiras seja declarada insolvente por decisão judicial, ou reconheça publicamente perante a CAIXA, sua impossibilidade de satisfazer suas obrigações pecuniárias ou caso tal impossibilidade seja notória, em ambos os casos no valor global superior a R$10.000.000,00 (dez milhões de reais);*

*X)    realização, pela CREDITADA, uma redução do seu capital social, resgate, amortização, reembolso, ou compra de participação societária, desde que tais operações impliquem pagamento (em espécie ou in natura) aos seus sócios, ou, caso o índice financeiro indicado na Cláusula Décima Segunda seja superior a 2,5 (dois e meio), distribuição de lucros ou juros sobre o capital próprio, ainda que já declarados, aos seus sócios;*

*XI)    alienação, pela CREDITADA, no individual ou no agregado, de qualquer de seus bens ou ativos, sem a prévia e expressa anuência por escrito da CAIXA, exceto, neste caso, (i) antecipação de receitas com cartão de crédito, (ii) venda de recebíveis vencidos e não pagos, (iii) alienação de mercadorias no curso ordinário de negócios, (iv) transferências de ativos obsoletos ou bens móveis de baixo valor agregado, (v) transferências no contexto de permuta por ativos similares de valor igual ou superior; e (vi) venda de torres na modalidade 'sale leaseback', neste caso, sujeito à aprovação prévia da CAIXA, a qual deverá ser manifestada dentro do período de 45 (quarenta e cinco) dias contados da tal questionamento formulado mediante notificação escrita, desde que comprovado o recebimento de tal notificação pela CAIXA, sendo certo que a não manifestação por parte da CAIXA não implicará aprovação tácita;*

*XII)    pagamento, pela CREDITADA ou por qualquer Afiliada Brasileira, de qualquer obrigação, antes da integral quitação de todas as obrigações desta Cédula, às Partes Relacionadas, inclusive na hipótese de falência, liquidação ou dissolução da CREDITADA, exceto quaisquer pagamentos entre a CREDITADA e a Avalista;*

TEXT_SP 9080887v8  1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)    7
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
caixa.gov.br

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

XIII) outorga e/ou constituição, pela CREDITADA ou por qualquer Afiliada Brasileira, de qualquer ônus ou gravame ou outro direito real de garantia, ou garantia fidejussória, em favor de terceiro (incluindo suas Afiliadas e controladora direta ou indireta), exceto (i) aquelas constituídas nos termos desta Cédula ou previamente a data do Primeiro Aditivo, ou (ii) pela (a) outorga de garantias reais como contragarantia em contratações de seguros e seguros garantias em geral; (b) outorga de garantias reais como contragarantia em nova fiança bancária para garantia judicial ou realização de novos depósitos judiciais limitadas, no caso das garantias outorgadas nos termos desse item (b) ao valor global de R$150.000.000,00 (cento e cinquenta milhões de reais); (c) outorga de garantias reais ou pessoais em contratos de locação de sites; (d) outorga de garantias reais ou pessoais em contratos de collocation (i.e. contratos com outras operadoras para instalação de equipamentos em torres), (e) financiamentos concedidos pela Agência Nacional de Telecomunicações - ANATEL, incluindo suas renovações, (f) garantias em favor da ANATEL, (g) garantias reais outorgadas como contragarantia para emissão de novas performance bonds em favor da ANATEL, neste caso, sujeito à aprovação prévia da CAIXA, as quais deverão ser manifestadas dentro do período de 45 (quarenta e cinco) dias contados de tal questionamento formulado mediante notificação escrita, desde que comprovado o recebimento de tal notificação pela CAIXA, sendo certo que a não manifestação por parte da CAIXA não implicará aprovação tácita e (h) renovações das operações já detidas pela CREDITADA ou suas Afiliadas Brasileira identificadas no Anexo Anexo 22(xiii)(1) desta Cédula, sendo que as garantias a serem outorgadas nos termos desse item (h) deverão estar limitadas ao valor garantido pela fiança e/ou performance bond, conforme indicado em tal anexo, observadas as mesmas garantias em vigor na presente data, sendo que as garantias reais outorgadas nos termos dos itens (a), (c) e (d) acima estão limitados ao valor global de R$50.000.000,00 (cinquenta milhões de reais). A CREDITADA declara, para os fins da presente Cédula, que o Anexo 22(xiii)(2) contém a totalidade das operações que contam com garantia real;

XIV) não utilização dos recursos para a finalidade indicada na Cláusula Sétima;

XV) não observância do Valor Mínimo por 1 (um) Período, observados os termos da Cláusula Décima, Parágrafo Terceiro, desta Cédula;

XVI) execução de qualquer garantia prestada a qualquer credor da CREDITADA ou de qualquer Afiliada Brasileira no valor, igual ou superior, a R$ 10.000.000,00 (um dez milhões de reais), e desde que não seja sanado no prazo de 10 (dez) dias úteis, contados da notificação enviada pela CAIXA, ressalvados os casos em que tal execução esteja suspensa em razão de decisão administrativa ou judicial;

XVII) publicação de ato regulatório cujos efeitos não tenham sido suspensos nos prazos legais, quando aplicável, que (i) afete de maneira adversa a capacidade da CREDITADA de honrar suas obrigações perante a CAIXA; ou (ii) inviabilize as atividades da CREDITADA ou parte significativa destas, ou de qualquer forma, impacte, de maneira adversa, a situação financeira (em ambos os casos, assim entendida como atividades que respondam por 10% (dez por cento) ou mais do faturamento anual da CREDITADA); ou (iii) resulte em uma aplicação de multa, sanção ou penalidade final e irrecorrível que impacte a situação financeira da CREDITADA e/ou suas Afiliadas Brasileiras em valor igual ou superior a R$100.000.000,00 (cem milhões de reais) em um mesmo exercício fiscal;

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)          8
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*XVIII) adoção de política pela CREDITADA que importe em discriminação de raça ou gênero ou assédio moral ou sexual, (ii) a comprovação por sentença judicial transitada em julgado ou decisão administrativa final sancionadora, exarada por autoridade ou órgão competente, (I) de que as atividades da CREDITADA geram danos ao meio ambiente, ou (II) que a CREDITADA (a) utiliza mão de obra em situação análoga à condição de trabalho escravo, conforme previsto na Portaria Interministerial nº 2, de 12 de maio de 2011, (b) utiliza trabalho infantil de forma não regulamentada, (c) explora a prostituição ou (d) exerce atividades ilegais, constando ou não no Cadastro de Empregadores;*

*XIX)   repasse, cassação ou suspensão da Concessão obtida junto à ANATEL para exploração de frequências da terceira geração (tecnologia 3G) e GSM sem prévia anuência da CAIXA, que não poderá ser injustificadamente negada;*

*XX)   caso o índice obtido pela divisão da Dívida Líquida pelo EBITDA seja superior a 2,5 (dois e meio), a ser calculado nos termos da Cláusula Décima Segunda;*

*XXI)   caso a CREDITADA não mantenha em caixa, em cada Data de Verificação em recursos imediatamente disponíveis ou em aplicações financeiras, o Saldo Mínimo;*

*XXII)   não observância da obrigação de subordinação prevista na Cláusula Décima Quarta desta Cédula;*

*XXIII)   transferência ou cessão a terceiros, a qualquer título, no todo ou em parte, dos direitos e obrigações decorrentes desta Cédula, total ou parcial, sem prévio e expresso consentimento da CAIXA;*

*XXIV)   não efetivação do(s) registro(s) cartorários previstos nesta Cédula, no prazo de 72 (setenta e duas) horas, contados a partir da assinatura deste instrumento, seja por ato de vontade ou ainda por qualquer outro óbice legal ou convencional;*

*XXV)   inexistência de saldo, em qualquer das contas de titularidade da CREDITADA que atenda ao pagamento dos compromissos assumidos por meio desta Cédula nas respectivas Datas de Pagamento e não sanados no prazo de 1 (um) dia útil; e*

*XXVI)   descumprimento de quaisquer das obrigações estabelecidas na Cláusula Décima, Parágrafo Segundo deste instrumento.*

*Ainda, para os fins do disposto nesta Cédula, define-se:*

*"Afiliada" de qualquer Pessoa significa outra Pessoa que, direta ou indiretamente, por meio de um ou mais intermediários, Controle, seja Controlada, ou esteja sob o Controle comum com essa primeira Pessoa. Adicionalmente, no caso de uma Pessoa que seja um fundo de investimentos ou cujo acionista Controlador seja um fundo de investimentos, também será considerada uma "Afiliada": (i) o gestor ou o quotista ou uma Afiliada do gestor ou do quotista desse fundo de investimento, (ii) outro fundo de investimento administrado ou gerido pelo gestor ou quotista ou uma Afiliada do gestor ou quotista desse fundo de investimento, e (iii) qualquer Pessoa que seja, direta ou indiretamente, Controlada, ou esteja sob o Controle comum desse fundo de*

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)     9
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 **CAIXA**    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*investimento, seja individualmente ou em conjunto com outra Afiliada, ou qualquer das outras
Pessoas acima expostas.*

*"Afiliada Brasileira" significa com relação a qualquer Pessoa uma Afiliada domiciliada no Brasil;*

*"Controle" (incluindo seus significados correlatos) significa, de acordo com o Artigo 116 da Lei nº
6.404, de 15.12.1976, (a) o poder para eleger a maioria do conselho de administração, ou órgão
semelhante, da Pessoa controlada ou, de outro modo, conduzir os negócios ou políticas dessa
Pessoa (por contrato ou de outro modo), e (b) a posse direta ou indireta de direitos que concedam
à Pessoa Controladora a maioria dos votos na assembleia geral de acionistas ou reunião similar,
da Pessoa Controlada.*

*"Parte Relacionada" de qualquer Pessoa especificada terá o significado descrito na Deliberação nº
642 de 7 de outubro de 2010 emitida pela Comissão de Valores Mobiliários, e também incluirá, na
medida em que não seja repetido, (i) qualquer Afiliada dessa Pessoa, (ii) qualquer diretor,
conselheiro, quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa
Pessoa, (iii) qualquer cônjuge, ex-cônjuge, ascendente, descendente ou parente colateral até o
segundo grau dessa Pessoa, uma Afiliada dessa Pessoa ou qualquer diretor, conselheiro,
quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa Pessoa, e
(iv) qualquer Afiliada dos acima expostos.*

*"Pessoa" significa qualquer entidade governamental ou qualquer pessoa física, firma, parceria,
sociedade, sociedade de responsabilidade limitada, joint venture, associação, fundos, fundos de
investimento, agente fiduciário, organização sem personalidade jurídica, ou outra entidade
organização, quer seja uma pessoa jurídica ou não.*

**CLÁUSULA QUINTA** – Incluir o Anexo 22(xiii)(1) e Anexo 22(xiii)(2) à Cédula nos exatos termos
dos Anexo A e Anexo B respectivamente deste aditivo.

**CLÁUSULA SEXTA** — A atual Cláusula Décima Segunda da Cédula, que trata da obrigação de
manter um índice financeiro, passa a viger com a seguinte redação:

*CLÁUSULA DÉCIMA SEGUNDA - Para fins do disposto na Cláusula Décima Segunda, o índice
obtido pela divisão da Dívida Líquida pelo EBITDA será apurado da seguinte forma: (i)
semestralmente, com base nos balancetes não auditados encerrados em 30 de junho de cada
ano; (ii) anualmente, pelas demonstrações financeiras encerradas em 31 de dezembro de cada
ano, consolidadas e auditadas por empresa de auditoria de renome no mercado.*

*Obrigamo-nos a entregar à CAIXA, durante a vigência desta Cédula, a declaração de
cumprimento do índice nos termos do Anexo II, (i) os balancetes semestrais não auditados
encerrados em 30 de junho até o dia 15 de agosto de cada ano, e (ii) as demonstrações
financeiras encerradas em 31 de dezembro, consolidadas e auditadas, até o dia 5 de maio de
cada ano.*

*Caso em determinado período de verificação das obrigações de que trata esta Cláusula, a
CREDITADA não cumprir com o índice acima estabelecido, a CREDITADA poderá
independentemente de qualquer notificação ou prazo de cura, declarar o vencimento antecipado
de todas as obrigações assumidas pela CREDITADA e/ou pela Avalista.*

TEXT_SP 90808887v8 1803/14

**SAC CAIXA: 0800 726 0101** (informações, reclamações, sugestões e elogios)     10
**Para pessoas com deficiência auditiva ou de fala: 0800 726 2492**
**Ouvidoria: 0800 725 7474**
**caixa.gov.br**

 **CAIXA**    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*Ainda para os fins do disposto na Cláusula Décima Primeira:*

*a) "Dívida Líquida" significa o valor calculado em bases consolidadas, na respectiva data de verificação, determinado de acordo com os princípios contábeis geralmente aceitos no Brasil, igual (a) à soma dos Passivos junto a instituições financeiras, dos títulos e valores mobiliários representativos de dívida emitidos, e do saldo líquido de operações de derivativos (passivos menos ativos de operações com derivativos); diminuído (b) das disponibilidades (caixa, bancos, aplicações de liquidez imediata ou aplicações de curto prazo, títulos e valores mobiliários de própria emissão ou de terceiros, e títulos públicos e privados de qualquer natureza) e (c) dos efeitos da marcação a mercado das operações de derivativos;*

*b) "EBITDA" significa o lucro operacional da CREDITADA, em bases consolidadas, relativo aos 12 (doze) últimos meses, somado às despesas de depreciação e amortização, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil; e*

*c) "Passivo(s)" significa o valor principal dos títulos e valores mobiliários representativos de dívida emitidos junto a instituições financeiras registrados no balanço consolidado da CREDITADA nas datas de medição, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil."*

**CLÁUSULA SÉTIMA** — Em razão da previsão de hipóteses de pagamento antecipado obrigatório, a Cláusula Décima Terceira da Cédula ora aditada passará a ter a seguinte redação, sendo as demais sucessivamente renumeradas:

*PAGAMENTO ANTECIPADO OBRIGATÓRIO*
*CLÁUSULA DÉCIMA TERCEIRA – Obrigamo-nos a liquidar antecipadamente a totalidade dos valores devidos nos termos desta Cédula, aí incluídos os valores de Principal e Encargos Financeiros, na hipótese da ocorrência de qualquer dos seguintes eventos, mediante solicitação prévia com, no mínimo, 5 (cinco) dias úteis de antecedência, por escrito, da CAIXA:*

*a) mudança no nosso objeto social de forma a alterar as atuais atividades principais ou a agregar a essas atividades novos negócios que tenham prevalência ou possam representar desvios em relação às atividades atualmente desenvolvidas sem prévia anuência da CAIXA, a qual não deverá ser negada sem justificativa;*

*b) realização de qualquer tipo de reestruturação societária, tais como fusão, incorporação ou cisão, salvo se a cisão for parcial e não for superior a 10% do nosso patrimônio líquido, sem a prévia anuência da CAIXA, a qual não deverá ser negada sem justificativa, excetuado se dentro do grupo econômico;*

*c) aquisição do controle acionário de sociedades que resulte na alteração do nosso objeto principal, de forma a alterar as atuais atividades principais ou a agregar a essas atividades novos negócios que tenham prevalência ou possam representar desvios em relação às atividades atualmente desenvolvidas, sem a prévia anuência da CAIXA, a qual não deverá ser negada sem justificativa;*

*d) alteração direta ou indireta do controle acionário da CREDITADA ou de qualquer controlada,*

TEXT_SP 9080887v8 1803/14
**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)    11
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

*sem a prévia anuência da CAIXA, com definição da expressão controle acionário extraída do artigo 116 da Lei nº 6.404, de 15.12.1976 e/ou celebração ou assunção de obrigação (condicional ou de outra forma) por parte da CREDITADA ou de seus acionistas diretos ou indiretos, para fazê-lo, exceto no âmbito do processo de recuperação judicial (Chapter 11 proceeding) da NII Holdings, Inc., desde que os novos controladores sejam umas ou mais das Pessoas identificadas no Anexo 13(d).*

**CLÁUSULA OITAVA** — Incluir o Anexo 13(d) à Cédula nos exatos termos do Anexo C deste aditivo.

**CLÁUSULA NONA** — Em razão da inclusão da subordinação das obrigações assumidas pela CREDITADA perante qualquer de suas partes relacionadas e da obrigação da CREDITADA em manter em caixa, em cada data de verificação, recursos imediatamente disponíveis ou em aplicações financeiras com liquidez imediata, as Cláusulas Décima Quarta e Décima Quinta da Cédula ora aditada passarão a ter a seguinte redação, sendo as demais sucessivamente renumeradas:

*SUBORDINAÇÃO*
*CLÁUSULA DÉCIMA QUARTA – A CREDITADA concorda expressamente que todas e quaisquer obrigações assumidas pela CREDITADA perante quaisquer de suas Partes Relacionadas são subordinadas às obrigações previstas nesta Cédula. Da mesma forma, a CREDITADA concorda que nenhum valor será pago a suas Partes Relacionadas antes da liquidação integral das obrigações previstas nesta Cédula, inclusive na hipótese de falência, liquidação ou dissolução da CREDITADA, exceto quaisquer pagamentos realizados entre a CREDITADA e a Avalista.*

*SALDO MÍNIMO*
*CLÁUSULA DÉCIMA QUINTA – A CREDITADA deverá manter em caixa, em cada Data de Verificação, recursos imediatamente disponíveis ou aplicações financeiras, no valor mínimo de R$200.000.000,00 (duzentos milhões de reais) ("Saldo Mínimo"), e deverá comprovar à CAIXA, por meio de (i) balancetes semestrais não auditados encerrados em 30 de junho entregues à CAIXA até o dia 15 de agosto de cada ano; e (ii) demonstrações financeiras encerradas em 31 de dezembro, consolidadas e auditadas, entregues à CAIXA até o dia 5 de maio de cada ano. Para fins desta Cédula, considera-se "Data de Verificação" as datas de 30 de junho e 31 de dezembro de cada ano.*

**CLÁUSULA DÉCIMA** – A atual Cláusula Trigésima Primeira da Cédula passa a viger com a seguinte redação:

*"CESSÃO*
*CLÁSULA TRIGÉSIMA PRIMEIRA - Esta Cédula poderá ser objeto de cessão e endosso por parte da CAIXA, no todo ou em parte, mediante aviso prévio (com 10 (dez) dias úteis de antecedência) à CREDITADA, nos termos da legislação civil e comercial, ressalvado que, até o 15 de setembro de 2015, a presente Cédula somente poderá ser cedida e/ou endossada mediante o consentimento expresso e por escrito da CREDITADA."*

**CLÁUSULA DÉCIMA PRIMEIRA** - É devida a Tarifa de Customização de Operação de Crédito, cujo pagamento pela CREDITADA é realizado na data de assinatura deste Primeiro Aditamento, no percentual de 0,60% (sessenta centésimos por cento) do valor repactuado, equivalente ao

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)    12
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

valor de R$3.146.008,88 (três milhões, cento e quarenta e seis mil e oito reais e oitenta e oito centavos) referente ao dia 13 de fevereiro de 2013 a ser atualizada na data da celebração deste Primeiro Aditamento.

**CLÁUSULA DÉCIMA SEGUNDA** - A CREDITADA declara, nesta data, o saldo devedor da Cédula, como dívida líquida e certa, e promete pagá-la nas datas e nos termos previstos em referido instrumento, conforme aditado por este Primeiro Aditamento.

**CLÁUSULA DÉCIMA TERCEIRA** – A **CREDITADA** levará o presente instrumento a registro no Registro de Títulos e Documentos da Comarca de São Paulo, Capital. As despesas relativas ao referido registro serão suportadas pela CREDITADA, que, desde já, autoriza o débito dos respectivos valores em sua conta de depósito nº 1859-6, Operação 003, mantida na agência nº 3150 da CAIXA.

**CLÁUSULA DÉCIMA QUARTA** – Todas as demais cláusulas e condições da Cédula, conforme aditada pelo seu Primeiro Aditamento, que não tenham sido expressamente alteradas pelo presente Primeiro Aditamento, ficam ratificadas permanecendo íntegras e em vigor para todos os efeitos de direito.

E, por estarem de perfeito acordo, a CREDITADA emite o presente Primeiro Aditamento à Cédula, devidamente assinado e em 4 (quatro) vias de igual teor, sendo somente a primeira delas (a via do banco) negociável, que passa a fazer parte integrante e indissociável da Cédula.

São Paulo, 13 de fevereiro de 2015.

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)    **13**
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

**CAIXA**

PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

**CREDITADA:**

_____
Assinatura da CREDITADA
NEXTEL TELECOMUNICAÇÕES LTDA.
CNPJ: 66.970.229/0001-67
Representante Legal: SULTANA SHAMIM KHAN
CPF: 055. 796. 177 - 71
Cargo:

_____
Assinatura da CREDITADA
NEXTEL TELECOMUNICAÇÕES LTDA.
CNPJ: 66.970.229/0001-67
Representante Legal: GUKUL V. HEMMADY
CPF: 236. 253. 478 - 22
Cargo:

**AVALISTA:**

_____
Assinatura da AVALISTA
NEXTEL TELECOMUNICAÇÕES S.A.
CNPJ: 00.169.369/0001-22
Representante Legal: SULTANA SHAMIM KHAN
CPF: 055. 796. 177 - 71
Cargo:

_____
Assinatura da AVALISTA
NEXTEL TELECOMUNICAÇÕES S.A.
CNPJ: 00.169.369/0001-22
Representante Legal: GOKUL V. HEMMADY
CPF: 236. 253. 478 - 22
Cargo:

**Identificação do Gerente Concessor/Conferência de Assinaturas - Termo de Aditamento - Investimentos**

| Nº. da Cédula | Nº. do Termo de Aditamento | Valor - R$ | Data do Termo de Aditamento |
|---|---|---|---|
| 21.3150.777.0000001- 97 | 1 | R$ 640.000.000,00 (seiscentos e quarenta milhões de reais) | 13/02/2015 |

| Nome do gerente | Matrícula |
|---|---|
| Fernando Ciotti | C053011.7 |

Atesto que as assinaturas constantes da Cédula referenciada são verdadeiras e que foram devidamente conferidas pelo empregado habilitado abaixo assinado, que reconheceu como válidas as assinaturas da **CREDITADA** de acordo com Ficha de Abertura e Autógrafos ou documento original de identificação (RG e CPF).

_____
Assinatura, sob carimbo, Caixa
Caixa Econômica Federal

_____
Assinatura, sob carimbo, concessor
Caixa Econômica Federal

TEXT_SP 9080887v8 180.3/14
**SAC CAIXA:** 0800 726 0101 (informações, reclamações, sugestões e elogios)        14
**Para pessoas com deficiência auditiva ou de fala:** 0800 726 2492
**Ouvidoria:** 0800 725 7474
caixa.gov.br



MICROFILMADO SOB Nº
2071014
10º OFICIAL DE REGISTRO DE TÍTULOS E DOCUMENTOS DA CAPITAL-SP





**CAIXA**

PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

CAIXA

_____
Assinatura da CAIXA
CAIXA ECONÔMICA FEDERAL
CNPJ: 00.360.305/0001-04
Representante Legal:
                LUIZ GUSTAVO SILVA PORTELA
CPF:           Superintendente Executivo
              Matr. 051710-5
Cargo:     SGE  Infraes., Energia e Telecom.
              CAIXA ECONÔMICA FEDERAL

_____
Assinatura da CAIXA
CAIXA ECONÔMICA FEDERAL
CNPJ: 00.360.305/0001-04
Representante Legal:
           FLAVIA SILVA NOGUEIRA
CPF:        Superintendente Regional S.E.
           Matr. 050.753-2
Cargo:     SR Osasco/SP
           CAIXA ECONÔMICA FEDERAL



| 10º | MICROFILMADO SOB Nº |
| --- | --- |
| | .. 2071014 |

10º OFICIAL DE REGISTRO DE
TÍTULOS E DOCUMENTOS DA CAPITAL-SP



TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)   15
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**



**ANEXO A**

**Anatel Bonds**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

**Garantias Judiciais**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

17



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

18



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |

TEXT_SP 90808587v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

19



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ | Judicial | Cível |

TEXT_SP 9080587v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

20



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
caixa.gov.br

21



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|----------------|------|----------|--------|
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Cível |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

22



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | - | | |
|---|---|---|---|---|---|---|
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

23

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|--------------|------|----------|--------|
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

24

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

25



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

26



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

## Outras Garantias

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

## Garantia em Juízo

| | Bloqueio | Deposito Judicial | Bens em Garantia |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

27

 **CAIXA**

PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

## ANEXO B

**Anatel Bonds**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

28



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

**Garantias Judiciais**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |

TEXT_SP 90808874 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)        29
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 **CAIXA**    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |

TEXT_SP 90808587v8 1803/14
SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br
30



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

31

 **CAIXA**

PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ | Judicial | Cível |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala:** 0800 726 2492
**Ouvidoria:** 0800 725 7474
caixa.gov.br

32

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)                    33
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Cível |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

34



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| | | | | R$ - | | |
|---|---|---|---|---|---|---|
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**
35



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

36



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

37

 PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 –
INVESTIMENTOS

| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

38



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

## Outras Garantias

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

## Garantia em Juízo

| | Bloqueio | Deposito Judicial | Bens em Garantia |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

39



PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

**Financiamentos**

| BANCO | NÚMERO DO CONTRATO | DATA DA CONTRATAÇÃO | VALOR DO CONTRATO | TIPO |
|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB |
| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME |

TEXT_SP 9080887v8 1803/14

SAC CAIXA: 0800 726 0101 (informações, reclamações, sugestões e elogios)    40
Para pessoas com deficiência auditiva ou de fala: 0800 726 2492
Ouvidoria: 0800 725 7474
caixa.gov.br

    PRIMEIRO ADITAMENTO À CÉDULA DE CRÉDITO BANCÁRIO
Nº 21.3150.777.0000001- 97 – INVESTIMENTOS

## ANEXO C

1)    Capital Research and Management Co.;
2)    Aurelius Capital Management, LP;
3)    JP Morgan Asset Management;
4)    GoldenTree Asset Management;
5)    Empyrean Capital Partners;
6)    Whitebox Advisors;
7)    JMB Capital;
8)    Benefit Street Partners;
9)    Credit Suisse Securities; ou
10)   qualquer das Afiliadas das empresas descritas nos itens (1) a (9), acima.

TEXT_SP 9080887v8 1803/14

**SAC CAIXA**: 0800 726 0101 (informações, reclamações, sugestões e elogios)    41
**Para pessoas com deficiência auditiva ou de fala**: 0800 726 2492
**Ouvidoria**: 0800 725 7474
**caixa.gov.br**

**EXHIBIT F-4b**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| Amendment 001 to Bank Credit Note No. 21.3150.777.0000001-97 | Expiration: 12/08/2018 | Amount - R$ R$ 640,000,000.00 |
|---|---|---|

I - LENDER - **CAIXA ECONÔMICA FEDERAL**, a state-owned financial institution, created pursuant to Decree-Law No. 759, from August 12, 1969, as part of the Treasury Department, governed by its current bylaws at the time of this contract, with headquarters at Setor Bancário Sul, Quadra 4, lotes 3/4, em Brasília/DF, enrolled in the National Corporate Taxpayer Registry of the Treasury Department CNPJ/MF under No. 00.360.305/0001-04, Superintendência Regional Osasco/SP, hereby represented by its undersigned legal representative, and henceforth **CAIXA** or **LENDER.**

II - ISSUER - **NEXTEL TELECOMUNICAÇÕES LTDA,** a limited liability company (*sociedade limitada*) with headquarters in the city of São Paulo, Av. das Nações Unidas, 14.171, 32° andar, Rochavera Crystal Tower, enrolled in the National Corporate Taxpayer Registry of the Treasury Department CNPJ/MF under No. 66.970.229/0001-67, herein represented, pursuant to its articles of association, by the undersigned representatives, and henceforth, ISSUER**.**

III - CHARACTERISTICS OF THE CREDIT:

| 1 - ISSUER/ISSUER | 2 - CNPJ |
|---|---|
| **NEXTEL TELECOMUNICAÇÕES LTDA** | 66.970.229/0001-67 |

| 3 - Limited Transaction Checking Account | | | | 4-Unlimited Transaction Checking Account | | | |
|---|---|---|---|---|---|---|---|
| Branch | Operation | Account | Suffix | Branch | Operation | Account | Suffix |
| | | | | | | | |

| 5 - Type of Operation |
|---|
| Investment - CDI - Post |
| 777 - Special Corporate Credit - Large Corporations - Investments |
| 6 - Total Credit Amount |
| R$ 640,000,000. 00 (six hundred forty million Reais) |

| 7 - Financial Charges |
|---|
| 115% (one hundred fifteen percent) CDI (Interbank Deposit Certificate) CETIP (Clearing House for the Custody and Financial Settlement of Securities) per year, calculated based on Clause Three |

| 8 - Term and Amortization System |
|---|
| Term: 84 (eighty four) months |
|    (a) on the first 24 months no payments will be made on the Principal; during this interest-only period, quarterly payments will be made on Financial Charges only. |
|    (b) during the following 60 months, Principal amortization will apply and will be duly increased by quarterly Financial Charges. |
| SAC – Constant Amortization System |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| 9 - Place of Payment |
| --- |
| São Paulo /SP |

| 10 - Guarantor | CNPJ |
| --- | --- |
| Nextel Telecomunicações S.A. | 00.169.369/0001-22 |

**IV – CHANGES MADE TO THIS AMENDMENT**

| 3 - Limited Transaction Checking Account | | | | 4 - Limited Checking Account | | |
| --- | --- | --- | --- | --- | --- | --- |
| Operation | Account | Suffix | Branch | Operation | Account | Suffix |
| 003 | 180 | 4 | 3150 | 003 | 1859 | 6 |

| 7 - Financial Charges |
| --- |
| 139.54% (one hundred thirty nine and fifty four percent) CDI CETIP per year |

| 11 - Guarantee | Minimum Amount |
| --- | --- |
| Fiduciary Assignment of Credit Rights on the CAIXA (SICAP) Collection Agreement | Minimum average monthly flow in the amount of R$ 70,000,000.00 |

**WHEREAS:**

I - Pursuant to Bank Credit Note No. 21.3150.777.0000001-97, issued on December 8, 2011, the **CREDITOR** granted a loan to the ISSUER**,** whose original characteristics will be amended  by the First Amendment to the Bank Credit Note ("First Amendment"), following the characteristics described in Table III above ("Note");

II - Herein the parties wish to re-negotiate the transaction fee, to include the guarantee of Fiduciary Assignment of Credit Rights on the CAIXA (SICAP) Collection Agreement, and to modify the early termination provisions and Note assignment.

The parties have decided herein to amend the Note, pursuant to the following terms and conditions:

**FIRST AMENDMENT TO THE NOTE**
**CLAUSE ONE** - The parties decide to modify the financial charges of the herein amended Note following the parameters described on Table IV of the Preamble to this First Amendment.

**Sole Paragraph** - All the clauses and conditions of the Note and First Amendment that mention the herein modified terms are expressly amended to reflect the new agreement of the parties, pursuant to this First Amendment.

**CLAUSE TWO – INCLUSION OF GUARANTEE**

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**
2

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



## FIRST AMENDMENT TO BANK CREDIT NOTE
### No. 21.3150.777.0000001-97 -- INVESTMENTS

Due to the inclusion of a guarantee regarding the Fiduciary Assignment of Credit Rights on the CAIXA (SICAP) Collection Agreement, Clause Ten is added to the herein amended Note and shall now read as follows, and the subsequent clauses shall be renumbered accordingly:

*CLAUSE TEN - INCLUSION OF GUARANTEE – To enforce the obligations undertaken herein in this Note ("Guaranteed Obligations"), the ISSUER herein, pursuant to the existing Law, irreparably and irrevocably fiduciarily assigns to CAIXA, pursuant to § 3 of Article 66-B of Law No. 4.728/65, as written by Law No. 10.931/04, to Articles 18 to 20 of Law No. 9.514/97, and to Decree-Law No. 911/69 and further amendments and, when applicable, to Article 1.361 and subsequent articles of the Civil Code, the title in fee simple subject to condition subsequent ("domínio resolúvel") and direct and indirect possession of all credit rights over present and future receivables resulting from the provision of telecommunication services carried through by the ISSUER to its customers, including the entire revenue from amounts received for this purpose, which shall be collected by CAIXA ("Receivables"), according to the following described terms, as well as resources deposited or kept in the Joint Account ("Assigned Rights").*

*PARAGRAPH ONE - Amounts relative to Receivables shall be received by CAIXA through the collection of non-convertible slips and automatic debit, pursuant to the Collection Agreement entered into by the ISSUER and CAIXA (No. 400089) ("Collection Agreement").*

*PARAGRAPH TWO - Henceforth, the amounts received daily within the scope of the Collection Agreement ("Collection Amounts"), representing part of the Receivables and of any other credits, shall be deposited into account No. 180-4, Branch No. 3150, Operation 003, whose transactions will be exclusive to CAIXA, linked to the due performance and payment of obligations resulting from the Note ("Joint Account"), whose balance and amounts daily deposited therein are also fiduciarily assigned by the ISSUER to CAIXA, being a part, for all effects, of the Assigned Rights, pursuant to this Clause. The ISSUER irrevocably commits (i) not to attempt to directly collect any sums regarding the Receivables; (ii) not to modify, in any material way, the current procedures and methods of collection of Receivables, or to take or fail to take any measures, when applicable, for the purpose of reducing Receivables collected by CAIXA until the due performance of the ISSUER's obligations provided in this Note; (iii) to keep the Collection Agreement in full force and effect as long as the Note is valid; and, (iv) not to assign, alienate, transfer, sell, burden, pledge, create liens, grant or encumber or in any way negotiate the Assigned Rights, without CAIXA's prior and written consent.*

*PARAGRAPH THREE - It is agreed that the average monthly amount of the Collected Amounts that shall be deposited in the Joint Account during the three months immediately prior to CAIXA's quarterly ("Term") assessment shall be conducted on the 31st of March, 30th of June, 30th of September, and 31st of December of each year, and the ISSUER commits to take all necessary measures to make the payments – the minimum about equivalent to seventy million Reais (R$ 70,000,000.00) ("Minimum Average Amount"), calculated based on the total amount of resources that shall be deposited in the Joint Account in each Term, divided by 3 (three). If CAIXA verifies that the Minimum Average Amount in a particular Term was not met, CAIXA shall, by law, at its discretion, immediately declare the early termination of the ISSUER's*

TEXT_SP 9080887v8 1803/14                                                     3
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

obligations set forth in this Note. Notwithstanding CAIXA's right to early terminate the ISSUER's obligations as set forth herein, *CAIXA shall, at its own discretion, as an alternative to declare the early termination of the ISSUER's obligations in this Note, demand that the ISSUER, within 10 (ten) days, starting on the day CAIXA's request is made, deposit, in the Joint Account, the amount equivalent to the difference between the Minimum Average Amount and the monthly average amount effectively verified by CAIXA, pursuant to this Clause ("Deficit Amount"). In this event, the "Deficit Amount" shall be retained in the Joint Account until CAIXA verifies, on a date determined pursuant to the terms of this clause, that the Minimum Average Amount has been reestablished.*

**PARAGRAPH FOUR** - *Regardless of what has been established in the following paragraph, CAIXA is herein identified as the sole legal fiduciary holder of the Assigned Rights, and this shall be true until all obligations that the ISSUER committed to in the Note are fully met, such that, once the ISSUER meets all obligations, as verified by CAIXA, CAIXA's fiduciary title will be terminated and all Assigned Rights will return to the ISSUER.*

**PARAGRAPH FIVE** - *Except when there is retention of the Deficit Amount, Collection Amounts shall be released into the ISSUER's unlimited transactions account daily, at 2:00 p.m., after CAIXA has exercised its inspection rights on the agreed upon dates, and, provided that the ISSUER did not incur into any early termination provisions, mandatory early payment events or provided that the ISSUER has not failed to comply with any of its pecuniary obligations.*

**PARAGRAPH SIX** - *The ISSUER represents herein that:*

*(i)     it is authorized, pursuant to the law and to its bylaws, to assign the Assigned Rights that it detains, as well as to fulfill the provisions herein;*
*(ii)    by entering into this contract it does not violate any provisions set forth in its bylaw or in any other applicable legal provision or regulation;*
*(iii)   the Assigned Rights are free and unencumbered from any burdens, collections, judicial or nonjudicial liabilities of any nature, including tax claims, or debt liabilities and /or liens, with the exception of this fiduciary assignment;*
*(iv)    there are no legal impediments from covenants of which the ISSUER is a party that may undermine the fiduciary assignment of the Assigned Rights hereupon granted to CAIXA; and,*
*(v)     that it had clear and sufficient prior knowledge of the obligations set forth herein, and that it has agreed to all the terms herein, and that is has decided, willfully and spontaneously, free of absence of consent, to grant fiduciary title of the Assigned Rights as an indivisible and irrevocable guarantee.*

**PARAGRAPH SEVEN** - *The ISSUER shall be liable for any and all damages caused on CAIXA due to misrepresentation or inaccuracies in the statements and guarantees herein provided.*

**PARAGRAPH EIGHT** - *In the event of payment default relative to the pecuniary obligations to which the ISSUER has committed in the Note, past the respective grace periods, as applicable, all amounts relative to the Assigned Rights shall be retained by CAIXA in the Joint Account and, in the event of an early termination or the mandatory early payment pursuant to the terms of this Note, they shall be used*

TEXT_SP 9080887v8 1803/14                                                                                    4
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

*in the payment of the ISSUER's obligations until they are fully paid, according to the terms of this Note, up to the limit of the Guaranteed Obligations.*

**PARAGRAPH NINE** - *In the event of an early termination, pursuant to the terms of this Note, CAIXA shall, without prior notice, promote the immediate use of the Assigned Rights to fulfill the guaranteed obligations that are overdue and unpaid by means of foreclosure proceedings or of the sale of Receivables, as applicable, or, in the case of Collection Amounts, to simply apply them as payment for the Guaranteed Obligations, pursuant to the terms of this Note, until full payment of the obligations. To this effect, CAIXA shall have the right to immediately exercise its legally granted rights over the Assigned Rights, pursuant to the terms of the Note, thus being allowed to, privately, totally or partially, negotiate, collect, receive, execute, sell or grant the Receivables, pursuant to the terms and conditions that CAIXA determines to be appropriate, grant a debt-release and sign any documents or terms, no matter how privileged they are, required to perform said actions, without notice to and/or authorization from the ISSUER. Any remaining amounts arising from the the Guaranteed Obligations shall be returned to the ISSUER.*

**PARAGRAPH TEN** - *The* ISSUER *herein waives any legal or contractual rights or privileges that might impact the quiet-title and full enforceability and transfer of Assigned Rights in the event of its foreclosure, pursuant to the terms and conditions of this Note.*

**PARAGRAPH ELEVEN**- *Notwithstanding the Note's provisions, and for purpose of Article 1.362 of the Brazilian Civil Code, Law 9.514/97, as amended, and of Law 4.728/65, as amended, the Guaranteed Obligations are described as follows:*

*(i)        Estimated principal amount of the debt: R$ 512,000,000.00 (five hundred twelve million Reais);*
*(ii)       Term and conditions of payment: principal payment, 24 (twenty four) months after the Note is signed, in 20 (twenty) quarterly payments of R$ 32,000,000.00 (thirty two million Reais) with maturity in March, June, September and December of each year, and the quarterly payment of financial charges, starting on the date the Note is signed, in March, June, September and December of each year;*
*(iii)      Interest Rates: 139.54% of the CDI;*
*(iv)      Interests on arrears: CDI plus 2% per month; and,*
*(v)       Penalty Clause: 2% over amount due.*

**PARAGRAPH TWELVE** - *The parties acknowledge and agree that the* ISSUER *does not have a receivables tracking system that is capable of identifying clients, amounts or invoices that are effectively deposited in the Joint Account and, similarly, except when otherwise expressly stated in this Note, the* ISSUER *is not required to perform this type of specific tracking.*

**CLAUSE THREE** - Clause Three of the Note, which addressed CHARGES, shall now read as follows:

*CHARGES*

TEXT_SP 9080887v8 1803/14                                          5
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

*CLAUSE THREE - Over the transaction value shall be applied financial charges equivalent to 139.54% (one hundred thirty nine and fifty four percent) of the daily average CDI Over Index (Interbank Deposit Certificate) fee, published daily by CETIP S.A. - Mercados Organizados ("CDI CETIP"), and capitalized daily.*

*Paragraph One - The average daily fee for the Interbank Deposit Certificates (CDI) used to index the outstanding balance will be the one posted on the second business day prior to indexation.*

*Paragraph Two - In the event that the CDI CETIP index is discontinued, CAIXA shall automatically replace it with whatever index the relevant authorities have set up as its replacement. In the absence of a legal or regulatory determination; the basis of calculation for compensation used by commercial banks credit operations in the financial market will be applied.*

*Paragraph Three - Financial Charges, calculated per business days, shall be charged quarterly.*

*Paragraph Four - In the event of payment, extraordinary payment or early payment at times different from those indicated in Clause Two, a business day pro-rata will be applied, and a written notice shall be sent to CAIXA at least 3 (three) business days in advance.*

**CLAUSE FOUR** - The first part of Clause Twenty Two of the Note, which contains the provisions of EARLY TERMINATION, shall now read as follows, and the wording on its remaining paragraphs shall not be altered:

*EARLY TERMINATIONCLAUSE TWENTY-TWO - The following are reasons for early termination and immediate payment of this Note, without judicial service or nonjudicial notice, in addition to the cases provided by law:*

*I)      if the* ISSUER *defaults on of any of the pecuniary obligations it has committed to in this Note, and the situation remains unresolved after the grace period of 1 (one) business day, starting from the original maturity date;*

*II)      if the* ISSUER *defaults on any of the non-pecuniary obligations it has committed to in this Note, and the situation remains unresolved beyond the grace period of 30 (thirty) business days, starting from the date when CAIXA sends the* ISSUER *a notice communicating the fact;*

*III)      noncompliance, misrepresentation, inaccuracies, errors or material omission attributed to the* ISSUER *in any statements, guarantee, information or material document signed, provided or delivered by the* ISSUER *in association with this credit transaction, if the situation remains unresolved beyond the grace period of 10 (ten) business days;*

*IV)      early termination or default of any pecuniary obligation of the* ISSUER *or of any of its Brazilian Affiliates, excluding obligations exclusively established between the* ISSUER *and the Guarantor, in unit or aggregate value, that shall be equal to or greater than ten million Reais*

TEXT_SP 9080887v8 1803/14                                                              6
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**CAIXA**

**FIRST AMENDMENT TO BANK CREDIT NOTE**
No. 21.3150.777.0000001-97 -- INVESTMENTS

*(R$ 10,000.00), if the situation is not resolved within 10 (ten) business days, starting on the day CAIXA sends notice of fact, except when payment for such obligations was suspended due to an administrative or court order or when such court order has been financially guaranteed in Court;*

*V)    early termination of any other of the ISSUER's pecuniary obligations to CAIXA if the situation is not resolved within the deadlines set forth in the respective agreements;*

*VI)    claim of payment for a note on a secured transaction against the ISSUER with a single or aggregated value equal to or higher than ten million Reais (R$ 10,000,000.00), that is not resolved within the period of 30 (thirty) days stating of the date of receipt of written notice from CAIXA, or that may become a legal proceeding, or whose payment has been suspended by court order or that has been financially guaranteed in Court;*

*VII)    (a) if the ISSUER and/or Brazilian affiliates file for voluntary bankruptcy; (b) a request for bankruptcy of the ISSUER and/or Brazilian affiliates is petitioned by a third party and is not overturned within the legal deadline; (c) affirmative court judgment granting bankruptcy or liquidation by the ISSUER and/or any other Brazilian affiliates; (d) ISSUER's and/or any other Brazilian affiliates' petition for judicial or nonjudicial recovery;*

*VIII)    liquidation, dissolution or extinction of the ISSUER;*

*IX)    if the ISSUER and/or Brazilian affiliates are legally declared insolvent, or if publically discloses to be insolvent, or if it is known by CAIXA, in the event of its failure to meet its pecuniary obligations, or if this inability is publicly known, in both cases, with a global amount greater than ten million Reais (R$ 10,000,000.00);*

*X)    if the ISSUER approves capital reductions, redemption, amortization, reimbursement, or purchase of shares, when such operations involve the payment (in cash or in natura) to its partners, or, when the financial index indicated in Clause Twelve is greater than 2.5 (two point five), profit distribution or interest on equity, even when already declared, to its partners;*

*XI)    individual or aggregated alienation, by the ISSUER, of any of its properties or assets, without previous and express written consent from CAIXA, except in the event of (i) revenue factoring with credit card, (ii) sale of overdue and unpaid receivables and, (iii) alienation of goods in the usual course of business, (iv) transfers of obsolete assets or goods of low added value, (v) transfers within the context of an exchange for similar assets of equal or greater value; and, (vi) sale of towers in the sale leaseback modality, in which case it shall be subject to pre-approval by CAIXA, which shall have 45 (forty five) days to question, starting on the date the written notice is received, as long as there is proof of receipt of notice by CAIXA, and CAIXA's failure to manifest an opinion shall not implicate in tacit approval;*

*XII)    payment, by the ISSUER or any of its Brazilian Affiliates, of any obligation, before full repayment of all obligations in this Note, to the Related Parties, including the hypothesis of ISSUER's bankruptcy, liquidation or dissolution of the ISSUER, except for any payments between ISSUER and Guarantor;*

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

*XIII)   granting, by the ISSUER or any Brazilian Affiliates, of any liens or burdens or other property guarantees or personal guarantees, on behalf of third parties (including its Affiliates and direct or indirect controlling company), except (i) those comprised in the terms of this Note or prior to the date of the First Amendment, or (ii) by (a) granting security interests as counter-guarantee in insurance contracts and guarantee-insurance in general; (b) granting of security interest as counter-guarantee in new personal guarantees ("fiança") for guarantees in court proceedings or to conduct new legal deposits in court proceedings, in case of guarantees granted within the terms of this item (b) at the global amount of one hundred fifty million Reais (R$ 150,000,000.00); (c) grant of security interests or personal guarantees in contracts of site leases; (d) grant of security interests or personal guarantees in placement contracts (i.e. contracts with other operators for equipment installation in towers), (e) financing granted by the National Telecommunications Agency - ANATEL, including their renewal, (f) guarantees for ANATEL, (g) security interest granted as counter-guarantee to issue performance bonds for ANATEL, in this case, subject to CAIXA's advanced approval, which shall be expressed within 45 (forty five) days counted from such questioning is expressed by means of a written notice, as long a there is proof of CAIXA's receipt of such notice, and CAIXA's failure to manifest an opinion shall not imply tacit approval and, (h) renewal of operations already withheld by the ISSUER or its Brazilian Affiliates identified in the attached Attachment 22(xiii)(1) of this Note, and the guarantees to be granted, pursuant to the terms of this item (h), shall be limited to the amount guaranteed by securities and/or performance bonds, as indicated in such attachment, following the same current guarantees applicable hereon, and the security interests granted pursuant to items (a), (c) and (d) above are limited to the global amount of fifty million Reais (R$ 50,000,000.00). The ISSUER states, for the purposes of this Note, that Attachment 22(xiii)(2) contains all operations qualified as a security interest;*

*XIV)    failure to use the resources for the purpose indicated in Clause Seven;*

*XV)    failure to comply with the Minimum Amount for 1 (one) Term, pursuant to Clause Ten, Paragraph Three, of this Note;*

*XVI)    enforcement of any guarantee given to any of the ISSUER's or Brazilian Affiliates' creditors at an amount equal to or greater than ten million Reais (R$ 10,000,000.00), as long as it is not resolved within the 10 (ten) business days of grace period, counted from the date the notice if sent by CAIXA, except in the event that such enforcement is suspended by administrative or court order;*

*XVII)    enactment of administrative regulations whose effects have not been suspended within the legal deadline, when applicable, that (i) adversely  impacts the ISSUER's ability to fulfill its obligations to CAIXA; or (ii) that makes the ISSUER's activities, or a significant part of them, not feasible or that in any way it adversely impacts the financial situation (in both cases understood as activities that answer for 10% (ten percent) or more of the ISSUER's balance); or (iii) results in the application of a fine, sanction or final and non-appealable penalty that impacts the ISSUER's and/or its Brazilian Affiliates' financial situation, at an amount equal to or greater than 100 one hundred million Reais (R$ 100,000,000.) within the same fiscal year;*

TEXT_SP 9080887v8 1803/14                                                          8
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

*XVIII) if the ISSUER adopts a policy that results in racial or gender discrimination or moral or sexual harassment, (ii) proof of final court order of administrative decision rendered by a competent authority or agency, (I)  that the ISSUER's activities harm the environment, (II) that the  ISSUER (a) does not use slave labor, pursuant to  Interministerial Ordinance No. 2, from May 12, 2011, (b) in no way uses unregulated child labor, (c) explores prostitution, or (d) conducts illegal activities, whether these are or are not logged in the Employer Registry;*

*XIX)    transfer, forfeiture or suspension of ANATEL Concession for the use of third generation frequency (3G technology) and GSM without advanced consent from CAIXA, which shall not be unjustifiably denied;*

*XX)    if the index obtained from dividing the Net Debt by the EBITDA is greater than 2.5 (two point five), to be calculated pursuant to Clause Twelve;*

*XXI)    if the ISSUER does not keep the Minimum Balance on each Verification Date in resources immediately available or in financial investment;*

*XXII)    failure to comply with the subordination obligation provided in Clause Fourteen of this Note;*

*XXIII) full or partial transfer or assignment, to third parties, for any purpose, of total or partial rights and obligations resulting from this Note, without CAIXA's advanced and express consent;*

*XXIV)    failure to perform the registration acts provided in this Note within 72 (seventy two) hours starting from the signing of this document, either as a willful act or due to any legal or contractual impediment;*

*XXV)    lack of a balance in any of the ISSUER's accounts that meets the payment commitments taken in this Note in the respective Payment Dates, that are not resolved within 1 (one) business day; and*

*XXVI)    failure to comply with any of the obligations set forth in Clause Ten, Paragraph Two of this instrument.*

*Also, for the purposes of this Note, the following concepts are defined:*

*An "Affiliate" of any Entity means another Entity that, directly or indirectly, by means of one or more intermediaries, Controls, is Controlled, or is under common Control with this first Entity. Additionally, in the case of an Entity that is an investment fund or whose controlling Shareholder is an investment fund, it shall also be considered an "Affiliate": (i) the manager or a shareholder or an Affiliate of the manager or of the shareholder, (ii) another investment fund managed by the manager or shareholder or and affiliate of this manager or shareholder's investment fund, and (iii) any entity that is, directly or indirectly Controlled or is under the common Control of this investment fund*

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

*either individually or in partnership with another Affiliate, or any of the aforementioned Entities.*

*"Brazilian Affiliate" means, relative to any Entity, an Affiliate that is domiciled in Brazil;*

*"Control" (including its associated meanings) means, pursuant to Article 116 of Law No. 6.404, dated 12.15.1976, (a) power to elect the majority of the board members, or similar organization, of the controlled Entity or, in some other way, to conduct this Entity's businesses or apply its policies (by means of a contract or in some other way), and, (b) the actual direct or indirect ownership of rights that grants to the Controlled Entity the majority vote of the Controlled Entity in a shareholders' general assembly or similar gathering.*

*"Related Party" to any particular Entity shall have the meaning described in Deliberation No. 642 dated October 7, 2010 issued by the Brazilian Securities and Exchange Commission (CVM), and it shall also include, as long as not repeated, (i) any Affiliate of this Entity, (ii) any director, council member, shareholder, stockholder, employee or administrator of this Affiliated Entity, (iii) any spouse, former-spouse, ascendant, descendant or collateral relative up to second degree of this Entity, or Affiliate of this Entity or any director, council member, stockholder, shareholder, employee or administrator of this Entity or an Affiliate of this Entity, or any Affiliate of the aforementioned.*

*"Person" means any government agency or any individuals, firm, partner, company, limited liability company, joint venture, association, fund, investment fund, trustee, organization without corporate entity, or another entity, whether or not a corporation.*

**CLAUSE FIVE**- To include Attachment 22(xiii)(1) and Attachment 22(xiii)(2) to the Note according, exactly, to the terms in Attachment A and Attachment B, of this amendment, respectively.

**CLAUSE SIX** - The current Clause Twelve, which addresses the obligation to have a financial index, shall read as follows:

*CLAUSE TWELVE - For the purposes of Clause Twelve's provisions, the index obtained from dividing the Net Debt by the EBITDA shall be calculated as follows: (i) every semester, based on non-audited temporary balance sheets closed on the 30th of June of each year; (ii) every year, based on financial statements closed on the 31st of December of each year, consolidated and audited by a major auditing company.*

*We commit to delivering to CAIXA, for as long as this Note is valid, a statement of compliance with the index pursuant to Attachment II, (i) the non-audited semester temporary balance sheets closed on the 30th of June of each year, by the 15th of August of each year, and (ii) the consolidated and audited financial statements closed on the 31st of December, by the 5th of May of each year.*

*If at any point during the period in which the obligations in this Clause are being verified, the* ISSUER *fails to comply with the above determined index, the* ISSUER *shall, without notice or grace period, early termination all obligations taken by the* ISSUER *and/or Guarantor.*

TEXT_SP 9080887v8 1803/14                                          10
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



**FIRST AMENDMENT TO BANK CREDIT NOTE**
No. 21.3150.777.0000001-97 -- INVESTMENTS

*Also for the purposes provided in Clause Eleven:*

*a)   "Net Debt" means the value calculated on consolidated bases, in the respective date of verification, determined grounded on accounting principles generally accepted in Brazil, equal (a) to the sum of the Liabilities from financial institutions, debt bonds and securities, and the net balance from derivative transaction (liabilities minus derivative transaction assets); minus (b) cash equivalents (cash, banks, marketable securities, short term investments, stock treasure or third party bonds and securities, and any type of public and private bonds) and (c) from the effects of market to market investment of derivatives transactions;*

*b)   "EBITDA" means the operating profit of the ISSUER, on a consolidated basis, relative to the past twelve (12) months, plus the depreciation and amortization expenses, all determined in accordance with the generally accepted accounting principles in Brazil; and*

*c)      "Liability(ies)" means the principal of the securities representing the debt issued at the financial institutions registered on the consolidated Balance Sheet of the ISSUER on the measurement dates, all determined in accordance with the generally accepted accounting principles in Brazil."*

**CLAUSE SEVEN** - Due to the provisions regarding mandatory early payments, Clause Thirteen of the Note, herein amended, shall now read as follows, and the subsequent clauses shall be renumbered accordingly:

*MANDATORY EARLY PAYMENT*
*CLAUSE THIRTEEN - We commit to making early payment of all amounts owed, according to the terms of this Note, including amounts relative to Principal and Financial Charges, in the event that any of the following takes place, upon advanced written request made within at least 5 (five) business days by CAIXA:*

*a)  change in our business purpose in order to change current main activities or to add new businesses to these activities that may prevalence or that may represent a deviation in the currently conducted activities, without advance consent from CAIXA, which shall not be denied without justification;*

*b)  to conduct any type of corporate restructuring, such as mergers ("Fusões" e "Incorporações") and spin-offs ("Cisão"),  unless the spin-off is partial ("Cisão Parcial") and equivalent to no greater than 10% of our equity, without advance consent from CAIXA, which shall not be denied without cause, unless if within the corporate group;*

*c)  a buy-out resulting in changes in our business purpose, requiring change to our current activities or to add new businesses to these activities that may represent a deviation in the currently conducted activities, without advance consent from CAIXA, which shall not be denied without justification;*

*d)   direct or indirect change in ISSUER's or any other controlled company's shareholder control,*

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

11

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



## FIRST AMENDMENT TO BANK CREDIT NOTE
### No. 21.3150.777.0000001-97 -- INVESTMENTS

*without advance consent from CAIXA, following the definition of shareholder control found in Article 116 of Law No. 6.404, dated 12.15.1976 and/or celebration or establishment of obligation (conditional or of another form) by the ISSUER or one of its direct or indirect shareholders, except within the scope of legal recovery proceedings (11 Chapter proceeding) of NII Holdings, Inc., as long as the new controllers are one or more of the Entities identified in Attachment 13 (d).*

**CLAUSE EIGH** - To include Attachment 13(d) to Note exactly accordance with the terms in Attachment C of this amend.

**CLAUSE NINE**- Due to the inclusion of subordination in the ISSUER's obligations to any of the related parties as well as the ISSUER's obligation to have, at each verification date, resources that are immediately available or that are in financial investment with immediate liquidity, Clauses Fourteen and Fifteen shall now read as follows and the subsequent clauses shall be renumbered accordingly:

*SUBORDINATION*
*CLAUSE FOURTEEN - The ISSUER fully agrees that any and all obligations taken by the ISSUER before any of its Related Parties are subject to the obligations provided in this Note. Similarly, the ISSUER agrees that no amount shall be paid to its Related Parties prior to the full liquidation of the obligations provided in this Note, including in the event of bankruptcy, liquidation or dissolution of the ISSUER, except for any payments made between ISSUER and Guarantor.*

*MINIMUM BALANCE*
*CLAUSE FIFTEEN - The ISSUER shall have available, on each Verification Date, resources that are immediately available or applied in financial investment, at the minimum amount two hundred million Reais (R$ 200,000,000,00) ("Minimum Balance"), and it will have to prove to CAIXA, by means of (i) non-audit semester temporary balance sheets closed on the 30th of June and delivered to CAIXA by the 15th of August of each year; and (ii) consolidated and audited financial statements closed on the 31 of December, and delivered to CAIXA by the 5th of May of each year. For the purposes of this Note, the "Verification Dates" are the 30th of June and 31st of December of each year.*

**CLAUSE TEN** - The current Clause Thirty One of the Note shall now read as follows:

*"ASSIGNMENT*
*CLAUDE THIRTY ONE - This Note may be, partially or fully, assigned or endorsed by CAIXA, upon prior notice of (10 (ten) business days in advance) to the ISSUER, pursuant to civil and commercial legislation, except that until September 15, 2015, this Note shall only be assigned and endorsed upon express written consent by the ISSUER."*

**CLAUSE ELEVEN** - A Customization of Credit Transaction Fee must be paid by the ISSUER on the same date when this First Amendment is signed in the amount of 0.60% (sixty hundredth percent) of the re-negotiated value, equivalent to

TEXT_SP 9080887v8 1803/14                                                          12
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



## FIRST AMENDMENT TO BANK CREDIT NOTE

### No. 21.3150.777.0000001-97 -- INVESTMENTS

three million one hundred forty six thousand eight Reais and eighty eight cents (R$ 3,146,008.88) regarding the 13th of February of 2013, to be updated on the date that this First Amendment is signed.

**CLAUSE TWELVE** - The ISSUER states, on this date, that the Note's outstanding balance is a certain and undisputed debt and promises to make payments on the dates and terms set forth in said document, pursuant to the amends provided in this First Amendment.

**CLAUSE THIRTEEN** - The ISSUER shall have this document registered at Deeds and Documents Registry of the Judicial District of the City of São Paulo. Expenditures acquired to register said document shall be paid by the ISSUER, who, herein, authorizes the debit of the respective amounts from its holding account No. 1859-6, Operation 003, at CAIXA's Branch No. 3150.

**CLAUSE FOURTEEN** - All remaining clauses and conditions of this Note, as amended in its First Amendment, that have not been expressly modified by this First Amendment, are ratified and remain complete and valid for all purposes of the law.

In witness thereof, the ISSUER issues the First Amendment to the Note, duly signed in 4 (four) copies of equal content and only the first copy (the bank's copy) is negotiable and becomes an integral and non-severable part of the Note.

São Paulo, February 13, 2015.

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

**ISSUER:**

[signature]
_____
Signature of ISSUER
NEXTEL TELECOMUNICAÇÕES LTDA.
CNPJ (Corporate Taxpayer Number):
66.970.229/0001-67
Legal representative:
CPF (Individual Taxpayer Number):
Position:

_____
Signature of ISSUER
NEXTEL TELECOMUNICAÇÕES LTDA.
CNPJ (Corporate Taxpayer Number):
66.970.229/0001-67
Legal representative:
CPF (Individual Taxpayer Number):
Position:

**GUARANTOR:**

[signature]
_____
Signature of GUARANTOR
NEXTEL TELECOMUNICAÇÕES S.A.
CNPJ (Corporate Taxpayer Number):
00.169.369/0001-22
Legal representative:
CPF (Individual Taxpayer Number):
Position:

_____
Signature of GUARANTOR
NEXTEL TELECOMUNICAÇÕES S.A.
CNPJ (Corporate Taxpayer Number):
00.169.369/0001-22
Legal representative:
CPF (Individual Taxpayer Number):
Position

**Identification of the Licensor Manager/Signatures Verification - Term of Amendment - Investments**

| Note Number | Amendment Number | Amount - R$ | Date of Amendment |
|---|---|---|---|
| 21.3150.777.0000001-97 | 1 | R$  640,000,000.00 (six hundred forty million Reais) | 02/13/2015 |

| Manager Name | Registration |
|---|---|
| _____ | _____ |

I declare that the signatures found in this Note are true and were duly verified by the certified undersigned employee who notarized the **ISSUER**'s signatures based on the Signature Registry Book or on original proof of identity (identity card or taxpayer registry card).

_____
Clerk's signature on stamp              Licensor Manager's signature on stamp
Caixa Econômica Federal                 Caixa Econômica Federal

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

14

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

*[signature and circular stamp: Nextel Legal Department]*

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



**FIRST AMENDMENT TO BANK CREDIT NOTE**
No. 21.3150.777.0000001-97 -- INVESTMENTS

**CAIXA:**


_____
CAIXA Signature
Caixa Econômica Federal
CNPJ (Corporate Taxpayer Number):
00.360.305/0001-04
Legal representative:
CPF (Individual Taxpayer Number):
Position:

_____
CAIXA Signature
Caixa Econômica Federal
CNPJ (Corporate Taxpayer Number):
00.360.305/0001-04
Legal representative:
CPF (Individual Taxpayer Number):
Position:

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**ATTACHMENT A**

**Anatel Bonds**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9080887v8 1803/14                                                   17
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**Judicial Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TER | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/08/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



## FIRST AMENDMENT TO BANK CREDIT NOTE
### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Civel |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ | Judicial | Civel |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Civel |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Civel |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Civel |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Civel |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Civel |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Civel |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Civel |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.598,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.544-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**CAIXA**

### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

**Other Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

**Guarantees in Judicial Deposits**

| | Blocked | Judicial Deposit | Assets in Guarantee |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**ATTACHMENT B**

**Anatel Bonds**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**Judicial Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176635 | 18/06/2016 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Civel |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ | Judicial | Civel |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | R$<br>- | | |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$<br>- | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$<br>- | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$<br>- | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$<br>- | Judicial | Cível |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$<br>- | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$<br>- | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



## FIRST AMENDMENT TO BANK CREDIT NOTE
### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Civel |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Civel |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Civel |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207750001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Civel |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
### No. 21.3150.777.0000001-97 -- INVESTMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
#### No. 21.3150.777.0000001-97 -- INVESTMENTS

| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
|------|------------------|------------|------------------|-------|----------|--------|
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**Other Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED - R$/US$ / VALUE OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

**Guarantees in Judicial Deposits**

| | Blocked | Judicial Deposit | Assets in Guarantee |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**FINANCING**

| BANK | CONTRACT No. | CONTRACT DATE | CONTRACT VALUE | TYPE |
|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB |
| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME |

TEXT_SP 9080887v8 1803/14
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]



### FIRST AMENDMENT TO BANK CREDIT NOTE
No. 21.3150.777.0000001-97 -- INVESTMENTS

**ATTACHMENT C**

1)      Capital Research and Management, Co;
2)      Aurelius Capital Management, LP;
3)      JP Morgan Asset Management;
4)      GoldenTree Asset Management;
5)      Empyrean Capita! Partners;
6)      Whitebox Advisors;
7)      JMB Capital;
8)      Benefit Street Partners;
9)      Credit Suisse Securities; or
10)    Any of the affiliated companies described in items (1) through (9) above.

TEXT_SP 9080887v8 1803/14                                    42
**SAC CAIXA:** 0800 726 0101 (information, complaints, suggestions and compliments)
**For people with speech or hearing disabilities:** 0800 726 2492
**Ombudsman:** 0800 725 7474
**caixa.gov.br**

**<u>EXHIBIT F-5a</u>**

PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA., EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

------------------------------------------------------------------------------------------------

**PREÂMBULO:**

------------------------------------------------------------------------------------------------

**EMITENTE** – NEXTEL TELECOMUNICAÇÕES LTDA., sociedade empresária limitada, com sede na Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, São Paulo (SP), inscrita no CNPJ/MF sob o nº 66.970.229/0001-67, neste ato representada pelos senhores abaixo assinados e qualificados.

------------------------------------------------------------------------------------------------

**CREDOR** – BANCO DO BRASIL S.A., sociedade de economia mista, com sede em Brasília, Capital Federal, na SBS Quadra 01, Bloco C, Lote 32 – Setor Bancário Sul, inscrita no CNPJ sob o nº 00.000.000/0001-91, por sua filial, Agência Large Corporate 3070 (SP), localizada na cidade de São Paulo, Estado de São Paulo, na Av. Paulista, 2.300, 2º andar, Cerqueira César, inscrita no CNPJ/MF sob o nº 00.000.000/1947-00, representado pelo Senhor João Marcos Mizobuti, brasileiro, casado, bancário, residente e domiciliado em Atibaia (SP), portador da carteira nacional de habilitação nº 03228530867, emitida por DETRAN/SP, inscrito no CPF/MF sob o nº 059.052.748-78 e pela Senhora Eliane Aparecida Scarponi Sartorelli, brasileira, solteira, bancária, residente e domiciliada em São Caetano do Sul (SP), portador da carteira de identidade nº 22.077.941, emitida por SSP/SP, inscrito no CPF/MF sob o nº 174.173.148-80, abaixo assinados.

------------------------------------------------------------------------------------------------

**CONSIDERANDO QUE**, em 31 de outubro de 2012, a **EMITENTE** emitiu em favor do **CREDOR** a Cédula de Crédito Bancário No. 307.001.181 no valor de principal de R$400.000.000,00 (quatrocentos milhões de reais) (a "Cédula"); e

**CONSIDERANDO QUE** a **EMITENTE** e o **CREDOR** pretendem aditar a Cédula de forma a alterar a taxa de juros incidente sobre os saldos devedores verificados na Conta de Empréstimo e incluir garantia real e fidejussória adicionais ao cumprimento das obrigações nela constantes, dentre outras disposições;

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 2

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-------------------------------------------------------------------------------------------------------------------

**RESOLVEM**, as partes do presente instrumento, celebrar o presente Primeiro Aditivo à Cédula de Crédito Bancário No. 307.001.181, mediante as seguintes cláusulas e condições.

**CLÁUSULA PRIMEIRA – ENCARGOS FINANCEIROS** – O item 1.2 do Preâmbulo e a Cláusula 4 da Cédula passam a viger com as seguinte redações:

*"1.2 DADOS DA OPERAÇÃO DE CRÉDITO:*

*Valor: R$400.000.000,00 (quatrocentos milhões de reais) ("Principal")*

*Vencimento Final: 31/10/2017*

*Datas de Pagamento dos Encargos Financeiros: março, junho, setembro e dezembro de cada ano ("Datas de Pagamento dos Encargos")*

*Número de vias desta Cédula de Crédito Bancário: 1 (uma) via negociável e 3 (três) vias não negociáveis*

*4. ENCARGOS FINANCEIROS - Sobre os saldos devedores verificados na Conta de Empréstimo, decorrentes do lançamento do valor do Principal, bem assim das quantias dele oriundas, devidas a título de acessórios, taxas e despesas, incidirão encargos financeiros equivalentes a 139,54% (cento e trinta e nove inteiros e cinquenta e quatro centésimos pontos percentuais) da taxa média dos Certificados de Depósitos Interbancários (CDI) ("Encargos Financeiros"), capitalizados diariamente. Referidos Encargos Financeiros, calculados por dias úteis, serão mensalmente levados a débito da Conta de Empréstimo e será exigido integralmente o seu pagamento, trimestralmente, na correspondente Data de Pagamento dos Encargos, conforme definição do item 1.2 do Preâmbulo, no vencimento e na liquidação da dívida. Para fins desta Cédula, a "Conta de Empréstimo" é uma conta vinculada gerida pelo CREDOR para fins de demonstração dos valores devidos pela EMITENTE, observados os débitos e créditos correspondentes aos lançamentos contábeis relativos às movimentações realizadas nos termos desta Cédula.*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 3

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---

*4.1. Para fins do disposto nesta Cédula, entende-se por (a) "dias úteis" todos os dias, exceto sábados, domingos e feriados bancários nacionais; e por "CDI", a taxa média dos Certificados de Depósitos Interbancários, over, extragrupo, divulgada pela CETIP S.A. – Mercados Organizados.*

*4.2. Em caso de extinção, não divulgação ou impossibilidade, por qualquer razão, de utilização das taxas médias diárias do CDI, durante o período em que não for possível a utilização das taxas médias diárias do CDI, será utilizada taxa substitutiva com base na variação da Taxa Selic do Banco Central do Brasil (Bacen), publicada pela ANDIMA - Associação Nacional das Instituições do Mercado Financeiro ou outra que venha a ser definida em comum acordo entre o CREDOR e a EMITENTE."*

**CLÁUSULA SEGUNDA – CONSTITUIÇÃO DE GARANTIA –** Para assegurar o cumprimento das obrigações assumidas na Cédula ("Obrigações Garantidas"), a **EMITENTE** cede e transfere fiduciariamente ao **CREDOR**, em caráter irrevogável e irretratável, por este ato e na melhor forma de direito, nos termos do § 3º do artigo 66-B da Lei n.º 4.728/65, com a redação dada pela Lei n.º 10.931/04, dos artigos 18 a 20 da Lei n.º 9.514/97, e do Decreto Lei n.º 911/69 e posteriores alterações, e no que for aplicável dos artigos 1.361 e seguintes do Código Civil, a titularidade, o domínio resolúvel e a posse direta e indireta da integralidade dos direitos creditórios sobre os recebíveis, presentes e futuros, decorrentes da prestação de serviços de telecomunicações realizada pela **EMITENTE** aos seus clientes, abrangendo toda a receita proveniente dos valores recebidos a esse título, os quais sejam arrecadados pelo **CREDOR** ("Recebíveis"), nos termos abaixo descritos, bem como sobre os recursos depositados ou mantidos na Conta Vinculada ("Direitos Cedidos").

**PARÁGRAFO PRIMEIRO –** Os valores relativos a parte dos Recebíveis de que trata o Caput são recebidos pelo **CREDOR** por meio de arrecadação de guias não compensáveis e débito automático, de acordo com o Termo de Adesão às Cláusulas

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 4

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

------------------------------------------------------------------------------------------------------

Gerais do Contrato Único de Prestação de Serviços, celebrado entre o **CREDOR** e a **EMITENTE** em 11/12/2014 ("Contrato de Arrecadação").

**PARÁGRAFO SEGUNDO** – Doravante, os valores recebidos diariamente no âmbito do Contrato de Arrecadação ("Valores Arrecadados"), representativos de parcela dos Recebíveis e de quaisquer outros créditos, passarão a ser creditados na conta nº 300.003-6, agência 3070-8, de movimentação exclusiva do **CREDOR**, vinculada à liquidação das obrigações decorrentes da CCB ("Conta Vinculada"), cujo saldo e valores nela creditados diariamente também são ora cedidos fiduciariamente pela **EMITENTE** ao **CREDOR**, integrando-se, para todos os efeitos, aos Direitos Cedidos, nos termos do Caput desta Cláusula. A **EMITENTE** se compromete a, em caráter irrevogável e irretratável, (i) não tomar medidas que visem a receber diretamente qualquer quantia referente aos Recebíveis; (ii) não alterar, de maneira material, os procedimentos e formas de cobrança dos Recebíveis atualmente em vigor, bem como tomar qualquer medida, ou deixar de tomar, quando aplicável, que vise a ou tenha como efeito diminuir a arrecadação dos Recebíveis pelo **CREDOR** até a satisfação integral das obrigações da **EMITENTE** previstas na Cédula; (iii) durante a vigência da Cédula, manter em vigor o Contrato de Arrecadação; e (iv) não ceder, alienar, transferir, vender, onerar, caucionar, empenhar ou gravar ou por qualquer forma negociar os Direitos Cedidos, sem o prévio e expresso consentimento do **CREDOR**.

**PARÁGRAFO TERCEIRO** – Fica convencionado que o montante médio mensal dos Valores Arrecadados que transitarão pela Conta Vinculada nos três meses imediatamente anteriores à apuração pelo **CREDOR** em cada trimestre ("Período"), a ser realizada nos dias 31 de março, 30 de junho, 30 de setembro e 31 de dezembro de cada ano deverá perfazer – e a **EMITENTE** se obriga a adotar todas as medidas necessárias para que perfaça – o valor mínimo equivalente a R$ 30.000.000,00 (trinta milhões de reais) ("Valor Médio Mínimo"), calculado pelo valor total dos recursos que vierem a ser depositados na Conta Vinculada durante cada

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 5

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---

Período, dividido por 3 (três). Caso, em determinado Período, o Valor Médio Mínimo não seja verificado pelo CREDOR, o CREDOR poderá, a seu exclusivo critério, declarar imediatamente vencidas, de pleno direito, as obrigações da EMITENTE no âmbito da Cédula. Não obstante, e sem prejuízo ao seu direito avençado no âmbito da presente Cláusula, o CREDOR poderá, a seu exclusivo critério, alternativamente à declaração de vencimento antecipado das obrigações da EMITENTE na presente Cédula, exigir que a EMITENTE, no prazo de 10 (dez) dias a contar da solicitação do CREDOR nesse sentido, deposite na Conta Vinculada, um valor equivalente à diferença entre o Valor Médio Mínimo e o montante mensal médio efetivamente apurado pelo CREDOR nos termos da presente Cláusula ("Valor do Déficit"). Nesse caso, o Valor do Déficit ficará retido na Conta Vinculada até que o Valor Médio Mínimo apurado pelo CREDOR em uma data de apuração nos termos da presente cláusula tenha sido reestabelecido.

PARÁGRAFO QUARTO – Sem prejuízo do disposto no parágrafo a seguir, fica o CREDOR, a partir deste ato, legalmente identificado como o único e legítimo titular, em caráter fiduciário, dos Direitos Cedidos, cuja condição perdurará até o integral adimplemento de todas as obrigações assumidas pela EMITENTE na Cédula, de modo que, ocorrendo o seu cumprimento pela EMITENTE, conforme atestado pelo CREDOR, resolver-se-á a propriedade fiduciária do CREDOR, retornando os Direitos Cedidos à propriedade plena da EMITENTE.

PARÁGRAFO QUINTO – Ressalvada a hipótese de retenção do Valor do Déficit acima contemplada, os Valores Arrecadados serão, diariamente, até às 14h00, liberados à conta de livre movimentação da EMITENTE, após a necessária verificação do CREDOR nas respectivas datas avençadas, e desde que não tenha ocorrido um evento de vencimento antecipado, hipótese de pagamento antecipado obrigatório ou descumprimento de obrigação pecuniária pela EMITENTE.

PARÁGRAFO SEXTO – A EMITENTE declara, neste ato, que:

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 6

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
-------------------------------------------------------------------------------------------

(i)      está autorizada, nos termos da lei e de seu estatuto social, a ceder os Direitos Cedidos de que é titular, bem como cumprir as disposições deste instrumento;

(ii)      a celebração deste instrumento não viola nenhuma disposição de seu estatuto social, assim como não infringe ou viola qualquer disposição legal e regulamentos a que está sujeita;

(iii)      os Direitos Cedidos estão livres e desembaraçados de quaisquer ônus, encargos, pendências judiciais ou extrajudiciais de qualquer natureza, inclusive fiscais, dúvidas, dívidas e/ou gravames de qualquer natureza, exceto a presente cessão fiduciária de direitos creditórios;

(iv)      inexiste impedimento legal contido em avenças de que a **EMITENTE** seja parte, que vede a presente cessão fiduciária dos Direitos Cedidos ora convencionados, em favor do **CREDOR**; e

(v)      teve prévio conhecimento, de forma clara e suficiente, das atribuições a ela impostas, e que anui a todos os termos do instrumento, e que decidiu, livre e espontaneamente, sem qualquer vício de vontade e consentimento, ceder fiduciariamente os Direitos Cedidos em garantia indivisível, irrevogável e irretratável.

**PARÁGRAFO SÉTIMO** – A **EMITENTE** será responsável por todos e quaisquer prejuízos causados ao **CREDOR** que decorram da falsidade ou inexatidão das declarações e garantias aqui prestadas.

**PARÁGRAFO OITAVO** – Verificada a ocorrência de um evento de inadimplemento em relação às obrigações pecuniárias assumidas pela **EMITENTE** na Cédula, observados os respectivos prazos de cura, conforme aplicáveis, todos os valores relativos aos Direitos Cedidos passarão a ser retidos pelo **CREDOR** na Conta Vinculada e, ocorrendo a decretação do vencimento antecipado da dívida ou hipótese de pagamento antecipado obrigatório nos termos desta Cédula, poderão ser utilizados na amortização das referidas obrigações da **EMITENTE**, até a sua integral liquidação, nos termos da Cédula, até o limite das Obrigações Garantidas.

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 7

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

------------------------------------------------------------------------------------------------------------------

**PARÁGRAFO NONO** – Ocorrendo a decretação do vencimento antecipado da dívida nos termos desta Cédula, o **CREDOR** poderá, independentemente de qualquer notificação, promover a imediata utilização dos Direitos Cedidos para satisfazer as obrigações garantidas então vencidas e não liquidadas, mediante a excussão judicial ou venda amigável dos Recebíveis, conforme seja aplicável, ou, no caso dos Valores Arrecadados, simplesmente aplicá-los no pagamento das Obrigações Garantidas, nos termos da lei e em conformidade com os termos da Cédula, até o total adimplemento das obrigações. Neste sentido, o **CREDOR** terá o direito de imediatamente exercer sobre os Direitos Cedidos todos os poderes que lhe são assegurados pela legislação vigente, nos termos da Cédula, podendo dispor de, cobrar, receber, realizar, vender, ou ceder, inclusive de forma particular, total ou parcialmente, os Recebíveis, nos termos e condições que o **CREDOR** considere apropriado, dar quitação e assinar quaisquer documentos ou termos por mais especiais que sejam, necessários à prática dos atos aqui referidos, independentemente de qualquer comunicação e/ou autorização adicional da **EMITENTE**. Todo valor que sobejar às Obrigações Garantidas deverá ser devolvido à **EMITENTE**.

**PARÁGRAFO DÉCIMO** – A **EMITENTE** renuncia neste ato a qualquer direito ou privilégio legal ou contratual que possa afetar a livre e integral exequibilidade e transferência dos Direitos Cedidos no caso de sua excussão, observados os termos e condições previstos nesta Cédula.

**PARÁGRAFO DÉCIMO PRIMEIRO**– Sem prejuízo do disposto na Cédula, e para os fins do artigo 1.362 do Código Civil Brasileiro, da Lei 9.514/97, conforme alterada, e da Lei 4.728/65, conforme alterada, as Obrigações Garantidas podem ser resumidamente descritas da seguinte forma:

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001;  (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 8

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-----------------------------------------------------------------------------------------------------------

(i)    Valor estimado de principal da dívida: R$400.000.000,00 (quatrocentos milhões de reais);

(ii)   Prazo e condições de pagamento: pagamento do principal em três parcelas de R$133.333.333,33 com datas de vencimento em 31/10/2015, 31/10/2016 e 31/10/2017 e pagamento semestral dos encargos financeiros em 31/10 e 01/05 de cada ano;

(iii)  Taxa de juros: 139,54% do CDI; e

(iv)   Encargos de inadimplemento: juros de mora: CDI mais 1% ao mês, acrescido de 1% ao ano; e cláusula penal: 2% sobre o valor devido.

**PARÁGRAFO DÉCIMO SEGUNDO** – As Partes têm conhecimento e concordam que a **EMITENTE** não possui sistema de individualização de recebíveis capaz de identificar clientes, valores e faturas que serão efetivamente depositadas na Conta Vinculada e, da mesma forma, exceto se de outra forma expressamente indicada nesta Cédula não assume nenhuma obrigação de realizar tal individualização.

**CLÁUSULA TERCEIRA – AVAL** – A **NEXTEL TELECOMUNICAÇÕES S.A.**, sociedade anônima, com sede na Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, na Cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/MF sob o nº 00.169.369/0001-22 ("**AVALISTA**"), presta aval em favor da **EMITENTE** obrigando-se como principal pagadora e solidariamente responsável pelo pagamento das Obrigações Garantidas.

**CLÁUSULA QUARTA – VENCIMENTO ANTECIPADO** – A Cláusula 10 da CCB passa a viger com a seguinte redação:

"*10. VENCIMENTO ANTECIPADO E OUTRAS DISPOSIÇÕES:*

*10.1. Poderá o CREDOR considerar vencidas antecipadamente, de pleno direito, as obrigações assumidas nesta Cédula e exigir o total da dívida aqui representada,*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 9

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------------

*mediante envio de notificação prévia à **EMITENTE** com 2 (dois) dias úteis de antecedência com o extrato da dívida, quando a nós for imputada a ocorrência de qualquer das situações a seguir:*

*a) inadimplemento, pela **EMITENTE**, de qualquer obrigação de natureza pecuniária assumida nesta Cédula, que não seja sanado no prazo de 1 (um) dia útil, contado da data de vencimento original;*

*b) inadimplemento, pela **EMITENTE**, de qualquer obrigação não pecuniária prevista nesta Cédula, que não seja sanado no prazo de 30 (trinta) dias contados da comunicação que lhe for enviada pelo **CREDOR** a respeito do fato;*

*c) descumprimento, falsidade, imprecisão, incorreção ou omissão material imputável à **EMITENTE**, em qualquer declaração, garantia, informação prestada na presente Cédula ou em qualquer documento material que houver sido firmado, prestado ou entregue pela **EMITENTE** relativo a esta operação de crédito, desde que não sanados no prazo de 10 (dez) dias úteis;*

*d) vencimento antecipado ou inadimplemento de qualquer obrigação pecuniária da **EMITENTE** ou de qualquer Afiliada Brasileira, excluindo obrigações exclusivamente entre a **EMITENTE** e a **AVALISTA**, em valor unitário ou agregado, que seja igual ou superior a R$ 10.000.000,00 (dez milhões de reais), que não seja sanado no prazo de 10 (dez) dias úteis, contados da notificação enviada pelo **CREDOR**, ressalvados os casos em que tais obrigações estejam com seu pagamento suspenso em razão de decisão administrativa ou judicial ou em que tenha sido garantido o Juízo;*

*e) vencimento antecipado de qualquer outra obrigação pecuniária da **EMITENTE** com o **CREDOR** desde que não sanada nos prazos estabelecidos nos respectivos instrumentos;*

*f) protesto cambiário contra a **EMITENTE** em valor unitário ou agregado igual ou*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 10

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---

*superior a R$ 10.000.000,00 (dez milhões de reais), que não seja sanado no prazo de 30 (trinta) dias após o aviso por escrito enviado pelo **CREDOR**, ou que venha a se transformar em procedimento judicial e que se encontre com o pagamento suspenso por meio de decisão judicial, ou que tenha sido garantido o Juízo;*

*g)    (i) pedido de autofalência pela **EMITENTE** e/ou de qualquer Afiliada Brasileira; (ii) pedido de falência da **EMITENTE** e/ou de qualquer Afiliada Brasileira formulado por terceiro e não elidido no prazo legal; (iii) decretação de falência ou liquidação da **EMITENTE** e/ou de qualquer Afiliada Brasileira; (iv) pedido de recuperação judicial ou extrajudicial pela **EMITENTE** e/ou de qualquer Afiliada Brasileira;*

*h)    liquidação, dissolução ou extinção da **EMITENTE**;*

*i)    caso a **EMITENTE** ou qualquer de suas Afiliadas Brasileiras seja declarada insolvente por decisão judicial, ou reconheça publicamente ou perante o **CREDOR**, sua impossibilidade de satisfazer suas obrigações pecuniárias , ou caso tal impossibilidade seja notória, em ambos os casos no valor global superior a R$10.000.000,00 (dez milhões de reais);*

*j)    realização, pela **EMITENTE**, uma redução do seu capital social, resgate, amortização, reembolso, ou compra de participação societária, desde que tais operações impliquem pagamento (em espécie ou in natura) aos seus sócios, ou, caso o índice financeiro indicado no item "t" abaixo seja superior a 2,5 (dois e meio), distribuição de lucros ou juros sobre o capital próprio, ainda que já declarados, aos seus sócios;*

*k)    alienação, pela **EMITENTE**, no individual ou no agregado, de qualquer de seus bens ou ativos, sem a prévia e expressa anuência por escrito do **CREDOR**, exceto, neste caso, (i) antecipação de receitas com cartão de crédito, (ii) venda de recebíveis vencidos e não pagos, (iii) alienação de mercadorias no curso ordinário de negócios, (iv) transferências de ativos obsoletos ou bens móveis de baixo valor*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 11

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº
307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM
31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$
400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---

agregado; (v) transferências no contexto de permuta por ativos similares de valor igual ou superior; e (vi) venda de torres na modalidade 'sale leaseback', neste caso, sujeito à aprovação prévia do **CREDOR**, a qual deverá ser manifestada dentro do período de 45 (quarenta e cinco) dias contados de tal questionamento formulado mediante notificação escrita, desde que comprovado o recebimento de tal notificação pelo **CREDOR**, sendo certo que a não manifestação por parte do **CREDOR** não implicará aprovação tácita;

l)    pagamento, pela **EMITENTE** ou por qualquer Afiliada Brasileira, de qualquer obrigação, antes da integral quitação de todas as obrigações desta Cédula, às Partes Relacionadas, inclusive na hipótese de falência, liquidação ou dissolução da **EMITENTE**, exceto quaisquer pagamentos entre a **EMITENTE** e a **AVALISTA**;

m)   outorga e/ou constituição, pela **EMITENTE** ou por qualquer Afiliada Brasileira, de qualquer ônus ou gravame ou outro direito real de garantia, ou garantia fidejussória, em favor de terceiro (incluindo suas Afiliadas e controladora direta ou indireta), exceto (i) aquelas constituídas nos termos desta Cédula ou previamente a data do Primeiro Aditivo, ou (ii) pela (a) outorga de garantias reais como contragarantia em contratações de seguros e seguros garantias em geral; (b) outorga de garantias reais como contragarantia em nova fiança bancária para garantia judicial ou realização de novos depósitos judiciais limitadas, no caso das garantias outorgadas nos termos desse item (b) ao valor global de R$150.000.000,00 (cento e cinquenta milhões de reais); (c) outorga de garantias reais ou pessoais em contratos de locação de sites; (d) outorga de garantias reais ou pessoais em contratos de collocation (i.e. contratos com outras operadoras para instalação de equipamentos em torres), (e) financiamentos concedidos pela Agência Nacional de Telecomunicações - ANATEL, incluindo suas renovações, (f) garantias em favor da ANATEL, (g) garantias reais outorgadas como contragarantia para emissão de novas performance bonds em favor da ANATEL, neste caso, sujeito à aprovação prévia do **CREDOR**, as quais deverão ser manifestadas dentro do período de 45

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 12

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº
307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM
31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$
400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

----------------------------------------------------------------------------------------------------------------------

*(quarenta e cinco) dias contados de tal questionamento formulado mediante
notificação escrita, desde que comprovado o recebimento de tal notificação pelo
CREDOR, sendo certo que a não manifestação por parte do CREDOR não implicará
aprovação tácita e (h) renovações das operações já detidas pela EMITENTE ou
suas Afiliadas Brasileira identificadas no Anexo 10.1(m)(1) desta Cédula, sendo que
as garantias a serem outorgadas nos termos desse item (h) deverão estar limitadas
ao valor garantido pela fiança e/ou performance bond, conforme indicado em tal
anexo, observadas as mesmas garantias em vigor na presente data, sendo que as
garantias reais outorgadas nos termos dos itens (a), (c) e (d) acima estão limitados
ao valor global de R$50.000.000,00 (cinquenta milhões de reais). A EMITENTE
declara, para os fins da presente Cédula, que o Anexo 10.1(m)(2) contém a
totalidade das operações que contam com garantia real;*

*n) não utilização dos recursos para a finalidade indicada na Cláusula Finalidade e
Liberação do Crédito;*

*o) execução de qualquer garantia prestada a qualquer credor da EMITENTE ou de
qualquer Afiliada Brasileira no valor, igual ou superior, a R$ 10.000.000,00 (dez
milhões de reais), e desde que não seja sanado no prazo de 10 (dez) dias úteis,
contados da notificação enviada pelo CREDOR, ressalvados os casos em que tal
execução esteja suspensa em razão de decisão administrativa ou judicial;*

*p) não observância do Valor Médio Mínimo por, pelo menos, 1 (um) Período;*

*q) publicação de ato regulatório cujos efeitos não tenham sido suspensos nos
prazos legais, quando aplicável, que (i) afete de maneira adversa a capacidade da
EMITENTE de honrar suas obrigações perante o CREDOR; ou (ii) inviabilize as
atividades da EMITENTE ou parte significativa destas ou, de qualquer outra forma,
impacte, de maneira adversa, a situação financeira (em ambos os casos, assim
entendida como atividades que respondam por 10% (dez por cento) ou mais do*

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações
ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito
Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-
CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de
Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 13

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-------------------------------------------------------------------------------------------------------

*faturamento anual da **EMITENTE**); ou (iii) resulte em uma aplicação de multa, sanção ou penalidade final e irrecorrível que impacte a situação financeira da EMITENTE e/ou suas Afiliadas Brasileiras em valor igual ou superior a R$100.000.000,00 (cem milhões de reais) em um mesmo exercício fiscal;*

*r)   adoção de política pela **EMITENTE** que importe em discriminação de raça ou gênero ou assédio moral ou sexual, (ii) a comprovação por sentença judicial transitada em julgado ou decisão administrativa final sancionadora, exarada por autoridade ou órgão competente, (I) de que as atividades da **EMITENTE** geram danos ao meio ambiente, ou (II) que a **EMITENTE** (a) utiliza mão de obra em situação análoga à condição de trabalho escravo, conforme previsto na Portaria Interministerial nº 2, de 12 de maio de 2011, (b) utiliza trabalho infantil de forma não regulamentada, (c) explora a prostituição ou (d) exerce atividades ilegais, constando ou não no Cadastro de Empregadores;*

*s)   repasse, cassação ou suspensão da Concessão obtida junto à ANATEL para exploração de frequências da terceira geração (tecnologia 3G) e GSM sem prévia anuência do **CREDOR**, que não poderá ser injustificadamente negada;*

*t)   caso o índice obtido pela divisão da Dívida Líquida pelo EBITDA seja superior a 2,5 (dois e meio), a ser calculado nos termos da cláusula 10.2, observados os termos das cláusulas 10.4 e 10.5;*

*u)   caso a **EMITENTE** não mantenha em caixa, em cada Data de Verificação em recursos imediatamente disponíveis ou em aplicações financeiras,o Saldo Mínimo;*

*v)   não observância da obrigação de subordinação prevista na Cláusula 15 desta Cédula;*

*w)   transferência ou cessão a terceiros, a qualquer título, no todo ou em parte, dos direitos e obrigações decorrentes desta Cédula, total ou parcial, sem prévio e*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001;  (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722: Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 14

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------------

expresso consentimento do **CREDOR**;

x)   inexistência de saldo, em qualquer das contas de titularidade da **EMITENTE** que atenda ao pagamento dos compromissos assumidos por meio desta Cédula nas respectivas datas de pagamento e não sanados no prazo de 1 (um) dia útil; e

y)   descumprimento de quaisquer das obrigações estabelecidas na Cláusula Segunda, Parágrafo Segundo, do primeiro aditamento a esta Cédula.

**10.2.** Para fins do disposto na Cláusula 10.1, alínea "t", o índice obtido pela divisão da Dívida Líquida pelo EBITDA será apurado da seguinte forma: (i) semestralmente, com base nos balancetes não auditados encerrados em 30 de junho de cada ano; (ii) anualmente, pelas demonstrações financeiras encerradas em 31 de dezembro de cada ano, consolidadas e auditadas por empresa de auditoria de renome no mercado.

**10.3.** Obrigamo-nos a entregar ao **CREDOR**, durante a vigência desta Cédula, a declaração de cumprimento do índice nos termos do Anexo II, (i) os balancetes semestrais não auditados encerrados em 30 de junho até o dia 15 de agosto de cada ano, e (ii) as demonstrações financeiras encerradas em 31 de dezembro, consolidadas e auditadas, até o dia 5 de maio de cada ano.

**10.4** Caso em determinado período de verificação das obrigações de que trata esta Cláusula, a **EMITENTE** não cumprir com o índice acima estabelecido no item "t", o CREDOR poderá independentemente de qualquer notificação ou prazo de cura, declarar o vencimento antecipado de todas as obrigações assumidas pela EMITENTE e/ou pela Avalista.

**10.5.** Ainda para os fins do disposto na Cláusula 10.1, alínea "t":

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001;  (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 15

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------

a)  "Dívida Líquida" significa o valor calculado em bases consolidadas, na respectiva data de verificação, determinado de acordo com os princípios contábeis geralmente aceitos no Brasil, igual (a) à soma dos Passivos junto a instituições financeiras, dos títulos e valores mobiliários representativos de dívida emitidos, e do saldo líquido de operações de derivativos (passivos menos ativos de operações com derivativos); diminuído (b) das disponibilidades (caixa, bancos, aplicações de liquidez imediata ou aplicações de curto prazo, títulos e valores mobiliários de própria emissão ou de terceiros, e títulos públicos e privados de qualquer natureza) e (c) dos efeitos da marcação a mercado das operações de derivativos;

b) "EBITDA" significa o lucro operacional da **EMITENTE**, em bases consolidadas, relativo aos 12 (doze) últimos meses, somado às despesas de depreciação e amortização, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil; e

c)  "Passivo(s)" significa o valor principal dos títulos e valores mobiliários representativos de dívida emitidos junto a instituições financeiras registrados no balanço consolidado da **EMITENTE** nas datas de medição, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil."

**10.5.** Ainda, para os fins do disposto nesta Cédula, define-se:

"Afiliada" de qualquer Pessoa significa outra Pessoa que, direta ou indiretamente, por meio de um ou mais intermediários, Controle, seja Controlada, ou esteja sob o Controle comum com essa primeira Pessoa. Adicionalmente, no caso de uma Pessoa que seja um fundo de investimentos ou cujo acionista Controlador seja um fundo de investimentos, também será considerada uma "Afiliada": (i) o gestor ou o quotista ou uma Afiliada do gestor ou do quotista desse fundo de investimento, (ii) outro fundo de investimento administrado ou gerido pelo gestor ou quotista ou uma Afiliada do gestor ou quotista desse fundo de investimento, e (iii) qualquer Pessoa

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 16

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------

*que seja, direta ou indiretamente, Controlada, ou esteja sob o Controle comum desse fundo de investimento, seja individualmente ou em conjunto com outra Afiliada, ou qualquer das outras Pessoas acima expostas.*

*"Afiliada Brasileira" significa com relação a qualquer Pessoa uma Afiliada domiciliada no Brasil;*

*"Controle" (incluindo seus significados correlatos) significa, de acordo com o Artigo 116 da Lei nº 6.404, de 15.12.1976, (a) o poder para eleger a maioria do conselho de administração, ou órgão semelhante, da Pessoa controlada ou, de outro modo, conduzir os negócios ou políticas dessa Pessoa (por contrato ou de outro modo), e (b) a posse direta ou indireta de direitos que concedam à Pessoa Controladora a maioria dos votos na assembleia geral de acionistas ou reunião similar, da Pessoa Controlada*

*"Parte Relacionada" de qualquer Pessoa especificada terá o significado descrito na Deliberação nº 642 de 7 de outubro de 2010 emitida pela Comissão de Valores Mobiliários, e também incluirá, na medida em que não seja repetido, (i) qualquer Afiliada dessa Pessoa, (ii) qualquer diretor, conselheiro, quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa Pessoa, (iii) qualquer cônjuge, ex-cônjuge, ascendente, descendente ou parente colateral até o segundo grau dessa Pessoa, uma Afiliada dessa Pessoa ou qualquer diretor, conselheiro, quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa Pessoa, e (iv) qualquer Afiliada dos acima expostos.*

*"Pessoa" significa qualquer entidade governamental ou qualquer pessoa física, firma, parceria, sociedade, sociedade de responsabilidade limitada, joint venture, associação, fundos, fundos de investimento, agente fiduciário, organização sem*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 17

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-------------------------------------------------------------------------------------------------------

*personalidade jurídica, ou outra entidade organização, quer seja uma pessoa jurídica ou não.*

**CLÁUSULA QUINTA – LISTA DE GARANTIAS –** Incluir o Anexo 10.1(m)(1) e 10.1(m)(2) à Cédula nos exatos termos dos Anexo A e Anexo B respectivamente deste aditivo.

**CLÁUSULA SEXTA – PAGAMENTO ANTECIPADO OBRIGATÓRIO –** A Cláusula 11 da Cédula passa a viger com a seguinte redação:

*"11. PAGAMENTO ANTECIPADO OBRIGATÓRIO*

*11.1. Obrigamo-nos a liquidar antecipadamente a totalidade dos valores devidos nos termos desta Cédula, aí incluídos os valores de Principal e Encargos Financeiros, na hipótese da ocorrência de qualquer dos seguintes eventos, mediante solicitação prévia com, no mínimo, 5 (cinco) dias úteis de antecedência, por escrito, do CREDOR:*

*a) mudança no nosso objeto social de forma a alterar as atuais atividades principais ou a agregar a essas atividades novos negócios que tenham prevalência ou possam representar desvios em relação às atividades atualmente desenvolvidas, sem prévia anuência do **CREDOR**, a qual não deverá ser negada sem justificativa;*

*b) realização de qualquer tipo de reestruturação societária, tais como fusão, incorporação ou cisão, salvo se a cisão for parcial e não for superior a 10% do nosso patrimônio líquido, sem a prévia anuência do **CREDOR**, a qual não deverá ser negada sem justificativa, excetuado se dentro do grupo econômico;*

*c) aquisição do controle acionário de sociedades que resulte na alteração do nosso objeto principal, de forma a alterar as atuais atividades principais ou a agregar a essas atividades novos negócios que tenham prevalência ou possam representar*

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 18

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

------------------------------------------------------------------------------------------------------

*desvios em relação às atividades atualmente desenvolvidas, sem a prévia anuência do CREDOR, a qual não deverá ser negada sem justificativa;*

*d) alteração direta ou indireta do controle acionário da **EMITENTE** ou de qualquer controlada, sem a prévia anuência do CREDOR, com definição da expressão controle acionário extraída do artigo 116 da Lei nº 6.404, de 15.12.1976 e/ou celebração ou assunção de obrigação (condicional ou de outra forma) por parte da **EMITENTE** ou de seus acionistas diretos ou indiretos, para fazê-lo, exceto no âmbito do processo de recuperação judicial (Chapter 11 proceeding) da NII Holdings, Inc., desde que os novos controladores sejam uma ou mais pessoas identificadas no Anexo 11.1(d), os quais estão previamente aprovados pelo **CREDOR**."*

**CLÁUSULA SÉTIMA – LISTA DE CONTROLADORES –** Incluir o Anexo 11.1(d) à Cédula nos exatos termos do Anexo C deste aditivo.

**CLÁUSULA OITAVA – SUBORDINAÇÃO E SALDO MÍNIMO –** Em razão da inclusão da subordinação das obrigações assumidas pela **EMITENTE** perante qualquer de suas partes relacionadas e da obrigação da **EMITENTE** em manter em caixa, em cada Data de Verificação, recursos imediatamente disponíveis ou em aplicações financeiras com liquidez imediata, as Cláusulas Décima Quinta e Décima Sexta da Cédula de Crédito Bancário ora aditada passarão a ter a seguinte redação, sendo as demais sucessivamente renumeradas:

*"**15. SUBORDINAÇÃO** – A **EMITENTE** declara e garante para todos os efeitos que todas e quaisquer obrigações assumidas pela **EMITENTE** perante quaisquer de suas Partes Relacionadas são subordinadas às obrigações previstas nesta Cédula. Da mesma forma, a **EMITENTE** concorda que nenhum valor será pago a suas Partes Relacionadas antes da liquidação integral das obrigações previstas nesta Cédula, inclusive na hipótese de falência, liquidação ou dissolução da **EMITENTE**, exceto quaisquer pagamentos realizados entre a **EMITENTE** e a **AVALISTA**.*

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722: Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 19

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº
307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM
31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$
400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-----------------------------------------------------------------------------------------------------------------

*16. SALDO MÍNIMO – A EMITENTE deverá manter em caixa, em cada Data de
Verificação, em recursos imediatamente disponíveis ou em aplicações financeiras
com liquidez imediata, o valor mínimo de R$200.000.000,00 (duzentos milhões de
reais) ("Saldo Mínimo"), e deverá comprovar ao CREDOR, por meio de (i) balancetes
semestrais não auditados encerrados em 30 de junho entregues ao CREDOR até o
dia 15 de agosto de cada ano; e (ii) demonstrações financeiras encerradas em 31 de
dezembro, consolidadas e auditadas, entregues ao CREDOR até o dia 5 de maio de
cada ano. Para fins desta Cédula, considera-se "Data de Verificação" as datas de 30
de junho e 31 de dezembro de cada ano."*

**CLÁUSULA NONA – CESSÃO –** A atual Cláusula 17 da *Cédula*, que dispõe sobre a
cessão, passa a viger com a seguinte redação:

*"Esta Cédula poderá ser objeto de cessão e endosso por parte do CREDOR,
mediante aviso prévio (com 10 (dez) dias úteis de antecedência) à EMITENTE, nos
termos da legislação civil e comercial, não havendo necessidade de o
cessionário/endossatário ser instituição financeira ou entidade a ela equiparada,
ressalvado que, até a 15 de setembro de 2015, a presente Cédula somente poderá
ser cedida e/ou endossada mediante o consentimento expresso e por escrito da
EMITENTE."*

**CLÁUSULA DÉCIMA – REGISTRO –** O **CREDOR** levará a registro no Registro de
Títulos e Documentos da Comarca de São Paulo, Capital, a Cédula e o presente
aditivo. As despesas relativas ao referido registro serão suportadas pela **EMITENTE**,
que, desde já, autoriza o débito dos respectivos valores em sua conta de depósito nº
5567-0, mantida na agência 3070-8 do **CREDOR**.

**CLÁUSULA DÉCIMA PRIMEIRA – PAGAMENTO DOS ENCARGOS
FINANCEIROS –** A **EMITENTE** compromete-se a liquidar, na data de assinatura

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações
ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito
Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-
CABB:  (i) Para capitais e regiões metropolitanas: 4004 0001;  (ii) Demais regiões: 0800 729 0001; SAC - Serviço de
Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 20

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---------------------------------------------------------------------------------------------------------------------

deste aditamento, os Encargos Financeiros, à taxa de juros vigente imediatamente anterior à celebração deste aditamento, previstos para Dezembro/2014, acumulados desde a última Data de Pagamento dos Encargos até a presente data.

**CLÁUSULA DÉCIMA SEGUNDA – TARIFA DE RENEGOCIAÇÃO –** É devida a tarifa de renegociação, cujo pagamento pela **EMITENTE** é realizado na data de assinatura deste aditamento, no percentual de 0,60% (sessenta centésimos por cento) do valor repactuado, equivalente ao valor de R$2.400.000,00 (dois milhões e quatrocentos mil reais). O pagamento da tarifa de renegociação deverá ser acrescido dos valores relativos a todos e quaisquer tributos incidentes sobre tal tarifa, incluindo quaisquer juros, adicionais de impostos, multas ou penalidades correlatas que porventura venham a incidir sobre as operações da espécie, bem como quaisquer majorações das alíquotas já existentes, de forma que o **CREDOR** receba os valores a que teria direito caso tais tributos não fossem incidentes. Se a dedução, retenção ou pagamento de tais tributos for requerida por lei, em relação ao pagamento, a **EMITENTE** concorda, desde já, com o aumento do montante devido a título de tarifa (*gross up*).

**CLÁUSULA DÉCIMA TERCEIRA – PROMESSA DE PAGAMENTO -** A **EMITENTE** declara, nesta data, o saldo devedor da Cédula, como dívida líquida e certa, e promete pagá-la nas datas e nos termos previstos em referido instrumento, conforme aditado por este Primeiro Aditamento.

Assim ajustados, o **CREDOR**, a **EMITENTE** e o **AVALISTA**, declarando não haver intenção de novar, ratificam a Cédula de Crédito Bancário ora aditada em todos os seus termos, cláusulas e condições não expressamente alterados neste documento, que àquela se integra, formando um todo único e indivisível para todos os fins de direito.

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 21

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

-------------------------------------------------------------------------------------------------------------------------

O presente instrumento é emitido em 4 (quatro) vias de igual teor, sendo que somente a primeira delas será negociável. As demais vias contêm a expressão "via não negociável".

São Paulo (SP), 13 de fevereiro de 2015

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

Página 22

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------------------

**CREDOR**

BANCO DO BRASIL S.A.

Agência Large Corporate 3070 (SP)

Assinatura_____   Rubrica_____

Eliane Ap. Scarponi Sartorelli
Gerente de Area UA

Assinatura_____   Rubrica_____

João Marcos Mizobuti
Gerente de Área UA
CPF: 059.052.748-78

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÓNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB**: (i) Para capitais e regiões metropolitanas: 4004 0001;  (ii) Demais regiões: 0800 729 0001; **SAC - Serviço de Atendimento ao Consumidor**: 0800 729 0722; **Central de Atendimento a pessoas com deficiência auditiva ou de fala:**

Página 22

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

----------------------------------------------------------------------------------------------------

**EMITENTE**

NEXTEL TELECOMUNICAÇÕES LTDA.

CNPJ: 66.970.229/0001-67

| Rubrica | Nome: | Rubrica | Nome: |
|---------|-------|---------|-------|
| | Profissão: | | Profissão: |
| | Estado Civil: | | Estado Civil: |
| | Nacionalidade: | | Nacionalidade: |
| | Residente em: | | Residente em: |
| | Identidade nº | | Identidade nº |
| | CPF/MF N.º | | CPF/MF N.º |

**AVALISTA**

NEXTEL TELECOMUNICAÇÕES S.A.

CNPJ: 00.169.369/0001-22

| Rubrica | Nome: | Rubrica | Nome: |
|---------|-------|---------|-------|
| | Profissão: | | Profissão: |
| | Estado Civil: | | Estado Civil: |
| | Nacionalidade: | | Nacionalidade: |
| | Residente em: | | Residente em: |
| | Identidade nº | | Identidade nº |
| | CPF/MF N.º | | CPF/MF N.º |

TEXT_SP 9053003v11 180314 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala: 0800 729 0088; Ouvidoria BB: 0800 729 5678

PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA., EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

## ANEXO A

**Anatel Bonds**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 25

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO N° 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
----------------------------------------------------------------------------------------------

### Garantias Judiciais

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÓNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário n° 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 26

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para

Página 27

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------

| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para

Página 28

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |

Página 29

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |

Página 30

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 31

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|---------------|------|----------|--------|
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Cível |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |

Página 32

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------

| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 33

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| | | | | | | |
|---|---|---|---|---|---|---|
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |

Página 34

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------

| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
|----------|-------------|---------------|-----------------|------|----------|--------|
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 35

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
------------------------------------------------------------------------------------------------------------------------------

| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

Página 36

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
----------------------------------------------------------------------------------------------------------

### Outras Garantias

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

### Garantia em Juízo

| | Bloqueio | Deposito Judicial | Bens em Garantia |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

Página 37

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO N° 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------------------------------

## ANEXO B

## Anatel Bonds

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário n° 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB:  (i) Para

Página 38

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------------------------------------

## Garantias Judiciais

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 39

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------

| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para

Página 40

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
-------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 41

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB**: (i) Para

Página 42

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 43

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

---------------------------------------------------------------------------------------------------------------------------------

| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|-------------|------|----------|--------|
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 44

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO N° 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------------------------

| | | | | | | |
|---------|-------------|------------|------------------|------|----------|--------|
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Cível |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário n° 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 45

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |

Página 46

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
----------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13  1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: **Central de Atendimento BB-CABB:** (i) Para

Página 47

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
-------------------------------------------------------------------------------------------------

| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
|----------|-------------|---------------|-----------------|------|----------|--------|
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca a minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para

Página 48

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

--------------------------------------------------------------------------------------------------------------------------------

| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

Página 49

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
-----------------------------------------------------------------------------------------------------------------

## Outras Garantias

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

## Garantia em Juízo

| | Bloqueio | Deposito Judicial | Bens em Garantia |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

Página 50

Continuação do PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA. EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).
--------------------------------------------------------------------------------------------------------------------

### Financiamentos

| BANCO | NÚMERO DO CONTRATO | DATA DA CONTRATAÇÃO | VALOR DO CONTRATO | TIPO |
|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB |
| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME |

PRIMEIRO ADITIVO À CÉDULA DE CRÉDITO BANCÁRIO Nº 307.001.181, EMITIDA POR NEXTEL TELECOMUNICAÇÕES LTDA., EM 31/10/2012, EM FAVOR DO BANCO DO BRASIL S.A., NO VALOR DE R$ 400.000.000,00 (QUATROCENTOS MILHÕES DE REAIS).

------------------------------------------------------------------------------------------------

## ANEXO C

1)    Capital Research and Management Co.;
2)    Aurelius Capital Management, LP;
3)    JP Morgan Asset Management;
4)    GoldenTree Asset Management;
5)    Empyrean Capital Partners;
6)    Whitebox Advisors;
7)    JMB Capital;
8)    Benefit Street Partners;
9)    Credit Suisse Securities; ou
10)   qualquer das Afiliadas das empresas descritas nos itens (1) a (9), acima.

TEXT_SP 9053003v13 1803/14 CENTRAIS DE ATENDIMENTO TELEFÔNICO - Para eventuais informações, sugestões, reclamações ou quaisquer outros esclarecimentos que se fizerem necessários a respeito deste Primeiro Aditivo à Cédula de Crédito Bancário nº 307.001.181, o Banco coloca à minha (nossa) disposição os seguintes telefones: Central de Atendimento BB-CABB: (i) Para capitais e regiões metropolitanas: 4004 0001; (ii) Demais regiões: 0800 729 0001; SAC - Serviço de Atendimento ao Consumidor: 0800 729 0722; Central de Atendimento a pessoas com deficiência auditiva ou de fala:

**EXHIBIT F-5b**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

---------------------------------------------------------------------------------------------------------------------------

**PREAMBLE:**

---------------------------------------------------------------------------------------------------------------------------

**ISSUER** – NEXTEL TELECOMUNICAÇÕES Ltda, a limited liability company (*sociedade limitada*) with headquarters at Av. das Nações Unidas, 14.171, 32 º andar, Rochavera Crystal Tower, São Paulo (SP) registered at the CNPJ/MF under No. 66.970.229/0001-67, represented herein by the undersigned and identified persons below.

---------------------------------------------------------------------------------------------------------------------------

**CREDITOR** – BANCO DO BRASIL S.A., a state-controlled public company (*sociedade de economia mista*), with headquarters in Brasília, Federal Capital, at SBS Quadra 01, Bloco C, Lote 32 – Setor Bancário Sul, registered at the CNPJ under No. 00.000.000/0001-91, by its Large Corporate Branch 3070 (SP), located in the city of São Paulo, state of São Paulo, at Av. Paulista, 2.300, 2º andar, Cerqueira César, registered at the CNPJ/MF under No. 00.000.000/1947-00, represented by Mr. João Marcos Mizobuti, Brazilian, married, banker, resident and domiciled in Atibaia (SP), Brazilian national driver's license No. 03228530867, issued by DETRAN/SP, registered at the CPF/MF under No. 059.052.748-78 and by Ms. Eliane Aparecida Scarponi Sartorelli, Brazilian, single, banker, residing and domiciled in São Caetano do Sul (SP), ID card No. 22.077.941, issued by SSP/SP, registered under CPF/MF No. 174.173.148-80, who signed below.

---------------------------------------------------------------------------------------------------------------------------

**WHEREAS,** on October 31, 2012, the **ISSUER** issued Bank Credit Note No. 307.001.181 in favor of the **CREDITOR** with a principal amount of four hundred million Reais (R$ 400,000,000.00) (the "Note"); and

**WHEREAS** the **ISSUER** and the **CREDITOR** agreed to amend the Note in order to alter the interest rate applicable to the balances due for the Loan Account and to include additional collateral and fiduciary guarantees in order to  secure the obligations established therein, among other provisions;

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------

The Parties to this instrument **HEREBY AGREE** to execute this First Amendment to Bank Credit Note No. 307.001.181 through the following terms and conditions.

**CLAUSE ONE – FINANCIAL CHARGES** – Item 1.2 of the Preamble and Clause 4 of the Note will now go into effect with the following wording:

*"1.2 CREDIT OPERATION INFORMATION:*

*Amount: four hundred million Reais (R$ 400,000,000.00) ("Principal")*

*Final Maturity: 10/31/2017*

*Financial Charge Payment Dates: March, June, September and December of each year ("Payment Dates of Charges")*

*Number of copies of this Bank Credit Note: one (1) negotiable copy and three (3) non-negotiable copies*

*4. FINANCIAL CHARGES – Financial charges equivalent to 139.54% (one hundred and thirty-nine point fifty-four percentage points) of the average rate for Inter-bank Certificates of Deposit will apply to the balances due in the Loan Account, resulting from the recording of the principal amount, as well as the amounts resulting thereto, due as accessory charges, fees and expenses ("Financial Charges"), capitalized daily. These Financial Charges, calculated by business days, will be debited every month to the Loan Account and payment will be due in full every quarter, on the corresponding Payment Dates of Charges, as per the definition in Item 1.2 of the Preamble, on the due date, and upon payment of the debt. For the purposes of this Note, the "Loan Account" is a binding account created by the CREDITOR for the purpose of demonstrating the amounts due by the ISSUER, subject to the debits and credits corresponding to the accounting entries for the transactions made pursuant to the terms of this Note.*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------------

*4.1. For the purposes of this Note, "business days" will be construed as every day except Saturday, Sunday or national bank holidays; and "CDI" will be construed as the average of the over, intergroup Interbank Deposit Certificates, disclosed by CETIP S.A. – Organized Markets.*

*4.2. In the event of termination, non-disclosure or impossibility, for any reason, to use the average daily CDI rates during the period in which it is not possible to use the average daily CDI rates, a replacement rate will be used based on the variation of the Selic Rate of the Banco Central do Brasil (Bacen), published by ANDIMA – National Association of Financial Market Institutions or another that may be jointly defined by the CREDITOR and the ISSUER."*

**CLAUSE TWO – ESTABLISHMENT OF GUARANTEE** – In order to secure the performance of the obligations assumed in the Note ("Guaranteed Obligations"), the **ISSUER** hereby and in full compliance with the law, irrevocably assigns and makes a fiduciary transfer to the **CREDITOR,** pursuant to the terms of § 3 of Article 66-B of Law No. 4.728/65, with the wording given by Law No. 10.931/04, of Articles 18 and 20 of Law No. 9.514/97, of Decree-Law No. 911/69 and later alterations, and in regard to what is applicable of Articles 1.361 et seq. of the Civil Code, the fiduciary title, in fee simple subject to condition subsequent and direct and indirect possession of the full amount of the credit rights over the present and future receivables resulting from the rendering of telecommunications services made by the **ISSUER** to its clients, covering all the revenues from the amounts received under this title, which are collected by the **CREDITOR** ("Receivables"), under the terms described below, as well as the on the funds deposited or held in the Linked Account ("Assigned Rights").

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------

**PARAGRAPH ONE** – The amounts referring to the part of the Receivables covered by the heading are received by the **CREDITOR** through collection slips that are not subject to compensation and automatic debit, according to the terms of the General Clause Acceptance Statement of the Single Services

Rendering Agreement, executed by the **CREDITOR** and the **ISSUER** on 12/11/2014 ("Collection Agreement").

**PARAGRAPH TWO** – Hereinafter, the amounts received daily within the scope of the Collection Agreement ("Amounts Collected"), representing the installment of the Receivables and any other credits, will be credited to account No. 300.003-6, branch 3070-8, exclusively transacted by the **CREDITOR**, contingent on the payment of the obligations resulting from the CCB ("Linked Account"), the balance of which and the amounts credited to it daily are also now given in fiduciary assignment by the **ISSUER** to the **CREDITOR,** and for all purposes are a part of the Rights Assigned, pursuant to the terms of the Heading of this Clause. The **ISSUER** irrevocably undertakes to (i) not take any measures to directly receive any amounts referring to the Receivables; (ii) not materially alter the collection procedures and forms for the Receivables currently in effect, or take any measure, or fail to take any, when applicable, the seek to or have the effect of reducing the collection of the Receivables by the **CREDITOR** until full payment of the **ISSUER'S** obligations established pursuant to the Note; (iii) while the Note is in effect, maintain the Collection Agreement in full force and effect; and (iv) not assign, sale, transfer, sell, encumber, give in guarantee, pledge or encumber in any way negotiate the Assigned Rights, without prior and express consent of the **CREDITOR**.

**PARAGRAPH THREE** – It is agreed that the average monthly amount of the Amounts Collected that will pass through the Linked Account in the three months immediately before the calculation by the

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

**CREDITOR** each quarter ("Period"), will be done on March 31, June 30, September 30 and December 31 of each year shall reach, and the **ISSUER** undertakes to adopt all necessary measures to ensure that it reaches, at least the equivalent to thirty million Reais (R$ 30,000,000.00) ("Minimum Average Amount"), calculated by the total value of the funds that are deposited into the Linked Account during each

Period, divided by three (3). If, in a given period, the Minimum Average Amount is not seen by the **CREDITOR**, at its sole discretion, the **CREDITOR** may immediately declare the early termination of the ISSUER's obligations within the scope of the Note. However, and without prejudice to its right within the scope of this Clause, the **CREDITOR** may, at its sole discretion, as an alternative to the declaration of early termination of the **ISSUER'S** obligations established pursuant to the Note, require that within a period of ten (10) days of the **CREDITOR's** request in this regard, the **ISSUER** deposit an amount into the Linked Account that is equivalent to the difference between the Minimum Average Amount and the average monthly amount actually calculated by the **CREDITOR** pursuant to the terms of this Clause ("Deficit Amount"). In this case, the Deficit Amount will be kept in the Linked Account until the Minimum Average Amount calculated by the **CREDITOR** on a calculation date pursuant to the terms of this Clause has been re-established.

**PARAGRAPH FOUR -** Notwithstanding the following paragraph, the **CREDITOR** is hereby legally identified as the sole and legitimate holder, on a fiduciary basis, of the Assigned Rights, the condition of which will remain until full compliance with all the obligations assumed by the **ISSUER** in the Note, so that, upon compliance by the **ISSUER,** as declared by the **CREDITOR,** the fiduciary ownership of the **CREDITOR** shall cease, and the Assigned Rights shall return to the full ownership of the **ISSUER**.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------------

**PARAGRAPH FIVE –** Except for the hypothesis of withholding of the Deficit Amount established above, the Amounts Collected will be released every day, by 2:00 p.m. to the account that can be freely used by the **ISSUER**, after the necessary verification of the **CREDITOR** on the respective dates indicated, and provided that there has not been any early termination event, case of obligatory early payment or breach of obligation by the **ISSUER.**

**PARAGRAPH SIX –** The **ISSUER** hereby declares that:

(i)        it is authorized, pursuant to the terms of the law and its By-laws, to assign the Assigned Rights it holds, as well as to carry out the provisions of this agreement;

(ii)        execution of this agreement does not violate any provision of its By-laws, and also does not violate any applicable legal provision and regulations;

(iii)        the Assigned Rights are free and unencumbered from all burdens, liens, judicial or extrajudicial pending matters of any nature, including, tax claims, debts and/or encumbrances of any nature, except for this fiduciary assignment of credit rights;

(iv)        there is no legal impediment contained in any agreements to which the **ISSUER** is a party that prohibit this fiduciary assignment of the Credit Rights now agreed to, in favor of the **CREDITOR**; and

(v)        it had clear and sufficient prior knowledge of the attributions imposed on it, and that it agrees to all the terms of this agree,emt, and that it freely and spontaneously, without any defect of will and content, to make a fiduciary assignment of the Credit Rights in an indivisible and irrevocable manner.

**PARAGRAPH SEVEN –** The **ISSUER** will be liable for any and all harm caused to the **CREDITOR** that results from misrepresentations or inaccuracies in the declarations and warranties stated herein.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------------

**PARAGRAPH EIGHT –** In the event there is a breach in relation to the monetary obligations assumed by the **ISSUER** in the Note, subject to the respective cure period, as applicable, all the amounts relative to the Assigned Rights will be withheld by the **CREDITOR** in the Linked Account, and, in the event an early termination of the terms of this Note is ordered, these amounts may be used in the amortization of these obligations of the **ISSUER**, until full payment is made, up to the limit of the Guaranteed Obligations.

**PARAGRAPH NINE –** In the event an early termination of the terms of this Note, the **CREDITOR** may, independent of any notice, immediately use the Assigned Rights to satisfy the obligations guaranteed that are then overdue but not liquidated, through judicial foreclosure or private sale of the Receivables, as applicable, or, in the case of the Collected Amounts, simply apply them to the payment of the Guaranteed Obligations, pursuant to the terms of the law and in accordance with the terms of the Note, until the obligations have been totally paid. In this regard, the **CREDITOR** will have the right to immediately exercise all the rights it is legally assured by the laws in effect and pursuant to the terms of the Note over the Assigned Rights, and totally or partially may use, collect, receive, cash in, sell or assign the Receivables, pursuant to the terms and conditions that the **CREDITOR** consider to be appropriate, give a debt-release and sign any documents or statements, no matter how specific, necessary to the practice of the acts referred to herein, independent of any notice and/or additional authorization by the **ISSUER**. Any amounts in excess of the Guaranteed Obligations will be returned to the **ISSUER**.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-------------------------------------------------------------------------------------------------------------------------

**PARAGRAPH TEN –** The **ISSUER** hereby waives any legal or contractual privileges that may affect the quiet-title and full enforceability and transfer of the Assigned Rights in the event of their foreclosure, subject to the terms and conditions set forth in this Note.

**PARAGRAPH ELEVEN –** Notwithstanding what is stated on the Note, and for the purposes of Article 1.362 of the Brazilian Civil Code, Law 9.514/97, as altered, and Law 4.728/65, as altered, the Guaranteed Obligations can be described as follows:

(i)       Estimated principal amount of the debt: four hundred million Reais (R$ 400,000,000.00);

(ii)      Term and payment conditions: payment of principal in three installments of R$ 133,333,333.33 with maturity on the following dates: 10/31/2015, 10/31/2016 and 10/31/2017 and payment of financial charges every six months, on 10/31 and 05/01 of each year;

(iii)     Interest rate: 139.54% of the CDI; and

(iv)      Penalty charges: late interest: CDI rate plus 1% a month, plus 1% a year; and a punishment Clause: 2% of the amount due.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------

**PARAGRAPH TWELVE –** The Parties agree that the **ISSUER** does not have a system of individualization of receivables capable of identifying clients, amounts and invoices that will actually be deposited into the Linked Account, and that except where otherwise indicated in this Note, it does not assume any obligation to carry out such an individualization.


**CLAUSE THREE – ENDORSEMENT – NEXTEL TELECOMUNICAÇÕES S.A.**, a corporation with headquarters at Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, São Paulo (SP) registered at the CNPJ/MF under No. 00.169.369/0001-22 ("**SURETY GUARANTOR**"), hereby acts as a co-guarantor (*avalista*) of the **ISSUER** by endorsing the ISSUER's obligations set forth herein, assuming the obligation as principal payer, with joint and several liability for payment of the Guaranteed Obligations.


**CLAUSE FOUR – EARLY TERMINATION –** Clause 10 of the CCB will now go into effect with the following wording:


*"10. EARLY TERMINATION AND OTHER PROVISIONS:*


*10.1. The **CREDITOR** may early terminate, by operation of law, the obligations assumed in this Note, and demand payment for the entire amount of the debt represented herein, by sending prior notice to the*


*ISSUER within two (2) business days with a statement of the debt, when the occurrence of any of the following situations has been imputed to us:*


*a) breach, by the ISSUER, of any obligation of a monetary nature assumed in this Note, that is not cured within one (1) business day from the date of the original maturity;*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-----------------------------------------------------------------------------------------------------------------------

b) breach, by the **ISSUER,** of any obligation of a non-monetary nature assumed in this Note, that is not cured within thirty (30) days from the date on which the **CREDITOR** sends notice in regard to this fact;

c) failure to comply, misrepresentation, inaccuracy, incorrectness or material omission imputable to the **ISSUER,** in any representation, warranty, information rendered in this Note or in any material document that has been signed, provided or delivered by the **ISSUER** relative to this credit operation, provided that they have not been cured within ten (10) business days;

d) early termination or breach of any monetary obligation of the **ISSUER** or of any Brazilian Affiliate, excluding obligations exclusively between the **ISSUER** and the **SURETY GUARANTOR,** in a single or aggregate amount equal to or greater than ten million Reais (R$ 10,000,000.00) that is not cured within a period of ten (10) business days from the date on which the **CREDITOR,** except for those cases in which the payment of these obligations is suspended as a result of an administrative or court order or in which the disputed amount has been financially guaranteed in escrow in Court;

e) early maturity or breach of any monetary obligation of the **ISSUER** to the **CREDITOR** provided that it has not been cured within the periods established in the respective agreements;

f) protest against the **ISSUER** in a single or aggregate amount equal to or greater than

 ten million Reais (R$ 10,000,000.00) that is not cured within a period of thirty (30) days from the date of notice sent by the **CREDITOR,** or which is transformed into a court proceeding and has its payment suspended by a court order, or the disputed amount has been financially guaranteed in escrow in court;

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-----------------------------------------------------------------------------------------------------------------------------

*g) (i) the filing for bankruptcy by the **ISSUER** and/or by any Brazilian Affiliate; (ii) bankruptcy request by the **ISSUER** and/or any Brazilian Affiliate filed by a third party and not avoided within the legally mandated period; (iii) bankruptcy or liquidation decree by the **ISSUER** and/or by any Brazilian Affiliate; (iv) request for judicial or extra-judicial recovery by the **ISSUER** and/or by any Brazilian Affiliate;*

*h) liquidation, dissolution or termination of the **ISSUER**;*

*i) in the event the **ISSUER** or any of its Brazilian Affiliate is declared to be insolvent by a judicial decision or recognizes publicly or before the **ISSUER** and/or by any Brazilian Affiliate; its impossibility to pay its monetary obligations, or if this possibility is well known, in both cases in a total amount greater than ten million Reais (R$ 10,000,000.00);*

*j) a reduction, by the **ISSUER**, of its capital stock, redemption, amortization, reimbursement or purchase of shares, provided that these operations require payment (in cash or in kind) to its shareholders, or, if the financial index indicated in item "t" below is greater than 2.5 (two point five), distribution of profits or interest on own capital, even if already declared, to its shareholders;*

*k) sale, by the **ISSUER**, individually or in the aggregate, of any of its goods or assets, without prior and express consent in writing of the **CREDITOR**, except, in this case, (i) advance of revenues with a credit card, (ii) sale of receivables sold and not paid, (iii) sale of merchandise in the ordinary course of business, (iv) transfer of obsolete assets or moveable property of low aggregated value;*

*(v) transfers within the context of exchange of assets for similar assets of an equal or greater value; and (vi) sale of towers in the modality of "sale leaseback," in this case, subject to prior approval of the*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-----------------------------------------------------------------------------------------------------------------------

*CREDITOR, which shall be stated within a period of forty-five (45) days from the date on which this request is made in writing, provided that receipt of this notice by the **CREDITOR** is proven; failure by the **CREDITOR** to respond shall not characterize tacit approval;*

*l) payment, by the **ISSUER** or by any Brazilian Affiliate of any obligation, prior to full payment of all the obligations of this Note, to the Affiliated Parties, including in the event of bankruptcy, liquidation or dissolution of the **ISSUER**, except any payments between the **ISSUER** and the **SURETY**;*

*m) grant, and/or establishment, by the **ISSUER** or by any Brazilian Affiliate of any obligation or encumbrance or other collateral or personal guarantee in favor of a third party (including its Affiliates and direct or indirect controller), except (i) those constituted under the terms of this Note or prior to the date of the First Amendment, or (ii) by (a) the grant of real guarantees as a counter-guarantee in insurance policies and guarantee insurance in general; (b) grant of real guarantees as counter-guarantees in new bank accommodations for judicial guarantees or new limited judicial deposits, in the case of guarantees granted pursuant to this item (b) up to the total amount of one hundred and fifty million Reais (R$ 150,000,000.00); (c) grant of real or personal guarantees in site rental contracts; (d) grant of real or personal guarantees in collocation contracts (i.e. contracts with other operators for installation of equipment in towers), (e) financing granted by the National Telecommunications Agency (ANATEL), including renewals, (f) guarantees in favor of ANATEL, (g) real property guarantees offered as counter-guarantees for the issue of new performance bonds in favor of ANATEL, in this case, subject to prior approval by the **CREDITOR**, which shall be stated within a period of forty-five*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------------

*(45) days from the date on which that question was raised in written notice, provided that proof of said notice is received by the **CREDITOR**; failure to respond by the **CREDITOR** shall not be deemed to be tacit approval and (h) renewals of operations already held by the **ISSUER** or its Brazilian Affiliates identified in Attachment 10.1 (m)(1) of this Note; the guarantees to be granted as per the terms of this item (h) shall be limited to the amount guaranteed by the accommodation and/or performance bond, as indicated in that attachment, subject to the same guarantees in effect on this date; the guarantees granted under the terms of items (a), (c) and (d) above are limited to the total amount of fifty million Reais (R$ 50,000,000.00). The **ISSUER** hereby declares, for the purposes of this Note, that Attachment 10.1 (m)(2) contains all the operations that have a real property guarantee;*

*n) failure to use the funds for the purpose indicated in the Clause Purpose and Release of the Credit;*

*o) execution of any guarantee provided to any creditor of the **ISSUER** or any Brazilian Affiliate in the amount, equal to or greater than ten million Reais (R$ 10,000,000.00), provided that it is not cured within a period of ten (10) business days, from the date of notice sent by the **CREDITOR**, subject to the cases in which this enforcement is suspended as a result of an administrative or court order;*

*p) failure to comply with the Minimum Average Amount for at least one (1) Period;*

*q) publication of an administrative regulation whose effects have not been suspended within the legal periods, when applicable, which (i) adversely affects the capacity of the **ISSUER** to honor its obligations before the **CREDITOR;** or (ii) makes the activities or a significant part thereof, of the **ISSUER** unfeasible, or in any other way adversely impacts the financial situation (in both cases, understood to be those activities that account for ten per cent (10%) or more of the annual sales of the*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------

*ISSUER); or (iii) result in the application of a fine, sanction or final and non-appealable penalty that impacts the financial situation of the ISSUER and/or its Brazilian Affiliates in an amount equal to or greater than one hundred million Reais (R$ 100,000,000.00) in the same fiscal year;*

*r) the adoption of a policy by the ISSUER that leads to discrimination on the basis of race or gender or leads to sexual discrimination or harassment, (ii) proof by a final judicial or administrative decision, issued by the competent authority or agency, (I) that the activities of the ISSUER have caused harm to the environment, or (II) that the ISSUER uses labor in a situation similar to that of slave labor, as set forth in Inter-ministerial Rule No. 2, of May 12, 2011, (b) uses child labor in a non-regulated manner, (c) exploits prostitution or (d) carries out illegal activities, whether or not they are listed in the Registry of Employers;*

*s) transfer, termination or suspension of the Concession obtained from ANATEL for the development of third generation frequencies (3G technology) and GSM without prior consent of the CREDITOR, which cannot be unjustifiably denied;*

*t) if the index obtained by the division of the Net Debt by EBITDA is greater than 2.5 (two point five), to be calculated pursuant to the terms of Clause 10.2, subject to the terms of Clauses 10.4 and 10.5;*

*u) if the ISSUER does not maintain the Minimum Balance in immediately available funds or in financial investments, on each Verification Date;*

*v) failure to comply with the subordination obligation established in Clause 15 of this Note;*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-------------------------------------------------------------------------------------------------------------------------

*w) full or partial transfer or assignment to third parties, in any way, of the rights and obligations resulting from this Note, without prior and*

*express consent of the* **CREDITOR***;*

*x) lack of funds in in any of the accounts owned by the* **ISSUER***, to meet the payment of commitments assumed in this Note on the respective payment dates and not cured within one (1) business day; and*

*y) failure to comply with any of the obligations established in Clause Two, Paragraph Two of the first amendment to this Note.*

**10.2.** *For the purpose set forth in Clause 10.1, line "t," the ratio obtained by division of the Net Debt by EBITDA will be calculated in the following form: (i) every semester, based on the unaudited interim balance sheets ending on June 30 each year; (ii) annually, by the financial statements ending on December 31 of each year, consolidated and audited by an auditing company recognized by the market.*

**10.3.** *We shall present to the* **CREDITOR***, while this Note is in effect, a declaration of compliance with the ration pursuant to the terms of Attachment II, (i) the unaudited interim balance sheets ending on June 30 each year by August 15 of each year; and (iii) the financial statements ending on December 31 of each year, consolidated and audited, by May 5 of each year.*

**10.4.** *If, in a given period of verification of obligations covered by this Clause, the* **ISSUER** *has not met the ratio established above in item "t," the CREDITOR may, independent of any notification or remedial period, declare the early maturity of all the obligations assumed by the ISSUER and/or by the SURETY.*

TEXT_SP 9053003v13 1803/14 **CALL CENTERS** – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------

**10.5.** *Also for the purpose of the provision in Clause 10.1, line "t":*

*a) "Net Debt" means the amount calculated on a consolidated basis, on the respective verification date, determined in accordance with generally accepted accounting principles in Brazil, equal to (a) the sum of the Liabilities at financial institutions, securities representing the debt issues, and the net balance of derivatives operations (liabilities less assets of operations with derivatives); less (b) amounts available (cash, banks, investments with immediate liquidity or short term investments, own or third party securities, and public and private securities of any nature) and (c) the effects of mark to market of the derivatives operations;*

*b) "EBITDA" means the operating profit of the **ISSUER**, on a consolidated basis, relative to the past twelve (12) months, plus the depreciation and amortization expenses, all determined in accordance with the generally accepted accounting principles in Brazil; and*

*c) "Liability(ies)" mean(s) the principal of the securities representing the debt issued at the financial institutions registered on the consolidated Balance Sheet of the **ISSUER** on the measurement dates, all determined in accordance with the generally accepted accounting principles in Brazil."*

**10.5.** *Also, for the purposes of this Note, the following definitions will be used:*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------

*"Affiliate" of any Party means another Party that directly or indirectly, through one or more intermediaries, Controls, is Controlled or is under the common Control of this first Person. In addition, in the case of a Party, whether an investment fund or whose Controlling shareholder is an investment fund, it will also be considered an "Affiliate" when: (i) the manager or shareholder or an Affiliate of the manager or of the shareholder of this investment fund, (ii) another investment fund administered or managed by the manager or shareholder or an Affiliate of the manager or of the shareholder of this investment fund, and (iii) any Party*

*that is directly or indirectly Controlled or is under the common control of this investment fund, whether individually or jointly with another Affiliate or any of the other Parties presented above.*

*"Brazilian Affiliate" means in relation to any Party an Affiliate domiciled in Brazil.*

*"Control" (including its related meanings) means, in accordance with Article 116 of Law No. 6.404 dated 12.15.1976, (a) the power to elect the majority of the board of directors, or similar body, of the Party controlled, or to otherwise conduct the business or the policies of this Party (by contract or another way), and (b) the direct or indirect possession of rights that grant to the Controlling Party the majority of the votes in the general shareholder meeting or similar meeting, of the Controlled Party*

*"Affiliate" of any specified Party will have the definition described in Resolution No. 642 of October 7, 2010 issued by the Securities and Exchange Commission, and which will also include, insofar as it is not repeated, (i) any Affiliate of this Party, (ii) any director, board member, shareholder, employee or administrator of this Party or an affiliate of that Party, (iii) any spouse, ex-spouse, descendant, ascendant or collateral relative up to the second degree of this Party, an Affiliate of this Party or any director, board*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-------------------------------------------------------------------------------------------------------------------------------

*member, shareholder, employee or administrator of this Party or an affiliate of that Party, and (iv) any*

*Affiliate of those listed above.*


*"Person" means any government entity or any individual, firm, partnership, company, limited liability*

*company, joint venture, association, fund, investment fund, fiduciary agent, organization without legal*

*personality or other organized*


*entity, whether a legal entity or not.*


**CLAUSE FIVE – LIST OF GUARANTEES –** Include Attachment 10.1 (m)(1) and 10.1 (m)(2) of this Note in

the exact terms of Attachment A and Attachment B, respectively, of this amendment.


**CLAUSE SIX – MANDATORY EARLY PAYMENT –** Clause 11 of this Note will now go into effect with the

following wording:


*"11 MANDATORY EARLY PAYMENT*


*11.1. We shall be obligated to make an early and in full payment of all the amounts due pursuant to the*

*terms of this Note, including the Principal and Financial Charges, in the event that any of the following*

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

*events occurs, upon request with prior notice of at least five (5) business days, in writing, of the* **CREDITOR***:*

*a) change in the company purpose that alters the current core activities or adds new businesses to these activities that prevail over or can represent changes in relation to the activities currently developed, without prior consent of the* **CREDITOR,** *which shall not be denied without cause;*

*b) performance of any type of company restructuring, such as a merger (fusão or incorporação), or spin-off (cisão), except if the spin-off is partial and not greater than 10% of our net equity, without prior consent of the* **CREDITOR,** *which shall not be denied without cause; except if the transaction is within the same economic group;*

*c) acquisition of share control of companies that results in the alteration of our core purpose, in a way that alters the current principal activities or adds new businesses to these activities that have prevalence or can represent*

*changes in relation to the activities currently carried out, without prior consent of the CREDITOR, which shall not be denied without justification;*

*d) direct or indirect change of the share control of the* **ISSUER** *or of any controlled company, without prior consent of the CREDITOR, with the definition of the expression share control taken from Article 116 of Law No. 6.404, dated 12.15.1976 and/or the undertaking of an obligation (conditional or otherwise) by the* **ISSUER** *or its direct or indirect shareholders, to do so, except within the scope of the judicial recovery proceeding (Chapter 11 proceeding) of NII Holdings Inc., provided that the new controlling shareholders*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-----------------------------------------------------------------------------------------------------------------------------
*are one or more persons identified in Attachment 11.1(d), which are previously approved by the* ***CREDITOR.***"

 **CLAUSE SEVEN – LIST OF CONTROLLERS** – Include Attachment 11.1(d) to the Note in the exact terms of Attachment C of this amendment.

**CLAUSE EIGHT – SUBORDINATION AND MINIMUM BALANCE** – As a result of the inclusion of subordination of the obligations assumed by the **ISSUER** to any of its affiliates and the obligation of the **ISSUER** to maintain on each Verification Date funds immediately available or in financial investments with immediate liquidity, Clauses Fifteen and Sixteen of the Bank Credit Note now amended will have the following wording, with the others to be successively renumbered:

*"**15. SUBORDINATION** – The **ISSUER** hereby represents and warrants for all purposes that any and all obligations assumed by the **ISSUER** to any of its Affiliates are subordinated to the obligations set forth in this Note. Likewise, the **ISSUER** agrees that no amount will be paid to its Affiliates before the full performance and payment of the obligations set forth in this Note, including in the event of bankruptcy, liquidation or dissolution of the **ISSUER,** except for any payments made between the **ISSUER** and the* ***SURETY GUARANTOR.***

*16. MINIMUM BALANCE  – On each verification date, the **ISSUER** shall have in immediately available funds or in financial investments with immediate liquidity, the minimum amount of two hundred million Reais (R$ 200,000,000.00) ("Minimum Balance"), and shall prove to the **CREDITOR**, through (i) interim balance sheets ending on June 30 each year, presented to the **CREDITOR** by August 15 of each year; and*

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
----------------------------------------------------------------------------------------------------------------------------

*(ii) financial statements ending on December 31 of each year, consolidated and audited, presented to the* **CREDITOR** *by May 5 of each year. For the purposes of this Note, "Verification Date" will mean June 30 and December 31 of each year."*

**CLAUSE NINE – ASSIGNMENT** –Clause 17 of the *Note*, which governs assignment, will now go into effect with the following wording:

*"This Note may be the object of assignment and endorsement by the* **CREDITOR,** *through prior notice of ten (10) business days to the* **ISSUER,** *pursuant to the terms of the civil and commercial legislation, without the need for the assignor/endorser to be a financial institution or entity treated as one; however, until September 15, 2015, this Note will only be able to be assigned and/or endorsed through prior written consent of the* **ISSUER.**"

**CLAUSE TEN – REGISTRATION** – The **CREDITOR** will take the Note and this Amendment for registration at the Registrar of Deeds and Documents of the Judicial District of São Paulo, SP. The costs related to this registration will be paid by the **ISSUER**, which hereby authorizes the debit of the respective amounts to its deposit account No. 5567-0, at Agency 3070-8 of the **CREDITOR**.

**CLAUSE ELEVEN – PAYMENT OF FINANCIAL CHARGES -** The **ISSUER** shall pay, on the date of execution of this amendment, the

Financial Charges, at the interest rate in effect immediately before the execution of this amendment, established for December 2014, accumulated since the last Payment Date of the Charges to the present.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------------

**CLAUSE TWELVE – RENEGOTIATION RATE –** The renegotiation rate is due, and shall be paid by the **ISSUER** on the date of execution of this amendment, in the percentage of 0.60% (sixty one hundredths of one per cent) of the renegotiated amount, equivalent to two million and four hundred thousand Reais (R$ 2,400,000.00). Payment of the renegotiation rate shall be in addition to the amounts relative to each and all taxes on this rate, including any interest, additional taxes, fines or penalties that may apply to the operations in question, as well as any rate increases that may already exist, so that the **CREDITOR** receives the amounts it is entitled to if those taxes did not apply. If the deduction, withholding or payment of these taxes is required by law, in relation to the payment, the **ISSUER** hereby agrees to the increase in the amount due as a gross up.


**CLAUSE THIRTEEN – PROMISE OF PAYMENT -** The **ISSUER** hereby represents, on this date, that the balance due of the Note is a net and certain debt, and promises to pay it on the dates and under the terms established in that agreement, as amended in this First Amendment.


Having thus agreed, the **CREDITOR,** the **ISSUER** and the **SURETY GUARANTOR,** representing that they do not intend to conduct a novation, hereby ratify this Bank Credit Note now amended in all its terms, Clauses and conditions not expressly altered in this document, which shall be an integral part of the former, forming with it a single and indivisible whole for all purposes of law.

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-----------------------------------------------------------------------------------------------------------------------

This agreement is executed in four (4) counterparts of equal content; only the first of which is negotiable. The other counterparts contain the expression "non-negotiable counterpart."

São Paulo, SP, February 13, 2015

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-----------------------------------------------------------------------------------------------------------------------------

**CREDITOR**

BANCO DO BRASIL S.A.

Large Corporate Branch 3070 (SP)


Signature _____ Initials _____


Signature _____ Initials _____

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------------

**ISSUER**

NEXTEL TELECOMUNICAÇÕES LTDA.

CNPJ (Corporate Taxpayer Number): 66.970.229/0001-67


[signature]

| | |
|---|---|
| _____ | _____ |
| Initials | Name:<br>Profession:<br>Marital Status:<br>Nationality:<br>Residing in:<br>ID No.<br>CPF/MF No. |

| | |
|---|---|
| _____ | _____ |
| Initials | Name:<br>Profession:<br>Marital Status:<br>Nationality:<br>Residing in:<br>ID No.<br>CPF/MF No. |


**SURETY**

NEXTEL TELECOMUNICAÇÕES LTDA.

CNPJ (Corporate Taxpayer Number): 00.169.369/0001-22


[signature]

| | |
|---|---|
| _____ | _____ |
| Initials | Name:<br>Profession: |

| | |
|---|---|
| _____ | _____ |
| Initials | Name:<br>Profession: |

TEXT_SP 9053003v13 1803/14 **CALL CENTERS** – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------------

Marital Status:                              Marital Status:
Nationality:                                  Nationality:
Residing in:                                  Residing in:
ID No.                                        ID No.
CPF/MF No.                                    CPF/MF No.

[round stamp:  Nextel Legal Department]


## ATTACHMENT A
## Anatel Bonds

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/ TERM | AMOUNT INSURED R$/US$ / AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------------

**Judicial Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT No. | END OF PERIOD/ TERM | AMOUNT INSURED R$/US$ / AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |

Fiscal – Fiscal

Cível – Civil & Commercial

Trabalhista – Labor

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------------------

Ambiental – Environmental

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
-------------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------------

| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |

**TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Cível |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
----------------------------------------------------------------------------------------------------------------------------

| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|-------------|------|----------|--------|
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|---------------|------|----------|--------|
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Civel |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Civel |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Civel |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Civel |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Civel |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Civel |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
|---|---|---|---|---|---|---|
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |

**TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------------------

| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-----------------------------------------------------------------------------------------------------------------------------

**Other Guarantees**

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/ TERM | AMOUNT INSURED R$ US$ AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessao de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessao de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessao de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

### Guarantees in Judicial Deposits

| | Blocked | Judicial Deposit | Assets in Guarantee |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

Outros – Others
Concessão de Uso – Concession of Use
Fiança Locatícia – Lease Guarantee
Empréstimo - Loan

### ATTACHMENT B

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------

### Anatel Bonds

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/ TERM | AMOUNT INSURED R$/US$ / AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9053003v13 1803/14 **CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

---------------------------------------------------------------------------------------------------------------------------

### Judicial Guarantees

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/ TERM | AMOUNT INSURED R$/US$ / AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

----------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Civel |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Civel |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ - | Judicial | Civel |
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Civel |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------

| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
|---------|--------------|------------|-------------|------|----------|--------|
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ - | Judicial | Fiscal |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Civel |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Civel |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Civel |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)
--------------------------------------------------------------------------------------------------------------------------------

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------

| | | | | | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ - | Judicial | Fiscal |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------

| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Civel |
|---|---|---|---|---|---|---|
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Civel |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Civel |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------

| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
|----------|-------------|---------------|------------------|------|----------|--------|
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------------

| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
|-------------|---------|---------------|-----------------|------------------|----------|--------|
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

## Other Guarantees

| INSURANCE COMPANY/BANK | POLICY/ CONTRACT NO. | END OF PERIOD/ TERM | AMOUNT INSURED R$/US$ / AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

## Guarantees in Judicial Deposits

|  | Blocked | Judicial Deposit | Assets in Guarantee |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

Outros – Others

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

-------------------------------------------------------------------------------------------------------------------------

Concessão de Uso – Concession of Use

Fiança Locatícia – Lease Guarantee

Empréstimo - Loan

**Financing**

| BANK | CONTRACT NUMBER | CONTRACT DATE | CONTRACT AMOUNT | TYPE | |
|---|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB | |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB | |
| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo | |
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo | |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME | |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME | |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME | |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME | |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME | |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME | |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME | |

TEXT_SP 9053003v13 1803/14 CALL CENTERS – For any information, suggestions, complaints or other clarifications that may be necessary in regard to this First Amendment To Bank Credit Note No. 307.001.181, the Bank is making available to me (us) the following phone numbers: BB-CABB Call Center: (i) For state capitals and metropolitan regions: 4004 0001; (ii) Other regions: 0800 729 0001; SAC – Consumer Service Center: 0800 729 0722. Call Center for persons with auditory or speech impairments

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

FIRST AMENDMENT TO BANK CREDIT NOTE No. 307.001.181, ISSUED BY NEXTEL TELECOMUNICAÇÕES LTDA., ON 10/31/2012, IN FAVOR OF BANCO DO BRASIL S.A. IN THE AMOUNT OF FOUR HUNDRED MILLION REAIS (R$ 400,000,000.00)

--------------------------------------------------------------------------------------------------------------------------

## ATTACHMENT C

1)     Capital Research and Management Co.;
2)     Aurelius Capital Management, LP;
3)     JP Morgan Asset Management;
4)     GoldenTree Asset Management;
5)     Empyrean Capital Partners;
6)     Whitebox Advisors;
7)     JMB Capital;
8)     Benefit Street Partners;
9)     Credit Suisse Securities; or
10)    Any of the affiliates of the companies described in items (1) to (9), above.

**EXHIBIT F-6a**

## INSTRUMENTO DE ASSUNÇÃO MÚTUA DE OBRIGAÇÃO DE NÃO FAZER E OUTRAS AVENÇAS

As seguintes partes (as "Partes"), a saber:

(a)    **BANCO DO BRASIL S.A.**, sociedade de economia mista, com sede em Brasília, Distrito Federal, na SBS Quadra 01, Bloco C, Lote 32 – Setor Bancário Sul, inscrita no CNPJ/MF sob o nº 00.000.000/0001-91, por sua filial, Agência Large Corporate 3070 (SP), localizada na cidade de São Paulo, Estado de São Paulo, na Av. Paulista, 2.300, 2º andar, Cerqueira César, inscrita no CNPJ/MF sob o nº 00.000.000/1947-00, neste ato representada na forma de seu estatuto social ("Banco do Brasil"); e

(b)    **CAIXA ECONÔMICA FEDERAL**, instituição financeira sob a forma de empresa pública, criada nos termos do Decreto-lei nº 759, de 12 de agosto de 1969, vinculada ao Ministério da Fazenda, com sede em Brasília, Distrito Federal, por sua Superintendência Regional de Osasco, com endereço em Brasília, Distrito Federal, no Setor Bancário Sul, Quadra 4, Lotes 3 e 4, inscrita no CNPJ/MF sob o nº 00.360.305/0001-04, neste ato representada na forma de seu estatuto social ("CEF" e, em conjunto com o Banco do Brasil, os "Credores");

(c)    **NEXTEL TELECOMUNICAÇÕES LTDA.**, sociedade empresária limitada, com sede em São Paulo, Estado de São Paulo, na Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, inscrita no CNPJ/MF sob o nº 66.970.229/0001-67, neste ato representada na forma de seu contrato social ("Nextel"); e

(d)    **NEXTEL TELECOMUNICAÇÕES S.A.**, sociedade por ações de capital aberto, com sede em São Paulo, Estado de São Paulo, na Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower, inscrita no CNPJ/MF sob o nº 00.169.369/0001-22, neste ato representada de seu estatuto social ("Nextel S.A.").

CONSIDERANDO QUE:

(i)    a Nextel emitiu (i) em 8 de dezembro de 2011, em favor da CEF, a Cédula de Crédito Bancário nº 21.3150.777.0000001-97, no valor de R$640.000.000,00 (seiscentos e quarenta milhões de reais) (conforme aditada nesta data, "CCB CEF"); e (ii) em 31 de outubro de 2012, em favor do Banco do Brasil, a Cédula de Crédito Bancário nº 307.001.181, no valor de R$400.000.000,00 (quatrocentos milhões de reais) (nesta data, "CCB BB" e, em conjunto com a CCB CEF, as "CCBs"); e

(ii)    em razão da não obtenção, pela Nextel, do índice obtido pela divisão de sua Dívida Líquida pelo EBTIDA igual ou inferior a 2,50 (dois inteiros e cinquenta centésimos), nos termos da Cláusula 10.1(i) da CCB BB e da Cláusula Décima Primeira da CCB CEF, com relação aos períodos compreendidos entre o primeiro e o segundo semestre de 2014, a Nextel e os Credores pretendem promover a reestruturação das dívidas representadas pelas CCBs ("Dívidas"). Para tanto, (a) a Nextel outorgou aos Credores garantia real às Dívidas, consistente na cessão fiduciária de recebíveis representados por faturas de prestação de serviços de telecomunicação e recursos depositados ou mantidos nas Contas Vinculadas (conforme definidas nas CCBs), nos termos dos aditamentos às CCBs celebrados nesta data; (b) os Credores pretendem suspender, por certo período, nos termos do presente instrumento, a exigibilidade do principal das Dívidas e de certas obrigações da Nextel previstas nas CCBs, sujeitas a certas condições resolutivas; e (c) as Partes pretendem estabelecer os termos e condições da reestruturação das Dívidas, a ser formalizada por meio de aditamentos às CCBs, cuja celebração estará sujeita a certas condições suspensivas;

RESOLVEM celebrar o presente Instrumento de Assunção Mútua de Obrigação de Não Fazer e outras Avenças (o "Contrato), que se regerá de acordo com as seguintes cláusulas e condições:

## 1.    Definições

1.1.    Sempre que forem empregados no presente Contrato, a menos que o contexto exija de outra forma, os termos não definidos no presente Contrato terão os mesmos significados a eles atribuídos nas CCBs.

1.2.    Ademais, para efeitos de interpretação e execução do presente Contrato:

"Afiliada" de qualquer Pessoa significa outra Pessoa que, direta ou indiretamente, por meio de um ou mais intermediários, Controle, seja Controlada, ou esteja sob o Controle comum com essa primeira Pessoa. Adicionalmente, no caso de uma Pessoa que seja um fundo de investimentos ou cujo acionista Controlador seja um fundo de investimentos, também será considerada uma "Afiliada": (i) o gestor ou o quotista ou uma Afiliada do gestor ou do quotista desse fundo de investimento, (ii) outro fundo de investimento administrado ou gerido pelo gestor ou quotista ou uma Afiliada do gestor ou quotista desse fundo de investimento, e (iii) qualquer Pessoa que seja, direta ou indiretamente, Controlada, ou esteja sob o Controle comum desse fundo de investimento, seja individualmente ou em conjunto com outra Afiliada, ou qualquer das outras Pessoas acima expostas.

"Afiliada Brasileira" significa com relação a qualquer Pessoa uma Afiliada domiciliada no Brasil.

"Controle" (incluindo seus significados correlatos) significa, de acordo com o Artigo 116 da Lei das S.A., (a) o poder para eleger a maioria do conselho de administração, ou órgão semelhante, da Pessoa controlada ou, de outro modo, conduzir os negócios ou políticas dessa Pessoa (por contrato ou de outro modo), e (b) a posse direta ou indireta de direitos que concedam à Pessoa Controladora a maioria dos votos na assembleia geral de acionistas ou reunião similar, da Pessoa Controlada.

"Dívida Líquida" significa o valor calculado em bases consolidadas, na respectiva data de verificação, determinado de acordo com os princípios contábeis geralmente aceitos no Brasil, igual (a) à soma dos Passivos junto a instituições financeiras, dos títulos e valores mobiliários representativos de dívida emitidos, e do saldo líquido de operações de derivativos (passivos menos ativos de operações com derivativos); diminuído (b) das disponibilidades (caixa, bancos, aplicações de liquidez imediata ou aplicações de curto prazo, títulos e valores mobiliários de própria emissão ou de terceiros, e títulos públicos e privados de qualquer natureza) e (c) dos efeitos da marcação a mercado das operações de derivativos.

"EBTIDA" significa o lucro operacional da Nextel, em bases consolidadas, relativo aos 12 (doze) últimos meses, somado às despesas de depreciação e amortização, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil.

"Parte Relacionada" de qualquer Pessoa especificada terá o significado descrito na Deliberação nº 642 de 7 de outubro de 2010 emitida pela Comissão de Valores Mobiliários, e também incluirá, na medida em que não seja repetido, (i) qualquer Afiliada dessa Pessoa, (ii) qualquer diretor, conselheiro, quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa Pessoa, (iii) qualquer cônjuge, ex-cônjuge, ascendente, descendente ou parente colateral até o segundo grau dessa Pessoa, uma Afiliada dessa Pessoa ou qualquer diretor, conselheiro, quotista, acionista, funcionário ou administrador dessa Pessoa ou uma Afiliada dessa Pessoa, e (iv) qualquer Afiliada dos acima expostos.

"Passivo" significa o valor principal dos títulos e valores mobiliários representativos de dívida emitidos junto a instituições financeiras registrados no balanço consolidado da Nextel nas datas de medição, todos determinados de acordo com os princípios contábeis geralmente aceitos no Brasil.

"Pessoa" significa qualquer entidade governamental ou qualquer pessoa física, firma, parceria, sociedade, sociedade de responsabilidade limitada, *joint venture*, associação, fundos, fundos de investimento, agente fiduciário, organização sem personalidade jurídica, ou outra entidade ou organização, quer seja uma pessoa jurídica ou não.

1.3.    Exceto quando o contexto não permitir tal interpretação:

(i)    palavras que denotam o singular incluirão o plural e vice-versa;

(ii)    referências ao Contrato ou a qualquer outro documento devem incluir eventuais alterações e aditivos que venham a ser celebrados entre as Partes;

(iii)    referências a diplomas legais devem ser interpretadas de acordo com tais diplomas legais, conforme alterados; e

(iv)    os títulos dos capítulos e das cláusulas do Contrato e de seus Anexos não devem ser usados na sua aplicação ou interpretação.

## 2.    Suspensão de Exigibilidade

2.1.    Suspensão de Exigibilidade. Pelo presente Contrato, e sujeito às condições resolutivas constantes no presente Contrato, os Credores concordam que, até 15 de setembro de 2015 ("Período de Suspensão"), (i) não será devido qualquer pagamento das parcelas de principal no âmbito da Cláusula Segunda, alínea (b), incisos (V) e (VI) da CCB CEF, não obstante o originalmente constante em tais Cláusulas; e (ii) não será exigível a obrigação de manutenção do índice financeiro, conforme determina a Cláusula 10.1(i) da CCB BB e a Cláusula Décima Primeira da CCB CEF com relação aos períodos de 30 de junho de 2014, 31 de dezembro de 2014 e 30 de junho de 2015, não obstante o originalmente constante em tais Cláusulas ("Suspensão de Exigibilidade"). Não obstante, fica preservada a obrigação de reportar (i) os balancetes semestrais não auditados encerrados em 30 de junho até o dia 15 de agosto de cada ano, e (ii) as demonstrações financeiras encerradas em 31 de dezembro, consolidadas e auditadas, até o dia 5 de maio de cada ano, nos termos da Cláusula 10.3 da CCB BB e da Cláusula Décima Primeira da CCB CEF.

2.2.    Efeitos da Suspensão de Exigibilidade. A Suspensão de Exigibilidade não implica nem será interpretada (i) como novação ou renúncia, provisória ou definitiva, por parte de quaisquer dos Credores, acerca dos direitos suspensos nos termos da Suspensão de Exigibilidade; e (ii) como novação, suspensão ou renúncia, provisória ou definitiva, por parte de quaisquer dos Credores, acerca de quaisquer outros direitos que lhes sejam conferidos por lei ou pelos instrumentos contratuais dos quais são parte, exceto conforme expressamente constante na Cláusula 2.1 acima. A Suspensão de Exigibilidade não ensejará, em nenhuma hipótese, a liberação ou desoneração das garantias outorgadas pela Nextel em favor dos Credores em relação às Dívidas, que permanecerão válidas e eficazes, inclusive durante o Período de Suspensão, para todos os fins de direito.

3.     **Obrigações da Nextel**

3.1.   <u>Acesso à Informação</u>. Os Credores terão acesso amplo e irrestrito à situação financeira, bem como acesso às informações do negócio, da Nextel, e quaisquer Afiliadas Brasileiras, bem como sobre o processo de recuperação judicial (*Chapter 11 proceeding*) da NII Holdings, Inc. ("<u>Processo de Recuperação</u>"), sempre que de forma razoável solicitar, sendo que a Nextel e suas Afiliadas manterão os Credores atualizados sobre o Processo de Recuperação conforme meios próprios utilizados para divulgação, quais sejam, informações divulgadas pelo "Diretor de Relação com Investidores" da NII Holdings, Inc. e pelo site https://cases.primeclerk.com/nii/, sem prejuízo das demais informações que quaisquer dos Credores venham a solicitar de forma razoável. Ainda, a Nextel ou suas Afiliadas informarão prontamente aos Credores sobre toda e qualquer informação que venha a afetar diversamente de forma material seus negócios ou suas operações.

3.2.   <u>Acordo com credores</u>. Nenhum contrato, acordo ou entendimento com credores da Nextel ou de suas Afiliadas poderá ser celebrado a partir dessa data, sem prévia e expressa anuência dos Credores (i) para oferecer ou criar quaisquer ônus, gravames ou garantias sobre bens e ativos da Nextel ou de suas Afiliadas Brasileiras; ou (ii) que contenha termos e condições mais favoráveis aos credores em comparação com as obrigações originalmente pactuadas com tais credores ou com as obrigações para com os Credores, incluindo, sem limitação, pagamento de quaisquer de suas obrigações com credores de forma que o cronograma de pagamento seja diferente daquele originalmente pactuado. As obrigações constantes da presente Cláusula não serão aplicáveis (a) outorga de garantias reais como contragarantia em contratações de seguros e seguros garantias em geral; (b) outorga de garantias reais como contragarantia em nova fiança bancária para garantia judicial ou realização de novos depósitos judiciais limitadas, no caso das garantias outorgadas nos termos desse item (b) ao valor global de R$150.000.000,00 (cento e cinquenta milhões de reais); (c) outorga de garantias reais ou pessoais em contratos de locação de sites; (d) outorga de garantias reais ou pessoais em contratos de *collocation* (*i.e.* contratos com outras operadoras para instalação de equipamentos em torres); (e) financiamentos concedidos pela Agência Nacional de Telecomunicações - ANATEL ("ANATEL"), incluindo suas renovações, (f) garantias em favor da ANATEL, (g) garantias reais outorgadas como contragarantia para emissão de novas *performance bonds* em favor da ANATEL, neste caso, sujeito à aprovação prévia dos Credores, as quais deverão ser manifestadas dentro do período de 45 (quarenta e cinco) dias contados de tal questionamento formulado mediante notificação escrita, desde que comprovado o recebimento de tal notificação pelo CREDOR, sendo certo que a não manifestação por parte de ambos os Credores não implicará aprovação tácita e (h) renovações de quaisquer operações já detidas pela Nextel ou suas Afiliadas Brasileiras identificadas no Anexo I deste Contrato, sendo que as garantias a serem outorgadas nos termos desse item (h) deverão estar limitadas ao valor garantido

pela fiança e/ou *performance bond*, conforme indicado em tal anexo; sendo que as garantias reais outorgadas nos termos dos itens (a), (c) e (d) acima estão limitadas ao valor global de R$50.000.000,00 (cinquenta milhões de reais).

3.3.    Não Ação. Durante o Período de Suspensão, a Nextel, por si e por suas Afiliadas, se obriga a: (i) não tomar nenhuma medida judicial, arbitral ou extrajudicial visando a questionar, anular ou invalidar quaisquer disposições contidas nos instrumentos constitutivos das CCBs ou das garantias das Dívidas; e (ii) não discutir a eficácia ou, de qualquer forma, questionar quaisquer outros créditos que a Nextel ou qualquer de suas Afiliadas detenha ou venha a deter contra os Credores, exceto se, com relação a cada CCB, o respectivo Credor estiver inadimplente com suas obrigações constantes na Cláusula 2.1 acima, levando-se em conta o disposto na Cláusula 4.1 deste Contrato.

3.3.1.    Sem prejuízo do disposto na Cláusula 3.3, a Nextel, por si e por suas Afiliadas, assegura aos Credores que, durante ou após o Período de Suspensão, não tomará nenhuma medida judicial, arbitral ou extrajudicial visando a, sob qualquer forma questionar, disputar ou recuperar recursos já disponibilizados ou garantias prestadas aos Credores no âmbito das CCBs e, no caso das Afiliadas, no âmbito de quaisquer outros contratos celebrados com os Credores, exceto se, com relação a cada CCB, o respectivo Credor tenha cumprido com suas obrigações constantes na Cláusula 2.1 acima, levando-se em conta o disposto na Cláusula 4.1 deste Contrato.

4.    **Condições Resolutivas à Suspensão de Exigibilidade**

4.1.    Condições Resolutivas. Caso quaisquer das condições resolutivas abaixo listadas (as "Condições Resolutivas") ocorram, a Suspensão de Exigibilidade estará automaticamente resolvida, de pleno direito, independentemente de qualquer notificação ou outra formalidade, nos termos do artigo 127 da Lei 10.406/2002:

(i)    ocorrência de qualquer hipótese de vencimento antecipado prevista na Cláusula Quarta do Primeiro Aditamento à CCB CEF, com exceção das obrigações cuja exigibilidade estão suspensas nos termos da Cláusula 2.1 do presente Contrato, ou de qualquer hipótese de pagamento antecipado obrigatório prevista na Cláusula Décima Terceira da CCB CEF sem que o respectivo pagamento seja realizado;

(ii)    ocorrência de qualquer hipótese de vencimento antecipado prevista na Cláusula 10.1 da CCB BB (com exceção das obrigações cuja exigibilidade estão suspensas nos termos da Cláusula 2.1do presente Contrato) ou de qualquer hipótese de pagamento antecipado obrigatório prevista na Cláusula 11.1 da CCB BB sem que o respectivo pagamento seja realizado;

(iii)   inadimplemento, pela Nextel ou pela Nextel S.A., de qualquer obrigação prevista no presente Contrato não sanado no prazo de 5 (cinco) dias a contar de sua ocorrência;

(iv)   falsidade, erro ou incorreção material das declarações da Nextel prestadas no presente Contrato;

(v)   caso a Nextel ou qualquer de suas Afiliadas Brasileiras seja declarada insolvente por decisão judicial, ou reconheça publicamente ou perante qualquer um dos Credores, sua impossibilidade de satisfazer suas obrigações pecuniárias, ou caso tal impossibilidade seja notória, em ambos os casos no valor global de R$10.000.000,00 (dez milhões de reais); e

(vi)   liquidação da NII Holdings, Inc. ou rejeição definitiva do plano de recuperação judicial (*reorganization plan*) no contexto do Processo de Recuperação.

4.2.   Efeitos da Resolução da Suspensão de Exigibilidade. Caso qualquer das Condições Resolutivas se verifique, a Suspensão de Exigibilidade será resolvida e os Credores ficarão livres para o exercício de seus direitos em face da Nextel e seus garantidores, observados os termos constantes das CCBs.

**5.   Reestruturação das Dívidas**

5.1.   Condições Suspensivas. As Partes se obrigam a celebrar os aditamentos às CCBs, na forma da Cláusula 5.2, tão logo sejam satisfeitas as seguintes condições suspensivas (as "Condições Suspensivas"):

(i)   o plano de recuperação no âmbito do Processo de Recuperação tenha sido efetivado (i.e. não sujeito a condição material de qualquer natureza) pelo juízo falimentar competente, nos termos da legislação aplicável (a "Aprovação");

(ii)   o plano de recuperação objeto da Aprovação (a) não implique, direta ou indiretamente, a incapacidade da Nextel ou da Nextel S.A. de cumprir com suas obrigações no âmbito do presente Contrato e das CCBs e/ou (b) não contemple a assunção, por parte das Afiliadas Brasileiras, de nenhuma obrigação ou ônus em desacordo ou inconsistente com o previsto nesse Contrato ou nas CCBs;

(iii)   a Aprovação ocorra antes do fim do Período de Suspensão;

(iv)   não tenha ocorrido um evento de vencimento antecipado ou hipótese de pagamento antecipado obrigatório no âmbito das CCBs, bem como a Nextel e a Nextel S.A. não tenham

descumprido nenhuma das disposições das CCBs ou deste Contrato, exceto, com relação às CCBs, às obrigações sujeitas à Suspensão de Exigibilidade;

(v)    a NII Holdings, Inc., bem como qualquer outra Parte Relacionada que detenha ou venha a deter créditos contra qualquer das Afiliadas Brasileiras, tenha celebrado com as Partes contrato de subordinação de seus créditos às obrigações constantes das CCBs, em forma e substância satisfatórias aos Credores ("Contrato de Subordinação"); e

(vi)    os Credores tenham recebido parecer legal (*legal opinion*) dos advogados externos da NII Holdings, Inc. atestando capacidade e autoridade para celebração do Contrato de Subordinação, bem como a validade e eficácia de seus termos com relação a tal parte, em termos satisfatórios aos Credores.

5.2.    Celebração das CCBs. Caso todas as Condições Suspensivas descritas na Cláusula 5.1 sejam satisfeitas, no prazo de 5 (cinco) dias úteis a contar da data da Aprovação e/ou da confirmação de cumprimento de todas tais condições, o que ocorrer por último, (i) a Nextel e o Banco do Brasil se obrigam a celebrar o aditamento à CCB BB, substancialmente na forma da minuta constante do Anexo 5.2(i) ao presente Contrato; e (ii) a Nextel e a CEF se obrigam a celebrar o aditamento à CCB CEF, substancialmente na forma da minuta constante do Anexo 5.2(ii) ao presente Contrato.

5.3.    Obrigação de Informar. A Nextel compromete-se a comunicar imediatamente os Credores sobre a obtenção da Aprovação.

6.    **Vigência**

6.1.    Vigência. O presente Contrato vigerá a partir da data de assinatura deste Contrato até o fim do Período de Suspensão, ressalvadas as disposições das Cláusulas 3.1, 3.3.1, 7.1, 8.1 e 9.5, que vigorarão até o pagamento integral e irrevogável das CCBs.

7.    **Foro**

7.1.    Foro. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil. As Partes elegem o Foro da Cidade de São Paulo, Estado de São Paulo, como competente para julgar quaisquer disputas ou controvérsias oriundas do presente Contrato, com a exclusão de qualquer outro, por mais privilegiado que seja.

8.    **Comunicações e Notificações**

8.1.    Notificações. Todas as notificações, comunicações e avisos exigidos ou permitidos de acordo com este Contrato deverão ser feitos por escrito e entregues pessoalmente com protocolo de recebimento, enviados por carta registrada com aviso de recebimento e porte pago ou enviados por fac-símile ou comunicação eletrônica (e-mail) e serão considerados recebidos na data do efetivo recebimento pela Parte notificada, em seu endereço, quando entregues pessoalmente, 3 (três) dias após a postagem, se postados, ou, imediatamente após a confirmação de entrega se enviados por fac-símile ou comunicação eletrônica (por e-mail). As notificações serão enviadas aos endereços abaixo indicados ou para outro endereço conforme diversamente informado por uma Parte às demais, observadas as formalidades previstas na presente Cláusula:

Para a Nextel:

NEXTEL TELECOMUNICAÇÕES LTDA.
Endereço: Avenida das Nações Unidas, 14171 – 32º andar, Torre Crystal
São Paulo, Brasil, CEP 04794-000
E-mail: financial.operations@nextel.com.br
A/C: Felipe Osmo e Renata Cunha

com cópia para (que não constitui uma notificação):

Motta, Fernandes Rocha - Advogados
Endereço: Alameda Santos, 2335, 10º andar
São Paulo, Brasil, CEP 01451-101
At.: Luis Wielewicki ou Bruno Furiati
Tel/Fax: (11) 3082-9398/ 3082-3272
Email: lwielewicki@mfra.com.br ou bfuriati@mfra.com.br

Se para os Credores:

BANCO DO BRASIL S.A.
Endereço: Avenida Paulista, 2300 – 1º andar, Cerqueira César, Edifício São Luis Gonzaga, CEP 01310-300, São Paulo, SP
E-mail: age3070@bb.com.br / msfneves@bb.com.br
A/C: Maurício Simões de Freitas Neves ou Herick R. S. C. Barbosa

CAIXA ECONÔMICA FEDERAL
Endereço: Avenida Paulista, 1842 – Torre Sul – 2º andar, Bela Vista
CEP01311-200, São Paulo, SP

E-mail: sge5824rj@caixa.gov.br

A/C: Luiz Gustavo Silva Portela ou Fernando Ciotti

com cópia para (que não constitui uma notificação):

Machado, Meyer, Sendacz e Opice Advogados

Endereço: Av. Brigadeiro Faria Lima, 3,144, 11º andar

São Paulo, Brasil, CEP 01451-000

At.: José Prado ou Renato G. R. Maggio

Tel/Fax: (11) 3150 7000 / 3150 7071

Email: jprado@machadomeyer.com.br ou rmaggio@machadomeyer.com.br

## 9.    Disposições Gerais

9.1.    Efeito Vinculante. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes, seus sucessores e cessionários permitidos a qualquer título.

9.2.    Cessão. Este Contrato não poderá ser alterado ou cedido por qualquer das Partes sem o consentimento prévio, por escrito, das demais Partes. Este Contrato obrigará e beneficiará as Partes e seus respectivos sucessores e cessionários que vierem a ser autorizados.

9.3.    Aditamento; Tolerância; Anuência. Este Contrato só poderá ser alterado, substituído, cancelado, renovado ou prorrogado, e só poderá haver renúncia aos termos deste Contrato, por instrumento escrito assinado por todas as Partes ou, em caso de renúncia, pela Parte que estiver renunciando ao direito relevante. Nenhum atraso ou omissão de qualquer das Partes em exercer qualquer direito nos termos deste Contrato deverá operar como uma renúncia a esse direito ou novação, nem impedir o exercício posterior ou subsequente deste.

9.4.    Acordo Integral. Este Contrato constitui o acordo integral das Partes acerca das matérias relacionadas à Suspensão da Exigibilidade, substituindo todos os acordos e entendimentos anteriores entre as mesmas, verbais ou por escrito, no que se refere ao seu objeto.

9.5.    Cumprimento Específico. As Partes reconhecem e concordam que indenizações em dinheiro podem ser remédios inadequados em caso de descumprimento de qualquer disposição prevista neste Contrato. Dessa forma, o cumprimento de quaisquer obrigações aqui constantes poderá vir a ser exigido na forma específica pela Parte credora da obrigação, nos termos do disposto nos Artigos 466-A e seguintes do Código de Processo Civil, respondendo a Parte infratora pelas perdas e danos a que der causa. Esse remédio não deverá ser considerado como

remédio exclusivo para o descumprimento deste Contrato, mas tão somente um recurso adicional a outros remédios disponíveis.

9.6.    Despesas. Cada parte será responsável pelo integral pagamento de todas as custas e honorários dos seus respectivos advogados.

9.7.    Independência das Disposições. Qualquer termo ou disposição deste Contrato que seja declarado inválido ou inexequível deverá ser considerado ineficaz somente na medida de tal invalidade ou inexequibilidade, sem tornar inválido ou inexequível os termos e disposições remanescentes deste Contrato.

E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS, as Partes firmam o presente Contrato em 4 (quatro) vias de igual teor e forma, para um só efeito, na presença das duas testemunhas abaixo.

São Paulo, 13 de fevereiro de 2015

[Restante da página deixada intencionalmente em branco]

*Página de Assinaturas do Instrumento de Assunção Mútua de Obrigação de Não Fazer e Outras Avenças celebrado entre Banco do Brasil S.A., Caixa Econômica Federal, Nextel Telecomunicações Ltda. e Nextel Telecomunicações S.A. em 13 de fevereiro de 2015.*

## BANCO DO BRASIL S.A.

Nome: Eliane Ap. Scarponi Sartorelli
Cargo: Gerente de Área UA
CPF: 174.173.148.760

Nome: João Marcos Mizobuti
Cargo: Gerente de Área UA
CPF: 059.052.748-78

## CAIXA ECONÔMICA FEDERAL

Nome: LUIZ GUSTAVO SILVA PORTELA
Cargo: Superintendente Executivo
Matr. 051770-5
SGE Infraes., Energia e Telecom.
CAIXA ECONÔMICA FEDERAL

Nome: FLAVIA SILVA NOGUEIRA
Superintendente Regional S.E.
Matr. 050.753-2
Cargo: SR Osasco/SP
CAIXA ECONÔMICA FEDERAL

## NEXTEL TELECOMUNICAÇÕES LTDA.

Nome: SULTANA SHAMIM KHAN
Cargo: VICE PRESIDENTE DE FINANÇAS
CPF: 055.796.177-71

Nome: COWEE V. HELLUASY
Cargo: DIRETOR PRESIDENTE
CPF: 236.253.478-22

## NEXTEL TELECOMUNICAÇÕES S.A.

Nome: SULTANA SHAMIM KHAN
Cargo: VICE PRESIDENTE DE FINANÇAS
CPF: 055.796.177-71

Nome: COWEE V. HELLUASY
Cargo: DIRETOR PRESIDENTE
CPF: 236.253.478-22

**Testemunhas:**

1.
Nome: Diego da Costa Dantas Amaral
CPF: 318.316.778-65

2. Marta Rodrigues
Nome: RG 32.616.360-8
CPF: 021.514.988-24

TEXT_SP 9049538v12 1803/14



ANEXO I

**Anatel Bonds**

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

TEXT_SP 9049538v12 1803/14

## Garantias Judiciais

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ | Judicial | Fiscal |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ | Judicial | Fiscal |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ | Judicial | Cível |

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Cível |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ | Judicial | Cível |

| | | | | - | | |
|---|---|---|---|---|---|---|
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Cível |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ | Judicial | Fiscal |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Cível |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Cível |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Cível |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ | Judicial | Fiscal |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | R$ - | | |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Cível |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Cível |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Cível |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Trabalhista |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |

| | | | | | | |
|---|---|---|---|---|---|---|
| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Trabalhista |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Ambiental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Trabalhista |

| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

## Outras Garantias

| SEGURADORA / BANCO | NÚMERO DA APÓLICE / CONTRATO | FINAL DE VIGÊNCIA / PRAZO | IMPORTÂNCIA SEGURADA - R$/US$ / VALOR DO CONTRATO | VALOR EM GARANTIA COLATERAL | TIPO | Processo |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Outros | Concessão de Uso |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Outros | Concessão de Uso |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Outros | Concessão de Uso |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Outros | Fiança Locatícia |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Outros | Fiança Locatícia |

## Garantia em Juízo

| | Bloqueio | Deposito Judicial | Bens em Garantia |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

## Financiamentos

| BANCO | NÚMERO DO CONTRATO | DATA DA CONTRATAÇÃO | VALOR DO CONTRATO | TIPO |
|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB |

TEXT_SP 9049538v12 1803/14

| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
|---|---|---|---|---|
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME |

ANEXO 5.2(i)

MINUTA DO 2° ADITIVO CCB BB

**PREÂMBULO:**

-------------------------------------------------------------------------------------

**EMITENTE** – NEXTEL TELECOMUNICAÇÕES LTDA., sociedade empresária limitada, com sede na Av. das Nações Unidas, 14.171, 32° andar, Rochavera Crystal Tower, São Paulo (SP), inscrita no CNPJ/MF sob o n° 66.970.229/0001-67, neste ato representada pelos senhores abaixo assinados e qualificados.

-------------------------------------------------------------------------------------

**CREDOR** – BANCO DO BRASIL S.A., sociedade de economia mista, com sede em Brasília, Capital Federal, na SBS Quadra 01, Bloco C, Lote 32 – Setor Bancário Sul, inscrita no CNPJ sob o n° 00.000.000/0001-91, por sua filial, Agência Large Corporate 3070 (SP), localizada na cidade de São Paulo, Estado de São Paulo, na Av. Paulista, 2.300, 2° andar, Cerqueira César, inscrita no CNPJ/MF sob o n° 00.000.000/1947-00, representada pelo Senhor [•], brasileiro, casado, bancário, residente e domiciliado em São Paulo (SP), portador da carteira de identidade n° [•], emitida por [•], inscrito no CPF/MF sob o n° 404.785.641-04 e pelo Senhor [•], brasileiro, casado, bancário, residente e domiciliado em São Paulo (SP), portador da carteira de identidade n° [•], emitida por [•], inscrito no CPF/MF sob o n° [•], abaixo assinados.

-------------------------------------------------------------------------------------

**AVALISTA** - NEXTEL TELECOMUNICAÇÕES S.A., sociedade anônima, com sede na Av. das Nações Unidas, 14.171, 32° andar, Rochavera Crystal Tower na Cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/MF sob o n° 00.169.369/0001-22, neste ato representada pelos senhores abaixo assinados e qualificados.

-------------------------------------------------------------------------------------

**CONSIDERANDO QUE**, em 31 de outubro de 2012, a Emitente emitiu em favor do Credor a Cédula de Crédito Bancário No. 307.001.181 no valor de principal de R$400.000.000,00 (quatrocentos milhões de reais) (a "Cédula");

**CONSIDERANDO QUE**, em 13 de fevereiro de 2015, a Emitente e o Credor celebraram o primeiro aditivo à Cédula de Crédito Bancário No. 307.001.181 alterando, dentre outras condições, a taxa de juros incidente sobre os saldos devedores verificados na Conta de

Empréstimo e incluindo garantia real e fidejussória adicionais ao cumprimento das obrigações nela constantes (o "Primeiro Aditamento" e, em conjunto com a Cédula, a "CCB");

**CONSIDERANDO QUE** a Emitente e o Credor pretendem aditar, sem intenção de novar, a Cédula de forma a alterar certas disposições;

**RESOLVEM**, as partes, celebrar o presente Segundo Aditamento à Cédula de Crédito Bancário n° 307.001.181, mediante as seguintes cláusulas e condições.

**CLÁUSULA PRIMEIRA – INTRODUÇÃO** – A Introdução da CCB passa a viger com a seguinte redação:

*"1. INTRODUÇÃO:*

---

*1.1. - EMITENTE:*
*Razão social: NEXTEL TELECOMUNICAÇÕES LTDA. ("Emitente")*
*CNPJ: 66.970.229/0001-67*
*Endereço: Alameda Santos 2356/2364, Cerqueira César*
*Cidade: São Paulo        UF: SP*
*CEP: 01.418-200*
*Agência: Large Corporate SP 3070 (SP)*
*Conta-corrente: 5.567-0 ("Conta-Corrente")*

*1.2. - DADOS DA OPERAÇÃO DE CRÉDITO:*
*Valor: R$ 400.000.000,00 (quatrocentos milhões de reais) ("Principal")*
*Vencimento Final: [31/10/2019]*
*Datas de Pagamento dos Encargos Financeiros: (i) [--], [--], [--] e [--] de cada ano até [--] (inclusive) e (ii) dia [--] de cada mês a partir de [--] (exclusive) ("Datas de Pagamento dos Encargos")*
*Número de vias desta Cédula de Crédito Bancário: 1 (uma) negociável e 2 (duas) vias não negociáveis"*

---

**CLÁUSULA SEGUNDA – CRÉDITO** – A Cláusula 1 da CCB passa a viger com a seguinte redação:

*"1. CRÉDITO – Nas datas de pagamento constantes na Cláusula 9 abaixo, até [31 de outubro] de 2019, pagaremos, em moeda corrente nacional, por esta Cédula de Crédito Bancário ("Cédula"), cujas características estão descritas no quadro preambular, ao* **BANCO DO BRASIL S.A.** *("Credor"), instituição financeira com sede na cidade de Brasília, Distrito Federal, na SBS Quadra 01, Bloco C, Lote 32 – Setor Bancário Sul, inscrito no CNPJ sob o nº 00.000.000/0001-91, representado por sua filial, Agência Large Corporate SP 3070 (SP), localizada na cidade do São Paulo, Estado de São Paulo, na Av. Paulista, 2.300, 2º andar, Cerqueira César, inscrita no CNPJ/MF sob o nº 00.000.000/1947-00, ou à sua ordem, na praça de pagamento indicada na Cláusula Local de Pagamento, a dívida líquida, certa e exigível, correspondente ao valor constante no item 1.2 do preâmbulo ("Principal"), acrescido dos Encargos Financeiros, na forma prevista nesta Cédula."*

**CLÁUSULA TERCEIRA – FORMA DE PAGAMENTO** – A Cláusula 9 da CCB passa a viger com a seguinte redação:

*"9. FORMA DE PAGAMENTO – Sem prejuízo do vencimento retroestipulado e das exigibilidades previstas nas demais Cláusulas, obrigamo-nos a pagar ao Credor os valores relativos à presente Cédula, da seguinte forma: a) Principal será pago em parcelas, com os vencimentos e valores nominais descritos no cronograma de pagamento constante do Anexo I à presente Cédula, sendo a primeira parcela devida em [30/06/2016] e a última parcela devida em [31/10/2019] (cada uma das datas indicadas no Anexo I, uma "Data de Pagamento de Principal"); e b) Encargos Financeiros: trimestralmente, até [--] (inclusive) e mensalmente, a partir de [--] (exclusive), em cada Data de Pagamento de Encargos, de acordo com a Cláusula 1.2 do Preâmbulo desta Cédula, obrigando-nos a liquidar com a última parcela do Principal, em [31/10/2019], todas as obrigações pecuniárias resultantes desta Cédula. Qualquer recebimento das prestações fora dos prazos avençados constituirá mera tolerância, que não afetará de forma alguma as datas de seus vencimentos ou as demais Cláusulas e condições desta Cédula, nem importará novação ou modificação do ajustado, inclusive quanto aos encargos resultantes da mora."*

**CLÁUSULA QUARTA – VENCIMENTO ANTECIPADO** – A alínea (t) da Cláusula 10 da CCB passa a viger com a seguinte redação, bem como a Cláusula 10 passa a viger com a alínea (aa) adicional abaixo:

*"(t)    caso o índice obtido pela divisão da Dívida Líquida pelo EBITDA seja superior a 4,0 (quatro) com relação ao primeiro semestre de 2016, 3,5 (três e meio), no segundo semestre de 2016 e 2,5 (dois e meio) a partir do primeiro semestre de 2017 (inclusive), a ser calculado nos termos da Cláusula 10.2, observados os termos das Cláusulas 10.4 e 10.5.*

*(aa) (i) uma vez efetivo, alteração no plano de recuperação judicial da NII Holdings, Inc. que (a) possa implicar, direta ou indiretamente, a incapacidade da Nextel ou da Nextel S.A. de cumprir com suas obrigações no âmbito da Cédula, e/ou (b) contemple a assunção, por parte das Afiliadas Brasileiras, de nenhuma obrigação ou ônus em desacordo ou inconsistente com o previsto nessa Cédula; ou (ii) alteração ou revogação na decisão judicial competente que vier a confirmar o plano de recuperação da NII Holding, Inc."*

**CLÁUSULA QUINTA – ÍNDICE FINANCEIRO** – As Cláusula 10.4 da CCB passa a viger com a seguinte redação:

*10.4. Caso em determinado período de verificação das obrigações de que trata esta Cláusula, a EMITENTE não cumprir com o índice acima estabelecido, a EMITENTE terá um prazo adicional de 10 (dez) úteis, a contar da notificação que lhe fizer o CREDOR neste sentido, para sanar o respectivo inadimplemento, mediante qualquer operação por meio da qual o referido índice possa ser restabelecido, incluindo, mas não se limitando a aumento de capital na EMITENTE para redução da Dívida Líquida, com ou sem o pagamento parcial da presente Cédula. Nessa hipótese, este restabelecimento, desde que efetivado no prazo de até 10 (dez) dias úteis e aceito pelo CREDOR mediante manifestação escrita neste sentido, deverá ser entendido como efetivado na data de determinação do respectivo índice, sem qualquer penalidade para a EMITENTE.*

**CLÁUSULA SEXTA – CESSÃO** – A Cláusula que dispõe sobre a cessão da CCB passa a viger com a seguinte redação:

*"17. CESSÃO – Esta Cédula poderá ser objeto de cessão e endosso por parte do CREDOR, mediante aviso prévio (com 10 (dez) dias úteis de antecedência) à EMITENTE, nos termos da legislação civil e comercial, não havendo necessidade de o cessionário/endossatário ser instituição financeira ou entidade a ela equiparada."*

TEXT_SP 9049538v12 1803/14

## CLÁUSULA SÉTIMA – REGISTRO

O CREDOR levará o presente aditamento a registro no Registro de Títulos e Documentos da Comarca de São Paulo, Capital. As despesas relativas ao referido registro serão suportadas pela EMITENTE, que, desde já, autoriza o débito dos respectivos valores em sua conta de depósito n° [--], mantida na agência [--] do CREDOR.

Assim ajustados, o **CREDOR**, a **EMITENTE** e o **AVALISTA**, declarando não haver intenção de novar, ratificam a Cédula de Crédito Bancário ora aditada em todos os seus termos, cláusulas e condições não expressamente alterados neste documento, que àquela se integra, formando um todo único e indivisível para todos os fins de direito.

E por ser de nossa livre e espontânea vontade, assinamos esta Cédula de Crédito Bancário em 4 (quatro) vias de igual teor, sendo apenas uma negociável, para todos os fins de direito.

São Paulo (SP), [--] de [--] de 2015

**EMITENTE:**

NEXTEL TELECOMUNICAÇÕES LTDA., sociedade empresária limitada, com sede em São Paulo (SP), na Alameda Santos n° 2.356/2.364, Cerqueira César, CEP: 01.418-200, inscrita no CNPJ/MF sob o n° 66.970.229/0001-67, nesta ato representada por:

| Rubrica | Nome: | Rubrica | Nome: |
|---------|-------|---------|-------|
| | Profissão: | | Profissão: |
| | Estado Civil: | | Estado Civil: |
| | Nacionalidade: | | Nacionalidade: |
| | Residente em: | | Residente em: |
| | Identidade n° | | Identidade n° |
| | CPF/MF N.° | | CPF/MF N.° |

**AVALISTA:**

NEXTEL TELECOMUNICAÇÕES S.A., sociedade anônima, com sede na Alameda Santos, n° 2356, 7° andar, Cerqueira Cesar, CEP 01418-200, na Cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/MF sob o n° 00.169.369/0001-22, neste ato representada por:

TEXT_SP 9049538v12 1803/14

| Rubrica | Nome: | Rubrica | Nome: |
|---|---|---|---|
| | Profissão: | | Profissão: |
| | Estado Civil: | | Estado Civil: |
| | Nacionalidade: | | Nacionalidade: |
| | Residente em: | | Residente em: |
| | Identidade nº | | Identidade nº |
| | CPF/MF N.º | | CPF/MF N.º |

**CREDOR:**

BANCO DO BRASIL S.A.

| Rubrica | Nome: | Rubrica | Nome: |
|---|---|---|---|
| | Profissão: | | Profissão: |
| | Estado Civil: | | Estado Civil: |
| | Nacionalidade: | | Nacionalidade: |
| | Residente em: | | Residente em: |
| | Identidade nº | | Identidade nº |
| | CPF/MF N.º | | CPF/MF N.º |

TEXT_SP 9049538v12 1803/14

## Anexo I

## CRONOGRAMA DE PAGAMENTO

| Ano | Período | Pagamento | Saldo |
|-----|---------|-----------|-------|
| 2016 | | | R$ 400.000.000,00 |
| | Junho | R$ 9.259.402,30 | R$ 390.740.597,70 |
| | Julho | R$ 9.259.402,30 | R$ 381.481.195,39 |
| | Agosto | R$ 9.259.402,30 | R$ 372.221.793,09 |
| | Setembro | R$ 9.259.402,30 | R$ 362.962.390,78 |
| | Outubro | R$ 9.259.402,30 | R$ 353.702.988,48 |
| | Novembro | R$ 9.259.402,30 | R$ 344.443.586,17 |
| | Dezembro | R$ 9.259.402,30 | R$ 335.184.183,87 |
| 2017 | Janeiro | R$ 9.259.402,30 | R$ 325.924.781,56 |
| | Fevereiro | R$ 9.259.402,30 | R$ 316.665.379,26 |
| | Março | R$ 9.259.402,30 | R$ 307.405.976,95 |
| | Abril | R$ 9.259.402,30 | R$ 298.146.574,65 |
| | Maio | R$ 9.259.402,30 | R$ 288.887.172,34 |
| | Junho | R$ 9.259.402,30 | R$ 279.627.770,04 |
| | Julho | R$ 9.259.402,30 | R$ 270.368.367,73 |
| | Agosto | R$ 9.259.402,30 | R$ 261.108.965,43 |
| | Setembro | R$ 9.259.402,30 | R$ 251.849.563,12 |
| | Outubro | R$ 9.259.402,30 | R$ 242.590.160,82 |
| | Novembro | R$ 10.692.724,17 | R$ 231.897.436,65 |
| | Dezembro | R$ 10.692.724,17 | R$ 221.204.712,48 |
| 2018 | Janeiro | R$ 10.207.768,03 | R$ 210.996.944,45 |
| | Fevereiro | R$ 10.207.768,03 | R$ 200.789.176,42 |
| | Março | R$ 10.207.768,03 | R$ 190.581.408,38 |
| | Abril | R$ 10.207.768,03 | R$ 180.373.640,35 |
| | Maio | R$ 10.207.768,03 | R$ 170.165.872,32 |
| | Junho | R$ 10.207.768,03 | R$ 159.958.104,29 |
| | Julho | R$ 10.207.768,03 | R$ 149.750.336,26 |
| | Agosto | R$ 10.207.768,03 | R$ 139.542.568,23 |
| | Setembro | R$ 10.207.768,03 | R$ 129.334.800,20 |
| | Outubro | R$ 10.207.768,04 | R$ 119.127.032,16 |
| | Novembro | R$ 10.207.768,03 | R$ 108.919.264,13 |
| | Dezembro | R$ 10.207.768,03 | R$ 98.711.496,10 |
| 2019 | Janeiro | R$ 10.207.768,03 | R$ 88.503.728,07 |
| | Fevereiro | R$ 10.207.768,03 | R$ 78.295.960,04 |
| | Março | R$ 10.207.768,03 | R$ 68.088.192,01 |
| | Abril | R$ 10.207.768,03 | R$ 57.880.423,98 |
| | Maio | R$ 10.207.768,03 | R$ 47.672.655,95 |
| | Junho | R$ 10.207.768,03 | R$ 37.464.887,91 |
| | Julho | R$ 10.207.768,03 | R$ 27.257.119,88 |
| | Agosto | R$ 10.207.768,03 | R$ 17.049.351,85 |
| | Setembro | R$ 10.207.768,03 | R$ 6.841.583,82 |
| | Outubro | R$ 6.841.583,82 | R$ - |

ANEXO 5.2(ii)

**MINUTA DO 2º ADITIVO CCB CEF**

**PREÂMBULO**:

---

**CREDORA**:

**CAIXA ECONÔMICA FEDERAL**, instituição financeira sob a forma de empresa pública, criada nos termos do Decreto-lei n.º 759, de 12 de agosto de 1969, vinculada ao Ministério da Fazenda, regendo-se pelo Estatuto vigente na data da presente contratação, doravante designada **CAIXA** ou **CREDORA**.
Endereço: Setor Bancário Sul, Quadra 4, lotes 3/4 - Brasília/DF
CNPJ: 00.360.305/0001-04
Superintendência Regional: Osasco – [--]

---

**EMITENTE/CREDITADA: NEXTEL TELECOMUNICAÇÕES LTDA.**
Endereço: Av. das Nações Unidas, 14.171, 32º andar, Rochavera Crystal Tower
São Paulo – SP
CNPJ: 66.970.229/0001-67

---

**CONSIDERANDO QUE**, em 8 de dezembro de 2011, a CREDITADA emitiu em favor da CAIXA a Cédula de Crédito Bancário No. 21.3150.777.0000001-97, no valor de principal de R$640.000.000,00 (seiscentos e quarenta milhões de reais) (a "Cédula");

**CONSIDERANDO QUE**, em 13 de fevereiro de 20115, a CREDITADA e a CAIXA celebraram o primeiro aditamento à Cédula de Crédito Bancário No. 21.3150.777.0000001-97 alterando, dentre outros aspectos, a taxa de juros incidente sobre os saldos devedores e incluindo garantia real adicional ao cumprimento das obrigações nela constantes (o "Primeiro Aditamento" e, em conjunto com a Cédula, a "CCB");

**CONSIDERANDO QUE**, a CREDITADA realizou, até a presente data, amortizações de principal no valor correspondente a [R$128.000.000,00] (cento e vinte e oito milhões de reais) no âmbito da CCB;

**CONSIDERANDO QUE** a CREDITADA e a CAIXA pretendem aditar, sem intenção de novar, a CCB de forma a alterar certas disposições ("Segundo Aditamento");
**RESOLVEM**, as partes, aditar a CCB por meio do presente Segundo Aditamento, de acordo com os seguintes termos e condições.
**CLÁUSULA PRIMEIRA** – As Características do Crédito passam a viger com a seguinte redação:

*CARACTERÍSTICAS DO CRÉDITO:*

| 1 – Número da CCB:<br><br>21.3150.777.0000001-97 | 2 – Vencimento final em:<br><br>08.10.2019 |
|---|---|

| 3 – Valor Total do Crédito ("Principal"):<br><br>[R$ 512.000.000,00 (quinhentos e doze milhões de reais)] |
|---|

| 4 – Tipo de Operação<br><br>Investimentos – CDI – Pós<br><br>777 – Crédito Especial Empresa – Grandes Corporações |
|---|

| 5 – Encargos Financeiros:<br><br>[139,54%][1] do CDI CETIP a.a., calculados de acordo com a Cláusula Terceira |
|---|

| 6 – Prazo e Sistema de Amortização e Pagamento:<br><br>*Prazo:* 58 meses, a contar da efetiva data de assinatura deste aditamento à Cédula, tudo nos termos e condições do Anexo I, observado o que segue:<br><br>(a) nos primeiros 17 meses haverá carência do Principal, com o pagamento apenas dos Encargos Financeiros em periodicidade trimestral.<br><br>(b) nos 41 meses subsequentes, haverá amortização do Principal, devidamente acrescido dos Encargos Financeiros, em periodicidade mensal.<br><br>Sistema de Amortização Constante - SAC |
|---|

7 – Conta de Não Livre Movimentação:

| Agência | Op. | Conta | DV |
|---|---|---|---|
| 3150 | 003 | 180 | 4 |

---

[1] Nota de redação: taxa indicativa sujeita à confirmação da CEF.

*8 – Conta de Livre Movimentação:*

| *Agência* | *Op.* | *Conta* | *DV* |
|-----------|-------|---------|------|
| *3150*    | *003* | *1859*  | *6*  |

*9 – Praça para Pagamento:*

*São Paulo, SP*

*10 – Avalista:*

| *Avalista*                      | *CNPJ*                |
|---------------------------------|-----------------------|
| *Nextel Telecomunicações S.A.*  | *00.169.369/0001-22*  |

*Nas Datas de Pagamento indicadas na Cláusula Segunda abaixo, até data de vencimento prevista no Campo 2 desta Cédula, em moeda corrente do País nesta cidade, eu, CREDITADA, na condição de emitente/ou eu AVALISTA, pagaremos(mos) à CAIXA ou à sua ordem, por esta Cédula que juntamente com os extratos de conta corrente e/ou planilha de cálculo fica reconhecida como título representativo da dívida certa, líquida e exigível, decorrente da utilização dos recursos colocados à disposição da CREDITADA e acréscimos dos Encargos Financeiros pactuados nesta Cédula;*

*A dívida representada por esta Cédula compreende os valores de amortização mensal, conforme indicado Campo 6 desta Cédula, com os respectivos Encargos Financeiros, apurados considerando a taxa efetiva mensal de juros, incidentes trimestralmente ou em cada parcela mensal, conforme indicado Campo 6 desta Cédula, devendo o extrato da operação ou a planilha, que complementa esta Cédula, expressar os valores e os respectivos percentuais de Encargos Financeiros, nos termos da Lei n°. 10.931 de 02/08/2004, e demais legislações vigentes.*

**CLÁUSULA SEGUNDA** – A Cláusula Segunda da Cédula passa a viger com a seguinte redação:

*DO PRAZO*

*CLÁUSULA SEGUNDA – A presente Cédula é celebrada pelo prazo de 58 (cinquenta e oito) meses, a contar da efetiva data de assinatura do presente aditamento 'à Cédula, observado o seguinte cronograma de pagamentos e amortizações:*

*(a) nos primeiros 17 meses haverá carência do Principal ("Período de Carência"), com o pagamento apenas dos Encargos Financeiros em periodicidade trimestral; e*

*(b) nos 41 meses subsequentes, haverá amortização do Principal, devidamente acrescido dos Encargos Financeiros, com termo inicial em [08/06/2016], em 41 (quarenta e uma) parcelas com periodicidade mensal, conforme segue (cada uma das datas de pagamento indicadas abaixo, uma "Data de Pagamento"):*

| Ano | Mês | Pagamento | Saldo |
|---|---|---|---|
| 2016 | Maio | R$    - | R$ 512.000.000,00 |
| | Junho | R$ 11.852.034,95 | R$ 500.147.965,05 |
| | Julho | R$ 11.852.034,95 | R$ 488.295.930,10 |
| | Agosto | R$ 11.852.034,95 | R$ 476.443.895,15 |
| | Setembro | R$ 11.852.034,95 | R$ 464.591.860,20 |
| | Outubro | R$ 11.852.034,95 | R$ 452.739.825,25 |
| | Novembro | R$ 11.852.034,95 | R$ 440.887.790,30 |
| | Dezembro | R$ 11.852.034,95 | R$ 429.035.755,35 |
| 2017 | Janeiro | R$ 11.852.034,95 | R$ 417.183.720,40 |
| | Fevereiro | R$ 11.852.034,95 | R$ 405.331.685,45 |
| | Março | R$ 11.852.034,95 | R$ 393.479.650,50 |
| | Abril | R$ 11.852.034,95 | R$ 381.627.615,55 |
| | Maio | R$ 11.852.034,95 | R$ 369.775.580,60 |
| | Junho | R$ 11.852.034,95 | R$ 357.923.545,65 |
| | Julho | R$ 11.852.034,95 | R$ 346.071.510,70 |
| | Agosto | R$ 11.852.034,95 | R$ 334.219.475,75 |
| | Setembro | R$ 11.852.034,95 | R$ 322.367.440,80 |
| | Outubro | R$ 11.852.034,95 | R$ 310.515.405,85 |
| | Novembro | R$ 13.686.686,94 | R$ 296.828.718,91 |
| | Dezembro | R$ 13.686.686,94 | R$ 283.142.031,97 |
| 2018 | Janeiro | R$ 13.065.943,08 | R$ 270.076.088,89 |
| | Fevereiro | R$ 13.065.943,08 | R$ 257.010.145,81 |
| | Março | R$ 13.065.943,08 | R$ 243.944.202,73 |
| | Abril | R$ 13.065.943,08 | R$ 230.878.259,65 |
| | Maio | R$ 13.065.943,08 | R$ 217.812.316,57 |
| | Junho | R$ 13.065.943,08 | R$ 204.746.373,49 |
| | Julho | R$ 13.065.943,08 | R$ 191.680.430,41 |
| | Agosto | R$ 13.065.943,08 | R$ 178.614.487,33 |
| | Setembro | R$ 13.065.943,08 | R$ 165.548.544,25 |
| | Outubro | R$ 13.065.943,08 | R$ 152.482.601,17 |
| | Novembro | R$ 13.065.943,08 | R$ 139.416.658,09 |
| | Dezembro | R$ 13.065.943,08 | R$ 126.350.715,01 |
| 2019 | Janeiro | R$ 13.065.943,08 | R$ 113.284.771,93 |
| | Fevereiro | R$ 13.065.943,08 | R$ 100.218.828,85 |
| | Março | R$ 13.065.943,08 | R$ 87.152.885,77 |
| | Abril | R$ 13.065.943,08 | R$ 74.086.942,69 |
| | Maio | R$ 13.065.943,08 | R$ 61.020.999,61 |
| | Junho | R$ 13.065.943,08 | R$ 47.955.056,53 |
| | Julho | R$ 13.065.943,08 | R$ 34.889.113,45 |
| | Agosto | R$ 13.065.943,08 | R$ 21.823.170,37 |
| | Setembro | R$ 13.065.943,08 | R$ 8.757.227,29 |
| | Outubro | R$ 8.757.227,29 | R$    - |

**CLÁUSULA TERCEIRA** – A Cláusula Oitava da CCB passa a viger com a seguinte

redação:

*DA FORMA DE PAGAMENTO*
*CLÁUSULA OITAVA – Como forma e meio de efetivo pagamento da dívida resultante desta Cédula, que se compõe do Principal devidamente acrescido dos Encargos Financeiros, a CREDITADA autoriza a CAIXA a debitar na Conta de Livre Movimentação mencionada no Campo 8, nas respectivas Datas de Pagamento, em caráter irrevogável e irretratável, os valores suficientes e exigíveis em cada uma delas conforme aplicável.*

*Parágrafo Primeiro – Durante os primeiros 17 (dezessete) meses a contar data de assinatura do presente aditamento à Cédula, denominado período de carência, a CREDITADA obriga-se ao pagamento trimestral dos Encargos Financeiros, descritos na Cláusula Terceira, com primeiro vencimento em [08/03/2015], vencendo-se as demais em [08/03, 08/06, 08/09 e 08/12] de cada ano.*

*Parágrafo Segundo – Após o Período de Carência, a CREDITADA obriga-se ao pagamento do Principal, devidamente acrescido dos Encargos Financeiros, em [41] prestações mensais, nos termos da Cláusula Segunda desta Cédula.*

*Parágrafo Terceiro – Na hipótese em que qualquer Data de Pagamento não for dia útil, o respectivo pagamento vencerá no 1º dia útil subsequente. Para efeitos do disposto nesta Cédula, entende-se por dia útil segunda a sexta-feira, exceto feriados de âmbito nacional ou dias em que, por qualquer motivo, não houver expediente bancário ou não funcionar o mercado financeiro na sede da CREDITADA.*

*Parágrafo Quarto – A CREDITADA autoriza a CAIXA, independentemente de prévio aviso, a utilizar o saldo que encontrar depositado em quaisquer contas por elas tituladas, em qualquer unidade da CAIXA, bem como outras que porventura sejam abertas, seja para liquidação ou para amortização parcial do débito apurado com base nesta Cédula, na hipótese de não ser verificado o pagamento na forma do caput desta Cláusula.*

*Parágrafo Quinto – São devidas prestações mensais calculadas de acordo com o Sistema de Amortização Constante – SAC, observadas as disposições da Cláusula Segunda, e encargos de acordo com a Cláusula Terceira.*

**CLÁUSULA QUARTA** – A Cláusula Décima Segunda da CCB passa a viger com a seguinte redação:

*DAS OBRIGAÇÕES ESPECIAIS*

*CLÁUSULA DÉCIMA SEGUNDA – A CREDITADA se compromete, a partir do primeiro semestre de 2016 (inclusive), a entregar documento que comprove que o índice obtido pela divisão da Dívida Líquida pelo EBITDA seja igual ou inferior a 4,0 (quatro) com relação ao primeiro semestre de 2016, 3,5 (três e meio), no segundo semestre de 2016 e 2,5 (dois e meio) a partir do primeiro semestre de 2017 (inclusive), devendo este índice ser apurado semestralmente pela CREDITADA (i) até o dia 15 de agosto com base no fechamento contábil de 30 de junho; (ii) até o dia 5º dia útil após o prazo máximo previsto pela regulamentação aplicável para a divulgação das demonstrações financeiras e das demonstrações contábeis da CREDITADA; e (iii) com base nas demonstrações financeiras consolidadas da CREDITADA.*

*Parágrafo Primeiro – Para efeitos de apuração dos índices financeiros constantes desta Cláusula, a serem calculados de acordo com os padrões contábeis geralmente aceitos no Brasil, deverão ser adotadas as seguintes definições e critérios:*

*"Dívida Líquida" significa o valor calculado em bases consolidadas na CREDITADA igual (a) à soma dos Passivos junto a instituições financeiras, dos títulos e valores mobiliários representativos de dívida emitidos e do saldo líquido de operações de derivativos (passivos menos ativos de operações com derivativos); diminuído (b) das disponibilidades (caixa, bancos, aplicações de liquidez imediata ou aplicações de curto prazo, títulos e valores mobiliários de própria emissão ou de terceiros, e títulos públicos e privados de qualquer natureza e (e) dos efeitos da marcação a mercado das operações de derivativos;*

*"EBITDA" significa o lucro operacional da CREDITADA, em bases consolidadas, relativo aos 12 (doze) últimos meses, somado às despesas de depreciação e amortização; e*

*"Passivo(s)" significa o valor principal dos títulos e valores mobiliários representativos de dívida emitidos junto a instituições financeiras registrados no balanço consolidado da CREDITADA nas datas de medição.*

*Parágrafo Segundo – Caso em determinado período de verificação das obrigações que tratam esta cláusula, a CREDITADA não cumpra com o índice acima estabelecido, a CREDITADA terá um prazo adicional de 10 (dez) dias úteis, a contar da notificação que lhe fizer a CAIXA neste sentido, para sanar o respectivo inadimplemento mediante qualquer operação por meio da qual o referido índice seja restabelecido, incluindo, mas não se limitando a, aumento de capital na CREDITADA para redução da Dívida Líquida, com ou sem o pagamento parcial da presente Cédula. Nessa hipótese, esse restabelecimento, desde que efetivado no prazo de até 10 (dez) dias úteis e aceito pela CAIXA mediante manifestação*

*escrita neste sentido, deverá ser entendido como efetivado na data de determinação do respectivo índice, sem qualquer penalidade para a CREDITADA.*

**CLÁUSULA QUINTA** – A Cláusula Vigésima Segunda CCB passa a viger com a alínea XXVII adicional abaixo:

*XXVII) (i) uma vez efetivo, alteração no plano de recuperação judicial da NII Holdings, Inc. que (a) possa implicar, direta ou indiretamente, a incapacidade da Nextel ou da Nextel S.A. de cumprir com suas obrigações no âmbito da Cédula, e/ou (b) contemple a assunção, por parte das Afiliadas Brasileiras, de nenhuma obrigação ou ônus em desacordo ou inconsistente com o previsto nessa Cédula; ou (ii) alteração ou revogação na decisão judicial competente que vier a confirmar o plano de recuperação da NII Holding, Inc.*

**CLÁUSULA SEXTA** – A CREDITADA levará a registro no Registro de Títulos e Documentos da Comarca de São Paulo, Capital, o presente Segundo Aditamento. As despesas relativas ao referido registro serão suportadas pela CREDITADA, que, desde já, autoriza o débito dos respectivos valores em sua conta de depósito nº [--], mantida na agência [--] da CAIXA.

**CLÁUSULA SÉTIMA** – Todas as demais cláusulas e condições da CCB, conforme aditada pelo seu Primeiro e Segundo Aditamentos, que não tenham sido expressamente alteradas pelo presente Segundo Aditamento, ficam ratificadas permanecendo íntegras e em vigor para todos os efeitos de direito.

E, por estarem de perfeito acordo, a CREDITADA emite a presente Cédula de Crédito Bancário devidamente assinada e em 4 (quatro) vias de igual teor, sendo somente a primeira delas (a via do banco) negociável.

São Paulo, [--] de [--] de 201[--]

**EMITENTE:**

NEXTEL TELECOMUNICAÇÕES LTDA.

**AVALISTA:**

TEXT_SP 9049538v12 1803/14

NEXTEL TELECOMUNICAÇÕES S.A.

**CREDOR:**

CAIXA ECONÔMICA FEDERAL

**EXHIBIT F-6b**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**AGREEMENT OF NEGATIVE PERSONAL OBLIGATION AND OTHER OBLIGATIONS**

The following parties (the "Parties"):

(a)      **BANCO DO BRASIL S.A.**, a state-controlled public company (*sociedade de economia mista*), with headquarters in the City of Brasilia, Federal District, at SBS Quadra 01, Bloco C, Lote 32 - Setor Bancário Sul, registered with the Taxpayers' Registry of the Ministry of Finance under No. CNPJ/MF 00.000.000/0001-91, represented by its branch, Large Corporate 3070 (SP), located in the city of São Paulo, State of São Paulo, at Av. Paulista, 2.300, 2° floor, Cerqueira César, registered with the Taxpayers' Registry of the Ministry of Finance under No. CNPJ/MF 00.000.000/1947-00, herein represented under the terms in its by-laws ("Banco do Brasil"); and

(b)      **CAIXA ECONÔMICA FEDERAL**, a state-owned financial institution incorporated as a governmental company, created under the terms in Decree-Law No. 759, dated August 12, 1969, controlled by the Ministry of Finance, with headquarters in the City of Brasilia, Federal District, represented by its Regional Superintendence in Osasco, with registered office in Brasilia, Federal District, at Setor Bancário Sul, Quadra 4, Lotes 3 e 4, registered with the Taxpayers' Registry of the Ministry of Finance under No. CNPJ/MF 00.360.305/0001-04, herein represented under the terms in its by-laws ("CEF" and, with Banco do Brasil, the "Creditors");

(c)      **NEXTEL TELECOMUNICAÇÕES LTDA.**, a limited liability company (*sociedade limitada*), with headquarters in the City of São Paulo, State of São Paulo, at Av. das Nações Unidas, 14.171, 32nd floor, Rochavera Crystal Tower, registered with the Taxpayers' Registry of the Ministry of Finance under No. CNPJ/MF 66.970.229/0001-67, herein represented under the terms in its by-laws ("Nextel"); and

(d)      **NEXTEL TELECOMUNICAÇÕES S.A.**, a corporation (*sociedade anônima*), with rheadquarters in the City of São Paulo, State of São Paulo, at Av. das Nações Unidas, 14.171, 32nd floor, Rochavera Crystal Tower, registered with the Taxpayers' Registry of the Ministry of Finance under No. CNPJ/MF 00.169.369/0001-22, herein represented under the terms in its by-laws ("Nextel S.A.")

WHEREAS:

(i)      Nextel issued on (i) December 8, 2011, in favor of CEF, the Bank Credit Note No. 21.3150.777.0000001-97, in the amount of six hundred forty million Reais (R$ 640,000,000.00) (as amended on this date, "CCB CEF"); and (ii) on October 31, 2012, in favor of Banco do Brasil, the Bank Credit Note No. 307.001.181, in the amount of R$ 400,000,000.00 (four hundred million Reais) (on this date, "CCB BB" and jointly with CCB CEF, "CCBs"); and

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

(ii)     due to Nextel's failure to achieve the index found by dividing its Net Debt by EBITDA at 2.50 (two point five) or less, under the terms in Clause 10.1(i) in CCB BB and Clause Eleven in CCB CEF, for periods between the first and the second halves in 2014, Nextel and Creditors intend to promote a restructuring of the debt represented by the CCBs ("Debts"). For that end, (a) Nextel granted to Creditors a guarantee to the Debts, namely a fiduciary assignment of receivables represented by future provision of telecommunication services and funds deposited or maintained at the Escrow Accounts (as defined in the CCBs), under the terms in the amendments to the CCBs executed on this date; (b) Creditors intend to suspend, for a specific period, under the terms hereunder, the enforcement of the principal of the Debts and Nextel's specific obligations provided for in the CCBs, subject to specific resolution conditions; and (c) the Parties intend to agree upon the terms and conditions to restructure the Debts, to be formalized by means of amendments to the CCBs, which execution is subject to specific conditions precedent;

RESOLVE to execute this Agreement of Negative Personal Obligation and Other Obligations (the "Agreement"), to be governed by the following clauses and conditions:

**1.     Definitions**

1.1.     Whenever used in this Agreement, unless otherwise specified by the context, the terms not defined in this Agreement should have the same meanings attributed in the CCBs.

1.2.     Additionally, for purposes of construing and enforcing this Agreement:

"Affiliate" of any Person means another Person that, directly or indirectly, by one or more intermediate parties, Controls, is Controlled, or is under common Control with the first Person. Additionally, in case of a Person that is an investment fund or which Controlling shareholder is an investment fund, the following should also be deemed as an "Affiliate": (i) the manager or shareholder or an Affiliate of the manager or shareholder of this investment fund, (ii) another investment fund managed or governed by the manager or shareholder or an Affiliate of the manager or shareholder of this investment fund, and (iii) any Person that is, directly or indirectly, Controlled, or under common Control of this investment fund, whether solely or jointly with another Affiliate, or any of the Persons above.

"Brazilian Affiliate" means regarding any Person, an Affiliate domiciled in Brazil.

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

"Control" (including correlated meanings) means, under the terms in Article 116 in the Law of Corporations (a) the power to elect the majority of the board of directors, or similar body, of the Person controlled or, otherwise, conduct the businesses or policies of this Person (under an agreement or otherwise), and (b) the direct or indirect possession of rights that grant to the Controlling Person the majority of votes in the Shareholders' General Meeting or similar meeting, of the Controlled Person.

"Net Debt" means the amount calculated under consolidated basis, on the respective auditing date, determined according to accounting principles generally accepted in Brazil, equal to (a) the sum of Liabilities before financial institutions, issued securities representing the debt and the net balance of derivative operations (liabilities less assets from derivative operations); subtracted from (b) available funds (cash, banks, immediately available applications or short term applications, securities issued by itself or third parties, and public and private bonds of any kind) and (c) effects of mark-to-market of derivative operations.

"EBITDA" means the operational profit of Nextel, under consolidated basis, related to the last twelve (12) months, summed to depreciation and amortization expenses, all determined according to accounting principles generally accepted in Brazil.

"Related Party" of any specified Person shall mean as described in Deliberation No. 642 dated October 7, 2010, issued by Brazilian Securities and Exchange Commission (*Comissão de Valores Mobiliários – CVM*) and shall also include, to the extent that is not repeated (i) any Affiliate of this Person, (ii) any director, board member, shareholder, employee or manager of this Person or an Affiliate of this Person, (iii) any spouse, former spouse, ascending relative, descending relative, or lateral relative up to second degree of this Person, Affiliate of this Person or any director, board member, shareholder, employee or manager of this Person or an Affiliate of this Person, and (iv) any Affiliate of the above mentioned parties.

"Liabilities" means the principal amount of securities representing the debt, issued before financial institutions registered in the balance sheet of Nextel on the calculation dates, all determined according to accounting principles generally accepted in Brazil.

"Person" means any governmental entity or individual, company, partnership, corporation, limited liability company, joint venture, association, funds, investment funds, escrow agent, entity with no legal personality, or other entity or organization, whether or not a legal entity.

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

1.3.    Except when otherwise determined by the context:

(i)    terms that refer to singular form will include the plural and vice versa;

(ii)    references to the Agreement or any other document shall include eventual modifications and amendments that are entered into by the Parties;

(iii)    references to laws and regulations should be interpreted according to such laws and regulations as amended, and

(iv)    the titles of the headers and provisions in the Agreement and its Exhibits should not be used in its application or construing.

**2.    Enforcement Suspension**

2.1.    <u>Enforcement Suspension</u>. Under the terms in this Agreement, and subject to resolution conditions hereunder, Creditors agree that, by September 15, 2015 ("<u>Suspension Period</u>") (i) no payment of parts of the principal under Clause Two, line (b), Items (V) and (VI) in CCB CEF is due, notwithstanding the original terms in these Clauses; and (ii) enforcement of the obligation to maintain a financial index, as determined in Clause 10.1(i) in CCB BB and Clause Eleven in CCB CEF for periods June 30, 2014, December 31, 2014, and June 30, 2015, shall not be required, notwithstanding the original terms in these Clauses ("<u>Enforcement Suspension</u>"). Notwithstanding, the obligation to report (i) non-audited balance sheets every six months ending on June 30, by August 15 every year, and (ii) financial statements ended on December 31, consolidated and audited, by May 5, each year, under the terms in Clause 10.3 in CCB BB and Clause Eleven in CCB CEF.

2.2.    <u>Effects of the Enforcement Suspension</u>. Enforcement Suspension does not imply and shall not be interpreted (i) as novation or waiver, provisional or final, by any of the Creditors, regarding suspended rights under the Enforcement Suspension; and (ii) as novation, suspension, or waiver, provisional or final, by any of the Creditors, regarding any of the rights granted by law or contractual instruments where they appear as parties, except as expressly determined in Clause 2.1 above. The Enforcement Suspension under no circumstance shall cause release or exemption of the guarantees granted by Nextel in favor of Creditors related to the .Debts, which shall remain in full force and effect, Including during the Suspension Period, for all legal purposes.

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**3.**     **Nextel Obligations**

3.1.    <u>Access to Information</u>. Creditors shall have broad and unlimited access to the financial status as well as access to the business information in connection with Nextel and any Brazilian Affiliate, as well as the judicial recovery proceeding (*Chapter 11 proceeding*) of NII Holdings, Inc. ("<u>Recovery Proceeding</u>"), whenever reasonably requested, and Nextel and its Affiliates shall maintain Creditors updated about the Recovery Proceeding using proper means of disclosure, namely, information disclosed by the "Director of Investors Relations" of NII Holdings, Inc. and the website  http://cases.primeclerk.com/nii/,  without  prejudice  to  other  information  that  any Creditor requests reasonably. Also, Nextel and its Affiliates shall promptly inform the Creditors about each and every information that materially and negatively affects   its businesses or operations.

3.2.    <u>Agreement with creditors</u>. No contract, settlement, or agreement with creditors of Nextel or its Affiliates may be entered into as of this date, without prior and express consent of the Creditors (i) to offer or create any encumbrance, lien, or guarantee over property or assets of Nextel and Brazilian Affiliates; or (ii) containing terms and conditions more favorable to the creditors compared to obligations originally agreed upon with such creditors or obligations with Creditors, including without limitation, payment of any of its obligations to creditors in order to cause the payment schedule to differ from the one originally agreed upon. Obligations in this Clause shall not apply to the (a) granting of guarantee as counter-guarantee in insurance agreements and guarantee insurance in general, (b) granting of guarantee as counter-guarantee in new personal guarantees ("fiança") for guarantees in court proceedings or new judicial deposits in court proceedings, in case guarantees granted under the terms in Item (b) to the global amount of one hundred fifty million Reais (R$ 150,000,000.00); (c) granting of real property guarantees or personal guarantees in site lease agreements; (d) granting of real property guarantees or personal guarantees in collocation agreements (i.e. agreements with other operators to install equipment on towers); (e) funding granted by the National Agency of Telecommunications – ANATEL ("ANATEL"), including renewals, (f) guarantees in favor of ANATEL, (g) real property guarantees granted as counter-guarantee to issue new performance bonds in favor of ANATEL, in this case, subject to Creditors' prior approval, which shall be given in forty five (45) days from the receipt of notice by CREDITOR, and failure to comment by both Creditors shall not imply tacit approval, and (h) renewal of any operations held by Nextel or its Brazilian Affiliate identified in Exhibit I to this Agreement, and guarantees to be granted under the terms of Item (h) should be limited to the amount insured

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

by the collateral and/or performance bond indicated in the exhibit; while real property guarantees granted under the terms in (a), (c), and (d) above are limited to the global amount of fifty million Reais (R$ 50,000,000. 00).

3.3.    Duty of Not to Act. During the Suspension Period, Nextel, per se and its Affiliates, agrees to: (i) not to take judicial, arbitral, or extrajudicial measures aiming to question, void or invalidate any terms in the CCBs or guarantees of the Debts; and (ii) not to discuss the effectiveness or, in any event, question any of the credits held, or to be held, by Nextel or any of its Affiliates against the Creditors, except if, regarding each CCB, the respective Creditor is in default with its obligations in Clause 2.1 above, considering the terms in Clause 4.1 herein.

      3.3.1.    Without prejudice to the terms in Clause 3.3, Nextel, per se and its Affiliates, assures to its Creditors that, during or after the Suspension Period, it will not take any judicial, arbitral or extrajudicial measure aiming to, under any way, question, dispute or recover funds made available or guarantees provided to Creditors under the CCBs and, in case of Affiliates , under any other agreement executed with Creditors, except if, regarding each CCB, the respective Creditor is in default with its obligations in Clause 2.1 above, considering the terms in Clause 4.1 herein.

**4.    Conditions Subsequent to the Enforcement Suspension**

4.1.    Conditions Subsequent. If any of the conditions subsequent below (the "Conditions Subsequent") occur, the Enforcement Suspension will be automatically terminated, in full, regardless of notice or other formalities, under the terms in Article 127 in Law 10.406/2002:

(i)    occurrence of any of the circumstances that lead to advanced due date set forth in Clause Four in the First Amendment to CCB CEF, except for obligations which enforcement is suspended under the terms in Clause 2.1 herein, or any circumstance that lead to mandatory advanced payment set forth in Clause Thirteen in CCB CEF and the respective payment is not made;

(ii)    occurrence of any of the circumstances that lead to an early termination set forth in Clause 10.1 in CCB BB (except for obligations which enforcement is suspended under the terms in Clause 2.1 herein), or any circumstance that lead to mandatory advanced payment set forth in Clause 11.1 in CCB BB and the respective payment is not made;

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

(iii)    default by Nextel or Nextel S.A. of any obligation provided for in this Agreement not cured within five (5) days from its occurrence;

(iv)    false, incorrect or materially mistaken information in Nextel statements herein;

(v)    if Nextel or any of its Brazilian Affiliates is declared to be insolvent by judicial decision, or acknowledges, publicly or before any of the Creditors, its impossibility to meet pecuniary obligations, or if this impossibility is well-known, in both cases in the global amount of ten million Reais (R$ 10,000,000.00); and

(vi)    liquidation of NII Holdings, Inc. or final rejection of the judicial recovery plan (reorganization plan) under the Recovery Proceeding.

4.2.    Effects of Resolution of the Enforcement Suspension. If any of the Conditions Subsequent is found, the Enforcement Suspension shall be resolved and Creditors will be free to enforce their rights against Nextel and its guarantors, under the terms in the CCBs.

**5.    Debt Restructuring**

5.1.    Conditions Precedent. The Parties agree upon entering amendments to the CCBs, under the terms in Clause 5.2, as soon as the following conditions precedent are complied with (the "Conditions Precedent"):

(i)    the reorganization plan under the Recovery Proceeding is in effect (i.e., it is not subject to material conditions of any kind) by the competent bankruptcy court, under the terms of applicable legislation (the "Approval");

(ii)    the reorganization plan object of the Approval (a) does not imply, directly or indirectly, the inability by Nextel or Nextel S.A. to comply with its obligations under this Agreement and the CCBs and/or (b) does not include agreement, by the Brazilian Affiliates, upon any obligation or lien in disagreement or inconsistent with the terms in this Agreement or in the CCBs;

(iii)    the Approval is granted prior to the end of the Suspension Period;

(iv)    there is no anticipated due date or case of mandatory advanced payment under the CCBs, and Nextel and Nextel S.A. have not

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

failed to comply with any of the terms in the CCBs or this Agreement, except, regarding the CCBs, the obligations subject to the Enforcement Suspension;

(v)      NII Holdings, Inc., as well as any other Related Party holding or that will hold credits against any of the Brazilian Affiliates, has entered with the Parties a credit subordination agreement to obligations included in the CCBs, under form and content approved by Creditors ("Subordination Agreement"); and

(vi)     Creditors have received a legal opinion (*parecer*) from NII Holdings, Inc. outside legal counsel, attesting the ability and authority to enter the Subordination Agreement, as well as the validity and effectiveness of its terms related to such party, under terms acceptable to the Creditors.

5.2.    CCBs Execution. Should all the Conditions Precedent described in Clause 5.1. occur, within five (5) working days from the date of Approval and/or confirmation of compliance with all such conditions, whatever happens last, (i) Nextel and Banco do Brasil agree upon entering the amendment to CCB BB substantially according to the draft attached as Exhibit 5.2(i) to this Agreement; and (ii) Nextel and CEF agree upon entering the amendment to CCB CEF, substantially according to the draft attached as Exhibit 5.2(ii) to this Agreement.

5.3.    Obligation to Notify. Nextel agrees upon promptly notifying Creditors about the granting of the Approval.

**6.      Term**

6.1.    Term. This Agreement shall be in effect from the date of signature of this Agreement until the end of the Suspension Period, except for the terms in Clauses 3.1, 3.3.1, 7.1, 8.1, and 9.5, which will be in effect until full and irrevocable payment of the CCBs.

**7.      Venue**

7.1.    Venue. This Agreement is to be governed and construed according to the laws of the Federative Republic of Brazil. The Parties choose the Court of the City of São Paulo, State of São Paulo, as competent jurisdiction to judge any litigation or conflict arising out of this Agreement, excluding any other court, as privileged as it may be.

**8.      Communications and Notices**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

8.1.    Notices. Every notice, communication, and warning required or permitted under this Agreement shall be made in writing and delivered in person with a delivery receipt, sent by registered mail with notice of receipt and prepaid postage or sent by fac-simile or electronic mail (e-mail) and will be deemed received on the date of effective receipt by the notified Party at its address, when delivered in person, three (3) days following the sent date, when send by mail, or immediately upon confirmation of delivery when sent by fac-simile or electronic communication (e-mail). Notices shall be sent to the addresses identified below or any other address as informed by one Party to the others, compliant with formalities set forth in this Clause:

To Nextel:

NEXTEL TELECOMUNICAÇÕES LTDA.
Address: Avenida das Nações Unidas, 14171 – 32nd floor, Torre Crystal
São Paulo, Brasil, CEP 04794-000
E-mail: financial.operations@nextel.com.br
C/O: Felipe Osmo and Renata Cunha

With copy to (which is not a notification):

Motta, Fernandes Rocha - Advogados
Address: Alameda Santos, 2335, 10th floor
São Paulo, Brasil, CEP 01451-101
C/O: Luis Wielewicki or Bruno Furiati
Phone/Fax: (11) 3082-9398/ 3082-3272
E-mail: lwielewicki@mfra.com.br or bfuriati@mfra.com.br

If to Creditors:

BANCO DO BRASIL S.A.
Address: Avenida Paulista, 2300 – 1st floor, Cerqueira César, Edifício São Luis Gonzaga, CEP 01310-300, São Paulo, SP
E-mail: age3070@bb.com.br / msfneves@bb.com.br
C/O: Maurício Simões de Freitas Neves or Herick R. S. C. Barbosa

CAIXA ECONÔMICA FEDERAL
Address: Avenida Paulista, 1842 - Torre Sul- 2° andar, Bela Vista
CEP 01311-200, São Paulo, SP

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

E-mail: sge5824rj@caixa.gov.br
C/O: Luiz Gustavo Silva Portela or Fernando Ciotti

With copy to (which is not a notification):

Machado, Meyer, Sendacz e Opice Advogados
Address: Av. Brigadeiro Faria Lima, 3.144, 11th floor
São Paulo, Brasil, CEP 01451-000
C/O: José Prado or Renato G. R. Maggio
Phone/Fax: (11) 3150 7000/3150 7071
Email: jprado@machadomeyer.com.br or rmaggio@machadomeyer.com.br

## 9.    General Terms

9.1.    <u>Binding Effect</u>. This Agreement is entered irrevocably and irretrievably, binding the Parties, their successors and assignees allowed at any title.

9.2.    <u>Assignment</u>. This Agreement cannot be amended or assigned by either Party without prior consent in writing of the other Parties. This Agreement shall bind and benefit the Parties and their successors and assignees that are duly authorized.

9.3.    <u>Amendment; Tolerance; Agreement</u>. This Agreement may only be amended, replaced, cancelled, renewed, or extended, and there may be waiver to the terms of this Agreement, in writing, signed by all the Parties or, in case of waiver, by the Party that is waiving its relevant rights. No delay or omission by any Party to exercise any right under the terms in this Agreement should operate as waiver to this right or novation, and shall not prevent the later or subsequent exercise of such right.

9.4.    <u>Entire Agreement</u>. This Agreement is the full agreement between the Parties regarding the matters related to the Enforcement Suspension, replacing all other previous agreements and understandings, whether oral or in writing, regarding the object of this agreement.

9.5.    <u>Specific Performance</u>. The Parties acknowledge and agree that indemnities in cash may be inappropriate remedies in case of non-performance with any of the terms set forth hereunder this Agreement. Therefore, the non-infringing Party may require specific performance of any obligation herein , under the terms in Article 466-A and following sections of the Brazilian Code of Civil Procedure, and the infringing Party may respond to damages caused. This remedy shall not be considered as

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

exclusive remedy for non-compliance with this Agreement, but as an additional remedy to other available remedies.

9.6.    <u>Expenses</u>. Each party shall be responsible for full payment of all costs and fees of their respective legal counsel.

9.7.    <u>Independence of Measures/Provisions</u>. Any term or disposition in this Agreement that is deemed to be invalid or unenforceable shall be considered ineffective to the extent of such invalidity or unenforceability, and shall not cause the remaining terms and dispositions to be invalid or unenforceable.

IN WITNESS WHEREOF, the Parties sign this Agreement in four (4) counterparts of equal tenor and form for one single effect, before two undersigned witnesses.

São Paulo, February 13, 2015

[Remaining portion of the page is intentionally blank]

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*Page of Signatures of the Agreement of Negative Personal Obligation and Other Obligations entered by and between Banco do Brasil S.A., Caixa Econômica Federal, Nextel Telecomunicações Ltda. and Nextel Telecomunicações S.A., on February 13, 2015.*

**BANCO DO BRASIL S.A.**

_____          _____
Name:                                    Name:
Position:                                Position:

**CAIXA ECONÔMICA FEDERAL**

_____          _____
Name:                                    Name:
Position:                                Position:

**NEXTEL TELECOMUNICAÇÕES LTDA.**

_____          _____
Name: [signature]                        Name:
Position:                                Position:

**NEXTEL TELECOMUNICAÇÕES S.A.**

_____          _____
Name: [signature]                        Name:
Position:                                Position:

**Witnesses:**

1. _____        2. _____
Name:                             Name:
CPF (Individual Taxpayer Number):  CPF (Individual Taxpayer Number):

[signature]
[circular stamp]
LEGAL NEXTEL

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**ATTACHMENT A**

**Anatel Bonds**

| INSURANCE COMPANY/BANK | POLICY/CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED R$/US$/AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| Fator Seguradora | 107750002008 | 22/05/2015 | R$ 31.953.196,80 | R$ 10.333.851,80 | Anatel | Performance |
| Fator Seguradora | 107750002007 | 22/05/2015 | R$ 106.981.056,00 | R$ 92.262.140,80 | Anatel | Performance |
| Fator Seguradora | 107750002009 | 22/05/2015 | R$ 12.034.668,80 | R$ 3.892.082,68 | Anatel | Performance |
| Fator Seguradora | 107750002010 | 22/05/2015 | R$ 78.678.521,60 | R$ 25.445.096,69 | Anatel | Performance |
| Fator Seguradora | 107750002011 | 22/05/2015 | R$ 102.360.137,60 | R$ 88.276.988,28 | Anatel | Performance |
| Austral | 207750007111 | 01/08/2015 | R$ 124.008.416,00 | R$ 65.649.503,39 | Anatel | Performance |
| Austral | 207750007112 | 01/08/2015 | R$ 78.412.768,00 | R$ 41.511.370,31 | Anatel | Performance |
| ABC Brasil | 3234214 | 22/05/2015 | R$ 3.608.505,60 | R$ 2.728.442,72 | Anatel | Performance |
| ABC Brasil | 3234314 | 22/05/2015 | R$ 6.615.884,80 | R$ 5.002.365,17 | Anatel | Performance |
| ABC Brasil | 3234514 | 22/05/2015 | R$ 3.226.832,00 | R$ 2.439.853,85 | Anatel | Performance |
| ABC Brasil | 3234614 | 22/05/2015 | R$ 4.091.046,40 | R$ 3.093.298,72 | Anatel | Performance |
| ABC Brasil | 3234814 | 22/05/2015 | R$ 196.000,00 | R$ 148.198,40 | Anatel | Performance |

**Judicial Guarantees**

| INSURANCE COMPANY/BANK | POLICY/CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED R$/US$/AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153113 | 16/09/2015 | R$ 21.138,87 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0172306 | 12/04/2017 | R$ 2.895.905,52 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176534 | 18/06/2015 | R$ 76.729,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176537 | 18/06/2015 | R$ 78.422,32 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176530 | 18/06/2015 | R$ 1.257.834,06 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176531 | 18/06/2015 | R$ 23.500,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176532 | 18/06/2015 | R$ 1.177.852,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176515 | 18/06/2015 | R$ 21.345,34 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176516 | 18/06/2015 | R$ 88.434,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176506 | 18/06/2015 | R$ 456.063,94 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176509 | 18/06/2015 | R$ 276.283,07 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176517 | 18/06/2015 | R$ 14.438,48 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176518 | 18/06/2015 | R$ 136.949,70 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176514 | 18/06/2015 | R$ 223.402,69 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176520 | 18/06/2015 | R$ 92.065,36 | R$ | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| J.Malucelli | 02-0775-0176521 | 18/06/2015 | R$ 1.750.218,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176522 | 18/06/2015 | R$ 71.460,17 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176523 | 18/06/2015 | R$ 47.121,37 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176524 | 18/06/2015 | R$ 360.720,38 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176542 | 18/06/2015 | R$ 333.166,30 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176553 | 18/06/2015 | R$ 8.940,89 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176556 | 18/06/2015 | R$ 811.395,28 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176560 | 18/06/2015 | R$ 21.998,00 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176557 | 18/06/2015 | R$ 92.826,79 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176562 | 18/06/2015 | R$ 260.876,12 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176563 | 18/06/2015 | R$ 29.785,74 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176564 | 18/06/2015 | R$ 30.740,50 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176569 | 18/06/2015 | R$ 254.434,11 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176572 | 18/06/2015 | R$ 8.824,19 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176575 | 18/06/2015 | R$ 1.296.866,18 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176540 | 18/06/2015 | R$ 15.251,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176535 | 18/06/2015 | R$ 1.295.938,55 | R$ | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | - | | |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0775-0176519 | 18/06/2015 | R$ 20.199.768,82 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0176558 | 18/06/2015 | R$ 42.620,54 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177267 | 27/06/2015 | R$ 409.674,13 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0177686 | 03/07/2015 | R$ 5.309.016,52 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0177861 | 05/07/2015 | R$ 164.164,66 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178391 | 12/07/2015 | R$ 127.564,71 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178389 | 12/07/2015 | R$ 101.439,09 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178403 | 12/07/2015 | R$ 621.692,33 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178406 | 12/07/2015 | R$ 156.235,72 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178374 | 12/07/2015 | R$ 275.000,10 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178375 | 12/07/2015 | R$ 212.592,26 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178373 | 12/07/2015 | R$ 8.667,96 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178387 | 12/07/2015 | R$ 20.920,53 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178400 | 12/07/2015 | R$ 11.732,88 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0178782 | 17/07/2015 | R$ 226.270,84 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0180237 | 07/08/2015 | R$ 134.947,72 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0181853 | 28/08/2015 | R$ 47.034,28 | R$ | Judicial | Civil & Commercial |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| J.Malucelli | 02-0775-0182434 | 06/09/2015 | R$ 97.500,00 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0182988 | 12/09/2015 | R$ 29.120,00 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0184951 | 09/10/2015 | R$ 7.551,21 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750002557 | 22/11/2015 | R$ 1.097.676,50 | R$ - | Judicial | Fiscal |
| Austral | 207750002558 | 22/11/2015 | R$ 904.905,15 | R$ - | Judicial | Fiscal |
| Austral | 207750002559 | 22/11/2015 | R$ 180.207,80 | R$ - | Judicial | Fiscal |
| Austral | 207750002592 | 06/12/2015 | R$ 1.980.865,67 | R$ - | Judicial | Fiscal |
| Austral | 207760000700 | 07/12/2015 | R$ 26.520,00 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0189993 | 12/12/2015 | R$ 26.137,42 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0192902 | 17/01/2016 | R$ 14.170,00 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0195357 | 25/02/2016 | R$ 27.047,80 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0194208 | 06/02/2018 | R$ 185.024,63 | R$ - | Judicial | Fiscal |
| Austral | 207750003098 | 02/04/2016 | R$ 1.445.356,78 | R$ - | Judicial | Fiscal |
| Austral | 207750003101 | 04/04/2016 | R$ 32.235.939,45 | R$ - | Judicial | Fiscal |
| Austral | 207750003057 | 25/03/2016 | R$ 5.018.419,22 | R$ - | Judicial | Fiscal |
| J.Malucelli | 02-0775-0240720 | 12/06/2016 | R$ 2.487.364,30 | R$ - | Judicial | Fiscal |
| Austral | 207760001007 | 02/04/2016 | R$ 17.725,27 | R$ | Judicial | Civil & Commercial |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | - | | |
|---|---|---|---|---|---|---|
| Austral | 207760001042 | 30/04/2016 | R$ 27.120,00 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750003439 | 17/05/2016 | R$ 2.133,27 | R$ - | Judicial | Fiscal |
| Austral | 207750003448 | 17/05/2016 | R$ 2.176,93 | R$ - | Judicial | Fiscal |
| Austral | 207750003440 | 17/05/2016 | R$ 7.276,00 | R$ - | Judicial | Fiscal |
| Austral | 207750003494 | 17/05/2016 | R$ 16.390,94 | R$ - | Judicial | Fiscal |
| Austral | 207750003443 | 17/05/2016 | R$ 19.719,22 | R$ - | Judicial | Fiscal |
| Austral | 207750003447 | 17/05/2016 | R$ 36.751,03 | R$ - | Judicial | Fiscal |
| Austral | 207750003434 | 17/05/2016 | R$ 38.680,14 | R$ - | Judicial | Fiscal |
| Austral | 207750003449 | 17/05/2016 | R$ 108.774,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003445 | 17/05/2016 | R$ 124.340,12 | R$ - | Judicial | Fiscal |
| Austral | 207750003442 | 17/05/2016 | R$ 302.352,18 | R$ - | Judicial | Fiscal |
| Austral | 207750003444 | 17/05/2016 | R$ 325.548,35 | R$ - | Judicial | Fiscal |
| Austral | 207750003441 | 17/05/2016 | R$ 382.094,86 | R$ - | Judicial | Fiscal |
| Austral | 207750003435 | 17/05/2016 | R$ 704.006,80 | R$ - | Judicial | Fiscal |
| Austral | 207750003437 | 17/05/2016 | R$ 759.528,65 | R$ - | Judicial | Fiscal |
| Austral | 207750003436 | 17/05/2016 | R$ 911.966,24 | R$ - | Judicial | Fiscal |
| Austral | 207750003438 | 17/05/2016 | R$ 3.738.083,37 | R$ | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | - | | |
|---|---|---|---|---|---|---|
| Austral | 207760001075 | 17/05/2016 | R$ 236.046,95 | R$ - | Judicial | Fiscal |
| Austral | 207760001076 | 17/05/2016 | R$ 1.355.034,00 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750003501 | 17/05/2016 | R$ 224.355,62 | R$ - | Judicial | Fiscal |
| Austral | 207750003499 | 17/05/2016 | R$ 328.657,17 | R$ - | Judicial | Fiscal |
| Austral | 207750003500 | 17/05/2016 | R$ 10.722,22 | R$ - | Judicial | Fiscal |
| Austral | 207550003498 | 17/05/2016 | R$ 53.759,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003497 | 17/05/2016 | R$ 97.665,75 | R$ - | Judicial | Fiscal |
| Austral | 207750003558 | 07/06/2018 | R$ 511.602,98 | R$ - | Judicial | Fiscal |
| Austral | 207760001107 | 07/06/2016 | R$ 21.320,00 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750003578 | 10/06/2016 | R$ 183.410,46 | R$ - | Judicial | Fiscal |
| Austral | 207750003580 | 10/06/2016 | R$ 14.334,57 | R$ - | Judicial | Fiscal |
| Austral | 207760001120 | 19/06/2016 | R$ 29.856,00 | R$ - | Judicial | Civil & Commercial |
| J.Malucelli | 02-0775-0197717 | 03/03/2016 | R$ 961.621,81 | R$ - | Judicial | Fiscal |
| J.Malucelli | 0207750208489 | 30/07/2016 | R$ 428.433,59 | R$ - | Judicial | Fiscal |
| Austral | 207750004034 | 05/09/2016 | R$ 69.255,10 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750004148 | 23/09/2016 | R$ 70.769,16 | R$ - | Judicial | Fiscal |
| Austral | 207750004150 | 23/09/2016 | R$ 3.979,27 | R$ | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | - | | |
| Austral | 207750004146 | 23/09/2016 | R$ 5.526,80 | R$ - | Judicial | Fiscal |
| Austral | 207750004147 | 23/09/2016 | R$ 2.711,62 | R$ - | Judicial | Fiscal |
| Austral | 207750004145 | 23/09/2016 | R$ 7.636,74 | R$ - | Judicial | Fiscal |
| Austral | 207760001306 | 01/10/2016 | 26.126.13 | R$ - | Judicial | Civil & Commercial |
| Austral | 207750005249 | 06/12/2015 | R$ 562.418,41 | R$ - | Judicial | Fiscal |
| Austral | 207750005248 | 22/11/2015 | R$ 199.202,55 | R$ - | Judicial | Fiscal |
| Austral | 207750005251 | 22/11/2015 | R$ 72.072,42 | R$ - | Judicial | Fiscal |
| Austral | 207750005250 | 22/11/2015 | R$ 130.423,91 | R$ - | Judicial | Fiscal |
| Ace Seguros | 17.75.0000654.12 | 18/02/2017 | R$ 69.255,10 | R$ - | Judicial | Civil & Commercial |
| Ace Seguros | 17.75.0000684.12 | 01/04/2017 | R$ 2.134.282,67 | R$ - | Judicial | Civil & Commercial |
| Ace Seguros | 17.75.0000746.12 | 09/05/2017 | R$ 133.705,00 | R$ - | Judicial | Civil & Commercial |
| Ace Seguros | 17.75.0000747.12 | 09/05/2017 | R$ 142.211,89 | R$ - | Judicial | Civil & Commercial |
| Austral | 20776001487 | 07/12/2015 | R$ 1.531,61 | R$ - | Judicial | Labor |
| Itaú BBA | KH4.04/04 | Indeterminado | R$ 8.731.962,57 | R$ 9.530.947,21 | Judicial | Fiscal |
| Santander | 180766506 | Indeterminado | R$ 4.407.770,67 | R$ - | Judicial | Fiscal |
| Bradesco | 2.029.910-P | Indeterminado | R$ 1.427.788,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.032.715-4 | Indeterminado | R$ 271.096,13 | R$ - | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| Bradesco | 2.034.604-3 | Indeterminado | R$ 1.008.244,00 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.040.906-1 | 14/09/2015 | R$ 233.784,00 | R$ - | Judicial | Labor |
| Bradesco | 2.042.526-1 | Indeterminado | R$ 647.720,81 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.461-9 | Indeterminado | R$ 3.982.922,59 | R$ - | Judicial | Fiscal |
| Bradesco | 2.043.325-6 | Indeterminado | R$ 1.304.356,12 | R$ - | Judicial | Fiscal |
| Bradesco | 2.045.058-4 | Indeterminado | R$ 586.218,01 | R$ - | Judicial | Fiscal |
| Bradesco | 2.046.903-P | Indeterminado | R$ 1.091.596,02 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.296-0 | Indeterminado | R$ 2.229.530,43 | R$ - | Judicial | Environmental |
| Bradesco | 2.047.609-5 | Indeterminado | R$ 16.364,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.047.808-p | Indeterminado | R$ 2.958.345,56 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.184-3 | Indeterminado | R$ 778.511,95 | R$ - | Judicial | Fiscal |
| Bradesco | 2.054.290-p | Indeterminado | R$ 11.580.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.185-1 | Indeterminado | R$ 21.773.289,00 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.186-p | Indeterminado | R$ 26.699.435,32 | R$ - | Judicial | Fiscal |
| Bradesco | 2.053.246-7 | Indeterminado | R$ 82.824,35 | R$ - | Judicial | Fiscal |
| Bradesco | 2.058.354-1 | Indeterminado | R$ 37.809.554,62 | R$ - | Judicial | Fiscal |
| Bradesco | 2.059.775-5 | Indeterminado | R$ 136.779,87 | R$ - | Judicial | Labor |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| Bradesco | 2.060.546-4 | Indeterminado | R$ 1.415.522,58 | R$ - | Judicial | Fiscal |
|---|---|---|---|---|---|---|
| Bradesco | 2.060.544-8 | Indeterminado | R$ 257.399,77 | R$ - | Judicial | Fiscal |
| Bradesco | 2.060.545-6 | Indeterminado | R$ 2.656.570,48 | R$ - | Judicial | Fiscal |
| Caixa Geral | 0061/12 | Indeterminado | R$ 9.700.359,77 | R$ 13.248.861,10 | Judicial | Fiscal |
| HSBC | 04540476736/001 | 31/07/2015 | R$ 4.823.318,15 | R$ - | Judicial | Fiscal |
| HSBC | 04540482388/001 | 24/08/2015 | R$ 2.812.489,04 | R$ - | Judicial | Fiscal |
| HSBC | 4540487584/001 | 10/09/2015 | R$ 737.532,37 | R$ - | Judicial | Fiscal |
| ABC Brasil | 3258414 | Indeterminado | R$ 1.259.491,51 | R$ 1.342.719,90 | Judicial | Fiscal |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**Other Guarantees**

| INSURANCE COMPANY/BANK | POLICY/CONTRACT NO. | END OF PERIOD/TERM | AMOUNT INSURED R$/US$/AMOUNT OF CONTRACT | VALUE OF COLLATERAL GUARANTEE | TYPE | PROCEEDING |
|---|---|---|---|---|---|---|
| J.Malucelli | 02-0750-0153112 | 02/09/2015 | R$ 60.507,96 | R$ - | Others | Concession of Use |
| J.Malucelli | 02-0775-0244382 | 04/07/2015 | R$ 12.923,64 | R$ - | Others | Concession of Use |
| Bradesco | 2.027.032-2 | 27/12/2017 | R$ 562.930,36 | R$ - | Others | Concession of Use |
| Safra | 307.136-1 | 09/02/2015 | R$ 2.409.968,88 | R$ - | Others | Lease Guarantee |
| Safra | 307.561-7 | 02/01/2015 | R$ 1.470.426,57 | R$ - | Others | Lease Guarantee |

**Guarantees in Judicial Deposits**

| | Blocked | Judicial Deposit | Assets in Guarantee |
|---|---|---|---|
| TOTAL | 4.364.578,71 | 118.277.753,26 | 86.116.309 |

**Financing**

| Bank | Contract Number | Contract Date | Contract Amount | Type |
|---|---|---|---|---|
| Banco do Brasil | 307.001.181 | 31/10/2012 | R$ 400.000.000,00 | CCB |
| Caixa Econômica Federal | 21.3150.777.0000001-97 | 08/12/2011 | R$ 640.000.000,00 | CCB |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| China Development Bank | Non-Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo | Loan |
|---|---|---|---|---|---|
| China Development Bank | Sinosure | 20/04/2012 | US$ 250.000.000,00 | Empréstimo | Loan |
| Banco do Brasil | 21/00631-8 | 20/12/2010 | R$ 927.040,00 | FINAME | |
| Banco do Brasil | 40/009 01-7 / 40/008 96-7 | 27/06/2013 | R$ 136.061,98 | FINAME | |
| Banco do Brasil | 40/009 02-5 | 13/08/2013 | R$ 107.434,56 | FINAME | |
| Banco do Brasil | 40/009 01-7 | 18/02/2014 | R$ 829.154,53 | FINAME | |
| Banco do Brasil | 40/009 02-5 | 21/03/2014 | R$ 176.265,77 | FINAME | |
| Banco do Brasil | 40/008 96-7 | 21/03/2014 | R$ 68.439,48 | FINAME | |
| Banco do Brasil | 40/008 97-5 | 25/06/2013 | R$ 9.661,50 | FINAME | |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**EXHIBIT 5.2(i)**
**FORM OF THE 2nd AMENDMENT CCB BB**

**PREAMBLE:**
--------------------------------------------------------------------------------------------------------------------

**ISSUER** - NEXTEL TELECOMUNICAÇÕES LTDA., a limited liability company (*sociedade limitada*), with headquarters in the City of São Paulo, State of São Paulo, at Av. das Nações Unidas, 14.171, 32nd floor, Rochavera Crystal Tower, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 66.970.229/0001-67, herein represented by the persons duly qualified and undersigned.
--------------------------------------------------------------------------------------------------------------------

**CREDITOR** - BANCO DO BRASIL S.A., a state-controlled public company, with headquarters in Brasilia, Federal District, at SBS Quadra 01, Bloco C, Lote 32 - Setor Bancário Sul, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.000.000/0001-91, represented by its branch, Agencia Large Corporate 3070 (SP), located in the city of São Paulo, State of São Paulo, at Av. Paulista, 2.300, 2nd floor, Cerqueira César, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.000.000/1947-00, herein represented by Mr [•], Brazilian, married, bank worker, resident and domiciled in São Paulo (SP, bearer of ID card No. [•], issued by [•], registered with the Taxpayers' Registry of the Ministry of Finance CPF/MF under No. 404.785.641-04 and Mr. [•], Brazilian, married, bank worker, resident and domiciled in the City of São Paulo (SP, bearer of ID card No. [•], issued by [•], registered with the Taxpayers' Registry of the Ministry of Finance CPF/MF under No. [•], duly undersigned.
--------------------------------------------------------------------------------------------------------------------

**GUARANTOR** - NEXTEL TELECOMUNICAÇÕES S.A., a corporation (*sociedade anônima*), with headquarters in the City of São Paulo, State of São Paulo, at Av. das Nações Unidas, 14.171, 32nd floor, Rochavera Crystal Tower, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.169.369/0001-22, herein represented by the persons duly qualified and undersigned.
--------------------------------------------------------------------------------------------------------------------

**CONSIDERING THAT** on October 31, 2012, Issuer issued in favor of Creditor, the Bank Credit Note No. 307.001.181, in the amount of four hundred million Reais (R$ 400,000,000.00) (the "Note");

**CONSIDERING THAT** on February 13, 2015, Issuer and Creditor entered into the first amendment to the Bank Credit Note No. 307.001.181, altering, among other conditions, the interest rate incurring on the outstanding balance found on the Escrow Account

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

and including additional guarantee and personal security to compliance with obligations therein (the "First Amendment" and, with the Note, the "CCB");

**CONSIDERING THAT** Issuer and Creditor intend to amend, with no intention to novate, the Note in order to alter some terms;

**THE PARTIES RESOLVE** to execute this Second Amendment to the Bank Credit Note No. 307.001.181, under the following terms and conditions.

**CLAUSE ONE – INTRODUCTION** – CCB Introduction shall be in effect with the following writing:

*"I. INTRODUCTION:*

---

*1.1. -  ISSUER:*
*Corporate Name: NEXTEL TELECOMUNICAÇÕES LTDA. ("Issuer")*
*CNPJ (Corporate Taxpayer Number): 66.970.229/0001-67*
*Address: Alameda Santos 2356/2364, Cerqueira Cesar*
*City: São Paulo          State: SP*
*CEP: 01.418-200*
*Branch: Large Corporate SP 3070 (SP)*
*Account: 5.567-0 ("Account")*

*1.2. DATA ON THE CREDIT OPERATION:*
*Amount: four hundred million Reais (R$ 400,000,000.00) ("Principal")*
*Final due date: [10/31/2019]*
*Dates of Payment of Financial Fees: (i) [--],[--],[--], and [--] each year by [--] (including) and (ii) day [--] each month starting on [--] (exclusive) ("Date of Payment of Fees")*
*Number of copies of this Bank Credit Note: 1 (one) negotiable and 2 (two) non-negotiable copies."*

---

**CLAUSE TWO – CREDIT –** Clause 1 in the CCB shall be in effect with the following wording:

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*"**1. CREDIT** – On the dates of payment in Clause 9 below, by [October 31], 2019, we shall pay in domestic currency, under this Bank Credit Note ("Note"), which characteristics are described in the preamble, to **BANCO DO BRASIL S.A.** ("Creditor"), a financial institution, with headquarters in Brasilia, Federal District, at SBS Quadra 01, Bloco C, Lote 32 - Setor Bancário Sul, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.000.000/0001-91, represented by its branch, Agencia Large Corporate 3070 (SP), located in the city of São Paulo, State of São Paulo, at Av. Paulista, 2.300, 2nd floor, Cerqueira César, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.000.000/1947-00, or to its order, on the location of payment indicated in the Clause Location of Payment, the right and enforceable net debt, corresponding to the amount in Item 1.2. in the preamble ("Principal"), added with Financial Fees, as set forth in this Note."*

**CLAUSE THREE – PAYMENT TERMS –** Clause 9 in the CCB shall be in effect with the following wording:

*"**9. PAYMENT TERMS** – Notwithstanding the due date determined before and obligations provided for in other Clauses, we hereby agree to pay the Creditor the amounts contained on this Note, as follows: a) Principal shall be paid in installments, with due dates and par value described in the payment schedule in Exhibit I to this Note, and the first installment is due on [06/30/2016] and the last installment is due on [10/31/2019] (each date indicated in Exhibit I, a "Date of Payment of Principal Amount"); and b) Financial Fees: quarterly, by [--] (inclusive) and monthly, starting on [--] (exclusive), on each Date of Payment of Fees, according to Clause 1.2 in the Preamble of this Note, agreeing upon paying the final installment of the Principal on [10/31/2019], every pecuniary obligation arising out of this Note. Any receipt of installments outside the agreed upon terms shall be mere tolerance and shall not affect in any way the due dates or other Clauses and conditions in this Note, and shall not imply novation or amendment to the agreement, including regarding fees arising out of interest."*

**CLAUSE FOUR – ANTICIPATED DUE DATE –** Line (t) in Clause 10 in the CCB shall be in effect with the following wording, and Clause 10 shall be in effect with additional line (aa) below:

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

"(t)      should the index achieved by dividing the Net Debt by EBITDA be higher than 4.0 (four) for the first half in 2016, 3.5 (three point five) in the second half in 2016, and 2.5 (two point five) starting on the first half in 2017 (inclusive), to be calculated under the terms in Clause 10.2, compliant with the terms in Clauses 10.4 and 10.5.

(aa) (i) upon being in effect, change to the judicial recovery plan of NII Holdings, Inc. that (a) could imply, directly or indirectly, the inability of Nextel or Nextel S.A. to comply with the obligations under this Note and/or (b) contemplates assumption, by Brazilian Affiliates, of no obligation or lien in disagreement or inconsistent with the terms in this Note; or (ii) change or revocation in the competent court order that confirms the judicial recovery plan of NII Holdings, Inc."

**CLAUSE FIVE – FINANCIAL INDEX –** Clause 10.4 in the CCB shall be in effect with the following wording:

**10.4.** *If at a specific period of auditing of obligations addressed in this Clause,* **ISSUER** *fails to achieve the index set forth above,* **ISSUER** *shall have additional ten (10) working days, from the notification by the* **CREDITOR** *in this sense, to cure the respective default, by any operation under which this index may be reestablished, including, without limitation, capital increase in the* **ISSUER** *to reduce the Net Debt, with or without partial payment of this Note. In this case, this reestablishment, provided that it occurs within ten (10) working days and accepted by the* **CREDITOR** *upon written notice, shall be deemed as effective on the date of determination of the respective index, with no penalty applicable to the* **ISSUER***.*

**CLAUSE SIX – ASSIGNMENT –** The clause addressing assignment in the CCB shall be in effect with the following wording:

"**17. ASSIGNMENT –** *This Note may be subject to assignment and endorsement by the CREDITOR upon prior notice (10 (ten) working days in advance) to the ISSUER, under the terms in the civil and commercial law, and the assignee/endorsee is not required to be a financial institution or any equal entity.*"

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**CLAUSE SEVEN – REGISTRATION**

CREDITOR shall present this amendment to be registered by the Registry of Titles and Documents in the City of São Paulo, Capital. Registration expenses shall be borne by the ISSUER who, hereby, authorizes the debt of the respective amounts from account No. [--], maintained at CREDITOR's branch [--].

Upon agreement, **CREDITOR**, **ISSUER** and **GUARANTOR**, with no further intention to novate, ratify the Bank Credit Note amended herein in all its terms, clauses, and conditions that are not expressly amended hereby, which is part of the note, creating an indivisible and single document for all due purposes.

In witness thereof, we sign this Bank Credit Note in four (4) copies of equal tenor, being one negotiable copy, for all due purposes.

São Paulo (SP), [--] [--], 2015

**ISSUER:**

NEXTEL TELECOMUNICAÇÕES LTDA., a limited liability company (*sociedade limitada*), with registered office in São Paulo  (SP), at Alameda Santos No. 2.356/2.364, Cerqueira César, CEP: 01.418-200, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 66.970.229/0001-67, herein represented by:

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Initials: | Name: | Initials: | Name: |
| | Occupation: | | Occupation: |
| | Marital Status: | | Marital Status: |
| | Nationality: | | Nationality: |
| | Resident at: | | Resident at: |
| | ID: | | ID: |
| | CPF/MF No. | | CPF/MF No. |

**GUARANTOR**:

NEXTEL TELECOMUNICAÇÕES S.A., a corporation (*sociedade anônima*), with registered office at Alameda Santos No.  2.356, 7th floor, Cerqueira Cesar, CEP: 01418-200, in the city of São Paulo, State of São Paulo, registered with the Taxpayers' Registry of the Ministry of Finance CNPJ/MF under No. 00.169.369/0001-22, herein represented by:

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| Initials: | Name: | Initials: | Name: |
| | Occupation: | | Occupation: |
| | Marital Status: | | Marital Status: |
| | Nationality: | | Nationality: |
| | Resident at: | | Resident at: |
| | ID: | | ID: |
| | CPF/MF No. | | CPF/MF No. |

**CREDITOR**:

BANCO DO BRASIL S.A.

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| Initials: | Name: | Initials: | Name: |
| | Occupation: | | Occupation: |
| | Marital Status: | | Marital Status: |
| | Nationality: | | Nationality: |
| | Resident at: | | Resident at: |
| | ID: | | ID: |
| | CPF/MF No. | | CPF/MF No. |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**Exhibit I**

<u>PAYMENT SCHEDULE</u>

| Year | Period | Payment | Balance |
|------|--------|---------|---------|
| 2016 | | | R$ 400.000.000,00 |
| | June | R$ 9.259.402,30 | R$ 390.740.597,70 |
| | July | R$ 9.259.402,30 | R$ 381.481.195,39 |
| | August | R$ 9.259.402,30 | R$ 372.221.793,09 |
| | September | R$ 9.259.402,30 | R$ 362.962.390,78 |
| | October | R$ 9.259.402,30 | R$ 353.702.988,48 |
| | November | R$ 9.259.402,30 | R$ 344.443.586,17 |
| | December | R$ 9.259.402,30 | R$ 335.184.183,87 |
| 2017 | January | R$ 9.259.402,30 | R$ 325.924.781,56 |
| | February | R$ 9.259.402,30 | R$ 316.665.379,26 |
| | March | R$ 9.259.402,30 | R$ 307.405.976,95 |
| | April | R$ 9.259.402,30 | R$ 298.146.574,65 |
| | May | R$ 9.259.402,30 | R$ 288.887.172,34 |
| | June | R$ 9.259.402,30 | R$ 279.627.770,04 |
| | July | R$ 9.259.402,30 | R$ 270.368.367,73 |
| | August | R$ 9.259.402,30 | R$ 261.108.965,43 |
| | September | R$ 9.259.402,30 | R$ 251.849.563,12 |
| | October | R$ 9.259.402,30 | R$ 242.590.160,82 |
| | November | R$ 10.692.724,17 | R$ 231.897.436,65 |
| | December | R$ 10.692.724,17 | R$ 221.204.712,48 |
| 2018 | January | R$ 10.207.768,03 | R$ 210.996.944,45 |
| | February | R$ 10.207.768,03 | R$ 200.789.176,42 |
| | March | R$ 10.207.768,03 | R$ 190.581.408,38 |
| | April | R$ 10.207.768,03 | R$ 180.373.640,35 |
| | May | R$ 10.207.768,03 | R$ 170.165.872,32 |
| | June | R$ 10.207.768,03 | R$ 159.958.104,29 |
| | July | R$ 10.207.768,03 | R$ 149.750.336,26 |
| | August | R$ 10.207.768,03 | R$ 139.542.568,23 |
| | September | R$ 10.207.768,03 | R$ 129.334.800,20 |
| | October | R$ 10.207.768,04 | R$ 119.127.032,16 |
| | November | R$ 10.207.768,03 | R$ 108.919.264,13 |
| | December | R$ 10.207.768,03 | R$ 98.711.496,10 |
| 2019 | January | R$ 10.207.768,03 | R$ 88.503.728,07 |
| | February | R$ 10.207.768,03 | R$ 78.295.960,04 |
| | March | R$ 10.207.768,03 | R$ 68.088.192,01 |
| | April | R$ 10.207.768,03 | R$ 57.880.423,98 |
| | May | R$ 10.207.768,03 | R$ 47.672.655,95 |
| | June | R$ 10.207.768,03 | R$ 37.464.887,91 |
| | July | R$ 10.207.768,03 | R$ 27.257.119,88 |
| | August | R$ 10.207.768,03 | R$ 17.049.351,85 |
| | September | R$ 10.207.768,03 | R$ 6.841.583,82 |
| | October | R$ 6.841.583,82 | R$ - |

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

**EXHIBIT 5.2(ii)**

**FORM OF THE 2nd AMENDMENT CCB CEF**

**PREAMBLE:**

---

**CREDITOR:**

**CAIXA ECONÔMICA FEDERAL**, a state-owned financial institution incorporated as a governmental company, created under the terms in Decree-Law No. 759, dated August 12, 1969, controlled by the Ministry of Finance, in accordance with its By-Laws in effect on the date of contract, hereinafter referred to as **CAIXA** or **CREDITOR**.

Address: Setor Bancário Sul, Quadra 4, Lotes 3 /4 – Brasilia/DF

CNPJ: 00.360.305/0001-04

Regional Superintendence: Osasco – [--]

---

**ISSUER/ISSUER: NEXTEL TELECOMUNICAÇÕES LTDA.**

Address: Av. das Nações Unidas, 14.171, 32nd floor, Rochavera Crystal Tower

São Paulo – SP

CNPJ: 66.970.229/0001-67

---

**CONSIDERING THAT** on December 8, 2011, the ISSUER issued in favor of CAIXA, the Bank Credit Note No. 21.3150.777.0000001-97, in the principal amount of six hundred forty million Reais (R$ 640,000,000.00) (the "Note");

**CONSIDERING THAT** on February 13, 2015, ISSUER and CAIXA entered into the first amendment to the Bank Credit Note No. 21.3150.777.0000001-97, altering, among other conditions, the interest rate incurring on the outstanding balance and additional guarantee to compliance with obligations therein (the "First Amendment" and, with the Note, the "CCB").

**CONSIDERING THAT** the ISSUER, to this date, made payments to the principal in the amount of [R$ 128,000,000.00] (one hundred twenty eight million Reais] under the CCB;

**CONSIDERING THAT** ISSUER AND CAIXA intend to amend, with no intention to novate the CCB in order to alter some terms ("Second Amendment");

**THE PARTIES RESOLVE** to amend the CCB under this Second Amendment, under the following terms and conditions.

**CLAUSE ONE**– The Credit Characteristics shall be in effect with the following wording:

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*CREDIT CHARACTERISTICS:*

| *1 - CCB NUMBER:* | *2 - Final due date on:* |
|---|---|
| *21.3150.777.0000001-97* | *10/08/2019* |

| *3 - Total Credit Amount ("Principal"):* |
|---|
| *[R$ 512,000,000.00] (five hundred twelve million Reais)* |

| *4 - Type of Operation* |
|---|
| *Investments – CDI – Post* |
| *777 – Special Company Credit – Large Corporations* |

| *5 - Financial Fees:* |
|---|
| *[139.54%][1] CDI CETP a.a., calculated according to Clause Three* |

| *6 - Term and System of Amortization and Payment:* |
|---|
| *Term: 58 months, from the effective date of signature of this amendment to the Note, all under the terms and conditions in Exhibit I, compliant with:* |
| *(a) in the first 17 months there will be a grace period for the payment of the Principal, with payment only of Financial Fees, quarterly;* |
| *(b) in the subsequent 41 months, there will be amortization of the Principal, duly added with Financial Fees, monthly.* |
| *Constant Amortization System – SAC* |

*7 – Non-Free Movement Account:*

| *Branch* | *Op.* | *Account* | *DV* |
|---|---|---|---|
| *3150* | *003* | *180* | *4* |

---

[1] Note: indicative rate subject to confirmation by CEF.

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*8 - Free Movement Account:*

| *Branch* | *Op.* | *Account* | *DV* |
|---|---|---|---|
| *3150* | *003* | *1859* | *6* |

*9 - Location of Payments:*

*São Paulo, SP*

*10 - Guarantor:*

| *Guarantor* | *CNPJ* |
|---|---|
| *Nextel Telecomunicações S.A.* | *00.169.369/0001-22* |

*On the Dates of Payment indicated in Clause Two below, by the due date set forth in Field 2 in this Note, in domestic currency in this city, I, ISSUER, as issuer and/or, I, GUARANTOR, shall pay to CAIXA or to its order, by this Note that with the bank statements of the account and/or calculation spreadsheet, is acknowledged as a title of enforceable net debt, arising out of the use of funds made available to ISSUER and added with Financial Fees agreed upon in this Note;*

*The debt represented by this Note includes the amounts of monthly amortization, as indicated in Field 6 in this Note, with respective Financial Fees, calculated considering the effective interest monthly rate, incurring quarterly or on each monthly installment, as indicated in Field 6 in this Note, and the operation statement or the spreadsheet, that complements this Note, shall express the amounts and respective percentage of Financial Fee, under the terms in Law No. 10.931 dated 08/02/2004 and other current laws.*

**CLAUSE TWO** – Clause Two in the Note shall be in effect with the following wording:

*TERM*

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*CLAUSE TWO – This Note shall be in effect for 58 (fifty-eight) months, from the effective date of signature of this amendment to the Note, all under the terms and conditions in Exhibit I, compliant with:*

*(a) in the first 17 months there will be a grace period for the payment of the Principal ("Grace Period"), with payment only of Financial Fees, quarterly; and*

*(b) in the subsequent 41 months, there will be amortization of the Principal, duly added with Financial Fees, starting on [06/08/2016], and 41 (forty one) installments to be paid monthly, as follows (each date of payment indicated below, a "Date of Payment"):*

| Year | Period | Payment | Balance |
|------|--------|---------|---------|
| 2016 | May | R$   - | R$ 512.000.000,00 |
|  | June | R$ 11.852.034,95 | R$ 500.147.965,05 |
|  | July | R$ 11.852.034,95 | R$ 488.295.930,10 |
|  | August | R$ 11.852.034,95 | R$ 476.443.895,15 |
|  | September | R$ 11.852.034,95 | R$ 464.591.860,20 |
|  | October | R$ 11.852.034,95 | R$ 452.739.825,25 |
|  | November | R$ 11.852.034,95 | R$ 440.887.790,30 |
|  | December | R$ 11.852.034,95 | R$ 429.035.755,35 |
| 2017 | January | R$ 11.852.034,95 | R$ 417.183.720,40 |
|  | February | R$ 11.852.034,95 | R$ 405.331.685,45 |
|  | March | R$ 11.852.034,95 | R$ 393.479.650,50 |
|  | April | R$ 11.852.034,95 | R$ 381.627.615,55 |
|  | May | R$ 11.852.034,95 | R$ 369.775.580,60 |
|  | June | R$ 11.852.034,95 | R$ 357.923.545,65 |
|  | July | R$ 11.852.034,95 | R$ 346.071.510,70 |
|  | August | R$ 11.852.034,95 | R$ 334.219.475,75 |
|  | September | R$ 11.852.034,95 | R$ 322.367.440,80 |
|  | October | R$ 11.852.034,95 | R$ 310.515.405,85 |
|  | November | R$ 13.686.686,94 | R$ 296.828.718,91 |
|  | December | R$ 13.686.686,94 | R$ 283.142.031,97 |
| 2018 | January | R$ 13.065.943,08 | R$ 270.076.088,89 |
|  | February | R$ 13.065.943,08 | R$ 257.010.145,81 |
|  | March | R$ 13.065.943,08 | R$ 243.944.202,73 |
|  | April | R$ 13.065.943,08 | R$ 230.878.259,65 |
|  | May | R$ 13.065.943,08 | R$ 217.812.316,57 |
|  | June | R$ 13.065.943,08 | R$ 204.746.373,49 |
|  | July | R$ 13.065.943,08 | R$ 191.680.430,41 |
|  | August | R$ 13.065.943,08 | R$ 178.614.487,33 |
|  | September | R$ 13.065.943,08 | R$ 165.548.544,25 |
|  | October | R$ 13.065.943,08 | R$ 152.482.601,17 |
|  | November | R$ 13.065.943,08 | R$ 139.416.658,09 |
|  | December | R$ 13.065.943,08 | R$ 126.350.715,01 |
| 2019 | January | R$ 13.065.943,08 | R$ 113.284.771,93 |
|  | February | R$ 13.065.943,08 | R$ 100.218.828,85 |
|  | March | R$ 13.065.943,08 | R$ 87.152.885,77 |
|  | April | R$ 13.065.943,08 | R$ 74.086.942,69 |
|  | May | R$ 13.065.943,08 | R$ 61.020.999,61 |
|  | June | R$ 13.065.943,08 | R$ 47.955.056,53 |
|  | July | R$ 13.065.943,08 | R$ 34.889.113,45 |
|  | August | R$ 13.065.943,08 | R$ 21.823.170,37 |
|  | September | R$ 13.065.943,08 | R$ 8.757.227,29 |
|  | October | R$ 8.757.227,29 | R$   - |

**CLAUSE THREE** – Clause Eight in the CCB shall be in effect with the following

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

wording:

*PAYMENT TERMS*

*CLAUSE EIGHT – As means for effective payment of the debt arising out of this Note, comprised by the Principal duly added with Financial Fees, ISSUER authorizes CAIXA to debit from the Free Movement Account mentioned in Field 8, on the respective Dates of Payment, irrevocably and irretrievably, amounts sufficient and required on each date, as applicable.*

*Paragraph One – During the first seventeen (17) months from the date of signature of this amendment to the Note, known as grace period, ISSUER agrees upon the quarter payment of the Financial Fees, described in Clause Three, with the first due date being on [03/08/2015], and remaining payments on [03/08, 06/08, 09/08, and 12/08] each year.*

*Paragraph Two – After the Grace Period, ISSUER agrees upon the payment of the Principal, duly added with Financial Fees in [41] monthly installments, under the terms in Section Two of this Note.*

*Paragraph Three – If any Date of Payment if not a working day, the respective payment shall be due on the first subsequent working day. For purposes of the terms in this Note, working day means Monday to Friday, except for national holidays or days when, for any reason, banks do not work or the financial market at ISSUER's registered office location does not work.*

*Paragraph Four – The ISSUER authorizes CAIXA, regardless of prior notice, to use the balance found deposited in any of the accounts where it appears as title holder, at any unit of CAIXA, as well as other accounts that could be opened, whether to liquidate or for partial amortization of the debt found under the terms in this Note, if the payment is not made according to the terms in the caput of this Clause.*

*Paragraph Five – Monthly installments are due and calculated according to the Constant Amortization System – SAC, compliant with the terms in Clause Two, and fees according to Clause Three.*

**CLAUSE FOUR-** Clause Twelve in the CCB shall be in effect with the following wording:

*SPECIAL OBLIGATIONS*

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

*CLAUSE TWELVE – The ISSUER agrees upon, starting on the first half in 2016 (inclusive), to present documentation proving that the index achieved by dividing the Net Debt by EBITDA is equal or lower than 4.0 (four) for the first half in 2016, 3.5 (three point five) in the second half in 2016, and 2.5 (two point five) starting on the first half in 2017 (inclusive), and this index should be calculated by the ISSUER every six months (i) by August 15 based on the accounting closure on June 30; (ii) by the fifth working day after the maximum term provided for applicable regulation to disclose ISSUER's financial statements and accounting statements; and (iii) based on ISSUER's consolidated financial statements.*

*Paragraph One - For purposes of calculation of financial indexes in this clause, to be calculated according to accounting principles generally accepted in Brazil, the following definitions and criteria should be used:*

*"Net Debt" means the amount calculated under consolidated basis at ISSUER, equal to (a) the sum of Liabilities before financial institutions, issued securities representing the debt and the net balance of derivative operations (liabilities less assets from derivative operations); subtracted from (b) available funds (cash, banks, immediately available applications or short term applications, securities issued by itself or third parties, and public and private bonds of any kind) and (e) effects of mark-to-market of derivative operation;*

*"EBITDA" means ISSUER's operational profit, under consolidated basis, related to the last twelve (12) months, summed to depreciation and amortization expenses; and*

*"Liability(ies)" means the principal amount of securities representing the debt, issued before financial institutions registered in the ISSUER's balance sheet on the calculation dates.*

*Paragraph Two – If at any audit time of obligations under this clause, ISSUER fails to meet the above mentioned index, ISSUER shall have additional ten (10) working days, from the notification by CAIXA in this sense, to solve the respective default, by any operation under which this index may be reestablished, including, without limitation, capital increase in the ISSUER to reduce the Net Debt, with or without partial payment of this Note. In this case, this reestablishment, provided that it occurs within ten (10) working days and accepted by CAIXA upon written*

*notice, shall be deemed as effective on the date of determination of the respective index, with no penalty applicable to the ISSUER.*

**CLAUSE FIVE** - Clause Twenty Two in the CCB shall be in effect with the additional line XXVII below:

*XXVII) (i) Upon being in effect, change to the judicial recovery plan of NII Holdings, Inc. that (a) could imply, directly or indirectly, the inability of Nextel or Nextel S.A. to comply with the obligations under this Note and/or (b) contemplates assumption, by Brazilian Affiliates, of no obligation or lien in disagreement or inconsistent with the terms in this Note; or (ii) change or revocation in the competent judicial decision that confirms the judicial recovery plan of NII Holdings, Inc.*

**CLAUSE SIX -** ISSUER shall present this amendment to be registered by the Registry of Titles and Documents in the City of São Paulo, Capital. Registration expenses shall be borne by the ISSUER who, hereby, authorizes the debt of the respective amounts from account No. [--], maintained at CAIXA [--].

**CLAUSE SEVEN –** All other clauses and conditions in this CCB, as amended by its First and Second Amendments, that are not expressly amended hereby, are ratified and shall remain in full force for all due purposes.

And, in witness thereof, ISSUER issues this Bank Credit Note duly signed in 4 (four) copies of equal tenor, and the first copy (bank copy) is negotiable.

São Paulo, [--] [--], 20[--]

**ISSUER:**


NEXTEL TELECOMUNICAÇÕES LTDA.


**GUARANTOR:**

[UNOFFICIAL TRANSLATION – QUALIFIED IN ITS ENTIRETY BY THE EXECUTED ORIGINAL]

NEXTEL TELECOMUNICAÇÕES S.A.


**CREDITOR:**


CAIXA ECONÔMICA FEDERAL

# **EXHIBIT G**

**Executory Contracts and Unexpired Leases to be Assumed**

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| ACE Insurance Company | 436 Walnut Street, PO Box 1000 Philadelphia, PA 19106-3703 | D&O - 2nd Excess ($10M X $20M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences. | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| ACL Services Ltd | 1550 Alberni Street Vancouver, BC  V6G 1A5 Canada | ACL Software License, Maintenance and Support (Customer ID: C015640) | ACL software license, maintenance and support. | 11/17/10 | $0.00 | | NII Holdings, Inc. |
| ACTIX LIMITED | 200 HAMMERSMITH ROAD LONDON, W6 7DL UNITED KINGDOM | Master Agreement | Network engineering tools | 11/1/2008 | $0.00 | | NII Holdings, Inc. |
| ADOBE SYSTEMS INCORPORATED | ATTN:  ASSOCIATE GENERAL COUNSEL 345 PARK AVENUE SAN JOSE, CA 95110 | Adobe Purchase Authorization Letter (Agreement ID: 4400234814) | Adobe software and support services | 4/20/2011 | $0.00 | | NII Holdings, Inc. |
| ADON UNIFIED FACILITY SOLUTIONS | ATTN: YOLANDA TINES 7022 ROGUE FOREST LANE GAINESVILLE, VA  20155 | Consulting Services Agreement | Consulting services relating to facilities management | 8/1/2014 | $0.00 | | NII Holdings, Inc. |
| AEROTEK, INC. | ATTN:  ASSISTANT CONTROLLER 7301 PARKWAY DRIVE HANOVER, MD 21076 | Consulting Services Agreement | Temporary staffing services | 2/1/2011 | $0.00 | | NII Holdings, Inc. |
| AFLAC | 1932 Wynnton Road Columbus, GA 31999 | Flexible Benefits Plan | NII Holdings, Inc. establishes a Flexible Benefits Plan for its Employees for purposes of providing eligible Employees with the opportunity to choose from among the fringe benefits available under the plan. | 4/1/2015 | $0.00 | | NII Holdings, Inc. |
| AGCS Marine Insurance Company | 1 Chase Manhattan Plaza, 37th Floor New York, NY 10005 | Transit | Insures property while in transit from one location to another. | 10/31/14 - 10/31/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| AGTA GROUP CPA, LLP | ONE MARKET STREET SUITE 201 LEESBURG, VA 20176 | Staffing Agreement | Provide the temporary services of financial services professionals (Contractors) as requested/ordered. | 2/24/2015 | $0.00 | | NII Holdings, Inc. |
| ALCATEL LUCENT BRASIL S.A. & ALCATEL-LUCENTINTERNATIONAL | AV. MARGINAL DIRIETA ANCHIETA 400 KM 11.5 JARDIM SANTA CRUZ SAO PAULO,  04182-901 BRAZIL | Master Purchase and Software Licensing Agreement | Providing various Deliverables and Services, related to customer accounts and account management | 9/22/2011 | $0.00 | | NII Holdings, Inc. |
| AMAZON WEB SERVICES | 410 TERRY AVENUE NORTH SEATTLE, WA 98109-5210 | AWS Enterprise Customer Agreement | IT platform hosting services | 7/25/2013 | $12,164.70 | 30 | NII Holdings, Inc. |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, Inc. | American Express Company, Corporate Services Operations AESC-P 20022 North 31st Ave Mail Code AZ-08-03-11 Phoenix, AZ 85027 | Corporate Services Commercial Account Agreement | Corporate card accounts | 3/27/2007 | $0.00 | | NII Holdings, Inc. |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. | American Express Company, Corporate Services Operations AESC-P 20022 North 31st Ave Mail Code AZ-08-03-11 Phoenix, AZ 85027 | Guarantee of Payment Agreement for Individual Accounts with Limits | Guarantee of individual accounts | 8/2/2007 | $0.00 | | NII Holdings, Inc. |
| AppDirect, Inc. | AppDirect 650 California St., 25th Floor San Francisco, CA 94108 Attn: Daniel Saks, Co-CEO & President Attn: Tammi Dowiat Copy: General Counsel | Marketplace As a Service Agreement | Makes available an Application Delivery Platform to customers and end users. | 4/25/2014 | $0.00 | | NII Holdings, Inc. |

Contracts listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| APPLE, INC | Apple, Inc<br>Attention: Tim Cook<br>1 Infinite Loop<br>Cupertino, California 95104 | iPhone Agreement | Master agreement with Apple for sales and distribution of Apple products and services | 10/4/2013 | $0.00 | | NII Holdings, Inc. |
| APPLE, INC | Apple, Inc<br>Attention: Tim Cook<br>1 Infinite Loop<br>Cupertino, California 95104 | iPhone Contract of Adherence  (Brazil) | Contract terms and conditions whereby Nextel Brazil enters into the iPhone Agreement for the territory of Brazil | 10/15/2013 | $0.00 | | NII Holdings, Inc. |
| APPLE, INC | Apple, Inc<br>Attention: Tim Cook<br>1 Infinite Loop<br>Cupertino, California 95104 | Letter Agreement:  "Termination of the Mexico COA and the iPhone Agreement with Respect to Mexico | Letter agreement whereby the Contract of Adherence for Nextel Mexico was cancelled, as were the associated commitments, terms and conditions in the iPhone Agreement for the territory of Mexico. | 4/21/2015 | $0.00 | | NII Holdings, Inc. |
| Argonaut Insurance Company | 101 Hudson Street, Suite 1201<br>Jersey City, NJ 07302 | D&O - 5th Excess ($10M X $50M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Aspen | 175 Capital Blvd, Suite 30<br>Rocky Hill, CT 06067 | D&O - 9th Excess ($10M X $95M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| ASTELLIA INC. | 11911 FREEDOM DRIVE<br>SUITE 730<br>RESTON, VA 20190 | Master Purchase Agreement for Software, Equipment, and Related Services | For the acquisition and implementation of software and equipment for a service assurance platform for a wireless network, and for installation, training, maintenance, and other services related to such system. | 6/30/2009 | $0.00 | | NII Holdings, Inc. |
| AT&T Mobility Holdings B.V. | N/A | Letter (Waiver) | Waives and/or modifies certain obligations, terms and conditions  of the Purchase and Sale Agreement | 4/30/2015 | $0.00 | | NIU HOLDINGS LLC |
| AT&T Mobility Holdings B.V. | N/A | INSTRUMENT OF ASSIGNMENT | Sells, assigns and transfers to AT&T Mobility Holdings B.V. all of Seller's rights, title and interest in and to all of the limited liability company membership interests (the "Company Parent Interests") of Nextel International (Uruguay) LLC recorded in the name of Seller on the books of Company Parent and does hereby irrevocably constitute and appoint any duly authorized officer of Company Parent as its attorney-in-fact to record and effect such sale, transfer and assignment of the Company Parent Interests on the books of Company Parent with full power of substitution in the premises. | 4/30/2015 | $0.00 | | NIU HOLDINGS LLC |

**NII Holdings, LLC**
Schedule of Executory Contracts Anticipated to be Assumed

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| AT&T Mobility National Accounts, LLC | AT&T Mobility National Accounts, LLC Attn: Offer, Development & Negotiation P.O. Box 97061 Redmond, WA 98073<br><br>with fac copy to:<br>AT&T Legal<br>fax#: 908-532-1263 | AT&T Corporate Digital Advantage Agreement , Version 9A , (AT&T Customer Location ID: 73399711602) | Providing mobile cellular telecommunications services. | est 3/14/13 | $15,873.58 | 266 | NII Holdings, Inc. |
| AXA Insurance Company | Colonia-Allee 10-20 51067 Cologne Germany | International Liability (Foreign Package) | Liability arising out of foreign operations. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Berkley Pro | 14 Wall Street, Suite 1610 New York, NY 10005 | D&O - 7th Excess ($10M X $75M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| BOSTON PROPERTIES LIMITED PARTNERSHIP | c/o Boston Properties 901 New York Avenue, N.W., Suite 400 Washington, D.C. 20001 Attn: Regional General Counsel with a copy to: Boston Properties 111 Huntington Avenue, Suite 300 Boston, Massachusetts 02199-7610 Attn: General Counsel | Deed of Lease | Office lease agreement | 1/20/2006 | $320.31 | S2019006688 | NII Holdings, Inc. |
| BRIGHTSTAR CORP. | Brightstar Corporation 9725 NW 117th Avenue, Suite 300 Miami, Florida 33178 Attention: Legal Counsel | Master Purchase Agreement for Products and Services | Providing certain wireless products and services | 6/10/2013 | $0.00 | | NII Holdings, Inc. |
| BURSON MARSTELLER, LLC | Brightstar Corporation ATTN: SHIRLEY HALLETT 222 MERCHANDISE MART PLAZA SUITE 250 CHICAGO, IL 60654 | Consulting Services Agreement | Services include, but not be limited to issues counseling. crisis management. corporate positioning. developing consumer marketing solutions, merger and acquisitions communications, healthcare initiatives, government lobbying, and formulating public relations plans. | 3/1/2012 | $0.00 | | NII Holdings, Inc. |
| CANON FINANCIAL SERVICES | 158 GAITHER DRIVE #200 MT LAUREL, NJ 08054 | Agreement | Renegotiated copier lease agreements | 1/1/2015 | $0.00 | | NII Holdings, Inc. |
| CATEN MCGUIRE, LLC / ULTRACOM, LLC | Caten McGuire, LLC Attn: Paul Anuszkiewicz 5555 Glenridge Connector, Suite 200 Atlanta, Georgia 30342 | Consulting Services Agreement | Various technical and commercial consulting advice and services. | 6/10/2008 | $0.00 | | NII Holdings, Inc. |
| CERTUS SOFTWARE, INC. | 10201 TORRE AVENUE, SUITE 200 CUPERTINO, CA 95014 | Certus Master Services Agreement | Various services and software | 1/13/2006 | $0.00 | | NII Holdings, Inc. |
| China Development Bank Corporation | Address for Notices: Address: 14th Floor, CITIC Tower, No. 1093 Shennan Zhong Road Shenzhen 518031, Guangdong Province China Attention: Che Nan Telephone No.: +86 (755) 2594 2783 Facsimile No.: +86 (755) 2598 7725 Email: chenan@cdb.com.cn | Shareholder Undertaking Agreement | Commitment of NII Holdings to maintain direct or indirect ownership of Nextel Brazil | 4/20/2012 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| China Development Bank Corporation | Address for Notices: Address: 14th Floor, CITIC Tower, No. 1093 Shennan Zhong Road Shenzhen 518031, Guangdong Province China Attention: Che Nan Telephone No.: +86 (755) 2594 2783 Facsimile No.: +86 (755) 2598 7725 Email: chenan@cdb.com.cn | Loan Subordination Agreement | Subordination of Intercompany Loans between BZ and its parent entities | 12/13/2012 | $0.00 | | NII Holdings, Inc and NII International Telecom, SCA (Accession Agreement) |
| China Development Bank Corporation | Address for Notices: Address: 14th Floor, CITIC Tower, No. 1093 Shennan Zhong Road Shenzhen 518031, Guangdong Province China Attention: Che Nan Telephone No.: +86 (755) 2594 2783 Facsimile No.: +86 (755) 2598 7725 Email: chenan@cdb.com.cn | Accession Agreement | Accession of NII International Telecom, SCA to Subordination Agreement | 10/22/2013 | $0.00 | | NII Holdings, Inc and NII International Telecom, SCA (Accession Agreement) |
| China Development Bank Corporation | Address for Notices: Address: 14th Floor, CITIC Tower, No. 1093 Shennan Zhong Road Shenzhen 518031, Guangdong Province China Attention: Che Nan Telephone No.: +86 (755) 2594 2783 Facsimile No.: +86 (755) 2598 7725 Email: chenan@cdb.com.cn | Parent Guaranty | Guaranty of NII Holdings, Inc of certain obligations under the the CDB Credit Agreements in Brazil | 9/25/2015 | $0.00 | | Nii Holdings, Inc |
| CIGNA HEALTHCARE GROUP | ATTN: NICOLE JONES, GENERAL COUNSEL 900 COTTAGE GROVE ROAD BLOOMFIELD, CT 6002 | Cigna HealthCare Financial Proposal for Nii Holdings, Inc. | Health care benefits renewal for 2015 | 1/1/2014 | $0.00 | | NII Holdings, Inc. |
| COMFONE AG | NUSSBAUMSTRASSE 25 CH-3000 BERN 22 SWITZERLAND | Pricing for Multiple Affiliates Using Comfone Key2roam (Agreement) | Provides pricing when multiple affiliates of NII use Comfone Key2roam services. | 5/1/2011 | $0.00 | | NII Holdings, Inc. |
| COMPUTAMAPS, S.A. | E. SPACE BAT D. 45 ALLEE DES ORMES SOPHIA ANTIPOLIS, MOUGINS 0.625.0 FRANCE | Data Products End User License Agreement | License to use of geographic data products & documentation | 12/3/2010 | $0.00 | | NII Holdings, Inc. |
| Comunicaciones Nextel de México, S.A. de C.V. | AT&T Inc. One AT&T Plaza 208 South Akard Street, 32nd Floor Dallas, Texas 75202 Attention: Bill Caldwell Fax: (214) 746-2216 Email: wc2842@att.com | AGREEMENT | Obligates Nextel Mexico to perform TSA obligations on behalf of Nextel International Services for Entel Peru through the remainder of the current term expiring August 19, 2015 | 4/30/2015 | $0.00 | | Nextel International (Services) Ltd. |
| Comunicaciones Nextel de México, S.A. de C.V. | AT&T Inc. One AT&T Plaza 208 South Akard Street, 32nd Floor Dallas, Texas 75202 Attention: Bill Caldwell Fax: (214) 746-2216 Email: wc2842@att.com | Side Letter - RE: TSA Signatories | Reference is hereby made to (i) the Purchase and Sale Agreement ("Purchase Agreement"), dated January 26, 2015, as amended; (ii) the Transition Services Agreement ("TSA"), dated as of the date hereof; and (iii) the Letter Agreement re: Intelfon Agreement Connectivity Obligation ("Intelfon Connectivity Letter"), dated as of the date hereof. Letter documents terms and conditions associated with handling of transition services and Intelfon obligations upon full execution of related agreements within a defined period. | 4/30/2015 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| Comunicaciones Nextel de México, S.A. de C.V. | N/A | Side letter agreement - RE: Intelfon several liability | Acknowledgement that liability is several and not jointly | 4/30/2015 | $0.00 | | NII Holdings, Inc. |
| Comunicaciones Nextel de México, S.A. de C.V. | N/A | Side letter agreement - RE: Intelfon connectivity obligations | Acknowledgement that NII, Nextel Brazil and Nextel Argentina will maintain connectivity obligations with Intelfon through the end of the Intelfon contract term | 4/30/2015 | $0.00 | | NII Holdings, Inc. |
| CONCUR TECHNOLOGIES, INC. | ATTN: CHIEF LEGAL OFFICER 18400 N.E. UNION HILL ROAD REDMOND, WA 98052 | Business Services Agreement | Hosted platform and services for processing employee business related expenses. | 3/5/2012 | $1,548.87 | 3 | NII Holdings, Inc. |
| CORDIA RECRUITING AND STAFFING | 8229 BOONE BLVD. SUITE 300 VIENNA, VA 22182 | Staffing Agreement | Provide the temporary services of financial services professionals (Contractors) as requested/ordered. | 8/18/2014 | $0.00 | | NII Holdings, Inc. |
| COUPA SOFTWARE, INC | 1855 SOUTH GRANT STREET SAN MATEO, CA 94402 | Annual subscription agreement | P2P software | 8/26/2014 | $0.00 | | NII Holdings, Inc. |
| DATAWATCH SYSTEMS, INC. | 4401 EAST WEST HIGHWAY SUITE 500 BETHESDA, MD 20814 | System Installation - Monthly Monitoring and Monthly Maintenance Costs | Provides office facility access control and security systems and services | 11/19/2014 | $592.24 | 126 | NII Holdings, Inc. |
| DELOITTE TAX & CONSULTING S.A.R.L. | 560, rue de Neudorf L-2220 Luxembourg B.P. 1173 L-1011 Luxembourg | E ngagement Letter for Compliance Services | Defines the terms upon which Vendor will offer Luxembourg direct tax compliance and additional tax services related to the direct tax compliance of the Client. | 2/13/2013 | $0.00 | | NII International Holdings S.a.r.l |
| DELOITTE TAX & CONSULTING S.A.R.L. | 560, rue de Neudorf L-2220 Luxembourg B.P. 1173 L-1011 Luxembourg | E ngagement Letter for Compliance Services | Defines the terms upon which Vendor will offer Luxembourg direct tax compliance and additional tax services related to the direct tax compliance of the Client. | 2/13/2013 | $0.00 | | NII International Telecom S.C.A. |
| DELOITTE TAX CONSULTING | 560, rue de Neudorf L-2220 Luxembourg B.P. 1173 L-1011 Luxembourg | E ngagement Letter for Compliance Services | Defines the terms upon which Vendor will offer Luxembourg direct tax compliance and additional tax services related to the direct tax compliance of the Client. | 1/10/2014 | $0.00 | | NII International Services S.a.r.l |
| DELOITTE TAX LLP | 1750 Tysons Boulevard Suite 800 McLean, VA 22102-4219 USA | Engagement Letter | General engagement letter to cover services and projects, with any significant projects being documented by a Work Order. | 12/18/2013 | $0.00 | | NII Holdings, Inc. |
| DELOITTE TAX LLP | 1750 Tysons Boulevard Suite 800 McLean, VA 22102-4219 USA | Engagement Letter | In connection with Client's restructuring, which may include a Chapter 11 filing, describes the scope of Deloitte Tax Services, responsibilities of Parties, and the fees associated with such Services.  Applies to all the Services provided during period beginning May 1, 2014 through Client's emergence from bankruptcy. | 5/6/2014 | $0.00 | | NII Holdings, Inc. |
| DELTA DENTAL OF VIRGINIA | ATTN: P.V. (DYKE) DAVIES, II, SENIOR VICE PRESIDENT & COO 4818 STARKEY ROAD ROANOKE, VA 24018-8542 | NII Holdings, Inc. Dental Benefits Renewal, Revised September 17, 2014 | 2015 Dental benefits for NII employees | 1/1/2014 | $0.00 | | NII Holdings, Inc. |
| EGAIN COMMUNICATIONS CORPORATION | 345 E. MIDDLEFIELD ROAD MOUNTAIN VIEW, CA 94043 | Software License and Services Agreement | Software and support services | 12/30/2009 | $0.00 | | NII Holdings, Inc. |
| ELECTRODATA S.A.C. | AV. GUARDIA CIVIL, SN ISIDRO LIMA,  LIMA-12 PERU | Master Purchase Agreement for Technical Deliverables and Related Services | Providing certain IT and network related Deliverables and related Services. | 2/2/2011 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| EMARKETER, INC. | eMarketer, Inc<br>11 Times Square<br>Floor 14<br>New York, NY 10036<br>Attn: Miranda Manganaro | Subscription Agreement Signature Page | Subscription agreement whereby Licensor provides research and analysis on digital marketing and media. | 1/1/2015 | $0.00 | | NII Holdings, Inc. |
| Empresa Nacional de Telecomunicaciones S.A., NII Mercosur Telecom, S.L., NII Mercosur Móviles, S.L., Entel Inversiones S.A., and JPMorgan Chase Bank, National Association | Nextel del Perú S.A.<br>c/o Empresa Nacional de Telecomunicaciones S.A.<br>Avenida Andrés Bello 2687, 14th Floor<br>Las Condes<br>Santiago, Chile<br>Attention: Sebastián Dominguez Philippi<br>Facsimile No.: +56223606886<br>    With a copy (which shall not constitute notice) to:<br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>Attention: David L. Williams<br>Facsimile No.: 212-455-2502<br><br>    If to Escrow Agent:<br>JPMorgan Chase Bank, N.A.<br>Escrow Services<br>1 Chase Manhattan Plaza, 21st Floor<br>New York, N.Y. 10005, U.S.A.<br>Fax No.: 212.552.2803<br>Email: ec.escrow@jpmorgan.com | Escrow Agreement | Escrow agreement related to Stock Purchase Agreement for NII Holdings operations in the territory of Peru | 8/19/2013 | $0.00 | | NII Holdings, Inc. |
| Endurance Risk Solutions | 750 Third Ave<br>New York, NY 10017 | Excess Liability - Primary | Provides additional limits of insurance for the underlying liability policies. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Entel Inversiones S.A., Empresa Nacional de Telecomunicaciones S.A., NII Mercosur Telecom, S.L., and NII Mercosur Móviles, S.L. | If to either of the Purchasers, to:<br>Empresa Nacional de Telecomunicaciones S.A.<br>Avenida Andrés Bello 2687, 14th Floor<br>Las Condes<br>Santiago, Chile<br>Attention: Felipe Ureta Prieto<br>        Carlos Cristián Maturana<br>Facsimile No.: +56223606886<br>    with a copy (which shall not constitute notice) to:<br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY 10017, U.S.A.<br>Attention: David L. Williams<br>        Edward Chung<br>Facsimile No.: 212-455-2502 | Stock Purchase Agreement | Purchase and Sale agreement terms and conditions transferring ownership of NII Holdings operations in the territory of Peru | 4/4/2013 | $0.00 | | NII Holdings, Inc. |
| ERICSSON, INC. | ATTN: VERGEL CERVANTES<br>6300 LEGACY DRIVE<br>PLANO, TX 75024 | Amended and Restated 3G Master Supply Agreement | Master supply agreement for telecommunications hardware, software and services | 2/2/2010 | $1,433,427.71 | 134 | NII Holdings, Inc. |
| ERNST & YOUNG PRODUCT SALES LLC | ATTN: MICHAEL SORDS , CFO<br>SUITE 1300<br>925 EUCLID AVENUE<br>CLEVELAND, OH 44115-1476 | Advisory Engagement Agreement | Frame agreement to perform professional Advisory (e.g., transformation, business performance improvement, cost reduction, organization restructuring or technology enablement of transformation services) professional services (the "Services") for NII Holdings, Inc. and Subsidiaries. | 2/3/2011 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| ERNST & YOUNG PRODUCT SALES LLC | ATTN: MICHAEL SORDS , CFO SUITE 1300 925 EUCLID AVENUE CLEVELAND, OH 44115-1476 | Ernst & Young Letter Agreement | Frame agreement with 5 year term, under which statements of work or Engagements may be executed. | 12/14/2010 | $0.00 | | NII Holdings, Inc. |
| ERNST & YOUNG PRODUCT SALES LLC | ATTN: MICHAEL SORDS , CFO SUITE 1300 925 EUCLID AVENUE CLEVELAND, OH 44115-1476 | Software Lisence Agreement | E&Y Shared Services Analyzer ("SSA") Head Office Expense Allocation Tool | 12/1/2010 | $0.00 | | NII Holdings, Inc. |
| ERNST & YOUNG PRODUCT SALES LLC | ATTN: MICHAEL SORDS , CFO SUITE 1300 925 EUCLID AVENUE CLEVELAND, OH 44115-1476 | Engagement Agreement - October 22, 2014 | New engagement agreement for Fresh Start Accounting and Tax related statements of work, dated 10/22/14 | 10/22/2014 | $0.00 | | NII Holdings, Inc. |
| Everest Reinsurance Company | 461 Fifth Ave, 20th Fl. New York, NY 10017-6234 | D&O - 4th Excess ($10M X $40M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| EXCEL ARCHIVES OF VIRGINIA, INC. (IRON MOUNTAIN) | 45675 Terminal Drive Sterling, VA 20166 | Storage and Service Agreement | Storage and related services | 8/11/2004 | $0.00 | | NII Holdings, Inc. |
| Factory Mutual Insurance Company | PO Box 7500 Johnston, RI 02919 | Commercial Property | Insures against property damage to buildings and contents due to a covered loss. It may also cover business interruption. | 10/31/14 - 10/31/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Federal Insurance Company | 15 Mountainview Rd Warren, NJ 07059 | Domestic (US) Commercial Package | Provides both liability and property insurance coverage. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Federal Insurance Company | 16 Mountainview Rd Warren, NJ 07059 | Domestic (US) Auto Liability | Insures against financial loss due to legal liability for injuries or property damage by an automobile. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Federal Insurance Company | 16 Mountainview Rd Warren, NJ 07059 | Domestic (US) Workers Compensation | Part One covers the employer's statutory liabilities under workers compensation laws. Part Two covers liability due to employees' work-related injuried that are not statutory. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Fucata S.A., NII Mercosur Telecom S.L., NII Mercosur Moviles S.L. | Focata S.A. San Martin 323, piso 17 Buenos Aires - C1004AAG Attn: Servio Bartclome Szpolski Gaston Marquevich WITH A COPY (which will not constiture notice) TO: Cabanellas * Etchebarne * Kelly San Martin 323, piso 17 Buenos Aires - C1004AAG Attn: Marcelo Etchebarne Martin Mittelman | Share Purchase Agreement | Share purchase agreement for transfer of NII operation in the territory of Chile | 8/14/2014 | $0.00 | S2019006953 | NII International Telecom S.C.A. |
| GAMELOFT ARGENTINA | Gameloft Attn: Business Management Suipacha 664 Piso 4 Capital Federal C1008AAN Argentina | Wireless Content Supply Agreement | Provides terms and conditions for providing/distributing content to End Users through NII Affiliates | 12/5/2008 | $0.00 | | NII Holdings, Inc. |
| GBT US LLC d/b/a AS AMERICAN EXPRESS GLOBAL BUSINESS TRAVEL | GBT US LLC d/b/a AS AMERICAN EXPRESS GLOBAL BUSINESS TRAVEL Three World Financial Center Attn: General Counsel's Office - Global Business Travel 200 Vesey Street New York, New York 10285 | Letter Agreement - Global Business travel | Terms and conditions for travel agency services | 11/26/2014 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| GEMALTO, INC. | ATTN: GENERAL COUNSEL<br>9442 CAPITAL OF TEXAS HIGHWAY NORTH<br>SUITE 2-400<br>AUSTIN, TX 78759 | Master Purchase Agreement | Provides SIM cards and related products. | 4/10/2007 | $0.00 | | NII Holdings, Inc. |
| GENERATION 6 TECHNOLOGIES, LLC | 7820B WORMANS MILL ROAD<br>SUITE 101<br>FREDERICK, MD 21701 | Contract - IT Infrastructure Services Support Agreement | IT infrastructure services and support (on-site and remote). | 4/1/2015 | $1,000.00 | S2019006675 | NII Holdings, Inc. |
| GLOBAL CROSSING TELECOMMUNICATIONS, INC. | ATTENTION: SR VP, NORTH AMERICAN CARRIER SERVICES<br>225 KENNETH DRIVE<br>ROCHESTER, NY 14623 | Master Services Agreement | Contains the general terms and conditions for the provision of Services by Global Crossing to Customer and Customer Affiliates. | 11/3/2010 | $0.00 | | NII Holdings, Inc. |
| GNAN SOLUTIONS, INC. | 673 POTOMAC STATION DRIVE<br>SUITE 727<br>LEESBURG, VA 20176 | Assignment and Amendment Agreement | Assignment Assumption and extension of term Amendment for IT consulting services agreement and statement of work back to NII Holdings | 12/13/2013 | $0.00 | | NII Holdings, Inc. |
| GOOGLE, INC | Google, Inc.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | Google Apps Enterprise Agreement | Enterprise agreement for NII and Affiliates, covering Customer's access to and use of the Services. | 9/12/2012 | $0.00 | | NII Holdings, Inc. |
| GOOGLE, INC | Google, Inc.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | Google Customer Adoption and Acceleration Program agreement | Customer adoptions assistance program terms and conditions for the benefit of Customer, crediting up to $25k is future services. | 3/31/2015 | $0.00 | | NII Holdings, Inc. |
| Great American Insurance Company | 301 E 4th St.<br>Cincinnati, OH 45202-4201 | Excess Liability - Primary | Provides additional limits of insurance for the underlying liability policies. | 9/1/14 - 9/1/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| HEALTH ADVOCATE, INC. | ATTN: DAVID S. ROCCHINO, E.V.P. AND CHIEF SALES OFFICER 3043 WALTON ROAD<br>SUITE 150<br>PLYMOUTH MEETING PA 19462 | Plan Sponsor Agreement | Provide administrative and informational services to families of NII employees | 12/1/2013 | $0.00 | | NII Holdings, Inc. |
| HEWLETT PACKARD COMPANY | 5400 LEGACY DRIVE<br>PLANO, TX 75024 | Master Outsourcing Agreement | Provider to perform the outsourced managed services | 2/12/2010 | $2,791.60 | 24 | NII Holdings, Inc. |
| HEWLETT PACKARD COMPANY | 5400 LEGACY DRIVE<br>PLANO, TX 75024 | HP Single Order Terms for Software (HP Unlimited with a Fence Licensing Schedule) | Software licenses and support services | 3/28/2011 | $0.00 | | NII Holdings, Inc. |
| HUAWEI DO BRASIL TELECOMUNICACOES LTD / HUAWEI SERVICOS DO BRASIL LTDA., / HUAWEI GESTAO E SERVICOS DE TELECOMUNICACOES DO BRASIL LTDA. | ATTN: JASON ZHAO YUNING<br>PRACA PROFESSOR JOSE LANNES, 40-11 ANDAR<br>BROOKLIN NOVO<br>SAO PAULO, SP CEP 04571-100<br>BRAZIL | Master Supply Agreement | Master supply agreement for telecommunications infrastructure hardware, software and services | 2/4/2011 | $0.00 | | NII Holdings, Inc. |
| IDEO LP | 150 Forest Avenue<br>Palo Alto, CA 94301 | Workshop Agreement | IT design workshop series | 3/13/2015 | $0.00 | | NII Holdings, Inc. |
| IDEO LP | 150 Forest Avenue<br>Palo Alto, CA 94301 | Workshop Agreement (#2) | IT design workshop series (#2) | 4/28/2015 | $0.00 | | NII Holdings, Inc. |
| IGLOO, INC. | ATTN: DANIEL KUBE, VP, SALES AND BUSINESS DEVELOPMENT<br>22 FREDERICK STREET<br>6TH FLOOR<br>KITCHENER ON N2H 6M6<br>CANADA | Exhibit C - Nii Holdings, Inc.: Sales Contract | Annual license & support fees for internal web platform | 1/1/2015 | $17,515.62 | 47 | NII Holdings, Inc. |
| INFORMATICA CORPORATION | ATTN: LEGAL DEPARTMENT<br>100 CARDINAL WAY<br>REDWOOD CITY ,CA 94063 | License to Use Informatica Software | Software license and support agreement | 12/21/2010 | $0.00 | | NII Holdings, Inc. |
| INPHOMATCH, INC. (SYBASE 365 LLC) | Sybase 365, LLC<br>Attn: General Counsel<br>One Sybase Drive<br>Dublin, CA 94568 | Interoperability Short Message Services Agreement | Provides the terms and conditions for providing SMS and other services to Customer and its end users. | 5/24/2004 | $0.00 | | NII Holdings, Inc. |
| INTEC BILLING, INC. | 301 PERIMETER CENTER NORTH<br>SUITE 200<br>ATLANTA, GA 30346 | Master Software Licence and Services Agreement | Software license and support agreement | 9/16/2011 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| INTRALINKS, INC. | ATTN:  GENERAL COUNSEL 1<br>150 E 42ND STREET<br>NEW YORK, NY 10017 | Agreement for Intralinks Service (various) | Use of hosted platform services, Contract/Warehouse Numbers: 1326302, 1443702, 1941765, 1941885, 1959105, 2040625, 2086415, 1878292, 2141092, 2212882, 2326385 | Respectively:<br>10/8/2012, 6/19/2013, 4/9/2014, 4/9/2014, 4/23/2014, 5/20/2014, 6/10/2014, 9/30/2014, 12/11/2014, 1/12/2015, 3/20/2015 | $0.00 | | NII Holdings, Inc. |
| Ironshore Indemnity Inc. | One State Street Plaza, 8th Fl.<br>New York, NY 10004 | D&O - 10th Excess ($15M X $105M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| JINNY SOFTWARE LIMITED | ATTN:  CHIEF COMMERCIAL OFFICER<br>20 NORTH ANNE STREET<br>DUBLIN  7<br>IRELAND | Master Purchase Agreement for Technical Deliverables and Related Services | Telecommunications related hardware, software and services. | 6/27/2012 | $0.00 | | NII Holdings, Inc. |
| JOSE MIGUEL PORTO | Calle Recuerdos No. 240, Dpto. 201<br>Chacarilla, San Borja, Lima, Peru<br>Attn: Jose Miguel Porto | Consulting Services Agreement | Consulting services as ordered on statements of work (legal related). | 8/26/2013 | $0.00 | | NII Holdings, Inc. |
| KABOOM LATAM INC. | Kaboom Latam Inc.<br>Attn: William Woods<br>Plaza 2000, Calle 50, Apartado Postal 0816-01098<br>Panama, Republica de Panama | Wireless Content Supply Agreement | Provides the terms under which Carrier, through Affiliates, will make available to End Users the Vendor Content. | 6/18/2010 | $0.00 | | NII Holdings, Inc. |
| KELLY SERVICES | 950 Herndon Parkway, #150<br>Herndon, Virginia 20170<br>Attn> Marybeth Mellin | Consulting Services Agreement | Consulting services as ordered on statements of work (general). | 1/17/2012 | $0.00 | | NII Holdings, Inc. |
| KPMG LLP | 1676 International Drive<br>McLean, VA 22102 | Engagement Letter (2015 US-Only) | Integrated Audit Services - describes statement of services, terms and conditions for the agreement to perform an audit of NII's Consolidated financial statements and an audit of its internal control over financial reporting (collectively, the Integrated Audit). | 5/5/2015 | $0.00 | | NII Holdings, Inc. |
| KPMG LLP | 1676 International Drive<br>McLean, VA 22102 | Engagement Letter (2014 US-Only) | Integrated Audit Services - describes statement of services, terms and conditions for the agreement to perform an audit of NII's Consolidated financial statements and an audit of its internal control over financial reporting (collectively, the Integrated Audit). | 10/1/2014 | $0.00 | | NII Holdings, Inc. |
| KPMG Luxembourg S.a.r.l. | 1676 International Drive<br>McLean, VA 22102 | Engagement Letter (2014 Lux-Only) | Integrated Audit Services - describes statement of services, terms and conditions for the agreement to perform a statutory audit of the annual accounts of the Company for the year ending December 31, 2014 | 10/14/2014 | $0.00 | | NII International Telecom S.C.A. |
| L.A. MULCAHY CONSULTING, LLC | 904 N. Emerson St.<br>Arlington, VA 22205<br>Attn: Liz Mulcahy | Consulting Services Agreement | Consulting services as ordered on statements of work (tax related). | 3/1/2015 | $0.00 | | NII Holdings, Inc. |

Contracts listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| Liberty Insurance Corp. | 175 Berkeley St.<br>Boston, MA 02117 | Excess Liability - Primary | Provides additional limits of insurance for the underlying liability policies. | 9/1/14 - 9/1/15 | $0.00 | 8 | NII Holdings, Inc. and all subsidiary companies |
| Lloyd's of London | 69 Mansell Street<br>London E1 8AN, England | Excess Terrorism | Excess coverage that protects against potential losses and liabilities that may occur due to terrorist activities. | 10/31/14 - 10/31/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| MICROSOFT CORPORATION | ATTN: LEGAL AND CORPORATE AFFAIRS<br>ONE MICROSOFT WAY<br>REDMOND, WA 98052 | MicroSoft Enterprise Agreement | Enterprise-wide volume license agreement | 11/1/2010 | $2,685.21 | S2019006665 | NII Holdings, Inc. |
| MICROSOFT CORPORATION | ATTN: LEGAL AND CORPORATE AFFAIRS<br>ONE MICROSOFT WAY<br>REDMOND, WA 98052 | Enterprise Enrollment Amendment ID B21 | Pricing and terms associated with Enterprise Agreement | 11/16/2010 | $0.00 | | NII Holdings, Inc. |
| MICROSOFT CORPORATION | ATTN: LEGAL AND CORPORATE AFFAIRS<br>ONE MICROSOFT WAY<br>REDMOND, WA 98052 | Microsoft Mobile Business and Services Framework Agreement | Master framework agreement - The Mobile Business and Services Program allow service providers and business customers to (a) obtain Microsoft Support Services and/or (b) gain access to certain Microsoft Services for purposes of making these Microsoft Services available to their customers. | 9/30/2010 | $0.00 | | NII Holdings, Inc. |
| MICROSTRATEGY SERVICES CORPORATION | 1861 INTERNATIONAL DRIVE<br>MCLEAN, VA 22102 | Software License Agreement | Software license terms and conditions. | 6/30/2010 | $0.00 | | NII Holdings, Inc. |
| MICROSTRATEGY SERVICES CORPORATION | 1861 INTERNATIONAL DRIVE<br>MCLEAN, VA 22102 | Price Quotation and Purchase Agreement (178219) | Master agreement with additional terms and conditions, which also pulls-in prior purchase/licenses through Affiliates. | 12/21/2010 | $0.00 | | NII Holdings, Inc. |
| MOJAVE NETWORKS, INC. | Chief Financial Officer<br>Betty Kayton<br>Mojave Networks, Inc.<br>4 W 4th Avenue, Suite 300<br>San Mateo, CA 94402 | Hosted Applications Distribution Agreement | An agreement to provide the terms under which Supplier, NII and the NII Affiliate Signatories, will make subscriptions to the Hosted Application available in the Market | 5/16/2014 | $0.00 | | NII Holdings, Inc. |
| MOTOROLA (MOTO-MOBILITY) | 800 West Sunrise Blvd<br>Fort Lauderdale, FL 33322 | Subscriber Unit Purchase Agreement for NII Holdings Inc. | Provides terms and conditions for sales, service and support of Motorola subscriber products for distribution outside of the United States. | 1/1/2005 | $0.00 | | NII Holdings, Inc. |
| MOTOROLA (MOTO-MOBILITY) | 800 West Sunrise Blvd<br>Fort Lauderdale, FL 33322 | Trademark Indemnification Agreement | Terms and conditions for trademark indemnifications for Products under the Subcriber Unit Purchase Agreement | 5/7/2010 | $0.00 | 155 | NII Holdings, Inc. |
| MOTOROLA SOLUTIONS, INC. | Motorola Solutions, Inc.<br>Network Solutions Sector<br>Customer Solutions Group<br>North American Region<br>1301 East Algonquin Road<br>Schaumburg, Illinois USA 60196<br>Attn: Vice President and Director iDEN North American Operations<br>     AND COPY TO:<br>Motorola Solutions, Inc.<br>Network Solutions Sector<br>Customer Commercial Relations<br>North American Region<br>1301 East Algonquin Road<br>Schaumburg, Illinois 60196<br>Attn: Director, Contracts and Regulatory | IDEN Infrastructure Equipment Supply Agreement (Argentina) | Master infrastructure supply agreement to provide hardware, software and services in the territory of Argentina. | 6/30/2000 | $116,666.67 | 156 | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| MOTOROLA SOLUTIONS, INC. | Motorola Solutions, Inc.<br>Network Solutions Sector<br>Customer Solutions Group<br>North American Region<br>1301 East Algonquin Road<br>Schaumburg, Illinois USA 60196<br>Attn: Vice President and Director iDEN North American Operations<br>AND COPY TO:<br>Motorola Solutions, Inc.<br>Network Solutions Sector<br>Customer Commercial Relations<br>North American Region<br>1301 East Algonquin Road<br>Schaumburg, Illinois 60196<br>Attn: Director, Contracts and Regulatory | IDEN Infrastructure Equipment Supply Agreement (Brazil) | Master infrastructure supply agreement to provide hardware, software and services in the territory of Brazil. | 6/30/2000 | $0.00 | | NII Holdings, Inc. |
| MOVIUS INTERACTIVE CORPORATION | 11360 Lakefield Drive<br>Johns Creek, Georgia 30097<br>Attn: Legal Dept | Master Purchase Agreement | Provides terms and conditions for sales, service and support of certain proprietary hardware and software products. | 9/14/2011 | $0.00 | | NII Holdings, Inc. |
| National Union Fire Insurance Company of Pittsburgh, PA | 32 Old Slip, Financial Square<br>New York, NY 10005 | Directors & Officers (D&O) - Lead ($10M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | 12 | NII Holdings, Inc. and all subsidiary companies |
| National Union Fire Insurance Company of Pittsburgh, PA | 32 Old Slip, Financial Square<br>New York, NY 10005 | D&O - 6th Excess ($15M X $60M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| National Union Fire Insurance Company of Pittsburgh, PA | 32 Old Slip, Financial Square<br>New York, NY 10005 | D&O - 11th Excess ($5M X $120M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| National Union Fire Insurance Company of Pittsburgh, PA | 32 Old Slip, Financial Square<br>New York, NY 10005 | Fiduciary Liability | Protects against the personal liability imposed upon directors, officers, and employees who ovsee pension and other benefit plans, and the company that sponsor such plans. | 10/30/14 - 10/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| National Union Fire Insurance Company of Pittsburgh, PA | 32 Old Slip, Financial Square<br>New York, NY 10005 | Employment Practices Liability | Liability due to wrongful acts resulting from the employment process (ex: wrongful termination, discrimination, sexual harassment, and retaliation) | 10/30/14 - 10/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| NETSCOUT SYSTEMS, INC. | 310 LITTLETON ROAD<br>WESTFORD, MA 1826 | Master Purchase and License Agreement | Terms and conditions under which NetScout provides integrated network and application performance management solutions and related services | 11/8/2013 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| New Cingular Wireless Services, Inc. and Citibank, N.A. | If to Purchaser:<br>AT&T<br>One AT&T Plaza<br>205 South Akard Street, Room 2713<br>Dallas, Texas 75202<br>Attention: Sherri Bazan, CPA<br>Fax: (214) 746-2277<br>Email: sb2038@att.com<br>    with copies (which shall not constitute notice) to:<br>AT&T<br>One AT&T Plaza<br>205 South Akard Street, 32nd Floor<br>Dallas, Texas 75202<br>Attention: John O'Connor, Senior Vice President and Assistant General Counsel<br>Bill Caldwell, General Attorney<br>Fax: (214) 746-2216<br>Email: JO8009@att.com<br>Wc2842@att.com<br>    with additional copies (which shall not constitute notice) to:<br>Sergio J. Galvis<br>Werner F. Ahlers<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>fax: (212) 757-3990<br>Email:Galviss@sullcrom.com, Ahlersw@sullcrom.com<br><br>if to the Escrow Agent:<br>Citibank, N.A.<br>Agency & Trust<br>388 Greenwich Street, 14th Floor<br>New York, NY 10013<br>Attn.: Mary Ellen Connolly<br>Phone: (201) 763-1884<br>Facsimile: (973) 461-7191 or (973) 461-7192 | ESCROW AGREEMENT | Escrow agreement associated with the Sale & Purchase Agreement for NII's operations in the territory of Mexico. | 1/26/2015 | $0.00 | | NIU Holding LLC |
| New Cingular Wireless Services, Inc., and AT&T Mobility Holdings B.V. | AT&T Inc.<br>One AT&T Plaza<br>208 South Akard Street, Suite 3702<br>Dallas, Texas 75202<br>Attention: D. Wayne Watts<br>Fax.: (214) 746-2103<br>Email: wayne.watts@att.com<br>With a copy (which will not constitute notice) to:<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>Attention: Sergio J. Galvis<br>Werner F. Ahlers<br>Fax.: (212) 558-3588<br>Email: galviss@sullcrom.com<br>ahlersw@sullcrom.com | ASSIGNMENT AND ASSUMPTION AGREEMENT | Assignment of the Purchase Agreement from New Cingular Wireless Services, Inc. to AT&T Mobility Holdings B.V., acknowledged by NIU Holdings LLC | 3/24/2015 | $0.00 | | NIU HOLDINGS LLC |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| New Cingular Wireless Services, Inc., NIHD TELECOM HOLDINGS B.V., NIU HOLDINGS LLC, Nextel International (Uruguay) LLC, and the Seller Guarantors | AT&T Inc.<br>One AT&T Plaza<br>208 South Akard Street, Suite 3702<br>Dallas, Texas 75202<br>Attention: D. Wayne Watts<br>Fax.: (214) 746-2103<br>Email: wayne.watts@att.com<br>With a copy (which will not constitute notice) to:<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>Attention: Sergio J. Galvis<br>Werner F. Ahlers<br>Fax.: (212) 558-3588<br>Email: galviss@sullcrom.com<br>ahlersw@sullcrom.com | Purchase and Sale Agreement | Purchase and Sale agreement transferring ownership of NII Holdings operations in the territory of Mexico | 1/26/2015 | $0.00 | | NII Holdings, Inc.<br>NII Capital Corp.<br>NII International Telecom S.C.A.<br>NII International Holdings S.a.r.l.<br>Nextel International (Uruguay), LLC<br>NIU Holdings LLC |
| New Cingular Wireless Services, Inc., AT&T Mobility Holdings B.V., and Citibank, N.A. | If to Purchaser:<br>AT&T<br>One AT&T Plaza<br>205 South Akard Street, Room 2713<br>Dallas, Texas 75202<br>Attention: Sherri Bazan, CPA<br>Fax: (214) 746-2277<br>Email: sb2038@att.com<br>    with copies (which shall not constitute notice) to:<br>AT&T<br>One AT&T Plaza<br>205 South Akard Street, 32nd Floor<br>Dallas, Texas 75202<br>Attention: John O'Connor, Senior Vice President and Assistant General Counsel<br>Bill Caldwell, General Attorney<br>Fax: (214) 746-2216<br>Email: JO8009@att.com<br>Wc2842@att.com<br>    with additional copies (which shall not constitute notice) to:<br>Sergio J. Galvis<br>Werner F. Ahlers<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>fax: (212) 757-3990<br>Email: Galviss@sullcrom.com, Ahlersw@sullcrom.com<br><br>if to the Escrow Agent:<br>Citibank, N.A.<br>Agency & Trust<br>388 Greenwich Street, 14th Floor<br>New York, NY 10013<br>Attn.: Mary Ellen Connolly<br>Phone: (201) 763-1884<br>Facsimile: (973) 461-7191 or (973) 461-7192 | ASSIGNMENT AND ASSUMPTION AGREEMENT | Escrow Agreement assignment | 3/24/2015 | $0.00 | | NIU HOLDINGS LLC |
| NEXIUS SOLUATIONS INC. | Attn: Legal<br>11951 Freedom Drive<br>13th Floor<br>Reston, Virginia 20190 | Consulting Services Agreement | Consulting services agreement (Eduardo Bolivar Gaytan) | 4/25/2015 | $0.00 | | NII Holdings, Inc. |
| NEXIUS SOLUATIONS INC. | Attn: Legal<br>11951 Freedom Drive<br>13th Floor<br>Reston, Virginia 20190 | Consulting Services Agreement | Consulting services agreement (Mario David Medina Arzate) | 4/25/2015 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| NEXIUS SOLUTIONS INC. | Attn: Legal<br>11951 Freedom Drive<br>13th Floor<br>Reston, Virginia 20190 | Consulting Services Agreement | Consulting services agreement (Arturo Barraza LopeZ) | 4/25/2015 | $0.00 | | NII Holdings, Inc. |
| NEXIUS SOLUTIONS INC. | Attn: Legal<br>11951 Freedom Drive<br>13th Floor<br>Reston, Virginia 20190 | Consulting Services Agreement | Consulting services agreement (Julio Cesar Martinez Sanchez) | 4/25/2015 | $0.00 | | NII Holdings, Inc. |
| NEXTEL COMMUNICATIONS, INC. | ATTN:  VICE PRESIDENT, INTELLECTUAL PROPERTY<br>6450 SPRINT PARKWAY KSOPHN0312 - 3A223<br>OVERLAND PARK, KS 66251 | FOURTH AMENDED AND RESTATED TRADEMARK LICENSE AGREEMENT | Amended and restated trademark agreement (Nextel) | 7/27/2011 | $0.00 | | NII Holdings, Inc. |
| Nextel de México, S.A. de C.V., Nextel Communications Argentina S.R.L., and Nextel Telecomunicações Ltda. | Comunicaciones Nextel de Mexico S.A. de C.V.<br>c/o NER Holdings<br>Montes Urales 460<br>Distrito Federal, DF 11000, Mexico<br>Attention: Rafael Espeleta Tejada, Vice President – Planning and Supply Chain<br>Fax no.: +52 55 51094492<br>E-mail address: re223u@att.com<br><br>With a copy (which will not constitute notice) to:<br>AT&T Inc.<br>One AT&T Plaza<br>208 S. Akard<br>Dallas, TX 75202<br>Attention: Bill Caldwell, General Attorney – Mergers & Acquisitions<br>Fax no.: (214) 746-2216<br>E-mail address: wc2842@att.com | Transition Services Agreement | Multi-party transition services agreement | 4/30/2015 | $0.00 | | NII Holdings, Inc. |
| Nextel del Perú S.A. | If to the Customer, to:<br>Nextel del Perú S.A.<br>c/o Empresa Nacional de Telecomunicaciones S.A.<br>Avenida Andrés Bello 2687, 14th Floor<br>Las Condes<br>Santiago, Chile<br>Attention:  Sebastián Dominguez Philippi<br>Facsimile No.:  +56223606886<br>    With a copy (which shall not constitute notice) to:<br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY  10017<br>Attention:  David L. Williams<br>    Edward Chung<br>Facsimile No.:  212-455-2502 | Transition Services Agreement | Transition services agreement associated with sale of Nextel Peru to Entel, enabling ongoing operations. | 8/19/2013 | $0.00 | | Nextel International (Services) Ltd. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| NII TELECOM, S. de R.L. de C.V.  &  NEXTEL DEL PERU S.A. | NII Telecom, S de R.L. d C.V.<br>Paseo de los Tamarindos #90<br>Piso 29<br>Colonia Bosques de las Lomas<br>Delegacion Cuajimalpa<br>Mexico, D.F.<br>05120<br>Attn: General Counsel<br><br>Nextel del Peru<br>Republica de Colombia No. 791<br>Piso 19<br>San Isidro<br>Lima 27 Peru<br>Attn: General Counsel | Qualified Operator Services Agreement | Intercompany operating agreement extending services to Nextel del Peru S.A. | 6/5/2013 | $0.00 | | NII Holdings, Inc. |
| NII TELECOM, S. de R.L. de C.V. ("LICENSEE")  &  NEXTEL TELECOMUNICACOES LTDA. ("NEXTEL BRAZIL") | NII Telecom, S de R.L. d C.V.<br>Paseo de los Tamarindos #90<br>Piso 29<br>Colonia Bosques de las Lomas<br>Delegacion Cuajimalpa<br>Mexico, D.F.<br>05120<br>Attn: General Counsel<br><br>Nextel Telecomunicacoes Ltda.<br>Avenida das Nacoes Unidas, 14.171<br>04795-100 Sao Paulo<br>Brazil<br>Attn: General Counsel | Qualified Operator Services Agreement | Intercompany operating agreement extending services Between NII Telecom, S. de R.L. de C.V. ("Licensee"), NII Holdings, Inc. ("NII") and Nextel Telecomunicoes Ltda. | 4/10/2015 | $0.00 | | NII Holdings, Inc. |
| NOKIA SIEMENS NETWORKS, OY | Mr. Gustavo Campos<br>Business Management - Latin America<br>575 Herndon Parkway, Suite 200<br>Herndon, VA 20170<br><br>copy to:<br>Legal and Compliance Affairs<br>Guillermo Gonzalex Camarena No. 1200, 15th Floor<br>Col. Lomas de Santa Fe, C.p. 01210, Mexico, D.F. | Master Supply Agreement | Master supply agreement for telecommunications hardware, software and services | 11/23/2010 | $0.00 | | NII Holdings, Inc. |
| OFFICE MOVERS, INC | Office Movers, Inc.<br>6500 Kane Way<br>Suite A<br>Elkridge, MD 21075<br><br>cc to:<br>The Kane Company<br>6500 Kane Way<br>Elkridge, MD 21075 | Contract for Services | Office moving and relocation services. | 8/8/2014 | $0.00 | | NII Holdings, Inc. |
| OFFIX | 13535 WELLINGTON CENTER CIRCLE<br>SUITE 107<br>GAINESVILLE, VA 20155 | Maintenance Order | Copier maintenance & support | 11/11/2014 | $0.00 | | NII Holdings, Inc. |
| OMNIPOINT, LLC | 3111 WEST DR. MLK JR. BLVD.<br>SUITE 100<br>TAMPA ,FL 33607 | Consulting Agreement | Consultant shall provide consulting services to Company as set forth under the terms and conditions of this agreement and any duly authorized statement of work. | 7/31/2012 | $0.00 | | NII Holdings, Inc. |
| OPENWAVE SYSTEMS | ATTN:  GENERAL COUNSEL<br>2100 SEAPORT BLVD<br>REDWOOD, CITY, CA 94063 | Communications Service Provider Agreement (No. 001108) | Original master agreement - Argentina, to license software to host a service that can be accessed by a Qualified Operator's Subscribers | 3/31/2003 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| OPENWAVE SYSTEMS | ATTN: GENERAL COUNSEL 2100 SEAPORT BLVD REDWOOD, CITY, CA 94063 | Communications Service Provider Agreement (No. 01099) | Original master agreement - Argentina, to license software to host a service that can be accessed by a Qualified Operator's Subscribers | 1/10/2003 | $0.00 | | NII Holdings, Inc. |
| OPERA SOFTWARE ASA | WALDEMAR THRANES GATE 98 OSLO 175 NORWAY | Software Development and License Agreement | Provides the general framework, terms and conditions to develop and utilize a modified version of the Opera Browser that will be compatible with Motorola iDEN devices. | 1/15/2010 | $0.00 | | NII Holdings, Inc. |
| ORACLE AMERICA, INC. | 500 ORACLE PARKWAY REDWOOD SHORES, CA 94065 | Oracle License and Services Agreement | Provides terms and conditions for licenses and services provided by Oracle and authorized distributors | 4/21/2010 | $393,216.61 | 121 | NII Holdings, Inc. |
| ORACLE AMERICA, INC. | 500 ORACLE PARKWAY REDWOOD SHORES, CA 94065 | Oracle Cloud Services Agreement | Terms and conditions for providing cloud services as specified in Orders placed. | 5/30/2014 | $0.00 | | NII Holdings, Inc. |
| PayFlex Systems USA, Inc. | 10802 Farnam Drive, Suite 100 Omaha, Nebraska 68154 | NII Holdings, Inc - Flexible Benefit Plan | Flexible benefits plan services and administration (Plan No. 501) | 01/01/07 | $0.00 | | NII Holdings, Inc. |
| PAYFLEX SYSTEMS USA, INC. | 10802 Farnam Drive, Suite 100 Omaha, Nebraska 68154 | Administrative Services Agreement for Cobra Administration | Administrative services agreement for COBRA | 1/1/2010 | $0.00 | | NII Holdings, Inc. |
| PINNACLE COMPANIES STAFFING, INC. | 1420 SPRING HILL ROAD SUITE 600 MCLEAN, VA 22102 | Staffing Agreement | Provide the temporary services of financial services professionals (Contractors) as requested/ordered. | 2/10/2015 | $0.00 | | NII Holdings, Inc. |
| PITNEY BOWES SOFTWARE LATIN AMERICA INC. | 4200 PARLIAMENT PLACE SUITE 600 LANHAM, MD 20706 | Master Purchase Agreement for Technical Deliverables and Related Services | Terms and conditions under which Supplier provides various Deliverables and related Services. | 9/30/2011 | $0.00 | | NII Holdings, Inc. |
| QUALCOMM TECHNOLOGIES, INC. | ATTN: PRESIDENT, QIS 5775 MOREHOUSE DRIVE SAN DIEGO, CA 92121 | QCHAT® OPERATOR LICENSE AGREEMENT | Provides the master license, terms and conditions associated with operation of the QChat PTT platform, and provides for Affiliates to become Operator under the Agreement for their respective territories | 9/10/2009 | $0.00 | | NII Holdings, Inc. |
| RANDSTAD NORTH AMERICA LP | PO BOX 742689 ATLANTA, GA 30374-2689 | Staffing Agreement | Provide the temporary services of financial services professionals (Contractors) as requested/ordered. | 6/9/2014 | $0.00 | | NII Holdings, Inc. |
| SAHARI PROFESSIONAL SERVICES LLC | 10951 WILD GINGER CIRCLE #301 MANASSAS, VA 20109 | Staffing Agreement | Provide the temporary services of financial services professionals (Contractors) as requested/ordered. | 8/11/2014 | $0.00 | | NII Holdings, Inc. |
| SMARTTRUST AB | Giesecke & Devrient 3S AB Server Software and Services Fredsborgsgatan 24, 6th floor Box 47154, SE-100 74 Stockholm, Sweden Attn: Legal Department (Magnus Toll) & John O'Malley Senior Vice President Mobile Network Operator (MNO) Giesecke & Devrient America Inc., 45925 Horseshoe Drive Dulles, VA 20166, USA | Master Services Agreement for Over-the-Air Services | Hosted platform and services for over-the-air device management and control. Provide personnel, expertise and the professional, technical and project management services. | 10/22/2009 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244 Concord, CA 94520 | Consulting Services Agreement | Consulting services agreement (Michael Carr) | 8/1/2014 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244 Concord, CA 94520 | Consulting Services Agreement | Consulting services agreement (Igor Stranisavljev) | 8/1/2014 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**
**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520 | Consulting Services Agreement | Consulting services agreement (Viankatesh Shangbhag) | 4/1/2014 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520 | Consulting Services Agreement | Consulting services agreement (Brian Pitchford) | 10/15/2014 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520<br>Attn: Andrew DeGuzman | Consulting Services Agreement | Consulting services agreement (John Causey) | 8/1/2014 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520<br>Attn: Andrew DeGuzman | Consulting Services Agreement | Consulting services agreement (M. Nouri) | 07/26/13 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520<br>copy to:<br>Juan Manuel Gallegos<br>P.O. Box 194<br>Oakton, VA 22124 | Consulting Services Agreement | Consulting services agreement (J M Gallegos) | 09/26/12 | $0.00 | | NII Holdings, Inc. |
| SOLO W2, Inc. | 1335 Willow Way, Ste 244<br>Concord, CA 94520<br>copy to:<br>Victor Acuna<br>23156 Blackhorn Sq<br>Sterling, VA | Consulting Services Agreement | Consulting services agreement (V. Acuna) | 10/15/12 | $0.00 | | NII Holdings, Inc. |
| SPRINT SPECTRUM L.P. | ATTN: MR. RICH YOUNG<br>6550 SPRINT PARKWAY<br>MAILSTOP: KSOPHR 0206 - 2C653<br>OVERLAND PARK, KS 66251 | International Push-To-Talk (PTT) Interconnection Agreement | PTT interop or interconnect agreement sets out the terms and conditions to enable the delivery of PTT traffic from one Party's network bound to the other Party's network for the mutual benefit of each Party | 6/30/2013 | $0.00 | 219 | NII Holdings, Inc. |
| SUBEX, INC. | ATTN: GREG LENEVEU<br>12101 AIRPORT WAY<br>SUITE 300<br>BROOMFIELD, CO 80021 | Master Purchase Agreement for Technical Deliverables and Related Services | Provides the terms under which Deliverables and related Services (revenue assurance software and related services) will be provided to Customer and Affiliates, as described in a statement of work. | 7/27/2012 | $0.00 | | NII Holdings, Inc. |
| SUNGARD TREASURY SYSTEMS INC. | ATTN:  LEGAL<br>340 MADISON AVENUE<br>FLOORS 6,7,8<br>NEW YORK, NY 10173 | License and Service Agreement | Provides the terms under which Deliverables and related Services (Treasury systems and services) will be provided to Customer and Affiliates, as described in a statement of work. | 6/30/2005 | $0.00 | | NII Holdings, Inc. |
| SUPERIOR COMMUNICATIONS, INC. | ATTN: MARK VEALS<br>5027 IRWINDALE AVE.<br>SUITE 900<br>IRWINDALE, CA 91706 | Master Purchase Agreement for Subscriber Products and Related Services | Master agreement for device accessories to which NII Affiliates can become a party. | 12/28/2012 | $27,262.44 | 91 | NII Holdings, Inc. |
| TATA AMERICA INTERNATIONAL CORPORATION | ATTN:  SVP AND GENERAL COUNSEL<br>101 PARK AVE<br>26TH FLOOR<br>NEW YORK, NY 10178 | Master Supply and Technical Services Agreement | Provides the terms and conditions for providing the consulting and technical services and created the Deliverables specified in statements of work. | 5/31/2010 | $557,670.77 | 115, 119, & 198 | NII Holdings, Inc. |
| TEKsystems, Inc. | 7437 Race Road<br>Hanover, MD 21076 | Consulting Services Agreement | Providing temporary staffing services for IT function. | 3/25/2013 | $0.00 | | NII Holdings, Inc. |
| TEKSYSTEMS, INC. | 7437 Race Road<br>Hanover, MD 21076 | Consulting Services Agreement | Providing temporary staffing services for IT function. | 3/25/2013 | $0.00 | | NII Holdings, Inc. |
| TELEFONICA INTERNATIONAL WHOLESALE SERVICES USA, INC. | ATTN:  PRESIDENT<br>1111 BRICKELL AVE<br>SUITE 1800<br>MIAMI, FL 33131 | Master Services Agreement | Provides terms and conditions under which Supplier will provide Internet transit services, and other services that might be ordered in the future. | 8/31/2012 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| TELEGLOBE CANADA LIMITED PARTNERSHIP | Teleglobe Canada Limited Partnership<br>1000 de La Gauchetiere Street West<br>Montreal (Quebec) H3B 4X5<br>Canada<br>Attention: Sal Bressi<br>Product Manager, Global Roaming<br>with a copy sent to:<br>Teleglobe USA Inc.<br>11495 Commerce Park Drive,<br>Reston, Virginia 20191,<br>Attn: Senior Vice President and General Counsel | THE TELEGLOBE WIRELESS GLOBAL ROAMING SERVICE | Provides the terms, covenants and conditions upon which a service enabling international roaming is to be provided by TELEGLOBE. | 4/14/2003 | $0.00 | | NII Holdings, Inc. |
| TELLABS INTERNATIONAL, INC | Tellabs International, Inc.<br>Attn: Group Manager, Services Marketing<br>One Tellabs Center<br>1451 W. Diehl Rd.<br>Naperville, IL 60563<br> & cc:<br>Tellabs International, Inc.<br>Attn: LAC Regional Counsel<br>One Tellabs Center<br>1451 W. Diehl Rd.<br>Naperville, IL 60563 | Support Services Agreement | Provides the terms and conditions under which Tellabs provides optical/transport equipment maintenance and support services for the NII long-haul network. | 1/1/2002 | $0.00 | | NII Holdings, Inc. |
| THE KANE COMPANY, t/a OFFICE SHREDDING | Office Shredding, LLC<br>6500 Kane Way<br>Suite A<br>Elkridge, MD 21075<br><br>cc to:<br>The Kane Company<br>6500 Kane Way<br>Elkridge, MD 21075 | Office Shredding Service Agreement | Office services for secure document destruction and disposal | 10/23/2014 | $777.00 | 107 | NII Holdings, Inc. |
| THE NETWORK, INC. | 333 RESEARCH COURT<br>NORCROSS, GA 30092 | Sales Order - The Network | Provides terms and conditions under which Vendor provides services and professional services associated with the employee hotline program. | 3/18/2013 | $0.00 | | NII Holdings, Inc. |
| THOMSON REUTERS (GRC) INC. | THOMSON REUTERS (GRC) INC.<br>3 Times Square<br>New York, NY, 10036 | Order Form | Terms and conditions for the provision of subscription services, content and professional services | 11/30/2014 | $0.00 | | NII Holdings, Inc. |
| Torus Insurance Company | Harborside Financial Center<br>Plaza Five, Suite 2900<br>Jersey City, NJ 07311 | D&O - 5th Excess ($10M X $50M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Torus Insurance Company | Harborside Financial Center<br>Plaza Five, Suite 2900<br>Jersey City, NJ 07311 | D&O - 9th Excess ($10M X $95M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| TOWERS WATSON DELAWARE, INC | Towers Watson<br>901 N. Glebe Road<br>Arlington, VA 22203<br>Attn: David Downer<br><br>cc to:<br>Towers Watson<br>901 N. Glebe Road<br>Arlington, VA 22203<br>Attn: Legal Department | Towers Watson's HR Technology Online Services Agreement | Online and related services agreement for HR management function. | 2/2/2015 | $0.00 | | NII Holdings, Inc. |

Contracts listed include all related amendments, schedules, exhibits, statements of work, and other ancillary documents, as each may have been amended, restated or supplemented from time to time.

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| TSI TELECOMMUNICATIONS SERVICES INC. | TSI Telecommunications Services Inc. Attn:  AVP - Sales 201 North Franklin Street, MS8G Tampa, Florida 33602 | Information and Network Products and Services Agreement | Provides terms and conditions under which Supplier will make the Products or Services described in the agreement and any related documents available to Customer. | 11/25/2002 | $0.00 | | NII Holdings, Inc. |
| | & cc::  Vice President and General Counsel | | | | | | |
| Twin City Fire Insurance Company | 277 Park Ave, 15th Fl. New York, NY 10172 | D&O - 3rd Excess ($10M X $30M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| U.S. Specialty Insurance Company of Houston | 13403 Northwest Freeway Houston, TX 77040 | Other insurance overage for employees. | Protects individuals and corporations operating around the world. | 11/5/14 - 11/5/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Unum Life Insurance Company of America | 2211 Congress Street Portland, Maine 04122 | UNUM- Long Term Care Policy (No. 586445) | Long term care insurance Policy No. 586445 | 01/01/09 | $0.00 | | NII Holdings, Inc. |
| Unum Life Insurance Company of America | 2211 Congress Street Portland, Maine 04122 | Unum Life Insurance Company of America insures the lives of NII Holdings, Inc. under the Select Group Insurance Trust Policy No. 292000 | Group life insurance policy for employees: Group Identification No. 586446 001 under the Select Group Insurance Trust Policy No. 292000 | 01/01/03 | $0.00 | | NII Holdings, Inc. |
| Unum Life Insurance Company of America | 2211 Congress Street Portland, Maine 04122 | Unum Life Insurance Company of America insures the lives of NII Holdings, Inc. under the Select Group Insurance Trust Policy No. 292000 | Group life insurance policy for employees: Group Identification No. 586439 001 under the Select Group Insurance Trust Policy No. 292000 | 01/01/03 | $0.00 | | NII Holdings, Inc. |
| Unum Life Insurance Company of America | 2211 Congress Street Portland, Maine 04122 | Unum Life Insurance Company of America Policy Number 586439 | Short Term Disability Plan provide by Unum Life Insurance Company of America under Policy Number 586439 | 01/01/03 | $0.00 | | NII Holdings, Inc. |
| UNWIRED PLANET, INC. (f/k/a OPENWAVE SYSTEMS, INC.) | Openwave Mobility, Inc. Attn: Senior Corporate Counsel 2100 Seaport Boulevard Redwood City, CA 94063 | Assignment and Assumption Agreement | Openwave Systems, Inc.  Assigns to Openwave Mobility, Inc. | 9/28/2012 | $0.00 | | NII Holdings, Inc. |
| UNWIRED PLANET, INC. (f/k/a OPENWAVE SYSTEMS, INC.) | Openwave Mobility, Inc. Attn: Senior Corporate Counsel 2100 Seaport Boulevard Redwood City, CA 94063 & Persistent Telecom Solutions, Inc. 2700 Mission College Blvd, #140-Z Santa Clara, CA 95054 | Assignment and Assumption Agreement | Openwave Systems, Inc.  Assigns to Openwave Mobility, Inc.  And Persistent Telecom Solutions, Inc. | 12/27/2012 | $0.00 | | NII Holdings, Inc. |
| USI-MIDATLANTIC, INC | Attn: Mr. Jeffery Verity 3190 Fairview Park Drive, Suite 400 Falls Church, VA 22042 | Business Associate Agreement | Insurance broker agreement | 12/18/2013 | $0.00 | | NII Holdings, Inc. |
| VERTICALNET, INC. d/b/a BRAVO SOLUTIONS, US | ATTN:  LEGAL 101 LINDENWOOD DRIVE SUITE 420 MALVERN, PA 19355 | Master Agreement for Subscription Services | Hosted sourcing management tool and related services. | 8/1/2010 | $0.00 | | NII Holdings, Inc. |
| VERINT SYSTEMS LTD. | 33 MASKIT STREET HERZLIYA  46733 ISRAEL | License and Sale Agreement | Provides the terms and conditions under which Vendor provides equipment, software and related services for the proposed solution for Lawful Interception (L1) access and delivery system, at the Front-End, and Collection at the Back-End, giving the customer the end-to-end solution to meet regulatory requirements. | 8/4/2011 | $0.00 | | NII Holdings, Inc. |

**NII Holdings, LLC**

**Schedule of Executory Contracts Anticipated to be Assumed**

| Scheduled Party Name | Notice Address(es) | Contract Title | Contract Description | Contract Date | Cure Amount | Claim No. | Debtor(s) |
|---|---|---|---|---|---|---|---|
| VMWARE INTERNATIONAL LIMITED | PARNELL HOUSE BARRACK SQUARE BALLINCOLLIG COUNTY CORK IRELAND | ELA Order | Provides the terms and conditions associated with licensing, use, maintenance and support of software across the Customer's enterprise (NII and Affiliates). | 12/30/2011 | $0.00 | | NII Holdings, Inc. |
| WEBFILINGS, LLC | 2900 UNIVERSITY BLVD AMES, IA 50010 | Master Subscription & Services Order | Order with terms and conditions for providing subscription and services a cloud-based financial reporting solution (for filings with the SEC, etc.) | 1/1/2015 | $0.00 | | NII Holdings, Inc. |
| Westchester Fire Insurance Company | PO Box 1000, 436 Walnut Street, Routing WB04H, Philadelphia, PA 19106 | Crime | Employee dishonesty coverage; forgery or alteration coverage; computer fraud coverage; funds transfer fraud coverage; kidnap, ransom, or extortion coverage; money and securities coverage; and money orders and counterfeit money coverage | 10/30/13 - 10/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| Willis of New York, Inc. | One World Financial Center 200 Liberty Street, 7th Floor New York, NY 10281 | Service Agreement | Terms and conditions governing the insurance related services for the lines of coverage identified in Schedule A and any other services specified in the agreement | 1/1/2015 | $0.00 | | NII Holdings, Inc. |
| Wolters Kluwer Financial Services, Inc. | PO Box 842014 Boston, MA 02284-2014 | Teammate Software License, Maintenance and Support (Control No. 40649023) | Teammate software license, maintenance and support. | 07/01/14 | $0.00 | | NII Holdings, Inc. |
| WORKDAY, INC. | ATTN: VP LEGAL 6230 STONERIDGE MALL ROAD PLEASANTON, CA 94588 | Master Subscription Agreement | Provides terms and conditions for providing hosted subscription services for human resources and employee management application. | 7/31/2012 | $0.00 | | NII Holdings, Inc. |
| XL Insurance America, Inc. | Seaview House, 70 Seaview Avenue Stamford, CT 06902-6040 | Commercial Property | Insures against property damage to buildings and contents due to a covered loss. It may also cover business interruption. | 10/31/14 - 10/31/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| XL Specialty Insurance Company | Seaview House, 70 Seaview Avenue Stamford, CT 06902-6040 | D&O - 1st Excess ($10M X $10M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| XL Specialty Insurance Company | Seaview House, 70 Seaview Avenue Stamford, CT 06902-6040 | D&O - 8th Excess ($10M X $85M) | Covers directors and officers for claims made against them while serving on a board of directors and/or as an officer; Covers claims arising from managerial decisions that have financial consequences | 10/30/13 - 7/30/15 | $0.00 | | NII Holdings, Inc. and all subsidiary companies |
| XO COMMUNICATIONS | 13865 SUNRISE VALLEY DRIVE HERNDON, VA 20171 | Master Services Agreement | Provides terms and conditions for products and services ordered. | 1/30/2010 | $14,120.67 | S2019006646 | NII Holdings, Inc. |
| | | | **TOTAL CURE AMOUNT** | | **$2,597,634.00** | | |

# EXHIBIT H

## New NII-ATC Guaranty

# GUARANTY AND SUBORDINATION AGREEMENT

THIS GUARANTY AND SUBORDINATION AGREEMENT (this "*Guaranty*"), dated as of _____, 2015 (the "*Signing Date*"), is by NII INTERNATIONAL TELECOM S.C.A., a partnership limited by shares (*société en commandite par actions*) organized and established under the laws of the Grand Duchy of Luxembourg ("*Guarantor*"), in favor of AMERICAN TOWER DO BRASIL – CESSÃO DE INFRAESTRUTURAS LTDA., a *sociedade empresária limitada* duly incorporated under the laws of the Federative Republic of Brazil ("*ATC Brazil*"). Guarantor and ATC Brazil may hereafter be referred to as a "*Party*" and, together, as the "*Parties*."

## BACKGROUND

A.      On March 22, 2005, NEXTEL TELECOMUNICAÇÕES LTDA., a *sociedade empresária limitada* duly incorporated under the laws of the Federative Republic of Brazil ("*Nextel Brazil*"), ATC Brazil and AMERICAN TOWER CORPORATION, a corporation organized under the laws of the State of Delaware ("*ATC*"), entered into the Amended and Restated Master Use of Space Agreement (as amended, modified, supplemented and/or amended and restated from time to time, the "*Master Use Agreement*").

B.      On March 22, 2005, NII Holdings, Inc., a corporation organized under the laws of the State of Delaware ("*NII*"), and ATC Brazil entered into a Guaranty of Obligations (as amended, modified, supplemented and/or amended and restated prior to the date hereof, the "*NII Guaranty*"), pursuant to which NII guaranteed, among other things, all liabilities of Nextel Brazil and certain of its affiliates under the Master Use Agreement.

C.      On August 8, 2013, Nextel Brazil, ATC Brazil, and AMERICAN TOWER DO BRASIL II – CESSÃO DE INFRAESTRUTURAS LTDA. (formerly known as NEXTEL TORRES E EQUIPAMENTOS LTDA.), a *sociedade empresária limitada* duly incorporated under the laws of the Federative Republic of Brazil ("*Tower Entity*"), entered into the Master Purchase and Sale Agreement (as amended, modified, supplemented and/or amended and restated from time to time, the "*Purchase Agreement*"). On December 6, 2013, Nextel Brazil and Tower Entity entered into the Master Infrastructure Assignment Agreement (as amended, modified, supplemented and/or amended and restated from time to time, the "*MIAA*", and collectively with the Master Use Agreement and the Purchase Agreement, the "*Agreements*", and, each, an "*Agreement*").

D.      Guarantor, ATC Brazil and Tower Entity entered into a Guaranty and Subordination Agreement, dated December 6, 2013, as amended by that certain Amendment to the Guaranty and Subordination Agreement, dated June 26, 2014, by and between Guarantor and ATC Brazil (as amended, modified, supplemented and/or amended and restated prior to the date hereof, the "*Luxco Guaranty*"), pursuant to which Guarantor guaranteed certain payment obligations of Nextel Brazil and its Relevant Affiliates (as defined in the MIAA) under the MIAA and the Purchase Agreement.

E.      On December 30, 2013, Tower Entity was merged into ATC Brazil, and as of that date and thereafter ATC Brazil became the legal successor of Tower Entity for all legal purposes,

including, without limitation, in all rights and obligations under the Purchase Agreement, the MIAA and the Luxco Guaranty.

F.      On September 15, 2014, NII, Guarantor and seven other affiliated debtors filed voluntary petitions for relief in cases under chapter 11 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").  Their cases, together with five cases subsequently filed by other affiliated debtors, were jointly administered by the Bankruptcy Court under case number 14-12611 (SCC) (collectively, the "***Chapter 11 Cases***").  Guarantor and certain other debtors were co-proponents of the First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors dated April 20, 2015 (including all other exhibits, supplements and schedules thereto, as may be amended, modified or supplemented from time to time, the "***Plan***"), which contemplates the Parties' execution of and delivery of this Guaranty, effective as of the Effective Date (as defined in the Plan), in full and final satisfaction of any and all claims of ATC, ATC Brazil, MATC Digital S. de R.L. de C.V. and any of their respective affiliates asserted in the Chapter 11 Cases.

G.      The Guarantor and ATC Brazil wish to replace the NII Guaranty, the Luxco Guaranty and the MATC Guaranty (as defined below) to (i) guarantee the prompt and full payment of all Nextel Obligations (as defined below) up to the Guaranteed Amount (as defined below) and as further provided herein and (ii) to the limited extent described in Section 6, subordinate Guarantor's rights to payment of principal, interest and any other amounts and its titles, interests and liens, whether now existing or hereafter arising, in respect of the Subordinated Indebtedness (as defined below) to any payment to be made to the ATC Parties (as defined below) under any applicable Agreement and as further provided in such Agreement, subject to the terms and conditions set forth herein, by entering into this Guaranty.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

***SECTION 1.  Guaranty.***

(a)      Guarantor hereby guarantees, as principal obligor and not merely as a surety, for the benefit of ATC Brazil, any Relevant Affiliate (as defined in the MIAA) of ATC Brazil and any other ATC Parties (as defined in the Master Use Agreement) (each, an "***ATC Party***" and collectively, the "***ATC Parties***"), as applicable, in an aggregate amount up to Seven Hundred Thirty Two Million, Seven Hundred Twenty Six Thousand, Eight Hundred and Eleven Brazilian Reais (R$732,726,811) as adjusted from time to time in accordance with Schedule 2 attached hereto (as the same may be amended, restated, replaced or otherwise modified subject to the written approval of the ATC Parties) (the "***Guaranteed Amount***"):

(i)      the prompt and full payment by Nextel Brazil or any Relevant Affiliate of Nextel Brazil of all Fees (as defined in the MIAA), the related Tax Payments (as defined in the MIAA) and any amounts due and owing by Nextel Brazil or any such Relevant Affiliate (as defined in the MIAA) of Nextel Brazil to any ATC Party as liquidated

damages as described in <u>Section 24(h)</u> of the MIAA (collectively, the "***Nextel MIAA Obligations***");

(ii)    the prompt and full payment by Nextel Brazil of any amounts due and owing by Nextel Brazil to any ATC Party as indemnity obligations as described in <u>Section 10.1</u> of the Purchase Agreement (which indemnity obligations are subject to the following sections, among others, in the Purchase Agreement: <u>Sections 10.4</u> (*Indemnity Period*), <u>10.5</u> (*Liability Limits*) and <u>10.6</u> (*Exclusive Remedies)*) (the "***Nextel PSA Obligations***"); and

(iii)    the prompt and full payment by Nextel Brazil or any Nextel Party (as defined in the Master Use Agreement) (collectively, with the Relevant Affiliates (as defined in the MIAA)  of Nextel Brazil, the "***Nextel Parties***") of all liabilities of such Nextel Parties arising under the Master Use Agreement as amended, terminated, waived or modified (the "***Nextel 2005 Obligations***", and collectively with the Nextel MIAA Obligations and the Nextel PSA Obligations, the "***Nextel Obligations***").

(b)    If (i) any Nextel Party fails to pay any of the Nextel Obligations when due (whether at the stated maturity, by acceleration or otherwise) or when they would have become due, and (ii) Guarantor receives written notice from any ATC Party specifying in reasonable detail the nature of such failure and the amount due, then (subject to any contractual defenses under the applicable Agreement available to the relevant Nextel Party) Guarantor shall immediately pay or cause to be paid on demand to the relevant ATC Party (*i.e.*, the party to whom the payment is owed under the applicable Agreement) or such ATC Party's successors, endorsees, transferees and assigns, in Brazil, in Brazilian Reais and in accordance with written payment instructions received by Guarantor from such ATC Party, the delinquent Nextel Obligations specified in the notice, to the extent then unpaid up to the Guaranteed Amount. Upon such payment being made, and for so long as the relevant ATC Party or Parties is or are entitled to retain such payment, ATC Brazil hereby confirms and acknowledges (on behalf of itself and each other ATC Party) that such payment shall be treated in all respects and for all purposes of the applicable Agreement as though it had been received directly from the Nextel Party or Parties who was or were the primary and/or direct obligor(s) with respect to the related Nextel Obligations and shall be acknowledged to have the same effects and consequences under the applicable Agreement and applicable law, as if such payment of such Nextel Obligations had been made by such relevant Nextel Party or Parties as and when paid by Guarantor.

(c)    This Guaranty is a continuing, absolute, and unconditional guaranty of payment and performance, not of collection. Except to the extent expressly waived herein, Guarantor may assert any contractual defenses available to any Nextel Party under the applicable Agreements other than (i) any defense arising from any insolvency, bankruptcy, reorganization or similar proceeding of any Nextel Party and (ii) defenses based on lack of corporate authority of any Nextel Party or lack of authority of any person signing any Agreement on behalf of any Nextel Party. Guarantor's liability under this Guaranty will not be affected by the rejection of this Guaranty in insolvency, bankruptcy, reorganization or similar proceedings.

(d)    If at any time (including any time after this Guaranty expires or is terminated) (i) any ATC Party is required to return or restore any payment received under this Guaranty or

(ii) any payment received by any ATC Party under this Guaranty is rescinded as required by applicable law (including in connection with any insolvency, bankruptcy, reorganization or similar proceeding of any Nextel Party) then Guarantor's obligations under this Guaranty will be reinstated to the extent of any such rescinded, restored or returned funds as though such payment had never been made.

(e)     Guarantor waives (i) any right to set-off or counterclaim against any ATC Party (provided that Guarantor shall have the right to exercise any and all contractual defenses otherwise available to any Nextel Party under the applicable Agreement other than (i) any defense arising from any insolvency, bankruptcy, reorganization or similar proceeding of any Nextel Party and (ii) defenses based on lack of corporate authority of any Nextel Party or lack of authority of any person signing any Agreement on behalf of any Nextel Party), or against any Nextel Party, and any defense for changes in applicable law or any other circumstances, in each case which might constitute a legal or equitable defense or discharge of a guarantor or surety, (ii) any right to require any ATC Party to institute a proceeding first against any Nextel Party or to exhaust any security for the payment, performance or observance of any Nextel Party's obligations under this Guaranty, and notice of acceptance thereof, and (iii) diligence, presentment, demand for payment or otherwise, filing of claims, protest, and notice.   For purposes of Brazilian Law and with respect to ATC Brazil, Guarantor hereby waives all its rights under Articles 333, 364, 366, 821, 827, 830, 834, 835, 836, 837, 838 and 839 of the Brazilian Civil Code (Law No. 10.406, dated as of January 10, 2002, as amended) and Article 595 of the Brazilian Civil Procedure Code (Law No. 5.859, dated as of January 11, 1973, as amended).

### SECTION 2.  Term; Termination.

(a)     Subject to Section 2(b), Section 2(c) and Section 2(d) below, this Guaranty will be in effect as of and from the Signing Date until _____, 2020.[1]

(b)     Notwithstanding Section 2(a), this Guaranty will terminate immediately if:

(i)     at any time after _____, 2017,[2] subject to Section 2(d) below, any unsecured debt of Nextel Brazil achieves the following Brazilian credit rating from any of the following credit rating agencies: (y) Baa3 by Moody's Investors Service; or (z) BBB- by Standard & Poor's Financial Information Services; or

(ii)     at any time after _____, 2017,[3] subject to Section 2(d) below, (A) for a period of three consecutive fiscal quarters, Nextel Brazil obtains (1) a Consolidated Indebtedness (as defined in the Credit Agreement (as defined below)) to Consolidated EBITDA (as defined in the Credit Agreement) ratio of 2.5 to 1.0 or less and (2) a Consolidated EBITDA (as defined in the Credit Agreement) to Consolidated Interest Expense (as defined in the Credit Agreement) ratio of 3.0 to 1.0 or more, in each case, as tested as of the end of any fiscal quarter (each, a "*Calculation Date*") for the period of 12 months ending on such Calculation Date and (B) Nextel Brazil delivers a Termination Certificate (as defined in Section 2(e)).   "*Credit Agreement*" means the Credit

---

[1] To be the date that is 5 years from the date of the Guaranty.
[2] To be the date that is 2 years from the date of the Guaranty.
[3] To be the date that is 2 years from the date of the Guaranty.

Agreement, dated April 20, 2012, by and among Nextel Brazil, the guarantors party thereto and China Development Bank Corporation, as amended by Amendment Agreement No. 1, dated September 23, 2013 and as further amended by Amendment Agreement No. 2, dated December 5, 2014, as in effect on the date hereof; or

(iii)    subject to <u>Section 2(d)</u> below, a Change of Control of Nextel Brazil occurs, but only if a replacement guarantor that has a creditworthiness that is the same or better than the creditworthiness of Guarantor as of the Signing Date, as reasonably determined by the Parties, executes a guaranty in favor of ATC Brazil (or any successors or assigns thereof) in the same form as this Guaranty (and assuming all of Guarantor's obligations hereunder). "***Change of Control***" means, whether effected in one transaction or a series of transactions, any direct or indirect: (A) merger, stock sale, consolidation, reorganization or similar transaction of Nextel Brazil in which the holders of all classes of capital stock normally entitled to vote for the election of directors for Nextel Brazil immediately prior to such transaction, would after the consummation of the transaction own, in the aggregate, less than a majority of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors of the surviving entity, exclusive, in all cases, of any affiliate transaction, or (B) the sale by Nextel Brazil of all or substantially all of its assets, exclusive, in all cases, of any affiliate transaction; or

(iv)    the cumulative aggregate amount of all payments made by Guarantor under this Guaranty equals or exceeds the Guaranteed Amount at the time in effect (the "***Maximum Payment Termination***").

(c)    Notwithstanding the provisions of <u>Section 2(a)</u> above, but subject to <u>Section 2(d)</u> below, Guarantor may, at its sole discretion, terminate this Guaranty and replace this Guaranty with a stand-by letter of credit, issued by a United States chartered commercial bank or trust company that is a member of the New York Clearing House Association and that has a current credit rating on its debt instruments of at least A1 by Moody's Investors Service or A+ by Standard & Poor's Financial Information Services or Fitch Ratings, which letter of credit (i) shall be payable in Brazilian Reais in an amount equal to the lesser of (x) two years of the aggregate scheduled Nextel Obligations payments to be made under the Agreements (provided that such amount shall be adjusted yearly on the renewal date of such stand-by letter of credit to cover the lesser of (1) two years of the aggregate scheduled Nextel Obligations payments to be made under the Agreements from the date of such renewal and (2) the Adjusted Guaranteed Amount (as defined below, but treating all payments previously made to or for the benefit of the ATC Parties under such stand-by letter of credit (or any prior stand-by letter of credit procured hereunder) as though they were payments previously made by Guarantor to or for the benefit of such ATC Parties hereunder) and (y) the Guaranteed Amount at the time in effect, less the cumulative aggregate amount of any payments previously made by Guarantor to the ATC Parties, or to any other party to whom the ATC Parties have directed payment, hereunder (such Guaranteed Amount, as so reduced to the relevant time of determination, the "***Adjusted Guaranteed Amount***" as of such relevant time of determination), (ii) shall be for an initial term of one year and shall contain an automatic evergreen renewal provision providing for automatic renewal for subsequent one year periods for as long as this Guaranty would have been in effect under this <u>Section 2</u> if this Guaranty had not been terminated by virtue of replacement by a stand-by letter

of credit pursuant to this Section 2(c), (iii) be payable in Brazil by presentment at an office of the issuing bank located in São Paulo, Brazil, New York, New York or such other office of issuing bank as the relevant ATC Party may agree in writing or by fax presentment to the issuing bank, (iv) shall provide for at least 60 days prior written notice by the issuing bank to beneficiary of any termination or non-renewal (such notice of termination or non-renewal referred to herein as a "*Termination Notice*") and shall provide that the beneficiary thereof has an immediate right to draw upon the full amount of such letter of credit upon receipt of any notice of termination or non-renewal (and, for the avoidance of doubt, the beneficiary of such stand-by letter of credit may, at the time of such draw, apply the amount withdrawn to the Nextel Obligations then due and owing and hold the excess for application to future amounts as and when due), (v) provide for partial draws and (vi) shall otherwise be in form and substance consistent with stand-by letters of credit customarily issued in the United States of America to secure payment of third party obligations in commercial transactions and otherwise reasonably satisfactory to the ATC Parties.  Subject to the immediately following sentence, the ATC Parties may not draw on a stand-by letter of credit after receiving a Termination Notice if prior to such draw (x) such stand-by letter of credit has been replaced with a new stand-by letter of credit that meets all of the conditions set forth in clauses (i) through (vi) of the immediately preceding sentence, (y) there has occurred any event or circumstance (other than the issuance of a stand-by letter of credit) that would have resulted in the termination or expiration of this Guaranty (had it been in effect) under Section 2(a) or Section 2(b) above (such event or circumstance as described in this clause (y) is referred to herein as a "*Guaranty Termination Event*"), or (z) this Guaranty has been reinstated in the manner provided for below in this Section 2(c) or in Section 2(d).  However, if at the time of the proposed draw on the stand-by letter of credit by the appropriate ATC Parties, there is an outstanding demand for payment of any Nextel Obligations under Section 1(b) that Guarantor is required to pay but has not paid (the "*Unpaid Obligations*"), then any ATC Party may draw on the stand-by letter of credit notwithstanding the immediately preceding sentence.  Subject in all cases to the limitations set forth in Section 2(d) below, Guarantor and/or the relevant issuing bank may terminate such stand-by letter of credit when this Guaranty, had it not been terminated by reason of the issuance of such stand-by letter of credit, would have been terminated pursuant to either Section 2(a) or Section 2(b) above, and such stand-by letter of credit also shall be terminated automatically (without the need for the Guarantor or the relevant issuing bank to give any notice thereof to the ATC Parties) when the cumulative aggregate amount of the draws made on such stand-by letter of credit equal the original issuance amount thereof.  At any time that such a stand-by letter of credit is in effect, Guarantor may reinstate this Guaranty by executing and delivering to ATC Brazil (as representative of the ATC Parties) and causing Nextel Brazil to execute and deliver its acknowledgment and consent to such reinstatement agreement in form and substance reasonably satisfactory to the ATC Parties, and following such reinstatement such stand-by letter of credit may be terminated or not renewed; provided that all amounts previously paid under such replaced stand-by letter of credit (or any prior stand-by letter of credit procured hereunder) to any of the ATC Parties, or to any other party to whom the ATC Parties have directed payment, shall, for all purposes of this Guaranty as so reinstated, including this Section 2, be deemed to have been payments made by Guarantor to such ATC Parties, or to any other party to whom the ATC Parties have directed payment, hereunder.  Notwithstanding anything else to the contrary in this Section 2(c), this Guaranty will be reinstated and remain in full force and effect if at any time following the issuance of a stand-by letter of credit (including, without limitation, any renewal or replacement letter of credit) pursuant to this Section 2(c), such stand-

by letter of credit is terminated, is no longer valid or enforceable or otherwise fails to meet any of the requirements of this Section 2(c), unless the same results from a Guaranty Termination Event; provided that all amounts previously paid under such stand-by letter of credit (or any prior stand-by letter of credit procured hereunder) to any of the ATC Parties, or to any other party to whom the ATC Parties have directed payment, shall, for all purposes of this Guaranty, including this Section 2, be deemed to have been payments made by Guarantor to or for the benefit of such ATC Parties hereunder.

(d)     Notwithstanding anything contained in Sections 2(a), 2(b)(i)-(iii), or 2(c) of this Guaranty to the contrary, without the prior written consent of the ATC Parties, if there is an outstanding demand for payment of any Unpaid Obligations and the Maximum Payment Termination has not yet occurred:

(i)     and this Guaranty is outstanding, then:

(A)     Guarantor may not replace this Guaranty with a stand-by letter of credit; and

(B)     this Guaranty will remain in full force and effect with respect to the Unpaid Obligations while such Unpaid Obligations remain unpaid regardless of whether a Guaranty Termination Event (other than the Maximum Payment Termination) has occurred;

(ii)     and a stand-by letter of credit described under Section 2(c) is outstanding, then:

(A)     such stand-by letter of credit will remain in full force and effect and will not terminate and any ATC Party may draw on such stand-by letter of credit for such Unpaid Obligations regardless of whether a Guaranty Termination Event (other than the Maximum Payment Termination) has occurred; and

(B)     Guarantor may not issue a replacement stand-by letter of credit in place of such stand-by letter of credit and this Guaranty shall be automatically reinstated in full force and effect with respect to the Unpaid Obligations while such Unpaid Obligations remain unpaid.

(e)     If Guarantor seeks to terminate this Guaranty pursuant to Section 2(b)(ii) hereof, then no later than 30 days prior to the next succeeding Calculation Date, Guarantor shall, or shall cause Nextel Brazil to, deliver to ATC Brazil:

(i)     quarterly financial statements of Nextel Brazil and its Consolidated Subsidiaries (as defined in the Credit Agreement) covering the 18-month period relevant to the calculations contemplated by Section 2(b)(ii) hereof (the "***Supporting Financial Statements***");

(ii)     projections of Nextel Brazil and its Consolidated Subsidiaries (as defined in the Credit Agreement), which projections shall cover, at a minimum, the period

beginning immediately after the end of the most recently ended fiscal quarter through and including _____, 2020[4] (such projections, the "***Projections***"); and

(iii)    a certificate signed by a responsible officer of Nextel Brazil (such certificate, a "***Termination Certificate***") certifying:

(A) the Supporting Financial Statements attached thereto are complete and correct in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made after giving effect to all supplements and updates thereto, as applicable;

(B) the Projections attached thereto have been prepared in good faith based upon assumptions such responsible officer believes to be reasonable;

(C) the calculations attached thereto demonstrate compliance with the ratios set forth in Sections 2(b)(ii)(A)(1) and (2) for each of the three fiscal quarters most recently ended; and

(D) the Projections demonstrate that Nextel Brazil shall be in *pro forma* compliance with the ratios set forth in Sections 2(b)(ii)(A)(1) and (2) for the period beginning immediately after the end of the most recently ended fiscal quarter through and including _____, 2020.[5]

### SECTION 3.  Representations and Warranties.

(a)    Guarantor makes the following representations and warranties to ATC Brazil as of the Signing Date, which representations and warranties shall survive the Signing Date and continue in full force and effect or so long as this Guaranty remains in effect.

(i)    Guarantor is a partnership limited by shares organized and established under the laws of the Grand Duchy of Luxembourg, validly existing with full partnership or other power and authority to carry on in all material respects its business as it is now being conducted and to enter into and perform its obligations under this Guaranty.

(ii)    This Guaranty has been authorized by all necessary partnership action on the part of the Guarantor and has been duly executed and delivered by Guarantor.  The execution, delivery and performance of this Guaranty by Guarantor does not (i) require any approval of the partners of Guarantor or any approval or consent of any trustee or holder of any indebtedness or obligation of Guarantor, (ii) contravene any applicable law, regulation, judgment or order applicable to or binding on Guarantor, (iii) contravene Guarantor's charter or other organizational documents, or (iv) constitute a material default under any indenture, mortgage, loan agreement, lease or other agreement or

---

[4] To be the date on which the Guaranty would otherwise terminate.
[5] To be the date on which the Guaranty would otherwise terminate.

instrument to which Guarantor is a party or by which Guarantor or any of its properties is bound.

(iii)    This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with the terms hereof and subject to applicable bankruptcy laws.

(iv)    There are no conditions precedent to the effectiveness of this Guaranty that have not been satisfied or waived.

(v)    The execution, delivery and performance of this Guaranty will not result in or require the creation or imposition of any Lien (as defined in the MIAA) on any of the properties or revenues of Guarantor pursuant to any applicable law or contractual obligation of any Guarantor (other than Liens created in connection with any Agreement in favor of any ATC Party).

**SECTION 4.  Rights and Powers.**  Any ATC Party may proceed, either in its own name or otherwise, to protect and enforce any or all of its rights under this Guaranty, at law or by other appropriate proceedings.

**SECTION 5.  Modification of Guaranty.**  No modification, amendment or waiver of any provision of, or any consent required by, this Guaranty, nor any consent to any departure by Guarantor therefor, shall in any event be effective unless the same shall be in writing and signed by Guarantor, Nextel Brazil and ATC Brazil.  For the avoidance of doubt, no failure or delay on the part of the ATC Parties in exercising any right or remedy hereunder and no course of dealing between any of the parties hereto shall constitute a modification or waiver of any of the terms hereof.

**SECTION 6.  Subordination.**

(a)    Except as set forth in Section 6(b), Guarantor expressly subordinates its rights to payment on any intercompany loans or other indebtedness now or at any time hereafter owing by Nextel Brazil to Guarantor, including without limitation all loans and other indebtedness evidenced by the notes described in the attached Schedule 1 (the "**Subordinated Indebtedness**"), to the prior right of ATC Brazil to receive payment in full of the Nextel Obligations (as may be limited under Section 1(a)) which subordination shall continue in full force and effect, until the earlier of (i) payment in full of the Nextel Obligations, or (ii) the expiration or termination of this Guaranty. This provision is sufficient to establish such subordination without the execution of any other document or any other action on the part of Guarantor, Nextel Brazil or ATC Brazil. Subject to Section 6(b), Guarantor agrees not to accept any payment or satisfaction of the Subordinated Indebtedness from Nextel Brazil or any security for the Subordinated Indebtedness while both this Guaranty and the Nextel Obligations are outstanding.

(b)    Notwithstanding the provisions of Section 6(a), Guarantor may enforce or receive payment, satisfaction or security, directly or indirectly, on the Subordinated Indebtedness from Nextel Brazil (a "**6(b) Payment**") at any time when both (i) no event of default under Section 24(a) of the MIAA that gives ATC Brazil the right to terminate the MIAA, has occurred and is continuing, (ii) no event of default in respect of an indemnification obligation of Nextel Brazil

under Article 10 of the Purchase Agreement has occurred and is continuing and (iii) no event of default under Section 18.1 of the Master Use Agreement that gives ATC Brazil the right to terminate the Master Use Agreement, has occurred and is continuing (any of the defaults described in subclause (i), (ii) or (iii), a "***Blockage Event***").  If Guarantor should receive any 6(b) Payment at a time when the Blockage Event exists, then Guarantor shall promptly return the subordinated amount of the 6(b) Payment (*i.e.*, the amount of the 6(b) Payment that would have been subordinated as provided in the first sentence of Section 6(a) at the time such payment was received by Guarantor) to Nextel Brazil, in the form received, without recourse, and until so delivered, hold the same in trust for Nextel Brazil until so returned.  Any 6(b) Payment received by Guarantor when no Blockage Event exists, or to the extent such payment is in excess of the amount thereof that would have been subordinated as provided in the first sentence of Section 6(a) at the time Guarantor received it, will not be subject to reimbursement or disgorgement, even if a Blockage Event thereafter exists or if any Nextel Party then or thereafter owes amounts to any ATC Party in respect of any Nextel Obligations, as the case may be.

> **SECTION 7.  Scope.** This Guaranty constitutes the entire agreement between Guarantor and ATC Brazil with respect to the subject matter of this Guaranty and supersedes all prior agreements, both written and oral, between them with respect to the subject matter of this Guaranty.  The Parties acknowledge that under the Plan the Luxco Guaranty, the NII Guaranty and that certain Guaranty of Obligations, dated March 23, 2005 (as amended, modified, supplemented and/or amended and restated prior to the date hereof, the "***MATC Guaranty***"), by NII in favor of MATC Digital S. de R.L. de C.V. are each extinguished and of no further force or effect.  If any terms of the Agreements conflict with the terms of this Guaranty, the terms of this Guaranty will prevail. This Guaranty is binding upon and inures solely to the benefit of Guarantor and its successors and permitted assigns, and by its acceptance of this Guaranty, each of ATC Brazil and Nextel Brazil and their respective, successors and permitted assigns. Nothing in this Guaranty, express or implied, is intended to or shall confer upon any other Person (as defined in the Purchase Agreement) any right, benefit or remedy of any nature whatsoever under or by reason of this Guaranty.

> **SECTION 8. Notices.**  All notices, requests, demands, waivers and other communications, required or permitted under this Guaranty must be in writing and will be deemed to have been delivered (i) five (5) Business Days (as defined in the Purchase Agreement) after being mailed by first-class mail, postage prepaid, (ii) the next Business Day when sent overnight by a recognized courier service, or (iii) upon delivery when personally delivered to the recipient (which if other than an individual will be an officer or other responsible party of the recipient).  Refusal by a recipient to accept delivery of a notice hereunder shall constitute delivery.  All such notices and communications will be mailed, sent or delivered as set forth below or to such other Person(s) or address(es) as the person to receive any such communication or notice may have designated by written notice to the other parties listed below.

If to Guarantor, to:

> NII INTERNATIONAL TELECOM S.C.A.
> c/o Nextel International, Inc.
> 1875 Explorer Street
> Suite 800
> Reston, Virginia  20190
> Attention: General Counsel

with a copy not constituting notice to:

> NEXTEL TELECOMUNICAÇÕES LTDA.
> c/o Nextel International, Inc.
> 1875 Explorer Street
> Suite 800
> Reston, Virginia  20190
> Attention: General Counsel

If to ATC Brazil, to:

> AMERICAN TOWER DO BRASIL – CESSÃO DE
> INFRAESTRUTURAS LTDA.
> c/o American Tower Corporation
> 116 Huntington Avenue
> Boston, Massachusetts 02116
> Attention: William H. Hess

with a copy not constituting notice to:

> American Tower Corporation
> 1000 N.W. 57th Court, Suite 350
> Miami, Florida 33126
> Attention: Susanne Kandel

with a copy not constituting notice to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, New York 10004
> Attention: Avner Ben-Gera

***SECTION 9.  Governing Law; Jurisdiction; Etc.***

(a)    THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD

TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(b)     EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c)     EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY IN ANY COURT REFERRED TO IN <u>SECTION 9(b)</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 8</u>. NOTHING IN THIS GUARANTY WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

*SECTION 10. <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10</u>.*

**SECTION 11. *Severability.*** If any term, covenant, condition or provision of this Guaranty, or the application thereof to any Person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Guaranty or the application of such term, covenant, condition or provision to any other Person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by Law

**SECTION 12. *Dispute Resolution.*** The sole and exclusive method for resolving all disputes, controversies, and claims arising out of or relating to this Guaranty will be the procedures set forth in this Section 12.

(a)    The Parties shall attempt in good faith to resolve any dispute, controversy, or claim ("***Dispute***") arising out of or relating to this Guaranty promptly by negotiations between representatives of their respective senior management (the "***Executives***") who have authority to settle the Dispute. Either Party may give the other Party written notice of any Dispute not resolved in the normal course of business. Within 20 days after delivery of such a notice, Executives of the Parties involved in the Dispute who have authority to settle the Dispute shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute. If any party intends to be accompanied at a meeting by an attorney, the other involved Parties shall be given at least three Business Days' notice of such intention and may also be accompanied by an attorney. If the Dispute has not been resolved within 30 days after such notice, unless extended by the agreement of the Parties involved in the Dispute in writing (the "***Negotiation Period***"), any Party may at any time after the end of the Negotiation Period (or any time after the date that is 90 days following delivery of the relevant notice of Dispute pursuant to this Section 12(a)) initiate arbitration of the Dispute in accordance with Section 12(b) below.

(b)    Upon the expiration of the Negotiation Period with respect to a particular Dispute (and prior to the date that is 90 days following delivery of the relevant notice of Dispute pursuant to Section 12(a)), any Party seeking relief (the "***Claimant***") may serve a demand for arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, as amended and in effect from time to time (the "***ICC Rules***"). The place of arbitration pursuant hereto will be New York, New York and the language of such arbitration will be English (provided that, the award or decision of such arbitration may be translated into Portuguese if necessary for such award or decision to be enforced). Three arbitrators will be chosen for the arbitration of any Dispute hereunder; the Claimant, on the one hand, and the opposing Party, on the other hand, shall each choose one arbitrator pursuant to the applicable ICC Rules and the third arbitrator will be selected by the mutual agreement of the two arbitrators previously designated above, provided that, if the two arbitrators designated by the Parties do not reach an agreement as to their appointment of the third arbitrator within 20 days following the date the second arbitrator is appointed hereunder, then such third arbitrator will be appointed in accordance with the ICC Rules. The arbitration proceedings shall be conducted in accordance with the ICC Rules, and the laws applicable to the arbitrators' resolution of the Dispute shall be those laws governing this Guaranty as provided in Section 9. The decision of the arbitrators will be final and binding on the Parties to the maximum extent permitted under applicable law, and a final judgment may be entered on the arbitration award in any court of competent jurisdiction.

(c)      The costs and expenses of the arbitration proceeding (including reasonable attorneys' fees, arbitrators' fees and expenses) pursuant to Section 9(b), shall be borne by Claimant and the opposing Party in inverse proportion as they may prevail on matters resolved in arbitration, which proportionate allocations shall be determined by the arbitrators (and the Parties shall request the arbitrators to include such proportionate allocation of expenses in the arbitrators' written decision, to the extent that a majority of the arbitrators deciding the relevant matters in such arbitration can agree on such allocation), provided that if such arbitrators do not render a decision with respect to such costs and expenses, the costs and expenses of the arbitration panel shall be borne equally by the disputing Parties and each respective disputing Party shall otherwise bear its own costs and expenses.

(d)      Notwithstanding the preceding provisions of this Section 12, and pursuant to Section 9, each Party shall remain entitled to demand to the judiciary for (i) injunctions prior to the initiation of any arbitration proceeding, and such injunctions shall not be construed as a waiver of or to the arbitration proceedings by the Parties, and (ii) the execution of any arbitration decision, including the final arbitration award.  The Parties recognize that any injunction granted by the judiciary shall, mandatorily be promptly reviewed by the arbitral tribunal, which shall decide on its ratification, revision or cancellation.

(e)      It is the intention of the Parties that all disputes, controversies or claims of any nature between them (except as otherwise provided in Section 12(d)), whenever arising, to the extent arising out of or relating to this Guaranty, be decided by arbitration as provided in this Section 12 and that no Party be required to litigate in any other forum any such disputes, controversies, or claims.  Except as otherwise provided in Section 12(d), no action concerning or otherwise involving any such disputes, controversies, or claims shall be filed by any Party other than before an arbitration panel pursuant to this Section 12, and the Parties agree that any such action, if filed, shall be dismissed upon application and shall be referred to arbitration hereunder with costs and attorneys' fees to the prevailing Party.

### SECTION 13.  Miscellaneous.

(a)      The Parties hereto acknowledge and agree that the term "Reais" and the sign "R$" shall mean the lawful currency of Brazil and that the term "Dollars" and the sign "$" shall mean the lawful currency of the United States.

(b)      This Guaranty may be executed in counterparts (and by different Parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   Delivery of a counterpart hereof by facsimile transmission or by e-mail transmission of an Adobe portable document format file (also known as a "*PDF*" file) or similar file shall be effective as delivery of a manually executed counterpart hereof.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty and Subordination Agreement to be duly executed and delivered by an officer thereunto duly authorized as of the date and year first above written.

**NII INTERNATIONAL TELECOM S.C.A.**

By:  NII International Holdings S.à r.l., its
Sole Manager

By:_____
Name:
Title:

**Acknowledged and Consented:**

**AMERICAN TOWER DO BRASIL –
CESSÃO DE INFRAESTRUTURAS LTDA.**

By: _____

    Name:

    Title:


**NEXTEL TELECOMUNICAÇÕES LTDA.**

By: _____

    Name:

    Title:

By:_____

    Name:

    Title:

Witness:

_____

Name:_____

Taxpayer Identification No.:_____

## SCHEDULE 1
## Description of Subordinated Indebtedness

| Description | Principal Amount (USD) | Date | Expires | Rate | Borrower | Lender |
|---|---|---|---|---|---|---|
| 02-2013 | $103,193,135.28 | 6/29/06 | 12/31/21 | 6M LIBOR + 4.63% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $67,868,980.89 | 6/4/98 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $14,976,560.62 | 7/1/98 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $24,008,082.77 | 1/28/99 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $404,740.00 | 6/11/99 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $2,599,619.92 | 3/2/00 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $9,998,542.61 | 8/8/00 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 03-2013 | $21,572,089.35 | 5/21/01 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 04-2013 | $3,033,232.00 | 3/28/06 | 12/31/21 | 6M LIBOR + 1% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 05-2013 | $6,000,000.00 | 5/3/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 06-2013 | $3,000,000.00 | 5/18/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 07-2013 | $2,519,625.00 | 6/2/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 08-2013 | $2,480,375.00 | 6/2/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 09-2013 | $6,175,257.00 | 6/23/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 10-2013 | $3,600,000.00 | 7/14/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 11-2013 | $8,157,034.00 | 7/22/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 12-2013 | $143,145.00 | 8/2/06 | 12/31/21 | 6M LIBOR + 1% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 13-2013 | $5,181,701.00 | 8/13/06 | 12/31/21 | 6M LIBOR | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 14-2013 | $308,884.00 | 9/26/06 | 12/31/21 | 6M LIBOR + 1% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 15-2013 | $308,884.00 | 11/13/06 | 12/31/21 | 6M LIBOR + 1% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 16-2013 | $65,000,000.00 | 10/1/08 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 17-2013 | $28,000,000.00 | 3/27/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |

| Description | Principal Amount (USD) | Date | Expires | Rate | Borrower | Lender |
|---|---|---|---|---|---|---|
| 18-2013 | $18,058,000.00 | 4/27/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 19-2013 | $5,000,000.00 | 5/13/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 20-2013 | $7,000,000.00 | 6/26/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 21-2013 | $4,000,000.00 | 7/13/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 22-2013 | $15,000,000.00 | 7/30/09 | 12/31/21 | 4.25% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 25-2013 | $50,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 26-2013 | $50,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 27-2013 | $50,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 28-2013 | $50,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 29-2013 | $50,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 30-2013 | $25,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 31-2013 | $25,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 32-2013 | $25,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 33-2013 | $25,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 34-2013 | $10,000,000.00 | 6/10/13 | 6/10/23 | 6M LIBOR + 3% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 35-2014 | $10,000,000.00 | 3/21/14 | 6/10/23 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 36-2014 | $56,000,000.00 | 3/21/14 | 6/10/23 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 37-2014 | $135,000,000.00 | 4/30/14 | 4/30/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 38-2014 | $150,000,000.00 | 5/22/14 | 5/22/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 39-2014 | $30,000,000.00 | 5/28/14 | 5/28/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 40-2014 | $80,000,000.00 | 6/26/14 | 6/26/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |

| Description | Principal Amount (USD) | Date | Expires | Rate | Borrower | Lender |
|---|---|---|---|---|---|---|
| 41-2014 | $32,000,000.00 | 7/28/12 | 7/28/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 42-2014 | $40,000,000.00 | 8/21/14 | 8/21/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 43-2014 | $50,000,000.00 | 9/11/14 | 9/11/24 | 12M LIBOR + 1.65% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 44-2014 | $25,000,000.00 | 12/23/14 | 12/23/24 | 12M LIBOR + 3.50% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 45-2015 | $50,000,000.00 | 2/23/2015 | 2/23/25 | 12M LIBOR + 3.50% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |
| 46-2015 | $55,000,000.00 | 3/27/2015 | 3/27/25 | 12M LIBOR + 3.50% | Nextel Telecomunicações Ltda. | NII International Telecom S.C.A. |

## SCHEDULE 2
## Amortization Schedule

NII Holdings
Brazil Tower Lease Debt Balance

| Date | Balance (in Brazilian Reais) |
|------|------------------------------|
| 06/30/15 | 731,914,267 |
| 07/31/15 | 731,096,136 |
| 08/31/15 | 730,272,380 |
| 09/30/15 | 729,442,961 |
| 10/31/15 | 728,607,840 |
| 11/30/15 | 727,766,978 |
| 12/31/15 | 726,920,334 |
| 01/31/16 | 726,067,870 |
| 02/29/16 | 725,209,545 |
| 03/31/16 | 724,345,319 |
| 04/30/16 | 723,475,152 |
| 05/31/16 | 722,599,002 |
| 06/30/16 | 721,716,828 |
| 07/31/16 | 720,828,590 |
| 08/31/16 | 719,934,245 |
| 09/30/16 | 719,033,752 |
| 10/31/16 | 718,127,067 |
| 11/30/16 | 717,214,149 |
| 12/31/16 | 716,294,955 |
| 01/31/17 | 715,369,441 |
| 02/28/17 | 714,437,565 |
| 03/31/17 | 713,499,282 |
| 04/30/17 | 712,554,548 |
| 05/31/17 | 711,603,319 |
| 06/30/17 | 710,645,550 |
| 07/31/17 | 709,681,197 |
| 08/31/17 | 708,710,213 |
| 09/30/17 | 707,732,554 |
| 10/31/17 | 706,748,174 |
| 11/30/17 | 705,757,026 |
| 12/31/17 | 704,759,065 |
| 01/31/18 | 703,754,242 |
| 02/28/18 | 702,742,511 |
| 03/31/18 | 701,723,824 |
| 04/30/18 | 700,698,134 |

| Date | Balance (in Brazilian Reais) |
|---|---|
| 05/31/18 | 699,665,392 |
| 06/30/18 | 698,625,550 |
| 07/31/18 | 697,578,559 |
| 08/31/18 | 696,524,370 |
| 09/30/18 | 695,462,934 |
| 10/31/18 | 694,394,200 |
| 11/30/18 | 693,318,118 |
| 12/31/18 | 692,234,639 |
| 01/31/19 | 691,143,711 |
| 02/28/19 | 690,045,282 |
| 03/31/19 | 688,939,302 |
| 04/30/19 | 687,825,718 |

# EXHIBIT I

**Retained Causes of Action**

## Schedule of Retained Causes of Action[1]

This schedule represents the most current list of causes of action (the "Causes of Action") to be retained in connection with the Plan. The Plan Proponents expressly reserve the right to alter, modify, amend, remove, augment, or supplement this schedule at any time in accordance with the Plan.

As set forth in Article III.H.1 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX.C, Article IX.D and Article IX.E of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the applicable Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them.

The Plan Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that any Plan Debtor may hold against any Entity shall vest in Reorganized NII.

Certain Categories of Causes of Action

The categories and particular Causes of Action listed below are indicative, but are in no way exclusive, of the Causes of Action retained in connection with the Plan.

1.    Causes of Action in connection with asserting or exercising rights of setoff, counterclaim, or recoupment.

2.    Causes of Action in connection with asserting or exercising claims on contracts or for breaches of duties imposed by law or in equity.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors In Possession and the Official Committee of Unsecured Creditors.*

3.      Causes of Action in connection with Executory Contracts or Unexpired Leases, including in connection with disputes regarding cure costs.

4.      Causes of Action in connection with asserting or exercising the right to object to Claims (and Proofs of Claim) or Interests.

5.      Causes of Action in connection with asserting or exercising any and all claims and rights pursuant to sections 105 or 362 of the Bankruptcy Code.

6.      Causes of Action in connection with asserting or exercising claims or defenses, including, without limitation, fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

7.      Causes of Action in connection with asserting or exercising claims, causes of action, controversies, demands, rights, actions, Liens, indemnities, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after any Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.