LATHAM & WATKINS LLP

885 Third Avenue
New York, NY 10022
(212) 906-1200 (Telephone)
(212) 751-4864 (Facsimile)
Mitchell A. Seider
Christopher Harris
Adam J. Goldberg
Sarah B. Rogers

*Counsel to the Ad Hoc Group of NII Capital 2021 Noteholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NII Holdings, Inc., <u>et al.</u>, | Case No. 14-12611 (SCC) |
| Debtors. | (Jointly Administered) |

**REVISED OBJECTION OF THE AD HOC GROUP OF NII CAPITAL 2021
NOTEHOLDERS TO CONFIRMATION OF THE FIRST AMENDED
<u>PLAN OF REORGANIZATION</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ................................................................................................................8

I.    THE INDENTURES AND THE 2009 REALIGNMENT ............................................8

    A.    The Capco Indentures and Related Guarantees................................................8
    B.    The 2009 Realignment and the Releases of Certain Guarantees...................12
    C.    The April 2010 Exchange Offer.....................................................................15

II.   THE DEBTORS AND OTHERS HAVE CONCEDED THAT THE
    TRANSFERRED GUARANTOR CLAIMS ARE WITHOUT MERIT ...................18

    A.    The March 2014 Aurelius Letter and Transferred Guarantor Claims ..........18
    B.    The Debtors and All Parties Other than Aurelius Believe the
         Transferred Guarantor Claims Lack Merit.....................................................19

III.  THE TRANSFERRED GUARANTOR CLAIMS HAVE NO MERIT ....................22

    A.    New York Law Applies...................................................................................23
    B.    Holders of Old Notes Lack Standing to Assert the Transferred
         Guarantor Claims .............................................................................................24

IV.   THE NEGOTIATIONS PROVIDE NO SUPPORT FOR THE
    REASONABLENESS OF THE SETTLEMENT ....................................................35

    A.    The Debtors Did Not Negotiate the Terms of the Settlement of the
         Transferred Guarantor Claims But Rather Let the Creditors Decide...........35
    B.    The First and Second PSAs.............................................................................40
    C.    Classification Schemes Changed Between First PSA and Second PSA .........42
    D.    The DIP Facility .............................................................................................43
    E.    Plan Provides Aurelius With Premium and Otherwise Moves Money
         from the Other Second PSA Parties' Right Pocket to their Left Pocket ........44

V.    THE DEBTORS' EVALUATION PROVIDES NO SUPPORT FOR THE
    REASONABLENESS OF THE SETTLEMENT ....................................................46

    A.    The Debtors and the Committee Did Not Evaluate the Reasonableness
         of Settling the Transferred Guarantor Claims for $285 Million....................46
    B.    The Debtors and the Committee Did Not Consider the Argument that
         the Letters of Transmittal Deprive the Trustees and Current Note
         Holders of Standing to Assert the Transferred Guarantor Claims ...............48

i

**OBJECTION** ......................................................................................................49

**VI.    THE SETTLEMENT DOES NOT MEET THE STANDARD FOR
        APPROVAL** ............................................................................................49

    **A.**    **The Settlement Is Not "Fair and Equitable"** ....................................51
    **B.**    **The Plan Fails to Satisfy the *Iridium* Factors** ...................................52
    **C.**    **The Plan Proponents Are Not Entitled to Business Judgment
            Deference** ..........................................................................................60

**VII.    THE CLASSIFICATION SCHEME IS UNCONFIRMABLE** ..................................62

**VIII.    THE PLAN FAILS TO SATISFY CRAMDOWN REQUIREMENTS**.....................64

**CONCLUSION** .....................................................................................................69

ii

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re 499 W. Warren St. Assocs., Ltd. P'ship*,
151 B.R. 307 (Bankr. N.D.N.Y. 1992) ...............................................................62

*In re Adelphia Comms. Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................50

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) .............................................................................66

*In re AMR Corp.*,
730 F.3d 88 (2d Cir. 2013).........................................................................24, 35

*In re Arkoosh Produce, Inc.*,
No. 00-41817, 2003 WL 25273746 (Bankr. D. Ohio 2003)..............................61

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ............................................................................61, 62

*Brad H. v. City of New York*,
951 N.E.2d 743 (N.Y. 2011)..............................................................................24

*In re Brooklyn Hosp. Ctr.*,
341 B.R. 405 (Bankr. E.D.N.Y. 2006)...............................................................62

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .................................................................66

*In re Chateaugay Corp.*,
155 B.R. 625 (Bankr. S.D.N.Y. 1993) ...............................................................62

*In re Dalen*,
259 B.R. 586 (Bankr. W.D. Mich. 2001)...........................................................61

*In re Drexel Burnham Lambert Group, Inc.*,
960 F.2d 285 (2d Cir. 1992)...............................................................................53

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162 (S.D.N.Y. 2011)................................................................27

*In re Enron Corp.*,
Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. 2004) ....................50

*F.D.I.C. v. McFarland,*
  33 F.3d 532 (5th Cir. 1994) ....................................................................................25

*Gaillard v. Natomas Co.*
  208 Cal. App. 3d 1250 (Cal. Ct. App. 1989) ..........................................................62

*In re Genco Shipping & Trading Ltd.,*
  513 B.R. 233 (Bankr. S.D.N.Y. 2014)....................................................................66

*In re Global Crossing Ltd.,*
  295 B.R. 726 (Bankr. S.D.N.Y. 2003)....................................................................60

*Hanson Trust PLC v. SCM Acquisition, Inc.,*
  781 F.2d 264 (2d Cir. 1986)...................................................................................62

*In re Hilsen,*
  404 B.R. 58 (Bankr. E.D.N.Y. 2009)......................................................................59

*Jamie Secs. Co. v. The Ltd.Inc.,*
  880 F.2d 1572 (2d Cir. 1989).................................................................................24

*John Doris, Inc. v. Solomon R. Guggenheim Found.,*
  618 N.Y.S.2d 99 (N.Y. Ct. App. 1994) ..................................................................31

*In re Johns-Manville Corp.,*
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)......................................................................66

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
  424 F.3d 195 (2d Cir. 2005)...................................................................................24

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,*
  842 F. Supp. 2d 682 (S.D.N.Y. 2012)....................................................................24

*In re MF Global Inc.,*
  466 B.R. 244 (Bankr. S.D.N.Y. 2012)....................................................................50

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),*
  478 F.3d 452 (2d Cir. 2007)......................................................................... *passim*

*NML Capital v. Republic of Argentina,*
  952 N.E.2d 482 (N.Y. 2011)...................................................................................24

*In re Nutritional Sourcing Corp.*
  398 B.R. 816 (Bankr. Del. 2008) ...........................................................................57

iv

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In
    re Integrated Resources, Inc.)*,
    147 B.R. 650 (Bankr. S.D.N.Y. 1992) ................................................................60

*Oklahoma Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
    986 F. Supp. 2d 412 (S.D.N.Y. 2013) ..............................................................27

*In re Ore Cargo, Inc.*,
    544 F.2d 80 (2d Cir. 1976) ..............................................................................31

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) .............................................................................51, 53, 60

*Quadrant Structured Products Co., Ltd. v. Vertin*,
    16 N.E.3d 1165 (N.Y. 2014) ............................................................................31

*Richard T. Blake & Assocs., Inc. v. Aetna Cas. & Sur. Co.*,
    681 N.Y.S.2d 73 (N.Y. App. Div. 1998) ...........................................................25

*In re Rochem, Ltd.*,
    58 B.R. 641 (Bankr. D.N.J. 1985) ....................................................................66

*In re Rosenberg*,
    419 B.R. 532 (Bankr. E.D.N.Y. 2009) .............................................................49

*SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*,
    934 F. Supp. 2d 516 (E.D.N.Y. 2013) ..............................................................25

*Seifer, Hirshorn & Packman, Inc. v. Ins. Co. of North Am.*,
    321 N.Y.S.2d 815 (N.Y. Ct. App. 1971) ...........................................................31

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982) ...........................................................................24

*In re Soup Kitchen Int'l Inc.*,
    506 B.R. 29 (Bankr. E.D.N.Y. 2014) ...........................................................49, 50

*In re Stone Barn Manhattan LLC*,
    405 B.R. 68 (Bankr. S.D.N.Y. 2009) ................................................................58

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983) .............................................................................53

*W.W.W. Assocs., Inc. v. Giancontieri*,
    566 N.E.2d 639 (N.Y. 1990) ............................................................................24

*In re Walt Disney Co. Derivate Litig.*,
    907 A.2d 693 (Del. Ch. 2005) ..........................................................................61

v

*White v. Continental Cas. Co.*,
    848 N.Y.S.2d 603 (N.Y. 2007) ............................................................24

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) ..........................................52, 66

## STATUTES

11 U.S.C. § 105(a) ................................................................................42, 54

11 U.S.C. § 363(b) ........................................................................................42

11 U.S.C. § 1122(a) ......................................................................8, 62, 63, 65

11 U.S.C. § 1123(a)(4) ..................................................................................64

11 U.S.C. § 1129 ...........................................................................................67

11 U.S.C. § 1129(b) ..........................................................................8, 64, 65

11 U.S.C. § 1129(b)(2)(B) ............................................................................51

26 U.S.C. § 882(a) ..................................................................................10, 29

26 U.S.C. § 957 .......................................................................................10, 28

N.Y. Gen. Oblig. Law § 13-107 ...................................................................27

N.Y. Gen. Oblig. Law § 13-107(1) ..............................................................27

N.Y. Gen. Oblig. Law § 13-107(2) ..............................................................27

## RULES

Fed. R. Bankr. P. 2019 ..........................................................................9, 42, 45

Fed. R. Bankr. P. 9019 ...................................................................................49

Fed. R. Bankr. P. 9019(a) ..............................................................................49

Fed. R. Civ. P. 30(b)(6)...........................................................................43, 48

## OTHER AUTHORITIES

*Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11*, 72
    AM. BANKR. L.J. 227 (1998) ..........................................................66

MERRIAM WEBSTER DICTIONARY (3rd ed. 2002).......................................20

New York Contract Law § 10.13 (West's N.Y. Prac. Series 2006) .................................................31

NORTON BANKRUPTCY LAW AND PRACTICE 3D § 167:2 (3d ed. 2011)...........................................50

NY\7082833.9

The Ad Hoc Group of NII Capital 2021 Noteholders (the "CapCo 2021 Group") files this objection (the "Objection") to confirmation of the *First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors* [Docket No. 664, Ex. 1] (the "Plan")[1] filed by the above-captioned debtors and debtors-in-possession (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee").  In support of this Objection the CapCo 2021 Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The CapCo 2021 Group has great respect for the efforts and achievements of the Debtors in maximizing the value of their estates and improving their subsidiaries' operations during their chapter 11 cases.  The CapCo 2021 Group also has no doubt that the Debtors strove in good faith to achieve what they believe to be a consensual plan.  But in striving for that goal, they sacrificed their duty to obtain a fair and equitable plan for all creditors.

2.      This Plan presents a remarkable situation.  By their own admission, the Debtors are settling claims (the Transferred Guarantor Claims) that they currently believe to be "*without merit*".  They are settling these admittedly meritless claims for $285.1 million—more than 10 percent of the estates' value under the Plan.  The impact of this distribution is to diminish the recoveries of holders of the Capco 7.625% Notes (or the "Capco 2021 Notes") by approximately $150 million, or about 34.3 percent of their proposed distributions under the Plan.  Moreover, the Transferred Guarantor Claims would receive a vastly disproportionate share of their distributions in cash—their distributions include $143.2 million of cash (or about *50 percent in cash*), and the cash distributions for all of the Capco Notes Claims are $130.2 million (or only about *15.6*

---

[1]      Capitalized terms that are not defined herein are used with the meanings ascribed in the Plan.

*percent in cash*).  The Debtors admittedly **did not negotiate** this $285 million settlement, but rather left it to their largest creditors (Aurelius, Capital Group and later the Luxco Group) to negotiate the amount.  And the Debtors admittedly **did not evaluate** and **have no judgment** on whether $285 million (or $1 million, or $1 billion) is a reasonable number to settle these claims.

3.    The evidence uncovered in the discovery to date—and it is ongoing—has been startling.  The discovery has already revealed that:

- After a careful vetting process by counsel and senior management, the Debtors stated, in deliberately worded disclosures in multiple SEC filings, that the Transferred Guarantor Claims are "without merit."[2]

- After a thorough investigation and analysis by counsel, the Debtors continue to believe **today** that the Transferred Guarantor Claims are without merit.[3]

- The Debtors continue to believe today that all of the Capco Notes should be treated *pari passu*—i.e., all guaranteed by the same entities.[4]

- One reason for this belief is that the Debtors drafted the Capco Indentures specifically to allow the 2009 Realignment (which was already contemplated) under the Capco Indentures.[5]

---

[2]    *See, e.g.,* NII Holdings, Inc., Quarterly Report, (Form 10-Q) (March 31, 2014) at 12; Revised Declaration of Adam J. Goldberg in Support of Objection to Confirmation of the Plan, dated May 18, 2015 ("Goldberg Decl."), Ex. A, Deposition Transcript of Steven Shindler, CEO of NII Holdings, Inc. ("Shindler Dep. Tr."), 80:8-81:25; Goldberg Decl., Ex. B, Deposition Transcript of Daniel Freiman, Treasurer of NII Holdings, Inc. ("Freiman Dep. Tr."), 124:5-17.

[3]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 78:22-24 ("Q: And it's still the company's belief [that the Transferred Guarantor Claims are without merit], right?  A: Yes."); Freiman Dep. Tr., Goldberg Decl., Ex. B, 118:16-119:8 ("Q: The merits of the transfer guaranty claims.  Mr. Swatsler: Objection to form.  A: I may have shared my view.  I don't recall specifically.  As consistent with what we disclosed at the time, we didn't believe the claims, in general, had merit.  Q: And was that your personal view as well? A: It was.  Q: And is that still your personal view? A: It is.  Q: And is that still the company's view?  A: Yes.").

[4]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 88:21-24 ("Q: And it is the company's belief that the three classes of Capco notes should receive pari passu treatment, right?  A: Yes."); Freiman Dep. Tr., Goldberg Decl., Ex. B, 130:19-22 ("Q: And it's still the company's belief that the [2021] notes are guaranteed by the same entities as the 2016 and '19 notes?  A: Yes.").

[5]    Freiman Dep. Tr., Goldberg Decl., Ex. B, 162:24-163:14 ("A: I was aware at the time of the indenture that we were planning to make certain changes to our organizational structure; and it was important to us, when we drafted the indenture, that we had the flexibility to do so.  Q: And did the changes that were planned include the 2009 transfers?  A: Yes.  Q: So the debtors drafted the indenture intending to ensure that the 2009 transfers complied with the indenture?  Mr. Swatsler: Objection to the form.  A: Yes.").

2

- The creditors understood that the Debtors were ███████████████████
████████████████████████

- The Debtors' goal was to achieve an agreement among their largest creditors, rather than any particular economic division of the value of the estates.[7]

- In over a year of negotiations, the Debtors never submitted their own proposal, but rather only provided feedback on the competing proposals circulated among Aurelius, Capital Group and the Luxco Group. The Debtors viewed their role as an "active facilitator" of the creditors' negotiations.[8]

- Despite believing that the Transferred Guarantor Claims were meritless, the Debtors left it up to the largest creditors to decide how to resolve the Transferred Guarantor Claims, and never indicated that they should or should not be resolved for any particular amount.[9]

- This deference is apparently because, as the Debtors expressed to Aurelius, Capital Group and the Luxco Group, the Debtors believed they had a conflict.[10]

---

[6] ████████████████████████████████████████████████████████████████████████

[7]     See Shindler Dep. Tr., Goldberg Decl., Ex. A, 91:23-92:12 (" Q: Is it fair to say that the debtors' goal has been be to achieve a consensual resolution among the creditors? Mr. Armstrong: Objection to the form. A: Yes. . . ."), 94:22-95:3 ("Q: Can you recall any instance where the debtors indicated that a proposal was unacceptable to the debtors because of the economic split? A: I can't recall anything specific, no.").

[8]     See Shindler Dep. Tr., Goldberg Decl., Ex. A, 93:5-14 ("Q: So the debtors' role was an active facilitator to try to get consensus among creditors? A: Yes."), 148:22-149:2 ("Q: So the debtors commented and influenced on proposals that the creditors made but did not submit their own standalone proposals? A: Correct."); Goldberg Decl., Ex. BB, Deposition Transcript of Daniel Gropper, Aurelius ("Gropper Dep. Tr."), 141:13-20 ("Q: So would you describe the debtors' role as an active facilitator of the negotiations among the creditors as to how to divide the economics? Counsel to Debtors and Aurelius: Objection to form A: The debtors were an active facilitator. . . .").

