**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------X
                                           :

In re:                                   :     Chapter 11
                                           :

NII Holdings, Inc., <u>et al.</u>,                 :     Case No. 14-12611 (SCC)
                                           :

                      Debtors.        :     (Jointly Administered)
                                           :

--------------------------------------------------------------------X

**MEMORANDUM DECISION CONFIRMING FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION PROPOSED BY THE PLAN DEBTORS AND DEBTORS IN**
**POSSESSION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

A P P E A R A N C E S :

JONES DAY
222 East 41st Street
New York, NY 10017
By:    Scott J. Greenberg, Esq.
       Lee A. Armstrong, Esq.
       Robert W. Hamilton, Esq.
       George R. Howard, Esq.

North Point
901 Lakeside Avenue
Cleveland, OH 44114
By:    Carl E. Black, Esq.
       Michael A. Platt, Esq.

*Attorneys for Debtors and Debtors in Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
       P. Bradley O'Neill, Esq.
       Stephen D. Zide, Esq.

*Attorneys for the Official Committee of Unsecured Creditors*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
By:    Susheel Kirpalani, Esq.
       Robert S. Loigman, Esq.
       Kate Scherling, Esq.

*Attorneys for the Independent Manager of NII International Holdings S.à r.l.*

LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
By:    Mitchell A. Seider, Esq.
       Christopher Harris, Esq.
       Adam J. Goldberg, Esq.
       Sarah B. Rogers, Esq.

*Attorneys for Ad Hoc Group of NII Capital 2021 Noteholders*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
By:    Andrew N. Rosenberg, Esq.
       Elizabeth R. McColm, Esq.

*Attorneys for Capital Research & Management Company*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
By:    Daniel H. Golden, Esq.
       David M. Zensky, Esq.
       Deborah Newman, Esq.

*Attorneys for Aurelius Capital Management, LP*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:    Christopher J. Marcus, Esq.

*Attorneys for the LuxCo Group*

U.S. DEPARTMENT OF JUSTICE
201 Varick Street, Suite 1006
New York, NY 10014
By:    Susan D. Golden, Esq.

*Office of the United States Trustee*

LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, NJ 07068
By:    Michael S. Etkin, Esq.

*Attorneys for Lead Plaintiff and the Putative Class*

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................................2

I.    Events Leading to the Filing ....................................................................................2

II.   The Disputed Claims..................................................................................................7

      A.  The Transferred Guarantor Claims ..............................................................7

      B.  The Fraudulent Conveyance Claims ............................................................18

      C.  The Intercompany Recharacterization Claims............................................19

III.  Investigation of the Disputed Claims by the
      Official Committee of Unsecured Creditors ................................................20

IV.   The Initial PSA and the Appointment of the Independent Manager ................22

V.    The Mexico Sale and the Amended PSA..................................................................24

VI.   The CapCo 2021 Group Emerges and Objects to the Settlement.......................27

VII.  The Plan ....................................................................................................................28

      A.  Solicitation Results ......................................................................................29

      B.  Brief Summary of the Settlement ................................................................29

      C.  Objections to the Plan ..................................................................................30

VIII. The Confirmation Hearing .....................................................................................31

      A.  Confirmation Testimony...............................................................................32

          1.  Steven M. Shindler.................................................................................32

          2.  Scott W. Winn.........................................................................................37

          3.  Homer Parkhill........................................................................................39

          4.  Daniel E. Freiman ..................................................................................42

          5.  Andrew Scruton .....................................................................................46

DISCUSSION ....................................................................................................................50

I.      Applicable Law .......................................................................................................... 50

II.     The Process Undertaken by the Debtors and by the Committee ...................................... 54

III.    The Settlements Contained in the Plan are Fair,
        Reasonable, and Well Above the Lowest Point in the Range of Reasonableness ............. 60

        A.   The Settlement of the Transferred Guarantor Claims ............................................ 61

             1.   Whether Certain Holders of the CapCo 2016/2019 Notes
                  Have Standing to Assert the Transferred Guarantor Claims ............................. 63

             2.   Whether the 2009 Transfers Complied with the CapCo 2009 Indentures ........... 69

                  a.   Whether the Transfer of the Equity Interests of the
                       Transferred Guarantors Constituted a Sale or
                       Disposition of All or Substantially All of the Assets of the Transferor ..... 70

                  b.   Whether the NII Global Transfer Complied with Section 4.10 ................ 72

        B.   Other Settlements Embodied in the Plan ............................................................... 78

             1.   The Fraudulent Conveyance Claims ................................................................ 78

             2.   The Recharacterization Claims ....................................................................... 80

             3.   Valuation, Allocation, and Postpetition Interest .............................................. 82

        C.   The *Iridium* Factors Weigh Decisively in Favor of Approval .............................. 83

             1.   The Uncontested Iridium Factors .................................................................... 83

                  a.   Factor #4: Whether Other Parties in Interest Support the Settlement ........ 83

                  b.   Factor #5: The Competency and Experience of
                       Counsel Supporting, and the Experience and
                       Knowledge of the Judge Reviewing, the Settlement ................................ 84

                  c.   Factor #6: The Nature and Breadth of
                       Releases to be Obtained by Officers and Directors .................................. 84

                  d.   Factor #7: The Extent to Which the
                       Settlement is the Product of Arm's Length Bargaining ............................ 84

2.  The Contested Iridium Factors..........................................................................85

    a.  Factor #1: The Balance Between the Litigation's
        Possibility of Success and the Settlement's Future Benefits ....................86

    b.  Factor #2: The Likelihood of Complex and Protracted
        Litigation, with its Attendant Expense, Inconvenience, and Delay...........93

    a.  Factor #3: The Paramount Interests of Creditors.......................................96

CONCLUSION.........................................................................................................102

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Compromise and settlement are the heart and soul of every successful chapter 11 proceeding. In a large complex case, sophisticated parties with substantial economic stakes square off against one another across the negotiating table, each armed with a team of lawyers and advisors who are highly skilled not only in bankruptcy law and practice but also in game theory. The party with the greatest stake, of course, is the debtor; the survival of its business and the livelihood of its employees often depend on what happens at that negotiating table. When a settlement is reached and provides the architecture for a plan of reorganization, Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable case law provide the framework for the bankruptcy court's consideration of the settlement embodied in the plan. The settlement proponent bears the burden to persuade the court that the settlement "is in the best interests of the estate."[1] In assessing whether a settlement is in the best interests of the estate, "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute."[2] Rather, the court "only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment."[3] Here, where the Court considered confirmation of the First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors In Possession and the Official Committee of Unsecured Creditors [Docket No. 664, Ex. 1] (the "Plan") over nine days of testimony and oral argument,

---

[1]    *HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 248 (Bankr. S.D.N.Y. 2012).
[2]    *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007).
[3]    *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640–41 (Bankr. S.D.N.Y. 2012) (citing *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)).

there was far more than a mini-trial.  As set forth in detail below, the settlement embodied in the Plan is clearly in the best interests of the estates.  The Plan is confirmed.

## BACKGROUND[4]

The debtors in these chapter 11 cases (collectively, the "Debtors") are primarily holding companies for certain non-debtor affiliates that provide wireless communication services for businesses and consumers in Brazil, Argentina, and, formerly, Mexico.  The ultimate parent and holding company for each of the Debtors and their non-debtor affiliates, NII Holdings, Inc. ("NII Holdings"), is a public company that has the exclusive right to use the Nextel brand in its markets and, through intercompany license and sublicense agreements with certain of its non-debtor subsidiaries, offers unique push-to-talk services associated with the Nextel brand in Latin America.  The services offered, all of which are provided under the Nextel brand, include, among other things, mobile telephone voice service and wireless data services.

## I.    Events Leading to the Filing

As described in the annual report of NII Holdings for the fiscal year 2013 (the "2013 10-K") and in the Declaration of Daniel E. Freiman in Support of Confirmation of the Plan,[5] the 2013 operating results of NII Holdings and its subsidiaries and affiliates (the "Company") were adversely affected by a number of internal and external business factors.  This resulted in

---

[4]    Having considered the voluminous evidence, testimonial and documentary, including all exhibits admitted into evidence, having conducted an independent analysis of the law and the facts, and mindful that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)), the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Rule 9014 of the Bankruptcy Rules.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

[5]    *See* Tr. Ex. P202 ("Freiman Decl.") ¶ 8.  References herein to "Tr. Ex. P__" are citations to the Plan Proponents' Exhibit List.  References herein to "Tr. Ex. O__" are citations to the Exhibit List of the CapCo 2021 Group (as defined below).

disclosure in the 2013 10-K, released on February 28, 2014, that, "due to our recent results of operations, [NII Holdings] may not be able to continue as a going concern."[6] At the same time, in early 2014, the Company was entering a transition period in which it expected to generate operating losses while completing the build-out of its 3G networks in Brazil and Mexico, a necessity for remaining competitive in those markets.[7] Although the Company believed it had sufficient liquidity to meet its needs in the short term, it recognized that it could soon be faced with long-term operational and liquidity issues and that this would present challenges to the Company's ability to meet its then-existing business plan.[8]

Also during this time, as part of its ordinary course monitoring of prospective covenant compliance under its debt instruments, the Company determined that there was a risk that NII Brazil and NII Mexico, two of its main operating subsidiaries, would fail to comply with certain of their debt covenants as of June 30, 2014, the next compliance calculation date under the existing credit agreements with their significant lenders — China Development Bank Corporation ("CDB"), Caixa Economica Federal ("Caixa"), and Banco de Brasil S.A. ("BdB" and, collectively with CDB and Caixa, the "Operating Company Lenders").[9] The Company disclosed this risk in the 2013 10-K, and it thereafter commenced preliminary discussions with the Operating Company Lenders about the possibility of obtaining future waivers or amendments to the credit agreements with the Operating Company Lenders (collectively, the "Operating Company Credit Agreements").[10]

---

[6]    Tr. Ex. P197 (NII Holdings, Inc. Dec. 31, 2013 Form 10-K), at 21; Freiman Decl. ¶ 8.

[7]    *See* Freiman Decl. ¶ 9.

[8]    *Id.*

[9]    *See id.* ¶ 12.  At the time of these initial meetings, NII Brazil had loans outstanding in the approximate amount of (i) $713 million to CDB, (ii) $272 million to Caixa, and (iii) $179 million to BdB (at then-prevailing exchange rates).  The loans borrowed from CDB by NII Mexico, which are included in these figures, were later repaid in full from the proceeds of the sale of NII Mexico during the chapter 11 cases.  *See* Freiman Decl. ¶¶ 14, 33.

[10]    *See* Freiman Decl. ¶ 13.

3

In early 2014, the Company hired (i) Rothschild Inc. ("Rothschild") to explore strategic measures to improve liquidity, including refinancing or restructuring existing debt; (ii) UBS Securities, LLC to explore potential strategic alternatives, including a potential sale of one or more of its businesses; and (iii) McKinsey & Co. to begin the process of reformulating its business plan.[11]

Around this time, groups of holders of unsecured notes issued by certain of the Debtors[12] began organizing, retaining advisors, and reaching out to the Debtors and their professionals.[13] In February 2014, entities managed by Capital Research and Management Company (collectively, "CapRe"), which had holdings across the Debtors' capital structure sufficient to create a "blocking position" for any chapter 11 plan, organized an *ad hoc* group of holders of LuxCo Notes and CapCo Notes (the "Cross-Holder Group") and retained advisors.[14]  A second group, comprised of holders of only CapCo Notes, was organized by Aurelius Capital Management, LP on behalf of its managed entities and affiliates (collectively, "Aurelius") around the same time.[15]

---

[11]    *See* Freiman Decl. ¶¶ 9–11.

[12]    The prepetition notes issued by NII Capital Corp. ("CapCo") are as follows: (i) the 8.875% senior notes due 2019 issued in the aggregate principal amount of $500,000,000 (the "CapCo 2019 Notes"); (ii) the 10% senior notes due 2016 issued in the aggregate principal amount of $800,000,000 (the "CapCo 2016 Notes," and, together with the CapCo 2019 Notes, the "CapCo 2016/2019 Notes"); and (iii) the 7.625% senior notes due 2021 issued in the aggregate principal amount of $1,450,000,000 (the "CapCo 2021 Notes," and, collectively with the CapCo 2016/2019 Notes, the "CapCo Notes").

The prepetition notes issued by NII International Telecom S.C.A. ("LuxCo") are as follows: (i) the 7.875% senior notes due 2019 issued in the aggregate principal amount of $700,000,000 and (ii) the 11.375% senior notes due 2019 issued in the aggregate principal amount of $900,000,000 (together, the "LuxCo Notes").  The CapCo Notes and the LuxCo Notes will be referred to herein collectively as the "Prepetition Notes."

[13]    Freiman Decl. ¶ 41.

[14]    *See* Tr. Ex. P201 ("Parkhill Decl.") ¶ 15; Freiman Decl. ¶ 41.

[15]    Freiman Decl. ¶ 42.

On March 4, 2014, Aurelius delivered a letter[16] to NII Holdings, CapCo, NII Global

Holdings, Inc. ("NII Global"), McCaw International (Brazil), LLC ("McCaw"), Airfone

Holdings, LLC ("Airfone"), and Nextel International (Uruguay), LLC ("NIU") (the latter three

Debtors, collectively, the "Transferred Guarantors") outlining certain alleged claims arising out

of historical transactions involving the Debtors.  Such claims included certain of the following

claims (collectively, the "Disputed Claims"):

- <u>Transferred Guarantor Claims</u>.  Claims for breach of the indentures governing
  the CapCo 2016/2019 Notes arising out of a series of transactions undertaken
  in late 2009 and early 2010, whereby the Transferred Guarantors that were
  guarantors of the CapCo Notes were transferred by NII Holdings down the
  corporate structure to NII Global, and then to Nextel International Holdings
  S.à.r.l. ("NIHS"), and ultimately to LuxCo.  The Transferred Guarantor
  Claims allege that the transfer from NII Global to NIHS resulted in a breach
  of the terms of the CapCo 2009 Indentures (as defined below) and, therefore,
  the guarantees by the Transferred Guarantors were not properly released.

- <u>Fraudulent Conveyance Claims</u>.  Potential avoidance actions and fraudulent
  conveyance claims arising out of a series of transactions undertaken by the
  Company in early 2013 in connection with the issuance of the LuxCo Notes,
  including: (i) NII Holdings' guarantee of the LuxCo Notes; (ii) CapCo's
  agreement to subordinate its $644 million loan receivable from LuxCo to the
  LuxCo Notes; (iii) the release or transfer of intercompany receivables or
  obligations by various Debtors, including approximately (a) $614 million of
  receivables owed to NII Holdings by NII Brazil and transferred to LuxCo in
  February 2013 and (b) $48 million owed to NII Holdings, Nextel International
  (Services), Ltd. ("NIS"); and NII Funding Corp. from McCaw; and (iv) the
  release or transfer in April 2013 by NIS and NII Holdings of approximately
  $93 million in intercompany receivables owed to them by Nextel del Peru
  S.A.

- <u>Intercompany Recharacterization Claims</u>. Claims to recharacterize as equity
  the intercompany obligations outstanding as of the Petition Date (as defined

---

[16]    *See* Tr. Ex. P002 (the "First Aurelius Letter").  The First Aurelius Letter outlined Aurelius's allegations
with respect to the Transferred Guarantor Claims and the Fraudulent Conveyance Claims.  On September 5, 2014,
Aurelius sent an additional letter to holders of Prepetition Notes outlining additional allegations and potential claims
(the "Second Aurelius Letter").  *See* Debtors' (I) Memorandum of Law in Support of Confirmation of First
Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the Official
Committee of Unsecured Creditors and (II) Consolidated Reply to Objections to Confirmation of First Amended
Joint Plan of Reorganization [Docket No. 786] ("Debtors' Conf. Brief") ¶ 23 n. 32.

below) between a Debtor and another Debtor or between a non-debtor subsidiary of NII Holdings and a Debtor.

In the spring of 2014, the Debtors began engaging in intensive negotiations with the Cross-Holder Group and the Aurelius Group in order to develop a framework to restructure the Company's balance sheet debt and to attempt to settle the Disputed Claims and other issues, including (i) disputes over the value of the Company's businesses in Mexico and Brazil and the allocation of that value[17] and (ii) the appropriate division of equity between holders of the LuxCo Notes and holders of the CapCo Notes. The advisors for the noteholder groups were provided with access to data rooms containing a voluminous body of information and documentation relating to the operations of the Debtors and their non-debtor affiliates, including hundreds of documents related to the Disputed Claims.[18]

Discussions with respect to various restructuring constructs and terms continued in the summer of 2014, with the Debtors receiving and rejecting at least one proposal from the Cross-Holder Group.[19] Among the options considered by the parties during the negotiations were: (i) litigating some or all of the Disputed Claims during the course of a bankruptcy proceeding; (ii) restructuring the Company's balance sheet through a chapter 11 plan and setting aside a reserve pending the outcome of post-bankruptcy litigation of the Disputed Claims; (iii) settling the Disputed Claims through a chapter 11 plan; and (iv) a combination of any of these potential structures.[20] In order to streamline negotiations so that all parties could understand the value impact of various litigation and economic drivers, Rothschild worked with the Debtors and the

---

[17]     Because the value of the businesses in Mexico and Brazil depended on many uncertain factors that could impact the markets in which these businesses operated, the prepetition valuations proposed by different parties differed by as much as $700 million during this period. Valuations proposed by CapRe, on the one hand, and Aurelius, on the other hand, ranged from approximately $3.8 billion to $4.5 billion. Tr. Ex. P208 ("Scruton Decl.") ¶ 17.

[18]     Parkhill Decl. ¶ 17.

[19]     *See* Tr. Ex. P203 ("Shindler Decl.") ¶ 17; Parkhill Decl. ¶ 24.

[20]     *See* Parkhill Decl. ¶ 17.

other financial advisors to create a unified model (the "Waterfall Model") that all parties could agree upon for use in negotiations.[21]  The Waterfall Model was based upon intercompany and third-party debt claims and cash balances as of a specific date and it enabled the parties to "shift" litigation and other economic variables and analyze their impact on recoveries more easily.[22]

Because of a wide variance in the parties' positions on, among other things, the Disputed Claims, the appropriate division of equity between LuxCo and CapCo, and valuation, the parties were unable to agree in the summer of 2014 on a structure for a consensual restructuring.[23]  On September 15, 2014 (the "Petition Date"), upon the expiration of the 30-day grace period triggered by NII Holdings' decision not to make an interest payment on certain notes, certain of the Debtors commenced these chapter 11 cases with no restructuring deal in place.[24]  All parties recognized that the Debtors likely could not survive a prolonged stay in chapter 11 due to liquidity concerns, the risks of further deterioration of the Debtors' business and their customer base, and the threat to their non-debtor operating company affiliates posed by a potential foreclosure by the Operating Company Lenders.[25]  The parties continued to discuss settlement options with respect to all significant issues, including the Disputed Claims, which are described in detail below.

## II.    The Disputed Claims

### A.  The Transferred Guarantor Claims

In late 2009, CapCo issued notes with a total principal amount of $1.3 billion, in two series: in August 2009, CapCo issued the CapCo 2016 Notes, and on December 15, 2009, CapCo

---

[21]        *See* Parkhill Decl. ¶¶ 21–23 (discussing the Waterfall Model); Tr. Ex. P055 (Simplified Total Plan Distributable Value Illustration).
[22]        *See* Parkhill Decl. ¶ 23.
[23]        *See* Parkhill Decl. ¶ 27.
[24]        *See* Freiman Decl. ¶ 52.
[25]        *See* Parkhill Decl. ¶ 26.

issued the CapCo 2019 Notes.[26]  Upon issuance, the CapCo 2016 Notes and CapCo 2019 Notes were governed by substantially identical indentures (together, the "CapCo 2009 Indentures").[27] The indentures provided that the CapCo 2016/2019 Notes would be supported by guarantees from "Subsidiary Guarantors."[28]

The CapCo 2009 Indentures contemplated that Subsidiary Guarantors were to be drawn solely from the Company's "Domestic Restricted Subsidiaries," defined as:

> [A]ny Restricted Subsidiary of the [Company] other than a Restricted Subsidiary that is (1) a "controlled foreign corporation" under Section 957 of the Internal Revenue Code (a) whose primary operating assets are located outside the United States and (b) that is not subject to tax under Section 882(a) of the Internal Revenue Code because of a trade or business within the United States or (2) a Subsidiary of an entity described in the preceding clause (1).[29]

Presumably in an effort to avoid adverse tax consequences attendant to a controlled foreign corporation guaranteeing the debt of a U.S. issuer, the CapCo 2009 Indentures did not include as guarantors the Company's "Foreign Restricted Subsidiaries"[30] — those "Restricted Subsidiaries" of the Company that were not "Domestic Restricted Subsidiaries."[31]  Section 10.05(a)(v) of the CapCo 2009 Indentures further provided that, in the event that a Subsidiary Guarantor became a "Foreign Restricted Subsidiary" through merger, consolidation, or otherwise, such Subsidiary Guarantor's guarantee was to be released.[32]

Among the Domestic Subsidiary/Subsidiary Guarantors initially guaranteeing the CapCo 2016/2019 Notes were the Transferred Guarantors: (i) NIU, which, after December 2009, held Comunicaciones Nextel de Mexico, the indirect owner of operating subsidiaries that conducted

---

[26]    *See* Tr. Ex. P134 (CapCo 2016 Notes Final Offering Memorandum); Tr. Ex. P138 (CapCo 2019 Notes Final Offering Memorandum).

[27]    Tr. Ex. P135 (CapCo 2016 Notes Indenture); Tr. Ex. O014 (CapCo 2019 Notes Indenture).

[28]    CapCo 2009 Indentures, definition of "Subsidiary Guarantor."

[29]    CapCo 2009 Indentures, definition of "Domestic Restricted Subsidiary."

[30]    CapCo 2009 Indentures, definition of "Foreign Restricted Subsidiary."

[31]    *See generally* 26 U.S.C. § 956.

[32]    CapCo 2009 Indentures § 10.05(a)(v).

the Debtors' operations in Mexico; (ii) McCaw, the indirect owner of operating subsidiaries that conduct the Debtors' operations in Brazil; and (iii) Airfone, a subsidiary of McCaw.[33]

Beginning prior to the issuance of the CapCo 2019 Notes and continuing over a period of fifteen days subsequent to the issuance, the Company began a multi-step intercompany reorganization (the "2009 Reorganization") that included: (i) the transfer of equity interests in NIU from NII Holdings to CapCo on December 15, 2009; (ii) the transfer of equity interests in Nextel Mexico from CapCo to NIU at or around December 15, 2009; (iii) the contribution of NIU and its subsidiaries (including Nextel Mexico) from CapCo to NII Global on December 19, 2009; (iv) the contribution of McCaw and its subsidiaries from NII Holdings to CapCo on December 21, 2009; (v) the contribution of McCaw and its subsidiaries from CapCo to NII Global on December 23, 2009; and (vi) the transfer of the equity interests in NIU (including Nextel Mexico) and McCaw and its subsidiaries from NII Global to NIHS on December 30, 2009 (the "NII Global Transfer," and, collectively with all of the transfers in the 2009 Reorganization, the "2009 Transfers").[34]

The Debtors have stated that the 2009 Reorganization was undertaken to improve their financial flexibility and overall tax efficiency.[35]   By transferring each of the Transferred Guarantors "below" LuxCo and converting each of the Transferred Guarantors from a corporation for U.S federal income tax purposes to a limited liability company disregarded as separate from its owner, the Company aimed to create a tax structure that allowed earnings from the Company's non-U.S. operating subsidiaries to flow up and through the disregarded

---

[33]        Tr. Ex. P136 (CapCo 2016 Notes Indenture); Tr. Ex. O014 (CapCo 2019 Notes Indenture).
[34]        *See* Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the First Amended Joint Plan of Reorganization Proposed by the Plan Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors [Docket No. 785] ("Committee Brief") ¶ 35, Annex 1 (illustration of 2009 Transfers).
[35]        *See* June 9, 2015 Hr'g Tr. 8:13–9:15 (Freiman); June 8, 2015 Hr'g Tr. 64:15–23 (Shindler).

Transferred Guarantors to NIHS.[36]  NIHS could then repatriate such earnings to the Company's

U.S. entities through repayment of intercompany loans, thereby allowing the Company to (i)

transfer non-U.S. earnings and cash to the U.S. for increased financial flexibility and (ii) take

advantage of the Company's U.S. entities' prior tax losses to shield such earnings from tax.[37]

Ultimately, the Company's tax advisors projected that the 2009 Reorganization would result in

tax savings of between $300 million and $500 million.[38]

In connection with planning the 2009 Reorganization pursuant to which the Transferred

Guarantors would become subsidiaries of LuxCo, the Company's tax advisors raised a concern

that the continuation of the Transferred Guarantors' guarantees following the 2009 Transfers

would raise a "deemed dividend issue."[39]  The solution of the Company and their tax advisors to

this potential issue was to draft the CapCo 2009 Indentures to provide for a release of the

Transferred Guarantors' guarantees in the event the 2009 Reorganization occurred.[40]

Accordingly, as a result of the 2009 Transfers, when NIU and McCaw (and through McCaw,

Airfone) became subsidiaries of LuxCo, a Foreign Restricted Subsidiary under the CapCo 2009

---

[36]        *See* Tr. Ex. O148 (NIIH Strategic Tax Review).
[37]        *Id.*
[38]        *Id.*
[39]        *See* June 9, 2015 Hr'g Tr. 11:2–7 (Freiman) ("So one of the issues we recognized in developing the series of steps was that by moving a U.S. corporation below a foreign corporation and that U.S. corporation, if it had a guarantee, it would result in a deemed dividend.").  In connection with the 2009 Reorganization, those Transferred Guarantors that were U.S. corporations converted to limited liability companies disregarded as separate from their owners for U.S. federal income tax purposes. *See* Tr. Ex. O148 (NIIH Strategic Tax Review).  Presumably the Debtors' tax advisors were concerned that a guarantee from a U.S. entity disregarded as separate from its owner for U.S. federal income tax purposes, such as the Transferred Guarantors, would be treated by the IRS as a guarantee by that entity's owner, in this case, LuxCo.  As LuxCo is a "controlled foreign corporation" for U.S. federal income tax purposes, a guarantee of CapCo's debt by LuxCo would trigger a deemed dividend to CapCo, thereby increasing CapCo's taxable income and thus, its tax burden. *See* 26 U.S.C. § 956(a).  Had the Transferred Guarantors remained corporations for U.S. federal income tax purposes, the "deemed dividend issue" could have been solved, but the tax benefits of the 2009 Reorganization could not have been realized because income from the operating subsidiaries could not have flowed through the Transferred Guarantors.  Instead, it would have been treated as earned by the Transferred Guarantors for U.S. federal income tax purposes as if such Transferred Guarantors were treated as corporations. *See generally* 26 U.S.C. §§ 301–395 (covering corporate distributions and disbursements).
[40]        *See* June 9, 2015 Hr'g Tr. 11:8–14 (Freiman) (Q: "And how would the problem be dealt with?"  A: "So the problem is dealt with by releasing the guarantee."  Q: "Whose guarantee?"  A: "The guarantee of the entities that moved below the foreign issuers.").