[9]     See Shindler Dep. Tr., Goldberg Decl., Ex. A, 94:21-95:14 ("Q: And I'm really just focused on the economic split for now. Can you recall any instance where the debtors indicated that a proposal was unacceptable to the debtors because of the economic split? A: I can't recall anything specific, no. Q: Or that a proposal was unacceptable based on the treatment of the transferred guarantor claims in particular? A: No. Q: Or have the debtors ever said that a particular economic split is required? A: No. Or that a particular resolution of the transferred guarantor claims was required? A: No."); Goldberg Decl., Ex. D, Deposition Transcript of Homer Parkhill, Financial Advisor to the Debtors ("Parkhill Dep. Tr."), 165:19-167:24; Goldberg Decl., Ex. E, Deposition Transcript of David Daigle, Capital Group ("Daigle Dep. Tr."), 73:5-11 (Q: Do you recall any instances where they told you the economic should be split a certain way? A: No. They very much wanted a resolution with as much creditor support as possible. How we got there, was not, it seemed to, me their primary interest."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 140:16-25 ("Q: So in the time period up until the first PSA was filed, did the debtors ever impose restrictions in terms of how the economic value should be allocated between different debtor entities of creditor groups? Counsel to Aurelius: Objection to form. A: I don't think the debtors ever imposed restrictions. . . .");

[10]    ████████████████████████████████████████████████████████████████████████

[10]    Daigle Dep. Tr., Goldberg Decl., Ex. E, 87:13-19 ("A: The company expressed a view that the board may have a conflict in adjudicating certain claims between the creditor groups. Q: And did those claims include the transferred guarantor claims? A: My belief is yes."); See Objection of the Ad Hoc Group of NII International

3

- Aurelius threatened to mire the cases in extensive litigation unless it obtained an acceptable premium through settlement of the Transferred Guarantor Claims.[11]

- The actual settlement percentage for the Transferred Guarantor Claims was simply a lever to drive value to Aurelius in exchange for its consent, and was adjusted as other economic factors were negotiated; for instance, the percentage was adjusted upwards as part of an agreement to pay the Luxco Group's legal fees.[12]

- No one advocated to give the Capco 2021 Notes part of the Transferred Guarantor Claims, even though both the Debtors and Capital Group believe the Capco 2021 Notes to be *pari passu*.[13]

- No one advocated against ████████████████████ █████████████████████████████████████ in order to reach a deal with Aurelius.

---

*Telecom Noteholders to the Debtors' Oral Motion to Establish a Governance Protocol* [Docket No. 262] (the "Luxco Objection"), at p. 4 ("[The Company] has confirmed over and over again that, because it is on both sides of the transactions underlying the Aurelius claims (*i.e.*, CapCo is on one side and LuxCo is on the other), it is conflicted and will not take a position in the inter-creditor dispute regarding those claims."); *See* ████ ████████████████████████████████████████████████████████████████

[11] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

[12]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 114:15-115:10; Shindler Dep. Tr., Goldberg Decl., Ex. A, 173:21-175:3 ("Q: Okay.  And is this indicative of the trading you mention where if one factor increased, another factor would decrease in negotiations?  Mr. Armstrong: Object to the form.  A: I'd say it's a typical example of the way things would go back and forth between the creditor groups.  One day they'd be focused on one issue, the next they'd be focused on a different issue.  They had an uncanny ability to, whatever the issue was, put it in those kinds of perspectives and we'll trade this and this if we adjust these factors and vice versa. . . .").

[13]    *See* Parkhill Dep. Tr., Goldberg Decl., Ex. D, 185:19-185:24 ("Q: In the course of the negotiations, do you recall anyone advocating the position that the 2021 notes should share equally in the transferred guarantor claims with the 2016 and '19 notes?  A: I don't recall."); Shindler Dep. Tr., Goldberg Decl., Ex. A, 113:19-22 ("Q: You don't recall anyone advocating that the 2021s should receive a portion of the transferred guarantor claims, in particular?  A: I don't recall that, no."); Daigle Dep. Tr., Goldberg Decl., Ex. E, 94:8-95:21; Gropper Dep. Tr., Goldberg Decl., Ex. BB, 151:15-20 ("Q: In the course of the negotiations do you recall anyone advocating that the 2021s should share in the transferred guarantor claims?  Counsel to Aurelius: Object to form.  A: I don't recall.").

[14]    *See* ██████████████████████████████ Shindler Dep. Tr., Goldberg Decl., Ex. A, 178:13-17 ("Q: Do you remember any of the negotiating parties advocating against diverting distributable cash from the 2021s to the 2016/2019s?  A: No."); Daigle Dep. Tr., Goldberg Decl., Ex. E, 117:13-24 ("Q: So some of the distributable cash was diverted from the 2021s, to the 2016s and 19s, in order to obtain Aurelius's support?  A. Correct.  Mr. Harper: Objection to form.  Q: In the negotiations at that time, was there anyone advocating that it was improper to divert cash from the – distributable cash from the 2021s?  A: No.  It – in my personal view, it was not a question of shifting value.  It was only a question of shifting form of value.").

4

- The Debtors never reached a judgment as to the reasonableness of the $285 million or 21 percent settlement of the Transferred Guarantor Claims on a standalone basis; they only evaluated the global settlement overall.[15]

- The Debtors do not have an upper or lower bound—whether 1 percent or 50 percent—for what would be a reasonable settlement of the Transferred Guarantor Claims.[16]

- There are no claims other than the Transferred Guarantor Claims that the Debtors believe to be without merit that they are paying even in part.[17]

- The Debtors have never settled another claim they believe to be without merit for hundreds of millions of dollars.[18]

- The Debtors were not aware of, and their decision to settle did not consider, the arguments asserted in the CapCo 2021 Group's Claim Objections[19] based on the Letters of Transmittal and New York statute.[20]

---

[15]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 29:17-23 ("Q: The debtors didn't reach a judgment that it was reasonable to settle the transferred guarantor claims at 21 percent as a standalone analysis? A: There was not any determination on any item on a standalone basis."); Freiman Dep. Tr., Goldberg Decl., Ex. B, 106:3-11 (Q: I'm wondering did the debtors reach a judgment that the transferred guarantor claims standing alone, that it was reasonable to settle those claims standing alone for 21 percent? Mr. Swatsler: Objection, asked and answered. A: I don't think we ever looked at that in isolation."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 161:5-24-162:19.

[16]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 45:13-17 ("Q: So the debtors do not have a specific number that was an upper or lower bound for the reasonableness of the transferred guarantor claims? A: We do not."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 201:17-24; Freiman Dep. Tr., Goldberg Decl., Ex. B, 113:7-16 ("Q: Have the debtors formed a view as to whether it would be reasonable to settle the claims at 1 percent or 21 percent as opposed to 50 percent of the transferred guarantor claims? Mr. Swatsler: Objection to the form. A: No, we didn't take a specific view on what percentage those claims should be settled at."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 143:13-16 ("Q: So the debtors did not put a cap or a floor on settlement of those claims? Counsel to Aurelius: Objection. A: Correct.").

[17]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 209:22-25 ("Q: Are you aware of any other claims that the debtors believe are without merit that the debtors have agreed to pay in part? A: No."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 263:22-264:2 ("Q: Are you aware of any claims that the debtors have characterized as meritless, that they have agreed to pay, in whole or in part? A: No.").

[18]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 210:13-20 ("Q: Okay. So do you recall any other settlements of over $100 million of value that the debtors have entered into on which they've settled a claim that they believed was without merit? Counsel to Debtors: Objection to the form. A: No, I'm not aware of any.")

[19]    *Limited Objections of the Ad Hoc Group of NII Capital 2021 Noteholders Seeking to Disallow and Expunge Certain Claims* [Docket Nos. 685, 686] (the "Claim Objections").

[20]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 71:3-8 ("Q: You don't recall any discussions with Jones Day about the letters of transmittal? . . . A: I don't recall."), 71:21-72:2 ("Q: Yeah, the debtors' decision to enter into the settlement was not based on an analysis based specifically on the letters of transmittal? Mr. Armstrong: Same objection. A: Not specifically."); Freiman Dep. Tr., Goldberg Decl., Ex. B, 157:2-7 ("Q: So I have a narrow question: Do you remember ever having heard an argument that the transmittal letters in particular caused CapCo to own the transferred guarantor claims? A: No."); 174:3-7 ("Q: Do you remember ever hearing an argument about the effect of New York General Obligation Law, Section 13-107 on the transferred guarantor claims? A: That's not

5

- At no point in the negotiations was there an discussion of defenses based on the Letters of Transmittal (defined below).[21]

- The Committee never considered the arguments asserted in the CapCo 2021 Group's Claim Objections (defined below) based on the Letters of Transmittal and New York statute.[22]

- At no point in the Committee's approval process was there ever an assessment whether the 21 percent settlement of the Transferred Guarantor Claims was independently fair.[23]

- Capital Group and the Luxco Group also believe the Transferred Guarantor Claims are without merit, and no one other than Aurelius has ever said the claims were strong.[24]

---

familiar to me."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 48:10-13 ("Q: Do you recall anyone in a meeting or conversation discussing the transmittal letters? A: No, not specifically.").

[21]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 61:15-18 ("Q: You didn't discuss the letter – the letters of transmittal that were provided in the exchange offer with the debtors, did you? A: I did not."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 51:19-22 ("Q: Do you recall anyone in a meeting or conversation discussing the transmittal letters? A: No, not specifically."); Goldberg Decl., Ex. Z, Deposition Transcript of Scott Winn, Independent Manager for Luxco ("Winn Dep. Tr."), 65:11-14 ("Q: Do you recall any of the parties in interest ever discussing an argument specific to the letters of transmittal? A: I don't recall one."); Goldberg Decl., Ex. AA, Deposition Transcript of Andrew Scruton, Financial Advisor to the Committee ("Scruton Dep. Tr."), 56:4-11 ("Q: In any of the meetings with the other constituencies [non-Committee] you discussed do you recall any discussions about the letters of transmittal specifically? A: In the meetings that I discussed at that time, I don't recall any mention of the letters of transmittal specifically."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 148:23-149:3 ("Q: So sitting here today, you don't recall a specific reference to the transmittal letters during the course of the negotiations leading up to the first PSA? A: Correct.").

[22]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 63:17-24 ("Q: Do you recall discussing the letters of transmittal with anyone? A: No.  Q: So you don't recall hearing an argument against the transferred guarantor claims based on the letters of transmittal themselves? A: I do not."); 125:18-21 ("Q: But not the letter of transmittal that we looked at? A: I don't recall the letter of transmittal being discussed."); Winn Dep. Tr., Goldberg Decl., Ex. Z, 65:11-14; Scruton Dep. Tr., Goldberg Decl., Ex. AA, 55-20-57:3 ("Q: In the course of any committee meetings do you recall any discussions about the letters of transmittal specifically? A: I don't recall any reference to the letters of transmittal. . . . Q: Do you recall Kramer Levin giving any advice on a defense to the transferred guarantor claims based specifically on the letters of transmittal. A: I don't recall.  So the answer is no."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 149:8-17 ("Q: How about in the committee meetings, do you recall any discussion of the letters of transmittal taking place in the committee meetings? . . . A: I don't recall.");

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[23]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 146:13-17 ("Q: And again, for the second PSA, there wasn't an independent assessment of whether the 21 percent allocation for the transferred guarantor claims was fair? A: Correct.").

[24]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 31:25-32:7, 36:24-37:3 ("Q: Other than the Aurelius group, do you recall any creditors expressing the view that their claims were strong? A: I don't recall."); Scruton Dep. Tr., Goldberg Decl. Ex. AA, 43:25-44:5 ("Q: So sitting here today you don't recall anyone else expressing the view that the transferred guarantor claims was strong? A: I can't recall."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 108:4-9 ("Q: And since the bankruptcy filing, other than noteholders with whom you have a common interest agreement,

6

4.      The evidence demonstrates that the Plan violates the fundamental principle of bankruptcy law that claims of equal dignity should be accorded equal treatment, and represents the other creditors' capitulation to a holdout creditor through the settlement of claims that are "without merit," according to the Debtors' repeated and certified reports to the investing public and their testimony to this date.  The Debtors chose not to be involved in negotiating how to divide the estates' value, and even more critically, never evaluated whether $285 million or 21 percent was an appropriate settlement for of the Transferred Guarantor Claims.  Instead, they accepted for the goal of consensus whatever resolution of the Transferred Guarantor Claims yielded agreement among the largest creditors.  The result has been an agreement among Aurelius, Capital Group and the Luxco Group (reflected in the Plan Support Agreement (the "Second PSA")) to concede an unwarranted premium to the holdout creditor (Aurelius) at the expense of holders of the Capco 2021 Notes, while the impact on the other parties to the Second PSA is minimal.

5.      The settlement undergirding the Plan cannot be reasonable under any evaluation because it allocates $285 million to claims—the Transferred Guarantor Claims—that are not allowable as a matter of law.  The Debtors' decision to settle the Transferred Guarantor Claims should not be accorded deference under the business judgment rule because (a) there is no judgment to defer to, as the Debtors did not reach a judgment that $285 million was a fair settlement, and (b) the Debtors failed to appraise themselves that holders of the Capco 10% Notes (the "Capco 2016 Notes") and the Capco 8.875% Notes (the "Capco 2019 Notes" and collectively with the Capco 2016 Notes, the "Capco 2016/2019 Notes") have no standing to assert the Transferred Guarantor Claims because any such claims were assigned and transferred

---

have any noteholders expressed the view that the transferred guarantor claims were strong?  A: No. . . ."); Luxco Objection, at pp. 14-16.

to Capco pursuant to the Letters of Transmittal (defined below).  Under the relevant New York statute, the Transferred Guarantor Claims are and have been Capco's property since 2010.

6.        Furthermore, the Plan's classification scheme is gerrymandered to deprive the holders of the Capco 2021 Notes of the opportunity to reject the plan, and as such amounts to a cramdown plan with respect to the Capco 2021 Notes.  The Plan should collapse under its own weight because it purports to treat the Capco 2016/2019 Notes as having additional rights to the Transferred Guarantor Claims that the Capco 2021 Notes do not possess, and yet the Plan seeks to classify claims for all of the Capco Notes together in violation of section 1122(a) of the Bankruptcy Code.  If the Capco 2016/2019 Notes and Capco 2021 Notes are to be accorded different treatment, they should be separately classified, as was the case in the Debtors' first proposed plan.  Additionally, in the Debtors' first proposed plan, when the parties to the First PSA (defined below) did not have 67 percent support of a combined class of all Capco Notes, the plan provided for separate classes of the Capco 2021 Notes and the Capco 2016/2019 Notes.  But now that the Luxco Group has joined the Second PSA and the parties thereto control 70 percent of a combined class of the Capco Notes, the Plan Proponents have changed their classification scheme to provide for a combined class of the Capco Notes and eliminate the separate class of Capco 2021 Notes, even though the underlying claims have not changed.  To remedy this gerrymandering, the Debtors should be required to modify the Plan and resolicit with proper classification.  Alternatively, the Court should apply the cramdown standards of section 1129(b) of the Bankruptcy Code and deny confirmation because the Plan unfairly discriminates against the holders of Capco 2021 Notes.

## **BACKGROUND**

## I.    **THE INDENTURES AND THE 2009 REALIGNMENT**

### A.    **The Capco Indentures and Related Guarantees**

8

7.     As of the Petition Date, the Debtors had $4.35 billion in outstanding principal amount of senior unsecured notes (the "Prepetition Notes").  The Prepetition Notes consist of three series of senior unsecured notes issued by Capco (the "Capco Notes") and two series of senior unsecured notes issued by Luxco (the "Luxco Notes").  The Capco 2016 Notes were initially issued (such notes, the "Old 2016 Notes" and together with the Old 2019 Notes, the "Old Notes") pursuant to an indenture dated as of August 18, 2009 (the "Initial Capco 2016 Notes Indenture"; and as amended and supplemented, the "Capco 2016 Notes Indenture").  The Capco 2019 Notes were initially issued (such notes, the "Old 2019 Notes") pursuant to an indenture dated as of December 15, 2009 (the "Initial Capco 2019 Notes Indenture", and together with the Initial Capco 2016 Notes Indenture, the "Initial Indentures"; and as amended and supplemented, the "Capco 2019 Notes Indenture", and together with the Capco 2016 Notes Indenture, the "Indentures").

8.     Wilmington Trust Company originally served as trustee under all of the Capco Notes. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
U.S. Bank National Association continues to serve in such capacity.  Aurelius did not control a majority of the Capco 2016 Notes and could not remove the trustee for the Capco 2016 Notes.[25] WSFS continues to serve as trustee for both the Capco 2016 Notes and the Capco 2021 Notes,

---

[25]     *See Verified Statement of the Official Committee of Unsecured Creditors of NII Holdings, Inc. et al. Pursuant to Bankruptcy Rule 2019* [Docket No. 416].

9

███████████████████████████████████████████████████████

████████████████████

9.    Payment under the Capco 2019 Notes and the Capco 2016 Notes was originally guaranteed by "each of [Capco's] First Tier Restricted Subsidiaries and each of its Domestic Restricted Subsidiaries" (the "Guarantors")[26] which consisted of eight subsidiaries serving as "Initial Guarantors" at issuance of the Old Notes.  *See* Goldberg Decl., Ex. K-1, Initial Capco 2019 Notes Indenture, § 4.18; Goldberg Decl., Ex. K-2, Initial  Capco 2016 Notes Indenture, § 4.18; *see also* Goldberg Decl., Ex. L-1, Offering Memorandum for the Capco 2019 Notes, dated December 9, 2009 (the "Capco 2019 Notes Offering Memorandum"), at p. 4; ██████████████

███████████████████████████████████████████████████████

████████████████████████████████    The Transferred Guarantors were among this group of Initial Guarantors.  NIU and McCaw were First Tier Restricted Subsidiaries, and Airfone was a Domestic Restricted Subsidiary.  *See* Capco 2019 Notes Offering Memorandum, Goldberg Decl., Ex. L-1, at p. 4; ███████████████████████████████████████

██████████████

10.    The Initial Indentures represent that the guarantees of the Initial Guarantors of the Capco 2016 Notes and the Capco 2019 Notes could be released.  The Initial Indentures, by their terms, provide for amendment and modification, including release of guarantees.  Specifically, pursuant to Section 10.05 of the Indentures, a Guarantor shall be released in the following

---

[26]    A First Tier Restricted Subsidiary is defined as each Restricted Subsidiary of NII Holdings, Inc. ("Parent"), other than Capco, which is held directly by the Parent.  Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01.