10

Indentures, these entities became Foreign Restricted Subsidiaries under the CapCo 2009 Indentures as of December 30, 2009. Despite this planning and careful drafting, nowhere in the transaction documentation underlying the issuance of the notes did the Debtors disclose to prospective purchasers of the CapCo 2016/2019 Notes that the guarantees of the Transferred Guarantors would or could be released shortly after issuance.[41]

On March 8, 2010, CapCo executed a supplemental indenture for each of the CapCo 2009 Indentures (together, the "Supplemental Indentures"). In the Supplemental Indentures, each applicable indenture trustee acknowledged receiving from the Company an Officer's Certificate that represented, warranted, and certified that the transfers of McCaw, Airfone, and NIU "complied with all applicable provisions and conditions of Sections 4.10, 10.04(a)(i), and 10.04(a)(ii)(B) of the [2009 CapCo Notes] Indenture[s]."[42] Each indenture trustee also acknowledged receiving from the Company an Opinion of Counsel "expressing the legal opinion . . . that, pursuant to Section 10.05(a)(v) of the [2009 CapCo Notes] Indenture[s], all of the conditions precedent to the release of the obligations of each Released Guarantor from its respective obligations under its respective Note Guarantee have been complied with."[43] Because the Transferred Guarantors had no assets of their own, the Company concluded that the release of the guarantees of the Transferred Guarantors was not material enough to require public disclosure and, accordingly, it did not publicly file the Supplemental Indentures at the time they

---

[41]    *See* Tr. Ex. P134 (CapCo 2016 Notes Indenture); Tr. Ex. P138 (CapCo 2019 Notes Indenture).

[42]    Tr. Ex. P132 (CapCo 2016 Notes Supplemental Indenture), at ¶ 2; Tr. Ex. P133 (CapCo 2019 Notes Supplemental Indenture).

[43] *Id.* ¶ 3.

were executed.[44]   The Supplemental Indentures were filed publicly with the SEC on March 10, 2014.[45]

Pursuant to a prospectus dated April 5, 2010 (the "Prospectus"), CapCo consummated a registered exchange offer (the "Exchange") by which it offered to exchange existing CapCo 2016/2019 Notes (the "Old Notes"), which could not be freely transferred on the capital markets, for unrestricted notes (the "Exchange Notes").[46]   The Company undertook the Exchange to comply with its obligations under registration rights agreements entered into in connection with the initial issuance of the CapCo 2016/2019 Notes (the "Registration Rights Agreements").[47] Pursuant to the Registration Rights Agreements, the Company was obligated to offer Exchange Notes, referred to in the Registration Rights Agreements as "Exchange Securities" and defined as "debt securities of the Company and the related guarantees of the Guarantors as provided for in the [CapCo 2009 Indentures] identical in all material respects to the Securities (except that the Additional Interest provisions and transfer restrictions shall be eliminated) to be issued under the [CapCo 2009 Indentures]," in exchange for Old Notes.[48]   The Registration Rights Agreements included the Transferred Guarantors among the identified "Guarantors."[49]   The Prospectus, however, did not include the Transferred Guarantors as guarantors of the Exchange Notes, nor did the Prospectus or any other document publicly filed at the time of the Exchange explicitly

---

[44]    *See* June 9, 2015 Hr'g Tr. 12:13–23; 59:8–60:14 (Freiman).
[45]    Tr. Ex. O016 (NII Holdings Mar. 10, 2014 Form 8-K), at Exs. 99.2, 99.3.
[46]    Tr. Ex. O013 (Prospectus).  The Exchange was an "A/B exchange offer," a registered exchange offer in which the issuer issues new registered securities with terms identical to original securities issued in a private placement and offers the new securities to the holders of the original restricted securities in exchange for those original securities. An A/B exchange offer provides freely tradeable securities to those investors that participate. *See* PRACTICALLAW.COM, http://us.practicallaw.com/7-382-3204 (last visited Aug. 25, 2015).
[47]    Tr. Ex. O013 (Prospectus), at 4 ("To satisfy our obligations under the Registration Rights Agreements [,] we are offering to exchange $800 million principal amount of our 10% Exchange Notes for an equal amount of our 10% Old Notes that have been registered under the Securities Act and $500 million principal amount of our 8.875% Exchange Notes for an equal amount of our 8.875% Old Notes that have been registered under the Securities Act.").
[48]    Tr. Ex. P136 (CapCo 2016 Notes Registration Rights Agreement); Tr. Ex. P140 (CapCo 2019 Notes Registration Rights Agreement).
[49]    *Id.*

disclose that the Company (i) had completed the 2009 Reorganization or (ii) purported to release

the guarantees by the Transferred Guarantors as a result of the 2009 Transfers.[50]  On its cover,

the Prospectus noted that "[t]he terms of the Exchange Notes are substantially identical to those

of the Old Notes, except that the Exchange Notes will be registered under the Securities Act, and

the transfer restrictions and registration rights relating to the Old Notes will not apply to the

Exchange Notes."[51]

    All of the holders of the Old Notes participated in the Exchange, tendering their Old

Notes to CapCo in exchange for Exchange Notes.[52]  The tenders of the Old Notes in the

Exchange were evidenced by letters of transmittal (the "Letters of Transmittal").[53]  Pursuant to

the Letters of Transmittal, each noteholder participating in the Exchange agreed to "exchange[],

assign[] and transfer[] to . . . the Issuer all right, title and interest in and to" any Old Notes

tendered for exchange.[54]  The Prospectus contained no disclosure suggesting that the holders of

the CapCo 2016/2019 Notes would be relinquishing any rights in connection with the Exchange

and noted that "[t]he Exchange Notes will evidence the same debt as the Old Notes, including

principal and interest, and will be issued under and be entitled to the benefits of the same

indentures that govern the Old Notes."[55]

    In March and December 2011, CapCo issued the CapCo 2021 Notes in the aggregate

principal amount of $1.45 billion.  The indenture for the CapCo 2021 Notes does not identify the

Transferred Guarantors as guarantors of the CapCo 2021 Notes.[56]

---

[50]    *See* June 9, 2015 Hr'g Tr. 110:25–111:25 (Freiman).
[51]    Tr. Ex. O013 (Prospectus), at 1.
[52]    *See* Tr. Ex. P200 (CapCo 2021 Stipulation) Ex. R, at ¶ 4(a); *see also* Tr. Ex. P019 (Disclosure Statement), at 16, Art. II(B).
[53]    Tr. Ex. O131 (CapCo 2019 Letter of Transmittal); Tr. Ex. O132 (CapCo 2016 Letter of Transmittal).
[54]    *Id.*
[55]    Tr. Ex. O013 (Prospectus), at 4.
[56]    Tr. Ex. O012 (CapCo 2021Notes Indenture).

On March 4, 2014, Aurelius sent the First Aurelius Letter[57] to certain of the Debtors, asserting that the NII Global Transfer – one of the many steps that the Company undertook in the 2009 Reorganization – violated Section 10.04 of the CapCo 2009 Indentures, which governs the disposition of all or substantially all of the assets of Subsidiary Guarantors.[58]  Additionally, while not raised in the First Aurelius Letter, parties asserting the Transferred Guarantor Claims also allege that the 2009 Transfers violate (i) Section 5.01(a) of the CapCo 2009 Indentures, which governs transfers of all or substantially all of the assets of NII Holdings[59] and (ii) Section 5.01(d) of the CapCo 2009 Indentures, which governs transfers of all or substantially all of the assets of

---

[57]     Tr. Ex. P002 (First Aurelius Letter).
[58]     *See* Tr. Ex. P002 (First Aurelius Letter).  Section 10.04 of the CapCo 2009 Indentures provides, in pertinent part:

> A Subsidiary Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge into (whether or not such Subsidiary Guarantor is the surviving Person), another Person, other than the Parent, the Company or another Subsidiary Guarantor unless:
>> (i)      immediately after giving effect to that transaction, no Default or Event of Default exists; and
>> (ii)     either:
>>> A.  the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Subsidiary Guarantor) is organized or existing under the laws of the United States, any state thereof or the District of Columbia and assumes all the obligations of that Subsidiary Guarantor under this Indenture and its Note Guarantee pursuant to a supplemental indenture satisfactory to the Trustee and the Registration Rights Agreement; or
>>> B.  such sale of other disposition or consolidation or merger complies with Section 4.10 hereof.

[59]     Section 5.01(a) of the CapCo 2009 Indentures provides, in pertinent part:

> The Parent shall not, directly or indirectly: (i) consolidate or merge with or into another Person (whether or not the Parent is the surviving corporation) or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of the Parent and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person, unless:
>> (i)      either: (a) the Parent is the surviving corporation; or (b) the Person formed by or surviving such any such consolidation or merger (if other than the Parent) or to which such sale, assignment, transfer, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia and
>> (ii)     assumes all the obligations of the Parent under its Guarantee and this Indenture and the Registration Rights Agreement, pursuant to agreements reasonably satisfactory to the Trustee . . . .

CapCo and its Restricted Subsidiaries.[60]  Sections 10.04, 5.01(a), and 5.01(d)[61] each mandate

that the applicable transferor meets specified conditions to effect a transfer of all or substantially

all of its assets.[62]  The requirements to effectuate a transfer of all or substantially all of the

applicable transferor's assets vary among the sections.  A transferor may satisfy the requirements

in two ways: (i) by transferring to a U.S. entity that assumes all of the transferred entity's

obligations under the CapCo 2009 Indentures[63] or (ii) by ensuring that the transfer "complies

with Section 4.10."[64]  NII Holdings may only satisfy the requirements by doing the former.

---

[60]      *See* Committee Brief ¶ 117.

[61]      Section 5.01(d) of the CapCo 2009 Indentures provides, in pertinent part:

The Company shall not, directly or indirectly: (i) consolidate or merge with or into another Person (whether or not the Company is the surviving corporation) or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person, unless:

(i)        immediately after giving effect to that transaction no Default or Event of Default exists; and . . . .

(ii)       in the case of a sale, assignment, transfer, conveyance or other disposition of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, either:

a.  (i) the Person acquiring the property in any such sale or disposition (x) is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia and (y) assumes all the obligations of the Company under the Notes, this Indenture and the Registration Rights Agreement, pursuant to agreements reasonably satisfactory to the Trustee; *provided* that in the case where such person is not a corporation, a co-obligor of the Notes is a corporation; and (ii) each Guarantor, unless such Guarantor is the Person with which the Company has consolidated with or merged into, will have by amendment to its Note Guarantee confirmed that its Note Guarantee will apply to the obligations of the Company in accordance with the Notes and this Indenture; or

b.  to the extent such properties and assets constitute all or substantially all of the properties and assets of the Parent and its Restricted Subsidiaries taken as a whole, such sale or other disposition complies with Section 4.10.

[62]      *See* CapCo 2009 Indentures §§ 5.01(a), 5.01(d), 10.04.

[63]      *See id.*

[64]      *Id.*  Section 4.10 of the CapCo 2009 Indentures provides, in pertinent part:

The Parent shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(i)        the Parent or such Restricted Subsidiary receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of; and

Thus, the Transferred Guarantor Claims allege that (i) the 2009 Transfers triggered operation of one or more of Sections 10.04, 5.01(a), and 5.01(d) (*i.e.*, a transfer of all or substantially all of the transferor's assets), obligating the transferor (whether NII Global, NII Holdings, or CapCo) to ensure that such transfer complied with the requirements of the relevant section and (ii) such transferor or transferors did not in fact comply with such requirements; consequently, it is alleged that the transfer at issue was made in breach of rights under the CapCo 2009 Indentures belonging to the holders of the CapCo 2016/2019 Notes. Neither the Aurelius Letter nor the Transferred Guarantor Claims challenge the actual release of the guarantees of the Transferred Guarantors; to the contrary, all parties seem to agree that, given the execution of the 2009 Transfers and the completion of the 2009 Reorganization, the release itself was in compliance with Section 10.05(a)(v) of the CapCo 2009 Indentures.[65] Rather, the allegation is that, because the 2009 Transfers allegedly violated the CapCo 2009 Indentures (whether Section 5.01(a), Section 5.01(d), or Section 10.04), and it was only by reason of the 2009 Transfers that the Transferred Guarantors met the conditions of Section 10.05(a)(v) for the release of the guarantees of the Transferred Guarantors by becoming subsidiaries of LuxCo (*i.e.*, a Foreign Restricted Subsidiary for purposes of the CapCo 2009 Indentures), the release of the guarantees was also in violation of the CapCo 2009 Indentures, notwithstanding such release's technical compliance with Section 10.05(a)(v).[66] Following receipt of the Aurelius Letter, the Debtors

---

(ii)    at least 75% of the consideration therefor received by the Parent or such Restricted Subsidiary is in the form of cash, Cash Equivalents or Replacement Assets or a combination thereof . . . .

[65]    *See* Response of Aurelius Capital Management, LP to the Objection of the Ad Hoc Group of NII Capital 2021 Noteholders to Confirmation of the First Amended Plan of Reorganization [Docket No. 780] ¶¶ 43–44; Committee Brief ¶ 120; Debtors' Conf. Brief ¶¶ 110–11; Revised Objection of The Ad Hoc Group of NII Capital 2021 Noteholders To Confirmation of the First Amended Plan of Reorganization [Docket No. 802] ("CapCo 2021 Obj.") ¶¶ 55–58.

[66]    *See id.* Section 10.05(a)(v) of the CapCo 2009 Indentures provides, in pertinent part, that "[a]ny Subsidiary Guarantor shall be released and relieved of any obligations under its Note Guarantee . . . (v) if such Subsidiary

took the position, in multiple securities filings, that the Transferred Guarantor Claims were "without merit."[67]

In the event the Transferred Guarantor Claims were successful, proponents of such claims argue that the guarantees of the Transferred Guarantors either should be deemed to still be in place or be reinstated, or assert that a court could fashion some other equitable remedy.[68]  The indenture trustees for each of the CapCo 2016 Notes and the CapCo 2019 Notes have filed proofs of claim against each of the Transferred Guarantors for the full amount due and owing under the CapCo 2016 Notes and the CapCo 2019 Notes, respectively (collectively, the "Proofs of Claim").[69]  None of the Proofs of Claim directly asserts alleged breaches of Section 5.01(a) or 5.01(d) of the CapCo 2009 Indentures, although each claim contains language reserving the claimant's right to amend its claim.[70]

---

Guarantor becomes a Foreign Restricted Subsidiary by merger, consolidation or otherwise, unless such Foreign Restricted Subsidiary (i) is a First Tier Restricted Subsidiary or (ii) is required to Guarantee the Notes and be a Subsidiary Guarantor pursuant to Section 4.18(b)."  CapCo 2009 Indentures § 10.05.

[67]        See, e.g., Tr. Ex. O001 (NII Holdings Mar. 31, 2014 Form 10-Q), at 12 ("We believe that the allegations contained in the [Aurelius March 2014] notice are without merit."); Tr. Ex. O002 (NII Holdings June 30, 2014 Form 10-Q), at 3 (same); Tr. Ex. O003 (NII Holdings Sept. 30, 2014 Form 10-Q), at 17 (same).

[68]        See Committee Brief ¶ 107; Debtors' Conf. Brief ¶ 79.

[69]        See Tr. Ex. P067 (Proof of Claim No. 157, U.S. Bank National Association, in its capacity as trustee under the CapCo 8.875% Note Indenture, against NIU Holdings, LLC (as assignee of Nextel (International) Uruguay, LLC), dated December 19, 2014); Tr. Ex. P068 (Proof of Claim No. 195, Wilmington Savings Fund Society, FSB, in its capacity as trustee under the CapCo 10% Note Indenture, against NIU Holdings, LLC (as assignee of Nextel (International) Uruguay, LLC), dated December 22, 2014); Tr. Ex. P069 (Proof of Claim No. 144, U.S. Bank National Association, in its capacity as trustee under the CapCo 8.875% Note Indenture, against McCaw International (Brazil), LLC, dated December 22, 2014); Tr. Ex. P070 (Proof of Claim No. 245, Wilmington Savings Fund Society, FSB, in its capacity as trustee under the CapCo 10% Note Indenture, against McCaw International (Brazil), LLC, dated December 22, 2014); Tr. Ex. P071 (Proof of Claim No. 139, U.S. Bank National Association, in its capacity as trustee under the CapCo 8.875% Note Indenture, against Airfone Holdings, LLC, dated December 19, 2014); Tr. Ex. P072 (Proof of Claim No. 203, Wilmington Savings Fund Society, FSB, in its capacity as trustee under the CapCo 10% Note Indenture, against Airfone Holdings, LLC, dated December 22, 2014).  The indenture trustee under the CapCo 2021 Notes did not file a proof of claim against any of the Transferred Guarantors, nor did any holder of CapCo 2021 Notes.

[70]        See id.

B.  The Fraudulent Conveyance Claims

The Fraudulent Conveyance Claims asserted in the First and Second Aurelius Letters primarily relate to a series of transactions undertaken by the Company from January through May 2013 in connection with the issuance of the LuxCo Notes.  The Fraudulent Conveyance Claims are based on transfers involved in the following transactions:

- CapCo Intercompany Note.  In 2009 and 2010, CapCo sold its direct and indirect equity interests in certain foreign subsidiaries, including operating subsidiaries in Argentina, Peru, and Chile, to LuxCo.[71]  In connection with these transactions, LuxCo issued a $644 million note (the "CapCo Intercompany Note") to CapCo in exchange for CapCo's sale of its 100% equity interest in NII Mercosur, LLC to LuxCo.[72]  The face amount of the CapCo Intercompany Note was based on a fair market value assessment of NII Mercosur, LLC.

- LuxCo Transactions.  In February and May 2013, LuxCo issued the LuxCo Notes in the aggregate principal amount of $1.6 billion.  Around the time of, and in part in connection with the issuance of the LuxCo Notes, NII Holdings and CapCo undertook the following three transactions: (i) NII Holdings entered into guaranties of LuxCo's obligations to repay the Luxco Notes; (ii) CapCo agreed to subordinate its right to payment under the CapCo Intercompany Note to LuxCo's repayment of the LuxCo Notes (the "CapCo/LuxCo Subordination"); and (iii) NII Holdings released or transferred $900 million in intercompany obligations owing primarily to NII Holdings by certain of LuxCo's subsidiaries (the "First Release").  The First Release consisted primarily of (a) 16 transactions by NII Holdings and other entities on February 7, 2013, whereby NII Holdings and such entities released, transferred, or forgave approximately $178 million in intercompany obligations and/or receivables owing to them and (b) NII Holdings' transfer of $614 million in obligations owed to NII Holdings by NII Brazil to LuxCo in exchange for an intercompany note from LuxCo, which was subsequently transferred through the corporate chain of ownership back to LuxCo and cancelled.

- Peru Transfers.   The Company engaged in a series of transactions (collectively, the "Peru Transfers") with the net effect of transferring two receivables in the aggregate amount of $93.6 million from Nextel Peru to

---

[71]    See Tr. Ex. P059 (Index I – 2009 Corporate Restructuring); Tr. Ex. P060 (Index II – 2009 Corporate Restructuring).

[72]    See Tr. Exs. P059, P060.

Nextel Peru (effectively cancelling the receivable).    Nextel Peru was subsequently sold in August 2013 for $405.5 million.

- McCaw Transfers.    In 2013, NII Holdings, NIS, and NII Funding Corp. forgave $48 million owed to them by McCaw (the "McCaw Transfers").

## C.  The Intercompany Recharacterization Claims

A third category of Disputed Claims involves claims seeking to recharacterize as equity the intercompany obligations outstanding as of the Petition Date between a Debtor and another Debtor or between a non-debtor subsidiary of NII Holdings and a Debtor (defined in the Plan as the "Recharacterization Claims").

In the years prior to the Petition Date, in the ordinary course of their business, the Debtors entered into various transactions with other Debtors and with their non-debtor affiliates, which led to the accrual of certain intercompany receivables and payables on the Debtors' books and records.  In addition, intercompany obligations arose in connection with the Debtors' capital-raising and intercompany funding activities.  As of the Petition Date, the Company had a number of outstanding intercompany balances on its balance sheet including:[73] (i) $657 million owing by Nextel Brazil to LuxCo (transferred by NII Holdings in 2013) and $939.9 million owing by Nextel Brazil to LuxCo (post-2013);[74] (ii) $3.06 billion owing by NII Holdings to CapCo;[75] (iii) $709 million owing by LuxCo to CapCo; (iv) $788 million owing by NIS to NII Holdings (the "NIS Obligations") and $214 million owing by NII Funding to NII Holdings (the "Funding

---

[73]    All amounts owed are as of the Petition Date.  Other intercompany claims also arose from the transactions giving rise to the potential Fraudulent Conveyance Claims.

[74]    These obligations are evidenced by more than 40 intercompany notes that generally arose in connection with loans from LuxCo to NII Brazil and were treated as debt from an accounting perspective; in a 2013 letter to the IRS, however, NII Holdings stated that it considered these obligations to be in the nature of equity contributions rather than debt.  While these obligations were expected to be paid on fixed maturity dates, in most cases the obligations were extended rather than paid.  To obtain credit from lenders at the local level in Brazil, certain of these obligations also were subordinated to other debt issued by NII Brazil.

[75]    These obligations are evidenced by four intercompany notes issued by NII Holdings to CapCo and arose in connection with CapCo's issuance of the CapCo Notes.  Each time CapCo issued a series of notes, it subsequently transferred the note proceeds to NII Holdings, which then issued an intercompany note (in the form of a documented promissory note) to CapCo in exchange for the funds.

Obligations");[76] (v) $19.6 million owing by Nextel Brazil to NII Holdings and NIS; (vi) $151.8

million owing by NII Mexico to NII Holdings, NIS, and NII Funding Corp. (the "Mexico

Obligations"); and (vii) $16.4 million owing by NII Argentina to NII Holdings, NIS, and NIS

Funding Corp. (the "Argentina Obligations").[77]

### III.    Investigation of the Disputed Claims by the
### Official Committee of Unsecured Creditors

On September 29, 2014, the United States Trustee for the Southern District of New York

(the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the

"Committee") in these cases. The U.S. Trustee supplemented the Committee by adding two

members on November 5, 2014. The Committee is co-chaired by CapRe, the largest holder of

the Prepetition Notes, and Aurelius Investment, LLC. The Committee members also include the

three trustees for the issuances of the Prepetition Notes: (i) Wilmington Trust, National

Association; (ii) Wilmington Savings Fund Society, FSB; and (iii) U.S. Bank, National

Association. In total (as of the time of the Confirmation Hearing), Committee members held, in

the aggregate, 84% of the CapCo 2016/2019 Notes, 53% of the CapCo 2021 Notes, and 39% of

the LuxCo Notes. In addition, unsecured creditors American Tower do Brasil - Cessao de

Infraestruturas Ltda. and Motorola Mobility LLC, both contract creditors of the Debtors, also

serve as Committee members. The Committee retained legal and financial advisors; each

---

[76]    The NIS Obligations and the Funding Obligations arose pursuant to obligations that existed between affiliated parties, but the precise genesis of certain of these obligations is unknown, and the obligations have little or no supporting documentation. Further, while no payments were made with respect to the Funding Obligations, it is unknown whether any repayments were made or contemplated with respect to the NIS Obligations. In addition, while both the NIS Obligations and the Funding Obligations were recorded as debt obligations on the respective entity's balance sheet, the Funding Obligations (and possibly the NIS Obligation) were not treated as debt for tax purposes.

[77]    The Mexico Obligations and the Argentina Obligations are owed pursuant to intercompany agreements relating to service fees and royalties which have been modified as the business changed, and some obligations were suspended or forgiven before the closing of the Mexico sale. Some payments have been made, and these obligations continued to accrue postpetition. Moreover, repayment of certain of the Mexico Obligations and the Argentina Obligations relating to NII Mexico had been subordinated to local debt obligations.

member of the Committee also retained its own individual counsel and certain members engaged separate financial advisors.

Immediately after the Committee's appointment, the Committee's professionals met with all parties involved in prepetition negotiations[78] and submitted an informal document request to the Debtors for all documents in the Debtors' control relating to the Disputed Claims.  This request ultimately led to the Committee's professionals reviewing over 13,000 documents and delving into various areas of expertise to inform the Committee's understanding and analysis of the Disputed Claims.  The Committee's stated goal in its investigation of the Disputed Claims was to understand the complexities of such claims and the parties' differing views on their merits and to assess the claims' strengths and weaknesses in order to effectively (i) advise the Committee members and (ii) assist in the ongoing negotiations between the prepetition negotiating parties.  The Committee's professionals also became intimately familiar with the other disputed issues in these chapter 11 cases regarding valuation and cash/equity allocation.  At the initial meetings, the Committee learned that, simultaneously with their efforts to negotiate a confirmable chapter 11 plan, the Debtors would be pursuing strategic alternatives for the sale of all or part of the Debtors' businesses in the event a confirmable chapter 11 plan could not be achieved.[79]  The Debtors informed the Committee that, due to approaching liquidity issues, they would need to either sell all or part of the business or obtain hundreds of millions of dollars in postpetition financing at the end of the first quarter of 2015.

---

[78]    These initial meetings were held with (i) the Debtors and their professionals on September 30, 2014; (ii) CapRe and its professionals on October 3, 2014; (iii) the professionals for the ad hoc group of holders of the LuxCo Notes that had split from the Cross-Holder Group shortly before the Petition Date (the "LuxCo Group") on October 6, 2014; and (iv) Aurelius and its professionals on October 7, 2014.

[79]    Scruton Decl. ¶ 20.

The Committee's initial meetings were followed by numerous phone calls and meetings with the parties to discuss the legal and factual issues and the arguments and counterarguments with respect to various aspects of the Disputed Claims.[80]  After holding these meetings and conducting their own research, the Committee's professionals made multiple presentations to the Committee with their analyses of the Disputed Claims and related legal and factual issues.[81] Among other things, they discussed with the Committee the legal complexity of the Disputed Claims and that, given the multiple factual and evidentiary issues presented, the high likelihood of competing expert testimony, the possibility that independent fiduciaries would need to be retained by the estates, and the probability that any judgment would be appealed, the cost of litigation would be high if the Disputed Claims were not settled.[82]

## IV.    The Initial PSA and the Appointment of the Independent Manager

After the Petition Date, the Debtors, Aurelius, CapRe, and the LuxCo Group continued their negotiations, now joined by the Committee and its advisors, who acted as facilitators in the settlement discussions.[83]   The parties exchanged multiple plan term sheets and settlement proposals.[84]  At a meeting called by Steven Shindler, the Debtors' Chief Executive Officer, at the

---

[80]     After the initial meetings described in n.78, *supra*, the Committee held additional formal meetings/calls with (i) CapRe on October 29, 2014; (ii) Aurelius on October 28, 2014; and (iii) the LuxCo Group on November 18, 2014.

[81]     On October 24, 2014, the Committee's professionals gave the Committee an overview presentation on the Disputed Claims, which included a detailed summary of the transactions at issue, and the numerous legal and factual issues being investigated.  This presentation also included a detailed factual description of the 2009 Transfers, the potential Fraudulent Conveyance Claims, and the Intercompany Claims.  *See* Tr. Ex. P125 (Oct. Status Report).  On November 12, 2014, the Committee's professionals provided the Committee with another presentation on their investigation, which included an analysis of the strengths, weaknesses, and risks associated with each of the Disputed Claims.  These presentations were ultimately prepared in written form and presented to the Independent Manager (as defined below) in connection with his investigation of the Disputed Claims.  *See* Tr. Exs. P117–121 (Nov. 12, 2015 Presentations).