A Domestic Restricted Subsidiary is defined as "any Restricted Subsidiary of the Parent other than a Restricted Subsidiary that is (1) a "controlled foreign corporation" under Section 957 of the Internal Revenue Code (a) whose primary operating assets are located outside the United States and (b) that is not subject to tax under Section 882(a) of the Internal Revenue Code because of a trade or business within the United States or (2) a Subsidiary of an entity described in the preceding clause (1)."  Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01.

10

circumstances, in relevant part:

>(i) in connection with any sale or other disposition of all of the Capital Stock of a Subsidiary Guarantor to a Person that is not (either before or after giving effect to such transaction) a Restricted Subsidiary of the Parent, if the sale of all such Capital Stock of that Subsidiary Guarantor complies with Section 4.10 hereof;

>(ii) if the Parent properly designates any Restricted Subsidiary that is a Subsidiary Guarantor as an Unrestricted Subsidiary under this Indenture;

>(iii) upon legal or covenant defeasance or satisfaction and discharge of the Notes as permitted under this Indenture;

>(iv) other than with respect to Domestic Restricted Subsidiaries, solely in the case of a Note Guarantee created pursuant to Section 4.18(b), upon release or discharge of the Guarantee which resulted in the creation of such Note Guarantee pursuant to Section 4.18(b), except a discharge or release by or as a result of payment under such Guarantee; or

>(v) if such Subsidiary Guarantor becomes a Foreign Restricted Subsidiary by merger, consolidation or otherwise, unless such Foreign Restricted Subsidiary (i) is a First Tier Restricted Subsidiary or (ii) is required to Guarantee the Notes and be a Subsidiary Guarantor pursuant to Section 4.18(b).

Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 10.05(a); Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 10.05(a).  Here, the 2009 Realignment, described in detail below, was conducted pursuant to Section (v).  Notably, nothing in sub-section (v) requires compliance with Section 4.10, in contrast to sub-section (i), which requires compliance with Section 4.10.  In fact, the Debtors testified that they drafted the Indentures with the 2009 Realignment already in mind, specifically to ensure that the Indentures allowed the 2009 Realignment.  *See* Freiman Dep. Tr., Goldberg Decl., Ex. A, 162:24-163:14 ("A. I was aware at the time of the indenture that we were planning to make certain changes to our organizational structure; and it was important to us, when we drafted the indenture, that we had the flexibility to do so.  Q: And did the changes that were planned include the 2009 transfers? A: Yes.  Q: So the

11

debtors drafted the indenture intending to ensure that the 2009 transfers complied with the indenture?  Mr. Swatsler: Objection to the form.  A: Yes.").

11.     Capco, the Guarantors, and the respective indenture trustee are authorized to jointly amend or supplement the Indentures without consent of the noteholders for any of the following reasons, in relevant part:

> (vi) to comply with the provisions described under Section 4.18 or Article Ten[.]

Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 9.01(vi); Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 9.01(vi).

12.     Furthermore, the Capco 7.625% Indenture (as supplemented and supplemented, "Capco 2021 Notes Indenture") expressly provides that the Debtors shall extend guarantees by their subsidiaries to the Capco 2021 Notes if such subsidiaries provide guarantees other indebtedness of the NII Holdings, Capco or the other guarantors of the Capco 2021 Notes.  *See* Goldberg Decl., Ex. K-3, Capco 2021 Notes Indenture, dated March 29, 2011, § 4.18(b).

**B.     The 2009 Realignment and the Releases of Certain Guarantees**

13.     In December 2009, the Debtors undertook a series of corporate transactions (which were contemplated when they drafted the Indentures) as part of a realignment of their corporate group structure (the "2009 Realignment").  *See* Disclosure Statement Art. IV(A)(3), pp. 29-30; *see also* Goldberg Decl., Ex. M, Officers' Certificate of NII Holdings, Inc. and NII Capital Corp., dated as of March 8, 2010 (the "Officers' Certificate"), at Ex. A.  All of the outstanding equity interests in McCaw and NIU, which were originally held by the Parent, were transferred to Capco on December 21, 2009 and December 15, 2009, respectively.  Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A; s*ee* Disclosure Statement Art. IV(A)(3), pp. 29-30. The Parent received capital surplus in exchange for transferring McCaw to Capco.  Officers'

12

Certificate, Goldberg Decl., Ex. M, at Ex. A. Capco then transferred all of the outstanding equity interests in McCaw and NIU to NII Global Holdings, Inc. ("Global") on December 23, 2009, and December 19, 2009, respectively, each in exchange for one share of Global Non-Voting Common Stock. Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A; *see* Disclosure Statement Art. IV(A)(3), pp. 29-30. Finally, on December 30, 2009, Global transferred all of the outstanding equity interests of NIU and McCaw to Nextel International Holdings S.à r.l. ("NIHS"), each in exchange for one half of one share of NIHS. Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A; *see* Disclosure Statement Art. IV(A)(3), pp. 29-30. McCaw was, as of December 30, 2009, the sole member of Airfone, and therefore Airfone became an indirect wholly-owned subsidiary of NIHS upon the transfer of McCaw. Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A; *see* Disclosure Statement Art. IV(A)(3), pp. 29-30.

14.    On March 8, 2010, the Parent and Capco delivered to each of the indenture trustees the Officers' Certificate to represent, warrant and certify the facts of the 2009 Realignment and that, among other things, the 2009 Realignment complied with the Initial Indentures and therefore the Transferred Guarantors were released from their obligations as Guarantors of the Capco 2016/2019 Notes under their respective Indentures. *See* Officers' Certificate, Goldberg Decl., Ex. M, at ¶¶2, 5-7. On the same date, the Parent and Capco received an opinion of counsel that, among other things, contained an opinion that "all of the conditions precedent to the Release pursuant to Section 10.05(a)(v) of [the Indentures] have been complied with." *See* Goldberg Decl., Ex. N, Opinion of Williams Cullen, dated as of March 8, 2010 (the "Opinion of Counsel"), at part (i), p. 2.[27] The Debtors continue to believe the Officers'

---

[27]    Pursuant to Section 10.05(b) of each of the Indentures: "Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that one of the . . . requirements [of 10.05(a)] has been satisfied and the conditions to the release of a Guarantor under this Section 10.05 have been met, the Trustee

13

Certificate and Opinion of Counsel to be accurate.  *See* Freiman Dep. Tr., Goldberg Decl., Ex. A, 140:21-142:7 (Officers' Certificate), 142:12-145-2 (Opinion of Counsel).

15.    Upon receipt of the Officers' Certificate and Opinion of Counsel, Supplemental Indenture No. 1 to the Initial Capco 2019 Notes Indenture (the "Supplemental Capco 2019 Indenture") and Supplemental Indenture No. 2 to the Initial Capco 2016 Notes Indenture (the "Supplemental Capco 2016 Indenture" and together with the Supplemental Capco 2019 Indenture, the "Supplemental Indentures"), each dated as of March 8, 2010, were executed  to memorialize the release of the Transferred Guarantors under their respective Indentures.  *See* Disclosure Statement Art. IV(A)(3), p. 30.   The Supplemental Indentures were executed by Capco, the respective indenture trustees, and the Guarantors thereto (which did not include the Transferred Guarantors).  *See* Goldberg Decl., Ex. O-1, Supplemental Capco 2019 Indenture, at Signature Pages; *see* Goldberg Decl., Ex. O-2, Supplemental Capco 2016 Indenture, at Signature Pages.  Each of the Supplemental Indentures stated: "[T]he Trustee hereby evidences that, on December 30, 2009 each of the Released Guarantors was released, pursuant to Section 10.05(a)(v) of the Indenture, from its respective obligations under its respective Note Guarantee."  Supplemental Capco 2019 Indenture, Goldberg Decl., Ex. O-1, § 4; Supplemental Capco 2016 Indenture, Goldberg Decl., Ex. O-2, at § 4.   The Supplemental Indentures immediately became effective and binding on all noteholders.  *See* Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 9.04; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 9.04 ("An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.").

16.    In February 2010, the Parent filed its 2009 Annual Report, which customarily

---

shall execute any documents reasonably required in order to evidence the release of such Subsidiary Guarantor from its obligations under its Note Guarantee."

listed all of its subsidiaries in an exhibit. *See* Freiman Dep. Tr. 137:14-138:5 (reviewing Ex.

21.1 of NII Holdings, Inc., Annual Report (Form 10-K), December 31, 2009). The list of

subsidiaries also indicated the direct parent of each subsidiary. *See* Freiman Dep. Tr., Goldberg

Decl., Ex. B, 138:8-138:16. The Transferred Guarantors were not listed as first tier subsidiaries

of Capco, but rather as subsidiaries of the entities contemplated by the 2009 Realignment. *Id.*

### C.    The April 2010 Exchange Offer

17.    In April 2010, Capco announced offers to exchange all outstanding Capco 2019

Notes and Capco 2016 Notes, each which had been privately offered and were unregistered (i.e.,

the Old Notes), for new notes registered under the Securities Act of 1933 (i.e., the Current Notes)

(such offers, the "Exchange Offers"). The prospectus filed in connection with the Exchange

Offers explained that the Current Notes, like the Old Notes, would be governed by each series of

notes' respective Indenture, including any amendments or supplemental indentures. *See, e.g.*,

Goldberg Decl., Ex. P, Prospectus filed April 6, 2010 (the "Prospectus") at pp. 38, 102.

18.    The Prospectus left no doubt as to which entities would—and which entities

would not—guarantee the Current Notes. Consistent with the terms of the Indentures, the

Prospectus stated:

> **Guarantees[:]** The Exchange Notes will be fully and unconditionally
> guaranteed on a senior unsecured basis by NII Holdings and all of its
> ***current and future first tier domestic restricted subsidiaries***, other than
> NII Capital. We refer to NII Holdings and these domestic subsidiaries as
> the "guarantors." ***No foreign subsidiaries will guarantee the Exchange
> Notes unless they are first tier subsidiaries of NII Holdings***.

Prospectus, Goldberg Decl., Ex. P, at p. 18 (emphasis added). Further, the Prospectus provided

an organizational chart that denoted (with the label "Guarantor") each entity serving as a

guarantor for the Current Notes:

15



*See* Prospectus, Goldberg Decl., Ex. P, at p. 8. Both immediately prior to and immediately after

the Exchange Offers, the only Guarantors of the Old Notes were those listed in the above chart.

Notably, the Offering Memoranda for the Old Notes had similar charts, but those charts included

the Transferred Guarantors as "Guarantors" at that point in time. *See* Capco 2019 Notes

Offering Memorandum, Goldberg Decl., Ex. L-1, at p. 4; ███████████████████

█████████████████████████

19.    Lest there remain any ambiguity from the written statements and graphical

depictions provided in the Prospectus to show that only first tier domestic restricted subsidiaries

of the Parent would guarantee the Current Notes, the Prospectus invited potential purchasers of

Current Notes to contact NII Holdings's corporate secretary for current copies of the Indentures,

which by then included the Supplemental Indentures executed in March 2010. Furthermore, the

Prospectus incorporated by reference multiple reports filed with the SEC following the 2009

16

Realignment which delineated the exact assets and liabilities attributable to Parent's guarantor subsidiaries versus its non-guarantor subsidiaries.[28]   The Debtors testified that, until Aurelius raised its claims in March 2014, no investor complained about the 2009 Realignment or asserted that the guarantees remained in place.  Freiman Dep. Tr., Goldberg Decl., Ex. B, 133:10-20 ("Q: Up until the receipt of the Aurelius letter, had you heard from any investors a belief that the 2009 restructuring was improper in any way?  A: No.  Q: Up until the receipt of the Aurelius letter, had you heard from any investor that they believed that the transferred guarantors' guaranties were still in effect?  A: No.").

20.    Holders of Old Notes who wished to participate in the Exchange Offers were required to complete, sign and deliver a form Letter of Transmittal to an exchange agent by May 6, 2010.[29]   The Letters of Transmittal effected the tender of the participating noteholders' Old Notes and, together with the Prospectus, set forth the terms and conditions of the Exchange Offers.  *See* 2019 Letter of Transmittal, Goldberg Decl., Ex. Q-1, at p. 1; 2016 Letter of Transmittal, Goldberg Decl., Ex. Q-2, at p. 1; Prospectus, Goldberg Decl., Ex. P, at p. 38. Pursuant to the Letters of Transmittal, each noteholder participating in the Exchange Offers agreed to "exchange[], assign[] and transfer[] to . . . the Issuer all right, title and interest in and to" any Old Notes tendered for exchange.  2019 Letter of Transmittal, Goldberg Decl., Ex. Q-1,

---

[28]    *See, e.g.*, Prospectus, Goldberg Decl., Ex. P, at pp. 11-12; *see also*, NII Holdings, Inc., Annual Report (Form 10-K), December 31, 2014, F-42 (listing separately in a "Condensed Consolidating Balance Sheet" the assets of "Guarantor Subsidiaries" and "Non-Guarantor Subsidiaries"); NII Holdings, Inc., Annual Report (Form 10-K), December 31, 2013, F-44 (same); NII Holdings, Inc., Annual Report (Form 10-K), December 31, 2012, F-37 (same); NII Holdings, Inc., Amendment No. 1 to Annual Report (Form 10-K), December 31, 2011, F-40 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q), June 30, 2011, 17 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q), March 31, 2011, 17 (same); NII Holdings, Inc., Annual Report (Form 10-K), December 31, 2010, F-44 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q), September 30, 2010, 17 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q), June 30, 2010, 17 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q), March 31, 2010, 16 (same); NII Holdings, Inc., Current Report (Form 8-K), March 8, 2010, ex. 99.1 (same).

[29]    *See, e.g.*, Goldberg Decl., Ex. Q-1, Form Letter of Transmittal for the Capco 2019 Notes filed as Exhibit 4.8 to Registration Statement dated March 8, 2010 (the "2019 Letter of Transmittal") at p. 1; Goldberg Decl., Ex. Q-2, Form Letter of Transmittal for the Capco 2016 Notes filed as Exhibit 4.7 to Registration Statement dated March 8, 2010 (the "2016 Letter of Transmittal" and together with the 2019 Letter of Transmittal, the "Letters of Transmittal") at p. 1.

17

at p. 4; 2016 Letter of Transmittal, Goldberg Decl., Ex. Q-2, at p. 5.

21.     All of the holders of the Old Notes participated in the Exchange Offers.  *See*
Goldberg Decl. Ex. R, Stipulation by and between the Debtors, the Official Committee of
Unsecured Creditors, and the CapCo 2021 Group, dated April 22, 2015, at ¶4(a)); *see also*
Disclosure Statement Art. II(B), p. 16.  Therefore, by the time the Exchange Offers expired in
May 2010, there were no rights or interests in any Old Notes vested in any party other than
Capco.

22.     Following the completion of the Exchange Offers, the Current Notes traded on the
secondary market, and the Parent continued to file financial statements with the SEC
distinguishing assets attributable to its guarantor versus its non-guarantor subsidiaries.[30]

## II.   THE DEBTORS AND OTHERS HAVE CONCEDED THAT THE TRANSFERRED GUARANTOR CLAIMS ARE WITHOUT MERIT

### A.   The March 2014 Aurelius Letter and Transferred Guarantor Claims

23.     In early 2014, the Debtors' liquidity situation deteriorated and they contacted
certain creditors to discuss a potential restructuring of various series of notes.  *See* Declaration of
Daniel Freiman ("Freiman Decl.") [Docket No. 19], ¶¶63-64.  Shortly thereafter, on March 4,
2014, Aurelius sent a letter (the "Aurelius Letter") to the Debtors raising, among other things,
allegations that eventually became known as the Transferred Guarantor Claims that are the
subject of the proofs of claim against the Transferred Guarantors asserting the Transferred
Guarantor Claims (the "Proofs of Claims").[31]   In addition to the Transferred Guarantor Claims,
the Aurelius Letter raised allegations of various fraudulent transfer and other avoidance actions
(collectively, and together with the Transferred Guarantor Claims, the "Aurelius Claims").  The

---

[30]      *See supra* note 5.

[31]      *See* Proofs of Claims Nos. 139, 144, 157, 195, 203 and 245.

Aurelius Letter made clear that Aurelius believes that notes issued "after December 30, 2009, the date of the transfer and purported guarantee releases at issue here, [] do not appear to be eligible to raise the contractual issues described herein"—that is, the Transferred Guarantor Claims.  *See* Goldberg Decl., Ex. S, Aurelius Letter, p. 1 n.1.

24.    The Proofs of Claims allege that (a) the 2009 Realignment breached the terms of the Indentures, and (b) the remedy for such breach should be reinstatement of the guarantees of the Transferred Guarantors and claims in the full amount of the Capco 2016 Notes and the Capco 2019 Notes against each of the Transferred Guarantors.