[82]     Scruton Decl. ¶ 31.

[83]     Scruton Decl. ¶ 32 (stating that the Committee's professionals acted as facilitators in the settlement negotiations, speaking with the participants and discussing potential alternative means by which to settle the issues in dispute).

[84]     Parkhill Decl. ¶¶ 34–35.

Debtors' offices in Reston, Virginia on November 14, 2014, principals of the Debtors, Aurelius, and CapRe reached an agreement in principle on the terms of a chapter 11 plan.[85]    This agreement was memorialized in a plan support agreement and related plan term sheet (the "Initial PSA") executed by the Debtors, Aurelius, CapRe, the Committee, and certain other parties on November 24, 2014.[86]    The Initial PSA provided for, among other things, an integrated settlement of all the Disputed Claims and the disputes as to valuation and cash/equity allocation (collectively, the "Settled Claims and Disputes"), with recoveries to unsecured creditors calculated as if: (i) 25 percent of the alleged fraudulent conveyances in the Fraudulent Conveyance Claims were avoided; (ii) 25 percent of the intercompany balances among the Debtors and their non-Debtor subsidiaries (other than the CapCo Intercompany Note) were recharacterized as equity; and (iii) 27.5 percent of the asserted Transferred Guarantor Claims were allowed.    The Initial PSA also contemplated a $250 million rights offering and $250 million in exit financing.[87]

While negotiations with the LuxCo Group remained ongoing, the LuxCo Group was not a party to the Initial PSA and had begun taking certain actions to oppose confirmation of the chapter 11 plan contemplated by the Initial PSA (the "Initial Plan").    The Initial PSA provided for the appointment of an independent representative for NIHS, the sole manager of LuxCo, which manager would be tasked with reviewing the settlement embodied in the Initial Plan, and, on behalf of LuxCo, making a recommendation to the Board of Managers of NIHS as to whether

---

[85]    Shindler Decl. ¶ 22.
[86]    *Id.*; Parkhill Decl. ¶ 39.
[87]    Scruton Decl. ¶ 38.  As contemplated by the Initial PSA, the parties thereto negotiated the terms of the Initial Plan and disclosure statement, which were filed with the Court on December 22 and 23, 2014 [Docket Nos. 322, 323, 326).  Also on December 22, 2014, the Debtors filed a motion seeking Court authority to enter into the Initial PSA [Docket No. 320].

it should cause LuxCo to join in the proposed settlement.[88]  On December 11, 2014, Scott W.

Winn of Zolfo Cooper was appointed as Class C Manager (the "Independent Manager") to the

Board of Managers of NIHS.[89]

## V.    The Mexico Sale and the Amended PSA

After the announcement of the Initial PSA, the Debtors were presented with an offer from

an affiliate of AT&T to purchase NII Mexico.[90]  On January 25, 2015, the Debtors publicly

announced their agreement to sell NII Mexico to an affiliate of AT&T for $1.875 billion — a

purchase price that was approximately $400 million greater than the valuation ascribed to NII

Mexico in the Initial PSA.[91]  Given this change to a key economic assumption underlying the

Initial PSA, the Debtors elected to terminate the Initial PSA and announced their intent to

continue negotiations on an amended plan with their key creditor constituencies.[92]

After the Debtors recommenced negotiations with their major noteholder constituencies,

including, at the Debtors' urging, representatives of the LuxCo Group who had not been parties

to the Initial PSA, the parties exchanged multiple plan term sheets and discussed various

settlement constructs over the course of the next few weeks.[93]    By February 20, 2015, the

Debtors, CapRe, Aurelius, and the LuxCo Group had reached an agreement in principle on the

---

[88]        *See* So-Ordered Stipulation Regarding the Appointment and Scope of the Independent Manager for NII International Telecom S.C.A. [Docket No. 293], Tr. Ex. P157.

[89]        After his appointment, the Independent Manager, with the assistance of professionals he retained, conducted his own investigation of the Settled Claims and Disputes to evaluate, from his own perspective, the reasonableness of the settlement of those claims in the Initial PSA.  The Committee aided in this investigation by meeting with the Independent Manger and his professionals and providing him with detailed written analyses of each of the Disputed Claims and various settlement scenarios or litigation outcomes previously considered by the Committee, including five comprehensive presentations totaling over 150 pages, which had been provided previously to the Committee by its professionals in November 2014.  Scruton Decl. ¶ 46.

[90]        Shindler Decl. ¶ 25.  The Debtors and the Committee maintain that the Debtors' entry into the Initial PSA projected stability to the marketplace by putting forward a viable standalone plan for the Debtors to emerge from bankruptcy, which stability helped contribute to AT&T's willingness to purchase NII Mexico.  *See* Scruton Decl. ¶ 47.

[91]        Scruton Decl. ¶ 47.

[92]        *See* NII Holdings Jan. 26, 2015 Form 8-K; Shindler Decl. ¶ 26; Scruton Decl. ¶ 48.

[93]        Shindler Decl. ¶¶ 28–29.

terms of a new plan support agreement and term sheet (the "Amended PSA").

At a meeting of the NII Holdings Board of Directors held on February 27, 2015, the Debtors' professionals led two lengthy sessions, one which consisted of legal advice only, and discussed with the Board (i) the merits of the arguments related to the Disputed Claims; (ii) the strengths and weaknesses of such arguments; (iii) the potential remedies; and (iv) the potential costs of, risks of, and general timeline for litigating such claims, were the alternative path of litigation to be pursued.[94]  After considering all of these factors, among others, and concluding that the terms of the Amended PSA were fair, reasonable, and in the best interests of the Debtors, their estates, and their creditors, the Board approved entry into the Amended PSA.[95]

At Committee meetings held on February 25, 2015 and March 3, 2015, the Committee discussed and considered the Amended PSA, which discussion included consideration of "best case" and "worst case" scenarios for the litigation of each of the Disputed Claims.[96]  At the conclusion of the March 3, 2015 meeting, the Committee unanimously determined to support the Amended PSA and serve as a co-proponent of the Plan with the Debtors.  The Independent Manager likewise supported and recommended that the NIHS Board of Managers enter into the Amended PSA.

Broadly, the Amended PSA provides for (i) a plan equity value of $2.813 billion (an increase of approximately $400 million over the Initial PSA); (ii) a negotiated split of distributions in the form of either cash or equity in the reorganized Company to each issuance of the CapCo Notes and the LuxCo Notes; (iii) a settlement of the Disputed Claims under which unsecured creditor recoveries would be calculated as if (a) 25 percent of the alleged fraudulent

---

[94]    Shindler Decl. ¶¶ 34–37.
[95]    Shindler Decl. ¶¶ 38–39.
[96]    Scruton Decl. ¶ 53.

conveyances were avoided; (b) 25 percent of the intercompany balances (other than the CapCo Intercompany Note) were recharacterized as equity; and (c) 21 percent of the asserted Transferred Guarantor Claims were allowed; (iv) a waiver by holders of the LuxCo Notes of their asserted entitlement to postpetition interest;[97] and (v) a $350 million debtor-in-possession financing loan to be provided by the LuxCo Group, Aurelius, and CapRe.[98]

The Amended PSA materially increased recoveries for each creditor constituency compared to recoveries they were slated to receive pursuant to the Initial PSA, with the holders of the CapCo 2021 Notes receiving the largest percentage increase in recoveries. Recoveries for holders of the CapCo 2021 Notes increased from 19.9% of their prepetition claim amount under the Initial PSA to 29.1% under the Amended PSA (a 47% increase); recoveries for holders of the CapCo 2016 and 2019 Notes increased by 10% (from 45.5% to 50.2% of their prepetition claim amount); and recoveries for the LuxCo Notes increased by 14% (from 87.9% to 100% of their prepetition claim amount).[99]  Only the CapCo 2021 Notes benefitted from reducing the settlement of the Transferred Guarantor Claims from 27.5% under the Initial PSA to 21% under the Amended PSA — a benefit in the amount of $46 million.[100]

On March 5, 2015, the Amended PSA was executed by the Debtors, the Committee, CapRe, Aurelius, and the LuxCo Group, and was filed with the Court.[101]

---

[97]       LuxCo's asserted postpetition interest amount totaled approximately $130 million, assuming (i) interest accrued at the contract rate and (ii) a June 30, 2015 emergence.  *See* Scruton Decl. ¶ 50.
[98]       Scruton Decl. ¶ 50.
[99]       Scruton Decl. ¶ 51.  All recovery amounts under the Initial PSA are provided on a post-rights offering basis.  Utilizing pre-rights offering recovery amounts under the Initial PSA would demonstrate an even greater increase in recoveries for the CapCo 2021 Notes under the Amended PSA.
[100]      Scruton Decl. ¶ 51.
[101]      Notice of Filing of Plan Support Agreement and Plan Term Sheet [Docket No. 506].

## VI.    The CapCo 2021 Group Emerges and Objects to the Settlement

Following the Debtors' announcement of the Mexico sale, in early February 2015, counsel for a newly formed group, the Ad Hoc Group of NII Capital 2021 Noteholders (the "CapCo 2021 Group"), reached out to counsel for the Debtors and the Committee to identify the group and to indicate an interest in becoming involved in the chapter 11 cases.  The CapCo 2021 Group then sent a letter on February 12, 2015 to the Debtors and the Committee, requesting that the CapCo 2021 Group be included in the plan negotiations that were underway.[102]  Eight days later, the parties to the negotiations reached an agreement in principle on the terms of the Amended PSA.

On March 9, 2015, four days after the Amended PSA was filed, one member of the CapCo 2021 Group, Mohawk Capital, sent a letter to the U.S. Trustee requesting the appointment of a separate official committee of holders of the CapCo 2021 Notes.[103]  After receiving letters from the Debtors and the Committee opposing the request and detailing the ways in which the holders of the CapCo 2021 Notes were already adequately represented by the Committee, the U.S. Trustee denied Mohawk's request.[104]

On March 13, 2015, counsel for the CapCo 2021 Group filed a notice of appearance in these chapter 11 cases and also filed a motion seeking to compel the Debtors to mediate with the CapCo 2021 Group regarding the terms of a chapter 11 plan (the "Mediation Motion").[105]  After

---

[102]    Mediation Motion (defined below), Ex. B.  According to the letter, the Ad Hoc Group represented approximately 7 percent of the CapCo 2021 Notes at that time.  This letter was followed by a second letter on February 23, 2015 requesting an opportunity to participate in negotiations.  Mediation Motion, Ex. C.
[103]    Tr. Ex. P211.
[104]    *See* Tr. Ex. P131.  In his letter denying the request, the U.S. Trustee explained that the request was denied because he "believes [the current composition of the Committee] adequately represents all creditor constituencies." *See id.*
[105]    Motion of the Ad Hoc Group of NII Capital 2021 Noteholders for an Order Pursuant to Sections 105(A) and 105(D) of the Bankruptcy Code, Local Bankruptcy Rule 9019-1 and General Order M-452 Directing the Debtors to Participate in Mediation [Docket No. 522].

notice and a hearing, the Mediation Motion was denied by the Court on March 31, 2015.  On

May 5, 2015, nearly a month into confirmation discovery, the CapCo 2021 Group filed

objections to the Proofs of Claim (together, the "Claims Objections"),[106] and sought to schedule

a hearing on the Claims Objections for the same hearing date as confirmation of the Plan.  At a

conference held on May 18, 2015, the Court declined to schedule the Claims Objections for the

confirmation hearing date and stated that the Claims Objections would be considered on a future

date to be determined by the Court.

## VII.    The Plan

On March 13, 2015, the Debtors and the Committee (together, the "Plan Proponents")

filed the Plan and related Disclosure Statement.[107]  No party in interest objected to the Disclosure

Statement.  At the request of the CapCo 2021 Group and other parties, the Plan Proponents made

certain modifications to the disclosures contained in the proposed Disclosure Statement and filed

a revised version with the Court on April 9, 2015.[108]  At a hearing held on April 20, 2015, the

Court found that the Disclosure Statement complied with the requirements of section 1125 of the

Bankruptcy Code and approved the Disclosure Statement.  Following approval of the Disclosure

Statement, the Debtors began soliciting votes on the Plan.[109]

---

[106]        Limited Objection of the Ad Hoc Group of NII Capital 2021 Noteholders Seeking to Disallow and
Expunge Certain Claims Filed by the Indenture Trustee of the 8.875% CapCo Notes [Docket No. 685]; Limited
Objection of the Ad Hoc Group of NII Capital 2021 Noteholders Seeking to Disallow and Expunge Certain Claims
Filed by the Indenture Trustee of the 10% CapCo Notes [Docket No. 686].

[107]        Notice of Filing of First Amended Plan and Disclosure Statement [Docket No. 527].

[108]        Notice of Filing of Clean and Blackline Versions of Further Revised (A) First Amended Plan, (B) Related
Disclosure Statement and (C) Proposed Order (I) Approving Disclosure Statement, (II) Approving the Form and
Manner of Service of Disclosure Statement Notice, (III) Establishing Procedures for Solicitation and Tabulation of
Votes to Accept or Reject Plan of Reorganization and (IV) Scheduling Hearing on Confirmation of Plan of
Reorganization [Docket No. 621].

[109]        On April 20, 2015, the Plan Proponents filed solicitation versions of the Plan and Disclosure Statement.
*See* Notice of Filing of Solicitation Version of the Disclosure Statement and First Amended Joint Chapter 11 Plan
[Docket No. 664].

A.      **Solicitation Results**

As set forth in the Declaration of Christina Pullo of Prime Clerk Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Plan, dated May 27, 2015 (the "Voting Declaration"),[110] Impaired Classes 4A, 4D, 5A through 5C, 6E, 7A, and 8A through 8E voted to accept the Plan.[111]  With respect to the Prepetition Notes, (i) holders of the LuxCo Notes voted to accept the Plan by over 94% in amount and over 84% in number and (ii) holders of the CapCo Notes voted to accept the Plan by over 89% in amount and 97% in number.  On a "per issuance" basis, each issuance of Prepetition Notes also individually voted to accept the Plan — (i) holders of the CapCo 2019 Notes voted to accept the Plan by over 99% in amount and over 99% in number; (ii) holders of the CapCo 2016 Notes voted to accept the Plan by over 99% in amount and over 98% in number; and (iii) holders of the CapCo 2021 Notes voted to accept the Plan by over 78% in amount and over 95% in number.[112]

B.      **Brief Summary of the Settlement**

Set forth below is a brief summary of the Settled Claims and Disputes resolved pursuant to the settlement embodied in the Plan (the "Settlement"):

- Settlement of the Fraudulent Conveyance Claims.  As a compromise of all Fraudulent Conveyance Claims, creditors' recoveries under the Plan are calculated as if 25 percent of such asserted claims were avoided.

- Settlement of the Recharacterization Claims.  As a compromise of all Recharacterization Claims, creditors' recoveries under the Plan are calculated as if 25 percent of the asserted Recharacterization Claims (except the CapCo Intercompany Note) were recharacterized as equity, with the remaining 75 percent of such obligations treated as unsecured debts against the obligors.  In addition, the Peru Transfers and the McCaw Transfers, which are included as Fraudulent Conveyance Claims, are subject to a compounding effect under the Settlement.  Finally, the CapCo Intercompany Note is treated entirely as debt, but the

---

[110]    Tr. Ex. P181 (Voting Declaration).
[111]    *See* Voting Decl., Ex. A.
[112]    *See* Voting Decl., Exs. A & B.

claim to avoid the CapCo/LuxCo Subordination is resolved as a Fraudulent Conveyance Claim.[113]

• <u>Settlement of the Transferred Guarantor Claims</u>.  As a compromise of the Transferred Guarantor Claims, recoveries to holders of Prepetition Notes under the Plan are calculated as if a gross percentage of 21 percent of each of the guarantees of the Transferred Guarantors remained in place, leading to a net recovery of 11 percent, or $150 million, to holders of the Transferred Guarantor Claims to be distributed from the Transferred Guarantors.[114]

• <u>Resolution of Disputes over Valuation</u>.  The Settlement reflects agreement on Plan Distributable Value in the amount of $2.813 billion and avoids all disputes with respect to valuation.[115]

• <u>Resolution of Allocation of Cash Distributions to Creditors and the Form Thereof</u>.  The Settlement provides that holders of the Prepetition Notes will receive an agreed-upon combination of cash and Reorganized NII Common Stock on account of their allowed claims instead of distributing cash recoveries solely to the structurally senior-most claims, which would have resulted in diminished recoveries in the form of cash to holders of the LuxCo Notes, and little to no recoveries in the form of cash to holders of CapCo Notes.  The Settlement also allows the Debtors to retain up to $515 million in cash to fund their operations and to fund payments required pursuant to the Plan.[116]

• <u>Resolution of Entitlements to Postpetition Interest</u>.  The Settlement includes a waiver by the LuxCo Group of holders of the LuxCo Notes' potential entitlement to receive postpetition interest on account of the LuxCo Notes, thereby eliminating a dispute as to such entitlements and as to the applicable interest rate and ensuring such value is available to holders of allowed claims asserted against structurally junior Debtors such as CapCo and NII Holdings.[117]

## C.    Objections to the Plan

Objections to the Plan were filed by a number of parties.  The following objections remained unresolved as of the commencement of the Confirmation Hearing: (i) the Revised Objection of the Ad Hoc Group of NII Capital 2021 Noteholders to Confirmation of the First

---

[113]    *See* Plan, Section III.H.2; Disclosure Statement at 32.
[114]    *See* Plan, Section III.H.2; Disclosure Statement at 32.  Under the Initial Plan, the Transferred Guarantor Claims were settled at 27.5% of their face amount.  The benefit from the reduction to 21% under the current Settlement inures solely to the benefit of the holders of the CapCo 2021 Notes and accounts for $46.3 million of the $169.4 million of increased recovery that holders of the CapCo 2021 Notes are receiving over the recovery provided for under the Initial PSA (on a pre-rights offering basis).  *See* Parkhill Decl. ¶ 52.
[115]    *See* Plan, Section I.A.130; Disclosure Statement at 5.
[116]    *See* Plan, Section II.C; Disclosure Statement at 3–4.
[117]    *See* Plan, Section II.F; Disclosure Statement at 32.

Amended Plan of Reorganization [Docket No. 760] (the "CapCo 2021 Group Objection"); (ii) the Objection of the United States Trustee to Plan Support Agreement and First Amended Joint Plan of Reorganization [Docket No. 743] (the "U.S. Trustee Objection"); and (iii) the Limited Objection of Lead Plaintiff to Confirmation of First Amended Joint Chapter 11 Plan [Docket No. 732] (the "Lead Plaintiff Limited Objection," and, collectively with the 2021 Objection and the U.S. Trustee Objection, the "Objections").[118]

In support of confirmation of the Plan and in response to the Objections, the Debtors filed (i) the Debtors' Memorandum of Law in Support of Confirmation of the Plan; (ii) the Declarations of Steven M. Shindler, Daniel E. Freiman, Homer Parkhill, J. Nicholas Melton, Byron Smyl, and Jay Jubas; and (iii) the Voting Declaration. The Committee filed its Statement in Support of Confirmation of the Plan as well as the Declaration of Andrew Scruton of FTI Consulting, Inc. Statements in support of confirmation of the Plan and in response to the Objections were filed by Aurelius, CapRe, and the Independent Manager, who also filed the Declaration of Mr. Winn in support of confirmation of the Plan.

## VIII.  The Confirmation Hearing

The confirmation hearing on the Plan (the "Confirmation Hearing") took place over nine days, beginning on June 3, 2015, with closing arguments held on June 15, 16, and 17, 2015. At the Confirmation Hearing, the following witnesses gave live testimony: (i) Steven M. Shindler, (ii) Scott W. Winn, (iii) Daniel E. Freiman, (iv) Homer Parkhill, and (v) Andrew Scruton.

---

[118]    During the Confirmation Hearing, the U.S. Trustee Objection was resolved and the Lead Plaintiff Limited Objection was overruled. Accordingly, this Decision will not address these objections.

A.    **Confirmation Testimony**

1.    **Steven M. Shindler**

During his extensive and highly credible testimony, Mr. Shindler, the Chief Executive Officer of NII Holdings and a member of its Board of Directors, discussed the Debtors' business and financial affairs and described the negotiations and process leading up to the Amended PSA and the Settlement.  Mr. Shindler began by describing the Debtors' financial situation at the end of 2013.  At that time, with approximately $4.35 billion in bonds outstanding and approximately $1.5 billion owed to the Operating Company Lenders, "it became evident that [the Company was] not on a pace that was going to allow [it] to generate enough revenue fast enough to meet [its] debt obligations" while continuing to fund capital expenditures and operational needs; this led the Company to include a "going concern qualifier" in the 2013 10-K.[119]  As groups of noteholders began forming, Mr. Shindler began a "very active ongoing dialogue" regarding a potential restructuring of the Prepetition Notes with his advisors and with two large creditor groups, the Cross-Holder Group and Aurelius, and their advisors, all of whom were doing extensive diligence on the Company.[120]

After the commencement of the Debtors' chapter 11 cases in September 2014, the Debtors found themselves in what Mr. Shindler described as a "more challenging" situation after the Cross-Holder Group split in two, and the negotiations became "more intense."  The Debtors were burning through liquidity at a rapid rate, and without a negotiated solution which addressed

---

[119]    June 3, 2015 Hr'g Tr. 201:2–25 (Shindler); Shindler Decl. ¶ 12.
[120]    June 3, 2015 Hr'g Tr. 207:2–3 (Shindler).

the Company's decreasing cash and continuing capital investment needs, the Debtors did not have a means to support their business for long.[121]

Mr. Shindler described the multiple proposals the Debtors received and considered in the fall of 2014, stating that the Company rejected proposals that were "not based on a sound foundation,"[122] though Mr. Shindler did not recall rejecting any proposals specifically because of the split of economic value or the value of the Transferred Guarantor Claims in particular. Mr. Shindler explained how, "in an attempt to break the deadlock in the restructuring negotiations," he held a November 14, 2014 meeting at the Debtors' headquarters with principals from Aurelius and CapRe which led to an agreement in principle on the terms of the Initial PSA.[123]

Mr. Shindler's testimony focused heavily on the Debtors' involvement in pushing the parties toward a revised deal after the Company exercised its right to terminate the Initial PSA upon receiving the offer from AT&T to purchase NII Mexico. Mr. Shindler discussed how certain parties wanted to (i) retain the terms of the Initial PSA and adopt the Mexico sale into any revised PSA and (ii) limit further negotiations to the parties to the Initial PSA.[124] Nonetheless, the Company invited the LuxCo Group to the negotiations and pushed everyone back to the table in order to come up with a revised settlement which would force the parties to reconsider the existing settlement terms and incorporate the $400 million more in value received from the

---

[121]    June 3, 2015 Hr'g Tr. 212:4–19 (Shindler) (Q: "What do you mean by more intense?" A: "Well from my standpoint as we looked at the situation that we're in we now have a limited amount of liquidity or we were burning through our liquidity at a relatively rapid rate, and without the benefit of a solution that we could come to with our creditor group we wouldn't have the means to continue to support the business.").

[122]    June 3, 2015 Hr'g Tr. 250:4–7 (Shindler); Shindler Decl. ¶ 16. Specifically, Mr. Shindler testified that one proposal from the LuxCo Group was rejected by the Company because of several issues, including that the overall valuation was not at a level that the Company's management, Board, and advisors thought was appropriate.

[123]    Shindler Decl. ¶ 20.

[124]    See, e.g., Tr. Ex. P176 (e-mail from M. Brodsky of Aurelius to S. Shindler, H. Parkhill, D. Gropper, and D. Prieto, dated Feb. 4, 2015).

33

sale.[125]  As Mr. Shindler explained, "[w]e had more available now to enhance the recoveries for the other creditors and we wanted to take the steps necessary to make that happen."[126]

Mr. Shindler saw himself as an active facilitator attempting to achieve consensus among the constituents and come up with a fair and equitable solution to the disputes at issue, but Mr. Shindler also understood his fiduciary duty to "do what's right to save this company."[127]  He remained cognizant of the ever-present regulatory, human resources, and operational challenges facing the Company during the Debtors' chapter 11 cases.  Mr. Shindler also was apprised on a daily basis by Mr. Freiman of the status of negotiations of amortization and covenants with the Operating Company Lenders, including the lenders' demand that the Company emerge from bankruptcy by September 2015 or any amendments to the Operating Company Credit Agreements would cease to be effective.  Mr. Shindler described himself as "very aggressive" and "anything but passive" in the process, never shy about expressing his view, and very aware of the Debtors' fiduciary obligations to their creditors.[128]

Mr. Shindler recalled advocating for holders of the CapCo 2021 Notes to get their share of distributable cash rather than "diverting" it away from them, and he stated that one of the reasons he was interested in terminating the Initial PSA was to get a better recovery for this group.  Mr. Shindler testified that Mr. Daigle of CapRe, who had responsibility for certain CapRe funds that held only CapCo 2021 Notes, negotiated on this group's behalf at every meeting.  Despite Mr. Shindler's acknowledgement that CapRe's holdings of CapCo 2021 Notes were the smallest of its holdings of Prepetition Notes, he still believes holders of the CapCo 2021

---

[125]    Shindler Decl. ¶ 28.
[126]    June 3, 2015 Hr'g Tr. 221:21–23 (Shindler).
[127]    June 3, 2015 Hr'g Tr. 252:4–13 (Shindler) ("[W]e were looking to come up with a fair and equitable solution that would allow the company to survive, and we took it upon ourselves to proactively engage in discussions to try to see if we could get consensus amongst the creditors.").
[128]    June 3, 2015 Hr'g Tr. 243:34–244:13 (Shindler).

34

Notes were fairly represented, not only by Mr. Daigle, but also by the Committee.[129] From Mr. Shindler's perspective, under the Settlement, holders of the CapCo 2021 Notes are not losing $150 million but rather receiving a 63 percent increase in recovery from the Initial PSA.[130] Mr. Shindler opined that, "if we were not to approve this plan today and reopen what has been an incredibly difficult negotiating process . . . this is a group that has $437 million of recovery today that would likely go down to zero if we were to go down a different path."[131]

Mr. Shindler described the final Board meeting, held on February 27, 2015, at which the Board convened to review, and ultimately approved, the Amended PSA. The Board, which had the opportunity to review and consider the materials[132] beforehand, attended two sessions that spanned several hours. The first session was led by Debtors' counsel Jones Day and by Rothschild; the second session was led by Debtors' counsel only, who had conducted a "very thorough review of the overall potential litigation claims and each one of the claims," including the background of the claim and potential defenses to it, as well as the length of time to litigate and the potential cost of such litigation.[133] Despite not having received any specific quantitative analysis on the cost and timeframe to litigate the Disputed Claims (or to litigate the Transferred Guarantor Claims only), Mr. Shindler testified that he understood any such litigation to be "lengthy and expensive," potentially taking years and costing $4 million a month or more.[134]

---

[129]    June 3, 2015 Hr'g Tr. 244:17–245:17 (Shindler).

[130]    June 3, 2015 Hr'g Tr. 245:24 –246:6 (Shindler).

[131]    June 3, 2015 Hr'g Tr. 246:11–15 (Shindler).