25.    Under the Plan, the Transferred Guarantor Claims are subject to a settlement in which they are separately classified and receive distributions valued at $285.1 million, or 10.14 percent of Plan Distributable Value.  *See* Disclosure Statement Art. I(B)., p. 7; Plan Art. II(C)(6), p. 22.  This classification and distribution scheme is an integral component of the Plan and settlement pursuant to the Second PSA.  The distributions to the class of Transferred Guarantor Claims flow exclusively to holders of the Capco 2016/2019 Notes.  Plan Art. II(C)(6), p. 22.

**B.    The Debtors and All Parties Other than Aurelius Believe the Transferred Guarantor Claims Lack Merit**

26.    In securities filings throughout the course of 2014, the Parent assured its creditors and shareholders that the Transferred Guarantor Claims were "without merit."[32]  When the Debtors stated that the Transferred Guarantor Claims were "without merit", they conveyed to the market that the claims had "no merit".  *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 86:11-14 ("Q: And the company was conveying to investors that it believed these claims had no merit,

---

[32]    *See, e.g.*, NII Holdings, Inc., Quarterly Report, (Form 10-Q) (March 31, 2014) at 12 ("We believe that the allegations contained in the [Aurelius March 2014] notice are without merit"); NII Holdings, Inc., Quarterly Report, (Form 10-Q) (June 30, 2014) at 3 (same); NII Holdings, Inc., Quarterly Report, (Form 10-Q) (September 30, 2014) at 17 (same); NII Holdings, Inc., Current Report (Form 8-K) (Aug. 15, 2014) ("NII's position remains unchanged with respect to the allegations contained in the notice of default delivered on March 19, 2014, by Aurelius.").

19

right?    A: Yes"); MERRIAM WEBSTER DICTIONARY (3rd ed. 2002) ("without: not having or

including").    Those statements were made after an extensive vetting process by legal, multiple

committees, and management.  *See* Freiman Dep. Tr., Goldberg Decl., Ex. B, 118:10-121:14.

27.    Moreover, the Debtors today continue to conclude that the Transferred Guarantor

Claims lack merit:

- "Q: And do you recall that in the SEC disclosures the quarterly disclosures in 2014, the debtors have stated that they believe the transferred guarantor claims are without merit?  A: I do recall, yes. Q: And that was the company's honest belief at the time, right?  A: Yes.  Q: And it's still the company's belief, right?  A. Yes." Shindler Dep. Tr., Goldberg Decl., Ex. A, 78:13-24.

- "As consistent with what we disclosed at the time, we didn't believe the claims in general had merit.  Q: And was that your personal view as well?  A: It was.  Q: And is it still your personal view?  It is.  Q: And is that still the company's view? A: Yes."  Freiman Dep. Tr., Goldberg Decl., Ex. B, 118:21-119:8.

The Debtors continue to hold this belief after an extensive investigation into the facts and

analysis by Jones Day.  *See, e.g.,* Disclosure Statement Art. IV(A)(3), p. 30 ("In the months since

the Debtors' receipt of the Aurelius Letters, Jones Day has reviewed tens of thousands of

documents and e-mails and conducted interviews of numerous employees of the Debtors in

connection with its own analysis regarding the merits of the Potential Litigation Claims."); *see

also* Gropper Dep. Tr., Goldberg Decl. Ex. BB, 135:12-18 ("Q: If I understand right, the

debtors—your understanding was that the debtors believed there was not a conflict because the

transferred guarantor claims lacked merit for all classes?  Counsel to Aurelius: Objection  A:

Yes.").

28.    Likewise, Capital Group believes the claims lack merit:

- "Q: And is it still your view today that the transferred guarantor claims lack merit?  . . .  A: Yes." Daigle Dep. Tr., Goldberg Decl., Ex. E, 31:25-32:7.

- "Q: And have the debtors ever shared their views as to the merits of the transferred guarantor claims? . . .  A: They have.  Q: What have they shared with

20

you about their views of the merits?  A:  They likewise believe that the merits of the transfer guarantor issues were weak."  Daigle Dep. Tr., Goldberg Decl., Ex. E, 34:2-11.

- "I still believe, and have believed since March of 14, that the claims have little merit."  Daigle Dep. Tr., Goldberg Decl., Ex. E, 39:6-7.

29.    It appears that the Committee also believes the claims to be without merit.  *See, e.g.,* ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████  The testimony of the one Committee member to date (Capital Group) is that the claims are without merit.  Daigle Dep. Tr., Goldberg Decl., Ex. E, 29:24-31:24.

30.    Similarly, although the CapCo 2021 Group has not yet deposed the Independent Manager (defined below), ████████████████████████████████  In meetings with Aurelius, ██████████████████████████████  He took the positions that:

- ██████████████████████████  ████████████████

- ██████████████████████████

- ██████████████████████████████████

- ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

21



*Id.*

31.     Given that the Luxco creditors are to be paid in full and are only giving up on the

potential for post-petition interest, versus the risk of ███████████████████████████

the Independent Manager rationally concluded that it was in the Luxco estate's interest to accept

the proposal ████████████████████████████

*Id.*

## III.    THE TRANSFERRED GUARANTOR CLAIMS HAVE NO MERIT

32.     It is not surprising that the Debtors and all other parties (besides Aurelius)

concluded that the Transferred Guarantor Claims lack merit, given that (1) even if the claims

22

once had merit, they have been owned by Capco since 2010, and (2) the 2009 Realignment on its face complies with the terms of the Indentures governing release of guarantors.

33.     The Transferred Guarantor Claims essentially allege that the 2009 Realignment breached Section 10.04 of the Indentures (which incorporates Section 4.10), and as a result the guarantees were not released under Section 10.05 of the Indenture.

34.     There are at least three purely legal reasons—each of which is independently sufficient to defeat the claims—why the Transferred Guarantor Claims would be defeated if litigated.  In particular:

> i.      the Transferred Guarantor Claims were transferred to CapCo pursuant to Letters of Transmittal and therefore the Current Note holders lack standing to assert them,
>
> ii.     the Transferred Guarantor Claims are meritless in any event because Section 10.05(a)(v) does not require compliance with Sections 4.10 and Section 10.04 of the Indentures, and
>
> iii.    the 2009 Realignment complied with Sections 4.10 and 10.04 of the Indentures.

None of these arguments would require parole evidence or discovery, as they are based solely on the terms of the contract and undisputed facts.[33]

###    A.      New York Law Applies

---

[33]     To the extent a court considered parole evidence, the Debtors testified that, at the time they were drafting the Indentures, they were contemplating engaging in the 2009 Realignment, and as a result they drafted the Indentures specifically to allow the 2009 Realignment to occur.  Freiman Dep. Tr., Goldberg Decl., Ex. B, 163:9-14 ("Q: So the debtors drafted the indenture intending to ensure that the 2009 transfers complied with the indenture?  Mr. Swatsler: Objection to form.  A: Yes.").  Presumably also for this reason, the Debtors testified that they do not recall anyone raising an argument that the guarantees were still in place until the Aurelius letter.  Freiman Dep. Tr., Goldberg Decl., Ex. B, 133:10-20 ("Q: Up until the receipt of the Aurelius letter, had you heard from any investors a belief that the 2009 restructuring was improper in any way?  A: No.  Q: Up until the receipt of the Aurelius letter, had you heard from any investor that they believed that the transferred guarantors' guaranties were still in effect?  A: No.").

35.    The Indentures and Guarantees are governed by the laws of the State of New

York.  *See* Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 12.08; Initial Capco

2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 12.08.

36.    "It is a well-established rule in this Circuit that the '[i]nterpretation of indenture

provisions is a matter of basic contract law.'" *Jamie Secs. Co. v. The Ltd. Inc.*, 880 F.2d 1572,

1576 (2d Cir. 1989) (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039,

1049 (2d Cir. 1982)).  "[W]hen parties set down their agreement in a clear, complete document,

their writing should be enforced according to its terms."  *NML Capital v. Republic of Argentina*,

952 N.E.2d 482, 489 (N.Y. 2011).

37.    "A written agreement that is clear, complete and subject to only one reasonable

interpretation must be enforced according to the plain meaning of the language chosen by the

contracting parties." *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011).  A contract

is "unambiguous" if its language has a definite and precise meaning, without risk of

misconception in the meaning of the agreement itself, and where there is no reasonable basis for

a difference of opinion.  *See White v. Continental Cas. Co.,* 848 N.Y.S.2d 603 (N.Y. 2007).  If a

contract is unambiguous, extrinsic evidence outside the four corners of the document is

inadmissible.  *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) (citing *W.W.W. Assocs., Inc. v.

Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

38.    "A contract interpretation 'that has the effect of rendering at least one clause

superfluous or meaningless is not preferred and will be avoided if possible.'" *MBIA Ins. Corp. v.

Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 706 (S.D.N.Y. 2012) (quoting *LaSalle Bank

Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).

## B.    Holders of Old Notes Lack Standing to Assert the Transferred Guarantor Claims

24

      **1.**      **Holders of Current Notes Purchased Pursuant to the Indentures as They Existed on April 5, 2010—*i.e.*, After the Transferred Guarantors Had Already Been Released**

39.      As a general rule, a party who enters into or becomes a beneficiary of a pre-existing contract—whether by assumption, assignment, succession-of-interest or the purchase of securities—takes the rights and liabilities then-existing under the contract, not those which may have existed under previous or alternative versions of it.  *See, e.g.*, *F.D.I.C. v. McFarland*, 33 F.3d 532, 537 (5th Cir. 1994) (FDIC could not enforce a guaranty that had existed when a mortgage loan, later acquired by the FDIC from a failed bank, was first originated; a search of the bank's files would have revealed that the guaranty was released, notwithstanding the FDIC's claim that the release had not been properly documented.); *Richard T. Blake & Assocs., Inc. v. Aetna Cas. & Sur. Co.*, 681 N.Y.S.2d 73, 75 (N.Y. App. Div. 1998) (Assignee of security interest in a portfolio of insurance policies could not foreclose on his collateral; the policies had been modified by an agreement between the insurer and the assignor, and "it is well established that an assignee stands in the shoes of the assignor and takes the assignment subject to any pre-existing liabilities."); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516 (E.D.N.Y. 2013) (Investor who purchased shares in a commercial mortgage-backed securitization trust lacked standing to sue servicer for breach of contract, because the investor did not own shares of the trust at the time the alleged breach occurred but instead became a beneficiary of the contract two years later.).

40.      Therefore, even if holders of the Old Notes had legitimately been injured by a breach that occurred in December 2009 (which is not the case), holders of the Current Notes—all of whom acquired the Current Notes after the 2009 Realignment—would not have suffered the same injury or have standing to assert the same claims.

25

41.     Instead, these holders of Current Notes, from the date of their initial purchase, only have the rights granted to them in the Indenture and Prospectus in effect when they acquired the Current Notes.   The Indentures in April-May 2010 had been amended to include the Supplemental Indentures under which the Current Notes were not guaranteed by the Transferred Guarantors.  The Prospectus governing the Current Notes also made that explicit.  Even Aurelius acknowledges this fact:  In a footnote in the Aurelius Letter, Aurelius noted that holders of notes issued after December 30, 2009, "d[id] not appear eligible to raise the [Transferred Guarantor Claims]."  *See* Aurelius Letter, Goldberg Decl., Ex. S, at 1 n. 1.

42.     Because all of the previous Old Note holders participated in the Exchange Offer and delivered Letters of Transmittal subject to New York law, current holders of the Capco 2016/2019 Notes must either have (1) acquired their Current Notes when they tendered their Old Notes to Capco, or (2) purchased the Current Notes on the secondary market following the 2010 Exchange Offers.  While the former category of individuals may once have had standing to assert claims arising from the 2009 Realignment in their prior role as holder of Old Notes, they no longer have that role, and thus cannot bring such claims today.   The second category of individuals has never had any claim against the Transferred Guarantors.

**2.    Holders of the Old Notes Assigned Their Claims to Debtors**

43.     Moreover, even if the law were not clear enough that holders of the Current Notes took the Indentures as they existed at the time of the Exchange Offers, the delivery of Letters of Transmittal and operation of New York law also transferred any claims that existed at the time of the Exchange Offers to Capco.   When the holders of the Old Notes executed the Letters of Transmittal—a necessary condition for their participation in the Exchange Offers—they transferred to Capco "all right, title and interest in and to" the Old Notes tendered for exchange. *See* 2019 Letter of Transmittal, Goldberg Decl., Ex. Q-1, at p. 4; 2016 Letter of Transmittal,

26

Goldberg Decl., Ex. Q-2, at p. 5.

44.     New York General Obligations Law Section 13-107 provides unambiguously that,

when ownership of a bond is transferred, certain claims vested in the transferor are automatically

assigned:

> Unless expressly reserved in writing, a transfer of any bond shall
> vest in the transferee all claims or demands of the transferor,
> whether or not such claims or demands are known to exist, (a) for
> damages or rescission against the obligor on such bond, (b) for
> damages against the trustee or depositary under any indenture
> under which such bond was issued or outstanding, and (c) for
> damages against any guarantor of the obligation of such obligor,
> trustee or depositary.

N.Y. Gen. Oblig. Law § 13-107(1).  This statute expressly includes claims against a guarantor,

unknown claims, and also includes breach of contract claims.  *See, e.g., Oklahoma Police
Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 416-18 (S.D.N.Y. 2013).

The defined terms in this statute are broad, and easily encompass the notes and the parties here.[34]

45.     Because the Letters of Transmittal did not expressly reserve them, the Old Note

holders' Transferred Guarantor Claims (if there were any such claims) would therefore be vested

in Capco.  *See e.g., Oklahoma Police and Pension Ret. Sys.*, 986 F. Supp. 2d at 418 (finding that

"because the notes are 'bonds' under New York General Obligations Law § 13-107(2) . . . the

plaintiff has no cause of action for breach of contract with respect to the notes").  Thus, for

multiple reasons, the Current Note holders—who are the only noteholders that exist—cannot

assert claims regarding transactions that occurred prior to delivery of Letters of Transmittal.

---

[34]     *See, e.g.*, N.Y. Gen. Oblig. Law § 13-107(2) (defining "bond" to include "any and all shares and interests in
an issue of bonds, notes, debentures, or other evidence of indebtedness of . . . corporations, whether or not secured);
*see also, e.g., Oklahoma Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 416-18
(S.D.N.Y. 2013) (concluding that notes at issue were covered by the definition of "bonds" under N.Y. Gen. Oblig.
Law § 13-107(2) because the Court had previously found that they were "evidence of indebtedness" under § 304(a)
of the Trust Indenture Act); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 183
(S.D.N.Y. 2011) (noting that Section 13-107 is "plainly limited to claims against the obligor, the indenture trustee or
depository, or the guarantor of the obligation").

NY\7082833.9

C.    **The 2009 Realignment Complied with Section 10.05 and Therefore Released the Transferred Guarantors**

46.    Moreover, even if the Current Note holders had standing to bring the Transferred Guarantor Claims, those claims would be subject to dismissal for two independent reasons:  (1) Section 10.05(a)(v) does not require compliance with Sections 4.10 and 10.04, and (2) even if it did, the 2009 Realignment complied with Sections 4.10 and 10.04 of the Indentures.

1.    **The 2009 Realignment Complied with Section 10.05 of the Indentures**

a.    **The Claimants Do Not Deny that the Requirements of Section 10.05(a)(v)—Other than the Purported Requirement to Comply with Section 10.04—Were Satisfied**

47.    There is no dispute that the 2009 Realignment complied with the explicit language of Section 10.05.

(i)    The Requirements of Sec. 10.05(a)(v) Were Met

48.    Pursuant to Section 10.05(a)(v) of the Indentures, a Guarantor shall be released:

> if such Subsidiary Guarantor becomes a Foreign Restricted Subsidiary by merger, consolidation or otherwise, unless such Foreign Restricted Subsidiary (i) is a First Tier Restricted Subsidiary or (ii) is required to Guarantee the Notes and be a Subsidiary Guarantor pursuant to Section 4.18(b).

*See* Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 10.05(a)(v); Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 10.05(a)(v).  A Foreign Restricted Subsidiary is defined as "any Restricted Subsidiary of the Parent that is not a Domestic Restricted Subsidiary."  *See* Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01.  A Domestic Restricted Subsidiary is defined as "any Restricted Subsidiary of the Parent other than a Restricted Subsidiary that is (1) a 'controlled foreign corporation' under Section 957 of the Internal Revenue Code (a) whose primary operating assets are located outside the United States and (b)

28

that is not subject to tax under Section 882(a) of the Internal Revenue Code because of a trade or business within the United States or (2) a Subsidiary of an entity described in the preceding clause (1)." *Id.* There is no dispute that the 2009 Realignment satisfies these terms.

49.    NIHS is a Foreign Restricted Subsidiary because it complies with subclause (1) of the definition of "Domestic Restricted Subsidiary." *See* Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A.  The Transferred Guarantors became Foreign Restricted Subsidiaries pursuant to clause (2) of the definition of "Domestic Restricted Subsidiary," when they became Subsidiaries of NIHS pursuant to the 2009 Realignment. *See* Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01; *see also* Officers' Certificate, Goldberg Decl., Ex. M, at Ex. A.

50.    A First Tier Restricted Subsidiary is defined as each Restricted Subsidiary of the Parent, other than Capco, which is held directly by the Parent.  As a result of the 2009 Realignment, all of the outstanding equity interests of the Transferred Guarantors became held by NIHS and therefore not directly by the Parent.  As such, the Transferred Guarantors were no longer First Tier Restricted Subsidiaries.

51.    None of the Transferred Guarantors were required to guarantee the Capco 2016 Notes or the Capco 2019 Notes pursuant to Section 4.18(b), which relates to guarantees if the Transferred Guarantors had guaranteed other debt of the Parent.  There appears to be no dispute on this point.