[132]    June 3, 2015 Hr'g Tr. 232:3–15 (Shindler); *see* Tr. Ex. P040 (Presentation to Board of Directors, Revised Plan Support Agreement, dated Feb. 27, 2015); Tr. Ex. P041 (Review of Claims Being Resolved by Proposed Settlement, dated Feb. 27, 2015).

[133]    Shindler Decl. ¶ 36; June 3, 2015 Hr'g Tr. 233:11–16 (Shindler) ("I would describe [the meeting] as it was a very thorough review of the overall potential litigation claims and each one of the claims with an in-depth review of what the claim was, what the potential defenses against those claims would be, and with each one there was plenty of opportunity to ask questions and make sure that we as board members understood.").

[134]    June 3, 2015 Hr'g Tr. 236:15–25 (Shindler) (stating that "the cost is difficult to estimate, but given the run rate that we've experienced here the last 15 months of advisor and legal fees running a brief rate of $4 million a month we would certainly expect that to continue and probably to intensify.").

During his testimony, Mr. Shindler emphasized that the Board had received several detailed presentations on the Disputed Claims since the receipt of the First Aurelius Letter a year earlier, including at the time of approval of the Initial PSA. After considering all presentations and legal advice regarding the Settled Claims and Disputes; the other paths available to the Debtors, all of which were fraught with risk; and the detrimental impact which costly and protracted litigation of any of the claims might have on the Debtors' business and their ability to reorganize, the Board concluded that entering into the Settlement was in the best interests of the Debtors, their estates, and their creditors.[135]

Mr. Shindler also responded to the accusations of the CapCo 2021 Group that the Company has settled claims that it believes are meritless. He testified that the Debtors continue to believe they are correct in their stated view, but "we also didn't think that was a reason to not come to a settlement when we were looking at the overall picture of . . . the situation that we were in."[136] With respect to the Transferred Guarantor Claims, he does not know how a court would rule, how much time litigation would take, or how much it would cost, all factors which must be taken into account when considering whether to approve the Settlement. The Company's thought process involved looking at an overall integrated settlement that Mr. Shindler and the Board of Directors felt was fair and reasonable.

Finally, Mr. Shindler disagreed with the notion that there are no timing issues affecting the Debtors' cases and that, if confirmation were denied, the Company would have time to propose, solicit, and confirm a different plan. He emphasized that the Settlement itself represents a fragile consensus among the stakeholders that almost fell apart numerous times over relatively small issues, and opined that, were the Settlement to fail, parties may revert to their

---

[135]    Shindler Decl. ¶ 37.
[136]    June 3, 2015 Hr'g Tr. 241:4–9 (Shindler).

litigation positions.[137]  A new economic solution, even if feasible, may not come quickly, leaving

the Debtors to remain in chapter 11 for an additional period of time.  He discussed the business

difficulties the Company has encountered while in chapter 11, including issues with employees,

suppliers, vendors, and regulators, which have been exacerbated by the company's presence in

chapter 11.[138]  Moreover, he emphasized the difficulties the Company has had in negotiating

with the Operating Company Lenders, whom the Company believes would be unwilling to make

any additional concessions on their loans, leaving the Company at risk of default and foreclosure

in Brazil if emergence occurs after such lenders' September 2015 deadlines.[139]

### 2.    Scott W. Winn

Mr. Winn, who was appointed as the LuxCo Independent Manager to represent the

interests of the LuxCo estate,[140] testified as to the role that he played in reviewing the Initial PSA

and negotiating the Amended PSA.  Mr. Winn testified that, following his December 12, 2014

appointment to the role of Independent Manager, he quickly became familiar with the issues in

these cases, including the Disputed Claims, by conducting in-person meetings with the

negotiating parties and by reviewing written analyses provided by them.[141]  Mr. Winn testified

that his initial role was to give a "thumbs up or thumbs down" to the LuxCo Board on the Initial

PSA,[142] but that after the Mexico sale, when it was clear that holders of the LuxCo Notes would

be paid in full, his role in the negotiation changed.  Mr. Winn emphasized, however, that he

continued to push for a better settlement because he couldn't "just look out for [the LuxCo]

---

[137]    June 8, 2015 Hr'g Tr. 89:6–19 (Shindler).
[138]    June 3, 2015 Hr'g Tr. 242:17–243:3 (Shindler).
[139]    June 3, 2015 Hr'g Tr. 243:4–13 (Shindler).
[140]    June 4, 2015 Hr'g Tr. 11:25–12:2 (Winn).
[141]    June 4, 2015 Hr'g Tr. 14:10–18:23 (Winn).
[142]    June 4, 2015 Hr'g Tr. 11:17–22 (Winn).

bondholders;" he felt he had to "look out for the entire estate," including creditors of CapCo, given the existence of the CapCo Intercompany Note.[143]

Mr. Winn described the negotiating process as "more art than science"[144] and likened it to a "Rubik's Cube" with settlement percentages for the different Settled Claims and Disputes which each could be adjusted upwards or downwards to fix the allowed amount of the claims and to provide a financial outcome to which the parties could agree.[145]  He opined that the settlement was "integrated" in that the way one set of claims was resolved would impact how to settle another set of claims.[146]   Through his analyses, Mr. Winn made a determination that the Transferred Guarantor Claims were weak, but he nevertheless felt that those claims posed risks to the Company were they to be litigated.[147]   In his view, understanding the Company's business "is a big piece of this puzzle"[148] because the greatest value comes from the two operating companies in Brazil,[149] whose value is highly susceptible to the risk of foreclosure by the

---

[143]    June 4, 2015 Hr'g Tr. 33:18–19; 32:17–33:10 (Winn) (stating that, although he is a fiduciary of LuxCo, "ultimately, the value flows through – through my estate flows to the 16s, 19s, and 21s.  And so, you know . . . [CapCo is] kind of indirectly a creditor of mine.").

[144]    June 4, 2015 Hr'g Tr. 23:19 (Winn).

[145]    June 4, 2015 Hr'g Tr. 27:7–10 (Winn) ("So as the negotiations ensued, it was fixing the Rubik's cube here to find an outcome that sort of roughly reflected where the claims were and provided for the flow of value in a way that the parties could agree to.").  A Rubik's Cube is a three-dimensional combination puzzle invented in 1974 by Erno Rubik and is the world's top selling puzzle game.  In a classic Rubik's Cube, each of the six faces is covered by nine stickers, each of one of six solid colors: white, red, blue, orange, green, and yellow.  An internal pivot mechanism enables each face to turn independently, thus mixing up the colors. For the puzzle to be solved, each face must be returned to having only one color.  *See* WIKIPEDIA, https://en.wikipedia.org/wiki/Rubik%27s_Cube (last visited Aug. 25, 2015).

[146]    Winn Decl. ¶ 27.  *See also* June 4, 2015 Hr'g Tr. 38:7–16 (Winn) ("[I]t's integrated in that how you resolve one of the litigations impacts what happens with another of the litigations. So these are not independent variables, they are dependent variables.").

[147]    June 4, 2015 Hr'g Tr. 28:17–30:7 (Winn).

[148]    June 4, 2015 Hr'g Tr. 20:6 (Winn).

[149]    June 4, 2015 Hr'g Tr. 24:8–16 (Winn) ("Well, in my mind, the difference between Nortel and here is Nortel, as I kind of started to allude to, is a stack of money at this point. And so while there may be cost and delay associated with the extensive litigation that I understand is going on there, the pile of money isn't going away. From my perspective, in this case, if there's a risk – and, look, there's no guarantees one way or the other.  But if there's a risk that the underlying value of the enterprise could deteriorate . . . .").

Operating Company Lenders.[150]   As a result, Mr. Winn determined that he was "comfortable"
with a 21 percent settlement value for the Transferred Guarantor Claims, given the risks
associated with litigating such claims.[151]

The Court finds that Mr. Winn's testimony neither supports nor refutes the Debtors'
position on the reasonableness of the settlement percentage for the Transferred Guarantor Claims
and does not afford it great weight.

### 3.    Homer Parkhill

Mr. Parkhill, a Managing Director at Rothschild, has been intimately involved in advising
the Company from the time Rothschild was initially retained in November 2013 to advise the
Company as to strategic alternatives.   In early 2014, as the Company began to forecast liquidity
issues, Rothschild's role shifted to assistance in evaluating restructuring alternatives available to
the Company and assisting with (i) discussions and negotiations with creditors over restructuring
alternatives and (ii) the restructuring process generally.[152]

During his testimony, Mr. Parkhill described in detail the history of the "hard-fought"
negotiations[153] among the Debtors and the various noteholder groups that had begun in the spring
of 2014 and which led first to the Initial PSA and, later, to the Amended PSA and the Plan.   He
described the differing plan constructs and the various proposals received and considered by the

---

[150]     June 4, 2015 Hr'g Tr. 20:9–21:5 (Winn) ("If those lenders foreclosed on the business – were to foreclose
on the business then the discussion of how do we distribute value will change a lot if there is less value to
distribute.").
[151]     June 4, 2015 Hr'g Tr. 103:1–9 (Winn) ("I don't think that that number can be looked at in isolation relative
to the other claims because of the fundamental interdependency among them. I think it's clear from what I told the
board that I may not agree with every individual number but I've also said that, you know, this is fundamentally
more art than science and that the impact on the guaranty claims and the impact to Luxco is something that I'm
comfortable with. . . . I have a view that given all the facts and circumstances, that this settlement is an appropriate
settlement and I really think that's as far as I need to go.").
[152]     Parkhill Decl. ¶ 12.
[153]     Parkhill Decl. ¶ 69.

Debtors.[154]  Mr. Parkhill also discussed the Waterfall Model that Rothschild had created to assist the parties to the negotiations in understanding how different proposals would impact creditor recoveries, which gave the parties a "common language" to understand the financial implications of various valuation, litigation, and settlement outcomes.[155]  Mr. Parkhill's detailed testimony demonstrated the key involvement of the Debtors and Rothschild in setting the stage for productive negotiations among the parties through the creation of the Waterfall Model and the many working sessions conducted with the advisors to the prepetition noteholder groups, and, later, the advisors to the Committee[156] and the Independent Manager, in order to educate the parties on the Waterfall Model and to analyze and discuss proposals using its outputs.

Mr. Parkhill discussed the Settlement's $285 million "gross impact," with respect to the Transferred Guarantor Claims.  The $285 million will be distributed from the estate of NIU (one of the Transferred Guarantors) and will "come ahead" of the recovery at CapCo, resulting in a net financial impact of a $150 million reduction in the recoveries to holders of the CapCo 2021 Notes.[157]  Notwithstanding this snapshot of the settlement of the Transferred Guarantor Claims in isolation, Mr. Parkhill testified that he continues to view the Settlement of all of the Disputed Claims as "interdependent" and that it is impossible to evaluate the financial impact of one

---

[154]     Various types of proposals emerged from the negotiations: (i) a "full reserve" plan construct, whereby plan distributions would be held in reserve pending the outcome of litigation of the Disputed Claims after emergence; (ii) a "partial reserve" plan construct, whereby certain plan distributions would be held in reserve pending the outcome of litigation of only certain of the Disputed Claims, typically the Transferred Guarantor Claims; and (iii) a settlement construct which would resolve all disputes during the chapter 11 cases.  *See* Parkhill Decl. ¶¶ 26, 36.

[155]     *See* Tr. Ex. P055; June 8, 2015 Hr'g Tr. 128:13–22; 125:18–23 (Parkhill) ("[T]hese negotiations are very complex, and when you look at the settlements and the implications of these settlements it requires a financial perspective that is based on detailed analysis to understand the implications of these percentages and value movements to the overall coverage to creditors.").

[156]     In his declaration, Mr. Parkhill emphasized the "particularly important" role the Committee played in the parties' efforts to reach a negotiated resolution of the Disputed Claims and other disputed issues.  Parkhill Decl. ¶ 33.

[157]     *See* June 8, 2015 Hr'g Tr. 134:7–138:17 (Parkhill); Tr. Ex. P212 (Financial Impact of the Transferred Guarantor Claims Under the Settlement); Tr. Ex. P055 (Waterfall Model Based on Second PSA); Tr. Ex. P058 (Simplified Total Plan Distributable Value Illustration).

category of the Disputed Claims without understanding the global nature of the Settlement.[158]

He testified, credibly, that neither he nor the Debtors' management analyzed the reasonableness

or fairness of resolving the Transferred Guarantor Claims at 21 percent "standing alone" because

it is impossible to measure the financial impact without knowing all of the other inputs to the

Waterfall Model.[159]

Mr. Parkhill repeatedly affirmed his belief in the interdependence of the Disputed Claims

both from a financial perspective and a merits perspective.[160]  When questioned further on this

point, Mr. Parkhill conceded that the percentages in the Waterfall Model were at times adjusted

based on economics and not solely based on parties' views of the merits, but added that "[t]here

are elements in the Settlement that aren't solely related to the merits, but the big percentage

movements were made based on people's perspectives on the merits."[161]  He emphasized that the

creditor beneficiaries with the greatest increase in value between the Initial PSA and the

Amended PSA were the holders of the CapCo 2021 Notes.[162]

Finally, Mr. Parkhill discussed his opinion that, if the Plan is not confirmed, it remains

extremely uncertain how the Debtors will be able to reorganize, given the various hurdles they

would face, including liquidity issues, the risk of further deterioration of the Debtors' businesses

and customer base, and potentially destructive actions that the Operating Company Lenders

---

[158]    June 8, 2015 Hr'g Tr. 126:24–127:3 (Parkhill) ("You have to look at both, you know, the financial impact and the merits of the claims, but you can't evaluate the financial impact without understanding what all the claims in the proposed settlement are doing because of this interdependency. . . .").
[159]    June 8, 2015 Hr'g Tr. 142:3–24; 144:5–9 (Parkhill) ("[Y]ou can't understand the financial impact of the settlement in isolation, you have to understand the balance of the respective settlements and valuation to be able to measure the financial impact of the settlement in a discreet [sic] way.").
[160]    June 8, 2015 Hr'g Tr. 142:19–24; 144:10–145:6 (Parkhill).
[161]    June 8, 2015 Hr'g Tr. 194:8–18 (Parkhill); 141:16–21 (Parkhill) ("My understanding is that the [21 percent] reflects two things.  It reflects the debtor's judgment on the relative merits, strengths and weaknesses of the respective claim, and it reflects the debtor's judgment around an economic settlement that is reasonable to undertake as a consequence of the actual percentage.").
[162]    June 8, 2015 Hr'g Tr. 170:9–13 (Parkhill); See Tr. Ex. P040 (Presentation to Board of Directors) at 6–7, 9 (showing that holders of CapCo 2021 Notes receive $169.4 million more on a pre-rights offering basis under the Amended PSA than under the Initial PSA).

41

would likely take that could risk the stability of the non-debtor operating subsidiaries in Brazil, were the Debtors to default under the Operating Company Credit Agreements.[163] Mr. Parkhill dismissed the possibility that such loans could be paid off with existing cash, noting that such cash is held at NIU, is needed for operations, and would not be able to be "downstreamed" to non-debtor operating companies without the consent of creditors at NIU and LuxCo, which consent Mr. Parkhill believes may not be given.[164]

### 4.    Daniel E. Freiman

Mr. Freiman, the Treasurer and Vice President – Corporate Development & Investor Relations of NII Holdings, testified regarding the background, negotiations, and present situation with the Operating Company Lenders and the resulting practical implications of all of these factors on the Debtors' timeline for concluding their chapter 11 cases.

In the spring of 2014, Mr. Freiman, the primary officer of the Company responsible for negotiations with the Operating Company Lenders, began discussions with these lenders regarding the possibility of obtaining waivers or amendments to the Operating Company Credit Agreements.[165]  With respect to CDB, whose loans were secured by Brazilian-law governed fiduciary assignment liens on certain telecommunications equipment and other assets, this was the Company's second major outreach in the space of seven months.[166]  Mr. Freiman described the strained relationship between the parties, the disappointment of CDB with the Company and its management, and CDB's significant concerns about the Company's ability to meet its

---

[163]    *See* Parkhill Decl. ¶ 59.

[164]    June 8, 2015 Hr'g Tr. 185:4–14 (Parkhill); 268:18–25 (Parkhill) ("We've had constant discussion with the LuxCo creditors about the use of cash for purposes of funding the business down in Brazil and others.  And it's been constant struggle around our ability to do that and their protection.  So I have no confidence that, if we have a failed process here, that we're going to be able to succeed in taking that cash and contributing it down to Brazil or repairing the overall dynamics to reach another settlement.").

[165]    Freiman Decl. ¶ 13.

[166]    Freiman Decl. ¶¶ 18–19 (stating that the first amendment of CDB's credit agreements occurred in September 2013).

business plan and fund its operations.[167]  Despite its concerns, CDB ultimately agreed to a short-term one-time waiver of compliance with the June 30, 2014 financial covenants, which paved the way for the Company to propose more "holistic" amendment terms for the credit agreements with CDB.[168]

After several months of additional negotiations, in which CDB demonstrated its unwillingness to provide the longer-term covenant and amortization relief sought by the Debtors unless the Debtors committed to a timeline for a restructuring of the Prepetition Notes and exit from chapter 11, CDB finally agreed to a credit agreement amendment that provided for an emergence deadline of no later than September 30, 2015.[169]  The amendment also added numerous potential default provisions, and one term required the provision of additional security to CDB — a pledge of shares of NII Mexico and certain bank accounts of NII Brazil.[170]  During his testimony, Mr. Freiman discussed his understanding that, were an event of default to occur under CDB's credit agreements and CDB were to begin enforcing against its collateral, it may be able to do so irrespective of the commencement of bankruptcy proceedings in Brazil.[171]

Mr. Freiman described the amendment negotiation process with Caixa and BdB as similar to that with CDB.  Caixa and BdB are also governmental lenders whom Mr. Freiman characterized as risk-averse and as possessing a different mindset than "typical commercial lenders."[172]  In connection with their negotiations with the Company, Caixa and BdB engaged in

---

[167]    June 9, 2015 Hr'g Tr. 24:21–25:5 (Freiman).
[168]    Freiman Decl. ¶¶ 20–23.
[169]    Freiman Decl. ¶¶ 25–28.
[170]    Freiman Decl. ¶ 28.
[171]    Freiman Decl. ¶¶ 16, 31; June 9, 2015 Hr'g Tr. 40:16–42:22 (Freiman).
[172]    June 9, 2015 Hr'g Tr. 42:11–16 (Freiman) ("Well, clearly from some of the points of view that [Mr. Parkhill] communicated to me, these banks are difficult to work with, very politically driven, very slow to react, and are not commercial banks.  They don't think like typical commercial lenders.").

a lengthy diligence process regarding the Company's business prospects and the Prepetition

Notes,[173] and they were extremely concerned with the Debtors' U.S. restructuring.[174]

Mr. Freiman described the execution of the Initial PSA as a turning point that enabled the

Company to have more productive amendment-related conversations with Caixa and BdB, as

"we were finally able to demonstrate that there was a path forward for the Company to emerge"

out of chapter 11.[175]   The banks continued to be unwilling to move beyond June 30, 2015 for an

extended covenant compliance date and an emergence date for the Debtors, but Mr. Freiman

noted that, once CDB agreed to a September 30, 2015 deadline, Caixa and BdB were willing to

agree to September 15, 2015.   While the February 2015 final agreement with Caixa and BdB

contained many terms, Mr. Freiman described the fiduciary assignments given to the banks by

the Company as a "critical concession."[176]   Although Caixa and BdB's loans were unsecured at

origination, in the February 2015 documents, the Company was forced to grant fiduciary

assignments — liens against collection accounts in Brazil — to Caixa and BdB.   In Mr.

Freiman's opinion, there is a significant risk of foreclosure by Caixa and BdB upon these assets

if the Company does not meet the September emergence deadline.[177]

Echoing the views of Mr. Parkhill, Mr. Freiman dismissed the possibility that the

amounts outstanding under the Operating Company Credit Agreements could be paid off with

existing cash, noting that such cash is held at NIU, and the Debtors do not have the authority to

---

[173]     Freiman Decl. ¶ 34.
[174]     June 9, 2015 Hr'g Tr. 36:5–18 (Freiman) ("Similar to the CDB, there was concern in Brazil about this restructuring event that was going on in the U.S.  They didn't have a firm grasp or understanding of what that entailed.  They were worried that we wouldn't be able to have the funding necessary for executing on the business plan. . . .").
[175]     June 9, 2015 Hr'g Tr. 37:2–10 (Freiman).
[176]     June 9, 2015 Hr'g Tr. 39:25–40:15 (Freiman).
[177]     June 9, 2015 Hr'g Tr. 40:16–41:17 (Freiman).

move it through LuxCo to NII Brazil without court approval.[178]  Moreover, even if permitted, the

Company would require a portion of such cash to operate until 2017, when the business plan

anticipates the Company will begin earning cash.[179]  Finally, Mr. Freiman pointed out that a

critical component of the Settlement is the distribution of certain amounts of this existing cash,

rather than simply equity, to holders of Prepetition Notes, and it would be difficult to modify the

Settlement to change this aspect.[180]

Mr. Freiman believes that if the Debtors' chapter 11 cases cannot proceed to emergence

by September 2015, a default by NII Brazil under the Operating Company Credit Agreements

may lead the Operating Company Lenders to exercise remedies which would be unlikely to be

impeded by the commencement of Brazilian insolvency proceedings.[181]  Having met face-to-face

with representatives of the Operating Company Lenders numerous times, Mr. Freiman

emphasized the lenders' continued questioning of the Debtors' credibility and the lenders' lack

of understanding of the U.S. restructuring process, and he stated his belief that, were the Debtors

to attempt to extend the September 2015 emergence deadlines, further concessions from these

lenders are unlikely to be obtained.[182]  Even if the Operating Company Lenders have more

confidence in the Debtors now than they did a year ago, this does not prove that they would

agree to additional relief on the dates or cooperate on any requested forbearance.  The Court

finds credible Mr. Freiman's testimony regarding the unlikelihood of the Debtors being able to

reopen negotiations with the Operating Company Lenders.

---

[178]     June 9, 2015 Hr'g Tr. 46:2–47:4 (Freiman) (explaining his understanding that, based on the existing cash
management order entered by the Court, the Debtors would have to ask the Court for authorization to move the
$600-plus million out of the Debtor estates into Brazil, which request he anticipates would garner objections from
creditors).
[179]     June 9, 2015 Hr'g Tr. 48:22–49:9 (Freiman).
[180]     June 9, 2015 Hr'g Tr. 47:5–48:6 (Freiman).
[181]     Freiman Decl. ¶ 57.
[182]     June 9, 2015 Hr'g Tr. 40:16–41:17 (Freiman) 150:4–151:25; Freiman Decl. ¶ 58.

5.    **Andrew Scruton**

Mr. Scruton's testimony focused on the role of the Committee and its professionals in investigating and analyzing the Disputed Claims as well as in negotiating the Initial PSA and the Amended PSA.    Mr. Scruton is a Senior Managing Director in the Corporate Finance/Restructuring Group of FTI Consulting, Inc. ("FTI"), financial advisor to the Committee.  He was one of two FTI Senior Managing Directors leading FTI's engagement with the Committee and personally led FTI's involvement in the analysis of the Disputed Claims.[183] Immediately after the appointment of the Committee, its professionals were asked by the Committee members and the Debtors to conduct an in-depth investigation of the Disputed Claims.  Mr. Scruton observed that, with negotiations for a prepetition settlement having failed and the Debtors having no clear exit in sight, there was "a need to start a fresh [sic]."[184]  He described his understanding of the Committee's mandate as bringing an impartial and fresh approach to the negotiations.[185]  With respect to the Disputed Claims, he noted the unique nature of the Transferred Guarantor Claims, which, unlike the other two categories of Disputed Claims, are not primarily claims between different Debtors.  He explained that the Transferred Guarantor Claims are "claims between certain debtors and creditors, and so the debtors were not as able to take an impartial perspective, they were going to defend those claims as strongly as they could."[186]    As a result, the Committee's independence and impartiality was particularly significant for this group of claims.

After they were retained, the Committee's professionals immediately called for a series of meetings with the main parties to hear their positions.  Mr. Scruton described a series of initial

---

[183]    Scruton Decl. ¶ 5.
[184]    June 11, 2015 Hr'g Tr. 12:1–7 (Scruton).
[185]    June 11, 2015 Hr'g Tr. 12:10–15; 14:8–11 (Scruton).
[186]    June 11, 2015 Hr'g Tr. 12:22–13:2 (Scruton).

meetings with each of the Debtors and their professionals, CapRe and its professionals, professionals for the LuxCo Group, and Aurelius and its professionals. In these meetings, each of the key issues underlying the Disputed Claims was discussed and each individual party made its "best pitch" to the Committee to convince the Committee to consider the issues in its favor.[187]

Thereafter, the Committee and its professionals began their own independent investigation of the Disputed Claims, a process that would eventually entail a review of more than 13,000 documents and would require extensive independent research and regular formal and informal calls and meetings with the various parties.[188] With respect to the Transferred Guarantor Claims, Mr. Scruton described the significant considerations in the Committee's analysis of the facts and circumstances surrounding the claims, including (i) the timing of the release of the guarantees of the Transferred Guarantors — that the CapCo 2016/2019 Notes were issued and then the guarantees were released almost immediately; (ii) the lack of disclosure — that there was no formal announcement of the release, but, rather, holders of the CapCo 2016/2019 Notes would have had to compare multiple voluminous documents to determine whether their rights had been changed; and (iii) the value of the guarantees in 2009, when the Company was likely solvent.

Mr. Scruton described the intense efforts by the Committee's professionals which helped lead to the Initial PSA, including multiple presentations given to the Committee and the independent development of a waterfall model by FTI. He provided an extensive description and analysis of an October 24, 2014 presentation[189] from the Committee's professionals to the Committee that highlighted the work completed to that date, which presentation included

---

[187]    June 11, 2015 Hr'g Tr. 18:3–9 (Scruton).
[188]    Scruton Decl. ¶¶ 21–25.
[189]    Tr. Ex. P125.

discussion of the Transferred Guarantor Claims as a main issue and an analysis of "winners" and "losers" under various scenarios that used the FTI-created waterfall and illustrated the interdependency of the Disputed Claims.[190] While Mr. Scruton testified that these presentations included qualitative views, as opposed to quantitative views, and therefore did not include a discussion of a litigation budget, he also stated that the Committee members' advisors were nonetheless very familiar with how long the Disputed Claims may take to litigate and how much it may cost.[191] He also described FTI's analysis and separate presentation to the Committee of various settlement proposals, including proposals prior to the Initial PSA that contemplated a partial reserve plan.[192] Mr. Scruton also noted that, in the lead-up to the Initial PSA and thereafter, the parties never reached agreement on a partial reserve plan because they could not agree on amounts for the other variables such as other settlement percentages and allocation.[193]

Mr. Scruton testified that, in evaluating the Initial PSA, each of the Disputed Claims was analyzed not only as part of one integrated settlement, but also individually,[194] and the Committee concluded that the settlement embodied in the Initial PSA fell within the range of

---

[190]    June 11, 2015 Hr'g Tr. 28:9–29:9 (Scruton).

[191]    June 11, 2015 Hr'g Tr. 44:18–45:4 (Scruton) ("So we went through an exhaustive discussion about the types of litigation, which forums, whether there would be appeals or not, how long it would take. We'd already analyzed how much to actually put aside, we already knew that if you reserved everything it's $1.4 billion of value you have to put aside, if you reserve just the transfer guarantor there'd be $800 million. Everyone knew there was $800 million at stake. Everyone knew there'd be tens of millions of dollars associated with litigating that type of – those types of – these types of claims and when those types of amounts were at stake. So it wasn't a secret in respect of the amounts.").