(ii)    <u>The Requirements of Section 10.05(b) Were Met</u>

52.    Section 10.05(b) of each of the Indentures provides that:

> "[u]pon delivery by the Company to the Trustee of an Officers'
> Certificate and an Opinion of Counsel to the effect that one of the .
> . . requirements [of 10.05(a)] has been satisfied and the conditions
> to the release of a Guarantor under this Section 10.05 have been
> met, the Trustee shall execute any documents reasonably required

29

in order to evidence the release of such Subsidiary Guarantor from
its obligations under its Note Guarantee."

53.     On March 8, 2010, the Parent and Capco delivered to each of the respective
Indenture Trustees the Officers' Certificate certifying that the 2009 Realignment complied with
Sections 4.10, 10.04(a)(i) and 10.04(a)(ii)(B) of the Indentures, and that as a result of the 2009
Realignment, the Transferred Guarantors were released from their obligations as Guarantors
under the Indentures.  The Parent and Capco received the Opinion of Counsel that included an
opinion that "all of the conditions precedent to the Release pursuant to Section 10.05(a)(v) of
each of the Indentures have been complied with."  *See* Opinion of Counsel, Goldberg Decl., Ex.
D, at part (i), p. 2.

54.     Upon receipt of the Officers' Certificate and Opinion of Counsel, the
Supplemental Indentures were executed by Capco, the respective Indenture Trustees, and the
guarantors thereto.

### b.     Section 10.05(a)(v) Does Not Require Compliance with Sections 4.10 and 10.04

55.     Given that there is no dispute that the 2009 Realignment complied with the
explicit terms of Section 10.05(a)(v), the only question is whether there is an implicit
requirement in Section 10.05(a)(v) to also comply with sections 4.10 and 10.04.  There is not.

56.     By its terms, compliance with Section 10.05(a)(v) does not also require
compliance with Section 10.04 (and Section 4.10 which it incorporates).  In fact, Section
10.05(a)(v) does not even refer to Sections 10.04  or 4.10.  If the parties had intended to provide
for such requirements, they would have written the Indentures to state such a result.  And that is
exactly what they did.  In Section 10.05(a)(i), the parties provided that the sale or disposition
releases the guarantee only if it "complies with Section 4.10 hereof".  That phrase is notably and
intentionally absent from Section (v).  To read an implicit requirement to comply with Section

30

4.10 into Section (v) would render that explicit requirement in section (i) meaningless.  Under New York law a contract should not be interpreted to render a term meaningless, which is exactly what Aurelius's interpretation would do.

57.    Moreover, even if section (i) did not provide a dispositive contrast to section (v), it would still be inappropriate to read an implicit unwritten requirement into section (v).  Courts in this jurisdiction do not interfere with the parties' contractual obligations, as all parties are presumed to be capable of managing their own affairs, and whether their bargains are wise or unwise is not ordinarily a legitimate subject of inquiry.  *See Seifer, Hirshorn & Packman, Inc. v. Ins. Co. of North Am.*, 321 N.Y.S.2d 815 (N.Y. Ct. App. 1971).  Courts may not relieve a sophisticated contracting party from terms of a contract that it later considers disadvantageous. *John Doris, Inc. v. Solomon R. Guggenheim Found.,* 618 N.Y.S.2d 99 (N.Y. Ct. App. 1994). And holders of notes issued pursuant to an indenture are presumed to be sophisticated parties. *See Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E. 3d 1165, 1172 (N.Y. 2014) (citing Glen Banks, New York Contract Law § 10.13 (West's N.Y. Prac. Series 2006); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) (where sophisticated drafter omits a term, *expressio unius* precludes the court from implying it from the general language of the agreement)) (interpreting the no-action clause in an indenture).

58.    In addition, it is logical that section (v), unlike section (i), would not require compliance with Section 4.10.  Section 10.05 in general is largely intended to ensure that the Parent or Capco do not undertake certain corporate action that would negatively impact the position of creditors by transferring assets from inside the "system" (i.e., the Restricted Subsidiary group) to outside the "system".  It is for this reason that Section 10.05(a)(i), which concerns releasing a Guarantor by transfer of the Guarantor's equity interests to a non-Restricted

31

Subsidiary of the Parent, also requires compliance with Section 4.10. Section 4.10 provides the extra layer of protection to creditors because it requires compliance with a new set of requirements in exchange for moving assets outside the "system". However, in the case of Section 10.05(a)(v), it is reasonable that the Parent or Capco would be able to effectuate an intercompany transaction among members of its Restricted Subsidiary group without such additional safeguards because those released subsidiaries would remain Restricted Subsidiaries and subject to the express terms of the Indentures (i.e., they must continue to comply with the various covenants described in the Indentures, and are limited in their ability to take the various corporate actions limited by those covenants). Additional restrictions imposed on the Debtors in releasing Guarantors outside the "system", such as pursuant to Section 10.05(a)(i), are not necessary. This was the bargained-for agreement, and it is reasonable.

> **c.** **The 2009 Realignment "Complied with" Section 10.04 and 4.10**

59.     Even if Section 10.05(a)(v) were conditioned on compliance with Section 10.04 and therefore Section 4.10 (which it is not), the 2009 Realignment in fact "complied with" Sections 10.04 and 4.10.

60.     There is no dispute that the 2009 Realignment complies with all requirements of Section 10.04 other than Section 10.04(a)(ii)(B). That provision requires that the transactions of the 2009 Realignment "compl[y] with" Section 4.10, which concerns Asset Sales: "such sale or other disposition or consolidation or merger complies with Section 4.10 hereof." Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 10.04(a)(ii)(B); Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 10.04(a)(ii)(B). Section 4.10 is a negative covenant that by its terms restricts only Asset Sales, and forbids certain types of Asset Sales unless certain criteria are satisfied: "The Parent shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless . . . ." Initial Capco 2019 Notes Indenture, Goldberg Decl.,

Ex. K-1, § 4.10(a); Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 4.10(a).

Here, there is no dispute that the 2009 Realignment did not constitute Asset Sales because it is a

type of transaction that is expressly carved out of the definition of Asset Sale—it is neither

forbidden by 4.10 nor expressly authorized by 4.10 (to the extent a transaction can be authorized

by a negative covenant, which is not the purpose of such a provision). Thus, the issue is whether

a transaction that is not forbidden by Section 4.10, i.e. is not an Asset Sale, therefore "complies

with" in Section 4.10.

61.    There are two reasons why it is clear that "complies with" in Section 10.04 is

satisfied in connection with a transaction that is not an Asset Sale.  First, it is critical to

understand that Section 4.10 is a negative covenant: "The Parent shall not . . . consummate an

Asset Sale unless . . .".  Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 4.10;

Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 4.10.  There are thus two ways

under the plain language of Section 4.10 to comply with that section.  Either (a) avoid doing the

prohibited action (consummating an Asset Sale), or (b) consummate the narrow category of

allowed Asset Sales ("unless . . .").  For instance, if Section 4.10(a) had stopped after "Asset

Sale," there would be no dispute that avoiding an asset sale "complies with" Section 4.10.

Adding the "unless" clause merely adds another way to comply with Section 4.10, rather than

eliminates the first.

62.    In contrast, if the drafters had intended that the only transactions allowed under

Section 10.04 are transactions that meet the criteria of Section 4.10, they could have simply

limited the acceptable transactions under Section 10.04 to the defined term Asset Sales, rather

than using the broader and undefined phrase "sale or other disposition or consolidation or

merger".  They did not use the term Asset Sales, because they did not intend any such limitation.

63.     Second, in the context of the Indentures, restricting transfers to only those expressly authorized by Section 4.10—i.e., only to Asset Sales authorized by Section 4.10—would lead to illogical results.  First, the very first carve out from the Asset Sale definition pertains to "transactions that involve assets or Equity Interests having a Fair Market Value of less than $15.0 million."  Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01.  If 10.04 only allowed transfers that are Asset Sales authorized by Section 4.10, then a guarantor holding assets of less than $15.0 million could never be transferred.  Moreover, any such guarantor would be unable to be released of its guarantees under any circumstance because the sale of its assets at fair market value would always be excluded from the definition of an Asset Sale, and therefore be unable to "comply with" Section 4.10.  Such a result does not withstand the bounds of logic.

64.     Similarly, clause (7) of the Asset Sale definition carves out from the meaning of an Asset Sale any Restricted Payment that "is permitted by Section 4.07 . . . ."[35]  Initial Capco 2019 Notes Indenture, Goldberg Decl., Ex. K-1, § 1.01; Initial Capco 2016 Notes Indenture, Goldberg Decl., Ex. K-2, § 1.01.  It is not difficult to imagine a scenario whereby the Parent has sufficient Restricted Payments capacity to carry out a transaction that could involve the sale of "substantially all" of the assets of a Guarantor.  Nevertheless, such a scenario would be an impossibility under the interpretation of "complies with" on which the Transferred Guarantor Claims rely.  Such illogical results could not have been the intent of the drafters, and therefore the only interpretation of "comply with" in the context of Section 10.04 is that a transaction not be forbidden by Section 4.10.  The 2009 Realignment is a transaction that was otherwise allowed by the Indenture and was not forbidden by Section 4.10 and therefore complies with 10.04.

---

[35]     Section 4.07 is the Restricted Payments covenant that restricts the Parent's and its Restricted Subsidiaries' abilities to take certain actions which would have the effect of harming the noteholders' position.

34

65.    In *In re AMR Corp.*, the Second Circuit reaffirmed that the plain language of indentures should prevail. *See In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013). In that case, the Second Circuit disagreed with the trustee's argument that a certain provision (the "Make-Whole" provision) would be rendered "meaningless" by affording the provision its plain meaning because it would not apply to the facts at hand in that case. *See id.* at 105. The Second Circuit concluded that although in certain circumstances a provision of the indenture may not be triggered, the contract is still to be interpreted in accordance with its plain meaning to the extent the terms are unambiguous. *Id.* Similarly here, the Asset Sale provision is satisfied because the transactions involving the Transferred Guarantors are specifically carved out from being Asset Sales, and this result does not make Section 4.10 or 10.04 meaningless. Based on the express terms of the Indentures, the transactions were permitted by—and therefore complied with—Section 4.10. As in *In re AMR Corp.*, the Court should refuse to read into the Indentures terms that the parties did not draft and agree upon.

## IV.    THE NEGOTIATIONS PROVIDE NO SUPPORT FOR THE REASONABLENESS OF THE SETTLEMENT

66.    The Debtors determined that, rather than advocate for a particular result for the Transferred Guarantee Claims (and the other economic terms), they would serve as an "active facilitator" to encourage Aurelius, Capital Group and the Luxco Group to reach an agreement amongst themselves regarding the terms of a plan. While the Debtors may have had good reason to adopt this approach (and apparently were motivated by a belief that they were conflicted), the result was a deal driven by the economic incentives of those large creditors, rather than the Debtors' conclusion that the claims were without merit.

### A.    The Debtors Did Not Negotiate the Terms of the Settlement of the Transferred Guarantor Claims But Rather Let the Creditors Decide

67.    The Debtors' goal was to achieve an agreement among their largest creditors,

35

rather than any particular economic division of the value of the estates.[36]  The Debtors took this

approach apparently because, as the Debtors expressed to multiple parties and the court, the

Debtors believed they had a conflict.[37]

68.    The Debtors pressed for a settlement that would satisfy the large creditors who

were party to negotiations:



69.    The Debtors were ultimately prepared to accept whatever split of the economics

achieved creditor support. *See, e.g.*, Shindler Dep. Tr., Goldberg Decl., Ex. A, 91:23-92:12 (" Q:

Is it fair to say that the debtors' goal has been be to achieve a consensual resolution among the

creditors?  Mr. Armstrong: Objection to the form.  A: Yes. . . ."), 94:22-95:3 ("Q: Can you recall

any instance where the debtors indicated that a proposal was unacceptable to the debtors because

of the economic split?  A: I can't recall anything specific, no."); Daigle Dep. Tr., Goldberg

Decl., Ex. E, 73:5-11 ("Q: Do you recall any instances where they [the Debtors] told you the

economics should be split a certain way.  A: No.  They very much wanted a resolution with as

much creditor support as possible.  How we got there, was not, it seemed to me, their primary

---

[36]    *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 91:23-92:4, 94:22-95:3 ("Q: Fair to say that the debtor goal
has been to achieve a consensual resolution among the creditors?  Counsel to Debtors: Objection to the form.  A:
Yes. . . . Q: Can you recall any instance where the debtors indicated that a proposal was unacceptable to the debtors
because of the economic split?  A: I can't recall anything specific, no.").

[37]    *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 87:13-19 ("A: The company expressed a view that the board
may have a conflict in adjudicating certain claims between the creditor groups.  Q: And did those claims include the
transferred guarantor claims?  A: My belief is yes."); Tr. of Hrg. (Nov. 24, 2014), Goldberg Decl., Ex. V, 14:23-25
("[W]e're fiduciaries to all of the estate, so it puts the Debtors and our advisors in an awkward position.");

NY\7082833.9

interest.").

70.     The Debtors specifically allowed the creditors to determine the terms of the settlement of the Transferred Guarantor Claims.  The Debtors never indicated what a reasonable settlement would be or indicated that any number or percentage was preferred or unacceptable. *See, e.g.*, Shindler Dep. Tr., Goldberg Decl., Ex. A, 28:7-29:23 ("Q: Or that a proposal was unacceptable based on the treatment of the transferred guarantor claims in particular?  A: No.  Q: Or have the debtors ever said that a particular economic split is required?  A: No, not that I can recall specifically, no.  Q: Or that a particular resolution of the transferred guarantor claims was required?  A: No."); Daigle Dep. Tr., Goldberg Decl., Ex. E, 101:12-16 ("Q: Did the debtors express any view whether the – whether the appropriate settlement amount was 17.5 percent, 21 percent or 21 percent?  A. Absolutely not. . . ."); Parkhill Dep. Tr., Goldberg Decl. Ex. D, 202:9-15 ("Q: So you don't recall ever conveying to a creditor that a particular percentage settlement proposal for the transferred guarantor claims was unreasonably low or unreasonably high?  A: Not specific to the transferred guarantor, as I said earlier."); Gropper Dep. Tr., Goldberg Decl., Ex. BB, 140:16-25 ("Q: So in the time period up until the first PSA was filed, did the debtors ever impose restrictions in terms of how the economic value should be allocated between different debtor entities of creditor groups?  Counsel to Aurelius: Objection to form.  A: I don't think the debtors ever imposed restrictions. . . .").

71.     It appears that the Debtors exempted themselves from the economic negotiations because they concluded that they were conflicted.  The Debtors told Capital Group, ████ and the Luxco Group that they were conflicted.  Daigle Dep. Tr., Goldberg Decl., Ex. E, 87:13-19 ("A: The company expressed a view that the board may have a conflict in adjudicating certain of the claims between the creditor groups.  Q: And did those claims include the transferred

NY\7082833.9

guarantor claims?  A: My belief is yes."); ████████████████████████████████████

████████████████████████████████████████████████████ Luxco Objection, at p.

4 ("[The Company] has confirmed over and over again that, because it is on both sides of the

transactions underlying the Aurelius claims (*i.e.*, CapCo is on one side and LuxCo is on the

other), it is conflicted and will not take a position in the inter-creditor dispute regarding those

claims").  Consistent with this, the Debtors informed the Court of their conflicted position.  At

the hearing on November 24, 2014, when the Debtors announced the First PSA, they stated that

"we're fiduciaries to all of the estate, so it puts the Debtors and our advisors in an awkward

position."  Tr. of Hrg. (Nov. 24, 2014), Goldberg Decl., Ex. V, 14:23-25.

72.     The actual amount of a settlement for the Transferred Guarantor Claims that the

three large creditor groups agreed upon was merely a mechanism to provide sufficient recovery

to Aurelius overall.  Daigle Dep. Tr., Goldberg Decl., Ex. E, 89:8-13 (the settlement value for the

Transferred Guarantor Claims "was one element of a broader package that included valuation,

fraudulent conveyance, intercompany claim recharacterization, guarantees, rights offering, value

of Mexico versus value of Brazil, everything.").  As the recovery on another economic element

increased or decreased, Aurelius demanded a corresponding concession to obtain Aurelius's

desired total return.  Daigle Dep. Tr., Goldberg Decl., Ex. E, 90:21-25 ("Q: When you say it was

part of a negotiation with many different pieces, do you mean that if there was a more give on

one piece, you might have to give up on another piece?  A: Yes.").[38]  While we do not know

---

[38]


NY\7082833.9

every detail of every back and forth during the negotiations, this dynamic was particularly clear in the final stages of the negotiations, when the percentage for the Transferred Guarantor Claims was explicitly horse-traded for the payment of the Luxco Group's attorneys' fees and an increase in the distributable value percentage to the Luxco Notes. *See supra* note 38; *see also* Daigle Dep. Tr., Goldberg Decl., Ex. E, 114:15-115:10; Shindler Dep. Tr., Goldberg Decl., Ex. A, 173:21-175:3.