[192]    Tr. Ex. P126.

[193]    See Tr. Ex. P124 (FTI presentation, dated Nov. 6, 2014) (showing that 3 of 4 proposals were for a partial reserve plan but each contained very different amounts which would need to be reserved); June 11, 2015 Hr'g Tr. 33:7–34:1 (Scruton) (explaining that, because the parties could not reach agreement on these variables, there were very different views on the appropriate amounts that would need to be put aside under a partial reserve plan).

[194]    June 11, 2015 Hr'g Tr. 141:9–18 (Scruton) (" . . . when we recommended to the committee that they enter into the settlement, the committee professional[s] said overall, [we'd] recommend it but when you look at each the individual items, when you look at transfer guarantor . . . in isolation, that was a reasonable settlement for that particular issue. We did it at 27-1/2 percent and . . . when we came to a value at PSA-2, the question was was 21 percent [reasonable] and we gave them the recommendation that, on its own, besides the rest of the settlement, on its own, that was a reasonable settlement for that particular claim.").

reasonableness for each category of Disputed Claims.[195]   He stated that his and the other
Committee professionals' key message to the Committee was that these claims had significant
attendant risks (legal, factual, and business risks), all of which needed to be considered in
evaluating whether the settlement embodied in the Initial PSA was reasonable.   Ultimately, Mr.
Scruton testified that, with respect to the Transferred Guarantor Claims, he and the other
Committee professionals thought the settlement percentage of 27.5 percent matched the work
that the professionals had done and that they were comfortable with it.   In fact, Mr. Scruton
testified that the settlement percentage could have been "much higher" than 27.5 percent and still
may have been viewed as reasonable by the Committee's professionals.[196]

Mr. Scruton described the Committee's role in the negotiations of the Amended PSA as
akin to a "mediation role."[197]   He specifically recalled asserting that holders of LuxCo Notes
were not entitled to postpetition interest as the LuxCo Group claimed, an issue he stated the
Committee pursued because it knew a concession on such issue would benefit holders of the
CapCo 2021 Notes.[198]   Mr. Scruton testified that CapRe, the Debtors, and the Independent
Manager were, along with the Committee, also advocating for the interests of holders of the
CapCo 2021 Notes during these negotiations.[199]   When the parties reached agreement on the
Amended PSA, the Committee met on February 25, 2015 and March 3, 2015 to consider the
Amended PSA with the aid of models depicting a wide variety of scenarios relating to the
settlement of the Disputed Claims.   In considering the Amended PSA, the Committee noted that
the only change to the settlement of the Disputed Claims was that the settlement percentage of

---

[195]    June 11, 2015 Hr'g Tr. 52:1–18 (Scruton).
[196]    June 11, 2015 Hr'g Tr. 56:15–57:10 (Scruton).
[197]    June 11, 2015 Hr'g Tr. 59:23–60:6 (Scruton).
[198]    June 11, 2015 Hr'g Tr. 74:4–18 (Scruton).
[199]    June 11, 2015 Hr'g Tr. 71:8–18 (Scruton).

49

the Transferred Guarantor Claims had been reduced from 27.5 percent to 21 percent.[200]  Mr.

Scruton testified that it was the Committee's view that, to the extent a settlement of the

Transferred Guarantor Claims at 27.5 percent was reasonable in the Initial PSA, a settlement of

the Transferred Guarantor Claims at 21 percent in the Amended PSA and Settlement was

certainly reasonable.[201]  Mr. Scruton's testimony was thorough and credible.

## DISCUSSION

### I.    Applicable Law

The Settlement is the centerpiece of the Plan.  If approved, it will resolve all of the

Settled Claims and Disputes.  A chapter 11 plan may "provide for the settlement or adjustment of

any claim or interest belonging to the debtor or the estate" and "include any other appropriate

provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C.

§§ 1123(b)(3)(A), (b)(6).  Courts analyze settlements under section 1123 by applying the same

standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to "approve a

compromise or settlement."  *See* Fed. R. Bankr. P. 9019(a); *see, e.g., Resolution Trust Corp. v.*

*Best Prods. Co. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995)

("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of

the Bankruptcy Code or pursuant to separate motion under Bankruptcy Rule 9019, the standards

applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

A court may approve a settlement under Rule 9019 of the Bankruptcy Rules if it is fair and

equitable and in the best interests of the estate.  *See Protective Comm. for Indep. Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) (hereinafter, "*TMT Trailer*

*Ferry*"); *see also HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.),* 466 B.R. 244, 247

---

[200]    Scruton Decl. ¶¶ 52–55; Tr. Ex. P116 (FTI presentation, dated Feb. 25, 2015).
[201]    June 11, 2015 Hr'g Tr. 68:14–23 (Scruton).

(Bankr. S.D.N.Y. 2012). The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).

"Compromises are a normal part of the process of reorganization." *TMT Trailer Ferry*, 390 U.S. at 424 (citation omitted). Indeed, compromises are favored because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *MF Global,* 466 B.R. at 247; *see also In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012). The settlement proponent bears the burden "to persuade the court that the settlement is in the best interests of the estate." *MF Global*, 466 B.R. at 248.

In assessing whether a settlement is in the best interests of the estate, "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying [each] dispute." *Adelphia*, 368 B.R. at 225. Rather, the court must be "apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *Dewey*, 478 B.R. at 640-41. In conducting its analysis of a settlement, a court may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement. *See Dewey*, 478 B.R. at 641; *In re Chemtura Corp.*, 439 B.R. 561, 609 (Bankr. S.D.N.Y. 2010). However, while the court may "give weight to the [debtor's] opinion that the settlement is fair and equitable, [it] may not simply adopt the [debtor's] position without making its own independent inquiry." *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014); *MF Global*, 466 B.R. at 247, *Dewey*, 478 B.R. 641 ("The bankruptcy court must exercise its own independent judgment in analyzing the *Iridium* factors"); *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) ("A court may not simply defer to a

51

debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement."). In complex settlements, it is appropriate for the court to not only consider each settled claim individually, *see*, *e.g.*, *In re Enron Corp.,* Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004), but also to consider the reasonableness of the settlement agreement as a whole. *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993) ("Since the Settlement Agreement is a global settlement of all the claims, it is not possible to vacate only the portions which affect [certain debtors' abilities to pay]. The appropriate inquiry is whether the Settlement Agreement in it [sic] entirety is appropriate for the . . . estate."). However, "the judge is not required to assess the minutia of each and every claim." *Nellis*, 165 B.R. at 123.

Perhaps the best formulation of how the Court should approach the task of evaluating a settlement can be found in the Supreme Court's seminal decision in *TMT Trailer Ferry*:

> [The Court must] apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

390 U.S. at 424-25.

To be approved, "[t]he settlement need not be the best that the debtor could have obtained." *Adelphia*, 368 B.R. at 225; *Nellis*, 165 B.R. at 123. Indeed, "[i]f courts required settlements to be perfect, they would seldom be approved." *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015) (affirming bankruptcy court's approval of a settlement pursuant to Rule 9019 of the Bankruptcy Rules even though one of the claims resolved as part of the settlement was "far from

52

compelling"). Rather, "there is a range of reasonableness with respect to a settlement — a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *91 (approving a settlement where the "distribution formula [was] not a precise mathematical quantification of the likelihood of substantive consolidation of each Debtor into each of the other Debtors, which would be impossible to calculate. Rather, the formula represent[ed] a negotiated compromise of numerous inter-estate issues, including substantive consolidation."). Rather than focusing on a precise measurement of likely outcomes, a court should instead "canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness." *Adelphia*, 368 B.R. at 225 (citation omitted).

When courts in this Circuit consider whether a settlement is within the range of reasonableness, they apply the following factors:

(1) the balance between the litigation's possibility of success and the settlement's future benefits;
(2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
(3) the paramount interests of creditors;
(4) whether other parties in interest support the settlement;
(5) the nature and breadth of releases to be obtained by officers and directors;
(6) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; and
(7) the extent to which the settlement is the product of arm's-length bargaining.

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) ("*Iridium*").

## II.        The Process Undertaken by the Debtors and by the Committee

Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, *see Soup Kitchen Int'l Inc.*, 506 B.R. at 37, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.[202]  Here, after undertaking an extensive analysis of each of the Settled Claims and Disputes and after considering and balancing the possibility of success in litigation, the risks and expense of litigating any or all of the Settled Claims and Disputes, and the benefits of the Settlement to the Debtors' estates and creditors, the Debtors concluded that, in their business judgment, the Settlement is reasonable and in the best interests of the Debtors' estates.   The Committee unanimously concurred; the CapCo 2021 Group vehemently disagreed.

The CapCo 2021 Group urges the Court to decline to give business judgment deference to the Debtors' decision to approve the Settlement because, the group asserts, the Debtors "did not undertake the analysis to reach a reasonably informed judgment on the merits of the Transferred Guarantor Claims and settlement of them for $285 million."[203]  The CapCo 2021 Group contends that the Debtors were so focused on achieving a consensual plan that they left negotiation of the terms of the Settlement, and, critically, the settlement of the Transferred Guarantor Claims (which claims the Debtors believe to be "without merit") entirely to the

---

[202]        *See Dewey*, 478 B.R. at 641 (citing *MF Global Inc.*, 2012 Bankr. LEXIS 3701 at *5) (recognizing that although courts have the discretion to approve settlements, the business judgment of the debtor in recommending a settlement should be considered).

[203]        CapCo 2021 Group Obj. ¶ 110.  The business judgment rule's presumptions shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets.  *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (citations omitted).  In discussing the business judgment rule in *Global Crossing*, Judge Gerber noted that courts give "great deference" to the substance of directors' decisions and will neither invalidate them nor substitute the court's views for those of the board if the board's decision can be attributed to any rational business purpose.  *Id.* at 744 (citing *Paramount Comm. Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)).

Debtors' largest creditors.[204]  In the CapCo 2021 Group's view, the negotiations that produced

the Settlement, although not undertaken in bad faith, deployed the settlement amounts for the

Disputed Claims as a "lever" to placate the economic objectives of the Debtors' creditors,

particularly Aurelius, rather than basing the settlement amounts on the merits of the claims.[205]

Therefore, the CapCo 2021 Group asserts, despite analyzing the Transferred Guarantor Claims

and concluding they had no merit, the Debtors nevertheless decided to support the Settlement

based on a "package deal" analysis of its terms.[206]  Because the Debtors took no position on the

Transferred Guarantor Claims individually and did not make a determination (i) that $285

million[207] was a fair settlement amount for such claims or (ii) regarding an appropriate range of

settlement for such claims, the CapCo 2021 Group maintains that the business judgment rule

should not apply to the Debtors' decision to settle the Transferred Guarantor Claims at 21

percent.[208]  The CapCo 2021 Group further asserts that, even if the Debtors did form a judgment

that $285 million was a reasonable settlement amount for the Transferred Guarantor Claims,

such judgment should not be credited as an "informed judgment" because the Debtors did not

---

[204]    CapCo 2021 Group Obj. ¶¶ 2–4.

[205]    CapCo 2021 Group Obj. ¶ 3 (arguing that "[t]he actual settlement percentage for the Transferred Guarantor Claims was simply a lever to drive value to Aurelius in exchange for its consent, and was adjusted as other economic factors were negotiated").

[206]    CapCo 2021 Group Obj. ¶ 112 (citing to Parkhill Dep. Tr., Goldberg Decl., Ex. D, 161:5–162:19).  The CapCo 2021 Group makes a similar argument as to the Committee.  See CapCo 2021 Group Obj. ¶ 86 ("Likewise, it appears that the Committee did not conduct a stand-alone analysis of the reasonableness of settling the Transferred Guarantor Claims for $285 million, nor did the Committee reach a determination that it was independently reasonable to settle the claims at 21 percent of the claimed amount.  Instead, the Committee only assessed the reasonableness of the global settlement overall.").

[207]    The CapCo 2021 Group repeatedly refers to the "settlement amount" of the Transferred Guarantor Claims as $285 million.  As Mr. Parkhill explained, while $285 million will be distributed from the estate of NIU on account of the Transferred Guarantor Claims, the net financial impact of this settlement to holders of CapCo 2021 Notes is a $150 million reduction in recoveries, not a $285 million reduction.  See June 8, 2015 Hr'g Tr. 134:7–138:17 (Parkhill).

[208]    CapCo 2021 Group Obj. ¶¶ 112–13.

adequately inform themselves as to and consider the Letter of Transmittal Argument (defined below) that the CapCo 2021 Group asserts would be a complete defense to such claims.[209]

The declarations in support of confirmation of the Plan and the evidence presented during the course of the five days of testimony at the Confirmation Hearing demonstrate that, during the year-long negotiations that produced the Settlement, the Debtors' Board, management, and professionals more than adequately informed themselves, through extensive analysis conducted by the Debtors' professionals and the numerous presentations given to the Board and to management, of the merits of each of the Settled Claims and Disputes.[210]  Contrary to the assertions of the CapCo 2021 Group, this undertaking included a detailed analysis of potential defenses to the Transferred Guarantor Claims arising from the Exchange, including specific analysis of arguments that, by participating in the Exchange, holders of CapCo 2016/2019 Notes had given up their standing to assert the Transferred Guarantor Claims.[211]

As Mr. Shindler testified at length, the Settlement as a whole was presented to the Debtors' Board, analyzed and explained by the Debtors' professionals on a component-by-component basis, and ultimately approved.[212]  While the Debtors' professionals admittedly did not develop a quantitative stand-alone analysis of the range of reasonableness of settling the Transferred Guarantor Claims, nor did they present the Debtors with a strict numerical estimate

---

[209]    CapCo 2021 Group Obj. ¶¶ 84, 87–88, 114.

[210]    *See* Tr. Ex. P039 (Overview of Waterfall Model and Settlement Implications, dated Dec. 15, 2014); Tr. Ex. P040 (Presentation to Board of Directors, Revised Plan Support Agreement, dated Feb. 27, 2015); Tr. Ex. P041 (Review of Claims Being Resolved by Proposed Settlement, dated Feb. 27, 2015).

[211]    *See* Tr. Ex. P041 (Review of Claims Being Resolved by Proposed Settlement, dated Feb. 27, 2015).  While the evidence presented casts some doubt as to whether the Letter of Transmittal Argument was specifically discussed with the Debtors' Board and management, as discussed below, the Court finds that the Letter of Transmittal Argument is simply a variation of the argument that holders of the CapCo 2016/2019 Notes gave up their right to assert the Transferred Guarantor Claims by participating in the Exchange.  Further, as discussed more fully below, the Court concludes that the Letter of Transmittal Argument is not a complete defense to the Transferred Guarantor Claims; accordingly, even if such argument was not specifically discussed, this would not rise to the level of a failure by the Debtors to be adequately informed.

[212]    Shindler Decl. ¶¶ 34–39.

56

of the likely length and cost of litigating such claims,[213] the evidence demonstrates that the Board was well aware of the complexity of such claims and found a settlement at 21 percent, albeit in the context of the Settlement as a whole, to be a reasonable resolution of such claims.[214]

Separate and apart from the Debtors' process, the Committee also undertook its own review of the merits of each of the Settled Claims and Disputes and considered the full range of alternatives available to the Debtors when examining both the Initial PSA, and, later, the Amended PSA.  The Committee's professionals prepared legal memoranda separately analyzing the Fraudulent Conveyance Claims, the Recharacterization Claims, and the Transferred Guarantor Claims and the issues surrounding each of such claims[215] and gave numerous presentations concerning the Disputed Claims and potential settlement scenarios involving them.[216]  They modeled a wide variety of outcomes for each of the Disputed Claims, including "best case" and "worst case" scenarios for the litigation of each claim, and analyzed the strengths and weaknesses of each claim in order to evaluate whether each of the proposed settlements was reasonable under the circumstances.

Based on this analysis, the Committee's professionals determined that each creditor constituency faced significant risk if the Disputed Claims were to be litigated.  For the Plan

---

[213]    On this point, Mr. Shindler testified that he understood the litigation would cost "a very large amount of money" and take "many months" to litigate.  *See* June 3, 2015 Hr'g Tr. 41:21–42:20; 236:7–20 (testifying that the Settled Claims and Disputes "were complex" and that "each one [i]s lengthy and expensive" and could lead to "potentially years of continuing through a difficult time-consuming, expensive, distracting process").

[214]    *See* June 8, 2015 Hr'g Tr. 141:16–21 (Parkhill) (testifying that the 21percent settlement of the Transferred Guarantor Claims "reflects two things . . . the debtor's judgment on the relative merits, strengths, and weaknesses of the respective claim, and it reflects the debtor's judgment around an economic settlement that is reasonable to undertake as a consequence of the actual percentage.").

[215]    *See* Tr. Ex. P120 (Kramer Levin Dec 26, 2014 Memorandum to Committee Discussing and Presenting Conclusions Regarding Eight Issues Relating to Transferred Guarantor Claims); Tr. Ex. P118 (Dec. 28, 2014 Presentation to Independent Manager – Discussion Materials Regarding Potential Fraudulent Conveyance and Recharacterization Claims).

[216]    *See* Tr. Ex. P122 (Oct. 20, 2014 Presentation); Tr. Ex. P125 (Oct. 24, 2014 Presentation); Tr. Ex. P117 (Dec. 30, 2014 Presentation); Tr. Ex. P119 (FTI Dec. 20, 2014 Presentation); Tr. Ex. P116 (FTI Feb. 25, 2015 Presentation Re: Proposed Modified Plan Term Sheet and Plan Support Agreement).

Distributable Value assumed under the Amended PSA, recoveries to holders of CapCo 2016/2019 Notes could vary from 100.0% to 34.5%, recoveries to holders of CapCo 2021 Notes could vary from 49.6% to 4.9%, and recoveries to holders of LuxCo Notes could vary from 107.9% to 48.1% on account of their prepetition claims.[217]  In addition to their legal and factual analyses, the Committee's professionals discussed with the Committee on multiple occasions the various outcomes under different scenarios of settlement or litigation of one or all of the Disputed Claims.  The Committee then determined that the settlements under the Plan were reasonable, fell well within an appropriate settlement range based on the Committee's understanding of the risks associated with the claims, and were in the best interests of the estates and creditors — both on an individual and a global basis, when coupled with the settlement of other disputed issues (including postpetition interest, valuation, and cash and equity allocation).[218]  In addition, the Committee considered that the Amended PSA would pave the way for a successful and expeditious emergence from bankruptcy that would maximize the Company's value for all creditors.

During the Confirmation Hearing, the CapCo 2021 Group elicited cross-examination testimony from witnesses indicating that the Debtors, the Committee, and the other parties to the Amended PSA were actively viewing the settlement in terms of an economic "Rubik's Cube,"[219] inasmuch as shifting the settlement percentage of one category of Disputed Claims required adjusting other settlement percentages to achieve the same economic consequences in terms of creditor recoveries.  Although the evidence demonstrates that the Debtors and the Committee did

[217]    *See* Tr. Ex. P116 (FTI Feb. 25, 2015 Presentation Re: Proposed Modified Plan Term Sheet and Plan Support Agreement).
[218]    Scruton Decl. ¶ 55.
[219]    June 4, 2015 Hr'g Tr. 27:7–10 (Winn) ("So as the negotiations ensued, it was fixing the Rubik's cube here to find an outcome that sort of roughly reflected where the claims were and provided for the flow of value in way that the parties could agree to.").

conduct extensive analyses on the merits of the Disputed Claims, the testimony and documentary evidence nevertheless reveals a high level of focus on the interrelated economics of the claims when viewed using the Waterfall Model.[220]  Moreover, the continued emphasis by the Debtors and the Committee on the "package deal" and "interrelated" nature of the Settlement reveals that the parties indeed maintained a considerable focus on the economic variables.[221]

        While acknowledging the aptness of the analogy to a Rubik's Cube, the Court notes that the evidence taken as a whole illustrates a process of *negotiation* — exactly the type of give-and-take, push me-pull you process that should be encouraged in chapter 11 cases.  And the Debtors engaged in that negotiation[222] and made their determination as to whether to approve the Settlement with the broader consequences in mind.  Against their strong belief that they had the better of the arguments with respect to certain categories of the Disputed Claims, the Debtors weighed the risks of failing to settle and actually litigating such claims, including, as Mr. Freiman and Mr. Shindler testified, (i) the risks to the non-debtor operating companies that may result from missing the September emergence deadlines set by the Operating Company Lenders, which deadlines were unlikely to be further extended and (ii) the liquidity constraints, the peril to

---

[220]    *See, e.g.*, June 8, 2015 Hr'g Tr. 142:12–143:2 (Parkhill) ("To understand the financial consequences of that settlement you have to understand valuation, you have to understand what the other settlement percentages are, because the settlements are interdependent . . . . [O]ne percentage adjustment in one area can change the economic consequence of a settlement in another . . . . So you have to have the complete picture to understand and to develop this financial profile of the economic consequence of the issue."); June 4, 2015 Hr'g Tr. 38:8–16 (Winn) ("[H]ow you resolve one of the litigations impacts what happens with another of the litigations.  So these are not independent variables, they are dependent variables. . . . [I]t's hard, frankly, to look at the transfer [sic] guaranty claims without understanding what's going on with the other two claims. . . . they're all intertwined in that way.").

[221]    June 3, 2015 Hr'g Tr. 236:16–20 (Shindler) ("My thought process was that we were looking at an overall integrated settlement that was complex in nature from a whole host of issues"); Deposition of Daniel Gropper 144:22–145:2 ("The negotiation of the claims were [sic] always done on an integrated basis. . . . So there were a myriad of issues that were involved in being resolved as part of both the global settlements, and they all interacted with one another.").

[222]    The record demonstrates that, contrary to the assertions of the CapCo 2021 Group, the Debtors played an active role in the negotiations, led by their CEO, Mr. Shindler, who (i) communicated with principals and advisors and convened and led meetings with creditors (*see* June 3, 2015 Hr'g Tr. 209:16–210:18; 214:24–215:11; 223:11–226:6; Tr. Exs. P020, P063, P065); (ii) rejected proposals as unsatisfactory or unfair (*see* June 3, 2015 Hr'g Tr. 207:22–208:07; 214:3–10); (iii) after the Debtors terminated the Initial PSA, invited the LuxCo Group to negotiations despite heavy criticism from other creditors (*see* June 3, 2015 Hr'g Tr. 229:2–230:11; Tr. Ex. P163).

the business, and the uncertainties that the Debtors may face by remaining in chapter 11 and failing to emerge in the near term.  The Debtors also considered the benefits of resolution of the Settled Claims and Disputes in light of the concessions made by the various creditor groups and the broad creditor support for the Settlement.

Accordingly, the Court declines the CapCo 2021 Group's invitation to afford the Debtors' business judgment no deference.  Nor, however, will the Debtors' business judgment that the Settlement is reasonable be sufficient to carry the day.  Instead, as mandated by precedent, the Court will undertake its own analysis of each component of the Settlement, including the settlement of the Transferred Guarantor Claims, and of the Settlement as a whole, bearing in mind the Debtors' business decision to approve the Settlement.[223]

## III.    The Settlements Contained in the Plan are Fair, Reasonable, and Well Above the Lowest Point in the Range of Reasonableness

Even if the Court were to conclude that the settlement percentages contained in the Amended PSA were negotiated and set by the parties solely based on economic outcomes under the Waterfall Model rather than based on the merits of the Settled Claims and Disputes, the Court nonetheless could determine, after undertaking its own independent analysis and review of each of the claims at issue, that the Settlement falls well within the range of reasonableness and should be approved.  Having conducted a nine-day evidentiary hearing on confirmation of the

_____

[223]    *See Nellis*, 165 B.R. at 123 ("The experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement.").  In determining whether to approve a complex settlement under a plan, bankruptcy courts consider each settled claim individually, while also examining the settlement as a whole. *See, e.g.*, *Adelphia*, 368 B.R. at 182-219 (analyzing each individual claim settled under complex plan settlement agreement); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928 at *16-23 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *84-117 (same); *In re Enron Corp.*, No. 02 Civ. 8489 (AKH), 2003 WL 230838 at *3 (S.D.N.Y. Jan. 31, 2003) (affirming bankruptcy court's decision that a settlement "as a whole was fair and equitable"); *In re Washington Mutual, Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable.  This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole.  Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.").

Plan and having reviewed hundreds of pages of briefing in connection with confirmation, the Court has familiarized itself with the facts and circumstances of the Settled Claims and Disputes and has indeed conducted an independent analysis of the Settlement, as follows.

### A.    The Settlement of the Transferred Guarantor Claims

The CapCo 2021 Group argues vehemently that the paramount consideration in evaluating the Settlement with respect to the Transferred Guarantor Claims is the claims' complete lack of merit; accordingly, their settlement for $285 million "is beyond even the broadest vision of the 'range of reasonableness.'"[224]  In support of this assertion, in the Claims Objections and in the CapCo 2021 Group Objection, the CapCo 2021 Group cites several "purely legal reasons — each of which is independently sufficient to defeat the [Transferred Guarantor Claims]" — why the Transferred Guarantor Claims would not succeed if such clams were litigated.[225]  First, the CapCo 2021 Group argues that, even if the Transferred Guarantor Claims once had merit, they were transferred to CapCo in the Exchange, leaving holders of Exchange Notes with no standing to assert such claims.  In addition, the CapCo 2021 Group submits that the 2009 Reorganization on its face complied with the applicable sections of the CapCo 2009 Indentures governing release of guarantors.[226]

The Debtors and the Committee criticize these arguments as misleading and over-simplified, asserting that, on the contrary, "there does not appear to be any 'silver bullet' defense to the Transferred Guarantor Claims that would be guaranteed to dispense with them without the need for substantial, lengthy efforts" because the issues the claims raise are "subject to

---

[224]    CapCo 2021 Group Obj. ¶ 109.

[225]    CapCo 2021 Group Obj. ¶ 34.  The CapCo 2021 Group asserts that none of these arguments would require parole evidence or discovery, as each is based solely on contractual terms and undisputed facts.  *Id.*

[226]    *Id.*  In order for the Transferred Guarantor Claims to succeed, a court would have to find that there was a breach of the CapCo 2009 Indentures in connection with the 2009 Transfers.

numerous, colorable arguments and counter-arguments, all of which would require factual development, and would be intensely disputed."[227]   Having conducted its own analysis, the Court agrees that the issues raised by the Transferred Guarantor Claims are complex, include triable issues of fact, and, because of their fact-intensive nature, would require discovery into parole evidence and likely lead to protected litigation.  In addition, with respect to the legal issues raised by the Transferred Guarantor Claims, there is limited case law directly on point.  For all of these reasons, the Court finds that the Debtors reasonably concluded that the outcome of any litigation of the Transferred Guarantor Claims would be vigorously contested and fraught with uncertainty.

In addition to the "purely legal" arguments it raises, the CapCo 2021 Group also emphasizes that the Debtors themselves believe the Transferred Guarantor Claims to be without merit and posits that value is being attributed to the settlement of such claims only to facilitate a broader settlement.[228]   In support of this contention, the CapCo 2021 Group focuses on the fact that the Debtors have stated in multiple securities filings that the Disputed Claims, including the Transferred Guarantor Claims, were "without merit" and asserts that no party other than Aurelius found the Transferred Guarantor Claims to be strong.[229]   Based on the testimony at the Confirmation Hearing — and a common sense interpretation of the words "without merit" — the Court does not find this argument convincing.