73.    It is also apparent that no one was advocating solely on behalf of holders of Capco 2021 Notes.  For instance, even though both the Debtors and Capital Group believed that the Capco 2021 Notes were *pari passu* with the Capco 2016/2019 Notes, no one advocated that the Capco 2021 Notes should share in the Transferred Guarantor Claims.  *See* Parkhill Dep. Tr., Goldberg Decl., Ex. D, 185:19-24 ("Q: In the course of the negotiations, do you recall anyone advocating the position that the 2021 notes should share equally in the transferred guarantor claims with the 2016 and '19 notes?  A: I don't recall."); Shindler Dep. Tr., Goldberg Decl., Ex. A, 113:19-22 ("Q: You don't recall anyone advocating that the 2021s should receive a portion of the transferred guarantor claims, in particular?  A: I don't recall that, no."); Daigle Dep. Tr., Goldberg Decl., Ex. E, 94:8-95:21; Gropper Dep. Tr., Goldberg Decl., Ex. BB, 151:15-20 ("Q: In the course of the negotiations do you recall anyone advocating that the 2021s should share in the transferred guarantor claims?  Counsel to Aurelius: Object to form.  A: I don't recall."). Likewise, when the idea was proposed (which was ultimately adopted) of ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████    *see* Shindler Dep. Tr., Goldberg Decl., Ex. A, 178:13-17 ("Q: Do you remember any of the negotiating parties advocating against diverting

NY\7082833.9

distributable cash from the 2021s to the 2016/2019s?  A: No."); Daigle Dep. Tr., Goldberg Decl., Ex. E, 117:13-24 ("Q: So some of the distributable cash was diverted from the 2021s, to the 2016s and 19s, in order to obtain Aurelius's support?  A. Correct.  Mr. Harper: Objection to form.  Q: In the negotiations at that time, was there anyone advocating that it was improper to divert cash from the – distributable cash from the 2021s?  A: No.  It – in my personal view, it was not a question of shifting value.  It was only a question of shifting form of value.").  The reason is that none of the parties negotiating the Transferred Guarantor Claims—Capital Group, Aurelius and the Luxco Group—were primarily invested in the Capco 2021 Notes.

### B.    The First and Second PSAs

74.    Negotiations between Aurelius and Capital Group ultimately led to a plan support agreement among them, the Debtors, the Committee and certain other parties, which was filed on November 24, 2014 (the "First PSA").[39]  The First PSA provided for settlement of the Transferred Guarantor Claims through distributions valued at 27.5 percent of the face amount of the Transferred Guarantor Claims asserted against each of the Transferred Guarantors.  *See* First PSA, Ex. 1 (Plan Term Sheet), pp. 3-4.  In addition to this settlement of the Transferred Guarantor Claims and the settlement of other Aurelius Claims, the First PSA provided for a $250 million rights offering to fund the Debtors' reorganization, with aggregate backstop fees of 6 percent (or $15 million) payable to Aurelius and Capital Group for their agreement to backstop a rights offering with an exercise price struck at a 40 percent discount to the "Plan Equity Value".  *Disclosure Statement for Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors* [Docket No. 323] (the "First PSA Disclosure Statement"), Art. I(A), p. 5.

---

[39]    *Notice of Filing Plan Support Agreement and Plan Term Sheet* [Docket No. 249].

NY\7082833.9

75.    The terms set forth in the First PSA would have resulted in more than double the amount of relative recoveries for the Capco 2016/2019 Notes compared to the Capco 2021 Notes.  The estimates provided in the First PSA Disclosure Statement projected the following total recovery rates:

| | |
|---|---|
| Capco 2016/2019 Notes: | 45.35% (pre-rights offering) |
| | 45.54% (post-rights offering) |
| Capco 2021 Notes: | 17.85% (pre-rights offering) |
| | 19.85% (post-rights offering) |

First PSA Disclosure Statement, Art. I(A), pp. 3-4.

76.    Notably, the Luxco Group was not a party to the First PSA, and on November 30, 2014, filed the Luxco Objection, in which it raised various objections to the terms of the First PSA.  The Luxco Group stated that the Transferred Guarantor Claims were meritless.  *Id.*, pp. 14-16 ("The problem for Aurelius—as evidenced by the plain language of the indenture itself, as well as the contemporaneous Board materials and other documents—is that their argument fails on multiple levels.").  The Luxco Group also requested the appointment of an independent manager to represent the interests of the Luxco creditors because of the absence of any fiduciary or other party advocating on behalf of Luxco creditors in the process that led to the First PSA. *Id.*, p. 2.  Following disputes between the Luxco Group and the parties to the First PSA regarding the independent manager's scope of responsibility, on December 10, 2014, the Debtors stipulated to the appointment of Scott Winn as the Luxco independent manager (the "Independent Manger") [Docket No. 292].  Notably, no independent manager or director was appointed to advocate for the interests of the Capco 2021 Note holders, even though the Debtors were no more able to advocate for the Capco 2021 Note holders against the Capco 2016/2019 Note holders as they were to advocate for Luxco Note holders against Capco Note holders.

41

77.    Prior to hearing on the First PSA Disclosure Statement, on January 26, 2015, the Debtors terminated the First PSA in connection with their entry into the Mexico Sale Transaction.  *See* Disclosure Statement Art. III(H)(3), IV(C), pp. 27, 32.

### C.    Classification Schemes Changed Between First PSA and Second PSA

78.    Under the First PSA, which the Debtors testified was vetted by counsel and constituted an appropriate classification scheme, *see* Parkhill Dep. Tr., Goldberg Decl., Ex. D, 257:16-259:4, the Capco 2021 Notes claims were placed in a class of their own, separate and apart from the Capco 2016/2019 Notes claims.  First PSA Disclosure Statement, Art I(B), p. 8. The class of Capco 2016/2019 Notes received a relatively higher distribution than the class of Capco 2021 Notes under the First PSA because the Capco 2016/2019 Notes received a distribution on account of the Transferred Guarantor Claims, from which the class of Capco 2021 Notes claims was excluded.  *See id.*  The noteholders party to the First PSA—Capital Group and Aurelius—collectively controlled approximately (i) 83.6 percent in amount of the Capco 2016/2019 Notes, but (ii) only 52 percent in amount of the Capco 2021 Notes and (ii) less than 67 percent in amount of all Capco Notes.  *See Verified Statement of the Official Committee of Unsecured Creditors of NII Holdings, Inc., et al. Pursuant to Bankruptcy Rule 2019* [Docket No. 416].  That is, there was some uncertainty whether the parties to the First PSA could cause a class of all of the Capco Notes claims to accept a plan, although they could cause a class of Capco 2016/2019 Notes to accept a plan.  Accordingly, the plan under the First PSA provided for a class of Capco 2016/2019 Notes, and a separate class of Capco 2021 Notes.

79.    Once the LuxCo Group was on board for the Second PSA, however, the Plan Proponents had over 70 percent of a combined Capco Notes class.  *See Motion of the Debtors and Debtors in Possession for an Order Pursuant to Sections 105(a) and 363(b) of the*

42

*Bankruptcy Code Authorizing Them to Enter into and Perform under a Plan Support Agreement* [Docket No. 590], ¶1.  The Plan Proponents then shifted the classification, so that all of the Capco Notes claims are classified together in Class 5.  Disclosure Statement, Art. I(V), p. 7.  In addition, the Plan provides for a completely new Class 6E for the Transferred Guarantor Claims, which benefits solely holders of the Capco 2016/2019 Notes.  *See* Disclosure Statement, Art. I(V), p. 7.

80.    The change in classification between the plans for the First PSA and Second PSA resulted in the elimination of a separate class of Capco 2021 Notes claims, for which the parties to the Second PSA do not control 67 percent in amount.[40]  The Debtors were aware that the parties to the Second PSA did not constitute 67 percent of the Capco 2021 Notes when they changed the classification scheme for the Plan.  Parkhill Dep. Tr., Goldberg Decl., Ex. D, 261:14-262:3.  Notably, the Debtors' Rule 30(b)(6) representative designated to speak on plan classification was unable to provide any explanation for the reason for the change.  Parkhill Dep. Tr., Goldberg Decl., Ex. D, 262:8-262:24.

### D.    The DIP Facility

81.    The DIP Facility was provided by Aurelius, Capital Group and the Luxco Group because the lucrative fees and original issue discount could factor into a settlement under the Second PSA, and the purpose of market testing was to protect the DIP proposal before the Court.  S*ee, e.g.,* Daigle Dep. Tr., Goldberg Decl., Ex. E, 168:18-24 ("Q: So how was the allocation decided upon?  A: The allocation was primarily decided between Aurelius and LuxCo group, and we expressed flexibility on our willingness to take a less than proportional share of the DIP if that would help facilitate an overall deal.");  ████████████████████████

---

[40]    *See* Tr. of Hrg. (March 31, 2015), Goldberg Decl., Ex. W, 54:11-16 ("Q: Okay.  Mr. Parkhill, do you know among the signatories to the current PSA what percentage of the Capco 21 notes those signatories hold?  A: I believe 60 percent, approximately.").

NY\7082833.9

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

### E.  Plan Provides Aurelius With Premium and Otherwise Moves Money from the Other Second PSA Parties' Right Pocket to their Left Pocket

82.    The settlement of the Transferred Guarantor Claims essentially takes money from the Capco 2021 Note holders and gives it to Aurelius, in a way that does not materially impact the recoveries of the other creditors (Capital Group and the LuxCo Group) who negotiated the deals and became party to the Second PSA.  The following chart shows (i) the principal amount of Prepetition Notes held by each noteholder party to the Second PSA (i.e., Capital Group, Aurelius and the Luxco Group), (ii) the approximate value of distributions on account of such claims under the Plan, (iii) the approximate value that would have been provided on account of such claims if distributions on account of the Transferred Guarantor Claims were instead distributed on account of all Capco Notes claims on a *pro rata* basis, (iv) the approximate net profit or loss to each party arising from the distributions of value on account of the Transferred Guarantor Claims under the Plan compared to a *pro rata* distribution of such value on account of all Capco Notes claims, (v) the approximate fees and original issue discount ("OID") received by each party under the DIP Facility, (vi) the approximate aggregate value of Plan distributions plus DIP fees and OID for each party, and (vii) the approximate net profit or loss to each party to arising from the aggregate of (a) distributions of value on account of the Transferred Guarantor Claims under the Plan compared to a *pro rata* distribution of such value on account of all Capco Notes claims and (b) the DIP fees and OID paid to such party.

[Remainder of page intentionally left blank.]

44

| Claims & Recoveries of Second PSA Parties (Amounts in millions) | | | |
|---|---|---|---|
| **Party** | **Capital Group** | **Aurelius** | **Luxco Group** |
| **Principal Amounts of Prepetition Notes** | • Luxco 11.375%: $332<br>• Luxco 7.875%: $250<br>• Capco 2021: $609<br>• Capco 2019: $190<br>• Capco 2016: $295<br><br>Total: $1,676[41] | • Luxco 11.375%: $10<br>• Luxco 7.875%: $26<br>• Capco 2021: $165.3<br>• Capco 2019: $246.1<br>• Capco 2016: $355.9<br><br>Total: $803.2[42] | • Luxco 11.375%: $355.2<br>• Luxco 7.875%: $203.3<br>• Capco 2021: $61.4<br>• Capco 2019: $46<br>• Capco 2016: $2<br><br>Total: $621.9 M[43] |
| **Distributions under Plan, including Settlement of Transferred Guarantor Claims** | • Luxco 11.375%: $332.8<br>• Luxco 7.875%: $250.2<br>• Capco 2021: $17.5<br>• Capco 2019: $95.2<br>• Capco 2016: $148<br><br>Total: $1,004 M | • Luxco 11.375%: $10<br>• Luxco 7.875%: $26<br>• Capco 2021: $48.2<br>• Capco 2019: $123.3<br>• Capco 2016: $178.5<br><br>Total: $386 | • Luxco 11.375%: $356<br>• Luxco 7.875%: $203.5<br>• Capco 2021: $17.9<br>• Capco 2019: $0.023<br>• Capco 2016: $1<br><br>Total: $578.5 |
| **Distributions if Value to Transferred Guarantor Claims is Shared by All Capco Notes Claims** | **$1,011** | **$336.2** | **$584.4** |
| **Profit / (Loss) from Transferred Guarantor Claim Settlement** | $(7.3)<br><br>(0.7% of distributions under Plan) | **$49.9**<br><br>12.9% of distributions under Plan | $(5.9)<br><br>(1.0% of distributions under Plan) |
| **Fees and OID from DIP Facility** | **$2.0** | **$1.4** | **$6.3** |
| **Total Value Received (Plan Distributions and DIP Fees and OID)** | **$1,005.6** | **$387.4** | **$584.7** |
| **Profit / (Loss) from Transferred Guarantor Settlement combined with DIP Fees and OID** | $(5.4)<br><br>(0.5% of distributions under Plan plus DIP fees and OID) | **$51.2**<br><br>13.2% of distributions under Plan plus DIP fees and OID | **$0.3**<br><br>0.07% of distributions under Plan plus DIP fees and OID |

[41] *Verified Statement of the Official Committee of Unsecured Creditors of NII Holdings, Inc. et al. Pursuant to Bankruptcy Rule 2019* [Docket No. 416].

[42] *Id.*

[43] *Fourth Verified Statement Pursuant to Rule 2019 of Federal Rules of Bankruptcy Procedure* [Docket No. 578].

83.     This analysis shows the following:

- Aurelius receives a premium of approximately $49.9 million through the settlement of the Transferred Guarantor Claims, or a 12.9 percent enhancement to its aggregate recoveries.

- The Luxco Group is more than fully compensated through fees and OID under the DIP Facility for the relatively small reduction in its recoveries arising from the settlement of the Transferred Guarantor Claims.

- Capital Group receives over $1 billion under the Plan without the need for any reserves in distributions or litigation over the merits of the Aurelius Claims, and it incurs less than a 1 percent reduction in its recoveries to obtain consent from both Aurelius and the Luxco Group for the Plan.

## V.    THE DEBTORS' EVALUATION PROVIDES NO SUPPORT FOR THE REASONABLENESS OF THE SETTLEMENT

84.     The testimony delivered to date—and discovery is ongoing—shows that the Debtors did not independently evaluate the reasonableness of a settlement of the Transferred Guarantor Claims for $285 million, or at a 21 percent recovery.  Instead, they considered only whether a global settlement would be appropriate.  Furthermore, whatever analysis of the Transferred Guarantor Claims that the Debtors and Committee did undertake did not include consideration of the Letters of Transmittal and the relevant New York statute that are the subject of the CapCo 2021 Group's Claim Objections.  Their analysis therefore omitted defenses to the Transferred Guarantor Claims that would result in their disallowance as a matter of law and is reasonably necessary to evaluation of whether any settlement of such claims is appropriate.

### A.    The Debtors and the Committee Did Not Evaluate the Reasonableness of Settling the Transferred Guarantor Claims for $285 Million

85.     The testimony is unanimous that the Debtors never evaluated whether $285 million, representing a 21 percent likelihood of the claimed amount, was, on its own, a reasonable settlement for the Transferred Guarantor Claims.  Instead, the Debtors only concluded on the reasonableness of the settlement on a global level.  *See* Freiman Dep. Tr., Goldberg Decl.,

46

Ex. B, 105:23-106:11 ("Q: I understand the debtors reached a judgment that the different elements balanced overall were reasonable. A: Right. Q: I'm wondering did the debtors reach a judgment that the transferred guarantor claims standing alone, that it was reasonable to settle those claims standing along for 21 percent? Mr. Swatsler: Objection, asked and answered. A: I don't think we ever looked at that in isolation."), 113:7-16 ("Q: Have the debtors formed a view as to whether it would be reasonable to settle the claims at 1 percent or 21 percent as opposed to 50 percent of the transferred guarantor claims? Mr. Swatsler: Objection to form. A: No, we didn't take a specific view on what percentage those claims should be settled at."); Shindler Dep. Tr., Goldberg Decl., Ex. A, 29:17-23 ("Q: The debtors didn't reach a judgment that it was reasonable to settle the transferred guarantor claims at 21 percent as a standalone analysis? A: There was not any determination on any item on a standalone basis."); Parkhill Dep. Tr., Goldberg Decl., Ex. D, 161:5-162:19.

86.    Likewise, it appears that the Committee did not conduct a stand-alone analysis of the reasonableness of settling the Transferred Guarantor Claims for $285 million, nor did the Committee reach a determination that it was independently reasonable to settle the claims at 21 percent of the claimed amount. Instead, the Committee only assessed the reasonableness of the global settlement overall. Daigle Dep. Tr., Goldberg Decl., Ex. E, 144:7-19 ("Q: So was any of your decision to vote in favor of the first PSA based on an analysis that a 27.5 percent allocation on the transferred guarantor claims was fair? A: The 27.5 allocation on the transferred guarantor claims was one element of the overall puzzle. It was one piece of the puzzle. And as to that part of the overall package, I was willing to accept 27 ½ percent settlement to the transferred guarantor issues. Q: Even through you personally did not think that was the appropriate percentage for those claims? Mr. Harper: Objection. A: I – I never looked at any variable in

47

isolation."), 146:2-12 ("Q: I want to ask you about your vote in favor of the second PSA, but to save time, I'll try asking it this way: Would the factors that you considered in voting in favor be the same factors you considered when you voted in favor of the first PSA?  A: Yes, with one addition.  Q: What is that?  A: The conclusion of the independent Scott Winn.").