As was explained by several witnesses at the Confirmation Hearing, the Debtors equate "without merit" to their view that they would prevail in litigation — a view that comports with the 79 percent likelihood that the claims will be defeated, reflected in the settlement of the

---

[227]    Debtors' Conf. Brief ¶ 93; *see also* Committee Brief ¶ 16 ("[T]he Ad Hoc Group's novel arguments at most give rise to issues that would be vigorously contested, with little likelihood that they would resolve the entire litigation at the threshold.  Their aggressive creativity, however, only underscores the degree to which any litigation would be complex and hard-fought at both the trial and appellate levels.").

[228]    CapCo 2021 Group Obj ¶ 69 (alleging that "[t]he Debtors were ultimately prepared to accept whatever split of the economics achieved creditor support").

[229]    *See* CapCo 2021 Group Obj. ¶¶ 26–31.

Transferred Guarantor Claims at 21 percent of their asserted amount. The Debtors and the Committee presented considerable evidence demonstrating the substantial time and resources they spent investigating the Transferred Guarantor Claims and analyzing various arguments that, if credited, would provide a basis for such claims to succeed. Further, despite the parties' public litigation positions, it does not appear that any party participating in the negotiations took the position or put forward a proposal that the Transferred Guarantor Claims should be settled at zero.[230] Indeed, one member of the CapCo 2021 Group testified that he found the settlement of the Transferred Guarantor Claims at 21 percent of their asserted value acceptable, so long as holders of the CapCo 2021 Notes were able to share in the proceeds of such a settlement.[231]

The Court will analyze the two principal legal arguments of the CapCo 2021 Group in turn.

### 1. Whether Certain Holders of the CapCo 2016/2019 Notes Have Standing to Assert the Transferred Guarantor Claims

Because the alleged breaches of the CapCo 2009 Indentures giving rise to the Transferred Guarantor Claims had all occurred as of December 30, 2009, the CapCo 2021 Group submits that only holders of CapCo 2016/2019 Notes outstanding as of December 30, 2009 (*i.e.*, Old Notes) have standing to assert the Transferred Guarantor Claims. Accordingly, the CapCo 2021 Group argues that holders of Exchange Notes issued in 2010, such as Aurelius, lack standing to assert the Transferred Guarantor Claims (the "Exchange Argument").[232] The First Aurelius Letter states that "[the CapCo 2021 Notes] were issued well after December 30, 2009, the date of the transfer and purported guarantee releases at issue here, and do not appear to be eligible to

---

[230]    *See* June 8, 2015 Hr'g Tr. 145:15–22 (Parkhill).
[231]    *See* Deposition of Mark Taub, May 13, 2015, at 110:17–111:6 (Q: "If the debtor had settled the transferred guarantor claims at 21 percent, with the 21's sharing equally in that settlement, would that have been unreasonable in Mohawk's view?" A: "If the 2021s were getting the same recovery as the '16s or '19s, we wouldn't have cared what the debtors' view of the settlement is.").
[232]    CapCo 2021 Obj. ¶¶ 39–45.

raise the contractual issues discussed herein;"[233] the CapCo 2021 Group urges that this statement should be taken as a party admission that holders of *any* CapCo Notes issued after December 30, 2009 are ineligible to raise the Transferred Guarantor Claims, thereby estopping Aurelius from asserting the Transferred Guarantor Claims.  The CapCo 2021 Group therefore asserts that no value on account of the Transferred Guarantor Claims should be attributed to the approximately 50 percent of outstanding CapCo 2016/2019 Notes owned by Aurelius.

The CapCo 2021 Group further contends that, by executing the Letter of Transmittal and thereby agreeing to "exchange[], assign[] and transfer[] to . . . the Issuer all right, title and interest in and to"[234] any Old Notes tendered for exchange, holders of Old Notes vested the Transferred Guarantor Claims in CapCo.  This "straightforward" argument contends that execution of the Letter of Transmittal, which is governed by New York law, triggered the operation of New York General Obligations Law Section 13-107 (the "New York Statute"), which provides that:

> Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.[235]

The CapCo 2021 Group asserts that by executing the Letter of Transmittal and by operation of the New York Statute, holders of Old Notes transferred whatever claims they may have had for breach of the CapCo 2009 Indentures, including the Transferred Guarantor Claims, to CapCo and therefore lack standing to assert such claims (the "Letter of Transmittal Argument" and,

---

[233]    Tr. Ex. P002 (First Aurelius Letter) n.1.
[234]    Tr. Exs. O131, O132 (form Letters of Transmittal).
[235]    N.Y. Gen. Oblig. Law § 13-107(1).

together with the Exchange Argument, the "Standing Arguments").[236]  If either the Exchange

Argument or the Letter of Transmittal Argument is correct, argues the CapCo 2021 Group, it

could be a "silver bullet" that would obviate the need for any litigation over the Transferred

Guarantor Claims to reach the merits.  The Court finds that, as the Plan Proponents contend,

there are strong legal and equitable arguments against the Standing Arguments.

As an initial matter, no party has produced any authority for the proposition that a party's

standing to assert claims arising prior to an A/B exchange[237] can be surrendered by the party's

participation in the A/B exchange.  While it has been held that a transferor of a note may transfer

its right to assert claims under the indenture governing such note to its transferee,[238] such

authority arises in the sale context, in which the transferor surrenders the economic risks and

benefits of ownership of the transferred notes to the transferee.  In the context of an A/B

exchange, however, the transferor retains identical economic risks and benefits of ownership of

such transferred notes through the exchange notes.  Moreover, as the Committee correctly points

out,[239] if a court were to find that, by participating in the Exchange, holders of Old Notes waived

claims, as opposed to transferred them, a further question would arise as to whether such a

waiver would be enforceable, insamuch as it was obtained without payment of additional

consideration from CapCo to the holders of Old Notes.[240]

---

[236]     While the Plan Proponents investigated questions of standing to bring the Transferred Guarantor Claims arising from the Exchange, testifying witnesses could not recall specific discussion of the Letter of Transmittal Argument.

[237]     As discussed in n.46, supra, the Exchange was an "A/B exchange offer," a registered exchange offer in which the issuer issues new registered securities with terms identical to original securities issued in a private placement and offers the new securities to the holders of the original restricted securities in exchange for those original securities. An A/B exchange offer provides freely tradeable securities to those investors that participate. *See* PRACTICALLAW.COM, http://us.practicallaw.com/7-382-3204 (last visited Aug. 25, 2015).

[238]     *Oklahoma Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 416-18 (S.D.N.Y. 2013).

[239]     Committee Brief ¶ 133.

[240]     *See Cigna Health and Life Ins. Co. v. Audax Health Sols.*, 107 A.3d 1082 (Del. Ch. 2014) (finding that shareholders' purported waiver of claims pursuant to a letter of transmittal executed in connection with a merger

Additionally, provisions of the CapCo 2009 Indentures suggest that all of the benefits available to holders of the Old Notes transferred from the Old Notes to the Exchange Notes upon completion of the Exchange.   Specifically, Section 2.07(f) of the CapCo 2009 Indentures provides that, pursuant to a Registered Exchange Offer such as the Exchange, the Trustee shall accept Restricted Global Notes, such as the Old Notes, and, in exchange, deliver a like amount of Unrestricted Global Notes (*i.e.,* the Exchange Notes) to the former holders of Restricted Global Notes.[241]   Section 2.07(j)(iv) of the CapCo 2009 Indentures goes on to state that "[a]ll Global Notes . . . issued upon any registration of transfer or exchange of Global Notes . . . shall be the valid and legally binding obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes . . . surrendered upon such registration of transfer or exchange."[242]   These provisions suggest that, if a "benefit" available to holders of the Old Notes under the CapCo 2009 Indentures was standing to bring the Transferred Guarantor Claims, such benefit transferred to the former holders of Old Notes, now holders of Exchange Notes, upon completion of the Exchange.

With respect to the Letter of Transmittal Argument, Section 2.07(j)(iv) could also be interpreted to evidence a written reservation of all benefits of the Old Notes, including any claims or demands belonging to a holder of Old Notes, for the benefit of holders of Exchange Notes, thereby preempting the applicability of the New York Statute.  Additionally, to the extent that, as the CapCo 2021 Group urges, execution of the Letter of Transmittal vested in CapCo the

---

agreement was not enforceable when no additional consideration was given to shareholders in exchange for the waiver).

[241]    *See* Tr. Exs. P135, P139 (CapCo 2009 Indentures), definition of "144A Global Note;" definition of "Regulation S Global Note."  The Old Notes were Global Notes sold in reliance on Rule 144A or Regulation S.  *See* NII Holdings Dec. 15, 2009 Form 8-K ("The Issuer offered and sold the Notes to the Initial Purchasers in reliance on the exemption from registration provided by Section 4(2) of the Securities Act. The Initial Purchasers then sold the Notes either to qualified institutional buyers pursuant to the exemption from registration provided by Rule 144A under the Securities Act or outside the United States in compliance with Regulation S.").

[242]    Tr. Exs. P135, P139 (CapCo 2009 Indentures), Section 2.07(j)(iv).

pre-Exchange right of holders of the Old Notes to bring a claim, this raises a litigable question as to whether, to give effect to Section 2.07(j)(iv), such section must be interpreted as effecting a post-Exchange assignment of such rights by CapCo to the holders of the Exchange Notes.[243]

There are also strong equitable arguments against the Standing Arguments. The documents underlying the Exchange reveal that the intention of the Exchange was to do no more than fulfill CapCo's obligation under the CapCo 2009 Indentures to conduct the Exchange pursuant to the Registration Rights Agreements[244] — to exchange Old Notes for "debt securities of [CapCo] and the related guarantees of the Guarantors as provided for in the Indenture identical in all material respects to the [Old Notes] (except that the Additional Interest provisions and transfer restrictions shall be eliminated) . . . ."[245] The promise of the Exchange (freely tradable Exchange Notes) could be reasonably viewed by CapCo and by holders of Old Notes as essentially a benefit offered by CapCo to incentivize prospective purchasers of the unregistered Old Notes.

Even at this threshold level, the Transferred Guarantor Claims are complicated, to say the least. Finding that holders of Old Notes gave up significant rights (*i.e.,* the right to assert the Transferred Guarantor Claims) simply by participating in the Exchange would appear to be contrary to the intentions and expectations of both CapCo and the holders of the Old Notes, not

---

[243]    Even were a court to find that (i) standing to bring the Transferred Guarantor Claims was not transferred to CapCo in the Exchange and (ii) such claims should prevail, the remedy is less than clear. Opponents of the Transferred Guarantor Claims argue that the New York Statute, which applies only to "claims or demands of the transferrer . . . for damages or rescission against the obligor," would operate to foreclose the remedy suggested by holders of the Transferred Guarantor Claims, namely, that the guarantees of the Transferred Guarantors should be reinstated, which they suggest is an equitable remedy. While there is little case law interpreting the New York Statute, there is at least a credible argument to be made that the New York Statute does not apply to equitable remedies such as this.

[244]    *See e.g.*, Tr. Ex. P144 (Prospectus) at 1–3.

[245]    *See* Tr. Ex. P144 (Prospectus) at 1; Tr. Exs. P136, P140 (Registration Rights Agreements), definition of "Exchange Securities." The reference to "Additional Interest" is to provisions in the CapCo 2009 Indentures obligating CapCo to pay a higher interest rate on the Old Notes if a registration statement for an A/B exchange is not filed within 210 days of issuance, suggesting that prospective purchasers would require a premium to hold unregistered and transfer-restricted Old Notes as compared to registered and freely tradable Exchange Notes.

to mention the expectations of the capital markets generally.[246]    As the Committee correctly points out, the CapCo 2021 Group's argument that any rights or claims possessed by noteholders were released through a form letter of transmittal "could upset longstanding expectations by participants in the bond market . . . by requiring parties to engage in massive due diligence and even litigation before effectuating a routine exchange."[247]    At the very least, if it was intended that holders of Old Notes would give up such rights by participating in the Exchange, it would be reasonable to expect the Prospectus to contain disclosure on this point, just as the Prospectus repeatedly states that, by participating in the Exchange, holders of Old Notes surrender their rights under the Registration Rights Agreement.[248]    There is no such disclosure with respect to a surrender of any rights under the CapCo 2009 Indentures by reason of participation in the Exchange.[249]

Further, to the extent the Registration Rights Agreements obligated CapCo to ensure that the "Guarantors" of the Old Notes listed in the Registration Rights Agreement,[250] including the Transferred Guarantors, also guaranteed the Exchange Notes, the Standing Arguments also must confront the issue of whether the Exchange itself violated CapCo's obligations under the

---

[246]    If it were true that, simply by participating in an A/B exchange, participants would be relinquishing rights to assert claims for breach of the indenture arising prior to the exchange, this would create a scenario in which issuers could breach an indenture with impunity between the issue date and the conclusion of an A/B exchange.

[247]    Committee Brief ¶ 15.

[248]    See, e.g., Tr. Ex. P144 (Prospectus) at 1, 4, 7.  Notably, there was also no negotiation, diligence, or documentation present which typically would accompany any transaction intended to waive or release existing claims.

[249]    Whether there was sufficient disclosure, in the Prospectus or elsewhere, to enable a reasonable investor to determine that the guarantees of the Transferred Guarantors had been released prior to the Exchange provides the Court with another reason as to why these are not simple issues.  Although the CapCo 2021 Group contends that a careful reading of the Prospectus and other securities filings of the Debtors would have been sufficient to put an investor on notice that the guarantees had been released, there is no declarative statement anywhere in the Prospectus or in the Debtors' other securities filings specifically informing an investor that the Transferred Guarantors would not be guaranteeing the Exchange Notes or that such guarantees had been released prior to or during the Exchange.  Whether there was disclosure sufficient to put an investor on notice or sufficient as a matter of equity would certainly be an issue in any future litigation.

[250]    See Tr. Ex. P136 (Registration Rights Agreement for 10.0% Senior Notes due 2016, dated August 18, 2009); Tr. Ex. P140 (Registration Rights Agreement for 8.875% Senior Notes due 2019, dated December 15, 2009) (listing Transferred Guarantors as Guarantors).

Registration Rights Agreements.  If so, it could be credibly argued that the Exchange could not have equitably extinguished the rights of holders of Old Notes under the CapCo 2009 Indentures while at the same time violating the rights of such holders under the Registration Rights Agreements.

## 2.  Whether the 2009 Transfers Complied with the CapCo 2009 Indentures

For the Transferred Guarantor Claims to succeed, holders of such claims would have to show that (i) the transfer of the equity interests of the Transferred Guarantors constituted a sale or disposition of all or substantially all of the assets of one or more of NII Global, NII Holdings, or CapCo, thereby triggering operation of Sections 10.04, 5.01(a), or 5.01(d) of the CapCo 2009 Indentures,[251] respectively, and obligating the applicable transferor to ensure that the transfer of such equity interests complied with the requirements for effectuating such transfers under the CapCo 2009 Indentures and (ii) such transferor or transferors did not in fact comply with such enumerated requirements.

The CapCo 2021 Group argues that, even if holders of Exchange Notes have standing to bring the Transferred Guarantor Claims, those claims would be subject to dismissal for two independent reasons: (i) Section 10.05(a)(v) of the CapCo 2009 Indentures does not require compliance with Sections 4.10 and 10.04 to release the guarantees provided by the Transferred Guarantors (which guarantees were properly released in the 2009 Reorganization), and (ii) even if such compliance were required, the 2009 Reorganization complied with Sections 4.10 and 10.04 of the CapCo 2009 Indentures.[252]  Aurelius, in contrast, asserts that the 2009 Transfers

---

[251]    The CapCo 2021 Group argues that, because the Proofs of Claim do not assert a breach of, specifically, Section 5.01(a) or 5.01(d) of the CapCo 2009 Indentures, proponents of the Transferred Guarantor Claims would be precluded from asserting breaches of such sections.  This argument ignores the fact that the Proofs of Claim here contain appropriate and broad language reserving the claimants' rights to amend their claims and that leave to amend a proof of claim is typically liberally granted.

[252]    CapCo 2021 Obj. ¶ 46.

triggered operation of one or more of Sections 10.04, 5.01(a), and 5.01(d) of the CapCo 2009

Indentures (*i.e.*, a transfer of all or substantially all of the transferor's assets)[253] but failed to

satisfy the requirement of Section 10.04(a)(ii) that such a transaction must "compl[y] with

Section 4.10."[254]   Because the transfers in the 2009 Reorganization violated Sections 10.04 and

4.10, Aurelius argues, the releases of the Transferred Guarantors' guarantees are ineffective.   All

of these arguments give rise to complex interpretive questions over the meanings of particular

sections of the CapCo 2009 Indentures and whether the 2009 Reorganization complied with such

sections, if applicable.

> a.   *Whether the Transfer of the Equity Interests of the*
> *Transferred Guarantors Constituted a Sale or Disposition*
> *of All or Substantially All of the Assets of the Transferor*

NII Global was formed as a holding company to facilitate the 2009 Reorganization,[255]

with no assets other than its equity interests in the Transferred Guarantors and its equity interests

in NIHS, which had no assets other than its equity interests in LuxCo.[256]   At the time of the NII

Global Transfer, which transferred the equity interests of the Transferred Guarantors from NII

Global to NIHS, the equity interests of the Transferred Guarantors gave NII Global a claim to the

---

[253]      As discussed in Section II.A., *supra*, the requirements to effectuate a transfer of all or substantially all of
the applicable transferor's assets vary among the sections.   A transferor may satisfy the requirements in two ways:
(i) by transferring to a U.S. entity that assumes all of the transferred entity's obligations under the CapCo 2009
Indentures or (ii) by ensuring that the transfer "complies with Section 4.10."   NII Holdings may only satisfy the
requirements by doing the former.

[254]      Tr. Ex. P002 (First Aurelius Letter).   There is also a separate claim for breach of Sections 5.01(a) and
5.01(d) of the CapCo 2009 Indentures that is not dependent on the interpretation of Section 4.10.

[255]      The Debtors state that, were the Transferred Guarantor Claims to be litigated, the Debtors would argue that
the equitable step-transaction doctrine should apply to collapse the various steps of the 2009 Transfers, treating them
as one single transfer of the Transferred Guarantors from NII Holdings to LuxCo that would not trigger application
of Section 10.04.   Debtors' Conf. Brief ¶ 94.   As the Debtors acknowledge, however, the equitable step-transaction
doctrine is not typically applied for the benefit of the party who planned for the transaction to occur in steps.   *Id.* ¶
95.

[256]      *See* June 9, 2015 Hr'g Tr. 12:13–23 (Freiman) (stating that entities participating in the 2009 Transfers had
"no assets of their own.").

Debtors' operating assets.[257]   A court may well conclude that NII Global's transfer of the equity interests of the Transferred Guarantors constituted a sale or disposal of all or substantially of NII Global's assets, thereby triggering operation of Section 10.04 of the CapCo 2009 Indentures and its corresponding requirement that, as LuxCo could not assume the guarantee of the Transferred Guarantors, NII Global's transfer of the equity interests of the Transferred Guarantors complied with Section 4.10.

By contrast, it is far less certain that the transfer of the equity interests of the Transferred Guarantors constituted all or substantially all of the assets of NII Holdings or CapCo and its Restricted Subsidiaries.  As an initial matter, NII Holdings did not actually transfer the equity interests of the Transferred Guarantors, nor did it make any other transfer as part of the 2009 Transfers; prior to the 2009 Transfers, CapCo held the equity interests of the Transferred Guarantors, and CapCo, not NII Holdings, began the steps comprising the 2009 Transfers. Accordingly, it is not clear to the Court that the "all or substantially all assets" test set forth in Section 5.01(a) would even apply in the case of NII Holdings.  However, as pointed out by the CapCo 2021 Group, even assuming, *arguendo*, that such test would apply, at the time of transfer NII Holdings held substantial cash, intercompany receivables, and equity interests in holding companies for the Debtors' Argentinean, Peruvian, and Chilean businesses, such that its indirect holdings in the equity of the Transferred Guarantors may not constitute all or substantially all of its assets.  Similarly, although CapCo actually did transfer the equity interests of the Transferred Guarantors, at the time of the 2009 Transfers, it too held substantial assets beyond its holdings in the equity of the Transferred Guarantors.   While further investigation into the facts would be

---

[257]       In contrast, the equity interests of NIHS did not give NII Global a claim on any of the Debtors' operating assets, meaning that the equity interests of the Transferred Guarantors were significantly more valuable at the time of transfer than were the equity interests of NIHS.

required to come to a final determination, it appears that, at the time of the 2009 Transfers, the equity interests of the Transferred Guarantors did not constitute all or substantially all of the assets of either NII Holdings or CapCo and its Restricted Subsidiaries — in which case neither Section 5.01(a) nor Section 5.01(d) would be implicated by the 2009 Transfers.

Even this conclusion leads to further complications. The likelihood that claims for alleged breaches of Section 5.01(a) and Section 5.01(d) may not be meritorious or may be expunged on procedural grounds does not mean, as the CapCo 2021 Group has urged repeatedly, that a "complete defense" exists for two-thirds of the Transferred Guarantor Claims.[258] The remedies the Transferred Guarantor Claims seek for the alleged breaches of Sections 10.04, 5.01(a), and 5.01(d) are not cumulative. Rather, the Transferred Guarantor Claims assert that the remedy for any and all of the alleged breaches of Sections 10.04, 5.01(a), and 5.01(d) is a reinstatement of the guarantees of the Transferred Guarantors or such other equitable remedy as a court may fashion; the remedy sought is the same whether a court finds that there is one breach or three. A breach of Section 10.04, standing alone, could still result in a full recovery on the Transferred Guarantor Claims.

   b.   *Whether the NII Global*
        *Transfer Complied with Section 4.10*

Section 4.10 of the CapCo 2009 Indentures provides that NII Holdings] shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an "Asset Sale" unless the entity relinquishing the assets receives consideration equating to the "Fair Market Value" of such assets and at least 75 percent of such consideration is in the form of cash.[259] The parties agree

---

[258]    *See, e.g.*, June 11, 2015 Hr'g Tr. 154:13–155:18 (Harris) (Q: "Did the committee's advisors ever advise the committee that there was a complete defense to two-thirds of the alleged breaches because no proof of claim was filed asserting them?").

[259]    Tr. Exs. P135, P139 (CapCo 2009 Indentures) § 4.10.

that NII Global received no consideration in connection with its transfer of the equity interests of

the Transferred Guarantors.  Accordingly, such transfer did not, on its face, comply with Section

4.10's requirements for "Asset Sales."

The parties also agree that the transfers of the equity interests of the Transferred

Guarantors were not Asset Sales.  This is because the 2009 CapCo Indentures' definition of

"Asset Sale" provides that a transfer of assets or equity interests between or among NII Holdings

and its Restricted Subsidiaries shall be deemed not to be Asset Sales;[260] both NII Global and

NIHS were Restricted Subsidiaries at the time of the NII Global Transfer.  The parties each

characterize this fact as dispositive of the issue of whether the NII Global Transfer "compl[ied]

with Section 4.10."  Holders of the Transferred Guarantor Claims argue that, because the NII

Global Transfer did not constitute an Asset Sale, it could not have "complie[d] with Section

4.10."  By contrast, the CapCo 2021 Group argues that, because Section 4.10 is a negative

covenant prohibiting Asset Sales *unless* the enumerated requirements are met, compliance with

the covenant can be achieved by simply refraining from conducting an Asset Sale.  Therefore, in

the CapCo 2021 Group's view, a transfer governed by Section 10.04 can be in compliance with

Section 4.10 if (i) it is an Asset Sale in compliance with the enumerated requirements or (b) it is

not an Asset Sale at all.  The CapCo 2021 Group therefore asserts that the NII Global Transfer

complies with Section 4.10 as required by Section 10.04 because it was not an Asset Sale at all.

Both interpretations are problematic.

---

[260]    Tr. Exs. P135, P139 (CapCo 2009 Indentures), definition of "Asset Sale."  "Restricted Subsidiary" refers to
any Subsidiary that is not an "Unrestricted Subsidiary" which, in turn, is defined as any "Subsidiary of the Parent
(other than the Company) that is designated by the Board of Directors of the Parent as an Unrestricted Subsidiary
pursuant to a Board Resolution in compliance with Section 4.16 hereof and any Subsidiary of such Subsidiary."  Tr.
Exs. P135, P139 (CapCo 2009 Indentures), definition of "Unrestricted Subsidiary."

First, interpreting Section 10.04's "complies with Section 4.10" language as barring compliance via any transaction that is not an Asset Sale forecloses Subsidiary Guarantors from engaging in transactions that are clearly permitted by the CapCo 2009 Indentures or would be in the interests of both the Debtors and holders of the CapCo 2016/2019 Notes. For example, as pointed out by the CapCo 2021 Group, transactions involving assets with a fair market value of less than $15 million are excluded from the CapCo 2009 Indentures' definition of Asset Sale; *i.e.*, if a Subsidiary Guarantor had less than $15 million of assets, it could never dispose of all or substantially all of its assets.[261]  Further, this interpretation of "complies with Section 4.10" would have prevented the 2009 Reorganization entirely, notwithstanding that such reorganization was projected to generate $300 million to $500 million in tax savings for the Debtors and otherwise would restrict the Debtors' flexibility to conduct any reorganization involving the Subsidiary Guarantors, no matter how beneficial such reorganization may be. That result too seems contrary to the interests of the Debtors and holders of the CapCo 2016/2019 Notes.

Likewise, interpreting the "complies with Section 4.10" language as providing that transactions triggering operation of 10.04 but that are not "Asset Sales" are deemed compliant with Section 4.10 is also problematic in that it seems inconsistent with the language and intent of Section 10.04. Section 10.04's requirements for effecting a transfer of all or substantially all of a Subsidiary Guarantor's assets are phrased in the alternative: the first pathway to compliance is for the Debtors to ensure that the transferee of such assets, if organized under the laws of the United States, assumes the obligations of a Subsidiary Guarantor under the CapCo 2009 Indentures, thereby ensuring that the transferred assets remain subject to a guarantee in favor of

---

261    CapCo 2021 Group Obj. ¶ 63.

holders of the CapCo 2016/2019 Notes.  Similar language is found in Sections 5.01(a) and 5.01(d), which govern the transfers of all or substantially all of the assets of NII Holdings and CapCo, respectively, though, in the case of NII Holdings, also a guarantor under the CapCo 2009 Indentures, there is no alternative method for satisfying the requirements; the transferee must assume NII Holdings' guarantee under the CapCo 2009 Indentures.  The existence of this first pathway to compliance, and its inclusion as a requirement of effecting a transfer of all or substantially all of the assets of NII Holdings, creates a strong inference that the intention of Sections 10.04, 5.01(a), and 5.01(d) was to provide assurance to holders of the CapCo 2016/2019 Notes that assets providing credit support for their investment would not be transferred beyond the reach of the guarantees.  Interpreting transactions that trigger operation of Section 10.04, but that are not Asset Sales, as deemed compliant with Section 4.10, and thus compliant with Section 10.04, allows for exactly the result that Section 10.04 seemingly seeks to avoid — transfer of assets beyond the reach of the guarantees of the CapCo 2016/2019 Notes.