> **B.**     **The Debtors and the Committee Did Not Consider the Argument that the Letters of Transmittal Deprive the Trustees and Current Note Holders of Standing to Assert the Transferred Guarantor Claims**

87.     In addition, there is no evidence that the Debtors considered the argument in the Claim Objections that the Letters of Transmittal and New York statutes deprive the Indenture Trustees and holders of the Current Notes (i.e., the Capco 2016/2019 Notes) from standing to bring the Transferred Guarantor Claims.  All three of the Debtors' witnesses testified that they never heard anyone discuss any argument based on the Letters of Transmittal at any time during the year of negotiations, or in any management or board discussions.[44]    Accordingly, the Debtors' proposed disclosure statements filed in December and early March did not mention the Letters of Transmittal; instead, that argument was added only after the Capco 2021 Group requested the addition of this defense, among others, to the Transferred Guarantor Claims.[45]

88.     Similarly, there is no evidence that the Committee considered the argument that Transferred Guarantor Claims were transferred to Capco under the Letters of Transmittal and New York statutory law.  The Committee members deposed confirmed that there was no

---

[44]     *See* note 20, *supra*.  Although Mr. Parkhill in his role as the Debtors' Rule 30(b)(6) representative testified that the Debtors position is that they did consider the Letters of Transmittal, the only basis he cited was that the final Disclosure Statement that said they did (which was only added in response to comments of the Capco 2021 Group). *See* Parkhill Dep. Tr., Goldberg Decl., Ex. D, 59:11-20, 55:16-19.  Of course, the fact that the Disclosure Statement says something is not admissible evidence, particularly given that Mr. Parkhill's personal knowledge, like the Debtors' other two witnesses, is that no one ever raised the issue.

[45]     *See Notice of Filing of Clean and Blackline Versions of Further Revised (A) First Amended Plan, (B) Related Disclosure Statement and (C) Proposed Order (I) Approving Disclosure Statement, (II) Approving the Form and Manner of Service of Disclosure Statement, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Reorganization and (IV) Scheduling Hearing on Confirmation of Plan of Reorganization* [Docket No. 621], Ex. B-2, pp. 37-38.

48

NY\7082833.9

discussion of the transmittal letters.  *See* Daigle Dep. Tr., Goldberg Decl., Ex. E, 63:20-24 ("Q:

So you don't recall hearing an argument against the transferred guarantor claims based on the

letters of transmittal themselves? A: I do not."); *see also* Winn Dep. Tr., Goldberg Decl., Ex. Z,

65:11-14; Scruton Dep. Tr., Goldberg Decl., Ex. AA, 55:20-24 ("Q: In the course of any of the

committee meetings do you recall any discussions about the letters of transmittal specifically?

A: I don't recall any reference to the letters of transmittal."); *see* Gropper Dep. Tr., Goldberg

Decl., Ex. BB, 149:8-17 ("Q: How about in the committee meetings, do you recall any

discussion of the letters of transmittal taking place in the committee meetings? . . . A: I don't

recall."). █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████      ████████████████████████████

██████████████████████████████████████████████

## **OBJECTION**

## VI.    THE SETTLEMENT DOES NOT MEET THE STANDARD FOR APPROVAL

89.    Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") requires Court approval to bind the estates to a settlement.  Fed. R. Bankr. P. 9019(a).

The Bankruptcy Court should undertake its own informed, independent inquiry, in evaluating the

terms of a settlement and cannot rely on the Plan Proponents' position.  *See In re Soup Kitchen

Int'l Inc.*, 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014); *In re Rosenberg*, 419 B.R. 532, 536 (Bankr.

E.D.N.Y. 2009) ("[A] court may not simply defer to a debtor in possession's judgment, but must

independently evaluate the reasonableness of the settlement."); *see also* Huang, Helena C., *Court

Faulted for Deference to Trustee in Approving Settlement*, Business Restructuring Review (Jones

Day), (April/May 2004) ("[T]he bankruptcy court must go beyond assessing the adequacy of the

proponent's investigation of the claims and issues involved to evaluate independently the merit

49

of the claims . . . ."). The settlement proponent bears the burden "to persuade the court that the settlement is in the best interests of the estate." *In re Soup Kitchen International Inc.*, 506 B.R. at 38 (quoting *In re MF Global Inc.*, 466 B.R. 244, 248 (Bankr. S.D.N.Y. 2012)); *see also* 8 NORTON BANKRUPTCY LAW AND PRACTICE 3D § 167:2 (3d ed. 2011).

90.    The Plan Proponents propose to distribute $285.2 million, approximately $150 million of which would otherwise go to the Capco 2021 Notes, in settlement of the Transferred Guarantor Claims through separate classification of such claims. The settlement of the Transferred Guarantor Claims should therefore be evaluated as it stands in the Plan—a separate distribution on account of specific claims. In analyzing complex settlements comprised of many distinct issues, which can be interrelated or not, courts in this circuit have analyzed the basis for settlement of each of those issues separately. *See, e.g., In re Enron Corp.,* Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, *83-*112 (Bankr. S.D.N.Y. 2004) (Judge Gonzalez individually addressed the integral features of the "Global Compromise", including whether any party had raised sufficient evidence or argument to rebut the terms of the settlement. For example, Judge Gonzalez separately examined the proposed treatment of the Guaranty Claims, the Intercompany Claims, the Inter-Debtor Waivers, among others, in ultimately coming to a view as to whether the Global Compromise was fair and equitable.). *See also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007).

91.    In the context of this case a separate analysis of the settlement of the Transferred Guarantor Claims is warranted because, even viewed from a global settlement perspective, the Transferred Guarantor Claims are an enormous piece (perhaps the largest piece) of the settlement. The parties to the Second PSA negotiated a discretely segregated distribution for the Transferred Guarantor Claims through separate classification of such claims. Holders of Luxco

50

Notes will receive payment in full of their prepetition claims under the Plan, even though all of
the Aurelius Claims (including the Transferred Guarantor Claims) were adverse to recoveries on
the Luxco Notes.  In this light, there is little actually paid for settlement of the Aurelius Claims
other than the Transferred Guarantor Claims.  The holders of Capco 2021 Notes bear most (if not
all) of the price of peace with Aurelius, and the only basis for disparate treatment of the Capco
2021 Notes compared to the Capo 2016/2019 Notes is a settlement of the putative Transferred
Guarantor Claims.  Although the Debtors hope that the Court will, as the Debtors did, step back
from the details, review the settlement from afar, and accept a fundamentally flawed and unfair
settlement in the interests of consensus, that is not what the law provides.

### A.    The Settlement Is Not "Fair and Equitable"

92.    The Supreme Court requires that any settlement under a plan must be "fair and
equitable."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414, 424 (1968) (hereinafter, "*TMT Trailer Ferry*"); *Chemtura*, 349 B.R. 561, 594-95
(Bankr. S.D.N.Y. 2010).  The requirement for a settlement to be "fair and equitable" incorporates
the absolute priority rule from the "cram down" standards of section 1129(b)(2)(B) of the
Bankruptcy Code.  *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium
Operating LLC)*, 478 F.3d 452, 462–63 (2d Cir. 2007) (hereinafter, "*Iridium*").  The animating
principle behind this requirement is that "a plan of reorganization which is unfair to some
persons may not be approved by the court even through the vast majority of creditors have
approved it."  *TMT Trailer Ferry*, 390 U.S. at 435.

93.    The settlement of the Transferred Guarantor Claims is not fair and equitable
because it provides substantially different treatment to claims of equal dignity without any valid
justification.  As described in Background Sections II and III, *supra*, the Transferred Guarantor

Claims have no merit and in any case have been transferred to Capco. As such, the settlement of the meritless Transferred Guarantor Claims for a payment of $285.2 million is unfair and inequitable because it results in approximately $150 million lower distributions for claims of equal priority under the Capco 2021 Notes. There can be no justification compelling enough to excuse a $285 million distribution on account of claims that should be disallowed as a matter of law.

### B.    The Plan Fails to Satisfy the *Iridium* Factors

94.    In addition to the "fair and equitable" analysis applicable in the plan context, it is well established in the Second Circuit that the propriety of a settlement is evaluated pursuant to the factors set forth in *Iridium*:

> (1) The balance between the litigation's possibility of success and the settlement's future benefits;
>
> (2) The likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficult of collecting on judgment;
>
> (3) The "paramount interest of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";
>
> (4) Whether other parties in interest support the settlement;
>
> (5) The competency and experience of counsel supporting and the experience and knowledge of the bankruptcy court judge reviewing the settlement;
>
> (6) The nature and breadth of releases to be obtained by the directors and officers; and
>
> (7) The extent to which the settlement is the product of arm's length bargaining.[46]

*In re Iridium*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr.

---

[46]    The CapCo Group has stipulated that it will not object to the Plan and settlement on the basis of lack of good faith or failure to negotiate in arm's length. The burden to satisfy these elements, however, remains with the Plan Proponents.

S.D.N.Y. 2006); citing *TMT Trailer Ferry*, 390 U.S. at 424); *see also In re Drexel Burnham*

*Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992).

> **1.     The Balance of Likelihood of Success on the Merits and the Settlements Benefits Weighs Decisively Against Approval of the Settlement**

95.     The Court should undertake its own investigation of the substantive issues, and

determine "each side's likelihood of success in litigation." *Chemtura*, 349 B.R. 561, 597 (Bankr.

S.D.N.Y. 2010).  In *Chemtura,* the court undertook a comprehensive analysis of make-whole and

no-call provisions in bond indentures to assess the merits of the claims asserted based on the

terms of the indenture.  *Id.* at 597.[47]  As in *Chemtura*, this case involves a legal analysis based on

a plain reading of contracts, and the likelihood of success in litigation should similarly be the

"most relevant *Iridium* factor" for analysis of the settlement.  *See Id.*

96.     The CapCo 2021 Group does not request a "mini-trial" of the facts or merits

underlying the settlement.  *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (Bankr.

S.D.N.Y. 1993).  Rather, a "canvassing" of the issues, as described in *In re W.T. Grant Co.*, 699

F.2d 599, 608 (2d Cir. 1983), will relatively quickly reveal that the Transferred Guarantor

Claims are without merit,[48] as the Debtors themselves admit.  Success by the Debtors, should the

Transferred Guarantor Claims ever be litigated, is extremely likely based on purely legal issues.

97.     In paying $285 million to settle claims that are without merit, the settlement fails

the first prong of the *Iridium* test.  The Plan Proponents may nevertheless argue that the merits

do not matter because the settlement is necessary to preserve the value of the estates given the

impending deadlines of September 15, 2015 and September 30, 2015 for consummation of a plan

---

[47]     In *Chemtura*, the court's analysis of the relevant legal precedent and merits of the claims underlying the settlement spanned twelve pages of its opinion.  While the CapCo 2021 Group maintains that such an extensive analysis will not be required to assess the Transferred Guarantor Claims, the Court nevertheless should assess the merits of the Transferred Guarantor Claims to consider whether they are valid as a matter of law.

[48]     *See* Sections V and VI, *infra*, and Claim Objections.

53

for the Debtors that meets certain criteria under agreements related to a potential default in the credit agreements of a non-debtor subsidiary. This supposed timing crises is vastly overblown and largely of the Debtors' creation. First, there is sufficient time to create a new plan. This is the third round of the Debtors' settlement efforts: (1) prepetition negotiations, (2) First PSA and (3) Second PSA. The parties are already extremely knowledgeable about the issues and each other' views and settlement positions. Indeed, when the First PSA was terminated, it took only a few days for those parties to reach an outline of the key economic terms for a new plan. *See Declaration of Homer Parkhill in Support of the Objection of Debtors and Debtors in Possession to Motion of the Ad Hoc Group of NII Capital 2021 Noteholders for an Order Pursuant to Sections 105(a) and 105(d) of the Bankruptcy Code, Local Bankruptcy Rule 9019-1 and General Order M-452 Directing the Debtors to Participate in Mediation* [Docket No. 584], ¶21, p. 9. Second, there is no reason to believe that the Debtors could not again obtain extensions from the lenders to their non-debtor subsidiaries once they have a revised plan, well before the end of September. The Debtors' Brazilian operations have improved since the last round of extensions, which should make an amendment or refinancing easier. *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 17:19-18:5, 20:25-21:16. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ The Debtors admittedly have not even broached the topic of an extension with them. *See* Freiman Dep. Tr., Goldberg Decl., Ex. B, 46:7-1 ("Q: Have they [CDB] told you? A: No. Q: Have you asked? A: No."),

57:10-13 ("Q: Have you raised the topic with those two lenders [BDB and Caixa] of a further extension of the deadline to emerge from Chapter 11? A: No."). Third, even if for some reason no plan could be confirmed, and no forbearance could be extended, it is very likely that the Debtors could simply repay the local loans. If they do not make the cash payments contemplated in the current plan, they will have sufficient extra cash on hand—in addition to the $500 million needed to run the business—to repay the local loans, even without obtaining any additional financing. Parkhill Dep. Tr., Goldberg Decl., Ex. D, 250:7-251:24. Quite simply, this is not a real emergency that would dictate accepting a flawed plan.

### 2. Litigation May Be Resolved Based on Contract Interpretation and Legal Issues

98. The second factor assesses the likelihood of complex and protracted litigation in the absence of a settlement, including the difficulty of collecting on a judgment. *In re Iridium*, 478 F.3d at 462. The probability of engaging in protracted and fact-intensive litigation on the Transferred Guarantor Claims is low. The Claim Objections of the CapCo 2021 Group to the Transferred Guarantor Claims are ripe for hearing on June 3, raise only issues of law and may be adjudicated quickly with no further discovery. Moreover, the Transfer Guarantor Claims can be defeated raising legal issues of contract interpretation; they could thus be resolved quickly through mechanisms such as a claim objection on the merits through a declaratory judgment complaint and a simultaneous motion for summary judgment. Indeed, there is no reason the Transfer Guarantor Claims could not have been resolved in the nine months these chapter 11 cases have been ongoing, such as through a claim objection or adversary proceeding seeking a declaratory judgment.[49] Instead, the Debtors never obtained an estimate of how long it would

---

[49] The CapCo 2021 Group acknowledges that Aurelius has threatened litigation beyond the Transferred Guarantor Claims. The remaining Aurelius Claims are chapter 5 avoidance actions that are property of the Debtors'

take or how much it would cost to litigate the Transferred Guarantor Claims on their own.  *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 31:21-32:25.  The second *Iridium* factor therefore weighs in favor of denying the settlement.

> **3.    The Paramount Interests of Creditors Are Opposed to a Settlement of Claims that are "Without Merit" According to the Debtors**

99.    The paramount interests of creditors, and each affected class's relative benefits and the degree to which creditors object to or affirmatively support the plan, constitutes the third *Iridium* factor.  The settlement of the Transferred Guarantor Claims is essentially a transfer of value from the holders of the Capco 2021 Notes to holders of the CapCo 2016/2019 Notes that has been agreed by other parties in interest to obtain consent of Aurelius.  This transfer effectively subordinates the Capco 2021 Notes to the CapCo 2016/2019 Notes, notwithstanding that the Debtors and other parties agree that all of the Capco Notes are of equal priority and notwithstanding that the Capco 2021 Notes have the same rights to any guarantees provided for the CapCo 2016/2019 Notes by virtue of Section 4.18(b) of the Capco 2021 Indenture.  The holdings of the parties to the Second PSA other than Aurelius reveal that they do not stand to significantly benefit or lose as a result of the settlement, and therefore have elected to support the Plan for expediency of resolution of the chapter 11 cases.

100.    The Debtors' largest creditor, Capital Group, stands to forgo distributions of approximately $7 million, or 0.7 percent of its over $1 billion of distributions under the Plan, as a result of the settlement of the Transferred Guarantor Claims.  It is plain that Capital Group is prepared to yield this de minimus concession in the face of scorched earth litigation threats to reach what they hope will be a swift distribution of the value of the estates.  Similarly, the members of the LuxCo Group are receiving par plus prepetition accrued interest on their Luxco

---

estates, and therefore such claims would only be considered in the context of plan confirmation or if Aurelius or another party were to obtain derivative standing upon approval of the Court.

Notes, and therefore are content to accept the deal for the same reasons.  In addition, they received substantial profits from their participation in the DIP Facility.  *See supra*, Background Section IV(E).

101.    The settlement is an economic deal that the largest creditors have rationally managed to stomach because they do not personally bear the vast majority of the cost for it.  The absence of support from creditors who put their wallets behind the concessions foisted upon holders of the Capco 2021 Notes is exacerbated because the constituency that is being treated unfairly (holders of CapCo 2021 Notes) was not adequately represented in negotiations that led to the Plan.

102.    In *In re Nutritional Sourcing Corp.* 398 B.R. 816 (Bankr. Del. 2008), the bankruptcy court denied confirmation of the plan because the settlement entered into among the debtors and certain creditors "severely adversely impacts . . . creditors who were not at the negotiating table and who were not adequately represented in their absence." *Id.* at 835.  Much like here, the parties negotiating the settlement were "heavily balanced" in favor of the creditors supporting the settlement, which also included the largest creditors of the debtors.  The court in *In re Nutritional Sourcing* was not convinced that the debtors and the creditors committee could adequately represent the interests of those not at the negotiating table: "As agents of Debtors, [the CEO and CFO] were motivated to create a plan that would receive the requisite percentage of votes." *Id.*  The court also addressed specifically the ability of the creditors committee to protect the interests of those not party to the negotiations: "the composition of the Committee was such that the vast majority of the creditors on that Committee held interests aligned against the [excluded] creditors . . . and the fact that the Committee held a fiduciary duty does not make up for the lack of a cross-section of Debtors' creditors."  That series of facts is very much

57

analogous to those presented in this case.