The CapCo 2021 Group urges that the "complies with Section 4.10" language must allow for the loss of a guarantee, or the loss of assets subject to a guarantee, because such loss is of no import so long as the guarantor or assets remain part of the "system" of Restricted Subsidiaries subject to the covenants and restrictions of the indenture.[262]  This argument largely misses the point of a guarantee.  A guarantee provides structural priority to the assets of the guarantor over creditors without a guarantee or security over such assets.  When a guarantee is lost, or when assets subject to a guarantee are lost, the beneficiary of the guarantee loses that structural priority, even if the assets or the guarantor remain part of the "system" of entities subject to the other covenants and restrictions of the indenture.  Indeed, this case provides a rather perfect

---

[262]    CapCo 2021 Group Obj. ¶ 58.

illustration of the economic impact of the loss of structural priority provided by a guarantee.
Assets that will pass through the estates of the Transferred Guarantors are sufficient to provide
recoveries in full to creditors of LuxCo, who do not hold a guarantee from the Transferred
Guarantors. However, because the CapCo estate receives access to those assets only after
payment in full of LuxCo creditors (including, to the extent of the CapCo Intercompany Note,
CapCo), recoveries from the CapCo estate for holders of the CapCo 2016/2019 Notes will be less
than par. The only "full" recovery holders of the CapCo 2016/2019 Notes receive is on account
of the Transferred Guarantor Claims, which, by "restoring" the guarantees of the Transferred
Guarantors to the extent of the allowance of the Transferred Guarantor Claims, operates to
restore structural priority to the holders of the CapCo 2016/2019 Notes vis-à-vis the LuxCo
estate.

In the alternative, the Transferred Guarantor Claims assert that the "complies with
Section 4.10" provision means that the transfer must have satisfied the requirements of Section
4.10 *as if it were an Asset Sale*.[263] This interpretation seems more plausible. As discussed
above, it seems unlikely that "complies with Section 4.10" is meant to (i) bar transactions
beneficial to both the Debtors and holders of the CapCo 2016/2019 Notes or (ii) serve as a means
of effecting a transfer of assets subject to their guarantees beyond the reach of such guarantees,
especially when such an alternate pathway was not made available in the case of transfers of all
or substantially all of the assets of NII Holdings. Interpreting "complies with Section 4.10" as
requiring that a transfer of all or substantially all of a Subsidiary Guarantor's assets comply with
Section 4.10 as if such transfer were an Asset Sale would seem to represent a prudent
compromise between these disparate positions. Under such an interpretation, the Debtors would

---

[263]       *See* Tr. Ex. P002 (First Aurelius Letter).

have the ability to pursue transactions such as the 2009 Reorganization, as long as they replaced the transferred assets with consideration equating to the fair market value of the transferred assets, with 75 percent of such consideration coming in cash.

This interpretation finds further support in Section 5.01(d)(iii) of the CapCo 2009 Indentures, which prohibits CapCo from disposing of all or substantially all of its assets and its Restricted Subsidiaries' assets, taken as a whole, unless one of two alternate conditions substantially identical to the two alternate conditions enumerated in Section 10.04 is met. Because all transactions governed by Section 5.01 are carved out of the definition of Asset Sale, an interpretation of the phrase "complies with Section 4.10" as meaning that non-Asset Sales never comply with Section 4.10 would prevent CapCo from ever transferring all or substantially all of it and its Restricted Subsidiaries' assets to a non-U.S. entity; contractually preventing such a transfer, even if it were in the best interests of CapCo's shareholders, would seem to be a breach of the fiduciary duties owed to such shareholders. Similarly, an interpretation that non-Asset Sales always comply with Section 4.10 would result in any Section 5.01(d)(iii) transfer complying with Section 4.10, giving CapCo free reign to remove all of the assets providing credit support for the 2016/2019 Notes, other than the guarantee of NII Holdings, beyond the reach of holders of the CapCo 2016/2019 Notes. Accordingly, the phrase "complies with Section 4.10," as used in Section 5.01(d)(iii)(B), would be rendered meaningless (or unenforceable) unless it is interpreted as requiring that the transaction satisfy the requirements of Section 4.10 as if it were an Asset Sale. If a court were to accept that interpretation, under ordinary canons of contract construction, a similar interpretation would be applicable to Section 10.04.

As the foregoing makes clear, there are myriad arguments that lend support to the

77

Transferred Guarantor Claims. Far from being frivolous, such arguments raise complex and litigable issues that cannot be fully disposed of by any one or a combination of the so-called "silver bullet" or "showstopper" arguments presented by the CapCo 2021 Group. Accordingly, the Court finds that a settlement of the Transferred Guarantor Claims at 21 percent is well within the range of reasonableness.

## B. Other Settlements Embodied in the Plan

In addition to settling the Transferred Guarantor Claims, the Settled Claims and Disputes resolved by the Plan include numerous other inter-creditor and inter-debtor issues, each which was the subject of significant dispute. These settled issues include: (i) the Fraudulent Conveyance Claims; (ii) the Recharacterization Claims; (iii) the valuation of the Debtors; (iv) the allocation of the Debtors' value between Brazil and Mexico operations; (v) the currency of distributions (*i.e.*, distributions of cash versus equity in the reorganized company); and (vi) entitlement to and payment of postpetition interest. After reviewing each of the Settled Claims and Disputes, the Court finds the settlement of each to be within the range of reasonableness. Given that no party has raised an objection to the settlement of these disputes, but recognizing the Court's duty to evaluate each component of the Settlement, the Court will address each issue below, albeit in summary fashion.

### 1. The Fraudulent Conveyance Claims

The adjudication of the Fraudulent Conveyance Claims, in which over $3 billion of intercompany transfers are at issue, would necessarily require a trial on the merits examining the circumstances of every one of the transactions underlying the claims. Such a fact-intensive litigation would involve an analysis of (i) the solvency and/or capitalization of the transferors (*i.e.,* NII Holdings, NIS, and CapCo, as applicable) and all of the transferees and (ii) the value, if any, transferred to or otherwise received by the transferors in the applicable transactions. As the

78

Debtors point out, the solvency prong of the analysis would require significant discovery into the

Debtors' businesses at the time of each of the transactions and would likely produce dueling

expert testimony regarding the solvency or insolvency of the applicable entities, leading to "hotly

contested," prolonged, and expensive litigation.[264]    In addition, litigants may opt to utilize

different tests to establish their positions regarding the solvency of the relevant Debtors,

including (a) the balance sheet test, analyzing whether an entity's liabilities exceed the market

value of its assets;[265] (b) the cash flow test, analyzing whether an entity is paying its debts as

they become due; and (c) the capital adequacy test, analyzing whether the entity has adequate

capital to operate its business.    The court presiding over any such litigation would have to

reconcile these competing approaches to determine whether an entity was solvent or insolvent at

the time of the applicable transfer.

If the court ultimately found that the applicable transferor was insolvent or

undercapitalized at the time of the relevant transaction, the party pursuing the Fraudulent

Conveyance Claims would then be required to establish that no reasonably equivalent value was

given in exchange for the transfer.  This analysis also would be complex because (i) given that

the majority of the Fraudulent Conveyance Claims are inter-debtor in nature and involve

"downstream" transfers or guarantees, the court may apply a rebuttable presumption that a

transfer to a solvent subsidiary is made for reasonably equivalent value[266] and (ii) the existence

---

[264]    Debtors' Conf. Brief ¶ 62.
[265]    Within this test, the litigants' experts may employ different methodologies for establishing solvency,
including, among others, the "income approach," or a discounted cash flow analysis; a "market approach" using data
available from the market; or an "asset-based" approach.  *See* Debtors' Conf. Brief ¶ 62.
[266]    *See, e.g., Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. 441, 444
(Bankr. M.D.N.C. 2011) ("With a downstream guarantee, courts presume that the parent corporation received a
benefit in the form of increased stock value resulting from the increased strength and value of its subsidiary
receiving the proceeds of the loan guaranteed by the parent.").

and solvency of intermediate subsidiaries between the transferor and the transferee in the Debtors' capital structure further complicates the reasonably equivalent value analysis.

In addition to the foregoing, the Debtors and the Committee also have pointed to a number of affirmative defenses which, if raised, may protect certain of the alleged Fraudulent Conveyance Claims from avoidance including, but not limited to, the application of section 546(c) of the Bankruptcy Code, an issue as to which there is limited (and conflicting) case law. Finally, as Mr. Winn testified, because of the integrated nature of the Recharacterization Claims and the Fraudulent Conveyance Claims in particular, the outcome of the litigation as to one category of Disputed Claim may affect another, further rendering the outcome of any litigation of the Fraudulent Conveyance Claims uncertain.[267]

### 2.   **The Recharacterization Claims**

With respect to the alleged Recharacterization Claims and the treatment of over $7 billion in intercompany balances on the Debtors' prepetition balance sheet, the Court concludes that settling the Recharacterization Claims (other than the CapCo Intercompany Note) as if 25 percent of such intercompany balances were treated as equity is within the range of reasonableness, in light of the wide range of colorable views possible with respect to each intercompany transaction at issue.

A recharacterization analysis involves examination of the intent associated with each transaction and includes, but is not limited to, consideration of the following factors set forth by the Sixth Circuit in *Autostyle Plastics*:  (i) the names given to the instruments, if any, evidencing

---

[267]    Winn Decl. ¶ 27.  *See also* June 4, 2015 Hr'g Tr. 38:7–16 (Winn) ("Well, I think it's integrated in two ways. In one way it's integrated in that how you resolve one of the litigations impacts what happens with another of the litigations. So these are not independent variables, they are dependent variables.  So as I started to allude to before, you might have a greater chance of likelihood on one, a lesser chance of likelihood on another, and yet end up at the same place. And if you – and it's hard, frankly, to look at the transfer guaranty claim without understanding what's going on with the other two claims. So it's all – they're all intertwined in that way.").

the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments, (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the identity of interest between the creditor and the stockholder; (vi) the inadequacy or adequacy of capitalization; (vii) the security, if any, for the advances; (viii) the entity's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were contractually subordinated to the claims of outside creditors; (x) the extent to which advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. *See Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001). The analysis undertaken by the Debtors and the Committee in this regard, which involved extensive review of underlying documents and the Company's historical practices, including interviews with the Company's employees, revealed that, despite the existence of documentation such as promissory notes and intercompany notes with respect to the transactions at issue, the history of repayment has varied, obligations have been treated differently, and the Company has taken inconsistent positions as to whether many of the transactions should be treated as equity or debt.[268] While certain economic terms of the existing documentation arguably support recharacterization of certain transactions, others contradict it. The Court finds that, were the Recharacterization Claims to be litigated, considerable discovery would be required for each transaction, followed by complex and lengthy litigation, the outcome of which would be uncertain.

---

[268]    For example, certain obligations recorded by the Company as debt were later represented to the IRS for tax purposes as equity. *See* Tr. Ex. P214 (IDR RA-5, dated Nov. 19, 2012).

### 3. <u>Valuation, Allocation, and Postpetition Interest</u>

The Settlement also encompasses consensual resolutions with respect to other inter-creditor and inter-debtor disputes including (i) the valuation of the Debtors;[269] (ii) the allocation of the Debtors' value between Brazil and Mexico operations;[270] (iii) currency of distributions (*i.e.*, distributions of cash versus equity in the reorganized company);[271] and (iv) entitlement to and payment of postpetition interest.[272] While no party has objected to the Settlement based on the settlement of any of the Settled Claims and Disputes other than the Transferred Guarantor Claims, the Court recognizes that the Debtors' creditors hold starkly opposing views on each of these issues and that all of the Settled Claims and Disputes were the subject of vigorous negotiations. After reviewing the record, the Court finds that the benefits afforded to the Debtors' estates of settling each of these issues far outweighs any potential benefits that could obtained in litigating any or all of these matters.

---

[269]    The distributions under the Plan are based on an agreed Plan Distributable Value (as defined in the Plan) of $2.813 billion, which (i) is substantially *higher* than under the Initial PSA based, in part, on the Mexico sale and (ii) reflects a higher value for the Brazil business than originally insisted on by the LuxCo Group.

[270]    The total enterprise value of the Debtors and the resulting Plan Distributable Value (as defined in the Plan) significantly affects creditor recoveries. The evidence demonstrates that valuation was widely in dispute during the negotiations leading to the Settlement. *See* Tr. Ex. P039 (Discussion Materials – Overview of Waterfall Model and Settlement Implications, dated Dec. 15, 2014) at App'x B (Negotiation History to Date).

[271]    Creditors of structurally senior Debtors, such as Aurelius and the LuxCo Group, each took the position during the negotiations that their distributions should be entirely in the form of cash. *See* June 8, 2015 Hr'g Tr. 172:9–19 (Parkhill). If this result were to occur, creditors of CapCo would not receive any of their distributions in cash. The Settlement resolves this disputed issue through the agreement by creditors such as Aurelius and the LuxCo Group to forego a portion of their recoveries in cash and to enable cash distributions to be made to structurally junior creditors such as those at CapCo, who, pursuant to the Settlement, are receiving more cash as a percentage of their recovery than they otherwise would be entitled based on the location of cash in the Debtors' capital structure.

[272]    On this issue, holders of LuxCo Notes argued that they were entitled to payment of postpetition interest, which, if paid at the contract rate, would have cost up to $170 million through the third quarter of 2015. The testimony reveals that the LuxCo Group argued vigorously for payment of postpetition interest to creditors of LuxCo and would be expected to continue to argue for it if approval of the Settlement were denied. *See* June 8, 2015 Hr'g Tr. 286:4–8 (Parkhill). Any litigation on this issue would necessarily involve expert testimony regarding the solvency of LuxCo as well as competing arguments as to the appropriate rate of interest to be applied to any postpetition interest found to be due and owing.

82

### C.    The *Iridium* Factors Weigh Decisively in Favor of Approval

In approving the Settlement embodied in the Plan, the Court applies the factors outlined by the Second Circuit in *Iridium*, the leading case on the standard for approving Bankruptcy Rule 9019 settlements, and concludes that the Settlement is well within the range of reasonableness.[273] The Court will address each factor in turn, with the four uncontested factors addressed first.

#### 1.    The Uncontested Iridium Factors

##### a.    *Factor #4: Whether Other Parties in Interest Support the Settlement*

The fourth *Iridium* factor asks a court to consider the level of support for the settlement among other parties-in-interest in the case.[274]   As is clear from the voting results, the Plan received overwhelming approval from every impaired class of creditors,[275] all of whom will be affected by the Settlement.   The Committee unanimously supports the Settlement and is a co-proponent of the Plan.   Further, the Independent Manager, in his capacity as a fiduciary for the LuxCo estate, recommended that LuxCo support the Plan and, after objecting to the terms of the Initial Plan, the LuxCo Group became a party to the Amended PSA.   Even holders of the CapCo 2021 Notes, whom the CapCo 2021 Group argues are "most heavily affected by the proposed settlement,"[276] overwhelmingly voted to accept the Plan;[277] the objecting CapCo 2021 Group

---

[273]        As described, *supra*, the *Iridium* factors are as follows: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay; (iii) the paramount interests of creditors; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's-length bargaining.  *Iridium*, 478 F.3d at 462.

[274]        At least one court has noted that "this factor, which has its origin in nonbankruptcy litigation (and particularly the review of class action settlements, which usually focus on fairness to the plaintiff and class member communities, as contrasted to the defendant putting value on the table), has limited applicability in bankruptcy cases." *Chemtura*, 349 B.R. at 116.

[275]        Tr. Ex. P181 (Voting Decl.).

[276]        CapCo 2021 Group Obj. ¶ 103.

holds only 26 percent of the outstanding CapCo 2021 Notes.[278]  Accordingly, this factor weighs

in favor of approval of the Settlement.

> b.  *Factor #5: The Competency and Experience of*
> *Counsel Supporting, and the Experience and*
> *Knowledge of the Judge Reviewing, the Settlement*

The fifth *Iridium* factor considers the competency of counsel supporting, and the

experience and knowledge of the judge reviewing, the settlement.  *Iridium*, 478 F.3d at 462.

None of the parties disputes the competency and experience of counsel supporting the settlement,

nor do any contest the competency and experience of this Court.

> c.  *Factor #6: The Nature and Breadth of*
> *Releases to be Obtained by Officers and Directors*

While the CapCo 2021 Group notes that the breadth of the releases contained in the Plan

are the broadest permissible by law,[279] no party has raised an objection to such releases.  The

Court finds the releases contained in the Plan to be appropriate and consistent with Second

Circuit standards and does not consider this *Iridium* factor relevant here.

> d.  *Factor #7: The Extent to Which the*
> *Settlement is the Product of Arm's Length Bargaining*

The Court concludes that the seventh *Iridium* factor — the extent to which the Settlement

was the product of arm's length bargaining — weighs in favor of approval of the Settlement.

The record includes evidence of months of vigorous and, at times, contentious, negotiation

among parties with adverse interests.  The parties expended significant time and effort debating

the merits of the Settled Claims and Disputes, multiple parties gave concessions, and agreement

---

[277]    Holders of the CapCo Notes voted to accept the Plan by over 89% in amount and 97% in number.  Looking at voting on a "per issuance" basis, each issuance of CapCo Notes also individually voted to accept the Plan, with holders of CapCo 2021 Notes voting to accept the Plan by over 78% in amount and over 95% in number.  *See* Voting Decl., Exs. A & B.

[278]    *See* Fourth Verified Statement Pursuant to Rule 2019 of Federal Rules of Bankruptcy Procedure, dated June 1, 2015 [Docket. No. 795].

[279]    CapCo 2021 Group Obj. ¶ 108.

ultimately was reached by parties with distinct fiduciary obligations — the Debtors, the Committee, and the Independent Manager — each of whom decided to support the Settlement after undertaking an independent review of its terms. In particular, the Court places great weight upon the Committee's support of the Settlement, given that the Committee is the estate representative for all unsecured creditors, including holders of CapCo 2021 Notes; its members represent a cross-section of holders of all series of Prepetition Notes and include the indenture trustees for each series. Finally, no party has argued that the Settlement was not the product of good faith, arm's length bargaining,[280] and the record is devoid of evidence that the Settlement was not produced by arm's length negotiations. The Court finds that the Settlement was not the product of fraud or collusion; rather, it was the result of extensive negotiation by parties with differing economic interests, a fact which supports approval of the Settlement.

## 2.  <u>The Contested Iridium Factors</u>

The present controversy centers on the first three *Iridium* factors, which are heavily disputed. The CapCo 2021 Group argues that each of the first three factors — the balance between the litigation's possibility of success and the settlement's future benefits, the likelihood of complex and protracted litigation, and the paramount interests of creditors — weighs against finding the Settlement reasonable to such a degree that confirmation of the Plan must be denied. The Plan Proponents argue that the Settlement is reasonable and that each of the first three *Iridium* factors has been satisfied. The Court has analyzed each of these contested factors, as set forth below, and finds that the Plan Proponents have made a substantial showing regarding their consideration of the merits of the claims proposed to be settled and the likelihood of success of

---

[280]    The CapCo 2021 Group stipulated that it would not challenge the Settlement on the basis that it was not the product of good-faith, arm's-length negotiations among the parties to the Settlement. *See* Tr. Ex. P200 (Stipulation by and between Debtors, Debtors in Possession, the Official Committee of Unsecured Creditors, and the Ad Hoc Group of NII Capital 2021 Noteholders, dated April 22, 2015).

such claims.  After conducting its own independent analysis and canvassing the record and the issues presented, the Court finds that the Settlement is reasonable and the Plan should be confirmed.[281]

<blockquote>

*a.    Factor #1: The Balance Between the Litigation's
<u>Possibility of Success and the Settlement's Future Benefits</u>*

</blockquote>

The first *Iridium* factor, and the principal factor at issue here, asks whether the likelihood of the debtor succeeding in litigating the claims proposed to be settled is outweighed by the future benefits the debtor can enjoy from the settlement.  *Iridium*, 478 F.3d at 462.  The CapCo 2021 Group contends that this factor weighs heavily in favor of denial of approval of the Settlement because (i) the Settlement allocates value to the allegedly meritless Transferred Guarantor Claims and (ii) the benefits provided by the Settlement could be replicated by resolving the Transferred Guarantor Claims and the other Settled Claims and Disputes by (a) confirming an alternative plan which could be negotiated and agreed to before the end of September 2015 or (b) simply litigating the Transferred Guarantor Claims to conclusion (where the Debtors would be certain to win).[282]  As to the former, the CapCo 2021 Group argues that the Transferred Guarantor Claims "piece" of the Settlement could be extricated from the broader deal and renegotiated, and the Debtors and their creditors could quickly and easily agree upon terms for a revised plan while retaining all of the other benefits of the current Settlement.[283]  The CapCo 2021 Group contends that the "supposed timing crises [are] vastly overblown and largely of the Debtors' creation," arguing that there is no reason to believe that the Debtors could not again obtain extensions from the Operating Company Lenders beyond September 2015 in order

---

[281]    For the reasons stated herein, the Court also denies the Claims Objections, which assert arguments substantially identical to those included in the CapCo 2021 Objection.

[282]    CapCo 2021 Obj. ¶¶ 95–97.  Significantly, the CapCo 2021 Group does not contest any portion of the Settlement beyond the settlement of the Transferred Guarantor Claims.

[283]    CapCo 2021 Group Obj. ¶ 97; June 17, 2015 Hr'g Tr. 34:17–36:23 (Seider).

to allow for time to confirm a revised plan or, if unable to do so, simply repay the lenders' loans.[284]

In considering the likelihood of success on the merits, as mandated by *Iridium*, the Court has reviewed each of the Settled Claims and Disputes and has discussed in detail, *supra*, the merits of each category of Disputed Claims, including the Transferred Guarantor Claims, the sole piece of the integrated Settlement that is being challenged.  Although not every one of the Settled Claims and Disputes enjoys an equal probability of success, the Court finds that none has an easy or obvious resolution, and each is ripe for settlement.  Importantly, as the Debtors point out, litigating any of the Settled Claims and Disputes will not augment the estates and increase the aggregate amount available for creditors; instead, litigation will only serve to re-allocate value within the Debtors' capital structure.[285]  The litigation outcome of any of the Disputed Claims may significantly harm one creditor constituency's recoveries and benefit another.

On the merits, with respect to the Transferred Guarantor Claims in particular, the Court finds that these claims are anything but straightforward.  If the Debtors chose to litigate such claims, they would face a number of arguments that would, at the very least, prevent a simple resolution and may present a significant risk of an adverse finding against the Debtors.  While the Debtors have continually asserted their belief that the Transferred Guarantor Claims are without merit, the Court finds credible the testimony of Mr. Shindler and Mr. Freiman that the Debtors nonetheless understood the litigation risk as to such claims.  As Mr. Shindler testified, "we felt that we were right on the issue but at the same time I don't know what a court is going to rule when we bring it forward, how long that's going to take, how much it's going to cost, and

---

[284]    CapCo 2021 Group Obj. ¶ 97.

[285]    June 15, 2015 Hr'g Tr. 52:17–22 (Greenberg) ("[T]he settlement doesn't involve the Debtor versus a third party where the estate is looking to bring in more recovery for all the creditors' benefit.  To the contrary, as you know, a win for one set of creditors is likely a loss for another set of creditors within our capital structure.").

when we took that into consideration we felt the appropriate thing to do was to settle in the manner we have."[286]  Moreover, a debtor is not prohibited from settling a claim nor is it required to litigate the claim to finality simply because it believes it may be able to expunge the claim in the future.  As this Court's analysis of the claims reveals, the Transferred Guarantor Claims raise complex disputed issues that cannot be decided simply as a matter of law, and numerous triable issues create uncertainty as to likelihood of success on the merits of these claims.

Moreover, notwithstanding the efforts of the CapCo 2021 Group to create a picture that runway exists with the Operating Company Lenders such that these lenders easily could be persuaded to continue to forbear from exercising remedies beyond September 2015, the record fails to support this argument.  The Court finds that the Debtors have demonstrated the existence of peril to their businesses if the Plan were not to be confirmed.  Mr. Freiman made clear that the Debtors have largely exhausted their credibility with the Operating Company Lenders, that the Operating Company Lenders are not equipped to react quickly to any new requests from the Debtors, and that there is substantial risk of foreclosure by CDB, BdB, and Caixa on certain of the Company's collection accounts in Brazil should the Debtors fail to emerge from bankruptcy by September 2015, which would compromise the Debtors' viability.[287]

Moreover, even if the Operating Company Lenders did agree to extend their deadlines for the Debtors' emergence from chapter 11 such that the Debtors may have time to renegotiate the settlement of the Transferred Guarantor Claims as part of a revised plan, the record reflects that such a successful renegotiation would be nearly impossible.  The Plan Proponents presented overwhelming evidence of the integrated nature of the Settlement, and Mr. Parkhill and Mr.

---

[286]    June 3, 2015 Hr'g Tr. 241:10–17 (Shindler); *see also* June 9, 2015 Hr'g Tr. 79:18–22 (Freiman) ("in other words, it was our belief that we had the stronger argument, we thought we were going to win.  But, of course, there is always a risk when you go into any type of litigation that a judge might view things differently.").
[287]    June 9, 2015 Hr'g. Tr. 40:15–41:24 (Freiman).

Shindler testified that, were one piece of the Settlement to be altered or excised, the entire deal would fall apart.[288]  As Mr. Scruton stated, the components of the Settlement "are all inextricably linked; each settlement was entered into in exchange for the parties' agreement to compromise on every other issue. . . . As such, the settlements embodied in the Plan are an integrated whole. . . . [D]isapproval of any individual settlement [would] unravel all others[.]"[289]

The Debtors and the Committee presented compelling evidence of the Settlement's significant future benefits to the Debtors' estates and their creditors (including holders of the CapCo 2021 Notes), all of which favor approval of the Settlement.

First, the Settlement preserves the value of the Debtors' Brazilian operating subsidiaries and prevents the loss of the concessions obtained from the Operating Company Lenders over the past year.  As Mr. Freiman testified, the Debtors' entry into the Initial PSA was a turning point in negotiations with the Operating Company Lenders and facilitated the entry into standstill agreements and amendments to the Operating Company Credit Agreements.[290]  If approved, the Settlement eliminates the risk of default in Brazil and foreclosure by the Operating Company Lenders due to a failure by the Debtors to emerge from chapter 11 by September 2015, as required by such documents.[291]

---

[288]    See, e.g. June 8, 2015 Hr'g Tr. 267:2–7 (Parkhill) (stating that "we have a strong concern that . . . [if] we aren't able to consummate this plan, that we won't be able to hold kind of a value that we've created in this plan together through the course of another set of negotiations.  It's unclear whether or not the parties would engage and whether or not, I think, it's possible the parties would start to litigate."); 90:15–19 (Shindler) ("I think we've pushed the parties as we were able to . . . But my view of being involved in the negotiations [is that] if we were to unwind this in some way or try to modify it, it would be an extremely difficult task to reach another consensus."); see also Deposition of Daniel Gropper 259:14–24 (opining that if the "court wanted to excise that one particular piece [the settlement of the Transferred Guarantor Claims] and say that's not appropriate, I think the entire settlement would blow up and these cases would be back at square one with no agreement on any issues.").

[289]    Scruton Decl. ¶ 66.

[290]    June 9, 2015 Hr'g Tr. 36:19–37:10 (Freiman).