### 4.    Other Parties in Interest Oppose the Settlement

103.    The fourth *Iridium* factor concerns the level of support for the settlement among

other parties in interest.  "But this factor, which has its origin in nonbankruptcy litigation (and

particularly the review of class action settlements, which usually focus on fairness to the plaintiff

and class member communities, as contrasted to the defendant putting value on the table), has

limited applicability in bankruptcy cases." *Chemtura*, 349 B.R. at 116.  While courts in this

circuit consider the level of support of all parties in interest, particular focus is often placed on

those creditors "most directly affected by it [the settlement] . . . ." *In re Stone Barn Manhattan

LLC*, 405 B.R. 68, 76 (Bankr. S.D.N.Y. 2009).  As discussed *supra* in ¶¶ 82-83, holders of the

Capco 2021 Notes are most affected by the proposed settlement, and therefore it should come as

no surprise that only creditors most heavily exposed to the recovery of the Capco 2021 Notes

have publicly opposed the settlement and the Second PSA.

104.    Further, as Judge Gerber explained, the reasons for opposition are more important

than a "counting exercise" of votes.  *See Chemtura*, 349 B.R. at 607.  Here, the Debtors have

abdicated leadership of the terms for a settlement and have been prepared to accede to whatever

deal their largest creditors may reach to carve up the Debtors' estates among themselves.  The

views of the Debtors and other parties in interest should not be given deference.

105.    The CapCo 2021 Group's opposition to the settlement of the Transferred

Guarantor Claims, through the various filings made at its own expense, should lead to the

conclusion that this factor weighs in favor of denying approval of the settlement.  The CapCo

2021 Group's pursuit of a targeted legal strategy to oppose the settlement of the Transferred

Guarantor Claims at its own expense—including, a request for mediation, and most recently, the

Claims Objections and this Objection—should weigh against approval of a settlement of those

58

claims unless there is first meaningful evaluation of the merits of those claims. Further, "where creditors have argued successfully that a proposed settlement should be rejected, they have often also proposed to assume the litigation costs or even to proceed with the claim on their own." *In re Hilsen*, 404 B.R. 58, 76 (Bankr. E.D.N.Y. 2009). The CapCo 2021 Group has done exactly that, invest considerably in a litigation strategy to expose the faulty premise of an unconfirmable plan.

### 5. The Competency of Counsel Should Be Given No Weight

106.    The next *Iridium* factor considers the competency of counsel supporting, and experience of judge reviewing, the settlement. *In re Iridium*, 478 F.3d at 462. The competency of the Debtors' advisors, which the CapCo 2021 Group does not contest, is not relevant here. The Debtors did not participate in the negotiations over the terms of the Transferred Guarantor Claim settlement and thus that settlement was not affected by counsel's competency. *See supra* Background Section IV(A).

107.    Moreover, while we do not know precisely what advice Debtors' counsel gave to the Debtors as to the merits of the Transferred Guarantor Claims, we do know that after hearing that thoroughly researched and vetted advice, the Debtors concluded that the Transferred Guarantors claims were ***without merit***. So to the extent the Court wishes to consider the competency of counsel, their competency would support that this settlement is unreasonable.

### 6. The Plan Includes Broad Releases for Directors & Officers

108.    Next, the court is to review the nature and breadth of releases to be obtained by directors and officers of the Debtors. The Plan includes broad releases, including releases by the Debtors as well as all holders of claims that vote in favor of the Plan. *See* Plan Art. IX(E)(1), (2), pp. 42-43. The contemplated releases represent the broadest form permissible by law.

109.    The *Iridium* factors weigh heavily against approval of the settlement. Paramount

59

in this evaluation is the absence of merit from the Transferred Guarantor Claims.  The settlement of those meritless claims, for $285 million, is beyond even the broadest vision of the "range of reasonableness."

### C.    The Plan Proponents Are Not Entitled to Business Judgment Deference

110.    The Plan Proponents' decisions to enter into the settlement are not entitled to the deference afforded by the business judgment rule because they did not undertake the analysis to reach a reasonably informed judgment on the merits of the Transferred Guarantor Claims and settlement of them for $285 million.   "[T]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets."   *In re Global Crossing Ltd.*, 295 B.R. 726 (Bankr. S.D.N.Y. 2003) (citing *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992)).  The business judgment rule applied in *Global Crossing* because the board consulted its advisors, met with all of its creditors, considered the issues ***independently*** of other parties in interest, and ultimately made a decision on how to proceed.  *Id.* (emphasis added).  Furthermore, the court noted that "[i]t is also clear . . . that while the Board, appropriately, considered the views of Unsecured Creditors, it did not take the action it did merely because Unsecured Creditors asked it to."  *Id.* at 739.

111.    In this case, the Debtors admittedly left the negotiation of the economic terms to the largest creditors (apparently because the Debtors decided in good faith that they were conflicted).  They are now proposing the settlement because they believed strongly in obtaining consensus; but consensus is not a basis to approve an unfair plan.  *TMT Trailer Ferry*, 390 U.S.

60

at 435 ("[A] plan of reorganization which is unfair to some persons may not be approved by the court even through the vast majority of creditors have approved it.").

112.     In the context of a plan settlement, the business judgment rule requires the trustee's decision to be made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [estate]." *In re Arkoosh Produce, Inc.*, Case No. 00-41817, 2003 Bankr. LEXIS 2222, *28 (Bankr. D. Ohio July 1, 2003) (quoting *In re Dalen, 259 B.R. at 609*).   The Debtors, despite evaluating the merits of the Transferred Guarantor Claims and concluding there were none, decided to support any economic settlement of those claims that garnered sufficient creditor support.   The Debtors thenceforth took no position (i.e., no an "honest belief" or otherwise) on what settlement would be in the best interests of the estates.   As noted above, they never reached a judgment that $285 million was a fair settlement of the transferred guarantor claims, and they never took a view on what would be an appropriate range of settlement of those claims.   *See* Shindler Dep. Tr., Goldberg Decl., Ex. A, 28:7-11; Parkhill Dep. Tr., Goldberg Decl., Ex. D, 161:5-162:19.   Instead, they only evaluated all of the elements of the global settlement combined as a package deal.   *See, e.g.*, Parkhill Dep. Tr., Goldberg Decl., Ex. D, 161:5-162:19.

113.     In these circumstances, the business judgment rule does not apply to the Debtors' decision to enter into the settlement of the Transferred Guarantor Claims.   *See, e.g., Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) ("[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."); *In re Walt Disney Co. Derivate Litig.*, 907 A.2d 693, 748 (Del. Ch. 2005) ("[I]n instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the

61

business judgment rule do not apply.") (citing *Aronson*, 473 A.2d at 813); *Gaillard v. Natomas Co.* 208 Cal. App. 3d 1250 (Cal. Ct. App. 1989) ("A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment.").

114.    Moreover, even if they had formed a judgment that $285 million was a reasonable settlement for the Transferred Guarantor Claims, that would not have been an informed judgment because both of the Plan Proponents failed to consider the impact of Letters of Transmittal and New York states which transferred the Transferred Guarantor Claims to Capco and deprives any other party of standing to assert those claims.  As noted above, there is no evidence that either the Debtors or the Committee considered the arguments concerning the Letters of Transmittal and New York statute that are the subject of the Claim Objections.  Deference under the business judgment rule is intended to shield fiduciaries who have done their diligence.  The Debtors and the Committee do not meet this standard, and therefore the Court should review this settlement under a higher standard.  *See Hanson Trust PLC v. SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986) (noting that directors are entitled to deference if they employ "reasonable diligence" in their gathering and consideration of the relevant information); *see also In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 412 (Bankr. E.D.N.Y. 2006).

## VII.    THE CLASSIFICATION SCHEME IS UNCONFIRMABLE

115.    Section 1122(a) of the Bankruptcy Code provides that claims or interests may be classified together with other claims or interests "only if such claim or interest is substantially similar to the other claims or interests of such class." *See* 11 U.S.C. § 1122(a).  The Bankruptcy Code therefore prohibits the classification of dissimilar claims together. *See In re Chateaugay Corp.*, 155 B.R. 625, 630 (Bankr. S.D.N.Y. 1993); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 312 (Bankr. N.D.N.Y. 1992).  Although the Code does not define "substantially

62

similar," it is accepted to mean "similar in legal character or effect as a claim against the debtor's assets or as an interest in the debtor."  7 COLLIER ON BANKRUPTCY ¶ 1122.03[3], at 1122-7 (16th ed. 2015).

116.    The Plan provides for classification of all three series of CapCo Notes together in Class 5, notwithstanding that, by the very terms of the Plan, the holders of those notes are not entitled to equal (or even similar) recoveries.  Class 6E provides the Capco 2016/2019 Notes collectively with additional distributions of $285 million that are not shared with the Capco 2021 Notes.  The purported additional rights of holders of the Capco 2016/2019 Notes that are separately classified in Class 6E, but this does not mask the economic reality that holders of the Capco 2021 Notes are being treated differently than the Capco 2016/2019 Notes based on the Plan Proponents' view that the claims for the Capco 2016/2019 Notes and Capco 2021 Notes are different.

117.    A creditor will vote its claims based on its total recoveries across all classes.  The decision to support or vote against as a claimholder in a particular class is not considered in a vacuum.  Therefore, when the Capco 2016/2019 Notes decide whether to support or reject the Plan, holders will consider their combined recoveries from both Class 5 and Class 6E.  Should they choose to accept the proposed cumulative distributions from both classes, they will vote all of their claims as such, regardless of whether those holders believe that the recoveries attributable to either class are unfair.  The same is true should they choose to reject the Plan. Their interests are therefore very different from those of the holders of Capco 2021 Notes, who only stand to recover under Class 5.  Based on the disparate recoveries contemplated by the Plan for the Capco 2016/2019 Notes and the Capco 2021 Notes, the Plan violates Section 1122(a) because it classifies claims together even though the claims are not substantially similar under

63

the terms of the Plan as evidenced by their substantially different treatment.

118.    Should the Court determine that the Transferred Guarantor Claims are meritless, a view held by all parties in interest with the exception of Aurelius, the proposed classification provides for the unequal treatment of holders of notes of equal dignity, in violation of section 1123(a)(4) of the Code.  Section 1123(a)(4) mandates that a plan provide "the same treatment for each claim or interest of a particular class . . . ."  *See* 11 U.S.C. § 1123(a)(4).  By the Debtors' own admissions, the Capco 2021 Notes are *pari passu* with the Capco 2016/2019 Notes.  *See, e.g.*, NII Holdings, Inc., Current Report (Form 8-K), December 8, 2011 (nothing that the Capco 2021 Notes "rank equally in right of payment" with Capco's other unsecured debt); NII Holdings, Inc., Current Report (Form 8-K), March 29, 2011 (same).  This equal priority is not only the Debtors' view but also the legal reality because the Capco 2021 Notes are entitled to the same guarantees as the CapCo 2016/2019 Notes pursuant to Section 4.18(b) of the Capco 2021 Indenture.  Because the proposed Plan provides for unequal distributions to the Capco 2016/2019 Notes and the Capco 2021 Notes, Section 1123(a)(4) of the Bankruptcy Code cannot be satisfied.

119.    The Plan Proponents should be required to modify the Plan, resolicit the votes of creditors and attempt to achieve confirmation through cramdown of a separate class comprised of the Capco 2021 Notes claims.  Alternatively, the current Plan should at least be considered under the cramdown standards.

## VIII.    THE PLAN FAILS TO SATISFY CRAMDOWN REQUIREMENTS

120.    The proposed classification scheme improperly impairs the ability of holders of the Capco 2021 Notes to effectively vote their interests by grouping them with holders of the Capco 2016/2019 Notes.  The way in which the Debtors have classified the Capco 2021 Notes is gerrymandering, and akin to a "cramdown" under Section 1129(b) of the Bankruptcy Code.  Had the Capco 2021 Notes been classified separately from the Capco 2016/2019 Notes, as is required

64

by Section 1122(a) of the Bankruptcy Code, holders of the CapCo 2021 Notes would have the opportunity to vote to reject the Plan as a class and would not be outvoted to the parties to the Second PSA based on their holdings of the CapCo 2016/19 Notes.

121. The Debtors admit that the parties to the Second PSA do not hold two-thirds by principal amount of the CapCo 2021 Notes. *See* Tr. of Hrg. (March 31, 2015), Goldberg Decl., Ex. W, 54:11-16. Under the First PSA, holders of the Capco 2021 Notes were placed in a class of their own, separate and apart from a class of holders of the Capco 2016/2019 Notes. This classification scheme appears to reflect an understanding by the proponents of the First PSA that they could carry the class of Capco 2016/2019 Notes, but were uncertain whether they could do the same for a consolidated class of all Capco Notes. Once the Luxco Group was on board, however, the Plan Proponents had 70 percent of a combined Capco Notes class (but still lacked 67 percent of a class of Capco 2021 Notes). So the classification scheme was changed, even though the rights of the noteholders did not. Holders of the Capco 2021 Notes are now classified together with holders of the Capco 2016/2019 Notes, despite the disparate recoveries arising from distributions on account of the separately classified Transferred Guarantor Claims. Under the Second PSA, the classification prevents holders of the Capco 2021 Notes from having the opportunity to reject the plan as a class, as they represent only approximately 53 percent of the consolidated class of Capco Notes claims. The Debtors' designated representative for deposition testimony on classifications is unaware of any justification for the consolidated classification of all of the Capco Notes claims. *See* Parkhill Dep. Tr., Goldberg Decl., Ex. D, 262:8-24. To remedy this gerrymandering, the Court should require the Plan Proponents to satisfy the cramdown standards of 1129(b) with respect to the treatment of the Capco 2021 Notes.

122. The Plan does not satisfy the cramdown requirements of 1129(b)(1) because it

65

unfairly discriminates against holders of the Capco 2021 Notes and, as explained *supra*, the settlement is not fair and equitable. The unfair discrimination standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes . . . ." *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). "Thus, a plan will be found to unfairly discriminate 'where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.'" *In re Genco Shipping & Trading Ltd.*, 513 B.R. at 241 (citing *In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, *174 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)).

123.    To determine whether a plan discriminates unfairly, courts in this circuit consider whether (1) there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is in direct proportion to its rationale. *In re WorldCom*, Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, *175 (citing *Buttonwood Partners*, 111 B.R. at 63); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656 (9th Cir. 1997); *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D. N.J. 1985)). "Unfair discrimination is best viewed as a horizontal limit on nonconsensual confirmation . . . . Just as the fair and equitable requirement regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes intra-priority fairness, assuring equitable treatment among creditors who have the same level of priority." *Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227 (1998).

124.    The Capco 2021 Notes receive substantially less distributions under the Plan than

66

the Capco 2016/2019 Notes, despite the fact that they are claims of equal priority.  This disparate treatment is unfair because it fails, at a minimum, three of the four factors listed above:

i.   First, there exists no reasonable basis for discriminating against the Capco 2021 Notes.   Settlement of the Transferred Guarantor Claims, which the Debtors believe have no merit, cannot be a reasonable basis to provide enhanced distributions of $285 million.  Furthermore, the Capco 2021 Notes are entitled to guarantees, and therefore distributions, of equal priority to those of the CapCo 2016/2019 Notes under Section 4.18(b) of the Capco 2021 Indenture.

ii.   Second, as a legal matter, the Debtors would be able to confirm the Plan (or another formulation) without discrimination against the CapCo 2021 Notes.  If the Plan Proponents were to either (a) reclassify holders of Capco Notes into separate classes, and allocate the proposed distributions for Class 6E *pro rata* among the three classes, or (b) simply eliminate Class 6E and redistribute those proceeds to the class consisting of all Capco Notes, the Plan would likely be confirmable. The discrimination itself is the primary factor that stands in the way of the Plan satisfying the requirements of section 1129 of the Bankruptcy Code.

iii.   Finally, the discrimination is grossly disproportionate to its rationale.   The rationale for disparate treatment among holders of Capco Notes—the Transferred Guarantor Claims—is meritless, and thus, any discrimination against the Capco 2021 Notes would fail to satisfy this final prong.  Likewise, the rationale that the disparate treatment is based on the fact that the indenture trustees for the Capco 2016/2019 Notes filed proofs of claims for the Transferred Guarantor Claims is an *ex post facto* creation.  The discrimination goes back to the First PSA, in which

67

the Transferred Guarantor Claims were allocated solely to Capco 2016/2019 Notes.  But the first PSA was filed on November 24, 2014, before the claims bar date and before anyone had submitted a proof of claim—that is, when it was unknown whether proofs of claim would be submitted on behalf of the Capco 2021 Notes, the Capco 2016/2019 Notes, or none of them.  So the actual reason for the discrimination was not any divergence in proofs of claim which did not yet exist, but rather because that is what Aurelius requested and no one in response advocated for equal treatment.

## **CONCLUSION**

WHEREFORE, the CapCo 2021 Group requests that the Court deny confirmation of the Plan, and grant such other and further relief as the Court deems just and proper.  The CapCo 2021 Group reserves its right to supplement this Objection, including, without limitation, with additional factual matters and arguments related thereto upon completion of ongoing discovery in connection with this Objection.

Dated: May 22, 2015

_/s/ Mitchell A. Seider_
Mitchell A. Seider
Christopher Harris
Adam J. Goldberg
Sarah B. Rogers
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4611
Telephone:     (212) 906-1800
Facsimile:     (212) 751-4864

_Counsel to the Ad Hoc Group of NII Capital 2021
Noteholders_

69