[291]    See Tr. Exs. P050, P051, P052, P053.

Second, with respect to the Debtors' businesses, the Settlement allows the Debtors to retain approximately $515 million in cash to fund their businesses going forward, as required by their business plan.  Mr. Freiman testified that the Debtors will need this cash to operate over the next two years as they bridge the gap between emergence from chapter 11 proceedings and turning cash-flow positive in 2017.[292]

Next, approval of the Settlement and confirmation of the Plan permit the Debtors to emerge from these chapter 11 cases and move their businesses forward without the distractions, competitive disadvantage, and high costs of restructuring which have existed during the Debtors' time in chapter 11.   Mr. Shindler testified that litigation overhang and uncertainty, and, specifically, the stigma in Brazil attached to being in a U.S. bankruptcy proceeding, have caused problems with the Company's ability to attract customers, retain employees, and negotiate with trade vendors[293] and have put the Company at an operational disadvantage vis-à-vis its competitors in the Brazilian market.[294]  As Mr. Freiman stated in his declaration, approval of the Settlement and confirmation and implementation of the Plan in the near term "are essential to provide much-needed reassurance to the Operating Company Lenders and the vendors, suppliers, site lessors, customers and employees of the Non-Debtor Affiliates, whose support is critical to the viability of the Business Plan."[295]  The expense of chapter 11 has also presented an additional financial burden for the Debtors, as professional costs to administer these cases have totaled

---

[292]    June 9, 2015 Hr'g Tr. 41:14–20 (Freiman).

[293]    June 3, 2015 Hr'g Tr. 242:17–243:3 (Shindler) (describing operational issues experienced by the Debtors in chapter 11 which have included difficultly attracting customers, unfavorable trade terms with vendors, and issues with regulators).

[294]    Freiman Dep. 37:2–12 ("The overhang of bankruptcy and restructuring has created issues for us operating in Brazil.  It's created creditor issues for us, we have difficulty getting good credit terms from our suppliers. . . . . There's a stigma attached to it that affects our operations in terms of our vendors or competitors.").

[295]    Freiman Decl. ¶ 56.

90

approximately $4 million a month[296] and both Mr. Shindler and Mr. Freiman expect that those costs would only increase if the Settled Claims and Disputes proceeded to litigation.[297]  In addition to eliminating this potentially high cost of litigating some or all of the Settled Claims and Disputes, a significant benefit to the Debtors, the Settlement also permits the Debtors' management to return to focusing their time on operations rather than being distracted by prolonged litigation.[298]

Finally, the Settlement provides substantial value to the Debtors' current creditors today — value that would otherwise be subject to the delay, risk, and uncertainty of litigation.  The Settlement provides for a Plan Distributable Value of $2.813 billion and for (i) cash payments to certain structurally junior claims and general unsecured creditors and (ii) elimination of a potential claim for postpetition interest by creditors of LuxCo as a result of concessions made by structurally senior claimants during the settlement negotiations.[299]  By eliminating the risk of expensive and protracted litigation, the Settlement preserves value for creditors and eliminates the possibility of uncertain, delayed, and decreased distributions which would accompany a "reserve" plan and the corresponding litigation.

The CapCo 2021 Group contends that a hypothetical alternative such as a "partial reserve" plan, pursuant to which the Debtors would withhold a substantial amount of common stock in the reorganized Debtors that would otherwise be distributed under the Plan while the Transferred Guarantor Claims were litigated to final resolution, would be a simple way to

---

[296]    June 3, 2015 Hr'g Tr. 236:7–20 (Shindler).
[297]    *Id.*; June 9, 2015 Hr'g Tr. 41:24–42:5 (Freiman).
[298]    *See* Shindler Decl. ¶ 37 (stating that "litigation of any of the Settled Claims and Disputes likely would lead to protracted, costly, and time-consuming court proceedings, would distract the Debtors' key personnel from effectively running the Debtors' business and would further deplete the Debtors' already-diminished cash reserves and liquidity.").
[299]    *See, e.g.* June 8, 2015 Hr'g Tr. 172:2–25, 173:2–18 (Parkhill) (discussing assertions of creditors of LuxCo and NIU that such creditors have a right to 100 percent recovery in cash and that acceptance of less than 100 percent cash by such creditors was a concession made in order to reach the Settlement).

preserve each of the benefits of the Settlement described above without including the Transferred Guarantor Claims.[300]  As an initial matter, in evaluating the Settlement, the Court need not consider a hypothetical settlement that is not before it.  *Nellis*, 165 B.R. at 123 ("[A] judge does not have to be convinced that the settlement is the best possible compromise.").  Further, given the weight of evidence to the contrary, the Court is not convinced that a partial reserve plan, or any other plan that carved out the resolution of the Transferred Guarantor Claims, would preserve the benefits of the Settlement.  The CapCo 2021 Group provided no evidence to support the theory that a new settlement built around a partial reserve plan could be negotiated, agreed upon, and confirmed by September 2015.[301]  To the contrary, as the Court previously has found, *supra*, if the Plan is not confirmed, a new settlement is unlikely to be reached quickly.  Testimony elicited at the Confirmation Hearing indicates that, if the Settlement fails, parties likely will "revert to their corners," abandoning all concessions made and requiring any new negotiations to start from square one on all issues.[302]  At the Confirmation Hearing, Mr. Shindler testified as to the intensity of the negotiations due to the parties' strong beliefs in their litigation positions and stated his expectation that certain parties may turn unreasonable were the Settlement to be denied and the parties needed to renegotiate the deal:

> Q: You expect them to turn unreasonable?
> A: Yes, I do. . . . I think that they've shown their willingness to cooperate up to this point, but I feel that based on the intensity of the negotiations that we've had

---

[300]    June 17, 2015 Hr'g Tr. 113:17–20 (Seider) ("[T]here are clear alternatives to approving this settlement. One is negotiate another plan and with the CapCo '21s participating in discussions and the other is to adopt the partial reserve plan . . . .").

[301]    The Court notes that a partial reserve plan was already considered and rejected by the parties as infeasible for numerous reasons.  *See* Parkhill Decl. ¶ 27.

[302]    June 8, 2015 Hr'g Tr. 267:10–19 (Parkhill) ("[T]here's a risk and not an immaterial risk that [creditors] exit their positions, they litigate . . . . I don't have any confident [sic] in our ability to, given the long history we've had with these constituents to, you know, put Humpty Dumpty back together again, so to speak."); Deposition of Daniel Gropper 259:14–24 (opining that if the "court wanted to excise that one particular piece [the settlement of the Transferred Guarantor Claims] and say that's not appropriate, I think the entire settlement would blow up and these cases would be back at square one with no agreement on any issues.").

to here and the strong beliefs that Aurelius, in particular, has with regard to certain claims, that if we were to modify the structure in some way that they would likely select a different path even though it could be risky to them . . . . [M]y view of being involved in the negotiations [is] if we were to unwind this in some way or try to modify it, it would be an extremely difficult task to reach another consensus.[303]

The Court finds Mr. Shindler's testimony on this point to be credible.

Balancing the Debtors' likelihood of success on the merits of the Settled Claims and Disputes against the compelling benefits of the Settlement, and recognizing that such benefits almost certainly would vanish if the settlement of the Transferred Guarantor Claims was extricated from the integrated Settlement, the Court finds that this factor weighs in favor of approving the Settlement.

> b. *Factor #2: The Likelihood of Complex and Protracted* *Litigation, with its Attendant Expense, Inconvenience, and Delay*

The second *Iridium* factor analyzes the likelihood of complex and protracted litigation. In analyzing this factor, "the judge should form an educated estimate of the complexity, expense, and likely duration of [the] litigation." *TMT Trailer Ferry*, 390 U.S. at 424.

The CapCo 2021 Group argues that the Transferred Guarantor Claims could be resolved quickly in a summary proceeding because the claims are purely legal disputes that would not require further discovery.[304] Because these claims raise only legal issues, asserts the CapCo 2021 Group, the probability of engaging in protracted and fact-intensive litigation on the Transferred Guarantor Claims is low.

The record belies that conclusion. The nine-day Confirmation Hearing was devoted almost exclusively to discussion of the Transferred Guarantor Claims, including their merits,

---

[303]    June 8, 2015 Hr'g Tr. 89:10–11; 90:2–8; 90:16–19.

[304]    *See* CapCo 2021 Obj. ¶ 98 (arguing that "the Transfer Guarantor Claims can be defeated raising legal issues of contract interpretation; they could thus be resolved quickly through mechanisms such as a claim objection on the merits through a declaratory judgment complaint and a simultaneous motion for summary judgment.").

potential defenses to the claims, and the negotiations related to their settlement given the parties' diametrically opposite views on the merits.[305]  At the Confirmation Hearing, even counsel for the CapCo 2021 Group conceded that the Exchange Argument is not a "silver bullet."[306]  Moreover, the CapCo 2021 Group presented no affirmative case in support of its arguments.

After reviewing the full record and conducting its own analysis, which is set forth in detail in Section III.A., *supra*, the Court finds that there is a high likelihood that litigation of the Transferred Guarantor Claims would be difficult, protracted, and costly.  The various defenses to the Transferred Guarantor Claims are not as straightforward as the CapCo 2021 Group suggests and, if raised in litigation, certain of these defenses, particularly those involving the Exchange, would require extensive discovery and factual analysis, may require expert testimony, and would cause any litigation on the Transferred Guarantor Claims to be lengthy.  Moreover, the Debtors have made clear that the CapCo 2021 Group's defenses to the Transferred Guarantor Claims merely scratch the surface of the defenses the Debtors would consider, investigate, and raise

---

[305]       The CapCo 2021 Group contends that the Debtors never estimated the time or cost to litigate the Transferred Guarantor Claims when determining whether to approve entry into the Settlement.  *See* CapCo 2021 Obj. ¶ 98.  As discussed, *supra*, while the Debtors' professionals admittedly did not develop a quantitative stand-alone analysis of the range of reasonableness of settling the Transferred Guarantor Claims, nor did they present the Debtors with a numerical estimate of the likely length and cost of litigating such claims, the evidence demonstrates that the Debtors' Board was well aware of the complexity of the claims and the resulting likelihood of any litigation becoming protracted and costly.  *See* June 3, 2015 Hr'g Tr. 236:7–20 (Shindler)  (testifying regarding his understanding that the Settled Claims and Disputes "were complex" and that "each one [i]s lengthy and expensive" and could lead to "potentially years of continuing through a difficult time-consuming, expensive, distracting process"); June 3, 2015 Hr'g Tr. 41:21-42:20 (Shindler) (stating his understanding that any such litigation would cost "a very large amount of money" and take "many months").  As the Committee correctly argues, courts have held that there is no strict requirement that, in seeking approval of a settlement, the proponent introduces a strict budget or litigation timeline to the court.  *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 280 (Bankr. N.D. Tex. 2007) (finding that the evidence militated in favor of approval of the settlement at issue, despite the absence of a specific budget or projected legal fees).  In *Heritage Org.*, the court stated that, once a court has made an "educated estimate" of the expense of the potential litigation as required by *TMT Trailer Ferry* and has determined that complex and protracted litigation will ensue if the proposed settlement is not approved, "expense and delay is inevitable."  *In re Heritage Org., L.L.C.*, 375 B.R. at 280.
[306]       June 3, 2015 Hr'g Tr. 139:25–140:3.

were the claims to be litigated.[307]   The Court finds that the 21 percent settlement amount is reasonable and is commensurate with the likelihood of success on the merits of the Transferred Guarantor Claims.

Further, the Court is convinced that the litigation of *any* of the Settled Claims and Disputes would be a significant drain on the Debtors' resources.[308]   No party disputes that litigation of the Fraudulent Conveyance and Recharacterization Claims would be lengthy, complex, and fact-intensive.  With respect to the Transferred Guarantor Claims, while the CapCo 2021 Group continues to argue that the probability of engaging in protracted and fact-intensive litigation on such claims is low,[309] the record provides clear evidence to the contrary.   As the Debtors observed during closing arguments, the record of the Confirmation Hearing, which spanned nine days, served as a preview of the substantial time and cost of litigating these claims to conclusion.[310]   *See, e.g., Ionosphere*, 156 B.R. at 429 ("[W]hat has been developed so far at great cost and expense of time is a blueprint for litigation, very complex litigation, and building on that blueprint is an enormous, lengthy and expensive task.").  Avoiding such litigation, and its

---

[307]      *See* June 15, 2015 Hr'g Tr. 93:15–94:6 (Platt) ("And, presumably, these are the best defenses that the ad hoc group has come up with that the debtors would be able to assert against the transferred guarantor claims.  And the irony . . . is that when you look at those showstoppers closely, the arguments aren't just showstoppers, but they're also not very strong arguments.  The debtors have better arguments than those and we've briefed some of those arguments. . . . And I'd actually suggest . . . that if the so-called showstopper arguments, the silver bullets, were the only arguments that the debtors had against the [transferred] guarantor claims, then 21 percent might actually start to look a little low because . . . those defenses that the ad hoc group raises that they say the debtors would have, when you actually delve into them, there are reasonable counterarguments to all of them.").
[308]      *See* n. 213, *supra*; Scruton Decl. ¶ 40 (stating the resolution of the Settled Claims and Disputes avoids "multiple litigations that the Committee concluded would be lengthy, complex, fact-driven, expert intensive, and costly, as well as appeals that had the potential to extend final resolution for years.").
[309]      CapCo 2021 Obj. ¶ 98.
[310]      June 15, 2015 Hr'g Tr. 23:2–24:13 (Greenberg) (" . . . after almost a week of testimony and argument, I think there should be no question left in the Court's mind about the complexity of the issues surrounding the multitude of claims and disputes that are bound up in the integrated settlement we've put before Your Honor. . . . we've just scratched the surfaced under the 9019 review.  And to actually delve into and litigate these claims, I think it was proven to Your Honor that it's not going to be a fast resolution.").

cost, delay, and resulting threat to the Debtors' ability to survive as a going concern, supports

approval of the Settlement.

### c.  *Factor #3: The Paramount Interests of Creditors*

The third *Iridium* factor examines whether the settlement being evaluated is in the

paramount interests of the debtor's creditors, "including each affected class's relative benefits

'and the degree to which creditors either do not object to or affirmatively support the proposed

settlement.'"  *Iridium*, 478 F.3d at 462 (citations omitted).  As the foregoing discussion of the

first two *Iridium* factors indicates, the evidence demonstrates that the Settlement here provides

numerous benefits to creditors, including offering certainty as to their recoveries, while at the

same time eliminating significant risks which accompany litigating the Settled Claims and

Disputes and remaining in chapter 11 if the Plan is not confirmed.  Moreover, the support of the

Committee (a co-proponent of the Plan who represents all unsecured creditors), the Independent

Manager of LuxCo, and the overwhelming majority of the Debtors' creditors, as indicated by the

voting results, weighs heavily in favor of approval of the Settlement and confirmation of the

Plan.

The CapCo 2021 Group argues that the third *Iridium* factor weighs against approval of

the Settlement because the Settlement (i) allocates value to the allegedly meritless Transferred

Guarantor Claims and thus improperly transfers value from holders of the CapCo 2021 Notes to

holders of the CapCo 2016/2019 Notes and (ii) is not fair to holders of the CapCo 2021 Notes,

who were not parties to the negotiations that produced the Settlement.[311]  In support of its

position, the CapCo 2021 Group urges reliance on *In re Nutritional Sourcing Corp.*, 398 B.R.

816 (Bankr. D. Del. 2008), in which the court declined to confirm a plan containing a settlement

---

[311]      CapCo 2021 Obj. ¶¶ 99–102.

that precluded payouts to certain trade creditors who were not party to the negotiations that led to the settlement at issue.[312]  In *Nutritional Sourcing*, the court placed great weight on the fact that the trade creditors objecting to confirmation were "not at the negotiating table and were not adequately represented in their absence," and that these creditors faced non-speculative, significantly decreased recoveries as a result of the settlement — their recovery decreased from 100% to 13.2%.[313]  The Court finds that the facts here are distinguishable from those at issue in *Nutritional Sourcing*.

In contrast to the concrete decrease in recoveries faced by the trade creditors in *Nutritional Sourcing*, the alleged harm to holders of the CapCo 2021 Notes is much more speculative because it involves settlement of litigation claims that have an uncertain outcome.  Here, the objecting CapCo 2021 Group stands to gain a total of $27 million[314] — less than 1% of Plan Distributable Value — while risking $2.813 billion — 100% of Plan Distributable Value — in a litigation gamble on the Transferred Guarantor Claims.[315]  Unlike in *Nutritional Sourcing*, there is substantial downside risk for holders of the CapCo 2021 Notes if, assuming no settlement, holders of the Transferred Guarantor Claims prevail on the merits.  The recoveries of

---

[312]    CapCo 2021 Obj. ¶ 102.

[313]    *In re Nutritional Sourcing Corporation*, 398 B.R. 816, 835–37 (Bankr. D. Del. 2008).

[314]    The Debtors emphasize that the recovery in dispute due to the CapCo 2021 Group's objection to the Plan is only $27.4 million.  This amount is derived from multiplying the total percentage of CapCo 2021 Notes that voted to reject the Plan (18.32%) by the difference in recovery to holders of the CapCo 2021 Notes due to the settlement of the Transferred Guarantor Claims ($150 million).  *See* June 15, 2015 Hr'g Tr. 21:7–15 (Greenberg) ("That's what this dispute really comes down to, $27.4 million, less than 1 percent of $2.8 [billion] of our plan's distributable value.  Your Honor, we're talking about 27.4 million dollars in a $6 billion plus capital structure.").

[315]    The Debtors also note that the Settlement avoids the need to resolve the question of whether the CapCo 2021 Group has standing to object to the Transferred Guarantor Claims, an issue that would have to be litigated if the Settlement were to fail.  *See* Debtors' Conf. Brief ¶ 127, n.125.  On this point, Aurelius argues that because the members of the CapCo 2021 Group are not creditors of the Transferred Guarantors, the CapCo 2021 Group does not even have standing to single out and object to the portion of the Settlement that relate to the Transferred Guarantor Claims.  As creditors of indirect parents of the Transferred Guarantors only, the members of the CapCo 2021 Group have too attenuated and insufficient an interest in the bankruptcy cases of the Transferred Guarantors to have standing to be heard on the settlement of the Transferred Guarantor Claims, asserts Aurelius, citing *Krys. v. Official Committee of Unsec. Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 116 (2d Cir. 2007) and *Innkeepers USA Trust*, 448 B.R. 131, 143 (Bankr. S.D.N.Y. 2011).  As this Decision overrules the objection of the CapCo 2021 Group and approves the Settlement, the Court need not address this argument.

the CapCo 2021 Notes could plummet dramatically from the $437 million recovery projected under the Plan to as low as $74.2 million, only 2.64% of Plan Distributable Value,[316] even before taking into account the overall value deterioration that would result from increased costs due to litigation and the detrimental impact on the business.[317]

Second, the evidence demonstrates that, while members of the CapCo 2021 Group did not participate directly in the settlement negotiations, unlike the trade creditors in *Nutritional Sourcing*, their interests were not wholly unrepresented. The parties to the negotiations included (i) the Committee, which has as one of its members the indenture trustee for the CapCo 2021 Notes and which includes holders of over 53 percent of the CapCo 2021 Notes; (ii) the Independent Manager; and (iii) certain cross-holders of Prepetition Notes, including CapRe. While CapRe has significant cross-holdings in these cases, many of its funds exclusively hold CapCo 2021 Notes. Accordingly, as the record and testimony showed, Mr. David Daigle, who participated in the negotiations on behalf of all CapRe funds, was one of the parties who pursued

---

[316]     *See* Parkhill Decl. ¶ 62. The Debtors and the Committee also assert that, since they are the most structurally junior constituency, the holders of the CapCo Notes are the parties that bear the risk of any decrease in enterprise value if the Plan is not confirmed and the Debtors fail to emerge from chapter 11. *See* Scruton Decl. ¶ 58.
[317]     Moreover, as the Court has previously found, due to the integrated nature of the Settlement, reopening one category of Disputed Claims is likely to destroy the entire Settlement and place all creditor recoveries at risk. The Plan Proponents presented overwhelming evidence of the integrated nature of the Settlement and elicited testimony that, were one piece of the Settlement to be altered or excised, the entire deal would fall apart. *See, e.g.* June 8, 2015 Hr'g Tr. 267:2–7 (Parkhill) (stating that "we have a strong concern that . . . [if] we aren't able to consummate this plan, that we won't be able to hold kind of a value that we've created in this plan together through the course of another set of negotiations. It's unclear whether or not the parties would engage and whether or not, I think, it's possible the parties would start to litigate."); June 8, 2015 Hr'g Tr. 90:15–19 (Shindler) ("I think we've pushed the parties as we were able to . . . But my view of being involved in the negotiations [is that] if we were to unwind this in some way or try to modify it, it would be an extremely difficult task to reach another consensus."); Deposition of Daniel Gropper 259:14–24 (opining that if the "court wanted to excise that one particular piece [the settlement of the Transferred Guarantor Claims] and say that's not appropriate, I think the entire settlement would blow up and these cases would be back at square one with no agreement on any issues.").

a fair recovery to holders of CapCo 2021 Notes on disputed issues including, but not limited to, the Transferred Guarantor Claims.[318]

The record also reveals that other parties, including the Debtors, the Committee, and the Independent Manager, sought to improve the settlement terms between the Initial PSA and the Amended PSA in order to increase the recoveries to holders of CapCo 2021 Notes.[319]  In fact, the benefit from the reduction in the settlement percentage on the Transferred Guarantor Claims from 27.5 percent in the Initial PSA to 21 percent in the Amended PSA inured solely to the holders of the CapCo 2021 Notes; on account of this reduction, under the Plan, holders of CapCo 2021 Notes receive $46.3 million more in recoveries than under the Initial Plan, while holders of CapcCo 2016 Notes and CapCo 2019 Notes receive $88.3 million less, on a pre-rights offering basis.[320]  As Mr. Shindler observed in his testimony, holders of the CapCo 2021 Notes are not losing $150 million but rather are receiving a 63 percent increase in recovery from the Initial PSA.  He opined that, "if we were not to approve this plan today and reopen what has been an incredibly difficult negotiating process . . . this is a group that has $437 million of recovery today that would likely go down to zero if we were to go down a different path."[321]  Finally, when looking at the voting results, the record reveals that holders of the CapCo 2021 Notes voted overwhelmingly in favor of the Plan with nearly 90 percent voting to accept; this ratification of

---

[318]    *See, e.g.*, Tr. Ex. P162 (email from David Daigle to Dennis Prieto of Aurelius, Jan. 23, 2015)  ("We own a lot of 2021s; we are giving up value we very firmly believe we are entitled to as a matter of fact and law in order to settle this and preserve maximum value for the estates.").  Mr. Shindler and Mr. Parkhill confirmed that, during the negotiations, Mr. Daigle sought to reduce the Transferred Guarantor settlement percentage, which reduction directly benefitted holders of CapCo 2021 Notes.  *See* June 3, 2015 Hr'g Tr. 245:10–18 (Shindler); June 8, 2015 Hr'g Tr. 168:8–16; 202:17–21 (Parkhill).

[319]    *See* June 3, 2015 Hr'g Tr. 244:17–21 (Shindler) (stating that he "was looking out for [holders of the CapCo 2021 Notes" and that "one of the reasons [he] insisted on terminating the first PSA was to specifically try to reallocate and get more of a recovery to the 21s."); *see also Id.* 265:2–4 (Shindler) ("I was one of the proponents trying to argue for more cash to be allocated to the 2021s based on some original splits that were shared with me.");Scruton Decl. ¶¶ 55–58 (stating that Committee's decision to support Amended PSA was based in part on the Settlement's fairness to CapCo creditors and the many benefits to holders of the CapCo 2021 Notes).

[320]    *See* Parkhill Decl. ¶ 53.

[321]    June 3, 2015 Hr'g Tr. 246:11–15 (Shindler).

the Settlement is further evidence that the group as a whole was satisfied with the Settlement.[322]

Each of these considerations supports the Court's finding that the Settlement is in the paramount

interests of the Debtors' creditors.

Finally, the Debtors have demonstrated real peril to their businesses which must be taken

into account when considering the risk to creditors in litigating the Transferred Guarantor

Claims.  Because of its likely length (including the time for appeals) and uncertain outcome,

such litigation could lead to a significant decrease in all creditors' recoveries, particularly those

of general unsecured creditors, whose claims are concentrated at structurally subordinated

Debtor entities.  The Court finds that avoiding such a gamble through entry into the Settlement is

in the paramount interests of creditors.  *See In re Adelphia Commc'ns, Inc.*, 327 B.R. 143, 166-

67 (Bankr. S.D.N.Y. 2005) ("[A]ny settlement must be evaluated in light of the strengths and

weaknesses of the settling entity's case, and the downside risks in the event of an adverse

outcome. . . . Gauging downside risk is a critical aspect of the litigation (and settlement) process.

When the consequences of a wrong decision are so huge, it is not unreasonable to hedge against

them."), *aff'd*, 337 B.R. 475 (S.D.N.Y. 2006).  As the Independent Manager observed, "if I

litigate [the Transferred Guarantor Claims], my upside is $150 million and my downside is four

or five times that.  And by entering into the settlement the company has the opportunity . . . to

grow and thrive and get increased recovery through increased value of the equity."[323]

---

[322]    In *Nutritional Sourcing*, the court did not find it persuasive that the objectors had voted in favor of the plan. In that case, the objectors were non-goods trade creditors of a chain of grocery stores, and the court thought it reasonable that they may not have understood the implications of the plan.  The same analysis does not apply here, where most of the holders of CapCo 2021 Notes are sophisticated institutional holders or investors and are represented by counsel.

[323]    June 3, 2015 Hr'g Tr. 126:9–17 (Winn); 40:18–41:6 (Winn) (explaining that "there's $150 million of round net money going to the guaranty claims" but litigation would risk losing on the Transferred Guarantor Claims (approximately $1 billion) and "risk losing the business").

The Court agrees, wholeheartedly.  After considering each of the *Iridium* factors and canvassing the factual and legal issues implicated by each category of Settled Claims and Disputes as well as the Settlement as an integrated whole, the Court finds that the Settlement falls above the lowest point in the range of reasonableness and should be approved.  Regarding the likelihood of success of litigation of the Disputed Claims, the Court has found that the issues surrounding each of the Disputed Claims are vigorously contested and far from straightforward, and, were the Debtors to abandon the Settlement and litigate any of the Disputed Claims, the outcome of litigation of any of the Disputed Claims would be highly uncertain.  Contrary to the arguments of the CapCo 2021 Group, no argument identified would defeat the Transferred Guarantor Claims summarily as a matter of law.  Further, the benefits of the Settlement strongly outweigh the likelihood of success in litigation, particularly given the attendant costs of litigation and the great risk of damage to the Debtors' businesses in remaining in chapter 11 beyond September 2015.  While the essence of compromise is that no party may be totally happy with all components of the Settlement, the Settlement provides the best means of maximizing value for the Debtors and all of their creditors and provides a path forward for the Debtors to successfully emerge from chapter 11.

## **CONCLUSION**

For all of the foregoing reasons, the Plan is confirmed.[324]

Dated: August 26, 2015
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE

---

[324]     The Court confirmed the Plan at the close of the Confirmation Hearing, and the order confirming the Plan was entered on June 19, 2015 [Docket No. 831].